# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF INDIANA
## TERRE HAUTE DIVISION

|  |  |
|---|---|
| CHADRICK EVAN FULKS,<br><br>               Petitioner,<br><br>          v.<br><br>T.J. WATSON, Warden, USP Terre Haute,<br>UNITED STATES OF AMERICA<br><br>           Respondents. | CIVIL ACTION<br>(Capital Habeas Corpus)<br><br><br>No. 2:15–cv–00033–WTL–MJD<br><br>**Hon. William T. Lawrence**<br>**United States District Judge** |

## AMENDED PETITION FOR WRIT OF HABEAS CORPUS
## PURSUANT TO 28 U.S.C. § 2241

PETER WILLIAMS
CLAUDIA VAN WYK
Assistant Federal Defenders
Federal Community Defender Office
for the Eastern District of Pennsylvania
601 Walnut Street, Suite 545 West
Philadelphia, PA 19106
Tel: 215.928.0520
Fax: 215.928.0826
pete_williams@fd.org
claudia_vanwyk@fd.org

*Counsel for Petitioner*

Dated: March 8, 2019

## PRELIMINARY STATEMENT

Petitioner Chadrick Evan Fulks shall be referred to as Petitioner, Mr. Fulks, or, when discussed as a child or in conjunction with other members of the Fulks family, Chad. Respondent shall be referred to as the Government. Citations to witness declarations and affidavits shall be referred to as "Dec." and "Aff.," respectively, followed by the name of the relevant witness. Citations to expert reports shall be referred to as "Report," followed by the name of the expert, the date, and the page number. All declarations, reports, affidavits, and other relevant records cited herein are provided in the Appendix filed with this Petition. Cites to pages in the Appendix shall be referred to as "App." followed by the relevant page number.

The transcript from Petitioner's trial and § 2255 level proceedings shall be cited as "Tr.," followed by the relevant date and page number.

All other citations are either self–explanatory or will be explained.

All emphasis in this Petition is supplied unless otherwise indicated.

# TABLE OF CONTENTS

PRELIMINARY STATEMENT .................................................................................................................. i

TABLE OF CONTENTS ..................................................................................................................... ii

INDEX TO APPENDIX ..................................................................................................................... iv

THE PARTIES ...................................................................................................................................... 1

PROCEDURAL HISTORY .................................................................................................................. 1

CLAIMS FOR RELIEF ....................................................................................................................... 3

I.      MR. FULKS IS INTELLECTUALLY DISABLED AND Is INELIGIBLE FOR THE DEATH PENALTY UNDER *ATKINS V. VIRGINIA* AND ITS PROGENY .................... 3

   A.    Introduction ................................................................................................................ 3

   B.    Deficits in Intellectual Functioning .......................................................................... 5

       1.    The Diagnostic Criteria .................................................................................... 5

       2.    Mr. Fulks Has Deficits in Intellectual Functioning. ...................................... 8

   C.    Deficits in Adaptive Functioning ............................................................................ 10

       1.    Formal Testing of Adaptive Behavior .......................................................... 12

       2.    Multimethod Assessment: Conceptual Domain ............................................ 14

       3.    Multimethod Assessment: Social Domain ..................................................... 27

       4.    Multimethod Assessment: Practical Domain ................................................ 30

   D.    Structural Evidence of Brain Impairments .............................................................. 31

   E.    Age of Onset ............................................................................................................ 35

   F.    Risk Factors for Intellectual Disability ................................................................... 36

       1.    Fetal Alcohol Spectrum Disorder ................................................................. 37

       2.    Child Abuse ................................................................................................... 40

       3.    Head Trauma During the Developmental Period .......................................... 41

       4.    Parental Neglect, Impaired Parenting, Domestic Violence, and Malnutrition ...... 41

       5.    Family Poverty .............................................................................................. 43

       6.    Substance Abuse During Childhood .............................................................. 44

       7.    Petitioner's FASD Is the Primary Cause of His Brain Impairments. ............ 44

G. Mr. Fulks Is Intellectually Disabled..............................................................44

H. Relief Is Appropriate Under 28 U.S.C. § 2241.............................................45

1. Petitioner's *Atkins* Claim Relies on New Legal and Factual Bases Not Available at the Time of His § 2255 Proceedings, and on Supreme Court Jurisprudence Effectively Reversing Fourth Circuit precedent. ....................................................47

2. Petitioner's Claim Challenges the Execution—not the Imposition—of His Sentence, as well as the Fundamental Legality of that Sentence...........................54

II. BECAUSE MR. FULKS HAS THE SAME COGNITIVE AND ADAPTIVE FUNCTIONING DEFICITS EXHIBITED BY THE INTELLECTUALLY DISABLED, HE IS CATEGORICALLY INELIGIBLE FOR THE DEATH PENALTY....................56

A. The Eighth Amendment Prohibits the Execution of Individuals, Such as Mr. Fulks, Who Suffer from Deficient Cognitive Functioning and Adaptive Deficits Resulting from Fetal Alcohol Exposure......................................................................................57

B. Mr. Fulks's Cognitive and Adaptive Deficits Render Him Ineligible for the Death Penalty...................................................................................................................62

1. Both Mr. Fulks's Adult IQ Scores and His Lifelong Adaptive Functioning Fall in the Intellectually Disabled Range and Render Him Categorically Ineligible for the Death Penalty. ....................................................................................................62

2. Mr. Fulks's FASD Renders Him Categorically Ineligible for the Death Penalty. 63

C. The Claim Is Cognizable Under § 2241. .......................................................68

III. PETITIONER'S SENTENCE OF DEATH WAS OBTAINED IN VIOLATION OF HIS SIXTH AMENDMENT RIGHT TO COUNSEL (WITHDRAWN). .............................70

REQUEST FOR RELIEF ....................................................................................................71

iii

## <u>INDEX TO APPENDIX</u>

**VOLUME I**

<u>Expert Reports and Declarations</u>

1. Report by Barry M. Crown, Ph.D. – March 6, 2019................................................00001

2. Report by Julian Davies, M.D. – March 4, 2019 .....................................................00012

3. Report by Natalie Brown, Ph.D. – February 11, 2019.............................................00051

4. Report by David Bachman, M.D. – July 31, 2013...................................................00188

5. Declaration of Seymour Halleck, M.D. – September 17, 2010 ...............................00190

6. Declaration of Margaret Melikian, D.O. – September 17, 2010..............................00193

7. Declaration of James H. Hilkey, Ph.D. – September 16, 2010................................00196

8. Declaration of Harry Krop, Ph.D. – September 16, 2010........................................00199

9. Declaration of James H. Hilkey, Ph.D. – June 2, 2008...........................................00209

10. Declaration of Margaret Melikian, D.O. – May 27, 2008 ......................................00223

11. Declaration of Seymour Halleck, M.D. – May 9, 2008..........................................00236

12. Report by Ruben C. Gur, Ph.D. – June 13, 2004....................................................00261

13. Report by James H. Hilkey, Ph.D. – May 7, 2004.................................................00271

14. Report by Jonathan Venn, Ph.D. – March 30, 2004 ...............................................00277

15. Report by Ralph Newman, M.D. et al. – February 19, 2004 ...................................00294

16. Letter from Jonathan E. Walker, M.D. to Jim Evans, Ph.D.
    January 14, 2004 .....................................................................................................00313

17. Report by James Evans, Ph. D. – January 8, 2004..................................................00315

**VOLUME II**

<u>Witness Declarations</u>

18. Declaration of Linda Adkins – January 27, 2017 ...................................................00321

iv

19. Declaration of Laura Cooper – September 15, 2016 ................................................00323

20. Declaration of Sharon Dotson – June 18, 2008 ........................................................00326

21. Declaration of Nathan Faulks – June 4, 2008............................................................00329

22. Declaration of Mike Kaasee – September 14, 2010 ...................................................00332

23. Declaration of Christina Kirkman – January 27, 2017 ..............................................00334

24. Declaration of Joy Krug – November 15, 2016..........................................................00336

25. Declaration of Lewis Lambert, Jr. – September 14, 2010 ..........................................00356

26. Declaration of Lewis Lambert, Sr. – September 14, 2010..........................................00358

27. Declaration of Marilyn Lauver – November 14, 2016 ...............................................00360

28. Declaration of Kelly Perry – January 27, 2017..........................................................00362

29. Declaration of Russell Spears – May 22, 2018..........................................................00364

Transcripts and Testimony

30. *United States v. Fulks*, 4:02-cr-992 (D.S.C.) Jury Trial Transcript Volume XVI –
    Testimony of Linda Adkins – June 22, 2004............................................................00366

31. *United States v. Fulks*, 4:02-cr-992 (D.S.C.) Jury Trial Transcript Volume XVIII –
    Testimony of Arlene Andrews – June 24, 2004 .......................................................00380

32. *United States v. Fulks*, 4:02-cr-992 (D.S.C.) Jury Trial Transcript Volume XVIII –
    Testimony of David Bachman – June 24, 2004........................................................00482

**VOLUME III**

33. *United States v. Fulks*, 4:02-cr-992 (D.S.C.) Jury Trial Transcript Volume XVIII –
    Testimony of Fred Bookstein – June 24, 2004 .........................................................00568

34. *United States v. Fulks*, 4:02-cr-992 (D.S.C.) Jury Trial Transcript Volume XX –
    Testimony of Christos Davatzikos – June 28, 2004 .................................................00606

35. *United States v. Fulks*, 4:02-cr-992 (D.S.C.) Jury Trial Transcript Volume XVII –
    Testimony of James Evans – June 23, 2004..............................................................00627

36. *United States v. Fulks*, 4:02-cr-992 (D.S.C.) Jury Trial Transcript Volume XVII –
    Testimony of Martha Floyd – June 23, 2004............................................................00694

37. *United States v. Fulks*, 4:02-cr-992 (D.S.C.) Jury Trial Transcript Volume IV – Testimony of Dewayne Fulks – June 4, 2004 ...........................................................00706

38. *United States v. Fulks*, 4:02-cr-992 (D.S.C.) Jury Trial Transcript Volume XVI – Testimony of Mark Fulks – June 22, 2004 ............................................................00762

39. *United States v. Fulks*, 4:02-cr-992 (D.S.C.) Jury Trial Transcript Volume VII – Testimony of Ronnie Fulks – June 9, 2004 ..........................................................00785

**VOLUME IV**

40. *United States v. Fulks*, 4:02-cr-992 (D.S.C.) Jury Trial Transcript Volume VIII – Testimony of Ronnie Fulks – June 10, 2004 ..........................................................00810

41. *United States v. Fulks*, 4:02-cr-992 (D.S.C.) Jury Trial Transcript Volume XII – Testimony of Ruben Gur – June 16, 2004 ..............................................................00825

42. *United States v. Fulks*, 4:02-cr-992 (D.S.C.) Jury Trial Transcript Volume XVII – Testimony of Cindy Harper – June 23, 2004...........................................................01002

43. *United States v. Fulks*, 4:02-cr-992 (D.S.C.) Jury Trial Transcript Volume XVII – Testimony of Sue Hatcher – June 23, 2004 ............................................................01006

44. *United States v. Fulks*, 4:02-cr-992 (D.S.C.) Jury Trial Transcript Volume XVI – Testimony of Kevin Holbrook – June 22, 2004........................................................01022

45. *United States v. Fulks*, 4:02-cr-992 (D.S.C.) Jury Trial Transcript Volume XVI – Testimony of Brian Messenger – June 22, 2004.....................................................01042

46. *United States v. Fulks*, 4:02-cr-992 (D.S.C.) Jury Trial Transcript Volume XVII – Testimony of Gayle Wolfe – June 23, 2004 ..........................................................01055

Records

47. The Gallaher School Results of Selective Screening for Chadrick Fulks – November 25, 1986.............................................................................................................01064

48. The Gallaher School Referral for Multidisciplinary Assessment for Chadrick Fulks – January 6, 1987 ....................................................................................................01065

49. Academic Evaluation Report by Peggy Blatt for Chadrick Fulks February 24, 1987 ..................................................................................................01066

50. Psychological Evaluation Report by Rodney Pardue for Chadrick Fulks March 4, 1987 ......................................................................................................01073

51. Instructional Recommendation Plan/Individualized Education Program for Chadrick Fulks – May 12, 1987 ......................................................................................01077

52. Peyton Elementary Review for Chadrick Fulks – March 1, 1989 ...........................01078

53. Instructional Recommendation Plan/Individualized Education Program for Chadrick Fulks – May 15, 1989 .......................................................................................01079

Additional Witness Declarations

54. Declaration of Dicie Fulks – July 17, 2008 ...............................................................01082

55. Declaration of Gayle Wolfe – September 15, 2016....................................................01084

Pursuant to 28 U.S.C. § 2241 and this Court's order of December 6, 2018, *see* Dkt. 54, Petitioner Chadrick Evan Fulks, through undersigned counsel, hereby submits this Amended Petition for Writ of Habeas Corpus Pursuant ("Amended Petition").

## THE PARTIES

1. Petitioner, CHADRICK EVAN FULKS, is a federal prisoner at the United States Penitentiary at Terre Haute (USP–Terre Haute) under a sentence of death (Reg. No. 16617–074).

2. Respondent, T.J. WATSON, is Warden of the USP Terre Haute and currently maintains custody of Mr. Fulks.

## PROCEDURAL HISTORY

3. In May 2004, Mr. Fulks pleaded guilty to eight charges, including two death–eligible offenses, arising from the November 2002 abduction and death of Alice Donovan and related events. On June 30, 2004, a jury sentenced Mr. Fulks to death. His convictions and sentence were affirmed by the United States Court of Appeals for the Fourth Circuit. *See United States v. Fulks*, 454 F.3d 410 (4th Cir. 2006). The Supreme Court denied Mr. Fulks's petition for writ of certiorari on June 25, 2007. *See Fulks v. United States*, 551 U.S. 1147 (2007).

4. On June 23, 2008, Mr. Fulks filed a motion to vacate the convictions and sentence and for a new trial pursuant to 28 U.S.C. § 2255, which was amended on October 21, 2008. The motion was denied and the denial was affirmed on appeal. *United States v. Fulks*, 683 F.3d 512 (4th Cir. 2012). The Supreme Court denied Mr. Fulks's petition for writ of certiorari on October 7, 2013. *See Fulks v. United States*, 571 U.S. 941 (2013).

5. On January 29, 2015, Mr. Fulks filed a pro se Petition for Writ of Habeas Corpus in this Court pursuant to 28 U.S.C. § 2241. Dkt 1. Upon order of the Court, Mr. Fulks filed a pro se Response to the Court's Entry Directing Further Proceedings on April 7, 2015. Dkt. No. 6. Both of these pleadings were prepared by another death row inmate. Dkt. 6 at 7. On May 11,

1

2015, this Court issued an Order to Show Cause directing Respondent to answer the allegations of the habeas petition and show cause why the relief requested by Mr. Fulks should not be granted. Dkt. 7. Respondent requested and this Court granted two extensions of time to file the response to the Petition. Dkt. 8–11. On August 18, 2015, Respondent filed a Return to Order to Show Cause. Dkt. 12. This Court ordered Respondent, on September 4, 2015, to supplement the Return. Dkt. 14. Following a request for and grant of another extension of time, Dkt. 15, 17, Respondent filed a Supplemental Response to Order to Show Cause on November 18, 2015, Dkt. 18.

6.     On January 13, 2016, at Mr. Fulks's request and after complying with administrative protocol for requesting an out–of–district appointment, counsel from the Federal Community Defender Office for the Eastern District of Pennsylvania ("FCDO") moved for appointment in Mr. Fulks's habeas corpus proceedings. Dkt. 20. This Court appointed the FCDO to represent Mr. Fulks on February 1, 2016. Dkt. 22. Through the FCDO, Petitioner requested, and this Court granted, a series of extensions to allow counsel, inter alia, to investigate the possibility of filing an amended habeas petition.

7.     On December 6, 2018, the Court granted Petitioner leave to file, by March 8, 2019, an amended habeas petition to supersede the previously filed petition. Dkt. 54.

<u>**CLAIMS FOR RELIEF**</u>

**I.     MR. FULKS IS INTELLECTUALLY DISABLED AND IS INELIGIBLE FOR THE DEATH PENALTY UNDER *ATKINS V. VIRGINIA* AND ITS PROGENY.**

**A.     Introduction**

8.      In *Atkins v. Virginia*, 536 U.S. 304 (2002), the United States Supreme Court ruled that the Eighth Amendment categorically bars the execution of intellectually disabled individuals. As the Court put it, "[t]hose mentally retarded persons who meet the law's requirements for criminal responsibility should be tried and punished when they commit crimes. Because of their disabilities in areas of reasoning, judgment, and control of their impulses, however, they do not act with the level of moral culpability that characterizes the most serious adult criminal conduct." *Id*. at 306.[1]

9.      The United States Supreme Court has ruled that the current, prevailing clinical definitions are binding in the task of determining whether an individual should be exempted from the death penalty. *Moore v. Texas*, 137 S. Ct. 1039, 1049, 1052–53 (2016) ("*Moore–I*"). The Supreme Court cited the two main diagnostic authorities in the field of intellectual disability as embodiments of the prevailing medical standards: the American Association on Intellectual and Developmental Disabilities ("AAIDD"), and the American Psychiatric Association ("APA"), which has most recently set forth its definition of intellectual disability in the Diagnostic and Statistical Manual of Mental Disorders – 5th Edition ("DSM–5"). These current standards, and

---

[1] *Atkins* referred to this diagnosis as mental retardation, which was the name used in the field at the time. Since *Atkins* was decided, the diagnosis of mental retardation has been renamed as intellectual disability. In *Hall v. Florida*, the Supreme Court acknowledged this change in nomenclature and adopted the term intellectual disability instead of mental retardation. *Hall v. Florida*, 572 U.S. 701 (2014). Accordingly, this petition uses the term intellectual disability or the abbreviation "ID." However, the terms "mental retardation" or "mentally retarded" are also used in their historic context relevant to this case.

not outdated standards employed in the past, govern the disposition of *Atkins* claims. *Moore–I*, 137 S. Ct. at 1053.

10. Pursuant to the definitions set forth by the APA and the AAIDD and endorsed by the Supreme Court, there are three prongs to a finding of intellectual disability: (1) deficits in intellectual functioning/subaverage intellectual functioning ("prong one"), (2) deficits in adaptive functioning ("prong two"), and (3) onset before age eighteen ("prong three"). *See* DSM–5 at 33; *Intellectual Disability: Definition, Classification, and Systems of Supports – 11th Edition*, American Association on Intellectual and Developmental Disabilities (2010) ("AAIDD–2010") at 5. As the voluminous evidence summarized below shows, Petitioner Chadrick Fulks satisfies these criteria. He has significantly subaverage intellectual functioning, as measured by individually administered tests of comprehensive intelligence; and significant adaptive deficits, reflected in extensive testing, the vivid accounts of people who have known him, and extensive records documenting his impairments. Both his intellectual and adaptive deficits are further confirmed by the presence of structural defects in his brain, which have been present since his birth. These deficits are also corroborated by the presence of several significant risk factors including a Fetal Alcohol Spectrum Disorder ("FASD"), which has caused Petitioner to suffer from brain damage since before his birth. Mr. Fulks has been intellectually disabled all of his life and is ineligible for the death penalty.

11. Mr. Fulks is entitled to pursue his *Atkins* claim under 28 U.S.C. § 2241. A federal habeas petitioner is entitled to review under § 2241 when review under 28 U.S.C. § 2255 is "inadequate or ineffective to test the legality of his detention" or sentence. 28 U.S.C. § 2255(e); *see also Brown v. Carraway*, 719 F.3d 583 (7th Cir. 2015) (§ 2241 can be used to challenge a defendant's *sentence* in addition to his or her conviction). This includes a number of

circumstances including, inter alia, where the defendant challenges the execution, rather than the imposition of his sentence. Here, Mr. Fulks presents a claim that, if successful, would render him ineligible for the death penalty and ineligible to be executed. Consistent with the Supreme Court's directives, he also makes this claim under current, prevailing clinical standards. However, neither the current standards nor the Supreme Court rulings applying those standards to an *Atkins* case were present at the time of his trial or § 2255 proceedings. Because § 2255 proceedings are both inadequate and ineffective to test the legality of Mr. Fulks's death sentence and because Mr. Fulks challenges the execution of his sentence in addition to its imposition, Mr. Fulks's *Atkins* claim should be heard and his death sentence should be vacated.

**B.      Deficits in Intellectual Functioning**

**1.      The Diagnostic Criteria**

12.      Under the classification schemes outlined by the APA and the AAIDD, deficient intellectual functioning is defined as an intelligence quotient ("IQ") of approximately 70 with a confidence interval derived from the standard error of measurement ("SEM") taken into consideration. Because a margin for measurement error or "confidence interval" on IQ tests generally involves a measurement error of five points, at a minimum, scores up to 75 also fall within the presumptive range for intellectual disability. DSM–5 at 37. *See also* AAIDD–2010 at 36 (finding the consideration of the standard error of measurement or "SEM" and reporting an IQ score with a confidence interval deriving from the SEM to be critical considerations in the appropriate use of IQ tests).

13.      Consistent with the AAIDD's and APA's diagnostic criteria, the Supreme Court held in *Hall* that because the SEM is "a statistical fact, a reflection of the inherent imprecision of the test itself," at a minimum, full–scale IQ scores of 75 or below will establish the diagnosis of intellectual disability if the other two prongs are met. *Hall*, 572 U.S. at 712, 723. *See also*

5

*Brumfield v. Cain*, 135 S. Ct. 2269, 2278 (2015) (IQ score of 75 was "squarely in the range of potential intellectual disability").

14.     In addition, both the AAIDD and the APA have rejected fixed cutoff points for IQ in the diagnosis of intellectual disability and mandated that any test score must be considered in the context of clinical judgment and adaptive functioning. In its 2010 Guidelines, the AAIDD specified:

> It is clear from th[e] significant limitations criterion used in this Manual that AAIDD . . . *does not* intend for a fixed cutoff point to be established for making the diagnosis of ID. Both systems (AAIDD and APA) require clinical judgment regarding how to interpret possible measurement error. Although a fixed cutoff for diagnosing an individual as having ID is not intended, and cannot be justified psychometrically, it has become operational in some states [citation omitted]. It must be stressed that the diagnosis of ID is intended to reflect a clinical judgment rather than an actuarial determination. A fixed point cutoff score for ID is not psychometrically justifiable.

AAIDD–2010 at 40 (emphasis in original).

15.     Similarly, the DSM–5 makes clear that "[c]linical training and judgment are required to interpret [IQ] test results and assess intellectual performance" and "clinical judgment is needed in interpreting the results of IQ tests." DSM–5 at 37. The DSM–5 also recognizes that a single IQ score is an imperfect predictor of functioning and must be considered in context with adaptive functioning when assessing an individual for ID. *Id.* For this reason, intellectual functioning is assessed through clinical assessment in addition to standardized testing. *Id.*

16.     The Supreme Court has also recognized that the assessment of intellectual functioning is not the rote imposition of hard cutoffs or actuarial determinations, but a conjunctive, clinical determination that is interrelated with the other prongs of the diagnosis, stating that: "Intellectual disability is a condition, not a number." *Hall*, 572 U.S. at 723; *see also id.* at 722 ("This awareness of the IQ test's limits is of particular importance when conducting the conjunctive assessment necessary to assess an individual's intellectual ability."); *id.* at 722–

6

23 ("It must be stressed that the diagnosis of [intellectual disability] is intended to reflect a clinical judgment rather than an actuarial determination." (quoting AAIDD–2010 with approval)); *id.* at 723 ("It is not sound to view a single factor as dispositive of a conjunctive and interrelated assessment." (citing DSM–5 with approval)).

17. IQ scores must also be corrected for the Flynn Effect. The Flynn Effect reflects a well–established finding that the average IQ score of the population increases at a rate of 0.3 points per year or 3 points per decade. Accordingly, the AAIDD requires that any IQ score be corrected downwards at a rate of 0.3 points per year since the test was normed. *See User's Guide: Mental Retardation, Definition, Classification and Systems of Supports*, 10th Ed., AAIDD (2007) ("AAIDD–2007"), at 20–21; AAIDD–2010 at 37 (same); *User's Guide: Intellectual Disability: Definition, Classification, and Systems of Supports*, AAIDD (2012) ("AAIDD–2012") at 23 (same); McGrew, K., Norm Obsolescence: The Flynn Effect, *The Death Penalty and Intellectual Disability*, AAIDD (2015) at 160-66 (same); Watson, Dale G. Intelligence Testing, *The Death Penalty and Intellectual Disability*, AAIDD (2015)) at 118–19 (same).

18. The APA also recognizes that "[f]actors that may affect test scores include . . . the 'Flynn effect' (i.e. overly high scores due to out–of–date test norms)" and mandates that IQ scores be interpreted using clinical judgment and training. DSM–5 at 37. Test score interpretation using clinical judgment includes correction for the Flynn Effect.

19. *The Death Penalty and Intellectual Disability*, published in 2015 by the AAIDD, stated the following regarding the Flynn Effect:

> Not only is there a scientific consensus that the Flynn [E]ffect is a valid and real phenomenon, there is also a consensus that individually obtained IQ test scores derived from tests with outdated norms must be adjusted to account for the Flynn [E]ffect, particularly in *Atkins* cases.

7

McGrew, K., Norm Obsolescence: The Flynn Effect, *The Death Penalty and Intellectual Disability* (AAIDD 2015) at 162. Furthermore, "in cases where current or historical IQ test scores are impacted by norm obsolescence (i.e., Flynn [E]ffect), and the scores are to be used as part of the diagnosis of ID in *Atkins* or other high stakes decisions, the global scores impacted by outdated norms should be adjusted downward by 3 points per decade (0.3 points per year) of norm obsolescence." *Id.* at 165.

20. The AAIDD and APA also mandate that the spurious inflation of IQ scores arising from prior administrations of intelligence tests—the "practice effect"—be taken into consideration when interpreting IQ testing. *See, e.g.,* AAIDD–2010 at 38; DSM–5 at 37.

**2. Mr. Fulks Has Deficits in Intellectual Functioning.**

21. Petitioner has been given three individually administered, comprehensive tests of intellectual functioning as an adult. In April 2003, neuropsychologist Jonathan Venn, Ph.D., administered a Wechsler Adult Intelligence Scale, Third Edition ("WAIS–III") to Petitioner. He received a full–scale IQ score of 77. Report, Jonathan Venn, Ph.D., at 10 (App. 0286). Correcting for the Flynn Effect, the full–scale IQ score from this test is 75 (74.6), which is squarely within the range for intellectual disability. *See Brumfield*, *supra*.

22. Petitioner's scores on the subsequent two tests are strikingly consistent with the first one. Less than four months after Mr. Fulks had taken the first WAIS–III in August 2003, psychologist James Hilkey, Ph.D., administered a second WAIS–III. On that test, Mr. Fulks received a full–scale IQ score of 78, which Flynn–corrects to a 76 (75.6). Report, James Hilkey, Ph.D., at 4 (App. 0274). In February 2004, neuropsychologist Eugene Gourley, Ph.D., administered the Woodcock Johnson Test of Cognitive Abilities, Third Edition ("WJ–III"). Mr. Fulks received a full–scale IQ score of 79, which Flynn–corrects to a 77 (77.2). Report, Butner

Medical Center, 3/25/04, at 11 (App. 0304). During this time, Petitioner was also administered four full batteries of either neuropsychological or psychological testing. The one– and two–point increase in scores on the subsequent two tests are consistent with the initial score of 75 and easily explained with the practice effect.

23. During his childhood, Mr. Fulks was administered a comprehensive IQ test (the Wechsler Intelligence Scales for Children – Revised ("WISC–R")) three times: at the ages of nine, twelve, and fourteen. At the age of nine, he received a score of 90, which Flynn–corrects down to an 86 (85.5). At twelve, he received a score of 96, which Flynn–corrects to 91 (90.6). At fourteen, he received a score of 93, which Flynn–corrects to an 87 (87.3). *See* Report, Natalie Novick–Brown, Ph.D., at 121 (App. 0171).

24. That Mr. Fulks's testing history began with higher scores and regressed to scores in the intellectual disability range as he grew older does not undermine his *Atkins* claim, but provides further support for it. "[I]individuals with mild mental retardation 'often are not distinguishable from children without Mental Retardation until a later age.'" *Sasser v. Hobbs*, 735 F.3d 833, 848 (8th Cir. 2013).

25. Mr. Fulks's medical and social history makes such a regression particularly likely. As set forth, *infra*, Petitioner suffers from brain damage stemming from a Fetal Alcohol Spectrum Disorder ("FASD"). Individuals such as Mr. Fulks who were born with cognitive impairments frequently experience declines in IQ as they age. Because of these cognitive deficits, their intellectual capacity develops more slowly than their age–mates. As time goes on, they fall increasingly behind their peers. In Mr. Fulks's case, this dynamic is further exacerbated by other risk factors in his history which correlate both with intellectual disability and drops in

9

IQ. Accordingly, Petitioner was primed for such a decline in IQ to occur. *See* Report, Barry M. Crown, Ph.D., at 7 (App. 0007), discussed *infra*; Section F, *infra* (describing risk factors for ID).

26. That Mr. Fulks had ID–level intellectual deficits before the age of eighteen is further confirmed by Petitioner's history of impaired adaptive behavior. These adaptive deficits emerged at a very young age, cut across all domains of functioning, and stem from brain abnormalities that have been present since before his birth. *See* Sections C and D, *infra*. Petitioner's brain abnormalities and adaptive functioning correspond to the ID level scores obtained in adulthood. They do not correspond to higher scores during childhood. Indeed, school personnel—without the benefit of the breadth and depth of evidence offered in support of Petitioner's *Atkins* claim—noted that Petitioner's overall functioning did not match his IQ scores and that he was functionally intellectually disabled. *See* Section C, *infra*; Report, Barry M. Crown, Ph.D., at 7 (App. 0007); Report, Natalie Novick–Brown, Ph.D., at 24–27 (App. 0074–77) (describing interviews with Joy Krug and Marilyn Lauver).

### C. Deficits in Adaptive Functioning

27. The AAIDD has defined adaptive behavior as "the collection of conceptual, social, and practical skills that have been learned and performed by people in their everyday lives." AAIDD–2010 at 43. The DSM–5 describes adaptive deficits as "how well a person meets community standards of personal independence and social responsibility, in comparison to others of similar age and sociocultural background." DSM–5 at 37. The focus in an adaptive behavior analysis is on *typical* performance, not *maximal* performance. AAIDD–2010 at 47.

28. The adaptive deficits prong is satisfied if there is a significant limitation in any one of the three types of adaptive behavior: conceptual, social, or practical. AAIDD–2010 at 43; DSM–5 at 37. Skills included in the conceptual domain are: executive functioning (judgment, planning, impulse control, abstract thinking, and problem solving), memory, language, reading,

writing, mathematics, and acquisition of practical knowledge. The social domain encompasses skills and characteristics such as: social judgment and competence; interpersonal communication skills; awareness of others' thoughts, feelings, and experiences; gullibility; empathy; and friendship abilities. The practical domain involves learning and self-management across life settings, including personal care; job responsibilities; money management; recreation; self-management of behavior; and school and work-task organization. DSM–5 at 37; AAIDD–2010 at 44.

29. As it is expected that strengths co–exist with weaknesses, analysis of adaptive behavior is based on the presence of weaknesses, not the absence of strengths. "[S]ignificant limitations in conceptual, social or practical adaptive skills [are] not outweighed by the potential strengths in some adaptive skills." AAIDD–2010 at 47. The Supreme Court has recognized that "intellectually disabled persons may have 'strengths in social or physical capabilities, strengths in some adaptive skill areas, or strengths in one aspect of an adaptive skill in which they otherwise show an overall limitation.'" *Brumfield*, 135 S. Ct. at 2281 (quoting AAIDD–2002). In *Moore–I*, the Supreme Court found unconstitutional the Texas Court of Criminal Appeal's attempt to overcome deficits with perceived adaptive strengths because "the medical community focuses the adaptive functioning inquiry on adaptive *deficits*." *Moore–I*, 137 S. Ct. at 1050 (citing AAIDD–2010, DSM–5, and AAIDD–2002 with approval). Subsequently, in *Moore v. Texas*, 2019 LEXIS 821, ___ S. Ct. ___ (Feb. 19, 2019) ("*Moore–II*"), the Supreme Court reversed the Texas Court of Criminal Appeals for again relying on strengths in its determination of Mr. Moore's *Atkins* claim. *Id.* at *9.

30. Additionally adaptive functioning is not based on criminal behavior, "street smarts or behavior in jail or prison." AAIDD–2012 at 20; DSM–5 at 38 (adaptive behavior may

11

be difficult to assess in controlled settings such as prison). Consistent with this diagnostic standard, the Supreme Court has rejected adaptive behavior analyses that rely on improved functioning in prison. *Moore–I*, 137 S. Ct. at 1050; *Moore–II*, 2019 U.S. LEXIS 821 at *10–11.

31. Assessments of adaptive functioning should be broad–based, comprehensive, and grounded in extensive data. They can include formal testing of adaptive functioning, as well as a multi–method and comprehensive evaluation. This multimethod assessment can include interviews with third–party reporters, records review, consideration of other testing, and review and synthesis of past evaluations. AAIDD–2012 at 16–20; AAIDD–2010 at 47; DSM–5 at 37–38. Here, all of these methods demonstrated that Petitioner has had significant adaptive deficits in all three domains of functioning both before and after the age of eighteen. Report, Natalie Novick–Brown, Ph.D., at 37 (App. 0087); DSM–5 at 37–38.

32. Natalie Novick–Brown, Ph.D., a clinical and forensic psychologist, has conducted an assessment of Mr. Fulks's adaptive functioning. Dr. Brown has twenty-three years of clinical and forensic experience in FASD and other medical conditions involving developmental disabilities. She has also researched extensively in this field. After conducting formal testing of adaptive behavior as well as a comprehensive, multimethod evaluation, Dr. Novick–Brown has concluded that Petitioner has significant deficits in all three domains of adaptive functioning, and that these deficits were present before the age of eighteen. Report, Natalie Novick–Brown, Ph.D., at 2, 53–54 (App. 0052, 0103–04).

### 1. Formal Testing of Adaptive Behavior

33. The AAIDD has indicated that scores of approximately two standard deviations or more below the mean on a valid adaptive behavior instrument fall within the presumptive range for intellectual disability. The AAIDD also mandates that the instrument's standard error of measurement must be taken into consideration, which effectively expands the presumptive range

12

to the top of a 95% confidence interval bracketing 70 (typically scores of 75 and below). However, the AAIDD makes clear that there is no fixed cutoff point for an adaptive behavior score: "A fixed point cutoff for ID is not psychometrically justifiable. The diagnosis of ID is intended to reflect a clinical judgment rather than an actuarial determination." AAIDD–2012 at 23. The DSM–5 recommends the use of formal adaptive behavior testing, but sets no presumptive range for intellectual disability on a formal test of adaptive functioning. DSM–5 at 37–38.

34.     Dr. Novick–Brown administered the Vineland Adaptive Behavior Scales – 3rd Edition ("Vineland–3") to two reporters regarding Mr. Fulks's adaptive functioning: Gayle Wolfe, his fifth grade special education teacher, and Linda Adkins, his childhood neighbor. Due to the retrospective nature of this assessment, Ms. Wolfe and Ms. Adkins were asked to describe Petitioner's functioning at the times they had regular contact with him within the developmental period, at ages ten and thirteen, respectively.

35.     The Vineland–3 includes a composite score which encompasses the individual's global functioning, and three domain scores: communication, social, and daily living skills, which correspond to the conceptual, social, and practical domains of functioning.

36.     Ms. Wolfe and Ms. Adkins reported the following scores.

**VINELAND–3 SCORES**
**(SS = Standard Score, Mean = 100, 1**
**Standard Deviation = 15)**

| Rater | Composite | Communication (Conceptual) | Socialization (Social) | Daily Living Skills (Practical) |
|---|---|---|---|---|
| Gayle Wolfe (5th Grade Teacher) | SS 48  < 1st Percentile | SS 38  < 1st Percentile | SS 38  < 1st Percentile | SS 63  1st Percentile |
| Linda Adkins (Neighbor) | SS 60  < 1st Percentile | SS 50  < 1st Percentile | SS 63  1st Percentile | SS 63  1st Percentile |

37.     All of these scores are two standard deviations or more below the mean. All of them fall within the presumptive range for intellectual disability.

### 2.     Multimethod Assessment: Conceptual Domain

#### a.     Academic functioning, learning, and memory

38.     Petitioner's academic performance was abysmal. He repeated the first grade, and began receiving special education for speech and language issues during his second time through the first grade. In the third grade, his teacher Dottie Thompson referred him for a multidisciplinary assessment because he had weaknesses in most academic subjects, had deficits in self–direction, was easily distractible, and needed "guidance at all times." Report, Natalie Novick–Brown, Ph.D., at 90 (App. 0140). Ms. Thompson completed a Devereux Elementary School Behavior Rating Scale, which indicated, inter alia, that Petitioner had a low rating for comprehension. Petitioner was placed in the behavioral disorder ("BD") classroom, and was "to be mainstreamed as behavior and academics permit." He received special education supports for the rest of his academic history, in the context of either the BD or SLD (specific learning disability) programs for the various schools he attended. For much of his academic career, those

14

supports encompassed all academic subjects and included individualized or small group attention within a self–contained classroom. After he was placed in special education, school records describe him as "low functioning," "not keeping up," and someone with learning needs that were "very concrete." *Id.* at 96–97 (App. 0146–47). By the time he reached the eighth grade, Petitioner was receiving special education in all academic subjects: Math, English, Science, and Social Studies. Despite receiving this level of support, Petitioner fell increasingly behind his peers. He failed to successfully complete the seventh, eighth, or ninth grades and eventually dropped out of school in the ninth grade. *See id.* at 39 (App. 0089); Individualized Education Program, Cabell County School District, 5/12/87 (App. 1077); Review, Cabell County School District, 3/1/89 (App. 1078); Individual Educational Program, Cabell County School District, 5/15/89 (App. 1079); Dec. Joy Krug (App. 0336–38).

39. Consistent with school records, third–party reporters repeatedly described Petitioner as slow, having an impaired ability to learn, and being consistently behind age–related expectations.

40. Gayle Wolfe taught Petitioner in the BD class when he was in the fifth grade. The BD classroom was a self–contained special education class with a significantly smaller class size (e.g., seven children in the fifth grade). These students received small-group and individualized attention from the special education teacher, and were mainstreamed with monitoring from a BD teacher whenever the school deemed it possible. This was the maximum level of support that the Cabell County School District was able to provide short of a separate, specialized school. As Ms. Wolfe indicated: "This [separate school] option was very expensive for the county, so the school sought to avoid it. In general, a separate placement would only get financed if there was a lawsuit. There was otherwise not much lower you could go than a self–contained class." Dec.

15

Gayle Wolfe at ¶ 13 (App. 1086). If a student had both intellectual and behavior problems, as Chad did, then the "BD" label took precedence because the school viewed behavior problems as the primary issue interfering with the student's education. Students with intellectual issues frequently had behavioral problems as they were frustrated with their academic difficulties. When Ms. Wolfe taught Chad in the fifth grade, five of the seven children in the BD class had intellectual problems and were "slow" like Chad. Report, Natalie Novick–Brown, Ph.D., at 20–21 (App. 0070–71) (describing interview with Gayle Wolfe); Dec. Laura Cooper at ¶ 7 (App. 0324).

41. Even in the context of a special education class, Ms. Wolfe described Petitioner as slow and noted that he was far behind his age–mates. His reading skills were at the first grade level, and he could not understand phonetics. In math, she worked with him to learn addition and subtraction—second grade skills. Tellingly, it was easier to teach Petitioner math because it was more "hands on" and involved less abstract thought. Petitioner's writing skills were particularly impaired. Report, Natalie Novick–Brown, Ph.D., at 21 (App. 0071) (Interview of Gayle Wolfe). Although Ms. Wolfe worked intensively with Petitioner on writing, he still did not learn to write a sentence. *Id.* at 43–44 (App. 0093–94).

42. Laura Cooper, who was Chad's sixth grade special education math teacher, reported that Petitioner was far behind his classmates. He had difficulties learning, and had to be taught slowly and repetitively. Ms. Cooper worked with Chad on basic practical skills, rather than sixth–grade math. Martha Floyd, who was also Chad's special education teacher in the sixth grade, reported that he was a slow learner. Cindy Harper, who taught Chad in kindergarten, reported that he had difficulty with learning even then. Dec. Laura Cooper (App. 0323–24); Tr.

6/23/04 at 85 (App. 0696) (Testimony of Martha Floyd); Tr. 6/23/04 at 74 (App. 1004) (Testimony of Cindy Harper); Dec. Joy Krug (App. 0336–38).

43. After his seventh grade year and the summer school that followed, Chad moved to Indiana to live with his father and attended Westview Jr. High School. He enrolled in the eighth grade on August 21, 1991, and was quickly referred for a special education assessment. He was placed in a remedial reading program by September 10, 1991, and was evaluated by September 30, 1991. Marilyn Lauver, Chad's counselor there, reported that the school authorities quickly provided special education services and bypassed the normal procedures for assessment. The school acted so quickly with him because he had received special education services in the past and because of his obvious intellectual and emotional deficits. Ms. Lauver further noted that his communication, practical, and social skills were at an intellectually disabled level. *See* Report, Natalie Novick–Brown, Ph.D., at 25–27 (App. 0075–77) (interview with Marilyn Lauver).

44. School Psychologist Joy Krug, who assessed Chad in September 1991, found him to be functionally intellectually disabled. She further concluded that he needed a great deal of help to survive in school, that his verbal impairments prevented him from reasoning, and that his ability to think abstractly and learn from experience was very limited. She also found that he was "impulsive and tended to act before thinking." *Id.* at 24 (App. 0074) (describing interview with Joy Krug). Based on Ms. Krug's assessment and his history, Chad received special education supports in all academic subjects: Reading, Mathematics, Social Studies, and Science. *Id.* at 23–25 (App. 0073–75); Dec. Joy Krug (App. 0336–38).

45. After Westview, Chad returned to Ohio, transferred to an alternative school, and was eventually sentenced to the Davis Center, a juvenile detention facility. There, he received his GED and a certificate in welding. He received a second GED later while in prison in Indiana.

17

This is not evidence of adaptive behavior. Adaptive functioning is defined by an individual's typical functioning at home, at work, in school, or in the community, and focuses on the individual's need for supports in any one of these settings in order to function independently. DSM–5 at 38. By definition, highly structured environments such as prisons or juvenile placements provide a significant level of supports and do not allow individuals the freedom to function independently. Accordingly, inmates and residents in these institutions do not have to rely on their own adaptive resources in order to function and advance. For this reason, adaptive behavior assessments are not made based on functioning in prison or other highly structured environments. AAIDD–2012 at 20 (ID determinations are not based on prison functioning); DSM–5 at 38 (adaptive behavior may be difficult to assess in controlled settings such as prison). Consistent with this diagnostic standard, the Supreme Court has rejected adaptive behavior analyses that rely on improved functioning in prison. *Moore–I*, 137 S. Ct. at 1050; *Moore–II*, 2019 U.S. LEXIS 821 at *10–11. Accordingly, functioning in these settings is not probative of adaptive behavior.

46.     *To be clear, Petitioner is not proffering his juvenile detention and prison functioning as evidence of adaptive behavior.* Nevertheless, as a matter of thoroughness, Petitioner notes that even in the restrictive setting of the Davis Center and prison, Chad's performance was deficient. In juvenile detention, Chad required close supervision, had to retake one of the GED modules, and barely achieved the minimum average score needed to pass the exam (he received an average score of 45.6, with a score of 45 required). Similarly, even after receiving intensive, individualized instruction from the welding instructor, Chad still failed the welding test and had to retake it in order to receive his certificate. Finally, while in the restrictive environment of Indiana prison, having had additional years of cognitive development, and

18

having been carefully tutored on the GED while in juvenile before taking the GED a second time, Mr. Fulks still barely squeaked by with an average score of 48. *See* Report, Natalie Novick–Brown, Ph.D., at 53, 107.

47.     Chad's impairments were apparent outside of the formal school setting as well. Linda Adkins, Chad's neighbor, indicated that he had early childhood delay in speech and language, motor, reading, and self–care skills. When he did learn to speak, he had a limited vocabulary, would frequently mispronounce words, and was very hard to understand. He also had difficulty understanding what he was being told and required frequent repetition before he could follow Ms. Adkins's instructions. Report, Natalie Novick–Brown, Ph.D., at 17 (App. 0067).

48.     Christina Kirkman (Holbrook), Chad's cousin, indicated that he had difficulty understanding basic schoolwork as a child. When he was in the second grade, she would help him with his homework. She found that he could not add or subtract, and had difficulties reading. Even with individualized instruction, Chad would have difficulty learning and become frustrated by his inability to grasp the material. He had deficits in attention and focus, and frequently could not repeat back what Ms. Kirkman was saying to him. At times, he would also perseverate on a phrase, repeating it over–and–over again. Report, Natalie Novick–Brown, Ph.D., at 18–20 (App. 68–70) (describing interview with Christina Kirkman); Dec. Christina Kirkman at ¶¶ 3, 7 (App. 0334).

49.     Dr. Novick–Brown administered the Fetal Alcohol Behavior Scale ("FABS") to Ms. Wolfe, Ms. Adkins, Ms. Lauver, and Ms. Kirkman. The FABS is a standardized assessment of behavior to determine whether an individual has the behavioral profile typical of someone with an FASD. Dr. Novick–Brown asked Ms. Wolfe, Ms. Adkins, Ms. Lauver, and Ms. Kirkman

19

to rate Petitioner's functioning on this scale at the target ages of ten, thirteen, fourteen, and twenty–one, respectively. All reporters returned scores in the range indicative of an FASD and found concordance on the following behaviors: "difficulty learning" and "performing precise tasks."[2] Report, Natalie Novick–Brown, Ph.D., at 34–36, 42 (App. 0084–86, 0092).

50. Dr. Novick–Brown also administered a behavioral screening, inquiring into the presence of behaviors found to correlate with the presence of FASDs, to Gayle Wolfe, Linda Adkins, Christina Kirkman, and Marilyn Lauver. This screening focused on the presence of these characteristics at the ages of ten, thirteen, fourteen, and twenty–one, respectively. The results indicated concordance on the fact that Petitioner had difficulties learning from experience. Report, Natalie Novick–Brown, Ph.D., at 34–36, 42 (App. 0084–86, 0092).

51. Achievement testing also reflected that Chad was consistently behind in his academic development. He first received individually administered achievement testing in the third grade, when he took the Wide Range Achievement Test ("WRAT") on November 1986 (nine years, six months). It reflected early evidence of impairments.[3] He scored in the bottom 9th percentile for word–reading, the bottom 12th percentile for mathematics, and the bottom 23rd percentile for spelling. The Kaufman Test of Educational Achievement, which was administered later that same school year, also reflected impaired scores: 18th percentile (math calculations); 14th percentile (spelling); 27th percentile (word–reading); and 37th percentile (reading comprehension). As time passed, he failed to develop intellectually and academically, his

---

[2] Ms. Kirkman responded "don't know" to many items, which rendered her overall score invalid. However, it did not render the individual responses invalid—which reflected concordance on "difficulty learning," "performing precise tasks," and other FABS data cited throughout this Petition.

[3] Although less reliable than individually administered testing and frequently inflated, group administered testing during early childhood also reflected impairments as early as kindergarten. *See* Report, Natalie Novick–Brown, Ph.D., at 41 (App. 0091).

20

classmates left him behind, and achievement test scores fell further and further below age–related expectations. *See* Report, Natalie Novick–Brown, Ph.D., at 40–42 (App. 0090–92).

52.     Chad took his last round of school–age individually administered achievement testing in September 1991 (fourteen years, four months). Despite having failed the first grade and having an additional year of cognitive development, Chad consistently received scores reflecting third to fifth–grade functioning on nine of the ten subtests that list grade equivalency. He also fell in the bottom 10th percentile or lower on fourteen of the sixteen reading, writing, and math subtests over four separate tests of achievement. (One of the tests does not list grade equivalencies.)  *See* Dec. Joy Krug (attached records) (App. 0339–41).

53.     Chad's eighth grade achievement test scores were as follows.

**INDIVIDUALLY ADMINISTERED**
**ACHIEVEMENT TEST SCORES – 8TH GRADE[4]**
**(14 years, 4 months – Age–Mates in the 9th Grade)**

| Test | Word–Reading | Reading Comp. | Spelling | Writing | Mathematics Calculation | Knowledge |
|---|---|---|---|---|---|---|
| KBFAT | SS 68 2nd %ile GE 3.5 | | SS 75 5th %ile GE 4.6 | | SS 73 4th %ile GE 4.5 | |
| WJTA | | SS 95 37th %ile GE 8.0 | | SS 80 9th %ile GE 4.4 | SS 81 10th %ile GE 4.6 | SS 79 8th %ile GE 4.4 |
| WRAT | SS 74 4th %ile GE 4E | | SS 81 10th %ile GE 5B | | SS 66 1st % GE 4E | |
| TOWL | 2nd %ile | | 16th %ile | 2–5 %ile (4 subtests) | | |

---

[4] The abbreviations for this table are as follows. KFBAT: Kaufman Brief Form Achievement Test. WJTA: Woodcock Johnson Test of Achievement. WRAT: Wide Range Achievement Test. TOWL: Test of Written Language. SS: Standard Score. GE: Grade Equivalency.

54. Mr. Fulks's adult–level achievement testing reflected similar impairments. As a twenty–five– and twenty–six–year–old, after years of special education supports and 2 rounds of GED courses, he tested predominantly at the fifth and sixth grade level across achievement testing administered by four separate psychologists and neuropsychologists. This testing reflected scores as low as the second grade level (writing). Even his most advanced scores were at the seventh and eighth grade levels, significantly below age–related expectations and showing significant impairments for a twenty–six–year–old adult. Report, Natalie Novick–Brown, Ph.D., at 41–42 (App. 0091–92).

**b.    Executive functioning, memory, learning, and cognitive flexibility**

55. Mr. Fulks received neuropsychological testing from four separate neuropsychologists over the course of 2003 and 2004. This testing reflected cognitive impairments in, inter alia, his executive functioning, attention, processing speed, memory, and visuospatial processing. These constitute conceptual impairments themselves. They are also consistent with the behavioral descriptions of adaptive impairments described below.

56. In addition, a global analysis of Mr. Fulks's neuropsychological testing reflects a generalized processing and integration deficit that further impairs his executive functioning. Mr. Fulks has impairments in nine domains of neuropsychological functioning: intellectual functioning, academics, memory, visuospatial processing, attention, processing speed, motor skills, executive functioning, and communication. He is in the bottom 2nd percentile in at least 30 percent of the neuropsychological and achievement testing administered forensically. Dr. Novick–Brown explains that "executive functioning skills are responsible for making decisions about how to act," explaining that such skills are "[r]eferred to as 'higher order' cognitive processing because the executive center of the brain receives and then integrates, analyzes, and

22

makes decisions based on neural input from other brain regions." *Id.* at 64 (App. 0114). Good executive functioning relies both on the cognitive capacity of the brain's decision–making centers as well as good input from the other regions of the brain. The testing demonstrates that Mr. Fulks has a widespread impairment both in his executive functioning and in the other areas of the brain that provide input to the executive functioning centers. Dr. Novick–Brown explains that "[t]est results in Mr. Fulks'[s] situation indicate marked executive dysfunction in conjunction with pervasive deficits in neural input, which largely explains why his adaptive functioning is so impaired when he had to make decisions on his own in complex situations." *Id.* at 65 (App. 0115). Accordingly, Mr. Fulks's executive functioning impairments become more severe as the environment or the tasks required of him become more complex. *Id.* at 64–65 (App. 0114–15).

57. While they were assessed in adulthood, these impairments have been present since the developmental period. As detailed, *infra*, fetal alcohol diagnostician Julian K. Davies, M.D., has evaluated Petitioner and diagnosed him with an FASD. He has concluded that Petitioner's fetal alcohol exposure is a primary cause of his intellectual and cognitive impairments—including the impairments discussed above. Although Dr. Davies has noted the presence of other contributing factors to Petitioner's brain impairment, those factors all occurred during the developmental period and are additional risk factors for intellectual disability. *See* Section F, *infra*.

58. Consistent with Mr. Fulks's neuropsychological impairments, the FASD behavioral screening administered by Dr. Novick–Brown to Ms. Adkins, Ms. Wolfe, Ms. Lauver, and Ms. Kirkman indicated agreement that Petitioner: was disorganized, was unaware of consequences, had difficulty following directions, was inattentive and had trouble concentrating,

had transition problems, had a tendency to overreact, had poor impulse control, gave up easily, had poor judgment, could not take a hint, and was easily confused. Report, Natalie Novick–Brown, Ph.D., at 46 (App. 0096).

59. The FABS results similarly showed that Petitioner had the following behavioral characteristics: unaware of the consequences of his behavior, had trouble completing tasks, poor judgment, poor attention control, and poor organizational skills. *Id.* at 46.

60. Consistent with these behavioral ratings on instruments administered retrospectively, the Devereux Elementary School Behavior Rating Scale, completed by third grade teacher Dottie Thompson, returned significantly high scores in "Classroom Disturbance" and "Inattentive–Withdrawn," all of which indicates a lack of self–regulation. *See* Report, Rodney Pardue, 3/4/87 (App. 1075); Report, Natalie Novick–Brown, Ph.D., at 45 (App. 0095).

61. Third–party reporters also described deficits in executive functioning. As discussed above, Dottie Thompson described Chad as distractible, having no self–direction or self–discipline, and needing constant supervision. Ms. Lauver described him as impulsive and unable to control his behavior. Ms. Krug found that Chad had impairments in reasoning, abstract thinking, impulse control, and the ability to learn from experience. *See* Report, Natalie Novick–Brown, Ph.D., at 46–47 (App. 0095–96) (describing interviews of Joy Krug, Marilyn Lauver); Referral for Multidisciplinary Assessment, Cabell County School District, 1/6/87 (App. 1065); Report, Rodney Pardue, 3/4/87 (App. 1073); Dec. Joy Krug (App. 0338).

62. Chad's functioning outside of school reflected problems with executive functioning, memory, and cognitive flexibility as well. Ms. Adkins, Ms. Holbrook, and Kelly Perry (Ms. Adkins's daughter and Petitioner's childhood neighbor) described him as slow. Ms. Perry even noted that he was less developed cognitively than his younger brother Shannon. Mrs.

24

Perry also described Chad as emotionally unstable, indicating that he threw dramatic temper tantrums. *See* Report, Natalie Novick–Brown, Ph.D., at 46 (App. 0096) (describing interviews of Kirkman and Adkins); Dec. Kelly Perry (App. 0362).

### c.     Communication

63.     The neuropsychological testing conducted on Mr. Fulks over the course of 2003 and 2004 reflected impairments in both expressive and receptive communication. As discussed, *supra*, these deficits have been present since the developmental period and largely present since birth. Report, Natalie Novick-Brown, Ph.D., at 63 (App. 0113).

64.     Consistent with the testing administered during adulthood and his diagnosis of FASD, Chad showed communication impairments from early on in the developmental period. He received speech and language therapy from his second year of the first grade until the end of his school career. At age eight, the Arizona Proficiency Scale showed age–inappropriate errors in pronunciation. As noted *supra*, Chad's third grade teacher Dottie Thompson reported comprehension as a deficit when she completed the Devereux Elementary School Behavior Scale. That same year, his scores on the Peabody Picture Vocabulary Test ("PPVT")—a test of vocabulary and language—reflected a two–year delay in language development (bottom 12th percentile).[5] At the age of nine years, ten months, he tested at the three year, five month level. Finally, and consistent with other areas of functioning and his cognitive impairments, as Chad grew older, he fell further and further behind his age–mates. At fourteen years, four months, he was administered the PPVT again and his scores showed a five–year delay (age–equivalent of nine years, eight months, bottom 5th percentile). *See* Results of Selective Screening, 11/25/96

---

[5] School records reflect that Petitioner was administered the PPVT twice during the third grade, and that he received the same score (SS 81, bottom 12th percentile, Age Equivalent 7 y 9 m) both times.

(App. 1064); Academic Evaluation Report, Peggy Blatt, 2/24/87 (App. 1069); Dec. Joy Krug (attached records) (App. 0341); Report, Julian K. Davies, M.D., at 19–20 (App. 0030–31).

65.     Chad's writing skills were similarly delayed. As discussed above, he was administered the Test of Written Language ("TOWL") in the third grade (nine years old) and was unable to complete it due to the length of the story. He was administered the TOWL again at age fourteen. At that point, he was able to complete the test but received scores in the bottom 2nd percentile on four of six subtests, the bottom 5th percentile on one of the six subtests, and the bottom 16th percentile on the last subtest. Consistent with these impairments, when Mr. Fulks's writing abilities were assessed at age twenty–six, he tested in the bottom 3rd percentile (at the second grade level). *See* Report, Natalie Novick–Brown, Ph.D., at 122–23 (App. 0172–73).

66.     Third–party reporters also described language impairments. Linda Adkins indicated that Chad's speech development was delayed. Ms. Adkins reported that he did not begin speaking until three years old, and when he did it was difficult to understand him because he would lisp and mispronounce words. (Ms. Perry also reported that he was difficult to understand as a child.) Ms. Kirkman confirmed Chad's delay in speech development and that he was difficult to understand even after he learned to speak. He also had difficulties with pronunciation, and sounded "like a baby." *Id.* at 48 (App. 0098). Other children teased him because of his speech issues. Ms. Kirkman indicated that he sounded more like a three–year–old when he was seven. Even Mr. Fulks's father, whose memory of Chad's childhood was largely nonexistent, indicated that Petitioner did not "say stuff real plain" as a child. *Id.* at 48 (App. 0098) (describing interviews with Linda Adkins, Christine Kirkman, and Roger Fulks); *see also* Dec. Kelly Perry (App. 0362) (confirming that Petitioner was difficult to understand as a child).

67. Chad also had deficits in receptive communication. Ms. Adkins and Ms. Perry reported that Ms. Adkins had to give him repeated instructions when asking him to do something, and even then he had difficulty understanding what Ms. Adkins wanted. Report, Natalie Novick–Brown, Ph.D., at 48–49 (App. 0098–99) (describing interviews with Linda Adkins and Christina Kirkman); Dec. Kelly Perry (App. 0362).

68. Chad showed the same impairments in school. Ms. Wolfe reported that he was teased because of his speech impediment, was insecure about his speech, and frequently remained silent as a result. She also noted difficulties with receptive communication skills, indicating that she had to speak with him on a very basic level. Report, Natalie Novick–Brown, Ph.D., at 48–49 (App. 0098–99).

69. The behavioral screening and FABS confirmed the presence of these impairments. All four reporters endorsed "indistinct speech" on the behavioral screening. On the FABS, the four reporters reflected concordance on: "communicates with poor timing/interrupts and communicates about unusual/unrealistic conversation topics." *Id.* at 47 (App. 0097).

### 3. Multimethod Assessment: Social Domain

#### a. Coping skills

70. Chad was consistently described as having deficient coping skills in social settings. Gayle Wolfe described him as a follower and easily victimized socially. He was frequently in trouble, but never caused problems on his own. He was a "copycat" who was drawn into trouble by other, more sophisticated, children and could never explain what started the problems, why he got involved, or why he misbehaved. *Id.* at 49–50 (App. 0099–0100).

71. Similarly, Ms. Lauver indicated that Chad was emotionally and socially immature. He seemed much younger than his age (fourteen), did not know how to solve problems with his peers, and did not know how to avoid social victimization in an age–

appropriate way. Ms. Lauver described his coping capacity as "almost non–existent." *Id.* at 50 (App. 0100).

72.     All four reporters on the behavioral screening "found concordance with respect to the following observed behaviors: immature, inflexible and stubborn, and moody/emotional outbursts." The standardized rating on the FABS reflected similar results. The reporters found concordance "on the following relevant behaviors: deficient mood control—rapid mood swings with changes triggered by seemingly small things and tendency to overreact." *Id.* at 49 (App. 0099).

### b.      Interpersonal relationships

73.     Mr. Fulks showed deficits in interpersonal relationships in multiple settings. Ms. Adkins reported that Chad was a follower and a "pleaser" as a child. He did not initiate activities. He was easily led by other children, and was frequently "picked on" and manipulated by his peers. He followed his older brother Dewayne around and "did whatever Dewayne told him to do. Dewayne tended to tell him do things that would get him into trouble." *Id.* at 50 (App. 0100) (describing interview with Linda Adkins). He seemed much younger than his actual age, and had no friends among his age–mates. Similarly, Ms. Kirkman could not recall Chad ever having a close friend in school, indicated that he did not know how to connect socially with people, and—as noted above—that he seemed more like a three–year–old when he was seven. *Id.* at 50–51 (App. 0100–01) (describing interviews of Christina Kirkman and Linda Adkins).

74.     Chad had similar impairments in the school setting. As detailed above, Ms. Wolfe noted that he was a follower, easily led by others, often lured into misconduct by more sophisticated children, and had little understanding as to why and how he got involved in misbehavior. Ms. Wolfe also indicated that that he was quiet, socially withdrawn, and immature.

He acted like a five– or six–year–old, even though he was eleven at the time he was taught by Ms. Wolfe. He had weak social reciprocity skills, was "very backward socially," had no friends in school, and did not have the social skills to initiate friendships with peers. *Id.* at 51 (App. 0101). Additionally, he had little sense of risk, and consequently was caught up in serious fights on the playground. *Id.*

75. Similarly, Ms. Lauver described Chad as unable to fit in despite initially trying to reach out to peers, lacking in social skills, and having no friends as a result. He came across as anxious, depressed, fearful, and suspicious. He showed no social judgment, and lacked basic social graces such as greeting people politely. He also had difficulty understanding jokes, and "[i]t was important to be very concrete and literal with" him. *Id.* at 26 (App. 0076). Ms. Lauver noted a marked delay in interpersonal skills: Petitioner acted like a seven–year–old, even though he was fourteen when she knew him. *Id.* at 52 (App. 0102).

76. Regarding leisure activities, as detailed in Section 4, *infra*, in the discussion of the Practical Domain, Petitioner was teased and ostracized, and had difficulty fitting in, because he had trouble understanding the rules of games. *Id.* at 52 (App. 0102) (describing interviews with Linda Adkins and Christina Kirkman).

77. The behavioral screening and FABS results all confirmed these behavioral reports. All four respondents on the behavioral screening agreed that Chad's behavior had the following characteristics: "superficial friendships, socially inept/problems with peers, follower/easily led by others, oppositional/disobedient, aggressive behavior with peers, difficulty with teamwork, and developmentally delayed." *Id.* at 50 (App. 0100). The FABS also returned concordance on the following characteristics: "had trouble playing on a team, established

superficial friendships easily but had no close friends, and seemed unaware of 'good manners.'"

*Id.*

### 4. Multimethod Assessment: Practical Domain

#### a. Recreation

78. Kelly Perry, Linda Adkins, and Christina Kirkman reported that Chad had impairments in recreational skills during childhood, which stemmed from his trouble understanding the rules of games and impaired coordination. Ms. Perry stated that it was difficult to play with him because he was "slow in his thinking." *Id.* Ms. Adkins confirmed this account, indicating that Petitioner did not seem to understand games when he was a child, would get confused when he played volleyball, and did not understand the game. He had similar difficulties understanding kickball and would kick the ball at the wrong time. Ms. Kirkman also confirmed that Chad had difficulties understanding sports. All three reporters described problems with coordination. *Id.* at 52 (App. 0102) (describing interviews of Linda Adkins and Christina Kirkman); Dec. Kelly Perry (App. 0362).

79. Visuomotor testing conducted in the developmental period confirmed Chad's brain–based problems with coordination. At age nine, he showed a two–year developmental delay. He showed visuomotor and perceptual problems again at age twelve. At age fourteen, he received test scores in the bottom 12th percentile (no age equivalency listed). Report, Natalie Novick–Brown, Ph.D., at 51–52 (App. 0101–02). Consistent with this childhood testing, Mr. Fulks's motor skills and visuospatial reasoning were shown to be impaired on neuropsychological testing administered when he was an adult. *Id.* at 56 (App. 0106).

80. Finally, as an adolescent and an adult, Mr. Fulks had few normal recreational activities: his leisure activities largely consisted of drug and alcohol abuse. *Id.* at 52 (App. 0102).

### b. Self–management across life settings

81. Mr. Fulks showed a consistent failure to manage his functioning and behavior across multiple life settings. As discussed *supra*, he could not keep pace with his peers academically, despite years of special education supports; he was unable to sustain productive work during his adult years; and, he never lived independently for any length of time as an adult. *Id.* at 52–53 (App. 0102–03).

82. Furthermore, he only accomplished something positive in his life—e.g., a GED, drug treatment, and a welding certificate—when in highly structured and controlled settings such as prison, juvenile facilities, or mental health placements. *Id*. To be clear, Petitioner is not proffering his prison functioning as evidence of adaptive behavior. *See* Section 2, *supra*. However, that he was unable to achieve anything of substance outside of these highly structured settings—when he had to rely on his own cognitive functioning to "organize and structure his behavior"—demonstrates the deficits in his ability to engage in adaptive reasoning and self–regulation across life–settings as well as deficits in the cognitive abilities related to self–sufficiency.[6] Report, Natalie Novick–Brown, Ph.D., at 52–53 (App. 0102–03).

### D. Structural Evidence of Brain Impairments

83. Evidence of Mr. Fulks's intellectual and adaptive deficits receives further support from structural evidence of brain damage. Prior to his trial, Mr. Fulks received an MRI, a PET scan, an EEG, and a Quantitative EEG ("QEEG"), all of which showed brain abnormalities. The MRI showed that there was a subarachnoid cyst in the right temporal lobe of Petitioner's brain, which had filled in an area where his brain had failed to develop. The PET scan and EEG revealed diffuse abnormality throughout his brain. The QEEG revealed evidence of brain

---

[6] As discussed above, although not reflective of his adaptive functioning, Mr. Fulks's functioning inside of juvenile detention and prison was also deficient. *See* Section C.2, *supra.*

damage in the frontal and occipital lobes. These structural abnormalities are consistent with brain damage from an FASD. Indeed, the nature and structure of these abnormalities, as shown on the PET scan and the MRI, demonstrated that both of these issues were congenital, and not formed through any post–natal trauma to the brain. Tr. 6/24/04 at 1–32 (Testimony of David Bachman, M.D.) (App. 0485–0513); Tr. 6/23/04 at 26 (App. 0648) (Testimony of James Evans, Ph.D.).

84. Prior to Mr. Fulks's 2004 trial, cognitive neuroscientist Ruben Gur, Ph.D., conducted a review of all of Mr. Fulks's imaging scans and a quantitative analysis of his PET scans, which revealed that he had a "highly abnormal brain." Tr. 6/28/04 at 24 (App. 0615). Dr. Gur noted the subarachnoid cyst, but also indicated that the cyst was "the least of [his] problems" because his "whole brain [was] misshapen." Tr. 6/16/04 at 78 (App. 0872). The structure of Mr. Fulks's brain abnormalities indicated that his brain never developed properly in the first place (as opposed to developing properly and then acquiring an injury). The quantitative analysis of the PET scan reflected abnormalities in the basal ganglia, thalamus, the cerebellum, and the frontal and temporal lobes. Consistent with Dr. Davies's diagnosis of FASD, these abnormalities were primarily congenital with fetal alcohol exposure as the most likely cause. *Id.* at 77–93 (App. 0871–87).

85. Christos Davatzikos, Ph.D., an Associate Professor of Radiology and Bioengineering at the University of Pennsylvania, subjected Mr. Fulks's MRI to a quantitative analysis. This quantitative analysis showed that Petitioner had a "highly abnormal profile" that could not have come from a normal brain. Tr. 6/26/04 at 19 (App. 0610). In addition to the cyst discussed above, quantitative MRI analysis reflected widespread abnormalities in the frontal and temporal lobes of the brain. This included, inter alia, abnormalities with the right frontal lobe, the

32

left temporal lobe, and the inferior frontal gyrus. Dr. Davitzikos also concluded that these abnormalities were likely congenital. *Id.* at 15–34 (App. 0606–25).

86. Biostatistics and morphometrics expert Fred Bookstein, Ph.D., examined the MRI and noted that it showed an abnormal corpus callosum, which is highly correlated with FASDs. Dr. Bookstein concluded it was fifteen times more likely that Mr. Fulks brain was affected prenatally by alcohol than a brain in the general population and that the chance he suffered from an FASD was six hundred to one. Tr. 6/24/04 at 93–112 (App. 0574–93).

87. Finally, as discussed above, Dr. Davies conducted a medical evaluation of Mr. Fulks and diagnosed him with an FASD. Dr. Davies is a Clinical Professor of Pediatrics at the University of Washington, School of Medicine. He is also a staff physician at the Fetal Alcohol Syndrome Clinic located in the University of Washington School of Medicine, which is both the longest–running FASD clinic in the country and one of the foremost Fetal Alcohol Spectrum Disorder diagnostic clinics in the United States. Dr. Davies has conducted research, authored articles, co–authored books, and conducted trainings related to FASDs. Curriculum Vitae, Julian K. Davies, M.D. (App. 0045–50); *See* Section F, *infra* (discussing Dr. Davies' analysis).

88. FASD is an umbrella term used to describe the spectrum of birth defects and neurologic impacts caused by maternal alcohol consumption during pregnancy. Brain damage that results from FASD often includes lower IQ; attention and hyperactivity issues; difficulties with judgment and impulse control; language and social difficulties; learning problems; deficits in memory; and impairments in executive functioning skills such as flexibility; planning, organization; inhibition; and novel problem solving. *See* Report, Julian K. Davies, M.D., at 1 (App. 0012).

33

89. Dr. Davies has reviewed the foregoing analyses and concluded that the nature of the structural brain damage documented above correlates with fetal alcohol exposure. Dr. Davies identified FASD as a primary cause of Mr. Fulks's brain damage. There are other potential risk factors for cognitive dysfunction in Mr. Fulks's history, such as pre–eighteen head injuries, early onset substance abuse, and complex trauma from an abusive and dysfunctional environment. However, Dr. Davies has identified these other factors as contributory factors to Mr. Fulks's brain damage that aggravated his FASD–related deficits.  Additionally, these risk factors were all present before the age of eighteen. *Id.* at 26–27, 31–33 (App. 0037–38, 0042–44).

90. The structural brain damage documented above confirms Mr. Fulks's intellectual and adaptive impairments. Most fundamentally, it identifies the source of his intellectual and adaptive deficits and verifies that these deficits were present before the age of eighteen as his brain damage has been there since birth.

91. Additionally, this brain damage lines up directly with the neuropsychological impairments described *supra*. The frontal and temporal lobes are associated with, inter alia, executive functioning (frontal), memory (temporal), and auditory language (temporal). Mr. Fulks's damaged frontal and temporal lobes explain the impairments in memory, attention, language, and executive functioning that are set forth through the neuropsychological testing. Furthermore, the thalamus functions as the "switchboard" of the brain and relays information from other parts of the brain to the executive centers for the purposes of making decisions. Tr. 6/16/04 at 49–50 (App. 0843–44) (Testimony of Ruben Gur, Ph.D.). The corpus callosum serves a similar function, relaying information back and forth between the two sides of the brain. These additional abnormalities show that Mr. Fulks's frontal and temporal lobe's ability to receive information from the rest of the brain is also impaired. This is consistent with the generalized

34

processing deficit reflected in the neuropsychological testing. Accordingly, Petitioner's structural brain damage, which has been present since before the age of eighteen, corresponds directly to his cognitive impairments. *Id.* at 47–48, 133–37 (App. 0841–42, 0927–31).

### E. Age of Onset

92. The age of onset for Mr. Fulks's intellectual and adaptive deficits was well before the age of eighteen. As set forth *supra*, Mr. Fulks had ID–level functioning from birth through adulthood. These deficits have been shown through: third–party reporters; records review; testing administered during the developmental period; achievement and neuropsychological testing administered forensically during adulthood; formal, retrospectively administered measures of adaptive behavior; behavioral ratings that were administered during the school years; and the retrospective administration of the FABS and a behavioral screening that encompassed three time periods before the age of eighteen. Additionally, Mr. Fulks suffers from an FASD and a number of other risk factors for intellectual disability, which establish the origin of the diagnosis and confirm that its age of onset was in the developmental period. *See* Section F, *infra*.

93. The age of onset is further confirmed by the structural evidence of brain damage, which is a primary cause of the intellectual and adaptive deficits Mr. Fulks has suffered since birth. To the extent other risk factors such as substance abuse or head trauma have contributed to his impaired functioning, the evidence described above shows that the risk factors occurred in the developmental period and further strengthen the case for ID. *See* Section D, *supra*; Report, Julian Davies, M.D., at 2, 33 (App. 0013, 0044); Report, Natalie Novick–Brown, Ph.D., at 66–68 (App. 0116–18).

94. That Mr. Fulks received IQ scores above the presumptive range for intellectual disability in childhood is consistent with an age of onset before the age of eighteen. Childhood

IQ scores are generally unstable, particularly in individuals such as Petitioner who were born with cognitive deficits. As age–peers progress, impaired individuals such as Petitioner develop more slowly than their age–group and fall increasingly behind. As a result, their scores drop. The risk factors for intellectual disability referred to above also correlate with drops in IQ during the developmental period. *See* Section B, *supra*, and Section F, *infra*; Report, Barry M. Crown, Ph.D. at 7–8 (App. 0007–08).

95.     Additionally, Mr. Fulks has had significant, pervasive adaptive deficits from early in his childhood. These deficits correspond to the ID–level intellectual functioning that was demonstrated during adulthood, not the scores from childhood. Even educators and mental health professionals who interacted with Petitioner when he was in school—who did not have the extensive imaging, record review, collateral reports, and testing that Petitioner presents— recognized that he was functionally intellectually disabled. Report, Natalie Novick–Brown, Ph.D., at 24–25, 27 (describing interviews with Joy Krug and Marilyn Lauver) (App. 0074–75, 0077); Report, Barry M. Crown, Ph.D. at 7–8 (App. 0007–08).

### F.     Risk Factors for Intellectual Disability

96.     Cause need not be determined for an ID diagnosis to be made. Intellectual disability has been established whenever the three prongs are present. DSM–5 at 39–40; AAIDD–2010 at 61. Nevertheless, current diagnostic standards have identified risk factors that correlate with the ID diagnosis and are known causes of it. *See* AAIDD–2010 at 57–68. These risk factors include biomedical factors that result in direct insults to cognition, as well as environmental risk factors in the social, educational, and behavior domains, which also affect cognitive development. *Id.* "Because ID is characterized by impaired functioning, its etiology is whatever caused this impairment in functioning." *Id.* at 61. Frequently, biomedical risk factors interact with environmental ones to cause intellectual disability. *Id.* at 68.

97. In its 2010 diagnostic manual, the AAIDD describes a person with ID who has the biomedical risk factor of a Fetal Alcohol Spectrum Disorder that interacts with environmental risk factors such as poverty, parental substance abuse, child abuse, and child neglect. *Id.* Petitioner's life history is almost identical to this example. He was born with an FASD and has a number of additional risk factors for ID in his history.

### 1. Fetal Alcohol Spectrum Disorder

98. FASD is a significant recognized risk factor for intellectual disability. *See* Greenspan, S., et. al., *Age of Onset and the Developmental Period Criteria*, The Death Penalty and Intellectual Disability (AAIDD–2015), at 80 (describing FASD as a "high frequency biological cause[] of ID"). As discussed in Section D, *supra*, FASD is an umbrella term used to describe the spectrum of birth defects and neurologic impacts caused by maternal alcohol consumption during pregnancy. *See* Report, Julian K. Davies, M.D., at 1 (App. 0012).

99. Using the 4–Digit Code system, the most conservative and demanding of all diagnostic standards for evaluating FASDs, and also using the diagnostic system established by the Institute of Medicine ("IOM"), which is a subsidiary of the National Academies of Science, as well as the DSM–5, Dr. Davies concluded that Mr. Fulks suffers from an FASD. Under the 4–Digit Code, the diagnostic designation is Static Encephalopathy, Alcohol Exposed. Under the IOM Guidelines, the designation is Alcohol Related Neurodevelopmental Disorder. Under the DSM–5, he meets the definition of Neurodevelopmental Disorder Associated with Prenatal Alcohol Exposure. Report, Julian K. Davies, M.D., at 2, 29 (App. 0013, 0040).

100. Dr. Davies based his diagnosis on evidence of two diagnostic factors: prenatal alcohol exposure and brain dysfunction.

### a. Prenatal alcohol exposure

101. Chad's mother, Diana Fulks, drank when she was pregnant with him. Both she and his father, Roger Fulks, reported that Diana drank alcohol throughout her pregnancies with Chad and his brothers Ronnie and Shannon. "Diana drank beer and wine, typically until she became intoxicated or the alcohol was gone." During the time she was pregnant with Chad, she and Roger drank at least every weekend and transitioned into drinking on a daily basis. Roger would regularly come home from work to find her drunk. Report, Natalie Novick–Brown, Ph.D., at 29 (App. 0079).

102. Kevin Holbrook, Petitioner's maternal uncle, reported that Diana drank heavily during all of her pregnancies, including her pregnancy with Petitioner. This included "[a] lot of whiskey. A lot of it." Both she and Roger would frequent bars during this time, and they were even out drinking on the night Diana went into labor with Chad. Tr. 6/22/04 at 129–30 (App. 1024–25) (Testimony of Kevin Holbrook).

103. Furthermore Arlene Andrews, Ph.D., who conducted an assessment of Mr. Fulks's social history prior to his 2004 trial, interviewed a number of third–party reporters who stated that Diana and Roger "both started drinking heavily early, and she drank through her pregnancies with all of the sons." Tr. 6/24/04 at 154 (App. 0410) (Testimony of Arlene Andrews, Ph.D.).

104. Diana's drinking habits after Chad's birth confirm her drinking while he was *in utero*. Diana drank heavily until Chad was fifteen years old. Christina Kirkman described Diana's problems with alcohol during Petitioner's childhood in an interview with Dr. Novick–Brown:

> She [Ms. Kirkman] recalled seeing Roger and Diana drinking alcohol together throughout her childhood, adding they both were "addicted" to alcohol. She saw Diana so intoxicated once, she urinated on herself. Another time, Diana vomited

and "just sat in it." This was around 1982/83 when Christina was 12 or 13. She recalled Diana drinking and smoking cigarettes during the pregnancy with Shannon but said she was too young to be aware of Diana's alcohol use during the pregnancy with Chad. The Fulks [parents] would spend money on beer and cigarettes before buying clothes for their children.

Report, Natalie Novick–Brown, Ph.D., at 18 (App. 0068). *See also* Dec. Linda Adkins (describing Diana's alcohol abuse during Petitioner's childhood) (App. 0321).

### b.      Evidence of brain dysfunction

105.     The brain dysfunction criterion of an FASD is established in one of two ways: structural evidence of brain impairment or FASD–level deficits on neuropsychological testing. Although only one of these two elements has to be present for the criterion of brain dysfunction to be met, both elements are present for Mr. Fulks. The abnormal MRI, PET scan, EEG, and QEEG and the quantitative analyses of the MRI and PET scan discussed above all establish structural evidence of brain damage under both the IOM and the more demanding 4–Digit Code criteria. Report, Julian K. Davies, M.D., at 26–27 (App. 0037–38).

106.     Regarding neuropsychological evidence of impairments, the extensive neuropsychological and psychological testing conducted by four forensic practitioners prior to Petitioner's trial reflects 4–Digit Code–level neurocognitive impairments in five domains: executive functioning, memory, attention, language, and academic functioning. These deficits also meet the definition of neuropsychological evidence of brain impairment under the criteria set forth by the IOM. Mr. Fulks only needed this extent of impairments in three domains to satisfy this diagnostic element. Furthermore, Dr. Davies has found areas of dysfunction that do not rise to the 4–Digit Code level of impairment but still constitute brain damage in motor skills and intellectual functioning. Report, Julian K. Davies, M.D., at 17–21, 27 (App. 0028–32, 0038).

### 2. Child Abuse

107. Physical and/or sexual abuse during childhood is another risk factor for intellectual disability, regardless of whether head injuries occur. AAIDD–2010 at 60. This risk factor was present in Petitioner's history.

108. Roger and Diana Fulks were physically abusive alcoholics who beat all of their children, whipped them, and threw them against walls. Roger beat Chad and his siblings with belts, pool sticks, and his fists. Diana hit them with her hands and with whatever objects she could lay her hands on. Witnesses observed both the beatings themselves, which were regular, and also observed injuries as a result of those beatings.[7]

109. Chad also had an extensive history as the victim of child sexual abuse. Most significantly, when he was approximately thirteen years old, he was sexually abused by Gary Kaasee, Sr., the father of his childhood friend Michael Kaasee. He was sexually abused by a male stranger during that same period of time. At age fifteen, he was also sexually abused by his step–father Dean Thompson.[8]

---

[7] *See, e.g.,* Tr. 6/10/04 at 13–14 (Testimony of Ronnie Fulks) (App. 0814–15); Tr. 6/4/04 at 140 (Testimony of Dewayne Fulks) (App. 0732); Tr. 6/22/04 at 135–36 (Testimony of Kevin Holbrook) (App. 1030–31); Tr. 6/22/04 at 167, 174 (Testimony of Mark Fulks) (App. 0770, 0777); Dec. Nathan Fulks at ¶ 9 (App. 0330); Dec. Christina Kirkman (8/28/08) at ¶ 5 (App. 0334); Dec. Sharon Dotson at ¶ 11 (App. 0327); Tr. 6/22/04 at 234 (Testimony of Linda Adkins) (App. 0373); Tr. 6/22/04 at 212–13 (Testimony of Brian Messenger) (App. 1044–45); Tr. 6/23/04 at 91–94 (Testimony of Martha Floyd) (App. 0702–05).

[8] *See* Report, Natalie Novick–Brown, Ph.D., at 6–7, 11, 14 (App. 0056–57, 0061, 0064); Memo, Joy Krug, 11/26/91 (indicating that Petitioner has a history of "being molested by an older man") (App. 0349); Dec. Mike Kaasee at ¶¶ 7–8 (describing prompt report of sexual abuse) (App. 0333); Dec. Lewis Lambert, Sr. (describing Petitioner's emotional state after the abuse) (App. 0358); Dec. Lewis Lambert, Jr. (same) (App. 0356–57); Dec. Harry Krop, Ph.D. (describing Petitioner's history of sexual abuse) (App. 0204–08).

### 3. Head Trauma During the Developmental Period

110. Head trauma is also a risk factor for ID. AAIDD–2010 at 60. Mr. Fulks had a history of head injuries during the developmental period. Beginning at age seven, he suffered multiple instances of pre–eighteen head trauma including, inter alia, being hit with a can of paint and losing consciousness at age eleven or twelve, being knocked out while fighting with his brother at age nine or ten, and getting into car accidents at ages fifteen or sixteen and experiencing post–concussive symptoms. Report, Natalie Novick–Brown, Ph.D., at 13, 66 (App. 0063, 0116); Report, Barry M. Crown, Ph.D., at 3 (App. 0003); Dec. Russell Spears at ¶¶ 5–6 (App. 364).

### 4. Parental Neglect, Impaired Parenting, Domestic Violence, and Malnutrition

111. Parental neglect, impaired parenting, domestic violence, malnutrition, and poverty are all risk factors for ID. AAIDD–2010 at 60. They were all present in Petitioner's history.

112. In addition to being physically abusive, Roger and Diana Fulks were neglectful, emotionally abusive, and impaired parents. Highly dysfunctional alcoholics, they drank until they were staggering or passed out. This occurred on a daily basis. They frequently drank and got high all night and slept through the day. They provided no parental supervision and overlooked obvious misbehavior such as stealing on the part of their children. The Fulks children played no sports, had no birthday parties, and did not participate in any normal childhood activities. Roger and Diana provided no support for the Fulks children to succeed academically, rarely attended conferences at the school, and, on one occasion, left Chad stranded at the school for hours after

he had a bathroom accident that soiled his clothing. Chad was described as receiving neither love nor moral guidance from his parents.[9]

113.    Petitioner was malnourished as a child. The Fulks children frequently went hungry as Diana and Roger would spend money on alcohol before they would buy food. The children often asked neighbors to feed them because their parents were either unable or unwilling to provide them with food. Indeed, when the children were very young, Diana gave the children bottles of Kool Aid instead of milk. The Fulks household was also filthy. It was overrun with roaches, flies, other bugs, rodents and dirty diapers. The Fulks children were frequently dirty and wore dirty, shabby, ill–fitting clothes.[10]

114.    Roger and Diana emotionally abused their children, cursing at them, insulting them, and calling them "unspeakable names." The weekly parties in the basement of their house where adults would drink, use drugs, fight, and engage in sexual acts, often in full view of the children. Roger displayed pornographic material where the children could see them and frequently showed Chad and his siblings pornographic movies, believing it to be funny.[11]

---

[9] *See, e.g.,* Tr. 6/10/04 at 10–12, 15–19 (Testimony of Ronnie Fulks) (App. 0811–13; Tr. 6/4/04 at 129–32, 137–39, 143, 145–48 (Testimony of Dewayne Fulks) (App. 0721–40); Tr. 6/22/04 at 136–37, 142–43 (Testimony of Kevin Holbrook) (App. 1031–1032, App. 1037–38); Tr. 6/22/04 at 162, 166–71 (Testimony of Mark Fulks); (App. 0765–74) Dec. Christina Kirkman, 1/27/17, at ¶ 2 (App. 0334); Dec. Linda Adkins, 1/27/17, at ¶¶ 2–3 (App. 0321); Tr. 6/22/04 at 231–33 (Testimony of Linda Adkins) (App. 0370–71); Tr. 6/22/04 at 212–15 (Testimony of Brian Messenger) (App. 1044–47).

[10] Tr. 6/4/04 at 129–32, 137–39, 143, 145–48 (Testimony of Dewayne Fulks) (App. 0721–40); Tr. 6/22/04 at 136–37, 142–43 (Testimony of Kevin Holbrook) (App. 1031–1032, App. 1037–38) ; Tr. 6/22/04 at 161–62, 166–71 (Testimony of Mark Fulks) (App. 0764–74); Dec. Nathan Fulks at ¶¶ 7–8 (App. 033); Dec. Dicie Fulks at ¶¶ 3–4, 7 (App. 1082–83); Dec. Linda Adkins, 1/27/17, at ¶¶ 2–3 (App. 0321); Dec. Kelly Perry, 1/27/17, at ¶¶ 2, 8 (App. 0362); Tr. 6/22/04 at 212–15 (Testimony of Brian Messenger) (App. 1044–47).

[11] Tr. 6/10/04 at 14 (Testimony of Ronnie Fulks) (App. 0815); Tr. 6/4/04 at 141–42, 150–51 (Testimony of Dewayne Fulks) (App. 0733–43); Tr. 6/22/04 at 135–38, 141–42 (Testimony of Kevin Holbrook) (App. 1030–37); Tr. 6/22/04 at 168–69; Dec. Sharon Dotson at ¶ 11 (App.

115. Additionally, Roger and Diana had a volatile and mutually abusive relationship. They fought with each other using their fists and whatever objects were close at hand. This occurred in front of the children. Diana could fight as well as or better than most men, but Roger would eventually overcome her. In the aftermath of these fights, Diana was seen with bruises on her face and cut lips. These fights also occurred when Diana was pregnant with Chad.[12]

116. Overall, Chad's childhood was characterized by turbulence, poverty, and abject parenting failures by Diana and Roger. Chad's juvenile probation officer Susan Hatcher and Officer Alan Meeks, a police officer who arrested Chad as a juvenile, agreed that Chad should be removed from his home because his home environment was so damaging. Tellingly, whether from lack of concern or the fact that he was in an alcoholic stupor for much of Chad's childhood, when questioned by Professor Andrews, Roger could not recall anything about his son before he was twelve years old. Tr. 6/23/04 at 0100–02 (Testimony of Susan Hatcher) (App. 1012–14); Tr. 6/24/04 at 138 (Testimony of Arlene Andrews, Ph.D.) (App. 0394).

### 5. Family Poverty

117. Family poverty is also a risk factor for intellectual disability. AAIDD–2010 at 60. As discussed above, Mr. Fulks grew up in poverty. His alcoholic parents failed to maintain a stable income, adequately manage the few financial resources they were able to maintain, or provide a stable environment. Chad and his siblings were undernourished and lived in horrible conditions. *See* Section 4, *supra*.

---

0327); Tr. 6/22/04 at 213 (Testimony of Brian Messenger) (App. 1045); Tr. 6/24/04 at 156–62, 68 (Testimony of Arlene Andrews, Ph.D.) (App. 0412–18, 0424).
[12] *See, e.g.,*Tr. 6/10/04 at 12–13 (Testimony of Ronnie Fulks) (App. 0813–14); Tr. 6/4/04 at 132–34 (Testimony of Dewayne Fulks) (App. 0724–26); Tr. 6/22/04 at 132–35 (Testimony of Kevin Holbrook) (App. 1027–30); Tr. 6/22/04 at 163–64 (Testimony of Mark Fulks) (App. 0766–67); Dec. Nathan Fulks at ¶ 5 (App. 0329); Tr. 6/22/04 at 233–35 (Testimony of Linda Adkins) (App. 0372–74); Tr. 6/22/04 at 213 (Testimony of Brian Messenger) (App. 1045); Tr. 6/24/04 at 156, 178–79 (Testimony of Arlene Andrews, Ph.D.) (App. 0412, 0434–35) .

### 6. Substance Abuse During Childhood

118. Childhood substance abuse is also a risk factor for intellectual disability, as it can cause drops in cognitive abilities over time. Report, Julian K. Davies, M.D., at 32 (App. 0043). Petitioner began drinking vodka and moonshine at eight or nine years old. At that same age, he began huffing paint and ingesting some form of formaldehyde and he eventually moved on to pre–eighteen use of cocaine, pills, and methamphetamine. *Id.*

### 7. Petitioner's FASD Is the Primary Cause of His Brain Impairments.

119. Although Mr. Fulks has a number of other risk factors for intellectual disability in his history, Dr. Davies has reviewed his history and functioning and determined that his FASD is a primary cause of his intellectual and cognitive impairments. Other risk factors for ID were present and likely contributed to his intellectual disability. However, his deficits presented themselves long before these risk factors emerged. Furthermore, the nature of his structural brain damage correlates highly with fetal alcohol exposure. Accordingly, Petitioner's FASD is the predominant cause of his ID and the other risk factors are co–occurring, contributory factors in Mr. Fulks's lifelong impairments. *See* Report, Julian Davies, M.D., at 30–33 (App. 0041–44); Report, Natalie Novick–Brown, Ph.D., at 66–69 (App. 0116–19); Report, Barry M. Crown, Ph.D., at 7 (App. 0007).

### G. Mr. Fulks Is Intellectually Disabled.

120. The above evidence establishes that Chad Fulks suffers from intellectual disability. He has deficits in intellectual and adaptive functioning, which had been present since before the age of eighteen. Petitioner's intellectual disability is established by extensive record review, four rounds of either neuropsychological or psychological testing, extensive imaging analyses, an EEG, and a QEEG, the presence of an FASD, and extensive interviews and testing

44

with collateral reports. His medical and functional history is almost identical to the archetype given by the AAIDD as to how intellectual disabilities develop.

121.    Mr. Fulks has been evaluated by neuropsychologist Barry M. Crown, Ph.D. An experienced clinical and forensic practitioner with decades of experience, Dr. Crown is a Diplomate with the American Board of Professional Neuropsychology, with added certifications in Child and Adolescent Neuropsychology, Neurodevelopmental Disabilities, Geriatric Neuropsychology, Forensic Neuropsychology, Rehabilitation Neuropsychology, Addiction Neuropsychology, and Neuroimaging in Neuropsychology. Dr. Crown has also served as the president, as the chair of the examinations committee, and as a member of the board of directors of the American Board of Professional Neuropsychology. Dr. Crown has conducted a clinical interview of Mr. Fulks, reviewed the extensive data discussed above, and evaluated Mr. Fulks under current diagnostic standards and concluded that he is intellectually disabled, meeting all three prongs of the diagnosis. *See* Report, Barry M. Crown, Ph.D. (App. 0001–09).

**H.    Relief Is Appropriate Under 28 U.S.C. § 2241.**

122.    This claim is appropriately brought under 28 U.S.C. § 2241. A federal habeas petitioner is entitled to review under § 2241 when § 2255 is "inadequate or ineffective to test the legality of his detention" or sentence. 28 U.S.C. § 2255(e); *see also Brown*, 719 F.3d at 586–89 (§ 2241 applies to challenges to a habeas petitioner's sentence, in addition to his conviction). "The essential function [of Section 2241] is to give a prisoner a reasonable opportunity to obtain a reliable judicial determination of the fundamental legality of his conviction and sentence." *In re Davenport*, 147 F.3d 605, 609 (7th Cir. 1998) (internal quotations omitted); *Webster v. Daniels*, 784 F.3d 1123, 1136 (7th Cir. 2015) (same).

123.    This category of claims includes, inter alia, claims that rely on a new legal or factual basis not available at the time of the petitioner's trial proceedings or his § 2255

proceedings. *See, e.g.*, *Garza v. Lappin*, 253 F.3d 918 (7th Cir. 2001); *Davenport*, 147 F.3d at 607–09; *Webster*, 784 F.3d at 1136. The majority of circuit courts of appeal—including the Seventh Circuit—have also expressly recognized that § 2241 is available to a petitioner if circuit precedent would have required the district court and appellate panel to erroneously reject petitioner's claim. *See, e.g.*, *Davenport*, 147 F.3d at 611.[13]

124. Section 2241 is also the appropriate vehicle where a petitioner challenges the execution, as opposed to the imposition, of the sentence. *Kramer*, 347 F.3d at 217; *Valona v. United States*, 138 F.3d 693, 694 (7th Cir. 1998) ("A motion seeking relief on grounds concerning the execution but not the validity of the conviction and sentence . . . may not be brought under § 2255 and therefore falls into the domain of § 2241.").

125. The Seventh Circuit has also found that § 2241 review is appropriate for "a non–frivolous claim of actual innocence" that could not have been brought under § 2255. *Kramer v. Olson*, 347 F.3d 214, 217 (7th Cir. 2003). Likewise, § 2255 is "inadequate" when it prevents a prisoner from obtaining review of a legal theory that addresses the "fundamental legality" of a sentence. *Webster*, 784 F.3d at 1124–25 (7th Cir. 2015).

126. As detailed below, Mr. Fulks's claim that his intellectual disability renders him categorically ineligible for the death penalty fits within the category of claims cognizable under § 2241, as § 2255 was and remains inadequate or ineffective to test the legality of his sentence.

---

[13] *See also United States v. Barrett*, 178 F.3d 34, 51–52 (1st Cir. 1999); *Triestman v. United States*, 124 F.3d 361, 363 (2d Cir. 1997); *In re Dorsainvil*, 119 F.3d 245, 247–48, 251 (3d Cir. 1997); *United States v. Wheeler*, 886 F.3d 415, 434 (4th Cir. 2018); *Reyes–Requena v. United States*, 243 F.3d 893, 904 (5th Cir. 2001); *Martin v. Perez*, 319 F.3d 799, 805 (6th Cir. 2003); *Alaimalo v. United States*, 645 F.3d 1042, 1047 (9th Cir. 2011); *In re Smith*, 285 F.3d 6, 8 (D.C. Cir. 2002).

**1. Petitioner's *Atkins* Claim Relies on New Legal and Factual Bases not Available at the Time of His § 2255 Proceedings, and on Supreme Court Jurisprudence Effectively Reversing Fourth Circuit Precedent.**

127. As stated above, a federal prisoner may proceed under § 2241 when asserting a habeas claim that relies on a legal or factual basis not available at the time of petitioner's trial or § 2255 proceedings. *See Garza*, 253 F.3d at 924–25; *Davenport*, 147 F.3d at 607. For instance, in *Garza*, the § 2241 petitioner challenged his conviction and death sentence based on the issuance of an opinion from the Inter–American Commission on Human Rights, which found his execution would violate international law. *Id.* at 923. Because the opinion upon which the *Garza* petitioner relied could not have been generated until § 2255 proceedings had ended and Mr. Garza's legal claim did not satisfy the conditions necessary for a successive § 2255 petition, the Seventh Circuit found that Mr. Garza's claim was reviewable under § 2241. Similarly, in *Davenport*, the Seventh Circuit reviewed a claim based on a retroactive change in the United States Supreme Court's interpretation of federal statutory law under § 2241, explaining that § 2255 was not available because the Court's decision related to statutory, and not constitutional law. 147 F.3d at 607–11.

128. In *Webster*, the habeas petitioner had been convicted of federal capital charges and sentenced to death. At his trial, Mr. Webster claimed that he was intellectually disabled and challenged his eligibility for the death penalty under *Atkins*, a claim the trial court rejected. *Webster*, 784 F.3d at 1125–33. Mr. Webster then presented newly discovered evidence of his intellectual disability that could not have been discovered at the time of trial by diligent counsel. *Id.* at 1133. Because Mr. Webster's execution would be constitutionally prohibited if his *Atkins* claim was meritorious and he could not seek review of this evidence under a successor § 2255 petition, the Seventh Circuit ruled that Mr. Webster's renewed *Atkins* claim and the new evidence were appropriately reviewed under § 2241. *Id.* at 1146.

129.    Here, Mr. Fulks's *Atkins* claim relies on the Supreme Court's decisions in *Hall v. Florida* and *Moore v. Texas*, as well as the current diagnostic standards that *Hall* and *Moore* require courts to use in evaluating ID claims. Because *Hall* and *Moore* were decided in 2014 and 2017, respectively, they constitute legal bases that were not available at the time of Mr. Fulks's 2004 trial or at the time he filed his § 2255 petition. Likewise, because the current editions of the AAIDD–2012 and DSM–5 were not adopted until 2012 and 2013, respectively, they constitute new factual bases not available at the time of Mr. Fulks's 2004 trial or at the time he filed his § 2255 petition. Accordingly, the claim is properly asserted under § 2241.

### a.    Petitioner's Claim that He Satisfies Prong One Relies on *Hall*, *Moore*, and Newly Adopted Diagnostic Criteria.

130.    While *Atkins* established that intellectually disabled persons are categorically ineligible for the death penalty, the Court did not provide "'definitive procedural or substantive guides for determining when a person who claims mental retardation' falls within the protection of the Eighth Amendment." *Hall*, 572 U.S. at 718. However, the Court did cite to language in the then–current fourth edition of the Diagnostic and Statistical Manual of Mental Disorders (DSM–IV–TR) stating that "'[m]ild' mental retardation is typically used to describe people with an IQ level of 50–55 to approximately 70." *Atkins*, 536 U.S. at 308 n.3. The *Atkins* Court also observed that that an IQ "between 70 and 75 or lower" is usually considered the "cutoff IQ score" for prong one. *Id.* at 309 n.5 (internal quotation marks omitted). Indeed, at the time of Mr. Fulks's trial, several state statutes required an IQ score of 70 or below to establish intellectual disability and several others used a score of 70 or below as presumptive evidence of such a condition. *Id.* at 1196–97.[14]

---

[14] While federal law has prohibited the death penalty for the "mentally retarded" since 1994, the relevant statute does not define the term. 18 U.S.C. § 3596(c).

131.     However, the legal landscape governing *Atkins* claims changed significantly in 2014, when the Supreme Court held that intellectual disability cannot be assessed according to any single factor, but rather is a "conjunctive and interrelated assessment." *Hall*, 572 U.S. at 723. Specifically, in *Hall*, the Court struck down a Florida statute establishing a "strict IQ test score cutoff of 70" for determining the applicability of *Atkins*. *Id.* at 712. In doing so, the Court made clear that, in addition to IQ scores, "an individual's ability or lack of ability to adapt or adjust to the requirements of daily life, and success or lack of success in doing so, is central to . . . diagnosing intellectual disability." *Id.* at 705 (citing DSM–5, at 37); *see also Brumfield*, 135 S. Ct. at 2277–78 (testimony that petitioner "scored 75 on an IQ test and *may have scored higher on another test* . . . was entirely consistent with intellectual disability" because "any IQ test score has a margin of error and is *only a factor* in assessing mental retardation") (emphasis added).

132.     More broadly, *Hall* was the first decision of the Supreme Court holding that States did not have "unfettered discretion to define the full scope of the constitutional protection" identified in *Atkins. Hall*, 572 U.S. at 719. Rather, with *Hall*, the Court established that the assessment of an *Atkins* claim must be "informed by the views of medical experts." *Id.* at 721; *see also id.* at 720–21 (recognizing that "[i]f the States were to have complete autonomy to define intellectual disability as they wished, the Court's decision in *Atkins* could become a nullity, and the Eighth Amendment's protection of human dignity would not become a reality").

133.     Despite this requirement, however, many lower courts continued to employ outdated diagnostic standards, or to disregard clinical guidelines altogether, in assessing whether a defendant was entitled to *Atkins* relief. The Supreme Court definitively invalidated this practice with its 2017 decision in *Moore v. Texas*, in which it held that courts are required to apply the "medical community's *current standards*" when evaluating a claim of intellectual disability. *Id.*

at 1053 (emphasis added). Citing the current manuals from the APA and the AAIDD, the Court explained that "[r]eflecting improved understanding over time, . . . current manuals offer the 'best available description of how mental disorders are expressed and can be recognized by trained clinicians.'" *Id*. (quoting DSM–5, at xli).

134. Although the *Moore* case itself focused on the adaptive–behavior prong of ID, it is equally significant for prong one because current clinical standards reject hard cutoffs for IQ scores, mandate application of the Flynn Effect and practice effect, and dictate that IQ scores be assessed in relation to adaptive deficits. *See* AAIDD–2007 at 20–21; AAIDD–2010 at 37; AAIDD–2012 at 23; DSM–5 at 37; *see also* McGrew, K., *Norm Obsolescence: The Flynn Effect*, at 160–62. Because all of these factors are critical to an accurate assessment of prong one of Mr. Fulks's *Atkins* claim, *Moore* (together with *Hall*) provided him with a previously–unavailable legal basis for that claim.

135. In addition to these new legal bases for his claim, Mr. Fulks relies on new diagnostic criteria first published in the DSM–5 in 2013. For instance, the DSM–5 newly established that an individual's IQ scores must be evaluated in direct relation to his or her adaptive deficits, explaining:

> IQ test scores are approximations of conceptual functioning but may be insufficient to assess reasoning in real–life situations and mastery of practical tasks. For example, a person with an IQ score above 70 may have such severe adaptive behavior problems in social judgment, social understanding, and other areas of adaptive functioning that the person's actual functioning is comparable to that of individuals with a lower IQ score. Thus, clinical judgment is needed in interpreting the results of IQ tests.

DSM–5 at 37. Consistent with this dynamic, the DSM–5 rejected the notion of ID evaluations as actuarial determinations, stating that "[t]he diagnosis of intellectual disability is based on both clinical assessment and standardized testing of intellectual and adaptive functions." *Id*.

136. The DSM–5, unlike the DSM–IV–TR, also recognizes that "[f]actors that may affect test scores include . . . the 'Flynn effect' (i.e. overly high scores due to out–of–date test norms)" and mandates that IQ scores be interpreted using clinical judgment and training. DSM–5 at 37. As discussed above, test score interpretation using clinical judgment includes correction for the Flynn Effect. *See supra* Section B.1.

137. This newly available diagnostic standard constitutes new factual evidence in support of Mr. Fulks's ID claim that makes it reviewable under § 2241 in the same way that the newly–discovered evidence in *Webster* allowed the petition in that case to proceed under § 2241.

**b.    Petitioner's claim that he satisfies prong two relies on *Hall*, *Moore*, and newly adopted diagnostic criteria.**

138. As explained immediately above, before 2014, Supreme Court jurisprudence did not mandate that lower courts apply clinical standards in assessing an *Atkins* claim. Although this changed with the Court's decision in *Hall*, that case was limited to discussing the appropriate medical consensus regarding a prong–one evaluation. Thus, even in the wake of *Hall*, courts continued to ignore up–to–date medical consensus applicable to a prong two evaluation. For instance, in 2015, the Fourth Circuit rejected a petitioner's claim that the outcome of his sentencing would have been different had his jury been instructed pursuant to *Hall*, relying in particular on the evidence relating to his adaptive functioning. *See Prieto v. Zook*, 791 F.3d 465, 470–72 (4th Cir. 2015). In its analysis, the court deviated from the current diagnostic standards in several ways, including: overemphasizing the petitioner's perceived adaptive strengths, relying on erroneous lay stereotypes of intellectual disability, and considering the petitioner's criminal conduct and behavior in prison as part of the adaptive–deficits analysis. *See id.*; DSM–5 at 34–35, 38; AAIDD–2010 at 47, 49; AAIDD–2012 at 20, 60; *Moore–I*, 137 S. Ct. at 1046, 1050–52, n.6; *Moore–II*, 2019 U.S. LEXIS 821 at *9–13. The court also appeared to disregard

evidence of significant risk factors for intellectual disability in the petitioner's history, which was also contrary to current diagnostic standards. *See Prieto*, 791 F.3d at 470–72; DSM–5 at 39; AAIDD–2010 at 57–62; *Moore–I*, 137 S. Ct. at 1051; *Moore–II*, 2019 U.S. LEXIS 821 at *5.

139.    Notably, the district court that presided over Mr. Fulks's sentencing and § 2255 proceedings committed similar errors just two years earlier in denying § 2255 relief to Mr. Fulks's co–conspirator, Brandan Basham. Specifically, the court found that Mr. Basham had failed to satisfy prong two of his *Atkins* claim based entirely on "the various 'skills' that Basham exhibited on his and Fulks's seventeen–day crime spree," agreeing with the Government that "Basham's actions clearly show that he operated at a level exceeding the ceiling abilities for mental retardation." *Basham v. United States*, 109 F. Supp. 3d 753, 841 (D.S.C. 2013). Among other unscientific aspects of the district court's analysis is the fact that it disregarded then–current diagnostic criteria expressly excluding criminal behavior from the adaptive behavior assessment. *See* AAIDD–2012 at 20; AAIDD–2010 at 49. Indeed, one of the seven so–called "*Briseño* factors" employed by Texas courts in assessing *Atkins* claims—the use of which was specifically struck down by the Supreme Court in *Moore*—asked the court to consider whether the petitioner's "offense require[d] forethought, planning, and complex execution of purpose?" *Moore–I* at 1046 n.6. As the Court observed in *Moore*, the *Briseño* factors were an "invention of the [Texas Court of Criminal Appeals] untied to any acknowledged source." *Id.* at 1044. It continued: "Not aligned with the medical community's information, and drawing no strength from our precedent, the *Briseño* factors 'creat[e] an unacceptable risk that persons with intellectual disability will be executed.'" *Id.* (quoting *Hall*, 134 S. Ct., at 1990).

140.    There is no reason to believe that, had Mr. Fulks asserted an *Atkins* claim in his § 2255 petition, the district court would have analyzed prong two of his claim any differently

52

than it analyzed that of Mr. Basham. However, post–*Moore*, it is clear that such an analysis is contrary to diagnostic standards and invalid. Hence, Mr. Fulks is now able to assert a successful *Atkins* claim on a legal basis that was not available to him at the time of his initial § 2255 proceedings.

141. Additionally, the new prong two diagnostic criteria in the AAIDD–2012 and DSM–5, each of which was published after the district court denied Mr. Fulks's § 2255 petition, constitute new factual bases not available at the time of his § 2255 proceedings. For instance, both the AAIDD–2012 and the DSM–5 made clear for the first time that it is critical to avoid the use of stereotypes in assessing adaptive functioning. The AAIDD–2012 expressly identifies numerous commonly held, but erroneous, stereotypes relating to individuals with intellectual disability which "are unsupported by both professionals in the field and published literature" and "must be dispelled." AAIDD–2012 at 60; *see also id.* (warning that "a number of incorrect stereotypes" about ID "can interfere with justice"). These invidious stereotypes include that individuals with ID: "look and talk differently from persons from the general population," "are completely incompetent and dangerous," "cannot do complex tasks," "cannot get driver's licenses, buy cars, or drive cars," "do not (and cannot) support their families," "cannot romantically love or be romantically loved," "cannot acquire vocational and social skills necessary for independent living," and "are characterized only by limitations and do not have strengths that occur concomitantly with the limitations." *Id.*

142. The DSM–5 confronts several of these stereotypes by explicitly recognizing that persons with significant adaptive deficits can, inter alia, have romantic relationships in adulthood, maintain competitive employment in jobs that do not emphasize conceptual skills, function age–appropriately in personal care, arrange for their own transportation and manage

money with support, raise a family with support, and develop a variety of recreational skills. *See*

DSM–5 at 34–35. The DSM–5 also provides more guidance as to what constitutes deficits in

adaptive functioning. *Id.* at 34–36.

143.    As with the new diagnostic criteria relating to prong one, the prong two criteria

that appeared for the first time in the AAIDD–2012 and DSM–5 constitute new factual bases

supporting Mr. Fulks's ID claim that were not available at the time of his § 2255 proceedings.

Together with the legal developments in *Moore–I*, these facts render Mr. Fulks's claim

appropriate for this Court's review under § 2241.

### 2.    Petitioner's Claim Challenges the Execution—not the Imposition—of His Sentence, as well as the Fundamental Legality of that Sentence.

144.    As explained above, § 2241 is the appropriate vehicle for claims that challenge

the execution, as opposed to the imposition, of a petitioner's sentence. This use of § 2241 has

been explained as follows:

> [F]ederal prisoners challenging some aspect of the execution of their sentence,
> such as denial of parole, may proceed under Section 2241. This difference arises
> from the fact that Section 2255, which like Section 2241 confers habeas corpus
> jurisdiction over petitions from federal prisoners, is expressly limited to
> challenges to the validity of the petitioner['s] sentence. Thus, Section 2241 is the
> only statute that confers habeas jurisdiction to hear the petition of a federal
> prisoner who is challenging not the validity but the execution of his sentence.

*Coady v. Vaughn*, 251 F.3d 480, 485 (3d Cir. 2001); *see also Valona*, 138 F.3d at 694 (7th Cir.

1998) ("A motion seeking relief on grounds concerning the execution but not the validity of the

conviction and sentence . . . may not be brought under § 2255 and therefore falls into the domain

of § 2241.").

145.    Here, Mr. Fulks is not claiming that his sentence violated *Atkins* at the time it was

imposed. Rather, consistent with the Supreme Court's decision in *Moore–I*, he claims that his

sentence is now unconstitutional under newly evolved diagnostic standards. *See Moore–I*, 137 S.

Ct. at 1050–53 (reversing Texas's denial of petitioner's *Atkins* claim, in part, because Texas employed diagnostic standards in effect at the time of petitioner's sentencing, as opposed to those current at the time of post–conviction review). And, because § 2241 contemplates challenges to the execution of petitioner's sentence, rather than the imposition, Mr. Fulks's claim that he is presently ineligible for the death penalty under *Atkins* and its progeny is properly brought under § 2241.

146.    Section 2241 is also the appropriate avenue of relief where the petitioner challenges the "fundamental legality" of his or her sentence. *Webster*, 784 F.3d at 1124–25 (7th Cir. 2015). The *Webster* court held that the petitioner had properly filed a § 2241 petition to establish that his intellectual disability made him ineligible for the death penalty. It described the "'Kafkaesque' nature of a procedural rule that, if construed to be beyond the scope of the savings clause, would (or could) lead to an unconstitutional punishment." *Id*. at 1139. It accordingly recognized that, where a "structural problem" prevents a petitioner from bringing a second § 2255 motion, the petitioner may in some circumstances (there, because of the availability of new facts), bring a § 2241 petition. *Id*. "To hold otherwise," the Seventh Circuit explained, "would lead in some cases . . . to the intolerable result of condoning an execution that violates the Eighth Amendment." *Id.*; *see also id.* (noting that "a core purpose of habeas corpus is to prevent a custodian from inflicting an unconstitutional sentence").

147.    Under current legal and diagnostic standards, Mr. Fulks is an intellectually disabled person. As such, precluding him from raising his *Atkins* claim under § 2241 to challenge the execution and fundamental legality of his unconstitutional death sentence would lead to precisely the "intolerable result" against which the *Webster* court warned.

**II. BECAUSE MR. FULKS HAS THE SAME COGNITIVE AND ADAPTIVE FUNCTIONING DEFICITS EXHIBITED BY THE INTELLECTUALLY DISABLED, HE IS CATEGORICALLY INELIGIBLE FOR THE DEATH PENALTY.**

148. Claim I establishes that Chad Fulks is ineligible for the death penalty on diagnostic grounds: he is intellectually disabled and meets all the criteria for intellectual disability. He is also ineligible on functional grounds, because, even assuming he is not intellectually disabled, his impairments satisfy all the requirements set forth in *Atkins*. Throughout his life, Mr. Fulks has suffered from the same adaptive deficits, measured by the same tests and clinical assessments, as the intellectually disabled. His deficits have impaired his functioning in the conceptual, social, and practical domains. He has longstanding deficits in intellectual functioning, with his three most recent IQ scores falling in the intellectually disabled range.

149. In *Madison v. Alabama*, 2019 U.S. LEXIS 1595, ___ S. Ct. ___ (Feb. 27, 2019), the Supreme Court recently established that the Eighth Amendment forbids the execution of a person whose impaired functioning meets a constitutional test of categorical ineligibility, regardless of the underlying medical diagnosis. *Madison* establishes that Mr. Fulks is constitutionally ineligible for the death penalty for two independent reasons, in addition to the reasons in Claim I. First, his pervasive deficits warrant *Atkins* relief because he has the same lifelong adaptive impairments and the same low adult cognitive functioning as an intellectually disabled person, regardless of whether he qualifies for that medical diagnosis. Second, Mr. Fulks suffers from FASD, a disorder comparable in severity to ID. The adaptive and executive functioning deficits that accompany FASD are the same as those that accompany ID. Therefore, carrying out Mr. Fulks's death sentence would violate the Eighth Amendment for precisely the

same reasons that led the Supreme Court to announce a categorical ban on the intellectually disabled in *Atkins*.

150. This claim is cognizable under 28 U.S.C. § 2241 because: (a) it relies on a new legal basis not available to Mr. Fulks at the time of his trial proceedings or his § 2255 proceedings; (b) it addresses the fundamental legality of his sentence; and (c) it involves a challenge to the execution—as opposed to imposition—of his sentence under the Eighth Amendment.

**A. The Eighth Amendment Prohibits the Execution of Individuals, Such as Mr. Fulks, Who Suffer from Deficient Cognitive Functioning and Adaptive Deficits Resulting from Fetal Alcohol Exposure.**

151. As discussed extensively above, the Supreme Court held in *Atkins* that the punishment of death for intellectually disabled offenders was excessive or disproportionate to their crimes. 536 U.S. at 311. Three years later, in *Roper v. Simmons*, 543 U.S. 551 (2005), the Court used similar reasoning to hold that juvenile offenders were also ineligible for the death penalty. *Id.* at 568.

152. To make these judgments, the Court applied the "evolving standards of decency that mark the progress of a maturing society." *Atkins*, 536 U.S. at 311–12 (quoting *Trop v. Dulles*, 356 U.S. 86, 100–101 (1958)); *Roper*, 543 U.S. at 560–61. However, this objective evidence, while important, was not dispositive for either of these determinations. The Constitution, the Court held, required it to exercise its own judgment about whether there was a "reason to disagree with" the societal consensus. *Atkins*, 536 U.S. at 312–13. Regarding the intellectually disabled, the Court found:

> [Intellectually disabled] persons frequently know the difference between right and wrong, and are competent to stand trial. Because of their impairments, however, by definition they have diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand

the reactions of others. There is no evidence that they are more likely to engage in criminal conduct than others, but there is abundant evidence that they often act on impulse rather than pursuant to a premeditated plan, and that in group settings they are followers rather than leaders. Their deficiencies do not warrant an exemption from criminal sanctions, but they do diminish their personal culpability.

*Id.* at 318.

153.    Similarly, in *Roper*, the Supreme Court found that juveniles have a "lack of maturity and underdeveloped sense of responsibility," that they "are more vulnerable or susceptible to negative influences and outside pressures," and that the "character of a juvenile is not as well formed as that of an adult." *Roper*, 543 U.S. at 569–70.

154.    Furthermore, regarding the intellectually disabled, the Court held that:

The risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty . . . is enhanced . . . by the lesser ability of [intellectually disabled] defendants to make a persuasive showing of mitigation in the face of prosecutorial evidence of one or more aggravating factors. [Intellectually disabled] defendants may be less able to give meaningful assistance to their counsel and are typically poor witnesses, and their demeanor may create an unwarranted impression of lack of remorse for their crimes.

*Atkins,* 536 U.S. at 320–21.

155.    These deficiencies prevented either of the traditionally recognized justifications for capital punishment—retribution or deterrence—from applying to offenders who were intellectually disabled or offenders who were under the age of eighteen at the time of the crime. *Id.* at 319; *Roper*, 543 U.S. at 570. Accordingly, the Court concluded that executing intellectually disabled defendants and juveniles constituted cruel and unusual punishment.

156.    Most recently, the Court has adopted a functional, instead of a diagnostic, test for deciding whether an individual's limitations categorically exclude him or her from eligibility for capital punishment. *See Madison*, 2019 U.S. LEXIS 1595. *Madison* considered whether a prisoner's "insanity" rendered him ineligible for execution under the Eighth Amendment, and

58

applied the test enunciated in *Panetti v. Quarterman*, 551 U.S. 930 (2007): whether "'the

prisoner's mental state is so distorted by mental illness' that he lacks a 'rational understanding'

of 'the State's rationale for his execution.'" *Madison*, 2019 U.S. LEXIS 1595 at *7 (quoting

*Panetti*, 551 U.S. at 958–60). In contrast to the prisoners in *Panetti* and the Court's earlier

opinion in *Ford v. Wainwright*, 477 U.S. 399 (1986), Madison suffered from dementia, not

delusions. Justice Kagan, for the majority, found the diagnosis constitutionally irrelevant:

> *Panetti* framed its test, as just described, in a way utterly indifferent to a
> prisoner's specific mental illness. The *Panetti* standard concerns, once again, not
> the diagnosis of such illness, but a consequence—to wit, the prisoner's inability to
> rationally understand his punishment. And here too, the key
> justifications *Ford* and *Panetti* offered for the Eighth Amendment's bar confirm
> our conclusion about its reach. As described above, those decisions stated that an
> execution lacks retributive purpose when a mentally ill prisoner cannot
> understand the societal judgment underlying his sentence. And they indicated that
> an execution offends morality in the same circumstance. Both rationales for the
> constitutional bar thus hinge (just as the *Panetti* standard deriving from them
> does) on the prisoner's "[in]comprehension of why he has been singled out" to
> die.

*Madison*, 2019 U.S. LEXIS 1595 at *20 (citations omitted). The Court remanded the case with

directions that the State address Madison's impairments in light of the appropriate Eighth

Amendment test, "even though he suffers from dementia, rather than delusions." *Id*., 2019 U.S.

LEXIS 1595 at *15.

157.     *Madison* requires a functional assessment of a particular prisoner's impairments.

It also requires a functional assessment of disorders other than ID. Since *Atkins*, informed

observers increasingly have recognized that other severe mental disorders are morally

indistinguishable from intellectual disability. In 2006, the American Bar Association adopted a

resolution providing in relevant part that:

> Defendants should not be executed or sentenced to death if, at the time of the
> offense, they had a severe mental disorder or disability that significantly impaired
> their capacity (a) to appreciate the nature, consequences or wrongfulness of their

conduct, (b) exercise rational judgment in relation to conduct, or (c) conform their conduct to the requirements of law.

*       *       *

A sentence of death should not be carried out if the prisoner has a mental disorder or disability that significantly impairs his or her capacity (i) to make a rational decision to forgo or terminate post–conviction proceedings available to challenge the validity of the conviction or sentence; (ii) to understand or communication pertinent information, or otherwise assist counsel, in relation to specific claims bearing on the validity of the conviction or sentence that cannot be fairly resolved without the prisoner's participation; or (iii) to understand the nature and purpose of the punishment, or to appreciate the reason for its imposition in the prisoner's own case.

American Bar Association, Resolution 122A (Aug. 7–8, 2006) *reprinted in* 30 Mental and Physical Disabilities Law Review 668 (Sept.–Oct. 2006). The American Psychiatric Association and the American Psychological Association had previously adopted this resolution in identical form. *Id.*

158. Several experienced jurists, faced with the excruciatingly difficult duty of reviewing death sentences imposed on defendants who suffer severe mental disabilities, have concluded that the categorical exclusion of *Atkins* should be extended to individuals with serious mental illness. In *Corcoran v. State*, 774 N.E.2d 495 (Ind. 2002), Justice Rucker, citing *Atkins* and dissenting, wrote:

> There has been no argument in this case that Corcoran is mentally retarded. However, the underlying rationale for prohibiting executions of the mentally retarded is just as compelling for prohibiting executions of the seriously mentally ill, namely evolving standards of decency. . . . I would hold that a seriously mentally ill person is not among those most deserving to be put to death. To do so in my view violated the Cruel and Unusual Punishment provision of the Indiana Constitution.

*Id.* at 502–03; *accord State v. Scott*, 748 N.E.2d 11, 20 (Ohio 2001) (Pfeifer, J., dissenting) ("evolving standards of decency" should preclude execution of defendant who has chronic schizophrenia, a medical disease); *see also State v. Ketterer*, 855 N.E.2d 48, 81–

60

87 (Ohio 2006) (Stratton, J., concurring) (citing ABA resolution, and concluding that "[t]he time has come for our society to reexamine the execution of persons with severe mental illness"). Other jurists have voiced similar reservations in other contexts, as have representatives of religious communities, the European Union, and the United Nations Commission for Human Rights. *See* Laurie T. Izutsu, Note, *Applying* Atkins v. Virginia *to Capital Defendants With Severe Mental Illness*, 70 Brook. L. Rev. 995, 1007–10 & nn.86–103 (2005) (collecting references). National polling data, too, reflect increasing public opposition to the execution of those with severe mental impairments. *Id.* at 1010–11 & nn.105–16.

159. As discussed in greater detail below, Mr. Fulks's specific deficits make him functionally ineligible for the death penalty. Just as Mr. Madison could be constitutionally ineligible for execution if his impairments satisfied *Panetti* and *Ford*, regardless of his diagnosis, Mr. Fulks is constitutionally ineligible for execution if his impairments satisfy *Atkins*, independently of whether he qualifies for an ID diagnosis. Moreover, FASD—another diagnosis that applies to Mr. Fulks—impairs judgment, reasoning, impulse control, and the ability to appreciate consequences. It is a congenital birth defect that originates *in utero* for reasons beyond the sufferers' control. Thus, the *Atkins* Court's reasons for declaring the execution of the intellectually disabled unconstitutional apply equally to those who, like Chad Fulks, suffer from FASD: "Because of their disabilities in areas of reasoning, judgment, and control of their impulses . . . they do not act with the level of moral culpability that characterizes the most serious adult criminal conduct." *Atkins*, 536 U.S. at 306.

**B.**     **Mr. Fulks's Cognitive and Adaptive Deficits Render Him Ineligible for the Death Penalty.**

  **1.**  **Both Mr. Fulks's Adult IQ Scores and His Lifelong Adaptive Functioning Fall in the Intellectually Disabled Range and Render Him Categorically Ineligible for the Death Penalty.**

160. As discussed in detail in Claim I, Mr. Fulks received three IQ tests in adulthood, over the course of a single ten–month period. On the first, he received a Flynn–corrected score of 75, which falls squarely within the range of intellectual disability. The second and third scores fell one and two points, respectively, above the presumptive range for ID when corrected for the Flynn Effect. *See* Report, Barry M. Crown, Ph.D., at 6 (App. 0006). According to Dr. Crown, practice effects could explain these slightly higher scores, given their proximity to first test. Dr. Crown found that, "overall, this pattern of test results is within the range for intellectual disability." *Id*.

161. As Claim I also discusses in detail, Mr. Fulks's lifelong adaptive functioning has manifested significant deficits in multiple domains that more than satisfy the second requirement for an ID diagnosis. Dr. Brown administered a recognized test of adaptive behavior, the Vineland Adaptive Behavior Scales – 3rd Edition. Mr. Fulks scored at or below the first percentile in all three of the tested domains, communication, daily living skills, and socialization. *See* Report, Natalie Novick–Brown, Ph.D., at 32–34 (App. 0082–84). In addition, Dr. Brown, after conducting an extensive record review, interviewing third parties who had known Mr. Fulks, and considering other third–party reports, found Mr. Fulks deficient in multiple domains. *In the conceptual domain*, he had deficits in functional academics, learning and memory, executive functioning, and communication; *in the social domain*, he had deficits in coping and interpersonal behaviors; and *in the practical domain*, he had deficits in recreation and self–management. *Id.* at 39–53 (App.0089–0103).

162. It is constitutionally irrelevant whether Mr. Fulks also qualifies for a formal ID diagnosis, as established in Claim I. As an adult, he fully satisfies the functional criteria for ID—significantly subaverage intellectual functioning and significantly deficits in adaptive behavior. As in *Madison*, therefore, he is constitutionally ineligible for the death penalty.

### 2. Mr. Fulks's FASD Renders Him Categorically Ineligible for the Death Penalty.

163. FASD is an umbrella term for a spectrum of birth defects and central nervous system ("CNS") impairments caused by prenatal exposure to alcohol. Mr. Fulks's test results amply satisfy the criteria for CNS impairments necessary for an FASD diagnosis:

> [N]europsychological testing by four different psychologists, using a variety of tests, found significantly impaired functioning (i.e., 1 or more standard deviations below the mean) in **nine** domains per CDC guidelines for neurocognitive disability in FAS or **eight** domains (excluding Academics) under more stringent 4–Digit Code guidelines (i.e., 2 or more standard deviations below the mean). In either case, the *number of deficient domains is consistent with ID* as well as *consistent with the central nervous system abnormality found in FASD.*

Report, Natalie Novick–Brown, Ph.D., at 57 (App. 0107) (emphasis in original). The sheer number of these dysfunctional domains, and the number of those involving at least moderate impairment, results in a "generalized processing and integration deficit" that impairs his ability to deal with environmental complexity. *Id.* at 64–65 (App. 0114–15).

164. The CNS deficits of FASD cause the same impairments that afflict the intellectually disabled. The *Atkins* Court noted the "diminished capacities" of the intellectually disabled to:

- Understand and process information;

- Communicate;

- Abstract from mistakes and learn from experience;

- Engage in logical reasoning;

- Control impulses; and

- Understand the reactions of others.

536 U.S. at 318. The Court observed that, in group settings, the intellectually disabled tend to act as "followers rather than leaders." *Id*. It held that, because of these qualities, executing the intellectually disabled would not "measurably further" the goals of retribution or deterrence, and that accordingly "such punishment is excessive and [] the Constitution 'places a substantive restriction on the State's power to take the life' of a mentally retarded offender." *Id.* at 321 (quoting *Ford*).

165.     Those who suffer from FASD have similar limitations. As Dr. Davies describes:

> The brain injuries caused by drinking during pregnancy are variable, but can include such outcomes as lower IQ, ADHD (attention deficit/hyperactivity disorder), difficulties with judgment and impulse control, language and social difficulties, learning disabilities, visuospatial deficits, motor and coordination challenges, memory problems, and impairments in executive functions – "higher–level" cognitive skills like flexibility, planning, organization, inhibition, judgment, and novel problem–solving. Individuals with FASDs have daily functioning skills and life outcomes that are often more impaired than their IQ alone would predict.

Report, Julian Davies, M.D., at 1 (App. 0012) (citing A.P. Streissguth et al., *Risk Factors For Adverse Life Outcomes In Fetal Alcohol Syndrome And Fetal Alcohol Effects*, 25(4) Journal of Developmental & Behavioral Pediatrics 228–38 (2004)).

166.     Mr. Fulks, like others with FASD, has suffered from all the impairments described in *Atkins* throughout his life.

167.     *Understanding and processing information*: Achievement testing in Mr. Fulks's adult years showed "deficits in most academic domains" and "deficits as low as 2.5 standard deviations below the mean" in tests of memory and learning. He scored as low as 2.5 standard deviations below the mean in tests of his visuospatial processing skills, which are associated with

learning disabilities in mathematics, and as low as 3.3 standard deviations below the mean in tests of processing speed. Report, Natalie Novick–Brown, Ph.D., at 60, 61 (App. 0110, 0111). Mr. Fulks received special education services from his second year of first grade through junior high. *Id.* at 39 (App. 0089). Beginning in kindergarten, achievement testing during his school years "indicated learning deficiency in all academic areas." *Id.* at 40 (App. 0090).

168. *Communication*: School records show that he received speech therapy throughout his school years. He received significantly low scores in comprehension on a structured rating instrument called the Devereux in third grade, and reporters who knew him in childhood described his indistinct speech. Testing of his communications skills found deficits that fell as low as two standard deviations below the mean, which was consistent with his childhood deficits. *Id.* at 47–49, 63 (App. 0097–99, 113).

169. *Abstracting from mistakes and learning from experience*: Behavior Screens administered to a teacher, a neighbor, a cousin, and a school counselor who knew Mr. Fulks reported their "concordan[t]" recollections of his "inflexible" and "stubborn" behaviors. He was unable to explain to his fifth grade Behavioral Disorder teacher "what started problems, why he got involved, or why he did things." *Id.* at 49 (App. 0099). As Dr. Brown explains:

> The generalized processing deficit in FASD explains why Mr. Fulks cannot think quickly (i.e., deficient processing speed) or generalize (i.e., deficient executive functioning) in the context of a 'new' experience that doesn't exactly resemble an old event. Consistent with the generalized processing deficit, Mr. Fulks' history was replete with examples of situations where he made bad decisions, showing he did not learn from experience or cope adequately when left to his own devices.

*Id.* at 65 (App. 0115).

170. *Logical reasoning*: "Executive dysfunction is *the* hallmark deficit in FASD." *Id.* at 62 (App. 0112). As Dr. Brown explains, "the executive system in an *intact* brain will conduct a complex reasoning process that includes considering consequences, weighing risks/benefits,

and linking cause and effect while resisting inappropriate impulses from the limbic system—*all*

*before communicating with the body about how to act. . . .* If executive functioning [] is

impaired, then the process of conscious cognitive processing will be faulty and produce adaptive

dysfunction." *Id.* at 64 (App. 0114) (emphasis in original). Among other deficiencies in the

components of executive functioning, "those with FASD tend to have problems on

neuropsychological tests that assess cognitive planning . . . and multiple measures of concept

formation." Mr. Fulks's scores on tests of executive function amply demonstrated deficiencies in

this domain, falling as low as 2.0 standard deviations below the mean and in one case more than

4.0 standard deviations below the mean. *Id*. at 62–63 (App. 0112–13). Reporters who completed

behavioral screens concurred on his deficiencies in consequential thinking, and his junior high

school psychologist reported that "his verbal impairments prevented him from reasoning, [and]

that his abilities to think abstractly and learn from experience were very limited." *Id.* at 46 (App.

0096).

171. *Impulsivity*: Impulsivity in FASD also stems from executive functioning deficits.

The literature contains "consistent empirical evidence of impairments in . . . response inhibition

and executive control." *Id.* at 62–63 (App. 0112–13). As discussed above, Mr. Fulks achieved

deficient scores in tests of executive functioning as an adult. Standardized behavior rating in

third grade found that he lacked self–regulatory control. *Id.* at 45 (App. 0095) Many reporters

described his impulsive behaviors. Report, Natalie Novick–Brown, Ph.D., at 46 (App. 0096). As

Dr. Brown explains:

> The generalized [processing] deficit does not mean a person with FASD cannot
> lead others or plan or make choices. However, it does mean that the capacity to
> lead, plan, and make choices will be flawed by deficient executive processing.
> That is, executive processes such as considering consequences and weighing
> options will be biologically derailed by strong emotions and urges from the limbic
> system that the individual does not have the executive capacity to override.

*Id.* at 65–66 (App. 0115–16).

172.     *Understanding reactions of others*: On a standardized screening instrument, the Fetal Alcohol Behavior Screen, three persons who had known Mr. Fulks in childhood or youth gave concordant reports about the following behaviors: he had trouble playing on a team, established superficial friendships easily but had no close friends, and seemed unaware of "good manners." *Id.* at 50 (App. 0100). His cousin recalled that he "didn't know how to connect socially," and a teacher described him as "weak in social reciprocity." *Id.* at 51 (App. 0101). A junior high school counselor reported that he lacked social graces and did not understand humor or jokes. *Id.*

173.     *Following*: Multiple persons who had known Mr. Fulks as a child described him as a follower. *Id.* at 50–51 (App. 0100–01).

174.     After reviewing these and other adaptive deficits, Dr. Brown concluded:

> Data from multiple, independent, convergent sources indicate Mr. Fulks exhibited cognitive, intellectual, and adaptive impairments across his lifespan that are consistent with FASD. FASD is a medical defect that impairs judgment and ability to consider consequences and control behavior, including criminal behavior.

*Id.* at 66 (App. 0116). Dr. Davies, relying on the "very poor adaptive functioning described in Dr. Brown's report," concluded that "[o]n the fetal alcohol spectrum, Mr. Fulks's brain injuries and overall functioning qualify as severe." Report, Julian Davies, M.D., at 28 (App. 0039).

175.     Executing a person who suffers from the CNS deficits of FASD no more serves the retributive or deterrent purposes of capital punishment than executing the intellectually disabled. Mr. Fulks's FASD, no less than his intellectual disability, should render him ineligible for the death penalty under the Eighth Amendment.

**C.      The Claim Is Cognizable Under § 2241.**

176.      Mr. Fulks appropriately brings this claim under 28 U.S.C. § 2241. As discussed in Claim I, a federal prisoner may obtain habeas review under § 2241 when § 2255 is "inadequate or ineffective to test the legality of his detention" or sentence. 28 U.S.C. § 2255(e); *see also Brown*, 719 F.3d at 586–89. The courts have recognized the availability of § 2241 various types of cases. They have sometimes reviewed claims that rely on new legal bases not available at the time of petitioners' trial proceedings or § 2255 proceedings. *See, e.g.*, *Garza*, 253 F.3d at 924–25; *Davenport*, 147 F.3d at 607–09. Courts have also found § 2255 "inadequate" when it prevents a prisoner from obtaining review of a legal theory that establishes his or her actual innocence, *see Kramer*, 347 F.3d at 217 (citing *Taylor v. Gilkey*, 314 F.3d 832, 835 (7th Cir. 2002)), or one that addresses the "fundamental legality" of a sentence, *Webster*, 784 F.3d at 1124–25. In other cases, courts have recognized the cognizability of claims under § 2241 that challenged the execution, as opposed to the imposition, of petitioners' sentences. *See Kramer*, 347 F.3d at 217; *Valona*, 138 F.3d at 694.

177.      Mr. Fulks's claim should likewise receive § 2241 review because he relies on new legal developments that establish the unconstitutionality of his sentence, and challenges the execution rather than the imposition of that sentence.

178.      First, Mr. Fulks relies on *Madison* to support his claim that he is functionally ineligible for the death penalty. The Supreme Court decided *Madison* on February 27, 2019, long after his trial, direct appeal, and § 2255 proceedings. A "structural problem" prevents him from seeking permission for a second § 2255 motion, *see Webster*, 784 F.3d at 1139, because the new evidence on which he relies does not establish that "no reasonable factfinder would have found [him] guilty," and the Supreme Court has not explicitly declared *Madison*'s retroactivity. *See* 28 U.S.C. § 2255(h)(1), (2).

68

179. Second, as in *Webster*, 784 F.3d at 1124–25, Mr. Fulks challenges the "fundamental legality" of his sentence. He relies on a series of cases, beginning with *Atkins* and culminating in *Madison*, that establish its unconstitutionality. *See Atkins*, 536 U.S. 304 (Eighth Amendment prohibits imposition of death penalty on the intellectually disabled); *Roper*, 543 U.S. 551 (Eighth Amendment prohibits imposition of death penalty on individuals who were under the age of eighteen at the time of the offense); *Kennedy v. Louisiana*, 554 U.S. 407 (2008) (Eighth Amendment prohibits imposition of death penalty for non–homicide offenses, including rape of child); *Graham v. Florida*, 560 U.S. 48 (2010) (Eighth Amendment prohibits imposition of sentence of life without parole sentence on juvenile offenders not convicted of homicide); *Miller v. Alabama*, 132 S. Ct. 2455 (2012) (Eighth Amendment precludes mandatory life in prison without possibility of parole for juvenile homicide offenders); *Hall*, 134 S. Ct. 1986 (categorical exemption for intellectually disabled established in *Atkins* cannot be statutorily limited to those with an IQ score falling below a certain number); *Moore–I*, 137 S. Ct. at 1053 (2017) (assessment for categorical exemption for intellectually disabled must employ current medical standards). As in *Webster*, a construction of the § 2255 savings clause that prevented Mr. Fulks from making this claim would qualify as "Kafkaesque." *Webster*, 784 F.3d at 1139.

180. Finally, Mr. Fulks challenges the execution of his sentence. Even if petitioners in other cases have obtained *Atkins* relief before trial, on appeal, or in initial post–conviction and habeas proceedings, executing a person ineligible for the death penalty remains unconstitutional regardless of the validity of his conviction or the imposition of his sentence. Mr. Fulks therefore appropriately invokes § 2241 to challenge the execution of his own death sentence.

181. Chad Fulks has struggled throughout his life with profound CNS deficits that followed him from the womb, impaired his development, and prevented him from understanding

and functioning adaptively in the world. This Court should recognize his ineligibility for the

death penalty and grant him § 2241 relief on this ground.

**III.     PETITIONER'S SENTENCE OF DEATH WAS OBTAINED IN VIOLATION OF HIS SIXTH AMENDMENT RIGHT TO COUNSEL (WITHDRAWN).**

182.     Petitioner withdraws this claim, which was originally advanced in his petition for

writ of habeas corpus, filed on January 29, 2015 (Dkt. 1).

## REQUEST FOR RELIEF

For all of the above reasons, and based upon the full record of this matter, Petitioner requests that the Court provide the following relief:

A) That an evidentiary hearing be conducted on the merits of Petitioner's claims, any procedural issues, and all disputed issues of fact;

B) That leave to amend this Petition be granted, if necessary, after further fact development through investigation and an evidentiary hearing;

D) That Petitioner be allowed a reasonable time to file a memorandum of law in support of this Petition following any further fact development or following the denial of fact development; that the Government be allowed a reasonable time to respond; and that Petitioner be allowed a reasonable time to reply;

E) That habeas relief from Petitioner's sentence of death be granted.

Respectfully submitted,

/s/ Peter Williams
PETER WILLIAMS
CLAUDIA VAN WYK
Assistant Federal Defenders
Federal Community Defender Office
for the Eastern District of Pennsylvania
601 Walnut Street, Suite 545 West
Philadelphia, PA 19106
Tel: 215.928.0520
Fax: 215.928.0826
pete_williams@fd.org
claudia_vanwyk@fd.org

Dated: March 8, 2019

**CERTIFICATE OF SERVICE**

I, Peter Williams, hereby certify that on this 8th day of March, 2019, a copy of the

forgoing was served via ECF filing on the following person:


Winfield D. Ong, Esquire
Assistant United States Attorney
Office of the United States Attorney
Southern District of Indiana
10 West Market Street, Suite 2100
Indianapolis, IN 46204–3048


/s/ Peter Williams
Peter Williams