# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF INDIANA
### TERRE HAUTE DIVISION

CHADRICK EVAN FULKS,

               Petitioner,

           v.

J. E. KRUEGER, Warden, USP Terre Haute,
UNITED STATES OF AMERICA

               Respondents.

CIVIL ACTION
(Capital Habeas Corpus)

No. 2:15–cv–00033–WTL–MJD

**Hon. William T. Lawrence**
**United States District Judge**

## APPENDIX TO
## AMENDED PETITION FOR WRIT OF HABEAS CORPUS
## PURSUANT TO 28 U.S.C. § 2241

### VOLUME I
### APP. 00001 TO APP. 00320

PETER WILLIAMS
CLAUDIA VAN WYK
Assistant Federal Defenders
Federal Community Defender Office
for the Eastern District of Pennsylvania
601 Walnut Street, Suite 545 West
Philadelphia, PA 19106
Tel: 215.928.0520
Fax: 215.928.0826
pete_williams@fd.org
claudia_vanwyk@fd.org

*Counsel for Petitioner*

Dated: March 8, 2019

# Index to Appendix

**VOLUME I**

Expert Reports and Declarations

1. Report by Barry M. Crown, Ph.D. – March 6, 2019.................................................00001

2. Report by Julian Davies, M.D. – March 4, 2019 .....................................................00012

3. Report by Natalie Brown, Ph.D. – February 11, 2019.............................................00051

4. Report by David Bachman, M.D. – July 31, 2013....................................................00188

5. Declaration of Seymour Halleck, M.D. – September 17, 2010 ................................00190

6. Declaration of Margaret Melikian, D.O. – September 17, 2010..............................00193

7. Declaration of James H. Hilkey, Ph.D. – September 16, 2010................................00196

8. Declaration of Harry Krop, Ph.D. – September 16, 2010.........................................00199

9. Declaration of James H. Hilkey, Ph.D. – June 2, 2008............................................00209

10. Declaration of Margaret Melikian, D.O. – May 27, 2008 ......................................00223

11. Declaration of Seymour Halleck, M.D. – May 9, 2008...........................................00236

12. Report by Ruben C. Gur, Ph.D. – June 13, 2004.....................................................00261

13. Report by James H. Hilkey, Ph.D. – May 7, 2004...................................................00271

14. Report by Jonathan Venn, Ph.D. – March 30, 2004 ................................................00277

15. Report by Ralph Newman, M.D. et al. – February 19, 2004 ...................................00294

16. Letter from Jonathan E. Walker, M.D. to Jim Evans, Ph.D.
    January 14, 2004 .....................................................................................................00313

17. Report by James Evans, Ph. D. – January 8, 2004...................................................00315

**VOLUME II**

Witness Declarations

18. Declaration of Linda Adkins – January 27, 2017 ....................................................00321

19. Declaration of Laura Cooper – September 15, 2016 ...............................................00323

20. Declaration of Sharon Dotson – June 18, 2008 .........................................................00326

21. Declaration of Nathan Faulks – June 4, 2008...........................................................00329

22. Declaration of Mike Kaasee – September 14, 2010 ...................................................00332

23. Declaration of Christina Kirkman – January 27, 2017 .............................................00334

24. Declaration of Joy Krug – November 15, 2016..........................................................00336

25. Declaration of Lewis Lambert, Jr. – September 14, 2010 .........................................00356

26. Declaration of Lewis Lambert, Sr. – September 14, 2010.........................................00358

27. Declaration of Marilyn Lauver – November 14, 2016 ..............................................00360

28. Declaration of Kelly Perry – January 27, 2017.........................................................00362

29. Declaration of Russell Spears – May 22, 2018..........................................................00364

Transcripts and Testimony

30. *United States v. Fulks*, 4:02-cr-992 (D.S.C.) Jury Trial Transcript Volume XVI –
    Testimony of Linda Adkins – June 22, 2004........................................................00366

31. *United States v. Fulks*, 4:02-cr-992 (D.S.C.) Jury Trial Transcript Volume XVIII –
    Testimony of Arlene Andrews – June 24, 2004 ...................................................00380

32. *United States v. Fulks*, 4:02-cr-992 (D.S.C.) Jury Trial Transcript Volume XVIII –
    Testimony of David Bachman – June 24, 2004....................................................00482

**VOLUME III**

33. *United States v. Fulks*, 4:02-cr-992 (D.S.C.) Jury Trial Transcript Volume XVIII –
    Testimony of Fred Bookstein – June 24, 2004 .....................................................00568

34. *United States v. Fulks*, 4:02-cr-992 (D.S.C.) Jury Trial Transcript Volume XX –
    Testimony of Christos Davatzikos – June 28, 2004 .............................................00606

35. *United States v. Fulks*, 4:02-cr-992 (D.S.C.) Jury Trial Transcript Volume XVII –
    Testimony of James Evans – June 23, 2004 .........................................................00627

36. *United States v. Fulks*, 4:02-cr-992 (D.S.C.) Jury Trial Transcript Volume XVII –
    Testimony of Martha Floyd – June 23, 2004........................................................00694

37. *United States v. Fulks*, 4:02-cr-992 (D.S.C.) Jury Trial Transcript Volume IV – Testimony of Dewayne Fulks – June 4, 2004...........................................................00706

38. *United States v. Fulks*, 4:02-cr-992 (D.S.C.) Jury Trial Transcript Volume XVI – Testimony of Mark Fulks – June 22, 2004 ..............................................................00762

39. *United States v. Fulks*, 4:02-cr-992 (D.S.C.) Jury Trial Transcript Volume VII – Testimony of Ronnie Fulks – June 9, 2004 ...........................................................00785

**VOLUME IV**

40. *United States v. Fulks*, 4:02-cr-992 (D.S.C.) Jury Trial Transcript Volume VIII – Testimony of Ronnie Fulks – June 10, 2004 ..........................................................00810

41. *United States v. Fulks*, 4:02-cr-992 (D.S.C.) Jury Trial Transcript Volume XII – Testimony of Ruben Gur – June 16, 2004 ...............................................................00825

42. *United States v. Fulks*, 4:02-cr-992 (D.S.C.) Jury Trial Transcript Volume XVII – Testimony of Cindy Harper – June 23, 2004..........................................................01002

43. *United States v. Fulks*, 4:02-cr-992 (D.S.C.) Jury Trial Transcript Volume XVII – Testimony of Sue Hatcher – June 23, 2004 ............................................................01006

44. *United States v. Fulks*, 4:02-cr-992 (D.S.C.) Jury Trial Transcript Volume XVI – Testimony of Kevin Holbrook – June 22, 2004.......................................................01022

45. *United States v. Fulks*, 4:02-cr-992 (D.S.C.) Jury Trial Transcript Volume XVI – Testimony of Brian Messenger – June 22, 2004.......................................................01042

46. *United States v. Fulks*, 4:02-cr-992 (D.S.C.) Jury Trial Transcript Volume XVII – Testimony of Gayle Wolfe – June 23, 2004 .........................................................01055

<u>Records</u>

47. The Gallaher School Results of Selective Screening for Chadrick Fulks – November 25, 1986.................................................................................................................01064

48. The Gallaher School Referral for Multidisciplinary Assessment for Chadrick Fulks – January 6, 1987 .......................................................................................................01065

49. Academic Evaluation Report by Peggy Blatt for Chadrick Fulks February 24, 1987 ....................................................................................................01066

50. Psychological Evaluation Report by Rodney Pardue for Chadrick Fulks

March 4, 1987 ........................................................................................................01073

51. Instructional Recommendation Plan/Individualized Education Program for Chadrick
Fulks – May 12, 1987 ........................................................................................01077

52. Peyton Elementary Review for Chadrick Fulks – March 1, 1989 ............................01078

53. Instructional Recommendation Plan/Individualized Education Program for Chadrick
Fulks – May 15, 1989 ........................................................................................01079

Additional Witness Declarations

54. Declaration of Dicie Fulks – July 17, 2008 ................................................................01082

55. Declaration of Gayle Wolfe – September 15, 2016.................................................01084

# Barry M. Crown, Ph.D. and Associates, P.A.

## 105 E. Gregory Square – Suite 2A

## Pensacola, Florida 32502

## Telephone: (850) 439-5550   Fax:  1 (877) 483-4856

bmcrown@barrycrown.com

In Miami:
9990 S.W. 77th Avenue – Suite 301
Miami, Florida 33156
(305) 665-0771


## NEUROPSYCHOLOGICAL CONSULTATION
## and REVIEW


**FULKS, Chadrick**                              **Date Seen: 4-18-18**

▮▮▮▮▮▮▮▮

CA:   40

Mr. Chadrick "Chad" Fulks, a 40 year old Caucasian male, was seen at the United States Penitentiary at Terre Haute, Indiana on April 18, 2018. He is being held there after a murder conviction and death sentence in the United States District Court, District of South Carolina, Florence Division. The underlying offense(s) occurred in November 2002 when he was 25 years old. I was asked to determine if Mr. Fulks meets the criteria for the diagnosis of Intellectual Disability.

### IDENTIFYING DATA FROM THE DEFENDANT

Mr. Fulks underwent an extensive mental status examination and clinical interview with me. He is a rambling historian and is imprecise in details. The following information is derived from the April 18, 2018 visit.

Mr. Fulks was born in Lincoln County, West Virginia on ▮▮▮▮▮▮▮. His mother worked in care facilities. His father, a Vietnam veteran, "worked on

cars," had a "hillbilly bar," and received SSI. Mr. Fulks reported two male siblings – Ronnie and Shannon. He also had another brother Dewayne, who committed suicide in 2009. He had one sister - Sherry. The parents were heavily alcohol involved. This continued through mother's pregnancy with Mr. Fulks. Mr. Fulks reported that his mother eventually became religious and stopped drinking.

Mr. Fulks grew up in West Virginia, Kentucky, and Indiana and experienced continuing problems in schooling. Additionally, there were problems that involved the juvenile justice system. He also reports setting fire to a trophy at one of his schools. He last attended formal schooling in the 10th grade, but eventually received a GED while being held in a juvenile facility in West Virginia.

After leaving school, Mr. Fulks said that he "ran the streets," drinking and doing drugs. He would break into cars and had a dream of going to Myrtle Beach. He reported living with his brother Dewayne and his brother's wife during adolescence. He reported living with his sister and her boyfriend at ages 15-16.

Mr. Fulks and a girlfriend had a child - Devon. They married at age 18. The child died of cardiac problems when he was 5 months old.

Mr. Fulks reported having a job making sandwiches at a sandwich shop named "Maderight" and working at a Snyder's Restaurant in Tennessee. He also reported that he worked stripping and waxing floors at age 16.

He has made suicide attempts by wrist slicing and also attempted to hang himself. Over the years, he has been placed on various psychotropic medications. First psychiatric involvement began in early adolescence. Prior to that, he had been given psychoeducational interventions.

He reports various activities while in prison. Examples include watching TV, writing, drawing, arts and crafts, and caring for small mice/frogs that are present in prison.

Drinking behavior began at age 9 or 10 with vodka and moonshine. He also inhaled ("huffed") gasoline and paint at that age as well as some sort of "embalming fluid." He also described drinking moonshine made by his Uncle Roy at ages 13-14. He also drank "Mad Dog 20/20." He reported

skipping school and getting drunk in abandoned houses. By 15, he was snorting cocaine and using meth and pills. He was also stealing cars and not just breaking into them.

There is a long history of head trauma with several incidents of loss of consciousness. At the age of 8 or 9, he fell over while playing on a motorcycle in a neighbor's garage and lost consciousness. During that same age-range, while riding a tiny motorcycle, he ran into a station wagon and lost consciousness. He was knocked out fighting with a brother when he was 9 or 10. At age 11, he flew off a bike and "busted my head on the sidewalk." He was hit on the head with a paint can at age 11 or 12 and lost consciousness. He was hit in the head with a rock at ages 13-14, with no loss of consciousness. At 14, he reported attempting suicide by taking Tylenol and losing consciousness. He was in car accidents at ages 15 and 16 with no loss of consciousness, but experienced post-concussive symptoms such as headaches, blurry vision, and/or disorientation afterwards. He was in a car accident at 17 and lost consciousness. He was also bitten in the face by a snake and shot at age 17.

Starting in youth, he has had headaches, which he describes as being in the left frontal area, around the orbit of the left eye, and "on the top near the back of the head." He would break out into cold sweats and would sometimes see things like spiders. His mother would call on "old preachers to come over and pray on me." At 17, he was stabbed with a butcher knife.

He reports that his home life was always dysfunctional to the point that teachers would buy him clothes. He also reports having difficulty reading, suffering from a speech impediment, and receiving special education services. Medical care was minimal at best. Parents were involved in sexual acting out.

## RECORD REVIEW

I have also had the benefit of reviewing several volumes of assembled records containing educational and medical records, reports of psychoeducational, psychological, neuropsychological, psychiatric, medical and neurological evaluations, and transcripts of testimony. I have also reviewed numerous declarations from third parties who knew Mr. Fulks containing recollections of his conditions and behaviors.

I have had the benefit of a detailed report prepared by Natalie Novick Brown, Ph.D., a fetal alcohol expert. Dr. Brown reports that Julian Davies, M.D., has diagnosed Mr. Fulks with Alcohol Related Neurodevelopmental Disorder (ARND) and Static Encephalopathy, Alcohol Exposed. Under DSM-5, Dr. Davies found Neurodevelopmental Disorder associated with Prenatal Alcohol Exposure.

Dr. Novick-Brown conducted an assessment of Mr. Fulks' adaptive behavior, and concluded that Mr. Fulks had significant deficits in the Conceptual, Social, and Practical Domains that were present before the age of 18. She further conducted an assessment of his lifelong functioning as it related to Mr. Fulks' FASD diagnosis, and found it to be consistent with this diagnosis.

I have noted certain relevant elements of Mr. Fulks' assessment history below, but rely on Dr. Novick-Brown's report for a comprehensive description of Mr. Fulks' history.

A Fetal Alcohol Spectrum Disorder was first found by neurologist David Bachman, M.D. Dr. Bachman suggested the possibility of Fetal Alcohol Syndrome in his report of July 31, 2003, and later concluded in his 2004 testimony that Mr. Fulks had an FASD. Dr. Bachman also suggested a borderline range of intelligence to mild retardation. A Mini-Mental Status Examination at the time was 23/30, which is in the impaired range. After issuing his report, Dr. Bachman reviewed an MRI, a PET scan, and an EEG. He noted the presence of a cyst in the right temporal area of the brain visible in the MRI and diffuse abnormality reflected by the PET scan and the EEG.

Analysis of Mr. Fulks' MRI by Fred L. Bookstein, Ph.D., indicated brain abnormalities that were suggestive of FASD.

Christos Davitzikos, Ph.D., independently confirmed abnormalities on imaging using a quantitative analysis of Mr. Fulks' MRI. Dr. Davatzikos identified the presence of a subarachnoid cyst and more widespread abnormalities in the frontal and temporal lobes that were likely to be congenital.

Ruben Gur, Ph.D., using quantitative analysis of PET imaging, found "highly abnormal brain anatomy with reduced volume in the frontal and

limbic region." Dr. Gur concluded that these abnormalities were consistent with an FASD.

[Dr. Gur's findings strongly suggest a Sensory Limbic Hyperconnexion Syndrome. This condition impairs the development and use of the frontal lobes and limbic system.]

Howard Becker, Ph.D., did not evaluate Mr. Fulks, but described the impairments associated with FASD

On March 30, 2004, Dr. Jonathan Venn issued a report describing a neuropsychological assessment taking place from March to May 2003. He made clinical findings of attentional problems and poor language skills, and noted low scores on the neuropsychological testing, including low scores that outstripped Mr. Fulks' IQ in severity. Dr. Venn noted borderline intellectual functioning based on a Full Scale IQ of 77 on the Wechsler Adult Intelligence Scale, Third Edition (WAIS-III). Adjusted for the Flynn Effect, the WAIS-III score would fall within the intellectually disabled range (75). Dr. Venn also found movement problems.

In a report dated May 7, 2004, Dr. James Hilkey, Ph.D., described testing administered in August 2003. Dr. Hilkey found Cognitive Disorder NOS, Dysthymia and Polysubstance Abuse Disorder, and Personality Disorder NOS (Dependent, Schizotypal, and Antisocial). As a part of his battery, Dr. Hilkey administered a WAIS-III in August 2003. A Full Scale IQ of 78 was reported. Corrected for the Flynn Effect, this score falls to a Full Scale IQ of 76.

James Evans, Ph.D., administered neuropsychological testing in November 2003 and in January 2004 and found impairments. He reported the presence of impairments, including frontal lobe damage in addition to other areas, indicating brain dysfunction that was "diffuse in nature." Dr. Evans also conducted a quantitative EEG (QEEG), which reflected brain abnormalities and "provided further support for a diagnosis of neurologic dysfunction."

In a January 14, 2004 report, Jonathan E. Walker, M.D., described his review of Mr. Fulks' quantitative EEG and found slowness in the left frontal region of the brain, with multiple coherence abnormalities in the right hemisphere and multiple phase abnormalities in both the left and right hemisphere.

A February 19, 2004 report described a forensic evaluation conducted at the Federal Medical Center at Butner, N.C., by psychiatrist Ralph Newman, M.D., psychologist Edward Landis, III, Ph.D., and neuropsychologist Eugene V. Gourley, Ph.D. Drs. Newman, Landis, and Gourley reported borderline to low average intellectual and cognitive functioning based on intelligence testing and neuropsychological functioning. Intelligence testing included the Woodcock-Johnson Tests of Cognitive Abilities, Third Edition, which returned a Full Scale IQ of 79. Corrected for the Flynn Effect, this score would fall to a 77. Other diagnoses included Antisocial Personality Disorder, Adjustment Disorder, and Amphetamine, Cannabis, and Alcohol Dependence.

Margaret Melikian, D.O., former head of the forensic unit of the Medical University of South Carolina, identified Cognitive Disorder NOS beginning in the developmental period stemming from FASD, substance abuse, and head injuries. She also identified Major Depressive Disorder, Adjustment Disorder, Amphetamine, Alcohol and Cannabis Dependence, and Antisocial Personality Disorder.

## FINDINGS

Having interviewed Mr. Fulks and had the benefit of multiple records, testimony, and reports, it is my opinion that he meets the definition of Intellectual Disability and that he satisfies all three criteria of the diagnosis: deficits in intellectual and adaptive functioning, and onset before the age of 18.

In April 2003, he was administered a WAIS-III by Dr. Venn and received a Full Scale IQ of 77. When corrected for the Flynn Effect, this score drops to 75, which is within the range for intellectual disability. He received slightly higher scores on two additional IQ tests given in the following year: a Full Scale IQ of 78 on the WAIS-III in August 2003 and a Full Scale IQ of 79 on the Woodcock-Johnson in February 2004. (These scores fall to 76 and 77 when corrected for the Flynn Effect.) Given their proximity to the first IQ test and other neuropsychological testing, the one and two point increases are explainable by practice effect. Overall, this pattern of test results is within the range for intellectual disability.

Mr. Fulks also has deficits in adaptive functioning. As noted above, Dr. Novick-Brown has conducted an assessment of Mr. Fulks' adaptive behavior. Dr. Brown concluded that he has significant deficits in the Conceptual, Social, and Practical Domains, and that these deficits were present before the age of 18. I have reviewed her report and agree with her findings.

Test results on all three batteries of neuropsychological testing (Drs. Venn, Evans, and Gourley) reflect the presence of cognitive impairments. These impairments are consistent with the abnormalities observed on the imaging studies, the EEG, and the QEEG described above.

Mr. Fulks was administered three Wechsler Intelligence Scales for Children – Revised (WISC-R) at the ages of 9, 12, and 14. On these tests, he received FSIQ scores of 90, 96, and 93, which drop to 86, 91, and 87 when corrected for the Flynn Effect.

However, scores on childhood IQ testing are unstable, particularly in individuals such as Mr. Fulks who have been born with brain dysfunction. Cognitive abilities develop more slowly as these individuals age. Over time, these impairments become more pronounced as compared to peers and IQ scores fall.

It is also notable that Mr. Fulks' adaptive deficits were broad, spanned all three domains of functioning, were apparent early in his development, and were consistent with the brain dysfunction reflected in neuropsychological testing, imaging studies, the EEG, and the QEEG. Functioning at that level is consistent with the IQ scores from adulthood.

Mr. Fulks has suffered from brain dysfunction since birth. Prenatal alcohol exposure is the predominant cause of Mr. Fulks' cognitive impairments. His history also has a number of other contributory factors that correlate with a decline in intellectual functioning and are risk factors for Intellectual Disability. These factors include a history of childhood abuse, potential head injuries incurred during the developmental period, polysubstance abuse beginning in childhood, and a dysfunctional environment and impaired parenting during childhood.

I also note that Mr. Fulks' adult IQ testing reflects consistent, similar scores across multiple test administrations that are below the scores from childhood and early adolescence.

Given all of these factors, it is my opinion that Mr. Fulks' deficits in both his intellectual functioning and adaptive functioning were present before the age of 18.

It is my opinion that he falls psychologically and neuropsychologically within the Fetal Alcohol Spectrum and that his functioning is consistent with an FASD. Under the DSM-5, he also fits the diagnostic category of Neurocognitive Disorder with multiple etiologies. Under the ICD-10-CM, he fits the diagnostic category of Frontal Lobe and Executive Function Deficit. There is indication of both Verbal and Non-verbal Learning Disabilities by history based on disparities in his childhood testing. This is characteristic of and explained by cognitive deficits associated with an FASD. By history, there is also polysubstance dependence and abuse. Additionally, there is a chronic Dysthymia with a history of Major Depressive Episodes.

Toxic exposure (prenatal alcohol exposure), head trauma, and substance abuse will typically delay neurodevelopment and can cause significant neuropsychological impairment. An already significantly damaged brain additionally hampers the development of the frontal lobes. This appears to be the case for Mr. Fulks.

I hold all of the opinions discussed above to a reasonable degree of neuropsychological certainty.

If you have any questions, please don't hesitate to contact me.

*Barry M. Crown, Ph.D.*

FL PY002131

Barry M. Crown, Ph.D.
Diplomate, American Board of
Professional Neuropsychology

Added Qualifications in Rehabilitation
Neuropsychology, Forensic Neuropsychology,
and Neuroimaging in Neuropsychology

Diplomate (Certified Pain Practitioner)
American Academy of Integrative
Pain Management

**Electronically signed by Barry M. Crown, Ph.D. on March 6, 2019 at 5:59PM, CST**

# BARRY M. CROWN, Ph.D.

105 E. Gregory Square – Suite 2A
Pensacola, Florida 32502
Telephone: (850439-5550   Fax: 1 (877) 483-4856
bmcrown@barrycrown.com

**Miami:**
9990 S.W. 77th Avenue – Suite 301
Miami, Florida 33156
(305) 665-0771

## EDUCATION

Ph.D.  Florida State University
Post-Doctoral Fellow in Psychiatry (Clinical Psychology), Harvard Medical School, Massachusetts General Hospital

## CERTIFICATIONS

Licensed Psychologist (PY002131), Board of Psychological Examiners, State of Florida
Diplomate, American Board of Professional Neuropsychology
   Added Qualifications in Child and Adolescent Neuropsychology, Neurodevelopmental Disabilities, Geriatric Neuropsychology, Forensic Neuropsychology, Rehabilitation Neuropsychology, Addiction Neuropsychology, and Neuroimaging in Neuropsychology
   [Chair, National Examinations Committee, 1994-1998; President, 1999-2001; Board of Directors, 2001-2010]
Diplomate (Certified Pain Practitioner), American Academy of Pain Management
Certified Addictions Specialist, American Academy of Health Care Providers in the Addictive Disorders (drugs, alcohol, food, gambling)

## ADDITIONAL TRAINING

Forensic Psychology, American Academy of Forensic Psychology
Family Therapy, Institute for Juvenile Research, Chicago
SPECT Brain Imaging, Medical College of Wisconsin (Clinical Fellowship)
Transcranial Doppler and Cerebral Blood Flow Monitoring, UCLA, Geffen School of Medicine (Fellowship)

## PREVIOUS ACADEMIC APPOINTMENTS

Boston University (Psychology), University of Illinois School of Medicine (Psychiatry), University of Miami School of Medicine (Psychiatry and Pediatrics), Florida International University (Psychology), Florida State University College of Medicine (clinical services)

## OTHER EXPERIENCES (SELECTED)

Research Coordinator, Governor's Office, State of Florida
Clinical Director, NIMH National Drug Abuse Training Center
Associate Director, National Council on Drug Abuse
Co-Director, Child Abuse Project, University of Miami School of Medicine, Jackson Memorial Hospital
Scientific Advisor to the Director, National Institutes of Health (Addictions)
Head, Neuropsychology Group, Miami Children's Hospital

## PRESENT PROFESSIONAL ACTIVITIES

Independent Practice, Miami, Florida and Pensacola, Florida (Barry M. Crown, Ph.D. and Associates, P.A., The Neuropsychology Laboratory of Barry M. Crown, Ph.D., The Sports Concussion Center of South Florida) – Neuropsychology, Behavioral Medicine (pain management), Clinical Psychology, Addictionology

Medical staff privileges: Baptist Hospital-Miami, South Miami Hospital, Homestead Hospital, Nicklaus (Miami) Children's Hospital

Dean, Continuing Medical Education (Psychology), Chair, Medical Education Executive Committee and Director, Continuing Psychological Education, Baptist Health, Miami, FL

## PROFESSIONAL MEMBERSHIPS

American Psychological Association; Florida Psychological Association; National Academy of Neuropsychology; American College of Professional Neuropsychology (Fellow); Society of Clinical Neuropsychology (Division 40 of APA), American Academy of Neurology (Affiliate); Society of Nuclear Medicine and Molecular Imaging; American Academy of Pain Medicine (clinical practice affiliate); British Psychological Society (Foreign Affiliate); American Association for Marital and Family Therapy (Clinical Fellow); Royal Society of Medicine (Overseas Fellow); Association for Psychological Science

JULIAN DAVIES, MD

4245 ROOSEVELT WAY NE
SEATTLE, WA 98105

T 206-313-0252
F 206-598-3040
JOOLIAN@UW.EDU

MARCH 4, 2019

# CHADRICK FULKS - MEDICAL EXPERT REPORT

Chadrick Evan Fulks ███████████ is a 41-year-old man referred to me by the Capital Habeas Unit of the Federal Community Defender for the Eastern District of Pennsylvania. His counsel asked me to evaluate whether Mr. Fulks has a Fetal Alcohol Spectrum Disorder and to consider other neurodevelopmental risks in his history.

## FASD BACKGROUND

Fetal Alcohol Spectrum Disorder (FASD) is an umbrella term used to describe the spectrum of birth defects and neurologic impacts caused by maternal alcohol consumption during pregnancy. One diagnosis under this umbrella is Static Encephalopathy / Alcohol Exposed, also known as Alcohol-Related Neurodevelopmental Disorder (ARND). This describes a pattern of brain damage associated with prenatal alcohol exposure.

The brain injuries caused by drinking during pregnancy are variable, but can include such outcomes as lower IQ, ADHD (attention deficit/hyperactivity disorder), difficulties with judgment and impulse control, language and social difficulties, learning disabilities, visuospatial deficits, motor and coordination challenges, memory problems, and impairments in executive functions - "higher-level" cognitive skills like flexibility, planning, organization, inhibition, judgment, and novel problem-solving. Individuals with FASDs have daily functioning skills and life outcomes that are often more impaired than their IQ alone would predict.[1]

Fetal Alcohol Syndrome (FAS) is the most familiar diagnosis on the fetal alcohol spectrum. FAS is a permanent birth defect syndrome caused by prenatal alcohol exposure, characterized by prenatal and/or postnatal growth deficiency, a unique cluster of minor facial anomalies, and central nervous system (CNS) abnormalities.

A diagnosis of FAS requires all of the above features (growth, face, brain) to be confirmed. For alcohol-exposed individuals who lack one or more of the criteria (such as growth deficiency or the facial features of FAS), diagnoses on the broader fetal alcohol spectrum like Static Encephalopathy / Alcohol Exposed may be appropriate.

---

[1] Streissguth, A. P., Bookstein, F. L., Barr, H. M., Sampson, P. D., O'Malley, K., & Young, J. K. (2004). Risk factors for adverse life outcomes in fetal alcohol syndrome and fetal alcohol effects. Journal of Developmental & Behavioral Pediatrics, 25(4), 228–238.

Such non-FAS diagnoses are actually associated with a higher risk of adverse life outcomes than FAS is, which is thought to be caused by lack of early recognition and supports.

The field of FASD is over 40 years old, and uses well-established diagnostic criteria, most notably the Institute of Medicine (IOM) guidelines,[2] the University of Washington 4-Digit Code,[3] the Centers for Disease Control (CDC) definition of FAS,[4] and the Diagnostic and Statistical Manual of Mental Disorders, 5th Edition (DSM-5).[5]

I am a board-certified pediatrician licensed in the State of Washington, and a Fellow of the American Academy of Pediatrics. I was trained at Yale, UCSF, and the University of Washington. I am a Clinical Professor of Pediatrics at the University of Washington School of Medicine, where for the past fifteen years I have evaluated children and adults at the longest-running FAS diagnostic clinic in the country. Since FAS is a birth defect syndrome, many experts in the field have pediatric backgrounds; the diagnostic criteria for FAS are the same for children and adults.

I have published articles in the peer-reviewed literature on prenatal alcohol/drug exposures, and present on these topics at regional and national conferences. I have been been retained in cases relating to FASDs by defense counsel in Arizona, California, Georgia, Illinois, Louisiana, Nebraska, Nevada, Ohio, Oregon, Pennsylvania, Texas, Utah, and Washington. I have qualified as an expert witness in state court in Nevada, Oregon, Pennsylvania, and Washington. A copy of my resume is attached as Exhibit A.

## MEDICAL EXPERT OPINION

It is my opinion to a reasonable degree of medical certainty that Mr. Fulks has Static Encephalopathy / Alcohol Exposed, also known as severe Alcohol-Related Neurodevelopmental Disorder (ARND). This is a diagnosis under the umbrella of Fetal Alcohol Spectrum Disorders (FASD).

In layman's terms, Mr. Fulks has structural and functional evidence of significant brain damage that is consistent with prenatal alcohol injuries. His brain was further impacted by childhood adversity, head injuries, and extensive substance abuse, but it is my opinion to a reasonable degree of medical certainty that prenatal alcohol exposure was a primary cause of his disabilities.

---

[2] Stratton, K. R., Howe, C. J., Battaglia, F. C., Institute of Medicine (U.S.). Committee to Study Fetal Alcohol Syndrome, National Institute on Alcohol Abuse and Alcoholism (1996). Fetal Alcohol Syndrome: Diagnosis, Epidemiology, Prevention, and Treatment. National Academies Press.

[3] Astley, S. J., & Clarren, S. K. (1997). Diagnostic Guide for Fetal Alcohol Syndrome and Related Conditions: The 4-Digit Diagnostic Code, 1st edition. Seattle, WA. University of Washington Publication Services.

[4] Bertrand, J., Floyd, R., Weber, M., O'Connor, M., Riley, E., Johnson, K., & Cohen, D. (2004). Fetal Alcohol Syndrome: Guidelines for Referral and Diagnosis. Centers for Disease Control and Prevention, Atlanta, GA.

[5] American Psychiatric Association DSM-5 Task Force (2013). Diagnostic and Statistical Manual of Mental Disorders : DSM-5. American Psychiatric Association, Washington, DC.

## MATERIALS RELIED UPON

Available for my review at the time of this report were the following materials:

### VOLUME I

Cabell County Board of Education Psychological Evaluation, March 2, 1990

Otto Klassen, M.D. Psychiatric Report, December 3, 1991

Cabell County School Records

Northeast Indiana Special Education Records

Andis Alternative Education Center Records

Report of David Bachman, M.D., July 31, 2003

Trial Testimony of David Bachman, M.D., June 24, 2004

Report of Arlene Andrews, Ph.D., May 13, 2004

Trial Testimony of Arlene Andrews, Ph.D., June 24, 2004

Report of James Evans, Ph.D.

Trial Testimony of James Evans, Ph.D., June 23, 2004

Report of Dr. Fred Bookstein, February 9, 2004

Trial Testimony of Dr. Fred Bookstein, June 24, 2004

Report of Christos Davatzikos, Ph.D.

Testimony of Christos Davatzikos, Ph.D.

### VOLUME II

Draft Report of Ruben Gur, Ph.D., June 13, 2004

Trial Testimony of Ruben Gur, Ph.D., June 16, 2004

Trial Testimony of Howard Becker, Ph.D., June 23, 2004

Report of James Hilkey, Ph.D., May 7, 2004

Report of Jonathan Venn, Ph.D., March 30, 2004

Report of Elin Berg, M.D., Ph.D., August 2, 2003

Report of Jonathan Walker, M.D., January 14, 2004

Forensic Evaluation by the Federal Medical Center, February 19, 2004

Testimony of James Hilkey, Ph.D., February 23, 2010

Testimony of James Hilkey, Ph.D., February 24, 2010

Testimony of Margaret Melikian, D.O., February 24, 2010

Declaration of James Hilkey, Ph.D., June 2, 2008

Declaration of Margaret Melikian, D.O., May 21, 2008

### VOLUME III

Brain Imaging Reports

PET scans from the file of Ruben Gur Brain Imaging Reports, December 5, 2003

Photo of Chad Fulks

Photo of Ronnie Fulks from the file of David Bachman

Photo of Fulks Children

VOLUME IV

Cabell Huntington Hospital Records

John Marshall University Pediatrics Records

LaGrange Community Hospital Records

St. Mary's Hospital Records

Federal Medical Center Prison Records

Lexington County Prison Records

VOLUME V

Psychological Evaluation by Natalie Novick Brown, Ph.D., February 11, 2019

Cabell County School Records, received in 2016 from Cabell County Schools

Trial Testimony of Kevin Holbrook, June 22, 2004

Comprehensive Test of Basic Skills scores

Woodcock-Johnson Summary and Score Report, February 16, 2004

VOLUME VI

Northeast Indiana Special Education Cooperative Records

Declaration of Joy Krug, November 15, 2016

As is standard in an FASD evaluation, at the beginning of my engagement I requested
any available family history, pregnancy and prenatal exposure history, childhood and
adult medical records, social history, school and developmental records, occupational
history, criminal justice history, and client mental health records, as well as the results
of any neurologic or neuropsychological testing. I have rendered my opinion based on
materials available to me at this time and retain the right to revise my opinion should
new information become available.

I have conducted my own independent records review and in-person clinical interview
of Mr. Fulks in 2016. I will summarize items from records review relevant to my
analysis, interspersed with information I obtained directly from the client. For a more
comprehensive social history and summaries of academic testing I would refer the
reader to the very thorough report of Dr. Natalie Novick Brown.

Childhood-era information will refer to the client as "Chad," with adult references as
"Mr. Fulks." Numbers in parentheses are Bates numbers from the records I received.

## PRENATAL EXPOSURES AND PREGNANCY HISTORY

1. Dr. Brown interviewed Chad's father Roger Fulks, who reported witnessing Chad's mother Diana use alcohol in a high-risk pattern during her pregnancy with Chad:

He and Diana both drank alcohol throughout her pregnancies with Ronnie, Chad, and Shannon. Diana drank beer and wine, typically until she became intoxicated or the alcohol was gone. During the time she was pregnant with Chad, they both drank alcohol at least every weekend. When they moved to Pine Street in Huntington, they began drinking daily and continued drinking daily when they lived on Leeward Avenue. Diana drank with the next-door neighbor while he was at work, and he would find her drunk when he got home at night. This was a daily scenario.

One time, Diana was arrested and had to go to jail for being "drunk and disorderly."

Roger never saw Diana cut back on her drinking, and she never told him she was cutting down due to pregnancy. He observed no change in her drinking pattern before, during, and after her pregnancy with Chad or with any of their children.

Diana never received prenatal care for any of her pregnancies. The older children, including Chad, were born in Dr. McClelland's office.

He and Diana smoked cigarettes when they drank. Typically, they shared a pack-and-a-half of cigarettes between the two of them daily. Diana did not reduce or stop smoking during her pregnancies. She was pretty healthy during the pregnancies and did not use any medications or illegal drugs. (Psychological Evaluation by Natalie Novick Brown, Ph.D., 1636-7)

2. Diana's youngest brother Kevin came to live with them in 1973:

Kevin moved in and out of their house numerous times during the years the Fulks children were growing up. Kevin described the heavy drinking and constant fighting in the home. His older brother and wife also lived with Diana and Roger numerous times. Both Roger and Diana would be drinking, and their fights would start "over nothing." Kevin described getting in the middle of fistfights, trying to stop them. Kevin reported that Diana drank heavily around this time, including drinking throughout her pregnancies. He observed her going to bed drunk many times when she was pregnant. (Dr. Brown, 1687)

3. In testimony, Chad's uncle Kevin described babysitting for Chad's parents so they could go out to bars, including the night Diana went into labor with Chad. He affirmed that he witnessed Diana drinking during her pregnancies with Chad and his other siblings, and that she drank "a lot of whiskey, a lot of it" during that time. (Testimony of Kevin Holbrook, 1830)

4. A neighbor on Pine Street described Diana drinking "too much" when Chad was a toddler, getting frequently intoxicated, mainly on the weekends. (Dr. Brown, 1623)

5. Chad's maternal cousin described Diana's drinking habits when Chad was young:

She recalled seeing Roger and Diana drinking alcohol throughout her childhood, adding they both were "addicted" to alcohol. She saw Diana so intoxicated once, she urinated on herself. Another time, Diana vomited and "just sat in it." This was around 1982/83 when Christina was 12 or 13. She recalled Diana drinking and smoking cigarettes during the pregnancy with Shannon but said she was too young to be aware of Diana's alcohol use during the pregnancy with Chad. The Fulks would spend money on beer and cigarettes before buying clothes for their children. (Dr. Brown, 1625)

6. Dr. Andrews testified that based on family interviews, Chad's father and mother "both started drinking heavily early, and she drank through her pregnancies with all of the sons." (Trial Testimony of Arlene Andrews, 239)

## BIRTH HISTORY

1. Chad's father reported a normal pregnancy, with delivery in the doctor's office. (Otto Klassen, M.D. Psychiatric Report, 5) Mother reported birthweight of 9 lbs 4 oz on a school form. (Personal Data Sheet - Speech and Language, Cabell County School Records, 30) However, Dr. Andrews found the parents' early memories of Chad to be remarkably vague, so this may be incorrect.

2. Mr. Fulks did not recall his birth weight precisely but thought it might have been ten pounds. He did not know of any birth complications.

## GROWTH HISTORY

1. At age 11 his height was measured at 56 3/4" (53rd percentile) with weight of 83 pounds (59th percentile). (John Marshall Medical Services, 997)

2. At 12 years and 9 months his height was 61" (54th percentile), weight 103 pounds (60th percentile). (Children's Medical Center of Marshall University, 999)

3. At 14 years and 3 months his height was 5'7.5" (73rd percentile), weight 131 pounds (73rd percentile). (Lincoln County School Records, 114)

4. At age 26 his height was reported to be 6'0" (81st percentile) with a weight of 225 pounds (97 percentile). (Report of Jonathan Venn, Ph.D., 712)

5. None of these available adolescent and adult measures are growth deficient, but we lack reliable early childhood measures.

## MEDICAL HISTORY

1. Mr. Fulks denied a childhood history of birth defects, seizures, loss of milestones, and pediatric heart, kidney, gastrointestinal, or orthopedic problems. He reported some ear infections when young, but no history of hearing loss or ear tubes. He and his siblings were rarely taken to the doctor.

2. Elementary school vision testing was in the 20/25-30 range. Hearing screening passed most evaluations except in 3rd grade. (Cabell County Schools, page 12) Vision at age 14 was 20/50 on the right, 20/30 on the left. (Lincoln County Schools, 114)

3. Mr. Fulks described childhood onset of motor and vocal tics. His motor tics have involved eye blinking and right neck/shoulder contractions that he suppresses by holding and squeezing his right trapezius muscle a lot. In childhood he would purse his lips and make a repeated airy sound that annoyed his siblings; he denied more complex tics. These tics were better in his teens, but the motor tics recurred during his trial prep and in the year preceding my interview, which he ascribed to stress.

He thought the recent Artane prescription has helped his tics a bit but wanted to try a higher dose.

4. Records described multiple episodes of head injury resulting in loss of consciousness (not consistently evaluated by medical professionals, no report of emergent head imaging or prolonged loss of consciousness/coma). (Report of James Evans, Ph.D., 311; Dr. Venn, 711)

5. Mr. Fulks also reported an extensive history of closed head injuries. These started in middle childhood, with various bike wrecks and a tree fall, with brief periods of unconsciousness but no ED evaluations or post-concussive symptoms. At age 12 his brother dropped a paint can onto his left forehead which resulted in loss of consciousness and an ED visit for stitches. His brother knocked him out when boxing at least once. At age 15 the brakes went out and he sustained a head injury in the resulting crash; he did not seek medical attention as he was "on the run." He feels this was his worst head trauma, and he suffered headaches, dizzy spells and balance issues in the months that followed. At age 17 he was knocked out in a police chase and needed stitches for the top of his head.

6. Mr. Fulks suffered stab wounds to his abdomen while incarcerated, with urinary retention. (Federal Medical Center Prison Records, 738)

7. Bell's palsy was diagnosed at age 25. (Dr. Venn, 708)

8. A medical evaluation by Dr. Bachman in 2003 noted unusual mouth and nasolabial fold asymmetry, subtle findings on neurological examination, abnormal performance on Mini Mental State Exam (especially frontal motor findings), with overall initial impression:

All things taken together, Mr. Fulks is of borderline intelligence, if not with actual mild mental retardation. There are a number of possible etiologies for this including possible fetal alcohol syndrome, early life lead exposure from moonshine, inhaled solvent exposure, chronic alcohol use, and recurrent head injuries as described above. Particularly striking were the frontal motor findings described above, particularly difficulty with motor sequencing and inhibition. (Report of David Bachman, M.D., 121)

9. Dr. Bachman's testimony following subsequent review of MRI, PET, EEG, and neuropsychological testing was that "fetal alcohol effect syndrome" moved to the top of the list of hypotheses. He testified that Dr. Bookstein's corpus callosum analysis supported fetal alcohol effects, as did consultation with Sterling Clarren, M.D. ("Caroff" in transcription). (Trial Testimony of David Bachman, M.D., 147)

10. Dr. Melikian testified that upon phone consultations with Dr. Bachman and Dr. Clarren she concluded that Mr. Fulks had fetal alcohol effects (growth 1, face 1, brain 3 or 4, alcohol 3 using 4 Digit Code analysis contributed by Dr. Clarren). Her statement that "I spoke with Dr. Clarren regarding fetal alcohol effects, and formed my opinion that Mr. Fulks did suffer from fetal alcohol effects, while he did not meet the criteria for fetal alcohol spectrum disorder" is internally inconsistent; she appears to mean that he did not meet criteria for Fetal Alcohol Syndrome. Fetal Alcohol Spectrum Disorder (FASD) is the umbrella term that replaced Fetal Alcohol Effects. (Testimony of Margaret Melikian, D.O., 908)

11. In his adult years Mr. Fulks described suffering from disc pathology in his back that disrupted his sleep with electric pain. It was formerly treated with gabapentin but when USP stopped using this drug Mr. Fulks was eventually prescribed Lyrica, which helped somewhat.

12. Mr. Fulks recalled being hospitalized for a left-sided facial infection and described skin infections at the top of his back and base of his spine. Recently he noted itchy/blustery rashes on his trunk and behind his legs. In the preceding year his dentition had seemed unusually fragile, with 1-2 broken teeth. He was diagnosed with "low calcium;" he reported taking supplemental calcium and Vitamin D.

13. Mr. Fulks also reported feeling knots in his throat when he swallows, swollen anterior cervical lymph nodes, and various tender but non-inflamed and non-purulent sub-dermal lumps in his upper throat, behind his ear, on his legs, and on his scrotum (he was prescribed an antifungal for the latter which didn't make sense to him).

14. He also described new-onset "kidney problems," consisting of new-onset nocturnal enuresis and a diagnosis of proteinuria, which was being worked up with renal ultrasound and 24-hour urine collection. He also reported frank and occult blood in his stool, with an endoscopy that removed some growths (polyps?) but no other identified cause that Mr. Fulks was aware of.

15. In the year preceding my interview Mr. Fulks claimed to have lost 91 pounds (in the context of depression), but he had regained 6 or so at the time of interview. He reported occasional fevers, headache, and a sense of smelling nasty things but denied sinus drainage or congestion; he also denied anosmia. He admitted to night sweats that soak his sheets. He denied chronic cough and thought he had been screened annually for TB. He was not sure when he was last tested for HIV or other infectious diseases.

16. Mr. Fulks also mentioned being told by other inmates that he passed out in his shower after screaming unintelligibly for about 10 minutes. He denied palpitations, chest pain, or other recent presyncopal or fainting events.

17. Mr. Fulks described a surgical history including a shank removal after a stabbing, and surgical repair of gunshot wound to the back/neck. Hospitalizations included the above facial infection and suicide attempt, as well as a more distant episode while incarcerated where he "passed out and bashed his head open."

18. Per medication list that Mr. Fulks shared with me, at the time of the interview he was taking aspirin 81g daily; calcium 625mg twice a day; docusate 100mg twice a day; pregabalin 75mg daily; trihexphenidyl 1mg daily; venlafaxine XR 225mg daily; vitamin D 1,000 IU daily; clotrimazole cream as needed. He was listed as having rashes to niacin and amoxicillin.

## SOCIAL HISTORY

1. Mr. Fulks described a childhood where he and his siblings were poor, on welfare, with two alcoholic parents. His dad hardly worked much, earning cash fixing neighborhood cars; he was handy at turning the gas and electric back on after it was shut off. After the gas meter itself was removed from their house, his father would burn wood in the basement to heat the house through vents, making things quite smoky at home. His father had a "hillbilly bar" in the basement, where they would host up to 20 people for parties. The kids would sit on the stairs and watch the adults drink and fight, or watch drunks playing gravel basketball in the driveway. The cops were there so much his dad got a police scanner to stay ahead of their visits.

2. Mr. Fulks also recalled that "Dad beat the crap out of us" daily. Punches, belt buckles, pool sticks, and thick tree limbs were used in beatings, worse when he was drunk. These beatings lefts marks, cuts, and bruises, and broke his brother's eardrum. His mother could be abusive when drunk, but usually tried to protect the children. Domestic violence was "constant," and his parents got in fistfights frequently.

3. Mr. Fulks remembered that one day his mother came back from church reformed and replaced substance abuse with church-going. Soon thereafter his father moved to Indiana with his brother, sent divorce papers, and married his sister-in-law's sister. That left Chad's mother "alone on welfare with four to five of us hellions." Between daily church-going and a cleaning job his mother wasn't at home much, leaving the children without supervision until 10-11 at night.

4. Mr. Fulks stated that "I was out on my own at thirteen," as his mother moved them around a lot, and "wound up dating a child molester." Chad and his younger brother shared a bed and were both fondled by his mother's boyfriend, who would threaten them with their mother's happiness and stability. The abuse ended when Chad left, but he blamed himself for not staying to protect his younger brother. Chad also reported being sexually abused at age 10 by an older 16-year-old neighbor who babysat them. He didn't know it was abuse at the time, but thought she was his "secret girlfriend."

5. In his mid-teens, Chad was sexually molested by a male stranger and wasn't supported by his mother in his report to police. He was also reportedly sexually abused by other adults who partied with his parents, followed by a marked change in his behavior per family friends and neighbors. (Dr. Brown, 1614)

6. Mr. Fulks described his employment history as "not many." He'd been taught welding in a juvenile placement but couldn't hold down welding jobs. He made sandwiches at one job, and worked in a friend's restaurant.

7. Mr. Fulks reported being married twice, and that his infant child was killed by a cousin's fall, causing internal injuries. His substance use escalated after losing his son. (Dr. Brown, 1619)

8. A summary by Arlene Andrews, Ph.D., "found evidence that these factors were present: a) chaos and profound psychological neglect; b) exposure to alcoholism in both parents and prenatal alcohol exposure; c) exposure to chronic violence in the home and parental scorn for one another; d) physical child abuse; e) nourishment insecurity; f) corrupting influence by parents and older siblings; g) educational neglect; h) stigma in the community because of family problems; i) sexual abuse; and j) poor coping resources." (Report of Arlene Andrews, Ph.D., 208)

## DEVELOPMENTAL AND ACADEMIC HISTORY

1. Chad's mother reported walking at 10 months, first words at 1 year, and sentences at 18 months on a school form completed for a speech and language evaluation when Chad was 8. (Personal Data Sheet - Speech and Language, Cabell County School Records, 30) "Sentences" at 18 months seems unlikely based on typical developmental timing and Chad's subsequent speech/language disabilities, and her report is inconsistent with reports from other declarants. Dr. Andrews found Chad's parents' memories of his childhood to be remarkably vague, which may help explain this inconsistency.

2. Linda Adkins, who lived 2 doors down and had a daughter close in age to Chad recalled the following to Dr. Brown:

He was around three years old when he said his first words. He lisped and mispronounced words, and it was hard to understand him. When he was around four, she sometimes could understand what he was saying, but he continued to have a lisp throughout childhood.

Chad also was slow in learning to read ("he wasn't at the level where my kids were at his age"), and he didn't seem to understand things. For example, he didn't understand volleyball and would get confused when he tried to play. The ball would come at him, and he would just stand there and not do anything. He also was clumsy and had poor coordination. When the children were playing kickball, he would miss the ball or kick it at the wrong time. He couldn't hit the ball with a bat when the children were playing baseball.

Chad also had trouble understanding verbal communication. Linda had to repeat information over and over because he didn't understand what she was saying to him. He kept saying "huh?" Linda had to keep reminding him to do things because he couldn't remember what she had requested. For example, she would tell him to go into the kitchen and bring her something from inside the refrigerator, and he would look around but not understand what she wanted. She had to repeat the instruction multiple times and narrow down her instructions to one thing at a time.

Chad was a quiet and withdrawn child. When he did play with his brothers and the neighborhood children, he was a follower and pleaser. He did what the other children wanted him to do and didn't initiate anything. (Dr. Brown, 1623-4)

3. According to his maternal cousin Christina who lived with Chad when he was 6, Chad was teased by mother, brothers, and peers for the way he talked, saying he talked "like a baby" and calling him "stupid" and "retarded." He was uncoordinated, inattentive, slow, and needed help understanding basic schoolwork in early elementary school.

Christina thought that Chad was born brain-damaged because he was "so slow at everything." She said he was delayed in talking and didn't start talking in sentences until kindergarten and even then he was hard to understand. He also seemed more like a three-year-old when he was seven. He didn't know how to connect socially with people. (Dr. Brown, 1626)

4.  Mr. Fulks was not aware of early developmental milestones but reported a speech impediment for which he received speech therapy in school.

5.  Chad repeated 1st Grade, despite reasonable attendance. (Cabell County School Records, 8)

6.  In Chad's second time through the 1st grade, it was noted that speech and language evaluation was warranted. (Cabell County School Records, 1825) Chad was due to receive special education speech support for articulation twice a week on a 1985 IEP form in 2nd grade. (Cabell County School Records, 31) In 2nd grade, other records reflected that he was enrolled in speech services. (Cabell County School Records, 12)

7.  Chad was referred for multidisciplinary school assessment for behavioral problems that included failure to complete tasks, lack of self-direction, needing guidance at all times, lack of self-discipline, distractibility, weaknesses in most academics. (Cabell County School Records, 41, 46)

8.  He was in a BD special education program for Behavior Disorders at age 10. (Cabell County School Records, 59) His special education teacher Ms. Wolfe from 1988-89 (5th grade) recalled that Chad would be more accurately described as "SLD" (Specific Learning Disability) because he couldn't write a sentence, couldn't spell, and was weak in a lot of other academic tasks (1st grade reading skills, 2nd grade math). His C grades were more reflective of effort (special education) and did not reflect his true academic performance. Chad was an unsophisticated follower, easily led astray by more sophisticated peers. At age 10 he acted like a 5-6 year-old and was very weak in social skills. (Dr. Brown, 1628-9)

9.  His grades declined in 5th Grade (stable attendance) and got even worse in 6th (worse attendance). (Cabell County School Records, 8)

10.  At age 12 his school psychologist suggested a complete academic evaluation to evaluate for learning disability. (Cabell County School Records, 3)

11.  In the fall of 1990 at age 13 IEP records indicated that math goals had been added to his special education objectives. (Cabell County School Records, 80) His eligibility for special education expanded to behavior disorder, speech, and specific learning disability (SLD). (Cabell County School Records, 86)

12.  A school record card shows him leaving Enslow Middle School in April 1991 (almost age 14). (Cabell County School Records, 10)

13.  At age 14 Chad was referred to Dr. Klassen for a behavioral evaluation.

14.  In late 1991 Chad was promoted to grade 9 and placed in LD (learning disabled) category, with a behavioral contract, tight supervision, and LD support for all major subjects. (Cabell County School Records, 6)

15. In 1992-93 year (again in grade 9) he appeared to be taking vocational classes and having poor attendance. (Cabell County School Records, 111)

16. Mr. Fulks eventually earned a GED in custodial care at Davis Center at age 17. (Dr. Brown, 1715). He also got a welding certificate that year with considerable extra support from his instructor. (Dr. Brown, 1618)

17. Mr. Fulks summarized his academic history as follows. "I couldn't do good in school, since the beginning." He found it hard to focus and learn. He felt this made his teachers mad, because "they just didn't get it." Math was his hardest subject. He recalled being tested in about 5th grade and being placed in Special Education for learning problems. Ms. Wolfe, his Special Education teacher "took them in," feeding him and his siblings lunch and bringing them clothes. His Special Education classification changed to behavioral in middle school, when he was "always in fights" over being bullied badly for his speech, clothes, smell, and poverty. He remembered a behavioral classroom teacher Mr. Sheets as another caring teacher that took good care of him in school.

## CHILDHOOD PHOTOGRAPH REVIEW

1. Childhood photographs were reviewed and were congruent with my in-person evaluation.

## PSYCHIATRIC HISTORY

1. Chad attempted suicide by pill overdose in early adolescence after his parents separated. He was unconscious when ambulance arrived and was treated at a hospital. (Otto Klassen, M.D. Psychiatric Report, 4; Trial Testimony of Arlene Andrews, 251; St. Mary's Hospital records, 1028)

2. He was diagnosed with major depression at age 14, and prescribed imipramine. (Dr. Klassen, 7)

3. There were reports of Panic Disorder in adolescence, as well as compulsive behaviors. (Federal Medical Center Prison Records, 737)

4. Dr. Simcox diagnosed Chad with Malingering and ASPD during an evaluation at Lexington in 1998. This evaluator also claimed that Mr. Fulks is "likely of average/above average intelligence" and "has no previous history of mental illness." (Federal Medical Center Prison Records, 1436-8) However, these assertions are contradicted by IQ testing and records demonstrating previous significant mental illness.

5. Mr. Fulks received diagnoses of PTSD, Major Depressive Disorder, Generalized Anxiety Disorder, and Tic Disorder. (Dr. Venn, 708)

6. Antisocial Personality Disorder (ASPD) and polysubstance dependence were diagnosed at Butner. (Federal Medical Center Prison Records, 746)

7. Dr. Hilkey diagnosed Mr. Fulks with poly-substance dependence, dysthymic disorder, and cognitive disorder not otherwise specified. (Report of James Hilkey, Ph.D., 941)

8. Dr. Melikian diagnosed Mr. Fulks with Cognitive Disorder, Not Otherwise Specified (affected by fetal alcohol spectrum disorder, chronic substance abuse, and multiple head injuries), Major Depressive Disorder, Adjustment Disorder with Anxiety, Amphetamine Dependence, Cannabis Dependence, Alcohol Dependence, and Anti-Social Personality Disorder (qualified by comments about showing remorse, influence of upbringing, and diminished cognitive ability). (Dr. Melikian, 951-4)

9. In Mr. Fulks's interview he did not recall being tested for ADHD but noted that in his family he "was the hyper one." He also had a lot of trouble with focus, and was very impulsive and reactive, like his father. School counselors kept recommending that his mother take him to a doctor or specialist, and she did take him to a psychiatrist once at age 14 or so. He was prescribed a medication of uncertain benefit, which he only took for one month because his mother couldn't afford it.

10. Mr. Fulks recalled "a lot of depression growing up." He also reported a childhood-onset history of "bad anxiety" and panic attacks (can't breathe and feels like his insides are going to explode). This anxiety was worse in solitary confinement, and once he moved all his belongings out of his cell because he felt crowded and that the walls were closing in.

11. Around the time of his trial Mr. Fulks recalled being on "a bunch of meds" but could not recall his precise diagnoses. He became acutely depressed in the previous year, as he was out of appeals and awaiting an execution date. He claimed that his new unit manager killed two mice that Mr. Fulks had enjoyed caring for (he had raised 4 generations in his cell). He dropped from 249 pounds to 158 in 7 months. Mr. Fulks reported that he cut his wrists and hung himself in June 2015, was found unconscious in his cell, and awoke in the ambulance.

12. Since getting a chance to appeal, a new legal team, and more medical attention Mr. Fulks felt that his depression had improved. A new medication (Effexor) was helping at the time of our interview in 2016.

13. Mr. Fulks stated that he used to have visions of his deceased infant son but denied other visual or auditory hallucinations. He denied mania. It was hard for him to leave his cell when he was more depressed, and he still noted stress and anxiety/situational paranoia when "out in the open" but he denied other paranoid ideation.

## SUBSTANCE USE HISTORY

1. Mr. Fulks reported that he and his brothers "always stole beer," as it was readily available. From age 7-8 and up they would drink a few times per week, to intoxication at times. His drinking progressed in adolescence and adulthood.

2. Chad's older brother liked to huff gasoline, which Chad did for about 6 months when he was 10-11 years old, on a daily basis. He was not sure if the gas was unleaded. A neighbor child self-immolated while they were huffing, which may have curbed Chad's inhalant abuse. He did try huffing paint a few times but didn't like it.

3. Mr. Fulks reported that his marijuana use started at age 9-10, and "wasn't as bad." He found that it helped him deal with his family life and was a "de-stresser." His dad grew it in the basement and his brother grew some in the woods.

4. Mr. Fulks reported that at age 14-15 he started abusing pills and cocaine. His meth use started at age 16 and escalated later. In the time leading up to the instant offense, Mr. Fulks described a lot of methamphetamine, alcohol, and marijuana consumption - "enough meth to kill a normal person." He claimed to have robbed a series of meth houses posing as FBI prior to the incarceration from which he escaped, so they had quite a supply.

## LEGAL HISTORY

1. Extensive, starting at age 9, and well-summarized by Dr. Brown in her report. (Dr. Brown, 1615-6)

## FAMILY HISTORY

1. Chad's father, mother, maternal and paternal grandparents, a paternal uncle, and maternal uncle have histories of problematic alcohol use. (Various)

2. Dr. Andrews testified that his younger brother Shannon developed a seizure disorder. (Trial Testimony of Arlene Andrews, 177)

3. Dr. Bachman had the opportunity to evaluate Ronnie Fulks, Chad's brother. He noted growth retardation (5'2.5", 116 pounds), a small head, history of congenital heart defect, and all of the physical/facial features of FAS. He testified with "great confidence" that Ronnie has Fetal Alcohol Syndrome. (151) Dr. Brown, a psychologist with considerable expertise in FAS, interviewed Ronnie Fulks and reported "He was very thin and appeared to be no taller than five feet. He had facial abnormalities consistent with Fetal Alcohol Syndrome (i.e., thin upper lip, smooth philtrum, small eye openings)." (Dr. Brown, 1635)

4. Mr. Fulks described his birth mother Diana as Caucasian and thought she may be around 5'4" tall. She had a brain aneurysm after his sentencing and was placed in care due to paralysis.

5. His father Roger was described by Mr. Fulks as Caucasian and perhaps 5'8". Mr. Fulks was not sure if his parents had learning problems or finished high school. Both parents were described as alcoholics.

6. Older brother Dewayne was six years his elder and was the family member Chad felt closest to growing up, according to our interview. Dewayne reportedly killed himself in 2009, which Mr. Fulks thought was due to meth abuse and blaming

himself for Chad's life outcome. Dewayne was reported by Mr. Fulks to have some learning problems in school.

7. Ronnie was the second oldest (3 years older), and they were also close. Mr. Fulks also described Ronnie as having "full FAS," being 5'2" as an adult, born with a hole in his heart, having an unusual head shape, and "bad developmental problems." Both Ronnie and Dewayne abused substances.

8. Mr. Fulks reported that his younger brother Shannon had "a lot" of epilepsy from age 7. Shannon did not get into the sort of trouble his brothers did, and now is a foreman at a potato chip factory. His sister Sherry also had less delinquency than her brothers.

9. Mr. Fulks told me that his son was born with a hole in his heart, which was monitored by a pediatrician until his son's death. Dr. Brown's records list this as an atrial septal defect and ventricular septal defect. (Dr. Brown, 1716)

10. Mr. Fulks was not aware of any other significant family history, including other birth defects, intellectual disability, ADHD, other neurological disease, other mental illness, vision/hearing problems, genetic syndromes, or tic disorders.

## STRUCTURAL EVIDENCE OF BRAIN DAMAGE

1. Emergency room non-contrast CT scan of head and neck in 2000 was read as normal during an evaluation after a fall at jail.

2. A head CT and MRI were read clinically as "normal" at Columbia Care Center in late 2003/early 2004. (Federal Medical Center Prison Records, 1103)

3. Dr. Bachman testified about a brain MRI with right temporal cyst, and a PET scan that was diffusely abnormal, as well as diffuse slowing on 1998 EEG. (Trial Testimony of David Bachman, M.D., 141-4)

4. Clinical read of 2003 brain MRI with and without contrast: 1. Right sylvian fissure/arachnoid cyst. 2. Otherwise unremarkable MRI of the brain.

5. Clinical read of a 2003 brain PET scan showed "diffusely decreased cortical metabolic activity." Literature search for Zoloft, Elavil, Klonopin, and Inderal did not reveal citations which would implicate these medications as responsible for the altered cerebral perfusion.

6. Quantitative EEG (QEEG) analysis in 2004 was abnormal. Dr. Walker concluded:

The focal slow activity in the left frontal region and with multiple coherence abnormalities in the right hemisphere and multiple phase abnormalities in both the left and right hemisphere, this QEEG is consistent with the residual effects of brain damage. (Report of Jonathan Walker, M.D., 729)

7. Dr. Evans summarized the QEEG as follows:

Results of a QEEG evaluation provided further support for a diagnosis of neurological dysfunction. This was especially in the form of central and posterior right hemisphere abnormalities of neural timing, and excessive power at frontal sites in a slower frequency band and at certain posterior sites in higher frequency bands. The QEEG findings as interpreted

independently by two different persons related closely to specific neuropsychological test findings. (Dr. Evans, 316)

8. Dr. Bookstein analyzed MRI images of Mr. Fulks's corpus callosum and found that aspects of its shape were a lot more like an FASD experimental sample than non-exposed controls; the reported odds ratio was that Mr. Fulks would have been at least 15 times more likely to be from the FASD set than the non-exposed set. (Report of Dr. Fred Bookstein, 384)

9. Dr. Davatzikos used volumetric MRI analysis to examine the volumes of different brain structures in Mr. Fulks's brain. He noted an overall "highly abnormal profile," most notably from significant atrophy in the region of the left insula and inferior frontal gyrus. In testimony he noted the subarachnoid cyst but opined that there were also more widespread abnormalities in the frontal and temporal lobes "whose combinations suggest that they are probably congenital." (Testimony of Christos Davatzikos, Ph.D., 437)

10. Dr. Gur integrated quantitative functional brain imaging based on Positron Emission Tomography (PET) scanning with neuropsychological testing, and concluded in his report that:

As indicated in the report of Dr. Davatzikos, Mr. Fulks has a highly abnormal brain anatomy with reduced volume in frontal and limbic regions. The PET results indicate focal reduction in neuronal activity in fusiform gyms and thalamus, areas that are central for complex visual processing and signal modulation. At the same time there is abnormal elevation of activity in several fronto-temporal regions and limbic structures including the entire cingulate gyms. The elevated metabolic activity in regions of tissue loss indicates an active pathological process that could be epileptogenic if cerebral perfusion is compromised. The pattern of abnormalities is consistent with results of neuropsychological testing, which shows deficits in functions related to these regions. This includes deficits in abstraction, flexibility, attention and impulse control, as well as affect processing and the olfactory deficit. His right hand tremor may relate to relative reduction in cerebellar activity on the right. His deficits in visual sensorimotor functioning likely relates to reduced metabolism in fusiform gyms and visual sensorimotor areas. Reduced thalamic activity likely interferes with signal modulation and the process of assigning meaning to the environmental cues.

This pattern is consistent with head injuries, where bony structures in the orbital regions produce tissue injury and the force of the blow produces shearing in medially located regions. However, other factors may have exacerbated the deficit including poor prenatal and perinatal conditions and extensive substance abuse. Most substances of abuse affect frontal regions and may add to tissue loss and abnormal physiologic landscape. (Report of Ruben Gur, Ph.D., 456)

11. In his testimony Dr. Gur noted dystrophy at the base of the brain and opined that fetal alcohol exposure was the most likely cause, as well as orbital frontal lack of grey matter of probable prenatal onset. (Trial Testimony of Ruben Gur, Ph.D., 510-1) He described quantitative PET abnormalities in thalamus, basal ganglia, and cerebellum that are very much associated with fetal alcohol exposure. (520-1) In summary, Dr. Gur testified that the structural imaging, functional imaging, and neuropsychometric testing were congruent in showing damage consistent with fetal alcohol exposure, with superimposed abnormalities thought due be due to environmental stress, head injuries, and substance abuse. (565-8)

## BRAIN DOMAINS WITH EVIDENCE OF DYSFUNCTION

1. Intellectual Functioning:

   At age 9 a COGAT/3 Reasoning Skills assessment showed Verbal national grade percentile of 32, Non Verbal 07 (compared to younger children since he repeated 1st Grade).

   Slosson Intelligence Test (SIT) at 9y9m: mental age 8y10mo, IQ 92. (Cabell County School Records, 53)

   At 9y8m his Wechsler Intelligence Scale for Children - Revised (WISC-R) had Verbal IQ 87, Performance IQ 95, Full Scale IQ 90. (Cabell County School Records, 64)

   Wechsler Intelligence Scale for Children - Revised (WISC-R) at age 12 with Verbal IQ 88, Performance IQ 105, Full Scale 96. This 17 point "split" between Verbal and Performance scales was noted to be statistically significant by the testing psychologist. He had specific weakness on Information, representing fund of knowledge and formal education. (Cabell County Board of Education Psychological Evaluation, pages 1-3)

   At age 14, his school psychologist Joy Krug reported a Slosson Intelligence Test with a Verbal IQ of 66 (mental age 9 years, 6 months), and thought being in a new school may have impacted his scores. On the WISC-R, Chad obtained a Verbal IQ of 85, Performance IQ of 105, and Full Scale IQ of 93. His Test of Nonverbal Intelligence (TONI) score was 84. Adaptive testing at the time revealed significant limitations in academic and social domains. Ms. Krug did view his functional capacity to be in the Intellectually Deficient range. (Declaration of Joy Krug, 1892-4; Dr. Brown 1630-2)

   Weschler Adult Intelligence Scale, Third Edition (WAIS-III) at age 25 with Verbal IQ 79, Performance IQ 78, Full Scale IQ 77. (Dr. Venn, 715)

   WAIS-III at age 26 with Verbal IQ 79, Performance IQ 81, Full Scale IQ 78. (Dr. Hilkey, 703)

   Woodcock-Johnson Test of Cognitive Abilities at age 26 with General Intellectual Ability of 79. This and other Butner testing may have been impacted by health and stress factors; he did pass a malingering test (the TOMM) per Drs. Gourley and Landis. (Federal Medical Center Prison Records, 741-4)

2. Academic Achievement:

   In 3rd grade achievement testing showed Vocabulary 22, Comprehension 05, Spelling 11, Language Mechanics 05, Language Expression 00, Math Computation 00, Math Concepts/Applications 21, Reference Skills 11, Science 01, Social Studies 06 (all scores in national grade percentiles compared to younger children). Zero

scores likely represented missed or skipped portions, although they could represent getting all questions wrong in that section. (Cabell County School Records, 18)

Screening in 3rd grade with the Wide Range Achievement Test (WRAT) showed Reading at 80, Spelling at 89, Math at 82. Math subtests on the Kaufman Test of Educational Achievement (KTEA) were "very difficult for subject" but math computation was at the 18th percentile. Spelling was at the 14th percentile. (Cabell County School Records, 50)

In 5th grade his Brigance academic testing showed reading at 5.6, spelling 4, math 4.2 - presumably grade levels. (Cabell County School Records, 55) His special education teacher from that year says these scores were wrong, as they were administered by a backup teacher lacking experience and recopied from previous year. "I was working with him at a much lower level in math and reading." (Dr. Brown, 1635)

In 6th grade achievement testing showed Vocabulary 55, Comprehension 26, Spelling 20, Language Mechanics 00, Language Expression 00, Math Computation 00, Math Concepts/Applications 00, Reference Skills 00, Science 00, Social Studies 00 (all scores in national grade percentiles compared to younger children). (Cabell County School Records, 9)

Other Comprehensive Test of Basic Skills (CTBS) scores are summarized in Dr. Brown's report, where she notes that "these tests are group-administered, multiple choice, frequently prone to inflation, and of questionable reliability." Dr. Brown also notes that the group-administered tests from 3rd and 6th grade have the same issues. (Dr. Brown, 1728-30)

Chad received special education services under SLD, apparently for math learning disability, with additional deficits in basic learning processes of Perception and Conceptualization. (Cabell County School Records, 86, 89) In Fall of 1990 his math was at a 4th grade level, and many other skill areas were below average. (Cabell County School Records, 87) His KTEA for math computation was a 72; this was noted to be a severe discrepancy from his IQ, and not primarily the result of "emotional disturbance; cultural environment or economic disadvantage." (Cabell County School Records, 89)

In Fall of 1991 he was documented to have a more diffuse learning disability, with severe discrepancy for all domains of academic achievement (4-5th grade level), also not primarily due to emotional or environmental factors. (Cabell County School Records, 98) In Spring of 1992 he failed Ohio proficiency tests in writing and reading. (Cabell County School Records, 107)

WRAT-3 at age 25 with Reading 5th percentile, Spelling 5th percentile, Math 8th percentile. (Dr. Venn, 716)

WRAT-3 at age 26 with Reading 14th percentile, Spelling 5th percentile, Math 6th percentile. (Dr. Hilkey, 703)

WRAT-3 at age 26 with Reading standard score of 77. (Dr. Evans, 313)

Woodcock-Johnson results at age 26 ranged "from scaled scores of 72 on the Writing Samples and 76 on the Math Fluency subtests to 91 on the Spelling and Passage Comprehension subtests." (Drs. Gourley and Landis, 1106).

Essentially, Chad's academic career was notable for global academic needs, with support needed in all areas at one time or another. As summarized by his school psychologist:

Chad's test results showed he needed a great deal of help to survive in school. His verbal impairments prevented him from reasoning, and his ability to think abstractly and learn from experience was very limited. He was impulsive and tended to act before thinking ...

Although Chad obtained scores on intellectual tests that fell in the range of mild handicap (i.e., mild intellectual disability), he also demonstrated a significant discrepancy between IQ and achievement. As a result, in order to keep him in regular classrooms with accommodations and be consistent with the criteria used and services provided, the team recommended he receive services for Learning Disabilities in English, Math, Science, and Social Studies ...

Functionally, Chad was intellectually disabled when one considered all his test scores (he didn't have the mental tools to compensate"). His strengths included " street smarts" and "survival skills," as indicated by testing showing he was immediately able to perceive details and respond behaviorally.

Ms. Krug said that while she likely wouldn't have been able to recognize FASD when she encountered it in a child in 1991, she now knew Chad's test scores were consistent with FASD. (Dr. Brown, 1631-2)

3. Memory:

   At 25 years of age Visual Immediate Memory 2nd percentile, Immediate Memory 3rd percentile, General Memory 12th percentile. (Dr. Venn, 717) Multiple areas of CVLT-II at or below -2 SD. Concept formation, learning, and memory (BCT) in the severe impairment range. (Dr. Venn, 717-20)

   Relative deficits in visual memory were noted at Butner, as well. (Federal Medical Center Prison Records, 744)

4. Language:

   Speech articulation problems were documented at 8 years of age, with Arizona Articulation Proficiency Scale showing age-inappropriate errors in sh, ch, j, s, and z; Chad qualified for IEP speech support to work on those sounds as well as frontal lisp. (Cabell County School Records, 36) Peabody Picture Vocabulary Test (PPVT) at age 9y7m showed a developmental age 7y10m, LQ 82. (Cabell County School Records, 37) A PPVT was given again at age 14 with a standard score of 73, mental

age of 9 years, 8 months. (Joy Krug, 1892). Spache test of auditory comprehension was listed at 3-5 at age 9-10. (Cabell County School Records, 59)

Luria receptive and expressive speech skills exceeding critical level. Receptive language skills (BDAE) at the 7th percentile. Boston Naming Test below the 1st percentile. (Dr. Venn, 719). Verbal fluency at the 5th percentile (COWAT). (Dr. Venn, 719)

Butner evaluation also found expressive vocabulary (BNT) at ~1st percentile. (Federal Medical Center Prison Records, 743)

5. Attention:

Dr. Evans administered an Integrated Visual and Auditory Continuous Performance Test (IVA) in 2003, with very low scores: Full Scale Attention Quotient of 40 (average is 100), Full Scale Response Control Quotient of 48. (Dr. Evans, 314)

Dr. Hilkey concluded that Mr. Fulks had Probable Attention Deficit Hyperactivity Disorder by History. (Dr. Hilkey, 704)

Dr. Venn found visual scanning and attention errors at <1st percentile and 4th percentile when repeated. (Dr. Venn, 718)

Evaluations at Butner showed attention and concentration scores at <1st-2nd percentile, possibly impacted by other factors. (Federal Medical Center Prison Records, 743)

6. Executive Functions:

At 9 years of age an academic assessment reported "extreme difficulty with abstract reasoning." (Cabell County School Records, 46)

Dr. Venn found scores at 1st and 2nd percentile on visual scanning and cognitive flexibility testing, and 9th-12th percentile when repeated. He also documented a highly unusual number of intrusions on CVLT-II, indicating significant failure to regulate his behavior in response to stimuli. (Dr. Venn, 718, 721)

Rey Complex Figure testing at Butner showed Copy and Recall scores below the 1st percentile, possibly impacted by other factors. (Federal Medical Center Prison Records, 743)

7. Visual-Motor:

"He appeared to have a lot of difficulty with the Jordan Left Right Reversal Test. It took him a long time to complete this test." (Cabell County School Records, 46) He was at a 7y9m developmental age at 9y9m on this test of visual receptive functioning. (Cabell County School Records, 49)

A Bender Gestalt Visual Motor Test of Integration had 3 errors. "This suggests that Chad has some visual/motor/perceptual difficulty." (Cabell County School Records, 75) Prior testing had been within normal limits. (Cabell County School Records, 65) Testing at age 26 showed only minor errors. (Federal Medical Center Prison Records, 703)

8. Motor Skills:

   Manual Finger Tapping Test at 4th percentile for right and left hand, with unusual symmetry indicating mild-moderate impairment. Grooved Pegboard with right hand 4th percentile, left hand 13th percentile. (Dr. Venn, 719-20)

9. Adaptive Functioning:

   Dr. Brown administered the Vineland Adaptive Behaviors Scales - 3rd Edition (Vineland-3) to Chad's teacher (target age 10) and neighbor (target age 13). Both respondents rated Chad as significantly deficient in adaptive behavior categories of Communication, Daily Living, and Socialization, with global composite scores of 48 (worse than -3.5 SD, <1st percentile) and 60 (worse than -2.7 SD, <1st percentile) respectively. (Dr. Brown, 1641)

   On the Fetal Alcohol Behavior Scale (FABS), all 4 respondents rated Chad at or above the threshold for having the behavioral profile of FASD (even with incomplete responses from Christine Holbrook). (Dr. Brown, 1643)

## A NOTE ON MALINGERING

When Mr. Fulks was referred for competency assessment at Federal Medical Center (Lexington) at age 21, he was reported to be an unreliable historian, to be attempting to feign medical and mental health symptoms, and to be malingering. (Federal Medical Center Prison Records, 1433-38)

Conversely, when he underwent mental health screening while incarcerated at age 22, Mr. Fulks minimized his history of academic challenges (denying repeating a grade, being in special education, history of expulsion), mental health history, and juvenile detention. (Dr. Brown, 1724) And when he was evaluated at Federal Medical Center (Butner) at age 26 he was considered to be a "good and reliable historian," gave adequate effort, and passed the Test of Memory Malingering. (Federal Medical Center Prison Records, 0732-44)

Thus, Mr. Fulks has a history of both exaggerating mental health and cognitive difficulties in young adulthood, as well as minimizing/masking them at times. For this reason, I have sought to corroborate Mr. Fulks' statements to me with historical records and other informants.

In the broader context of his lifelong history of developmental and behavioral challenges, it is difficult to imagine that Mr. Fulks could have consistently malingered his performance on repeated standardized testing from early childhood to adulthood. This would be challenging even for individuals with advanced training in neuropsychology. It would also assume that the younger Chad wanted special education

services he didn't need at ages when children are highly motivated to *avoid* this stigma. Finally, it would also be physically impossible for Mr. Fulks to have malingered his neuroimaging results. His testing results are also consistent with multiple third-party reports of his functioning.

## IN-PERSON EVALUATION

I had the opportunity to interview and examine Mr. Fulks during a 150-minute contact visit on 10/24/16, in a semi-private interview room at the United States Penitentiary, Terre Haute. I explained the scope of my evaluation, my background and licensure, that his participation was optional, and that I could not maintain my typical level of confidentiality. He appeared to understand and agreed to proceed.

### MENTAL STATUS EVALUATION

Mr. Fulks was cooperative with the interview and exam. We were allowed to meet in a contact visit room with him shackled for the majority of the exam, with an inaccurate scale and stadiometer.

Mr. Fulks was responsive to questions and on-topic, with a nervous air. His mood was not overtly depressed, flat, or labile during our interview. There was no evidence of pressured speech, flight of ideas, or responding to internal stimuli. His speech was simpler, with what sounded like a combination of Southern rural accent and residual articulation issues.

Mr. Fulks failed the Montreal Cognitive Assessment (MoCA, version 7.1),[6] which is a medical clinician screening tool for cognitive dysfunction, used in this case for a brief qualitative evaluation. It is not intended to supersede the type of neuropsychometric testing performed by psychologists, as many of the tasks are easier than those found on formal diagnostic tests.

His total score on the MoCA was 22 out of 30 (in the abnormal range, even with one point added for abbreviated education), with a normal score being 26 or above. He appeared to give good effort. He talked to himself to an unusual degree on certain subtests, repeating the instructions out loud; he was audibly self-critical when his performance was poor. Subtest results are listed below.

Visuospatial/Executive: Mr. Fulks's alternate trail-making was correct but very laboriously so; his 3-D cube copy was very disorganized and incomplete; his "draw-a-clock" had almost correct number placement (credit given) and hands that were very close to the same length (credit not given). He achieved 3 out of 5 points in this section.

---

[6] Nasreddine, Z. S., Phillips, N. A., Bédirian, V., Charbonneau, S., Whitehead, V., Collin, I., et al. (2005). The Montreal Cognitive Assessment, MoCA: a brief screening tool for mild cognitive impairment. Journal of the American Geriatrics Society, 53(4), 695–699.

Naming: He was able to correctly identify a lion, rhino, and camel. (3/3 points)

Attention: A 5-digit list was recalled correctly on forward order, and he was correct with 3-digit list in backward order; he was slow to respond and had excessive errors of omission on a vigilance task; serial 7 subtractions was accurate but notably slow and effortful. (5/6 points)

Language: He failed to accurately repeat the second sentence - "The cat always hid under the couch when dogs were in the room" became "The cat always hid under the couch when the dog was in the room." Language fluency (maximum number of words he could produce that start with F) was poor, only 9 words in one minute. (1/3 points)

Abstraction: He was able to describe a similarity between train & bicycle ("transportation") but failed watch & ruler ("both got numbers"). (1/2 points)

Delayed Recall: He recalled 3 of 5 words at 5 minutes, got one remaining word with category prompts, and the last word was still incorrect with multiple choice. (3/5 points)

Orientation: Intact to month, year, day of week, place, and city; off by one on the date. (5/6 points)

His performance on this screening evaluation indicated potential problems in visuospatial/executive skills, attention, language, abstract thinking, and memory. It was also consistent with the 23 out of 30 score on a similar test reported by Dr. Bachman (139). Had this been the first testing he'd received, I would have recommended thorough testing by a psychologist. Indeed, such testing confirmed deficits in these areas of concern.

## PHYSICAL EXAMINATION

Weight: 184 pounds on facility exam room scale; Mr. Fulks reported that his weight several weeks prior was 168 pounds.

Height: 70.25 inches on facility stadiometer, but Mr. Fulks reported his height to be six feet, which matches other adult records.

Occipitofrontal head circumference (OFC): Measured by me at 55.5 cm (45th percentile).

General: Clothed in prison garments, clean-shaven, with thin, close-cut hair. Slumped posture.

Head, Eyes, Ears, Nose, Throat (HEENT): Upper lip was a 3 (just below the FAS range), using the in-person guide appropriate for his ethnicity. Philtrum (vertical groove between nose and lip) depth was a 3 on the lip-philtrum guide (below the FAS range).

Palpebral fissure lengths (width of visible eye openings) were measured manually at 28 mm on the right, and 27 mm on the left.

Typical head shape. No midface flattening. Typical ear position and rotation; small nodule vs prominent cartilage behind left ear. Conjunctivae clear. Poor dentition, with missing and cracked teeth, intact palate. Posterior pharynx mildly erythematous without exudate. Flatter/softer left nasolabial fold with mild droop to left corner of mouth; facial expression otherwise symmetric.

Neck: No notable cervical lymphadenopathy or thyromegaly, but tender 2mm firm nodule palpated under the skin just about the cricoid.

Heart: Regular rate and rhythm, without murmur.

Chest: Lungs clear to auscultation, typical respiratory rate.

Abdomen: Soft, non-tender, without palpable organomegaly. Genitourinary and rectal exam deferred.

Skin: No notable birthmarks or rash on face, trunk, arms, or lower legs. Small scattered moles, none alarming in appearance. Tattoos on back. Incomplete list of scars includes left forehead, top of head, and occiput, as well as left lateral spine at T2. Small (5mm or smaller) subtle subcutaneous nodules on left anterior distal thigh and left shin.

Extremities: No clinodactyly, elbow valgus or evidence of radio-ulnar synostosis. No jaundice or edema noted.

Neurologic: Right-handed by self-report. Cranial nerves II-XII intact. Visual fields intact. Sensation intact to light touch, but palmar digit recognition was inconsistent (2 out of 3). Strength 5/5 in upper and lower extremities. Normal rapid alternating movements, but fingertip touching was clumsy. Finger-nose-finger accurate. Intact tandem gait and one-leg stance, considering leg shackles. Mr. Fulks did have prominent motor tics: eye blinking and right neck/shoulder contractions. No verbal tics or other unusual motor movements were appreciated.

## PHOTOGRAPHIC ANALYSIS OF FACIAL FEATURES[7]

The University of Washington FAS Facial Photographic Analysis Software is used by clinics around the world to analyze the sentinel facial features of FAS, and has been shown to be more accurate and reliable than manual evaluations, particularly in eye measurements.[8]

---

[7] Astley S. J. Fetal Alcohol Syndrome Facial Photographic Analysis Software, version 2.0.

[8] Astley, S. J. (2015). Palpebral fissure length measurement: accuracy of the FAS facial photographic analysis software and inaccuracy of the ruler. Journal of Population Therapeutics and Clinical Pharmacology, 22(1), e9–e26.

Palpebral fissure lengths (eye widths): Mean palpebral fissure lengths (PFL) of 31.3 mm, which is 1.12 standard deviations (SD) above the mean on the Stromland PFL chart, which is a Caucasian-normed chart.

Lip: Lip circularity 57.9, rank of 3 on the University of Washington Lip-Philtrum Guide (which is not in the FAS range on a scale of 1-5, with 5 being the most severe).

Philtrum: Rank of 3 (not in the FAS range on a scale of 1-5, with 5 being the most severe) on the University of Washington Lip-Philtrum Guide.

## DIAGNOSIS AND OPINION

Based on my examination of Chadrick Fulks and review of relevant ancillary materials, it is my opinion to a reasonable degree of medical certainty that Mr. Fulks has Static Encephalopathy / Alcohol Exposed, using the University of Washington 4-Digit Code.[9] This is equivalent to Alcohol-Related Neurodevelopmental Disorder (ARND) using the Institute of Medicine (IOM) criteria,[10] and is a diagnosis under the umbrella of Fetal Alcohol Spectrum Disorders (FASD).

When evaluating for a Fetal Alcohol Spectrum Disorder, there are 4 main areas to explore: evidence of growth deficiency, degree of FAS facial features, level of brain dysfunction, and history of prenatal alcohol exposure. A process of differential diagnosis is also important, to consider other genetic, prenatal, postnatal, medical, and psychiatric explanations for a patient's outcomes.

FASD diagnosis is multi-disciplinary, and it is typical for medical professionals to rely on the reports of colleagues such as psychologists and social workers when evaluating level of brain dysfunction, adaptive functioning, alcohol exposure, and life history.

### GROWTH

Birth and early pediatric growth records are currently unavailable, which is unfortunate as the growth impairments in FAS are often most evident in the newborn and early childhood period, and often "catch up" in adolescence.[11] Mr. Fulks's middle childhood and adult growth data do not show deficits in weight or height.

---

[9] Astley, S. J., & Clarren, S. K. (2000). Diagnosing the full spectrum of fetal alcohol-exposed individuals: introducing the 4-digit diagnostic code. Alcohol and Alcoholism (Oxford, Oxfordshire), 35(4), 400–410.

[10] Stratton, K. R., Howe, C. J., Battaglia, F. C., Institute of Medicine (U.S.). Committee to Study Fetal Alcohol Syndrome, National Institute on Alcohol Abuse and Alcoholism (1996). Fetal Alcohol Syndrome: Diagnosis, Epidemiology, Prevention, and Treatment. National Academies Press.

[11] Carter, R. C., Jacobson, J. L., Sokol, R. J., Avison, M. J., & Jacobson, S. W. (2013). Fetal alcohol-related growth restriction from birth through young adulthood and moderating effects of maternal prepregnancy weight. Alcoholism Clinical and Experimental Research, 37(3), 452–462.

## FACIAL FEATURES

Mr. Fulks does not have the face of FAS. His upper lip, philtrum, and eye widths are all in the normal range. Research suggests that the facial features of FAS require an alcohol exposure during a very narrow window of opportunity, perhaps on days 19-20 of pregnancy. Thus, the majority of alcohol-affected individuals do not have the facial features; in fact, only 9% of patients in our FAS clinic have "the face" of FAS.[12]

## BRAIN

In an FASD evaluation, we look for structural and/or functional (psychometric testing) evidence of brain damage. One or the other can independently satisfy this brain criterion. Mr. Fulks has both.

On routine clinical MRI a 1.5 by 1.5 cm arachnoid cyst was seen along the right sylvian fissure. Such cysts represent about 1% of identified intracranial lesions and can be incidentally noted on imaging; the sylvian fissure is a common location for such a cyst. Depending on size and growth trends, arachnoid cysts may or may not be associated with symptoms.[13] This finding alone is insufficient evidence of structural damage.

Volumetric analysis (using computer analysis to compare volumes of specific brain structures to a normal control group) showed a highly abnormal profile, with widespread abnormalities in the frontal and temporal lobes that were thought to be congenital in origin by Dr. Davatzikos. The shape of Mr. Fulks's corpus callosum (a thick bundle connecting left and right brain that is notorious for being sensitive to prenatal alcohol damage) was analyzed by Dr. Bookstein and found to be much more consistent with his FASD group than his normal controls.

Routine clinical reading of a brain PET scan showed diffusely decreased cortical metabolic activity. Furthermore, Dr. Gur integrated quantitative functional brain imaging (based on PET scanning) with neuropsychological testing and opined in his testimony that Mr. Fulks has quantitative PET abnormalities in the thalamus, basal ganglia, and cerebellum that are highly associated with fetal alcohol exposure, with superimposed abnormalities thought to be due to environmental stress, head injuries, and substance abuse.

Other more functional neurodiagnostic testing included EEG and quantitative EEG. A 1998 EEG was reported to show diffuse slowing by Dr. Bachman. A QEEG was read as

---

[12] Astley, S. J. (2010). Profile of the first 1,400 patients receiving diagnostic evaluations for fetal alcohol spectrum disorder at the Washington State Fetal Alcohol Syndrome Diagnostic & Prevention Network. The Canadian Journal of Clinical Pharmacology = Journal Canadien De Pharmacologie Clinique, 17(1), e132–64.

[13] Gelabert-González, M., Santín-Amo, J. M., Aran-Echabe, E., & García-Allut, A. (2015). [Imaging diagnosis of arachnoid cysts]. Neurocirugia (Asturias, Spain), 26(6), 284–291.

abnormal by two specialists, consistent with residual effects of brain damage and providing support for neurological dysfunction.

These brain findings are certainly consistent with the research literature on FASD but are not caused only by prenatal alcohol exposure.[14,15,16,17] There is not yet a pattern of brain damage that is as unique to prenatal alcohol injury as the face of FAS, but such structural evidence of brain damage satisfies the brain criterion. As in much of medicine, pattern recognition and differential diagnosis (weighing possible etiologies) play an important role in diagnosis.

It is also unusual in the clinical practice of FASD to have this much neurodiagnostic testing to integrate. This is due to many factors: cost, feasibility for a typically younger and wriggly clinic population, evolving standards of what is a clinical versus research tool (doctors and insurance companies can be quite conservative in this regard), and the plain fact that for the majority of FASD clinical evaluations the neuropsychometric testing data is sufficient and more relevant to that patient's clinical recommendations. In forensic practice where it is common to have concerns of malingering (it's hard to fake an MRI) and the desire for additional evidence to support a diagnosis in an inherently adversarial process, such neurodiagnostic testing is more common. In this case, the wide range of testing information available to me strengthens my conclusions.

The cumulative impression of both routine clinical testing and research-informed analyses here is that Mr. Fulks has a structurally abnormal brain in a pattern consistent with the FASD literature, with some findings quite suggestive of congenital defects as well as the probability of further damage from environmental stress, head injuries, and substance abuse. This is sufficient to meet the brain criterion.

Turning to functional evidence of brain damage, Mr. Fulks has ample evidence on neuropsychometric testing to qualify for a 4-Digit Code diagnosis of Static Encephalopathy, which is a non-progressive brain injury diagnosable in the presence of significant impairments (-2 standard deviations or worse on standardized testing) in 3 or more functional domains. He shows such impairments in multiple domains of brain function on standardized testing: Academic Achievement, Memory, Language, Attention, and Executive Functioning.

---

[14] Guerri, C., Bazinet, A., & Riley, E. P. (2009). Foetal Alcohol Spectrum Disorders and alterations in brain and behaviour. Alcohol and Alcoholism (Oxford, Oxfordshire), 44(2), 108–114.

[15] Astley, S. J., Aylward, E. H., Olson, H. C., Kerns, K., Brooks, A., Coggins, T. E., Davies, J. K. et al. (2009). Magnetic resonance imaging outcomes from a comprehensive magnetic resonance study of children with fetal alcohol spectrum disorders. Alcoholism Clinical and Experimental Research, 33(10), 1671–1689.

[16] Treit, S., Lebel, C., Baugh, L., Rasmussen, C., Andrew, G., & Beaulieu, C. (2013). Longitudinal MRI Reveals Altered Trajectory of Brain Development during Childhood and Adolescence in Fetal Alcohol Spectrum Disorders. The Journal of Neuroscience : the Official Journal of the Society for Neuroscience, 33(24), 10098–10109.

[17] Sowell, E. R., Thompson, P. M., Mattson, S. N., Tessner, K. D., Jernigan, T. L., Riley, E. P., & Toga, A. W. (2002). Regional brain shape abnormalities persist into adolescence after heavy prenatal alcohol exposure. Cerebral Cortex (New York, NY : 1991), 12(8), 856–865.

Furthermore, he has additional evidence of delay or dysfunction in the following domains: Intelligence (unusual VIQ/PIQ "split" at age 12, later intelligence scores in the upper 70s), Visual-Motor, and Motor skills. The uneven performance on testing (some scores in the average range and some that are markedly impaired) is a hallmark of FASD, as is a decline in academic performance after about 4th grade, as academic demands increase.

Such widespread mild to severe impairments would predict very poor real-world functioning without substantial external supports and structure. This is reflected in Mr. Fulks's life history and very poor adaptive functioning described in Dr. Brown's report. On the fetal alcohol spectrum, Mr. Fulks's brain injuries and overall functioning qualify as severe.

Notably, a number of Mr. Fulks's deficits were present in childhood before head injuries and substance abuse became significant comorbid risk factors, such as early childhood speech/language problems, poor coordination, social/emotional concerns, failing first grade despite reasonable attendance, qualifying for speech services in first grade, and a referral at age 9 for multidisciplinary school assessment for behavioral problems that included failure to complete tasks, lack of self-direction, needing guidance at all times, lack of self-discipline, distractibility, and weaknesses in most academics.

These domains are congruent with the areas that he struggled with on the Montreal Cognitive Assessment during my evaluation. They are consistent with patterns of dysfunction seen in FASD. They also meet Institute of Medicine ARND criteria for:

B. Evidence of a complex pattern of behavior or cognitive abnormalities that are inconsistent with developmental level and cannot be explained by familial background or environment alone, such as learning difficulties; deficits in school performance; poor impulse control; problems in social perception; deficits in higher level receptive and expressive language; poor capacity for abstraction or metacognition; specific deficits in mathematical skills; or problems in memory, attention, or judgment

## ALCOHOL

Mr. Fulks was exposed to alcohol prenatally in a pattern that is consistent with the medical literature placing the fetus at high risk for fetal alcohol damage (generally high peak blood alcohol concentrations delivered at least weekly in early pregnancy).

This was recently documented in Dr. Brown's interview of Chad's father and is consistent with the reports of other family members and neighbors who were witnesses to his mother's excessive drinking during Chad's pregnancy and early childhood.

Previously, Dr. Andrews had interviewed multiple family members and concluded that Mr. Fulks's mother drank alcohol during her pregnancy with Chad. It is typical in the field of FASD to rely on social work or psychology colleagues for confirmation of prenatal alcohol exposure, whether from records review or interviews with family members and other witnesses to drinking.

Mr. Fulks meets 4-Digit Code criteria for "high risk" prenatal alcohol exposure, as well as the following IOM criteria:

a A pattern of excessive intake characterized by substantial, regular intake or heavy episodic drinking. Evidence of this pattern may include frequent episodes of intoxication, development of tolerance or withdrawal, social problems related to drinking, legal problems related to drinking, engaging in physically hazardous behavior while drinking, or alcohol-related medical problems such as hepatic disease.

b As further research is completed and as, or if, lower quantities or variable patterns of alcohol use are associated with ARBD or ARND, these patterns of alcohol use should be incorporated into the diagnostic criteria.

## DIAGNOSIS

Thus, Mr. Fulks meets criteria for Static Encephalopathy / Alcohol Exposed, also known as severe Alcohol-Related Neurodevelopmental Disorder (ARND).[18] This diagnosis is a Fetal Alcohol Spectrum Disorder (FASD). It is also worth noting that Mr. Fulks would receive a DSM-5 diagnosis of Neurodevelopmental Disorder Associated with Prenatal Alcohol Exposure (ND-PAE, code F88).[19]

This diagnosis is congruent with prior expert testimony. Terminology has evolved, but Dr. Bachman and Dr. Melikian both diagnosed Mr. Fulks with Fetal Alcohol Effects, an older term for ARND. My conclusion also matches that of Dr. Clarren (one of the co-developers of 4-Digit Code and my predecessor at the University of Washington), with the added confidence of a more thorough records review and an in-person evaluation.

I have used 4-Digit Code in my analysis for consistency with prior evaluations of Mr. Fulks and with my routine clinical practice. 4-Digit Code is known for generally having the most specific and stringent of the diagnostic criteria for FASDs. The thresholds for facial features and brain injury (for Static Encephalopathy) are higher in 4-Digit Code than in other criteria in clinical use.

However, there are published protocols for forensic use of IOM criteria.[20] I am knowledgeable in and comfortable working with both criteria, and I will note here that Mr. Fulks also meets IOM criteria for Alcohol-Related Neurodevelopmental Disorder (ARND).

---

[18] Astley, S. J., & Clarren, S. K. (2000). Diagnosing the full spectrum of fetal alcohol-exposed individuals: introducing the 4-digit diagnostic code. Alcohol and Alcoholism (Oxford, Oxfordshire), 35(4), 400–410.

[19] American Psychiatric Association DSM-5 Task Force (2013). Diagnostic and Statistical Manual of Mental Disorders : DSM-5. American Psychiatric Association, Washington, DC.

[20] Brown, N. N., Wartnik, A. P., Connor, P. D., & Adler, R. S. (2010). Proposed Model Standard for Forensic Assessment of Fetal Alcohol Spectrum Disorders, Journal of Psychiatry & Law 38, 383.

## DIFFERENTIAL DIAGNOSIS

Other adverse pre- and post-natal factors also contributed to the brain dysfunction displayed by Mr. Fulks.

Chad's mother used tobacco during pregnancy, which increases risk for low birthweight, ADHD, and antisocial behaviors.[21] However, the research is clear that alcohol is the most worrisome prenatal exposure compared to other substances of abuse.

His available family history contains drug and alcohol abuse, a younger sibling with epilepsy, an older brother with FAS, a sibling and son with congenital heart defects, and delinquency, but the known family history is not notable for a clear-cut pattern of inheritable intellectual disability or other developmental disabilities.

Mr. Fulks described a number of medical symptoms to me which were outside of the scope of my evaluation and expertise. These symptoms did not fall into a pattern that clearly matched a medical or genetic syndrome that would better explain his brain dysfunction.

Mr. Fulks does have evidence of a tic disorder, which can co-occur with ADHD and anxiety disorders such as OCD. Prenatal alcohol exposure is one of the known risk factors for tic disorders,[22] and a constellation of FAS, ADHD, and Tourette syndrome has been described.[23]

Postnatal adverse risk factors are extensive and include caregiver substance abuse; domestic violence; physical abuse; sexual abuse; poverty; academic neglect; lack of appropriate structure and supervision at home; older siblings involved in substances and delinquency; parental divorce; and extensive early onset substance use. This life history multiplied his risk of adverse outcomes such as disrupted school experience, trouble with the law, confinement, mental health diagnoses, drug/alcohol problems, as these risk factors increase the odds of such "secondary disabilities" in FASD 2- to 4-fold.[24]

---

[21] Davies, J. K., & Bledsoe, J. M. (2005). Prenatal alcohol and drug exposures in adoption. Pediatric Clinics of North America, 52(5), 1369–93, vii.

[22] Mathews, C. A., Scharf, J. M., Miller, L. L., Macdonald-Wallis, C., Lawlor, D. A., & Ben-Shlomo, Y. (2013). Association between pre- and perinatal exposures and Tourette syndrome or chronic tic disorder in the ALSPAC cohort. The British Journal of Psychiatry : the Journal of Mental Science, 204(1), bjp.bp.112.125468–45.

[23] Fernández-Mayoralas, D. M., Fernández-Jaén, A., Muñoz-Jareño, N., Calleja Pérez, B., & Arroyo-González, R. (2010). Fetal Alcohol Syndrome, Tourette Syndrome, and Hyperactivity in Nine Adopted Children. Pediatric Neurology, 43(2), 110–116.

[24] Streissguth, A. P., Bookstein, F. L., Barr, H. M., Sampson, P. D., O'Malley, K., & Young, J. K. (2004). Risk factors for adverse life outcomes in fetal alcohol syndrome and fetal alcohol effects. Journal of Developmental & Behavioral Pediatrics, 25(4), 228–238.

Childhood mistreatment, also known as complex or developmental trauma, has been shown to affect the life outcomes displayed by Mr. Fulks. "The organization and functional capacity of the human brain ... is vulnerable to extreme, repetitive, or abnormal patterns of stress during critical or circumscribed periods of childhood brain development that can impair, often permanently, the activity of major neuroregulatory systems, with profound and lasting neurobehavioral consequences."[25]

Adults like Mr. Fulks who have ≥4 adverse childhood experiences (ACEs) such as emotional abuse, physical abuse, sexual abuse, parental substance abuse, domestic violence, and separation of parents have been shown to have a risk of panic reactions, depressed affect, anxiety, and hallucinations that are increased 2.5-, 3.6-, 2.4-, and 2.7-fold, respectively. The risk of smoking, alcoholism, illicit drug use, and injected drug use is increased 1.8-, 7.2-, 4.5-, and 11.1-fold, respectively. High perceived stress, difficulty controlling anger, and the risk of perpetrating intimate partner violence is increased 2.2-, 4.0-, and 5.5-fold, respectively.[26]

Lead exposure is possible but not formally documented. Early childhood lead exposure can lower IQ but not typically by more than 5-10 points.[27] Later lead exposure (a possible risk from moonshine consumption) is unlikely to impact IQ to that degree but could have impacting his cognitive functioning to some degree.

Traumatic brain injury (TBI) is another prominent risk factor in Mr. Fulks's case, with more minor injuries in middle childhood and more significant but still technically "mild" closed head injuries in adolescence. In general, the prognosis for children with TBI is better than for adults with comparable TBI. A recent systematic review of pediatric mild TBI found that "most studies show that post-concussion symptoms and cognitive deficits resolve over time. Limited evidence suggests that post-concussion symptoms may persist in those with lower cognitive ability and intracranial pathology on neuroimaging [at the time of injury]."[28] Since Mr. Fulks indeed had pre-injury lower cognitive functioning (lower "cognitive reserve"), he was at increased risk for lingering post-concussion cognitive, somatic, emotional, and behavioral symptoms.[29] Furthermore, pediatric TBI has also been linked to an approximately 2-fold increased

[25] Anda, R. F., Felitti, V. J., Bremner, J. D., Walker, J. D., Whitfield, C., Perry, B. D., et al. (2005). The enduring effects of abuse and related adverse experiences in childhood. European Archives of Psychiatry and Clinical Neuroscience, 256(3), 174–186.

[26] Ibid.

[27] Lanphear, B. P., Hornung, R., Khoury, J., & Yolton, K. (2005). Low-level environmental lead exposure and children's intellectual function: an international pooled analysis. Environmental Health Perspectives, 113(7), 894–899.

[28] Hung, R., Carroll, L. J., Cancelliere, C., Côté, P., Rumney, P., Keightley, M., et al. (2014). Systematic review of the clinical course, natural history, and prognosis for pediatric mild traumatic brain injury: results of the International Collaboration on Mild Traumatic Brain Injury Prognosis. Archives of Physical Medicine and Rehabilitation, 95(3 Suppl), S174-91.

[29] Fay, T. B., Yeates, K. O., Taylor, H. G., Bangert, B., Dietrich, A., Nuss, K. E., et al. (2010). Cognitive reserve as a moderator of postconcussive symptoms in children with complicated and uncomplicated mild traumatic brain injury. Journal of the International Neuropsychological Society, 16(1), 94–105.

risk of premature mortality, psychiatric inpatient admission, psychiatric outpatient visits, disability pension, welfare recipiency, and low educational attainment.[30]

Substance abuse starting at an early age and continuing during the adolescent developmental period is another notable risk factor for Mr. Fulks: alcohol, marijuana, a relatively brief period of inhalant abuse, "pills," cocaine, and methamphetamine abuse were described. The literature on long-term impacts of substance use during the developmental period is emerging and as yet poorly controlled for other risk factors (such as preexisting impairments like FASD), but substance abuse in adolescence has been implicated in cognitive deficits and brain structural impacts. However, there is also evidence of at least partial recovery from deficits after a period of abstinence. Onset of use before age 18 has been linked with the greatest neurocognitive deficits, for alcohol and marijuana at least.[31] The literature on inhalant impacts is limited in adolescent recreational users (versus occupational exposures), but inhalant abuse appears to cause some impacts that may improve with abstinence.[32] Research on methamphetamine abuse and cognitive decline has been mixed, but meth appears to cause mild (on average) cognitive decline, of unknown duration, in at least some users of the drug.[33]

It is my opinion that Mr. Fulks's head injuries and early onset substance abuse aggravated his underlying FASD, impacted his academic and behavioral issues, and contributed to his declining IQ scores over time, but are unlikely to be the sole cause of his imaging and neuropsychometric findings. His pre-existing developmental and behavioral concerns, the diffuse nature of brain abnormalities reported, and the highly abnormal volumetric analysis implicate an early, likely congenital insult more than childhood to adolescent-era damage.

Finally, Mr. Fulks has a mental health history that includes depression, suicide attempts, anxiety, PTSD, ASPD, and poly-substance dependence. Mental health problems are frequently comorbid with FASDs. In one study of adults with FASD, 92% met criteria for an Axis-I disorder such as alcohol or drug dependence (60%), depression (44%), psychotic symptoms (40%), and anxiety or bipolar disorder (20% each). In addition, 48% met criteria for at least one personality disorder, with 19% having antisocial personality disorder.[34]

---

[30] Sariaslan, A., Sharp, D. J., D'Onofrio, B. M., Larsson, H., & Fazel, S. (2016). Long-Term Outcomes Associated with Traumatic Brain Injury in Childhood and Adolescence: A Nationwide Swedish Cohort Study of a Wide Range of Medical and Social Outcomes. PLoS Medicine, 13(8), e1002103-18.

[31] Lisdahl, K. M., Gilbart, E. R., Wright, N. E., & Shollenbarger, S. (2013). Dare to Delay? The Impacts of Adolescent Alcohol and Marijuana Use Onset on Cognition, Brain Structure, and Function. Frontiers in Psychiatry, 4.

[32] Lubman, D. I., Yücel, M., & Lawrence, A. J. (2008). Inhalant abuse among adolescents: neurobiological considerations. British Journal of Pharmacology, 154(2), 316–326.

[33] Dean, A. C., Groman, S. M., Morales, A. M., & London, E. D. (2013). An Evaluation of the Evidence that Methamphetamine Abuse Causes Cognitive Decline in Humans. Neuropsychopharmacology, 38(2), 259–274.

[34] Famy, C., Streissguth, A. P., & Unis, A. S. (1998). Mental illness in adults with fetal alcohol syndrome or fetal alcohol effects. The American Journal of Psychiatry, 155(4), 552–554.

It is vanishingly rare to see a patient in FAS clinic who does not have some combination of at-risk family history, prenatal alcohol exposure, other prenatal influences, and adverse childhood experiences. It is not possible to scientifically tease apart the negative influences of all of these factors with precision, particularly in an adult who has also abused multiple substances and suffered head injuries. In Mr. Fulks's case, however, his history of early childhood developmental delays, school failure, and behavioral challenges, as well as having both functional and structural evidence of brain damage in a pattern consistent with FASD, implicate prenatal alcohol as a primary cause. I consider the later risk factors as co-occurring rather than competing etiologies.

One final piece of evidence points to FASD: his older brother. Dr. Bachman had the opportunity to evaluate Ronnie, and noted growth retardation, microcephaly (a small head), congenital heart defect, and all of the physical/facial features of FAS. He testified with "great confidence" that Ronnie has Fetal Alcohol Syndrome. Ronnie's reported findings, Dr. Brown's impressions, and the available photos are indeed consistent with this diagnosis.

What does this mean for Chad, Ronnie's younger brother? One of the strongest known predictors of FASD is the presence of an older sibling with FAS: Ronnie's FAS diagnosis increases the risk of Chad having an FASD as much as 400-fold compared to the general population risk.[35] What's more, "FAS studies consistently report that women who have had one child with FAS, and who continue to drink, have progressively more severely affected children with subsequent pregnancies."[36]

## SUMMARY

Chadrick Fulks has Static Encephalopathy / Alcohol Exposed, a severe Fetal Alcohol Spectrum Disorder. This birth defect syndrome was compounded by adverse life experiences, head injuries, and substance abuse.

Based on my review of the available records and my in-person examination, I hold the above opinions to a reasonable degree of medical certainty. The analysis I have conducted could have been conducted by any qualified FASD professional at the time of Mr. Fulks's trial and conviction.

Thank you for the opportunity to examine Mr. Fulks.

Julian Davies, MD
Signed on March 4, 2019

---

[35] Abel, E. L. (1988). Fetal alcohol syndrome in families. Neurotoxicology and Teratology, 10(1), 1–2.

[36] Astley, S. J., Bailey, D., Talbot, C., & Clarren, S. K. (2000). Fetal alcohol syndrome (FAS) primary prevention through fas diagnosis: II. A comprehensive profile of 80 birth mothers of children with FAS. Alcohol and Alcoholism (Oxford, Oxfordshire), 35(5), 509–519.

# JULIAN K. DAVIES, M.D.

4245 ROOSEVELT WAY NE, SEATTLE WA 98105
206-598-3000    JOOLIAN@UW.EDU

## EDUCATION
Undergraduate (B.A. magna cum laude): Yale University 9/90-5/94
Graduate (M.D.): University of California, San Francisco School of Medicine 9/95-6/00

## POSTGRADUATE TRAINING
University of Washington Pediatrics Residency 6/00-6/03
   Continuity clinic focus on international adoption pediatrics

## FACULTY POSITIONS HELD
Clinical Professor in the Full-Time Clinical Faculty Pathway 8/03-Present
   Division of General Pediatrics in the Department of Pediatrics,
   University of Washington School of Medicine

Co-Director, Center for Adoption Medicine 1/05-Present

Fetal Alcohol Syndrome Clinic Pediatrician 8/03-Present
   University of Washington School of Medicine

Interim Medical Director, Pediatric Care Center 2/12-9/12, 10/14-1/15

## HOSPITAL POSITIONS HELD
On staff at Seattle Children's Hospital, Seattle, WA

## HONORS
Undergraduate: B.A. magna cum laude, Distinction in the English Major

Medical School:
   1998 Department of Pediatrics Award for Excellence in the Pediatric Clerkship
   2000 Dr. Robert Crede Award for Primary Care and Dedication to Patient Care

University of Washington Employment:
   2009 First Annual Maria Hall Award for Excellence in Patient & Family Centered Care
   2009 June Medical Staff Teamwork Leadership and Caring Award
   2015 January-June UW Medicine PRAISE Award
   2018 January-June UW Medicine PRAISE Award

## BOARD CERTIFICATION
American Board of Pediatrics: Certified 10/03

## CURRENT LICENSES TO PRACTICE
State of Washington

App. 00045

## PROFESSIONAL ORGANIZATIONS
American Academy of Pediatrics
Council on Foster Care, Adoption, and Kinship Care

## TEACHING RESPONSIBILITIES
Noon conferences on international adoption and FASDs to UW students and residents
Continuity Clinic Preceptor

## SPECIAL NATIONAL RESPONSIBILITIES
"Adoptmed" Adoption Professional Listserv Administrator

Medical Advisory Board Member for SPOON Foundation, which works to improve nutrition and feeding practices for orphans and vulnerable children

Member of the Global Nutrition Working Group, a project with Joint Council on International Children's Services and Mead-Johnson aimed at improving orphanage nutrition and feeding (2011-2013)

## SPECIAL LOCAL RESPONSIBILITIES
Organizer of "Raising Resilient Rascals" Regional Adoption and Foster Care Conferences (2007-2011)

## RESEARCH FUNDING
Magnetic Resonance Imaging and Spectroscopy in children with prenatal alcohol exposure. (Susan J. Astley, Ph.D., Principal Investigator). Julian Davies, MD, Co-Investigator. NIAAA R01 AA12915-01A1. 5% salary coverage from 3/01/02 - 2/28/06.

## PUBLICATIONS
## MANUSCRIPTS IN REFEREED JOURNALS
**Davies J**, Bledsoe J. Prenatal Alcohol and Drug Exposures in Adoption. *Pediatr Clin N Am*. 2005;52:1369-1393.

Astley SJ, Aylward E, Brooks A, Carmichael Olson H, Coggins T, **Davies J**, Dorn S, Gendler B, Jirikowic T, Kerns K, Kraegel P, Maravilla K, Richards T. Neuropsychological and behavioral outcomes from a comprehensive magnetic resonance study of children with fetal alcohol spectrum disorders. *Can J Clin Pharmacol*. 2009;16(1):e178-201.

Astley SJ, Aylward E, Brooks A, Carmichael Olson H, Coggins T, **Davies J**, Dorn S, Gendler B, Jirikowic T, Kerns K, Kraegel P, Maravilla K, Richards T. Magnetic resonance spectroscopy outcomes from a comprehensive magnetic resonance study of children with fetal alcohol spectrum disorders. *Magnetic Resonance Imaging*. 2009;27(6):760-78.

Astley SJ, Aylward E, Brooks A, Carmichael Olson H, Coggins T, **Davies J**, Dorn S, Gendler B, Jirikowic T, Kerns K, Kraegel P, Maravilla K, Richards T. Functional magnetic resonance imaging outcomes from a comprehensive magnetic resonance study of children with fetal alcohol spectrum disorders. *J Neurodevelop Disord*. 2009;1:61–80.

Astley SJ, Aylward E, Brooks A, Carmichael Olson H, Coggins T, **Davies J**, Dorn S, Gendler B, Jirikowic T, Kerns K, Kraegel P, Maravilla K, Richards T. Magnetic resonance imaging outcomes from a comprehensive magnetic resonance study of children with fetal alcohol spectrum disorders. *Alcohol Clin Exp Res*. 2009;33(10):1671-89.

Shipe M, Edwards T, Evans K, Schook C, Leavitt D, Peter A, Saltzman B, **Davies J**, Tse R. Optimizing Surgical Treatment of Internationally Adopted Children With Cleft Lip and/or Palate: Understanding the Family Experience. *Cleft Palate Craniofacial J*. 2016;53(4): 444-52.

Astley, SJ, Bledsoe, JM, **Davies, JK**. The essential role of growth deficiency in the diagnosis of fetal alcohol spectrum disorder. *Adv Pediatr Res*. 2016;3(9):1-20.

Astley, SJ, Bledsoe, JM, **Davies, JK**, Thorne, JC. Comparison of the FASD 4-Digit Code and Hoyme et al. 2016 FASD diagnostic guidelines. *Adv Pediatr Res*. 2017;4(13):1-26.

Hemingway, SJA, Bledsoe, JM, **Davies, JK**, Brooks, A, Jirikowic, T, Olson, EM, et al. Twin study confirms virtually identical prenatal alcohol exposures can lead to markedly different fetal alcohol spectrum disorder outcomes-fetal genetics influences fetal vulnerability. *Adv Pediatr Res*. 2018;5(23):1-19.

## BOOK CHAPTER
Thorne JC, Jirikowic T, Brooks A, **Davies J**. Fetal Alcohol Spectrum Disorders. In: Nass RD, Frank Y, eds. *Cognitive and Behavioral Manifestations of Pediatric Diseases*. 1st ed. New York, NY: Oxford University Press; 2010:577.

## ONLINE
**Davies J**. Adoptmed.org website. http://adoptmed.org
Developer and primary author for one of the most comprehensive adoption medicine sites, which was recognized in a developmental journal critical website review.

**Davies, J**. Fetal alcohol syndrome and fetal alcohol spectrum disorders. First Consult, MD Consult Web site. Available at: http://www.firstconsult.com. Posted December 13, 2012. Accessed April 21, 2013.

## ABSTRACT
Astley SJ, Aylward E, Brooks A, Carmichael Olson H, Coggins T, **Davies J**, Dorn S, Gendler B, Jirikowic T, Kerns K, Kraegel P, Maravilla K, Richards T. Associations between brain structure, chemistry, and function as assessed by MRI, MRS, fMRI and neuropsychological testing among children with fetal alcohol spectrum disorders (FASD). *Alcohol Clin Exp Res*. 2006;30(6):229A.

## REGIONAL LECTURES
Fetal Alcohol Spectrum Disorders and Juvenile Justice. Children's Justice Conference, Seattle, WA, 3/11/05

Integrative Medicine in Adoption. North Pacific Pediatric Society Conference, Seattle, WA, 3/15/07

The Decade of the Brain Came and Went – What Have We Learned, and Fetal Alcohol Spectrum Disorders. Shoulder to Shoulder Conference, Portland, OR, 11/8/07

From Adderall to Risperdal et al: Psychotropic Meds and Adoption, and From Snake Oil to Fish Oil: Integrative Medicine and Adoption. Shoulder to Shoulder Conference, Portland, OR, 11/13/08

Pediatric Grand Rounds on International Adoption. Seattle Children's, 6/3/10

Sleep in Foster Care and Adoption, and Prenatal Alcohol and Drug Exposures. Shoulder to Shoulder Conference, Portland, OR, 11/16/10

Sleep, Executive Functions, Prenatal Exposures talks. Coalition for Oregon Adoption Agencies and Northwest Adoptive Families Association, Portland, OR, 4/15/11

Prenatal Alcohol & Drug Exposures - From Impacts to Interventions training. Lummi Nation, 7/8/11

Prenatal Alcohol and Drug Exposures, and Executive Functions in Adoption. Shoulder to Shoulder Conference, Portland, OR, 11/1/11

Helped organize and presented at five annual regional "Raising Resilient Rascals" adoption and foster care conferences. Seattle, WA, 2007-2011

Nature and Nurture of the Brain, Sleep, and Executive Functions - all-day training for Oregon DHS. Salem, OR, 4/4/12

Helping Your Children Stay Healthy. Better Me, Better Mom FCAP Conference. Seattle, WA, 6/27/12

Foster and Adoption Nutrition. Shoulder to Shoulder Conference, Portland, OR, 11/14/12

Importance of Permanency. AMARA, Seattle, WA, 2/6/13

FASD and Executive Functions trainings. Providence Swindell's Conferences, Oregon City and Medford, OR, 3/13-14/13

Parenting Kids with Complex Learning and Behavioral Issues. Adoption: What You Need To Know Conference, Seattle, WA, 11/14/14

Medical Update and Sleep in Foster Care and Adoption. Refresh Conference, Redmond, WA, 2/26-27/15.

Beyond the Diagnosis for Children and Adolescents with FASD. MOFAS Diagnostic Consortium webinar, 3/30/16

App. 00048

Sleep in Adoption & Foster Care, Kids and Quackery. Shoulder to Shoulder Conference, Portland, OR, 10/30/17

**NATIONAL & INTERNATIONAL LECTURES**
FAS and Fetal Alcohol Spectrum Disorders: North American Council on Adoptable Children (NACAC) Annual Conference, Minneapolis, MN, 7/29/04

Gathering and Interpreting Information in Adoption. Academy of Adoption Attorneys Annual Conference, Vancouver, BC, 5/5/06

Many Doors, No Master Key: Fetal Alcohol Spectrum Disorders and Adoption. NACAC Annual Conference, Long Beach, CA, 7/28/06

Complementary/Alternative Approaches to Developmental/Behavioral Problems. Transitional Care for Individuals with Developmental Disabilities Symposium at UC Irvine, 3/22/07

From Adderall to Risperdal et al: Psychotropic Meds and Adoption, and From Snake Oil to Fish Oil: Integrative Medicine and Adoption. Joint Council on International Children's Services (JCICS) Medical Institute, San Antonio, TX, 4/10/07

The Nature and Nurture of the Brain. JCICS Medical Institute, Washington, DC, 4/9/08

Sleep and Adoption. JCICS Medical Institute, Baltimore, MD, 3/17/10

FASDs in the Foster Care System. AAP Birth Defect Prevention and Identification CME Webinar Series, 11/18/10

Are You Sleeping? Adoption Learning Partners and JCICS Webinar, 5/19/11

Fetal Alcohol Spectrum Disorders. Indian Health Service FASD Training, Seattle, WA, 9/22/11.

International Adoption. Uniformed Services Pediatric Seminar (USPS), Seattle, WA, 3/13/12

Best Practices in Post-Adoption Nutrition. JCICS Medical Institute, Washington, DC, 4/16/12

Lightning Talks. JCICS Conference, New York, NY, 5/21/13

Fetal Alcohol Spectrum Disorders and Beyond the Diagnosis. Indian Health Service Webinars, 7/10/13 and 9/22/13

Nature and Nurture of the Brain Keynote, and Sleep, Nutrition, FASD talks. Bethany Adoption Conference, Grand Rapids, MI, 10/2-3/13

Beyond the Diagnosis: Effective Interventions for Children and Adolescents with Fetal Alcohol Spectrum Disorders. 16th Annual Fundamentals of Addiction Medicine Conference, Marysville, WA, 3/13/14

Fetal Alcohol Spectrum Disorders. Fight for Life Death Penalty Conference, Phoenix, AZ, 12/10/14

Nutrition and Feeding Practices in International Orphanages and Foster Care. American Academy of Pediatrics National Conference & Exhibition, Washington, DC, 10/26/15

Mitigating Prenatal Alcohol Damage Through Accurate Identification and Management. Zero to Three National Training Institute, Seattle, WA, 12/3/15

Beyond the Diagnosis: Effective Interventions for Children and Adolescents with an FASD. MOFAS Annual FASD Matters Conference, Minneapolis, MN, 11/10/16

The Essential Role of Growth Deficiency in the Diagnosis of Fetal Alcohol Spectrum Disorder. The 7th International Conference on Fetal Alcohol Spectrum Disorder Research: Results and Relevance, Vancouver, BC, 3/2/17

Comparison of the FASD 4-Digit Code and Hoyme et al. 2016 FASD Diagnostic Guidelines when Applied to the Records of 1,814 Individuals. The 7th International Conference on Fetal Alcohol Spectrum Disorder Research: Results and Relevance, Vancouver, BC, 3/4/17

NORTHWEST FORENSIC ASSOCIATES, LLC
Natalie Novick Brown, PhD

| Clinical and Forensic Psychology | 31811 Pacific Hwy S., B-341 |
| --- | --- |
| | Federal Way, WA. 98003 |
| | 425-275-1238 |
| | drnataliebrown@gmail.com |

## PSYCHOLOGICAL EVALUATION
### Chadrick Evan Fulks



February 11, 2019

Chadrick ("Chad") Fulks is a 41-year-old man referred for functional and behavioral assessment by the Federal Community Defender Office, Eastern District of Pennsylvania. Mr. Fulks is incarcerated on death row in the United States Penitentiary in Terre Haute, Indiana. In 2004, he pled guilty in the District of South Carolina for the 2002 carjacking and kidnapping of Alice Donovan, which resulted in her death. Following a sentencing hearing, Mr. Fulks was sentenced to death.

Mr. Fulks is diagnosed by Dr. Julian Davies (FAS Diagnostic and Prevention Network, Washington State) with *Alcohol Related Neurodevelopmental Disorder (ARND)* and *Static Encephalopathy Alcohol Exposed* (i.e., equivalent medical conditions), which fall under the fetal alcohol spectrum disorder (FASD) umbrella. Dr. Davies also diagnosed Mr. Fulks with the Diagnostic and Statistical Manual-Fifth Edition (DSM-5) mental health condition *Neurodevelopmental Disorder Associated with Prenatal Alcohol Exposure (ND-PAE)*, which is a mental defect associated with FASD.

I have been asked by current habeas counsel to review Mr. Fulks' lifelong behavioral/functional history and respond to the following consultative questions:

1. Does Mr. Fulks have significant impairments in his adaptive functioning that would meet the second diagnostic criterion for a diagnosis of intellectual disability (ID)?

2. Were any impairments in Mr. Fulks' adaptive functioning present before the age of 18, as required by the adaptive behavior component of the third diagnostic criterion for a diagnosis of ID?

3. Is Mr. Fulks' lifelong cognitive, intellectual, and adaptive functioning consistent with FASD?

4. Aside from fetal alcohol exposure, are there other risk factors in Mr. Fulks' life history for poor cognitive, intellectual, or adaptive functioning that were present before the age of 18?

5. Did Mr. Fulks experience any secondary disabilities that are associated with FASD?

6. Were there risk factors present in Mr. Fulks' life history that made these secondary disabilities more likely?

I am a clinical and forensic psychologist with specialized training and 23 years of forensic and clinical experience in FASD and other medical conditions involving developmental disabilities. Input regarding the above questions is typical for mental health professionals such as myself who have acquired expertise via formal training, review of the relevant literature, and experience in the developmental/behavioral manifestations of FASD.

My resume is attached as an appendix to this report.

## FORENSIC OPINION

**Data from multiple, independent, convergent sources indicate that Mr. Fulks exhibited significant impairments in child, adolescent, and adult adaptive functioning in three domains (i.e., Conceptual, Practical, and Social), which meets the second diagnostic criterion for a DSM-5 and AAIDD diagnosis of ID.**

**Data from multiple, independent, convergent sources indicate Mr. Fulks exhibited significant adaptive deficits *prior to age 18*, which meets the third diagnostic criterion for a diagnosis of ID as it relates to adaptive behavior.**

**Data from multiple, independent, convergent sources indicate Mr. Fulks has exhibited cognitive, intellectual, and adaptive impairments across his lifespan that are consistent with FASD. FASD is a medical defect that impairs judgment and ability to consider consequences and control behavior, including criminal behavior.**

**Aside from fetal alcohol exposure, other risk factors in Mr. Fulks' life history for poor cognitive, intellectual, or adaptive functioning that were present before the age of 18 included postnatal head injury, substance abuse, and environmental traumas, most of which occurred after age 10. While such experiences may have had an additive and cumulative influence on his functioning from adolescence on, there was abundant evidence of significant functional problems very early in his life that preceded these events.**

**Mr. Fulks' developmental history reflected all eight secondary disabilities associated with FASD.**

**Because all of the risk factors associated with adverse developmental outcomes in FASD were present in Mr. Fulks' life history, and he received none of the protective factors, this significantly increased his risk of secondary disabilities.**

## PROCEDURES

This report is based on information from multiple sources, including (a) record review; (b) in-person interview with Mr. Fulks; (c) in-person interviews with all collateral witnesses identified below except Russell Spears, who was interviewed by phone; (d) psychological testing; (e) standardized adaptive behavior assessment and behavior questionnaires; (f) consultation with Dr. Paul Connor regarding neuropsychological testing of Mr. Fulks in the forensic context; (g) consultation with Dr. Julian Davies regarding his medical diagnosis; and (h) review of relevant research.

Mr. Fulks' interview took place on November 21, 2016, in a private room at the United States Penitentiary in Terre Haute, Indiana. The interview lasted 7.0 hours.

Three psychological tests were administered to Mr. Fulks:

- Early Trauma Inventory Self-Report Short Form (ETISR-SF),
- PTSD and Suicide Screener (PSS), and
- Trauma Symptom Inventory-2 (TSI-2).

The following persons were interviewed:

- Roger Fulks (biological father)
- Ronnie Fulks (older brother)
- Christina Kirkman Holbrook (maternal cousin)
- Joy Krug (school psychologist at Westview Junior High)
- Marilyn Lauver (junior high counselor at Westview Junior High)
- Gayle Wolfe (fifth grade behavioral disorder teacher)
- Linda Adkins (former neighbor)
- Russell Spears (friend)

I requested an interview with Diana Thompson (birth mother) but was informed by defense counsel as well as Mr. Fulks that she was ill from multiple strokes and no longer spoke intelligibly.

Behavior questionnaires (*Behavior Screen, Personal Behaviors Checklist, Behavior Rating Inventory of Executive Functioning*) were completed by the following individuals: Linda Adkins (former neighbor), Gayle Wolfe (fifth grade teacher), Marilyn Lauver (eighth grade counselor), and Christina Kirkman Holbrook (cousin).

The *Vineland Adaptive Behavior Scales-Third Edition (Vineland-3)* was administered in person to Gayle Wolfe (fifth grade teacher) and Linda Adkins (former neighbor).

I relied on neuropsychological test interpretation by Paul Connor, PhD, and consulted with Julian Davies, MD, regarding his diagnoses of Mr. Fulks.

Records reviewed for this evaluation (Appendix A) involved records obtained by trial counsel in 2002 and 2004 as well as additional records obtained by prior and current habeas counsel, including recently received declarations from witnesses who were available.

This report contains the following Appendices:

- A.  Record List
- B.  Documented Life History
- C.  Standardized Testing Across the Lifespan
- D.  Resume

My opinion is based on materials available to me at the time of this report, and I retain the right to revise my opinion should new information become available.

Data referencing Mr. Fulks in this report refer to him as "Chad" in childhood and "Mr. Fulks" in adulthood. Generally, after initial identification, collateral witnesses may be referred to by their first names for clarity.

## BRIEF SUMMARY OF RELEVANT RECORDS

See Appendix B for a detailed life history.

*Offense*

Chad Fulks pled guilty to the kidnapping and carjacking of Alice Donovan in 2004, which resulted in her death. He committed these crimes with co-defendant Brandon Basham in Myrtle Beach, South Carolina. Mr. Fulks acknowledged that both he and Basham raped Ms. Donovan prior to her death.

The Donovan incident followed Mr. Fulks' escape from prison with Basham and was part of the pair's 17-day flight across several states, during which they carjacked and kidnapped 19-year-old Samantha Burns in West Virginia, resulting in her death, and committed multiple other crimes. Ms. Burns' body has never been located. During the 17-day period of the offenses, both men drank large quantities of alcohol and used drugs, including marijuana and methamphetamine.

Mr. Fulks has consistently denied killing either woman and also denied knowing either had been killed until Basham told him after the fact that he (Basham) had killed them both.

After pleading guilty to kidnapping and carjacking resulting in the death of Alice Donovan, Mr. Fulks was sentenced to death following a penalty-phase proceeding in South Carolina. He also pled guilty in West Virginia to the kidnapping and carjacking that resulted in the death of Samantha Burns. In exchange for his guilty plea in the Burns case, he received a sentence of life imprisonment without the possibility of parole.

*Childhood History*

Chad Fulks is the son of Diana and Roger Fulks and the second youngest of their five children. His older siblings from oldest to youngest are Sherry, Dewayne, and Ronnie. Shannon Fulks is Mr. Fulks' younger brother.

Both Diana and Roger were alcoholics who abused alcohol daily. While intoxicated, they frequently fought physically with each other and beat their children. Diana drank alcohol throughout all of her pregnancies, including when she was pregnant with Chad.

The Fulks home was the "party house" in the neighborhood. The downstairs room of the house had a pool table in it, and the walls of the room were covered with sexually explicit magazine pictures. Roger had a large collection of pornographic videos, which he watched regularly with the children. During Chad's childhood, the pool room was the site of almost daily "parties," during which Diana, Roger, and other adults got drunk and used drugs. The police were dispatched to the house so often that the police radio simply directed patrol cars to the "blue house on the corner."

While drunk, Diana occasionally walked around the house nude in front of the children and sometimes passed out nude. One of Dewayne's childhood friends reported in a declaration that on one occasion when he was a teenager, Diana made sexual advances toward him when she was drunk.

The Fulks home was described as filthy and chaotic. There often was not enough to eat and other than Chad, who became obsessively clean in adolescence, no one in the family bathed regularly. Acquaintances reported the children always wore dirty, shabby, ill-fitting clothes. Diana and Roger often disturbed neighbors with their loud arguments

and fighting, which occasionally spilled into their front yard.

Both parents called their children vulgar names, and Diana hit them with household objects and threw objects like flower pots and coffee pots at them.

Because Roger often was unemployed, and Diana did not work, the family had little income. Roger and Diana usually spent what little money they had on alcohol rather than food for their children. Consequently, Chad and his siblings spent much of their time scrounging for food from neighbors. Ronnie reported that Dewayne's friends taught Chad how to break into cars, something which pleased Roger. A family friend reported that Roger and Diana would send Chad out to steal from gas stations and restaurants and wouldn't let him return home until he had obtained the food, liquor, and money they had sent him for.

In early childhood, Chad was very close to his two older brothers, Dewayne and Ronnie, and spent a lot of time with them. The three of them adopted a phrase, "True Soldiers for Life," to describe their mutual affection and loyalty. To this day, Mr. Fulks' signature on letters typically is followed by the initials, "T.S.F.L."

Peers, older friends, and adults who knew Chad Fulks as a child described him as very quiet and expressed a shared perception that he needed their protection because he spent so much time with his older brothers and their friends.

When Chad was around 12 years old, his mother abruptly became religious, stopped drinking "cold turkey," and started spending most of her time in church. Several witnesses reported that with this change, Diana became even less available to her children than she had been when she was drinking. She and Roger soon divorced, and the children were split up. Ronnie went with his father to live in Indiana, and Chad initially stayed with his mother. [Dewayne was out of the household by that point.] While witnesses generally attributed the break-up of the Fulks marriage to Diana's new sobriety and change of perspective, Mr. Fulks recently reported a belief that he caused his parents' divorce because they separated shortly after he told his mother he had witnessed his father's infidelity.

Diana began dating and soon married Dean Thompson not long after she and Roger divorced. When Diana moved in with Dean, they took Chad and his younger sibling Shannon to live in a two-bedroom apartment in Chesapeake, Ohio. At that point, Chad (age 13 at the time) began spending most of his free time out of the home with street youth.

Like his oldest brother Dewayne, who had set himself on fire during his teens, Chad also attempted suicide in his mid-teens by overdosing on pills. He was taken to a hospital for treatment, and when a counselor recommended psychological counseling, Diana took him to see a counselor one time. The suicide attempt occurred after Chad had been

Evaluation: Chadrick Fulks
Page 6 of 137

Northwest Forensic Associates, LLC
Natalie Novick Brown, PhD

App. 00056

sexually molested by a male stranger, and his mother did not support his report to the police about the incident.

Prior to the sexual abuse incident at age 13 noted above, Chad had been sexually abused by several other adults who partied with his parents. Several declarants, including family friends as well as neighbors with no particular attachment to the Fulks family, reported seeing a marked change in Chad's behavior around this time, which they attributed to the sexual abuse he had experienced.

When he was 14, Diana sent Chad to live with his father in Indiana. Chad was enrolled in eighth grade in Indiana, and although he saw the school counselor during the fall quarter, he did not receive any mental health counseling. After returning to his mother's care four months later, he spent much of the balance of his childhood in the streets. During that time period, he was expelled from ninth grade in Ohio and subsequently enrolled in alternative school. He did not complete ninth grade. At age 17, he was placed in the Davis Juvenile Detention Center for approximately nine months.

*Adult History*

Generally, Mr. Fulks' adulthood was as chaotic as his childhood. Except for one job that lasted eight months, he tended to hold jobs for only a few weeks and supported himself largely by breaking into cars and stealing or check fraud. He also used drugs and was arrested frequently. Relationships were short-lived and dysfunctional and involved the same kind of domestic violence he had observed in his parents' relationship.

At age 18, Mr. Fulks began a two-year marriage to Amber Fowler one month after she had given birth to a child he viewed as his son. The child died at five months of age after a young cousin jumped on his stomach. After the instant offense, Mr. Fulks reported to experts he had been devastated by his son's death and turned to drugs for emotional relief.

Following the marriage to Amber, Mr. Fulks had a series of relationships with other women, including another brief marriage. During the penalty phase of his trial, several of these women testified that he physically and sexually abused them repeatedly during their relationships.

In the years prior to the offense, Mr. Fulks was incarcerated numerous times for crimes involving drugs and various forms of theft. In 2002, he was in prison in Kentucky for relatively minor charges when he learned he was about to be indicted for physically abusing the nine-year-old son of his second wife, Veronica Evans, to whom he had been married for a few months. Shortly after hearing about these new charges, which could have resulted in substantial prison time, he escaped from prison with Brandon Basham and ultimately committed a series of crimes that resulted in the deaths of Samantha Burns and Alice Donovan. He was 25 years old at the time.

In July 2009, Mr. Fulks' oldest brother Dewayne committed suicide by hanging himself in jail. Records documented Mr. Fulks' reports to previous experts that he became deeply depressed after learning of his brother's suicide.

*Legal History*

In addition to truancy and school suspensions for misconduct, Mr. Fulks' juvenile history consisted of the following:

- Age 9: Battery (struck an elderly woman with a stick), placed on a 12-month Improvement Period;

- Age 10: Assault and Battery (pulled down a young child's pants) – pled guilty, placed on probation for one year;

- Age 12: Brandishing/Assault (put a gun to another child's head), committed to a six-month Improvement Period;

- Age 13: Destruction of Private Property (car prowl with older brother), placed on probation for one year, required to complete substance abuse treatment;

- Age 15: Arson, probation revoked;

- Age 16: Aggravated Burglary (guns and electronics) with oldest brother Dewayne. Adjudicated delinquent, Chad was sent to a youth facility in Ironton, Ohio, for 90 days. He escaped and was on escape status for over a year until he returned to his mother's residence and she notified police. He then was sent to another youth facility in West Virginia (Davis Center) and finally released to the community at age 18.

Mr. Fulks' adult criminal history included:

- Age 19: Operating a Motor Vehicle Without a License and Refusal to Provide Identification Data - He was convicted, fined, and given a suspended sentence and one year of probation. He violated probation on technical grounds after three months and then failed to appear in court.

- Age 19: Simple Possession of Marijuana - He was convicted and fined.

- Age 20: Worthless Checks, Attempted Forgery, Burglary, Fraud, Attempted Aggravated Criminal Trespassing - He was convicted and sentenced to nine months in prison.

- Age 20: Burglary - He was convicted and sentenced to ten years in prison, with four years suspended. After serving 25 months in prison [Butner report indicates 28 months], he was released and placed on probation, which he violated.

- Age 20: Charged with Forgery of Checks, Possession of Two or More Credit Cards, Fraud, Burglary, Use of Vehicle with Permission and Grand Larceny.

- Age 21: Transportation of a Stolen Vehicle, Aiding and Abetting Burglary of a Vehicle with Intent to Commit Theft, Aiding and Abetting Theft of Property, and Evading Arrest - He was convicted of these federal charges and sentenced to 12 months in prison, followed by three years of supervision.

- Age 21 - He was charged with Non-Sufficient Funds.

- Age 24 - A bench warrant was issued for Resisting Law Enforcement and Use/Possession of Drug Paraphernalia.

- Age 25 - A warrant was issued for failure to comply with the conditions of release.

- Age 25 - He was indicted for Unlawfully Dispensing Legend Drugs without a License. A 12-count charge for Fraudulent Use of a Credit Card was pending at the time of the instant offense. After his arrest, he pled guilty to all 12 counts of credit card fraud and received five years on each count, to run concurrently with each other.

- Age 25 - He was charged with First Degree Abuse of a Child Aged Twelve or Under. This charge eventually was dismissed after his arrest on the capital case.

- Age 25 - At the time of his arrest for the instant offense, Mr. Fulks had been charged with First Degree Robbery and had active bench warrants for Receiving Stolen Property, Possession of Marijuana, and Theft of a Legend Drug, all of which occurred in October 2002.

- Age 25 - INSTANT OFFENSE

## INTERVIEW OF CHAD FULKS

Chad Fulks presented as an immediately cooperative man who looked younger than his chronological age. He wore his hair in a crew cut and was clean-shaven. His hands were shackled. Throughout the interview, he exhibited two noticeable tics: head twitching to the left and blinking. [He reported that the tics began during his trial.] Socially, he was childlike and seemed eager for acceptance. He was quite forthcoming and reported negative as well as positive information.

He generally understood that the purpose of the interview was a psychological evaluation.

Asked about his current functioning, he reported that the last couple of years had been the most difficult for him in terms of depression and anxiety. He noted he had spent 14 years in solitary confinement and referred to his cell as a "living tomb." Although in the past he had enjoyed drawing, painting, and building things, he no longer participated in these activities because he had no money to purchase art supplies. He added that his

family did not send him money for canteen. He previously liked to read as well but no longer was able to concentrate due to anxiety, which included "bad anxiety attacks." He described the following symptoms during the attacks: tingly feeling in his body, numbness in his foot, breathing difficulty, rapid heartbeat, perspiration, and a perception that everything was moving very quickly, that he couldn't breathe, and that the walls were shutting in on him. The attacks happened two or three times a day, and each tended to last 10 to 15 minutes. He noted that while he had tried a number of medications for the attacks, no single medication helped much, although Effexor seemed to give him a little relief from depression symptoms. At the time of the current evaluation, he was taking Lyrica as well as Effexor. Lyrica, a mood stabilizer, reportedly reduced the frequency of the panic attacks.

Mr. Fulks also took Tylenol for extreme back pain. He noted his L4 disk "broke off" and although back surgery had been arranged in the past, it conflicted with his hearing schedule, had to be cancelled, and was never rescheduled. Asked what caused the back injury, he said that in 2007 his codefendant jumped on his back and stabbed him. Basham reportedly was angry because Mr. Fulks wouldn't stop helping the victims' families find their remains. He said Basham slipped out of his cuffs, jumped on him, and stabbed him behind his ear with a pencil. [He revealed an obvious scar from the incident and said he was in a wheelchair for six months after the attack because the injury caused him to lose all feeling in his legs.] He noted that prison medical staff thought he was faking his debilitation until a doctor discovered that a piece of his L4 disk had moved close to his sciatic nerve.

Mr. Fulks said the most important person in his life now was his mother. He said she quit writing to him long ago because she experienced a "brain injury" the same week he was sentenced to death and had been in a care center since then. He noted she was paralyzed and had difficulty speaking. He said he didn't hear from her anymore but still wrote her every week. He indicated he was very close to his two oldest brothers in childhood (especially his deceased brother Dewayne). Dewayne used to visit him prior to his suicide in 2009. Asked about the suicide, Mr. Fulks said Dewayne "blamed himself for me being here." He explained that after escaping from jail with Basham, he went to Dewayne's home, and Dewayne gave him "a bunch of crystal meth," which he binged on during the course of the offense.

Mr. Fulks reported no lasting friendships except for Donny Carroll, whose sister he had dated. He noted that all of his friendships tended to be superficial and short-lived because he was "always on the go so much."

At the time of this interview, Mr. Fulks was receiving correspondence from only two people: an elderly female pen pal in New Zealand and his spiritual advisor. He received visits once a month from the latter.

He said the happiest time in his life, but also the "toughest" time, was in his "younger days" when his family was together. He immediately began talking about his parents' divorce when he was 13. He described both parents as "alcoholics" and said they often were violent with each other. He added that his mother went to church one night and abruptly announced she was never going to drink or smoke again. From that point on, she spent most of her time in church. Around that same time, his father, who continued to abuse alcohol, moved to Indiana. Two months after his father relocated, divorce papers arrived in the mail.

While he reportedly loved his father, Mr. Fulks said they were never close because of his father's frequent physical abuse. He noted that In childhood, he viewed his father's harsh discipline as "normal."

He described his parents' party room, which was a pool room with a bar in the basement of their house in Huntington ("it was like a neighborhood gathering place"). He said neighbors routinely came to their house to get drunk and fight.

The most difficult and "confusing" time in his life was when his infant son died. He indicated that his son was "everything" to him ("I had dreams of giving him the life I never had"). Until that event, things were going relatively well in his life. He had obtained a state welding certificate while in a boys' home, was working hard to support his wife and son, and wanted "so bad to have a normal life."

Asked about the welding class, he said the class lasted a year and was very difficult for him. He received extra help from his instructor, Mr. Sandrich, who told him more than once, "I'm not letting you leave here till you're certified." The most difficult thing to learn was overhead welding because no matter how much he tried, he couldn't weld angles properly ("couldn't get my brain and hands to match up"). However, the instructor worked with him repetitively until he finally mastered the skill. Mr. Fulks said he wasn't used to having someone believe in him like that. At the end of the year, he passed the certification test, which required him to do a number of different welds that his instructor had worked with him on. His plan at the time was to go home, find a job, and have a "different kind of life." He was 17 at the time.

Asked what went wrong with his plan, Mr. Fulks said he couldn't bear living with his mother because her husband Dean Thompson had sexually abused him when he was 15. He soon married Amber Fowler and moved in with her parents, who immediately began pressuring him to get a job. Getting hired was not easy. Although he was certified to weld, he had no experience. After a lot of searching, he finally was hired by a company that needed repair work on river barges. He said he was "electrocuted" daily during the first month he worked there ("water is pouring out all the time, and you get shocked"). After about a month, he learned how to protect himself. About a week after he started feeling good about his job, his son died, which reportedly changed everything about his life. He explained that while he had been smoking marijuana until his son died,

he wasn't drinking alcohol or using any other drugs. However, after the death, he started using any drug he could find and drinking heavily in order to "numb" himself. Eventually, Amber's parents told him to leave because he and Amber were constantly fighting. For the next two months, he was homeless and stayed on the Ohio riverbank.

Asked how he ended up in his current situation, he said the explanation began five years before the offense.

One day while driving somewhere with his girlfriend Heather Goodman, his car broke down. With Heather as the "lookout," he broke into a salvage yard to steal a starter for his car, and while there his checkbook fell out of his back pocket ("I was like the world's dumbest criminal"). He said he took full responsibility for the offense at the time to protect Heather.

Sentenced to 10 years in prison for the burglary, he ultimately served only 28 months because he completed court-ordered drug treatment. He described the treatment program as very difficult because inmates were encouraged to "spy" on each other and report anyone breaking the rules ("everybody would dog you, and you'd get punished"). He said he was in the "hot seat" often for not writing "tickets" on other inmates. After completing the treatment program, which involved daily counseling and classes, his sentence was shortened.

In late 2002, he was arrested with his wife Veronica Evans for credit card fraud. He said he was "on the run" at the time "from parole and probation in Indiana." The arrest occurred three weeks after he had gotten a job as a welder with Coachman RV. While driving to work one day, he sped 100 mph in a 25 mph zone without a driver's license. When he noticed the police car's flashing lights behind him, the "first thing that run through my head was thinking I could get away from him." After his arrest, his father and uncle bailed him out of jail and from that point on, he and Veronica were "on the run" with Veronica's three-year-old son in the car, traveling from state to state and stealing "to survive."

At one point, he broke into a car and found an FBI uniform, badge, and gun. He kept the items "like a dummy," thinking he could get drugs "for free" by "pretending to be a Fed." His plan ended when Veronica went into a Walmart one day, phoned the police, and reported he was holding her and her son hostage. Unaware she had summoned the authorities, he became alarmed when he saw police cars pulling into the Walmart parking lot ("thought they'd busted her"). He put on the FBI uniform with the idea of fooling the police into releasing Veronica to him ("dumb idea") and was surrounded by police with guns as soon as he got inside the store. They found the FBI badge when they looked at his wallet. Eventually, Veronica "turned" on him and "made up stories" about him to make it appear she was his hostage, and he alone was charged. Veronica later sent him a letter of apology, indicating she had lied to the police so she could regain custody of her son, who had been placed in foster care by that point. However, when he

gave Veronica's letter to the police, a detective told him they hadn't believed her in the first place. By this point, he was charged with so many crimes that he believed he was looking at spending the rest of his life in prison.

After Mr. Fulks was moved to a maximum security unit, Brandon Basham was placed in the same cell. Basham told him he was "kicking it" with one of the female officers, which Mr. Fulks observed firsthand. The officer was in charge of their unit and began bringing them everything they asked for. One day, she let them go out in the yard and adjust the angle of the cameras. Basham showed him there were cameras facing both directions on the back wall and a hole in the fence at the top of the roof where they could escape. A week later, the same officer let them go out to the yard at night. They had constructed a rope by that point and had several filled water bottles to use as weights, which they tied to the end of the rope. They swung the rope over a beam, climbed to the top of the jail, pulled the cage apart with a pair of pliers the officer had given them, and climbed four stories down the rope. They ran through the woods, where Basham seemed to know how to find the items they needed. For example, they came upon an old school bus that Basham's family had converted into a trailer. The bus had clothes, a gun, and a bottle of Jack Daniels inside. After changing out of their jail uniforms, they walked for days though woods and swamps, stealing whatever food they could find and ultimately committing the crimes of record.

Mr. Fulks spontaneously stated he had done "a lot of stupid things" in his life, including running from the police "a lot" because he always thought he could get away. He said he was in "constant trouble" with the authorities, often for credit card fraud ("that's how I survived"). He frequently stole cars, after which he would just keep the vehicles and drive them for months. Not long after his son died, he went to a party where a friend had a 100-pound snake ("my worst fear"). Deciding to "show off," he put the snake on his shoulders, thinking people would be impressed at how "cool" he was. He had been drinking all day by that point and didn't realize how his behavior was coming across. Two men at the party got annoyed at his behavior, began cursing at him, and called him over. When he got closer, one of them pointed a gun at him and shot him. [He revealed the scar on his shoulder and said the bullet came out through his neck.] After he was shot, he tried to pull the snake off, but it was squeezing his face by that point, and he passed out. He awoke to the sight of a medic and police officers all around him and was told later the snake had crawled off when he passed out.

Mr. Fulks reported two suicide attempts in his life. He said he was 15 when he ingested all the pills he found in his mother's medicine cabinet and ended up in the hospital. In June 2015, he slashed his wrists and tried to hang himself after a new unit manager had confiscated his and other inmates' possessions. His possessions included some mice he had been raising for seven or eight years ("it gave me something to care for"). Although the warden and officers were aware of his mice and tacitly approved, when the new unit manager discovered them, he killed the animals, which devastated him ("that was the only thing I had left").

Asked if he considered himself impulsive, Mr. Fulks acknowledged impulsivity was one of his worst problems. He explained that he always reacted emotionally without thinking about consequences. He noted that as soon as a police officer turned on the lights to pursue him, running "was automatic." If he was in an argument, he automatically exploded emotionally rather than thinking things through. He said he had been working on this problem for the past seven years with his spiritual advisor.

Mr. Fulks said he was bullied "all the time" in childhood, typically for a lisp that required daily speech therapy in school. He said he was in many fights growing up but never bullied anyone, although he would defend himself. If he wasn't being taunted for having a lisp, it was for wearing dirty clothes to school or for his family being "poor." Because of the fighting, he often received sanctions at school (suspensions and paddling), all of which seemed "normal" to him. He noted his father told him repeatedly, even into his adult years, "If you let them do it to you once, they'll keep doing it." He said he was in several fights while in jail in South Carolina and also was stabbed "a bunch." He noted that other inmates constantly "tested" him. One time, after meeting with someone from his legal team, he returned to his cell to find his canteen and clothing had been stolen. He knew he had to stand up for himself, or the harassment would never stop. Consequently, when he saw an inmate eating his canteen, "flaunting it in my face," he grabbed the canteen and they began fighting. Several inmates jumped on him, and he was stabbed 32 times, with one of the shanks breaking off in his stomach. He noted other inmates "always" wanted to fight him over his case, and one time he was beaten by police officers.

Asked if he ever felt manipulated or taken advantage of, Mr. Fulks described being sexually abused at age 14. He went to a friend's house, and the friend asked him if he wanted to help his stepfather set up a fruit stand. When he accepted the offer, the stepfather took him into the woods to find some wooden posts for the fruit stand. As they walked into the woods, the man walked up behind him, put his arm around his throat, and the next thing he remembered was feeling his pants being pulled off. He tried to scream, but the man covered his mouth. He escaped and ran through the woods with the man chasing him. After getting away, he called some friends from a pay phone, and they showed up with bats to protect him. Eventually, police arrived and summoned his mother. When she showed up, she refused to press charges against the man and said it was probably her son's fault. She told the police she couldn't handle him anymore and was going to send him to his grandparents' house. Because of his mother's reaction, he started believing the sexual abuse was his fault. It was shortly after this incident that he attempted suicide with his mother's medications.

Mr. Fulks noted that the above incident was a turning point in his life. He recalled feeling he was on his own and homeless, which had been the case since he was 13 and left his father's care. From age 15 on, his life reportedly was unstable. He would stay with his mother for a week or two and then find somewhere else to stay. He was

homeless many times in his adult years and committed crimes in order to pay for motel rooms. During his second marriage, he and his wife lived in a car for a month. He said he was on state and federal probation at the time and getting conflicting instructions from his two probation officers. He said he failed probation "miserably." They wanted him to work, but he could find no one willing to hire him because of his convicted felon status. He described the probation process as "constant pressure" ("I would look for a job all day long, every day"). When he finally found a job selling perfume, he was "like the worst salesman ever." Back then, he thought there was no better place to sell perfume than a strip club, which was where he met his second wife, Veronica Evans. He kept the perfume job for a month but made no money because he had to buy the perfume in order to sell it.

Responding to a question about what he regretted most in his life, Mr. Fulks said he believed he failed everyone and could have done a lot of things differently in life: "If I would have just stayed at that jail and not escaped, Samantha Burns would be alive."

Asked if he had ever been dishonest in the past with a mental health evaluator, he admitted he once tried to "fool" doctors in a 1998 evaluation.

## COLLATERAL WITNESS INTERVIEWS

[Mr. Fulks is referred to by his first name in this section to be consistent with how he is referred to by collateral witnesses.]

**Linda Adkins** (neighbor in West Virginia)

Interviewed in person on 7/12/17 for 2.0 hours, Ms. Adkins reported:

- She had a good memory of Chad as a child because he grew up with her children and was close in age to her second oldest daughter Michelle.

- The Adkins family lived two houses away from the Fulks residence on Pine Street in the Beverly Hills section of Huntington, West Virginia. Chad was 16 months old when his family moved to the street. Linda and Diana became friends, and Linda saw Chad nearly every day for five or six years until the Fulks family moved to their Leeward Avenue house. Although the Leeward house was "right around the corner" from Linda's house, Linda stopped visiting Diana daily at that point because Diana "drank too much" and there was "too much going on over there." The Leeward house had a pool table in the basement, and everyone from the neighborhood gathered there to drink and party ("it was the party house on the block"). The house was cluttered and messy.

- Linda never observed Diana or Roger show any affection to their children, who were "just there in the background." They gave their children no attention or

praise, and there was "very little directing when they were wrong." She said because the Fulks neglected their children, at one point Linda encouraged Diana not to have any more children after Shannon was born: "I was concerned about her parenting. She was always yelling at the kids, not feeding them."

- Diana often complained to Linda that her children were hungry, and she didn't know what to feed them because there was no food in the house. When Linda would give Diana money to buy food for the children, she often saw Roger getting into his car and returning to the house later with a 12-pack of beer in hand. After this went on for a while, Linda started giving Diana food instead of money, and at that point, Diana stopped going to Linda's house.

- Linda initially went to some of the parties at the Fulks home on Pine Street and observed the drinking that went on there. The parties occurred at least once a week. Roger was always drinking, party or not. He drank at night when he got off work and drank all the time he wasn't working. Diana drank mainly on the weekends. Their beverage at the time was usually beer. Linda typically observed their drinking during her daily visits.

- The Fulks had parties in their Pine Street home "but not as bad in terms of drinking and fighting" as in the Leeward Avenue home. The parties tended to start on Friday evening and last through the weekend. Neighbors would go to the Fulks home carrying their own alcohol and food. At the Leeward house, the men usually played pool while the women socialized. Every now and then, people at the parties would get drunk and fight.

- Linda frequently saw both Diana and Roger intoxicated.

- When asked whether she knew Diana had been arrested before Chad's birth for being drunk and disorderly, Linda said she was not surprised: "It wouldn't take many beers for her to get mouthy." She said Diana didn't have much tolerance for alcohol, and after three or four beers, "her mouth would start going." That was how Linda knew Diana was intoxicated.

- Linda saw Diana occasionally when she was pregnant with Shannon and observed that Diana drank alcohol throughout the pregnancy.

- Chad was two years old and still in diapers when his younger brother Shannon was born. He was finally potty-trained about a year after Shannon was born.

- Chad was slow in developing and talked and moved slowly. She compared him to her children and to his brothers: "Chad was more a loner, standoffish, shy." He was around three years old when he said his first words. He lisped and mispronounced words, and it was hard to understand him. When he was around four, she sometimes could understand what he was saying, but he continued to have a lisp throughout childhood.

- Chad also was slow in learning to read ("he wasn't at the level where my kids were at his age"), and he didn't seem to understand things. For example, he didn't understand volleyball and would get confused when he tried to play. The ball would come at him, and he would just stand there and not do anything. He also was clumsy and had poor coordination. When the children were playing kickball, he would miss the ball or kick it at the wrong time. He couldn't hit the ball with a bat when the children were playing baseball.

- Chad also had trouble understanding verbal communication. Linda had to repeat information over and over because he didn't understand what she was saying to him. He kept saying "huh?" Linda had to keep reminding him to do things because he couldn't remember what she had requested. For example, she would tell him to go into the kitchen and bring her something from inside the refrigerator, and he would look around but not understand what she wanted. She had to repeat the instruction multiple times and narrow down her instructions to one thing at a time.

- Chad was a quiet and withdrawn child. When he did play with his brothers and the neighborhood children, he was a follower and pleaser. He did what the other children wanted him to do and didn't initiate anything. If Linda's daughters told him to do something, he'd do it. He would follow Dewayne around and do whatever Dewayne told him to do. Dewayne tended to tell Chad to do things that would get him in trouble. Chad also was sensitive. He cried a lot and whined. When the other children were rough, he screamed like they were going to hurt him. His behavior was different than the others. He was sweet and seemed much younger than his age. He was close to his mother and seemed like a momma's boy. He had no friends his age.

- Asked if Chad was exposed to domestic violence, Linda reported observing domestic violence between Diana and Roger. One time, Linda saw Diana pick up an object and start to strike Roger's car with it, at which point he pushed her. She often saw bruises on both Diana and Roger. She said the police showed up at the Fulks home "plenty of times."

- Chad did not get into fights as a child more than other children his age. However, he was suspended a lot at school. Other children picked on him and manipulated him.

- Dewayne and Roger were "hell-raisers." Whenever Dewayne earned some money, his parents would take it away from him. Ronnie was "pure bad-ass, always into something." One time he painted a motorcycle that belonged to Linda's husband.

- Asked about Chad's strengths, Linda responded that he was ""good at just being Chad" and was "a sweet little boy." She viewed him as "more vulnerable than his brothers."

**Christina Kirkman Holbrook** (maternal cousin)

Interviewed in person for 1.0 hour in West Virginia on 7/10/17, Christina reported:

- She was older than Chad by five or six years. She lived with the Fulks for six months when she was around twelve, and Chad was six. She recalled he was receiving speech therapy at the time and also had to repeat first grade. She also spent some time with Chad when he lived on Pine Street in Huntington and when her family lived with the Fulks for a short time on Leeward Street.

- The Fulks home was known in the neighborhood as the party house. There were kegs of beer there, and neighbors gathered to party at the house every weekend.

- Diana and Roger neglected their children "emotionally, spiritually, physically" and did not express love to them. Christina recalled that when Sherry broke her arm, her parents kept saying it wasn't broken and wouldn't take her to the doctor, even though Christina could see the bone "sticking up wrong."

- Christina observed that Chad was neglected as a baby when the family lived on Pine Street because Diana had trouble keeping up with her three older children.

- Chad was physically abused by his parents. Diana would pull Chad's hair and throw things at him; Roger spanked him harshly with a belt or switch to the point of causing welts. They punched him in the head. The physical abuse was "pretty regular." The Fulks children tended to stay away from home all day to avoid their parents.

- One time when the family lived on Pine Street, Diana took the children to a shelter. Because Christina was there playing at the time, she went with them to the shelter. Christina recalled seeing "some sort of a fight" before they all had to get in the car. Later, her mother or aunt picked her up at the shelter.

- She recalled seeing Roger and Diana drinking alcohol throughout her childhood, adding they both were "addicted" to alcohol. She saw Diana so intoxicated once, she urinated on herself. Another time, Diana vomited and "just sat in it." This was around 1982/83 when Christina was 12 or 13. She recalled Diana drinking and smoking cigarettes during the pregnancy with Shannon but said she was too young to be aware of Diana's alcohol use during the pregnancy with Chad. The Fulks would spend money on beer and cigarettes before buying clothes for their children.

- When Christina's family stayed with the Fulks, the house was filthy. There were dead rats in the cabinets, fleas everywhere, trash under the beds, and the place stunk so badly Christina's mother cleaned it. Diana sometimes cooked and did laundry, but things tended to be thrown into closets and hidden instead of cleaned.

- Christina observed in childhood that Chad had a speech problem: "He talked funny and sounded younger than he was." He couldn't pronounce words and talked like a two year old. He was very hard to understand. Christina noted Chad sounded just like her granddaughter, who had a cleft palate. His upper lip almost looked like he had a cleft palate. His tongue also didn't work right. Sometimes, Christina had to ask Sherry what he was saying. Chad also stuttered but grew out of it. She recalled one of his brothers teasing him for stuttering. Other children teased him about the way he talked. They would say he talked "funny," "like a baby." Peers called him "retarded."

- His siblings called him "stupid" a lot, and his mother called him "retarded" as well as "stupid."

- Chad always seemed to be alone. He was shy and quiet and didn't fit in. He didn't know how to play sports with the other children. He was very small for his age, and the other children were bigger and tougher.

- Chad didn't get as much attention from his parents as his siblings. Unless he did something bad to get their attention, they ignored him.

- Ronnie had a growth problem, but Chad was the "ghost child." He was very quiet compared to his brothers and was ignored by his siblings as well as his parents. He was left out of many family activities. He typically was present but not involved.

- She didn't recall Chad ever having a close friend at school or in the neighborhood, although his brothers had friends. One time, she observed Chad playing ball with the neighbor children. The children started teasing him because he was uncoordinated, and he just wandered off with his head down and a sad expression on his face.

- People around him knew Chad was slow and needed help understanding basic schoolwork. When he was in second grade, Christina – a good student in school - was asked a few times to help him with his homework and found he couldn't add and subtract. She recalled sitting on the front porch helping him, and he would get real frustrated because he didn't understand. He was behind on homework, and she recalled reading one of his school books with him to help him catch up. However, he had a short attention span and couldn't stay focused. He couldn't repeat back what she was saying. Sometimes, Chad would get stuck on a word or phrase and repeat it over and over again.

- Christina thought that Chad was born brain-damaged because he was "so slow at everything." She said he was delayed in talking and didn't start talking in sentences until kindergarten and even then he was hard to understand. He also seemed more like a three year old when he was seven. He didn't know how to connect socially with people.

- She thought Chad might have started drinking alcohol in childhood. She described the pool table in the basement with beer kegs, noting that the children could get into the beer because "it was right in front of them all the time."

- Christina often observed Diana encouraging her children to steal. One time, Christina and her mother were with the Fulks at a store ("Hecks"), and Chad was in a stroller. Diana was encouraging Sherry to steal something.

- Asked to describe Chad's strengths, Christina could not think of anything.

**Gayle Wolfe** (Chad's fifth grade Behavioral Disorder teacher at Peyton Elementary in West Virginia)

Interviewed in person for 2.5 hours on 7/10/17, Ms. Wolfe reported she had a master's degree in Elementary Education and was trained and certified in Intellectual Disability and Behavior Disorders. She reported:

- In 1988/89, which was the year Chad was in her classroom, Gayle was the only special education teacher at Peyton Elementary. She was asked by school district administrators to "clean up" problems in the school regarding staff attitudes. Although the law pertaining to special education instruction had passed in 1973, it took a long time for teachers to understand the importance of keeping behaviorally disordered children in a special group because teachers were not knowledgeable about special education at that point. Consequently, she had to teach the teaching staff about special education as well as teach the children. The teaching staff also didn't understand what a 'less restrictive environment' was. Consequently, one of Gayle's primary goals was to help mainstream the children into a regular classroom ("they had had several years of a neglectful teacher, and no one would take these children into their classes").

- There were seven children in Chad's Behavioral Disorder classroom, which included third- through fifth-grade students. Because the 1988/89 school year was the first time she taught behaviorally disordered children (prior to 1988/89, she had taught severely intellectually deficient children), she connected well with each of the students and remembered them well. Chad, whom she remembered "very well" as one of her favorite students, was one of her older children in her classroom. She did a lot of counseling with him, and 50 percent of her time with him was spent reminding him of his decisions.

- Five of the seven children in her classroom had intellectual problems and were "slow" like Chad, although there was one autistic child who was "very bright." Noting that behavioral problems typically were associated with intellectual problems, she indicated that the 'BD' (Behavioral Disorder) label took precedence because the school "incorrectly" viewed behavior problems as the primary issue interfering with the student's education. She explained that many

students with intellectual problems also had behavioral problems because they were so frustrated with academics.

- Chad was "SLD" (Specific Learning Disability) because he couldn't write a sentence, couldn't spell, and was weak in a lot of other academic tasks.

- She recalled specifically how Chad ended up in her classroom: "Where he lived was an area called Beverly Hills. If you were on one side of the street, there were very wealthy and beautiful doctors' homes. On the other side of the road, the houses were pretty trashy. Gallaher Elementary was on the hill where Chad lived, which is where he went to school. Gallaher had a mix of very rich and very poor kids. Peyton was on the other side of the hill." Gayle noted Peyton was the closest BD school, which is how Chad ended up there. She noted that Chad didn't constantly misbehave, but she recalled one incident in particular. Children were on the playground, and Chad "supposedly pulled down the underwear of a doctor's child, and this is what landed him in a BD program, although he probably had some behaviors before that."

- The academic curriculum in Gayle's BD classroom included everything from kindergarten up, which allowed her to use whatever the test results showed was the right grade level for a child. She recalled that Chad couldn't "get" phonetics, and his reading skills were at the first-grade level. He was a sight reader and also used picture cues. She worked more with him on math skills than reading because math was easier to mainstream and "hands-on." She noted that Chad was a hands-on learner. She worked with him specifically on addition and subtraction, which were second-grade skills, but not multiplication, a third-grade skill. Although she worked all year with him on writing, he did not learn how to write a sentence. Nonetheless, she was able to get him mainstreamed for some activities toward the end of the academic year, at which point he spent part of the school day in the BD classroom and the rest of the day in the regular classroom.

- Once a student was placed in the special education program, the school's policy was to keep promoting the child each year rather than retention. A 'C' grade on a BD child's report card did not represent actual academic performance but rather meant there had been an effort to learn. Chad had significant trouble learning, although he tried. Gayle recalled going through the same reading lessons over and over with him.

- When Chad wasn't frustrated with his schoolwork, he functioned well in the regular classroom. However, when he got frustrated, he cried. He wasn't a child who taunted, teased, or provoked other kids, but he tattled a lot. The self-contained BD environment was a benefit in terms of Gayle's getting more one-on-one time academically with Chad and getting to know him. The problem was, the other children in Chad's class had behavior problems as well, and they all tended to copy each other. He seemed very concerned about looking good. Even

though she doubted he had a bath every night, he always wore tight jeans and had his blonde hair slicked back. He was very thin. Classmates would tease him because of his lisp and tight jeans.

- She noted there was something unusual about Chad's face: "It was almost like he had a cleft lip on his upper lip. There was a flat look to the groove above his lip. When he smiled, a bit of his lip would go out like it couldn't stretch long enough for a smile. I always questioned whether he had something wrong at birth." She indicated that when she was in court at the time of his trial, she recognized him by his unusual upper lip. She recalled he also had a broad space between his eyes and low-set ears.

- Chad never caused a problem on his own because he was always a follower. When he was teased and got angry, he cried rather than getting aggressive. There was one boy in particular ("Rodney") who occasionally coerced Chad into misconduct. A typical BD child, Rodney was more cognitively sophisticated than Chad and had much more street sense. He frequently started problems on the playground and liked to get other children in trouble. She tried to keep Chad away from Rodney because Chad was a "copycat." Watching from her classroom window, she would see Chad remain aloof for a while, but Rodney would "eventually fish him in." Other children would draw him into mischief as well: "There wasn't hardly a day that I didn't talk to him about not following other kids." She never had to talk to Chad about something he instigated, because it was always something that someone else had instigated and gotten him involved in. She added that Chad was one of her favorites because he always broke down and cried when he was in trouble: "He genuinely felt remorse for getting in trouble."

- Although he was 10 years old during the year he was in her classroom, Chad acted like a five or six year old. He was very weak in reciprocal social interaction skills and had no friends. He couldn't explain what started problems, why he got involved, or why he did things. He was very insecure about his speech. He'd hide his face at times and was quiet. Gayle had to talk to him on a very primitive level.

- Chad's parents were not involved in his schooling. She didn't recall either of them ever coming to meetings at the school or calling her about his grades or behavior. She went to the Fulks home at least five times, "mostly for the fact that Chad had followed someone's lead and gotten into trouble at school." She tried to counsel his parents about how to work with him on his tendency to follow other children into trouble, and they would nod their heads, but she didn't think they understood or cared.

- She described her memories of the Fulks residence: "It was one of those houses that had indoor furniture on the outside." There was a couch on the porch. In the yard there were tires and old, broken-down cars. There was a refrigerator out back. The Fulks, who knew she was going to visit with them about Chad's

behavior, would remain outside to meet with her. She described the appearance of the yard as "chaos," noting it was possible to see around the house into the backyard because it was on the corner. When she would arrive at the house, Chad's mother always offered her a beer. Sometimes, both parents would have beers in their hands. Sometimes, a neighbor or two would be there, and they would join in on the conversation.

- She noted the Brigance test results in Chad's records were the wrong scores: "I was working with him at a much lower level in math and reading. We never felt the Brigance was a good test because we didn't think it gave accurate information, even though this was the test that was used at Peyton." She said she recopied the scores from the previous year into Chad's file rather than test him with the Brigance. The teacher she had replaced at Peyton had a poor reputation, so they moved him out when they brought her in and told her to recopy his records. The staff member who did the testing in the 1987-88 and 1988-89 school years (fourth and fifth grade) was a backup teacher with no degree in school psychology who did not know how to administer testing.

**Joy Krug (school psychologist at Westview Junior High in Indiana)**

Interviewed in person for 1.0 hours on 7/13/17, Ms. Krug referred to Mr. Fulks' school records during the interview and reported:

- Westview Junior High, where Chad enrolled as an eighth grader while living with his father, was "one of the top schools in the state." The school offered numerous services to its students (e.g., nurses, special education teachers, counselors, social workers, and a psychiatrist). Ms. Krug followed each child through every year of their schooling. However, when children like Chad entered the school during junior high, she performed testing and recommended services if appropriate. She indicated that test administration at Westview required a significant amount of training, which she had received.

- Chad attended Westview for only four months. He enrolled on 8/21/91, which was the first day of school. It was clear as soon as he enrolled that he had disabilities for which he needed supports, and by 9/10/91, he had been placed in a remedial reading support program.

- Ms. Krug administered a battery of tests to Chad, who was age 14 at the time:
  - On the Slosson Intelligence Scale, a brief test of intellectual functioning, he obtained a score that was equivalent to a Verbal IQ of 66 (mental age of 9 years, 6 months, or the mildly mentally handicapped range). She noted that this score was lower than previous test records showed, which likely was due to his being in a new school, which obviously was "traumatizing" to him. She noted he also had visual perceptual deficits, so this would have made the Slosson more difficult.

- On the Peabody Picture Vocabulary Test (PPVT), he achieved a standard score of 73, which was equivalent to a mental age of 9 years, 8 months. She noted the PPVT was a verbally-loaded test like the Slosson and added that she viewed his functional capacity to be in the Intellectually Deficient range.

- On the Kauffman Brief Form Achievement Test, he obtained scores on the math, reading, and spelling subtests that were consistent with the Slosson and Peabody scores, all within the borderline to mildly impaired range.

- On the Test of Nonverbal Intelligence (TONI), his score of 84 fell in the low average range. Taken together with his performance on the Wechsler Intelligence Scale for Children-Revised (WISC-R), results indicated verbal skills were significantly more impaired than nonverbal skills. This was confirmed by scores on the Test of Written Language (TOWL), where all his scores were more than 2 standard deviations below the mean, and on four of six subtests, scores were 4 standard deviations below the mean.

- On the WISC-R, Chad obtained a Verbal IQ of 85, Performance IQ of 105, and Full Scale IQ of 93. His scores on four of the six verbal subtests were 2 or more standard deviations below the mean (Information, Similarities, Arithmetic, Vocabulary). Digit Span and Comprehension were within normal limits. These scores indicated Chad was not prepared to function and communicate in the world he was expected to live in. He performed better on performance subtests, with relative strength in identifying visual detail. She noted he was eventually determined to be Learning Disabled.

- Scores on the Wide Range Achievement Test (WRAT) fell in the mildly impaired to low average range. On the Woodcock Johnson Achievement Test, scores fell in the borderline to low average range.

- On the Adaptive Behavior Evaluation Scale (ABES), scores reflected significant limitations in academic and social domains. On the Environmental/Interpersonal Behavior Scale, which assessed social skills, communication, and functioning, Chad's scaled score of 7 fell significantly below the mean. On a Task Related Behavior scale, a measure of functional academics, his score was 0, which was several standard deviations below the mean.

- Chad's test results showed he needed a great deal of help to survive in school. His verbal impairments prevented him from reasoning, and his ability to think abstractly and learn from experience was very limited. He was impulsive and tended to act before thinking.

- A case conference on Chad was called on 10/3/91, which was unusual because typically it took six months for a case conference to be called on a student.

- Although Chad obtained scores on intellectual tests that fell in the range of mild handicap (i.e., mild intellectual disability), he also demonstrated a significant discrepancy between IQ and achievement. As a result, in order to keep him in regular classrooms with accommodations and be consistent with the criteria used and services provided, the team recommended he receive services for Learning Disabilities in English, Math, Science, and Social Studies.

- His primary weakness was language and sequencing his verbal thoughts, which she attributed to frontal lobe problems.

- After completing her psychological evaluation of Chad, Ms. Krug referred him to Dr. Otto Klassen for psychiatric evaluation. Dr. Klassen ultimately prescribed imipramine for depression, but a follow-up with the psychiatrist never happened because Chad left the school.

- The school was unable to address Chad's behavioral issues because his home life was so unstable, and the principal suspended him when he got in trouble.

- Functionally, Chad was intellectually disabled when one considered all his test scores ("he didn't have the mental tools to compensate"). His strengths included "street smarts" and "survival skills," as indicated by testing showing he was immediately able to perceive details and respond behaviorally.

- Ms. Krug said that while she likely wouldn't have been able to recognize FASD when she encountered it in a child in 1991, she now knew Chad's test scores were consistent with FASD.

**Marilyn Lauver (counselor at Westview Junior High in Indiana)**

Interviewed in person for 1.5 hours on 7/13/17, Ms. Lauver reported:

- Ms. Lauver's role at Westview was to work with the special education team and liaison with the students' families and teachers regarding discipline.

- She remembered Chad's blonde hair, "hacked up" haircut, unkempt and disheveled appearance, and ill-fitting clothes. She said he didn't seem healthy to her. Asked about his face, she said he was "like a feral animal with a fearful expression. He was sullen, had no manners, didn't know to shake hands, and was very withdrawn." She remembered that when he appeared in her office with his father, he "clearly was not looking forward to school." She could tell he was scared.

- She recalled knowing at the time that Chad was "kind of thrust into his father's home," and neither seemed comfortable with the other: "Dad looked like he'd been hit by a truck the whole time during the enrollment. Chad just cowered." There was no contact between the school and Chad's father after enrollment.

- When Chad arrived at Westview, he was in a grade lower than he should have been for his age, so they found a way to make him age/grade appropriate by skipping him to the next grade.

- Because Chad "escalated so quickly," she didn't have time to work with him much, although she saw him about 10 times over the months he was in the school. She noted behavior issues on the school bus and recalled he was taunted, noting "he clearly came from poverty." When he was taunted, he'd spit on his peers in response. She did not know why he left Westview.

- Comparing Chad to others his age at Westview, she said that emotionally, he seemed much younger than 14. In addition to spitting on other children on the school bus, he pouted, hung his head and "folded up." She noted that most of the other children would sit up and have some eye contact, but Chad was unable to acknowledge and respect authority. For example, one time he became very agitated and explosive with the principal, who later said he was afraid of what was "inside that child."

- Chad was unable to perform academically like other children his age due to intellectual deficits and emotional disorganization. He was reading well below grade level and was way behind in math.

- Interpersonally, he never looked comfortable anywhere. He had problems fitting in with the other students and had no friends. He initially tried to reach out to some peers but wasn't successful. He seemed "absolutely depressed, fearful, suspicious, and highly anxious." Athletics were really important at Westview, as was membership in a church and a church group. Chad didn't have those activities. He also stood out because of his unkempt appearance and poor social skills. She thought his classmates were "wary" of him. You could see in his body language that he knew he wasn't well accepted. He did not know how to solve problems with peers. When he did not like how they were making him feel, he acted out towards them rather than talking to them. For example, he was put off the bus for spitting on other children.

- His social problems included not knowing how to greet people politely (e.g., standing up and shaking hands when meeting an adult). He didn't say 'thank you,' and he had no social graces. He did not understand humor or jokes. He was serious about everything and never smiled or laughed.

- It was important to be very concrete and literal with Chad. In many ways, he acted like a seven year old, even though he was 14.

- Except when he acted out, Chad was very emotionally guarded, with flat affect, his body folded up, and no eye contact. He seemed to work really hard to control himself, but he was impulsive. It seemed like he simmered for a while and then erupted.

- She said the school received a report that Chad had been sexually abused by an older man. She noted the report was consistent with the way he behaved and consistent with the way children who were being physically and sexually abused typically behaved (e.g., constant vigilance, apparent need for self-protection, haunted expression in his eyes, fear, and anxiety). She could feel him always ready to defend himself.

- The school moved toward special education placement for Chad very quickly. The typical practice was for a teacher to observe a student in class and then request testing. Chad's teacher Renee Morales and her aide Roberta Markley completed rating scales to assess his functioning and behavior, which found he had significant problems with learning, depression, physical symptoms, and fears as well as inappropriate behaviors. He was remarkable for having been retained in school, his truancy in West Virginia, and sexual victimization. They perceived his spitting and not fitting in were symptoms of this problematic history. They were aware that the probation department had been involved with Chad before he got to Westview. She noted, "There were so many red flags."

- Chad qualified for special education at Westview as Learning Disabled (LD). Many students who received LD services or were emotionally handicapped (EH) also had intellectual disabilities. She explained that the LD designation indicated a significant discrepancy between ability and performance: "It was all about the adaptive behavior and his ability to learn." She noted there was no difference between Chad and children diagnosed with Intellectual Disability with respect to social, practical, and communication skills, adding that his coping capacity was "almost non-existent."

- He had come to the school with the label Behaviorally Disordered (BD), which was one of the reasons Westview staff acted so quickly to get him tested and classified. For example, he was referred immediately for evaluation to Dr. Klassen, a psychiatrist, which was unusual. Dr. Klassen ultimately prescribed antidepressant medication for him.

- During the four months Chad was enrolled at Westview, he was unable to keep up with his classmates in either special education or regular classes, despite many supports ("my memory was he was failing almost everything").

- Chad's strengths at the time were "his willingness to defend himself and survive."

**Russell Spears (childhood friend)**

Interviewed by phone for .3 hours on 9/17/18, Russell reported:

- Born in 1967, Russell indicated he was approximately 10 years older than Chad. They met in Chesapeake, Ohio, when Chad was 12 and living with his brothers in

a trailer next to Russell and his wife Jennifer. After a year or so, Chad moved in with Russell and Jennifer.

- Russell and his adult friends spent a lot of time partying, and several young adolescents – including Chad – "ran around" with them, drinking alcohol and smoking marijuana like the adults. When Russell and Jennifer moved to Huntington, Chad moved with them.

- When Chad was around 15 or 16, he moved in with Russell's sister-in-law Tammy. Meanwhile, the partying (i.e., alcohol and marijuana use) had continued and at one point, Chad began snorting crushed Tuinal (barbiturate).

- According to Russell, Chad couldn't "hold his liquor" and did "stupid" things when intoxicated (e.g., yelling and arguing, crashing a car that had bad brakes). Russell noted, "There were several little boys like Chad running with us. They would get drunk and run their mouths. If they insisted on coming with us, they would get whupped if they wouldn't listen." Russell said he hit Chad in the head on a few occasions whenever Chad got "unruly" and "needed to calm down." Although Chad was knocked unconscious several times from these punches, Russell indicated there was never any medical attention. After regaining consciousness and sobering up, Chad seemed fine, and there was no perceptible change in his functioning.

**Ronnie Fulks** (older brother)

Interviewed in person for 2.0 hours in West Virginia on 7/10/17, Ronnie presented as someone obviously physically affected by years of methamphetamine use. His teeth were missing, and his face was gaunt. He was very thin and appeared to be no taller than five feet. He had facial abnormalities consistent with Fetal Alcohol Syndrome (i.e., thin upper lip, smooth philtrum, small eye openings). He reported:

- Diana and Roger physically abused their children and often fought physically with each other in front of the children. Regarding the physical abuse, their mother was the "more harsh" of the two because she hit them with objects, whereas their father "just" used a switch or belt. Adding that their mother not only could hold her own with their father, she could "beat him up" and also "won" a lot of fistfights with other men. He noted she fought "like a man."

- Ronnie described both parents as alcoholics and said his mother never stopped drinking during his childhood, even for a day, which included drinking throughout her pregnancy with Shannon. Eventually, she abruptly stopped drinking when she discovered religion, after which she became as addicted to church as she had been to alcohol. She also was a constant smoker.

- Diana cooked for her children and did laundry, but she neglected them emotionally, as did their father. Neither parent was involved in their schooling or helped them with homework. There was no parental supervision or monitoring.

- Ronnie described the family home on Leeward Avenue as a "party house" where alcohol and marijuana were freely available to the children. He described the pool table in the basement and said neighbors partied at their house every night. Often, there would be fighting, which sometimes involved his parents. At age six, he started taking marijuana roaches out of the ashtrays and smoking them. A bit later, he started drinking alcohol and huffing paint and gasoline fumes.

- Ronnie and Dewayne introduced Chad to methamphetamine. Chad started drinking and using marijuana at an early age, and by age 14, he was drinking and smoking marijuana daily.

- Ronnie and his brothers were in trouble a lot in childhood for fighting and stealing. The first time he got in trouble at school was in kindergarten for beating up a sixth grader.

- At age 15, Chad got involved with an older woman in the neighborhood who had a reputation for going after teenage boys and lived with her for a few months.

**Roger Fulks** (father)

Interviewed in person in Indiana for 1.0 hour on 7/13/17, Roger described his marriage to Diana but acknowledged limited memories of Chad in childhood. He reported:

- He ran a gas station for eight years in the 1970s and worked eight years for Orkin Exterminators in the 1980s. [According to collateral reports, his employment was quite sporadic, and he was unemployed periodically.]

- Describing his relationship with Diana when their children were young, he said "things were all right as long as Diana didn't get drunk." He acknowledged his own drinking but said he never got so drunk that he passed out, which was not the case with Diana. He said they always ended up fighting when they drank, which was several times a week.

- He and Diana both drank alcohol throughout her pregnancies with Ronnie, Chad, and Shannon. Diana drank beer and wine, typically until she became intoxicated or the alcohol was gone. During the time she was pregnant with Chad, they both drank alcohol at least every weekend. When they moved to Pine Street in Huntington, they began drinking daily and continued drinking daily when they lived on Leeward Avenue. Diana drank with the next-door neighbor while he was at work, and he would find her drunk when he got home at night. This was a daily scenario.

- One time, Diana was arrested and had to go to jail for being "drunk and disorderly."

- Roger never saw Diana cut back on her drinking, and she never told him she was cutting down due to pregnancy. He observed no change in her drinking pattern before, during, and after her pregnancy with Chad or with any of their children.

- Diana never received prenatal care for any of her pregnancies. The older children, including Chad, were born in Dr. McClelland's office.

- He and Diana smoked cigarettes when they drank. Typically, they shared a pack-and-a-half of cigarettes between the two of them daily. Diana did not reduce or stop smoking during her pregnancies. She was pretty healthy during the pregnancies and did not use any medications or illegal drugs.

- He remembered one time when Diana was sitting on the front steps talking to a neighbor. When Roger opened the front door, he heard Diana tell the neighbor that he wasn't Sherry's father. Diana was drunk at the time.

- He was unaware of any head injuries Chad might have received in childhood or adolescence.

- He did not know if Chad was delayed in talking, but he knew Chad "didn't say stuff real plain."

- He did not know if Chad had problems in school prior to age 14 and said there were no parent-teacher conferences during those years.

- When Chad moved to Indiana to join him and his wife Marcia, they couldn't handle him because he was misbehaving in school. After a few months, he had to send Chad back to his mother. He had no contact with his son after his 18th birthday.

- When Chad was an adolescent, he got involved sexually with an adult neighbor who was old enough to be his mother.

- Chad was a follower and wanted to do everything his brothers were doing. He was pretty close to Dewayne.

- Asked if Chad was ever arrested as a juvenile, Roger said "they pulled up someone's flowers once and had to pay a $300 fine." He was unaware of any other arrests.

## PSYCHOLOGICAL TESTING

Three tests were administered to screen for posttraumatic stress disorder, which was noted in some of Mr. Fulks' records. The third test (TSI-2) contains validity scales to determine response style.

Early Trauma Inventory Self Report-Short Form (ETISR-SF)

The ETISR-SF is a self-report checklist that assesses a range of traumas, including childhood physical, sexual, and emotional abuse as well as general traumas.

Mr. Fulks endorsed numerous traumatic experiences on this measure (general traumas, harsh physical punishment, emotional abuse, and sexual abuse). Abuse experiences included parental alcoholism/drug abuse and witnessing violence in and out of the home.

<u>PTSD and Suicide Screener (PSS)</u>

The PSS is a 14-item test derived from the Detailed Assessment of Posttraumatic Stress (DAPS). The PSS is designed to quickly screen individuals for posttraumatic stress disorder (PTSD) and suicide risk. The PSS has good sensitivity and specificity for a DSM diagnosis of PTSD, as determined by longer measures such as the DAPS and the Clinician-Administered PTSD Scale (CAPS). The PSS consists of two scales: PTSD Risk (PR) and Suicide Risk (SR). PR taps into aspects of all PTSD symptom clusters in both the DSM-IV-TR and DSM-5 and best predicts PTSD status. The SR scale consists of four items that index suicidal thoughts and behaviors and indicate a significant risk of suicide.

Mr. Fulks' scores of 31 and 10 on the PR and SR scales, respectively, indicated a risk of PTSD and suicide. In his interview and on the ETISR-SF, he described multiple traumas during childhood, including his parents' drinking and physical abuse.

<u>Trauma Symptom Inventory – Second Edition (TSI-2)</u>

The TSI-2 was administered in order to screen for symptoms of posttraumatic stress and other psychological sequelae of traumatic events, including possible ongoing effects of sexual and physical assault in childhood. Two validity scales on the TSI-2 assess tendencies to deny symptoms that are commonly endorsed, over-endorse unusual or bizarre symptoms, or respond in an inconsistent or random manner. T-scores over 75 on the Response Level scale and raw scores 15 or higher on the Atypical Response scale invalidate the TSI-2.

Mr. Fulks' scores on the TSI-2 validity scales fell within normal limits (Response Level T-Score = 54; Atypical Response T-Score = 83). Clinical scale T-scores at or above 65 (mean = 50, standard deviation = 10) are considered clinically elevated.

Scores on the following TSI-2 scales fell within the clinically elevated range: Anxious Arousal (T = 69), Depression (T = 78), Intrusive Experiences (T = 82), Dissociation (T = 68), Somatic Preoccupations (T = 69), Suicidality – Ideation but not Behavior (T = 69), Impaired Self-Reference (T = 70), and Tension Reduction Behavior (T = 68).

The following scales fell within normal limits: Anger (T = 59), Defensive Avoidance (T = 60), Sexual Disturbance (T = 46), and Insecure Attachment (T = 62).

Three of four broad domain areas were clinically significant: Self Disturbance (T = 72), Posttraumatic Stress (T = 71), and Somatization (T = 69). A fourth broad domain, Externalization (T = 61) fell within normal limits.

Overall, Mr. Fulks' TSI-2 profile was consistent with PTSD, suggesting symptoms that likely reach the clinical threshold for diagnosis.

## FORMAL ADAPTIVE BEHAVIOR ASSESSMENT

### Vineland Adaptive Behavior Scales – Third Edition (Vineland-3)

Brain development from infancy into the adult years is significantly delayed in FASD,[1] which along with congenital brain damage explains the substantial adaptive delays in this population.[2] The American Association of Intellectual and Developmental Disabilities (AAIDD) describes what adaptive assessment measures: "The assessment of adaptive behavior focuses on the individual's typical performance, not their best or assumed ability or maximal performance. Thus, what the person typically does, rather than what the individual can or cannot do, is assessed when evaluating the individual's adaptive behavior."[3] In other words, adaptive assessment involves the measurement of *everyday behavior* rather than performance in the formal structured context of a cognitive testing situation.[4]

Per DSM-5, adaptive functioning may be assessed using individualized, culturally appropriate, psychometrically sound measures.  Measuring adaptive functioning via standardized measures such as the Vineland Adaptive Behavior Scales is the standard of care in the mental health and education fields[5, 6, 7] as research supports the reliability of the Vineland.[8, 9, 10] The AAIDD recognizes the Vineland as a valid formal measure for the assessment of adaptive behavior.[11]

---

[1] Streissguth, A. P., Aase, J. M., Clarren, S. K., Randels, S. P., LaDue, R. A., & Smith, D. F. (1991). Fetal alcohol syndrome in adolescents and adults. *Journal of the American Medical Association, 265,* 1961-1967.
[2] Ibid.
[3] Schalock, R.L., et al. (2010). *Intellectual disability: Definition, classification, and systems of supports.* Eleventh Ed. Washington, DC: AAIDD.
[4] Edwards, W.J., & Greenspan, S. (2014). Adaptive behavior and fetal alcohol spectrum disorders. *Journal of Psychiatry and Law, 38,* 419-447.
[5] Tasse, M.J. (2009). Adaptive behavior assessment and the diagnosis of mental retardation in capital cases. *Applied Neuropsychology, 16,* 114-123.
[6] Greenspan, S., & Switzky, H.N. (2006). Forty-four years of AAMR manuals. In *What is mental retardation?: Ideas for an evolving disability in the 21st century.* Switzky, H.N., & Greenspan, S. (Eds.). Washington, DC: American Association of Mental Retardation.
[7] Edwards & Greenspan, op. cit.
[8] Tasse, op. cit.
[9] Greenspan & Switzky, op. cit.
[10] Edwards & Greenspan, op. cit.
[11] Schalock et al., op. cit.

Vineland-3 items focus on specific tasks individuals typically perform at different stages of development. Rather than asking whether the person is *capable* of performing a particular task, the Vineland-3 assesses whether the person *regularly performs* the task without prompting or assistance.

Vineland-3 items are divided into three broad categories of adaptive behavior: Communication, Daily Living, and Socialization skills, which correspond to the three adaptive criteria for Intellectual Disability (i.e., Conceptual, Practical, and Social).

In the current assessment, two individuals who observed Mr. Fulks from different perspectives were administered the Vineland-3: **Gayle Wolfe** (teacher) and **Linda Adkins** (neighbor).

The Vineland-3 test publisher indicates that in the case of retrospective assessment, two or more raters with similar responses increases confidence in the reliability of the results.

In addition to assessing responses for consistency between raters, additional methods were used to increase reliability: comparison of ratings with anecdotal reports, documented history, and administration of a second standardized behavior rating measure containing three reliability scales (i.e., Behavior Rating Inventory of Executive Function (BRIEF). Results of the BRIEF are shown below:

Reliability Scales: Behavior Rating Inventory of Executive Function

| Validity Scale | Clinical Threshold Score | Gayle Wolfe [teacher] | Linda Adkins [neighbor] |
|---|---|---|---|
| Negativity | $\geq 6$ | 4 | 0 |
| Infrequency | $\geq 3$ | 0 | 0 |
| Inconsistency | $\geq 8$ | 1 | 3 |
| RESULTS | | **VALID** | **VALID** |

Results of the BRIEF indicated that both respondents exhibited a straightforward unbiased approach to behavior rating, thereby supporting the validity of their Vineland ratings (as did the consistency between their ratings).

Vineland-3 results, shown in the table below, were scored by computer from an algorithm created by the test developer (Pearson). Ratings of specific adaptive behaviors were converted to standard scores for major domains (Mean = 100, Standard Deviation = 15) and v-scale scores for subdomains (mean = 15, standard deviation = 3) and then compared to age-based norms. Results were the following:

Vineland Adaptive Behavior Scales-3

| Subdomain / DOMAIN | Gayle Wolfe [teacher] Target Age: 10 | | Linda Adkins [neighbor] Target Age: 13 | |
|---|---|---|---|---|
| | v-Scale Score / Std Score | Std Dev / Percentile | v-Scale Score / Std Score | Std Dev / Percentile |
| Receptive | 3 | - 2.3 | 3 | -2.0 |
| Expressive | 1 | - 3.0 | 6 | -1.3 |
| Written | 8 | - 0.7 | 9 | -0.3 |
| **COMMUNICATION** | 38 ss | <1 %ile | 50 ss | <1 %ile |
| Personal | 10 | 0 | 8 | -0.7 |
| Domestic | 6 | -1.3 | 6 | -1.3 |
| Community | 5 | -1.7 | 7 | -1.0 |
| **DAILY LIVING SKILLS** | 63 ss | 1 %ile | 63 ss | 1 %ile |
| Interpersonal Relationships. | 1 | -3.0 | 8 | -0.7 |
| Play/Leisure Time | 7 | -1.0 | 9 | -0.3 |
| Coping Skills | 3 | -2.3 | 7 | -1.0 |
| **SOCIALIZATION** | 38 ss | <1 %ile | 63 ss | 1 %ile |
| **GLOBAL COMPOSITE** | 48 ss | <1 %ile | 60 ss | <1 %ile |

The Vineland-3 results above provide reliable and convergent data that quantify the nature and severity of Mr. Fulks' adaptive behavior in childhood and adolescence. Results of the assessment administered to Ms. Wolfe show that compared to other ten-year-olds, his adaptive functioning was significantly deficient. Results of the assessment administered to Ms. Adkins, who observed his development during his early teens, reflect that Mr. Fulks' adaptive functioning remained significantly deficient in adolescence. The level of deficiency reported by both respondents is consistent with the FASD research.[12]

**Behavior Screening**

Four individuals completed behavior screens of Mr. Fulks: **Gayle Wolfe** (teacher), **Linda Adkins** (neighbor), **Christina Kirkman Holbrook** (cousin), and **Marilyn Lauver** (junior high counselor). The behavior screen is comprised of behaviors associated with FASD in the literature. As was the case with Gayle Wolfe and Linda Adkins (see previous section), BRIEF validity scores from Christina Holbrook (2, 0, 4) and Marilyn Lauver (2, 0, 1) also indicated valid behavioral observations.

These four individuals differed in the amount of contact they had with Mr. Fulks: Linda Adkins had regular, frequent contact from his toddler years to age 13; Christina Holbrook saw him frequently throughout childhood into his early adult years; Gayle Wolfe had one academic year of daily contact with him when he was 10; and Marilyn Lauver had a few school counseling sessions with him when he was 14. Their

---

[12] Streissguth et al., op. cit.

observations of Mr. Fulks' behaviors during the time they had regular contact with him are shown in the table below:

Behavior Screen

| BEHAVIOR | Gayle Wolfe [teacher] Target Age: 10 | Linda Adkins [neighbor] Target Age: 13 | Marilyn Lauver [jr hi counselor] Target Age: 14 | Christina Kirkman Holbrook [cousin] Target Age: 21 |
|---|---|---|---|---|
| Disorganized | X | X | | X |
| Immature | X | X | X | X |
| Superficial friendships | X | X | X | X |
| Socially inept/peer problems | X | X | X | X |
| Unaware of consequences | X | X | X | X |
| Difficulty following directions | X | X | X | X |
| Inattentive | X | X | | X |
| Transition difficulties | X | X | X | X |
| Inflexible, stubborn | X | X | X | |
| Follower/easily led by others | X | X | | X |
| Indistinct or unusual speech | X | X | | X |
| Tendency to overreact | X | X | X | |
| Poor impulse control | X | X | X | |
| Oppositional, disobedient | X | X | X | |
| Gave up easily | X | X | X | X |
| Aggressive peer behavior | X | X | X | |
| Developmentally delayed | X | X | X | X |
| Difficulty with teamwork | X | X | | X |
| Moody, emotional outbursts | X | X | X | |
| Poor judgment | X | X | | X |
| Difficulty learning from experience | X | X | | X |
| Poor coordination | | X | X | X |
| Couldn't take a hint | X | X | X | X |
| Easily confused | X | X | | X |

Concordance in the raters' observations indicated numerous behaviors associated with the executive and adaptive dysfunction found in FASD.

**Fetal Alcohol Behavior Scale (FABS)**

The FABS[13] was developed by researchers at the University of Washington to describe the "behavioral essence" of adaptive/functional deficits associated with Fetal Alcohol Spectrum Disorders. The FABS, which contains 36 items that differentiate FASD from non-FASD persons, are imbedded within the Personal Behaviors Checklist, which contains 71 items. The behaviors addressed by the FABS are controlled by the prefrontal

---

[13] Streissguth, A.P., Bookstein, F.L., Barr, H.M., Press, S., & Sampson, P.D. (1998). A Fetal Alcohol Behavior Scale. *Alcoholism: Clinical and Experimental Research, 22,* 325 – 333.

cortex (i.e., executive functions). Using a reference sample of 472 patients aged 2 to 51 diagnosed with Fetal Alcohol Syndrome (FAS) or Fetal Alcohol Effects (FAE), the FABS demonstrated high item-to-scale reliability and good test-retest reliability over an average interval of five years in identifying subjects with known or presumed prenatal alcohol exposure in detection studies. FABS scores also predicted dependent living among adult patients with FASD. The FABS assesses the following domains: Communication and Speech, Personal Manner, Emotions, Motor Skills and Activities, Academic/Work Performance, Social Skills/Interactions, and Bodily/Physiologic Functions.

A cut-score of 15 or higher on the FABS distinguishes persons with FASD from those without FASD. The same individuals who completed the Behavior Screen (above) also completed the FABS, producing the following scores:

Fetal Alcohol Behavior Scale (FABS)

| Rater | Relationship | Target Age | Raw Score |
|---|---|---|---|
| Gayle Wolfe | Fifth grade teacher | 10 | 17 |
| Linda Adkins | Neighbor | 13 | 17 |
| Marilyn Lauver | Junior high counselor | 14 | 20 |
| Christina Kirkman Holbrook | Cousin | 21 | 15* |

* Christina Kirkman Holbrook responded "don't know" to 16/36 FABS items, rendering her total FABS score invalid.

All respondents' behavior ratings fell at or above the threshold level of 15, indicating that based upon their observations, Mr. Fulks displayed the "signature" behavior profile in childhood that is unique to individuals with FASD.


### DATA ANALYSIS and OPINION

The purpose of this evaluation was to address specific consultative questions from habeas counsel regarding Chad Fulks' life history and functioning.

***Consultative Question #1: Does Mr. Fulks have significant impairments in his adaptive functioning that would meet the second diagnostic criterion for a diagnosis of intellectual disability (ID)?***

The second criterion (i.e., Criterion B) in DSM-5 for a diagnosis of Intellectual Disability (ID) is the following:

> Deficits in adaptive functioning that result in failure to meet developmental and sociocultural standards for personal independence and social responsibility.

Without ongoing support, the adaptive deficits limit functioning in one or more activities of daily life, such as communication, social participation, and independent living, across multiple environments, such as home, school, work, and community....Criterion B is met when at least one domain of adaptive functioning – Conceptual, Social, or Practical – is sufficiently impaired that ongoing support is needed in order for the person to perform adequately in one of more life settings at school, at work, at home, or in the community. (p. 33, 38)

Similarly, the AAIDD indicates that the adaptive behavior criterion for the ID diagnosis is met when there are significant deficits in at least one of the following domains: conceptual, social, or practical.[14]

DSM-5 defines the three domains as follows: *conceptual* (e.g., competence in memory, language, reading, writing, math reasoning, acquisition of practical knowledge, problem solving, and judgment in novel situations), *social* (e.g., awareness of others' thoughts, feelings, and experiences; empathy; interpersonal communication skills; friendship abilities; social judgment), and *practical* (e.g., learning and self-management across life settings, including personal care, job responsibilities, money management, recreation, self-management of behavior, school and work task organization).

Assessments of adaptive behavior are to be comprehensive and drawn from multiple sources of information. In addition to formal tests of adaptive behavior discussed above, the AAIDD notes that comprehensive assessments likely will include review of the individual's family and medical history, education and employment records, and other relevant records and information, as well as clinical interviews with third-party reporters.[15]

According to DSM-5, adaptive functioning may be assessed in two ways: clinical evaluation and/or individualized, culturally appropriate, psychometrically sound measures.

In the current evaluation, Mr. Fulks' adaptive functioning was assessed using both methods recommended by DSM-5 and AAIDD: comprehensive (i.e., multi-source, multi-method) clinical evaluation and standardized adaptive assessment with the Vineland-3, with accuracy verified in numerous ways including comprehensive review of other sources relevant to Mr. Fulks' adaptive behavior.

Given possible self-presentation bias due to the forensic nature of this evaluation, the potential for the individual being assessed to mask impairments, and numerous inconsistences in self-reported information in previous evaluations (see Appendix B), I

---

[14] Schalock, R.L., et al. (2010). *Intellectual disability: Definition, classification, and systems of supports.* Eleventh Ed. Washington, DC: AAIDD.
[15] Ibid.

did not rely on Mr. Fulks' self-report unless it was corroborated by at least one reliable source.

## Formal Assessment of Adaptive Behavior

Retrospective assessment with the Vineland-3 was conducted to focus on Mr. Fulks' childhood functioning. The Vineland-3 test publisher permits retrospective assessment with the instrument if an individual has been out of the community for some time. The accuracy of retrospective adaptive ratings on measures such as the Vineland has been endorsed by the American Association of Intellectual and Developmental Disabilities (AAIDD) and American Psychological Association.[16, 17]

Both DSM-5 and the Vineland-3 manual recommend that family members or those who know the subject well function as adaptive behavior respondents. In the current case, the Vineland-3 was administered in person to two respondents: Mr. Fulks' fifth grade teacher *Gayle Wolfe* and childhood neighbor *Linda Adkins*, both of whom had frequent and regular contact with Mr. Fulks during his childhood. In Ms. Wolfe's case, she saw Mr. Fulks on a daily basis for a full academic year when he was 10 years old. Ms. Adkins saw him regularly and often throughout his elementary school years and last saw him when he was 13. Each respondent independently rated Mr. Fulks' behavior at the time of last regular contact (age 10 for Gayle Wolfe and age 13 for Linda Adkins). To ensure against bias, the accuracy of their behavior ratings was verified with validity scales on a second behavior-rating measure administered in the same setting (i.e., BRIEF).

As noted previously, items on the Vineland-3 are divided into three broad categories of adaptive behavior that correspond to DSM-5's Criterion B requirements for ID: Communication (*'Conceptual'* in ID), Daily Living Skills (*'Practical'* in ID), and Socialization (*'Social'* in ID).

The AAIDD states that scores of approximately 2 SDs below the mean on formal measures of adaptive functioning such as the Vineland-3, accounting for the standard error of measurement, fall within the presumptive range for ID. DSM-5 sets no presumptive range for ID on standardized tests of adaptive functioning.

Vineland-3 results, summarized below in Exhibit A, indicate that Mr. Fulks exhibited significant adaptive deficits in childhood:

---

[16] Schalock, R.L., et al. (2010). *Intellectual disability: Definition, classification, and systems of supports.* Eleventh Ed. Washington, DC: AAIDD.
[17] Baker, B.L. (2006). Message from the President (of the American Psychological Association). *Psychology in Mental Retardation and Developmental Disabilities, 32,* 1-4.

| Subdomain / DOMAIN | Gayle Wolfe [5th grade teacher] Target Age: 10 | | | Linda Adkins [neighbor] Target Age: 13 | | |
|---|---|---|---|---|---|---|
| | Standard Score | Percentile | SD | Standard Score | Percentile | SD |
| COMMUNICATION | 38 | <1 | < -4.0 | 50 | <1 | < -3.3 |
| DAILY LIVING SKILLS | 63 | 1 | -2.5 | 63 | 1 | -2.5 |
| SOCIALIZATION | 38 | <1 | < -4.0 | 63 | 1 | -2.5 |
| GLOBAL COMPOSITE | 48 | <1 | < -3.5 | 60 | <1 | < -2.7 |

EXHIBIT A. Vineland Adaptive Behavior Scales-3

Specifically, Vineland-3 results show that compared to normally developing children, Mr. Fulks' Communication, Daily Living, and Socialization skills fell at or below the 1st percentile (i.e., 2.5 standard deviations below the mean), and his Global Composite scores fell below the 1st percentile. Such results indicate that compared to age-peers, Mr. Fulks' adaptive functioning was severely deficient – both in childhood and in his early teens.

## Multi-Method Clinical Assessment of Adaptive Functioning

*CONCEPTUAL* (competence in memory, language, reading, writing, math reasoning, acquisition of practical knowledge, problem solving, and judgment in novel situations)

(a) <u>Functional Academics / Learning and Memory</u>

- *Academic History:* Records in Appendix B show that Mr. Fulks repeated first grade and did not complete his seventh, eighth, or ninth grade school years. He initially was enrolled in eighth grade after moving to Indiana without having completed seventh grade, and approximately two months later he was promoted to ninth grade to keep him with age-peers. Ultimately, he never completed ninth grade. He received special education services from his second year of first grade through junior high. At first, special education services involved speech and language therapy. In third grade (1987), he was referred for comprehensive multidisciplinary assessment because of deficits in self-direction, work habits, and basic academic skill development. From that point on, he received special education support for the remainder of his school career, which encompassed all academic subjects at one point or another in his history. Much of this support was provided in the form of individualized or small group supports within a self-contained classroom. Despite the special education supports that Mr. Fulks received throughout his school years, he fell further behind over time as age-peers progressed while his performance stalled. Attendance was not a significant issue until seventh grade.

- *Report Cards:* School records contained the following academic marks:

| Year | Grade | Age | Reading | Spelling | Writing | Lang/ English | Math | Gen Ed |
|---|---|---|---|---|---|---|---|---|
| 82/83 | K | 5 | | | | | | |
| 83/84 | 1 | 6 | S- | U | S- | | U | S- |
| 84/85 | 1 | 7 | S | S+ | S | | S | |
| 85/86 | 2 | 8 | S | S- | S | | S | |
| 86/87 | 3 | 9 | S- | S | S | S- | S- | |
| 87/88 | 4 | 10 | A | A | B | A | B | |
| 88/89 | 5 | 11 | C | C | C | C | D | C: Science, Soc Std |
| 89/90 | 6 | 12 | B: Computer Lit. C: Art, Music D: PE, Foreign Language F: Health, Home Economics | | | D | C | D: Science, Soc Std |
| 90/91 | 7 | 13 | Chesapeake Union Exempted Village (Ohio) – entered 4/3/91 <br><br> Semester 1: <br> F: Health <br><br> Semester 2: <br> F: Ohio History, English, Science, Reading/Literature <br> D: Math <br><br> Summer School: <br> F: Science <br> D: Ohio History, English, Reading/Literature <br> C: Math | | | | | |
| 91/92 | 9 | 14 | Westview Jr/Sr High - Indiana <br> Semester 1: <br> "Incomplete" in all subjects, including SPED English, Math and Science <br><br> Drift Creek Alternative School - Ohio <br> Semester 2: <br> C-: Social Studies <br> D+: Applied Math <br> C+: Applied Science <br> A-: Work and Family <br> C: Natural Resources | | | | | |
| 92/93 | 9 | 15 | Andis Alternative School (formerly Drift Creek) – Ohio <br> Semester 2: <br> B: Nat Resources/Lab, Nat Resources/Related, Vocational English, Vocational Social Studies, Work & Family <br><br> Earned 1.75 high school credits: did not advance to tenth grade | | | | | |

- *Academic Testing:* Beginning in kindergarten, achievement testing during Mr. Fulks' school years (Appendix C) indicated learning deficiency in all academic domains. The special education multidisciplinary team at Peyton Elementary

concluded he had a "learning disability" when he was in third grade, after which he received special education services throughout the balance of his school years. Yet, even with these special supports and the additional year of cognitive development he had due to retention in first grade, he fell increasingly behind his classmates as he progressed in school.

For example, although the Comprehensive Test of Basic Skills (CTBS) was a group-administered test of questionable validity, testing in kindergarten suggested problems in Word Recognition (10th percentile), Vocabulary (12th percentile), and Math Concepts (7th percentile), and testing in first grade suggested problems in Word Recognition (13th percentile) and Language Expression (10th percentile). [Group testing in second grade found significantly higher scores, which was inconsistent with later individualized testing with more reliable measures but may have reflected performance increases due to the extra year of first grade.]

Achievement testing with multiple measures in third grade found deficient scores in Reading (9th percentile) and Math Calculation (12th percentile) on the Wide Range Achievement Test (WRAT) and in Spelling (14th percentile) on the Kaufman Test of Educational Achievement (KTEA). Testing with the group-administered Cognitive Achievement Test-3 (CogAT-3) found deficiencies in Comprehension (5th percentile), Spelling (11th percentile), and Writing (5th percentile), which generally was consistent with individually administered tests.

According to Gayle Wolfe, testing with the Brigance in fourth and fifth grades was unreliable (see Collateral Interview earlier in this report).

In sixth grade, testing with the KTEA found deficient scores in Reading Comprehension (14th percentile), Spelling (16th percentile), and Math Calculation (3rd percentile).

By the time Mr. Fulks was in eighth grade in 1991, testing at Westview Junior High found skills at the third-grade level (2nd percentile) in Reading on the Kaufman Brief Form Achievement Test (KBFAT), fourth-grade level (9th percentile) in Writing on the Woodcock Johnson Test of Achievement (WJTA), fourth-grade level (5th percentile) in Spelling on the KBFAT, and fourth- and fifth-grade levels (4th and 10th percentiles) in Math Calculation on the KBFAT and WJTA, respectively. Testing with the Test of Written Language (TOWL) also found deficits: Word Reading (2nd percentile), Spelling (16th percentile), and Writing (2-5th percentile).

Forensic achievement testing in Mr. Fulks' adult years indicated little improvement. For example, testing with the WRAT-3 generally found deficits, with some variability:

Reading skills fell at the fifth-grade level (5th percentile) at age 25-11, at the eighth-grade level (14th percentile) at age 26-2, and at the sixth-grade level (65th percentile) at age 26-6.

Spelling skills fell at the fifth-grade level (5th percentile) at age 25-11 and at the same level and percentile at age 26-2.

Math Calculation skills fell at the sixth-grade level (8th percentile) at age 25-11 and at the sixth-grade level (6th percentile) at age 26-2.

Testing with the Woodcock Johnson Tests of Achievement-3 (WJTA-3) at age 26-9 found Word Reading skills at the eighth-grade level (8.0 GE, 21st percentile) and Reading Fluency at the seventh grade level (7.6 GE, 16th percentile), Reading/Passage Comprehension and Spelling skills at the seventh-grade level (7.7 GE, 27th and 26th percentiles, respectively), Writing Samples at the second-grade level (2.3 GE, 3rd percentile) and Writing Fluency at the fifth-grade level (5.7 GE, 20th percentile), Math Calculation at the fifth-grade level (5.7 GE, 14th percentile), Applied Problems at the sixth-grade level (6.4 GE, 12th percentile), and Math Fluency skills at the sixth-grade level (6.1 GE, 6th percentile).

In addition, school testing of visuomotor skills at age nine indicated a two-year developmental delay. Later testing at age 12 found ongoing problems in visuomotor and perceptual skills. Testing at age 14 indicated visual-motor skills that fell 1.3 standard deviations below the mean (12th percentile). (See Appendix C)

- *Behavior Rating:*
  - o Results on the Behavior Screen administered to Gayle Wolfe (teacher), Linda Adkins (neighbor), Christina Kirkman Holbrook (cousin), and Marilyn Lauver (school counselor) indicated concordance on trouble learning from experience.
  - o Standardized behavior rating with the Fetal Alcohol Behavior Scale (FABS) found concordance among the above individuals on the following: difficulty learning and performing precise tasks.

- *Collateral Witness Reports:* Generally, collateral witnesses reported during their collateral interviews that Mr. Fulks was consistently behind age mates in all subjects and that he received significant special education support for much of his academic career but still had learning difficulties despite this heightened level of support. Witnesses also reported the following:
  - o <u>Linda Adkins</u> (neighbor): Ms. Adkins reported in her interview that compared to her own children and his brothers, Chad Fulks exhibited multiple developmental delays in early childhood (i.e., motor skills, speech and language, practical skills, and reading skills). For example, he

was delayed in potty-training (age three) and was especially slow in learning to speak. He couldn't say many words, and the words he did say were difficult to understand because he mispronounced them. He used few words but was very hard to understand. He also had trouble understanding things. Ms. Adkins had to repeat things over and over because he didn't understand what she was saying and kept saying "huh?" She also had to keep reminding him to do things because he didn't remember what she told him.

- o <u>Christina Kirkman Holbrook</u> (cousin): Ms. Kirkman reported in her interview that Mr. Fulks had to repeat first grade and needed help understanding basic schoolwork. When he was in second grade, Ms. Kirkman sometimes helped him with his homework and found he couldn't add and subtract. She recalled sitting on the front porch helping him. He would get really frustrated because he didn't understand. He was behind in his homework, and she recalled reading one of his school books with him to help him catch up. However, he had a short attention span and couldn't stay focused. He also couldn't repeat back what she was saying. Sometimes, he would get stuck on a word or phrase and repeat it over and over again.

- o <u>Cindy Harper</u> (kindergarten teacher): Ms. Harper reported in trial testimony that Mr. Fulks had difficulty with learning.

- o <u>Gayle Wolfe</u> (fifth grade Behavioral Disorder teacher at Peyton Elementary): Ms. Wolfe reported in her interview that she remembered Chad Fulks "very well" as one of her favorite students. He also was one of her older students (because he had been retained in first grade). She did a lot of counseling with him, and 50 percent of her time was spent reminding him of his decisions. His special education category was "SLD" (Specific Learning Disability) because he couldn't write a sentence, couldn't spell, and was weak in many other academic tasks. He also couldn't "get" phonetics. His reading skills were at the first-grade level. He was a sight reader and also used picture cues. She worked more with him on math skills than reading because math was easier because it was "hands-on" and easier to mainstream. He was a hands-on learner. She worked with him on addition and subtraction, which were second-grade skills, but not multiplication, a third-grade skill. Although she worked all year with him on writing, he did not learn how to write a sentence. Regarding the Cs he received in most of his fifth-grade subjects (except for an F in Math), she indicated that a grade of 'C' on a BD child's report card did not represent actual academic performance but rather meant the student had made an effort to learn. She noted that the Brigance test results in his records (see Appendix C) were the wrong scores: "I was working with him at a much lower level in math and reading. We never

felt the Brigance was a good test because we didn't think it gave accurate information, even though this was the test that was used at Peyton." She said she recopied the scores from the previous year into his file rather than testing him with the Brigance, noting the staff member who did the testing in 1987 and 1988 was a backup teacher with no degree in school psychology and no knowledge on how to administer testing.

o Laura Cooper (sixth-grade special education math teacher at Peyton Elementary): Ms. Cooper reported in a declaration that Mr. Fulks had to be taught slowly and repetitively because he struggled so much and was so far behind his classmates. His math skills were far below grade level. She worked with him on basic practical skills such as counting money or telling time rather than sixth-grade math. She indicated that she tended to pass her students if they made some effort and were able to make a little progress. Although Mr. Fulks received a C in her Math class, the grade only represented the individualized work he did with her, not that he could do math at a sixth-grade level. In her declaration, she indicated that although Mr. Fulks was classified as Behaviorally Disordered (BD), this did not mean he did not suffer from intellectual problems. Rather, the BD label took precedence over other categories such as MI (Mentally Impaired) because the school viewed the behavioral problems as the main issue interfering with a student's education.

o Martha Floyd (sixth-grade special education teacher at Peyton Elementary) reported in trial testimony that Mr. Fulks was a slow learner.

o Joy Krug (school psychologist at Westview Junior High): Ms. Krug reported in her interview that Mr. Fulks attended Westview for only four months. He enrolled in eighth grade on 8/21/91, which was the first day of school. It was clear as soon as he enrolled that he had disabilities for which he needed supports, and by 9/10/91, he had been placed in a remedial reading support program. She reviewed the battery of tests she administered to him (see Appendix C) and noted that his test results showed he needed a great deal of help to survive in school. She reviewed some of his testing she had administered to him. On achievement tests, his scores in math, reading, and spelling fell in the moderately to mildly impaired range (68 – 75 SS) on the Kauffman Brief Form Achievement Test (KBFAT), in the moderately impaired to low average range (66 – 81 SS) on the Wide Range Achievement Test (WRAT), and in the low average to average range (80 – 95 SS) on the Woodcock Johnson Tests of Achievement (WJTA). [With the exception of the Reading subtest on the WJTA, all achievement test scores were below grade level.] Regarding communication skills, his standard score of 73 on the Peabody Picture Vocabulary Test (i.e., expressive language) was equivalent to a mental age of 9 years, 8 months, and he produced moderately to mildly impaired scores (2nd – 16th percentile) on the Test of Written Language (TOWL). She asked his

teachers to complete an adaptive behavior scale (ABES) because he demonstrated such difficulty in academic and social domains. His scores on the ABES reflected significant limitations, particularly on the Task Related Behavior scale, a measure of functional academics, and on the Environmental / Interpersonal Behavior scale, which assessed social skills, communication, and functioning. Overall, his test scores showed he did not have the skills to survive in school without "a lot of extra help." He had a wide span of problems. His verbal impairments prevented him from reasoning, and his ability to think abstractly and learn from experience were very limited. The pattern he exhibited was troubling because the discrepancy between his verbal and performance skills led to him to act before thinking. Although he obtained scores on tests of intellectual ability that fell into the range of mild intellectual disability, he also demonstrated a significant discrepancy between IQ and achievement, as indicated by the difference between his WISC-R IQ score and scores on the achievement tests. As a result, it was recommended that he receive services for learning disabilities in English, Math, Science, and Social Studies.

o Marilyn Lauver (counselor at Westview Junior High): Ms. Lauver reported in her interview that when Mr. Fulks arrived at Westview, he was in a grade lower than he should have been for his age, so they eventually found a way to make him age/grade appropriate by placing him in ninth grade. He qualified for special education as Learning Disabled (LD). She explained that the LD designation indicated a discrepancy between ability and performance: "It was all about the adaptive behavior and his ability to learn." Many LD or emotionally handicapped (EH) students had intellectual disabilities. She noted that there was no difference between Mr. Fulks and children with Intellectual Disability with respect to his social, practical, and communication skills. One of the reasons why Westview staff acted so quickly with him was because he came to the school with the label Behaviorally Disordered and was unable to perform like other children his age due to his intellectual deficits and emotional disorganization. He was reading well below grade level and was way behind in math. He did not keep up with his classmates in either his special education classes or his regular classes ("my memory was he was failing almost everything"). She noted that Mr. Fulks acted like a seven-year-old, even though he was 14.

(b) Executive Functioning (e.g., problem solving and judgment in novel situations)

- *Behavior Rating:*
  - o Standardized behavior rating with the Devereux when Mr. Fulks was in third grade (2/11/87) found Significantly High scores in Classroom Disturbance and Inattentive-Withdrawn, which indicated lack of self-regulatory control (i.e., executive dysfunction).

- o Results on the Behavior Screen administered to Gayle Wolfe (teacher), Linda Adkins (neighbor), Christina Kirkman Holbrook (cousin), and Marilyn Lauver (school counselor) indicated concordance on numerous aspects of executive dysfunction that they observed in Mr. Fulks: disorganized, unaware of consequences, difficulty following directions, inattentive/trouble concentrating, transition problems, tendency to overreact, poor impulse control, gave up easily, poor judgment, couldn't take a hint, and easily confused.

- o Standardized behavior rating with the Fetal Alcohol Behavior Scale (FABS) in the current evaluation found concordance among the above individuals on the following relevant behaviors: unaware of the consequences of his behavior, had trouble completing tasks, poor judgment, poor attention control, and poor organization skills (i.e., messiness and tendency to lose or misplace things frequently).

- *Collateral Witness Reports:*

  - o <u>Linda Adkins</u> (neighbor): Ms. Adkins reported in a declaration that "everything" was slow about Mr. Fulks in childhood, including his pace of speaking and moving. He was "especially slow" in learning to speak.

  - o <u>Kelly Perry</u> (neighbor/Linda Adkins' daughter): Ms. Perry reported in a declaration that it was difficult to play with Mr. Fulks in childhood because his thinking was so slow. His younger brother Shannon was more advanced in development. She observed that when his mother spoke to Mr. Fulks, she had to repeat herself in order for him to understand. He could not control his distress and threw dramatic temper tantrums.

  - o <u>Christina Kirkman Holbrook</u> (cousin): Ms. Kirkman Holbrook reported in a declaration that Mr. Fulks was "slow," did not understand things he should have known for his age and could not comprehend basic school work.

  - o <u>Dottie Thompson</u> (third grade teacher): Ms. Thompson reported that Mr. Fulks was unable to self-direct and indicated he needed adult guidance "at all times." [School records reflect that Dottie Thompson referred Mr. Fulks for assessment due to his distractibility and behavior control problems.]

  - o <u>Joy Krug</u> (school psychologist at Westview Junior High): Ms. Krug reported in her interview that she tested and evaluated Mr. Fulks when he arrived at Westview in 1991. Test results indicated that his verbal impairments prevented him from reasoning, that his abilities to think abstractly and learn from experience were very limited, and that he was impulsive and tended to act before thinking. He obtained scores on intellectual tests that fell in the range of mild intellectual disability and also demonstrated a significant discrepancy between IQ and

achievement. As a result, in order to keep him in regular classrooms with accommodations, the school's multidisciplinary team recommended he receive services for Learning Disabilities in English, Math, Science, and Social Studies. His primary weaknesses were language and sequencing verbal thoughts, which she attributed to frontal lobe problems. Functionally, he was intellectually disabled when one considered all his test scores, and he "didn't have the mental tools to compensate." His strengths included "street smarts" and "survival skills," as indicated by testing showing he was able to immediately perceive details and respond behaviorally.

- o <u>Marilyn Lauver</u> (counselor at Westview Junior High): Ms. Lauver reported in her interview that Mr. Fulks was impulsive. She said that although he tried hard to control his impulses, he often was unsuccessful.

(c) <u>Communication</u>

- *School Records/Testing:*

  - o Achievement testing in first grade found writing skills at the 10th percentile (mild impairment). In eighth grade, writing skills fell between the 2nd to 5th percentiles, which was four years below grade level. When tested in the forensic context at age 26-9, Mr. Fulks' writing skills fell at the 3rd percentile.

  - o Assessment with the Peabody Picture Vocabulary Test found a two-year developmental delay when Mr. Fulks was nine and nearly a five-year delay when he was 14. Forensic testing at age 26-9 found a standard score of 77 (i.e., 6th percentile).

  - o School records (Appendix B) reflect that Mr. Fulks received speech therapy throughout his school years.

- *Behavior Rating:*

  - o Rating by his teacher with the Devereux when Mr. Fulks was in third grade (2/11/87) found a Significantly Low score in Comprehension, which indicated significant receptive communication problems (i.e., adaptive dysfunction).

  - o Results of the Behavior Screen administered to Gayle Wolfe (teacher), Linda Adkins (neighbor), Christina Kirkman Holbrook (cousin), and Marilyn Lauver (school counselor) indicated concordant observations on 'indistinct speech.'

  - o Standardized behavior rating with the Fetal Alcohol Behavior Scale (FABS) found concordance among the above individuals on the following relevant behaviors: communicates with poor timing/interrupts and communicates about unusual/unrealistic conversation topics.

- *Collateral Witness Reports:*

  o <u>Linda Adkins</u> (neighbor) reported in her interview that Mr. Fulks did not begin speaking until he was around three years old. She indicated that because he lisped and mispronounced words, it was hard to understand him. When he was four, she still had trouble understanding him. He continued to lisp throughout childhood. He also had trouble understanding what others were saying to him. For this reason, she had to repeat things over and over to him because he didn't understand and kept saying "huh?" She said she had to keep reminding him to do things because he couldn't remember what she had requested. For example, she would tell him to go in the kitchen and bring her something inside the refrigerator, and he would look around but not understand what she wanted. She had to repeat the instruction multiple times and narrow down her instructions to one thing at a time.

  o <u>Kelly Perry</u> (neighbor / Linda Adkins' daughter) reported in a declaration that Mr. Fulks had trouble speaking because he could not pronounce words. It was hard to understand him when he talked, and in conversations, he did not respond much. He smiled but could not follow conversations. When his mother talked to him, she had to say things more than once for him to understand. His younger brother Shannon was smarter than he was and understood things Mr. Fulks could not grasp.

  o <u>Roger Fulks</u> (father) reported in his interview that Chad "didn't say stuff real plain" in childhood.

  o <u>Kevin Holbrook</u> (maternal uncle) reported in a declaration Mr. Fulks had a speech impediment as a child.

  o <u>Christina Kirkman Holbrook</u> (maternal cousin) reported in her interview that that she thought Mr. Fulks was born brain-damaged because he was "so slow at everything." He was delayed in talking and didn't start talking in sentences until kindergarten, at which point he was hard to understand. He couldn't pronounce words and sounded like a two-year-old whenever he spoke. He also stuttered but eventually grew out of it. Other children teased him about sounding "like a baby" when he spoke and called him "retarded." His siblings called him "stupid." His mother called him "stupid" and "retarded." She remembered that he received speech therapy. In her declaration, Christina reported that she sometimes had to ask his older sister Sherry to translate what he was saying because she couldn't understand him. Because of his speech problems, he seemed more like a three-year-old when he was seven.

  o <u>Gayle Wolfe</u> (fifth grade Behavioral Disorder teacher at Peyton Elementary) reported in her interview that classmates teased Mr. Fulks because of his lisp. He was very insecure about his speech and would

hide his face at times and remain quiet. To communicate with him, she had to talk to him on a very primitive level.

(d) <u>Neuropsychological Testing</u>

Neuropsychological testing of Mr. Fulks' *Conceptual* skills in academics, memory, attention, processing speed, communication, and executive functioning (see analysis in Question #3 below) reflected impairments that were consistent with the adaptive deficits identified in his Vineland-3 assessments and multi-source data summarized above.

*SOCIAL* (e.g., awareness of others' thoughts, feelings, and experiences; empathy; interpersonal communication skills; friendship abilities; social judgment)

(a) <u>Coping</u>
- *Behavior Rating:*
  - o Results of the Behavior Screen administered to Gayle Wolfe (teacher), Linda Adkins (neighbor), Christina Kirkman Holbrook (cousin), and Marilyn Lauver (school counselor) found concordance with respect to the following observed behaviors: immature, inflexible and stubborn, and moody/emotional outbursts.
  - o Standardized behavior rating with the Fetal Alcohol Behavior Scale (FABS) found concordance among the above individuals on the following relevant behaviors: deficient mood control: rapid mood swings with changes triggered by seemingly small things and tendency to overreact.
- *Trial Testimony:*

  Testimony from women Mr. Fulks lived with (i.e., Amber Fowler, Heather Goodman, and Veronica Evans) indicated that during his adult years he was emotionally unstable.
- *Collateral Witness Reports:*
  - o <u>Linda Adkins</u> (neighbor) reported in her interview that Mr. Fulks cried a lot and whined in childhood. When the other children were rough, he screamed like they were going to hurt him.
  - o <u>Gayle Wolfe</u> (fifth grade Behavioral Disorder teacher at Peyton Elementary) reported in her interview that Mr. Fulks couldn't explain what started problems, why he got involved, or why he did things. However, he never caused a problem on his own because he was always a follower. When he was teased and got angry, he cried rather than getting aggressive. He was a "copycat," and other children would draw him into mischief: "There wasn't hardly a day that I didn't talk to him

about not following other kids." In contrast, she never had to talk to him about something he instigated, because it was always something that someone else had started and gotten him involved in.

- o <u>Marilyn Lauver</u> (counselor at Westview Junior High) reported in her interview that emotionally and socially, Mr. Fulks seemed much younger than fourteen. In addition to spitting on other children on the school bus when he was upset, he pouted, hung his head, and "folded up." He did not know how to solve problems with peers. When he did not like how the other children were treating him, he acted out towards them rather than talking to them. His coping capacity was "almost non-existent." At one point, he had to be put off the bus for spitting on other children.

(b) <u>Interpersonal</u>

- • *Behavior Reports:*

  - o Results of the Behavior Screen administered to Gayle Wolfe (teacher), Linda Adkins (neighbor), Christina Kirkman Holbrook (cousin), and Marilyn Lauver (school counselor) found concordance with respect to the following: superficial friendships, socially inept/problems with peers, follower/easily led by others, oppositional/disobedient, aggressive behavior with peers, difficulty with teamwork, and developmentally delayed.

  - o Standardized behavior rating with the Fetal Alcohol Behavior Scale (FABS) found concordance among the above individuals on the following relevant behaviors: had trouble playing on a team, established superficial friendships easily but had no close friends, and seemed unaware of 'good manners.'

- • *Collateral Witness Reports:*

  - o <u>Linda Adkins</u> (neighbor) reported in her interview that when Chad played with his brothers and the neighborhood children, he was a follower and pleaser. He did what the other children wanted him to do and didn't initiate anything. Other children picked on him and manipulated him. He followed Dewayne around and did whatever Dewayne told him to do. Dewayne tended to tell him to do things that would get him in trouble. He was sweet and seemed much younger than his age. He was close to his mother and seemed like a momma's boy. He had no friends his age

  - o <u>Kelly Perry</u> (neighbor / Linda Adkins' daughter) reported in a declaration that Mr. Fulks walked funny, was quite clumsy, and tripped on himself when running. When playing baseball, he was uncoordinated. He had a hard time hitting the ball when batting or catching the ball when fielding. He also didn't understand the rules of the games. He was slow in his thinking, which made playing with other children difficult for him.

o   Christina Kirkman Holbrook (cousin) reported in her interview that she did not recall Mr. Fulks ever having a close friend at school or in the neighborhood. She said he didn't know how to connect socially with people and seemed more like a three-year-old when he was seven.

o   Roger Fulks (father) reported in his interview (and declaration) that his son was a follower.

o   Mark Thompson (family friend) also reported in a declaration that Mr. Fulks was a follower.

o   Gayle Wolfe (fifth grade special education teacher) noted in her interview that Mr. Fulks was a follower. She reported that he did not instigate problems but often was led into misconduct by other children. He was vulnerable to being led. When confronted for his behavior, he was unable to explain why he started problems, why he got involved, or why he did things. She described him as quiet, socially withdrawn, and immature, indicating that he acted like a five or six-year-old even though he was 11 at the time he was in her classroom. She noted he was weak in social reciprocity and had no friends. In her declaration she indicated that he had no sense of caution and got caught up in some serious fights on the playground. He was "very backward socially" and not someone who would go up to another child to make a friend.

o   Marilyn Lauver (counselor at Westview Junior High) reported in her interview that interpersonally, Mr. Fulks never looked comfortable anywhere. Although he initially tried to reach out to some peers, he couldn't fit in because he lacked social skills and consequently had no friends. He seemed "absolutely depressed, fearful, suspicious, and highly anxious." He had no social judgment. She thought his classmates were "wary" of him. His social deficits included a lack of basic social graces. For example, he did not know how to greet people politely (e.g., standing up and shaking hands when meeting an adult), and he didn't say 'thank you.' He did not understand humor or jokes, and it was important to be very concrete and literal with him. In many ways, he acted like a seven-year-old, even though he was fourteen.

*PRACTICAL* (learning and self-management across life settings, including personal care, job responsibilities, money management, recreation, self-management of behavior, school and work task organization)

(a) Recreation

● *School Testing:*

Visuomotor testing (i.e., ability to coordinate behavior with visual information) at age nine indicated a two-year developmental delay. Testing

at age twelve found visuomotor and perceptual problems. Testing at age fourteen indicated visuomotor skills that fell 1.3 standard deviations below the mean (12th percentile).

- *Collateral Witness Reports:*
  - o <u>Linda Adkins</u> (neighbor) reported in her interview that Chad didn't seem to understand things when he was a child. For example, he didn't understand volleyball and would get confused when he tried to play. The ball would come at him, and he would just stand there and not do anything. Then, he would kick it at the wrong time. He was clumsy and had poor coordination. When the children were playing kickball, he would miss the ball. He couldn't hit the ball with a bat when the children were playing baseball. He was a quiet and withdrawn child.

  - o <u>Kelly Perry</u> (neighbor / Linda Adkins' daughter) reported in a declaration that Mr. Fulks had difficulty playing games with peers in childhood because he was clumsy and did not understand the rules. She noted he was "slower in thinking, and that made playing with us hard."

  - o <u>Christina Kirkman Holbrook</u> (maternal cousin) reported in her interview that Chad didn't know how to play sports with the other children. One time, she observed him playing ball with the neighbor children. The children started teasing him because he was uncoordinated, and he just wandered off with his head down and a sad expression on his face.

- Mr. Fulks' leisure activities during adolescence and adulthood primarily consisted of drinking and drug use.

(b) <u>Self-Management Across Life Settings</u>

- School records, collateral witness interviews (see earlier section in this report), and witness declarations referenced above show that Mr. Fulks was unable to keep up with peers academically despite special education supports throughout his school years.

- Mr. Fulks was unable to sustain productive work in his adult years despite having a GED and welding certificate, and he supported himself largely by breaking into cars or check fraud.

- There is no evidence that Mr. Fulks ever lived independently for any length of time. For example, within a month of his release from Davis Center to his mother's home at age 18, he married Amber Fowler. The two then lived with her son in his mother-in-law's home. After his brief relationship with Amber ended, he moved in with his oldest brother Dewayne and Dewayne's wife Carly. Following multiple arrests in Tennessee in early 1998, he left Indiana and moved to Myrtle Beach, South Carolina, where he lived at the beach and began working for a construction company. Two or three months later, he

was arrested and charged in federal court with car theft and related offenses. He was incarcerated in federal prison until December 1999, at which point he was arrested immediately and charged with burglary. Released from jail on bond, he worked for three or four weeks as a welder and fiberglass installer while living with Dewayne and Carly and then was incarcerated in federal prison for two years. Released on federal probation in March 2002, he moved in with a counselor he had met in a prison substance abuse program (Tina Severance), and she helped him get a job selling perfume. He immediately began a relationship with Veronica Evans, which led to Tina evicting him from her residence. He moved in with Veronica and married her two months later. Two months after that, they were arrested when he directed her to use a stolen credit card to buy jewelry at a Walmart. When he was apprehended by police in the Walmart parking lot, police found stolen credit cards and a stolen pistol in his vehicle. Detained in jail, he escaped with Brandon Basham, which began the chain of events resulting in the deaths of Samantha Burns and Alice Donovan.

- The assessment of adaptive functioning focuses on an individual's typical functioning in the community. The AAIDD indicates that intellectual disability determinations are *not based on prison functioning*.[18] Similarly, DSM-5 notes that adaptive functioning may be difficult to assess in a controlled setting such as prison.[19] The only times Mr. Fulks accomplished something positive in his life was when he lived in highly structured environments where he was not reliant on his own cognitive functioning to organize and structure his behavior. For example, although he had left school in ninth grade, he was able to obtain a GED and welding certificate at age 17 when he was in a structured juvenile residential program. Although he initially failed the test for the welding certificate, he was able to pass it the second time around with one-on-one support from his instructor, who reportedly was committed to ensuring Mr. Fulks passed the test. While in prison, another highly structured environment, he participated in anger management and stress management groups, received another GED in 2001, and completed a substance abuse treatment program in 2002.

In summary, retrospective Vineland-3 results in this evaluation found impairments in all three domains (i.e., conceptual, social, and practice), which were consistent with:

Contemporaneous cognitive testing in childhood,

Contemporaneous academic performance in school,

Contemporaneous behavior rating in school,

---

[18] Schalock, R.L., et al. (2012). *User's Guide, Intellectual disability: Definition, classification, and systems of supports.* Eleventh Ed. Washington, DC: AAIDD.

[19] American Psychiatric Association. (2013). *Diagnostic and statistical manual of mental disorders (5th ed.).* Arlington, VA: Author, p. 38.

Contemporaneous records in Appendix B,

Retrospective witness declarations and testimony,

Retrospective behavior screening in the current evaluation,

Retrospective standardized behavior assessment,

Retrospective collateral witness interviews, and

2003/04 forensic neuropsychological testing.

Thus, in addition to reliability assessment with the BRIEF, data from nine different sources provided convergent support that the Vineland-3 results were valid and that Mr. Fulks exhibited significant deficits in adaptive behavior throughout childhood and adulthood.

**OPINION: Data from multiple, independent, convergent sources indicate that Mr. Fulks exhibited significant impairments in childhood and adult adaptive functioning in three domains (i.e., Conceptual, Practical, and Social), which meets the second diagnostic criterion for a DSM-5 and AAIDD diagnosis of ID.**

***Consultative Question #2: Were any impairments in Mr. Fulks' adaptive functioning present before the age of 18, as required by the adaptive behavior component of the third diagnostic criterion for a diagnosis of ID?***

Although Mr. Fulks has displayed adaptive impairments his entire life, Question #1 enumerates pre-age 18 deficits in all three domains (conceptual, social, and practical).

**OPINION: Data from multiple, independent, convergent sources indicate Mr. Fulks exhibited significant adaptive deficits *prior to age 18*, which meets the third diagnostic criterion for a diagnosis of ID as it relates to adaptive behavior.**

***Consultative Question #3: Is Mr. Fulks' lifelong cognitive, intellectual, and adaptive functioning consistent with FASD?***

**Neuropsychological Assessment**

The Centers for Disease Control (CDC) quantified the protocol for measuring the cognitive deficits in FAS in its 2004 publication containing diagnostic guidelines.[20] Namely, deficits that fall one or more standard deviations below the mean (i.e., 16th percentile or lower) in standardized testing are considered deficient except for IQ testing, which requires deficits that fall two or more standard deviations below the

---

[20] Bertrand et al., 2004, op. cit.

mean (i.e., 2nd percentile or lower). Under the 4-Digit Code, which is used by many practitioners in the clinical setting (and used by Dr. Davies in diagnosing Mr. Fulks), central nervous system dysfunction is designated Rank 3 (i.e., "Significant Dysfunction") when there is evidence from standardized testing of significant impairment (i.e., 2 or more standard deviations below the mean) in three or more domains of brain functioning (e.g., executive function, memory, cognition, social/adaptive skills, academic achievement, language, motor, attention or activity level).[21]

Neuropsychologist Paul Connor prepared Exhibit B below based on prior neuropsychological testing of Mr. Fulks (Dr. Venn in 2003, Dr. Evans in 2003/04, Dr. Gourley in 2004, and Dr. Hilkey in 2003). In Exhibit B, Dr. Connor converted standard scores from the test batteries administered to Mr. Fulks in adulthood to z-scores (i.e., standard deviations from a mean of "0"), with the direction of deficit made constant (i.e., lower scores reflecting poorer performance, and higher scores reflecting better performance). The horizontal green line in Exhibit B depicts the z-score mean or average score for each test administered, and the horizontal red line depicts the cut-point for a "deficit" finding.

---

[21] Astley, S.J. (2004). *Diagnostic guide for Fetal Alcohol Spectrum Disorders: The 4-digit diagnostic code, 3rd Ed.* Seattle: FAS Diagnostic and Prevention Network.



**Adult Neuropsychological Testing of Chadrick Fulks ALL TESTING**

EXHIBIT B. Adult Neuropsychological Testing by Forensic Experts

Absent significant brain damage, Mr. Fulks' neurocognitive test results should fall in line with the mean for each test in Exhibit B, or "0" standard deviation line (reflected by the horizontal green line). However, most of his scores fall well below that line and even below the dotted green line depicting his full-scale IQ scores (77 per Dr. Venn, 79 per Dr. Gourley, 78 per Dr. Hilkey).

Overall, the test profile in Exhibit B is quite variable or scattered, with the large majority of scores falling one or more standard deviations below the mean and relatively few scores falling at or above the mean, indicating a broad patchwork of significant impairments reflecting severe pervasive brain damage. A variable or "patchy" neuropsychological profile such as this is prototypical in FASD and predicts that Mr. Fulks will tend to perform better in structured situations (e.g., cognitive testing) compared to situations that rely solely on his deficient executive processing. His documented life history (e.g., obtaining a GED as well as a welding certificate with support from his instructor while living in a structured juvenile facility, obtaining another GED while incarcerated in prison) is consistent with such a prediction.

Widespread deficits of the type seen in Mr. Fulks' cognitive profile have a *profound* effect on adaptive behavior. While it may be possible for a person to compensate for

one or two mild impairments in a single cognitive domain, when there are multiple mild to severe impairments in several areas of the brain as in Mr. Fulks' case, compensation is impossible without external structure and supports.

As Exhibit B illustrates, neuropsychological testing by four different psychologists, using a variety of tests, found significantly impaired cognitive functioning (i.e., 1 or more standard deviations below the mean) in nine domains per CDC guidelines for neurocognitive disability in FAS or eight domains (excluding Academics) under more stringent 4-Digit Code guidelines (i.e., 2 or more standard deviations below the mean). In either case, the *number of deficient domains is consistent with ID* as well as *consistent with the central nervous system abnormality found in FASD*. According to Dr. Connor, 80 percent of the test scores in Exhibit B (82/102) fell 1 or more standard deviations below the mean in the following deficient domains:

- Intellectual Functioning (variable results)
- Academics (all academic areas)
- Memory and Learning (verbal and visual)
- Visuospatial Processing
- Attention
- Processing Speed
- Motor Skills
- Executive Functioning
- Communication

(a) Intellectual Functioning (variable results)

Although IQs in FASD have been found to range from the 20s to 140s[22], research generally tends to find borderline to average intellectual functioning in this population.[23, 24] Mean IQ in persons diagnosed with FAS is approximately 79, and mean IQ in those with other medical conditions under the FASD umbrella is approximately 90.[25] In addition, often there is variability among index/subtest scores on IQ tests.[26, 27]

---

[22] Streissguth et al., 1996, op. cit.

[23] Streissguth, A.P., Barr, H.M., & Sampson, P.D. (1990). Moderate prenatal alcohol exposure: effects on child IQ and learning problems at age 7 ½ years. *Alcoholism: Clinical and Experimental Research, 14,* 662–669.

[24] Mattson, S.N., Riley, E.P., Gramling, L., et al. (1997). Heavy prenatal alcohol exposure with or without physical features of fetal alcohol syndrome leads to IQ deficits. *Disability Rehabilitation, 131,* 718–721.

[25] Streissguth et al., 1996, op. cit.

[26] Mattson, S.N., Crocker, N., & Nguyen, T.T. (2011). Fetal alcohol spectrum disorders: Neuropsychological and behavioral features. *Neuropsychological Reviews, 21,* 81-101.

[27] Woods, G.W., Greenspan, S., & Agharkar, B.S. (2011). Ethnic and cultural factors in identifying Fetal Alcohol Spectrum Disorders. *Journal of Psychiatry and Law, 39,* 9-37.

Mr. Fulks' IQ was tested in adulthood by three different psychologists, who found the following results:

IQ TESTING
[Standard Scores]

| Date | Age | Test | Source | VIQ / VCI | PIQ / PRI | WMI | PSI | FSIQ |
|------|-----|------|--------|-----------|-----------|-----|-----|------|
| 3-5/03 | 25-11 | WAIS-III | Dr. Venn, PhD | 79 / 76 | 78 / 84 | 86 | 79 | 77* |
| 8/03 | 26-2 | WAIS-III | Dr. Hilkey, PhD | 79 | | | | 81 |
| 2/04 | 26-9 | WJCS-III | Dr. Gourley (Federal Medical Center at Butner, NC) | Visual-Auditory Learning: 75 SS Analysis/Synthesis: 76 SS Verbal Comprehension: 77 SS Incomplete Words: 100 SS Sound Blending/Decision Speed: 99 SS Auditory Working Memory: 98 SS | | | | 79* |

* statistically-significant differences

Testing by Drs. Venn, Gourley, and Hilkey found full-scale IQ scores ranging from 77 to 79, with statistically significant discrepancies between VCI-PRI (8 points) and VCI-WMI (10 points) in Dr. Venn's testing as well as significant discrepancies between the first and last three domain subtests in Dr. Gourley's testing.

Adult IQ testing was significantly lower than childhood testing with the WISC-R (i.e., 90 at age nine, 96 at age 12, and 93 at age 14). Such age-related decline in functioning is typical in FASD.[28, 29] Statistically significant discrepancies between verbal and nonverbal skills at ages twelve and fourteen (with relative weakness in verbal skills) suggested the possibility of brain damage.

Overall, the variability in Mr. Fulks' IQ scores across his lifespan is consistent with FASD.[30]

(b) Academic Achievement (all academic areas)

Learning difficulties are among the cognitive deficits typically associated with FASD, especially in the areas of math and/or visual-spatial processing.[31] Deficits in arithmetic are consistently documented in FASD, although some students show relative deficits in

---

[28] Jirikowic, T., Kartin, D., & Carmichael Olson, H. (2008). Children with fetal alcohol spectrum disorders: A descriptive profile of adaptive function. *Canadian Journal of Occupational Therapy, 75,* 238-248.

[29] Streissguth et al., 1996, op. cit.

[30] Ali, S., Kerns, K.A., Olson H.C., & Astley, S.J. (2018). An investigation of intra-individual variability in children with fetal alcohol spectrum disorder (FASD). *Child Neuropsychology, 24,* 617-637.

[31] Kerns, K.A., Don, A., Mateer, C.A., & Streissguth, A.P. (1997). Cognitive deficits in nonretarded adults with fetal alcohol syndrome. *Journal of Learning Disabilities, 30,* 685-693.

reading or spelling.[32, 33, 34] Arithmetic involves complex cognitive functioning that is markedly sensitive to alcohol exposure in utero.[35, 36, 37, 38]

Drs. Venn, Evans, and Hilkey administered the Wide Range Achievement Test – Third Edition (WRAT-3) to Mr. Fulks between April 2003 and November 2003, and Dr. Gourley administered the Woodcock Johnson Tests of Achievement – Third Edition (WJTA-III) in February 2004:

### ACHIEVEMENT TESTING
[SS = Standard Score, % = Percentile, GE = Grade Equivalence]]

| DATE | AGE | TEST | READING | COMP | SPELL | WRITING | MATH CALC | MATH ANAL |
|------|-----|------|---------|------|-------|---------|-----------|-----------|
| 4/03 | 25-11 | WRAT-3 Venn | **75 SS** 5% 5 GE | | **76 SS** 5% 5 GE | | **79 SS** 8% 6 GE | |
| 8/03 | 26-2 | WRAT-3 Hilkey | **84** 14% 8 GE | | **75** 5% 5 GE | | **77** 6% 6 GE | |
| 11/03 | 26-6 | WRAT-3 Evans | **77 SS** 6 GE | | | | | |
| 2/04 | 26-9 | WJTA-III Gourley | 88 SS 21% 8.0 GE | 91 SS 27% 7.7 GE | 91 SS 26% 7.7 GE | **72 SS** **3%** **2.3 GE** | **84 SS** **14%** **5.7 GE** | **76 SS** **6%** **6.1 GE** |

* **Bold type = 1 or more SD below the mean**

WRAT test results generally were consistent, although by May 2004 Reading showed modest improvement, and the Spelling score on Dr. Gourley's WJTA-III was significantly different than the scores obtained on the WRAT-3 by Drs. Venn and Hilkey. Although the two tests involved different spelling words, the significant test-retest, intertest, and intratest variability in FASD better explains the discrepancy.[39, 40, 41] Overall, achievement

---

[32] Rasmussen, C., & Bisanz, J. (2009). Exploring mathematics difficulties in children with fetal alcohol spectrum disorders. *Child Development Perspectives, 3,* 125–130.

[33] Kopera-Frye, K., Dehaene, S., & Streissguth, A.P. (1996). Impairments of number processing induced by prenatal alcohol exposure. *Neuropsychologia, 34,* 1187 – 1196.

[34] Jacobson, S.W., Dodge, N., Dehane, S., Chiodo, L.M., Sokol, R.J., & Jacobson, J.L. (2003). Evidence for a specific effect of prenatal alcohol exposure on "number sense." *Alcoholism: Clinical and Experimental Research, 27,* A121.

[35] Streissguth et al., 1991, op. cit.

[36] Goldschmidt, L., Richardson, G.A., Stoffer, D.S., Geva, D., & Day, N.L. (1996). Prenatal alcohol exposure and academic achievement at age six: a nonlinear fit. *Alcoholism, Clinical and Experimental Research, 20,* 763–770.

[37] Streissguth, A.P., Barr, H.M., Carmichael-Olson, H., Sampson, P.D., Bookstein, F.L., & Burgess, D.M. (1994) Drinking during pregnancy decreases Word Attack and Arithmetic scores on standardized tests: Adolescent data from a population-based prospective study. *Alcoholism, Clinical and Experimental Research, 18,* 248–254.

[38] Kodituwakku, 2009, op. cit.

[39] Kodituwakky, 2009, op. cit.

[40] Mattson, S.N., Crocker, N., & Nguyen, T.T. (2011). Fetal alcohol spectrum disorders: Neuropsychological and behavioral features. *Neuropsychological Reviews, 21,* 81-101.

[41] Ali, S., Kerns, K.A., Mulligan, B.P., Carmichael Olson, H., & Astley, S.J. (2018). An investigation of intra-individual variability in children with fetal alcohol spectrum disorder (FASD). *Child Neuropsychology, 24,* 617-637.

testing in the adult years found deficits in most academic domains, which was consistent with childhood academic testing (see Appendix C).

(c) Memory and Learning (verbal and visual)

The hippocampus, a brain region serving memory, appears to be particularly vulnerable to the harmful effects of alcohol during brain development.[42] Literature review found those with FASD typically show deficits in memory processes involving *conscious effort*, such as free recall and organization.[43] In contrast, concrete hands-on learning does not appear to be impaired in FASD.[44, 45]

Testing of Mr. Fulks' memory and learning skills found deficits as low as 2.5 standard deviations below the mean in verbal and visual memory skills, which was consistent with childhood testing in this domain (see Appendix C).

(d) Visuospatial Processing

Spatial processing measures have been found to discriminate alcohol-affected individuals from nonaffected persons[46] and are associated with learning disabilities in mathematics.[47]

Testing of Mr. Fulks' visuospatial processing skills found deficits as low as 2.5 standard deviations below the mean.

(e) Attention (visual sustained attention)

Attention deficits are common in FASD[48, 49] and often are associated with attention deficit disorders, with or without hyperactivity. In fact, a number of studies have found

---

[42] Berman, R.F., & Hannigan, J.H. (2000). Effects of prenatal alcohol exposure on the hippocampus: Spatial behavior, electrophysiology, and neuroanatomy. *Hippocampus, 10,* 94-110.

[43] Kodituwakku, 2009, op. cit.

[44] Coles, C.D., Strickland, D.C., Padgett, L., & Bellmoff, L. (2007). Games that "work": Using computer games to teach alcohol-affected children about fire and street safety. *Research in Developmental Disabilities, 28,* S18–530.

[45] Kodituwakku, P.W. (2010). A neurodevelopmental framework for the development of interventions for children with fetal alcohol spectrum disorders. *Alcohol, 44,* 717-728.

[46] Mattson, S.N., Roesch, S.C., Fagerlund, A., Autti-Ramo, I., Jones, K.L., May, P.A., Adnams, C.M., Konovalova, V., & Riley, E.P. (2010). Toward a neurobehavioral profile of fetal alcohol spectrum disorders. *Alcoholism: Clinical and Experimental Research, 34,* 1640–16S0.

[47] Kable, J.A., Coles, C.D., & Taddeo, E. (2007). Sociocognitive habilitation using the Math Interactive Learning Experience (MILE) program for alcohol-affected children. *Alcoholism: Clinical and Experimental Research, 31,* 142S–1434.

[48] Nanson, J.L., & Hiscock, M. (1990). Attention deficits in children exposed to alcohol prenatally. Alcoholism: Clinical and Experimental Research, 14, 656–661.

[49] Lee, K.T., Mattson, S.N., & Riley, E.P. (2004). Classifying children with heavy prenatal alcohol exposure using measures of attention. *Journal of the International Neuropsychological Society, 10,* 10:271–277.

that attention-deficit/hyperactivity disorder (ADHD) is the most prevalent comorbid mental health disorder in individuals with FASD,[50, 51, 52] regardless of IQ.[53]

Testing of Mr. Fulks' ability to sustain attention found deficits as low as 4.0 standard deviations below the mean.

(f) Processing Speed

Studies that have examined cognitive processing in FASD have consistently found this population is significantly slower to process information than age-matched controls.[54] A literature review found that children with FASD show greater difficulty with executive control tasks requiring rapid processing of relatively complex information in domains such as language, visual construction, memory, and number processing.[55] Although this population does not show deficits on tasks involving automatic processing (e.g., 'motor memory'), research shows that when task demands increase or require interhemispheric transfer of information, performance in those with FASD declines at a faster rate compared with controls under speeded conditions.[56, 57, 58]

Testing of Mr. Fulks' processing speed skills found deficits as low as 3.3 standard deviations below the mean.

(g) Motor Coordination

Research reviews have found a variety of fine and gross motor impairments in the FASD population, especially with respect to integrating discrete motor functions into complex coordinated motor movements (i.e., coordination).[59, 60] Those with FASD tend to have little difficulty with simple perceptual tasks and instead show impairments in tasks involving complex visual-motor integration[61] or inter-hemispheric transfer of

[50] Streissguth et al., 1996, op. cit.
[51] Bhatara, V., Loudenberg, R., & Ellis, R. (2006). Association of attention deficit hyperactivity disorder and gestational alcohol exposure. Journal of Attention Disorders, 9, 515–522.
[52] Fryer, S.L., McGee, C.L., Matt, G.E., Riley, E.P., & Mattson, S.N. (2007). Evaluation of psychopathological conditions in children with heavy prenatal alcohol exposure. Pediatrica, 199, e733–e741.
[53] Lee, K.T., Mattson, S.N., & Riley, E.P. (2004). Classifying children with heavy prenatal alcohol exposure using measures of attention. Journal of the International Neuropsychological Society, 10, 271–277.
[54] Kodituwakku, 2009, op. cit.
[55] Kodituwakku, 2009, op. cit.
[56] Burden, M.J., Jacobson, S.W., & Jacobson, J.L. (2005). Relation of prenatal alcohol exposure to cognitive processing speed and efficiency in childhood. Alcoholism: Clinical and Experimental Research, 29, 1473–1483.
[57] Roebuck et al., 2002, op. cit.
[58] Kodituwakku, 2009, op. cit.
[59] Mattson, S.N., Crocker, N., & Nguyen, T.T. (2011). Fetal alcohol spectrum disorders: Neuropsychological and behavioral features. Neuropsychology Review, 21, 81-101.
[60] Connor, P.D., Sampson, P.D., Streissguth, A.P., Bookstein, F.L., & Barr, H.M. (2006). Effects of prenatal alcohol exposure on fine motor coordination and balance: A study of two adult samples. Neuropsychologia, 44, 744-751.
[61] Ibid.

information.[62] Such findings are consistent with the general information processing/integration deficit in FASD (i.e., as cognitive work becomes more complex and challenging, impairments increase).[63, 64, 65, 66]

Testing of Mr. Fulks' motor skills found deficits that fell as low as 2.5 standard deviations below the mean, which was consistent with visuomotor deficiencies in childhood testing (see Appendix C).

(h) Executive Functioning

Executive dysfunction is *the* hallmark deficit in FASD.[67] Of all the cognitive deficits known to be associated with the central nervous system abnormality in FASD, executive dysfunction is by far the most debilitating because it affects capacity to function adequately *and* independently. Research consistently finds this population is impaired in executive control involving *conscious effort and supervisory attention*.[68, 69, 70, 71] Specifically, those with FASD tend to have problems on neuropsychological tests that assess cognitive planning[72, 73], conceptual set shifting[74, 75], nonverbal and verbal fluency[76, 77], and multiple measures of concept formation.[78] In addition, there is

[62] Roebuck, T.M., Mattson, S.N., & Riley, E.P. (2002). Interhemispheric transfer in children with heavy prenatal alcohol exposure. *Alcoholism: Clinical and Experimental Research, 26,* 1863-1871.
[63] Kodituwakku, 2009, op. cit.
[64] Uecker, A., & Nadel, L. (1996). Spatial locations gone awry: object and spatial memory deficits in children with fetal alcohol syndrome. *Neuropsychologia, 34,* 209–223.
[65] Mattson, S.N., Gramling, L., Riley, E.P., et al. (1996). Global-local processing in children prenatally exposed to alcohol. *Child Neuropsychology, 2,* 165–175.
[66] Aragon, A.S., Kalberg, W.O., Buckley, D., Barela-Scott, L.M., Tabachnick, B.G., & May, P.A. (2008). Neuropsychological study of FASD in a sample of American Indian children: Processing simple versus complex information. *Alcoholism: Clinical and Experimental Research, 32,* 2136-2148.
[67] Mattson, S.N., Crocker, N., & Nguyen, T.T. (2011). Fetal alcohol spectrum disorders: Neuropsychological and behavioral features. *Neuropsychology Review, 21,* 81-101.
[68] Kodituwakku, P.W., Handmaker, N.S., Cutler, S.K., et al. (1995). Specific impairments in self-regulation in children exposed to alcohol prenatally. *Alcoholism: Clinical and Experimental Research, 19,* 1558–1564.
[69] Mattson, S.N., Goodman, A.M., Caine, C., et al. (1999). Executive functioning in children with heavy prenatal alcohol exposure. *Alcoholism: Clinical and Experimental Research, 23,* 1808–1815.
[70] Kodituwakku, P.W., Kalberg, W., May, P.A. (2001). The effects of prenatal alcohol exposure on executive functioning. *Alcohol Research & Health, 25,* 192–198.
[71] Rasmussen, C. (2005). Executive functioning and working memory in fetal alcohol spectrum disorder. *Alcoholism: Clinical and Experimental Research, 29,* 1359–1367.
[72] Kodituwakku et al., 1995, op. cit.
[73] Mattson et al., 1999, op. cit.
[74] Coles, C.D., Platzman, K.A., Raskind-Hood, C.L., et al. (1997). A comparison of children affected by prenatal alcohol exposure and attention deficit, hyperactivity disorder. *Alcoholism: Clinical and Experimental Research, 21,* 150–161.
[75] Carmichael Olson, H., Feldman, J.J., Streissguth, A.P., et al. (1998). Neuropsychological deficits in adolescents with fetal alcohol syndrome: clinical findings. *Alcoholism: Clinical and Experimental Research, 22,* 1998–2012.
[76] Schonfeld, A.M., Mattson, S.N., Lang, A.R., et al. (2001). Verbal and nonverbal fluency in children with heavy prenatal alcohol exposure. *Journal of Studies on Alcohol, 62,* 239–246.
[77] Kodituwakku, P.W., Adnams, C.M., Hay, A., et al. (2006). Letter and category fluency in children with fetal alcohol syndrome from a community in South Africa. *Journal of Studies on Alcohol, 67,* 502–509.
[78] McGee, C.L., Schonfeld, A.M., Roebuck-Spencer, T.M., et al. (2008). Children with heavy prenatal alcohol exposure demonstrate deficits on multiple measures of concept formation. *Alcoholism: Clinical and Experimental Research, 32,* 1388–1397.

consistent empirical evidence of impairments in working memory, response inhibition, and executive control.[79, 80, 81, 82] For example, investigation of orbitofrontal functioning (i.e., shifting stimulus-reward associations) found children with FASD were impaired at affective set shifting[83], which was associated with parent-rated behavior control problems.[84] Overall, a robust body of research shows that people with FASD display greater difficulty with complex tasks of executive functioning that are cognitively more demanding than less complex tasks requiring relatively little mental effort.[85]

Testing of Mr. Fulks' executive function skills found deficits that fell as low as 2.0 standard deviations below the mean and in one case more than 4.0 standard deviations below the mean.

(i)  Communication

Deficient communication skills are often seen in FASD.[86, 87] Literature review found children with FASD showed deficits in relatively complex language tasks involving phonological working memory and social pragmatics but not on less taxing tasks.[88] The language impairments in FASD are associated with learning problems, information processing, social reasoning, and difficulties initiating and maintaining conversations, handling peer interactions and following social norms.[89, 90]

Testing of Mr. Fulks' communication skills found deficits that fell as low as 2.0 standard deviations below the mean, which was consistent with childhood deficits in this domain (see Appendix C).

---

[79] Green, C.R., Mihic, A.M., Nikkel, S.M., et al. (2009). Executive function deficits in children with fetal alcohol spectrum disorders (FASD) measured using the Cambridge Neuropsychological Tests Automated Battery (CANTAB). *Journal of Child Psychology and Psychiatry, 50,* 688–697.

[80] Mattson, S.N., Riley, E.P., Auti-Ramo, I., et al. (2009). Discrimination of nondysmorphic children with prenatal alcohol exposure from nonexposed controls. *Alcoholism: Clinical and Experimental Research Supplement, 33,* 37A.

[81] Noland, J.S., Singer, L.T., Arendt, R.E., et al. (2003). Executive functioning in preschool-age children prenatally exposed to alcohol, cocaine, and marijuana. *Alcoholism: Clinical and Experimental Research, 27,* 647–656.

[82] Green, C.R., Munoz, D.P., Nikkel, S.M., et al. (2007). Deficits in eye movement control in children with fetal alcohol spectrum disorders. *Alcoholism: Clinical and Experimental Research, 31,* 500–511

[83] Rolls, E.T., Hornak, J., Wade, D., et al. (1994). Emotion-related learning in patients with social and emotional changes associated with frontal lobe damage. *Journal of Neurological Neurosurgical Psychiatry, 57,* 1518–1524.

[84] Kodituwakku, P.W., May, P.A., Clericuzio, C.L., et al. (2001). Emotion-related learning in individuals prenatally exposed to alcohol: an investigation of the relation between set shifting, extinction of responses, and behavior. *Neuropsychologia, 39,* 699–708.

[85] Kodituwakku, 2009, op. cit.

[86] Conroy, J.L., & Lane, K.A.(2009). *Characteristics of youth with FASD on adjudicated probation orders.* Final Report to the Department of Justice Canada and British Columbia Ministry of Children and Family Development.

[87] Mattson, S.N., & Riley, E.P. (1998). A review of the neurobehavioral deficits in children with Fetal Alcohol Syndrome or prenatal exposure to alcohol. *Alcoholism: Clinical and Experimental Research, 22,* 279–94.

[88] Kodituwakku, 2009, op. cit.

[89] Shaywitz, S.E., Caparulo, B.K., & Hodgson, E.S. (1981). Developmental language disability as a consequence of prenatal exposure to ethanol. *Pediatrics, 68,* 850–5 8-10

[90] Carmichael Olson, C. (1994). The effects of prenatal alcohol exposure on child development. *Infants and Young Children, 6,* 10–25.

### Consistency with Childhood Functioning

The deficient cognitive domains listed above are consistent with standardized testing during the school years (see Appendix C), which found deficiencies in the following domains:

    (a) deficient Academic Achievement scores in first, third, sixth, and eighth grades;

    (b) deficient Memory and Learning scores in third grade;

    (c) deficient Communication scores in third and eighth grades; and

    (d) deficient Visuomotor Integration scores in third, sixth, and eighth grades.

The deficient cognitive domains listed above are consistent with Mr. Fulks' history of childhood adaptive deficits, as described in Consultative Question #1.

### Consistency with the Fetal Alcohol Behavior Profile

Three individuals Gayle Wolfe (fifth grade teacher), Linda Adkins (neighbor), and Marilyn Lauver (junior high counselor) completed the Fetal Alcohol Behavior Scale (FABS) with respect to Mr. Fulks' behavior in childhood. In all three cases, results exceeded the threshold distinguishing those with FASD from those without, indicating Mr. Fulks displayed the "signature" behavior profile unique to children with FASD.

### Generalized Processing and Integration Deficit

According to Dr. Connor, although Mr. Fulks demonstrated *at least mild impairment* (i.e., < -1 SD) in the nine functional domains described above in this section, he exhibited *at least moderate impairment* (i.e., < -2 SD) in 30 percent of the tests shown in Exhibit B (i.e., 31/102 tests), typically on complex unstructured tasks where he had to problem-solve without external guidance. This type of profile reflects a *generalized processing and integration deficit* in executive functioning.

Executive function skills are responsible for making decisions about how to act. Referred to as 'higher order' cognitive processing because the executive center of the brain receives and then integrates, analyzes, and makes decisions based on neural input from other brain regions, the executive system in an *intact* brain will conduct a complex reasoning process that includes considering consequences, weighing risks/benefits, and linking cause and effect while resisting inappropriate impulses from the limbic system – *all before communicating with the body about how to act.* The executive system relies on neural input below the level of consciousness to do the conscious 'thinking' work of the brain. If neural input to the executive system is impaired, then executive skills will be working with flawed data. If executive functioning also is impaired, then the process of conscious cognitive processing will be faulty and produce adaptive dysfunction. Test results in Mr. Fulks' situation indicate marked executive dysfunction in conjunction with

pervasive deficits in neural input, which largely explains why his adaptive functioning was so impaired when he had to make decisions on his own in complex situations.

The generalized information processing and integration deficit found in Mr. Fulks' test profile is unique to FASD and operates in the following way: environmental complexity overwhelms already-impaired executive capacity, which deteriorates further *in direct proportion to task complexity and the corresponding mental challenge required to cope with the situation*. Task complexity involves numerous environmental factors such as novelty, ambiguity and lack of structure, unpredictability, distraction, simultaneous task demands, and/or time pressure. Of course, additional extraneous environmental factors such as stress, acute intoxication, or influence from others will exacerbate the decline in executive control. Generally, the more structured the environment, the less need for independent thinking and problem-solving in the face of contextual complexity. In Mr. Fulks' case, neuropsychological testing occurred in highly structured environments (i.e., privacy, minimal distraction) where he was given specific instructions for each test, varying degrees of examiner guidance depending on the test, and opportunities to practice, which removed important elements of environmental complexity from the situation (e.g., distractions, ambiguity, unpredictability, lack of structure). Nonetheless, he still obtained some test results that were severely deficient.

The generalized processing deficit does not mean a person with FASD cannot learn, but typically the process of learning is slow and requires a great deal of repetition. Hands-on modalities and regular practice significantly improve capacity to learn in this population, which explains why Mr. Fulks could pass his GED and earn a welding certificate in a structured boys' facility when the instructor worked closely with him and gave him special help. Conversely, the generalized processing deficit also explains why, when he had to make decisions and organize his life on his own, he did not support himself with stable employment and maintain a stable independent life course.

The generalized processing deficit in FASD explains why Mr. Fulks cannot think quickly (i.e., deficient processing speed) or generalize (i.e., deficient executive functioning) in the context of a 'new' experience that doesn't exactly resemble an old event. Consistent with the generalized processing deficit, Mr. Fulks' history was replete with examples of situations where he made bad decisions, showing he did not learn from experience or cope adequately when left to his own devices.

The generalized processing deficit in FASD does not mean someone like Mr. Fulks cannot manipulate others because manipulating others does not require cognitive sophistication.

The generalized deficit does not mean a person with FASD cannot lead others or plan or make choices. However, it does mean that the capacity to lead, plan, and make choices will be *flawed* by deficient executive processing. That is, executive processes such as considering consequences and weighing options will be biologically derailed by strong

emotions and urges from the limbic system that the individual does not have the executive capacity to override. Dr. Evans' testimony in 2004 essentially conveyed the same message: Mr. Fulks has impaired impulse control due to brain impairment, which is demonstrated by reliable test results obtained within a highly controlled setting with examiner guidance and specific rules about what needs to be done. There are no strong emotions or urges in such a situation. However, in the real world, particularly in stressful situations that may or may not involve influence from others and intoxication among other things, Mr. Fulks' capacity to make choices is even more impaired than his testing shows, which is clearly evident in his behavioral history.

**OPINION: Data from multiple, independent, convergent sources indicate Mr. Fulks exhibited cognitive, intellectual, and adaptive impairments across his lifespan that are consistent with FASD. FASD is a medical defect that impairs judgment and ability to consider consequences and control behavior, including criminal behavior.**

_**Consultative Question #4**: Aside from fetal alcohol exposure, are there other risk factors in Mr. Fulks' life history for poor cognitive, intellectual, or adaptive functioning that were present before the age of 18?_

Apart from Mr. Fulks' cognitive and adaptive functioning, other risk factors documented in the records were postnatal brain trauma, his own substance abuse, and environmental adversity. The latter involved physical abuse, sexual abuse, emotional abuse, neglect, exposure to domestic violence, and caregiver instability.

**Postnatal Brain Trauma**

Mr. Fulks reported a head injury at age ten although records indicate his first head injury occurred at age seven and three additional head injuries in adolescence. He reported no functional sequelae from any of these head injuries. Childhood records document only one head injury: in 1984, his brother Dewayne knocked over a can of paint that hit Mr. Fulks (age seven) in the head and knocked him unconscious. There is no report of functional sequelae following this event.

**Substance Abuse**

Mr. Fulks told several mental health experts (Drs. Melikian, Venn, Hilkey) that he began drinking alcohol/moonshine and using marijuana at age 10. He told Dr. Venn that by age twelve, he was drinking regularly, sometimes to the point of blackouts. He told Dr. Hilkey that he huffed petrochemicals around age 10 but told Dr. Dr. Melikian he was fourteen when he began huffing. He told Dr. Melikian that he used LSD and abused pain medication at age 16. A drug screen following his suicide attempt at age 13 found no illegal drugs in his system.

## Childhood Adversity

Records from numerous sources establish that Mr. Fulks was exposed to significant childhood adversity at different points in his life (e.g., physical, sexual, and emotional abuse; exposure to domestic violence; neglect; residential and caregiver instability; exposure to familial substance abuse and criminality; poverty).

## Differential Diagnosis

Although the above experiences may have affected Mr. Fulks' behavior, several events *prior to age 10 when he started using substances* rule out the causative influence on cognitive functioning of any of these factors:

(a) EARLY DEVELOPMENTAL DELAYS: Mr. Fulks was delayed in walking and talking per collateral witnesses and when he did start speaking, he had articulation problems that resulted in speech and language services throughout elementary school and into seventh grade (i.e., ongoing communication delay).

(b) EARLY LEARNING PROBLEMS: Testing in kindergarten with the Comprehensive Test of Basic Skills (CTBS) suggested Mr. Fulks had learning problems (Word Recognition at the 10th percentile, Vocabulary at the 12th percentile, and Math Concepts at the 7th percentile). Testing with the CTBS in first grade also found problems (Word Recognition at the 13th percentile and Language Expression at the 10th percentile). After he was retained and completed an additional year of first grade, his CTBS scores improved significantly. Although the CTBS had questionable reliability (e.g., group administration, multiple-choice format, frequent score inflation), the deficiencies in kindergarten and first grade test results were consistent with scores Mr. Fulks later received on more reliable tests in third grade. Deficient scores on the CTBS in kindergarten and first grade also were consistent with academic marks in first grade (S- in Reading, Writing, and General Education and U in Spelling and Math), which constituted another sign he was having considerable difficulty keeping up with peers in academic performance. Attendance was not the problem as he was absent only 9 of 176 days that school year. First-grade teacher Suzanne Walker (nee Welker) reported in an interview with Mr. Fulks' trial attorneys that retention in her first-grade class meant a child had significant deficits because she typically was opposed to retention.

(c) SPECIAL EDUCATION: In his second year of first grade, Mr. Fulks received special education services that involved speech and language support. Academically, he obtained Satisfactory marks in all subjects but Spelling, where he received S-. Again, attendance was not the problem as he was absent 10 out of 175 days.

(d) ONGOING ACADEMIC WEAKNESS AND SPEECH DELAY IN SECOND GRADE: Academic marks in second grade were S in Reading, Writing, and Math and S- in Spelling and Language, with absences totaling 13 of 178 days. His IEP continued

speech and language services due to his articulation problem (i.e., communication delay).

(e) SELF-CONTAINED CLASSROOM: In third grade, Mr. Fulks was placed in a self-contained resource room, to be mainstreamed as his behavior and academic progress permitted. His IEP continued speech services for articulation problems (i.e., ongoing communication delay) and added services for all academic subjects. Nonetheless, he continued having problems with academic performance (i.e., S in Spelling and Writing but S- in Reading, Language, and Math), with absences totaling 21 out of 178 days.

(f) INDIVIDUALLY-ADMINISTERED TESTING: The first individualized achievement test administered to Mr. Fulks during his school years was the Wide Range Achievement Test (WRAT) in third grade. Results on the WRAT found deficits in Reading (9th percentile) and Math Calculation (12th percentile). Another individualized test, the Kaufman Test of Educational Achievement (KTEA) found a deficiency in Spelling (14th percentile), with weakness in Math Calculation (18th percentile). Individualized testing of Mr. Fulks' learning capacity at age 9-8 with the Jordan Reversal Test found a two-year delay in developmental age (7-9), and testing of his receptive communication skills with the Peabody Picture Vocabulary Test (PPVT) found a similar two-year delay (7-10). His special education classification was Specific Learning Disability, according to Gayle Wolfe.

(g) EXECUTIVE DYSFUNCTION: A third-grade IEP referral in January 1987 noted executive function impairments (i.e., "Does not complete tasks. Is not self-directing. Needs guidance at all times...") as well as weakness in Reading, Arithmetic, English, Spelling, Work Habits, Distractibility, No Self-Discipline. In February 1987, Mr. Fulks was referred for testing because of behavior problems, deficits in self-direction, and poor achievement. Third-grade teacher Dottie Thompson indicated in school records that Mr. Fulks had no self-discipline and needed to be in a controlled situation at all times. Standardized behavior assessment with the Devereux by Ms. Thompson indicated clinically high elevations on Classroom Disturbance, Inattentive, and Withdrawn and a significantly low elevation on Comprehension. Mr. Fulks' report card in third grade reflected weakness (S-) in Reading, English, and Math.

(h) As discussed in detail above in Consultative Question #1, third-party witnesses consistently reported that Mr. Fulks exhibited impairments in learning, memory, executive functioning, communication, and social skills prior to age 10.

In summary, postnatal head injury at age seven (for which no functional sequelae were ever reported) and substance abuse (which reportedly did not begin until age 10) are ruled out as causative factors in Mr. Fulks' cognitive, intellectual, and adaptive functioning *prior to age 10*. Environmental trauma also is ruled out because he was able to perform adequately on some tests/subtests in his early school years in the context of

performing poorly on other tests. This is not to say that ongoing environmental trauma, head injuries, and substance abuse in adolescence had no effect on his functioning, but if there were negative cognitive effects, it is likely their influence would not have manifested until his teen years.

**OPINION: Aside from fetal alcohol exposure, other risk factors in Mr. Fulks' life history for poor cognitive, intellectual, or adaptive functioning that were present before the age of 18 include postnatal head injury, substance abuse, and environmental traumas, most of which occurred after age 10. While such experiences may have had an additive and cumulative influence on his functioning from adolescence on, there is abundant evidence of significant functional problems very early in his life that preceded these events.**

*<u>Consultative Question #5</u>: Did Mr. Fulks experience any secondary disabilities that are associated with FASD?*

Since the 1980s, a robust body of research has determined that the negative developmental trajectory in FASD is due largely to executive dysfunction, which causes maladaptive social behavior and deficient coping capacity.[91, 92, 93] For example, in 1996 a large research study commissioned by the Centers for Disease Control[94] identified the eight "secondary disabilities" or negative developmental outcomes associated with FASD in the context of childhood adversity.

Exhibit C below depicts the secondary disabilities found in the CDC research. In the Exhibit, "FAE" (Fetal Alcohol Effects) reflects the outdated term for FASD conditions that did not include all three of the primary facial features found in FAS (i.e., flattened philtrum, small upper lip circumference, and short palpebral fissures). The term 'FAE' was replaced in the 1996 Institute of Medicine diagnostic guidelines[95] with two conditions: Partial Fetal Alcohol Syndrome (pFAS) and Alcohol Related Neurodevelopmental Disorder (ARND).

---

[91] Streissguth et al., 1996, op. cit.
[92] Gibbard, W.B., Wass, P., & Clarke, M.E. (2003). The neuropsychological implications of prenatal alcohol exposure. *Conodion Acodemy of Child ond Adolescent Psychiotry, 12,* 72-76.
[93] Schonfeld, Paley, Frankel, & O'Connor, op. cit.
[94] Streissguth et al., 1996, op. cit.
[95] Stratton, K., Howe, C., Battaglia, F. (1996). *Fetol olcohol syndrome: Diognosis, epidemiology, prevention, ond treotment.* Washington, DC: National Academy Press.



EXHIBIT C. Negative Developmental Trajectory in FASD ("Secondary Disabilities")

As Exhibit C shows, individuals with FASD who are raised in adverse environments have extraordinarily negative developmental trajectories, including criminal conduct. In addition, persons diagnosed with ARND (such as Mr. Fulks) tend to have worse outcomes than those diagnosed with FAS. This is because those with FAS are more 'visible' due to facial abnormalities and tend to receive a diagnosis and services early in life. Exhibit D below illustrates that prior to the instant offense, Mr. Fulks' life history matched the negative secondary disabilities trajectory:

| Secondary Disability | Chad Fulks' Developmental History |
|---|---|
| Disrupted Education | Retained in first grade, Mr. Fulks never completed seventh or eighth grades before being placed in ninth grade, which he also did not complete despite special education services throughout his school years. He earned a GED at age 17 while in a structured juvenile setting (i.e., Davis Center) and subsequently earned another GED in prison at age 24. |
| Mental Health Problems | After Mr. Fulks' behavior control problems brought him to the attention of the juvenile authorities, he was diagnosed with conduct disorder shortly before his tenth birthday. |
| | Although he was later seen by a psychiatrist at age fourteen, he was not evaluated for his pervasive learning disability or developmental delays. |

| | |
|---|---|
| | Instead, his behavior problems were the focus, and he was diagnosed with major depression and prescribed an antidepressant. |
| | During competency evaluation at age 21, he was diagnosed with malingering and antisocial personality disorder. |
| | At age 23 he was diagnosed in prison with PTSD. |
| Substance Abuse | After his arrest for the instant offense, Mr. Fulks told forensic mental health experts his substance abuse began around age 10, although contemporaneous records reflected somewhat inconsistent self-reports: |
| | Age 13: After an arrest for assault, he was required to participate in substance abuse counseling with random drug screens. There was no indication of a positive drug screen during his court-ordered Improvement Period prior to moving to Indiana to live with his father. |
| | Age 14: During a psychiatric evaluation in Indiana, he denied substance use. |
| | Age 17: After being shot in the shoulder while sitting in his vehicle, medical staff described him as intoxicated. He reported at the time that he had dipped snuff as well as consumed alcohol. |
| | Age 18: According to his self-report and declarations from siblings, after his 'son' Devon's death, he began drinking daily and taking "whatever drugs he could get." He reported that when he was living briefly with Dewayne and his wife Carly, he tried crystal meth for the first time with Dewayne and then began using the drug daily. |
| | Age 19: When seen in a hospital after running from the police, he was observed to be intoxicated. He told medical staff he drank occasionally, and this episode was the first time he had consumed alcohol in seven months. |
| | Age 19: Arrested in Myrtle Beach, he was charged with marijuana possession. He also was in possession of hashish at the time. |
| | Age 20: He reported in a competency evaluation at Butner that he smoked marijuana but denied any other drug use. |
| | Age 22: He reported to a pre-sentence investigator that he did not drink alcohol, that he used marijuana "experimentally," and that he had used cocaine three times daily from 1996/97 to December 1999 but no longer used the drug. |
| | Age 22: He reported in a prison interview that he used drugs heavily and occasionally drank alcohol prior to his incarceration. In a mental health screen, he reported that prior to his arrest, he drank alcohol, smoked marijuana "occasionally," and used cocaine regularly (3-4 times per week). |
| Trouble with the Law | Juvenile Arrest History<br><br>Age 9 (1986): Battery (striking elderly woman with a stick) → 12-month Improvement Period |

| | Age 9 (1987): **Assault and Battery** (pulling down the pants of a four-year-old girl → one year of **probation** |
|---|---|
| | Age 12 (1989): **Brandishing/Assault** (pointing handgun at another boy) → committed to a 6-month Improvement Period |
| | Age 13 (1990): **Destruction of Private Property** (car prowl) → one year of probation + substance abuse treatment |
| | Age 17 (1994): **Transferring/Receiving Stolen Property, Bringing Stolen Property into State, Fugitive from Justice** → committed to DOC/Davis Center |
| | <u>Adult Arrest History</u> |
| | Age 19 (1997): **Operating a Motor Vehicle Without a License** and **Refusal to Provide Identification Data** → convicted, fined and given a suspended sentence with one year of probation, violated probation on technical grounds after three months and then failed to appear in court |
| | Age 19 (1997): **Simple Possession of Marijuana** → convicted and fined |
| | Age 20 (1997): **Worthless Checks, Attempted Forgery, Burglary, Fraud, Attempted Aggravated Criminal Trespassing** → convicted and sentenced to nine months in prison |
| | Age 20 (1998): **Burglary** → convicted and sentenced to ten years in prison, with four years suspended; after serving 25 months in prison (Butner report dated 2/19/04 indicated 28 months), he was released and placed on probation, which he violated |
| | Age 20 (1998): Charged with **Forgery of Checks, Possession of Two or More Credit Cards, Fraud, Burglary, Use of Vehicle Without Permission, Grand Larceny** |
| | Age 21 (1998): **Transportation of a Stolen Vehicle, Aiding and Abetting Burglary of a Vehicle with Intent to Commit Theft, Aiding and Abetting Theft of Property, Evading Arrest** → convicted of these federal charges and sentenced to 12 months in prison, followed by three years of supervision |
| | Age 21 (1998)- **Non-Sufficient Funds** |
| | Age 24 (2001) - Bench warrant issued for **Resisting Law Enforcement** and **Use/Possession of Drug Paraphernalia** |
| | Age 25 (2002) - Warrant issued for **failure to comply with the conditions of release** |
| | Age 25 (2002) - Indicted for **Unlawfully Dispensing Legend Drugs Without a License** |
| | Age 25 (2002) - Charged with **First Degree Abuse of a Child Aged Twelve or Under** → dismissed after arrest on capital case |
| | Age 25 (2002) – At the time of his arrest for the instant offense, he had been charged with **First Degree Robbery** and had active bench warrants for **Receiving Stolen Property, Possession of Marijuana, and Theft of a Legend Drug**, all of which occurred in October 2002. In addition, a 12-count charge for **Fraudulent Use of a Credit Card** was pending at the time of the instant offense. After his arrest, he pled guilty to all 12 counts of credit card fraud |

| | and received five years on each count, to run concurrently with each other. |
|---|---|
| | Age 25 (2002): **INSTANT OFFENSE** |
| Confinement | Juvenile commitment for approximately nine months at age 17 |
| | Confinement in prison at least three times prior to instant offense |
| Inappropriate Sexual Behavior | Age 9: Arrested and charged with battery for pulling down the pants of a four-year-old girl |
| | Age 18: A nurse discovered him having sexual intercourse with his wife in his hospital bed |
| Employment Problems | No confirmed evidence of gainful employment |
| Dependent Living | No confirmed evidence of living independently and successfully on his own |

EXHIBIT D. Secondary Disabilities Prior to Instant Offense

As can be seen in Exhibit D, by age 25 when Mr. Fulks was arrested for the instant offense, his developmental trajectory involved all eight of the secondary disabilities associated in the research with FASD: disrupted education, mental health problems, substance abuse, trouble with the law, confinement, inappropriate sexual behavior, employment problems, and dependent living.

**OPINION: Mr. Fulks' developmental history reflects all eight secondary disabilities associated with FASD.**

***Consultative Question #6:*** *Were there risk factors present in Mr. Fulks' life history that made these secondary disabilities more likely?*

Risk of secondary disabilities is reduced if children with FASD are raised in protective, nurturing, and structured homes where they receive an early FASD diagnosis and developmental disabilities services across the school years. Thus, environmental factors either *moderate* or *exacerbate* the adaptive expression of the cognitive impairments in FASD.[96, 97, 98]

In Mr. Fulks' case, records establish that his early childhood years were spent in a nonprotective and unstructured caregiving environment where he received very little nurturing and almost no response to his developmental needs. He also was exposed in childhood to multiple traumas (e.g., parental neglect, physical/sexual/emotional abuse,

[96] Stratton, K., Howe, C., Battaglia, F. (1996). *Fetal alcohol syndrome: Diagnosis, epidemiology, prevention, and treatment.* Washington, DC: National Academy Press.
[97] Streissguth et al., 1996, op. cit.
[98] Streissguth, A. P., Bookstein, F. L., Barr, H. M., Sampson, P. D., O'Malley, K., & Kogan Young, J. (2004). Risk factors for adverse life outcomes in fetal alcohol syndrome and fetal alcohol effects. *Journal of Developmental and Behavioral Pediatrics, 25,* 228–238.

alcoholism and drug abuse, criminality, and domestic violence; sibling substance abuse and criminality; environmental/caregiver instability; and chronic environmental chaos). Role modeling throughout childhood included deception, manipulation, violence, and coping to stress by abusing substances.

Although Mr. Fulks received special education and speech therapy services in school and psychiatric evaluation at age fourteen for 'behavior problems,' he received no documented interventions that directly addressed his FASD and traumatic experiences. Consequently, he entered his adult years having received none of the protective factors found to reduce the risk of secondary disabilities in FASD.

For children such as Mr. Fulks who reach adulthood without having received any of the protective factors identified in the FASD research, a stable life situation in the adult years as well as behavioral treatment and comprehensive supervision have been found to attenuate some of the negative developmental consequences associated with FASD.[99] For example, assisted living and supported employment protect adults with FASD from social and emotional distress, trouble with the law, and health risks.[100]

Mr. Fulks received none of the adult interventions that might have made a difference in his functioning.

**OPINION: Because all of the risk factors associated with adverse developmental outcomes in FASD were present in Mr. Fulks' life history, and he received none of the protective factors, this significantly increased his risk of secondary disabilities.**

Based on the FASD literature and convergent data from six independent sources (i.e., records, previous neuropsychological testing, in-person interview, current adaptive assessment, behavior questionnaires, and collateral witness interviews), I hold the above opinions to a reasonable degree of psychological certainty.

Thank you for the opportunity to assist in this matter.

Natalie Novick Brown, PhD

---

[99] Freunscht & Feldman, op. cit.
[100] Streissguth et al., 2004, op. cit.

## Appendix A
## RECORDS

| Transcripts |
|---|
| Trial Testimony of Dewayne Fulks - Volume IV, June 4, 2004 |
| Trial Testimony of Ronnie Fulks - Volume VII, June 9, 2004 |
| Trial Testimony of Ronnie Fulks, cont'd - Volume VIII, June 10, 2004 |
| Trial Testimony of Ruben Gur - Volume XII, June 16, 2004 |
| Trial Testimony of Tina Severance, Jury Trial Transcript, Vol. III, June 3, 2004 |
| Trial Testimony of Tina Severance, cont'd., Jury Trial Transcript, Vol. IV, June 4, 2004 |
| Trial Testimony of Beth McGuffin, Jury Trial Transcript, Vol. VI, June 8, 2004 |
| Trial Testimony of Veronica Evans, Jury Trial Transcript, Vol. XIII, June 17, 2004 |
| Trial Testimony of Heather Goodman, Jury Trial Transcript, Vol. XIV, June 18, 2004 |
| Trial Testimony of Amber Fowler, Jury Trial Transcript, Vol. XV, June 21, 2004 |
| Trial Testimony of Paula Lybrand, Jury Trial Transcript, Vol. XV, June 21, 2004 |
| Jury Trial Transcript - Volume I, June 1, 2004 |
| Jury Trial Transcript - Volume XVI, June 22, 2004 |
| Jury Trial Transcript - Volume XVII, June 23, 2004 |
| Jury Trial Transcript - Volume XVIII, June 24, 2004 |
| Jury Trial Transcript - Volume XIX, June 25, 2004 |
| Jury Trial Transcript - Volume XX, June 28, 2004 |
| Jury Trial Transcript - Volume XXI, June 29, 2004 |
| Jury Trial Transcript - Volume XXII, June 30, 2004 |
| Hearing Testimony of James Hilkey, Ph.D., February 23, 2010 |
| Hearing Testimony of James Hilkey, Ph.D., February 24, 2010 |
| Hearing Testimony of Margaret Melikian, D.O., February 24, 2010 |
| |
| **Reports and Declarations** |
| Cabell County Board of Education Psychological Evaluation, March 2, 1990 |
| Otto Klassen, M.D., Psychiatric Report, December 3, 1991 |
| Report of David Bachman, M.D., July 31, 2003 |
| Report of Arlene Andrews, Ph.D., May 13, 2004 |
| Report of James Evans, Ph.D., undated |
| Report of Fred Bookstein, Ph.D., February 9, 2004 |
| Report of Christos Davatzikos, Ph.D. |
| Report of Ruben Gur, Ph.D., June 13, 2004 |
| Report of James Hilkey, Ph.D., May 7, 2004 |
| Report of Jonathan Venn, Ph.D., March 30, 2004 |
| Report of Elin Berg, M.D., Ph.D., August 2, 2003 |
| Report of Jonathan Walker, M.D., January 14, 2004 |
| Forensic Evaluation, Federal Medical Center, February 19, 2004 |
| Forensic Report, Federal Medical Center in Lexington Kentucky, August 5, 1998 |

| |
|---|
| Declaration of Andrea Lyon, June 19, 2008 |
| Declaration of Seymour Halleck, M.D., May 9, 2008 |
| Declaration of Margaret Melikian, D.O., May 27, 2008 |
| Declaration of James Hilkey, Ph.D., June 2, 2008 |
| Declaration of William Alexander Morton, June 3, 2008 |
| Declaration of Mark Cunningham, Ph.D., May 20, 2008 |
| Declaration of James Aiken, June 18, 2008 |
| Declaration of Mark Thompson, June 9, 2008 |
| Declaration of Mark Fulks, June 16, 2008 |
| Declaration of Martha Floyd, June 5, 2008 |
| Declaration of Tim Kane, June 3, 2008 |
| Declaration of Tracy Graybeal, June 4, 2008 |
| Declaration of Monica Wolowinski, June 4, 2008 |
| Declaration of Ronnie Fulks, June 4, 2008 |
| Declaration of Linda Adkins, June 3, 2008 |
| Declaration of Linda Adkins, January 27, 2017 |
| Declaration of Matthew Rawlings, June 4, 2008 |
| Declaration of Andrea Roddy, May 14, 2008 |
| Declaration of Nathan Fulks, June 4, 2008 |
| Declaration of Elvin Taylor, June 18, 2008 |
| Declaration of Harry Tyree, June 18, 2008 |
| Declaration of Sharon Dotson, June 18, 2008 |
| Declaration of Beth McGuffin, June 16, 2008 |
| Declaration of Christina Kirkman (Holbrook), June 20, 2008 |
| Declaration of Christina Kirkman (Holbrook), January 27, 2017 |
| Declaration of Laura Cooper, September 15, 2016 |
| Declaration of Joy Krug, November 15, 2016 |
| Declaration of Marilyn Lauver, November 14, 2016 |
| Declaration of Kelly Perry, January 27, 2017 |
| Declaration of Gayle Wolfe, September 15, 2016 |
| Declaration of Russell Spears, May 22, 2018 |
| |
| **Court Opinions** |
| Opinion, 4th Circuit Court of Appeals, July 27, 2006 |
| Opinion, 4th Circuit Court of Appeals, June 26, 2012 |
| |
| **Imaging and Photos** |
| Brain Imaging |
| PET scans from the file of Ruben Gur |
| Brain Imaging Reports, December 5, 2003 |
| Photos |
| Photo of Chad Fulks |

| |
|---|
| Photo of Ronnie Fulks from the file of David Bachman |
| Photo of Fulks Children |
| |
| **Records** |
| Cabell County School Records |
| Northeast Indiana Special Education Records |
| Andis Alternative Education Center Records |
| Cabell Huntington Hospital Records |
| John Marshall University Pediatrics Records |
| LaGrange Community Hospital Records |
| St. Mary's Hospital Records |
| Prison Records for Federal Medical Center at Butner, NC |
| Lexington County Prison Records |
| Psychometric Data Report, Indiana Department of Corrections, March 20, 2000 |
| Diagnostic and Classification Summary, Indiana Department of Corrections, April 4, 2000 |
| Record of GED from Davis Center Education Dept, July 11, 1995 |
| GED Transcript, West Virginia Department of Education |
| Trial Team Chronology – Government Exhibit 31 at the 2010 Evidentiary Hearing |
| Indiana DOC GED Report, November 29, 2001 |
| Davis Center Records |
| Davis Center Correspondence & Court Order |
| Hopkins County Circuit Court Judgment, December 30, 2002 |
| Cabell County Court Records for Chadrick Fulks |
| Todd Circuit Court File for Commonwealth of Kentucky v. Chadrick Fulks, 02-CR-64 |
| Order, Commonwealth of Kentucky v. Chadrick Fulks, 02-CR-63, 02-CR-64, 02-CR-65, January 5, 2004 |

## Appendix B
## DOCUMENTED LIFE HISTORY

[Source of data: records listed in Appendix A. For ease of identification, Mr. Fulks and others referenced in this section are referred to by their first names, and information involving offense history is boxed.]

**Family History** for Chadrick Evan Fulks ██████████ )

Mother: Diana Lynn Holbrook Thompson ██████████
Father: Herman Roger Fulks ("Roger"; ██████████ )
Siblings:
  Sherry Lynn Fulks ██████████
  Roger Dwayne Fulks ("Dewayne"; ██████████ )
  Ronald Dale Fulks ("Ronnie"; ██████████ )
  Shannon Ray Fulks ██████████
Stepmother: Marcia Fulks
Stepfather: Dean Thompson
Maternal Grandparents: Wilda Maynard Holbrook and Leon Holbrook
Paternal Grandparents: Nancy Jane McClellan Fulks and Herman Fulks

Paternal Uncles/Aunts:
  Regina Fulks Adkins ██████████
  Inetta Marie Fulks McCallister ██████████
  Roy Fulks ██████████
  Mark Keith Fulks ██████████
  Edith Faye Fulks Stacey ██████████
  Gregory Fulks ██████████

Maternal Uncles/Aunts:
  Sharon Holbrook Dotson ██████████ )
  Robin Louise Holbrook Payton ██████████ )
  James R. Holbrook ("Buddy"; ██████████
  Gail Sue Beatty ██████████
  Kevin Holbrook ██████████
  Leroy Holbrook, Jr. ██████████ )

Current Wife: Veronica Evans (Date of Marriage: 6/11/02)
Former Wife: Amber Denise Fowler (Dates of Marriage: 7/6/95 – 4/97)
Children:
  Devon Christopher Fulks ██████████ – died of injuries
  received when four-year-old cousin jumped on his abdomen)

**Parents' History**

Roger Fulks (father) was born in 1948 to Nancy and Herman Fulks. He was the oldest of seven children. His father worked in the coal mines for 15 years and died right after learning he qualified for Black Lung disease benefits. He was unable to complete the paperwork process before he died, and his wife Nancy did not receive the benefits. Roger recalled that during his childhood his father Herman drank alcohol all the time and argued with his mother about the drinking and money. The family was poor and did not celebrate birthdays. Herman was rarely home. He punished the children by whipping them or placing them on restriction. The children had to walk three miles to and from school every day. His sister Edith (paternal aunt) is the only sibling who completed high school. Roger dropped out of school in the first semester of eleventh grade.

Diana (birth mother) also was raised in a poor family. Her father Leon had a drinking problem and could not keep a job. The family moved frequently because of financial problems. Leon was a violent alcoholic. He once knocked his wife Wilda down the stairs in one of their homes when he came home drunk. She was pregnant at the time, and he constantly beat her until she had bruises and black eyes. Leon beat Diana, Buddy, and Robin the worst. When Diana was eleven, she ran away to a neighbor's house to avoid a beating, but her father found her and took her home. He once beat her with poison ivy vines, which cut into her legs and caused infection. She nearly died as a result. This was the only time she could recall getting medical care. Leon once cut Robin's back so badly with a switch that he paid her money to not tell anyone about it. Leon went to jail a couple times. There were many nights when her parents went out together and drank, leaving the children to care for themselves. When they returned home after drinking, they usually had brutal fights. Leon played guitar and often invited friends to the house to play music, drink, and party all night. When Diana was six or seven, one of Leon's drunk buddies came into the bedroom and tried to kiss and touch the girls. Leon caught him and made him leave the girls alone that night, but he invited the man back to the house many times after that. Leon called his children names and told them he wasn't really their father. Their mother cleaned houses to have money for food. Leon sold things in the house to buy alcohol, so Wilda would take money from his pockets when he slept in order to pay the bills. Leon did sporadic work repairing televisions, but he spent most of his money drinking. People donated food and clothing to the family. Diana was picked on because she was poor, and she got into a lot of fights at school. She eventually was expelled for fighting. Her sister Sharon was picked on as well because she had paralysis as a result of polio.

In 1965, both Roger and Diana dropped out of school. Roger was in eleventh grade and had obtained As, Bs, and Cs from fifth through eighth grades, Cs and Ds in ninth grade, and mostly Ds and Fs in tenth grade. He missed between 17 and 40 days of school each year. Diana was in tenth grade when she dropped out of school in 1965. She had received Fs in all subjects at the time.

In 1967, Roger (age 19) and Diana (age 17) married and moved in with Roger's parents. They followed his uncle to Michigan so Roger could work in the same factory as his uncle and lived there until Roger was drafted into the Army. Diana remained with Roger's parents after he was drafted and got a job in a local bar. Soon, she was staying out late and socializing with other men. In 1968, Roger was shipped to Vietnam. When his mother Nancy wrote him about what Diana was doing, Roger filed for divorce with his mother's help. His Complaint alleged Diana was engaging in multiple extramarital affairs, and several people testified about her adultery at the hearing, which she did not attend. Roger was granted a divorce on the grounds of adultery. After Roger returned home on vacation after a year in Vietnam, he and Diana remarried on 6/17/69. In January 1970, Roger was honorably discharged from the Army and transferred to the Army Reserve. He received several medals.

Oldest sibling Sherry was born in February 1970. Diana has reported the pregnancy was normal, and there were no birth complications. Sherry believes she is not Roger's daughter. Birth records are unavailable as she was born in an obstetrician's office.

Dewayne, the second of the couple's five children, was born in September 1971.

In 1973, the couple moved from West Virginia where Roger's parents lived to Kentucky so Roger could find work. Around this time, Diana's youngest brother Kevin (around age 16 at the time) quit school and came to live with them. Kevin moved in and out of their house numerous times during the years the Fulks children were growing up. Kevin described the heavy drinking and constant fighting in the home. His older brother and wife also lived with Diana and Roger numerous times. Both Roger and Diana would be drinking, and their fights would start "over nothing." Kevin described getting in the middle of fistfights, trying to stop them. Kevin reported that Diana drank heavily around this time, including drinking throughout her pregnancies. He observed her going to bed drunk many times when she was pregnant.

The drinking and partying continued as usual in 1974. While pregnant with their third child Ronnie that year, Diana caught Roger making out with another woman named Sandy (i.e., the sister of Roger's current wife) and chased them with a shotgun. A few days later, Diana and Sandy got into a fight, and Diana was beaten so badly she had to eat with a straw.

In March 1974, the couple's third child Ronnie was born. Diana admitted drinking heavily during the pregnancy with Ronnie. He was born premature with many health problems and never developed normally. He was always under weight and height and as an adult is under five feet tall. During the pregnancy, Diana wouldn't admit to family that she was pregnant and instead told them she had a tumor.

In 1975, the couple moved back to Lincoln County, West Virginia.

## Childhood History

████████  ***Birth***

Chadrick Evan Fulks was born this date to Diana and Roger Fulks in Lincoln County, WV. He was born in a local doctor's office in the town of West Hamlin. [Birth records were requested but evidently no longer existed.] Diana reported in a defense interview that Dr. McClellan had a small clinic for examinations and another room for delivering babies. She reported a normal pregnancy and delivery and said she took Chad home the day of his birth.

████████  ***Age 1***

Shortly after moving to Pine Street, Diana and Roger met their neighbor Linda Adkins. Linda was married to an alcoholic and had three daughters. Sherry became close to Linda and her daughters and remained very close to Linda today. She called Linda her "second mother." Linda described the amount of heavy drinking by Roger and Diana, the fighting which took place, and the general neglect of the children. When Roger worked a real job, he drank heavily on the weekends. When he wasn't working at all, he drank heavily all the time. Diana drank right along with him. Diana sometimes came to Linda's house complaining she had no food to feed her children. On several occasions Linda gave her cash but stopped this practice after seeing Roger walking up his front steps carrying a 12-pack of beer shortly after Diana left her house with money. From that point on, Linda only gave Diana food when she complained there was nothing for her children to eat. Linda remained puzzled as to how the Fulks always found money to buy beer, even at times when Roger was not working, but didn't have money to buy food. According to Linda, the Fulks had no phone and sometimes had no electricity, their children were on the free-lunch programs, and churches donated clothing for the children, yet Roger and Diana always had a steady supply of alcohol to drink.

████████  ***Age 2***

According to Kevin Holbrook and Linda Adkins, Chad was developmentally delayed in walking and talking. His parents expressed no concern and did not take him to a doctor. When he did learn to talk, he had a speech impediment (stuttering, lisping). Later, he would receive speech and language services in school.

███████ Shannon Ray Fulks was born (fifth and last child). Linda Adkins convinced Diana to have her tubes tied after this pregnancy.

Sherry reported she was very afraid when her parents fought, and sometimes she and the boys tried to break them up, but it never helped. Sherry hid and covered her ears until the fighting was over. She is convinced today that if their neighbor Linda Adkins hadn't helped them, they would have been placed in foster care. Sherry was teased at school because she was poor, and her clothes weren't stylish or clean. Peers used to tease her because she was skinny and had stringy hair.

Linda Adkins remembered a fight between Roger and Diana, which moved from the house onto the street. Linda heard a lot of yelling and went outside to see Diana in the yard. Diana was drunk and swinging a two-by-four board. Roger also was drunk and cussing at Diana. Diana threatened to break out the windows in Roger's car, which he had named "Bandit." The Fulks children were outside crying. Linda went outside and ordered Diana and Roger to go back inside their house.

9/4/79     Sherry enrolled in fourth grade at Gallaher Elementary School. She was absent four days and received Cs or C- in all subjects except Math, where she received a D.

Dewayne enrolled in third grade and was absent three days. He received S in Reading, Spelling, and General Ed but U in Writing, English, and Math. He was *retained in third grade.*

Ronnie enrolled in kindergarten and was absent 20 days. He was *retained in kindergarten.*

███████     ***Age 3***

9/2/80     Sherry enrolled in fifth grade at Gallaher Elementary School. She was absent three days. Her grades for the school year were the following: A in Music; Bs in Spelling, Writing; Cs in Reading, Language, Science; D in Math.

Dewayne repeated third grade. He was absent 12 days. He received S in all subjects except English and Math where he received U. He was promoted to fourth grade. His achievement test results showed improvement from the prior year in Reading (79 percentile) and Language (72 percentile), but Math scores remained extremely low (11 percentile).

Ronnie repeated kindergarten at Gallaher Elementary School. He was absent 29 days. He was promoted to the first grade.

According to Dewayne, Ronnie, and Chad, their parents never expressed any interest in their grades or school activities and never asked for report cards. When their grades were bad, the school contacted the parents. Diana was the parent who attended school meetings, but she did so sporadically. At times, teachers noted alcohol on her breath. Roger never met with the teachers or the principal.

█████ **Age 4**

6/9/81 Dewayne's teacher Hazel Flynn put a note in his school file indicating that while she was promoting him to fourth grade, he had not mastered Math skills and had failed that subject. She said his English grade also was not satisfactory because he had failed to turn in a significant number of assignments.

9/1/81 Sherry enrolled in sixth grade at Gallaher Elementary School. She was absent for nine days. Her grades for the school year were B in Spelling, C+ in Writing, C in Reading, C- in Language and Math, D+ in Social Studies, D- in Science.

Dewayne enrolled in fourth grade at Gallaher Elementary School. He was absent nine days. He obtained a B in Spelling, Cs in Writing and Math, C- in Reading, and Ds in Science, Language, and Social Studies. At the end of the school year, he failed Math.

Ronnie enrolled in first grade at Gallaher Elementary School. He was absent 8 days. He received S- in all subjects.

█████ **Age 5**

Defense interviews with Diana, Sherry, and Chad indicated that Roger and Diana drank and fought regularly, and the police were called by neighbors. Sometimes, Diana and the children were taken to the "Family Mission" downtown for a "cooling off" period. The children had to miss school and remain very quiet, and there was no place they could play.

9/1/82 Chad enrolled in kindergarten at Gallaher Elementary School. He attended 144 days and was absent 35 days.

Interviewed by defense staff in June 2003, Chad's kindergarten teacher Cindy Harper recalled he was a very quiet child. She recalled one time when Chad "became sick in class" and soiled his pants. She cleaned him up

as best she could, but he needed a change of clothes. He was very embarrassed and ashamed because he soiled himself. He went to the principal's office to wait for someone for bring him some clean clothes. Although his parents were called, nobody ever came to bring him clothes, so he never returned to class.

Sherry enrolled in the seventh grade at Lincoln Jr. High School. Her final grades were all Ds and Fs. She failed the school year and received only four credits for the year. In a defense interview, Sherry reported that it was around this time she began drinking, smoking cigarettes, and hanging out with the wrong crowd ("they were the only crowd I fit into").

Dewayne enrolled in fifth grade at Gallaher Elementary School. He was absent a total of seven days, and his grades were: B in Math, Spelling, Music; C in Reading and Health; D in Language, Science, Social Studies. In a defense interview, Dewayne reported he was 12 years old when he began accepting drinks and pills offered to him by people hanging out with his parents in their basement: "We did whatever we wanted, our parents were too busy fighting and drinking to care what we were doing." He said he and his siblings were unhappy: "We all growed up too fast. I tried to protect Chad from dad. I felt sorry for him. He cried a lot as a kid and Dad beat him for it.... It was like every man for himself.... What goes on in the house, stays in the house." All through childhood, Dewayne had thoughts of killing himself, and his parents never knew about it.

Ronnie enrolled in second grade at Gallaher Elementary School. He was absent three days. He received S- in all subjects and was promoted.

Nancy Fulks reported in an interview that around this time, Diana phoned her and requested transportation to pay a fine for shoplifting.

1983   After several years of living on Pine Street, the Fulks decided to move "around the corner" and rent a house on the corner of Pine Street and Leeward Avenue. Roger immediately converted the basement area into a "pool room" and hung graphic pornography on the walls. This became a gathering place for adults in the neighborhood to drink and party. The parties occurred every night and lasted into the early morning hours. Usually, there was a fight between those in attendance, which often spilled out into the yard or street. The police often were called. The Fulks children sometimes wandered downstairs where the adults were drinking and fighting or stayed upstairs to watch hard-core pornographic movies that belonged to Roger. Both David Kiser (neighbor) and Mark Fulks reported finding children ages six and seven watching these movies.

████████ *Age 6*

**9/1/83**    Chad enrolled in first grade at Gallaher Elementary School. He was present 167 days and absent nine days. He received S- in Reading, Writing, and General Education and U in Spelling and Math. He was not promoted to second grade.

Chad's first-grade teacher Suzanne Walker (nee Welker) initially had no recall of Chad but stated that if he was retained, he clearly demonstrated significant deficits or she never would have agreed to retain him as she typically was opposed to retention.

Paternal Uncle Roy Fulks lived a wild life of drinking and drugs. He was shot two or three times and stabbed on a few occasions. He would take Chad with him when he hung out with the Hell's Angels, at which time Chad would observe the adults drinking, doing drugs, and naked women walking around or riding motorcycles.

**1983/84**    Sherry repeated seventh grade at Lincoln Junior High. She was absent 17 days and failed seventh grade again. Her grades were all Fs and Ds, and she received three credits for the school year.

Dewayne enrolled in sixth grade at Gallaher Elementary School. He was absent 14 days, and he received the following grades: C (Writing, Math), D (Reading, Spelling, Language, Science, Social Studies, Health). He was promoted to seventh grade.

Sherry reported that sometimes when he was drunk, Roger talked to her about his Vietnam experiences and always ended up crying. There were times when he sat around all day without bathing for two or three days at a time. Sherry also recalled that her mother had peculiar hygiene: Diana rarely wore makeup but always made sure her hair was bleached blonde and her skin was tanned. Diana used toilet paper instead of tampons during her period and wasn't clean in general.

Around this time, Diana was arrested for being Drunk and Disorderly. She reported that after a fight with Roger, she left her house to walk to Geno's Pizza to use the pay phone. She was going to call her mother to see if she could stay with her for a few days. However, she was picked up by the Huntington Police after they saw her staggering down the street, and she spent the remainder of the night in the drunk tank at the jail.

**3/84**    Achievement testing for Chad in first grade indicated Word Attack skills at the 13th percentile, Vocabulary at the 18th percentile, Comprehension at the 27th percentile, and Language Expression at the 10th percentile.

**████**  *Age 7*

5/19/84  The School Placement and Advisory Committee determined that due to Chad's "articulation problems," the next school year he would receive Speech and Language assistance twice weekly for an hour each day.

6/15/84  Chad received special education multidisciplinary assessment, and his Individualized Education Program (IEP) contained a recommendation for Speech and Language services "to improve articulation" beginning in September 1984. Eventually, he began receiving Speech Therapy as recommended for his Communication Disorder. A Personal Data Sheet completed by Chad's mother indicated one of his older brothers also had received Speech Therapy.

9/4/84  Chad re-enrolled in first grade at Gallaher Elementary School. He attended 165 days and was absent 10 days. He received S in all subjects with an S- in Spelling.

Sherry repeated seventh grade for the third time. Her grades were all Fs and two Ds, and she received two credits for the year. Nonetheless, she was promoted to eighth grade.

Dewayne enrolled in seventh grade at Lincoln Junior High. His grades were all Fs, and he received NO credit for the school year. He was absent a total of 24 days.

Ronnie enrolled in fourth grade at Gallaher Elementary School. After two months, he was transferred to Peyton Elementary School where he was placed in a Behaviorally Disordered class. At the time of the transfer, his grades were Cs and Ds.

1984  According to an interview with Chad, he was fondled and undressed around this time by a babysitter named Shelly. Dewayne, who had a crush on her, followed them into the basement where he observed Shelly fondling Chad. Dewayne, who was in the crawl space at the time, knocked over a can of paint that hit Chad in the head and knocked him unconscious. Shelly made Chad promise not to tell anybody about her fondling him, so he never told his parents about being knocked out.

According to an interview with Shannon, Diana argued with one of the men drinking at their home, grabbed him by his hair, and began banging his head against the washer until he was bleeding.

According to Chad, because the house was so small and the space in the basement had been converted into a pool hall, Roger built an extra room for the children in the attic. The space was very cramped and cold in the winter; in the summer the attic was sweltering hot, and the smell of sewage from a ditch next to the house was sickening. Roger hooked up the house illegally to the gas line, which eventually was disconnected after it was discovered.

12/3/84     Ronnie enrolled in fourth grade at Peyton Elementary School in the Behaviorally Disordered Class. He was absent three days. His grades improved to Cs and B in Science and Health.

Shannon had seizures in childhood, for which he received medication. However, because the medicine made him a "zombie," Diana took him off it. From that point on, whenever he had a seizure, Diana and Roger stayed close to him and tried to make sure he didn't "swallow his tongue." The hospital accused Diana of giving him seizures with blows to the head because they couldn't find another reason for the problem. Social workers investigated but did not discover anything.

4/85     According to Mental Health records written in 1987, Chad's father lost his job around this time and was unemployed for the next two years. He did not work again until Spring 1987.

The pool hall downstairs and Roger's unemployment resulted in round-the-clock drinking by Roger and Diana. The children were completely unsupervised, and the neighbors would see them in the streets at all hours of the night. All of the children learned to shoplift from their parents, who frequently asked them to steal beer and bring it home. Neighbors reported the children stole bicycles from all over town. At times, their yard was cluttered with stolen bicycles. Diana showed Linda Adkins a new diamond ring that she claimed Dewayne "found" and gave to her. Dewayne, Ronnie, and Chad all reported that their parents never confronted them about the stolen items they brought home.

According to Linda Adkins, Roger liked to work on old cars and then sell them for a small profit. He taught Dewayne to work on cars and after telling Dewayne what parts he needed, Dewayne would leave and then return home with the parts. His father never asked him any questions about how he got the parts. Ronnie learned to steal from Dewayne, and Chad learned to steal from them both. The boys understood that if Roger asked them to get something for him, that meant they would have to steal it.

According to Chad, he went along when his father took a woman named Rhonda to pick up her car. Diana didn't want Roger to help Rhonda but agreed provided Roger took Chad with him. During the ride, Roger kept giving Chad beer, but

Chad didn't fall asleep. After dropping Rhonda off at her car, she "accidently" drove her car into a small ditch, so Roger got out of the car to help. He was gone a long time and left Chad in the car. Chad knew what they were doing because he'd seen them kissing before. He kept the secret for a while but eventually told Diana about it.

████████  ***Age 8***

9/3/85   Chad enrolled in second grade at Gallaher Elementary School. He attended 165 days and was absent 13 days. He received S in Reading, Writing, and Math and S- in Spelling and Language. He was promoted.

Sherry enrolled in eighth grade at Lincoln Junior High. She dropped out of school in March 1986.

Dewayne enrolled in seventh grade again at Lincoln Junior High. He was absent 55 days and failed every subject, receiving no credit. Nonetheless, he was promoted to eighth grade.

Ronnie enrolled in fifth grade at Peyton Elementary School. He was absent 18 days. He received C in Music and Bs in all other subjects except Spelling, where he obtained a D.

10/85   Chad's evaluation report in second grade at Gallaher Elementary indicated results of testing showed an articulation problem in speech. Speech and language services were recommended.

10/14/85   IEP (Second Grade)
Chad was placed in the Resource Room for Speech Therapy two times per week to address articulation problems.

3/19/86   When Sherry dropped out of eighth grade, she was getting Fs in English, Science, and Music and D in US History.

According to Sherry, around the time she dropped out of school, she was dating Brian Messinger, a truck driver who had lived with the Fulks family for a year. Brian was 35 years old, and Sherry was 16. They eventually ran away together to New York. Diana was livid when Sherry returned home and placed her in counseling.

Brian Messinger described the Fulks home as "filthy." He described the parents as alcoholics who drank every day while their children ran wild. He said Roger and Diana were abusive to the children (e.g., always yelling at them, cursing at them, calling them names). There usually wasn't any food around, so he'd sometimes

bring something home to feed everybody. Roger and Diana always had brutal physical fights when they were drinking, which was more often than not. Brian said it was a pretty fair fight between the two of them. They always had black eyes, bloody noses, and bruises. He described Chad as a "follower" and said he always tried to keep up with Dewayne and the older boys: "If you put him up to something, he'd do it. He was always trying to prove he was a man."

**■■■■■** *Age 9*

9/3/86 Chad enrolled in third grade at Gallaher Elementary School. He attended 157 days and was absent 21 days. He received S- in Reading, Language and Math and S in Spelling and Writing.

In a 2003 interview, teacher Dottie Thompson remembered Chad as a "cute little blonde-haired boy who looked like a choir boy." She described him as quiet. She also recalled he had a tattoo on his arm, which she always thought was strange on such a young boy. She remembered he had "sticky fingers" but said other children did as well. She knew he had older brothers and remembered thinking he was probably negatively influenced by them.

According to Chad, the principal at Gallaher paddled children who misbehaved, and he was paddled often for fighting. He got into fights when other children teased him about his clothes. Instead of paddling children one at a time, the principal would bring all of them in together and make them wait and watch while their peers were being paddled. The paddle itself had holes in it so it stung badly. Chad began to dread class so much that he hid out in the gym and empty classrooms. Diana eventually spoke with the principal, after which Chad was never paddled again.

Neighbor Laurie Messinger (married to Brian Messinger) used to spend time at the Fulks' home when she was around 12 years old. She observed that Diana and Roger fought all the time and *always* had some sort of bruise or cut on them. Roger used to make inappropriate comments to Laurie (e.g., the size of her breasts) and tried to touch her once, but she got away. The Fulks boys also made inappropriate comments about her body. She ended up dating Dewayne for a while when he was in high school and she was in middle school. He stole gifts for her on Valentine's Day and Christmas. She said Roger and the whole family were known as thieves. She recalled Roger asking Dewayne to steal beer for him once. She said most of the neighbors didn't like the Fulks because they were two-faced, but they continued to come over and shoot pool and drink anyway. The Fulks house was always filthy, and there were holes in the walls all over the place. The walls of the basement where everybody played pool were covered in pornography "and not just regular Playboy

stuff either, but real nasty stuff." About Chad, Laurie said, "If somebody put him up to it, he'd do it. He was always trying to prove he's a man, even when he was a kid …. He never got approval from anybody."

9/3/86 Dewayne enrolled in eighth grade at Lincoln Junior High School. He was absent for 37 days and received mostly Fs. At the end of the year, his GPA was .45, and he received two credits. He failed the school year.

Ronnie enrolled in sixth grade at Peyton Elementary School. He was absent seven days. He received As in Social Studies and Music, Bs in Reading and Writing, B- in Math, and C in Spelling.

11/20/86 IEP (Grade 3)
Chad was placed in the Resource Room for Speech Therapy to address articulation problems (i.e., a lisp).

11/25/86 Results of academic assessment (Grade 3) for Chad showed Reading at the second-grade level and Spelling and Math at the third-grade level. Results of the Peabody Picture Vocabulary Test (receptive language skills) indicated a developmental delay of two years. An IEP in November 1986 indicated ongoing Speech Therapy.

| | |
|---|---|
| **11/30/86** | **Battery** of Elva Sullivan occurred in Huntington. Chad and Ronnie were arrested, and Petitions 86-J-621 and 86-J-622 were filed in Cabell County Circuit Court (Huntington, WV) alleging that Chad (age 9) and Ronnie (age 12) committed battery by striking an elderly woman, Elva Sullivan, with a stick. Chad's attorney entered a plea of not guilty on 12/5/86. On 12/18/86, a motion requesting a 12-month Improvement Period was granted. |

1/6/87 Chad's third-grade teacher Dottie Thompson referred Chad for a Multidisciplinary Assessment. She noted Chad had no self-discipline and needed to be in a controlled situation at all times. She wrote that he complained of stomach problems, did not complete tasks, was not self-directing, and needed guidance at all times.

Mr. Thompson indicated Chad's weaknesses were in Reading, Arithmetic, English, Spelling, Work Habits, Distractibility, and No Self-Discipline, and his had relative strengths in Writing, Social Studies, and Science.

| | |
|---|---|
| **2/10/87** | Chad and another boy were arrested for an incident on the at Gallaher Elementary. Petition 87-J-116 alleged Chad (age 9) and John Frank Flynn grabbed a four-year-old girl's pants on the playground and pulled them down. On 2/13/87, Chad was arrested by Huntington Police and charged with **Battery**. |

> At an Adjudicatory Hearing on 4/1/87, Chad admitted responsibility for the allegations in the petition and was adjudicated a juvenile delinquent. The Court ordered a Predisposition Report be completed and submitted to all parties 72 hours before the Dispositional Hearing. On 5/4/87, the Court ordered that Chad be placed on probation for one year plus an 8 pm curfew.

2/4/87      An academic Evaluation Report (Grade 3) indicated Chad was referred because of behavior problems and poor achievement. It was noted that his behavior and general demeanor during individual testing sessions were exemplary, but reports from school staff indicated little regard for social convention and school rules when he was not directly under adult supervision. He was under the supervision of juvenile authorities at the time.

Psychometric Summary [see Appendix C for abbreviations]:
- SIT: 9-7 CA, 8-10 MA, 92 IQ
- PPVT: 9-7 CA, 7-10 MA, 82 SS
- WRAT:
  - Reading: 80 SS, 2E GE
  - Spelling: 89 SS, 3B GE
  - Arithmetic: 82 SS, 3B GE
- KTEA:
  - Reading Decoding: 91 SS, 3.2 GE, 8-9 AE
  - Reading Comprehension: 95 SS, 3.7 GE, 9-3 AE
  - Spelling: 84 SS, 2.6 GE, 8-0 AE
  - Math Computation: 86 SS, 3.3 GE, 8-9 AE
  - Math Application: 95 SS, 3.7 GE, 9-0 AE
  - Reading Composite: 93 SS, 3.4 GE, 8-9 GE
  - Math Composite: 89 SS, 3.4 GE, 8-9 AE
  - Battery Composite: 89 SS, 3.3 GE, 8-6 AE
- Jordon Left/Right Reversal: 7-9 Developmental Age
- Devereux: clinically High elevations on Classroom Disturbance, Inattentive, Withdrawn; significantly Low elevation on Comprehension
- TOWL: unable to complete due to length of story
- Spache Diagnostic Reading Scales: 3.5 Auditory Comprehension Level

Chad's teacher reported that in the last two or three weeks, Chad had been changing the names on other students' papers and writing his name on the papers. During the assessment, he communicated well with the examiner. He said he had stayed up until midnight watching movies on the VCR. His teacher said he was fine on a one-to-one basis, but he had difficulty in group situations or when trusted to be responsible when he was alone.

The evaluator reported that "[o]n the Test of Written Language he seemed to preplan his story before writing. After he began to write he would proof read after every 2-3 sentences and think about the story before continuing. He appeared to have a lot of difficulty with the Jordan Left Right Reversal Test. It took him a long time to complete this test. The KTEA math subtests were also very difficult for him. To add groups, he drew boxes and put dots in each box, then counted the total. With subtraction problems he drew marks on paper and then crossed out the number he was subtracting. He had extreme difficulty with abstract reasoning."

3/3/87    A Psychological Evaluation Report (Grade 3), by School Psychologist Rodney Pardue, covered testing conducted on 2/4/87. In the referral, Chad's teacher noted: "Chad 'lacks self-discipline' and 'needs to be under a controlled situation at all times.' He shows poor work habits and deficits in basic academic skill development. He previously repeated 1st grade."

Test Results:
- WISC-R: 87 VIQ, 95 PIQ, 90 FSIQ (Information, Similarities: 6; Picture Completion: 12) – The evaluator noted the 8-point difference between VIQ and PIQ was "not significant."
- Draw-A-Person: age appropriate
- Devereux Behavior Rating Scale: Significantly High ratings were found on Classroom Disturbance, Inattentive-Withdrawn; Significantly Low ratings were found on Comprehension, Need for Closeness to Teacher
- Bender-Gestalt: within normal limits

"Comparisons among subtest scores and general test factors suggest a relatively poor language and experiential background. Despite these limitations, Chad shows an ability to make appropriate judgments. His abstract reasoning skills are poor, both verbally and nonverbally."

"Reports from school staff indicate that he may show little regard for social convention and school rules when he is not directly subject to adult supervision."

4/87    Testing with the CogAT-3 (Cognitive Abilities Test) found Verbal reasoning at the 32nd percentile and Non-Verbal reasoning at the 7th percentile. [The CogAT is a group-administered K-12 assessment that estimates learned reasoning and problem-solving abilities through a battery of verbal, quantitative, and nonverbal test items.] Achievement testing indicated Vocabulary at the 22nd percentile, Comprehension at the 5th percentile, Spelling at the 11th percentile, Language Mechanics at the 5th percentile, Math Concepts/Applications at the 21st percentile, Reference

Skills at the 11th percentile, Science at the 1st percentile, and Social Studies at the 6th percentile.

4/27/87      Chad was referred to Prestera Mental Health Center by Probation Officer Sue Hatcher for behavioral problems while he was awaiting sentencing for the incident where he pulled down the pants of a six-year-old girl.[101] Psychologist Michael Nuce conducted an intake interview with Chad and Diana. Nuce's subsequent report indicated that Chad's two older brothers were on juvenile probation and improvement plans. Diana reported that she and Roger had control over their children, that Chad was not a "mean boy" but was merely "mischievous." Diana also reported that none of the children was a behavioral problem at home and that they picked up their clothes, etc. She acknowledged that her sons fought, characterized Chad as an instigator, and indicated that they disciplined their children by sending them to their rooms. Diana characterized the incident with the six-year-old as unintentional and a joke. Chad admitted fighting during recess but denied misbehavior elsewhere in school. He also made inconsistent statements regarding parental drinking, alternatively indicating and then denying that his parents had a drinking problem. Both Diana and Chad indicated that he was being blamed without sufficient cause.

Following the intake interview, Nuce contacted Probation Officer Hatcher, who indicated that Diana and Chad were minimizing and/or denying behavioral issues. Chad was reportedly "roaming the streets" and cursing at adults, there were significant behavioral concerns at school, and Ms. Hatcher was considering placement outside the home.

Nuce noted that Chad came for only one session and no further appointments were made or kept. Diana expressed concern about the cost of services.

Diagnosis:

| | |
|---|---|
| Axis I | Conduct Disorder, socialized |
| Axis II | None |
| Axis III | None reported |
| Axis IV | Moderate psychosocial stressors, recent court involvement |
| Axis V | Poor |

4/29/87      Probation Officer Sue Hatcher completed a Pre-Disposition Report regarding Petition 87-J-I 16 (Battery). Ms. Hatcher reported that Chad was accused of pulling the victim's pants down on the playground while Chad and a second male student held her. He was reportedly fumbling with her underwear when the recess bell rang. Chad reported that he and the

---

[101] Other records indicate the child was four years old.

other student were only playing with the victim, that he went to tag her, and her pants fell down when he touched them.

Officer Alan Meeks (arresting officer) told Ms. Hatcher that when visiting the Fulks' home, he had observed Chad's parents drinking on multiple occasions. He believed the parents were not providing adequate supervision and recommended that Chad be removed from the home for his own benefit. Ms. Hatcher noted that members of the Fulks family denied alcohol abuse in the home, but collateral reports contradicted this. At the time of the report, Chad's brothers Ronnie and Dewayne were in the Behavior Disorder program in school and had arrest histories. Dewayne was on an Improvement Period for assaulting an elderly neighbor.

Ms. Hatcher reported that the Fulks family house was dirty and run down on the outside, but that housekeeping standards were acceptable. She also stated that Chad had problems in the neighborhood and was reportedly hitting other children, cursing at parents, and bullying and hitting one child at school. A neighbor indicated that many other neighbors were afraid of the Fulks children, and she did not allow her children to play with them. Another neighbor reported that the Fulks children frequently carried alcohol into their home.

Dottie Thompson, Chad's third grade teacher, reported to Ms. Hatcher that she believed Chad had a severe behavior disorder but that he could be handled with supervision. She also indicated that he denied wrongdoing when confronted. The school principal reported he had smelled alcohol on the breath of both parents. Indicating he had received complaints that the Fulks children were running the streets at night unsupervised, he said he had recommended that Chad be removed from the home. The principal also reported that Chad had a history of fighting in school, assaulting other students, and being verbally abusive to children and adults.

| 5/12/87 | Annual IEP (Grade 3; School Year 1987/88) |

- SPED Classification: Behavior Disorders (Resource Room – "Mainstream as behavior and academic progress permit"; regular classroom for Art, Music, PE)
- Additional Services: Speech and Language Therapy twice weekly, Counseling at Prestera Center, and Probation Officer Sue Hatcher
- Teacher Reports: "Threatens other students. Can't be unsupervised. Has been spitting at other students."
- Observation: "Answered questions in class, interacted appropriately with peers. Didn't always follow directions."

 **Age 10**

| | |
|---|---|
| 5/21/87 | Chad and his mother were seen by Michael Nuce at Prestera Mental Health Center. They discussed a reward program and contract with Chad's teacher. There was mention of Chad spending the summer with his grandparents. |

According to Roger, Chad had a crush on an adult female neighbor who lived across the street and would become very angry if he saw anyone else talking to her.

Ronnie reported that Diana began attending church around this time, became "born again," and suddenly stopped drinking. She started spending much of her time away from the house helping Romey Swanson in his home for unwed mothers. Arguments between her and Roger escalated.

9/1/87    Chad enrolled in fourth grade at Peyton Elementary School. He attended 161 days and was absent 19 days. He had been transferred to Peyton for placement in a Special Education Classroom for Behaviorally Disordered children. His grades for the school year were As in Reading, Spelling, Language, Art & PE; Bs in Writing and Music; and Cs in Science and Social Studies.

Ronnie enrolled in seventh grade at Lincoln Junior High and was absent 34 days. He received B in Language Arts; Cs in World Geography, Home Economics, Health; and Ds in English, Math, Science, and PE. He had completed 6.67 credits, and his GPA was 1.60.

10/29/87    Chad's case was officially closed at the Prestera Mental Health Center.

5/4/88    Probation Officer Sue Hatcher went before the Cabell County Circuit Court on Petition 87-J-116 to report Chad had successfully completed the 12-month Improvement Period. The Court ordered Chad be released from probation.

**Age 11**

5/25/88    Medical Record, John Marshall Medical Services
- Height: 56 ¾ inches, Weight: 83 pounds
- Mother reported he had headaches in the evening behind his eyes. The headaches lasted three to four hours.

| | |
|---|---|
| 6/7/88 | IEP (Grade 5)<br>• SPED Category: Behavioral Disorder ("BD") Monitoring (Regular classroom with BD monitoring and placement if needed)<br>• Services: Speech Therapy, BD Resource Room and monitoring in regular classroom<br>• Weaknesses: tattles, agitates others |
| 9/1/88 | Chad enrolled in fifth grade at Peyton Elementary School. He attended 174 days and was absent 16 days. He received Bs in Art and PE and Cs in all other classes.<br><br>Ronnie enrolled in eighth grade at Lincoln Jr. High School. He was absent 46 days. He received B in Math; Cs in Language Arts, Science, and Home Ec; Ds in English, Industrial Arts, PE, Music; and Fs in American Government, West Virginia Studies. He completed 5.67 credits, and his GPA was 1.50. |
| 10/30/88 | A Herald Dispatch newspaper article featured Chad. In the article, Diana reported that her husband had been unemployed since August when "he had to quit his job after he hurt his arm." She said they often did not have enough food and that the local food bank had been a tremendous resource for her family. Chad (age 11 at the time) was quoted as saying, "School is the hardest thing about being poor …. they say stuff about me, they laugh at me, they say their clothes are better than mine. They cuss me out and they call us welfare bums." |
| 11/22/88 | IEP (Grade 5)<br>• Special Ed: Speech and Language Services, BD Resource Room and monitoring, mainstreaming in Music, Art, PE<br>• Strengths: average functioning<br>• Weaknesses: tattles, agitates others |
| 1/18/89 | Chad presented at Children's Medical Center at Marshall University, where records indicated he complained of pain above his eyes and headaches for the preceding six months. He said he had to leave school twice and that he had one episode of nausea. A sibling (likely Ronnie) saw the doctor because of short stature and intense headaches. Chad was assessed to have "Headaches – probably secondary to eye strain." |
| 3/1/89 | School records indicated Chad participated in regular Science and Health classes but was not keeping up. He continued to receive speech therapy. Recommendations for the following school year were a BD classroom due to his low functioning level and continuation in a speech program for |

remediation of the "S, Z, Sh, Ch, J, Th" sounds. Reading and conversation were target areas.

5/15/89     IEP (Grade 6)
- SPED category: Behavioral Disorders
- SPED Services: speech therapy, resource room for academics
- Strengths: pleasant personality
- Weaknesses: Math, Spelling, Language – needs very concrete in learning
- Brigance:
  - Word Reading: 4th grade level
  - Reading Comprehension: 4th grade level
  - Spelling: 4th grade level
  - Math: 4th grade level

     *Age 12*

According to Chad, his mother cracked a ketchup bottle over his father's head during a fight. Roger grabbed her and tried to throw her out of a second story window. Chad was afraid his father would kill his mother, but his Uncle Kevin stopped him. Chad was very embarrassed by his parents' behavior. They usually kept pre-mixed Screwdrivers in the refrigerator and would *try* to wait until after noon to begin drinking but were not always successful. They drank anything alcoholic they could get their hands on.

9/5/89     Chad enrolled in sixth grade at Beverly Hills Middle School. His grades were B in Comparative Literature; Cs in Math and Art; Ds in Language Arts, Foreign Language, Social Studies, Science, PE; and Fs in Health and Home Economics.

1989     According to Shannon, he got into fights at school because he was poor, his clothes weren't stylish, and the reputations of his older siblings preceded him. The other children picked on him. He said Chad got into fights trying to protect him. Shannon and Ronnie were close for a while and played GI Joes together, but after a while Ronnie got caught up in drugs and he and Shannon drifted apart.

| | |
|---|---|
| 11/29/89 | Chad pointed a handgun at an 11-year-old boy named Robert Keefer and was arrested for **Brandishing**. On 3/14/90, the charge was amended to **Assault**. The court accepted Chad's guilty plea, adjudicated him a juvenile delinquent, and sentenced him to a six-month Improvement Period. |

| 3/2/90 | A Psychological Evaluation Report (Grade 6) by School Psychologist Eric King indicated Chad was referred by his teacher Laura Cooper for triennial assessment. A speech problem was noted under "Observations." |

Test Results (conducted 3/2/90):
- WISC-R: 88 VIQ, 105 PIQ, 96 FSIQ - The 17-point difference between verbal and performance IQ scores was statistically significant.
    o Verbal Comprehension Factor: mean score of 75 (specific weakness on the Information subtest, which measured general fund of knowledge and past formal education)
    o Perceptual Organization Factor: mean score of 11.25
    o Freedom from Distractibility Factor: mean score of 8.66
- Bender Gestalt Visual Motor Test of Integration: 3 errors (2 distortions, 1 dictation) - suggested visual/motor/perceptual difficulty
- Burks' Behavior Rating Scales: no significant behavior problems per teacher ratings

Conclusion: Chad had behavior problems that indicated placement in the Emotional and Behavioral Disorders ("EBD") program. However, a complete academic evaluation was recommended to determine if a learning disability existed.

███████ ***Age 13***

Around this point in time, Roger abruptly left Huntington and moved to Shipshewana, Indiana, where his younger brother Mark Fulks lived and worked. Roger didn't discuss the move with his family and instead left them a letter notifying them of the move. Now on her own, Diana struggled to parent and make ends meet. She and the children received welfare support and food stamps. Eventually, Roger found employment in a local factory but did not voluntarily send money to Diana to support the children. Roger soon began dating Mark's sister-in-law Marcia and eventually married her.

Diana moved with the children to a rental house in the Guyandotte section of Huntington after losing the house on Leeward Avenue because she was too far behind in house payments. They were only in Guyandotte a few months when Diana moved her family to 609 Rear Buffington Street in Huntington.

| 5/30/90 | Around this time, an arrangement was made for Ronnie to join Roger and his future wife Marcia in Indiana. |

| 6/11/90 | Specific Learning Disability Team Report (Grade 6) Observations: Examiner noted that Chad had difficulty with word meaning at times, and this affected his reading comprehension. Testing: |

- KTEA:
  - Reading Decoding: 92 SS
  - Reading Comprehension: 84 SS
  - Spelling: 85 SS
  - Math Calculation: 72 SS
  - Math Reasoning: 83 SS
- Bender-Gestalt: perceptual deficits

6/13/90    School personnel met to discuss Chad's IEP and continued placement in the Behavior Management class for the upcoming school year. Despite multiple attempts, they were unable to reach his mother and held the meeting without her. It was noted that the home phone had been disconnected, and there was no answer at the mother's place of work.

IEP (Grade 6)
- SPED services: Math (multiplication/division, fractions, plus basic geometry skills), Speech therapy (errors of S and Z)
- Study Skills: poor organization skills
- Peer Interaction: fair
- Classroom Behavior: average
- Motor Skills: age appropriate
- Content Skills: poor math skills
- SPED: Behavior Management, speech therapy

8/28/90    Ronnie enrolled in Westview Junior High in Topeka, Indiana.

9/14/90    Sue Hatcher (Probation Officer) told the court that Chad had successfully completed his six-month Improvement Period. The court ordered discharge from the Improvement Period.

9/14/90    IEP (Grade 7)
Present level of educational performance:
  - Reading: 5.3 GE [source of testing not listed]
  - Math: 4.3 GE [source of testing not listed]
  - Written Language: below average
  - Oral Language: receives speech (services)
  - Study Skills: below average – Learning Disabled, Resource 2x/week
  - Peer Interaction: satisfactory
  - Classroom Behavior: average
  - Motor Skills: average
  - Perceptual Skills: below average
  - Content Skills: below average

- Chad met eligibility criteria for special education services. He was placed in a resource class for Math (four hours per week) and Speech and Language (two hours per week).

12/4/90 — A Probation Report indicated Chad was cited for Truancy because of habitual absences from school without good cause.

| 12/4/90 | Chad was arrested for **Destruction of Private Property** after he and another juvenile were seen climbing out of the broken car door window. He also was charged with Truancy. He admitted the truancy charges on 2/13/91 and was adjudicated delinquent. The property destruction charges were held in abeyance and then dismissed on 3/21/91. The predisposition report indicated Chad had truancy problems and had missed 12 days of school. He was in the BD classroom but was taking several regular classes. At the time of the report, Chad's parents were in the process of divorcing. Diana reported that the divorce was causing Chad and Ronnie to act out. Roger was reported to have alcohol problems.

Sherry (21) was managing a TCBY, Dewayne (19) was incarcerated, Ronnie (17) had left school and was living with his youth minister, Shannon (11) was in the fifth grade.

The court ordered placement in Pressley Ridge School in Ona, West Virginia, but suspended this sentence in lieu of probation for one year and conditions that included drug treatment, drug screening, a curfew, and court-ordered school attendance. |
|---|---|

2/5/91 — Chad was treated at St. Mary's Hospital Emergency Department. His mother reported he had been in a fight at Enslow Middle School and received a head injury and injury to his nose. Diana reported she was unemployed. The treating physician wrote: "Patient is a 13 yr old white male. Patient was assaulted earlier today at school. Patient's mother reported he came home from school with a bloody nose and a contusion on the left back of his head. Patient denies LOC or any other pain. Chad reported that he was having difficulty breathing from his nose and that his nose had bled from both nostrils earlier. The nurse noted contusions on left temporal area. X-rays were taken of skull, cervical spine, facial bones and nasal bones - all x-rays were normal."

4/26/91 — Chad was hospitalized at St. Mary's Hospital in Huntington after being found unresponsive in his home. The medical record noted that the cause was "(p)robably drug ingestion" and described the incident as a possible suicide attempt. Diana indicated that she had an argument with Chad

about visiting his girlfriend. Chad denied suicidal ideation but was unable or unwilling to explain when he took the pills. Toxicology screening was positive for antihistamine and acetaminophen. Chad was released the same day.

5/3/91     Chad later reported to defense staff prior to trial that he scheduled a follow-up appointment with the psychiatrist but did not attend.

5/6/91     The divorce between Chad's parents was finalized, and Roger married Marcia one week after the divorce was final.

█████   *Age 14*

8/91      Chad was sent to Indiana to join Ronnie and live with his father and stepmother.

8/21/91   After arriving in Indiana, Chad enrolled in eighth grade at Westview Junior High School although he had never completed seventh grade.

          According to Chad, the transition to Indiana was difficult because the other children made fun of his clothes and the way he talked. He started getting into fights and cutting classes. Transition at home also was difficult. Chad perceived Marcia didn't want him there. She would lock him in his room when he got home from school and tell Roger, "It's either him or me." She accused Chad of stealing one of her dresses and held it against him the whole time he lived there, even though he denied it and she never found the dress. She checked all of the letters Diana sent to Chad and read them before he did.

9/10/91   Chad was placed in a remedial reading support program. Testing by School Psychologist Joy Krug found the following results:
          - SIT: 66 SS, 9-6 MA
          - PPVT: 73 SS, 9-8 AE
          - Analytical Reading Instructional: 4th grade
          - KBFAT:
            - Math 73 SS, 4.8 GE
            - Read 68 SS, 3.5 GE
            - Spell 75 SS, 4.6 GE

9/25/91   Jan Hardesty, Chad's teacher at Westview, referred him for evaluation because he was failing every class and had social problems, had few friends, and had been involved in two fights in the past week.

9/30/91  Psychometric Evaluation conducted by School Psychologist Joy Krug at Westview Junior High School found:
- WISC-R: 85 VIQ, 105 PIQ, 93 FSIQ
- WJTA:
  - Written: 80 SS, 4.0 GE
  - Reading 95 SS, 8.0 GE
  - Math: 81 SS, 5.7 GE
  - Knowledge: 79 SS, 4.4 GE
- WRAT:
  - Reading: 74 SS, 4E GE
  - Math: 66 SS, 4E GE
  - Spelling: 81 SS, 5B GE
- Adaptive Behavior Evaluation Scale
  - Environmental/interpersonal Behavior: 7 ss
  - Self-Related Behavior: 12 ss
  - Task-Related Behavior: 0 ss
  - Adaptive Behavior Quotient: 81 SS (12th percentile
- TOWL:
  - Vocabulary: 2%
  - Thematic Maturity: 2%
  - Spelling: 16%
  - Word Usage: 5%
  - Style: 2%
  - Hand Writing: 2%
  - Written Language Quotient: 59 SS
- Analytical Reading Inventory: 4th Frustration

As a result of the testing shown above, the special education team recommended a classification of 8th Grade Learning Disability for all academic subjects (English, Science, Social Studies, Math).

10/3/91  Learning Disability Certification indicated Chad had normal or near normal potential, and there was a severe discrepancy between his potential and his academic achievement in Word Reading, Reading Comprehension, Writing, Expressive Language, Listening Comprehension, Math Calculation, and Math Reasoning. He was found to have disorders in:
- Understanding language,
- Using language, and
- Written language,
with imperfect ability to:
- Listen,
- Read,
- Write,

- Spell, and
- Do math calculations.

It was determined that Chad's learning problem was not primarily the result of: environmental disadvantage, cultural disadvantage, economic disadvantage, visual handicap, hearing handicap, motor handicap, mental retardation, or emotional disturbance.

10/4/91     An Educational Evaluation Report Form contained the following Woodcock-Johnson test scores, followed by a recommendation that Chad be placed in the Learning Disability program:
- Reading: 4th grade
- Math: 5th grade
- General Knowledge: 4th grade

10/10/91    After receiving several complaints from students concerning Chad's behavior on the school bus, Principal Stan Shopa met with Chad. Students had complained Chad was blowing his nose in his hands and then wiping his hands on other students. Chad initially denied the incidents and became "surly and defensive." Another student later reported that Chad had pushed, intimidated, and threatened him. The principal again met with Chad, who denied the accusation. The bus driver reported later that Chad had threatened several students and physically blocked another student from exiting the bus. As a result of his behavior, Chad was suspended from school for five days and his bus riding privileges were revoked indefinitely. The principal sent Chad's father a letter with the above information, and Joy Krug (school psychologist) was sent a copy of the letter. Another member of the school staff contacted Welfare to arrange a meeting which would "hopefully lead to family counseling." Mr. Shopa wrote in a memo to his file: "It is my feeling that Chad Fulks is a highly disturbed and lethally disturbed young man. He goes from person to person with the intent of intimidating and frightening each of his victims. He is very quick to anger and becomes verbally and physically abusive. I would hope that he could be tested immediately for [Emotionally Handicapped] placement before he seriously hurts someone."

10/22/91    A summary of Chad's history in Indiana school records indicated:
- Placed in Behavior Disordered class since second grade, with Learning Disability placement (qualified LD with Math SS 72)
- "Scapegoat"/placed on probation because of truancy, several battering misdemeanors, behavior disorder
- Drugs in home (emotional, physical abuse)
- Molested by adult male
- Made ward of WV court

| | |
|---|---|
| 10/29/91 | Another letter was sent to Chad's father from the principal of Westview. The letter indicated that per Mr. Fulks' request, Chad would be reinstated on the school bus with the condition that if there were future problems, he would forfeit his bus riding privileges. |
| 11/13/91 | Principal Shopa again wrote to Chad's father, indicating he had recently been in touch with Chad's juvenile probation officer in West Virginia. Mr. Shopa informed Mr. Fulks that Chad had been attending Westview Junior High "illegally," and they would be withdrawing him immediately and recommending Mr. Fulks return him to West Virginia. [Apparently, the principal had learned Chad was a ward of the State of West Virginia, and his father only had visitation rights.] Mr. Fulks was notified that Chad was not considered a resident of Indiana, and the father's signature for special education placement was nullified due to the fact he was not the custodial parent. Attached to the letter was a Notice of Suspension Letter indicating Chad had been suspended for five days for causing a fight. A typed note at the bottom of the form stated Chad would not be able to return to Westview Junior High School until legal residency was established. |
| 11/15/91 | A Petition filed by the Juvenile Referee in Cabell County Circuit Court alleged Chad had violated the terms of a Court Order dated 3/21/91 by being verbally abusive and intimidating other students in school and by being suspended from school on the following dates: 9/27/91, 10/11-10/18/91, and 11/11/91. The petitioner requested the Dispositional Order be modified to a more restrictive alternative. |
| 11/20/91 | A Case Conference Report (Grade 9) for Westview Junior High School indicated Chad's special education category was Learning Disabled and that he should be placed in a "sp class" as the least restrictive alternative. |
| 11/22/91 | Following a hearing in Cabell County Circuit Court, the court awarded custody of Chad to Roger and ruled that the petition awarding temporary custody to the State be dismissed. Chad's probation also was terminated, and he was ruled a resident of Indiana. |
| 11/25/91 | IEP (Grade 9) – Westview Junior High School Present levels of educational performance: 4th-5th grade level in Language Arts. Annual Goals: <br>• To provide a sequential Language Arts, Math, Science Program <br>• To monitor mainstream classes <br>• To guide Chad in emotional-social skills <br> Regular classes: PE, Agriculture, Mechanics, Art |

| 11/25/91 | A Case Conference at school established a behavioral contract for Chad. LD tight supervision on a probationary basis was recommended until the second semester, at which time he would be considered an LD ninth grader (placed per his "social awareness level" [not defined] to allow for more "hands on" prevocational support). Therapy with Dr. Klassen was recommended. |
|---|---|
| 11/26/91 | A memo to Dr. Klassen from School Psychologist Joy Krug indicated: (1) Chad had been placed him the LD program and grade-skipped to ninth grade; (2) his father had just regained custody, but the stepmother presented "more hope" than the father as she was the one seeking counseling for Chad; (3) Chad had been a ward of the state in West Virginia; (4) he had a history of being molested by an older man; and (5) he had a "sociopathic pattern." [Ms. Krug did not define this term.] |
| 12/3/91 | A Psychiatric Report prepared by Dr. Klassen after meeting with Chad, Roger, and Marcia contained the following relevant information: Chad was referred because of behavioral issues at home and school. Marcia reported that "Chad would get very angry if things didn't go his way and tear things up. 'He can be happy, but his feelings get hurt.'" Roger reported past alcohol abuse and admitted being drunk the night before the evaluation after having consumed three quarts of beer. Roger described Diana as an alcoholic until her religious conversion. Roger also described their 23-year marriage as involving a great deal of fighting, including physical fights. |

Chad reported that his stepmother Marcia was "picking" on him, "mocking" him, and falsely accusing him of wrongdoing and that he wished to return to West Virginia as a result.

Dr. Klassen had been informed that Chad was in a split eighth/ninth grade classroom. He had been recently placed in LD, had skipped to the ninth grade, and required LD support in all major subjects. He had behavioral problems on the bus with a school suspension and a bus suspension. A tight behavioral contract was developed and tight supervision on a probationary basis was imposed.

Dr. Klassen noted that Chad had a reported history of being sexually abused by an older man, which Chad did not report during this evaluation and that a sociopathic pattern of behavior was reportedly observed in the previous psychological evaluation.

Chad reported sleep disturbance, depression, loss of appetite, and being unable to "find pleasure." Chad denied drug and alcohol use, but Dr. Klassen was skeptical of this report.

Chad's ability to read a paragraph was at the sixth-grade level, with errors coming from a lack of attention. Perseveration was noted on the drawing of geometric patterns. The Map Test reflected "reasonabl(y) adequate" capacity to learn but "a spotty fund of information suggesting learning disruption." The Draw-A-Person Test reflected unmet dependent needs and a lack of trust.

Initial impressions included Major Depression and to "remain alert to the possibility of developing sociopathic traits." Imipramine 100mg was prescribed. Dr. Klassen made an appointment to see Chad and Roger again in nine days.

| | |
|---|---|
| 1/92 | Around this time, Chad returned to his mother's care in Chesapeake, Ohio. |
| 1/9/92 | Roger Fulks signed an Authorization for Release of Information allowing Chad's records to be sent from Westview High School in Topeka, Indiana, to Chesapeake High School in Chesapeake, Ohio. |
| 1/10/92 | Chad was officially withdrawn from Westview Junior High. |
| 3/2/92 | A court order in Lawrence County, Ohio, gave Diana temporary legal custody of Chad so she could enroll him in school. |
| 3/9/92 | Chad enrolled in ninth grade at Chesapeake High School. Shortly before his fifteenth birthday, Chad began leaving his mother's home and staying off and on with various friends. Eventually, he left Chesapeake High School after being suspended and enrolled in an alternative school to complete ninth grade. Diana told defense staff that as far as she could remember, Chad never really lived at home with her after the age of "thirteen or so." |

**█████** *Age 15*

| | |
|---|---|
| 9/3/92 | Chad was treated in the Emergency Department at St. Mary's Hospital for stomach pain, dizziness, and weakness. X-rays of his abdomen were negative. |
| 3/1/93 | Chad enrolled in Andis Alternative Education Center (formerly known as the Drift Creek Alternative School). He was present 45 days and absent 14 days. He received Incomplete marks in all classes (Natural Resources, Vocational English, Vocational Social Studies, Work and Family) during the third semester and Bs in all classes during the fourth semester. He earned a total of 1.75 credits. |

███████ *Age 16*

[There are no contemporaneous records for this year of Chad's life. Based on a current collateral interview with Linda Adkins, it appears Chad was living with a 28-year-old female in the neighborhood (Rhonda) at the time.]

███████ *Age 17*

| | |
|---|---|
| 7/9/94 | Chad was arrested and charged with **Transferring and Receiving Stolen Property** (1990 Chevrolet S-10 Pickup truck). The truck was stolen from Wyoming County in West Virginia. On 8/14/94, he was arrested and charged with **Bringing Stolen Property into the State**. A Detention Order was filed, and it was determined Chad was a **Fugitive from Justice** (for stealing the vehicle on 4/22/94). Chad was detained at the Kanawha Home for Children in Dunbar, West Virginia, pending further proceedings. On 9/1/94, the court ordered that the latter charge be dismissed, and Chad admitted to the allegations in the first petition (Transferring and Receiving Stolen Property). He was adjudicated a juvenile delinquent and committed to the custody of the Department of Corrections. It was ordered he be held at the Kanawha Home for Children pending his transfer to the Industrial Home for Youth in Salem, West Virginia, and then transferred to Davis Center, a juvenile Correctional Center in Davis, West Virginia. |

9/21/94 According to Diana, she married Dean Thompson in Greenup, Kentucky, on this date. Dean called himself a "preacher" although he had no formal education and had never been ordained. He had an almost nonexistent work history. He reportedly told Diana that God told him he should not work, so she was the sole provider in their new family. Diana's job involved "sitting with old people." She had no health insurance for herself or Dean.

9/24/94 Chad was committed to the Davis Center.

11/1/94 The Davis Center sent a progress report to Judge Cummings at Cabell County Circuit Court. Chad was reported to be doing well in all areas and had good work habits. The progress report indicated Chad had "good work habits" but needed to work on leadership abilities. He had taken three of five tests required for his GED, obtaining an average score on those tests of 43. An average score of 45 was required to obtain a GED.

| 1/10/95 | In another progress report from Davis Center, the court was informed Chad needed to pass his GED. His group leader, Paul Komtop, wrote that Chad was doing better but needed to focus attention on long-term goals. |

1/10/95     In another progress report from Davis Center, the court was informed Chad needed to pass his GED. His group leader, Paul Komtop, wrote that Chad was doing better but needed to focus attention on long-term goals.

2/23/95     Chad's Medical Discharge Summary from Davis Center indicated cigarette smoking since age 15 and a history of marijuana abuse.

3/8/95     Davis Center informed the court that Chad had completed his GED with a 45.6 average. The record indicated that a GED required an average score of 45.0. Group leader John Dressier wrote: "Chad has shown an adult attitude both with his peers and with adults. Good resident." The GED transcript indicated the following scores from 10/13/94 to 3/2/95: Language Arts Writing 44, Social Studies 45, Science 52 (after having taken the test a second time), Language Arts Reading 44, and Mathematics 43.

3/29/95     Correspondence to the court from Davis Center indicated a commitment date of 9/1/94 and an anticipated release date of 5/11/95 (i.e., a little over eight months). Chad's Aftercare Plan indicated completion of 162 hours in Food Preparation, 261 hours in Auto Mechanics, and 672 hours in education classes preparing him for the GED. He had completed a Substance Abuse Education class. Through the "modified group program," he had shown improvement in judgment/impulse control, maturity, responsible decision making, motivation, adult relationships, and social skills/relationships. Chad wanted to reside with his mother upon release. Service needs included transition counseling and probation "until Chadrick has a successful return to the community." The Plan indicated Chad would be seeking employment as a welder upon release.

3/29/95     Correspondence from Davis Center School Counselor Betty Riley indicated that Chad had completed his GED and was interested in "Continuing his welding training at the Cabell County Vo-Tech school.

4/19/95     David Hockman, Superintendent of Davis Center, informed the court that Chad had just completed his program at Davis Center and was ready to return to court for further disposition.

School records contained the following academic marks over the course of Chad's academic career:

## Report Cards

| Year | Grade | Reading | Spelling | Writing | Lang/Eng | Math | Gen Ed |
|---|---|---|---|---|---|---|---|
| 1982/83 | K | | | | | | |
| 1983/84 | 1 | S- | U | S- | | U | S- |
| 1984/85 | 1 | S | S+ | S | | S | |
| 1985/86 | 2 | S | S- | S | | S | |
| 1986/87 | 3 | S- | S | S | S- | S- | |
| 1987/88 | 4 | A | A | B | A | B | |
| 1988/89 | 5 | C | C | C | C | D | C (Sci, Soc Std) |
| 1989/90 | 6 | Computer Lit. = B<br>Art, Music = C<br>PE, For. Lang. = D<br>Health, Home Ec. = F | | | D | C | D (Sci, Soc Std) |
| 1990/91 | 7 | Reading: D<br>Ohio History: D<br>Fs in Ohio History, English, Science, Reading before summer school credit | | | D | C | F (Sci) |
| 1991/92 | 9 | Social Studies: C-<br>Applied Math: D+<br>Applied Science: C+<br>Work and Family: A-<br>Natural Resources: C | | | | | |
| 1992/93 | 9<br>(alt school) | Nat Resources/Lab: B<br>Nat Resources/Related: B<br>Voc English: B<br>Voc Social Studies: B<br>Work & Family: B | | | | | |

## Adult History

 ***Age 18***

5/28/95      Devon Christopher Fulks was born in Cabell Huntington Hospital to Amber Fowler, whom Chad had dated prior to his commitment to Davis Center. Records contain Amber's report that she was on welfare at the time of the birth. Devon was born with a cardiac murmur, atrial septal defect, and ventriculseptal defect. Amber denied drinking but admitted smoking cigarettes during the pregnancy. She was not married at the time of Devon's birth but was dating a man named John Akers.

5/30/95      Probation Officer Mike Lacy informed the Cabell County Circuit Court that Chad successfully completed the program at Davis Center and was eligible for release. Chad had successfully completed all sections of the GED while incarcerated. [He had to re-take the Science test a second time.] The Court ordered that Chad be released and delivered to the

home of his aunt Sharon Dotson, where his mother could pick him up. [Chad was not in fact released on this date.]

6/2/95    Probation Officer Mike Lacy informed the court that contrary to his 5/30/95 statement, Chad had failed to pass the test for his welding certification, which was required for completion of the program at Davis Center. He asked that Chad be released to the care of his mother on the scheduled release date but that another hearing be held to deal with the certification issue.

6/26/95    Chad was released from the Davis Center to the care and control of his mother.

7/6/95    Chad married Amber Denise Fowler. Both were 18 years old. She reported no occupation on the marriage license; Chad reported he was a welder.

Sherry reported that Chad and Amber brought their infant son to visit her. Sherry noticed that when Amber picked up Devon he began crying and screaming right away, and Amber became frustrated and angry when she was unable to soothe him. When Sherry offered to take him, she noticed his diaper was dirty and hadn't been changed in a while. When Devon would begin crying, Chad would tell Amber to pick him up.

11/10/95    Amber's son Devon (five months old) was transported by ambulance to the ER at Cabell Huntington Hospital where he later died of cardiopulmonary arrest due to trauma.

According to Shannon, Chad changed dramatically after Devon's death. He began drinking heavily, was quick to anger, avoided people, and cried frequently. He often talked with Shannon about suicide.

Chad and his siblings reported that eventually, he began drinking all day long, every day, and taking whatever drugs he could get. He reportedly attempted suicide but got ill and vomited. [This suicide attempt is not documented.] He was unable to sleep, and when he did sleep, he dreamed about Devon. Sometimes, he saw visions of Devon as if he was really there. He forgot to bathe for days at a time and began spending most of his time at a riverbank to avoid people. Everyone noticed the change in him, but they weren't able to help. He and Amber began arguing regularly, and he stayed away from the house more and more to avoid her.

12/16/95    Medical records indicated EMTs found Chad sitting semiconscious, with a bullet wound to his left shoulder. Chad, described as "intoxicated," said he had been drinking but hadn't eaten that day. He reported he was unemployed

when he got to the hospital. The "History" portion of the record indicated he had been sitting in his vehicle, and someone had shot him in the left shoulder. It was noted that he dipped snuff and drank "some alcohol."

12/18/95     Nursing notes indicated staff found Chad and his wife together in his hospital bed, "apparently performing sexual intercourse," which interfered with his IV. Chad said if his wife couldn't sleep in his bed, he would leave and signed himself out against medical advice. After signing the paperwork to leave AMA, he changed his mind. He was discharged later that morning.

12/24/95     Chad returned to the ER at St. Mary's Hospital with sharp pain in his right shoulder. X-rays were read as normal. He said he had never gotten his prescription filled for Lortab upon release from the hospital. He was discharged home with OTC medication for pain.

1/25/96     Amber Fulks filed for divorce from Chad, checking the box indicating "No Children" born into the marriage.

1996     Chad reported he was living with Dewayne and his wife Carly around this time. He smoked crank (crystal meth) for the first time with Dewayne and then began using crank every day.

 **_Age 19_**

6/12/96     Chad was transported by emergency medical staff to the Cabell Huntington Hospital and admitted for observation. He complained of pain in his ribs and was coughing up blood. Alcohol was noted on his breath. The History and Physical Exam record noted: "A 19-year-old old white male who was intoxicated earlier this evening and was fighting with some other men at which time the police showed up. The patient ran from the police and ran into a gate with the left side of his abdomen. He was then caught by the police who subsequently kicked him in the same spot in the left upper abdomen and left lower chest. He arrived here in stable condition. Vital signs were stable throughout. He was complaining of left upper abdominal pain." He reported drinking only occasionally, and this episode was the first time he had consumed alcohol in seven months. The Assessment noted: "A 19-year-old old white male status post blunt abdominal trauma with impaired sensorium."

| | |
|---|---|
| 1/10/97 | Chad was arrested by the Myrtle Beach Police Department and charged with **Simple Possession of Marijuana**. He had in his possession 28 grams of marijuana and 10 grams of hashish. He was convicted. |

4/2/97     The divorce between Chad and Amber, granted this date on the grounds of irreconcilable differences, ended their brief marriage. There was no

property to divide and no marital debt. According to Chad, he was in jail in West Virginia at the time, and Amber's aunt, a secretary for the Wayne County Prosecutor, came to him in the jail saying she could arrange to have the charges dropped against him if he would just agree to the divorce from Amber. Chad agreed and signed the papers, and the charges were dropped.

**■■■■■** *Age 20*

1997 — Chad met Heather Goodman at a Christmas party, and they began a year-long relationship. According to Heather, she perceived Chad wasn't "all there." She reported that he drank a lot during their relationship.

| | |
|---|---|
| 12/3/97 | Chad was arrested in Hamilton County, TN, and charged with **Passing Worthless Checks** (Case #0813478). |

| | |
|---|---|
| 12/27/97 | Chad was charged in Hamilton County, TN, with **Attempted Forgery** (Case #802268). |

| | |
|---|---|
| 1/10/98 | Chad was charged with **Attempted Aggravated Criminal Trespassing** (Case #0802269). |

| | |
|---|---|
| 1/26/98 | A **Burglary,** for which Chad was later arrested and convicted, occurred this date at the home of Lula W. Jones in Shipshewana, Indiana. Ms. Jones stated that on this date, her daughter arrived at her residence at 10:30 am to take her to the grocery store. Upon returning home several hours later, they observed a dark red car in the driveway. As they approached, they observed a Caucasian male, thin build, with long blonde hair, running to the car, getting in, and driving quickly down the driveway. As the car passed, they were able to observe the driver and a female passenger. Upon entering the home, they discovered a checkbook lying on the floor in the hallway. The checks were printed with the names Chad and Amber Fulks. Missing was a jewelry box containing several rings including a diamond ring, emerald ring, ruby ring, two sapphire rings, four watches, a small black safe containing personal papers, and a prescription for heart medication. On 3/5/98, an Affidavit for Probable Cause was filed in LaGrange Superior Court after interviews with the victim. After finding Chad's checkbook in the victim's home, police obtained his photograph and conducted a photo line-up for the victim and her daughter. Ms. Jones identified Chad immediately without hesitation; however, her daughter could not decide between Chad and another individual in the line up. An Order for an Arrest Warrant was entered. |

| 4/25/98 | Chad was arrested by the Myrtle Beach Police Department and charged with **Receiving Stolen Goods**. He told police his name was Shannon Ray Fulks at the time of his arrest. According to Chad, he was with Heather Goodman when he was arrested, and she also was charged. Her mother Garnett Goodman bonded her out of jail within a week or so, but Chad stayed in jail. Heather met another man and moved in with him. Each was using cocaine at the time. The place they were living in was raided, and she was arrested again and charged with possession of cocaine. Her mother and stepfather traveled to South Carolina and bonded her out of jail. Chad was released around the same time, and they all traveled to West Virginia. According to Heather's mother, Chad and Heather followed her to West Virginia in a vehicle Chad said he had borrowed from the mother of a man he met in the detention center. Chad told the woman he needed to borrow her car to return to West Virginia to check on his sick child and would return the car in five days. Chad reported the woman gave him a handwritten note explaining she had loaned the car to him. The note included insurance information. They returned to Huntington and stayed one night. Heather was acting "wild" and wanted to see the Smokey Mountains on their return trip to Myrtle Beach. Chad was driving the car in Tennessee when he was stopped by the highway patrol. The woman who owned the car had reported the car stolen, and Chad was charged in federal court. |
| --- | --- |
| | On 7/8/98 (age 21), Chad was received at the Federal Medical Center in Lexington, Kentucky, on charges of Larceny of a Motor Vehicle. |

| 8/5/98 | Competency Evaluation, Federal Medical Center, Lexington, KY (Butner) |
| --- | --- |
| | Chad was referred for a competency assessment after having been charged with Interstate Transportation of a Stolen Vehicle. He represented himself as his younger brother Shannon. Statements from Chad's cellmate Robert Lee and Lee's mother were reviewed as well as statements from Amber Fowler (former wife) and Diana Thompson (mother). Amber Fowler, Diana Thompson, Robert Lee, Bill Acres (investigator), and Robert Simpson (Assistant US District Attorney) were interviewed. The following tests were administered: Minnesota Multiphasic Personality Inventory – Second Edition (MMPI-2), Wechsler Memory Scales – Third Edition (WMS-III), Rey Fifteen-Item Test, WAIS-III, and the Structured Interview of Reported Symptoms (SIRS). The individual scores of the testing were not reported. |
| | Chad was found to be competent at the time of the evaluation and was not found to be insane at the time of the offense. He also was found to be an unreliable historian, malingering, and attempting to feign cognitive impairment and mental illness. |

During the evaluation, Chad presented with "odd mannerisms" when interviewed, such as dramatic eye-blinking, head-twitching, hand-rubbing, and rocking back and forth. He claimed to have been treated for psychiatric problems in the past but could not recall where, when, what his diagnosis was, or what type of treatment he received. He initially denied experiencing hallucinations but later indicated that he received messages from the TV and heard the voices of his dead uncle and son calling him stupid. Staff reported that Chad did not present with these odd behaviors when he was unaware staff was watching him, that he gradually stopped showing the presence of abnormal behaviors in the presence of staff, and that he began showing the odd mannerisms discussed above again when interviewed by psychological or social work staff.

Chad also claimed not to know a number of basic facts about his background, including why he was incarcerated other than saying he had broken a car window in Tennessee, whether he had graduated from high school, what town he grew up in, if he was presently married, or what his mother's phone number was. He had written his mother's phone number on prison forms. He was administered an EEG but failed to remain still during the administration, claiming that his movements were involuntary.

MMPI results reflected an invalid profile. The SIRS reflected an unreliable reporting of symptoms. On measures designed to assess cognitive functioning, his performance was consistently equivalent to that typically seen in individuals who were moderately intellectually disabled, which was not found to be consistent with his observed ability to write or function independently. Evaluators noted that Chad cared for his personal needs independently, such as bathing, eating, and cleaning his cell. The evaluators also noted that he had no difficulty following the rules of the unit.

Diagnoses included Antisocial Personality Disorder and Malingering.

Relevant reports of his social history were as follows:

Chad's mother Diana reported that his birth, infancy, and elementary school years were unremarkable. His parents divorced when he was 14, and he moved with his mother and siblings to Chesapeake, Ohio. Diana reported that Chad had "multiple suspensions in junior high," but she was vague about why he was suspended. She "assumed Chad was using drugs but did not know what drugs he was using." Chad acknowledged marijuana use but denied any other drug use apart from social drinking.

Diana denied any significant family history of mental illness but did report Chad's father was an alcoholic and was physically abusive to Chad. She denied Chad had ever received mental health treatment. She further

reported that when Chad was 15, he left home and moved in with a 28-year-old woman for approximately five months. During or shortly after that time, he was involved in a burglary with his older brother. Guns and a VCR were stolen. Chad's older brother was sentenced to five years in prison, but Chad was sent to a youth facility in Ohio. He escaped from the youth facility and remained at large for over a year. Ultimately, he returned home, and Diana turned him in to the police. He was then sent to a youth facility in West Virginia.

Diana reported that Chad "did well" in the youth facility, earning a GED and welding certificate. He was released from the facility when he was 18 and moved home. Shortly thereafter, he married Amber Fowler. The couple lived with Amber's mother and had a son together (Devon).

Amber Fowler reported that Chad was often physically abusive to her. When Amber's son Devon was five months old, her three-year-old nephew jumped on the infant's stomach and killed him.

Diana reported that during the time Chad was married to Amber, he "used his younger brother Shannon's driver's license to write a number of bad checks." As a result, Chad was arrested and jailed for six months in Huntington, West Virginia. While incarcerated, Amber divorced him. Shortly thereafter, Chad became involved with another woman (Heather Goodman) and spent time in Florida and South Carolina with her. Diana reported that Chad was incarcerated for theft in South Carolina.

According to collateral information, while incarcerated in South Carolina, Chad engaged in "deceitful and antisocial behavior." His bond was posted by another inmate's mother, who also loaned him her automobile. Chad gained sympathy from other inmates in the prison by lying to them and telling them that his wife and daughter had been in a serious car accident. Collateral information further suggested he told this story with great emotion and in a convincing manner. As soon as Chad was released on bond, he drove the car out of South Carolina and was apprehended in Great Smokey Mountain National Park in Tennessee several days later.

| 3/23/99 | Chad was sentenced in U.S. District Court, Eastern District of Tennessee, to a 12-month term of imprisonment and three-year term of supervised release for the offenses of **Transportation of Stolen Vehicle, Aiding and Abetting Burglary of a Vehicle with Intent to Commit Theft**, and **Aiding and Abetting the Theft of Property Less Than $1,000.** |

 ***Age 22***

6/2/99    Chad was released by the Federal Bureau of Prisons.

| 6/3/99 | Chad was arrested and charged in Hamilton County, Tennessee, with **Burglary, Fraud, and Passing Worthless Checks**. He was convicted on 6/10/99 and sentenced to nine months in prison. He was incarcerated in Crown City, Ohio. |
| --- | --- |

| 12/7/99 | Chad was arrested and charged with **Burglary**, a class B felony. On 1/24/00, he pled guilty to the charge. |
| --- | --- |

1/3/00      Medical records reflect that Chad was transported to Vencor Hospital in LaGrange, Indiana, after falling in jail. He complained of pain in his head, neck and back and was "not sure" if he lost consciousness. He reported he was prescribed Valium and Vistaril at the time. A CT head and neck scan without contrast was read as normal. X-rays of the cervical, thoracic, and lumbar spine also were normal.

1/4/00      Chad was released from jail after his uncle posted $20,000 bond.

1/21/00      Chad was hired as a welder and fiberglass installer at US Cargo, where he earned $9.00 per hour. According to Dewayne, Chad moved in with him and his wife Carly around this time, and they were confused by some of his behaviors. For example, he took four or five showers a day, shaved his chest and other body hair, constantly combed his hair and checked his appearance in the mirror, and washed and waxed his car two or three times a week, and never left their home.

2/7/00      A Pre-sentence Investigation Report contained the following information:
- Chad completed up to the eleventh grade and received his Welding Certificate at the Davis School in 1993.
- He had a pending Probation Violation.
- He was currently on medication for "nerves due to his son's death" and pain reducers but was not sure why those were prescribed to him by the attending physician at the LaGrange County Sheriff Department.
- He admitted experimental use of marijuana and no use of alcohol. He reported using cocaine three times daily from 1996/97 until his arrest on 12/7/99. He reported he no longer used cocaine.

The report concluded: "It appears that the defendant has a history of criminal and delinquent activity. Probation records indicate a pending probation violation. It appears the defendant is remorseful for his actions. It appears the defendant has a strong family network and an effort is being made on their part to support him."

2/15/00      A DOC Diagnostic and Classification Summary indicated that Chad pled guilty to Burglary and was sentenced to 10 years in prison, with four years

suspended to probation. He was sentenced to a concurrent term of 60 days for violating probation on a conviction of Operating a Motor Vehicle without a License, a Class A misdemeanor. He told DOC staff that he committed the offense in order to get money.

He reported in a Social History that his father was an alcoholic and physically abused him. He reported that he was a welder who had completed eleventh grade. He reported no mental health history and indicated occasional use of alcohol and heavy use of drugs prior to his incarceration. He was determined to not be a threat to himself or others during his incarceration.

Test results (TABE):
- Reading: 8.9 GE
- Math: 6.0 GE
- Language: 10.3

3/15/00    While incarcerated, Chad underwent Mental Health Screening but was not seeking counseling services at the time. He had been prescribed Lorazepam at the county jail for approximately three months but had not taken the medicine since his arrival in prison. He said he was trying to cope on his own without the medication. He denied ever receiving mental health treatment prior to his incarceration and reported that no member of his family had ever received mental health treatment. He denied ever trying to hurt himself or any suicide attempts in the past. He reported that prior to his arrest, he used alcohol and marijuana "occasionally" and used cocaine regularly (three to four times per week). He said he completed eleventh grade at Westview High School in Lagrange, Indiana. [This was inaccurate. He did not complete or go beyond ninth grade.] He said was a Certified Welder after completing 16 months of training in a vocational school. He reported receiving his GED in 1996. He denied ever repeating a grade in school [inaccurate] and reported he was never in Special Education [inaccurate]. He reported one school suspension for smoking cigarettes and no expulsions [inaccurate – he was expelled from school in Indiana for burning a school plaque]. He denied he was ever placed in a juvenile detention center [inaccurate] or Group Home [inaccurate]. He admitted he had been on Juvenile Probation but was unsure of the charges.

3/20/00    A Psychometric Data Report, Psychology Unit (DOC) contained the following information:
- Age: 22; Grade Completed: 11
- TABE Level: D
- Reading Vocabulary: 8.7 GE [2/15/00 records indicated 8.9 GE]
- Comprehension: 9.1 GE
- Language Expression: 10.3 GE
- Math Comprehension: "did not do this test" [same record indicates 4.9 GE]

**Age 23**

| | |
|---|---|
| 7/9/00 | Chad was assaulted by two other inmates in the dorm and suffered "blunt trauma to his left side." He was transported to the ER at the Appalachian Regional Hospital. A form noted he was hit on his left side by an unknown object. He had a small cut over his left eye and a large abrasion on his left rib area. |
| 2/7/01 | Chad was seen by a prison psychologist, who wrote: "Five yrs ago infant son died in a household accident while P/O was at work. Blames self; blames wife, blames God. Began drinking, lost wife. Can see infant but can't touch him. Has slow speech, looking at floor, oriented x 3; depressed mood & constricted affect. Thoughts were logical & relevant with blame & guilt. No suicide / homicide ideation. Limited insight, fair judgment. Diagnosis: PTSD; unresolved grief. Will Follow-up." |
| 2/27/01 | The prison psychologist saw Chad again and wrote: "Ruminating and blaming self, wife, and God for infant son's death. Can see son right in front of P/O. Previously been in treatment. Will follow." |
| 2/28/01 | Chad attended an Anger Management group. The session note indicated: "Reason for referral: Difficulty with adjustment resulting in depression, anger, increased stress. Inadequate coping skills. Self-defeating behaviors & poor self-esteem." |
| 4/3/01 | Chad attended a Stress Management group. |
| 5/8/01 | The prison psychologist saw Chad and wrote: "continues to ruminate over son's death, blaming self for not being there, continues to report depression, be downcast, and to slowly respond when spoken to. Evaluate for medication."<br><br>Chad attended a Stress Management group. |
| 5/9/01 | Chad attended a Stress Management group. |

**Age 24**

| | |
|---|---|
| 6/29/01 | Celexa was prescribed. |
| 11/29/01 | A State of Indiana GED transcript indicated the following scores (Writing 45 (33rd percentile), Social Studies 53 (67th percentile), Science 48 (45th percentile, Interpreting Literature and the Arts (52 (64th percentile), and |

Mathematics 45 (25th percentile). Average score was 48.6, which was above the passing threshold of 45.

12/4/01     Chad completed his GED at Westville Correctional Institution.

12/17/01     A US Probation Officer in the Eastern District of Tennessee informed Westville Correctional Institution (Indiana) that Chad would have a three-year term of federal probation to begin immediately after his release from prison. The probation would be supervised out of the Knoxville, Tennessee, office.

2/1/02     Chad completed a Substance Abuse program. While in that program, Chad met Tina Severance, who worked in the program. They became friends, and she invited him to live with her after his release from prison.

3/22/02     After completing the non-suspended portion of his original 10-year sentence, Chad was released from prison and ordered to report to his Federal Probation officer within three days of release.

Chad moved in with Tina Severance immediately after his release and began looking for a job. Tina eventually got him a job selling perfume. While living with Tina, Chad met Veronica Evans, who was an exotic dancer at a local strip club. The two began an affair. Tina discovered the affair and burned all of Chad's belongings in anger. Chad left her and moved in with Veronica and her three-year-old son Myles.

5/11/02     Chad presented at LaGrange Community Hospital in LaGrange, Indiana, complaining of a sharp pain in his chest, accompanied by vomiting. Chad reported he had been under a lot of stress, was really concerned about finances, and was rather upset at the time of the hospital visit. Impression: "most likely an anxiety attack, acute, now resolved."

██████     *Age 25*

6/10/02     According to Chad and his mother, Chad introduced Veronica to Diana and told her that he and Veronica were getting married the next day.

6/11/02     Chad Fulks and Veronica Jean Evans married in Catlettsburg, Kentucky. Veronica reported she was a college student; Chad reported he was a welder.

| | |
|---|---|
| 8/25/02 | Chad directed Veronica to use a stolen credit card to buy a necklace at a Walmart in Madisonville, Kentucky. Upon entering the store, Veronica informed police Chad was in the parking lot with a gun, and she was afraid he would kill her. The police responded, searched, and discovered stolen credit cards and a pistol among other things. The officers subsequently arrested the couple and transported them to the Hopkins County Detention Center. Veronica's three-year-old son was placed in foster care. On 8/27/02, Veronica agreed to cooperate with the government and was released from detention. On the basis of evidence seized from their home, Chad Fulks was charged with **12 counts of Credit Card Fraud** in Hopkins County, Kentucky. He was convicted on 12/30/02 of all 12 counts and sentenced to five years in prison for each count, each count to run concurrently. |

| | |
|---|---|
| 11/3/02 | Kentucky State Police served Chad with an indictment charging him with **First Degree Abuse of a Child aged 12 years or younger** (Veronica's son). |

| | |
|---|---|
| 11/4-20/02 | **INSTANT OFFENSE:** Chad Fulks and Branden Basham, whom he met in the detention center, committed a series of crimes that resulted in the deaths of two female victims: Samantha Burns and Alice Donovan. Mr. Fulks was arrested on November 20, 2002. |

## Appendix C
## STANDARIZED TESTING ACROSS THE LIFESPAN
[Bold type = >1 standard deviations below the mean / >2 grades below classmates]

**Abbreviations:**
FSIQ = Full Scale IQ Score
VIQ = Verbal IQ
PIQ = Performance IQ
GE = Grade Equivalence
AE = Age Equivalence
% = percentile
MA = Mental Age
CA = Chronological Age
DA = Developmental Age
SS = Standard Score (Mean = 100, SD=15)
ss = Scaled Score (mean = 10, sd = 3)
wnl = within normal limits

**Test Names:**
WISC = Wechsler Intelligence Scales for Children
WJCS = Woodcock Johnson Test of Cognitive Skills
TONI = Test of Nonverbal Intelligence
SIT = Slosson Intelligence Test (verbal screening)
WRAT = Wide Range Achievement Test
KTEA = Kaufman Test of Educational Achievement
KBFAT = Kaufman Brief Form Achievement Test
WJTA= Woodcock Johnson Test of Achievement
BAT = Brigance Achievement Test
TOWL = Test of Written Language
PPVT = Peabody Picture Vocabulary Test
CTBS* = Comprehensive Test of Basic Skills
CogAT* = Cognitive Abilities Test
TABE* = Test of Adult Basic Education

\* These tests are group-administered, multiple choice, frequently prone to inflation, and of questionable reliability.

## Intellectual Testing
[Standard Scores – Mean = 100, SD = 15]

| DATE | GR | AGE | TEST | SOURCE | VIQ / VCI | PIQ / PRI | WMI | PSI | FSIQ |
|------|----|----|------|--------|-----------|-----------|-----|-----|------|
| 11/86 | 3 | 9-6 | SIT | Selective Screening for Gallaher Elementary School, undated | 90 | | | | |
| 2/87 | 3 | 9-8 | WISC-R | Psychological Evaluation Report, Rodney Pardue, PhD, 3/3/87 | 87 | 95 | | | 90 |
| 2/87 | 3 | 9-8 | SIT | Psychometric Summary, Gallaher Elementary School, 2/24/87 | 92 | | | | |
| 4/87 | 3 | 9-10 | CogAT-3[102] | WV State-County Testing Program, Student Test Record | 32% | **7%** | | | |
| 3/90 | 6 | 12-9 | WISC-R | Psychological Evaluation Report, Eric King, MA, 3/2/90 | 88 | 105 | | | 96* |
| 9/91 | 9 | 14-4 | SIT | Data Sheet, Joy Krug, undated | **66** | | | | |
| 9/91 | 9 | 14-4 | TONI | Data Sheet, Joy Krug, undated | | **84** | | | |
| 9/91 | 9 | 14-4 | WISC-R | Data Sheet, Joy Krug, undated | **85** | 105 | | | 93* |

---

[102] The CogAT is not an intelligence test but rather a group-administered multiple-choice test that estimates learned reasoning and problem solving abilities through a battery of verbal, quantitative, and nonverbal test items.

| 3-S/03 | ~ | 2S-11 | WAIS-III | Jonathan Venn, PhD | 79 / 76 | 78 / 84 | 86 | 79 | 77 |
| 8/03 | ~ | 28 | WAIS-III | James Hilkey, PhD | 79 | | | | 81 |
| 2/04 | ~ | 26-9 | WJCS-III | Dr. Gourley (Federal Medical Center at Butner, NC) | Visual-Auditory Learning: **75 SS** Analysis/Synthesis: **76 SS** Verbal Comprehension: **77 SS** Incomplete Words: 100 SS Sound Blending/Decision Speed: 99 SS Auditory Working Memory: 98 SS | | | | **79\*** |

\* statistically-significant difference between indices

## Achievement Testing
[Excludes Composite scores, which are averages of specific underlying scores]

| DATE | GR | AGE | TEST | WORD READ /ATTCK | COMP | SPELL | LANG/ WRITING | MATH CALC | MATH ANAL/ FLU |
|---|---|---|---|---|---|---|---|---|---|
| 3/83 | K | S-10 | CTBS[103] | **Recog 10%** | **Vocab 12%** Passage S3% | | | | 7 % |
| 3/84 | 1 | 6-10 | CTBS[104] | **13%** | **Vocab 18%** Passage 27% | | **Expres 10%** | | |
| 4/86 | 2 | 8-11 | CTBS[105] | **50%** | **Vocab 67%** Passage 64% | 38% | **Mech 46%** **Expres 70%** | 23% | 23% |
| 11/2S/86 | 3 | 9-6 | WRAT[106] | **80 SS 9% 2E GE** | | 89 SS 23% 3B GE | | **82 SS 12% 3B GE** | |
| 2/11/87 | 3 | 9-8 | WRAT[107] | **80 SS 9% 2E GE** | | 89 SS 23% 3B GE | | **82 SS 12% 3B GE** | |
| 2/11/87 | 3 | 9-8 | KTEA[108] | 91 SS 27% 8-9 AE 3.2 GE | 9S SS 37% 9-3 AE 3.7 GE | **84 SS 14% 8-0 AE 2.6 GE** | | 86 SS 18% 8-9 AE 3.3 GE | |
| 2/11/87 | 3 | 9-8 | TOWL[109] | Unable to complete due to length of story | | | | | |
| 4/87 | 3 | 9-10 | CogAT-3[110] | 22% | 5% | 11% | 5% | | 21% |

[103] Student Interpretive Report for Comprehensive Test of Basic Skills, Cabell County School District, 4/1/83
[104] Student Interpretive Report for Comprehensive Test of Basic Skills, Cabell County School District, 4/26/84
[105] Student Interpretive Report for Comprehensive Test of Basic Skills, Cabell County School District, 6/6/86
[106] Results of Selective Screening for Gallaher Elementary School, undated
[107] Psychometric Summary for Gallaher Elementary School, 2/24/87
[108] Academic Assessment, Peggy Blatt, 2/26/87
[109] Academic Assessment, Peggy Blatt, 2/26/87
[110] WV State-County Testing Program, Student Test Record, 4/87

| Date | | Age | Test | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 3/1S/88 | 4 | 10-10 | BAT[111] | 4.7 GE* | | S.0 GE* | | 4.5 GE* | |
| 5/15/89[112] | 5 | 11-11 | BAT[113] | 4 GE* | 4 GE* | 4 GE* | | 4 GE* | |
| 3/90 | 6 | 12-9 | CogAT-3[114] | S8% | 26% | 20% | | | |
| 4/90 | 6 | 12-10 | BAT[115] | 6 GE* | | | | 3 GE* | |
| 4/90 | 6 | 12-10 | WRAT[116] | 6B GE | | | | 7B GE | |
| 5/16/90 | 6 | 13-0 | KTEA[117] | 92 SS 30% 11-6 AE S GE | 84 SS 14% 10-0 AE | 85 SS 16% 10-6 AE | | 72 55 3% 9-9 AE 4 GE | |
| 9/10/91 | 8 | 14-4 | KBFAT[118] | 68 SS 2% 3.5 GE | | 75 SS 5% 4.6 GE | | 73 SS 4% 4.6 GE | |
| 9/30/91 | 8 | 14-4 | WJTA[119] | | 9S SS 37% GE 8.0 | | 80 SS 9% 4.4 GE | 81 SS 10% 5.7 GE | |
| 9/30/91 | 8 | 14-4 | WRAT[120] | 74 SS 4% 4E GE | | 81 SS 10% 5B GE | | 66 SS 1% 4E GE | |
| 9/30/91 | 8 | 14-4 | TOWL[121] | 2% | | 16% | 2-5% | | |
| 3/20/00 | ~ | 22 | TABE[122]** | 77% 8.7 GE | 75% 9.1 GE | | 89% 10.3 GE | 2S% 4.9 GE | |
| 4/28/03 | ~ | 2S-11 | WRAT-3[123] | 75 SS 5% 5 GE | | 76 SS 5% 5 GE | | 79 SS 8% 6 GE | |
| 8/12/03-8/13/03 | ~ | 26-2 | WRAT-3[124] | 84 SS 14% 8 GE | | 75 SS 5% 5 GE | | 77 SS 6% 6 GE | |
| 11/26/03 | ~ | 26-6 | WRAT-3[125] | 77 SS 6% 6 GE | | | | | |
| 2/16/04 | ~ | 26-9 | WJTA-3[126] | 88 SS 21% 8.0 GE | 91 SS 27% 7.7 GE | 91 SS 26% 7.7 GE | 72 SS 3% 2.3 GE | 84 SS 14% 5.7 GE | 76 SS 6% 6.1 GE |

Shaded rows = group-administered tests of questionable reliability

---

[111] IEP, Cabell County Schools, 6/9/88

[112] Date of report containing test scores. Date of testing not listed.

[113] IEP, Cabell County Schools, 5/15/89

[114] WV State-County Testing Program, Student Test Record, 3/90

[115] IEP, Cabell County Schools, 6/13/90

[116] IEP, Cabell County Schools, 6/13/90

[117] Specific Learning Disability Team Report, Cabell County Schools, Beverly Hills, MS, 6/11/90

[118] Data Sheet, Joy Krug

[119] Data Sheet, Joy Krug; Case Action Summary Sheet, Westview Jr, H.S. (also included Knowledge SS: 79, GE 4.4)

[120] Data Sheet, Joy Krug

[121] Data Sheet, Joy Krug

[122] Department of Corrections

[123] Report, Jonathan Venn, PhD, 3/30/04

[124] Report, James Hilkey, PhD, 5/7/04

[125] Report, James Evans, PhD

[126] Report, Dr. Gourley, Fed Med Center at Butner, NC, 3/25/04 – This testing also included Reading Fluency (85 SS, 16%, 7.6 GE), Writing Fluency (87 SS, 20%, 5.7 GE), and Applied Problems (82 SS, 12%, 6.4 GE).

\* In her collateral interview, Gayle Wolfe (fifth grade teacher) questioned the validity of BAT results in 1988 and 1989 (fourth and fifth grades) and also said testing in the 1987-88 and 1988-89 school years (fourth and fifth grades) was administered by a back-up teacher with no training in test administration.

\*\* As noted above, the TABE is a group-administered test with questionable validity. In this case, TABE results (except for math computation) were significantly inconsistent with scores on tests preceding and following its administration.

## Learning/Memory

| DATE | GR | AGE | TEST | SOURCE | VISUAL | AUDITORY |
|---|---|---|---|---|---|---|
| 2/11/87 | 3 | 9-8 | Jordan L-R Reversal | Psychometric Summary for Gallaher Elementary School, 2/24/87 | **7-9 DA** | |
| 2/16/04 | ~ | 27-9 | WJCS-III | Forensic Evaluation, MH Division, Federal Medical Center at Butner, NC, 3/25/04 | Visual-Auditory Learning: **75 SS (5%)** | |

## Visuomotor Integration

| DATE | GRADE | AGE | TEST | SOURCE | RESULTS |
|---|---|---|---|---|---|
| 2/4/87 | 3 | 9-8 | Bender | Psychological Evaluation Report, Rodney Pardue, PhD, 3/3/87 | wnl |
| 2/11/87 | 3 | 9-8 | Jordan Reversal Test | Psychometric Summary, Gallaher Elementary School, 2/24/87 | **7-9 AE** |
| 3/1/90 | 6 | 12-9 | Bender Gestalt | Psychological Evaluation Report, Eric King, M.A., 3/2/90 | **3 errors (2 distortions, 1 rotation) - suggests visual/motor/ perceptual deficiency** |
| 9/91 | 8 | 14-4 | Visual Motor Integration Test | Data Sheet, Joy Krug | **82 SS 12%** |

## Communication

| DATE | GRADE | AGE | TEST | SOURCE | EXPRESSIVE | RECEPTIVE |
|---|---|---|---|---|---|---|
| 2/11/87 (re 11/25/96) | 3 | 9-8 | PVVT | Academic Assessment, Peggy Blatt, 2/26/87, Results of Selective Screening for Gallaher Elementary School, undated | . | **82 SS** **12%** **3 GE** **7-10 MA** |
| 9/30/91 | 8 | 14-4 | PPVT | Data Sheet, Joy Krug | | **73 SS** **4%** **9-8** AE |
| 2/16/04 | ~ | 27-9 | WJCS-III | Forensic Evaluation, MH Division, Federal Medical Center at Butner, NC, 3/25/04 | | 77 SS[127] 6% |

## Adaptive Behavior Assessment

| DATE | GRADE | AGE | TEST | SELF-RELATED | TASK-RELATED | INTERPERSONAL | AB QUOTIENT |
|---|---|---|---|---|---|---|---|
| 9/30/91 | 8 | 14 | ABES | 12ss | **0ss** | 7ss | **81 SS** **10%** |

## Behavior Rating (by teachers)

| DATE | GRADE | AGE | TEST | SOURCE | SIGNIFICANTLY HIGH RESULTS | SIGNIFICANTLY LOW RESULTS |
|---|---|---|---|---|---|---|
| 2/11/87 | 3 | 9 | Devereux | | **Classroom Disturbance** **Inattentive-Withdrawn** | **Comprehension** **Need for Closeness** **to** Teacher |
| 3/1/90 | 6 | 12-9 | Burks | Psychological Evaluation Report, Eric King, MA, 3/2/90 | wnl | wnl |

---

[127] Verbal Comprehension score

Appendix D
Resume

**Natalie Novick Brown, PhD, SOTP**
**Northwest Forensic Associates, LLC**
Office: 524 Tacoma Ave. South    Tacoma, WA  98402
**Mailing Address: 31811 Pacific Hwy South, B-341**
Federal Way, WA 98003
Phone: (425) 275-1238
drnataliebrown@gmail.com

**Curriculum Vitae**

**Licensed Psychologist** (Washington State: #PY1965)

Certified Psychologist (CPQ #3258), Association of State & Provincial Psychology Boards

Certified Sex Offense Treatment Provider (Washington State SOTP #FC112)

Certified Psychologist/Evaluator for Department of Corrections, Division of Developmental Disabilities, Department of Social & Health Services (Washington State)

Certified Parenting Evaluator, University of Washington Department of Psychiatry and Behavioral Sciences

National Register of Health Service Providers in Psychology, #49892

Certified Polygraph Examiner / Post-conviction Sex Offender Testing (PCSOT)

## EDUCATION

| | |
|---|---|
| 2003-04 | International School of Polygraph (Fort Lauderdale, FL) and Post-Conviction Sex Offender Polygraph Training |
| 1995-96 | Internship, Sex Offense Treatment Provider (SOTP) |
| 1994-95 | Post-Doctorate in FASD, University of Washington Fetal Alcohol and Drug Unit, Department of Psychiatry and Behavioral Sciences, School of Medicine |
| 1993-94 | Parenting Evaluation Training Program, Department of Psychology, University of Washington |
| 1989-94 | Ph.D. in Clinical Psychology, University of Washington |
| 1978-79 | M.H.A. in Health Care Administration, University of Washington |
| 1974-75 | M.L.S. in Library and Information Sciences, University of Washington |
| 1964-68 | B.A. in Sociology (Psychology minor), University of California at Los Angeles (UCLA) |

## CLINICAL EXPERIENCE

| | |
|---|---|
| 1996 – present | **Clinical and Forensic Psychologist** |

Professional consultation/evaluation and related testimony in criminal and civil matters, including adult/juvenile sex offense/risk assessment evaluation (e.g., civil commitment under Sexually Violent Predator laws); adult, adolescent, and child psychological evaluation (general psychological assessment, competency, dependency, FASD, neurodevelopmental disabilities (e.g., autism spectrum disorder, ADHD, learning disabilities), child abuse/neglect); post-conviction/commitment treatment planning; parenting evaluation; and independent medical examination (IME)

Psychological assessment of recidivists referred by King County Mental Health Court and King County Drug Court

Seattle Police Department: victim assessment and consultation regarding neurodevelopmental impairment

Special Commitment Center (WA): community-based therapy for released Sexually Violent Predators

Group therapy (1996-2000)/individual therapy (1996-present)

Supervision of doctoral students and psychologists obtaining SOTP certification

| | |
|---|---|
| 2005 – present | **Clinical Assistant Professor** (courtesy staff), Department of Psychiatry and Behavioral Sciences, School of Medicine, University of Washington |

Research involving FASD prevention and treatment of substance-abusing mothers, interventions, assessment, brain-behavior impairment, and suggestibility.

| | |
|---|---|
| 1994 - 1995 | **Postdoctoral Fellowship / Faculty Appointment** (1994-2000), Fetal Alcohol and Drug Unit (Dr. Ann Streissguth), University of Washington |

Training re FASD and other neurodevelopmental disorders, maternal alcohol use assessment, and lifelong adaptive assessment/secondary disabilities. Courtesy appointment as Clinical Instructor.

| 1992 - 1994 | Pre-doctoral Internships (University of Washington) |
|---|---|

(1) forensic evaluation and expert testimony

(2) individual psychotherapy

(3) pain management assessment/treatment

(4) rehabilitation psychotherapy (including traumatic brain injury)

## PRE-DOCTORAL WORK EXPERIENCE

| 1987-89 | Columbia Hospital / Omni Substance Abuse Clinic - CEO / Board of Directors |
|---|---|
| 1981-87 | Toppenish Hospital (WA) - CEO |
| 1979-81 | Virginia Mason – Assistant CEO / McLeary (WA) Hospital CEO |
| 1977-79 | Providence Medical Center - Medical Librarian |

## RESEARCH

| 2005 – present | Clinical Assistant Professor (courtesy appointment) - Fetal Alcohol and Drug Abuse Unit, Department of Psychiatry and Behavioral Medicine, University of Washington<br>• Research on suggestibility and FASD prevention/treatment under Parent-Child Assistance Program (PCAP) |
|---|---|
| 1994 - 1995 | Postdoctoral Fellow - Fetal Alcohol Unit, University of Washington<br>• Research on FASD in Washington State prisons |
| 1991 - 1994 | Dissertation<br>• Relation Between Psychological Correlates of Alcoholism Risk and Stress-Response Dampening Across the Blood Alcohol Curve |
| 1991 - 1993 | Research Coordinator<br>• Prediction of High Risk Drinking in Young Adults |
| 1990 - 1992 | Research Coordinator<br>• Alcohol and Social Influence |
| 1989 - 1991 | Research Coordinator<br>• Self-Esteem in Young Adults |

PEER REVIEW

**Journal of Mental Health and Clinical Psychology**
Sciaccess Publishers

**Epigenetics**
Taylor & Francis

**Criminal Behaviour and Mental Health**
Wiley Online

**International Journal of Law and Psychiatry**
International Academy of Law and Mental Health, Harvard University

**Addiction**
Society for the Study of Addiction

## PUBLICATIONS

Novick Brown, N. (submitted). Fetal alcohol spectrum disorders (FASD): Intellectual disability equivalence. In G. Becker, K. Hennicke, & M. Klein (Eds.), *Adults with fetal alcohol spectrum disorders: Diagnosis, screening, intervention, and addiction prevention. Vol. 2.* Berlin, Germany: De Gruyter Publisher.

Novick Brown, N. (submitted). Fetal alcohol spectrum disorders (FASD) and risk of violence. In J.M. Fabian (Ed.), *Violence risk in criminal offender populations.* Oxford, UK: Wiley.

Grant, T.M., Graham, J.C., Carlini, B.H., Ernst, C.C., & Novick Brown, N. (2018). Use of marijuana and other substances among pregnant and parenting women with substance use disorders: Changes in Washington State after marijuana legalization. *Journal of Studies on Alcohol and Drugs, 79,* 79-87.

Brown, J.M., Haun, J., Zapf, P.A., & Novick Brown, N. (2017). Fetal alcohol spectrum disorder (FASD) and competency to stand trial (CST): Suggestions for a 'best practices' approach to forensic evaluation. *International Journal of Law and Psychiatry, 52,* 19-27.

Brown, J., Haun, J., Novick Brown, N., & Zapf, P.A. (2016). The deleterious effects of fetal alcohol spectrum disorder on competency to stand trial. *The Journal of Special Populations, 1,* 1-7.

Greenspan, S., Novick Brown, N., & Edwards, W. (2016). FASD and the concept of "intellectual disability equivalence." In M. Nelson & M. Trussler (Eds.), *Law and ethics in fetal alcohol spectrum disorder.* Amsterdam: Springer.

Grant, T.M., Novick Brown, N., & Dubovsky, D. (2015). Screening for Fetal Alcohol Spectrum Disorders: A critical step toward improving treatment success. In: G. Becker, K. Hennicke, & M. Klein (Eds), *Addicted adults with fetal alcohol spectrum disorders: Diagnosis, screening, and intervention.* Berlin, Germany: De Gruyter Publisher.

Novick Brown, N., Burd, L., Grant, T. M., Edwards, W., Adler, R., & Streissguth, A. (2015). Prenatal alcohol exposure: An assessment strategy for the legal context. *International Journal of Law and Mental Health.*

Novick Brown, N., & Connor, P.D. (2014). Executive dysfunction and learning in children with fetal alcohol spectrum disorders (FASD). *Cognitive Sciences, 8,* 47-105.

Novick Brown, N., & Connor, P.D. (2014). Impact of executive functioning on learning in fetal alcohol spectrum disorders (FASD). In: Bennett, K.P. (Ed.), *Executive functioning: Role in early learning processes, impairments in neurological disorders and impact of cognitive behavior therapy (CBT).* Hauppauge, NY: Nova.

Grant, T., Graham, J.C., Ernst, C.C., Peavy, K.M., & Novick Brown, N. (2014). Improving pregnancy outcomes among high-risk mothers who abuse alcohol and drugs: Factors associated with subsequent exposed births. *Children and Youth Services Review, 46,* 11-18.

Novick Brown, N., Clarren, S., & Grant, T. (Winter 2014). Fetal alcohol spectrum disorders: What judges and other legal professionals need to know. *Judges' Page, Court Appointed Special Advocates.*

Rich, S.D., & Novick Brown, N. (2014). A case for a diagnostic code for neurodevelopmental disorder associated with prenatal alcohol exposure: A child/adolescent psychiatrist and forensic psychologist speak out. *Psychiatric News, http://psychnews.psychiatryonline.org/newsarticle.aspx?articleid=1792237.*

Novick Brown, N., & Rich, S.D. (Winter 2013). A neurodevelopmental paradigm for fetal alcohol spectrum disorder. *Judges' Page, Court Appointed Special Advocates.*

Grant, T.M., Novick Brown, N., Graham, J.C., & Ernst, C.E. (2013). Substance abuse treatment outcomes in women with fetal alcohol spectrum disorder. *International Journal of Alcohol and Drug Research,* http://ijadr.org/index.php/ijadr/article/view/112/213.

Brown, N.N., Wartnik, A., & Rich, S.D. (2013). Diagnosing FASD in the era of DSM-5: Good news for the forensic context. *Fetal Alcohol Forum, 10,* 34-37.

Grant, T.M., Novick Brown, N., Dubovsky, D., Sparrow, J., & Ries, R. (i2013). The impact of prenatal alcohol exposure on addiction treatment. *Journal of Addiction Medicine, 7,* 87-95.

Grant, T.M., Novick Brown, N., Graham, J.C., Whitney, N., Dubovsky, D., & Nelson, L.A. (2013). Screening in treatment programs for Fetal Alcohol Spectrum Disorders that could affect therapeutic progress. *International Journal of Alcohol and Drug Research, 2,* 37-49.

Novick Brown, N., Adler, R.S., & Connor, P.D. (2012). Conduct-disordered adolescents with fetal alcohol spectrum disorder: Intervention in secure treatment settings. *Criminal Justice and Behavior, 39,* 789-812.

Novick Brown, N., O'Malley, K., & Streissguth, A.P. (2012). FASD: Diagnostic dilemmas and challenges for a modern transgenerational management approach. In S. Adubato & D. Cohen (Eds.), *Prenatal Alcohol Use and Fetal Alcohol Spectrum Disorders: Diagnosis, Assessment, and New Directions in Research and Multimodal Treatment.* Bentham Online Publishing.

Novick Brown, N., Gudjonsson, G., & Connor, P. (2011). Suggestibility and Fetal Alcohol Spectrum Disorders (FASD): I'll tell you anything you want to hear. *Journal of Psychiatry and Law, 39,* 39-71.

Novick Brown, N. (Spring 2011). Evidence-based interventions in children with Fetal Alcohol Spectrum Disorders. *Paradigm, 16,* 12-17.

Novick Brown, N., Wartnik, A.P., Connor, P.D., & Adler, R.S. (2010). A proposed model standard for forensic assessment of FASD. *Journal of Psychiatry and Law, 38,* 383-418.

Novick Brown, N. (June 2008). FASD Experts: Multidisciplinary forensic assessment for a multidimensional condition. *Iceberg, 18.*

Novick Brown, N. (2007). ADHD and FASD: Comorbidity and its effect on sexual behavior problems. In K O'Malley (Ed.), *ADHD and FASD: Diagnosis, natural history, and therapeutic issues across the lifespan.* Hauppauge, NY: Nova Pub.

Novick (Brown), N. (1998). FAS: Preventing and treating sexual deviancy. In A.P. Streissguth & J. Kanter (Eds.), *The challenge of fetal alcohol syndrome: Overcoming secondary disabilities.* Seattle: University of Washington Press.

Novick (Brown), N.J. (1996). *Sexual victimization and inappropriate sexual behavior in children: Recommendations for evaluation and treatment.* Proceedings of 1996 International Conference on Fetal Alcohol Syndrome, Seattle, Washington.

Novick (Brown), N.J., & Streissguth, A.P. (1995). Identifying clients with possible fetal alcohol syndrome: Fetal alcohol effects in the treatment setting. *Treatment Today, 7(3),* 14-15.

Novick (Brown), NJ, & Streissguth, AP (1995). Some thoughts on the treatment of adults and adolescents impaired by fetal alcohol exposure. *Treatment Today, 7(4),* 20-21.

Novick (Brown), N.J., Cauce, A.M., & Grove, K. (1994). Competence self-concept. In B.A. Bracken (Ed.), *Handbook of self-concept.* New York: Wiley.

Novick (Brown), N.J., & Brown, J.D. (1992). *The influence of self-esteem on response to mood.* Paper presented, 100th Annual Convention of the American Psychological Association, Washington, D.C., August, 1992.

Brown, J.D., Novick (Brown), N.J., Lord, K.A., & Richards, J.M. (1992). When Gulliver travels: Social context, psychological relatedness, and self-appraisals. *Journal of Personality and Social Psychology, 62,* 717-727.

Norris, J, Novick (Brown), N.J., & Kerr, K.L. (1992). *Alcohol and violent pornography: Impact of social influence on sexual arousal.* Poster presented at the Research Society on Alcoholism Meeting, San Diego, California, June, 1992.

Brown, J.D., & Novick (Brown), N. (1991). *Social context, psychological relatedness, and self-appraisals.* Paper presented at the 99th Annual Convention of the American Psychological Association, San Francisco.

## INVITED PRESENTATIONS, WORKSHOPS, TRAININGS

0920/18      FASD: Screening and Assessment. LOPD. Albuquerque, NM.

05/11/17      FASD in the Capital Context. Capital Habeas Seminar, Chattanooga, TN.

06/03/16      Fetal Alcohol Spectrum Disorders in the Parenting Context. 53rd Annual Conference, Association of Family and Conciliatory Courts. Seattle, WA.

05/18/16      FASD and Sexual Offending in Indian Country. Webinar, Health and Human Services.

04/29/16      Confabulation, Malingering, Memory, and Suggestibility: Clinical and Forensic Considerations. American Institute for the Advancement of Forensic Studies, St. Paul, MN.

09/11/15      FASD: Identification, Assessment, and Treatment. Co-presented with Therese Grant and Paul Connor. Western State Hospital, Tacoma, WA.

08/20/15      FASD and Sexually Inappropriate Behavior. FASD Train-the-Trainer Workshop for Casey Family Programs, Indian Child Welfare, University of Washington, Seattle, WA.

07/13/15      (1) One Size Does Not Fit All: Forensic Assessment of Sex Offenders with FASD. XXXIV International Conference on Law and Mental Health, Vienna, Austria (2) FASD in the Courtroom: FASDExperts Approaches Its Eighth Year

(3) Panel: The Central Role of Neuropsychology in Forensic FASD Assessment (4) Panel: Forensic Assessment of FASD: The Impact of Suggestibility. XXXIV International Conference on Law and Mental Health, International Academy of Law and Mental Health, Vienna, Austria.

06/25/15    (1) Plenary: Identifying Fetal Alcohol Syndrome (2) Panel: Fetal Alcohol Syndrome: Experts and Presentation at Evidentiary Hearing. Capital Habeas Unit (CHU) National Conference, Denver, CO.

05/29/15    FASD: What You Should Know. Court Improvement Training Academy (CITA), University of Washington Law School, Suquamish Nation, Poulsbo, WA.

10/23/14    Insights from Poverty to Death Row: ND-PAE Diagnosis and DSM-5. American Academy of Child and Adolescent Psychiatry Annual Meeting, San Diego, CA.

05/23/14    Plenary: Forensic Assessment of FASD: Update on Diagnosis and Latest Research. FASD and the Law Conference, Woodbury, MN

05/14/14    FASD: Diagnosis and Intervention. Washington State Developmental Disabilities Administration, Seattle, WA

04/29/14    Sex Is *Not* a Four-Letter Word: FASD and Sexuality. Living With FASD: 2014 Summit Conference (international webinar)

02/05/14    FASD: Dawn of a New Era in Diagnosis. Minnesota Organization on FAS (MOFAS), MN (webinar)

11/26/13    Fetal Alcohol Spectrum Disorder. Washington State Developmental Disabilities Administration, Kent, WA

10/16/13    Neurodevelopmental Disorders in the DSM-5. Skype workshop for Pathways Counseling Center, St. Paul, MN

09/27/13    FASD: Back (and to) the Future: 1973 – 2013. 40th Anniversary Professional Summit, New Jersey Task Force on FASD, Atlantic City, NJ

09/25/13    FASD: Practical Supports for the Legal Context. 2013 FASD Summit, The Arc of Arkansas, Little Rock, AR

08/28/13    Developmentally Delayed Offenders in the Criminal Justice System. Frontier Regional FASD Training Center, Missoula, MT

08/22/13    Developmentally Delayed Offenders in the Criminal Justice System. Frontier Regional FASD Training Center, Fargo, ND

| | |
|---|---|
| 08/04/13 | FASD: Moving Beyond Prevention to Practical Supports. The Arc: 2013 National Convention. Bellevue, WA |
| 07/26/13 | Developmentally Delayed Offenders in the Criminal Justice System. Frontier Regional FASD Training Center, Boise, ID |
| 07/15/13 | FASD and Criminal Justice: Cognitive and Social Deficits Associated With FASD. 33rd International Congress on Law and Mental Health, Amsterdam, Netherlands. |
| 06/25/13 | Developmentally Delayed Offenders in the Criminal Justice System. Frontier Regional FASD Training Center. Cheyenne, WY |
| 06/25/13 | Developmentally Delayed Offenders in the Criminal Justice System. Frontier Regional FASD Training Center, Cheyenne, WY |
| 05/03/13 | Understanding and Treating Developmentally Delayed Sex Offenders. American Institute for the Advancement of Forensic Studies; St. Paul, MN |
| 04/06/13 | Seeking the Standard of Care in Custody Assessments in WA State. AFCC-WA Spring Conference; Seattle, WA |
| 09/06/12 | Understanding the Link Between FASD and Sexual Offending. Indian Health Service; Seattle, WA |
| 07/20/12 | Forensic Assessment of Developmental Disabilities. American Institute for the Advancement of Forensic Studies; St. Paul, MN |
| 07/13/12 | FASD and Competency. WI Association of Criminal Defense Lawyers; Stevens Point, WI |
| 04/19/12 | Changing Public Policy in the Juvenile Courts: What Works? Fifth National Biennial Conference on Adolescents and Adults with FASD: It's a Matter of Justice, Vancouver, BC, Canada |
| 03/29/12 | Fetal Alcohol Spectrum Disorders. Death Penalty Institute, Lexington, KY |
| 02/03/12 | Alcohol Related Birth Disorders and the Law. Mid-year ABA Conference, Interagency Coordinating Committee on FASD in Collaboration with U.S. Dept. of Justice and Minnesota Organization on FAS, New Orleans, LA |
| 02/02/12 | FASD and Neurobehavioral Issues in the Criminal Justice System. Capital Defense Project of SE Louisiana, New Orleans, LA |

| | |
|---|---|
| 11/18/11 | Assessing and Understanding Fetal Alcohol Spectrum Disorders in Capital Clients. Virginia Bar Assoc., 19th Annual Capital Defense Workshop, Richmond, VA |
| 10/07/11 | FASD and the Criminal Justice System. Seattle City Attorney's Office and University of Washington, Seattle, WA |
| 09/21/11 | FASD: Preventing and Treating Sexual Deviancy. Indian Health Service FASD Training, Seattle, WA |
| 07/09/11 | FASD and Competency. Capital Mitigation – Beyond Atkins, Center for American and International Law; Houston, TX |
| 06/23/11 | FASD in the Courtroom. Ninth Annual Statewide Conference, Arizona Public Defenders Association; Tempe, AZ |
| 05/20/11 | FASD and Intellectual Disability/Mental Retardation. Metropolitan Public Defender, Oregon Capital Resource Center, Oregon Criminal Defense Lawyers Association; Portland, OR |
| 03/11/11 | Forensic Aspects of Fetal Alcohol Spectrum Disorders. Sponsored by Pathways Counseling Center, MOFAS, Minnesota DOC, MN Community Corrections Association, & American Institute for the Advancement of Forensic Studies; St. Paul, MN |
| 10/27/10 | FASD: Its Relevance Throughout the Legal Process from Competency to Stand Trial to Clemency. 2010 Appellate Judicial Attorneys Institute, Burlingame, CA |
| 10/02/10 | Forensic Assessment of FASD in the Habeas Context. Federal Defenders Annual Death Penalty Conference, Boise, ID |
| 07/16/10 | Team Approach to Litigating FASD (plenary). Center for American and International Law, Plano, TX |
| 07/10/10 | Fetal Alcohol Spectrum Disorder in the Courtroom: The 20th Anniversary of Dr. Ann Streissguth (plenary + break-out). NAACP LDF, Airlie, VA |
| 04/22/10 | Forensic Assessment of FASD with State-of-the-Art Facial Analysis, Diffusion Tensor Imaging and MRIs. 7th National Seminar on the Development and Integration of Mitigation Evidence (plenary). American Bar Association, Seattle, WA |
| 04/17/10 | Suggestibility in FASD: Forensic Assessment and Implications. 4th International Conference on Fetal Alcohol Spectrum Disorder, Vancouver, BC, Canada |

| 03/31/10 | Fetal Alcohol Spectrum Disorder and Justice. Alcohol Healthwatch, Parnell, New Zealand. (Abbreviated presentations also provided on 4-1-10 to New Zealand Ministry of Health and Ministry of Justice.) |
|---|---|

03/31/10    Fetal Alcohol Spectrum Disorder and Justice. Alcohol Healthwatch, Parnell, New Zealand. (Abbreviated presentations also provided on 4-1-10 to New Zealand Ministry of Health and Ministry of Justice.)

02/25/10    Fetal Alcohol Spectrum Disorder (FASD). Texas Criminal Defense Lawyers Association, Austin, TX

02/12/10    FASD and Justice: A Multidisciplinary Assessment Model for Adults and Adolescents. CACJ/CPDA Capital Defense Seminar, Monterey, CA.

02/06/10    Fetal Alcohol Syndrome: Practical Tools. 3rd Interdisciplinary Program: UW School of Law & Washington Death Penalty Assistance Center, Seattle, WA.

03/11/09    FASD in the Legal System: A Multidisciplinary Assessment Model for Adults and Adolescents. 3rd International Conference on Fetal Alcohol Spectrum Disorder, Victoria, BC.

11/18/08    Screening for FASD in Family Practice. Family Practitioners, University of Washington/Swedish Hospital, Family Practice Medical Residents In-service.

10/25/08    Cross-Examination of Adverse Expert Witnesses in SVP Commitment Trials. Sex Offender Commitment Defense Association (SOCDA), Atlanta, GA

05/30/08    Fetal Alcohol Syndrome and Fetal Alcohol Effect: Identifying Clients and Understanding Consequences. Fifth National Seminar on the Development and Integration of Mitigation Evidence, Habeas Assistance & Training Counsel Project, Baltimore, MD

11/03/07    Direct and Cross Examination of Experts in SVP Cases. Sex Offender Commitment Defense Association (SOCDA), San Diego, CA

08/18/07    Fetal Alcohol Syndrome / Fetal Alcohol Effects. 12th Annual Federal Habeas Corpus Seminar, Nashville, TN

05/23/07    Fetal Alcohol Spectrum Disorders: History, Diagnosis, and Mitigation Issues. Capital Federal Public Defender Unit (capital habeas and trial attorneys, Federal District of Nevada)

04/14/07    What Attorneys and Policy Makers Need to Know About FAS and FASD. American Bar Association/Harvard Law School National Conference on Children and the Law, Cambridge, MA

02/18/07    Fetal Alcohol Spectrum Disorders (FASD). California Attorneys for Criminal Justice/California Public Defender Association (CACJ/CPDA) Annual Death Penalty Conference, Monterey, CA

| 06/30/06 | Sexually Violent Predator Evaluation, Risk Assessment, and Testimony, Florida Public Defenders Sexually Violent Predator Conference, Orlando, FL |
| 04/19/06 | Screening Protocol for Fetal Alcohol Spectrum Disorders (FASD). King County Mental Health / Drug Courts, Seattle, WA |
| 02/26/05 | FASD: Problems of Witness Suggestibility and False Confessions. International FASD Conference, Victoria, British Columbia, Canada |

## PROFESSIONAL ORGANIZATIONS

| 1990 – present | American Psychological Association (APA) |
| 2008 – present | American Society-Law Society (APA) |
| 2015 – present | International Association of Law and Mental Health (IALMH) |
| 2005 – present | Association for the Treatment of Sex Abusers (ATSA) |
| 2004 – present | Association of Family & Conciliatory Courts (AFCC – National) (WA-AFCC - Washington State; Board of Directors, Treasurer; Chair: Quality Assurance and Ethics Committee) |
| 2000 – present | American College of Forensic Examiners, Diplomate |
| 2011 – present | Midwest Alliance on Shaken Baby Syndrome (Board of Directors) |
| 2001 – 2003 | Jacksonville Youth Authority Advisory Board |
| 1996 – 2000 | Chairman, Social Issues Committee, Washington State Psychological Association |
| 1994 – 2000 | Washington State Psychological Association, Board of Directors |



# MUSC
## INSTITUTE OF PSYCHIATRY

**Geriatric Services**
67 President Street
PO Box 250861
Charleston • SC 29405

Ph (843) 792-5567
FAX (843) 792-7374

July 31, 2003

John Blume, Attorney-at-Law
1247 Sumter St., Ste. 303
Columbia, SC 29201

RE:     Chad Fulks
         ██████████

Dear Mr. Blume:

This letter is written at your request to summarize my medical findings in regard to your client, Mr. Chad Fulks. As you are aware, I had the opportunity to examine Mr. Fulks in my office at MUSC on 6/17/03. No additional medical records were available for my review at the time of that examination. The medical history was taken primarily from your client.

There are a number of findings in regard to Mr. Fulks' medical history that are relevant in this case. First, it is my understanding that his mother drank heavily during the time that she was pregnant with him. It is not known whether she had any problems during that pregnancy or whether there were any difficulties with the birth of your client. There is no information available at this time on developmental milestones. However, the patient does recall that he did have speech difficulties at an early age and required some speech therapy. In fact, he may well have failed the first grade and had persistently poor grades through elementary and high school.

Your client also reports a number of head injuries during his childhood and adolescence. For instance, at age 14–15 he reports being struck in the head with a flashlight when he was living in a group home, resulting in brief loss of consciousness on several occasions. He also has a history of significant alcohol intake beginning at age ten including the use of moonshine. Also, while in school he frequently was involved in inhaling either paint thinner or gasoline fumes. At the age of 18–19, he was in a motor vehicle accident resulting in a blow to the left frontal area. He may well have had loss of consciousness of uncertain duration. He was not hospitalized and left the scene of the accident. He also maintains at age 18–19 he was knocked out in an altercation with a policeman. At that time he says he was seen in the emergency room at Huntington Hospital in Huntington, WV.

On mental status testing, Mr. Fulks performed in the borderline range of intelligence to perhaps mild mental retardation. On a Mini Mental State Exam today, he scored 23/30, putting him in the Impaired Range. He had limited information on some common proverbs, but on other proverbs performed reasonably well. He was able to do some simple analogies but other analogies again had no idea how to relate them to each other. Particularly striking was the patient's difficulty in controlled motor performance tasks. He had difficulty maintaining set. He also had difficulty inhibiting motor responses on these tasks as well.

There were a number of subtle findings on neurologic examination. The patient had a constricted affect as well as an odd appearance to his face, with his mouth at a somewhat odd angle. There was some crowding of his incisors,

*"An equal opportunity employer, promoting workplace diversity."*

http://www.musc.edu
C:\WINDOWS\TEMP\ltr Blume-J 07-28-03 CF.wpd\l

in the lower ones more so than the upper ones. There was also some asymmetry of his nasolabial fold. All movements had a somewhat slow and effortful appearance. He had diminished deep tendon reflexes except for his ankle jerks bilaterally. No tremor, ataxia, or other abnormal movements were noted. His gait was slow and careful but otherwise unremarkable. He also related that he had pain in a number of areas, which he related to an altercation with police. In particular, he complained of some pain related to his neck, right upper trapezius, angle of jaw on the left side, and lower back and right buttocks. There is also some possible swelling of the left wrist.

All things taken together, Mr. Fulks is of borderline intelligence, if not with actual mild mental retardation. There are a number of possible etiologies for this including possible fetal alcohol syndrome, early life lead exposure from moonshine, inhaled solvent exposure, chronic alcohol use, and recurrent head injuries as described above. Particularly striking were the frontal motor findings described above, particularly difficulty with motor sequencing and inhibition. Finally, the patient demonstrates evidence of chronic pain behavior.

Thank you very much for the opportunity to examine your client. Should you have any further questions regarding his case, please do not hesitate to contact me.

Sincerely,

David L. Bachman, M.D.
Professor of Psychiatry and Neurology

DLB:atb

App. 00189

## Declaration of Seymour Halleck
### Pursuant to 28 U.S.C. §1746

I, Seymour Halleck, being of full age, do hereby declare the following:

1. I am a forensic psychiatrist. I am an emeritus Professor of Psychiatry at the University of North Carolina School of Medicine, Chapel Hill. I was a Professor at that institution from 1972 to 1999. My current practice focuses on forensic psychiatry in both civil and criminal cases.

2. I was retained by John Blume to evaluate Chadrick Fulks prior to Mr. Fulks' 2004 trial. Although I completed the evaluation, Mr. Blume did not call me to testify at trial. I submitted a declaration in 2008 in connection with post-conviction proceedings in Mr. Fulks' case, summarizing my evaluation of Mr. Fulks and my knowledge of his case. A more complete description of my experience and qualifications is contained in that declaration. My curriculum vitae was also attached to the 2008 declaration.

3. I have been asked by Mr. Fulks' attorneys to consider a declaration written by Dr. Harry Krop, Ph.D. and offer my expert opinion on the extent to which Dr. Krop's analysis would further inform my forensic evaluation of Mr. Fulks.

4. Based on Dr. Krop's declaration, I believe that Mr. Fulks' childhood was even more traumatic than I found it to be when I evaluated him in 2004. The information on Mr. Fulks' background that I received prior to trial included head trauma, extreme physical and emotional abuse, extensive alcohol and drug abuse, extreme poverty and shocking parental neglect. Although I had some information that Mr. Fulks had been sexually abused when I evaluated him, Dr. Krop's declaration describes a greater level of sexual abuse than I was aware of in 2004 when I evaluated him or in 2008 when I prepared my declaration . The fact that Dr.

App. 00190

Krop also conducted a forensic analysis and concluded that the reports of sexual abuse perpetrated on Mr. Fulks appeared valid is an important consideration.

5.    As I noted in my declaration, sexual abuse can be extraordinarily emotionally damaging to an individual, and victims of childhood sexual abuse are more likely to involve themselves in aberrant sexual activity in the future - including violent sexuality such as rape. The damage to a child's psyche, caused by sexual abuse, increases with the number of times that victim has been abused.

6.    With this in mind, had I seen the more extensive history of abuse such as that contained in Dr. Krop's declaration, I would have opined that Mr. Fulks was likely to be suffering from even more emotional difficulties than I detailed in my 2008 declaration. I have been conducting forensic evaluations for over 30 years. When one considers the number of times Mr. Fulks was sexually abused by different people, including having been abused by family members - sister, stepfather; people who should have made him feel safe - school teacher, married neighbor; and all manner of random people who violated him as a child, Mr. Fulks' history of childhood sexual abuse is among the most extensive I have seen.

7.    Additionally, incidents of childhood sex abuse will frequently stop a victim's emotional development at the time the abuse began. Had I been called to testify in 2004 and known then what I have now learned from Dr. Krop's declaration, I would have opined more convincingly that Mr. Fulks' emotional development was arrested at a very young age and this stunted emotional development significantly hampered his ability to cope with the other stressors that existed in his environment.

8.    I would also have been able to make a stronger argument that the sexual abuse would have interacted with Mr. Fulks' other difficulties, such as his brain damage, history of

App. 00191

childhood neglect, the emotional and physical abuse he suffered and his extensive problems with drugs and alcohol.

9.     As I stated in my 2008 declaration, childhood sexual abuse can help us understand violent sexual behavior as well as violence and anger against women. With Dr. Krop's declaration in mind, the childhood sexual abuse experienced by Mr. Fulks becomes a much stronger explanation for his sexually violent behavior towards women than the information on which I had previously based my evaluation and opinions. Had I had this additional information in 2004 and had Mr. Blume called me to testify at trial, I believe that this more exhaustive history of sexual abuse, coupled with the other impairments I detailed in my declaration, would have constituted significant mitigating factors for the jury to consider.

10.     I offer all of the above opinions based on my expertise and to a reasonable degree of psychiatric certainty.

11.     I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

_____
Seymour Halleck, M.D.

Dated:              , 2010

## Declaration of Margaret Melikian, D.O.
### Pursuant to 28 U.S.C. §1746

I, Margaret Melikian, being of full age, do hereby declare the following:

1.      I am a forensic psychiatrist. I am on the faculty at the Medical University of South Carolina in Charleston. I received a bachelor of science in electrical engineering from the University of Tulsa in 1986. I graduated from the Oklahoma State University College of Osteopathic Medicine in 1997. I have completed a four year residency in psychiatry at the Medical University of South Carolina in Charleston and an additional one year fellowship in forensic psychiatry at the University of South Carolina in Columbia.

2.      I was retained by John Blume's defense team prior to Chad Fulks' 2004 trial, when I evaluated him. Although I was never called as a witness, I was called as a witness in his section 2255 hearing in 2010. I also submitted a declaration and a curriculum vitae prior to giving my 2010 testimony.

3.      I have been asked by Mr. Fulks' attorneys to consider a declaration written by Dr. Harry Krop Ph.D. and offer an opinion on the extent to which the information contained in Dr. Krop's declaration would further inform my testimony and my own declaration regarding my forensic evaluation of Mr. Fulks.

4.      Based on Dr. Krop's declaration, I believe that Mr. Fulks' upbringing was more chaotic and damaging than I understood it to be when I testified in February 2010. Although I was aware that Mr. Fulks had suffered a measure of sexual abuse as a child and had been raised in an environment that contained significant amounts of inappropriate sexual activity, the breadth of sexual abuse that Dr. Krop described was beyond what I was aware of in terms of the number of different incidents involving different perpetrators.

App. 00193

5.     In my testimony, I indicated that child sexual abuse can be extraordinarily damaging to individuals. It can lead to personality problems, low self-esteem, an inability to trust others and an inability to interact with the world. In Mr. Fulks' case, I now understand that sexual abuse touched every part of his life - at home, in school, around his neighborhood. It informed much of his world.

6.     With this in mind, had I been provided with Dr. Krop's declaration prior to my testimony at the 2255 hearing and could have independently corroborated it, I would have stated that the sexual abuse that Mr. Fulks experienced was even more extensive than I believed it to be when I testified. Mr. Fulks' history of extensive sexual abuse could interact with the other difficulties I testified to, such as physical and emotional abuse, a lifetime of heavy drug and alcohol use and Fetal Alcohol Spectrum Disorder.

7.     I am familiar with the facts of this case and that they involve sexual assault and violence against women. In addition to the findings that I have outlined above, the information contained in Dr. Krop's declaration may have allowed me to explain Mr. Fulks' abusive behavior towards women and his inability to form normal relationships with women, despite his desire to do so.

8.     All of the factors outlined above would have served as important additional mitigating circumstances for the jury to consider had I been called as a witness at trial.

9.     I base all of the above opinions on my expertise in forensic psychiatry and express them to a reasonable degree of medical certainty.

10. I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

Margaret Melkian, D.O.

Dated: SEPT. 17 , 2010
MARATHON , Florida

## Declaration of James H. Hilkey
## Pursuant to 28 U.S.C. §1746

I, James H. Hilkey, being of full age, do hereby declare the following:

1.      I am a clinical forensic psychologist with a practice based in Durham, North Carolina.   Prior to my retirement from Federal service, I was Chief of Psychological Services at the Federal Correctional Institution at Butner, North Carolina, where I conducted forensic psychological evaluations for Federal Courts.   I have received a Masters degree in Counseling Psychology from Arizona State University and a Ph.D. in Counseling Psychology from Indiana State University.    A curriculum vitae is attached to this declaration as exhibit A.

2.      I began an evaluation of Chadrick Fulks in August 2003 after two North Carolina attorneys retained me with regard to murder and kidnapping charges that were pending against Mr. Fulks at that time in the North Carolina state court system.   When those charges were later transferred to the federal system, I was retained by John Blume to continue my evaluation of Mr. Fulks.

3.      As part of my evaluation of Mr. Fulks in 2003 and 2004, I conducted interviews and administered a variety of psychological tests.   I was not called to testify at Mr. Fulks' sentencing hearing in 2004, though I was prepared to testify at that time.   However, I did put the results of my evaluation into a declaration for Mr. Fulks' postconviction counsel in June 2008, and I testified about the results of my evaluation at postconviction hearing in February 2010.

4.      I have been asked by Mr. Fulks' attorneys to consider a declaration written by Dr. Harry Krop and to offer an opinion on whether the information in Dr. Krop's declaration would have affected my assessment of Mr. Fulks, which was the subject of my February 2010 testimony. Indeed it would have.

App. 00196

5.  I reviewed Dr. Krop's declaration this week. Although Mr. Fulks reported a few relatively minor incidents of sexual abuse during my evaluation, and I had heard some second- and third-hand references to possible abuse, the information I received prior to reading Dr. Krop's declaration gave no hint of the overwhelming extent of the sexual abuse committed upon Mr. Fulks at a young and vulnerable stage of his life. Therefore, I was not able to consider Mr. Fulks' full history of sexual abuse when I gave my testimony in February 2010. It would have been important for me to have all available information about Mr. Fulks' history of abuse so that I could have related that history to my clinical findings clearly evident from clinical interviews and results obtained on psychological testing.

6.  I testified that I administered a personality test called the Millon Clinical Multiaxial Inventory, Third Edition (MCMI-III), to Mr. Fulks and that he scored high on the clinical scale for dependency. I also testified that Mr. Fulks is developmentally very young and has a childlike affect. These are all signs of a dependent personality, which is consistent with Mr. Fulks' significant history of sexual abuse. His dependant personality would have been formed by traumatic breaks in early bonding and attachment, in this case as a result of victimization as a child. The extensive sexual abuse that Mr. Fulks suffered as a child also is consistent with the poor judgment and impulsivity that Mr. Fulks exhibits as an adult.

7.  I also testified that Mr. Fulks has symptoms of Posttraumatic Stress Disorder. This too is consistent with his history as a victim of sexual abuse.

8.  In fact, all of the results of my testing were consistent with findings one would expect from a person who had suffered extreme trauma at a young age. Thus, while I am terribly troubled to learn these heretofore accounts of the sexual abuse experienced by Mr. Fulks, I am not surprised to find out that he was subjected to genuinely traumatic events as a child.

App. 00197

9.      I give all of these opinions based upon my training and expertise and to a reasonable degree of psychological certainty.

10      I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 174

James H. Hilkey, Ph.D.

Dated:   September 16, 2010
Durham, North Carolina

App. 00198

<h1 style="text-align:center">Declaration of Harry Krop, Ph.D.<br>Pursuant to 28 U.S.C. Sec. 1746</h1>

**I, Harry Krop, being of full age, do hereby depose and declare as follows:**

1. I previously submitted a pro bono Declaration to this Court, prepared for the purpose of explaining to the Court the necessity in a capital case for having an expert in the specific area of sexual abuse consult with counsel and evaluate the Defendant in a case where it is suspected that the Defendant may have been the victim of sexual abuse. A copy of my earlier declaration is attached hereto, along with a copy of my curriculum vita.

2. It is my understanding that my earlier Declaration was submitted to assist the Court in understanding why Chadrick Fulks might not have disclosed to his trial counsel the nature and extent of the sexual abuse he suffered as a child and that Mr. Fulks' disclosure pattern was consistent with other victims of sexual abuse, particularly in cases wherein that abuse occurred on multiple occasions and/or was perpetrated by someone of the same sex and/or involved a close family member.

3. It is also my understanding that my earlier Declaration was submitted by counsel in an effort to convince the Court of the benefit to this litigation of hiring a mental health professional with qualifications such as mine to interview Mr. Fulks, review relevant documents and gather information from family members and/or other individuals familiar with Mr. Fulks as a child. In this way, counsel hoped to demonstrate to this Court that with certain suspected victims of sexual misconduct, it is necessary that a trained professional with an expertise in sexual abuse evaluate that individual, conduct a forensic analysis to determine the validity of the accounts of alleged sexual misconduct and, if determined to be valid, to explain the ramifications of such abuse on the development of the victim's personality and future behavior patterns.

4. In my earlier Declaration, I explained that my qualifications included not only interviewing suspected victims of child sexual abuse but also evaluating for the Florida court system perpetrators of child sexual abuse. I have also provided opinions regarding sexual abuse issues in Federal cases and Court Martial cases.

5. My only involvement in this case prior to being contacted by counsel on August 30, 2010 was the preparation of a prior Declaration on February 2, 2010. Counsel has now, however, provided for my review a number of documents, including trial

transcripts, Declarations from witnesses, Declarations from various mental health professionals, prepared in conjunction with these post-conviction proceedings, and the Fourth Circuit's opinion on direct appeal in this case.

6.      In addition, I have now evaluated Mr. Fulks, having conducted an in-depth interview on September 13, 2010 for approximately three and a half hours at USP-Terre Haute.

7.      I provide below a summary of facts upon which I have based the opinions with which I conclude this declaration.  Because of time constraints, the summary is not exhaustive of the facts I learned from the records and my interview with Mr. Fulks.  All of the opinions I express herein are made to a reasonable degree of psychological certainty.

8.      Although I provide more detailed conclusions following my discussion below of Mr. Fulks' sexual history, at the outset, let me summarize by saying that, in my thirty years of working with victims and perpetrators of sexual abuse (many of whom were themselves first victims), I do not recall ever having seen anyone who was sexually victimized as often and by so many different adults as Mr. Fulks was.  Having conducted a forensic analysis, I believe the reports of abuse to be valid and credible. Given the types of abuse Mr. Fulks suffered – including assaults by people in positions of authority, family members, adult men, perpetrators who threatened him if he "told," – and the response of disbelief or punishment he got from adults who should have protected him, I do not find it surprising that Mr. Fulks was reluctant to disclose this sexual abuse. However, the extent and the nature of the sexual assaults and misconduct that adults perpetrated on Mr. Fulks would, I believe, have appalled jurors, even without further explanation from experts.  I also believe that, had the psychological ramifications of this abuse been explained to a jury, the jury would have had a framework within which to understand Mr. Fulks' adult behavior towards women, including his sexually assaultive behavior, and his inability to form normal relationships.  Moreover, an expert could have explained that these behaviors were the natural, albeit horrific, consequence of the sexual assaults committed against Mr. Fulks as a child.

9.  Through my review of the records, declarations and my interview with Mr. Fulks, I have learned the following:

## Legal Status

Chadrick Evan Fulks is a 32-year-old, white male under sentence of death.  He

pled guilty to the 2004 kidnapping and carjacking, resulting in death, of a middle-aged white woman named Alice Donovan in Myrtle Beach, South Carolina.  Mr. Fulks committed these crimes with a co-defendant, Brandon Basham.  Mr. Fulks has acknowledged that both he and Basham raped Ms. Donovan.

The Donovan incident occurred following Mr. Fulks' escape from prison with Basham and was part of the pair's seventeen-day flight across several states, during which Fulks and Basham carjacked and kidnapped another woman, 19-year-old Samantha Burns, in West Virginia, and committed multiple other crimes.  Ms. Burns' body has never been found.  During this seventeen day period, Mr. Fulks and Basham drank a substantial amount of alcohol and used drugs, including marijuana and methamphetamines.

Mr. Fulks consistently denies having killed either woman and denies knowing that either had been killed until Basham told him after the fact that he (Basham) had killed them both.

Mr. Fulks pled guilty to the charges of kidnapping and carjacking resulting in the death of Alice Donovan, and was sentenced to death after a penalty-phase proceeding in South Carolina.  Mr. Fulks also pled guilty in West Virginia to the kidnapping and carjacking resulting in the death of Samantha Burns.  In exchange for his plea in the Burns case, he received a sentence of life imprisonment without the possibility of parole.

## Childhood History

Chadrick Fulks is the son of Diane and Roger Fulks and the second youngest of their five children.  His older siblings, from oldest to youngest, are Sherri, Dewayne, and Ronnie.  Shannon Fulks is Chadrick's's younger brother.  Dewayne Fulks committed suicide in 2009; he hanged himself in jail several days after being arrested for a domestic incident.

During Chadrick Fulks' childhood, Diane and Roger Fulks were both alcoholics who daily drank to excess and, while drunk, regularly became violent.  While drunk, they frequently fought physically with each other and beat their children.  Diane drank while she was pregnant with Chadrick and Ronnie, and perhaps the other children.  The downstairs room of their house had a pool table in it and Roger had the walls of the room covered with all manner of sexually explicit pictures from magazines. Roger is reported to have had a large collection of pornographic videos, which he watched regularly with his children in the room.

This room was also the site of almost daily "parties" at which Diane, Roger and other adults would get drunk and use illegal drugs. The police were dispatched to the house on such a regular basis that the police radio would simply direct patrol cars to the "yellow house on the corner." While drunk, Diane on occasion would appear in front of the children with few or no clothes on and would pass out naked in the home. One declarant, a childhood friend of Dewayne Fulks, reports that a drunken Diane made sexual advances to him when he was a teenager.

Lack of food and chaos were constants in the Fulks' household. The house and the family have both been described by friends and neighbors as "gross" and dirty. Other than Chadrick, who became obsessively clean in his teenage years, none of the Fulks bathed regularly. Acquaintances report that the children always wore dirty, shabby, ill-fitting clothes. Diane and Roger frequently were in the front yard, screaming and yelling. Both parents frequently called Chadrick Fulks a son of a bitch and other similarly unsuitable names. Diane Rogers is reported to have thrown things at the children like flower pots and coffee pots and frequently to have hit them with these thrown objects.

Chadrick Fulks' parents were very poor and would spend the little money they had on alcohol, not food. As a result, Chadrick and his siblings spent much of their time scrounging for food from neighbors and friends. This has been confirmed by numerous people. Ronnie Fulks reports that older friends of their brother, Dewayne, taught Chadrick how to break into cars, and that Roger was pleased that Chadrick had that skill that was lucrative for the family. It has also been reported by a family friend that Diane and Roger Fulks would send Chadrick out to rob gas stations and restaurants to obtain food, drinks, and cigarettes. They would not let Chadrick return home until he got the goods they had sent him for.

When Chadrick was about twelve years old, his mother (unexpectedly and suddenly in the eyes of the rest of the family) became very religious. She went "cold turkey" and stopped drinking alcohol altogether, seemingly overnight. She started attending church for a large portion of every day. Several witnesses confirm Chadrick's comments that his mother became even less available to the children once she stopped drinking because she was never at home, choosing to spend her time at church instead. Chadrick's parents divorced shortly thereafter and the children split between the parents. Chadrick Fulks stayed with his mother. While people have generally attributed the break-up of the parents' marriage to Diane Fulks' new sobriety and change of outlook, Chadrick recently explained that he believes he caused the divorce, noting that his parents separated shortly after he told his mother about an episode of his father's infidelity.

Chadrick's mother began dating Dean Thompson not long after she and Roger divorced and married Dean when Chadrick was about fourteen. Diane moved with Dean, Chadrick and several of their siblings into a two-bedroom apartment in Chesapeake, Ohio. (Please see additional information about this under "Sexual History.") Chadrick frequently stayed away from home, preferring to be on the streets to being in the apartment.

Chadrick and his brother, Dewayne, each attempted suicide when they were teenagers. Dewayne set himself on fire and Chadrick took an overdose of pills. A counselor at the hospital to which Chadrick was taken recommended that Chadrick get psychological counseling. Diane took Chadrick to a single meeting with a counselor but never followed up after that. Chadrick was sent to live with his father for a period of time and saw a school counselor there but, again, there was no follow-up.

Chadrick was very close to his two older brothers, Dewayne and Ronnie, and spent a lot of time with them as a child. The three of them adopted a phrase, "True Soldiers For Life," to describe their loyalty to each other. (To this day, Chadrick's signature on letters is always followed by the initials, T.S.F.L.) Chadrick's childhood peers, older friends, and adults who knew Chadrick as a child describe him as being very quiet, and they often talk about their perceived need to protect him because he was often in the company of boys who were bigger and older than he was. This probably had something to do with the fact that Chadrick often spent time with his older brothers and their friends.

As noted in the sexual history below, Chadrick was introduced to sexual activity at a very young age and suffered sexual abuse at the hands of numerous adults. Several declarants, both family friends and neighbors with no particular attachment to the Fulks family, report seeing a marked change in Chadrick that they believe corresponds with sexual episodes from his childhood.

## Adult History

In general, Mr. Fulks' adulthood has been as chaotic as his childhood was. He has held jobs only briefly, he has been in trouble repeatedly with the law, he has supported himself largely through breaking into cars, and he has been involved repeatedly with drugs.

When Mr. Fulks was 18 years old he began a two-year marriage to Amber Fowler. During trial, Ms. Fowler testified that Mr. Fulks had physically abused her throughout their marriage. In 1995, one month before she married Mr. Fulks, Amber gave birth to a

son named Devon.  Devon died when he was five months old.  Mr. Fulks reports having been devastated by Devon's death and turning to drugs for relief from his emotional distress over the death.

Mr. Fulks had a series of relationships with women after his marriage to Ms. Fowler ended.  During this penalty-phase trial, several of these women testified for the prosecution that Mr. Fulks had physically and sexually abused them repeatedly throughout their relationships.

It is my understanding that Mr. Fulks has had several periods of incarceration for crimes involving drugs and various forms of theft.  In 2002, he was in prison in Indiana for relatively minor charges when he was told that he was about to be indicted for physically abusing Miles, the 9-year-old son of Veronica Evans, to whom he had been married for a few months.  Shortly after hearing about these new charges, which could have resulted in a substantial prison term, Mr. Fulks escaped from prison with Basham.  The criminal episodes that culminated in the death of Samantha Burns and Alison Donovan followed this escape.

Dewayne Fulks committed suicide in July 2009.  Dewayne had always told Chadrick Fulks that he could never stand to be in jail again and would rather take his own life than be there.  Mr. Fulks tried to warn family members of this when he learned Dewayne had been arrested but was unable to reach them.  Dewayne hanged himself in his cell days after he was incarcerated.  Mr. Fulks became deeply depressed after learning of Dewayne's death.

## Sexual History

1.      Mr. Fulks provided a detailed sexual history wherein he described numerous scenarios of sexual abuse and/or inappropriate sexual conduct.  He had no formal sex education but prematurely learned about sex when he was about eight from an older teenage girl (Shelly Adkins).  Over the next year, this girl taught Mr. Fulks to engage in oral sex and other sexual acts on numerous occasions until she began dating boys her own age.  Mr. Fulks recalls being devastated when she "broke it off" and rejected him for boys her own age.

2.      Subsequent to this experience, Mr. Fulks describes other instances of sexual abuse involving a female teacher and an adult female neighbor, all during his prepubescent years.  As an adolescent, he represents that he was molested by an adult male who both fondled him and forced him to engage in sexual intercourse with a girl whom he considered to be a close friend.  In addition, he relates being manipulated into

engaging in sexual activity with his sister by an older female neighbor who also joined in the activity. Although he believes he was too drunk to fully appreciate the deviancy of this activity at the time, he maintains that he still feels "dirty" and guilt-ridden regarding his participation in the activity. Mr. Fulks contends that he was sexually abused by a close friend's father and reports that his stepfather repeatedly sexually abused him, unbeknownst to his mother, so that he felt compelled to move out of his mother's home.

3.     Mr. Fulks describes some of his earlier sexual experiences with attractive older females as enjoyable at the time, but in retrospect he recognizes that he was not sufficiently mature at the time to fully understand the inappropriateness of those encounters. He now recognizes how those encounters shaped and influenced his personality and future behavior patterns. Mr. Fulks appreciates the impact his sexual encounters (i.e., abuse) have had on his life. In this regard, he recognizes that his early sexual experiences led to his "sexual addiction" and his dysfunctional relationships as he felt a need to choose a "partner" who had a sexual appetite as strong as his own. Mr. Fulks described, in detail, an adult pattern of over-sexualized behavior involving frequenting strip clubs and excessive masturbation.

4.     Although I cannot verify that the sexual history provided by Mr. Fulks is entirely accurate, there is no evidence from the psychological/psychiatric evaluations I conducted that Mr. Fulks was malingering. In addition, Mr. Fulks demonstrated appropriate affect (including crying at times) while describing his sexual history, and his accounts contained both peripheral and contextual details consistent with a valid depiction of sexual abuse. I have also reviewed a number of Declarations from friends and neighbors of the Fulks family which corroborate or are otherwise consistent with many of the instances of sexual abuse Mr. Fulks himself has reported. A forensic analysis (i.e. a review of the totality of Mr. Fulks' reported history and collateral materials) strongly suggests that Mr. Fulks' allegations of sexual misconduct are credible.

5.     Although sexual abuse victims react differently to their experiences, research has shown that victims who are most traumatized or adversely affected by their abuse are those who experienced same sex activity (particularly males), those who were abused by familial perpetrators, and those who were not believed when they attempted to disclose the abuse. Based on the history provided by Mr. Fulks, he experienced all of these scenarios and was made to feel that he was to blame for the activity. Not only did Mr. Fulks not have a male role model who might be in a position to mitigate the potential detrimental sequence of his victimization, to the contrary, his father and stepfather contributed to his distorted perception of sexuality.

6.     As noted in my earlier (February, 2010) Declaration, many sexual abuse

victims, especially males, are hesitant to disclose their abusive activity and either never disclose, partially disclose or gradually disclose. During my evaluation, rapport was readily established, as Counsel had assured Mr. Fulks of my expertise. Accordingly, he was able to explain the shame, humiliation, guilt and embarrassment he experienced related to the abuse. He also described being manipulated by a perpetrator into believing he would not be believed if he reported the sexual activity or that he would be blamed for it. Mr. Fulks was in fact disbelieved and essentially punished by his mother and stepfather when he reported having been molested by his friend's father. In this regard, his mother and stepfather refused to report the incident to the police and sent Mr. Fulks away from the family home for the summer to live with his grandparents. Mr. Fulks also explained how difficult it has been for him to talk about his experiences unless he is comfortable with an individual. He described the fact that people from his original defense team would ask him questions about sexual abuse over the phone, and that he was questioned by people he was meeting for the first time with whom he was ill at ease. He noted also that some interviewers seemed intent on eliciting instances of having been abused by his father or mother, and seemed uninterested in anything "less" than that. This made him highly wary of their intentions. Consequently, he was reticent to disclose what he considered to be extremely shameful experiences that he still believes (as do many child victims of abuse) he was responsible for causing.

7. In my extensive experience in working with sex abuse victims and sexual offenders (many of whom were victims themselves), I have come across very few, if any, who were victimized as frequently and by as many people as Mr. Fulks was. I am of the opinion to a reasonable degree of psychological certainty that, given the nature and extent of his reported abuse, that these early experiences shaped and adversely impacted Mr. Fulks' personality and maladaptive behavior pattern.

8. Even if one assumes a child might be able to cope with a single instance of sexual abuse, the extensiveness of Mr. Fulks' victimization likely left him feeling that he had no control over his own body and that no one respected the physical boundaries of his body. His model of adult male behavior included a father who exposed him to sexual images, beat him during drunken rages and encouraged him to engage in thievery, beginning at a young age; a man who forced him to have intercourse with a young female friend so he could watch them; the father of a friend who attempted to force Mr. Fulks into performing oral sex on him and a stepfather who videotaped and fondled him when he thought Mr. Fulks was asleep. His model of adult female behavior included a mother who, when drunk, threw objects at her children and tried to seduce a friend of her teenage son; a teenage girl who taught him (as a child) to perform sexual acts; a school teacher who repeatedly molested him; a married female neighbor who not only had intercourse with him when he was barely pubescent but who orchestrated a sexual encounter between

a drunk, teenage Mr. Fulks and his own older sister, who appears to have participated voluntarily in these activities.

9.     The emotional development of any child subjected to this kind of modeling and abuse is bound to be arrested and the child's ability to engage in normal relationships terribly damaged.  The emotional development of a child subjected to this kind of abuse who additionally finds no adult support from any source, lives in poverty, and is exposed to constant chaos as was true of Mr. Fulks, has virtually no chance of progressing or recovering.

10.     It is my opinion, which I hold to a reasonable degree of psychological certainty, that the information related to Mr. Fulks' victimization was critical to an understanding of the full range of Mr. Fulks' mental and emotional states throughout his life and during the period of time he was on the run, when these crimes were committed.  Neither a full psychiatric evaluation nor an accurate social history could be complete without access to the information that Mr. Fulks' sexual history provides.

11.     It is my understanding that trial counsel had concerns that Mr. Fulks had suffered sexual abuse as a child given the various "red flags." Given the amount of easily accessed forensic literature that discusses the patterns of disclosure among victims of child sexual abuse, and the fact that experts in sexual abuse are generally well-known around the criminal justice system, it is extremely surprising to me that capital trial counsel did not seek the help or advice of a mental health expert in child sexual abuse during the investigative or trial stages of Mr. Fulks' case.

12.     It is also likely that testimony by an expert in sexual abuse in this particular case could have countered several important arguments I understand the prosecution to have made during Mr. Fulks' trial, particularly witnesses who testified that Mr. Fulks manifested sexual violence towards women.  I also understand that the prosecution ridiculed the suggestion by defense witnesses that Mr. Fulks very much wanted a family of his own, after having suffered emotional deprivation as a child. The prosecution responded, as I understand it, by suggesting that Mr. Fulks' siblings had grown up with similar deprivations but had not grown up to sexually abuse women or to commit crimes of violence.  By fairly direct implication, this would have suggested to the jury that it was Mr. Fulks' own inborn miscreant tendencies that propelled him into his life a sexual violence against women, rather than a behavior pattern Mr. Fulks developed as the result of the extensive sexual assaults perpetrated upon him (and not his siblings) during childhood periods of great emotional and psychological vulnerability.

13.     Evidence of the extent and nature of the sexual abuse Mr. Fulks had suffered

as a child would likely have been mitigating in and of itself.  Additional testimony explaining how such abuse interferes with a child's normal development could likely be considered powerful mitigating evidence.  It would have explained why Mr. Fulks was unable to form normal relationships with women and how his childhood was different from that of his brothers.  Thus, it would have explained why he was more psychologically prone to committing crimes of violence, particularly against women. Expert testimony about the way sexual abuse leaves a child feeling helpless and prevents a child from developing a sense that he can exert any control over people, except through the use of deceit or brute force, would also likely have helped the jury understand Mr. Fulks' criminal behavior as an outgrowth of the terrible wrongs people committed against him when he was a child.

I offer all of the opinions I have expressed in this Declaration, on the strength of my expertise as a psychologist who has spent over three decades working with victims of sex abuse and with sexual offenders. I offer all of the aforementioned opinions to a reasonable degree of psychological certainty.

I declare under penalty of perjury that the foregoing declaration is true and accurate to the best of my knowledge, information and belief.

September 16, 2010
Gainesville, Florida

Harry Krop Ph.D.
Harry Krop, Ph.D.
Licensed Psychologist
FL License No.: PY0002364

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
Florence Division

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| | ) |
| v. | ) CRIMINAL NO. 4:02-992 |
| | ) |
| | ) |
| CHADRICK E. FULKS | ) |
| | ) |

## DECLARATION OF JAMES H. HILKEY

1.      My name is James H. Hilkey. My curriculum vitae is attached as Exhibit A. I am a licensed practicing psychologist in Durham, North Carolina. From 1980 to 1996, I was the Chief of Psychology Services with the Federal Bureau of Prisons in Butner, North Carolina. I was responsible for the clinical and administrative supervision of twenty psychologists servicing the forensic/psychiatric in-patient unit, substance and sex offender programs, and general psychological services for the Federal Correctional Institution. Prior to becoming the Chief of Psychology Services, I served as a supervisory clinical psychologist at FCI Butner from 1976 to 1980. In this position, I was responsible for clinical and administrative services to an acute psychiatric in-patient population of mentally ill federal offenders. I often conducted pre-trial forensic evaluations for the federal courts and the Witness Protection Program. From 1973 to 1976, I was a staff psychologist for the substance abuse program at USP Terre Haute.

2.      In 1968, I received my B.A. degree in Psychology from Westmont College in Santa Barbara, California. In 1970, I received my M.C. degree in Counseling Psychology from Arizona State University. In 1975, I received my Ph.D. in Counseling Psychology from Indiana State University.

PA Document #4

1

3.　　I have served on the Federal Bureau of Prisons Task Force for Correctional Medical Center Design, the Federal Bureau of Prisons Standing Committee for Psychological Testing, and the Federal Bureau of Prisons Task Force for Critical Incident Debriefing. I have presented papers to the International Congress of Mental Health, the National Sheriffs' Association, the American Correctional Association, and the Southeastern Psychological Association.

4.　　My research and clinical work has focused on assessing and evaluating federal prisoners in a psychiatric in-patient setting.

5.　　I was asked by John Blume to perform a psychological evaluation on Chad Fulks to assess his psychological functioning as it pertains to the mitigating factors as defined in 18 U.S.C.A. § 3592.

6.　　I initially examined Mr. Fulks on August 12, 2003 at the Alvin S. Glenn Detention Center in Columbia, South Carolina. Mr. Fulks was further examined on August 13, 2003 at the Alvin S. Glenn Detention Center. Mr. Fulks was also examined on January 5, 2004 at the Columbia Care Center in Columbia, South Carolina, and on February 18, 2004 at the Federal Medical Center in Butner, North Carolina. Approximately fourteen hours were spent in direct examination of Mr. Fulks which included the administration of the following battery of psychological tests and assessment procedures:

　　　a.　　Wechsler Adult Intelligence Scale, Third Edition;

　　　b.　　Wide-Range Achievement Test, Third Edition;

　　　c.　　Bender Gestalt Visual Motor Test;

　　　d.　　Rey Fifteen Item Test;

　　　e.　　Personality Assessment Inventory;

　　　f.　　Millon Clinical Multiaxial Inventory, Third Edition;

2

    g.     Minnesota Multiphasic Personality Inventory, Second Edition;

    h.     Rorschach Projective Technique, Structurally Scored; and

    i.     Mental status examination and clinical interviews.

I also reviewed medical, school, mental health, and criminal records pertaining to Chad Fulks.

7.     On the four occasions I examined Mr. Fulks, he presented as a dependent and primitive young man. His insight and judgment appeared generally poor. His behavior was consistent with an individual with significant personality and neurological problems. During our meetings, Mr. Fulks was fully oriented and was cooperative. During several of our longer sessions, Mr. Fulks became distracted but was able to return to task with minimal encouragement. Mr. Fulks presented as an isolated and dependent young man who appeared socially younger than his chronological age.

8.     Mr. Fulks admitted to a pronounced lack of stability during his early years, stating that his parents were heavy abusers of alcohol and that both parents were "mean" when drinking. Poor parental guidance including abusive punishment and sexually inappropriate behavior was cited. Mr. Fulks' parents had a very violent relationship which only worsened over the years. His mother was often seen with black eyes, cut lips, bruises, and other marks of violence. The children in the Fulks home were often without supervision and basic necessities such as food. The parents' desire for alcohol took precedence over providing a proper home environment.

9.     As a child, Mr. Fulks indicated that he felt depressed and estranged from other children because of his speech impediment and tattered clothing. Mr. Fulks failed the first grade and continued to struggle academically until he dropped out of school in the tenth grade. Mr. Fulks exhibited learning disabilities and was placed in special education programs for learning disabled and behaviorally disturbed children.

App. 00211

10. Mr. Fulks acknowledged a significant history of substance abuse beginning with inhaling petrochemicals and drinking moonshine liquor around the age of ten. Throughout his life, Mr. Fulks has used various drugs including LSD, prescription pain killers, marijuana, powder cocaine, crack cocaine, and methamphetamine.

11. As a teenager, Mr. Fulks attempted to commit suicide by a drug overdose and hanging.

12. Mr. Fulks has a history of head trauma and once suffered a gunshot wound to his shoulder.

13. The malingering assessment revealed no evidence of exaggeration of symptoms. This result increases the confidence placed in results of cognitive and personality testing.

14. Mr. Fulks was administered the Wechsler Adult Intelligence Scale, Third Edition, and the Wide-Range Achievement Test, Third Edition. These instruments were administered on August 12 and 13, 2003. Mr. Fulks obtained a full-scale IQ score of 78, placing him in the borderline range of intelligence. This is a global assessment of his problem-solving skills; a score in the range places him in the seventh percentile of his peers. There is a 95% chance that his true IQ falls between 74 and 83. Academic achievement is measured on the Wide-Range Achievement Test, Third Edition. It indicated that Mr. Fulks is able to read at an eighth grade level and spell at a fifth grade level, and complete arithmetic problems at a sixth grade level.

15. Mr. Fulks was initially administered three separate personality tests, the Millon Clinical Multiaxial Inventory, Third Edition, the Personality Assessment Inventory ("PAI"), and the Rorschach. The validity of Mr. Fulks' responses to the items on the PAI fell in the normal range suggesting that he did not over-report or under-report psychopatholgy. His PAI profile was marked by significant elevations across several scales, including a broad range of clinical features and increasing the possibility of multiple diagnoses. His profile type is associated with

4

App. 00212

marked distress and severe impairment in functioning. Areas of clinical significance include drug-related problems, somatic concerns including rumination about physical problems, high levels of anxiety suggesting that he is easily overwhelmed, and difficulties consistent with a significant depressive experience. Mr. Fulks' responses to the PAI suggest marked suspiciousness and mistrust in his relationship with others. His image of himself is poorly established and fragile. Even minor slights from others result in real doubts about his worth.

16.    The MCMI-III suggested that Mr. Fulks has marked deficiencies in the abilities to effectively manage his feelings, thinking, and behavior. He is likely to show signs of depression and dependent personality features. The modal diagnoses from the MCMI-III include dependent personality disorder with schizotypical personality features and depressive personality traits.

17.    Mr. Fulks did not present with indicators of Antisocial Personality Disorder on objective personality testing.

18.    The Rorschach test results confirm and extend the results from the MCMI-III and the PAI. Mr. Fulks gave nineteen responses to ten ambiguous ink blots. Results are valid with clinically significant results on two constellations, depression and coping deficit index. Mr. Fulks, based on the results from this projective test, is prone to episodes of affective disturbance that include depression that interferes with effective interpersonal functioning. He also has markedly difficult times mustering adequate psychological recourses to cope with the demands placed upon him. The Rorschach results also suggest that Mr. Fulks has marked impairment in his reality testing capacity, whereby he tends to misperceive events and to form mistaken impressions of people and the significance of their actions. Poor judgment is consistent with these findings.

App. 00213

19. Based on the findings of my evaluation, the following Axis I diagnoses were tendered: poly-substance dependence, dysthymic disorder, and cognitive disorder not otherwise specified.

20. In sum, Mr. Fulks presents with multiple significant psychological problems. He is a young man who has a number of biological problems. Both parents have had significant substance abuse problems, which in itself drastically increases the likelihood that he will be more prone to have problems with substance abuse. Specialists in neuropsychology and neurology have identified cognitive problems most likely stemming from Mr. Fulks' mother's consumption of alcohol during pregnancy. Mr. Fulks has a history of head trauma with loss of consciousness. Environmentally, Mr. Fulks was raised in a highly chaotic home characterized by poverty and a history of drug abuse, inconsistent supervision and neglect, and physical abuse. He also reports being sexually abused. Psychologically, Mr. Fulks has never developed adequate coping mechanisms. This failure severely limited his ability to meet the demands of daily life. He has also been chronically depressed, lacks self esteem, and is easily influenced by those around him. Consistent with his neurological impairment and his socialization, Mr. Fulks' behavior has been marked by impulsivity and his thinking influenced by extremely poor judgment.

21. It is my opinion that the combination of Mr. Fulks' neurological impairment and his significant psychological problems result in a lack of capacity to fully appreciate the nature of his behavior and to anticipate the consequences of his actions. He is a young man with significant deficits and is highly malleable.

22. I have reviewed the testimony of Donna Ward given at Mr. Fulks' sentencing hearing wherein Ms. Ward described a November 17, 2004 phone call allegedly made by Mr. Fulks while Brandon Basham was hiding from the police in the Ohio River. I am further aware that the prosecution used this call to argue that Mr. Fulks, without the aid of Basham, attempted

6

App. 00214

to lure Ms. Ward's daughter out for a faux job interview. Donna Ward's testimony would not have altered the opinions I was prepared to give at the sentencing hearing. In fact, the Ward incident supports my assessment Mr. Fulks has poor judgment, lacks the capacity to appreciate the consequences of his actions, and is cognitively impaired.

23. In accordance with 28 U.S.C.A. § 1746, I declare that under penalty of perjury that the foregoing is true and accurate.

James H. Hilkey, Ph.D.

Signed before me this 2nd day
of June, 2008.

Notary Public for Wake County, NC
My Commission Expires: March 4th, 2012

JEREMY L. PIERCE
NOTARY
My Comm. Exp.
March 4, 2012
PUBLIC
WAKE COUNTY, N. C.

7

Curriculum Vita

# James H. Hilkey, Ph.D.

**Business Address:**

Duke Forest Place Suite B120
3326 Chapel Hill Boulevard
Durham, North Carolina 27707
Telephone: (919) 493-1110
Fax: (919) 932-1734
Email: jhilkey01@aol.com

**Home Address:**

802 Cedar Falls Road
Chapel Hill, North Carolina 27514
Telephone: (919) 929-3933

**Date/Place of Birth**

Modesto, California
March 21, 1946

**Marital Status:**

Married, Cynthia Wilhelm, Ph.D., Five children

**Education:**

1975    Ph.D.     *Counseling Psychology,* (APA Approved),
Indiana State University, Terre Haute, Indiana

1970    M.C.     *Counseling Psychology*
Arizona State University, Tempe, Arizona

1968    B.A.     *Psychology*
Westmont College, Santa Barbara, California

**Current Employment:**

1996 – Present     *Licensed Practicing Psychologist*
Durham, North Carolina

Practice provides criminal and civil forensic evaluations to state and Federal Courts. Admitted as an expert witness in multiple Federal Judicial Districts and in Superior Courts in North Carolina. Consultation also provided to trial attorneys. Practice includes individual and group psychotherapy to adolescents and adult patients and psychological assessment.



App. 00216

Curriculum Vita
James H. Hilkey, Ph.D.
Page Two

**Past Employment:**

1980-1996
*Chief, Psychology Services*
Federal Bureau of Prisons
Federal Correctional Institution
Butner, North Carolina

Responsible for clinical and administrative supervision for twenty psychologists servicing the forensic/psychiatric inpatient unit, substance and sex offender programs, and general psychological services for the Federal Correctional Institution. Responsible for APA Approved Predoctoral Training Program in Forensic Psychology, a member of the Warden's Executive Staff, and administered the Employee's Assistance Program.

1976-1980
*Supervisory Clinical Psychologist*
Mental Health Division
Federal Correctional Institution
Butner, North Carolina

Responsible for clinical and administrative services to an acute psychiatric inpatient population of mentally ill federal offenders. Conducted forensic evaluations for the Federal Courts. Conducted psychological evaluations for Witness Protection Program

1971-1976
*Staff Psychologist*
United States Penitentiary
Terre Haute, Indiana

Responsible for planning, organizing and implementation of treatment services of federal prisoners with history of severe addictive disorders.

1970-1971
*Graduate Fellow*
Department of Counseling Psychology
Indiana State University, Terre Haute, Indiana

Taught group dynamic course, assisted in supervising professor's teaching load and research projects

1969-1970
*Resident Counselor*
LaMancha Resident Complex
Tempe, Arizona

Resident counselor and coordinator of psychological services for commercial student resident complex

App. 00217

Curriculum Vita
James H. Hilkey, Ph.D.
Page Three

| | |
|---|---|
| 1968-1969 | *Child and Adolescent Therapist*<br>Arizona State Hospital<br>Phoenix, Arizona |

Provided clinical services to severely emotionally disturbed children in a resident/inpatient state hospital

## Teaching-Academic Positions

1976-1996

*Clinical Adjunct Professor*
Department of Psychiatry
School of Medicine
University of North Carolina
Chapel Hill, North Carolina

Served as clinical supervisor and member of the training committee for predoctoral internships in clinical psychology

1979 – 1998

*Lecturer*

Division of Rehabilitation Psychology
School of Medicine, University of North Carolina
Chapel Hill, North Carolina

Taught selected courses to master-level students in Rehabilitation Psychology

1978 – 1989

*Lecturer*
Department of Clinical Psychology
Duke University, Durham, North Carolina

Served as on-site practicum supervisor for third and fourth Year doctoral students in clinical psychology. Member, Doctoral dissertation committees.

1979 – 1988

*Adjunct Assistant Professor*
Department of Counseling
Psychology, School of Education, University of North Carolina, Chapel Hill.

Taught advanced psychological assessment for doctoral students in Counseling Psychology. Served on doctoral dissertation committees and practicum supervisor.

1974 – 1975

*Assistant Adjunct Professor*
Department of Criminology
Indiana State University, Terre Haute, Indiana

App. 00218

Curriculum vita
James H. Hilkey, Ph.D.
Page Four

|  | Taught graduate level students in personality theory, theories of counseling, psychological aspects of confinement, mental health management in the prison environment |
|---|---|
| 1973 – 1974 | *Instructor* Department of Psychology Saint Mary's of the Woods College Terre Haute, Indiana |
|  | Taught abnormal psychology to undergraduate women |

**Consultant:**

| 1999 – 2004 | North Carolina Department of Corrections Provide consultation to staff – psychological debriefing Following critical/traumatic incidents |
|---|---|
| 2000 – 2001 | Attorney General, State of Florida Osterback et al. v. Michael Moore (Department of Corrections) Evaluated conditions of confinement in State of Florida's maximum security prison units.  Class action suit successfully mediated. |
| 2001-2002 | Consultant (volunteer) Agape Children Home, Kissumo, Kenya, Staff consultation and program development for orphaned street children. |
| 1988 | Temporary assignment to Immigration and Naturalization Service, Federal Bureau of Investigation, and Federal Bureau of Prisons, Oakdale, Louisiana.  Interfaced with federal agencies to secure safe release of staff hostages after Cuban detainee takeover.  Provided post release care for released hostages and their families. |
| 1980 – 2002 | Behavior Analysts and Consults, Inc Stuart, Florida. Conduct pre-employment clinical interviews for high-security employees |
| 1994 – 1998 | North Carolina Psychology Board Review ethical complaints referred by the Psychology Board. |
| 1980 – 1996 | United State Department of Justice, Federal Prison System Technical assistance to mental health delivery systems at Federal Medical Centers at Springfield, Missouri; Rochester, Minnesota; and Ft Worth, Texas, Federal Transportation Center, Oklahoma City, Oklahoma. |

Curriculum Vita
James H. Hilkey, Ph.D.
Page Five

| | |
|---|---|
| 1982 | National Institute of Corrections, Department of Corrections, State of Oklahoma, Joseph Harp Correctional Center.  Staff assistance visit for mental ill inmates |
| 1974 - 1975 | Central State Hospital, Indianapolis, Indiana Provided in-service training for staff at this facility. |
| 1975 | Indiana State Department of Corrections, Indiana State Penitentiary, Michigan City, Indiana. In-service training in therapeutic community treatment for substance abusers. |
| 1971 | Chicago YMCA, Chicago, Illinois Provided staff development training for administrative staff. |
| 1971 | Bureau of Indian Affairs, Haskell Indian School Lawrence, Kansas. Provided staff  training in crisis intervention for students. |
| 1969-1971 | Interlocken Music Camp Interlocken, Michigan Provided staff training/team building workshops for faculty. |
| 1969-1972 | Peace Corps Phoenix, Arizona Provided psychological screenings for prospective volunteers for oversea assignments. |

**Supervised Internships:**

| | |
|---|---|
| 1971-1972 | United States Penitentiary Terre Haute Indiana |
| 1971 | Summer Presidential Internship United States Department of Justice Terre Haute, Indiana |
| 1973-1974 | Student Health and Counseling Center Indiana State University Terre Haute, Indiana |
| 1966-1968 | Santa Barbara Mental Health Center Santa Barbara, California |

App. 00220

Curriculum Vita
James H. Hilkey, Ph.D.
Page Six

**Dissertation Topic:**

Effects of videotape pretraining and guided performance on selected process and outcome variables of group counseling.

**Licenses and Certifications:**

Licensed Practicing Psychologist
Health Service Provider
North Carolina License Number: 602

Child Forensic Examiner (NC Child Medical Evaluation Program), University of North Carolina at Chapel Hill

National Register of Health Care Providers in Psychology
Register Number: 99333

**Professional Affliations:**

Member, American Psychological Association
North Carolina Psychological Association

**Committees:**

1990
Federal Bureau of Prisons
Task Force for Correctional Medical Center Design
Washington, D.C.

1980-1990
Federal Bureau of Prisons
Standing Committee for Psychological Testing

1983 & 1985
Invited Panel Member, Substance Abuse Treatment
Federal Judges Sentencing Institute
Raleigh, North Carolina

1985
Federal Bureau of Prisons
Task Force for Critical Incident Debriefing
Morgantown, West Virginia

**Professional Paper Presentation:**

1986
Hilkey, J.H. A hierarchical model for assessment of the correctional milieu.
International Congress of Mental Health
Washington, D.C.

1986
Hilkey, J.H. Understanding the mental ill offender
Invited address, National Sheriff's Association Annual Meeting, Arlington, Virginia

Curriculum Vita
James H. Hilkey, Ph.D.
Page Seven

| | |
|---|---|
| 1987 | Hilkey, J.H.  Suicide Prevention in the Federal Bureau of Prisons<br>Winter Conference, American Correctional Association<br>Denver, Colorado |
| 1978 | Hilkey, J.H. and J. Edinger.  The mulimodal paradigm in the<br>correctional –psychiatric environment.<br>Southeastern Psychological Association Meeting<br>Atlanta, Georgia |
| 1978 | Effects of videotape pretraining and guided performance on<br>Selected process and outcome variables on group counseling<br>Southeastern Psychological Association Meeting<br>Atlanta, Georgia |
| 1978 | Edinger, J., J. Hilkey, S. Scher, R. Morris, and J. Hoover.<br>Innovations in correctional treatment: The Butner experience<br>Southern Psychological Association Meeting<br>New Orleans, Louisiana |

## Publications:

Hilkey, J.H., C. Wilhelm, and A. Horne.  Comparative effects of videotape pretraining Versus no pretraining on selected process and outcome variable in group therapy. *Psychological Reports,* Vol. 50, No. 3, Part 2, 1982

Hilkey, J. H. and C. L. Wilhelm.  Forensic evaluations of the notorious defendant *North Carolina Journal of Mental Health*, Summer, 1992

Hilkey, J. H.  A theoretical model for assessment of delivery of mental health services in the correctional facility.  *Psychiatric Annals,* Vol. 18, No. 2

## References:

Available upon request

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
Florence Division

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>)<br>)<br>v.                                    )<br>)<br>)<br>CHADRICK E. FULKS                )<br>)  | CRIMINAL NO. 4:02-992 |

**DECLARATION OF MARGARET MELIKIAN**

1.      My name is Margaret Melikian.  My curriculum vitae is attached as Exhibit A.  I am an Assistant Professor of Psychiatry and Behavioral Sciences at the Medical University of South Carolina.  I have also served as the Program Director of Forensic Psychiatry at the Medical University of South Carolina.

2.      I received my Doctor of Osteopathic Medicine in 1997 from the Oklahoma State University College of Osteopathic Medicine.  I then did a residency in general psychiatry at the Medical University of South Carolina.  After my residency in general psychiatry, I completed a fellowship in forensic psychiatry at the University of South Carolina.

3.      My research and work has focused on forensic inpatient care, evaluation of competency of criminal defendants to stand trial, criminal responsibility evaluations, evaluation of sexually violent predators, and evaluation of criminal defendants scheduled to be executed.

4.      I was asked by John Blume to assess Chad Fulks for cognitive deficits and mental illness.  After I presented my findings to Mr. Blume, I was asked to testify at Chad Fulks' sentencing hearing.  I was present in the federal courthouse and was prepared to give my opinions on these matters to the jury.  I was not called by Mr. Blume at the sentencing hearing.

1

PA Document #3

App. 00223

5.    In preparation for my assessment, I interviewed and examined Chad Fulks on December 9, 2003 and December 11, 2003. I also reviewed various records, literature, and consulted with Mr. Fulks' trial counsel.

6.    It is my opinion that Chad Fulks meets the diagnostic criteria for Axis I diagnosis of Cognitive Disorder, Not Otherwise Specified (NOS). Cognitive Disorder, NOS is diagnosed when a patient has a syndrome of cognitive impairment that does not meet the criteria for delirium, dementia, or amnesic disorders. The impairment is often due to a specific medical condition and/or a pharmacological reaction. Mr. Fulks' cognitive problems include low IQ, difficulties concentrating or paying attention, visual and motor abnormalities, and limited reasoning and problem solving skills. These deficits showed up very early in his childhood and in his poor performance in school. Mr. Fulks was slow to walk and talk, required special education placement by the fourth grade, had a speech impediment, and tested for a very low IQ. Mr. Fulks' cognitive dysfunction is due to the direct effect of general medical conditions. Medical conditions affecting his cognitive ability are fetal alcohol spectrum disorder, chronic substance abuse, and multiple head injuries.

7.    It is my opinion that Mr. Fulks meets the diagnostic criteria for Axis I diagnosis of Major Depressive Disorder. Major Depressive Disorder is a condition characterized by a long-lasting depressed mood or marked loss of interest or pleasure in activities. These symptoms are sufficiently severe to interfere with the patient's daily functioning. Mr. Fulks attempted suicide on two occasions at the ages of 13 and 16. During my evaluation, Mr. Fulks presented with a sad mood, decreased appetite, poor sleep, poor concentration, and feelings of worthlessness and guilt. He has been on antidepressant medication and has had improvement in his symptoms.

2

8.     It is my opinion that Mr. Fulks meets the diagnostic criteria for Axis I diagnosis of Adjustment Disorder with Anxiety. Adjustment Disorder with Anxiety is a condition in which the patient continues to feel nervous, worried, or afraid after a stressful event or events. Mr. Fulks' required the medication Klonopin for his anxiety. Klonopin is a benzodiazepine, which, in my experience, is rarely given to inmates unless they present with the most serious indicators of anxiety. Mr. Fulks also reported a history of problems with anxiety prior to his incarceration. He reported being diagnosed with panic disorder between the ages of 13 and 14. Mr. Fulks reported increased anxiety, believing others are talking about him and having trouble functioning in groups. He described separation anxiety and would hide from the school bus to avoid leaving his mother. Based on my observation and assessment, Mr. Fulks displayed an excessive amount of anxiety given his situation.

9.     Mr. Fulks used illicit substances in amounts or duration that did not meet the criteria for specific Axis I diagnosis. Mr. Fulks began using LSD at age 16. He used this approximately 2 times a week by placing it in eye drops. He reported visual hallucinations while intoxicated and denied flashbacks. Mr. Fulks began abusing Lortab (a narcotic) at age 16. He used this narcotic approximately one time per week. Mr. Fulks also reported inhaling gas and paint fumes on numerous occasions at age 14.

10.     Mr. Fulks meets the diagnostic criteria for Axis I diagnosis of Amphetamine Dependence. Amphetamines are addictive stimulants and extensive use can result in both physical and psychological addiction. This means that, without the substance, a person will feel that he cannot function properly. Additionally, when abruptly stopping use, the person will also experience physical symptoms of withdrawal. Mr. Fulks has a long history of amphetamine abuse. At age 17 be began using crack cocaine and used it approximately two times per week.

3

He also used powder cocaine for 2 to 3 months on a daily basis. He also reported snorting Ritalin on occasion. He began smoking crystal methamphetamine at age 21 and smoked on a daily basis for 2 years. He has built up a tolerance to the affect of amphetamines, has had withdrawal symptoms, has used increasing amounts, and has given up other activities in order to use the substances.

11. It is my opinion that Mr. Fulks meets the diagnostic criteria for Axis I diagnosis of Cannabis Dependence and Alcohol Dependence. Mr. Fulks began using cannabis and alcohol at a young age and was eventually able to use large amounts with a lesser effect than most people. He began smoking marijuana at age 10 and would smoke approximately 10 joints per day. He would also lace his marijuana with embalming fluid. Mr. Fulks began drinking alcohol at age 10 and also consumed moonshine. He reported drinking on a daily basis starting at age 14. He has built up a tolerance to the affect of these substances, has had withdrawal symptoms, has used increasing amounts, and has given up other activities in order to use the substances.

12. Mr. Fulks meets the diagnostic criteria for Axis II diagnosis of Anti-Social Personality Disorder. Anti-Social Personality Disorder is a condition characterized by a persistent disregard for, and violation of, the rights of others that begins in childhood or early adolescence and continues into adulthood. Deceit and manipulation are central features of this disorder. Mr. Fulks exhibited disruptive behavior before the age of 15, such a lying, running away from home, fighting, and failing to conform to the social norms with respect to lawful behavior. As an adult, Mr. Fulks has continued these patterns formed in childhood. People who grow up in abusive or neglectful environments, such as Mr. Fulks, are at higher risk for this disorder. Mr. Fulks' substance abuse history contributes to his personality difficulties. While lack of remorse is significant factor in the diagnosis, it should be noted that Mr. Fulks does show

4

remorse and due to his upbringing he was taught and encouraged to steal by his family. His childhood environment had little structure; his mother and father were frequently intoxicated and fought often in front of the children. The parents were often too hung over to make sure the children had food, were clean, and were in school. Further, because of his diminished cognitive ability, Mr. Fulks has many childlike, gullible, and suggestible qualities to his personality.

13.    Mr. Fulks' below average intelligence and impulsivity make it unlikely that he would be a leader among his peers.

14.    Mr. Fulks had several instances of sexual abuse by adults at a young age. A teenage babysitter performed oral sex on him at age 8 or 9. Around age 13 he was molested by a friend's father. At age 15 he moved in with a 28 year-old woman. At approximately at age 10, he was disciplined at school for pulling down the pants of another child, which may have been acting out due to his own sexual abuse. Mr. Fulks was raised in an environment with inappropriate sexual activity in the home and graphic sexual imagery adorning the walls.

15.    Mr. Fulks gave a history of excessive substance use around the time of the incident. Mr. Fulks reported snorting Ritalin just prior to escaping from the Hopkins County Detention Center. Shortly after escaping, Mr. Fulks and Brandon Basham went to a trailer owned by a Basham family member. There they found clothes and consumed one liter of whiskey. They then spent several days in a hotel drinking and smoking marijuana. Mr. Fulks then traveled to the home of his brother where they began smoking crystal methamphetamine. He reported obtaining 8 eight balls (approximately 3.5 grams each) and using 6 while in the Michigan area. He began having visual hallucinations after smoking crystal methamphetamine. Fulks and Basham took 2 eights balls with them when they left for Huntington, West Virginia. While driving they consumed another liter of whiskey. After checking into a motel in

5

Huntington, West Virginia, Mr. Fulks and his cohorts smoked $800.00 worth of crystal methamphetamine and smoked marijuana. After leaving Huntington and while driving to Little River, South Carolina, they consumed alcohol, marijuana and 2 eight balls. After leaving South Carolina, Mr. Fulks continued to use marijuana and crystal methamphetamine while driving. Upon arriving back in Huntington, West Virginia, Mr. Fulks and Basham went to Beth McGuffin's house where they continued to use various drugs. In addition, Mr. Fulks reported significant use of crack cocaine throughout the period after his escape. This continuous use of substances impaired his ability to sleep and he reported that he "didn't sleep for days on end." He reported using so many stimulants that the muscles in his jaw were clamped shut. He also reported visual hallucinations associated with his drug use. His significant use of substances made him more impulsive and impaired his judgment.

16.    I have reviewed the testimony of Donna Ward given at Mr. Fulks' sentencing hearing wherein Ms. Ward described a November 17, 2004 phone call allegedly made by Mr. Fulks while Brandon Basham was hiding from the police in the Ohio River. I am further aware that the prosecution used this call to argue that Mr. Fulks, without the aid of Basham, attempted to lure Ms. Ward's daughter out for a faux job interview. Donna Ward's testimony would not have altered the opinions I was prepared to give at the sentencing hearing. In fact, the Ward incident supports my assessment Mr. Fulks has cognitive deficits, poor judgment, and is not likely to be a leader among his peers.

6

App. 00228

In accordance with 28 U.S.C.A. § 1746, I declare that under penalty of perjury that the foregoing is true and accurate.

_____
Margaret Melikian, D.O.

Signed before me this 27th day of
May , 2008

_____
Notary Public for South Carolina
My Commission Expires: 9-25-12

7

# CURRICULUM VITAE
## Margaret Melikian, D.O.

| | |
|---|---|
| **Office Address:** | Medical University of South Carolina<br>Institute of Psychiatry<br>Suite 115 Annex 1     Office: 843/ 792-1461<br>67 President Street     Fax: 843/ 792-2254<br>P.O. Box 250861<br>Charleston, South Carolina, 29425 |
| **Medical License:** | South Carolina Medical License 0526<br>DEA and DHEC |
| **Board Certifications:** | Diplomate, **Psychiatry,** American Board of Psychiatry and Neurology, October 2002<br>Board Certified, **Forensic Psychiatry,** American Board of Psychiatry and Neurology, April 2003 |
| **Academic Appointments:** | **Assistant Professor, Psychiatry and Behavioral Sciences**<br>Medical University of South Carolina, Charleston, South Carolina<br>July 1, 2007 to present<br><br>**Program Director, Forensic Psychiatry** August 1, 2002 to January 31, 2007 Medical University of South Carolina, Charleston, South Carolina<br><br>**Assistant Professor, Psychiatry and Behavioral Sciences**<br>Medical University of South Carolina, Charleston, South Carolina<br>August 1, 2002 to January 31, 2007<br><br>**Associate Instructor, Neuropsychiatry and Behavioral Sciences**<br>Hall Psychiatric Institute, Columbia, South Carolina<br>March 1, 2002 to June 30, 2002 |
| **Post Doctoral Education:** | **Fellowship in Forensic Psychiatry**<br>University of South Carolina, Columbia, South Carolina<br>Training including acute forensic inpatient care; evaluation of competency to stand trial and criminal responsibility; expert testimony in General Sessions, Common Pleas and Probate Courts, workman's compensation and disability evaluations; sexually violent predator evaluations; competency to be executed evaluations; and medical malpractice cases.<br>Certificate conferred June 2002. |



EXHIBIT
A

App. 00230

Margaret Melikian, D.O.
Curriculum Vitae
Page 2

**Education:**
**Post-Doctoral Residency in General Psychiatry**
Medical University of South Carolina, Charleston, South Carolina
Completed an accredited psychiatry residency training program with training in all aspects of neuropsychiatry, including neurology, psychopharmacology, psychotherapy, psychiatric emergencies, addictions, psychopathology, consult-liaison, geriatrics and community mental health. Additional training included an elective fellowship in behavioral neurology and memory disorders.
Certificate conferred June 2001

**Medical Education:**
**Oklahoma State University College of Osteopathic Medicine**
Tulsa, Oklahoma
Doctor of Osteopathic Medicine conferred May 1997
Grade Point Average: 3.72    Rank 11/88

**Undergraduate Education:**
**University of Tulsa**
Tulsa, Oklahoma
Bachelor of Science in Electrical Engineering conferred 1986

**Honors/Awards Residency:**
Golden Apple Award for Teaching 1997-1998
Circle of Excellence for Resident Teaching 1997-1998

**Honors/Awards Medical School:**
The Psychiatry and Behavioral Sciences Department Award for Outstanding Academic Achievement 1997
Sigma Sigma Phi (AOA equivalent)
Deans Award for Academic Excellence 1993-1994

**Publications:**
Principles of Suicide Risk Assessment. *Postgraduate Medicine.* 2002:112/3:65 Frierson RL, Melikian M, Wadman PG

Arnold-Chairi malformation and sleep-disordered breathing: *P*olysomnography of nine consecutive cases. *Sleep Research* 1997: 26:585 Rains JC, Melikian M, Breus MJ, Brown TM, Stephen PS, Ballilio E

**Research:**
Roskamp Laboratory for Biological Research in Psychiatry
University of South Florida, 1996
Tampa, Florida
Worked as research assistant in Alzheimer's lab performing PCR Cloning

Margaret Melikian, D.O.
Curriculum Vitae
Page 3

| | |
|---|---|
| **Research (Cont'd):** | <u>Sleep Disorders Associated with Neurologic Anomalies</u><br>University of Mississippi, 1995<br>Jackson, Mississippi<br>Compiled database from ten years of sleep study data |
| | <u>Hypoxia Recognition Training for Pilots</u><br>Oklahoma State University College of Osteopathic Medicine, 1994<br>Tulsa, Oklahoma<br>Acted as research subject and instructor for pilot education |
| **Forensic Experience:** | Completed over 150 court ordered Competency to Stand Trial and Criminal Responsibility evaluations of criminal defendants in South Carolina |
| | Qualified as an Expert in Forensic Psychiatry in Federal Court, South Carolina General Sessions Court, Probate Court, Family Court and Court of Common Pleas |
| **Presentations:** | Grand Rounds, University of South Carolina Medical School, *Correctional Psychiatry*, Columbia, SC May, 2006 |
| | Day of Discovery, Institute of Psychiatry, Medical University of SouthCarolina, *Physician Serial Killers*, Charleston, SC March, 2006 |
| | Day of Discovery: Forensic Psychiatry, Medical University of South Carolina, *Psychiatry and the Death Penalty*, Charleston, SC May 2005 |
| | Invited Lecturer: Charleston Law School, *The Insanity Defense,* Charleston, SC April 2005 |
| | Ninth Annual Probate Court Seminar, *Commitments and Conservertorship,* Charleston, SC December 2004 |
| | Judges and Attorneys Substance Abuse and Ethics Seminar, *Finding Help for Your Client,* Charelston, SC 2004 |
| | Invited to Provide Testimony to South Carolina Senate Sub-Committee on Sexual Predators, Columbia, SC November 2004. |

Margaret Melikian, D.O.
Curriculum Vitae
Page 4

**Presentations**
　　**(Cont'd):**　University of South Carolina Law School, *Forensic Psychiatry in South Carolina*, Columbia, SC June 2004

The American College of Osteopathic Neurologists and Psychiatrists Mid-Year Meeting & Scientific Seminar, Charleston, SC *The Insanity Defense*, April 2004

Forensic Day of Discovery, Medical University of South Carolina, *Violence Risk Assessment*, April 2003

Day of Discovery, Medical University of South Carolina, *The Insanity Defense,* November 2002

American Academy of Psychiatry and the Law, Annual Meeting, Newport Beach, California, *The Fetus-As-Person*, October, 2002.

Forensic Grand Rounds, William S. Hall Psychiatric Institute, *Civil Commitment Law Across the United States*, April 2002.

Special Topics Series, William S. Hall Psychiatric Institute, *Forensic Issues of Bestiality*, March 2002.

Invited Forensic Psychiatry Expert, United States Department of Justice, National Advocacy Center, July 2001 and September 2001.

Guest Lecturer - College of Charleston, Department of Psychology *Dementia,* November 2001.

Margaret Melikian, D.O.
Curriculum Vitae
Page 5

**Work Experience:**   Forensic Psychiatry Fellowship: July 2001 to June 2002. William S. Hall Psychiatric Institute.

General Psychiatry Resident: July 1997 to June 2001. Medical University of South Carolina.

Consulting Engineer: Edeco Engineering Inc. Tulsa, Oklahoma. July 1989 to July 1990 and November 1991 to May 1993. Electrical and project engineering. Design of control systems for petrochemical facilities.

Pipeline Engineer: Sun Oil Inc. Tulsa, Oklahoma. July 1990 to November 1991. Operations engineer for petroleum pipeline and refinery.

Senior Electrical Engineer: Kerr McGee Coal and Uranium Corp. Oklahoma City, Oklahoma. June 1987 to June 1989. Control system design for both underground and surface coal mining and uranium processing.

Electronics Technician: Public Service Company of Oklahoma. Tulsa, Oklahoma. June 1984 to February 1987. Repair and installation of microwave radio and fiber optic telecommunications equipment.

**Committees:**   Residency Selection Committee
Medical University of South Carolina
Department of Psychiatry and Behavioral Sciences
2002 - 2007

Residency Education Committee
Medical University of South Carolina
Department of Psychiatry and Behavioral Sciences
2002 - 2007

Peer Review Committee
Medical University of South Carolina
Department of Psychiatry and Behavioral Sciences
2004- 2007

Margaret Melikian, D.O.
Curriculum Vitae
Page 6

**Committees:**
    **(Cont'd)**          Appointment and Promotions Committee
                          Medical University of South Carolina
                          Department of Psychiatry and Behavioral Sciences
                          2004-2005

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
Florence Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 4:02-992 |
| | ) | |
| | ) | |
| CHADRICK E. FULKS | ) | |
| | ) | |

### DECLARATION OF SEYMOUR L. HALLECK

1.      My name is Seymour L. Halleck.  My curriculum vitae is attached as Exhibit A.  I currently am a emeritus Professor of Psychiatry at the University of North Carolina School of Medicine, Chapel Hill.  I was a Professor at that institution from 1972 to 1999.  My current practice focus is forensic psychiatry and includes both civil and criminal cases.

2.      I have been listed in the Best Doctors in America under Forensic Psychiatry several times in the 1990s.  I also received of the Golden Apple award from the American Academy of Psychiatry and Law in 2003.  In 1980, I received the Isaac Ray Award from the American Psychiatric Association.  In 1978, I received the Edwin Sutherland Award from the American Society of Criminology.  In 1974, I received the Arthur Marshall Distinguished Alumnus Award from the Menninger School of Psychiatry.

3.      From 1990 to 1999, I served as the editor-in-chief of the Journal of the American Academy of Psychiatry and Law.  I was also editor-in-chief of Journal of Contemporary Psychiatry between 1980 and 1990.  I have been an associate editor of several other journals.

4.      I have written or edited twelve books, including Evaluation of the Psychiatric Patient: A Primer (New York: Plenum Medical Book Co., 1991), The Mentally Disordered

PA Document #2

App. 00236

Offender (Rockville, Md.: National Institute of Mental Health, 1986), and <u>Law in the Practice of Psychiatry</u> (New York: Plenum Publishing Co., 1980).

5.     I have served as a consultant to the Federal Bureau of Investigation and from 2002 to 2004 I served as a Federal Monitor to the Ohio Department of Corrections. From 1962 to 1972, I served as the Chief Psychiatric Consultant for the Wisconsin Division of Corrections. From 1961 to 1963, I served as the Chief of Psychiatric Services for the Wisconsin Division of Corrections. From 1953 to 1955, I served as a staff psychiatrist for the Department of Justice's Medical Center for Federal Prisoners in Springfield, Missouri.

6.     I was a member of the Advisory Research Council of the Federal Bureau of Prisons from 1983 to 1990. From 1988 to 1990, I chaired the American Psychiatric Association's Task Force on Uses and Misuses of Psychiatric Diagnosis in the Legal Process.

7.     I was asked by John Blume to assess Chad Fulks for cognitive deficits and mental illness in connection with presenting mitigating circumstances at Mr. Fulks' sentencing hearing. After I presented my findings to Mr. Blume, I was prepared to testify at Chad Fulks' sentencing hearing. I was not called by Mr. Blume at the sentencing hearing.

8.     In preparation for my assessment, I interviewed and examined Chad Fulks at the Butner Federal Prison on February 4, 2004 for four hours. I also interviewed Mr. Fulks at the Columbia Care Center on April 20, 2004 for two hours and on April 21, 2004 for another two hours. I reviewed various documents, including FBI's reports of Mr. Fulks' alleged criminal activity, Mr. Fulks' school records, criminal history, certain incarceration records, letters written by Mr. Fulks, and a large number of medical reports and mental health assessments. I also reviewed the expert reports of David Bachman, Margaret Melikian, Howard Becker, Fred

2

App. 00237

Bookstein, Christos Davatzikos, James Evans, Ruben Gur, James Hilkey, Alex Morton, and Jonathan Venn.

9.     On November 4, 2002, Mr. Fulks and Branden Basham escaped from the Hopkins County Detention Center in Madisonville, Kentucky.  Mr. Fulks insists he was persuaded to escape by Basham who had told Mr. Fulks that he knew the whereabouts of Mr. Fulks' stepson. After escaping they remained free for over two weeks and during that time they consumed a large quantity of drugs, including, alcohol, marijuana, crack cocaine, and methamphetamine. Mr. Fulks reported that he was in a state of almost constant anxiety and intoxication during this time period.  He had no sense of time and was in constant fear because of Mr. Basham's erratic behavior.  Mr. Fulks was also in fear that Basham would cause harm to him or one of the women traveling with them .

10.     Mr. Fulks was born into a chaotic family situation.  During his early childhood, Mr. Fulks' mother and father consumed large amounts of alcohol and marijuana on a daily basis. His mother drank heavily when she was pregnant with him.  Mr. Fulks' brother Ronnie is very short, and is suspected of having fetal alcohol syndrome. Mr. Fulks is believed by some experts to have fetal alcohol syndrome.

11.     In his earliest years, Mr. Fulks' home life was also characterized by a great deal of violence.  The parents would frequently have physical altercations.  Mr. Fulks' father was known to be abusive to Mr. Fulks and his brothers.  The father would beat the children with his fists or belts on an unpredictable basis.

12.     At one point, Mr. Fulks' parents put a pool table in their home and began to have people over in the evening for parties which were often characterized by fights between various participants.  The police were frequently called to control the violence and neither of Mr. Fulks'

3

App. 00238

parents did much to try to protect the children. Pornography adorned the walls of the pool room, and participants in the partying engaged in various forms of violent and sexual behavior.

13. In addition to being characterized by violence, the Fulks home was also one in which the children were neglected. The children lived in a state of severe poverty and much of the help the family received from public assistance was diverted to alcohol and drug use. Mr. Fulks and his siblings often had to go without food. Mr. Fulks remembers his clothes as having been hand-me-downs that were usually tattered and ugly. He and his siblings were painfully aware that they had to take care of themselves. Part of their self-care was sustained by stealing, an activity which both parents condoned.

14. The situation in the Fulks home was so desperate that when Chad was approximately eleven years old, a local West Virginia newspaper wrote an article about the Fulks family and described the family's extreme poverty and the effect it was having on Mr. Fulks at school. In this article, Mr. Fulks vividly described being teased, cursed, and ostracized because of his poverty.

15. Mr. Fulks did very poorly in school. He failed the first grade and continued to struggle academically until he dropped out of school in the tenth grade. Mr. Fulks exhibited learning disabilities and was placed in special education programs for learning disabled and behaviorally disturbed students.

16. The family situation underwent some change when Mr. Fulks was twelve years old and his mother began attending church. She stopped drinking and decided to dedicate her life to religious activities. Apparently she became so involved with religion that she spent even less time with the children than she had when she was drinking. The children were still left to fend for themselves and wander the streets without any adult supervision.

4

17. At age thirteen, Mr. Fulks attempted suicide. Further psychiatric treatment was recommended but the family did not follow through. Later that same year, Mr. Fulks lived with his father in Indiana when he was evaluated at a mental health clinic in December 1991. He was diagnosed as having major depression with the possibility of developing an addictive disorder.

18. Mr. Fulks began drinking alcohol, together with his family, at the age of nine or ten. He reported that he would sometimes drink at any hour of the day, including early morning. He began using marijuana about the same time and experimented with LSD when he was approximately fourteen years old. By the time Mr. Fulks was fourteen or fifteen years old, he was using alcohol and marijuana heavily on a daily basis. He was also introduced by his family members to potent moonshine. In addition to these substances, Mr. Fulks has also used cocaine powder, crack cocaine, barbiturates, and methamphetamine.

19. Mr. Fulks also experienced sexual abuse at a young age. A teenage babysitter performed oral sex on him at the age of eight or nine. When Mr. Fulks was approximately twelve or thirteen, he was fondled by the father of one of his friends. At the age of fifteen, Mr. Fulks moved in with a twenty-eight year old woman. Although a child may find such experiences pleasurable, the child is not able to understand the meaning of the intimacy in a situation in which sex is divorced from love. This can lead to an increased likelihood of aberrant sexual activity in the future, including violent sexuality such as rape. Rape is an act of violence and anger toward women. Because Mr. Fulks' mother failed to provide nurturing environment and deprived him of the necessaries life, anger toward women was a probable result.

20. Mr. Fulks reported at least eight events in which he had lost consciousness beginning at age eleven when his brother hit him with a paint can. His experiences with loss of consciousness have been related to accidents, fighting, or car wrecks. He has been troubled by

5

headaches since the age of thirteen. He was shot in the arm and neck when he was sixteen years old after an altercation during which he was extremely intoxicated. If a person loses consciousness, they have had a concussion. Brain cells are damaged. Concussions are cumulative and lead to brain damage, which is associated with cognitive impairment.

21. Mr. Fulks was married for the first time in 1995 to Amber Fowler. Ms. Fowler gave birth to a child named Devon, who Chad considered as his son. The child died at age six months from a blunt trauma to his abdomen when his young cousin jumped on him. Mr. Fulks was extremely distressed at the loss of Devon. There have been long-term effects of this loss, including an increasing use of alcohol and drugs. The excessive drinking and drug use caused the marriage to end. In 2002, Mr. Fulks married Veronica Evans, a stripper with a long history of psychiatric problems. Chad was very fond of Evans' son Myles and tried to recapture the relationship he had lost with the death of Devon.

22. Mr. Fulks has had symptoms of depression throughout much of his adolescence and adult life. He has been treated with a variety of anti-depressant drugs, including Imipramine, Elavil, Zoloft, and Effexor. During the time that I evaluated him he was primarily on Elavil and Zoloft and an anti-anxiety drug, Klonopin. His symptoms of depression generally include sad mood, sleep disturbance, both falling and staying asleep, diet variations, low energy, difficulty concentrating, anxiety and agitation, low self esteem and occasional suicidal thoughts.

23. Mr. Fulks has also complained on a chronic basis of headaches and anxiety attacks. He described panic attacks which are characterized by a tingling feeling in his head and body, difficulty breathing and a rapid heart rate. Sometimes he feels that these attacks will kill him and rushes to the bathroom. He claims to still be experiencing these attacks even though he is taking Klonopin which should help prevent them.

6

App. 00241

24.    Mr. Fulks has been a heavy consumer of medical services when they are available in a correctional setting. Sometimes he has medical complaints which are not accompanied by a physical finding of illness. I believe that he uses his interactions with physicians as a form of dependency, gratification, and nurturance which he does not get in other ways.

25.    As previously described, I have reviewed other expert reports in this case. The reports reviewed indicated the presence of serious brain damage, which led to major cognitive impairment. The brain damage was based on either the prenatal environment, head injuries sustained in childhood, or substance abuse.

26.    My mental status examination of Mr. Fulks was consistent with the findings of cognitive impairment. Mr. Fulks exhibited problems with concentration, memory, and the ability to provide information in a coherent manner.

27.    Mr. Fulks has very low self-esteem. It appears that he is easily taken advantage of by others.

28.    Mr. Fulks clearly meets the DSM IV diagnostic requirements for polysubstance dependence, including alcohol, marijuana and amphetamines. At times he meets the diagnostic criteria for Major Depressive Disorder, although because of the variability of his depression the diagnosis of Dysthymic Disorder could also be appropriate. I also believe that on the basis of his neuropsychological testing, his clinical presentation, and history, Mr. Fulks has some type of cognitive disorder and he should be diagnosed as having Cognitive Disorder, Not Otherwise Specified.

29.    Mr. Fulks at the time of the crime had a serious mental illness based on his serious depression, anxiety, substance abuse, and the many cognitive difficulties he experienced prenatally and in early childhood. Cognitive impairment and drug use made it difficult for him

7

App. 00242

to undertake a benefit-risk analysis in the situations where he was at risk of engaging in criminal acts. He also likely lacked understanding how some of these situations were influencing him. The many insults to his brain caused impairment to his executive functions, particularly his ability to control angry feelings.

30. While Mr. Fulks meets the DSM IV criteria for antisocial personality disorder, there are many troubling aspects of this diagnosis. The diagnosis of antisocial personality disorder is based on a description of bad behavior: failure to conform to social norms, deceitfulness, impulsivity or failure to plan ahead, irritability and aggressiveness, reckless disregard for safety of self or others, consistent irresponsibility, and lack of remorse. Six of the seven criteria are behavioral. In my experience, this diagnosis is often used in criminal trials to negate the presence of mental illness rather than to describe the presence of mental illness. The diagnosis does not tell us anything about causation, treatment, or future adjustment. The jury is typically left with the impression that a person is bad, not sick. In effect, there is a circularity in the manner in which this diagnosis is used in the courtroom: the answer to the question of why a person has antisocial personality disorder is that "he behaves badly." If it is then asked conversely why does a person behave badly, the answer is "he has antisocial personality disorder." Rather than using the label of antisocial personality disorder, it is far more scientific to ask the question "what causes this person to behave badly." In the case of Mr. Fulks, major causes of antisocial behavior include prenatal insults, abuse in early childhood, depression, substance abuse., and his many concussions. In fact, all of these traumas and illnesses have left him with moderate to severe brain damage.

31. Because of Mr. Fulks early deprivations and cognitive deficits, he is more likely to be a follower .

App. 00243

32.    I have reviewed the testimony of Donna Ward given at Mr. Fulks' sentencing hearing wherein Ms. Ward described a November 17, 2004 phone call allegedly made by Mr. Fulks at a time when Brandon Basham was hiding from the police in the Ohio River. I am further aware that the prosecution used this call to argue that Mr. Fulks, without the aid of Basham, attempted to lure Ms. Ward's daughter out for an alleged job interview. Donna Ward's testimony would not have altered the opinions I was prepared to give at the sentencing hearing. In fact, the Ward incident supports my assessment that Mr. Fulks is cognitively impaired and has difficulty in accessing the benefits, risks, and alternatives to antisocial acts.

33.    In accordance with 28 U.S.C.A. § 1746, I declare that under penalty of perjury that the foregoing is true and accurate.


_____
Seymour L. Halleck, M.D.


Signed before me this ___9th___ day of
___May___, 2008


_____
Notary Public for ___Brian B. Hege___
My Commission Expires: ___Feb. 18, 2013___

# CURRICULUM VITAE

## Seymour L. Halleck, M.D.

### PERSONAL INFORMATION

Date and Place of Birth:     April 16, 1929;  Chicago Illinois

Marital Status:     Married,  3 Daughters

Business Address:     500 Laurel Hill Road
Chapel Hill, NC 27514
Telephone:     (919) 966-1489

### EDUCATION

Ph.B.   -     University of Chicago, 1948
B.S.   -     University of Chicago, 1950, Anatomy
M.D.   -     University of Chicago, 1952
Sc.D.   -     Rockford University, 1969 (Honorary)

Internship:     U.S. Public Health Service Hospital - San Francisco, California, 1952-1953

Residency:     Menninger School of Psychiatry - Topeka, Kansas, 1955-1958

### SPECIAL HONORS AND AWARDS

Arthur Marshall Distinguished Alumnus Award, Menninger School of Psychiatry, 1974
Edwin Sutherland Award, American Society of Criminology, November 1978
Isaac Ray Award, American Psychiatric Association, May 1980
Nominated for Vestermark Award, American Psychiatric Association for Contributions to
   Psychiatric Education, 1984 and 1985

### CERTIFICATION/LICENSURE

Licensed by examination in Illinois, October 1953
Licensed by reciprocity in Wisconsin, July 1958
Licensed by reciprocity in North Carolina, June 1972
Certification by the American Board of Psychiatry and Neurology, October 1958
Licensed by reciprocity in Ohio, 2003

### CURRENT POSITIONS HELD

Professor, Department of Psychiatry, University of North Carolina School of Medicine, Chapel
Hill, North Carolina, September 1972 to Present

1



App. 00245

02/08/2001 13:21 FAX  9199290709                                          ☑ 001

Associate Chair for Clinical Services and Adult Education, Department of Psychiatry, University of North Carolina School of Medicine, Chapel Hill, North Carolina, 1992 to 1995

Consultant, The Fielding Institute, Santa Barbara, California, April 1975 to 1982

Director, Psychiatry Residency Training Program, Department of Psychiatry, University of North Carolina School of Medicine, Chapel Hill, North Carolina, September 1990 to June 1992

Chief, Psychiatry Emergency Crisis Service, Department of Psychiatry, University of North Carolina School of Medicine, Chapel Hill, North Carolina, January 1994 to June 1995

Adjunct Professor, University of North Carolina School of Law, Chapel Hill, North Carolina, May 1977 to Present

Editor and Founder, Contemporary Psychiatry: A Journal of Critical review, Plenum Publishing Corporation, 1981 to 1991

Consultant, American Psychiatric Association Council on Psychiatry and Law, 1984 to 1991

Editor-in-Chief, Bulletin of the American Academy of Psychiatry and the Law, 1990 to 1999

Board Examiner, American Board of Psychiatry and Neurology

Editorial Consultant, Plenum Press, New York

## PAST POSITIONS HELD

Clinical Assistant, Department of Pathology, University of Chicago School of Medicine, Chicago, Illinois, 1949-1951

Staff Psychiatrist, Department of Justice, Medical Center for Federal Prisoners, Springfield, Missouri, 1953-1955

Assistant Professor, Department of Psychiatry, University of Wisconsin School of Medicine, Madison, Wisconsin, July 1958 - February 1960

Psychiatric Consultant, Wisconsin Diagnostic Center, July 1958 - February 1960

Psychiatric Consultant, Wisconsin School for Girls, July 1958-February 1960

Coordinator of Institution Services, Psychiatric Services, Wisconsin Division of Corrections, February 1960-January 1961

Clinical Assistant Professor, Department of Psychiatry, University of Wisconsin School of Medicine, Madison, Wisconsin, February 1960-May 1963

2

Chief of Psychiatric Services, Wisconsin Division of Corrections, January 1961-May 1963

Member of Advisory Committee (Parole Board), Wisconsin Central State Hospital, February 1960-September 1972

Chief Psychiatric Consultant, Wisconsin Division of Corrections, May 1962-August 1972

Lecturer, Department of Sociology, University of Wisconsin, Madison, Wisconsin, 1963-1964

Associate Professor, Department of Psychiatry, University of Wisconsin School of Medicine, Madison, Wisconsin, May 1963-July 1966

Director, Student Health Psychiatry, University of Wisconsin, Madison, Wisconsin, May 1963-August 1972

Professor, Department of Psychiatry, University of Wisconsin School of Medicine, Madison, Wisconsin, July 1966-August 1972

Acting Chairman, Department of Psychiatry, University of Wisconsin School of Medicine, Madison, Wisconsin, December 1971-July 1972

Newspaper Columnist, Madison Capital Times and Chapel Hill Newspaper, September 1971-May 1973

Director of Residency Training, Department of Psychiatry, University of North Carolina School of Medicine, Chapel Hill, North Carolina, September 1972-April 1976

Consultant, Dorothea Dix Hospital, Forensic Unit, Raleigh, North Carolina, May 1973-May 1974

Member, Board of Directors, Consultant and Instructor, Southeast Institute, Chapel Hill, North Carolina, 1973-1979

Senior Editor, Aldine Annual of Crime and Justice, 1974-1976

Member, President's Commission of Mental Health, 1977

Consultant, Consultation Service for Psychiatry Residency Programs Under the Auspices of American Psychiatric Association Committee on Graduate Medical Education, 1981

Vice-Chairman, Department of Psychiatry, University of North Carolina School of Medicine, Chapel Hill, North Carolina, December 1983-June 1985

Acting Chair, Department of Psychiatry, University of North Carolina School of Medicine, Chapel Hill, North Carolina, July 1985-June 1986

3

02/08/2001 13:22 FAX   9199290709                                                    ☒003

Associate Director for Recruitment, Residency Training Program, Department of Psychiatry, University of North Carolina School of Medicine, Chapel Hill, North Carolina, May 1976 to September 1990

Deputy Editor, Bulletin of the American Academy of Psychiatry and the Law, 1969

Book Review Editor, Journal for Academic Psychiatry, 1991-1998

Director of Psychiatry Liaison with Area Health Education Centers Program, University of North Carolina School of Medicine, Chapel Hill, North Carolina, 1986-1990

## POSITIONS ON EDITORIAL BOARDS

Member, Advisory Editorial Board of the International Journal of Family Therapy

Member, Editorial Board, American Journal of Psychotherapy

Member, Editorial Board, Bulletin of the Menninger Clinic

Member, Editorial Board, Journal of Psychiatry and the Law

Member, Editorial Board, Psychiatry Digest

Member, Editorial Board, Advocacy Now, Journal of Patient Rights and Mental Health Advocacy

Member, Editorial Board of Human Motivation (Publication Sponsored by Self-Esteem Institute)

Advisory Editor, International Journal of Family Therapy

Member, Editorial Board, Journal of Family and Child Mental Health

Member, Editorial and Advisory Board, Journal of Law-Psychology Program, University of Nebraska-Lincoln

Consulting Editor, Bulletin of the Menninger Clinic, January 1986 to Present

## PROFESSINAL MEMBERSHIPS

American Psychiatric Association
American Association of Directors of Psychiatric Residency Training
North Carolina Psychiatric Association
American Medical Association
Durham-Orange County Medical Society
American Academy of Psychiatry and the Law
American Society of Criminology

4

App. 00248

National Council on Crime and Delinquency
Wisconsin Psychiatric Association (inactive)
Dane County Medical Society (inactive)
Isaac Ray Society (inactive)

## CURRENT OFFICES HELD

Member, Advisory Research Council, Federal Bureau of Prisons, 1983 to 1990
Member, American Psychiatric Association Commission on Judicial Action, 1985 to 1990
Chairman, American Psychiatric Association Task Force on Uses and Misuses of Psychiatric
  Diagnosis in the Legal Process, 1988 to 1990

## PAST OFFICES HELD

Member, Board of Directors, American Society of Criminology

Membership Secretary, Isaac Ray Society

Counselor, Southern Wisconsin Psychiatric Association

Member, Professional Advisory Committee, Dane County Association for Mental Health

Member, Committee on Legal Medicine, Wisconsin Medical Association

Member, Sub-Committee on Correctional Psychiatry of the Committee on Law and Psychiatry,
American Psychiatric Association 1968

Member, Executive Board, American Association of Directors of Psychiatric Residency
Training, 1973-1986

Member, Board of Trustees, Orange County Mental Health Association, 1975-1976

Member, Committee on Graduate Education, American Psychiatric Association, 1976-1978

Chairman, Committee on Graduate Education, American Psychiatric Association, 1976-1978

Member, Board of Directors, National Council on Crime and Delinquency, 1976-1985

Member, Commission on the Integration of Psychiatric Therapies, American Psychiatric
Association, 1977-1985

Member, Program and Policy Committee, National Council on Crime and Delinquency, 1978

Program Chairman, American Association of Directors of Psychiatric Residency Training, 1978

Member, Ad Hoc Committee on Sentencing, National Council on Crime and Delinquency, 1979

5

App. 00249

02/08/2001 13:22 FAX  9199290709                                                                ☑ 005

President-Elect, American Association of Directors of Psychiatric Residency Training, 1979-1980

President, American Association of Directors of Psychiatric Residency Training, 1980-1981

Member, Group for the Advancement of Psychiatry (GAP) Committee on Psychiatry and the Law, 1980-1984

Chairman, Task Force on the Role of Psychiatrists in the Sentencing Process of Criminal Offenders, American Psychiatric Association, 1981

Member, North Carolina Neuropsychiatric Association Committee on Psychiatry and the Law, 1981

Member, Ad Hoc Committee on Racism and the Criminal Justice System, National Council on Crime and Delinquency 1981

Member, Program Services Committee, National Council on Crime and Delinquency, 1982

## PUBLICATIONS - ARTICLES

1. Halleck, S.L., The Role of the Psychiatrist in Residential Treatment of Delinquents. Journal of Social Therapy, Vol. 4, N. 4, 1958.

2. Halleck, S.L. and Hersko, M., The Family Physician and the Adolescent Delinquent. Journal of American Medical Association, Vol. 170, July 4, 1959, 1153-1156.

3. Halleck, S.L., The Criminal's Problem with Psychiarty, Psychiarty: Journal for Study of Interpersonal Processes, Vol. 23, No. 4, November 1960.

4. Halleck, S.L., and Pacht, A.R., Current Status of the Wisconsin State Sex Crimes Law. Wisconsin Bar Bulletin, December 1960.

5. Halleck, S.L., Hersko, M., Rosenberg, M. and Pacht, A., Incest: A Three-Way Process. Journal of Social Therapy, Vol. 7, No. 1, 1961.

6. Halleck, S.L., The Initial Interview with the Offender. Federal Probation, March, 1961.

7. Halleck, S.L., Pacht, A.R. and Ehrmann, J.C., Diagnosis and Treatment of the Sexual Offender: A Nine-Year Study. Americal Journal of Psychiatry, January 1962.

8. Halleck, S.L., Juvenile Delinquents: "Sick" or "Bad." Social Work: Journal of the National Association of Social Workers, Vol. 7, April 1962.

6

App. 00250

9.    Halleck, S.L., Physicians' Role in Management of Victims of Sex Offenders. Journal of the American Medical Association, April 1962.

10.   Halleck, S.L. and Hersko, M., Homosexual Behavior at a Training School for Adolescent Girls. American Journal of Orthopsychiatry, Vol. 32, October 1962.

11.   Halleck, S.L. and Woods, S.W., Emotional Problems of Psychiatric Residents, Psychiatry: Journal for the Study of Interpersonal Processes, Vol. 25, November 1962.

12.   Halleck, S.L. and Miller, M.H., Critics of Psychiatry: A Review of Contemporary Critical Literature. The American Journal of Psychiatry, January 1963.

13.   Halleck, S.L., Impact of Professional Dishonesty on Behavior of Disturbed Adolescents. Social Work: Journal of the National Association of Social Workers, Vol. 8, April 1963.

14.   Halleck, S.L. and Miller, M.H., The Psychiatric Consultation. American Journal of Psychiatry, August 1963.

15.   Halleck, S.L. and Woods, S.W., Dissocial Behavior on a University Campus. Journal of Personnel Guidance, 1963.

16.   Halleck, S.L., Thurrell, R.J. and Johnson, A., Psychosis in Prison. Journal of Criminal Law and Criminology, Vol. 56, No. 3, 1965.

17.   Halleck, S.L., American Psychiatry and the Criminal: A Historical Review. Published as a special supplement to the American Journal of Psychiatry, March 1965.

18.   Halleck, S.L., Psychotherapy, Freedom and Crime, The Bulletin of the Menninger Clinic, May 1966.

19.   Halleck, S.L., A Critique of Psychiatry in the Legal Process. Wisconsin Law Review, June 1966.

20.   Halleck, S.L. and Pacht, A., Clinical Services to a Correctional System, Journal of National Council on Crime and Delinquency, 1966.

21.   Halleck, S.L., Review of Psychoanalysis, Psychiatry and Law. Contemporary Psychology, 1967.

22.   Halleck, S.L., The Impact of Post World War II on American Youth. Duke University Symposium, 1967.

23.   Halleck, S.L. and Miller, M.H., Medical Critics of Psychiatry, Psychiatry Digest, July 1967.

7

02/08/2001 13:23 FAX   9199290709                       ☑ 006

24.   Halleck, S.L., Hysterical Personality Traits, Archives of General Psychiatry, Vol. 16, June 1967, 750-757.

25.   Halleck, S.L., Sex and Mental Health on the Campus. Journal of American Medial Association 8:200, May 22, 1967, 684.

26.   Halleck S.L., Management of Dangerous Behavior on a University Campus. American Journal of Psychiatry, November 1967.

27.   Halleck, S.L., Student Dissent. Think Magazine, November-December 1967.

28.   Halleck, S.L., The Roots of Student Despair. Think Magazine. November-December 1967.

29.   Halleck, S.L., The Process of Youthful Unrest. Proceedings of the New York State Association for Mental Health, Inc., 1968. Also presented to the President's Commission on Violence.

30.   Halleck, S.L., Marijuana and LSD on the Campus. Proceedings of the American Correctional Association, 1968.

31.   Halleck, S.L., Sexual Problems of College Students. Medical Aspect of Human Sexuality, May 1968.

32.   Halleck, S.L., The Road to Choas. Psychiatry and Social Science Review, July 1968.

33.   Halleck, S.L., Hypotheses of Student Unrest. National Educational Association Journal, August, 1968.

34.   Halleck, S.L., Students and the Draft. Progressive Magazine, September 1968.

35.   Halleck, S.L., Psychiatry and the Status Quo. Archives of General Psychiatry, September 1968.

36.   Halleck, S.L., Student Values in a Changing World. Think Magazine, September-October 1968.

37.   Halleck, S.L., The Psychiatrist and the Legal Process. Psychology Today, February 1969.

38.   Halleck, S.L., The Reform of Mental Hospitals. Psychology Today, March 1969.

39.   Halleck, S.L., Corrections in a Democratic Society. Presented to Center for Study of Democratic Institutions; Synopsized in the Center Magazine, April 1969.

40.   Halleck, S.L., Sex and Power. Medical Aspects of Human Sexuality, October 1969.

8

02/08/2001 13:23 FAX   9199290709                                            007

41. Halleck, S.L., The Price Youth Pays for Freedom. Think Magazine September 1969.

42. Halleck, S.L., Style of American Life. Psychology Today, November 1969.

43. Halleck, S.L., Bolamn, W.M., Rice, D.G. and Ryan, L.M., An Unintended Side Effect in a Community Psychiatry Program. Archives of General Psychiatry, Vol. 20, May 1969.

44. Halleck, S.L., The Power of the Psychiatric Excuse. Marquette Law Review. Vol. 52, No. 2, 1970.

45. Halleck, S.L., The Great Drug Education Hoax. Progressive Magazine, February 1970.

46. Halleck, S.L., Relevancy in the Behavioral Sciences. The Relevant Scientist, 1970.

47. Halleck, S.L., The Changing Nature of Student Psychiatry in An Era of Political Awareness. American Journal of Psychotherapy, Vol. 24, No. 4, October 1970.

48. Halleck, S.L., Why Adults Hate Kids. Think Magazine, November-December 1970.

49. Halleck, S.L., Therapy is the Handmaiden of the Status Quo. Psychology Today, April 1971.

50. Halleck, S.L., The Uses of Psychiatry. Progressive Magazine, September 1971.

51. Halleck, S.L., Psychiatry and Correctional Justice. Bulletin of Menninger Clinic, Vol. 35, No. 6, November 1971, 402-407.

52. Halleck, S.L., Stress and the College Student. Nutshell Magazine, 1971-1972.

53. Halleck, S.L., Crime and the Dilemmas of Psychiatry. Essay Book Review, Psychiatry and Social Science Review, January 1972.

54. Halleck, S.L., The Student Movement. College Physical Education, Proceedings of the 1972 Mid-American Conference, Washington, D.C., AAHPER, 1973.

55. Halleck, S.L., Sociologic and Psychologic Stress in Adolescence. Current Medical Digest, September, 1973.

56. Halleck, S.L., The Future of the Mental Health Professions, Psychiatric Opinion, February 1974.

57. Halleck, S.L., (Editor), A Re-Examination of the Concept of Rehabilitation. Psychiatric Annals, Vol. 4, No. 3, March 1974, 61-85.

9

58. Halleck, S.L., Legal and Ethical Aspects of Behavioral Control. American Journal of Psychiatry 131:4, April 1974.

59. Halleck, S.L., A Troubled View of Current Trends in Forensic Psychiatry. The Journal of Psychiatry and Law, Summer 1974.

60. Halleck, S.L., Future of Psychiatry. Bulletin of Menninger Clinic, November 1974.

61. Halleck, S.L., Introduction to Aldine Annual of Crime and Criminal Justice, 1974.

62. Halleck, S.L., Voyeurism and Exhibitionism in Adolescents. Medical Aspects of Human Sexuality, Vol. 9, No. 5, May 1975, 75-76.

63. Halleck, S.L., Socially Reinforced Obsessing. Journal of Consulting and Clinical Psychology, Vol. 44, No. 1, February 1976, 146-147.

64. Halleck, S.L., Another Response to Homosexuality: The Ethical Challenge. The Journal of Consulting and Clinical Psychology, Vol. 44, No. 2, April 1976, 167-170.

65. Halleck, S.L., The Medical Model in Psychiatric Training. American Journal of Psychotherapy, Vol. 30, No. 2, April 1976, 218-235.

66. Halleck, S.L., Family Therapy and Social Change. Social Casework, Vol. 57, No. 8, October 1976, 483-493.

67. Halleck, S.L., Psychodynamic Aspects of Violence. Bulletin of the American Academy of Psychiatry and Law, Vol. 4, No. 4, 1977, 328-335, Symposium Issue from Violence in Families.

68. Halleck, S.L., Can We Fit the Treatment to the Patient? Current Methodological and Theoretical Problems. Bulletin of the Menninger Clinic, Vol. 41, No. 4, July 1977, 303-328.

69. Halleck, S.L. and Witte, A.D., Is Rehabilitation Dead? Crime and Delinquency, published by the National Council on Crime and Delinquency, October 1977, 372-382.

70. Halleck, S.L., Book Review of The Criminal Personality, A Profile for Change, Vol. 1, by Samuel Yochelson and Stanton Samenow, published by Aronson Publishers, New York, 538 pp. Review in the Bulletin of the Menninger Clinic, Vol. 42, No. 1, January 1978.

71. Halleck, S.L., Psychotherapy in the Correctional Setting: Problems and Prospects. Quarterly of Clinical Criminology, published by the Ministry of Justice, April 1978, 141-154.

App. 00254

72. Halleck, S.L.,The Internship Year: A Negative View. In the Opinion and Comment Section of the American Journal of Psychiatry, 135:10, October 1978, 1202-1205.

73. Halleck, S.L., Violence in Families. Continuing Education for the Family Physician, Vol. 9, No. 5, November 1978, 26-39.

74. Halleck, S.L., Editorial on Psychiatry and the Prisoner. American Journal of Psychiatry, 137:5, 603-604, May 1980.

75. Halleck, S.L., Editorial on the Ethics of Anti-Androgen Therapy. American Journal of Psychiatry, May 1981.

76. Halleck, S.L., Covert Values in the Treatment of Psychosis. American Journal of Psychotherapy, May 1981.

77. Halleck, S.L. and Halleck, H., Vengeance and Victimization. Victimology: An International Journal, May 1981.

78. Halleck, S.L., The Concept of Responsibility in Psychotherapy. American Journal of Psychotherapy, Vol. 36, 292-303, July 1982.

79. Halleck, S.L., Malpractice in Psychiatry. Psychiatric Clinics of North America, Vol. 6, No. 4, 567-575, 1983.

80. Halleck, S.L., The Ethical Dilemmas of Forensic Psychiatry: A Utilitarian Approach. Bulletin of American Academy of Psychiatry and the Law, Vol. 12, No. 3, 279-288, 1984.

81. Halleck, S.L., Responsibility and Excuse in Medicine and Law: A Utilitarian Perspective. Journal of Law and Contemporary Problems, Vol. 49, No. 3, 127-146, Summer 1986.

82. Halleck, S.L., Which Patients are Responsible for Their Illnesses? American Journal of Psychotherapy, Vol. 42, No. 3, 338-353, July 1988.

83. Halleck, S.L., Mental Distress in the Workplace: Legal and Medical Aspects. Journal of Occupational Problems in Medical Practice, Vol. 5, No. 1, 1990.

84. Halleck, S.L., Dissociative Phenomena and the Question of Responsibility. The International Journal of Clinical and Experimental Hypnosis, Vol. 38, No. 4, 298-314, 1990.

85. Halleck, S.L., Hoge, S.K., Miller, R.D., Sadoff, R.L. and Halleck, N.H., The Use of Psychiatric Diagnoses in the Legal Process: Task Force Report of the American Psychiatric Association, Vol. 20, No. 4, 481-499, 1992. Bulletin of the American Academy of Psychiatry and Law.

11

86.     Halleck, S.L., Clinical Assessment of Voluntariness of Behavior, Vol. 20, No. 2, 221-236, 1992. Bulletin of the American Academy of Psychiatry and Law.

87.     Halleck, S.L., The Perils of Being a Plaintiff: Impressions of a Forensic Psychiatrist, Clinical Orthopedics and Related Research, No. 338, 1997, 72-78 pp.

88.     Halleck, S.L., American Psychiatric Association Resource Document on Peer Review Expert Testimony, Journal of the American Academy and the Law, Vol. 25, No. 3, 1997, 359-374 pp.

## PUBLICATIONS - CHAPTERS IN BOOKS

1.     Halleck, S.L., Pacht, A. and Ehrmann, J.C., Psychiatric Treatment of the Sex Offender. Edited by Jules Masserman, Chapter in Current Psychiatric Therapy, 1961.

2.     Halleck, S.L., American Psychiatry and the Criminal: A Historical Review. Edited by Jules Masserman, Chapter in Current Psychiatric Therapy, 1964.

3.     Halleck, S.L., Community Psychiatry: A Troubled Viewpoint. Chapter in Community Psychiatry, edited by Roberts and Loeb. University of Wisconsin Press, 1966.

4.     Halleck, S.L., The Problem of Victimization. Chapter in Treatment of Sex Offenders, edited by Ralph Slovenko. Charles C. Thomas, 1966.

5.     Halleck, S.L., Corrections in a Democratic Society. Chapter in Aggression and Violence. American Medical Association, 1969.

6.     Halleck, S.L., Chapter on Critical Evaluations on the Crime of Punishment: The Goal of Protection. International Journal of Psychiatry, Vol. 9, 1970-1971, edited by J. Aronson, Science House, New York.

7.     Halleck, S.L., Mental Health. Chapter in Health Today, CRM Books, 1972.

8.     Halleck, S.L., The Therapeutic Encounter. Chapter in Sexual Behavior, edited by H.L.P. Resnick and M. Wolfgang, Boston, Mass., Little and Brown, 1972.

9.     Halleck, S.L., Delinquency. Chapter in Handbook of Child Psychopathology, edited by Wolman, McMillan, 1973.

10.    Halleck, S.L., Alienation of Affluent Youth, Revised. Chapter in World Biennial of Psychiatry, Vol. II, edited by Silvanio Arieti, New York, Basic Books, 1971.

11.    Halleck, S.L., The Counselor as Double Agent. Chapter in New Directions for College Counselors, edited by C.F. Warnath, San Francisco, Jossey-Bass, 1973.

12

12. Halleck, S.L., The Future of Indeterminate Confinement. Chapter in The Mentally Disordered Offender, C. Thomas, 1974.

13. Halleck, S.L., A Multi-Dimensional Approach to Violence. Chapter in Violence and Criminal Justice, edited by D.V. Chappel and J. Monchaz, Massachusetts, Lexington Books, 1974.

14. Halleck, S.L., Psychological Stress in the Campus Community: A Conversation with Joseph Katz, Seymour Halleck and Nevitt Sanford. Chapter in Community Psychology Series, Vol. 3, American Psychological Association, Div. 27, Bernard L. Bloom, 1975, 246-276.

15. Halleck, S.L., Emotional Problems of the Graduate Student. Chapter in Scholars in the Making, The Development of Graduate and Professional Students, edited by Joseph Katz and Rodney Hartnett, Cambridge, Massachusetts, Ballinger Publishing Company, 1976, 161-176.

16. Halleck, S.L., Chapter 22 on "The Role of the Psychiatrist in the Criminal Justice System" in section entitled The Psychiatrist as Educator and Therapist, 933-949, in Controversies in Psychiatry, edited by John Paul Brady and H. Keith, H. Brodie, W.B. Saunders Company, Philadelphia, 1978.

17. Halleck, S.L., Response to Presentation on "Knowing, Reaching and Serving the Wounded, Disadvantaged and Vulnerable of Our World" by Margaret Mead at the World Federation on Mental Health Meeting in Vancouver, British Columbia in August 1977. In Today's Priorities in Mental Health: Knowing and Doing, edited by Morton Beiser, Robert Krell, Tsung-Yi Li and Milton Miller, Symposium Specialists, Miami, Florida, May 1977, 69-72. (Title of journal changed in 1979. Publication now called Rassegna Penitenziaria E Criminologia.)

18. Halleck, S.L., Psychiatry and Social Control: Two Contradictory Scenarios. Chapter in The Human Mind Revisited, Essays in Honor of Karl A. Menninger, 433-449, edited by Sydney Smith, International Universities Press, Inc., New York, October 1978.

19. Halleck, S.L., Violence: Treatment Versus Correction. Chapter in Violence: Perspectives on Murder and Aggression, 377-393, edited by Irwin Kutash, Samuel B. Kutash and Louis B. Schlesinger, San Francisco, The Jossey-Bass Social and Behavioral Science Series, Jossey-Bass Publishers, Inc., November 1978.

20. Halleck, S.L., The Future of Psychiatric Criminology. Chapter in Biology and Crime, Vol. 10, Sage Research Progress Series in Criminology, 139-158, edited by C. Ray Jeffrey, Beverly Hills, California, Sage Publishers, Inc., 1979.

21. Halleck, S.L., Malpractice in Psychiatry. Chapter in New Directions for Mental Health Services, No. 4, 69-89, edited by H. Richard lamb, San Francisco, Jossey-Bass Publishers, Inc., 1979.

13

22.    Halleck, S.L., Social Violence and Aggression. Chapter 56 in Third Edition of the Comprehensive Textbook of Psychiatry, 3149-3155, edited by Harold I. Kaplan, Alfred M. Freedman and Benjamin J. Sadock, Williams and Wilkins Company, July 1980.

23.    Halleck, S.L., Ethical Aspects of Diagnosis and Treatment. Chapter in Current Psychiatric Therapies, Vol. 20, pp. 167-176, edited by Jules H. Masserman, M.D., New York, Grune and Stratton, 1981.

24.    Halleck, S.L., Psychotherapy Research: Methodological and Efficacy Issues, American Psychiatric Association Commission of Integration of Psychotherapies, XV +261 pp., American Psychiatric Association, 1982.

25.    Halleck, S.L., The Role of the Psychiatrist in the Criminal Justice System. Chapter 27 in Psychiatry 1982: The American Psychiatric Association Annual Review, 381-396, edited by Lester Grinspoon, M.D., American Psychiatric Press, Inc., Washington, D.C., 1982.

26.    Halleck, S.L., Psychiatry in the Sentencing Process. Chapter in Issues in Forensic Psychiatry, 181-215, A Report of the Task Force on the Role of Psychiatry in the Sentencing Process (with Paul Appelbaum, M.D., Jonas Rappeport, M.D. and George E. Dix), American Psychiatric Press Inc., Washington, D.C., 1984.

27.    Halleck, S.L., The Assessment of Responsibility in Criminal Law and Psychiatric Practice, Chapter 6 in Law and Mental Health. International Perspectives, Vol. 1, 193-220, edited by David N. Weisstub, Pergamon Press, New York, 1984.

28.    Halleck, S.L., Forensic Psychiatry. Chapter in Core Readings in Psychiatry: An Annotated Guide to the Literature, 461-465, edited by Michael H. Sacks, M.D., William H. Sledge, M.D., and Phyllis Rubinton, M.L.S., Praeger Publications, New York, 1984.

29.    Halleck, S.L., Treatment Planning. Chapter in Vol. 1. The Somatic Therapies in The Psychiatric Therapies. A Report by the American Psychiatric Association Commission on Psychiatric Therapies, Chaired by Tokoz B. Karasu, M.D., American Psychiatric Press, Inc., Washington, D.C., 1984.

30.    Halleck, S.L. and Walker, P.A., A Working Model Program in Linking Academic and State Service Agencies in Psychiatric Residency Training in North Carolina, Chapter in Working Together: State-University Collaboration in Mental Health, edited by John A. Talbott and Carolyn B. Robinowitz, American Psychiatric Press, Inc., Washington, D.C., 54-59, 1986.

31.    Halleck, S.L., Criminal Responsibility, Chapter 22 in Review of Psychiatry, Vol. 8, 451-466, edited by Allan Tasman, M.D., Robert E. Hales, M.D., and Allen J. Frances, M.D., American Psychiatric Press, Inc., Washington, D.C., 1989.

32.    Halleck, S.L., Forensic Psychiatry. Chapters in Case Reading In Psychiatry: An Annotated Guide to the Literature. 2d Edition, A.P.A. Press, in press.

14

33.   Halleck, S.L., The Post World War II History of Forensic Psychiatry, in The Post World War II History of Psychiatry, Eitors: Nemian, J. and Menninger, R., A.P.A. Press, in press.

## PUBLICATONS-EDITORIALS

Over 40 editorials published by Contemporary Psychiatry: A Journal of Critical Review, Plenum Publishing Corporation, New York.

## PUBLICATIONS - BOOKS

1.   Halleck, S.L., Roberts, L. and Loeb, M. (editors). Community Psychiatry, University of Wisconsin Press, 1966.

2.   Halleck, S.L., Psychiatry and the Dilemmas of Crime, Harper and Row, April 1967.

3.   Halleck, S.L. and Bromberg W. (editors). Current Issues in Psychiatric Criminology, Charles C. Thomas, 1969.

4.   Halleck, S.L., The Politics of Therapy, Science House, 1971.

5.   Halleck, S.L., (editor), Aldine Annual of Crime and Criminal Justice, 1973.

6.   Halleck, S.L., (senior editor), Aldine Annual of Crime and criminal Justice, 1974.

7.   Halleck, S.L., The Treatment of Emotional Disorders, New York: Jason Aronson Publishers, January 1978, 526 pp.

8.   Halleck, S.L., Law in the Practice of Psychiatry, New York: Plenum Publishing Corporation, July 1980, 294 pp.

9.   Halleck, S.L., Karasu, T.B., et al. The Psychiatric Therapies, Vol 1, The Somatic Therapies, and Vol. 2, The Psychosocial Therapies, American Psychiatric Press, Inc., Washington, D.C., 1984, 908 pp.

10.   Halleck, S.L., The Mentally Disordered Offender, National Institute of Mental Health, Rockville, M.D., 1986.

11.   Halleck, S.L., Evaluation of the Psychiatric Patient: A Primer, Plenum Medical Book Co., New York, 1991, 216 pp.

15

**ADDENDUM TO CURRICULUM VITAE**
**Seymour L. Halleck, M.D.**

While the enclosed C.V. is fairly accurate, it may not provide a clear picture of my current professional activities. I retired from my full-time position at the University of North Carolina in September 1995. I continued to do a moderate amount of teaching and some patient care under University auspices for about a year afterwards. I also began to expand a forensic psychiatry practice which included both criminal and civil cases. I continued to serve as a consultant to the Federal Bureau of Investigation and occasional teacher at a nearby Federal prison. (These activities began before my retirement but are not noted in my old C.V.) From 2002 to 2004 I served as a Federal Monitor to the Ohio Department of Corrections.

By 1996 I stopped my private clinical practice, began to cut back on my University teaching and stated practicing forensic psychiatry independent of the University. I still do occasional teaching at the University of North Carolina Law School and Medical School and still carry the title of Professor of Psychiatry.

My forensic practice has been successful and has brought me several honors. I was editor of the Journal of the *American Academy of Psychiatry and Law* between 1990 and 1999 and have been listed in *Best Doctors in America* under Forensic Psychiatry since 1997. Two years ago I received the "Golden Apple" award from the American Academy of Psychiatry and Law.

Seymour L. Halleck, M.D.

16

App. 00260

**Ruben C. Gur PhD ABPP/CN**
Neuropsychology

Voice/Fax: (215)247-2716 email: gur@bbl.med.upenn.edu

**815 Saint George's Rd.**
**Philadelphia, PA 19119**

## QUANTITATIVE FUNCTIONAL BRAIN IMAGING CONSULTATION
### DRAFT

Patient's name: **Chadrick E. Fulks**
Date of birth: ███████████
Date of report: June 13, 2004
Referring source: John Blume, Esq.

### Summary of PET quantitative analysis for Mr. Chadrick E. Fulks

The PET [18]F-FDG study of cerebral metabolic rates for glucose (CMRgl) was deemed technically sound. A quantitative analysis of the PET data was requested to evaluate whether regional activity values deviate statistically from normal.

To perform the quantitative analysis, count data were downloaded electronically to a SUN Microsystems workstation and a standard set of regions of interest (ROIs) was applied using validated procedures[1]. Dr. J. Daniel Ragland performed placement of ROIs and the region-to-whole-brain (R/WB) ratio values were transferred electronically to a Macintosh computer for graphical display using Deltagraph® (v4.5 for Mac). Two graphs were generated, one to evaluate regional hypo- or hyper-metabolism and the other to focus on any asymmetries.

Examination of the R/WB regional values (**Figure PET-1**) showed abnormal relative metabolism in a significant number (12 out of 35, p < 0.001) of regions. Notably, marked focal decrease in metabolism was documented in fusiform gyrus (FG) and thalamus (TH), while relative increases were notable in Superior Frontal (SF), Dorsal Prefrontal – Lateral (DL) and Medial (DM), Inferior Frontal (IF), Occipital cortex, Lateral (OL), Mid–Temporal (MT), Cingulate Gyrus – anterior (CA), Cingulate Gyrus – genu (CG), Cingulate Gyrus – Posterior (CP), and Lateral Lenticular nucleus(LL). Reduced fusiform and thalamic activity could be a result of head injuries, most likely a

---

[1] Gur RE, Resnick SM, Alavi A, Gur RC, Caroff S, Dann R, Silver F, Saykin AJ, Chawluk JB, Kushner M, Reivich M. Regional brain function in schizophrenia: I. A positron emission tomography study. *Archives of General Psychiatry*, 1987, 44, 119-125.

Gur RC, Mozley LH, Mozley PD, Resnick SM, Karp JS, Alavi A, Arnold SE, Gur RE. Sex differences in regional cerebral glucose metabolism during a resting state. *Science*, 1995, 267, 528-531

Ragland JD, Glahn DC, Gur RC, Censits DM, Smith RJ, Mozley PD, Alavi A, Gur RE. PET regional cerebral blood flow change during working and declarative memory: Relationship with task performance. *Neuropsychology*, 1997, 11, 222-231.

blow to the top of the head. The abnormally increased activity in some temporal, occipital and frontal regions could reflect epileptiform or psychotic process. This could also relate to shearing associated with closed head injury. The findings of cortical hyper-metabolism are worrisome because they may lead to further tissue deterioration, unless there is also increased cerebral blood flow, which we were not able to determine.

Hemispheric asymmetry measures (**Figure PET-2**) indicate that the reduced activity in the fusiform gyrus is in the right, resulting in relatively higher left hemispheric metabolism in this region, while reduced thalamic activity is bilateral. Notably, in all regions showing abnormally increased activity the increase is lateralized to the left, while the lingual gyrus of the occipital lobe (LI) and the medial lenticular (LM), or globus pallidus, show focal decrease in the left. The symmetric activity in cerebellum is also abnormal because it is usually lower in the left in right-handed individuals. Some of these abnormalities can be appreciated by visual inspection of the PET scans (**Figure PET-3**), although knowledge of the normative data is essential to document regional deviations in many parts of the brain where normal metabolism may be asymmetric.

## Interpretation

Quantitative examination of the PET data indicates an abnormal shift in regional activity, with hypo-metabolism in regions associated with complex visual processing and signal modulation, and hyper-metabolism of glucose in several cortical regions. Abnormal asymmetries in these regions were also documented. While the abnormalities in regional CMRgl are not themselves diagnostic in that they do not converge to support a specific etiology, they do establish with statistical certainty that Mr. Fulks has abnormal brain function. The extent to which the increased glucose metabolism in cortex, particularly temporal areas, is cause for concern depends of the adequacy of cerebral perfusion. This can be established with a PET study using a tracer such as $^{15}OH_2$ for measuring regional cerebral blood flow (rCBF). The interpretation of all these PET abnormalities also depends strongly on the anatomic analysis (see Dr. Davatzikos report).

## Summary of neuropsychological evaluation for Mr. Chadrick E. Fulks

For preparing this report, I have reviewed the comprehensive neuropsychological testing performed by Drs. James Evans and Jonathan Venn and submitted the results for analysis and display using the Behavioral Imaging (BI) algorithm, I interviewed Mr. Fulks, and administered additional computerized tests and a measure of olfactory functioning to further delineate the nature and extent of deficits. I have also reviewed the screening results performed more recently by Dr. Landis at the Butner facility.

### Prior testing and the "Behavioral Image"
In general, all evaluations agree that Mr. Fulks has put forth a good effort and was not trying to feign dysfunction. Therefore, the testing is considered a valid indication of his neurocognitive abilities. The evaluations also point out consistently that Mr. Fulks generally functions at a low level, with specific deficits in executive functions and memory.

The results of traditional neuropsychological testing were entered into the "Behavioral Imaging" algorithm as described in Gur et al.[2] The resulting behavioral image translates the neuropsychological scores into a color scaled presentation of the brain from top and side views, with red and yellow colors representing average or better performance and blue and dark colors representing brain dysfunction. The behavioral image of Mr. Fulks based on Dr. Evans evaluation (**Figure NP-1,** top panel) indicated overall impaired performance, with two notable foci of hypofunction on the left inferior and orbital frontal and, extending to the posterior temporal lobe, and left occipital region. The behavioral image based on Dr. Venn's testing (**Figure NP-1,** bottom panel) is remarkably consistent, also showing reduced left frontal functioning in the identical region and reduced occipito-parietal functioning, albeit more superiorly. The variability in occipital localization likely reflects differences in the sensitivity of visual testing by these evaluators.

Lesions of the kind depicted by the behavioral image are associated with several cognitive and emotional difficulties, in addition to those documented in the testing. In the cognitive domain, individuals with such lesions tend to have visual-perceptual problems, they will be considered "clumsy" and inattentive, they are easily distractible, and they have difficulty "sizing up" situations. Emotionally, people with lesions in the left fronto-temporal areas tend to be anxious, depressed and have poor impulse control.

**Clinical interview**

I interviewed Mr. Fulks in a cell provided by the prison. Mr. Fulks was dressed in prison-issued clothing and his handcuffs were removed. He was polite and friendly, and talked almost incessantly unless instructed to respond to specific questions. His speech was slow and somewhat slurred, with minimal prosody. His face had a stare that seemed to reflect efforts to understand what was going on around him. He had a slight tremor in his right hand, especially when he had to use his left hand.

Mr. Fulks described numerous head injuries with LOC, almost too many to detail. For example, at age 9 or 10 he was hit in the head by a full can of paint thrown by his older brother Dwight, who was about 17 at the time. The can hit his left frontal part and he was unconscious and had to be treated. At about age 11 the top of his head hit the wall when his brother "practiced boxing" on him, again with LOC. He was hit by a physician car, again at the top of his head, and at age 16 he lost the brakes on a car he drove and totaled it. His brother stitched the open wounds with a fishing line, and since then he has suffered "blackouts" and memory loss. While at a group home in Ohio, another juvenile

---

[2] Gur RC, Trivedi SS, Saykin AJ, Gur RE. "Behavioral imaging" - a procedure for analysis and display of neuropsychological test scores: I. Construction of algorithm and initial clinical evaluation. Neuropsychiatry, Neuropsychology and Behavioral Neurology, 1988, 1, 53-60.

Gur RC, Saykin AJ, Blonder LX, Gur RE. "Behavioral imaging": II. Application of the quantitative algorithm to hypothesis testing in a population of hemiparkinsonian patients. Neuropsychiatry, Neuropsychology and Behavioral Neurology, 1988, 1, 87-96.

Gur RC, Saykin AJ, Benton A, Kaplan E, Levin H, Kester DB, Gur RE. "Behavioral imaging": III. Inter-rater agreement and reliability of weightings. Neuropsychiatry, Neuropsychology, and Behavioral Neurology, 1990, 3, 113-124.

knocked him unconscious with a phone book and a flashlight. His father and brother also have beaten him up to the point of LOC several times. He had another MVA where he ran into a tree and lost consciousness, and another time during a police chase he ran off the road, crashed into a tree and was unconscious for several hours. He also had a motorcycle accident where he hit a car and fractured the back of his skull in an impact that also broke some teeth. When he was shot in his shoulder he also fell and lost consciousness. In addition, he reported his mother being drunk and otherwise intoxicated much of the time, and that she did not refrain from alcohol when she was pregnant with him.

**Testing**
Mr. Fulks approached the testing confidently and put forth his best effort. He worked diligently, and was cautious and meticulous in his approach. When encountering difficult tasks he talked to himself in an effort to guide his responses. He generally performed in the average to much below average range (**Figure NP-2**). His effort to perform accurately (**Figure NP-2,** top panel) seems to have masked deficits, as his reaction time (speed) was significantly impaired whenever his accuracy was within the normal range (**Figure NP-2,** bottom panel). Notably for executive functioning, he was unable to attain the third category on the PCET even though he was able to discover the firs two categories quite fast, consistent with dorsolateral prefrontal damage. On the attentional test he was able to perform on average for target detection, but this was by using a very liberal strategy that resulted in a highly abnormal rate of false positives. His immediate memory was impaired for words, faces and shapes, although his ability to retain information, once memorized, is less impaired. On the other hand, his accuracy for the intellectual measure was impaired while his speed was normal. For spatial processing he attained performance within the normal range, but at the expense of highly abnormal speed (>4SDs below average). His sensorimotor performance was markedly abnormal for both accuracy and speed.

On the measures of affect processing, his accuracy was within normal limits but his speed was severely compromised. The exception was for recognition of high intensity happy, where he was impaired for accuracy but not speed. Finally, olfactory testing using the UPSIT was in the range of Moderate Microsmia (<5th %tile).

**Interpretation of neuropsychological evaluation**

The impairments documented in the neuropsychological testing indicate the presence of moderate to severe cerebral dysfunction affecting fronto-temporal and limbic regions, as well as visual and sensorimotor areas. Both cortical and subcortical regions are affected, including the limbic system. This is strongly supported by the affect processing and the olfactory findings.

Individuals with this degree and distribution of cerebral dysfunction have behavioral deficits encompassing both cognition and affect. Probably of greatest relevance to this case are impaired ability to process emotion and the ability to understand emotional expressions on other people's faces. Such difficulties may create paranoid ideation and cause inappropriate responses. The deficits indicate poor ability to

abstract and understand the context of his behavior and control impulses. One should bear in mind that individuals with focal brain lesions might behave in ways that deviate from their "normal" self, ways in which they would not have behaved had they not suffered from brain dysfunction. Therefore, the presence of brain dysfunction such as observed in Mr. Fulks diminishes the ability to assess his environment and control his behavior. While it is impossible to establish the etiology of these deficits, the pattern is consistent with traumatic head injuries complicated by substance abuse.

**Integration across the behavioral and imaging studies**

As indicated in the report of Dr. Davatzikos, Mr. Fulks has a highly abnormal brain anatomy with reduced volume in frontal and limbic regions. The PET results indicate focal reduction in neuronal activity in fusiform gyrus and thalamus, areas that are central for complex visual processing and signal modulation. At the same time there is abnormal elevation of activity in several fronto-temporal regions and limbic structures including the entire cingulate gyrus. The elevated metabolic activity in regions of tissue loss indicates an active pathological process that could be epileptogenic if cerebral perfusion is compromised. The pattern of abnormalities is consistent with results of neuropsychological testing, which shows deficits in functions related to these regions. This includes deficits in abstraction, flexibility, attention and impulse control, as well as affect processing and the olfactory deficit. His right hand tremor may relate to relative reduction in cerebellar activity on the right. His deficits in visual sensorimotor functioning likely relates to reduced metabolism in fusiform gyrus and visual sensorimotor areas. Reduced thalamic activity likely interferes with signal modulation and the process of assigning meaning to the environmental cues.

This pattern is consistent with head injuries, where bony structures in the orbital regions produce tissue injury and the force of the blow produces shearing in medially located regions. However, other factors may have exacerbated the deficit including poor prenatal and perinatal conditions and extensive substance abuse. Most substances of abuse affect frontal regions and may add to tissue loss and abnormal physiologic landscape.

Prepared by


Ruben C. Gur Ph.D., ABPP
Professor
Director of Neuropsychology and the Brain Behavior Laboratory

**<u>Abbreviations in PET Figures:</u>**

SF = Superior Frontal; DL = Dorsal Prefrontal – Lateral; DM = Dorsal Prefrontal – Medial; MF = Mid–Frontal; IF = Inferior Frontal; SM = Sensorimotor; SP = Superior Parietal; SG = Supramarginal Gyrus; OL = Occipital cortex, Lateral ; OM = Occipital cortex, Medial; LI = Lingual Gyrus; FG = Fusiform Gyrus; OT = Occipital Temporal; ST = Superior Temporal; MT = Mid–Temporal; IT = Inferior Temporal; TP = Temporal Pole; PH = Parahippocampal Gyrus; HI = Hippocampus; AM = Amygdala; IN = Insula; OF = Orbital Frontal; RG = Rectal Gyrus; CA = Cingulate Gyrus – Anterior; CG = Cingulate Gyrus - genu; CP = Cingulate Gyrus – Posterior; C1 = Corpus Callosum – Anterior; C2 = Corpus Callosum – Posterior; CN = Caudate Nucleus; LM = Lenticular – Medial [Globus Pallidus]; LL = Lenticular – Lateral [Putamen]; TH = Thalamus; MI = Midbrain; PO = Pons; CE = Cerebellum.

PAR = Parietal
OCC = Occipital
CC = Corpus callosum
BG = Basal ganglia
BS = Brainstem



**Figure PET 1. MEAN±SD of region to whole brain ratio (R/WB) results for cerebral metabolic rates for glucose (CMRgl) in healthy males and Mr. Fulks**



**Figure PET 2. MEAN±SD LATERALITY of cerebral metabolic rates for glucose (CMRgl) in healthy males and Mr. Fulks**



App. 00267

**Figure PET-3. PET scans of Mr. Fulks showing transverse sections**



**Figure NP-1. Behavioral images of Mr. Fulks based on standard neuropsychological testing**

**Dr. Evans' testing**



**Dr. Venn's testing**





**Figure NP 2.** Z-scores of performance on the computerized neurocognitive tests for Nr. Fulks. ABF=abstraction/flexibility; ATT=attention; MEM=memory; INT=intellectual; SPA=spatial; SM=sensorimotor; EMO=emotion

# JAMES H. HILKEY, Ph.D.

Licensed Practicing Psychologist
3326 Chapel Hill Boulevard, Suite B120
Durham, North Carolina 27707
Ph. (919) 493-1110  FAX (919) 932-1734

## PSYCHOLOGICAL EVALUATION

NAME:                                  Chadrick Evan Fulks
SSN:
DATE OF BIRTH:
CRIMINAL NUMBER:      4:02-992
DATE OF REPORT:         May 7, 2004

## REFERRAL AND IDENTIFYING INFORMATION

Chadrick Evan Fulks is a twenty-eight year old married Caucasian male currently in custody awaiting trial on charges of Kidnapping and Car Jacking. This psychological evaluation was requested by Mr. Fulks' attorneys to aid them in their representation. The United States is seeking the death sentence in this case and this evaluation was completed to assess Mr. Fulks' psychological functioning as it pertains to Mitigating Factors as defined in Title 18 U.S.C. Section 3592. Mr. Fulks is represented by Attorney John H. Blume and Assistant Federal Public Defender William F. Nettles.

## ASSESSMENT PROCEDURES

Mr. Fulks was initially examined on August 12, 2003, at the Alvin S. Glenn Detention Center in Columbia, South Carolina. Prior to initiating formal assessment procedures Mr. Fulks was informed that there were limits on the confidentiality of this evaluation, that if called to testify in his case, findings from my examination would be shared with the Court and with the attorneys for the United States. Mr. Fulks was examined on August 13, 2003, at the Alvin S. Glen Detention Center, on January 5, 2004, at the Columbia Care Center in Columbia, South Carolina, and finally on February 18, 2004, at the Federal Medical Center in Butner, North Carolina. Approximately fourteen hours were spent in direct examination of Mr. Fulks which included the administration of the following battery of psychological tests and assessment procedures:

Chadrick Evan Fulks
Psychological Evaluation
Page Two

Wechsler Adult Intelligence Scale, Third Edition
Wide Range Achievement Test, Third Edition
Bender Gestalt Visual Motor Test
Rey Fifteen Item Test
Personality Assessment Inventory
Millon Clinical Multiaxial Inventory, Third Edition
Minnesota Multiphasic Personality Inventory, Second Edition
Rorschach Projective Technique, Structurally Scored
Mental Status Examination and Clinical Interviews

In addition collateral information including medical, school, mental health and criminal records were reviewed and included as a foundation for opinions contained in this evaluation.

# FINDINGS

*Behavioral and Interview Observations:*

Mr. Fulks was examined on four separate occasions between August 2003 and February, 2004 in three different settings. On all visits, Mr. Fulks presented as a young man who was dressed in prison issued jump suits and it was apparent that he paid attention to his physical appearance; his hair was trimmed and neatly combed, his finger nails were bitten close to the quick. Mr. Fulks appeared to be well nourished as his weight was appropriate to his medium frame; Mr. Fulks thought he had lost approximately forty pounds since his arrest. He presented with no unusual physical mannerisms; however, Mr. Fulks' facial expressions had a vacant quality, his occasional smiles appeared forced, and a slight drop was noted on the left side of his mouth. Mr. Fulks was able to maintain good eye contact. Mr. Fulks' speech was soft with little modulation in volume or intensity. On several occasions I asked that he speak up and it was apparent he was concerned that others might hear our conversations. There was a childlike and dependent quality to Mr. Fulks' speech patterns frequently deferring to his attorney's authority. During my most recent visit with Mr. Fulks, conducted at the Federal Medical Center at Butner, North Carolina, he presented with a serious infection from a wound to his abdomen. He was convinced the infections were the result of pieces of razor blade left in the wound from the assault. Mr. Fulks became quite frightened, requiring excessive reassurance before he was willing to consent to medical treatment. During this procedure, he repeatedly expressed childlike concerns that Mr. Blume was going to be unhappy with him.

Mr. Fulks' affect appeared depressed with signs of anxiety. Mr. Fulks' thought processes were generally logical and goal directed. He did endorse some perceptual distortions such as visual and auditory hallucinations; however, there were typically some explanation such as substance abuse involvement. Generally speaking, Mr. Fulks presented as a dependent and primitive young man. His insight and judgment

appeared generally poor. His behavior was consistent with an individual with significant personality and neurological problems.

Mr. Fulks was fully aware of the purpose of the examination, was able to accurately recite the criminal charges lodged against him, and seemed to quickly develop a rapport with me. Mr. Fulks was fully oriented and was cooperative. He appeared well motivated to complete tasks as requested. During several of the longer sessions, Mr. Fulks became distracted but was able to return to task with minimal encouragement. Mr. Fulks presented as an isolated and dependent young man who appeared socially younger than his chronological age.

Mr. Fulks admitted to a pronounced lack of stability during his early years stating that both parents were heavy abusers of alcohol, that both parents were "mean" when drinking. Poor parental guidance including abusive punishment and sexually inappropriate behavior was cited. He indicated that he felt depressed and estranged from other children, in part due to a speech impediment and the fact that his clothing was often old and tattered. Mr. Fulks, despite poor living conditions, stated that he was always concerned about keeping clean, stating that he took two to three showers daily. Mr. Fulks acknowledged a significant history of substance abuse beginning with inhaling petrochemicals and drinking moonshine liquor at the age of ten. Mr. Fulks did not minimize problems with conduct in school or prior criminal infractions. Mr. Fulks admitted that he dropped out of school in the tenth grade but did state that he later earned a GED. He also indicated that he was placed in Special Education Classes because of behavioral problems and some learning difficulties. He did endorse some psychiatric symptoms including a suicide attempt by overdose in 1991. Treatment for depression was initiated following the suicide attempt. Mr. Fulks endorsed a history of head trauma and a gun shot wound to his shoulder. He was seriously wounded while detained at the Alvin S. Glenn Detention Center in Columbia, South Carolina, apparently a victim of gang related assault.

*Malingering Assessment:*

Mr. Fulks was administered two separate malingering assessment instruments in addition to an analysis of the validation scales built into the objective personality tests administered. He correctly reproduced all symbols from the *Rey Fifteen Item Test*. All but the most cognitively disabled individuals are able to reproduce at least nine of these items. Mr. Fulks was also administered the *Structured Interview of Reported Symptoms (SIRS)*, an instrument designed to assess malingering of psychiatric symptoms. Of the Primary Scales, four (Rare Symptoms, Symptom Combinations, Improbable or Absurd Symptom, Reported vs. Observed Symptoms) were scored in the *Honest* range. The remaining four scales (Subtle Symptoms, Blatant Symptoms, Selectivity of Symptoms, Severity of Symptoms) were scored in the *indeterminate* range. Results from this instrument do not support a diagnosis of malingering.

*Intellectual, Achievement, and Organic Test Results:*

Mr. Fulks was administered the *Wechsler Adult Intelligence Scale, Third Edition (WAIS-III)* and the *Wide Range Achievement Test, Third Edition.* These instruments were administered on August 12 and 13, 2003. At the time I was not aware that these instruments had been administered by another psychologist on an earlier date; however, the results were highly consistent with the prior administration of the *(WAIS-III).* Mr. Fulks obtained a Full Scale IQ score of 78 placing him in the *Borderline Range* of intelligence. This is a global assessment of his problem solving skills; a score in the range places him at the 7th percentile of his peers. There is a 95% chance that his true IQ falls between 74 and 83. There is very little difference between Mr. Fulks' abilities to use verbal and non verbal problem solving skills. He obtained a Verbal IQ score of 79 (95% confidence interval, 75-85; 8th percentile) *Borderline Range*, his Performance IQ score was 81 (95% confidence interval 75-83, 10th percentile) *Low Average Range.*

Academic achievement as measured on the *Wide Range Achievement Test, Third Edition* indicated that Mr. Fulks is able to read at the *Eight Grade Level* ( 14th percentile), spell at the *Fifth Grade Level* (5th percentile), and complete arithmetic problems at the *Sixth Grade Level* (6th percentile).

*Bender-Gestalt Visual Motor Test* stimulus patterns were generally well reproduced with only minor errors recorded.

*Personality Test Results:*

Mr. Fulks was initially administered three separate personality tests, the *Millon Clinical Multiaxial Inventory Third Edition (MCMI-III)*, the *Personality Assessment Inventory (PAI)*, and the *Rorschach.* Given the invalidity of a prior administration of the *Minnesota Multiphasic Personality Inventory, Second Edition (MMPI-2)* during an assessment by a different evaluator, Mr. Fulks was given the opportunity to retake this true-false personality test. Because of Mr. Fulks' reported problems with attention, the objective personality tests items were read to him.

The validity of Mr. Fulks' responses to the items on the *PAI* fell in the normal range suggesting that he did not present an unrealistic or inaccurate impression more negative or more positive than the clinical picture would warrant. His *PAI* profile was marked by significant elevations across several scales, indicating a broad range of clinical features and increasing the possibility of multiple diagnoses. His profile type is associated with marked distress and severe impairment in functioning. Areas of clinical significance include drug related problems, somatic concerns including rumination about physical problems, high levels of anxiety suggesting that he is easily overwhelmed, and difficulties consistent with a significant depressive experience. Mr. Fulks' responses to the *PAI* suggest marked suspiciousness and mistrust in his relationship with others. His image of himself is poorly established and fragile; even minor slights from others result in real doubts about his worth.

Chadrick Evan Fulks
Psychological Evaluation
Page Five

Results from the *MCMI-III* response indicate a style consistent with individuals who display a characterlogical inclination to complain or to be self-pitying. Additional interpretations include individuals who are in states of extreme emotional vulnerability and acute stress. Regardless, clinical interpretations from Mr. Fulks' responses were generated. Consistent with the results from the PAI, the *MCMI-III* suggested that Mr. Fulks has marked deficits in these abilities to effectively manage his feelings, thinking and behavior. He is likely to show signs of a depressive dependency. The modal diagnoses from the MCMI-III include Dependant Personality Disorder with Schizotypal Personality Features and Depressive Personality Traits.

Rorschach test results confirm and extend the results from the *MCMI-III* and the *PAI*. Mr. Fulks gave nineteen responses to the ten ambiguous inkblots. Results are valid with clinically significant results on two constellations, Depression and the Coping Deficit Index. Mr. Fulks, based on the results from this projective test, is prone to episodes of affective disturbance that include depression that interferes with effective interpersonal functioning. He also has markedly difficult times mustering adequate psychological recourses to cope with the demands placed on him. Rorschach results also suggest that Mr. Fulks has marked impairment in his reality testing capacity, whereby he tends to misperceive events and to form mistaken impressions of people and the significance of their actions. Poor judgment is consistent with these findings.

The results from the *MMPI-2* profile produced by Mr. Fulks were valid. There were significant elevations on all of the ten clinical scales with the exception of scale 5 (masculinity/feminine). The profile produced is a fairly rare type (floating profile) usually attributed to individuals with a number of significant psychological problems. His mood is described as apathetic, fearful and hopeless. Cognitively, Mr. Fulks finds it hard to concentrate with rumination and obsessions. Interpersonal relationships are marked by introversion and alienation.

## DIAGNOSTIC IMPRESSIONS

Based on the findings of this evaluation, the following diagnoses are tendered based on the criteria established in the *Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, TR.*

AXIS I: Clinical Syndromes

304.80 Polysubstance dependence
300.4 Dysthymic Disorder
294.9 Cognitive Disorder Not Otherwise Specified
Probable Attention Deficit Hyperactive Disorder by History

AXIS II: Personality Disorder

301.9 Personality Disorder, Not Otherwise Specified
(Dependant, Schizotypal, and Antisocial)

Chadrick Evan Fulks
Psychological Evaluation
Page Six

AXIS III: Medical Conditions

Complications due to recent stab wound, hypertension

AXIS IV: Environmental Social Stressors

Serious legal problems, lack of consistent support systems, physical
health concerns

AXIS V: Global Assessment of Functioning

41-50

## DISCUSSION, OPINIONS, AND RECOMMENDATIONS

Mr. Fulks presents with multiple significant psychological problems. He is a young man
who has a number of biological problems. Both parents have had significant substance abuse
problems, which in itself drastically increases the likelihood that he will be more prone to have
problems with substance abuse. Specialists in neuropsychology and neurology have identified
cognitive problems most likely stemming from Mr. Fulks' mother's consumption of alcohol
during his pregnancy. Mr. Fulks has a history of head trauma with loss of consciousness.
Environmentally, Mr. Fulks was raised in a highly chaotic home characterized by poverty and a
history of drug abuse, inconsistent supervision and neglect, and physical abuse. He also reports
being sexually abused. Psychologically, Mr. Fulks has never developed adequate coping
mechanisms, severely limiting his ability to meet the demands of daily living. He has been
chronically depressed, lacks self-esteem and is easily influenced by those around him. Consistent
with his neurological impairment and his socialization, Mr. Fulks' behavior has been marked by
impulsivity and his thinking influenced by extremely poor judgment.

It is my opinion that the combination of Mr. Fulks' neurological impairment and his
significant psychological problems result in a lack of capacity to fully appreciate the nature of his
behavior or to anticipate the consequences of his actions. As a young man with significant
deficits, he is highly malleable.

James H. Hilkey, Ph.D.
Licensed Psychologist

# Jonathan Venn, Ph.D., ABPP

**DIPLOMATE IN CLINICAL AND FORENSIC PSYCHOLOGY**

5000 Thurmond Mall • Suite 348
Columbia, South Carolina 29201-2374
Tel: (803) 765-1800 • Fax: (803) 765-1804
email: mail@jonvenn.com

---

## REPORT OF NEUROPSYCHOLOGICAL EVALUATION

## CONFIDENTIAL — FOR PROFESSIONAL USE ONLY

| | |
|---|---|
| **Name**: | Chadrick Evan Fulks |
| **Age**: | 26 |
| **Date of Birth**: | ▮▮▮▮▮▮ |
| **Dates of Examination**: | 03/27/2003, 04/11/2003, 04/15/2003, 04/17/2003, 04/28/2003, 04/30/2003, 05/01/2003, and 05/02/2003 |
| **Date of Report**: | 03/30/2004 |

## REFERRAL STATEMENT:

This right-handed, Caucasian man was referred for neuropsychological evaluation by his attorney, John Blume, Esquire, of Columbia, SC, in relation to criminal charges.

## QUALIFICATIONS:

I studied neuropsychology and neuroscience at Northwestern University and earned a Ph.D. in Clinical Psychology at Northwestern University in 1977. I received further training in neuropsychological assessment during my internship and traineeships at Veterans Administration Hospitals. I continued to receive training in neuropsychology as a Lieutenant in the U.S. Naval Reserve and as an employee of the South Carolina Department of Mental Health. I have received continuing education in neuropsychology and neuroscience through the National Academy of Neuropsychology, the American Board of Professional Psychology, the American Psychological Association, the American Academy of Forensic Psychology, Marquette University, Hamot Institute for Behavioral Health, the South Carolina Psychological Association, Reitan Neuropsychology Laboratory, and other organizations. I have been a member of Division 40 (Neuropsychology) of the American Psychological Association since 1987. I have dissected human and animal brains. I have lectured on neuropsychology at the William S. Hall Psychiatric Institute in Columbia, SC, which is affiliated with the University of

South Carolina School of Medicine.

I have been licensed as a psychologist in the State of Maryland since 1983, in the State of South Carolina since 1988, and in the State of Alabama since 2002. I am Certified by the American Board of Professional Psychology in Clinical Psychology (1986) and in Forensic Psychology (1996). I am certified by the American Board of Psychological Specialties in Neuropsychology (1998).

I have conducted neuropsychological evaluations as an intern at a Veterans Administration Hospital; as an employee of the South Carolina Department of Mental Health, the South Carolina Department of Juvenile Justice, and the Baltimore Gas and Electric Company; by contract with the South Carolina Vocational Rehabilitation Department; and by private referral from physicians, attorneys, and a variety of health care providers. I have conducted over 300 neuropsychological evaluations.

I have testified as a neuropsychologist in civil courts in South Carolina and in California. I have never failed to be qualified as an expert.

## SOURCES OF INFORMATION:

Booklet Category Test (BCT) (04/28/2003)
Boston Diagnostic Aphasia Examination (Complex Ideational Material subtest) (BDAE) (04/11/2003)
Boston Naming Test (BNT) (04/28/2003)
California Verbal Learning Test – Second Edition (CVLT) (04/11/2003)
Clinical Interviews (03/27/2003, 04/17/2003, 04/30/2003, 05/01/2003, and 05/02/2003)
Controlled Oral Word Association Test (COWAT) (04/11/2003)
Digit Vigilance Test (DVT) (04/11/2003 and 05/01/2003)
Grooved Pegboard Test (04/11/2003 and 05/01/2003)
Hand Dynamometer (04/11/2003)
Judgment of Line Orientation (JLO) (04/11/2003 and 05/01/2003)
Luria-Nebraska Neuropsychological Battery: Form I (Motor Functions Scale, Receptive Speech Scale, Expressive Speech Scale) (04/30/2003)
Manual Finger Tapping Test (04/11/2003)
Motor Impersistence Test (MIT) (05/01/2003)
Reitan-Indiana Aphasia Screening Test (RIAST) (04/11/2003)
Reitan-Klove Sensory Perceptual Examination (04/28/2003 and 04/30/2003)
Rey Memory Test (RMT) (04/11/2003)
Seashore Rhythm Test (SRT) (04/28/2003)
Snellen Visual Acuity Test (04/15/2003)
Speech Sounds Perception Test (SSPT) (04/28/2003)
Tactual Performance Test (TPT) (04/30/2003)

Telephone Consultations: Elin Berg, M.D. (02/17/2004); Oliver P. Harden, M.D. (02/17/2004); Daniel Martell, Ph.D. (02/05/2004); Gail Rodin, Ph.D. (06/19/2003); Charlton Stanley, Ph.D. (01/20/2004)
Test of Memory Malingering (TOMM) (04/28/2003)
Trail Making Test (TMT) (04/11/2003 and 05/01/2003)
Wechsler Adult Intelligence Scale - Third Edition (WAIS-III) (04/15/2003 and 04/28/2003)
Wechsler Memory Scale - Third Edition (WMS-III) (04/15/2003 and 04/28/2003)
Wide Range Achievement Test - Revision Three (WRAT 3) (04/28/2003)
Wisconsin Card Sorting Test (WCST) (04/11/2003)

# RECORDS REVIEWED:

## 1. EMSA Correctional Care.

Mr. Fulks reports neck pain. Percogesic (acetaminophen; analgesic, antipyretic) is prescribed. (03/13/2003)

Mr. Fulks has Bell's palsy. Prednisone (prednisone acetate; anti-inflammatory, immunosuppressant) and Percogesic (acetaminophen; analgesic, antipyretic) are prescribed. (04/09/2003)

Mr. Fulks has Bell's palsy. Prednisone (prednisone acetate; anti-inflammatory, immunosuppressant) is continued. (04/13/2003)

## 2. Prison Health Services.

Mr. Fulks is diagnosed with Posttraumatic Stress Disorder, Major Depressive Disorder, Generalized Anxiety Disorder, and Tic Disorder.

On 01/20/2003 he was prescribed Elavil (amitriptyline hydrochloride; antidepressant); Serzone (nefazodone hydrochloride; antidepressant); and Klonopin (clonazepam; anticonvulsant). There is no mention of any side-effects.

Mr. Fulks has Major Depressive Disorder. Elavil (amitriptyline hydrochloride; antidepressant) is continued. Serzone (nefazodone hydrochloride; antidepressant) is increased. There is no mention of any side-effects. (Angela Harper, M.D.; 03/02/2003)

Elavil (amitriptyline hydrochloride; antidepressant) and Serzone (nefazodone hydrochloride; antidepressant) are continued. Mr. Fulks denies having any side effects, and there is no mention of

any side effects. Mr. Fulks seems cognitively limited. (Angela Harper, M.D.; 03/31/2003)

Serzone (nefazodone hydrochloride; antidepressant), Elavil (amitriptyline hydrochloride; antidepressant), Percogesic (acetaminophen; analgesic, antipyretic), and Prednisone (prednisone acetate; anti-inflammatory, immunosuppressant) are prescribed. (Oliver Harden, M.D., 04/01/2003 through 04/30/2003)

Mr. Fulks is combative with officers and he is placed in a restraint chair. (04/24/2002 [presumably 04/24/2003])

On 04/30/2003, Serzone (nefazodone hydrochloride; antidepressant) was discontinued, Elavil (amitriptyline hydrochloride; antidepressant) and clonazapem (Klonopin; anticonvulsant) were continued, and Effexor (venlafaxine hydrochloride, antidepressant) was added. There is no mention of any side-effects.


# COLLATERAL INTERVIEWS:


1. **Elin Berg, M.D.; psychiatrist (telephone).**

Dr. Berg saw Mr. Fulks at the Lexington County Detention Center and at the Alvin S. Glenn Detention Center in Columbia, SC, beginning in 01/2003. Mr. Fulks has Major Depressive Disorder, Generalized Anxiety Disorder, Tic Disorder, and symptoms of Posttraumatic Stress Disorder. In 01/2003 he was treated with Elavil (amitriptyline hydrochloride, antidepressant) for sleep difficulties; Serzone (nefazadone hydrochloride, antidepressant) for anxiety and depression; and Klonopin (clonazepam, anticonvulsant) for anxiety and tic disorder. On 04/30/2004 Dr. Berg discontinued Serzone and added Effexor (venlafaxine hydrochloride) for anxiety and depression. Mr. Fulks' medications improved his concentration and did not cause any side effects. (02/17/2004)


2. **Betty Burroughs; Mental Health Social Worker; Medical Division; Alvin S. Glenn Detention Center; Columbia, SC.**

Mr. Fulks arrived at the Alvin S. Glenn Detention Center on 04/24/2003. On 04/30/2003 Dr. Elin Berg diagnosed him as having Major Depressive Disorder, Post-Traumatic Stress Disorder, and Generalized Anxiety Disorder. He creates no problems and there are no behavioral reports against him at the Center. He is very quiet, always stays to himself, and does not interact with his

peers. (05/02/2003)

**3.** **Lt. Bob Garrison; Lexington County Detention Center.**

Mr. Fulks has created no behavior problems and there are no disciplinary reports against him. (04/17/2003)

**4.** **Oliver P. Harden, M.D.; Eau Claire Adult and Internal Medicine (telephone).**

Dr. Harden saw Mr. Fulks at the Lexington County Detention Center and treated him for Bell's palsy with prednisone acetate (anti-inflammatory, immunosuppressant). The medications prescribed by Dr. Harden did not cause any side effects. (02/17/2004)

# INTERVIEW RESULTS:

## Family History:

Mr. Fulks was born in West Hamlin, WV. He spent most of his life in Huntington, WV. He also has lived in Ohio, Kentucky, Florida, and South Carolina. His biological father was an auto mechanic and also worked in manufacturing and has been disabled for the last couple of years with a bone disease. His biological mother was a heavy drinker. His biological mother has been a nurse for years, and she preaches at a Pentecostal Holiness church. A biological sister works for a photographer. A biological brother works in manufacturing. Another biological brother works in manufacturing and also works as a cook. Another biological brother supervises a trailer park.

Mr. Fulks married his first wife, Amber Fowler (age 26), at age 18 or 19. They divorced in 1996 or 1997. A son Devon Fulks (DOB ███████████ from this marriage died at age 6 months. Mr. Fulks married his second wife, Veronica Fulks (age 23), in 2002.

## Educational History:

Mr. Fulks attended high school in Ohio. He was a special education student because of behavioral difficulties. He had difficulty with math and found school to be too difficult. He left school during the 11th grade. He earned a welding certificate at a vocational school in West Virginia. He was on the basketball

team at the vocational school but he never got to play.

**Employment History**:

Mr. Fulks worked as a welder in Indiana, Ohio, and Florida. He worked as a cook and did parking lot maintenance for a restaurant. He has packaged hamburgers.

**Substance Abuse History**:

Mr. Fulks began using alcohol around the age of 9 to 11. By the age of 12 to 14 he was drinking regularly. He has used alcohol heavily at times and has lost consciousness frequently from drinking alcohol. He huffed paint during middle school. He huffed gasoline regularly for a couple of months in the 11th grade. He has abused methamphetamine, marijuana, cocaine, crack, LSD, and unidentified pills. He has been a heavy user of cocaine and methamphetamine.

**Health History**:

Mr. Fulks has a history of concussions. At age 10 his brother threw a gallon can of paint at him, hitting him in the left frontal area. He lost consciousness for one minute. He received stitches at the emergency room. He again suffered concussion when his brother hit him using a boxing glove and he lost consciousness briefly. Around the ages of 12 to 16 he suffered two or three concussions with loss of consciousness due to assaults. He again lost consciousness in 1995 when he was shot in the back at a party. He has lost consciousness from abusing unidentified pills.

He has been in motor vehicle collisions and has suffered bilateral knee injuries. He suffered a possible brain injury in only one collision: around 1996 his brakes went out at an intersection and he was struck on the driver's side door. His scalp was split open on the top of his head. He lost consciousness for about ten minutes. This was his worst head injury. He has suffered headaches since that time. Headaches are bifronto-temporal and involve eye pain. He denies any other sequelae from that injury.

Dizzy episodes began around the ages of 17 to 18, and he continues to feel dizzy at times. During dizzy episodes he tingles all over, he feels like his head is tightening up, and he has to sit or lie down. He gets dizzy when he stands up. He has lost consciousness while standing up on ten to twenty occasions. In

11/2002 he injured his nose and mouth in a fall when he lost
consciousness while standing up.


**Current Status**:

At 6'0" Mr. Fulks is of average height and weighs 225 lbs.  He
reports good vision and hearing.  He denies having any
difficulties with his upper extremities.  His medication regimen
during this evaluation did not cause him any side effects.


**Activities of Daily Living**:

Mr. Fulks is independent in self-care.  He can tell time.  When he
lived at his mother's house his chores were to mow the grass and
wash the dishes.  He drives a car.  He has difficulty with
directions.  His nickname was "Turn Around Chad" because he was
always getting lost while driving.  He attended church regularly
with his mother and stepfather.  He enjoys fishing, swimming,
going to the beach, driving to new places, and watching auto races
on TV.  His stepfather tried to teach him to play the guitar: they
tried for hours but it was too complicated for him and he could
not learn.  As a boy he was a good runner and a good football
player at home with his brothers.  He was not good at shooting
baskets.


# BEHAVIORAL OBSERVATIONS:

Mr. Fulks was neatly groomed and his hair was neatly combed at all
times.  His motor coordination tended to be a little stiff and awkward.
His gait was a slow shuffle.  He held his neck and upper body stiffly
while walking.  A small scar is apparent on his left forehead where he
reports his brother hit him in the head with a gallon can of paint.  A
scar from a gunshot wound to his back is visible at the right side of
T2.  Mild tremor was observed in his right hand.  He made frequent
movements of his head, neck, mouth, upper torso, and hands; and he said
he has done this all his life.  Head and neck movements had a writhing
quality.  He bounced in his chair.  I asked him to try holding perfectly
still, and he tried to do so, but his right hand moved slightly, and he
said it was difficult for him to hold still.

Attending to and participating in conversation was difficult for Mr.
Fulks and required an unusual amount of effort.  He closed his eyes and
struggled to comprehend my questions.  He was not good at following
instructions.  A low level of receptive vocabulary was apparent.

At times Mr. Fulks spoke at a good rate of speed, but in general he tended to move, think, and speak slowly. A mild stutter was noted. At times his speech lacked prosody. He was quiet and soft-spoken. He was so soft-spoken that his speech was not always intelligible, and I had to ask him to speak up. His speech was generally understandable but at times was indistinct and poorly articulated. He spoke in full sentences, at a simple level of vocabulary, with normal latencies and some elaboration. He did not volunteer information between questions but sat silently waiting for the next question. He had difficulty responding to questions. He tended to be concrete in his thinking and could not always formulate answers to abstract questions. Recalling personal information was difficult for him and required an unusual amount of effort: he closed his eyes and worked hard to retrieve personal information. His discourse was poorly organized. He tended to be circumstantial, and his answers were not always relevant to the question that had been asked. He related his personal history in a confused and sometimes irrelevant manner. His answers to questions were not well-organized but tended to be jumbled and inconsistent. At times his sentence construction was jumbled. He did not maintain continuity of time or person while answering questions. Word-finding difficulty was apparent.

Mr. Fulks was polite, pleasant, respectful, and cooperative with all procedures. He was child-like in manner. No deficits were noted in alertness or persistence. His energy level was low to normal. He was despondent in mood. His affect was full in range.

On a "Go" task he gave one echopraxic response, which he self-corrected. He had greater difficulty with a "No-Go" task: he was slow to initiate responses, he repeatedly gave responses that were partially echopraxic or partially anticipatory, and ultimately he developed a compensatory strategy of keeping his fingers down by holding them tightly against his hand.

## MENTAL STATUS EXAMINATION:

Mr. Fulks was oriented to place. He was not consistently oriented to time: at one interview he was oriented to the month and the year but not to the day of the month. He knew the year but not the date, month, or season of his second marriage, even though this had taken place only one year before. A low level of numerical skill was apparent: he did not know the year of his wife's birth, and he could not calculate it accurately. He said he lived in Florida when he was 21, but he could not calculate what year that was. He knew the name of the President of the United States, the name of the President's wife, and the President's state of origin, but he did not know the President's political party. He knew the Presidents in order only back to Clinton. He understood the

nature and purpose of the evaluation.

Memory problems were apparent. He could not always remember important personal information. He had difficulty with a simple memory task: he registered three words with his eyes closed and exerting an unusual amount of effort. He recalled the words one minute later, and he recalled them five minutes after that. Concentration tasks required an unusual amount of effort. He performed serial threes slowly. He performed serial sevens slowly and could do it only by counting aloud and on his fingers. He closed his eyes during serial sevens and worked effortfully. He calculated change from a dime but his receptive speech skills are low and he needed this question repeated. He calculated change from a dollar. He interpreted proverbs at a basic level of abstraction. He interpreted a proverb slowly and effortfully. He demonstrated a basic knowledge of current events. He denied auditory or visual hallucinations. He experiences brief visual images of his deceased son. He reports that at times he has been so pre-occupied with memories of his deceased son that he was unresponsive to people. No delusional thinking was elicited. He showed insight into his depressed mood.

## PSYCHOLOGICAL TEST RESULTS:

Mr. Fulks cooperated with psychological testing and exerted good effort. He was fully attentive. He repeatedly had difficulty comprehending test instructions (i.e., on BCT, COWAT, TMT-B, WMS-III Family Pictures I, WMS-III Logical Memory II, WMS-III Word Lists I, and WMS-III Mental Control). On TMT-B he focused on only the last few words of the instructions, and his response had to be corrected. Occasionally he gave impulsive, anticipatory responses during tests. At times he moved slowly. His energy level varied and was low at times.

Responding to neuropsychological tests was a struggle for Mr. Fulks. His test behaviors showed how much effort was required for him to participate in this examination. He used compensatory strategies like pressing his eyes shut tightly, covering his eyes, and putting his head down to facilitate concentration. On the Digit Symbol subtest of the WAIS-III he used his left thumb to hold his place. On the TMT-B he cued himself aloud. He laughed inappropriately during WMS-III – Faces I and II and during Family Pictures II. He looked puzzled and did not monitor his responses efficiently on the WCST.

During the course of this evaluation Mr. Fulks had an episode of Bell's palsy on the left side of his face that lasted a number of days including our sessions on 03/27/2003 and 04/11/2003. For that reason certain tests (DVT, JLO, TMT, and Grooved Pegboard) that require vision were given on 04/11/2003 and were repeated on 05/01/2003 when the Bell's

palsy had resolved.  He did not remember the TMT-B accurately, even though he had taken it only three weeks earlier.

### Intellectual Functioning:

On a test of intellectual functioning, the Wechsler Adult Intelligence Scale - Third Edition (WAIS-III), Mr. Fulks obtained scores as follows:

| IQ | SCORE | PERCENTILE |
|---|---|---|
| Verbal | 79 | 08 |
| Performance | 78 | 07 |
| Full Scale | 77 | 06 |

| INDEX | SCORE | PERCENTILE |
|---|---|---|
| Verbal Comprehension | 76 | 05 |
| Perceptual Organization | 84 | 14 |
| Working Memory | 86 | 18 |
| Processing Speed | 79 | 08 |

| SUBTEST | SCALED SCORE | PERCENTILE |
|---|---|---|
| Vocabulary | 6 | 09 |
| Similarities | 6 | 09 |
| Arithmetic | 8 | 25 |
| Digit Span | 8 | 25 |
| Information | 5 | 05 |
| Comprehension | 6 | 09 |
| Letter-Number Sequencing | 7 | 16 |

| SUBTEST | SCALED SCORE | PERCENTILE |
|---|---|---|
| Picture Completion | 6 | 09 |
| Digit Symbol-Coding | 5 | 05 |
| Block Design | 8 | 25 |
| Matrix Reasoning | 8 | 25 |
| Picture Arrangement | 6 | 09 |
| Symbol Search | 7 | 16 |
| Object Assembly | 8 | 25 |

His Full Scale IQ score of 77 places him in the borderline range of intelligence. He copied figures slowly (Digit Symbol-Copy = 67, cumulative percentage = 1-2%).

**Academic Achievement**:

On a test of academic achievement (WRAT 3), Mr. Fulks obtained borderline scores as follows:

| WRAT 3 | GRADE LEVEL | STANDARD SCORE | PERCENTILE |
|---|---|---|---|
| Reading | 5 | 75 | 05 |
| Spelling | 5 | 76 | 05 |
| Arithmetic | 6 | 79 | 08 |

**Learning and Memory**:

On a memory test (WMS-III) Mr. Fulks obtained low to low-average scores as follows:

| WMS-III | SCORE | PERCENTILE |
|---|---|---|
| Auditory Immediate Index | 83 | 13 |
| Visual Immediate Index | 68 | 02 |
| Immediate Memory Index | 71 | 03 |
| Auditory Delayed Index | 89 | 23 |

| | | |
|---|---|---|
| Visual Delayed Index | 84 | 14 |
| Auditory Recognition Delayed Index | 80 | 09 |
| General Memory Index | 82 | 12 |
| Working Memory Index | 83 | 13 |

His Visual Immediate Index is lowered by the fact that he switched two items on Family Pictures II. If he had not made this error, his Visual Immediate Index would have been 81. Intrusions were apparent during verbal tests (Logical Memory I and II, Verbal Paired Associates I and II, and Word Lists I and II).

His CVLT-II performance is remarkable for 43 intrusions. On the CVLT-II he obtained low scores as follows:

| CVLT-II | RAW SCORE | STANDARD/T SCORE | PERCENTILE |
|---|---|---|---|
| Trial 1 | 3 | -2.0 | 02 |
| Trial 2 | 9 | -0.5 | 31 |
| Trial 3 | 10 | -0.5 | 31 |
| Trial 4 | 8 | -2.0 | 02 |
| Trial 5 | 8 | -2.0 | 02 |
| Trials 1-5that | 38 | 36T | 08 |
| List B | 5 | -1.0 | 16 |
| Short-Delay Free Recall | 8 | -1.0 | 16 |
| Short-Delay Cued Recall | 9 | -1.0 | 16 |
| Long-Delay Free Recall | 5 | -2.5 | Below 01 |
| Long-Delay Cued Recall | 7 | -2.0 | 02 |

**Impairment Index:**

On the Halstead Impairment Index, Mr. Fulks earned a score of 0.7/1.0 (04th percentile). This score is in the range of mild to moderate impairment.

**<u>Sensory Functions</u>:**

Mr. Fulks' visual fields are full. His visual acuity is 20/25 in his right eye and 20/30 in his left eye. He does not wear corrective lenses. Tactile suppressions appeared reliably in both hands. There may be hearing loss in his left ear, although audiology would be needed to confirm this. He made only one error in visual stimulation, only two errors in finger agnosia, and only four errors in graphesthesia. The difference between his right and left hands on Tactile Form Recognition is only one second (21/20), which is not significant.

**<u>Attention, Concentration, and Cognitive Flexibility</u>:**

Mr. Fulks obtained a low-average score on a test of listening skill (SRT: 23/30 correct, 14th percentile). He obtained an average score on a test of listening to phonemes (SSPT: 04/60 errors, 62nd percentile).

A test of visual scanning and attention (DVT) was administered twice (on 04/11/2003 and on 05/01/2003). As can be seen from the table below, when the test was repeated he worked a little faster and made fewer errors:

|  | 04/11/2003 | | 05/01/2003 | |
|---|---|---|---|---|
| **DVT** | **RAW SCORE** | **PERCENTILE** | **RAW SCORE** | **PERCENTILE** |
| **Total Time** | 6:52 | 54 | 6:38 | 69 |
| **Errors** | 47 | Below 01 | 22 | 04 |

A test that involves visual scanning and cognitive flexibility (TMT) was administered twice. On 05/01/2003 he cued himself during this test by reciting aloud. He obtained low to low-average scores as follows:

|  | 04/11/2003 | | 05/01/2003 | |
|---|---|---|---|---|
| **TMT** | **SECONDS** | **PERCENTILE** | **SECONDS** | **PERCENTILE** |
| **TMT-A** | 60 | 01 | 40 | 08 |
| **TMT-B** | 165 | 02 | 107 | 12 |

App. 00289

### Language and Communication Skills:

On a test of receptive speech skills (Luria), Mr. Fulks' worked slowly and his performance was characterized by paraphasias. His Scale Total at 57T is below his Critical Level of 59.45T.

On a test of expressive speech skills (Luria), his performance was characterized by paraphasias and simplifications. Simplifications could be related to his West Virginia dialect. His Scale Total at 63T exceeds his Critical Level of 59.45T. Low levels of grammar and articulation as well as his regional dialect probably contribute to this high score.

On a test of receptive language skills (BDAE) he scored 08/12 (07th percentile).

On a naming test (BNT) he scored 46/60 (below 01st percentile).

He generated only 20 words on a test of verbal fluency (COWAT) (05th percentile).

On the RIAST he showed difficulties with reading, spelling, calculating, listening, pronouncing, and right-left orientation.

### Visual-Spatial Skills:

A test of visuospatial perception (JLO) was administered twice. On 04/11/2003 he was observed to move his head around the test booklet to an unusual degree, and he scored 25/30 (56th percentile). On 05/01/2003 he scored 28/30 (72nd percentile).

### Motor Skills:

On a test of finger tapping speed (Manual Finger Tapping Test), he obtained scores as follows:

| TAPPING | RAW SCORE | PERCENTILE |
|---|---|---|
| Dominant Right Hand | 37.8 | 04 |
| Non-Dominant Left Hand | 37.8 | 04 |

The identity between his right- and left-hand performances is a significant finding, in the range of mild to moderate impairment.

A test of finger dexterity (Grooved Pegboard Test) was administered twice (on 04/11/2003 and on 05/01/2003). On both occasions he was notably awkward with his left hand. He obtained low to low-average scores as follows:

| GROOVED PEGBOARD | 04/11/2003 | | 05/01/2003 | |
|---|---|---|---|---|
| | SECONDS | PERCENTILE | SECONDS | PERCENTILE |
| Dominant Right Hand | 96 | Below 01 | 77 | 04 |
| Non-Dominant Left Hand | 125 | Below 01 | 90 | 13 |

A test of grip strength (Hand Dynamometer) was administered twice on 04/11/2003. He obtained average to low-average scores as follows:

| GRIP STRENGTH | KGS. | PERCENTILE | KGS. | PERCENTILE |
|---|---|---|---|---|
| Dominant Right Hand | 44.5 | 24 | 51.5 | 62 |
| Non-Dominant Left Hand | 39.0 | 14 | 48.0 | 46 |

On a test of motor functions (Luria), his movements tended to be stiff, awkward, and perseverative. He had difficulty coordinating the movements of his left upper extremity, and he was observed to rest his left upper extremity on a table or to use his right hand to steady it. His Total Score at 53T is below his Critical Level of 59.45.

On a test of motor impersistence (MIT), he passed all items, although some items appeared to be difficult for him. His head, tongue, and upper extremities were in constant motion. He used a compensatory strategy of biting his tongue to hold it in place.

## Abstraction and Concept Formation:

On a test that involves concept formation, learning, and memory (BCT) Mr. Fulks made 78 errors (05th percentile), which is in the range of severe impairment.

On a test of concept formation and cognitive flexibility (WCST) Mr. Fulks completed only four categories and made 27 perseverative responses (13th percentile).

**Problem-Solving:**

On a test of haptic problem-solving (TPT) he obtained average to low-average scores as follows:

| TPT | RAW SCORE | PERCENTILE |
|---|---|---|
| Dominant Right Hand | 6:59 | 14 |
| Non-Dominant Left Hand | 7:53 | 14 |
| Both Hands | 3:12 | 16 |
| Total Time | 18:04 | 14 |
| Memory | 7 | 24 |
| Localization | 3 | 18 |

# SUMMARY:

Chadrick Evan Fulks is a 26-year-old, right-handed, Caucasian male who was a special education student in school because of behavioral difficulties. He left school in the 11th grade and later earned a welding certificate at a vocational school. He worked as a welder and also has worked as a cook, has packaged hamburgers, and has done parking lot maintenance for a restaurant. He reports a number of closed head injuries, as reviewed above. The history that Mr. Fulks reported indicates five or six mild traumatic brain injuries as defined by the American Congress of Rehabilitation Medicine.

Mr. Fulks had an unusually difficult time responding to neuropsychological tests. As reviewed above, he used compensatory strategies like closing his eyes, covering his eyes, putting his head down, using his thumb to mark his place, biting his tongue, and pressing his fingers tightly in place. These compensatory strategies indicate difficulties in attentional skills and in monitoring his own behavior.

Mr. Fulks' Full Scale IQ score of 77 is in the borderline range of intelligence. As reviewed above, he obtained low scores on many neuropsychological tests, at a level consistent with borderline intelligence. However, some of his behaviors and test scores are unusual even for persons with borderline intelligence. He reliably demonstrated tactile suppression in both hands. Forty-three intrusions on the CVLT-II is highly unusual and indicates significant failure to regulate his behavior in response to stimuli. Mr. Fulks moves almost constantly, and the possibility of a movement disorder should be ruled

out.  Other signs observed during this evaluation like mild echopraxia;
a mild stutter; and occasional, impulsive, anticipatory responses during
test administration are not necessarily consistent with borderline
intelligence but are consistent in indicating difficulties in cognition,
communication, and self-monitoring.


Thank you for referring your client for neuropsychological evaluation.

Jonathan Venn, Ph.D.
Licensed Psychologist, South Carolina License No. 440
ABPP Certified in Clinical Psychology and Forensic Psychology
Diplomate in Neuropsychology, American Board of Psychological
Specialties
Adjunct Professor, University of South Carolina

**FORENSIC EVALUATION**
**Mental Health Division**
**Federal Medical Center**
**Butner, North Carolina**

| | |
|---|---|
| **NAME:** | FULKS, Chadrick Evan |
| **REGISTER NUMBER:** | 16617-074 |
| **DOCKET NUMBER:** | 4:02-992-17 |
| **DATE OF BIRTH:** | ███████ |
| **DATE OF REPORT:** | 02/19/04 |
| **DATE REPORT SIGNED:** | 03/25/04 |

**IDENTIFYING INFORMATION:**  Mr. Chadrick Evans Fulks is a 26-year old, married white male from Proctorville, Ohio who was living in a motel in Myrtle Beach with his co-defendant and two female friends prior to being taken into custody for the alleged offenses.  Mr. Fulks and his co-defendant were on escape status. On 01/21/04, he was admitted to the Mental Health Department of the Federal Medical Center (FMC) in Butner, North Carolina for evaluation pursuant to Rule 12.2.  This rule provides that if a defendant intends to introduce expert evidence relating to a mental disease or defect or any other mental condition of the defendant bearing on either the issue of guilt or the issue of punishment in a capital case, the defendant must notify an attorney for the government in writing of this intention and file a copy of the notice with the clerk.  The Court Order states the sole purpose of this examination is to rebut mental health evidence presented by the defense in mitigation.  Mr. Fulks is charged with Kidnaping, Carjacking, Bank Robbery and Murder. There is one co-defendant listed in this case (Brandon Leon Basham).  In a Court Order dated 01/09/04, the Honorable Joseph F. Anderson, Jr., United States District Judge for the District of South Carolina, Florence Division ordered the evaluation of Mr. Fulks' mental condition.  He is represented by John Blume and William Nettles.  The Assistant United States Attorney assigned to this case is Jonathan S. Gasser.

Information available for review during Mr. Fulks' evaluation included copies of the Court Orders, most recently dated 01/08/04; FBI Criminal Complaint; Superseding Indictment; Relevant portions of the United States Attorney Office death penalty protocol submitted to the Attorney General's Office in Washington D.C.; Relevant FBI Summaries; Pretrial Services Report for the Norther District of Indiana; Death Penalty Notice; Investigative "LEED Sheet No. 72" regarding "Clifford Jay;" FBI 302 documents regarding statement of Mr. Fulks and Brandon Leon Basham; Brunswick Sheriff's Department report

regarding statement of Mr. Basham; Letters from Mr. Basham to Beth McGuffin; Booking information Mr. Fulks and Mr. Basham; Missing Persons Fliers on Samantha Burns and Alice Donovan; Medical Records from Columbia Care Center and a Memorandum summarizing the background history of Chad Fulks, dated 02/17/04.

**DATES OF CONTACT AND PROCEDURES ADMINISTERED:** During this evaluation Mr. Fulks was seen individually by Ralph Newman, M.D., Staff Psychiatrist with psychological consultation provided by Edward E. Landis III , Ph.D., Staff Psychologist, Director of Psychology Training. Neuropsychological testing was provided by Eugene V. Gourley III, PhD. Other members of the Mental Health and Correctional staff observed his behavior during the course of this evaluation and their comments were considered prior to the preparation of this report. In addition, he underwent physical, laboratory, and psychological assessments including the administration of the following procedures:

Clinical Interviews (Ongoing)
Behavioral Observation (Ongoing)
Physical Examination (12/21/04)
Woodcock-Johnson Tests of Cognitive Abilities - III (Standard and
     Extended Batteries) (02/16/04)
Woodcock-Johnson Tests of Achievement - III (Standard
     Battery - Form A) (02/16/04)
Personality Assessment Inventory (02/17/04)

**BACKGROUND INFORMATION:** The following information is a composite of that obtained from Mr. Fulks and the collateral sources referenced above. Mr. Fulks was considered to be a good and reliable historian. He had a proclivity to interpret questions in a concrete manner and answer accordingly, which required rephrasing or clarification of the question on occasion. Prior to the first interview, he was advised information would be shared with the Court, as well as with the defense and prosecuting attorneys in the form of a written report. He indicated he understood this information. Prior to the first interview, this evaluator contacted Mr. Fulks' attorney to discuss the information that would be gathered from his client in the course of interviews.

Mr. Fulks was born on ███████, in West Hamlin, West Virginia to the union of Diana Thompson and Herman Roger Fulks. He describes a stressful childhood. He was physically abused by his father to include being hit with his fists and various objects including switches and belts. These beatings primarily occurred when his father was intoxicated with alcohol and/or marijuana. He denied fractures or lacerations requiring sutures from these beatings.

Page 2 of 19

App. 00295

His father was violent towards his three brothers and his mother,
but not his sister. Other stressors including being of a lower
socioeconomic status for want of new clothes and toys. His
parents used the money they received in government subsidies and
charity to buy alcohol and luxury items such as a pool table.
His mother was frequently intoxicated during his childhood to the
extent of "passing out." The relationship between Roger and
Diana was marred with intense physical violence to the extent of
police being summoned. There was also reports of frequent loud
parties in the house with the children fending for themselves in
terms of meals, homework and sleep. His parents divorced when he
was age 13 as a result of their frequent fighting. Subsequently
he was raised by his mother and step-father, Dean Thompson, who
entered the family when Mr. Fulks was age 15. He currently
reports a good relationship with both his mother and step-father
who last visited him approximately four days prior to admission
at FMC Butner. His last contact with his father approximately
two years ago, and reports a distant relationship with ongoing
resentment for abuse as a child. His father has remarried and
this estrangement has extended to his step-mother.

Mr. Fulks mother, Diana Thompson, currently resides in
Procterville, Ohio. He states she is employed as a nurse and is
in good health. He states his mother drank alcohol heavily.
This abuse included vodka and moonshine. His mother's
intoxication was evidenced by verbal and physical altercations
with her spouse and neglect of the children. She quit abusing
alcohol when he was age 12. At that time, she became involved in
the church to the exclusion of all else, including the five
children. Her husband left the family soon after she immersed
herself in church and stopped drinking. She is reported to have
drank alcohol through the pregnancy with Mr. Fulks, in addition
to his siblings. His brother, Ronnie is reported to have
features of Fetal Alcohol Syndrome, to include low birth weight
small cranium, short stature and developmental delays. His
brothers, Dewayne and Ronnie were placed in a series of group
homes and juvenile facilities due to conduct disorders, during
which time, Mr. Fulks, his mother and youngest brother, Shannon,
made frequent moves around West Virginia and lived on welfare.
This pattern began when Mr. Fulks was approximately 13 and
continued until he began having legal problems.

Mr. Fulks' father resides in Shippshawana, Indiana and is a
retired welder with Ford Motor Company. He reportedly suffers
from osteoporosis and a back injury. He remarried in 1991 a week
after the divorce from Diana was finalized. As noted, his father
heavily abused alcohol and marijuana. He was physically abusive
to his wife and his sons, in addition to neglecting all five

Page 3 of 19

App. 00296

children.  He was stationed in Vietnam prior to the birth of
Mr. Fulks and worked at bagging the bodies of soldiers killed in
action.  He reportedly suffered from nightmares, flashbacks and
irritability upon his return.  While his children were growing
up, he worked sporadically and generally was unable to hold a job
as a result of his alcohol and cannabis abuse.  He no longer
drinks alcohol or abuses marijuana.  As noted, both parents have
a history of alcohol abuse, and his father additionally abused
marijuana.  His mother was arrested for Drunk and Disorderly
Conduct.  There is no evidence of Department of Social Services
intervening in the family.

Mr. Fulks has three brothers, ages 32, 28, and 24 all living in
Indiana in close proximity to the father.  He reports a good
relationship with all of his brothers, but is closest to his
eldest brother, Dewayne.  He has a 34-year old sister, Sherry,
who lives in Ohio near his mother.  His two older brothers,
Dewayne and Ronnie, have been incarcerated for Possession of
Drugs.  They have a history of abusing amphetamines, cannabis and
alcohol.  He states his sister and younger brother are well
adjusted.  His siblings have no history of mental illness.  He
states two of his paternal uncles have been in trouble with the
law and a paternal and a maternal uncle abuse alcohol.  Another
paternal uncle abuses cannabis.  He denies any extended family
history of mental illness.

Mr. Fulks has a heterosexual orientation.  At age nine, he was
molested by a 15-year old female babysitter.  At the age of 11,
he was fondled by the father of a friend.  He states he reported
this incident.  He denies any sexual problems or sexual
paraphilias to include pedophilia, exhibitionism, sadism,
masochism or voyeurism.

Mr. Fulks dropped out of school in the tenth grade related to
poor grades, unstable family situation including moves between
his mother and father's homes and teasing by peers.  He reports
failing the first and possibly third grades, due to a combination
of academic and behavioral problems.  He had learning
difficulties in all subjects, but primarily in mathematics.  At
age nine or ten, in the fourth grade, he was placed in special
education in all subjects due to learning difficulties.  He
states that his grades were poor, generally below a 'C.'
Behavioral problems included fighting, primarily in order to
defend his youngest brother.  School officials became involved
with the family after Mr. Fulks was disciplined for pulling down
the pants of another child at approximately age ten.  He states
he was truant up to three times per week in order to go fishing.
He denied defiance of his teachers and other authority figures

Page 4 of 19

App. 00297

while in school. He was noted by former elementary school teachers as a quiet child who suffered from a speech impediment which contributed to being teased by peers. He obtained his GED while incarcerated in Indiana. He denies any gang involvement.

Mr. Fulks has never been awarded SSI/SSD. His longest period of employment was in 1997, as a factory worker in a snack food company called Made Rite. He held this job for approximately eight months, after which he was fired for not showing to work following Christmas break. His last job was as a welder for Coachman RV, approximately two years ago. He held this job for three weeks after which he was fired for speeding on his way to work and not having a drivers license. He states that he never "got around" to getting a drivers license. He had numerous jobs lasting several weeks, from which he was fired due to being late or not showing, contributed by his abuse of drugs and alcohol with morning hangovers or staying up through the night on a binge.

Mr. Fulks has been married twice and is currently married. His first marriage was from 1995 to 1997 to Amber Fowler. The marriage ended due to frequent arguments over Mr. Fulks drinking and lack of steady employment. These arguments would escalate to mutual physical altercations. He denies any domestic violence charges were ever filed. While incarcerated in the Indiana Department of Corrections, at the age of 23, he met a correctional employee, Tina Severance, and began to live with her following his release from prison. She lost her job as a result of this relationship. Soon thereafter, he met Veronica Evans who was an adult dancer in a local club and married her in June of 2002. He reports the marriage was good, but they both abused drugs to include amphetamines and alcohol. Due to the seriousness of his current charges, he has doubts the marriage will last. Mr. Fulks had a son, Devon Christopher, from his first marriage who died at the age of six months after a cousin jumped on him and ruptured his stomach. Mr. Fulks was distraught after this death and reportedly increased his consumption of alcohol and drugs.

Mr. Fulks has no military history.

Mr. Fulks is of the Pentecostal faith and describes himself as religious. He had a religious upbringing when reared by his mother. He states his mother and step-father are ministers. He attends church twice weekly on Tuesdays and Sundays.

Mr. Fulks participated in a Burglary with his eldest brother, Dewayne, when he was approximately age 15, during which guns and

Page 5 of 19

App. 00298

electronics were stolen. He was sent to a youth facility in Ironton, Ohio for 90 days. He allegedly escaped from this facility and was on escape status for over a year until he returned to his mother and she notified the police. He was sent to another youth facility in West Virginia and released to the community at age 18. He states he and his brothers were taught and encouraged to steal as children by their parents. Items would include food, clothes, toys, bicycles, progressing to electronics, jewelry and automotive items.

Mr. Fulks' adult criminal history began at the age of 19 with a conviction for Operating a Motor Vehicle Without a License and Refusal to Provide Identification Data. He received a fine, suspended sentence and one year of probation. He violated his probation after three months on technical violations, but failed to appear in court. At the age of 19, he was convicted of Simple Possession of Marijuana and received a fine. At the age of 20, he was convicted of Worthless Checks and Attempted Forgery for which he was given a suspended sentence. At the age of 20, he was convicted of Burglary and sentenced to ten years with four years suspended when he was sentenced at the age of 22. He was placed on probation after two years, but violated. At the time of his current arrest, he has an active warrant for this probation violation. Other charges at the age of 20 included Forgery of Checks, Possession of Two or More Credit Cards, Fraud, Burglary, Use of Vehicle with Permission and Grand Larceny. At the age of 21, he was convicted of Federal charges to include Transportation of a Stolen Vehicle, Aiding and Abetting Burglary of a Vehicle with Intent to Commit Theft, Aiding and Abetting Theft of Property, and Evading Arrest. He was sentenced to 12 months followed by three years of supervision. A warrant for his arrest was issued at the age of 25 for not complying with the conditions of his release. At the age of 21, he was charged with Non-Sufficient Funds. At age 24, a Bench Warrant was issued for Resisting Law Enforcement and Use/Possession of Drug Paraphernalia. At age 25, he was indicted for Unlawfully Dispensing Legend Drugs without a License. A 12 count charge for Fraudulent Use of a Credit Card is pending. At age 25, a bench warrant for Criminal Abuse 1ˢᵗ Degree to a Child 12 or Under was issued. His wife, Veronica Evans, was also charged in this offense. He has a pending charge of Robbery 1ˢᵗ Degree and active bench warrants issued for Receiving Stolen Property, Possession of Marijuana and Theft of a Legend Drug, all of which allegedly occurred October of 2002.

Mr. Fulks reports at age 13 he attempted to hang himself, but the rope broke. He states this suicide attempt was witnessed by his younger brother, who did not inform anyone. Soon after, he took

an overdose of unknown pills and was found unconscious. A psychiatric consultant at the hospital recommended inpatient care which his mother refused, attributing the overdose to manipulation. He received no treatment. At the age of 14, his mother placed him in therapy on a weekly basis in order to manage his increasingly delinquent behavior. This period of therapy occurred prior to being placed in juvenile detention at Ironton. Following his release from juvenile detention in West Virginia, he was briefly treated as an outpatient for his abuse of drugs. He has no history of inpatient psychiatric hospitalization. Following his arrest on his current charges and prior to this evaluation, he was evaluated by a psychiatrist, Dr. Berg, who diagnosed him with a Mood and Anxiety Disorder. He remembers being diagnosed with Major Depression and Panic Disorder at age 13 or 14. It is also noted in collateral accounts he exhibited compulsive behavior at that time consisting of taking multiple daily showers and changing clothes frequently. At the time of his admission to FMC Butner, he was prescribed Zoloft 100mg twice daily, Buspar 7.5mg twice daily, Elavil 150mg at bedtime and Klonopin 2mg three times daily. At the time of the alleged offenses, he was prescribed no psychotropic medications.

Mr. Fulks began drinking alcohol at the age of ten as introduced by his father in the form of beer and moonshine. He reports daily drinking beginning in the morning with an "eyeopener." He states family members thought he drank too much. He made no attempts to quit and did not view his drinking as excessive or a source of trouble. He had frequent blackouts and withdrawal symptoms consisting of tremors, but no seizures or other adverse medical conditions. He has no significant period of abstinence outside of incarceration. His last drink was November of 2002, during the period of time of the alleged offenses. During this period he was drinking "mad dog" (wine) and beer.

Mr. Fulks began abusing drugs at the age of ten beginning with cannabis which was given to him by his older brother, Dewayne, He was using up to ten joints per day which included mixing the cannabis with embalming fluid. He grew cannabis in order to keep up with his heavy pattern of abuse. His drug of choice was crystal methamphetamine, which he used by smoking. He began abusing this drug at age 21. He used this drug daily and throughout the course of a day, both alone and with friends. Adverse psychological effects reported by Mr. Fulks included confusion and forgetfulness during periods of intoxication and withdrawal. In order to afford the drug he would steal, which included breaking into cars. He denies abuse of this drug during the alleged offenses due to lack of supply. He began abusing crack cocaine at the time of the alleged offense, having had no

previous experience with this drug. He reports he attempted to purchase amphetamine, but the dealer only had crack cocaine. He reports an approximate ten day binge surrounding the time of the alleged offenses in November of 2002. He states he enjoyed the intoxicating effects of crack. He reports occasional abuse of LSD since the age of 16 with his last use approximately three years ago. He classifies his pattern of abuse as occasional and denies any flashbacks. He has never been in inpatient treatment for his abuse of drugs or alcohol. He has no history of intravenous drug abuse.

According to numerous collateral documents, Mr. Fulks is charged with Escape from the Hopkins County Jail in Madisonville, Kentucky on 11/04/02; Kidnaping and Carjacking of James Hawkins from Hanson Kentucky to Portage, Indiana on 11/05/02; Burglary of the residence and Theft of Firearms of Robert Talsma in Michigan City, Indiana on 11/08/02; Attempted Murder of Carl Jordan in Conway, South Carolina on 11/14/02; and Carjacking, Kidnaping and Murder of Alice Donovan on 11/14/02, beginning in the Conway, South Carolina and ending with her murder in Brunswick County, North Carolina. Mr. Fulks was taken into custody by the police on 11/20/02, in Goshen, Indiana. Details of the alleged offenses are contained in extensive Reports of Investigation by the Federal Bureau of Investigation (FBI) and a Case Overview. As ordered by the Court, Mr. Fulks was not questioned regarding details of the alleged offense including his behavior and mental status surrounding this period. The purpose of this evaluation was to provide a rebuttal to any mental health evidence presented by the defense in its mitigation of the death penalty if Mr. Fulks is found guilty of a capital offense.

Mr. Fulks was not asked to give an account of the alleged offenses.

**COURSE IN INSTITUTION:** After admission to the Mental Health Department, Mr. Fulks disclosed his medical history and underwent a physical examination and laboratory studies. He reported a history of being hit above the left eye with a thrown can of house paint, sustaining a brief loss of consciousness. He did not require treatment. He reports a chronic history of headaches since childhood. He has gastroesophageal reflux (GERD) and constipation. While incarcerated in South Carolina, he claims his coccyx was fractured. He was stabbed in the lower abdomen by inmates as evidenced by nine pinpoint wounds with resulting urinary retention. He was also hit in the head at the time of the assault on 12/09/03. Weapons used in the assault included batteries and "studs" in a sock and sharpened toothbrushes. He denies medication allergies, but is allergic to onions with the

development of a rash. He had a CT head scan and MRI of the head without contrast at Columbia Care Center on 12/09/03 and 01/12/04 respectively. Both studies were normal Physical examination performed on 01/21/04, was remarkable for a superficial midline abdominal wound without drainage. He had a Foley catheter in place due to urinary retention. Medications on admission included Zoloft 100mg twice daily, Klonopin 2mg three times per day, Buspar 7.5mg twice daily, and Elavil 150mg at bedtime. He is treated with Aciphex 20mg per day for GERD and Inderal 10mg twice daily for prophylaxis of headaches and treatment of tremor subsequent to being abstinent from alcohol.

Laboratory studies included a CBC with differential, routine blood chemistries, thyroid function tests, Syphilis serology, and HIV screening. The results were unremarkable. Admission urinalysis was normal. Tuberculin skin testing performed on 12/12/03 was non-reactive.

During an admission mental status examination, Mr. Fulks presented as a modestly overweight, white male who was adequately groomed, soft-spoken and well related with good eye contact. He was noted to cooperate with correctional staff during the interview process. His grooming was underscored by concern over regular dressing changes of his suprapubic abdominal wound. He was noted to have a mild tic on the left side of his mouth. No other tics or abnormal movements were noted. He was alert and oriented to person, place, time and situation. Thought processes were goal-oriented with tight associations. He denied delusions or hallucinations. He admitted to visual hallucinations of shadows and colors while using methamphetamine and LSD. Affect was noted to be blunted without an predominant affect. He described his mood as in pain from his healing stomach wound and being in handcuffs during the interview. He denied vegetative symptoms of either depression or mania. He reports recent weight gain which he attributes to change in diet and lack of physical activity. He denied suicidal or homicidal ideation or intent. His immediate, recent and remote memory was intact with an ability to repeat six digits forward and three backwards, retaining three objects after five minutes, and naming the past three Presidents, birth dates of family members and various telephone numbers. His knowledge of current events was average given his limited ability to watch television and read a newspaper. He was able to name two states surrounding South Carolina and three surrounding West Virginia. His ability to perform calculations was average as evidenced by performing serial 3's beginning with 21 and an ability to multiply single digits. He was unable to perform serial 7's or multiply double digits without paper and pencil. He had no difficulty with money

Page 9 of 19

App. 00302

problems to include making change from a purchase. In response
to the proverb 'Don't cry over spilled milk,' he stated "don't be
mad over something so little." In response to 'Don't count your
chickens before they're hatched,' he stated "don't plan on things
going the way you want." He correctly stated the similarities
between two sets of objects. In response to a play and a movie
he stated "you can watch both, but a play is live and a movie
isn't." In tests of judgement, if he were to find a wallet with
money on the street, he would "keep the money" and would not know
what he would do with the rest of the wallet. If he were the
first on the scene of a house fire, he would see if anyone was
home by knocking on the door and then he would call the fire
department at 911.

Mr. Fulks remained on the locked unit for the duration of his
evaluation. Mr. Fulks was cooperative with Mental Health,
Medical and Correctional staff. He was able to understand and
accept explanations for his housing status. Room sanitation and
personal hygiene were good. He complied with wound care. No
bizarre behavior was noted during this evaluation. He was not
afforded the opportunity to interact with other inmates.

Mr. Fulks' mental status remained stable. He denied depression
or mania. He demonstrated no evidence of panic attacks. He
complied with his prescribed psychotropic medication to include
Klonopin 2mg three times per day, Buspar 7.5mg twice daily, and
Zoloft 100mg twice daily. Elavil was decreased to 100mg at
bedtime in order to reduce the risk of further urinary retention.

Mr. Fulks presented to FMC Butner with an open superficial
abdominal wound, resulting from prior stab wounds. As a result
of the stab wounds, he continued to exhibit urinary retention,
requiring foley catheter. His wound was cleaned and debrided
daily. Wet to dry packing was placed into the wound daily and
covered with a dry dressing. On 01/29/04, he had a wound culture
positive for Methicillin Resistant Staphalococcus Aureus (MRSA).
He was treated with Septra DS twice daily for five days with
efficacy. He had no evidence of bacteremia, but the wound was
likely colonized with MRSA. He refused to see the Urologist on
02/07/04, stating that unless he was given an additional
telephone call to his mother, he would refuse his medical
appointments and procedures. He understood the risk of refusing
his Urology appointment, but declined to sign a treatment refusal
form. He claimed he would see a Urologist hired by his attorney
when he was returned to the local jail. Additionally, he
demanded a wheelchair, refusing wound care and removal of the
Foley catheter until this demand was met. He eventually
responded to counseling by mental health and administrative

Page 10 of 19

App. 00303

staff.  On 02/10/04, Mr. Fulks permitted his Foley catheter to be
removed.  He is able to urinate without the assistance of a Foley
catheter, but occasionally self-catheterizes himself.  He
intermittently refuses wound care based on degree of frustration
and irritability.  He recently developed a six centimeter
abdominal abscess.  On 02/18/04, he began a five day course of
Vancomycin 1gram IV every 12 hours and Clindamycin 900mg IV every
eight hours.

**PSYCHOLOGICAL TESTING:**  Mr. Fulks was cooperative with testing,
and appeared to put forth adequate effort to comply with test
instructions.  He was administered an extensive battery of
intellectual testing over a period of five hours on 02/16/04.
Testing conditions were less than ideal.  Due to security
concerns, Mr. Fulks was restrained to a rolling chair throughout
testing, including tethers on both arms which limited his
mobility slightly.  He was also required to wear a gown and
surgical gloves to limit his potential to expose others and the
environment to contagion.  He reported ongoing pain at the site
of his stab wound, and was noted to wince at times and exhibit
other signs of distraction due to discomfort.  Periodic
background noise appeared to occasionally interfere with his
concentration.  Despite these difficulties, he expressed an
accurate understanding of instructions for the assigned tasks and
a willingness to persevere to complete the testing.  He did not
appear to have difficulty with vision or fine motor control.  He
did report having an ear infection, and had cotton wadding in one
ear.  These considerations suggest test results may tend to
underestimate his level of ability.

The Woodcock-Johnson Test of Cognitive Abilities was administered
to obtain an overall estimate of Mr. Fulks's intellectual
functioning.  He obtained divergent scores across the various
subtests administered, ranging from scaled scores of 75 on the
Visual-Auditory Learning, 76 on Analysis-Synthesis, and 77 on the
Verbal Comprehension subtests to 100 on the Incomplete Words,
99 on the Sound Blending and Decision Speed, and 98 on the
Auditory-Working memory subtests.  Overall results indicate his
intellectual ability is in the Low range.  In comparison to same-
aged peers, his Auditory Processing ability was in the Average
range, his abilities in Comprehension-Knowledge,
Visual-Spatial Thinking, Processing Speed, and Short-Term Memory
were in the Low Average range, and Long-Term Retrieval and Fluid
Reasoning were in the Low range.  His General Intellectual
Ability scaled score was 79, which suggests his overall
performance would equal or exceed approximately 8% of same-aged
peers.  These findings suggest Mr. Fulks functions at the
boundary between the Borderline and Low Average ranges of adult

intellectual ability. While there were no statistically remarkable discrepancies among his cognitive abilities, there were pronounced differences in performance across specific tasks.

On the Woodcock-Johnson Test of Achievement - Standard Battery, Mr. Fulks obtained somewhat more consistent subtest scores, ranging from scaled scores of 72 on the Writing Samples and 76 on the Math Fluency subtests to 91 on the Spelling and Passage Comprehension subtests. In comparison to same-aged peers, his Academic Skills in Reading, Math, and Written Language were all in the Low Average range. As the Cognitive and Achievement batteries were formed jointly, scores across the batteries can be meaningfully compared. His Total Achievement scaled score of 84 was not markedly different from his General Intellectual Ability scaled score.

**Neuropsychological Testing:** Additional neuropsychological testing was administered to supplement his cognitive and achievement testing. Because Mr. Fulks was being treated for a bacterial infection, he was tested on the medical floor. Mr. Fulks was polite and cooperative throughout the testing. He indicated he was feeling "OK" and felt he could complete the tasks without difficulty. He did have an IV port in one hand and while he indicated this was not uncomfortable, the presence of the port may have limited his performance on fine motor tasks. Mr. Fulks was easily engaged in conversation but exhibited primarily flat affect. He did not exhibit any overt behaviors indicative of hyperactivity, agitation, or distractibility. He was alert, oriented and rational with no evidence of confusion or thought disorder. The test situation was adequate with no notable limiting characteristics. Results may be an underestimate of his potential due to his medical condition at the time of the evaluation and the stress of incarceration.

Noteworthy aspects of test performance are discussed below. Where possible, raw scores from tests were converted to percentiles based on norms for age, education, and gender. Performances are labeled in this report as High Average, Average, Low Average, Borderline Impaired, or Impaired based on comparisons with the normal population.

**TESTS ADMINISTERED**

Test of Memory Malingering
Boston Naming Test
Controlled Oral Word Association (letter and category)
Finger Tapping Test

App. 00305

Grooved Pegboard Test
Hand Dynamometer
Neuropsychology Impairment Scale
Rey Complex Figure Test
Symbol Digit Modalities Test
Trail Making Test A & B
Booklet Category Test

ATTENTION AND CONCENTRATION: Performance on a written task requiring to match numbers to symbols was within the Impaired range (2nd percentile). On a task requiring Mr. Fulks to orally match numbers to symbols, performance was also Impaired (<1st percentile).

On the Trail Making Test A, a timed task requiring Mr. Fulks to connect numbers in order, his performance was in the Borderline Impaired range (10th percentile). He had more difficulty on Trail Making Test B requiring him to alternate numbers and letters with Impaired range performance (<1st percentile).

VERBAL SKILLS: Mr. Fulks' performance on a measure of verbal fluency requiring him to name as many words as he can within one minute beginning with a specified letter was in the Borderline Impaired range (8th percentile). He showed stronger performance when asked to name words from a semantic category (e.g. animals) with his score falling in the Average range (60th percentile).

Expressive vocabulary measured by the Boston Naming Test placed his performance in the Impaired range (approx. 1st percentile).

VISUAL SKILLS: Performance on a visual construction task requiring the patient to copy a complex design was Impaired (<1st percentile). He maintained the overall gestalt of the figure but appeared to draw details carelessly, resulting in several inaccuracies in the details of the figure.

Drawing the complex figure three minutes after copying the figure also resulted in an Impaired range score(<1st percentile). Unlike his attempt to copy the figure, he took considerable time attempting the recall trial, but produced a significantly distorted drawing.

MOTOR SKILLS: On the Grooved Pegboard task, a measure of fine motor speed and dexterity, Mr. Fulks performed in the Impaired range for both his dominant (<1st percentile) and non-dominant (<1st percentile) hands. Mr. Fulk's hand strength was measured in the Average range (65th percentile) for his dominant hand and for his non-dominant hand (48th percentile).

Fine motor speed measured by the Finger Tapping Test was in the Low Average range for both his dominant (16th percentile) and non-dominant hand (23rd percentile).

REASONING AND PROBLEM SOLVING: On the Booklet Category Test, a measure of hypothesis testing and executive functioning, Mr. Fulk's score was Low Average (12th percentile).

MOTIVATION AND EFFORT: On the Test of Memory Malingering (TOMM), a task designed to measure effort and motivation, Mr. Fulks' was within normal limits indicating he was exerting adequate effort and attention to the task.

NEUROPSYCHOLOGICAL SYMPTOMS: The Neuropsychological Impairment Scale was also administered to assess Mr. Fulk's neuropsychological symptoms. Validity scales indicated Mr. Fulks may have an affective (emotional) component to some of his symptoms or that some of his symptoms may be related to stress. Mr. Fulks responses indicated that he subjectively experiences a wide variety of neuropsychological symptoms. His responses resulted in elevations for problems related to attention, memory, learning, frustration tolerance, and academic skills. His responses were generally consistent with people reporting significant difficulties after neurological injury or illness. However, at least some of his symptoms were likely related to his recent health concerns and stress related to his incarceration.

SUMMARY: Overall, the neuropsychological assessment was generally consistent with his cognitive and achievement testing indicating cognitive abilities generally in the borderline to low average range. Scores ranging from borderline to low average were noted for hypothesis testing, verbal fluency, and hand strength. Weaknesses were noted on tasks requiring sustained attention and effort, fine motor speed, visuo construction and visual memory. Relative deficits for visual memory also appeared consistent with the results of Woodcock-Johnson testing indicating stronger skills for many verbal tasks. His performances on motor tasks showed good laterality and strength despite weaker speed and dexterity skill. Mr. Fulks did not show any evidence of intentional exaggeration during the tasks, but his recent illness and the stress of incarceration may have limited performance on some tasks, especially those involving processing speed.

Personality Factors: Mr. Fulks completed the PAI on 02/17/04. The written instructions were reviewed for him, and he recalled completing this test on a prior occasion. None of the primary

validity scales were markedly elevated.  He responded in a
consistent manner to logically related test content, and endorsed
a modest number of infrequent test responses.  He was also noted
to omit or offer more than one response to four items, though the
total number of such responses was within acceptable limits.  It
did not appear that he made a concerted effort to minimize his
own faults and problems.  There were indications he may have
tended to select responses that would over-represent his current
distress and symptoms, though this trend did not appear to render
results overall uninterpretable.

The configuration of basic clinical scales indicates Mr. Fulks
acknowledged extensive problems with drug and alcohol abuse,
complained of many somatic problems, and experiences significant
anxiety and subjective distress.  The variety and extent of
findings across several domains suggest the possibility of
significant impairment though, as noted above, these trends may
to some extent reflect Mr. Fulks' style of responding.
Individuals with this pattern of results typically have histories
of significant misuse of and dependence on alcohol and other
psychoactive substances, impairments in work and social roles,
and of legal consequences connected with substance use.  These
persons have often failed to reduce or stop their use of
substances, despite recognition that abuse causes them
significant health problems, loss of contact with friends and
family members, and results in criminal sanctions.  Mr. Fulks'
apparent preoccupation with health concerns may reflect some
ongoing tendency to experience psychological distress in the form
of somatic complaints, but appears more likely to result from his
concerns with genuine health problems at the time of testing.
Similarly, results suggesting difficulties with situational
stress and persisting anxiety may reflect both chronic problems
in managing problems adaptively, and the unusual demands of
Mr. Fulks' situation at the time of testing.  While there are
indications of lesser concerns with low mood and morale, and
suspiciousness toward others, these trends are not unusual among
persons evaluated during the pendency of criminal proceedings.
There are suggestions that Mr. Fulks exhibits some maladaptive
personality characteristics, including lack of direction or
purpose in life, turbulent, ambivalent relationships, and
impulsivity that may be associated with self-defeating and
otherwise harmful acting out.  These persons may be persistently
frustrated and angry, and are likely to be disinhibited by
substance abuse.  It appears he acknowledged a history of
antisocial behaviors, but may not exhibit the full symptom
picture for Antisocial Personality Disorder.  Due to the variety
of findings noted above, this type of test result may be seen in
a wide variety of conditions, including Alcohol or other

Substance Dependence, Posttraumatic Stress Disorder, Conversion or Somatization Disorder, Dysthymic Disorder, various mood or anxiety disorders, or cognitive disorders, likely complicated by Cluster B character pathology.

**IMPRESSIONS**:    According to the *Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision, (DSM-IV-TR)*, we view Mr. Fulks as follows:

Axis I:     Amphetamine Dependence, In a Controlled
                Environment, 304.40
            Cannabis Dependence, In a Controlled Environment,
                304.30
            Alcohol Dependence, In a Controlled Environment,
                303.90
            Adjustment Disorder with Mixed Anxiety and Depressed
                Mood, 309.28
Axis II:    Antisocial Personality Disorder, 301.7
                (Principal Diagnosis)
Axis III:   Status Post Abdominal Stab Wound; Urinary Retention;
                Abdominal Abscess, Past History of Hypertension
Axis IV:    Incarceration; Prosecution for a Capital Offense; Lack
                of Family Support; Medical Problems
Axis V:     GAF = 76 (transient mood and anxiety symptoms in
                response to psychosocial stressors with generally good
                functioning on a locked unit dictated by security
                concerns)

The primary diagnosis of Antisocial Personality Disorder is given to Mr. Fulks based on his pervasive patten of disregard for and violation of the rights of others beginning age 15 at the latest. It is noted he was incarcerated for a Burglary followed by an escape from juvenile detention.  He reported behavioral problems dating back to 3rd grade with fighting and truancy.  His adult history is marked by multiple arrests for unlawful behavior to include Burglary, Fraud, Possession of Drug Paraphernalia, Possession of Marijuana, Resisting Arrest, Forgery, Probation Violation, and charges of Child Abuse, Robbery, Fraud and Theft. He has a history of deceitfulness as evidenced by using aliases, forging checks and unlawfully using credit cards.  He has a history of impulsivity as evidenced by his extensive abuse of drugs and lack of planning for the future.  Indications of irresponsibility are his failure to sustain consistent work behavior unrelated to a mental illness.  His self-reported work history is notable for unauthorized absences or showing up late to work on a regular basis.  This behavior was frequently the result of drug or alcohol intoxication and withdrawal.  This behavior is also further support for his impulsivity and failure

to plan ahead.   With the exception of the alleged offenses and pending charges, there is no evidence of aggressiveness or irritability.   Due to the limited scope of this evaluation in addressing the alleged offenses and past criminal behavior, the element of remorse was not evaluated.   The diagnosis of Intermittent Explosive Disorder is ruled out by his lack of previous aggressive behavior, assaultive acts or destruction of property.   He related previous fights to defending his younger brother from bullying.

The Diagnoses of Amphetamine, Cannabis and Alcohol Dependence is given to Mr. Fulks based on his maladaptive pattern of abuse of these substances beginning in childhood and extending to the present with no appreciable period of abstinence outside of incarceration.   Mr. Fulks has made no attempt to cut down on his abuse of drugs and alcohol, nor has he attempted to limit his intake.   He has a history of spending a great deal of time in activities necessary to obtain the drugs including visiting dealers, breaking into cars and growing his own cannabis.   His use of drugs and alcohol has interfered with his ability to maintain steady employment and has contributed to the deterioration of his first marriage and estrangement from family members.   Tolerance is documented by his escalating amounts of these drugs used in order to achieve intoxication.   He has resorted to growing his own cannabis, drinking moonshine, and has eluded to manufacturing methamphetamine in order to supply his escalating habit.   He describes withdrawal symptoms from alcohol to include tremor and nervousness.   Withdrawal from amphetamines can manifest as dysphoria, sleep disturbance, unpleasant dreams and fatigue which can be confused with a primary Mood Disorder such as Major Depressive Disorder or Dysthymic Disorder. Amphetamine Intoxication can present with an Amphetamine-Induced Anxiety Disorder which can mimic the signs and symptoms of either Panic Disorder or Generalized Anxiety Disorder and would likely response to the same treatment to include a Selective Serotonin Reuptake Inhibitor (SSRI) and/or a benzodiazepine.   A premorbid diagnosis of Panic Disorder of Generalized Anxiety Disorder is unlikely given his heavy abuse of amphetamines, which would likely exacerbate these disorders by increasing the frequency and severity of panic attacks and exacerbating other anxiety symptoms including restlessness, tremor, irritability, insomnia and muscle tension.

Mr. Fulks was not given the diagnosis of Cocaine Dependence or Abuse since his use of this drug was brief, over a period of ten days.   Since he reports this drug was abused in combination with cannabis, potential additives including embalming fluid, and alcohol, any impairment or distress cannot be isolated to crack

cocaine. With respect to the diagnosis of an Anxiety or Mood Disorder, it is noted symptoms of cocaine withdrawal are primarily dysphoria which can last from hours to days. In addition to an anxiety disorder, cocaine intoxication can present with symptoms mirroring either an episode of depression or mania. Regardless of the etiology, these symptoms could respond to treatment with a SSRI or another antidepressant.

The diagnosis of Adjustment Disorder with Anxiety and Depressed Mood is given to Mr. Fulks based on his reports of anxiety and sadness which he attributes to the stress of incarceration, an upcoming legal battle with consideration of the death penalty, and estrangement from his family. Other than his self-report, an objective diagnostic assessment is difficult since he presented on therapeutic doses of Zoloft, Klonopin, and Buspar. The differential diagnosis would include Major Depressive Disorder, but there is no indication he was suffering from this Disorder prior to the alleged offenses. There is no evidence he sought treatment for depression, nor plagued by a lack of energy, suicidal thoughts or lack of interest in activities, including sex and drugs.

The diagnosis of Posttraumatic Stress Disorder is unlikely since Mr. Fulks denies re-experiencing the recent assault or avoidance of stimuli to include returning to the open population in proximity to other inmates, including African-American inmates. He has made repeated requests to be moved to open population and has expressed no fear of being attacked. He denies any increase in nervousness or vigilance since being attacked.

A more accurate diagnostic assessment would include a gradual withdrawal of Mr. Fulks' psychotropic medications followed by longitudinal assessment over an extended period, generally at least one year. This type of assessment would differentiate Panic Disorder, Generalized Anxiety Disorder and Major Depressive Disorder from Substance-Induced Anxiety or Mood Disorder. An Adjustment Disorder with Mixed Anxiety and Depressed Mood will continue to complicate the differential diagnosis since stressors related to incarceration and possible capital punishment are likely to be chronic.

Mr. Fulks is ready to be returned to Court for resolution of his legal situation. He denies suicidal ideation or intent. His history of Escape should be noted and commensurate security precautions enacted for transport. His mental status is stable and he is medically clear for transport. His medication should be continued during transport, in order to avoid withdrawal syndrome or side effects. Medications on discharge include

App. 00311

Zoloft 100mg twice daily, Klonopin 2mg twice daily, Elavil 100mg
at bedtime, Buspar 7.5mg twice daily, Propranolol 10mg twice
daily, Aciphex 20mg daily and Colace 100mg twice daily.  He
continues to require regular dressing changes.


Ralph Newman, M.D.
Staff Psychiatrist
Mental Health Department
Federal Medical Center
Butner, North Carolina


Edward E. Landis III, Ph.D., ABPP
Staff Psychologist
Director of Psychology Training


Eugene V. Gourley III, Ph.D.
Staff Neuropsychologist


RN:eel/evg/sjt



# Neurotherapy Center of Dallas, Inc.

**Jonathan E. Walker, M.D.**
Neurology
Clinical Neurophysiology
EEG Biofeedback

Jim Evans, PhD
183 Morning Lake Drive
Moore, South Carolina 29369
Fax: 864-595-9038

Included: Copy of paper Modular Coherence and Learning Disabilities

Dear Dr. Evans:                                                    January 14, 2004

This is a computerized EEG report on your client Chad Fulks recorded 11/13/03. The data you sent me included z-transformed relative power, FFT color maps, z-transformed absolute power maps, relative power raw scores, and z-scores and phase lag z-scores. These were all done using the Thatcher database. Relative power z-scores for delta, theta, alpha and beta were all normal. The single-hertz bins analysis of the relative power data revealed a decrease in delta, which was rather diffuse in the central head regions and in the frontal regions for 1 to 2 Hz activity. No significant abnormalities were seen.

The z-transformed absolute power FFT color maps revealed an excess of 5 Hz activity at F3/FZ, an excess of 19 to 23 Hz activity at PZ, an excess of 25 to 29 Hz activity at PZ and an excess of 29 Hz at PZ/F3.

The coherence z-scores revealed the following abnormalities: decreased delta coherence at P4/F8, P4/T4 and O2/T4; decreased theta coherence at P4/T4 and decreased alpha coherence at F4/C4 and O2/T4.

Significant phase lag abnormalities included increase beta phase at P3/F7, P3/T3, F3/P3 and O2/T4. There was increased delta phase lag at F4/O2 and O2/T4. There was increased theta phase lag at C4/T4, P4/T4 and O2/T4.

QEEG CLINICAL CORRELATION: The focal slow activity in the left frontal region and with multiple coherence abnormalities in the right hemisphere and multiple phase abnormalities in both the left and right hemisphere, this QEEG is consistent with the residual effects of brain damage.

Possible clinical correlates might include: (1) weakness or slowness of the right hand based on the slow activity at F3/FZ, (2) anxiety based on the excess fast activity at TZ and F3. This raises the possibility of childhood abuse and a possible head injury in childhood, (3) decreased delta coherence

at P4/F8 could cause a lag between perception and emotional expression, (4) the decrease in delta coherence at P4/T4 could result in perceptual memory delays, (5) the decrease in delta coherence at O2/T4 could cause a lag in visual memory, (6) the decrease in theta coherence could also result in perceptual memory problems, (7) the decrease in alpha coherence at F4/C4 could result in poor sensorimotor integration with the left hand and left sensation, (8) the decrease in alpha coherence at O2/T4 could result in slow visual memory integration, (9) the decreased relative delta suggests poor quality sleep.

Sincerely,

Jonathan E. Walker, M.D.
Board Certified in Neurology

JW/kv
Dictated but not read. Subject to transcription error.

# NEUROPSYCHOLOGICAL EVALUATION REPORT

NAME: Chad Fulks
Birthdate: ███████ ' Age: 26
Dates of Evaluation: 11-26-2003 and 01-08-2004
Handedness: Right
Reason for Evaluation: Mr. Fulk's attorney, John Blume, requested this evaluation to obtain information which might be used in preparing for the legal defense of his client.

## Background Information

The following information was obtained from reports of previous neurological and neuropsychological evaluations of Mr. Fulks, and from thé client during the course of the evaluation.

According to Mr. Fulks, he experienced school learning problems from an early age, and attended special education classes for learning disabled children as well as classes for children with behavioral disorders. He indicated that he may have been retained in the third grade. When questioned about alcohol and drug use, he said that he began using alcohol and marijuana at a rather early age, but could not recall the exact age. He also inhaled gasoline fumes, and by age 17 was using LSD and cocaine. He reported four instances of head injuries following which he was unconscious. There is evidence that Mr. Fulks' Mother consumed alcohol during the pregnancy to which he was born, and that he was a victim of considerable physical abuse as a child. Mr. Fulks has a history of academic failure and poor school performance. He was retained twice in first grade. It also is reported that he has a history of mental health problems including depression and attention deficit disorder, that he attempted suicide at age fourteen, had early treatment for speech problems, has never held a job for a normal period of time and has been confined in both juvenile and adult correctional facilities. His educational and psychosocial histories, and perhaps some facial abnormalities have been found to be consistent with fetal alcohol syndrome.

A neurological evaluation was completed by David Bachman, M.D. on 06-17-2003. Results indicated borderline intelligence or mild mental retardation, as well as difficulty maintaining set. He also reportedly had significant problems with controlled motor performance tasks, including difficulty with sequencing and inhibiting motor responses, and somewhat slow effortful movements. Constricted affect and odd facial appearance were reported, including asymmetry of the nasolabial fold. "Chronic pain behavior" also was noted.

A neuropsychological evaluation of Mr. Fulks was completed by Jonathan Venn, Ph.D. at unspecified times, but apparently during the spring and summer of 2003. His interviews with Mr. Fulks reportedly yielded further relevant information, including that the client had been sexually abused at age nine, his Father frequently physically abused both his own children and his wife, most family members were heavy users of alcohol, the biological brother is only five feet tall and has a criminal history, and the client married twice and had a son who died in infancy. During this evaluation Mr. Fulks reported having had head injuries involving loss of consciousness. Relevant behavioral observations during that evaluation included that Mr. Fulks showed depressed mood, variable skill in understanding of abstract concepts, mild stuttering, slow movement and speech, mild word finding problems, difficulty with dates and ages, and, at times, convoluted, disorganized, self-contradictory and irrelevant speech. Wechsler Adult Intelligence Test scores were in the "borderline" range, i.e., Verbal quotient 79, Performance quotient 78, Full Scale quotient 77. Scores on neuropsychological tests and related observations generally were low, with some being different from or even lower than would be expected of someone with borderline level intelligence. The latter included tactile suppressions, mild stuttering, mild echopraxia, occasional impulsive responses, and many intrusions on the California Verbal Learning Test-II indicative of failure to monitor his own responses. An Halstead Impairment Index of .7 was found, indicating mild to moderate neuropsychological impairment. There were no indications of malingering noted.

Neuropsychological Evaluation Results

Behavioral Observations. Mr. Fulks seemed cooperative with all aspects of the evaluation. There were no behavioral indications of malingering; and the fact that test scores were similar to those obtained by others at earlier examinations also contraindicates faking. When seen the first time, Mr. Fulks stated that he had taken no medications that day, but had taken Zoloft and Neurontin the day before. He complained frequently about a severe chronic headache. He conversed readily with the examiner, and his speech, although somewhat slow, did not seem abnormal for a person from the mountains of West Virginia. He frequently spoke of his Mother, sometimes in a rather child-like, dependent manner. Problems with memory for dates of past events in his life were indicated. When asked to list the major difficulties he experiences (or has experienced) in regard to mental and physical problems, he listed headaches, early speech problems, major difficulty with attention and concentration, and involuntary movements which he referred to as "jumpy muscles". He also reported special concern that he recently had experienced a paralysis of the entire left side of his face. Screening tests indicated adequate auditory and visual acuity for the

tests administered. Mild visual acuity weakness may exist, since the screening test suggested 20/40 acuity at near point.

Observations at the second evaluation session were similar. However, at that relatively brief session Mr. Fulks was at a prison hospital recuperating from stab wounds and a head injury reportedly inflicted by inmates at his previous place of incarceration. He claimed that stomach cramps he presently was experiencing overshadowed his continuing headaches.

Neuropsychological Test Results. Selected subtests from the Wechsler Adult Intelligence Scale III and the Wide Range Achievement Test-3 were administered primarily to compare with those obtained at earlier evaluations. Most of the subtests from the Reitan Neuropsychological Test Battery, various other neuropsychological tests, and two personality type tests were administered. A quantitative EEG (QEEG) evaluation also was included.

Scaled scores on the four Wechsler subtests administered were: Vocabulary 8; Similarities 6; Block Design 8; Digit Span 6. The average of these would be indicative of low average intellectual ability. This is essentially the same as found by previous examiners, and any slight increase in scores may be explained by practice effects. Mr. Fulks' Wide Range Achievement Test standard score on the Reading (word recognition) subtest was 77, and indicative of a 6th grade reading level.

Most of the subtests from the Reitan Neuropsychological Test Battery were administered. Mr. Fulks' scores on these tests were determined using the Heaton, et al norms which take into account gender, age and educational background. When scored in that manner his performances were quite variable. That is he attained normal scores on the Category Test (booklet format), Part B of the Trail Making Test, all but one sub-section of the Tactual Performance Test, and the non-dominant hand score of the Finger Oscillation Test, while scoring well below normal on several other tests. Tests where his T scores (in parentheses below) were in the impaired range (lower than 40) were: Part A of the Trail Making Test (36) ; Speech Sounds Discrimination Test (29) ; Rhythm Test (33) ; Finger Oscillation dominant hand (37) ; Tactual Performance Test memory for location (30). Using the appropriate Reitan subtests to calculate the Halstead Impairment Index resulted in an Index score of .6 which is considered indicative of moderate degrees of neuropsychological impairment.

Various other neuropsychological type tests were administered, again with variable levels of dysfunction suggested. Mr. Fulks performed generally well on the Wisconsin Card Sorting Test, attaining normal scores for both total and perseverative errors. However, he required more than the normal amount of trials to achieve the first category and scored rather low in terms of failure to maintain set. The latter is suggestive of problems in self-monitoring, and is consistent with reports from other examiners. He showed evidence of problems with word finding on the

Controlled Oral Word Association Test (raw score of 21; below the 10th percentile). Except for very poor memory for location on the Tactual Performance Test mentioned earlier, and a below average score on the Wechsler Digit Span subtest, his memory test scores were adequate. That is, he scored within normal limits on the Logical Memory and Faces subtests of the Wechsler Memory Scale-III (both immediate and delayed memory). Similarly, he performed well and showed no evidence for visual perceptual problems on the Benton Line Orientation Test. Mr. Fulks' poorest performances were on the Integrated Visual and Auditory Continuous Performance Test (IVA). This test requires one to attend closely to simple visual and auditory stimuli presented in an intermixed fashion on a computer monitor and through headphones, and to press a switch when the number one is seen or heard while refraining from pressing when the number two is seen or heard. It is an inherently boring task which taxes ones ability to attend closely for approximately 20 minutes and to refrain from impulsive responding during that time. Average scores are 100 (with a standard deviation of 15). Mr. Fulks attained a Full Scale Attention Quotient of 40 and a Full Scale Response Control Quotient of 48. Scores for both auditory and visual stimuli were well below average. Such low scores commonly are seen in persons diagnosed with attention deficit disorder involving problems with both attention and impulsivity. His speed of responding to the IVA stimuli also was longer than normal. The only test administered on 01-08-2004 was the Stroop Color and Word Test. He attained below average T scores on the Word Naming, Color Naming, and Color-word subtests. That is a common pattern in persons with diffuse brain dysfunction. His Interference score of −18 indicated the likelihood of poor cognitive flexibility and/or a tendency to become cognitively unstable under stress.

The Rorschach projective personality assessment procedure and Beck Depression Inventory (BDI) were used to supplement behavioral observations in assessing this man's general psychological/emotional adjustment. He responded to nine of the ten Rorschach cards, giving a total of 12 responses. The card to which he did not give a response was the one commonly considered most difficult to respond to. Throughout the Rorschach administration Mr. Fulks engaged in unusual behavior when handed the cards. That is, he would use his free hand to selectively cover parts of the blots as if having difficulty with visual perception. Four of his responses were of poor form level, i.e., what he reported perceiving did not match the actual blot characteristics. This is an uncommonly large number of poor form level responses even for a person of limited intelligence, and is suggestive of problems with reality testing. There were a few responses of a type often seen with depressed persons, and others suggestive of a combination of anger and fearfulness. His responses to the BDI (which is a self-report inventory) were strongly indicative of depression (raw score of 48). This score likely was somewhat inflated given the wording of some items and this man's present incarceration status. For example it would be expected that incarcerated persons

would endorse "I feel I am being punished", thus adding three points to the BDI score. However, there was evidence here for depression.

A quantitative EEG (QEEG) evaluation also was completed. Samples of brain electrical activity were taken from 19 scalp electrode sites during eyes closed and eyes open, resting conditions. Artifacts were removed visually and using an automated artifact removal program until reliability coefficients of .92 or higher were achieved for all channels. After artifact removal, the remaining data were analyzed using a spectral analysis computer program (Neuroguide) which calculates measures of interhemispheric coherence and phase relationships (neural timing) within each of four frequency bands between all left and all right side electrode sites, as well as between homologous left and right side sites. Additionally, measures of both absolute and relative power at each scalp electrode site are calculated within each of four frequency bands and at each individual frequency from 1 to 30 Hz. After these measures were obtained they were compared to a normative database (Thatcher) to determine which were significantly abnormal for persons of Mr. Fulks' age and gender. Fifteen abnormalities of coherence and phase were found, with 12 of these involving right hemisphere sites. Sites P4, T4 and O2 most often were involved in these abnormalities. Right hemisphere abnormalities of this type commonly are associated with brain damage or dysfunction leading to problems in visual perception (as of spatial relationships), to difficulty with non-verbal auditory perception/memory, and to problems with emotional control and modulation. Mr. Fulks test scores reported above generally indicate that he does, in fact, have such difficulties.

EEG power abnormalities also were found, with frontal (F7, F3, Fz, F4, F8) slowing indicated by excess absolute power within the 4-6 Hz (theta) band. This often is associated with problems with "executive" functions. In Mr. Fulks' case this would relate to his demonstrated problems with word finding, response control and sustained attention.

The QEEG data were further interpreted by Jonathan Walker, MD, a board certified neurologist with special expertise in electroencephalography, including QEEG. He was not aware of this man's history except his age and that he had experienced many events which could be expected to result in brain damage. He stated that Mr. Fulks' QEEG record is consistent with residual effects of brain damage, as well as "the possibility of childhood abuse and childhood head injury". His statements concerning likely clinical correlates of such injuries included slowness of right hand activity, abnormalities of perception and memory, poor quality sleep, and abnormalities of sensation and sensorimotor integration on the left side. Each of these is supported by test findings and/or observations of Mr. Fulks' behaviors and reports.

## Summary

Mr. Fulks was evaluated on two occasions for a total of approximately eight hours. He has a reported history of multiple conditions and situations each of which could be expected to cause brain damage and neuropsychological dysfunction. These include maternal use of alcohol during the pregnancy to which he was born, childhood consumption of alcohol and inhalation of gasoline fumes, physical abuse as a child, and several instances of head injuries following which he was unconscious. He had speech and school learning problems from an early age.

Despite considerable reported pain of a chronic headache, Mr. Fulks was cooperative throughout the evaluation, and appeared to be responding to the best of his ability. There were some specific behavioral indications of problems with visual perception. There was no behavioral evidence of malingering, and malingering also was contraindicated by the fact that very similar test scores were obtained from two different neuropsychological evaluations by two different psychologists. Results of tests of cognitive ability pointed toward "borderline" intelligence. His reading word recognition achievement was commensurate with that. Neuropsychological test results indicated neuropsychological impairment. Specifically, there was evidence for impaired auditory perception, psychomotor speed, and non-verbal tactual memory (perceptual memory for location). These impairments are suggestive of central and posterior cortical damage. Additionally there was evidence for frontal damage in his extremely poor scores on tests of response control, sustained attention and word finding. In other words, Mr. Fulks' brain damage\dysfunction appears to be rather diffuse in nature.

Results of a QEEG evaluation provided further support for a diagnosis of neurological dysfunction. This was especially in the form of central and posterior right hemisphere abnormalities of neural timing, and excessive power at frontal sites in a slower frequency band and at certain posterior sites in higher frequency bands. The QEEG findings as interpreted independently by two different persons related closely to specific neuropsychological test findings.

Results of a projective personality assessment procedure and a self-report depression inventory were suggestive of depression, anxiety and possible occasional problems with reality testing of a type often associated with serious psychiatric type disorder.

In conclusion, this man's history and results of this evaluation were strongly indicative of brain damage and neuropsychological impairment. Additionally, the strong possibility of major depressive episodes and possibly other serious mental illness was indicated.

James R. Evans, Ph.D.
Licensed Clinical Psychologist