**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION**

CHADRICK EVAN FULKS,

          Petitioner,

          v.

J. E. KRUEGER, Warden, USP Terre Haute,
UNITED STATES OF AMERICA

          Respondents.

:
:
:
:
:
:
:
:
:
:
:
:
:
:

CIVIL ACTION
(Capital Habeas Corpus)


No. 2:15–cv–00033–WTL–MJD

**Hon. William T. Lawrence
United States District Judge**


**APPENDIX TO
AMENDED PETITION FOR WRIT OF HABEAS CORPUS
PURSUANT TO 28 U.S.C. § 2241**

**VOLUME II
APP. 00321 TO APP. 00567**


PETER WILLIAMS
CLAUDIA VAN WYK
Assistant Federal Defenders
Federal Community Defender Office
for the Eastern District of Pennsylvania
601 Walnut Street, Suite 545 West
Philadelphia, PA 19106
Tel: 215.928.0520
Fax: 215.928.0826
pete_williams@fd.org
claudia_vanwyk@fd.org

*Counsel for Petitioner*


Dated: March 8, 2019

# Index to Appendix

**VOLUME I**

Expert Reports and Declarations

1. Report by Barry M. Crown, Ph.D. – March 6, 2019...................................................00001

2. Report by Julian Davies, M.D. – March 4, 2019 .....................................................00012

3. Report by Natalie Brown, Ph.D. – February 11, 2019...............................................00051

4. Report by David Bachman, M.D. – July 31, 2013......................................................00188

5. Declaration of Seymour Halleck, M.D. – September 17, 2010 ................................00190

6. Declaration of Margaret Melikian, D.O. – September 17, 2010...............................00193

7. Declaration of James H. Hilkey, Ph.D. – September 16, 2010.................................00196

8. Declaration of Harry Krop, Ph.D. – September 16, 2010..........................................00199

9. Declaration of James H. Hilkey, Ph.D. – June 2, 2008..............................................00209

10. Declaration of Margaret Melikian, D.O. – May 27, 2008 ......................................00223

11. Declaration of Seymour Halleck, M.D. – May 9, 2008...........................................00236

12. Report by Ruben C. Gur, Ph.D. – June 13, 2004.....................................................00261

13. Report by James H. Hilkey, Ph.D. – May 7, 2004...................................................00271

14. Report by Jonathan Venn, Ph.D. – March 30, 2004 ................................................00277

15. Report by Ralph Newman, M.D. et al. – February 19, 2004 ...................................00294

16. Letter from Jonathan E. Walker, M.D. to Jim Evans, Ph.D.
    January 14, 2004 ......................................................................................................00313

17. Report by James Evans, Ph. D. – January 8, 2004...................................................00315

**VOLUME II**

Witness Declarations

18. Declaration of Linda Adkins – January 27, 2017 ....................................................00321

19. Declaration of Laura Cooper – September 15, 2016 .................................................00323

20. Declaration of Sharon Dotson – June 18, 2008 ........................................................00326

21. Declaration of Nathan Faulks – June 4, 2008 ...........................................................00329

22. Declaration of Mike Kaasee – September 14, 2010 ...................................................00332

23. Declaration of Christina Kirkman – January 27, 2017 .............................................00334

24. Declaration of Joy Krug – November 15, 2016 ........................................................00336

25. Declaration of Lewis Lambert, Jr. – September 14, 2010 .........................................00356

26. Declaration of Lewis Lambert, Sr. – September 14, 2010 .........................................00358

27. Declaration of Marilyn Lauver – November 14, 2016 ..............................................00360

28. Declaration of Kelly Perry – January 27, 2017 ........................................................00362

29. Declaration of Russell Spears – May 22, 2018 .........................................................00364

Transcripts and Testimony

30. *United States v. Fulks*, 4:02-cr-992 (D.S.C.) Jury Trial Transcript Volume XVI –
Testimony of Linda Adkins – June 22, 2004 .........................................................00366

31. *United States v. Fulks*, 4:02-cr-992 (D.S.C.) Jury Trial Transcript Volume XVIII –
Testimony of Arlene Andrews – June 24, 2004 .....................................................00380

32. *United States v. Fulks*, 4:02-cr-992 (D.S.C.) Jury Trial Transcript Volume XVIII –
Testimony of David Bachman – June 24, 2004 .....................................................00482

**VOLUME III**

33. *United States v. Fulks*, 4:02-cr-992 (D.S.C.) Jury Trial Transcript Volume XVIII –
Testimony of Fred Bookstein – June 24, 2004 ......................................................00568

34. *United States v. Fulks*, 4:02-cr-992 (D.S.C.) Jury Trial Transcript Volume XX –
Testimony of Christos Davatzikos – June 28, 2004 ...............................................00606

35. *United States v. Fulks*, 4:02-cr-992 (D.S.C.) Jury Trial Transcript Volume XVII –
Testimony of James Evans – June 23, 2004 ..........................................................00627

36. *United States v. Fulks*, 4:02-cr-992 (D.S.C.) Jury Trial Transcript Volume XVII –
Testimony of Martha Floyd – June 23, 2004 .........................................................00694

37. *United States v. Fulks*, 4:02-cr-992 (D.S.C.) Jury Trial Transcript Volume IV – Testimony of Dewayne Fulks – June 4, 2004............................................................00706

38. *United States v. Fulks*, 4:02-cr-992 (D.S.C.) Jury Trial Transcript Volume XVI – Testimony of Mark Fulks – June 22, 2004 ...............................................................00762

39. *United States v. Fulks*, 4:02-cr-992 (D.S.C.) Jury Trial Transcript Volume VII – Testimony of Ronnie Fulks – June 9, 2004 ............................................................00785

**VOLUME IV**

40. *United States v. Fulks*, 4:02-cr-992 (D.S.C.) Jury Trial Transcript Volume VIII – Testimony of Ronnie Fulks – June 10, 2004 ...........................................................00810

41. *United States v. Fulks*, 4:02-cr-992 (D.S.C.) Jury Trial Transcript Volume XII – Testimony of Ruben Gur – June 16, 2004 .................................................................00825

42. *United States v. Fulks*, 4:02-cr-992 (D.S.C.) Jury Trial Transcript Volume XVII – Testimony of Cindy Harper – June 23, 2004.............................................................01002

43. *United States v. Fulks*, 4:02-cr-992 (D.S.C.) Jury Trial Transcript Volume XVII – Testimony of Sue Hatcher – June 23, 2004 ..............................................................01006

44. *United States v. Fulks*, 4:02-cr-992 (D.S.C.) Jury Trial Transcript Volume XVI – Testimony of Kevin Holbrook – June 22, 2004..........................................................01022

45. *United States v. Fulks*, 4:02-cr-992 (D.S.C.) Jury Trial Transcript Volume XVI – Testimony of Brian Messenger – June 22, 2004.......................................................01042

46. *United States v. Fulks*, 4:02-cr-992 (D.S.C.) Jury Trial Transcript Volume XVII – Testimony of Gayle Wolfe – June 23, 2004 ............................................................01055

Records

47. The Gallaher School Results of Selective Screening for Chadrick Fulks – November 25, 1986.......................................................................................................................01064

48. The Gallaher School Referral for Multidisciplinary Assessment for Chadrick Fulks – January 6, 1987 .......................................................................................................01065

49. Academic Evaluation Report by Peggy Blatt for Chadrick Fulks February 24, 1987 .....................................................................................................01066

50. Psychological Evaluation Report by Rodney Pardue for Chadrick Fulks

March 4, 1987 ................................................................................................01073

51. Instructional Recommendation Plan/Individualized Education Program for Chadrick
Fulks – May 12, 1987 ...................................................................................01077

52. Peyton Elementary Review for Chadrick Fulks – March 1, 1989 ............................01078

53. Instructional Recommendation Plan/Individualized Education Program for Chadrick
Fulks – May 15, 1989 ...................................................................................01079

Additional Witness Declarations

54. Declaration of Dicie Fulks – July 17, 2008 ................................................01082

55. Declaration of Gayle Wolfe – September 15, 2016 ..................................................01084

AFFIDAVIT/DECLARATION OF LINDA ADKINS
PURSUANT TO 28 U.S.C. SUBSECTION 1746 &
18 PA. C.S. SECTION 4904

I, Linda Adkins, do hereby declare, affirm and verify as follows:

1. I lived two houses down from the Fulks family on Pine Street in the Beverly Hills section of Huntington, West Virginia. When the Fulks family moved on to our street, Chad was about 16 months old. His parents, Roger and Diane, had three older children: Sherry, Dewayne and Ronnie.

2. Both Roger and Diane were alcoholics. They would borrow money from me saying that they needed to buy food for the family and then I would see them return to their house carrying a twelve pack of beer. I frequently saw Roger and Diane intoxicated.

3. When the Fulkses first moved on my street, I did not know that they had a baby. They almost never brought him out of the house. I was surprised when I first met Chad because I didn't know that the Fulkses had any other children other than Sherry, Dewayne or Ronnie. Chad stayed in his baby bed and I thought this was strange because he should have been outside playing.

4. Everything was slow about Chad. He talked slow and he moved slow. He was still in diapers when his younger brother Shannon was born. Roger and Diane had two children in diapers at the same time.

5. Chad was especially slow in learning to speak. My daughters were much more advanced than Chad at his age. Chad couldn't say many words and the words he said were difficult to understand because he mispronounced them. When Chad was really young, he was very hard to understand. He used very few words and the ones he did use came out funny. For example, his "L" came out as "W". I eventually learned to understand Chad's talk, but often had to ask Dewayne and Ronnie what Chad was saying.

6. I saw Chad frequently during the time that he was my neighbor from when he was a toddler until he was a young teenager. His speech got better as he grew up and received help at school. Even at his best, though, Chad had a bad lisp.

7. Chad was slow in so many ways. He didn't understand things like the other kids in the neighborhood. They used to play volleyball, but they didn't have a net. Chad didn't understand the game and got lost in the process. Chad was clumsy and his coordination was not good. When the kids were playing kickball, he missed the ball. When they were playing baseball, he tried to bat, but missed the ball by a long shot.

8. Chad had trouble understanding things. I had to repeat myself over and over because he didn't understand what I was saying to him. He kept saying "Huh?" Other times I had to keep reminding him to do things because he didn't remember what I had told him.

L.A.
1-27-17

App. 00321

9. Chad was a quiet child. His brothers Dewayne and Ronnie were loud and active, while Chad was withdrawn from people and stayed to himself. When he did play with his brothers and the neighborhood kids, he was a follower and did what the other kids wanted. He didn't initiate anything. He tried to keep up with his older brother Dewayne and keep Dewayne happy. He tried to please his older brothers by doing what they told him to do.

10. Chad was a sensitive kid. He cried a lot and whined. When playing with the neighborhood kids, he didn't like being rough. When the other kids were rough, he screamed like they were gonna hurt him.

I declare under penalty of perjury and pursuant to the laws of the United States of America, 28 U.S.C. § 1746, that the foregoing is true and correct.

*Linda Adkins*

Linda Adkins

1-27-17

Date

DECLARATION OF LAURA COOPER
PURSUANT TO 28 U.S.C. SUBSECTION 1746

I, Laura Cooper, do hereby declare, affirm and verify as follows:

1. My name is Laura Cooper. I was Chad Fulks' special education teacher when he was in the 6th grade. It was my first year of teaching middle school and my first year in the Cabell County School District of West Virginia. That year, my special education class included Behavior Disorder (BD) children, Learning Disabled (LD) children, and Mentally Impaired (MI) children, all mixed together. The students I taught were from 6th, 7th and 8th grades. Some students I taught all day, but some I taught only for certain subjects. I taught Chad math. Regardless of whether students were BD, LD, or MI, the lessons I taught were far more basic than they would be in a regular class. The students also received much more one-on-one attention than they would have in a regular class.

2. When I taught Chad, the special education department did not have enough funding. There were not enough special education teachers to cover our special education population. This lack of resources frequently prevented us from providing our students with all of the time and attention that they needed. For example, I might be trying to teach Chad math, but then someone would show up for reading, so my attention would turn to them. I did the best that I could.

3. Chad's movement between different schools and districts during that time made it easy for him to fall through the cracks. For example, Lincoln County School District was just over the hill, but they had different books, different student standards, different goals. It takes a while to get to know a student and recognize his or her deficits. If a student like Chad moved around frequently, there was a good chance that the student's teachers would not have the opportunity to recognize the extent of the student's deficits.

4. Chad's math skills were far below a 6th grade skill level. I worked with him on basic knowledge that he needed, which was not necessarily 6th grade math. I spent time teaching him things like telling the time, or counting money, because he had not learned those simple skills. To put it another way, I was teaching Chad at a level below 6th grade math because that is what he needed most. Even when I tried to teach him some 6th grade math problems, I taught Chad differently than other children. I taught him much more slowly and repetitively because he struggled so much. It was hard because he was so far behind. For instance, all 6th graders were supposed to understand circles and the parts of a circle as part of 6th grade math. Chad did not know these kinds of basics. So, when I tried to teach him grade-appropriate math, there was a lot of going back and filling in gaps.

5. I never made it too hard for my students to get a good grade. I tended to pass them if they tried and made some progress. I have reviewed Chad's school records and they reflect that I gave Chad a C. This grade only spoke to the individualized work that I was able to do with him. It didn't represent a C for general 6th grade math.

6. The records show that I administered Chad the Brigance test, which covered reading, spelling and math. At that time, that was a test that the county required to assess the student's needs. When you look at Chad's records around that time, he was just not keeping up in non-BD classes. Chad showed a big deficit in math. His reading score on the Brigance reflects that he was reading at the 6th grade level. His actual reading level might have been much lower. I would only administer portions of the Brigance until he hit his ceiling score, not the whole thing. It looks like I administered it to Chad in less than a day, suggesting that I administered some portions of the test to him and not others. On the Brigance, there were separate sections for testing the student's ability to sound out the words through reading aloud and then the student's reading comprehension. Reading comprehension is more difficult and requires a higher level of thought than sounding out the words. I cannot tell if I administered the reading comprehension test to Chad, or only the portion that involves sounding out the words.

7. Chad was placed in my class because he was categorized as BD. That did not mean that he did not suffer from intellectual problems. If you were below average in a certain subject, or if you were MI, you would still get classified as BD if you also had behavioral problems. The BD label took precedence because the school viewed the behavioral problems as the main issue interfering with the student's education. The school sometimes failed to examine whether a student's behavior was caused by low IQ. This was unfortunate. Many students with intellectual problems also had behavioral problems because they were so frustrated by their difficulties with the academics. However, the school was focused on what was interrupting the coursework, not why. Also, Chad's behavior was not bad with me in a setting where I could give him more attention than he would receive in a regular class.

8. Chad had regular education classes the rest of the day, so he had regular education teachers for the other core subjects. This was not unusual for children who were having academic difficulties. When you were a BD student back then, administrators wanted you back out in regular education classes as much as possible. With BD monitoring, the regular education teacher would get a copy of the student's IEP. Then, the BD monitoring teacher would conference with them to give them background on the student. If things didn't go well once the student went to the regular education class, they would pull the student out for a self-contained special education class for his weakest point only, even if the student also struggled in additional subjects. There was a school-wide emphasis on minimizing the amount of support each special education student received.

9. IQ testing in the district at that time was done one on one with a school psychologist. For students like Chad, the administration of the testing might be spread out over time—a little here, a little there, depending on how the student seemed to be performing. Notes in my records show that I was trying to get ahold of Chad's mom for an annual review, but she was not answering. I do not recall meeting her.

10. There is also an indication in the records that the school psychologists Rodney Pardue and Eric King wanted to do more academic testing, but it doesn't look like that additional testing was ever done. At that time, there were no state standards for all of this testing, so moving Chad around to all of these schools would have been especially bad for him—no consistency, no oversight.

I declare under penalty of perjury and pursuant to the laws of the United States of America, 28 U.S.C. § 1746, that the foregoing is true and correct.

Executed in Cabell County
State of West Virginia
On the 15 day of Sept., 2016

Laura Cooper

THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
Florence Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 4:02-992 |
| | ) | |
| CHADRICK E. FULKS | ) | |

## **DECLARATION OF SHARON DOTSON**

1.      My name is Sharon Dotson.  I am over 18 years of age and competent to make this declaration..  I am Chad Fulks' maternal aunt.

2.      Members of the Fulks trial team came to the trailer that I share with my mother and spoke to her about various matters relating to Chad and my sister Diane.  The trial team never asked to speak with me.  Had they asked to speak with me, I would have informed them of the matters contained in this declaration.

3.      My parents Wilda Mae and Leon Holbrook had a tumultuous marriage because of Leon's alcoholism.  My parents often argued and fought.  One time when I was six or seven years old, Leon went into a violent rage and began choking my mother.  I had to intervene by hitting him with my ankle brace to stop the choking.

4.      Leon physically abused all of my siblings, but singled out my sister Diane and my brother Buddy because they were the oldest.

5.      Leon moved the family around a lot.  At one time he was a police officer in North Carolina, but could not hold this or any other job because of his drinking.

PA Document #21

App. 00326

- 2 -

6.    Leon often took food from the house and the children went hungry.  Our utilities were often cut off, and when I was 11 years old we had to live in a chicken coop because we had no other place to go.

7.    When I was 12 years old, Leon left my mother.  He said he was going to get a new job that day, but never came home.  Leon remarried and lost contact with his kids.  I did not see Leon again until I was 30 years old.

8.    Since my sister Diane was a child, she has been very possessive of her belongings, easily stressed and angered.

9.    Diane married Roger and they both drank heavily.  Roger was very much like Leon and was prone to violence.  I remember one time I was in the car with Diane and Roger when Roger started to choke Diane.  I attempted to pull Roger off of Diane and he punched me. I was knocked to the ground by this blow.

10.    Diane was unhappy with her marriage and sometimes suicidal when she lived on Leeward Avenue.  Diane would call me and tell me that she was going to kill herself.

11.    Roger and Diane physically abused their children.  Roger repeatedly hit the kids on the head when they were small.  He constantly called them names like "sons of bitches" and "dumb ass."  Diane would throw items at the kids and also call them names.

12.    Roger used to brag about his stealing in front of the kids.  Not surprisingly, the kids also learned to steal.

13.    In the basement, Roger had pictures up on the wall of naked women with their legs spread.

14.    After Roger left her, Diane eventually married Dean Thompson.  I was in court when Dean pled guilty to molesting his granddaughter.

- 2 -

- 3 -

15.   In accordance with 28 U.S.C.A. § 1746, I declare that under penalty of perjury that the foregoing is true and accurate.

_Sharon Dotson_
Sharon Dotson

Signed before me this _18th_ day of
_June_ , 2008
_Richard H. Kemp_
Notary Public for _West Virginia_
My Commission Expires: _Sept. 6, 2016_



OFFICIAL SEAL
NOTARY PUBLIC
STATE OF WEST VIRGINIA
RICHARD H. KEMP
2008 Quarrier St.
Charleston, WV 25311
My Commission Expires Sept. 6, 2016

- 3 -

App. 00328

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
Florence Division

UNITED STATES OF AMERICA            )
                                    )
                                    )
        v.                          )    CRIMINAL NO. 4:02-992
                                    )
                                    )
CHADRICK E. FULKS                   )
                                    )

## DECLARATION OF NATHAN FULKS

1.    My name is Nathan Fulks.  I am currently incarcerated at the West Shoreline Correctional Facility in Muskegon Heights, Michigan.  Roger Fulks is my first cousin.

2.    I am familiar with Roger Fulks and his former wife Diane.  I have personally observed their treatment of their children and their interactions with others.

3.    In my opinion, Roger Fulks has long been a sexual deviant.  I recall several occasions when Roger participated in running a sex train on different women.

4.    During the 1970's, Diane had a reputation as a being a flirtatious, unfaithful wife. Roger and Diane often fought over these marital issues.

5.    Roger Fulks was a very violent man and would look for any excuse to fight. Roger was a very good fighter and took pride in the damage he could cause.  I have seen Roger and Diane fight on many occasions.  Diane could fight as well or better than most men.  Because of his skill at fighting, Roger would eventually overcome Diane.  I have seen him throw her on the floor and stomp on her.  The children were exposed to this violence and would try to break up fights between Roger and Diane.  Roger thought it was funny when the children tried to intervene.

1

PA Document #18

6. Roger Fulks had a pool table in the basement of their home on Leeward Avenue in Huntington, West Virginia. Many people would congregate in the pool room where they would consume alcohol and drugs. Violence often erupted in the basement. I have also seen firearms pulled during the altercations. Drinking, fighting, and using drugs were normal activities at the Fulks' residence on Leeward Avenue.

7. Roger and Diane neglected their children. When the children were infants, neither parent regularly changed their children's diapers. Roger refused to do so because he believed it was not a man's duty. Diane, in my opinion, just did not care.

8. The Fulks' home was filthy. Garbage and auto parts were scattered everywhere. The home was not a healthy environment to raise children.

9. I have seen Roger and Diane beat and throw their children against the walls. The Fulks children have been whipped with heater hoses from cars, electrical cords, and fan belts. I have seen cuts and bruises on Chad's face and body from these vicious beatings. I recall one time Chad's back was so badly scourged that dried blood caused Chad's shirt to stick to his back.

10. The Fulks family was very poor. The children often did not have enough to eat. I recall one instance when Ronnie Fulks stole money from my wallet and gave it to his mother. I asked Diane to return the money, but she refused. In my opinion, the family needed that money to buy food.

11. When Chad Fulks was a young teenager, he drank alcohol, smoked marijuana, and knew drug dealers in the Huntington area. Chad has purchased marijuana for me before when he was approximately 13 years old.

12. In approximately 1989 or 1990, Roger Fulks disclosed to me an incident that had occurred with Chad. I was in the pool room on Leeward Avenue with Roger. Roger made a

- 2 -

comment that something was going on with Chad. I pressed Roger for information and he was reluctant to provide it. I could tell Roger was deeply embarrassed. He made a comment that he did not want to end up in prison for retaliating over what had happened to Chad. Some years later, I learned from Chad that he had been sexually abused by a man during this time period.

13. In accordance with 28 U.S.C.A. § 1746, I declare that under penalty of perjury that the foregoing is true and accurate.

_Nathan Fulks_
Nathan Fulks

Signed before me this __4__ day of
__June_____, 2008

R. Darnell
Notary Public Muskegon Co., Mi.
My Commission Expires __4/6/12__

_R Darnell_
Notary Public for __Muskegon County__

My Commission Expires: __4/6/12__

App. 00331

## Declaration of Mike Kaasee
## Pursuant to 28 U.S.C. §1746

I, Mike Kaasee, being of full age, do hereby declare the following:

1. I have known Chad Fulks since we were both young. Growing up, we lived next door to each other in Chesapeake, Ohio. Diane Fulks, Chad's mother, used to rent a trailer from my mother, Kris Maynard. Chad lived with his mother in the trailer. The trailer was located on our property, so we lived right next door to each other.

2. Chad and I spent a lot of time together as kids. We also hung out with Lewis and Brian Lambert, who lived in Chesapeake, too.

3. My mother and my biological father, Gary Kaasee, Sr., got a divorce when I was about 1 year old. My dad had two sons from another marriage: Gary Kaasee, Jr., and Greg Kaasee. When I knew Chad, my two half brothers - Gary, Jr., and Greg - lived my my dad. Chad used to hang around with Greg, and Gary, Jr., too. He met my dad through them.

4. My dad was always acting crazy. Sometimes he would be violent. Other times he would do sexual things that were weird and out of place. I never wanted to be around him. He used to show up at my house and take me places. I hated this. Whenever I could, I would run away and hide around town when he would come looking for me. After I felt like he was gone, I would call my mom and have her pick me up.

5. When I was very young, my father held my mom and me hostage in our own home. He wouldn't let us leave for hours and he beat me for what felt like most of the day.

6. At one point, my father came to my house and took me to where he lived with his new wife. He led me into his bedroom where his wife was passed out drunk. My father pulled the covers off of her and his wife was laying there, completely naked. He told me to "fuck" her. He

kept saying that over and over again. I ran out of his house and hid in a church until I was sure

he had gone away. Then I called my mom and had her come and get me.

7. One day, when Chad and I were in our early teens, I saw Lewis Lambert around town.

Lewis told me Chad had called him and asked him to drive over to Value City Furniture Mart to

pick Chad up. At that time, my dad used to have a fruit stand outside of that store. Lewis said

when Lewis got there, Chad was outside the store breaking melons on the concrete. My dad was

nowhere to be found. Chad was very upset and angry. Chad told Lewis my dad had sexually

abused him.

8. I absolutely believe my dad sexually molested Chad. My dad was never right in the

head and Chad was a quiet kid back then who went along with what people around him told him

to do. Chad would've gone along with whatever my dad asked him to do until it was too late. I

have no doubt my dad pulled Chad into a situation where my dad could do something awful to

Chad.

9. I hereby certify that the facts set forth above are true and correct to the best of my

personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28

U.S.C. § 1746.


Dated: _Sept 4 2016_
Chesapeake, OH

_Christopher Kean_
Mike Kaasee

AFFIDAVIT/DECLARATION OF CRISTINA KIRKMAN
PURSUANT TO 28 U.S.C. SUBSECTION 1746 &
18 PA. C.S. SECTION 4904

I, Christina Kirkman, do hereby declare, affirm and verify as follows:

1. I am Chad Fulks's cousin. His mother Diane and my mother Sharon are sisters. I am five or six years older than Chad. I spent time with Chad when he lived on Pine Street in Huntington, West Virginia and then my family lived with his family for a short while when they lived on Leeward Street.

2. Chad's parents, Roger and Diane, drank alcohol for as long as I have known them. They were both addicted to alcohol and would spend money on beer and cigarettes before buying clothes for the kids. I have seen Diane so drunk that she urinated on herself and another time threw up and just sat in it. Diane ~~did not~~ express her love for her kids ~~until~~ she was sloppy drunk.

3. When he was young, Chad had a speech problem. He talked funny and sounded younger than he was. His tongue didn't work right. Most people couldn't understand what Chad was saying. Only if you were around him a lot would you be able to understand him. Sometimes, I had to ask his sister Sherry Lynn to translate what he was saying. Chad also stuttered, but he grew out of that.

4. Chad was a shy kid and didn't talk much. Still, the kids teased Chad about the way he talked. The kids at school were really bad at teasing him and he didn't want to go to school because of it. All the kids knew that he was in a special class. I don't remember Chad ever having a really close friend at school or in the neighborhood.

5. One time I saw Chad playing ball with a bunch of neighborhood kids. He was not playing well because he was uncoordinated. The kids started teasing him and he just wandered off with his head down and a sad expression on his face.

6. Chad was slow and people who knew him thought that he was slow. He couldn't comprehend basic schoolwork. When he was in second grade, either Chad's mother or my mother asked me to help him with his homework. I tried to help him with his arithmetic homework and found that Chad had difficulty with adding and subtracting. Chad had a short attention span. Chad couldn't read well either. He was not understanding things that he should have known at his age.

7. Sometimes Chad got stuck on a word or phrase, saying it over and over again.

8. Diane called Chad "retarded."

9. Chad was a quiet child compared to his brothers. He was ignored by his parents and his siblings. I used to call him "a ghost child" because it was like he was not there. He was left out of many family activities. He was there, but not there.

I declare under penalty of perjury and pursuant to the laws of the United States of America, 28 U.S.C. § 1746, that the foregoing is true and correct.

_____
Christine Kirkman

_____
Date

I, Joy Krug, do hereby declare, affirm and verify as follows:

1. I was the school psychologist at Westview Junior and Senior High Schools when Chad — *including special education,* Fulks was a student. I was also the Supervisor of Special ~~Education~~ Services, and I was a *JEK gifted,* grant writer for the school. *and curriculum*

2. Westview schools were very unique when Chad was a student, and different from most *JEK* schools elsewhere. The federal government provided our schools with a great deal of money under Title I because we had a large Amish population whose income was low. *We also* As a result, we were able to provide services to our students that many school districts are *received* not able to provide. For example, we provided a support study hall for junior high school *state and* students and a nurse for each school facility. We also retained the services of a *JEK local* psychiatrist, Dr. Otto Klassen, who evaluated and treated students with mental health *JEK funding to* disabilities. Westview schools even paid for psychiatric medications that Dr. Klassen *support our* prescribed to our students. *services.*

3. Even for those students who had significant disabilities, and whom we did evaluate and qualify under federal law for special education services, we took seriously the federal mandate to provide those students with an appropriate education in the least restrictive environment. As much as possible, we educated these students in regular education classrooms with remediation, accommodations, and supports.

4. It was clear as soon as Chad enrolled in Westview that he had disabilities for which he needed supports. Our antenna went up very fast, and we pulled out all the stops. He enrolled in Westview as an eighth grader at the end of August 1991, when he was fourteen years old. By September 10, 1991, he was placed in a remedial reading support program.

5. At that time I also administered psychological tests to Chad. I administered the Slosson Intelligence Scale, a brief test of intellectual functioning. Chad obtained an IQ score of 66 on this test, equivalent to a mental age of 9 years, 6 months. This score is more than two standard deviations below the mean IQ score of 100, and places Chad in what we used to call the "mildly mentally handicapped" range, but we now call the range of "mild mental retardation" or "mild intellectual disability."

6. I also administered the Peabody Picture Vocabulary Test to Chad, and he achieved a standard score of 73, equivalent to a mental age of 9 years, 8 months. This is very consistent with the Slosson score of 66, and falls within the borderline to mildly impaired range. Both the Slosson and the Peabody are verbally loaded tests; that is, they are more geared toward assessing verbal skills than nonverbal skills.

*JEK*

7. In addition, I administered the Kauffman Brief Form achievement test to Chad. His scores on the math, reading, and spelling subtests were consistent with the Slosson and Peabody scores; all within the borderline to mildly impaired range.

8. I liked to administer many psychological instruments to students who demonstrated difficulty at school because the instruments are different from one another and can give information about a variety of domains of functioning. At the end of September 1991, I administered additional psychometric testing to Chad. This included a Wechsler Intelligence Scale for Children, Revised (WISC-R), the Test of Nonverbal Intelligence (TONI), the Woodcock Johnson Test of Achievement (Woodcock Johnson), and the Wide Range Achievement Test (WRAT). I also had teachers who worked closely with Chad complete the Adaptive Behavior Evaluation Scale (ABES), an educationally relevant measure of adaptive behavior (everyday functioning) that has three subscales: Environmental/Interpersonal Behaviors, Self-Related Behaviors, and Task-Related Behaviors.

9. On the WISC-R, Chad obtained a Verbal IQ score of 85, a Performance IQ score of 105, and a Full Scale IQ score of 93. His scores on 4 of the 6 verbal subtests were two or more standard deviations below the mean (Information, Similarities, Arithmetic, and Vocabulary). His score on Digit Span was 8, or low average, and his score on Comprehension was 12, or high average. These scores indicate that Chad was not prepared to function and communicate in the world he was expected to live in. Chad performed better on the performance subtests, within the low to high average range on all except one, Picture Completion, on which he achieved an above-average score. His score on the Picture Completion subtest indicated that he had relative strengths in noting and identifying visual details.

10. Chad's performance on the TONI, a quotient of 84, falls in the low average range. Taken with his performance on the WISC-R, the testing indicates that Chad's verbal skills are significantly more impaired than his nonverbal, or performance, skills. This is confirmed by his scores on the Test of Written Language (TOWL), on which all of his scores are more than two standard deviations below the mean, and on 4 of the 6 subtests, his scores are four standard deviations below the mean.

11. On the WRAT, Chad obtained standard scores in the mildly impaired to low average range. On the Woodcock Johnson, he obtained scores in the borderline to low average range.

12. I asked Chad's teachers to complete the ABES to assess Chad's adaptive behavior because he demonstrated such difficulty in academic and social domains. His scores reflected significant limitations in both of these domains. On the Environmental/Interpersonal Behavior scale, which assesses social skills, communication, and functioning, Chad's standard score was 7 out of a mean of 10, again two standard deviations below the mean. On the Task Related Behavior scale, a measure of functional academics, Chad's score was a 0.

13. Chad's scores demonstrate that he did not have the skills to survive in school without a lot of extra help. He had such a wide span of problems. His verbal impairments prevented him from reasoning and his ability to think abstractly and learn from experience was very limited. The pattern he exhibited was troubling because the discrepancy between his verbal and performance skills led to him to act before thinking.

14. Following this assessment and a review of Chad's previous psychological evaluation and special education placement in West Virginia, we convened a case conference on October 3, 1991. Although Chad had obtained scores on tests of intellectual that fell into the range of mild handicap (the current terminology is mild intellectual disability), he also demonstrated a significant discrepancy between IQ and achievement, as indicated by his scores on the WISC-R and the achievement tests described above. As a result, in order to keep him in regular classrooms with accommodations (in the least restrictive environment) and to be consistent with the qualification criteria used and services provided to him in West Virginia, we recommended that Chad receive services for learning disabilities in English, Math, Science, and Social Studies.

15. After I conducted my psychological evaluation of Chad, I referred him for a psychiatric evaluation with Dr. Otto Klassen. Dr. Klassen prescribed imipramine for depression. Chad should have had a follow through evaluation with Dr. Klassen, but it looks like that never happened.

16. Because Chad's home life was so unstable, and because school principal Stan Shopa suspended Chad when he got into trouble, we didn't have enough time with Chad to fully understand and address his issues. We needed more time with Chad. It is heartbreaking to me that we didn't have an opportunity to provide Chad what he really needed.

17. An investigator working on Chad's current defense team with the Federal Community Defender Office of the Eastern District of Pennsylvania recently came to see me. I directed her to Yvonne Eash at the Westview Administration Building to obtain my old case summaries, which are not included with the regular school records and have to be obtained separately. The investigator obtained these records and I reviewed them with members of Chad's defense team. They are attached to the end of this declaration.

18. The investigator from the Federal Community Defender's Office was the first person working on Chad's legal defense to contact me. Had anyone representing Chad come to see me in the past, I would have provided them the information in this declaration and testified to it had I been asked to do so.

I declare under penalty of perjury and pursuant to the laws of the United States of America, 28 U.S.C. § 1746, that the foregoing is true and correct.

Executed in LaGrange County
State of Indiana
On the _15_ day of _Nov_ , _2016_

_[signature: Jay E. Krug]_

NAME  Chad Fulks _____ BIRTHDATE ___███████_____

ADDRESS  Box 428 Shipshewana, IN  46565 _____ PHONE NO. 825-7952 _____
   (Street or Route)      (Town)    (Zip Code)

FATHER'S NAME  Herman Fulks _____ MOTHER'S NAME_____

| DATE | ACTION |
|---|---|
| | Records not complete: |
| |   Chesapeak,Ohio - Where lived with mother, also previously had attended Huntington W.V. |
| 8-2191 | Entered Westview Grade 8 |
| 9-10-91 | Placed in remedial reading support program. |
| |   Brief Testing C.A. 14-4 |
| |     Slosson IQ 66 |
| |        MA 9-6 |
| |     Peabody SS 73 |
| |     Test Age 9-8 |
| |     Analytical Reading Insturctional 4th grade |
| |     Kauffman Brief form |

              GE   SS
Math   4.8   73
Read   3.5   68
Spell  4.6   75

| 9-12-91 | Permission for Testing |
| 9-27-91 | Suspended from school for fighting until testted and case conference to determine needs. |
| 9-30-91 | Psychometric evaluation |
| |   Sociopathic pattern-20 points favoring performance |
| |   L.D. pattern-Low auditory,low sequencing scale |
| |   WISC-R V. 85, P 105, FS 93 |

| Woodcock: | GE | SS | WRAT: | GE | SS |
|---|---|---|---|---|---|
| Written | 4.0 | 80 | Reading | 4E | 74 |
| Reading | 8.0 | 95 | Math | 4E | 66 |
| Math | 5.7 | 81 | Spelling | 5B | 81 |
| Knowledge | 4.4 | 79 | | | |

Adaptive Behvior Evaluation Scale ABES
    (Standard Score 6 and below significant)

| Environmental/Interpersonal Behavior | SS | 7 |
|---|---|---|
| Self Related Behavior | SS | 12 |
| Task Related Behavior | SS | 0* |
| Adaptive Behavior Quotient | SS | 81 significant |
| | | 12 percentile |

| 10-3-91 | Case Conference recommend L.D. 8th for English, Science, Soc. Studies, Math |
| 10-10-91 | Problems on Bus |

10-11-91 suspended from school (see file)
  to
10-18-91  and suspended from riding bus

NAME Chad Fulks                                    BIRTHDATE ▓▓▓▓▓▓

ADDRESS  Box 428 Shipshewana, IN   46565                    PHONE NO.  825-7952
     (Street or Route)              (Town)      (Zip Code)

FATHER'S NAME   Herman Fulks               MOTHER'S NAME

| DATE | ACTION |
|---|---|
| 10-18-01 | Returned to school |
| 10-22-91 | Records/information received from West VA |
|  |   1. Had been placed Behvior Disordered since 2nd grade- with L.D. placement |
|  |   2. 3-90 Retest Evaluation WISC-R V. 88 P. 105 F.S. 96 Qualified L.D. with Math SS 72 |
|  |   3. Was scape goat/placed on probation-(because trauncy, several battering misdemeanors, behavior disorder |
|  |   4. Drugs in home(emotional physical abuse) |
|  |   5. Chad was molested by adult male |
|  |   6. Made ward of court W.V. |
| 10-29-91 | reinstate bus (see file) |
| 11-13-91 | Removed from Westview-Word W.V. father not formal custody |
| 11-22-91 | Notice from W.V. that Mr. Fulks regained custody of Chad. |
| 11-25-91 | Case Conference |
|  | Establised contract behavior (see attached info) |
|  | Recommend L.D. tight supervision, on probationary basis until 2nd semester at which time he would be considered L.D. 9th grader (placed according to "social awareness level" also allow for more "hands on" prevocational level |
|  | Recommend-therapy/support Dr. Klassen(Appt. Dec. 3 at 6:00 p.m.) |
| 11-26-91 | Start new program |
| 1-10-92 | Withdrew from Westview Return to his Father |
| 2-?- | 7. |
| 4-2-92 | Probate-Juvenile Court Glen was Brill Judge |
| 11-5-92 | Request for records. Lawrence Co. Ohio |
| 11-30-92 | Conference with Probation Officer, Chad and father, Herman Fulks.  On Dec. 9, Chad goes to court to determine if delinquent.  In the mean time court order to be involved in a school program.  Recommend home bound 2 hrs. 3:30 to 5:30 at the school on Tues., Wed. Thurs. until completion of EH evlauation. |
| 12-2-92 | Referral for EH evaluation |

Name: **CHAD FULKS**

|  | YRS. | MO. | DAY |
|---|---|---|---|
| Date | 91 | 9 | 30 |
| B.D. | ▮ | ▮ | ▮ |
| C.A. | 14 | 4 |  |

PEABODY PICTURE VOCABULARY................TEST AGE 9-8 SS73
SLOSSON INTELLIGENCE SCALE MA 9-6 SS **66**
ANALYTICAL READING INVENTORY 4th frustration
WRITTEN LANG. Q 59

VISUAL MOTOR INTEGRATION TEST............        SS 82
WIDE RANGE ACHIEVEMENT
   READING...............................GE __4E__ SS __74__
   MATH..................................GE __4E__ SS __66__
   SPELLING..............................GE __5B__ SS __81__
WOODCOCK-JOHNSON TESTS OF ACHIEVEMENT
   Written CLUSTER......G.E. __4.4__   GR SS ____   AGE SS __80__
   MATHEMATICS CLUSTER..G.E. __5.7__   GR SS ____   AGE SS __81__
   KNOWLEDGE CLUSTER....G.E. __4.4__   GR SS ____   AGE SS __79__
TEST OF NONVERBAL INTELLIGENCE (TONI)
   TONI QUOTIENT.........................  __84__

KAUFFMAN ··
   Reading ...........GE 3.5   SS 68
   Math ..............GE 4.8   SS 73
   Spelling .........GE 4.6   SS 75

TOWL
Test of Written Language

|  | % | SS |
|---|---|---|
| Voc | 2 | 3 |
| Thematic Maturity | 2 | 3 |
| Spelling | 16 | 7 |
| Word Usage | 5 | 5 |
| Style | 2 | 3 |
| Hand Writing | 2 | 3 |

WESCHLER INTELLIGENCE SCALE FOR CHILDREN
WISC-R

**VERBAL TESTS**

INFORMATION: General knowledge, long term memory from experience, education
0 1 2 3 4 (5) 6 7 8 9 10 11 12 13 14 15 16 17 18 19 20

SIMILARITIES: Forming relationship, abstract thinking, integrative thinking
0 1 2 3 4 5 6 (7) 8 9 10 11 12 13 14 15 16 17 18 19 20

ARITHMETIC: Concentration, auditory sequencing, arithmetic reasoning
0 1 2 3 4 5 6 (7) 8 9 10 11 12 13 14 15 16 17 18 19 20

VOCABULARY: Word knowledge, verbal fluency, expressive vocabulary
0 1 2 3 4 5 6 (7) 8 9 10 11 12 13 14 15 16 17 18 19 20

COMPREHENSION: Practical knowledge and social judgment, reasoning, logical solutions
0 1 2 3 4 5 6 7 8 9 10 11 (12) 13 14 15 16 17 18 19 20

(DIGIT SPAN) Attention, concentration, immediate auditory & visual memory-sequencing
0 1 2 3 4 5 6 7 (8) 9 10 11 12 13 14 15 16 17 18 19 20

**PERFORMANCE TESTS**

PICTURE COMPLETION Alertness to details & long term visual memory
0 1 2 3 4 5 6 7 8 9 10 11 12 13 14 15 (16) 17 18 19 20

PICTURE ARRANGEMENT: Interpretation of social situations, visual sequencing, visual alertness
0 1 2 3 4 5 6 7 8 (9) 10 11 12 13 14 15 16 17 18 19 20

BLOCK DESIGN: Reproduce abstract design from pattern, visual analysis
0 1 2 3 4 5 6 7 (8) 9 10 11 12 13 14 15 16 17 18 19 20

OBJECT ASSEMBLY: Putting familiar forms into pattern, visual integration
0 1 2 3 4 5 6 7 8 9 10 11 (12) 13 14 15 16 17 18 19 20

CODING: Speed/accuracy/tracking of symbols, immediate visual memory
0 1 2 3 4 5 6 7 8 (9) 10 11 12 13 14 15 16 17 18 19 20

MAZES: Visual predictions, organization, patterning
0 1 2 3 4 5 6 7 8 9 10 11 12 13 14 15 16 17 18 19 20

| BELOW AVERAGE | | | | AVERAGE | | ABOVE AVERAGE | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| SUB TRAINABLE | TRAINABLE | EDUCABLE | BORDERLINE | SLOW LEARNER | BRIGHT LEARNER | RAPID LEARNER | SUPERIOR LEARNER | VERY SUPERIOR | GIFTED | |

PR 79

|  | Learning Rate | Test Age |
|---|---|---|
| V. | 85 | 123 |
| P. | 105 | 14-11 |
| F.S. | 93 | 13-3 |

Chad Fulks, 10-10-91

At approximately 8:00 a.m., six students came to the office complaning that Chad had blown his nose in his hand and was wiping his hand on students' faces and clothing. The students were asked to write down the incident and return it to me. Four students complied (notes are with Mrs. Lauver). In addition, they reported that Chad had threatened anyone who might report him.

I called Chad into the office and reviewed the incident with him in the presence of Mrs. Lauver. Chad vehemently denied the incident, became surley and defensive and felt that he was being singled out. He was warned that another bus incident would result in bus suspension.

At noon, an 8th grade boy came to me and said that he had been threatened by Chad. He was told that if he said anything about the bus incident that Chad would kill him. There being no physical activity accompanying this incident, I told the boy to get to me just as soon as the threats escalated beyond the threat stage.

At 2:45, the above mentioned boy returned and told me that he had been pushed, intimidated and threatened by Chad. He named two witnesses who corroborated his story. Chad was once again summoned to the office. He denied not only the allegation but stated that he had not seen the boy all day. Chad was placed on in-school suspension until the bell. I told him that I wanted to see his father before I saw him again. He became furious. He stated repeatedly that this was all bull crap and that I was always picking on him. This continued with him becoming more incensed. His language became more vulgar. I told Chad that I was going to put him on the bus, and that I didn't expect any further bus problems. I instructed both a.m. and p.m. drivers to put him in the front seat.

At around 5:00 p.m., the afternoon driver called and said that Chad had threatened several students on the bus and tried to prevent Sam Wait from exiting. It took several warnings before Chad would finally take his seat. Additionally, Chad was yelling obscenities to different students on the bus as well as threatening them.

I met with Mr & Mrs. Fulks this morning and filled them in on the above. Chad is suspended for five days, and I have revoked his bus privileges indefinitely. Mrs. Lauver contacted Dave Judkins of Welfare who arranged for a meeting that will hopefully lead to family counseling.

Recommendations: It is my feeling that Chad Fulks is a highly disturbed and lethally disturbed young man. He goes from person to person with the intent of intimidating and frightening each of his victims. He is very quick to anger and becomes verbally and physically abusive. I would hope that he could be tested immediately for E.H. placement before he seriously hurts someone.

cc: Marilyn Lauver
    James Miller
    Joy Krug

Stan Shopa

# Westview Jr. - Sr. High School

1635S-600W
Topeka, Indiana 46571

Office of the Principal

Telephone
Shipshewana 219-768-4146

October 10, 1991

Mr. & Mrs. Herman Fulks
P.O. Box 428
Shipshewana, IN    46565

Dear Mr. & Mrs. Fulks;

Once again, we have had a complaint concerning your son Chad on the
school bus.  Several students complained that Chad blew his nose in
his hand and was wiping it on different students on the bus.  More
seriously, they indicated that he threatened to "beat them up" if
anyone were to complain.

I spoke to Chad who at first denied the allegation, and then began making
excuses.  I found his attitude to be surley and offensive.  As this was
his third bus infraction, he was told that bus privileges would be
suspended with the next bus violation/complaint.

Your assistance with Chad's behavior will be appreciated.

Sincerely,

Stan Shopa

SS/tag
cc:  Joy Krug
     Marilyn Lauver
     James Miller

App. 00343

WESTVIEW JR. SR. HIGH SCHOOL
R# 1
TOPEKA, INDIANA 46571

NOTICE OF STUDENT SUSPENSION

Date  October 11, 1991

To:  Mr. & Mrs. Herman Fulks        , Parent(s), Guardian or Custodian

From: Stan Shopa, Principal, Westview Jr. Sr. High School

This notice is to inform you that   Chad Fulks        was suspended from

attendance at Westview for    5    school days beginning on Friday, October 11

at  8:15a.m. through and including Friday, October 18  at   3:25p.m.        .

Prior to being suspended from school attendance        Chad        was provided

with an informal hearing on his/her alleged misconduct which, at a minimum included:

1.  A   verbal   statement of charges against him/her.

2.  A summary of the evidence against him/her.

3.  An opportunity to explain his/her conduct.

In this informal hearing, this administrator determined that the conduct of

     Chad        violated the following rule(s) or standard(s).

Threatening, intimidating and initiating a fight with two students

on October 10, 1991.

All bus privileges will be suspended indefinitely.

Suspension from school means that the student will lose full credit for the days out

of class.  It also means total exclusion from all extra-curricular activities.

Signature

App. 00344

# Westview Jr. - Sr. High School

1635S-600W
Topeka, Indiana 46571

**Office of the Principal**

**Telephone**
Shipshewana 219-768-4146

October 29, 1991

Mr. & Mrs. Herman Fulks
P.O. Box 428
Shipshewana, IN    46565

Dear Mr. & Mrs. Fulks,

As per your telephone request today, Chad will be reinstated on our school buses.

Because of past behavior, please be advised that if there are any further behavior problems, Chad will forfeit his transportation priveleges.

Your assistance will be appreciated.

Sincerely,

Stan Shopa

cc:  M. Lauver
     J. Miller
     J. Krug
     J. Marks

App. 00345

# Westview Jr. - Sr. High School

1635S-600W
Topeka, Indiana 46571

Office of the Principal

Telephone
Shipshewana 219-768-4146

November 13, 1991

Mr. Herman Fulks
Box 428
Shipshewana, IN  46565

Dear Mr. Fulks

Since Chad's latest fight on 11/11/91, I have been in contact with
Richard Harrold, a juvenile probation officer in West Virginia, Dave
Judkins, LaGrange County Welfare director and Don Fry, director of
LaGrange County probation department.

Evidently a number of things that should have happened didn't happen.

1st - Chad is considered a ward of the state of West Virginia.
      As such, he was only granted a probationary visit with
      Mr. Fulks.  It was never intended for him to leave the
      state and attend school permanently in Indiana.

2nd - Although West Virginia has superceded the original divorce
      decree, Mrs. Fulks was awarded full custody of Chad.
      There is no written evidence of joint custody.

3rd - Because of #2, Chad cannot be considered a resident of
      the county much less the state because of the prior
      arrangements reached in West Virginia.  This also negates
      or nullifies the father's signature for special education
      placement at Westview due to the fact that he is not the
      custodial parent.

In short, I regret to inform you that Chad has been attending Westview
illegally.  We will be withdrawing Chad as of this date and urge that
you return him to West Virginia.

Sincerely

Stan Shopa
Principal

SS/nm

Enc.

WESTVIEW JR. SR. HIGH SCHOOL
R# 1
TOPEKA, INDIANA 46571

NOTICE OF STUDENT SUSPENSION

Date  November 13, 1991

To: Mr. & Mrs. Herman Fulks , Parent(s), Guardian or Custodian

From: Stan Shopa, Principal, Westview Jr. Sr. High School

This notice is to inform you that Chad Fulks was suspended from

attendance at Westview for 5 school days beginning on Tuesday, November 11

at 8:30a.m. through and including Monday, November 18 at 3:25p.m. .

Prior to being suspended from school attendance Chad was provided

with an informal hearing on his/her alleged misconduct which, at a minimum included:

1. A verbal statement of charges against him/her.

2. A summary of the evidence against him/her.

3. An opportunity to explain his/her conduct.

In this informal hearing, this administrator determined that the conduct of

Chad violated the following rule(s) or standard(s).

Promoting and causing a fight.

Chad will not be allowed to return to Westview until legal

residency is established.

Suspension from school means that the student will lose full credit for the days out

of class. It also means total exclusion from all extra-curricular activities.

Signature

App. 00347

<u>SCHOOL CONTRACT FOR CHAD FULKS</u>

With Chad's return to Westview, the following conditions will prevail:

1. Any school bus problem requiring a referral by the bus driver will result in withdrawal of all bus privileges.

2. Any act of physical aggression on school property or on the school bus will result in the following:

   A. <u>First Offense</u>:  Five day suspension plus removal of Chad from afternoon classes.  Student will be transported home by special driver.

   B. <u>Second Offense</u>:  Five day suspension plus removal from morning classes.  Student will be taught from 3:30-5:00 P.M. three days a week.  Parents will be responsible for all transportation.

3. No use of profanity or obscenities will be tolerated.  Expressions such as "bull," or "bull crap" will be viewed as profanity.

4. Chad will not be expected to be in the nurse's room unless medication is to be dispensed or an injury is sustained.

5. Chad will need to perform within the expected performance and behavior level of each individual class.


_____          _____
        Signature of Parent                     Signature of Student





Westview School Corporation

1545S 600W
TOPEKA, INDIANA 46571

219/768-4404
219/768-4149
219.768-4497

FAX 219.768-7368

To:      Dr. Klassen
From:    Joy Krug
Subject: Chad Fulks referral   Dec. 3, 1991 at 6:00 p.m.
Date:    Nov. 26, 1991

As you note the case action summary  there are several things to  keep in mind:
1. We just replaced   him L.D. and grade skipped him to grade 9.  (Note attached contract)
2. Father has just regained custody.   I see more hope in his new wife than in the father  himself.
3. He came from West Virginia where he was a ward of the state.
4. He has a history of being molested by an older man.
5. He has sociopathic pattern.

I'm not sure of the degree therapy will be helpful with Chad and/or his father.   The
person seeking help is the stepmother.

App. 00349



**Don Munn, MSW**
*Family Therapist*

**Otto D. Klassen, M.D.**
*Child and Adult Psychiatry*

**Jeff Antioho, MSW**
*Family Therapist*

**Victor R. Koop, M.A.Sc., Ph.D.**
*Psychologist*

*Crystal Valley*

Professional Consultants

## PSYCHIATRIC CONSULTATION

NAME:   Chad Fulks
DATE:   December 3, 1991

I.   **IDENTIFICATION**:   Chad Fulks is a 14-year-old Westivew Junior
High School student in a split grade eight and nine, referred by
the school.   He lives with his father, Herman R. Fulks, and a new
stepmother, Marsha Fulks, in Shipshewana with these parents and
Marsha's sister Sandy, 35.   Marsha also has a daughter at Ball
State University (a sophomore) who is home on vacations.   From
the marriage of his parents Chad is the fourth of five children
with full siblings Ronnie, 17, Duane, 20, Shannon (a girl), 12,
and Sherry, 22.   Both parents (father and stepmother) accompanied
Chad to this consultation.

II.   **PROBLEM**:   All of them, however, had difficulty defining the
problem.   Behavior problems at school and also at home were
mentioned.   Chad himself "knew" that something was bothering him.
Mother said they were here to try to get some help.   An
understanding of this did not come until later, when Chad
revealed alone his "secret."   Before that time it was the step-
mother who stated concerning Chad, after he came to join them
from West Virginia in order to start school in August of 1991, as
the time fighting started, and "interruptions."   "I really don't
know how to cope with it."   And further, Marsha reported that,
"He gets very disgusted, mad if things don't go his way," and
referred to him as tearing up a mechanical pencil after an
argument over changing the channel on the television set, further
that, "He can be happy, but his feelings get hurt."

In order to this understand this, a bit of family history is
necessary.   After his dad left his mother in West Virginia two
years ago, Chad remaining in West Virginia, had taken an overdose
of pills and was hospitalized.   This year, at the beginning of
the school year, he had moved to be with his dad and his new
stepmom, to go to school in the Westview system where apparently
an older brother had gone before (Ronnie).   Indeed, in mid-
November the family went back to West Virginia for a court
appearance which awarded custody of Chad to his father.   The
"secret":   Chad wants to go back to West Virginia now because he
can't stand his stepmother whom he reports is "picking" at him,
"mocking" him, accusing him falsely to such degree that he is
simply "unable to make it here."   However, he can't come out with

this because he does not wish to hurt his dad's feelings and has been unable to tell him.

In addition, Chad feels set apart at this school, jumped on by a group of fellows at school whom he perceives expect him to be a thief like his older brother Ronnie was when he was here. Chad denies having had any serious troubles in West Virginia except the overdose two years ago and the associated behaviors after Dad had left which put him on probation.

Chad's mother, Diana Fulks, 42, has meanwhile moved to Chesapeake, Ohio, across the Ohio River from West Virginia. Chad's father acknowledges that in the days when he lived with Diana Fulks, he "used to drink a case a day with her" (beer). With that drinking he denies ever having had any blackouts, ever being arrested, ever having been physically or otherwise abusive to his family. Asked when he was last drunk he reported that he was drunk the night before this interview, on "part of three quarts of beer."

Chad was born in West Virginia, the product of a normal pregnancy according to the father's report, the delivery being in a doctor's office. Herman had been married to Diana twice, the first time for one year which produced no children, the second time lasting 23 years. The first marriage was followed almost immediately by his departure in the service for Vietnam, divorce occurring while he was gone. When he returned the remarriage occurred, but despite the 23 year history there was lots of fighting, including physical fighting. He described Diana as a severe drinker and as an alcoholic, but as a woman who was now changed, has become a church-goer and herself a "preacher."

Herman explained the move to getting custody of Chad two to three weeks ago as necessary in order to keep him in the Westview school system.

There is a family history of alcoholism in Herman's family, with two brothers and three sisters as siblings, at least one brother being alcoholic. His father, too, "used to be" an alcoholic but now "goes to church and has recently stopped." In Chad's biological mother's family one brother is a likely alcoholic.

Chad was 12 when his dad left and remained with his mother until last August. His behavioral troubles apparently were serious: he had been made a ward of the state and having been on probation for behavioral problems. He was never removed from the home, however. The "psychiatric" evaluation in West Virginia, consisting of a lady coming to his house to talk to him, had been carried out.

Herman Fulks works at the Junior Food Mart in Middlebury as a stock man, Marsha is a homemaker but looking for work.

App. 00351

III.   SCHOOL REPORT:   In a note from Joy Krug I was advised that the school had recently placed Chad in LD and had skipped him to grade nine.   A further report that Chad had a history of being molested by an older man (unreported in this session), and that a sociopathic pattern of behavior could be observed, is noted.   It was clear that it was the stepmother who was seeking assistance. The school reported further that Chad was in need of remedial support, a WISC-R dated 9-30-91 revealed a Verbal IQ of 85, a Performance IQ of 105, and a Full Scale IQ of 93.   All major subjects required LD, and there were behavior problems on the bus, with a school suspension on 10-11-91, and a bus suspension on 10-18-91.   In a school conference on 11-25-91 a tight behavioral contract was developed and tight supervision on a probationary basis and LD ninth grade was supported, with the recommendation for this consultation and therapy supported financially by the school.

IV.   EXAMINATION:   Chad is a reasonably attractive boy who presents the appearance of normal physical health.   He is oriented in time, to place, and to person adequately and appears to possess average intelligence.   He reports that he is unable or poorly able to sleep, has lost appetite, and is depressed, having lost the experience of being able to find pleasure.   He feels displaced and in trouble at school, unhappy at home, and is searching for a way to return to his mother's home where, by all report, he was also unhappy.

Chad denies the use of alcohol or drugs but this examiner did not find himself fully reassured by this answer.

In this examination in Reading Test paragraphs he read adequately for sixth grade at least, though there were small errors of inattention such as the word mother became brother.

Geometric patterns were drawn adequately in direct copy.   When drawing a five line drawing from memory on the first try after eight seconds he made a substantial perseveration (adding two extra lines) but the second try was drawn quite adequately.   A neurological survey failed to disclose localizing signs. Cerebral dominance was right for hand and foot, right for winking and peeking, but uncertain for sighting.

On the Map Test he demonstrated reasonably adequate capacity to learn and a spotty fund of information suggesting learning disruption.

Chad reports that after his dad left he had trouble eating and sleeping, and that the overdose on several different bottles of pills was quite serious, including "they had to restart my heart in the hospital."

In the Draw-A-Person Test Chad drew a large page-filling male

figure with intact boundaries. The overly large mouth, the emphasis on ears, nostrils, and eyes combined to suggest both a very needy (in the sense of unmet dependent needs), and distant, and distrustful (in the sense of not trusting intimacy) boy. The drawing was not psychotic, could be thought of as a bit pre-paranoid, and was not distinctly depressed either. Neither was the overall effect "psychopathic."

VI. INITIAL IMPRESSION:

Axis I:    Major depression, 293.33, remain alert to the
               possibility of the development of addictive disorder
Axis II:   V71.09, but remain alert to the possibility of
               developing sociopathic traits.
Axis III:  No physical problems are known.

VII. RECOMMENDATIONS: I have placed Chad on Imipramine, to be moved up to 100 mg at bedtime, and have made an appointment to see him again with his father in nine days at which time we will discuss with his father his secret wish to be returned to his mother. Following this, but depending upon the outcome of that session, we may have a family session.

Otto D. Klassen, M.D.

ODK/csh

PSYCHOLOGICAL EVALUATION REPORT
Cabell County Board of Education
Tenth Avenue and Bruce Street
Huntington, WV 25701

AME:      FULKS, CHADRICK EVAN          CASE NUMBER:      83673
OB:       ███████                       SCHOOL: BEVERLY HILLS MIDDLE
GE:       12-09                         GRADE PLACEMENT:  06
ARENTS:   ROGER/DIANE FULKS             DATE OF TESTING:  03-01-90
DDRESS:   129 LEEWARD AVENUE            DATE OF REPORT:   03-02-90
          HUNTINGTON, WV 25705          EVALUATOR: ERIC A. KING

EASON FOR REFERRAL:

    Chad was referred for evaluation by his teacher, Mrs. Cooper due
> triennial assessment.

EHAVIOR OBSERVATIONS:

    Chad was cooperative during the testing session.  He attempted all
isks presented to him.  Rapport was easily established.  It appeared
iat Chad had a speech problem.  No other significant observations were
ited.

ESTS ADMINISTERED:

ie Wechsler Intelligence Scale for Children-Revised
ie Bender-Gestalt Visual Motor Test of Integration
ie Human Figure Drawing
ie Burks' Behavior Rating Scales

ESULTS OF EVALUATION:

echsler Intelligence Scale for Children-Revised:

                    Verbal IQ          88 ±3
                    Performance IQ    105 ±5
                    Full Scale IQ      96 ±3

rbal Subtest                          Performance Subtest

($\bar{x}$=8)                                   ($\bar{x}$=11)

formation        5 (w)                Picture Completion    12
milarities      10                    Picture Arrangement   12
ithmetic        10                    Block Design           9
cabulary         6                    Object Assembly       12
mprehension     10                    Coding                 9
git Span         7

Chad's VIQ is 88, his PIQ is 105, and his FSIQ is 96. These cores indicate that Chad is currently functioning in the average ange of Wechsler intelligence classifications.

There was a 17 point difference between Chad's verbal and erformance IQ's. This is statistically significant and suggests that is nonverbal skills are much better developed than his verbal skills.

On the Verbal Comprehension Factor, Chad obtained a mean score of .75. This is below average performance. He presented a specific eakness on the Information subtest which measures Chad's general fund f knowledge and reflects past formal education.

On the Perceptual Organization Factor, Chad obtained a mean score f 11.25. This is slightly above average performance and suggests Chad as well developed skills in such areas as visual sequencing, visual iscrimination, and analysis/synthesis.

On the Freedom-from-distractibility Factor, Chad obtained a mean core of 8.66. This is slightly below average performance. He resented no specific strengths nor weaknesses.

The Bender Gestalt Visual Motor Test of Integration:

Chad had three errors on the Bender - 2 distortions and 1 otation. This suggests that Chad has some visual/motor/perceptual ifficulty.

he Human Figure Drawing:

Chad's drawing was of a male named Adam. Chad described the igure as happy because he got something new. The figure had utstretched arms which may suggest attention/affection needs. Also, he teeth were emphasized which is seen many times in the drawings of ndividuals with aggressive tendencies.

he Burks' Behavior Rating Scales:

The Burks' Behavior Rating Scales were designed to identify atterns of deviant behavior shown by children in grades 1-9. The nformation for scoring the scale is provided by teachers, parents, and ther persons who know the child and his behavior. The information btained is grouped into 19 separate categories and then rated as "not ignificant", "significant", or "very significant."

All of Chad's behavior areas are in the non-significant range, here appear to be no significant behavior problems according to this ehavior report rated by Laura Cooper, B.D. teacher.

## Declaration of Lewis Lambert, Jr.
## Pursuant to 28 U.S.C. §1746

I, Louis Lambert, Jr., being of full age, do hereby declare the following:

1. I met Chad when he was growing up in Chesapeake, Ohio. I was about 16 years old when I met him. Chad was a few years younger than me. We both lived in the same neighborhood in Chesapeake, Ohio, although my family's circumstances were a lot better than Chad's.

2. I also knew Mike Kaasee, and Chad's older brother, Ronnie. Chad and his family lived right next door to Mike. He, Ronnie and Mike regularly walked from their house to visit me at mine.

3. Many of the neighborhood kids came by my house to hang out. I kept an eye out for Chad because he was smaller and younger than the rest of the neighborhood boys and he was very quiet. When other boys played basketball in the street and talked back and forth, Chad would just sit and watch.

4. Chad and Ronnie were very poor. Their mother rented a trailer from Mike's mother. They wore the same clothes day after day, and those clothes were usually dirty. Ronnie and Chad looked dirty too, like they didn't bathe much.

5. Chad and Ronnie didn't seem to get much to eat at home. Whenever they would come over to my house, my mother would fix them something to eat. Each time, they would eat so fast that you could tell they were very hungry and hadn't eaten in a while.

6. My father, Lewis Lambert, Sr., owned and worked on Mustangs. He gave me a Mustang, and I would give my friends rides when they needed them.

7. One day, I got a frantic phone call about Chad. I remember hanging up the phone,

getting

into my car and racing to Value City Furniture to help Chad. I don't remember what, if anything, Chad told me when I got there. I do know he was more upset that day than I'd ever seen him.

8. I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

Lewis Lambert, Jr.

Dated: Sept. 14 , 2010
Chesapeake, OH

## Declaration of Lewis Lambert, Sr.
## Pursuant to 28 U.S.C. §1746

I, Lewis Lambert, Sr., being of full age, do hereby declare the following:

1. I met Chad Fulks when he was a youngster. Chad used to come down to our house in Chesapeake, Ohio to play with my two sons, Lewis, Jr. and Brian. I spent a lot of time back then fixing up Mustang race cars. Chad was very interested in my cars and would hang around, asking questions and offering to help. I had actually purchased a gold Mustang for my sons to drive. Chad really liked that car and enjoyed getting taken on rides around town in it.

2. I knew Chad was not very well off at home. We all had the impression he was pretty poor, in fact. One of the kids Chad hung around with, Mike Kaasee, was also pretty poor. Chad and Mike lived next door to each other for a while because Mike's mother, Kris Maynard, rented a trailer on her property to Chad's family. I remember that Chad's family sometimes didn't have running water because Ms. Maynard hadn't paid the water bill.

3. I usually knew what was going on with the neighborhood kids because I preferred to keep my boys close to the house, rather than letting them run around to friends' houses where I couldn't monitor everyone's conduct. A lot of parents weren't paying very close attention to their kids, even though there were known child predators running around the neighborhood. I always told my own kids and the kids who hung around my house that if they ever needed help, they could call me and I'd come and get them.

4. I recall one time when Lewis Jr. got a phone call from Chad. Lewis Jr. jumped off the phone, headed out the door and right into his Mustang. I don't know exactly what the problem was but I do remember Lewis Jr. coming back home and telling me that Chad was really upset and in some sort of daze over what had happened to him. I don't know exactly what it was that happened with Chad but I know something happened that upset Chad very badly.

5.     I declare under penalty of perjury that the foregoing is true and correct, pursuant to 28 U.S.C. §1764.

September _14_, 2010

Lewis Lambert, Sr.

DECLARATION OF MARILYN LAUVER
PURSUANT TO 28 U.S.C. SUBSECTION 1746

I, Marilyn Lauver, do hereby declare, affirm and verify as follows:

1. My name is Marilyn Lauver, and I was the junior high school counselor for Westview Jr./Sr. High School when Chad Fulks was a student there. I worked with the special education team and the principal and acted as a liaison to students' families. I started off teaching English, but moved into counselling by the time Chad was at Westview. I worked for the school district for ~~28~~ 21 years and I am now retired.

2. I remember Chad because he was a cute, blond kid, but he looked unkempt and disheveled, even feral. When I enrolled him, he needed a haircut and new shoes. He appeared as though he was not being cared for. He had just landed with his father when he was enrolled and his father did not appear thrilled to have Chad with him.

3. Chad had difficulty fitting in with the other students at school. The school was a hard place to break into for new students generally because most students had grown up in the area and their parents had grown up in the area. But for Chad it was particularly difficult. Athletics were really important at the school, as was membership in a church and a church group. Chad didn't have those things. Chad also stood out because of his ill-kept appearance and because he lacked social skills. He did not know how to greet people politely; he did not know to stand up and shake hands when meeting an adult. Chad also did not know how to solve problems with other students. When he did not like how they were making him feel, he acted out toward them rather than being able to talk to them. He did not understand humor and did not understand jokes. It was important to be very concrete and literal with him. In many ways he behaved like a seven year old, even though he was fourteen.

4. Chad was very emotionally guarded. He worked really hard to keep himself in control, but he was impulsive and was not always able to do it. We had received a report that Chad had been sexually abused by an older man, and he behaved the way children who are being physically and sexually abused behave.

5. Chad seemed to have very few friends. It was obvious that life had been hard for Chad, and he expected it to be hard. It set him up be very defensive. He felt that the world was against him. But he was also sad. When I would see him in the principal's office, he curled up, folded into himself, and hung his head down, waiting.

6. We moved toward special education placement for Chad very quickly. The typical practice was for a teacher to observe the student in class, and then request testing. Chad's teacher Renee Morales and her aide Roberta Markley completed rating scales to assess Chad's functioning and behavior. They both determined that Chad had significant difficulties with learning, depression, and physical symptoms and fears, and that he also



exhibited inappropriate behavior. Chad also had a psychological evaluation. Chad was quickly referred to Dr. Otto Klassen, a psychiatrist, for evaluation, which was unusual. Dr. Klassen prescribed an antidepressant medication for Chad.

7. Chad was qualified for special education as learning disabled (LD). Many students who received services for LD or emotionally handicap (EH) also had intellectual disabilities.

8. Westview tried very hard to meet students' needs within the school, and we were creative about the types of services we provided to the students. Even when they had significant needs, we preferred to design programs to serve them rather than to bus them to facilities elsewhere.

9. No one representing Chad ever came to speak with me before now. If they had, I would have been more than happy to tell them what I have described here, to speak with any experts they had, and to testify on Chad's behalf.

I declare under penalty of perjury and pursuant to the laws of the United States of America, 28 U.S.C. § 1746, that the foregoing is true and correct.

Executed in LaGrange County
State of Indiana
On the 14th day of November, 2016

I, Kelly Perry, do hereby declare, affirm and verify as follows:

1. I am the daughter of Linda Adkins and I grew up with Chad Fulks. My family lived on Pine Street in the Beverly Hills section of Huntington, West Virginia and the Fulks family lived down the street. Later, the Fulks family moved a few houses away on Leeward Street. I am 3 years older than Chad.

2. Chad's parents, Roger and Diane Fulks, were alcoholics who frequently disturbed the neighbors with their loud behavior at night. They did not take good care of their children and focused on themselves ahead of the kids. Often, Chad knocked on our door asking for food. On one occasion, Diane ordered pizza bread from our local restaurant and ate the food in front of the kids without offering them any. I felt sad for Chad and his siblings.

3. Chad was quiet and shy, especially compared to others in his family. He stayed on their porch or in the house when his other siblings were outside playing. Sometimes he was in his room lying down on his bed saying that his stomach hurt. He just stayed to himself.

4. I felt sorry for Chad because he was different. He had trouble speaking in that he could not pronounce words. It was hard to understand him when he talked. I grew up with him and got used to how he talked. Sometimes, he talked real fast, which made it even harder to understand him.

5. Chad was quite clumsy. He walked funny and tripped on himself when running. When playing baseball on the corner, he was not coordinated. He had a hard time hitting the ball when batting or catching the ball when fielding. What made it even harder for him was that he did not understand the rules of the games we played. He was slower in his thinking and that made playing with us hard.

6. Chad was slow. In conversations, he did not respond much. He smiled, but could not follow our conversation. When Diane talked to him, she had to say things more than once for Chad to understand. Chad's younger brother Shannon was smarter than he was and understood things Chad did not even though he was older.

7. When Chad was young, he threw temper tantrums. When he did, he threw himself down on the ground in the side yard. It was dramatic.

8. Diane eventually stopped drinking and started going to church. Even when she was going to church, she didn't pay attention to Chad. It was like "I am going to church and you are on your own." Before, all she cared about was her alcohol, but then all she cared about was her church.



I declare under penalty of perjury and pursuant to the laws of the United States of America, 28 U.S.C. § 1746, that the foregoing is true and correct.

_Kelly Perry_
Kelly Perry

_1/27/17_
Date

DECLARATION OF RUSSELL SPEARS
PURSUANT TO 28 U.S.C. SUBSECTION 1746

I, Russell Spears, do hereby declare, affirm and verify as follows:

1. Many people know me by my nickname "Bubby".

2. I first met Chad Fulks in Chesapeake, Ohio. Dwayne, Ronnie and Chad Fulks lived in a trailer next to me and my wife Jennifer. Dwayne and my sister Lois were sleeping together.

3. At some point, Chad did not have a place to stay, so he moved in with me and Jennifer. Through us, he met and started dating Jennifer's sister Tammy. When we moved from Chesapeake back to Huntington, Chad moved with us. We found an apartment in Rotary Gardens Apartments, a church run apartment complex with government subsidized rent. Both Chad and Tammy lived with us for a while.

4. Rotary Gardens became a cool place to live. Duane and his wife Penny moved there. Then my sister-in-law Tammy got her own place and Chad moved in with her. All of us partied together, drinking and using drugs. At that time, I was in my mid-twenties and Chad was in his mid-teens – around 15 or 16 years old.

5. We all were partying pretty hard at that time. However, Chad stood out as someone who could not handle his liquor or drugs. On one occasion, Chad was drinking and smoking weed most of the day. Chad was also snorting crushed up barbiturate depressant pills called Tuinals. He kept arguing with us and raising his voice. He got so loud that we thought that he might get us in trouble with the apartment supervisor, so we tried to keep him inside the apartment and quiet him down. Chad would not get quiet, so I hit him in the head with one or two punches, knocking him out cold. While Chad was unconscious, his brother Dwayne and I laid him right back in his bed and he did not come to until morning.

6. Around this same time, Chad and I got into a car accident. Chad and I had been driving this car with bad brakes. We parked the car for the night in the parking lot at Rotary Gardens. In the morning, we added some brake fluid and got ready to drive. The apartment complex was located on the top of a hill, so you would have to drive down a steep driveway to reach the road. I warned Chad that he had to be careful coming out of the driveway because there was a lot of traffic. Chad was driving and when he got to the end of the driveway, he turned the wrong way into traffic. Our car was hit by someone going really fast. We got t-boned and the other car smashed right into the driver side door. I got out of the car, but Chad just sat there for one or two minutes. Chad pulled himself out of the car and started talking crazy, out of his head. His clothes were bloody and he had blood coming out of the side of his head. Chad ran away, but I stayed because the accident happened in front of a bus stop and many people who knew me from Rotary Gardens were there and could have identified me. I stayed to talk to the police while the

guy driving the other car was cut out of his car. When I got back to the apartment, Chad was there with a big gash on the side of his head. He did not know what happened to him and I had to tell him. Chad would not go to the hospital.

7.  Chad often was hard to handle when he was intoxicated. One day Chad and I were riding in the front seat of a pickup truck with another guy driving. We had been drinking and smoking pot most of the day, had gone swimming and were on our way back home. Chad was sitting in the middle and kept pulling down his spandex pants and showing us his penis, saying "suck it". I told him to cut it out, but he kept doing it. I started to "hot box" my cigarette, making a long hot ember. Then, when Chad pulled down his pants, I threw the cigarette at his penis. Chad let go of his spandex pants and his groin area started burning. Chad began screaming and acting wild, so I hit him in the head with my elbow causing his head to snap back into the back window, breaking the window. I then slammed Chad's head into the dashboard until he stopped moving. Chad was out for a few minutes, but when he woke up, he wanted to know what had happen. We told him and we kept on drinking. That next morning, Chad asked me how his genitals got burned. I had to tell him for the second time what had happened.

8.  All of the things I've described above happened when we lived together and when Chad was in his mid-teens.

9.  As a prank, we loosened the lugs on a bike that Chad was using. At that time, there was a concrete ramp at Rotary Gardens that people tried to jump. We knew that Chad intended to try the jump and when he jumped the ramp, the front tire fell off and the bike forks went straight into the ground. Chad fell face first in the dirt and the bike seat smacked him in the back of the head. Chad was pretty banged up and neighbors called the fire department to help him.

I declare under penalty of perjury and pursuant to the laws of the United States of America, 28 U.S.C. § 1746, that the foregoing is true and correct.

_Russell Spears_
Russell Spears

_5 22 18_
Date

Q.    THE FULKS FAMILY HAD PETS?

A.    YES.

Q.    WERE THOSE DOGS HEALTHY?

A.    THEY DIDN'T LOOK HEALTHY.

Q.    WHAT WOULD HAPPEN WHEN YOU PET THEM?

A.    I NEVER HAD A PROBLEM WITH THE DOGS.  THE DOGS WERE REALLY NICE.   THE DOGS WERE VERY SPOILED.

Q.    BUT THEIR HAIR WAS NICE?

A.    NAPPY.  NO,  THE HAIR WAS NAPPY.

Q.    IT WOULD FALL OUT SOMETIMES?

A.    YES.

Q.    WHERE DID EVERYBODY SLEEP?

A.    SHERRI HAD HER OWN ROOM.   I REMEMBER THE OTHER BEDROOM, ALL OF THE BEDS WOULD BE IN THERE,  THE BOYS AND THE MOTHER AND FATHER WOULD SHARE A ROOM.   SOMETIMES ONE OF THE BOYS WOULD SLEEP ON THE COUCH.

Q.    SOMETIMES THE HOUSE LOOKED OKAY AND SOMETIMES IT WAS DIRTY?

A.    YES.

Q.    SOMETIMES IT WAS REALLY DIRTY?

A.    YES.

Q.    BUT THEY WOULD CLEAN IT UP ONCE IN A WHILE?

A.    YES.

Q.    DO YOU EVER REMEMBER ANY OF THE CHILDREN TRYING TO LEAVE,  LEAVE HOME?

A.    YES.   THEY THREATENED TO RUN AWAY.

Q.    BUT THEY DIDN'T?

A.    NO.

Q.    DID DEWAYNE EVER TELL YOU HOW HE FELT ABOUT HIS HOME LIFE?

A.    HE WAS REALLY UPSET WITH IT.

Q.    DID HE EVER TELL YOU HE WANTED TO KILL HIMSELF?

A.    YES.

Q.    MORE THAN ONCE?

A.    YES.

        MS. JOHNSON:  THANK YOU, LORI.  PLEASE ANSWER ANY QUESTIONS MR. GASSER HAS.

        THE COURT:  CROSS-EXAMINATION.

        MR. GASSER:  WE HAVE NO QUESTIONS.

        THE COURT:  THANK YOU.  YOU MAY STEP DOWN.  NEXT WITNESS.

        MR. BLUME:  ONE SECOND, YOUR HONOR.

        MS. JOHNSON:  LINDA ADKINS.

        LINDA ADKINS, HAVING BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

                        DIRECT EXAM

BY MS. JOHNSON:

Q.    YOU HAVE NEVER BEEN A WITNESS IN A CASE?

A.    NO.

Q.    LINDA,  WHERE DO YOU LIVE?

A.    125 LEEWARD AVENUE IN HUNTINGTON,  WEST VIRGINIA.

Q.    AND HOW LONG HAVE YOU LIVED THERE?

A.    AT THIS ADDRESS, NOT VERY LONG, BUT I LIVED ON PINE STREET, 129 PINE STREET.

Q.    AND PINE STREET AND LEEWARD WOULD GO LIKE THIS?

A.    THIRTY-THREE (33) YEARS.

Q.    AND WHERE DID YOU LIVE BEFORE THAT?

A.    I LIVED ON PINE STREET, 129 PINE STREET.  BEFORE THAT, I WAS BORN AND RAISED DOWN AT WAYNE COUNTY.

Q.    WHICH IS ALSO REAL CLOSE?

A.    YES.

Q.    OTHER THAN THIS TRIP,  HAVE YOU BEEN OUTSIDE OF HUNTINGTON IN THOSE 33 YEARS?

A.    ONE TIME.

Q.    ONE TIME.  HOW DO YOU KNOW THE FULKS FAMILY?

A.    WELL, CHAD, AND HIS MOM, AND HIS FAMILY MOVED INTO MY NEIGHBORHOOD WHEN CHAD WAS A YEAR AND A HALF OLD.

Q.    AND THEY, ACTUALLY, LIVED SOME OF THE TIME ON PINE STREET AND SOME OF THE TIME ON LEEWARD AVENUE; IS THAT CORRECT?

A.    YES, MA'AM.

Q.    WHEN THEY MOVED IN, IT WAS ON PINE STREET?

A.    YES, TWO DOORS DOWN FROM ME.

Q.    AND TWO DOORS DOWN FROM YOU, AND CHAD WAS ABOUT 15 MONTHS THEN?

A.    YES.

Q.    DO YOU REMEMBER CHAD AS A LITTLE KID?

A.    YES.

Q.    WHAT WAS HE LIKE?

A.    HE WAS A GOOD LITTLE FELLOW.  WHEN HE FIRST MOVED IN, HE COULDN'T TALK, HE SAID UM TO EVERYTHING.   HIS FIRST TWO WORDS WERE LINDA AND LAWNMOWER.  IT COULDN'T COME OUT THAT WAY, BUT IT CAME OUT WINNA AND WANMOWER.  BUT I KNEW WHAT HE WAS SAYING.

Q.    WHEN YOU SAY HIS FIRST TWO WORDS WERE WINNA AND WANMOWER, YOU MEAN AFTER MOM AND DAD AND THAT KIND OF STUFF?

A.    I DON'T KNOW IF HE SAID MOM AND DAD.  I TAUGHT HIM TO SAY WINNA AND WANMOWER.   FIRST TWO WORDS I HEARD.

Q.    WHAT DO YOU REMEMBER ABOUT CHAD AS A TEENAGER?

A.    HE WAS ALWAYS QUIET.   ACTUALLY, I NEVER HAD A PROBLEM WITH CHAD.

Q.    BUT YOU KNEW THAT?

A.    I KNEW THAT HE GOT IN A LOT OF TROUBLE,  YES.

Q.    AND THAT HE HAD GIRLFRIENDS?

A.    YES.   HE WAS SEEING AN ELDERLY GIRL,  SHE WAS 26,  28 YEARS OLD AT THE END OF THE STREET.

Q.    THAT IS WHEN HE WAS MAYBE 14,  15, SOMETHING LIKE THAT?

A.    HE WAS VERY YOUNG.   I KNOW HE WASN'T 16 YET.

Q.    DID YOU SEE A LOT GOING BACK WHEN THE FULKS KIDS WERE LITTLE, DID YOU SEE A LOT OF THEM?

A.   YES.

Q.   **HOW WOULD YOU DESCRIBE THEIR CHILDHOOD FROM WHAT YOU OBSERVED?**

A.   PRETTY ROUGH CHILDHOOD.

Q.   **WAS IT CLEAR TO YOU WHY THEY HAD A TOUGH CHILDHOOD?**

A.   WELL,  THEIR DAD DRANK A LOT, THEIR MOM DRANK.   THEY JUST NEVER REALLY HAD ANY KIND OF LIFE.   I MEAN, THEY DIDN'T GET TO DO ANYTHING.   THEY NEVER GOT TO PARTICIPATE IN SPORTS. AS FAR AS I KNOW, THE KIDS DIDN'T HAVE A BIRTHDAY PARTY.

Q.   **WHEN YOU SAY THAT THE PARENTS DRANK A LOT,  HOW MUCH DO YOU MEAN "DRANK A LOT?"**

A.   WELL,  WHEN IT WAS -- WHEN THEY WERE ON PINE STREET, IT WAS JUST ON THE WEEKENDS.  BUT WHEN IT WENT TO LEEWARD AVENUE, IT WAS ALMOST A NIGHTLY THING.   THEY PUT A POOL TABLE DOWNSTAIRS, AND THERE WAS A LOT OF TROUBLE THERE,  A LOT OF PEOPLE, A LOT OF FIGHTING.   A LOT OF STUFF GOING ON.

Q.   **LINDA, YOU ARE NOT A TEETOTALER YOURSELF?**

A.   NO.

Q.   **YOU DON'T MIND DRINKING, YOU DON'T DISAPPROVE OF IT?**

A.   NO,  NOT IF YOU DO IT SPARINGLY.

Q.   **AND WHEN THEY MOVED ON TO LEEWARD AVENUE, THAT IS WHEN YOU STOPPED?**

A.   YES.

Q.   **BEING FRIENDLY WITH THEM?**

A.   YES.   I THINK WE WENT OVER THERE ONE TIME WHEN I THINK

IT WAS RAYMOND WHO WAS, I DON'T KNOW IF HE WAS MARRIED TO WILDA, THE GRANDMOTHER, THEY LIVED TOGETHER.  ANYWAYS, I THINK IT WAS HIS BIRTHDAY PARTY THAT I WENT OVER THERE FOR, ME AND MY HUSBAND.  I THINK THAT IS THE LAST TIME I WAS THERE.

Q.    BECAUSE WHAT YOU SAW THERE MADE IT CLEAR TO YOU THAT YOU DIDN'T WANT TO BE THERE?

A.    RIGHT.  AND MY EX-HUSBAND REACTION, TOO.  HE WAS STONED AND IS OVER DRINKING, SO, WE DIDN'T GO BACK.

Q.    YOU DIDN'T GO BACK.  WHEN YOU FIRST MET DIANA, YOU WERE, ACTUALLY, FRIENDS WITH HER?

A.    YES.

Q.    AND WHAT WOULD SHE COME TO YOUR HOUSE AND ASK FOR?

A.    FOOD FOR THE KIDS.  SHE WOULD COME DOWN CRYING, SHE DIDN'T KNOW WHAT SHE WAS GOING TO FEED THE KIDS FOR BREAKFAST, WHAT THEY WERE GOING TO EAT.  I WOULD GIVE HER MONEY, FOUR OR FIVE DOLLARS TO GO TO THE STORE TO GO GET SOMETHING TO EAT. I WOULD PAY ATTENTION. ROGER WOULD GET IN THE VAN, GO TO JENO'S, COME BACK WITH BEER, GO UP THE STEPS, AND I WOULDN'T HEAR ANYMORE.  WELL, AFTER I GOT TO SEEING THIS, THE NEXT TIME SHE COME ASK FOR FOOD FOR THE KIDS BECAUSE THE KIDS WERE HUNGRY, I GAVE HER BACON, EGGS, CEREAL, MILK, WHATEVER TO FEED THE KIDS.

Q.    INSTEAD OF MONEY?

A.    RIGHT.  IT DIDN'T LAST VERY LONG.  SHE DIDN'T COME

BACK CRYING THEY DIDN'T HAVE ANY FOOD TO EAT.

Q.    BUT, OFTEN, YOU FED THE KIDS AT YOUR HOUSE?

A.    THE KIDS WERE WELCOME AT MY HOUSE.   BASICALLY,  MY
KITCHEN WAS OPEN TO ALL KIDS IN THE NEIGHBORHOOD.

Q.    AND YOU OFTEN TOOK THOSE KIDS TO SCHOOL?

A.    YES.

Q.    WHAT WAS DIANA LIKE WHEN SHE STOPPED DRINKING?

A.    WELL,  HONESTLY, WHEN SHE WAS DRINKING, SHE ALWAYS KNEW
WHERE HER KIDS WERE AT.

Q.    SHE WAS, AT LEAST, THERE?

A.    SHE WAS THERE, AND SHE KIND OF KEPT AN EYE ON THEM AS
FAR AS, YOU KNOW, THEY WEREN'T OUT GONE FOR FOUR OR FIVE HOURS
OR SOMETHING.   BUT ONCE SHE GOT INTO THE CHURCH,  THE KIDS
WERE, BASICALLY, LEFT ON THEIR OWN TO RAISE THEIR SELF.

Q.    FROM WHAT YOU COULD SEE, THE CHILDREN WEREN'T BETTER
SUPERVISED AFTER SHE STOPPED DRINKING?

A.    NO.   BECAUSE IT WASN'T LONG AFTER SHE QUIT DRINKING
THAT ROGER LEFT.   AND THE KIDS JUST MORE OR LESS, BASICALLY,
TOOK CARE OF THEIR SELF.

Q.    BEFORE THEY ACTUALLY LEFT, WHEN THEY WERE BOTH STILL
DRINKING,  ROGER AND DIANA FOUGHT?

A.    YES.

Q.    AND YOU WEREN'T DOWN IN THE POOL ROOM PARTY, SO YOU
DIDN'T SEE THE PARTIES OR ANY FIGHTING THERE?

A.    NO.

Q.    SOMETIMES YOU SAW EVIDENCE OF IT ON DIANA?

A.    YES.

Q.    AND THAT WOULD BE LIKE BLACK EYES?

A.    YES,  I SEEN HER WITH A BLACK EYE,  BUSTED LIP.

Q.    AND WHAT ABOUT THE KIDS,  DID YOU EVER SEE THEM BEAT THE CHILDREN?

A.    I THINK DEWAYNE HAD A BLACK EYE ONCE WHEN HIM AND HIS DAD GOT INTO IT.

Q.    YOU KNEW THAT THEY WHIPPED THE KIDS?

A.    YES.

Q.    YOU DIDN'T, YOURSELF, SEE THEM BEAT THE CHILDREN?

A.    NO.

Q.    BUT YOU DID HEAR THEM CALL THE KIDS THROUGHOUT THE NEIGHBORHOOD AND CALL THEM HORRIBLE NAMES?

A.    YES,  LITTLE MF'ERS.

Q.    DO YOU REMEMBER ANY SPECIFIC FIGHTS BETWEEN ROGER AND DIANA?

A.    ONE ABOUT 3:00 O'CLOCK IN THE MORNING ONE MORNING.  THE KIDS CAME RUNNING TO ME THAT THEIR MOM AND DAD WAS FIGHTING AND THAT DIANA --

Q.    DID YOU SAY 3:00 O'CLOCK IN THE MORNING?

A.    YES, MA'AM.

Q.    THE KIDS CAME TO YOUR HOUSE?

A.    YES, MA'AM.

Q.    AND THEY WERE TELLING YOU THAT THEY WERE FIGHTING?

A.    YEAH.   DIANA HAD THIS TWO BY FOUR AND SHE WAS GOING TO HIT THE MAN'S VAN WITH THE TWO BY FOUR.

Q.    **THE MAN, THAT IS ROGER?**

A.    IF SHE HITS THE VAN, DADDY WILL KILL HER.   I GO OUT, AND I AM JUST HOLLERING AT DIANA.  AND IT SURPRISED ME, I TOLD THEM,  I TOLD THEM, YOU ARE TEARING THESE KIDS APART.  STOP IT.  GET IN THE HOUSE.   THEY TURNED LIKE TWO LITTLE KIDS, WENT UP THE STEPS, WENT IN THE HOUSE WITHOUT EXCHANGING A WORD WITH ME.

Q.    **OTHER TIMES, THE KIDS WOULD COME TO YOUR HOUSE WHEN THEY FOUGHT?**

A.    YES.

Q.    **THAT WASN'T ONCE OR TWICE, THAT WAS A LOT OF TIMES?**

A.    YES.

Q.    **THAT WAS CHAD,  TOO?**

A.    YES.

Q.    **DO YOU RECALL A SPECIFIC TIME WHEN HE CAME, WHEN YOU FOUND HIM IN YOUR HOUSE?**

A.    WELL,  HE WASN'T IN MY HOUSE, HE WAS IN -- THERE WAS A GARAGE THAT HAD THE ROOF HAD FELL IN.   WE HAD CONCRETE BLOCKS AROUND,  CONCRETE WAS STILL AT THE BOTTOM.  HE COME UP MISSING, AND WE COULDN'T FIND HIM.   WE FOUND HIM IN A CORNER OF A PILE OF LEAVES ASLEEP.

Q.    **HOW OLD WAS HE THEN?**

A.    HE WAS ABOUT THREE OR FOUR.

Q.    BECAUSE HE KNEW YOUR HOUSE WAS SAFE?

A.    EVIDENTLY.

Q.    YOU SAID THAT MOSTLY YOU DIDN'T SEE THE CHILDREN REALLY BEATEN BY THEIR PARENTS, JUST WHIPPED,  BUT DID YOU EVER FIND A TIME WHEN YOU NEEDED TO CHECK ONE OF THE INDIVIDUALS WITH A VISITOR IN THE HOUSE?

A.    YES, THAT WAS RONNIE DALE.  WHEN THEY WERE HAVING SOME KIND OF PARTY AND EVERYONE WAS DRINKING AND THIS GUY NAMED KENNY, I DON'T KNOW WHAT HIS LAST NAME WAS, HE COME DOWN THE STEPS, AND RONNIE DALE WAS DOWN THERE.  I DON'T KNOW WHAT RONNIE DALE DID.

Q.    HOW OLD WAS HE THEN?

A.    I WOULD SAY HE WAS SIX OR SEVEN.  HE WAS ALWAYS SO SMALL THAT I REALLY COULDN'T DETERMINE AN AGE.  BUT HE PICKED HIM UP BY ONE ARM.  I DON'T KNOW IF HE WENT TO SMACK HIM ON THE BUTT, HE HIT HIM IN THE BACK, AND IT KNOCKED THE BREATH OUT OF RONNIE DALE, AND HE JUST LET HIM FALL TO THE GROUND. WELL,  ME AND MY BROTHER-IN-LAW WERE SITTING ON MY FRONT PORCH, AND I AUTOMATICALLY JUMPED UP AND RAN UP THERE.  I PICKED RONNIE UP, AND HE KIND OF CAUGHT HIS BREATH, AND I SEEN HE WAS OKAY.  WELL THEN, I WENT AFTER THE GUY.  THE GUY DRAWED (SIC) BACK TO HIT ME, MY BROTHER-IN-LAW JUMPED IN BETWEEN US, AND TOLD HIM THAT THAT WOULD BE A MISTAKE.  AND HE DIDN'T HIT ME.

Q.    NOW, WHEN ALL OF THIS HAPPENED,  ROGER AND DIANA WERE

**THERE?**

A.    YES, MA'AM.

**Q.    BUT THEY DID NOT INTERVENE?**

A.    NO.

**Q.    AS THEY GOT OLDER, DID ALL OF THE KIDS CONTINUE TO COME OVER TO YOUR HOUSE?**

A.    TO THIS DAY, SHERRI STILL COMES TO MY HOUSE.

**Q.    SHERRI STILL COMES?**

A.    YES.

**Q.    BUT AS THEY GOT NINE,  10,  11,  12, THE BOYS STOPPED COMING?**

A.    YES.

**Q.    AND WHAT DID YOU DO FOR SHERRI?**

A.    I DID A LOT FOR HER.   CAUGHT HER SMOKING, TRIED TO PREVENT THAT.  SHE PICKED IT BACK UP.   EXPLAINED THE BIRDS AND THE BEES TO HER AND FEMININE HYGIENE.

**Q.    SHE DIDN'T KNOW HOW YOU TAKE CARE OF A PERIOD?**

A.    NO.

**Q.    BECAUSE HER MOTHER DIDN'T TAKE CARE OF ANY OF THAT?**

A.    NO.

**Q.    AND HOW ABOUT HOUSECLEANING?**

A.    OH, YES.  I MADE HER WASH DISHES WITH MY GIRLS.   IF YOU SPENT THE NIGHT AT MY HOUSE, WHEN YOU GOT UP, YOU HELPED CLEAN.   BECAUSE I WOULD HAVE 12 OR 13 TEENAGE GIRLS BECAUSE MY HUSBAND WORKED OUT OF TOWN, AND HE WAS ONLY HOME ON

WEEKENDS, AND DURING THE SUMMER, THEY WOULD COME OVER AND SPEND THE NIGHT, AND THEY WOULD ALL BE THERE.

Q.   AS THE BOYS GOT OLDER AND THEY WEREN'T COMING TO YOUR HOUSE ANYMORE, BUT SHERRI WAS, WHAT WERE THEY DOING?

A.   WELL, I DIDN'T SEE WHAT THEY WERE DOING, BUT I HEARD THEY WERE OUT TERRORIZING THE NEIGHBORHOOD, STEALING BICYCLES, STEALING STEREOS, OVER AT THE CEMETERY, SITTING ON THE WALL MOONING PEOPLE.

Q.   THEY STOLE SOMEBODY'S CHRISTMAS PRESENTS ONCE?

A.   THAT WAS MR. AND MRS. SMITH'S BOYS. THE FULKS WEREN'T ALLOWED AT MR. AND MRS. SMITH'S HOUSE. AND THEIR BOYS WEREN'T ALLOWED TO GO ANYWHERE EXCEPT TO MY HOUSE. JIMMY AND JERRY WERE ALLOWED TO COME DOWN TO MY HOUSE. THEY WEREN'T ALLOWED TO GO ANYWHERE ELSE. AND MS. SMITH WAS WORKING AT A GAS STATION. AND IT WAS CLOSE TO CHRISTMASTIME, AND SHE ONLY WORKED PART-TIME, BUT THIS ONE DAY SHE GOT OFF EARLY, AND SHE COME HOME FROM WORK. AND SHE SEEN THE FULKS KIDS WERE SITTING AT THE HOUSE WITH JIMMY AND JERRY PLAYING CARDS. AND SHE SAID THEY JUMPED UP AND THEY LEFT WHEN SHE GOT THERE, OF COURSE. SHE NEVER THOUGHT ANYTHING OF IT.

BUT SHE WENT INTO HER BEDROOM LATER ON WHERE SHE HAD ALL THE BOYS CHRISTMAS PRESENTS. EVIDENTLY, ONE OF THE BOYS HAD GOT UP TO USE THE BATHROOM. SHE SAID SHE DIDN'T KNOW IF IT WAS RONNIE, DEWAYNE, OR CHAD, BUT ONE OF THEM HAD WENT INTO THEIR BEDROOM, TOOK ALL OF THE STUFF SHE HAD BOUGHT FOR HER

BOYS FOR CHRISTMAS,  PUT IT OUTSIDE THE BEDROOM WINDOW, AND WHEN THEY ALL WENT OUT, SHE DIDN'T KNOW THAT THEY HAD TOOK THE STUFF OUT OF THE BEDROOM.  THEY HAD NOTHING WHEN THEY WENT OUT.  BUT, EVIDENTLY, THEY CAME BACK AND COLLECTED THEIR STUFF FROM OUTSIDE THE HOUSE.

**Q.    AND ONCE RONNIE DALE TRIED TO SET THE SMITH'S HOUSE ON FIRE,  RIGHT?**

A.    YES.

**Q.    SO,  ALL OF THIS THAT YOU KNOW ABOUT IS NOT FROM WHAT HAPPENED DOWN AT THE PARTIES IN THE ROOM WITH THE POOL TABLE?**

A.    NO.

**Q.    BECAUSE, EXCEPT FOR THAT ONCE, YOU DIDN'T GO THERE?**

A.    NO.

**Q.    YOU DIDN'T LET YOUR DAUGHTER GO TO THOSE PARTIES EITHER?**

A.    NO.

**Q.    YOU HEARD ABOUT THEM, BUT YOU DIDN'T GO?**

A.    I HEARD ABOUT THEM.

**Q.    SOMETIMES THE PARTIES WOULD SPILL OUT IN THE STREET?**

A.    YES.

**Q.    AND WHAT WOULD YOU SEE WHEN THEY WOULD SPILL OUT INTO THE STREET?**

A.    YOU WOULD HEAR A LOT OF SCREAMING, YELLING IF YOU WERE SITTING OUT ON THE PORCH.  USUALLY THE COPS WOULD SHOW UP.

**Q.    COULD YOU TELL WHAT THE FIGHTS WERE ABOUT?**

A.    I THINK, USUALLY, JUST OVER TOO MUCH DRINKING.

**Q.    WHAT HAPPENED WHEN THE POLICE DID COME?**

A.    THEY USUALLY DID NOTHING.

**Q.    THE JURY HAS HEARD QUESTIONS BEFORE ABOUT WHETHER OTHER PEOPLE FROM THIS NEIGHBORHOOD GOT IN A LOT OF TROUBLE WITH THE LAW.  BUT YOU KNEW MOST OF THE KIDS IN THE NEIGHBORHOOD; IS THAT RIGHT?**

A.    YES, MA'AM.

**Q.    AND WHAT PROPORTION OF THEM DO YOU THINK DID HAVE TROUBLE WITH THE LAW?**

A.    JUST ABOUT EVERY ONE OF THEM EXCEPT FOR, ACTUALLY, I THINK MY THREE GIRLS.

**Q.    THAT WASN'T JUST TRIVIAL CRIMES,  RIGHT?**

A.    RIGHT.

**Q.    TWO OF THEM ARE IN JAIL FOR MURDER TODAY; IS THAT RIGHT?**

A.    YES, MA'AM.

**Q.    BOYS THAT LIVED RIGHT ON THAT PINE STREET/LEEWARD AVENUE CORNER?**

A.    YES, MA'AM.

       MS. JOHNSON:  THANK YOU.   ANSWER ANY QUESTIONS MR. GASER MIGHT HAVE.

            THE COURT:   CROSS-EXAMINATION.

            MR. GASSER:  WE HAVE NO QUESTIONS.

            THE COURT:  THANK YOU.  YOU MAY STEP DOWN.   ANY

**DIRECT EXAM OF ARLENE ANDREWS**

A.    ODDLY, THAT IS TRUE.   OF THE STUDIES THAT I MENTIONED TO YOU BEFORE, ONE WAS THIS COLLECTION OF INTERVIEWS WITH CARETAKERS.  AND ACROSS A WIDE RANGE IN WHICH YOUR LIFE CAN SCREW UP, BEING IN PRISON, BEING UNEMPLOYABLE, BEING KICKED OUT OF SCHOOL, THINGS LIKE THAT, ACROSS A WIDE RANGE, HAVING AN IQ ABOVE 70 WAS WORSE FOR THE PEOPLE WITH BRAIN DAMAGE FROM FETAL ALCOHOL -- FROM PRENATAL EXPOSURE TO ALCOHOL.  THE HIGH IQ DOES NOT PROTECT; THE LOW IQ IN THIS SYNDROME PROTECTS FROM THE SECONDARY DISABILITIES.

MR. BLUME:  THANK YOU.

THE COURT:   ANY RECROSS?

MR. GASSER:  NO, SIR.

THE COURT:  MEMBERS OF THE JURY, LET'S GO AHEAD AND BREAK FOR LUNCH.  IT IS FIVE MINUTES UNTIL ONE.  LET'S BREAK UNTIL, LET'S JUST SAY 2:25.  THAT WILL BE AN HOUR AND A HALF. WE ARE BREAKING UNTIL 2:25.  SEE YOU THEN.

(WHEREUPON, A LUNCH RECESS WAS HELD.)

THE COURT:  READY TO PROCEED?

MR. SCHOOLS:  YES, SIR.

THE COURT:  NEXT WITNESS PLEASE.

MS. JOHNSON:  DR. ARLENE ANDREWS.

ARLENE ANDREWS, HAVING BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

DIRECT EXAM

BY MS. JOHNSON:

DIRECT EXAM OF ARLENE ANDREWS

Q.    DR. ANDREWS, WHERE ARE YOU EMPLOYED?

A.    AT THE UNIVERSITY OF SOUTH CAROLINA.

Q.    WHAT DO YOU DO THERE?

A.    I'M A PROFESSOR OF SOCIAL WORK, AND I DIRECT THE INSTITUTE FOR FAMILIES AND SOCIETY.

Q.    AND WOULD YOU TELL THE JURY, BRIEFLY, ABOUT YOUR EDUCATIONAL BACKGROUND AND YOUR WORK EXPERIENCE?

A.    I HAVE A BACHELOR'S DEGREE FROM DUKE UNIVERSITY, AND A MASTER'S DEGREE IN SOCIAL WORK FROM THE UNIVERSITY OF SOUTH CAROLINA, AND ALSO A PH.D. DOCTORAL DEGREE IN CLINICAL COMMUNITY PSYCHOLOGY WITH A FOCUS IN COMMUNITY PSYCHOLOGY, ALSO FROM USC.

I HAVE WORKED IN THE ACADEMIC ENVIRONMENT FOR ALMOST 20 YEARS, BUT BEFORE THAT, I WAS THE FOUNDING EXECUTIVE DIRECTOR OF THE COUNSEL ON CHILD ABUSE AND NEGLECT, WHICH IS NOW PREVENT CHILD ABUSE SOUTH CAROLINA.  IT IS A STATE-WIDE CHILD ABUSE PREVENTION ORGANIZATION.  ALSO FOUNDING EXECUTIVE DIRECTOR OF SISTER CARE, WHICH IS A PROGRAM FOR ABUSED WOMEN AND THEIR CHILDREN, DOMESTIC VIOLENCE.  COFOUNDER OF NURTURING CENTER, WHICH IS A TREATMENT PROGRAM FOR VERY YOUNG CHILDREN, TOGETHER WITH THEIR PARENTS, FOR CHILDREN WHO HAVE BEEN ABUSED AND NEGLECTED.  AND SINCE -- IN THE 20 YEARS THAT I HAVE BEEN IN ACADEMIA, I HAVE TAUGHT COURSES ON VICTIMIZATION, CHILD ABUSE, AS WELL AS SOCIAL WORK PRACTICE AND RESEARCH.  AND HAVE CONSULTED WITH A NUMBER OF

DIRECT EXAM OF ARLENE ANDREWS

ORGANIZATIONS THAT ARE TRYING TO PROMOTE HEALTHY FAMILIES.

Q.    AND YOU ALSO HAVE BEEN INVOLVED IN DEVELOPING AND PROMULGATING STANDARDS FOR WHAT EVERY CHILD NEEDS IN THE INTERNATIONAL CONTEXT; IS THAT RIGHT?

A.    NOT EXACTLY DEVELOPING THEM, BUT I DID EDIT A BOOK ON THE CONVENTION ON THE RIGHTS OF THE CHILD, PARTICULARLY ARTICLE 27, WHICH HAS TO DO WITH ADEQUATE STANDARDS OF LIVING FOR HEALTHY CHILD DEVELOPMENT.  IT ADDRESSES -- THE CONVENTION IS A STATEMENT OF PRINCIPLES BY ALL THE NATIONS OF THE WORLD REGARDING WHAT WILL HELP CHILDREN IN TERMS OF THEIR PHYSICAL DEVELOPMENT, EMOTIONAL DEVELOPMENT,  MORAL DEVELOPMENT,  SOCIAL DEVELOPMENT,  AND MENTAL DEVELOPMENT. AND WE, BASICALLY, PUT TOGETHER A GROUP OF EXPERTS WHO WROTE A BOOK ON HOW TO, ACTUALLY, IMPLEMENT THOSE STANDARDS.

Q.    AND YOU ARE ALSO A PARENT?

A.    I AM.  I HAVE A 20-YEAR-OLD DAUGHTER, AND A 25-YEAR-OLD SON, AND I HAVE BEEN MARRIED FOR 28 YEARS.

Q.    AND I WANT TO SHOW YOU DEFENDANT'S EXHIBIT 20.  IS THIS A COPY OF YOUR CV?

A.    YES,  IT IS.

        MS. JOHNSON:  DEFENDANT OFFERS THIS AS EXHIBIT 20.

        MR. SCHOOLS:  NO OBJECTION.

        THE COURT:  WITHOUT OBJECTION.

BY MS. JOHNSON:

Q.    MS. ANDREWS, IN THE COURSE OF YOUR TRAINING AND YOUR

**DIRECT EXAM OF ARLENE ANDREWS**

**EXPERIENCE,  HAVE YOU HAD OCCASION TO USE OR DEVELOP FAMILY HISTORY ASSESSMENTS?**

A.    YES,  I HAVE.

**Q.    AND CAN YOU TELL THE JURY, BRIEFLY, WHAT A FAMILY HISTORY ASSESSMENT IS?**

A.    IT IS A FAIRLY STANDARD PROCEDURE IN THE FIELD OF SOCIAL WORK, AND IT TYPICALLY INVOLVES THREE PARTS.

THE FIRST IS, BASICALLY, A DESCRIPTION OF THE LIFE EVENTS THAT HAVE OCCURRED.  USUALLY, THERE IS A FOCUS PERSON OR FAMILY SYSTEM, AND YOU BASICALLY COMPILE, AS ACCURATELY AS POSSIBLE, A LIST OF THE FACTS OF THE LIFE EVENTS THAT OCCURRED AND TO SORT OF PUT THEM OUT YEAR BY YEAR.

THE SECOND PART IS TO LOOK AT THESE FACTS AND TO INTERPRET THEM USING THEORIES AND RESEARCH ABOUT HUMAN BEHAVIOR IN THE SOCIAL ENVIRONMENT --IN THE SOCIAL ENVIRONMENT AS TO HOW PEOPLE RELATE TO ONE ANOTHER.  WHETHER THAT IS TWO PEOPLE, LIKE MOTHER AND CHILD, OR FATHER AND CHILD, OR MOTHER AND FATHER RELATE TO ONE ANOTHER, OR THE WHOLE SYSTEM OF PEOPLE, LIKE FAMILY PEOPLE.

THE THIRD PART, TYPICALLY, WOULD INVOLVE RENDERING THEN AN OPINION ABOUT THE BEST COURSE OF TREATMENT IN THE PARTICULAR CASE, ALTHOUGH THAT WASN'T REQUESTED IN THIS CASE.

**Q.    SO,  MAYBE YOU CAN GIVE SOME EXAMPLES OF WHEN FAMILY ASSESSMENTS ARE USED.  WHEN FAMILY HISTORY ASSESSMENTS ARE USED?**

**DIRECT EXAM OF ARLENE ANDREWS**

A.    THEY ARE DONE ALL THE TIME IN SOCIAL WORK.  I LEARNED TO DO THEM IN WORKING WITH FAMILIES WITH CHILDREN WITH SERIOUS DISABILITIES.  THERE IS A MULTIDISCIPLINARY ASSESSMENT, EDUCATION SPECIALIST, PHYSICIAN, NURSE, OTHER KINDS OF SPECIALISTS, BUT A SOCIAL WORKER IS USUALLY INVOLVED TO HELP LOOK AT THE LIFE HISTORY TO SEE HOW EQUIPPED THE FAMILY IS TO CARE FOR THE CHILD.  THEY ARE ALSO OFTEN DONE IN ELDER CARE, FOR EXAMPLE, WHEN YOU ARE PREPARING FOR LATE-LIFE ISSUES. ONE OF THE SLOGANS OF THE NATIONAL ASSOCIATION OF SOCIAL WORKERS IS THAT, SOONER OR LATER, YOU WILL NEED A SOCIAL WORKER.

WE DO THEM IN MENTAL HEALTH, THAT IS THE OTHER AREA, WITH CHILDREN'S MENTAL HEALTH, IN PARTICULAR, THAT I HAVE SOME FAMILIARITY WITH.  AND, OF COURSE, IN CHILD WELFARE,  CHILD ABUSE, AND NEGLECT CASES, OR DOMESTIC VIOLENCE VERY OFTEN DONE IN A VARIETY OF SETTINGS.

**Q.    AND SO, YOU HAVE DONE FAMILY HISTORY ASSESSMENTS IN ALL THE SETTINGS THAT YOU MENTIONED?**

A.    IN MOST OF THEM.  I HAVEN'T DONE MUCH IN ELDER CARE. I AM AWARE OF THAT, AND I HAVE BEEN IN SOME CLASSES ABOUT IT, BUT MOST OF MY WORK HAS BEEN WITH CHILDREN AND THEIR FAMILIES.

**Q.    THAT THIRD PART, THE PART ABOUT MAKING RECOMMENDATIONS, THAT APPLIES TO SOME OF THESE SETTINGS WHERE IT WOULD BE UP TO PROFESSIONALS TO MAKE RECOMMENDATIONS ABOUT WHAT OUGHT TO HAPPEN TO A PARTICULAR PERSON?**

**DIRECT EXAM OF ARLENE ANDREWS**

A.    YES.

Q.    IT WASN'T THAT YOU WERE ASKED TO DO IT, IT IS NOT PART OF WHAT YOU WOULD DO IN A CRIMINAL CASE?

A.    THAT'S RIGHT.

Q.    ARE THERE -- AND HOW MANY FAMILY HISTORY ASSESSMENTS DO YOU THINK YOU HAVE CONDUCTED OVER YOUR CAREER?

A.    IT IS HARD TO SAY.  I HAVE DIRECTLY CONDUCTED SEVERAL HUNDRED.  I HAVE SUPERVISED STUDENTS BECAUSE I HAVE BEEN A TEACHER FOR SO LONG OR CONSULTED ON CASES.  YOU KNOW, SOMEWHERE BETWEEN THREE AND 500, BUT I REALLY COULDN'T SAY, PRECISELY.

Q.    AND ARE THERE ACCEPTED PROCEDURES, ONES THAT YOU BOTH, YOU KNOW, WERE TRAINED IN, AND NOW TRAIN YOUR STUDENTS IN, WHEN YOU CONDUCT A FAMILY HISTORY ASSESSMENT?

A.    THERE ARE.  WE, OF COURSE, INTERVIEW A NUMBER OF PEOPLE, IF POSSIBLE, THE PERSON THAT IS DIRECTLY INVOLVED. BUT WE TALK TO AS MANY PEOPLE IN THE FAMILY, AS POSSIBLE,  AND PEOPLE WHO KNOW THE FAMILY FROM OUTSIDE THE FAMILY.  BUT WE ALSO PARTICULARLY RELY ON ANY RECORDS THAT HAVE BEEN RECORDED, SUCH AS MEDICAL RECORDS, OR SCHOOL RECORDS, OR JUVENILE COURT RECORDS.  BASICALLY, REPORTS THAT HAVE BEEN MADE BY PROFESSIONALS, WHO MAY HAVE KNOWN THE FAMILY IN SOME WAY. SOMETIMES WE LOOK AT OTHER RECORDS,  TOO, LIKE, FOR INSTANCE, A CERTIFICATE OF BAPTISM, OR A BIRTH CERTIFICATE, OR SOMETHING LIKE THAT.

DIRECT EXAM OF ARLENE ANDREWS

Q.    THAT IS SO TO MAKE SURE THAT WHEN SOMEONE SAYS THAT SOMETHING HAS HAPPENED,  YOU WERE BAPTIZED, MARRIED IN A PARTICULAR YEAR, OR BORN?

A.    TO GET AN ACCURATE DATE, TO VERIFY ACTS.

Q.    ACTUALLY, BEYOND CHECKING WITH RECORDS,  DO YOU HAVE OTHER MEANS,  OTHER PROFESSIONALLY ACCEPTED MEANS OF DETERMINING WHETHER SOMETHING SOMEONE TELLS YOU IS CREDIBLE OR NOT SO CREDIBLE?

A.    WE DO.  WE ARE VERY CAREFUL ABOUT CHECKING WHAT WE CALL RELIABILITY.  FOR EXAMPLE, IF YOU ARE, BASED ON INTERVIEWS IN PARTICULAR, IF SOMEONE SAYS THE SAME THING EVERY TIME,  SAYS THE SAME THING TO SEVERAL DIFFERENT PEOPLE, IT TENDS TO BE MORE RELIABLE.  OBVIOUSLY, IF THEY CHANGE WHAT THEY SAY FROM ONE PERSON TO ANOTHER, FROM ONE DATE TO ANOTHER, IT IS UNRELIABLE.  WE LOOK AT VALIDITY, HOW CLOSE TO THE TRUTH IS THIS, WAS THIS PERSON A DIRECT WITNESS TO THIS LIFE EVENT, OR HAVE SOLID REASON TO BELIEVE THAT WHAT THEY BELIEVE OCCURS, ACTUALLY OCCURED.

WE LOOK AT ISSUES OF BIAS.  DOES THIS PERSON HAVE A REASON FOR DISTORTING, FOR EXAGGERATING, OR PERHAPS MINIMIZING OR DENYING THE INFORMATION THAT THEY ARE GIVING US.  SO, WE TRY TO CAREFULLY EVALUATE THE INFORMATION THAT IS PROVIDED TO US IN DEVELOPING A FAMILY HISTORY.

Q.    LET ME STOP YOU THERE FOR A MINUTE.  IN A CRIMINAL CASE THEN, YOU WOULD BE PARTICULARLY RELUCTANT TO RELY UPON WHAT

**DIRECT EXAM OF ARLENE ANDREWS**

**THE DEFENDANT, HIMSELF, HAD TO SAY BECAUSE YOU WOULD, OBVIOUSLY, KNOW WHAT THE BIAS MIGHT BE IN THAT CASE?**

A.    THAT'S RIGHT.  BUT, PARTICULARLY, IN A CASE LIKE THIS. ALTHOUGH, MY EXPERIENCE WITH INTERVIEWING PEOPLE WHO, JUVENILES OR ADULTS, WHO FACED CRIMINAL CHARGES, IS THAT THEY RARELY LIE ABOUT THEIR FAMILY HISTORY, WHICH IS WHAT I AM GENERALLY ASKING THEM.

**Q.    EVEN THOUGH THEY MIGHT LIE ABOUT SOMETHING ELSE?**

A.    RIGHT.

**Q.    BUT, IN ANY EVENT, YOU ARE NOT RELYING IN YOUR FINDINGS -- IN ANY OF YOUR FINDINGS ON WHAT CHAD FULKS TOLD YOU IN INTERVIEWS WITH HIM?**

A.    NO.

**Q.    AND, NORMALLY, AM I RIGHT, THAT YOU TRY TO GET, AT LEAST, TWO SOURCES,  TWO DIFFERENT SOURCES ON ALL KEY FACTS?**

A.    I TRY.   IT IS NOT ALWAYS POSSIBLE, BUT, YEAH, THAT IS MY PREFERRED WAY OF DOING THINGS.

**Q.    NOW,  IT MIGHT BE THAT FOR A PARTICULAR DETAIL LIKE, SAY, ABOUT THE EXTENT OF SOMEBODY'S DRINKING,  SOMEONE MIGHT TESTIFY AS TO WHAT THEY RECALL ABOUT HOW OFTEN THEY WERE DRINKING AND RECALL ONE INCIDENT.  SOMEONE ELSE MIGHT MAKE ANOTHER GENERALIZATION, TALK ABOUT A SLIGHTLY DIFFERENT INCIDENT.   SO, YOU ARE NOT TALKING THAT EVERY SINGLE THING IS VERIFIED,  EVERY SINGLE DETAIL IS VERIFIED?**

A.    DEFINITELY NOT, THAT'S RIGHT.

DIRECT EXAM OF ARLENE ANDREWS

Q.    BUT ANYTHING THAT YOU OR ANY OTHER PERSON TRAINED IN FAMILY HISTORY ASSESSMENT WOULD CONCLUDE HAD ACTUALLY OCCURRED, YOU WOULD HAVE TO HAVE MORE THAN ONE SOURCE?

A.    RIGHT.   WE LOOK, GENERALLY, FOR PATTERNS IN SOCIAL BEHAVIOR, AND HOW PEOPLE ARE INTERACTING WITH ONE ANOTHER, AND THAT IS -- WE ARE LOOKING FOR MORE GENERAL.   AND THE DETAILS OFTEN PROVIDED VERY ELABORATIONS, BUT THEY ARE NOT THAT CRITICAL.

        MS. JOHNSON:  I OFFER DR. ARLENE ANDREWS AS AN EXPERT IN CHILD DEVELOPMENT AND AS AN EXPERT IN CONDUCTING A FAMILY HISTORY ASSESSMENT.

        MR. SCHOOLS:  NO OBJECTION TO HER QUALIFICATIONS.

        THE COURT:  ALL RIGHT.   YOU MAY PROCEED.

BY MS. JOHNSON:

Q.    NOW,  YOU TOLD US THAT YOU CAN DO THESE FAMILY HISTORY ASSESSMENTS FOR DIFFERENT PURPOSES.

A.    THAT'S CORRECT.

Q.    AND SO, IF YOU WERE, FOR EXAMPLE, DOING IT TO THINK ABOUT AN ELDER CARE PLAN,  YOU WOULD BE MORE FOCUSED UPON WHAT HAD HAPPENED IN THE RELATIVELY RECENT PAST?

A.    THAT'S CORRECT.

Q.    AND I SUPPOSE, IF YOU ARE THINKING ABOUT MAKING A CUSTODY RECOMMENDATION, YOU ARE GOING TO THINK ABOUT WHAT HAS HAPPENED IN THE CHILD'S LIFE WITH PROBABLY MORE FOCUS ON WHAT HAPPENED RECENTLY, BUT YOU CARE ABOUT ALL OF IT?

**DIRECT EXAM OF ARLENE ANDREWS**

A.    RIGHT.

Q.    SO, IT VARIES WHAT PERIOD OF TIME YOU WOULD FOCUS ON DEPENDING UPON WHAT YOU WERE ASKED TO DO?

A.    THAT'S CORRECT.

Q.    AND, IN THIS CASE,  WHAT WERE YOU ASKED TO FOCUS ON?

A.    I WAS ASKED TO FOCUS ON CHAD FULKS'S CHILDHOOD.

Q.    AND THAT IS REALLY YOUR AREA OF EXPERTISE IN CONDUCTING THESE ASSESSMENTS.  IT IS ALSO ON CHILD DEVELOPMENT?

A.    THAT'S RIGHT.

Q.    SO,  WHEN YOU SAY "CHILDHOOD," PEOPLE SOMETIMES MEAN DIFFERENT THINGS BY BEING A CHILD, TELL ME WHAT YOU MEAN BY THAT.

A.    BECAUSE I AM LOOKING AT THE FAMILY DYNAMICS,  I REALLY LOOK AT THE CHILD DEVELOPMENT THROUGH THE PERIOD OF TIME IN WHICH THE CHILD, WHO IN THIS CASE WAS CHAD, LIVED WITHIN HIS FAMILY,  WHO LIVED IN THE FAMILY CONTEXT.

Q.    SO,  IN THIS CASE, WHAT SOURCES OF INFORMATION DID YOU USE?  YOU MENTIONED SOURCES THAT PEOPLE COMMONLY USED.  CAN YOU SORT OF,  WITHOUT LISTING,  YOU KNOW,  500 OF THEM,  TELL US,  JUST SORT OF GENERAL CATEGORIES THAT YOU ACTUALLY USED IN THIS CASE.

A.    THERE WERE A NUMBER OF THEM.  THE ONES I RELIED ON FOR THE CHILDHOOD ASSESSMENT WERE A SERIES OF CHILDHOOD RECORDS: HIS SCHOOL RECORDS FROM SCHOOLS IN WEST VIRGINIA AND OHIO; JUVENILE RECORDS REGARDING JUVENILE OFFENSES; MEDICAL RECORDS;

App. 00389

DIRECT EXAM OF ARLENE ANDREWS

THE MILITARY RECORDS OF HIS FATHER, WHICH WERE RELEVANT; THE MARRIAGE AND DIVORCE RECORDS OF HIS PARENTS; AND SOME EDUCATIONAL AND PSYCHIATRIC EVALUATIONS THAT WERE DONE OF CHAD WHILE HE WAS A CHILD.

**Q.   AND THEN YOU DID HEAR SOME GENERAL -- SOME SORT OF MORE SPOTTY INFORMATION ABOUT THE CRIME AND ABOUT OTHER EVENTS, BUT THAT ISN'T WHAT YOU WERE SUPPOSED TO FOCUS ON?**

A.    THAT'S RIGHT.

**Q.   AND YOU DON'T THINK YOU HAVE A FULL RANGE OF INFORMATION ABOUT THE CRIME OR EVENTS LEADING UP TO THE CRIME?**

A.    NO.   I DO HAVE THE RECORDS, AND I LOOKED AT THEM, BUT THEY WEREN'T THAT RELEVANT TO HIS CHILDHOOD.

**Q.   AND I NOTICE THAT, WHEN YOU GAVE THE LIST OF WHAT YOU DID LOOK AT IN THIS CASE,  YOU DID NOT MENTION DEPARTMENT OF SOCIAL SERVICES RECORDS OR CHILD PROTECTIVE SERVICES RECORDS, SOMETHING LIKE THAT.   DID YOU REQUEST THOSE RECORDS?**

A.    I DID REQUEST THOSE AND THE INVESTIGATOR WENT LOOKING FOR THEM, AND WE KNEW THERE HAD BEEN REPORTS MADE TO THE DEPARTMENT OF SOCIAL SERVICES BASED ON WHAT OTHER PROFESSIONALS HAD TOLD US.   BUT I WAS TOLD THAT THE RECORDS, AND I AM AWARE OF THIS BECAUSE IN SOUTH CAROLINA RECORDS ARE ALWAYS, IN A FOUNDED CASE OF CHILD ABUSE,  WHENEVER THERE IS A REPORT AND AN INVESTIGATOR GOES OUT AND THEY DETERMINE IT IS FOUNDED, WHICH MEANS THEY BELIEVE THE ABUSE DID OCCUR, OR UNFOUNDED, THERE IS NOT ENOUGH EVIDENCE, IN FOUNDED, THEY ARE

DIRECT EXAM OF ARLENE ANDREWS

ONLY KEPT HERE SEVEN YEARS.  I WAS TOLD, IN WEST VIRGINIA, THEY ARE ONLY KEPT FIVE TO SEVEN YEARS.   IF THERE WERE ANY RECORDS, THEY HAVE BEEN DESTROYED.  WE WERE NOT ABLE TO LOOK AT THOSE.   AND WE ALSO COULDN'T FIND THE NAMES OF ANY OF THE SOCIAL WORKERS THAT MAY HAVE BEEN INVOLVED IN ANY OF THE CASES.

**Q.     AND YOU HEARD INDIRECTLY ABOUT WEST VIRGINIA,  BUT THAT IS CONSISTENT WITH YOUR EXPERIENCE IN OTHER PLACES THAT, EVEN WHEN IT IS FOUNDED,  IT IS KEPT FOR FIVE,  SEVEN YEARS?**

A.   UNFOUNDED CASES SOMETIMES ARE KEPT FOR A YEAR; FOUNDED CASES, FIVE TO SEVEN YEARS.

**Q.     AND SO, LOOKING AT THE PERIOD OF TIME THAT YOU ARE TALKING ABOUT,  DURING THE PERIOD OF HIS CHILDHOOD,  HIS WHOLE CHILDHOOD IS MORE THAN SEVEN YEARS IN THE PAST?**

A.   THAT'S RIGHT.

**Q.     IN PREPARING A FAMILY HISTORY, IS IT CONVENTIONAL TO USE A GENOGRAM?**

A.   YES, IT IS.

**Q.     CAN YOU TELL THE JURY, FIRST, WHAT A GENOGRAM IS?  THEN I WILL LET YOU SHOW THE JURY CHAD'S GENOGRAM.**

A.   BASICALLY, A FAMILY TREE.   IT SHOWS THE PEOPLE TO WHOM HE IS RELATED AND FROM WHOM HE IS DESCENDED.

**Q.     SO, DO YOU WANT TO COME DOWN AND EXPLAIN,  POINT OUT WHO IS WHO ON MR. FULKS'S FAMILY TREE? I GUESS I SHOULD SAY YOU PREPARED THIS; IS THAT RIGHT?**

**DIRECT EXAM OF ARLENE ANDREWS**

A.    YES, I DID.

THIS IS THE GENOGRAM OF CHAD DURING HIS CHILDHOOD.  I WILL JUST INTRODUCE YOU TO SOME OF THE KEY PEOPLE IN IT.   THIS IS CHAD.   AS YOU WILL SEE FROM THIS CHART, HE IS THE FOURTH OF FIVE CHILDREN.   LET ME SAY FIRST,  THAT CIRCLES ARE WOMEN AND SQUARES ARE MEN.   IF THERE IS A CROSS, IT MEANS THAT PERSON IS DECEASED.   THE SLASH LINES HERE INDICATE A DIVORCE.  AS I SHOW YOU THIS CHART, YOU WILL SEE THAT CHAD IS THE SON OF ROGER FULKS, AND YOU WILL NOTICE THAT I ONLY USE THEIR FIRST NAMES.  I COULD USE MR. FULKS AND MS. FULKS,  BUT SINCE THERE ARE ONLY FULKS, IT COULD GET CONFUSING.   I WILL BE REFERRING TO THEM BY THEIR FIRST NAMES.

HIS FATHER, ROGER, MARRIED HIS MOTHER, DIANA.  YOU WILL SEE THEY WERE DIVORCED BEFORE THEY HAD CHILDREN, AND THEN THEY HAD CHILDREN STARTING WITH THE SISTER SHERRI,  HIS BROTHER DEWAYNE, HIS BROTHER RONNIE, HIMSELF,  HIS YOUNGER BROTHER SHANNON, AND THEN THEY WERE DIVORCED, GONE.   THEY HAVE BOTH SINCE REMARRIED.

DIANA IS THE OLDEST CHILD.   SHE HAS A SISTER SHARON, SISTER ROBIN,  BROTHER JAMES,  SISTER GAYLE, BROTHER KEVIN, AND THEN THEY HAD ANOTHER BROTHER WHO DIED IN A CAR WRECK.  HER MOTHER IS WILDA HOLBROOK.   HER FATHER IS DECEASED.   AND HER PARENTS WERE DIVORCED.

ROGER IS THE DESCENDENT, IS THE OLDEST SON AND OLDEST CHILD OF HERMAN AND NANCY FULKS.   HE HAS TWO SISTERS,  TWO

DIRECT EXAM OF ARLENE ANDREWS

BROTHERS, THEN A SISTER, THEN THERE WAS A BABY THAT DIED IN INFANCY.

Q.    YOU ASKED ME -- YOU ASKED ME TO LEAVE IT UP THERE DURING THE COURSE OF YOUR TALKING SO, IF IT BECAME CONFUSING OF WHO IS WHO, THE JURY COULD LOOK AT IT; IS THAT RIGHT?

A.    YES.

Q.    NOW, WE HAVE TALKED ABOUT HOW YOU HAVE DONE THIS IN PREVIOUS CASES.  I UNDERSTAND, IN A LOT OF CASES, YOU SUMMARIZE YOUR FINDINGS AT THE BEGINNING AND THEN YOU GO THROUGH IN FAIRLY GREAT DETAIL THE EVENTS OF THE PERSON'S CHILDHOOD, ALL OF THE DETAILS THAT YOU COLLECTED, AND THEN YOU TALK AT GREATER LENGTH ABOUT THE SIGNIFICANCE OF YOUR FINDINGS, AND THEN YOU CONCLUDE.  AND WE SORT OF AGREED WE WILL NOT SUMMARIZE THE FINDINGS.  WE WILL MAKE IT A LITTLE SHORTER?

A.    THAT'S RIGHT.

Q.    AND I ALSO TOLD YOU THAT THE JURY HAS HEARD TESTIMONY ALREADY FROM GAYLE, KEVIN, AND MARK, AS WELL AS FROM DEWAYNE AND RONNIE, AND ALSO FROM SEVERAL NEIGHBORS.  ACTUALLY, YOU TALKED TO ONE OF THE NEIGHBORS; IS THAT RIGHT?

A.    THAT'S RIGHT.  I TALKED TO LINDA ADKINS.

Q.    THE JURY HAS HEARD TESTIMONY FROM LINDA ADKINS, AS WELL AS SOME OTHER NEIGHBORS.  SO, WE ARE GOING TO TALK ABOUT WHAT THEY SAID IN MUCH LESS DETAIL, MUCH MORE SUMMARY FORM, THAT IS WHAT WE AGREED UPON.  BUT YOU HAVE TALKED TO THESE PEOPLE,

**DIRECT EXAM OF ARLENE ANDREWS**

AS WELL?

A.    RIGHT.

Q.    LET'S START PRIOR TO CHAD'S BIRTH.  WHAT IS IT THAT WAS IMPORTANT THAT HAPPENED BEFORE CHAD WAS BORN?

A.    WHAT IS MOST INTERESTING IS HIS PARENTS HAD HAD A VERY CONFLICTED RELATIONSHIP FROM THE BEGINNING.

Q.    YOU KNOW WHAT?  I AM SORRY.   I AM GOING TO INTERRUPT YOU.   I ACTUALLY FORGOT TO ASK YOU SOMETHING THAT YOU WANTED ME TO ASK YOU VERY EARLY ON, AND I JUST SKIPPED OVER THE PAGE. I WILL GO BACK TO THAT.

WE SAID WE WOULD SKIP THE SUMMARY OF YOUR FINDINGS, BUT YOU WANTED ME TO ASK YOU ABOUT THE THINGS THAT YOU THOUGHT WERE UNUSUAL ABOUT THIS CASE.  SO, IF WE GO BACK TO THAT, THEN WE WILL GO BACK TO THE HISTORICAL?

A.    PROBABLY THE THING THAT WAS MOST UNUSUAL IS, AND I HAVE INTERVIEWED LOTS OF FAMILIES, WAS THE AMAZINGLY POOR RECALL THAT BOTH OF HIS PARENTS HAD.  I TALKED TO ROGER AND DIANA. THEY LIVE SEPARATELY IN SEPARATE STATES NOW.   THEY SIMPLY CANNOT REMEMBER CHAD VERY WELL AS A CHILD.   HIS FATHER TOLD ME THAT HE DOESN'T REMEMBER CHAD AT ALL UNTIL HE WAS ABOUT 12, EVEN THOUGH HE LIVED IN THE HOUSE WITH HIM.

MR. SCHOOLS:  EXCUSE ME,  YOUR HONOR,  CAN WE APPROACH?

(WHEREUPON, A BENCH CONFERENCE WAS HELD.)

MR. SCHOOLS:  JUDGE,  THIS IS BLATANTLY HEARSAY.   I

DIRECT EXAM OF ARLENE ANDREWS

UNDERSTAND SHE IS AN EXPERT, AND SHE IS ENTITLED TO TESTIFY ABOUT THINGS UPON WHICH HER OPINION IS BASED ON.  BUT UNDER THE NEW 704, I THINK IT IS -- THERE IS A BALANCING TEST THAT IS SUPPOSED TO GO ON BEFORE YOUR HONOR ADMITS HEARSAY TO DETERMINE WHETHER THE HEARSAY IS MORE PREJUDICIAL THAN NOT. THE DEFENDANTS HAVE, OBVIOUSLY, HAVE COMPULSION OVER MR. AND MRS.  FULKS TO COME TESTIFY THEMSELVES.  I THINK IT IS IMPROPER FOR THIS WITNESS TO BE TESTIFYING IN DETAIL ABOUT WHAT THESE WITNESSES TOLD HER.  IF SHE WANTS TO ADVISE THE JURY THAT SHE SPOKE WITH THEM AND THAT SHE BASED HER OPINIONS ON PART OF WHAT THEY TOLD HER,  I THINK THAT IS FINE.  BUT THE DETAILS OF WHAT THEY TOLD HER IS HIGHLY PREJUDICIAL BECAUSE WE DON'T HAVE ANY WAY OF CROSS-EXAMINING THAT.

MS. JOHNSON:  OF COURSE, YOU COULD COMPEL THEM YOURSELF BY SUBPOENA IF YOU WISH TO COMPEL THEM BY SUBPOENA. BUT WHAT SHE IS GOING TO TESTIFY TO IS, WHAT IS THE ACCEPTED PRACTICE IN HER FIELD, WHICH IS THE THINGS THAT ARE REMARKABLE.  AND IT IS REMARKABLE, AT THE VERY LEAST, BECAUSE THOSE PEOPLE CLAIM THEY DON'T REMEMBER SIGNIFICANT FACTS ABOUT HIS CHILDHOOD.

THE COURT:  IS THAT AS FAR AS YOU ARE GOING TO GO, THAT THEY DON'T REMEMBER SIGNIFICANT FACTS?

MS. JOHNSON:  THAT IS WHAT SHE IS GOING TO DO NOW. THERE IS ANOTHER POINT AT WHICH SHE DOES RELY ON WHAT THEY SAID ABOUT MS. FULKS'S DRINKING DURING HER PREGNANCY THAT WE

DIRECT EXAM OF ARLENE ANDREWS

HAVE ALREADY HEARD.  SHE ALSO HAS NUMEROUS OTHER SOURCES THAT ARE NOT THEM.  THIS IS WHAT IS THIS CONVENTIONAL PRACTICE. WIGGINS ESTABLISHES THAT A FAMILY HISTORY, TO SOME EXTENT, IS SUPPOSED TO BE DONE IN, VIRTUALLY, EVERY CASE.  IF IT IS SUPPOSED TO BE DONE, IT HAS TO BE TESTIFIED TO.

MR. SCHOOLS:  I DON'T DISAGREE WITH THAT.  WE HAVE NO NOTICE OF THIS.  WE GOT A VERY BRIEF SUMMARY OF WHAT MS. -- DR. ANDREWS WAS GOING TO TESTIFY TO.  THERE WAS NO INDICATION IN THERE ON WHAT SHE RELIED ON, WHAT SHE LOOKED AT, THE RECORDS THAT SHE REFERRED TO.  I HAVE NEVER SEEN -- I HAVE NO IDEA WHETHER WHAT SHE IS TESTIFYING TO IS SUPPORTED BY THE INFORMATION SHE HAS GOT OR NOT BECAUSE WE DON'T KNOW.

THE COURT:  LET ME STOP YOU.  WHAT I WANT TO KNOW IS, ARE YOU GOING TO STOP AT THE POINT WHERE SHE IS NOW WHERE SHE SAYS THE PARENTS PROVIDED NO INPUT OR DON'T REMEMBER ANYTHING, OR IS SHE GOING TO RELAY ADDITIONAL HEARSAY-TYPE EVIDENCE FROM THE PARENTS TO FORM HER OPINION?

MS. JOHNSON:  THE ONLY THING I AM DOING, AT THIS POINT, IS WHAT THEY DON'T REMEMBER.  AS SHE CONTINUES TO TESTIFY, SHE WILL TALK ABOUT, I THINK THE DRINKING IS PROBABLY THE ONLY THING THAT SHE ACTUALLY TALKS ABOUT, SPECIFICALLY, SHE HEARD FROM THEM, AND THAT IS SUPPORTED BY NUMEROUS OTHER PEOPLE.

YOU KNOW, AS I SAID, OBVIOUSLY, THEY CAN CALL THEM, TOO, IF THEY WANT TO CALL THEM.  IF THEY WANT A LIST OF THE

DIRECT EXAM OF ARLENE ANDREWS

RECORDS, THEY HAVEN'T ASKED US FOR ANY FURTHER ELABORATION OR TO GIVE FURTHER ELABORATION IF THEY WANT IT.   THEY HAVE THE OPPORTUNITY FOR REBUTTAL AND CROSS-EXAMINATION OF THE SOURCES OF THEIR INFORMATION IF THEY DOUBT THAT THEY ARE ACCURATE SOURCES.

THE COURT:   THIS HAS ALWAYS BEEN THE SUBJECT OF A PROBLEM WHEN AN EXPERT GETS UP AND BASES AN OPINION ON UNDERLYING DATA THAT IS NOT ADMISSIBLE IN AND OF ITSELF, BUT IT IS DATA THAT -- OF THE TYPE FOR WHICH THAT EXPERT NORMALLY RELIES TO FORM AN OPINION.   IT HAS ALWAYS BEEN A GRAY AREA FOR THE TRIAL JUDGE, AND DOES THE JURY HEAR ABOUT THE UNDERLYING DATA OR NOT.   AND THE RULE WAS AMENDED WITHIN THE LAST COUPLE OF YEARS TO DEAL WITH THAT.

I AM TRYING TO GET MY HANDS ON A CURRENT COPY OF IT. EVEN THOUGH THE RULES DON'T APPLY, I WOULD LIKE TO LOOK AT IT.

MR. SCHOOLS:   IT IMPOSED A 403-TYPE ANALYSIS ON THAT INFORMATION.   YOU KNOW, I THINK IT IS PRETTY CRITICAL TESTIMONY ABOUT WHETHER HIS PARENTS REMEMBER THINGS ABOUT HIS CHILDHOOD AND WHETHER THEY REMEMBER HOW MUCH THEY DRANK. WITHOUT QUESTION, THE MOST RELEVANT WITNESS WITH RESPECT TO HOW MUCH HIS MOTHER DRANK DURING HER PREGNANCY WITH CHAD IS HIS MOTHER.   IT IS FAIRLY CRITICAL TESTIMONY SHE IS GOING TO TESTIFY ABOUT.

MS. JOHNSON:   I WILL HAVE HER TESTIFY THAT SHE SAYS THAT SHE WAS DRINKING DURING THAT TIME PERIOD, SHE DOESN'T

DIRECT EXAM OF ARLENE ANDREWS

RECALL EXACTLY.  IF YOU DON'T WANT ME -- IF YOU ARE SAYING I CAN'T ELICIT THAT, I WILL INSTRUCT THE WITNESS.  THERE ARE MANY OTHER BASES TO THOSE CONCLUSIONS.

I DO THINK THAT IT WOULD BE EXTREMELY SURPRISING TO CUT OFF THIS KIND OF INFORMATION WHEN THE SUPREME COURT HAS CLEARLY SAID THAT A FAMILY HISTORY ASSESSMENT IS APPROPRIATE IN VIRTUALLY -- ALWAYS NECESSARY WHEN THERE ARE INDICATIONS OF A TROUBLED FAMILY BACKGROUND.

THE COURT:  I UNDERSTAND.

MS. JOHNSON:  I WANT TO SAY ONE MORE THING.  YOU KNOW,  I PARTICULARLY LAID THE FOUNDATION ABOUT HOW SHE JUDGES THE RELIABILITY OF THESE THINGS.  SHE WON'T TALK ABOUT ANYTHING FOR WHICH HER PROFESSIONAL JUDGMENT IS NOT RELIABLE EVIDENCE.

MR. SCHOOLS:  SHE WILL OPINE AND NOW SAY THE MOTHER TOLD HER THE TRUTH.

THE COURT:  I ASSUME, AT SOME POINT, SHE IS GOING TO OFFER A PROFESSIONAL OPINION.

MS. JOHNSON:  SHE IS GOING TO TESTIFY TO HER FINDINGS ABOUT THE HISTORY, AND THEN SHE IS GOING TO DESCRIBE WHAT THOSE FINDINGS MEAN.  SHE IS NOT GOING TO SAY THAT THIS LED MR. FULKS TO DO A PARTICULAR THING OR ANYTHING LIKE THAT.  THAT IS NOT WITHIN THE RANGE OF HER EXPERTISE.  MAYBE WHAT WE OUGHT TO DO IS, SINCE YOU HAVE SAID THAT I CAN ELICIT INFORMATION ABOUT WHAT THEY DON'T REMEMBER,  I MEAN, WE CAN GO

DIRECT EXAM OF ARLENE ANDREWS

ON.  IF, AT SOME POINT, SHE SAYS SOMETHING THAT YOU FIND PROBLEMATIC, YOU ARE TELLING ME I MUST INSTRUCT THE WITNESS THAT SHE CANNOT SAY WHAT ROGER OR DIANA TOLD HER, I WILL DO THAT.  I DON'T THINK --

THE COURT:  LET'S EXCUSE THE JURY AND TAKE THIS UP.

(WHEREUPON, THE BENCH CONFERENCE CONCLUDED.)

THE COURT:  MEMBERS OF THE JURY,  I AM GOING TO -- I WILL ASK YOU TO GO TO THE JURY ROOM WHILE I TAKE UP THIS MATTER WITH THE LAWYERS.

THE COURT:  LET ME ASK THE WITNESS TO STEP OUTSIDE FOR A MOMENT, IF YOU WOULD,  PLEASE.

(WHEREUPON, THE FOLLOWING WAS HEARD OUTSIDE THE PRESENCE OF THE TRIAL JURY AND THE WITNESS ARLENE ANDREWS.)

THE COURT:  AS I WAS SAYING AT SIDEBAR, UP UNTIL THE YEAR 2000, THIS PRECISE ISSUE WAS NOT ADDRESSED BY THE RULES OF EVIDENCE.  AND I KNOW THE RULES OF EVIDENCE DON'T APPLY IN THIS PROCEEDING.  BUT THE PROBLEM WAS, THE RULES OF EVIDENCE PROVIDED THAT EXPERTS COULD BASE OPINIONS ON UNDERLYING DATA, EVEN IF THAT DATA WOULD NOT BE ADMISSIBLE BEFORE THE JURY, AS LONG AS THAT DATA WAS MATTERS OF THE TYPE IN WHICH THOSE TYPE EXPERTS NORMALLY RELIED IN THE FIELD.  BUT THE RULES DIDN'T SAY WHETHER THE JURY WAS ALLOWED TO HEAR THAT UNDERLYING DATA.

IN 2000, THE RULES WERE AMENDED TO SAY,  "FACTS OR DATA THAT ARE OTHERWISE INADMISSABLE SHALL NOT BE DISCLOSED TO THE JURY BY THE PROPONENT OF THE OPINION, UNLESS THE COURT

DIRECT EXAM OF ARLENE ANDREWS

DETERMINES THAT THEIR PROBATIVE VALUE IN ASSISTING THE JURY TO EVALUATE THE EXPERT'S OPINION SUBSTANTIALLY OUTWEIGHS THEIR PREJUDICIAL EFFECTS."

IT IS LIKE MR. SCHOOLS SAID AT SIDEBAR, IT CALLS FOR A 403-TYPE BALANCING TO DECIDE WHETHER THIS UNDERLYING DATA COMES IN.  SO, WHAT I NEED TO KNOW IS, WHAT IS THE UNDERLYING DATA THAT YOU PROPOSE TO INTRODUCE?  WE ALREADY KNOW SHE IS GOING TO SAY -- OR ALREADY SAID THAT SHE TALKED WITH THE PARENTS, AND THEY HAD NO RECOLLECTION OF THE RELEVANT FACTS; IS THAT CORRECT?

MS. JOHNSON:  SHE DIDN'T SAY ALL OF THE THINGS THEY DIDN'T REMEMBER.  SHE TALKED ABOUT THEY HAVE NO RECOLLECTION, AND THAT WAS REMARKABLE.

LET ME SAY SOMETHING FIRST, THOUGH.  YOUR HONOR HAS REPEATEDLY SAID THAT THE RULES OF EVIDENCE ARE A GUIDANCE IN THIS PROCEEDING.  THIS IS A PARTICULAR CASE IN WHICH THE GUIDANCE CAN BE NO MORE THAN GUIDANCE.  AND THAT IS BECAUSE, THIS KIND OF TESTIMONY OF AN EXPERT ABOUT A FAMILY HISTORY, I DON'T KNOW WHEN THAT WOULD BE ADMISSIBLE IN ANY OTHER KIND OF PROCEEDING.  I GUESS I COULD TRY TO IMAGINE SOME DURESS CLAIM THAT IT MIGHT BE ADMISSIBLE IN.  BUT HERE IS EXACTLY THE SORT OF INFORMATION THAT IS SPECIFICALLY RELEVANT TO PUNISHMENT THAT DOES NOT COME IN ELSEWHERE.

THE SUPREME COURT HAS SAID, IN WIGGINS, THAT A FAMILY HISTORY ASSESSMENT NEEDS TO BE DONE.  I THINK NOTHING IN THAT

DIRECT EXAM OF ARLENE ANDREWS

CASE SUGGESTS THAT, IN FACT, THERE IS CLEARLY HEARSAY TESTIMONY REFERRED TO IN WIGGINS, WHICH THE COURT SAYS THE JURY SHOULD HAVE HEARD.

SO, TO START UP, I DON'T THINK THAT THE 403-TYPE ASSESSMENT IS ACTUALLY THE STANDARD THAT GOVERNS THIS KIND OF PROCEEDING. BUT EVEN IF IT WERE, I AM ACTUALLY GOING TO HAVE HER TESTIFY TO VERY LITTLE THAT HER -- THAT MR. FULKS'S PARENTS SAID. SHE IS GOING TO TALK ABOUT WHAT THEY DON'T REMEMBER, WHICH I WOULD ASSUME THAT THEY ARE THE BEST SOURCE OF INFORMATION ON WHAT THEY DON'T REMEMBER. AND IN SOME SENSE, I WOULD HAVE TO SAY THAT IS NOT REALLY HEARSAY EITHER. THEY ARE CLAIMING THAT THEY DON'T REMEMBER, AND I FIND THAT TO BE JUST AS PROBATIVE AS IF THEY DON'T REMEMBER. BUT THE OTHER THINGS THAT I AM TRYING TO RECALL --

THE COURT: LET ME JUMP IN AND ASK. SINCE YOU QUALIFIED THE WITNESS AS AN EXPERT, I ASSUME THAT, AT SOME POINT, YOU WERE GOING TO ASK HER TO OFFER AN OPINION OR NOT? OR IS SHE GOING TO LAY OUT THE FAMILY HISTORY ASSESSMENT?

MS. JOHNSON: WHAT SHE IS GOING TO DO IS, FIND AN OPINION THAT A FAMILY HISTORY ASSESSMENT PERSON TYPICALLY OFFERS. SHE WILL DESCRIBE THE FAMILY, AND THAT IS PART OF HER FINDINGS. AND THE OTHER PART THAT SHE DOES IS TO TALK ABOUT THIS FROM THE RESEARCH, THE SIGNIFICANCE OF THOSE KINDS OF FACTORS THAT SHE FOUND.

THE COURT: ALL RIGHT. SO, BESIDES TESTIFYING THAT

DIRECT EXAM OF ARLENE ANDREWS

THE PARENTS DON'T RECALL A LOT OF INFORMATION THAT SHE WOULD HAVE OTHERWISE LIKED TO HAVE GOTTEN FROM THEM, WHAT ELSE IS GOING TO BE A PROBLEM?

MS. JOHNSON:  I THINK THAT,  IF I RECALL CORRECTLY, SHE WAS GOING TO TESTIFY ABOUT THE PARENTS' STATEMENTS ABOUT DIANA'S DRINKING DURING HER PREGNANCY.  ALTHOUGH,  YOU KNOW, I THINK THAT IS PROBATIVE.  BUT THERE CERTAINLY IS LOTS OF OTHER EVIDENCE ABOUT THAT.  AND SHE HAS MORE THAN TWO OTHER SOURCES THAN THEM WITH RESPECT TO THAT, AS WELL.

I AM TRYING TO THINK IF THERE IS ANYTHING ELSE THAT SHE SPECIFICALLY ATTRIBUTES TO ONE OF THEM AND ONLY ONE OF THEM. AND I DON'T RECALL ANYTHING ELSE, AT THIS POINT, EXCEPT PERHAPS  -- NO, THAT IS ACTUALLY IN THE RECORD.  I AM NOT RECALLING ANYTHING THAT SHE SPECIFICALLY SAYS ABOUT THEM, ALTHOUGH SHE MAY DO THAT SIMPLY BY WAY OF ILLUSTRATION.  IF SHE SORT OF SPOKE ABOUT ANY MAJOR FINDING,  ANY THEME IN THE CHILDHOOD, SHE HAS MORE THAN ONE SOURCE FOR WHICH SHE MAY HAVE BEEN PLANNING TO USE AN ANECDOTAL DETAIL FROM ONE OF THE PARENTS.  IF YOU INSTRUCT HER SHE CAN'T DO THAT, SHE WILL NOT DO THAT.  BUT I DO THINK THAT IS WITHIN THE NORMAL RANGE OF WHAT A FAMILY HISTORY ASSESSMENT PERSON DOES.  AND SHE TALKED ABOUT THAT SHE WASN'T GOING TO DO THAT IN ANY SITUATION WHERE PROFESSIONAL STANDARDS WOULD NOT FIND IT TO BE RELIABLE.

THE COURT:  MR. SCHOOLS.

MR. SCHOOLS:  YOUR HONOR,  I THINK WHAT GOES INTO THE

DIRECT EXAM OF ARLENE ANDREWS

FAIRNESS ANALYSIS THAT YOU ARE TO CONDUCT UNDER 705 IS THE COMBINATION OF RULE 16 WITH 705.  AND WE ALL AGREE THAT RULE 16 WOULD APPLY.  AND WHAT RULE 16 SAYS IS THAT, IF THE DEFENDANT INTENDS TO OFFER AN EXPERT, AND WE HAVE REQUESTED IT, THE DEFENDANT IS OBLIGATED TO DISCLOSE TO THE GOVERNMENT A SUMMARY THAT DESCRIBES NOT JUST THE WITNESS'S OPINIONS, BUT THE BASES AND REASONS FOR THOSE OPINIONS, AND THE WITNESS'S QUALIFICATIONS.

I GOT A FOUR-PAGE CV FROM DR. ANDREWS RIGHT BEFORE SHE TESTIFIED.  THE QUALIFICATIONS LISTED IN THE NOTICE THAT THEY PROVIDED HAS LISTED HER INSTITUTIONS AND WHERE SHE PRESENTLY WORKS.  BUT THE SUMMARY SAYS, SIMPLY, THAT THE PURPOSE OF DR. ANDREWS' ASSESSMENT WAS TO DETERMINE THE EFFECT MR. FULKS'S FAMILY BACKGROUND HAD ON HIS CHILDHOOD DEVELOPMENT. DR. ANDREWS FOUND EVIDENCE THAT THE FOLLOWING FACTORS WERE PRESENT, AND THEY LIST A NUMBER OF FACTORS THAT SHE CONCLUDED WERE PRESENT IN MR. FULKS'S BACKGROUND.

SHE THEN, ACCORDING TO THE SUMMARY, STATES MOST OF THESE FACTORS WERE SEVERE AND PERSISTENTLY PRESENT THROUGH THE MOST TENDER YEARS OF MR. FULKS'S DEVELOPMENT UP UNTIL ADOLESCENCE. THE RECORD INDICATES THAT THESE DEVELOPMENTAL EFFECTS ARE THE FACTORS.  SHE LISTED THOSE DEVELOPMENTAL EFFECTS.  I GOT NO CLUE WHAT SHE IS RELYING ON.  SHE HAS TESTIFIED TODAY SHE HAD SCHOOL RECORDS, SHE HAD MEDICAL RECORDS, SHE HAD MARRIAGE RECORDS, SHE HAD CRIMINAL HISTORY RECORDS.  I HAVEN'T SEEN

DIRECT EXAM OF ARLENE ANDREWS

ANY OF THAT STUFF.  I HAVE NO IDEA WHETHER HER OPINION IS BASED IN FACT OR NOT.  I MEAN, BECAUSE I HAVE NOT SEEN ANY OF THAT STUFF, BECAUSE IT WASN'T DISCLOSED TO ME THAT HER OPINIONS WERE BASED ON THAT STUFF.  AS FAR AS I COULD TELL FROM REVIEWING THE SUMMARY OF THE TESTIMONY,  HER OPINIONS WERE BASED ON HAVING TALKED TO MR. FULKS.

SO,  THE REASON THAT THIS IS SURPRISING TO THE GOVERNMENT IS BECAUSE THE DEFENSE DID NOT, IN THEIR RULE 16 DISCLOSURE, DISCLOSE THAT.  I ASSUME MS. JOHNSON WILL SAY,  WELL MR. SCHOOLS SHOULD HAVE ASKED FOR MORE DETAIL.  I DON'T FEEL THAT IS MY OBLIGATION.  I THINK IT IS THEIR OBLIGATION TO COMPLY WITH THE RULE.  I HONESTLY, JUDGE, I DON'T -- WE ARE NOT SITTING HERE LAYING IN WAIT THINKING, YOU KNOW, WE DON'T HAVE THE BASES OF DR. ANDREWS' OPINION. I DON'T KNOW WHAT SHE IS GOING TO SAY, WE WILL OBJECT WHEN THEY CALL HER.  I HAD NO IDEA SHE WAS GOING TO SAY SHE TALKED TO THESE WITNESSES.  AND HAD I KNOWN, IF THEY HAD COMPLIED WITH RULE 16, WE MIGHT HAVE VERY WELL HAD THEM INTERVIEWED BY FBI AGENTS IN THE RELEVANT LOCATION.  WE MIGHT HAVE FIGURED OUT WHERE TO FIND THE RECORDS THAT THEY GOT.  I DON'T THINK THE RULE OBLIGATES THEM TO GIVE US THE RECORDS, BUT AT LEAST WE WOULD BE ON NOTICE THAT WE NEED TO GO FIND THEM AS QUICK AS WE CAN IF IT IS POSSIBLE.  AND WE GOT NONE OF THAT.

SO, SHE IS GOING TO TESTIFY TO OPINIONS THAT ARE BASED ON A WEALTH OF INFORMATION, NONE OF WHICH WAS DISCLOSED TO THE

DIRECT EXAM OF ARLENE ANDREWS

GOVERNMENT.  AND I THINK, IN COMBINATION WITH YOUR DISCRETION UNDER 705, AGAIN, UNDERSTANDING THAT THE RULE DOESN'T APPLY, I THINK THAT IS WHERE THE UNFAIRNESS COMES IN.   I JUST HAVEN'T SEEN THAT STUFF.

MS. JOHNSON:  WELL,  YOUR HONOR,  I DON'T KNOW WHAT MR. SCHOOLS KNOWS OR DOESN'T KNOW.   BUT MR. GASSER CERTAINLY HAS HEARD SOCIAL WORKERS TESTIFY ABOUT FAMILY HISTORY ASSESSMENTS.  AND IT IS CONVENTIONAL WITH ALL OF THEM TO RELY UPON RECORDS AND INTERVIEWS.   I DON'T THINK HE WILL DENY HE HAS SEEN THAT NUMEROUS TIMES IN THE PAST.  AND IF THEY REALLY HAD SOME DOUBTS ABOUT IT, THEY COULD HAVE ASKED US FOR IT.  IF THEY WANT A LIST OF THE RECORDS THAT WE HAVE LOOKED AT,  WE WILL GIVE THEM A LIST OF THE RECORDS THAT SHE LOOKED AT THAT WE GAVE HER, AND THEY CERTAINLY HAVE THIS WHOLE WEEKEND TO GO FIND THESE WITNESSES IF THEY THINK THEY ARE GOING TO IMPEACH THEM IN ANY WAY.   BUT WE WEREN'T ASKED FOR MORE INFORMATION THAN THAT.  AND WE DIDN'T GIVE ANYTHING MORE THAN WE WERE ASKED FOR.   WE GAVE A SUMMARY, AND THIS IS A SUMMARY OF WHAT SHE IS GOING TO TESTIFY TO.

AND I THINK THERE WAS NO INDICATION THAT THERE WAS DISSATISFACTION WITH THAT.   I ALSO GAVE MR. SCHOOLS A SUMMARY OF THE FINDING THAT IS A LITTLE MORE DETAIL.  I SHOWED HIM THAT CHART YESTERDAY WHEN HE ASKED ABOUT THE CHART.   AT THE TIME HE SAW THAT CHART, HE DID NOT ASK ME FOR ANY FURTHER DETAIL.   I DON'T KNOW THAT WE -- I JUST DON'T THINK WE WERE

App. 00405

DIRECT EXAM OF ARLENE ANDREWS

ON NOTICE THAT THEY WANTED ANYTHING MORE.  AND IF THEY WANT MORE, THEY CAN HAVE IT NOW, AND THEY HAVE THE WEEKEND TO INVESTIGATE THIS IF THEY WANT TO.  IT IS THE FEDERAL GOVERNMENT.  IF THEY WANT TO INVESTIGATE IT, THEY WILL FIND THE PEOPLE.

THE COURT:  MR. SCHOOLS, THE RULE SAYS THEY ARE SUPPOSED TO -- THE SUMMARY MUST DESCRIBE THE WITNESS'S OPINIONS, THE BASES, AND REASONS FOR THE OPINIONS, AND THE WITNESS'S QUALIFICATIONS.  SO, YOU SAY THE BASES WOULD INCLUDE ALL THE UNDERLYING DATA, ALL OF THE PEOPLE INTERVIEWED, AND RECORDS REVIEWED, AND SO FORTH?

MR. SCHOOLS:  I THINK THAT IS THE NATURE OF -- THE RULES KIND OF MESH.  I THINK, IF YOU LOOK UNDER 705, THE STUFF THAT IS ADMISSIBLE IS THE STUFF ON WHICH SHE BASES HER OPINION.  SO, YES.  I DON'T KNOW THAT THEY ARE OBLIGATED TO TELL US, YOU KNOW -- WELL, I THINK UNDER THAT, IF THEY WANT TO OFFER HEARSAY TESTIMONY UNDER THE 705, THAT WE ARE, AT LEAST, ENTITLED TO NOTICE THAT THEY INTERVIEWED THE DEFENDANT'S PARENTS IN CONNECTION, AND THAT IS PART OF WHAT SHE BASES HER OPINION ON.  I MEAN --

MS. JOHNSON:  YOUR HONOR, I HAVE TO SAY, WHEN THEY DID NOT OBJECT TO HER QUALIFICATIONS TO DO THIS, I HAD ALREADY BEEN THROUGH THE RELIABILITY MATTERS AND HOW SHE DECIDES ABOUT RELIABILITY, WHICH CLEARLY INDICATES THAT SHE IS RELYING ON HEARSAY.  I HAVE TO SAY AGAIN, THIS IS THE WAY

DIRECT EXAM OF ARLENE ANDREWS

FAMILY HISTORY ASSESSMENTS ARE ALWAYS DONE.  IT IS NOT SOMETHING NEW.  AND IT IS TRUE THAT ISOLATED COURTS, PRIOR TO WIGGINS, DID NOT PERMIT THE ADMISSION OF THIS EVIDENCE.  BUT AFTER WIGGINS, I AM UNAWARE OF ANY COURT THAT HAS PREVENTED THIS KIND OF TESTIMONY.

THE COURT:  ALL RIGHT.  I WILL ALLOW THE TESTIMONY. I WILL OVERRULE THE GOVERNMENT'S OBJECTION AND ALLOW FULL CROSS-EXAMINATION ON THESE ISSUES.

PLEASE BRING IN THE JURY.

(WHEREUPON, THE FOLLOWING WAS HEARD IN THE PRESENCE OF THE TRIAL JURY.)

THE COURT:  PLEASE CONTINUE.

BY MS. JOHNSON:

**Q.    DR. ANDREWS,  YOU WERE TELLING US ABOUT THE REMARKABLY POOR RECALL OF DIANA AND ROGER.  WOULD YOU LIKE TO FINISH THAT?**

A.   YES.  ONE OF THE THINGS THAT WAS VERY UNUSUAL ABOUT THIS CASE WAS THAT HIS FATHER DOESN'T TELL ME -- TELLS ME HE DOESN'T REMEMBER HIM AT ALL BEFORE HE WAS ABOUT AGE 12, EVEN THOUGH THE FATHER LIVED IN THE HOUSEHOLD WITH THE FAMILY DURING THAT ENTIRE TIME, AND WAS, IN FACT, THERE DAY AND NIGHT MUCH OF THE TIME BECAUSE HE WAS UNEMPLOYED SOME OF THE TIME. HE WAS AROUND CHAD; HE JUST DOESN'T REMEMBER HIM.

HE DOESN'T REMEMBER WHEN WE WAS BORN.  HE DOESN'T REMEMBER HE WAS IN SPECIAL CLASSES AT SCHOOL.  HE DOESN'T

DIRECT EXAM OF ARLENE ANDREWS

REMEMBER THAT HE TRIED TO COMMIT SUICIDE AT ONE POINT.  THAT WAS EVEN AFTER HE WAS 12.

HIS MOTHER ALSO DOESN'T REMEMBER HIM IN MUCH DETAIL.  SHE DOESN'T REMEMBER THE ACTUAL BIRTH, WHICH IS UNUSUAL FOR MOTHERS.  SHE CAN'T REMEMBER IF HE WENT TO KINDERGARTEN.  SHE HAS SORT OF A VAGUE RECOLLECTION THAT HE SEEMED OKAY WHEN HE WAS VERY LITTLE.

ANOTHER THING THAT WAS UNUSUAL ABOUT THIS FAMILY WAS THAT, GIVEN THERE WAS A VERY HIGH LEVEL OF CONFLICT IN THE FAMILY, THEY STAYED TOGETHER FOR A REMARKABLY LONG PERIOD OF TIME. WE WERE ABLE TO SEE -- WE RARELY SEE A FAMILY MAINTAIN ITSELF THAT LONG WITH THAT CONFLICT.

THE THIRD HAS TO DO WITH, OFTEN WHEN WE LOOK AT WHAT WE CALL THREATS TO CHILD DEVELOPMENT, THINGS THAT ARE HARMFUL, THINGS THAT OCCUR, WE SEE ACTUAL ACTS THAT MAY HARM THE CHILD. WE SAW A LOT OF THAT IN THIS CASE.  WHAT WAS EVEN MORE POWERFUL IN THIS CASE IS WHAT WAS MISSING THAT SHOULD HAVE BEEN THERE.  VERY MUCH A CASE OF DEPRIVATION.

**Q.    NOW, WE ARE BACK TO WHERE I CUT YOU OFF BEFORE BECAUSE I HAD FORGOT TO DO THAT.   NOW,  LET'S START WHAT YOU NOTED IN ASSEMBLING YOUR HISTORY THAT WAS NOTEWORTHY PRIOR TO HIS BIRTH.   THAT IS WHERE WE WERE.**

A.   RIGHT.   WELL,  HIS PARENTS HAD A CONFLICTED RELATIONSHIP RIGHT FROM THE BEGINNING.  THEY WERE MARRIED WHEN HIS MOTHER, DIANA, WAS JUST 17, AND HIS FATHER WAS 19.   AND

DIRECT EXAM OF ARLENE ANDREWS

THEY WENT OUT TO LIVE IN MICHIGAN.  VERY SOON AFTER, HIS FATHER, ROGER, WAS DRAFTED IN TO THE ARMY.   THAT WAS BACK IN, I THINK, 1968.  IT WAS STILL DURING THE VIETNAM WAR, AND THERE WAS A DRAFT DURING THAT TIME.   AFTER FOUR MONTHS OF TRAINING, HE DID GO TO VIETNAM, HE SPENT A YEAR THERE, AND HE WAS EXPOSED TO -- ONE OF HIS BEST BUDDIES STEPPED ON A LAND MINE. THERE WERE ROCKETS THAT WOULD COME INTO THEIR COMPOUND.   HE ALSO WORKED IN A MORGUE AND WAS EXPOSED TO DEATH AND DEAD BODIES.   SO,  IT WAS A VERY DIFFICULT ASSIGNMENT.

WHILE HE WAS IN VIETNAM, HIS MOTHER HELPED HIM GET A DIVORCE FROM DIANA BECAUSE HE WAS SENT LETTERS TELLING HIM, AND THE DIVORCE RECORDS SAY, THAT HIS SISTER FOUND DIANA HAVING SEX WITH ANOTHER MAN, AND SHE WAS LIVING WITH YET ANOTHER MAN.   AND SO, EVEN THOUGH HE WASN'T PHYSICALLY THERE, HIS FAMILY HELPED HIM GET A DIVORCE, AND THEY WERE DIVORCED.

**Q.    BUT THEN HE -- WHEN HE COMES BACK FROM VIETNAM, WHAT HAPPENS?**

A.   ONE OF THE FIRST THINGS HE DID WHEN HE CAME BACK FROM VIETNAM, HE WENT TO SEE DIANA, AND THEY WERE ALMOST IMMEDIATELY REMARRIED.   SO,  THEY DECIDED TO TRY AGAIN.   AND THEN EIGHT MONTHS LATER, THEIR FIRST DAUGHTER,  THEIR FIRST CHILD, SHERRI, WAS BORN.

AND THE OTHER THINGS THAT WERE HAPPENING EARLY IN HIS LIFE AND THEN RONNIE -- I MEAN,  DEWAYNE WAS BORN ABOUT A YEAR AND A HALF AFTER SHERRI WAS, AND RONNIE WAS BORN A FEW YEARS AFTER

DIRECT EXAM OF ARLENE ANDREWS

THAT.  BUT EARLY IN THAT RELATIONSHIP, THE FIGHTS STARTED BECAUSE ROGER WOULD ACCUSE DIANA OF HAVING AFFAIRS, AND DIANA WOULD ACCUSE HIM OF HAVING AFFAIRS.  THAT WAS A MAJOR THEME IN THE FIGHTS THAT THEY HAD.

DIANA DIDN'T WORK OUTSIDE THE HOME, ROGER DID.  HE HAD JOBS, HE WORKED AT A GAS STATION.  AND THEY DIDN'T HAVE -- THEY HAD SOME SUPPORT FROM ROGER'S FATHER -- I MEAN, FATHER AND MOTHER, BUT VERY LITTLE SUPPORT FROM DIANA'S FAMILY. THEY WEREN'T THAT INVOLVED WITH THEM AT ALL THEN.  ALTHOUGH DIANA GETS ALONG WITH HER EX-IN-LAWS SOMEWHAT NOW, BUT THEN SHE DIDN'T BECAUSE THEY WERE A PARTY TO HAVING FACILITATED THE DIVORCE.  WE ALSO KNOW THAT ROGER HAS WAR TRAUMA AFFECTS WHEN HE FIRST RETURNED FROM VIETNAM.

**Q.    THAT IS NOT JUST BY HIS ACCOUNT, THAT IS BY OTHERS, TOO?**

A.    BY OTHER ACCOUNTS, RIGHT.  AFTER HE STARTED DRINKING, HE DIDN'T HAVE SUCH BAD EFFECTS.  BUT HE AND DIANA BOTH STARTED DRINKING HEAVILY EARLY, AND SHE DRANK THROUGH HER PREGNANCIES WITH ALL OF THE SONS.

**Q.    WITH ALL OF THE SONS, IS THAT WHAT YOU SAID?**

A.    YES.

**Q.    YOU ARE NOT SO SURE ABOUT SHERRI, THE FIRST CHILD?**

A.    RIGHT.

**Q.    YOU DON'T HAVE AS MUCH INFORMATION ABOUT THAT?**

A.    NO.

DIRECT EXAM OF ARLENE ANDREWS

Q.    AND THEN YOU HAD GOTTEN THROUGH SHERRI AND DEWAYNE, AND THEN RONNIE IS BORN.  HOW MUCH AFTER DEWAYNE?

A.    THREE YEARS LATER.  BASICALLY, WHEN CHAD WAS BORN, SHERRI WAS SEVEN, RONNIE WAS SIX  -- DEWAYNE WAS SIX, AND RONNIE WAS THREE

Q.    NOW, I WOULD LIKE YOU TO TALK ABOUT CHAD'S INFANCY AND EARLY CHILDHOOD.  THAT IS THE PERIOD OF TIME WHEN HE WENT TO SCHOOL.  I UNDERSTAND THINGS CHANGE FOR ANY CHILD WHEN THEY GO TO SCHOOL.

A.    WELL, HE WAS BORN IN A DOCTOR'S OFFICE, WHICH WAS -- THEY LIVED IN RURAL WEST VIRGINIA, AND THAT WAS A BIRTHING PLACE.  AND THERE AREN'T ANY RECORDS.  WE WERE UNABLE TO FIND RECORDS OF HIS BIRTH.  AS I SAID, HIS MOTHER HAS A VAGUE RECOLLECTION OF HIM, AND SHERRI HAS A BETTER RECOLLECTION THAN HER MOTHER.  SHE SAID HE HAD A VERY SWEET TEMPERAMENT, HE DIDN'T CRY MUCH, DIDN'T GET SICK VERY OFTEN.  HIS OLDER SISTER, SHERRI, WAS INVOLVED IN CARING FOR HIM A LOT.  WHEN HE WAS TWO YEARS OLD, HIS YOUNGER BROTHER SHANNON WAS BORN, AND THAT WAS THE LAST CHILD IN THE RELATIONSHIP.

AT FIVE, HE STARTED KINDERGARDEN, BUT HE DID MISS 35 DAYS OF SCHOOL THAT YEAR.  NO INDICATION IT WAS DUE TO ILLNESS.  WE JUST KNOW HE MISSED THE SCHOOL.  AND THAT ABOUT THE TIME HE STARTED FIRST GRADE, IS WHEN ROGER GOT A POOL TABLE, AND THE NEIGHBORS STARTED HANGING OUT.

Q.    CAN I INTERRUPT A MINUTE?  THAT IS WHEN THEY MOVED FROM

**DIRECT EXAM OF ARLENE ANDREWS**

**PINE STREET SORT OF AROUND THE CORNER TO LEEWARD AVENUE?**

A.   UH-HUH (AFFIRMATIVE RESPONSE).

AND THE HOME WAS VERY CROWDED WITH PEOPLE COMING AND GOING.  THEY WERE DRINKING.  THERE WAS LOTS OF FIGHTS, WATCHING PORNOGRAPHY VIDEOS, MAGAZINES.

DIANA DID COOK FOOD. USUALLY COOKED A MEAL A DAY.  THEY NEVER HAD A SIT-DOWN MEAL.  THEY GENERALLY -- THE KIDS COULD GO THROUGH THE KITCHEN AND GET FOOD OR CEREAL IN THE MORNING AND THINGS THAT WERE THERE IN THE KITCHEN.

HIS PARENTS PRETTY CONSISTENTLY ACTED LIKE THEY DESPISED EACH OTHER, USED VIOLENCE AGAIN AND AGAIN.  THEY FOUGHT WITH THEIR FIST. THEY SHOVED,  THEY STRANGLED, THEY HIT EACH OTHER WITH OBJECTS.  THEY FOUGHT EACH OTHER AND FOUGHT OTHER ADULTS.  THEIR PARENTS THREATENED TO KILL EACH OTHER IN FRONT OF THE CHILDREN.

HE HEARD HIS MOTHER AND FATHER CALL EACH OTHER AND THEIR CHILDREN UNSPEAKABLE NAMES, LIKE MOTHER FUCKER, BAPTIST -- BASTARDS, EXCUSE ME.  I AM THINKING, BAPTISTS ARE CERTAINLY APPALLED AT THIS.  IT IS HARD TO SAY THESE WORDS.  AND I APOLOGIZE. BUT THEY -- NOT USED TO SAYING THEM.

**Q.   YOU ARE A METHODIST, AREN'T YOU?**

A.   YES, WE ARE, TOO.  BUT THE CHILDREN WERE EXPOSED TO THIS KIND OF LANGUAGE ALL THE TIME.  AND IT WAS JUST EVERY DAY FOR THEM.

THEY LEARNED TO RUN AND HIDE WHEN THEIR PARENTS WERE

DIRECT EXAM OF ARLENE ANDREWS

FIGHTING.  THEY LEARNED TO ACCEPT THESE KINDS OF THINGS GOING ON IN THEIR LIFE, AND NOBODY SEEMED TO BE IN CHARGE OF THE HOUSE.

DEWAYNE, WHO WAS 12 WHEN CHAD WAS SIX STARTING FIRST GRADE, WAS ALREADY USING ALCOHOL AND DRUGS.  AND HE WAS ALREADY INTO TROUBLE IN THE SCHOOL AND IN THE COMMUNITY.  AND CHAD REALLY LOOKED UP TO HIS BROTHER DEWAYNE.  HE  WAS HIS MAIN ROLE MODEL.

CHAD WAS EDUCATIONALLY NEGLECTED BY HIS PARENTS.  HE ACTUALLY FAILED THE FIRST GRADE.

**Q.   SO NOW YOU ARE MOVING INTO THAT MIDDLE CHILDHOOD, THAT SORT OF ELEMENTARY SCHOOL PERIOD,  RIGHT?**

A.   RIGHT.  YEAH.  THROUGH THE FIRST GRADE IS WHEN I THINK OF AS EARLY CHILDHOOD.  AND THEN ABOUT AGES SEVEN TO 11 IS MIDDLE CHILDHOOD.

HE DID HAVE -- THE ONLY CONSISTENCY IN HIS LIFE IS THAT BOTH OF HIS PARENTS WERE THERE, AND HIS BROTHERS AND SISTERS WERE ALL THERE.  BUT THE DYNAMICS WERE SUCH THAT VERY LITTLE ATTENTION WAS FOCUSED ON HIM.  IT WAS A HIGH-ENERGY HOUSEHOLD,  BUT NOT FOCUSED ON THE CHILDREN, EVEN THOUGH THERE WERE FIVE CHILDREN IN THE HOME.  AND HE WAS ONE OF THE YOUNGER ONES.  AND THEN, WE GET TO MIDDLE CHILDHOOD.

**Q.   AND THAT IS FROM SEVEN TO 11?**

A.   ABOUT SEVEN TO 11,  YEAH.  WHEN HE WAS SEVEN YEARS OLD, HE REPEATED --WHEN HE TURNED SEVEN, HE REPEATED THE FIRST

DIRECT EXAM OF ARLENE ANDREWS

GRADE.

AT THAT TIME, HE WAS DIAGNOSED WITH A SPEECH PROBLEM.  HE HAD A WAY OF SPEAKING WITH A LISP.  A SCHOOL ASSESSED HIM AND DID PLACE HIM, THE FOLLOWING YEAR, IN SPEECH THERAPY.  IT WAS ABOUT THIS TIME, TOO, THAT HIS FATHER LOST HIS JOB, BEGAN BEING AT HOME MOST OF THE TIME.  HE DID SOME THINGS THAT WERE REQUIRED BECAUSE THEY WERE GETTING SOME PUBLIC ASSISTANCE OR WELFARE.  HE DROVE FOR MEALS ON WHEELS AND DELIVERED MEALS AND DID SOME COMMUNITY SERVICE, BUT HE WAS HAVING A HARD TIME GETTING A PAYING JOB.

THE CHILDREN WERE, VIRTUALLY, UNSUPERVISED.  NEIGHBORS TALKED ABOUT HOW THEY WERE RUNNING AROUND IN THE STREETS.  THE OLDER CHILDREN WERE STEALING THINGS, AT THAT POINT.  AND THIS IS WHEN CHAD WAS STILL ONLY IN THE SECOND GRADE.  AND THE FIRST OFFENSE YOU SEE THAT CHAD COMMITTED WAS WHEN HE WAS ABOUT NINE YEARS OLD, HE AND HIS BROTHER RONNIE.

**Q.   STOP A MINUTE.   THE FIRST OFFENSE OF WHICH THERE IS A COURT RECORD; IS THAT RIGHT?**

A.   THAT'S RIGHT.  BECAUSE CHAD IS STARTING TO GET INTO BEHAVIORAL PROBLEMS LIKE HIS OLDER BROTHERS ALREADY HAVE.  HE HUNG AROUND A LOT WITH RONNIE AND DEWAYNE.  AND HE AND RONNIE HIT AN ELDERLY LADY WITH A STICK.  AND THAT IS WHEN HE FIRST GOT INVOLVED WITH A PROBATION OFFICER.  AND THE COURT WAS INVOLVED.

HE WAS IN THE THIRD GRADE, AND THAT IS WHEN A

App. 00414

DIRECT EXAM OF ARLENE ANDREWS

PSYCHOLOGICAL ASSESSMENT WAS DONE.  AND I ATTENDED TO THE COMMENTS IN IT THAT WERE MADE ABOUT HIS SOCIAL BEHAVIOR.  AND THE TEACHER WHO ASKED FOR THE ASSESSMENT HAD WRITTEN THAT CHAD LACKS SELF-DISCIPLINE AND NEEDS TO BE IN A CONTROLLED SITUATION AT ALL TIMES.  HE SHOWS POOR WORK HABITS AND DEFICIENCIES IN BASIC ACADEMIC SKILL DEVELOPMENT.  THE EXAMINER WROTE THAT, DURING THE ASSESSMENT, CHAD WAS FRIENDLY, RELAXED, AND COOPERATIVE.  HE WORKED CAREFULLY WITH GOOD EFFORT AND GOOD HUMOR.  BUT THE SCHOOL STAFF SAID THAT HE HAD LITTLE REGARD FOR SOCIAL CONVENTION AND SCHOOL RULES WHEN HE IS NOT DIRECTLY SUBJECT TO ADULT SUPERVISION.

**Q.    IS THERE ANOTHER CRIMINAL RECORD?**

A.    HE AND ANOTHER LITTLE BOY GRABBED THE PANTS OF A VERY LITTLE GIRL AND PULLED THE PANTS DOWN.  AND HE, AGAIN, HAD A CHARGE FOR THAT.

**Q.    AND THE RECORDS ALSO REFLECT THERE WAS SOME QUESTION ABOUT SHAKING HER DOWN FOR MONEY AT THE SAME TIME; IS THAT RIGHT?**

A.    UH-HUH (AFFIRMATIVE RESPONSE).

**Q.    SO, WHAT HAPPENS THEN?  DOES SOMEONE ATTEND TO HIM TO SEE IF HE GETS ANY TREATMENT?**

A.    HE WAS REFERRED, AT THAT POINT, TO THE MENTAL HEALTH CENTER.  AND THERE WAS AN ASSESSMENT DONE IN WHICH THEY LOOKED AT THE DYNAMICS OF THE FAMILY AND RECOMMENDED TREATMENT.  AND HE AND HIS MOTHER WENT FOR AN ASSESSMENT, AND

DIRECT EXAM OF ARLENE ANDREWS

THEY WENT ONE OTHER TIME, BUT THEN THEY STOPPED GOING.  THE MOTHER DID NOT FOLLOW THROUGH.  THE FATHER WAS NOT INVOLVED AT ALL.

**Q.    IS THERE ANYTHING -- YOU SORT OF DESCRIBED BEFORE WHAT WAS GOING ON WITH THE FAMILY IN HIS EARLY CHILDHOOD.  IS THERE ANYTHING NEW THAT DEVELOPS DURING THIS PERIOD THAT THE JURY NEEDS TO HEAR ABOUT?**

A.    WITHIN THE FAMILY?

**Q.    WITHIN THE FAMILY.**

A.    WHEN HE IS NINE YEARS OLD?

**Q.    NO,  I AM JUST TALKING ABOUT IN HIS MIDDLE CHILDHOOD PERIOD.  I AM TRYING TO HURRY YOU ALONG JUST A LITTLE BIT.**

A.    IT WAS JUST THAT HE WAS PLACED IN A BEHAVIORAL DISORDER CLASSROOM. AND HE WAS -- HIS FAMILY WAS ASKED TO MONITOR HIS -- HIS MOTHER WOULD APPEAR FOR THESE MEETINGS THAT HE WOULD HAVE.  BUT THERE WERE PRETTY CLEAR SIGNS THAT HE WAS BECOMING EMOTIONALLY AND BEHAVIORALLY DISTURBED AT THAT POINT.

OUTSIDE THE FAMILY, PEOPLE WERE NOTICING THAT CHAD WAS BULLYING,  SHOWING DISRESPECT,  CUSSING, AND HAVING PROBLEMS. AND THAT HE NEEDED SUPERVISION WAS THE CONSISTENT THEME IN ALL THE ASSESSMENTS THAT I READ, THAT HE NEEDED SUPERVISION.

AND THE ASSESSMENTS ALWAYS SAID,  TOO, THAT HE RESPONDED VERY WELL WHEN GIVEN ADULT ATTENTION.  THAT HE NEEDED A STRUCTURED ENVIRONMENT.  AND WE HAD THREE DIFFERENT PEOPLE, THE SCHOOL PRINCIPAL,  A POLICE OFFICER, AND A PROBATION

DIRECT EXAM OF ARLENE ANDREWS

OFFICER WHO RECOMMENDED THAT CHAD BE REMOVED FROM HIS HOME BECAUSE HE WAS NOT RECEIVING ADEQUATE ADULT SUPERVISION.

**Q.    NOW,  IT IS NOT IN THE COURT RECORDS, AND YOU DON'T HAVE INFORMATION ABOUT THIS APPEARING IN HIS EARLY CHILDHOOD, BUT DO YOU HAVE SOME INFORMATION ABOUT PHYSICAL ABUSE OF CHAD STARTING IN HIS MIDDLE CHILDHOOD PERIOD; IS THAT RIGHT?**

A.    WE DO.   WE HAVE -- WELL,  WE KNOW, IN GENERAL, THAT THERE WAS A LOT OF HITTING AGAINST THE CHILDREN.  THERE WAS USE OF SWITCHES,  BELTS.   AND CHAD, NOT ONLY WAS HIT HIMSELF, HIT ON THE HEAD,  RAPPED ON THE HEAD,  THE PARENTS,  HIS FATHER WOULD RAP HIM ON THE HEAD WITH HIS KNUCKLES REAL HARD, AND HE WOULD CRY AND RUN AWAY.   HE ALSO SAW A LOT OF BEATINGS OF HIS BROTHERS, IN PARTICULAR, THAT OF HIS OLDER BROTHERS, IN PARTICULAR, AND FIGHTING BETWEEN THE BROTHERS AND THEIR PARENTS.

**Q.    IS THERE SEXUALLY INAPPROPRIATE BEHAVIOR IN THE HOUSE AT THIS POINT?**

A.    THERE IS.   THERE IS.  THE CHILDREN ARE ALLOWED TO WATCH PORNOGRAPHIC VIDEOS, AND THERE ARE PICTURES IN THE POOLROOM OF NAKED WOMEN ALL AROUND IN THERE.  AND THERE ARE PORNOGRAPHIC MAGAZINES AVAILABLE IN THE HOUSE.   HIS MOTHER ALSO WAS DRUNK A LOT OF THE TIMES.   SOMETIMES SHE WOULD BE COMPLETELY PASSED OUT.   SOMETIMES, EVEN THOUGH THERE WERE LOTS OF NEIGHBORS IN THE HOUSE, A LOT OF TIMES SHE WOULD WALK AROUND IN FLIMSY GOWNS THAT YOU COULD SEE THROUGH, AND WHEN

DIRECT EXAM OF ARLENE ANDREWS

SHE WAS COMPLETELY NAKED, AND CAME TO THE TOP OF THE STAIRS AND --

Q.    TOP OF THE STAIRS OF?

A.    WENT DOWN TO THE POOLROOM.

Q.    AND THERE WERE NEIGHBORS IN THERE, AT THAT TIME?

A.    AND ROGER SAW HER.   THEY WERE YELLING BACK AND FORTH. THERE WAS A SCENE.

Q.    THAT MAY HAVE HAPPENED MORE THAN ONCE,  BUT YOU HAVE SUFFICIENT SOURCES TO BE CERTAIN THAT IT HAPPENED ONCE?

A.    YES.

Q.    CHAD'S MOTHER, OTHERWISE, MADE SOME ATTEMPTS TO CARE FOR HIM; IS THAT RIGHT?

A.    SHE DID. SHE WENT TO THE MEETINGS AT SCHOOL SOME OF THE TIME.   AND SHE DID THINGS LIKE COOKING FOOD.   SHE TRIED TO MAKE A HOME.   SHE FOUND FOOD FOR THEM WHEN THEY DIDN'T HAVE ANY MONEY. SHE WOULD GO TO THE EMERGENCY FOOD BANK THAT WAS AVAILABLE IN THE COMMUNITY.   SHE WENT TO THE WELFARE DEPARTMENT AND GOT FOOD STAMPS,  BUT SHE WAS, WHAT WE CALL, PSYCHOLOGICALLY UNAVAILABLE.   SHE WAS TRYING TO PROVIDE CARE, BUT SHE WASN'T REALLY THERE EMOTIONALLY,  PROBABLY BECAUSE SHE WAS DRUNK A LOT OF THE TIME.

SHE WAS ONCE ARRESTED FOR BEING DRUNK AND DISORDERLY AND WAS IN THE DRUNK TANK AT THE JAIL OVERNIGHT.   THE PARENTS DIDN'T SEEM MOTIVATED A LOT.   THE FATHER WAS DRINKING AND SMOKING MARIJUANA.   AND, FOR EXAMPLE,  HE HAD FALSE TEETH,

DIRECT EXAM OF ARLENE ANDREWS

BUT HE DIDN'T WEAR THEM.  HE JUST -- HE SAID THEY WERE UNCOMFORTABLE.  HE DIDN'T SEEM TO CARE ABOUT HIS APPEARANCE IN THAT WAY.

I HAVE ALSO MENTIONED THAT HIS OLDER BROTHERS AND SISTER WERE VERY POOR ROLE MODELS FOR HIM, TOO.  AND CHAD, HIMSELF, STARTED DRINKING ALCOHOL AND SMOKING MARIJUANA DURING THIS PERIOD, MIDDLE CHILDHOOD PERIOD, SOMEWHERE BEFORE 11, DRINKING A GOOD BIT AND SMOKING.

**Q.    SO THEN, CAN YOU TELL THE JURY ABOUT HIS EARLY TEENS?**

A.    WELL, BY THE TIME HE WAS 12 OR 13, HE WAS FOLLOWING HIS OLDER BROTHER DEWAYNE EVERYWHERE, EXCEPT DEWAYNE WAS IN PRISON.  HE HAD STARTED, AT THAT POINT, GOING IN AND OUT OF PRISON.  HE HAD -- DEWAYNE AND CHAD ARE PRETTY CLOSE.

CHAD WAS ENROLLED IN THE SIXTH GRADE.  HE WAS STILL IN BEHAVIORAL CLASS FOR BEHAVIORALLY DISORDERED CHILDREN, BUT HIS GRADES WERE GETTING WORSE.  WHEN HE FIRST GOT IN THE CLASS FOR BEHAVIORALLY DISORDERLY CHILDREN, HIS GRADES WERE OKAY. BUT AS HE GREW OLDER, THEY GOT WORSE AND WORSE EVERY TIME.

NOW, THE REMARKABLE THING THAT HAPPENED ABOUT THE TIME CHAD WAS 12 OR 13 IS THAT HIS MOTHER, VERY SUDDENLY, STOPPED DRINKING.  SHE -- HER SISTER AND A NEIGHBOR INVITED HER TO GO TO THEIR CHURCH.  SHE DID.  SHE BECAME SAVED.  SHE BECAME A VERY ACTIVE MEMBER OF THE CHURCH.

**Q.    THAT, TOO, IS NOT JUST BY HER ACCOUNT, BUT BY NUMEROUS OTHER PEOPLES' ACCOUNTS?**

**DIRECT EXAM OF ARLENE ANDREWS**

A.   ONE OF THE THINGS THAT PEOPLE WILL DO WHO HAVE BEEN ON ALCOHOL WILL GIVE UP THEIR SOCIAL CONTACTS TO STOP DRINKING ALCOHOL.   DIANA DID THAT.  SHE SPENT A LOT OF TIME AT THE CHURCH.  SHE WOULD STAY THERE LATE AT NIGHT.   THE SOURCE OF HER ALCOHOL WAS HER HOME, BUT IT WAS ALSO WHERE HER CHILDREN WERE.   THE FIGHTS BETWEEN HER AND ROGER ESCALATED, AT THAT POINT, BECAUSE SHE WAS AWAY SO MUCH, AND THE CHILDREN WERE LESS TENDED THAN THEY WERE BEFORE.

**Q.   AND THEN, SHORTLY AFTER THAT, THE FAMILY ACTUALLY DISSOLVES; IS THAT RIGHT?**

A.   THAT'S RIGHT.  ROGER LEFT.  HE WENT TO LIVE IN SHIPSHEWANNA, INDIANA TO HELP HIS BROTHER.  HE WORKS ON CARS. AND THEY WERE GOING TO TRY TO START A BUSINESS UP THERE.   AND HE, EVENTUALLY, GOT ANOTHER KIND OF JOB UP THERE.   DIANA WAS LEFT WITH THE CHILDREN IN WEST VIRGINIA.  AND SHE WAS ON HER OWN AND WENT OFF TO WELFARE, INITIALLY, GOT TRAINING AS A NURSING ASSISTANT.

**Q.   CHAD BECOMES WORSE?**

A.   YES.

**Q.   OR COMES TO THE ATTENTION OF AUTHORITIES?**

A.   THERE IS A SERIES OF PROBLEMS THAT HAPPENS WHEN HE IS 12 AND 13.  ONE INVOLVED HIS USE OF A HANDGUN, WHERE HE PULLED OUT A HANDGUN.   ONE PSYCHOLOGICAL -- SCHOOL PSYCHOLOGICAL EVALUATION, AT THAT POINT, SAID THAT HE HAS A NEED FOR ATTENTION, AND HE ALSO HAS AGGRESSION.   AND THE TEACHER'S

DIRECT EXAM OF ARLENE ANDREWS

NOTES IN THAT EVALUATION SAID, THIS IS ABOUT HIS SOCIAL BEHAVIOR, CHAD IS VERY QUIET, HE TENDS TO WASTE TIME, HE DOES NOT APPEAR TO BE VERY SOCIALLY ACCEPTED BY OTHERS IN HIS HOME BASE.  HE SEEMS TO BE MORE OF A LONER AND INTERESTED IN HEAVY METAL ROCK MUSIC, WHEREAS MOST STUDENTS IN THIS AGE GROUP ARE NOT.  IT APPEARS HE IS HEAVILY INFLUENCED BY ELDER STUDENTS AS NOTED IN THE HALLWAYS.

OF COURSE, HE HAD BEEN SPENDING A LOT OF TIME WITH HIS OLDER BROTHERS, SO HE WAS PROBABLY COMFORTABLE WITH THAT.

**Q.    I WANT YOU TO GO BACK FOR A MINUTE TO THE CHARGE ABOUT PULLING A HANDGUN.  YOU JUST MENTIONED PULLING A HANDGUN, BUT, IN FACT, FROM THE COURT DOCUMENTS THAT YOU READ, THE PROBATION REPORTS SHOW THAT HE PULLED IT OUT AND POINTED IT AT ANOTHER CHILD?**

A.    AT ANOTHER CHILD, AN 11-YEAR-OLD BOY.

**Q.    AND THEN HE ALSO HAS OTHER LEGAL TROUBLES THEN OF A MORE MINOR NATURE?**

A.    WELL, HE WAS TRUANT FROM SCHOOL.  THERE WAS DESTRUCTION OF PRIVATE PROPERTY.  THIS INVOLVING ANOTHER JUVENILE, AS WELL.  HE WAS TAKEN TO -- THIS IS IN A CRIMINAL -- THIS WASN'T A CRIMINAL CHARGE, TREATED AT ST. MARY HOSPITAL.  THE REPORT SAID THAT HE NEEDED TO BE TREATED.  SOMEBODY HAD REPORTED HE HAD BEEN IN A FIGHT AT SCHOOL AND INJURED IN THE FIGHT AT SCHOOL.  HE WAS DEFINITELY HAVING -- HIS CONDITION WAS DETERIORATING AT THIS POINT.  SHERRI,

DIRECT EXAM OF ARLENE ANDREWS

DEWAYNE, RONNIE, AND HE HAD ALL DROPPED OUT OF SCHOOL.

SHANNON WAS ATTENDING SCHOOL.

**Q.    SHANNON IS THE YOUNGER BROTHER?**

A.    YES.

**Q.    HE IS STILL ATTENDING.  ALL OF HIS OLDER SIBLINGS HAVE DROPPED OUT.  WHAT IS HAPPENING TO HIS OWN PERFORMANCE IN SCHOOL?**

A.    IT IS GETTING WORSE.  HE IS STARTING TO FAIL EVERYTHING.  HE IS IN THE SEVENTH GRADE AT THIS POINT.

**Q.    AND WHAT HAPPENS RIGHT BEFORE HE TURNS 14?**

A.    JUST ABOUT A MONTH BEFORE HE TURNED 14, HE ATTEMPTED SUICIDE.  HE TOOK A LARGE QUANTITY OF PILLS THAT TURNED OUT TO BE ACETAMINOPHEN, WHICH IS TYLENOL,  OR TYLENOL-TYPE SUBSTANCE.  HE WAS UNCONSCIOUS WHEN AN AMBULANCE WAS CALLED. HE WAS UNRESPONSIVE TO PINCHING, WHICH VERIFIED THE UNCONSCIOUSNESS.  HE WAS TAKEN TO THE HOSPITAL AND TREATED THERE.

AT THAT TIME, THERE WAS A PSYCHIATRIC EVALUATION DONE. AND THEY OFFERED TO ADMIT HIM TO THE ADOLESCENT TREATMENT UNIT, BUT HE SAID HE DIDN'T WANT TO GO, AND HIS MOTHER DIDN'T HAVE HIM PLACED THERE, SO THERE WAS NO TREATMENT.

**Q.    AND THIS IS ALSO BY HOSPITAL RECORDS, THIS IS NOT BY --**

A.    RIGHT.

**Q.    -- NOT COUNTS FROM NOW.**

**AND THEN THERE IS A FINALIZATION OF THE DIVORCE.  ROGER**

**DIRECT EXAM OF ARLENE ANDREWS**

**HAS ALREADY LEFT, BUT THE DIVORCE IS THEN FINALIZED, AND ROGER REMARRIES?**

A.   THAT'S RIGHT.   ROGER MARRIED MARSHA.

**Q.   AFTER THEY ARE DIVORCED,  OFFICIALLY, WHAT HAPPENS TO CHAD?**

A.   WELL,  ROGER GOT THE DIVORCE ORDER THAT SAYS THAT CHAD AND SHANNON WOULD BE LIVING WITH ROGER.  BUT CHAD DID NOT WANT TO GO TO INDIANA, WHICH IS WHERE HE WAS LIVING.  BUT HE DID GO IN AUGUST WHEN SCHOOL STARTED AND THE TRANSITION DID NOT GO VERY WELL AT ALL.  HE NEEDED SPECIAL EDUCATION, BUT HE WASN'T IMMEDIATELY PUT IN SPECIAL EDUCATION.  AND HE STARTED GETTING INTO FIGHTS AND FEELING -- THE PSYCHOLOGICAL ASSESSMENT SAID HE FELT THE KIDS WERE MAKING FUN OF HIS CLOTHES AND THE WAY HE TALKED BECAUSE HE WAS FROM WEST VIRGINIA.  HE DIDN'T GET ALONG VERY WELL WITH HIS STEPMOTHER.

**Q.   HE DIDN'T WANT TO GO.  HIS MOTHER HAD ACTUALLY CONSENTED TO HIM GOING; IS THAT RIGHT?  THAT IS IN THE COURT RECORDS?**

A.   RIGHT.

**Q.   AND THEN, SO HE GETS THERE, AND BY THE EIGHTH GRADE, WHAT IS HIS READING LEVEL?  THIS IS BY SCHOOL RECORDS.  WHAT IS HIS READING LEVEL?**

A.   BY EIGHTH GRADE, THEY WERE ASSESSING, IT TOOK A WHILE. IN THE EIGHTH GRADE, HIS READING LEVEL WAS AT A FOURTH GRADE LEVEL,  MATH LEVEL AT FIFTH GRADE,  GENERAL KNOWLEDGE WAS AT

DIRECT EXAM OF ARLENE ANDREWS

THE FOURTH GRADE.

**Q.     AND HE CONTINUES TO HAVE BEHAVIOR PROBLEMS; IS THAT RIGHT?**

A.     RIGHT.   HE WAS SUSPENDED FROM SCHOOL FOR THREATENING KIDS ON THE SCHOOL BUS AND SUSPENDED FROM RIDING THE SCHOOL BUS FOR THAT.   AND THE SCHOOL PSYCHOLOGIST MADE A NOTE AND REFERRED HIM FOR A PSYCHIATRIC EVALUATION.  AND IN THE NOTE, SHE SAID -- THIS WAS IN NOVEMBER OF THE SCHOOL YEAR -- THAT CHAD WAS IN A CLASS FOR LEARNING DISABILITIES.  THEY HAD SKIPPED HIM TO THE NINTH GRADE, WHICH WOULD BE THE GRADE HE WOULD HAVE BEEN IN IF HE HAD NOT FAILED FIRST.   SHE NOTED HE HAS A HISTORY OF BEING MOLESTED BY AN OLDER MAN.  HE HAS A SOCIOPATHIC PATTERN.   THE PERSON SEEKING HELP IS HIS STEPMOTHER, NOT THE DAD.

**Q.     WHEN THERE WAS THIS REPORT BEING SEXUALLY ABUSED, DID ANYBODY DO ANYTHING ABOUT THAT?**

A.     NOT THAT I COULD FIND.

**Q.     NO EXPRESSION OF PARENTAL CONCERN OR THEM DOING ANYTHING THAT YOU KNOW?**

A.     NO.

**Q.     SO,  BY THIS TIME, WHAT IS CHAD'S DRUG AND ALCOHOL USE LIKE?**

A.     HE IS DRINKING ALCOHOL,  SMOKING MARIJUANA, AND HUFFING GAS ON A VERY REGULAR BASIS.   HIS DAD WAS ALSO DRINKING HEAVILY.  WHEN HE DID GO WITH HIM FOR A PSYCHIATRIC

DIRECT EXAM OF ARLENE ANDREWS

EVALUATION, AND HE TOLD THE PSYCHIATRIST, WHO WAS EXAMINING CHAD, THAT HE,  ROGER, HAD BEEN DRUNK THE NIGHT BEFORE.

**Q.    WHEN HE MEETS THIS PSYCHIATRIST, WHEN CHAD IS REFERRED TO A PSYCHIATRIST,  WHAT IS IT THE PSYCHIATRIST FINDS OUT ABOUT CHAD?**

A.    WELL,  A NUMBER OF THINGS.  BUT ONE,  AGAIN, WITH REGARD TO HIS SOCIAL BEHAVIOR, THE TEST THAT HE GAVE INDICATED THAT THIS WAS A VERY NEEDY, AND DISTANT, AND DISTRESSFUL BOY. AND THAT HE WAS NOT -- THE TEST SAID HE WAS NOT PSYCHOTIC.  HE COULD HAVE BEEN A BIT PARANOID, BUT NOT DISTINCTLY DEPRESSED. NO OVERALL EFFECT OF PSYCHOPATHIC.

HE DID GO GIVE HIM A DIAGNOSIS OF MAJOR DEPRESSION AND PRESCRIBED AN ANTIDEPRESSANT FOR HIM.  AND NOTED THAT THEY SHOULD REMAIN ALERT TO THE POSSIBILITY OF DEVELOPING AN ADDICTIVE DISORDER AND REMAIN ALERT TO THE POSSIBILITY OF DEVELOPING SOCIOPATHIC TRAITS.

**Q.    THAT IS NOT A FAVORABLE THING TO SAY ABOUT SOMEBODY THAT THEY WOULD POSSIBLY DEVELOP SOCIOPATHIC TRAITS?**

A.    NO.

**Q.    BUT ARE YOU REPORTING, AS BEST AS YOU CAN, THE BAD AND THE GOOD OF BOTH CHAD AND HIS ENVIRON; IS THAT RIGHT?**

A.    THAT'S RIGHT.

**Q.    AND, YOU KNOW, WHEN THERE IS THIS DISCUSSION OF HIS POSSIBLE DEPRESSION, AND ADDICTION, AND MAYBE DEVELOPING SOCIOPATHIC TRAITS, IS THERE ANY FOLLOW-UP OF TREATMENT THEN?**

App. 00425

**DIRECT EXAM OF ARLENE ANDREWS**

A.    NO.   NOT THAT I SAW, NO.

**Q.    THERE IS NO RECORD OF ANY FOLLOW-UP?**

A.    NO.

**Q.    AND NO ONE TOLD YOU THAT THERE WAS ANY FOLLOW-UP EITHER; IS THAT RIGHT?**

A.    THAT'S RIGHT.

**Q.    AND THEN, CHAD GOES BACK TO HIS MOM?**

A.    HE DID.

**Q.    AND WHAT HAPPENS THEN?**

A.    HE WENT BACK.  SHE WAS LIVING IN OHIO, AT THAT POINT.

**Q.    BUT THIS IS REALLY JUST ACROSS THE BORDER FROM HUNTINGTON; IS THAT RIGHT?  SO IT IS CLOSE?**

A.    HE STARTED SCHOOL AT CHESAPEAKE HIGH SCHOOL AND THEN, FAIRLY QUICKLY, GOT IN TROUBLE THERE.  THE TROUBLE HE GOT IN THERE FOR WAS, HE SET FIRE, WITH ANOTHER BOY, TO A WOODEN PLAQUE THAT WAS HANGING ON THE WALL AT THE SCHOOL.  AND SO, HE WAS CHARGED WITH ARSON.  AND, AT THAT POINT, THEY SAID THERE WAS A REFERRAL MADE, AT THAT POINT, FOR ALCOHOL AND DRUG COUNSELING.  BUT HE WAS, BY THE TIME HE HAD TURNED FIFTEEN, WHICH WAS AT THE END OF THAT YEAR IN MAY,  HE WAS LIVING IN A GROUP HOME, WHICH WAS THE CONSEQUENCES OF THE PROBLEMS HE HAD AT THAT SCHOOL.

HE WAS ALSO SPENDING TIME WITH A WOMAN NAMED RHONDA, WHO, ACCORDING TO THE NEIGHBORS AND THE FAMILY MEMBERS I TALKED TO, WAS IN HER LATE TWENTIES.  SHE WAS SOMEONE WHO HAD LIVED IN

DIRECT EXAM OF ARLENE ANDREWS

THEIR OLD NEIGHBORHOOD.  AND HE WAS LIVING WITH HER AS IF THEY WERE BOYFRIEND AND GIRLFRIEND, EVEN THOUGH HE WAS ONLY FIFTEEN YEARS OLD.

AT THAT POINT, HE REALLY NEVER LIVES AT HOME AGAIN.  HE STAYS WITH HIS MOM SOMETIMES,  HE STAYS WITH HIS DAD SOMETIMES,  HE STAYS WITH SHERRI SOMETIMES.  WHEN DEWAYNE AND RONNIE ARE OUT OF PRISON, HE STAYS WITH THEM SOMETIMES.  HE VISITS OTHER FAMILY MEMBERS.  BUT, I THINK, HIS CHILDHOOD WAS ESSENTIALLY OVER AT THAT POINT WHEN HE WAS JUST 15 YEARS OLD.

I FOUND THAT HE WAS WHAT WE CALL PSEUDOMATURE.  HE WAS BEHAVING AS IF HE WERE AN ADULT, WHEN, IN FACT, HE WAS STILL FAIRLY YOUNG.  OH, IN ADDITION TO FAMILY MEMBERS, HE WAS ALSO IN GROUP HOMES OR INCARCERATED IN SOME WAY MOST OF THE TIME AFTER THAT POINT.

**Q.    HE HAS A NUMBER OF INCARCERATIONS AFTER THAT POINT?**

A.    RIGHT.

**Q.    OFF AND ON.  AND YOU HAVE, GENERALLY, LOOKED AT THOSE RECORDS.  BUT BECAUSE THAT IS THE -- YOU SAY IT IS THE END OF HIS CHILDHOOD, THAT IS THE END OF THE PERIOD FOR WHICH YOU THOROUGHLY PERFORMED AN EVALUATION?**

A.    THAT'S RIGHT.  I THINK BOTH OF HIS PARENTS DID NOT DO ANYTHING TO TRY TO MAKE A HOME LIFE FOR HIM AT THAT POINT.  AND,  THEREFORE,  HE WAS PRETTY MUCH ON HIS OWN.  HIS MOTHER WAS TRYING TO CREATE AN INDEPENDENT LIFE FOR HERSELF, AND HIS FATHER HAD A NEW FAMILY UP IN INDIANA.

DIRECT EXAM OF ARLENE ANDREWS

Q.    SO, WE ARE PROBABLY ABOUT HALF DONE, MAYBE A LITTLE BETTER BECAUSE YOU HAVE DESCRIBED WHAT HAPPENED IN HIS CHILDHOOD.   AND NOW, YOU ARE GOING TO TALK ABOUT, IN SOME SENSE, THE THEMES THAT YOU SEE THROUGH THESE VARIOUS EVENTS, AND ALSO WHAT THE LITERATURE THAT YOU KNOW ABOUT SAYS WHAT KIND OF EFFECTS THAT HAS UPON A CHILD; IS THAT RIGHT?

A.    THAT'S RIGHT.

Q.    SO,  I GUESS I AM SUPPOSED TO PUT THIS UP NOW?

A.    IF YOU WOULD,  PLEASE.

    IT IS AN EXHIBIT I PREPARED.  IT IS BASICALLY A SUMMARY OF THE KEY THINGS THAT I FOUND IN HIS LIFE.

Q.    WHAT IS THE FIRST THING?

A.    THE MAJOR THEME IN THIS LIFE IS ONE OF CHAOS.  BY "CHAOS," I MEAN THAT, FROM A CHILD,  AGAIN,  I AM LOOKING AT THIS LIFE FROM THE PERSPECTIVE OF A CHILD.  THE LIFE IS UNSTABLE,  IT IS NOT PREDICTABLE, THERE IS VERY LITTLE CONSISTENCY.  AND THE REASON CONSISTENCY IS IMPORTANT IN SOCIAL DEVELOPMENT, IS THE ABILITY TO PREDICT HOW ANOTHER PERSON IS GOING TO ACT, IS THE KEY TO DEVELOPING ANY HEALTHY SOCIAL RELATIONSHIPS.  FOR EXAMPLE, IF A BABY CRIES,  A BABY THAT GETS HEALTHY DEVELOPMENT, THE MOTHER WILL RESPOND TO THE BABY CRYING OR THE FATHER OR SOME PARENT.  IF THE BABY FALLS DOWN, THE MOTHER WILL COMFORT IT.   IF THE BABY IS HUNGRY, THEY WILL PROVIDE FOOD; SAD, HUG; DO SOMETHING GOOD, PRAISE. THESE ARE THINGS THAT ARE PREDICTABLE IN A CHILDHOOD WHEN YOU

DIRECT EXAM OF ARLENE ANDREWS

ARE GETTING HEALTHY DEVELOPMENT.

WHEN WHAT CHAD GOT, IF YOU CRIED WHEN HIS PARENTS WERE FIGHTING, HE GOT IGNORED; IF HE WAS HUNGRY, HE HAD TO GO FIND HIS OWN FOOD, HE COULDN'T COUNT ON SOMEBODY TO PROVIDE THAT FOR HIM; IF HE WAS SAD, HE WOULD GO AND HIDE; IF HE DID SOMETHING GOOD, NO ONE SEEMED TO NOTICE; IF HE DID SOMETHING BAD, SOMETIMES PEOPLE NOTICED AND PUNISHED HIM,  SOMETIMES PEOPLE NOTICED AND DIDN'T DO ANYTHING; AND SOMETIMES, JUST BECAUSE YOU ARE IN THE WRONG PLACE AT THE WRONG TIME, YOU GOT PUNISHED, EVEN THOUGH YOU HADN'T DONE ANYTHING BAD.

SO, THERE WAS JUST CHAOS.  IT MAKES A CHILD VERY INSECURE AND CONFUSED.

**Q.    THEN THERE ARE THREE THINGS THAT SORT OF CAUSED THIS CHAOS IN HIS LIFE?**

A.    IN HIS LIFE.  ONE IS BEING THE CHILD OF TWO ALCOHOLICS.  HAVING ONE PARENT AS AN ALCOHOLIC CAN BE VERY DAMAGING TO A CHILD.  HAVING TWO MAKES IT EVEN WORSE.  THE FAMILY'S EVERYDAY EXISTENCE, ITS INTENSITY, IS DOMINATED BY ALCOHOL.  CHILDREN LEARN THAT WHAT ADULTS DO IS THEY USE A LOT OF ALCOHOL AND DRUGS.  IN THIS PARTICULAR CASE, THEY FIGHT.  NOT EVERYBODY WHO USES ALCOHOL OR DRUGS FIGHTS, AND WE HAD BOTH OF THEM ON HERE.  THEY HANG OUT A LOT INSTEAD OF DOING WORKING, OR DOING HOUSEKEEPING, OR DILIGENT KINDS OF THINGS.  THEY LEARN THAT THEY ARE DIFFERENT FROM OTHER PEOPLE, AND THEY TEND TO -- PEOPLE RAISED BY ALCOHOLICS OFTEN

DIRECT EXAM OF ARLENE ANDREWS

WILL DEVELOP THEIR OWN IDENTITY, SOME SORT OF ALTERNATIVE IDENTITY THAT, WE ARE DIFFERENT.

IN THIS PARTICULAR CASE, HE FOLLOWED DEWAYNE AND RONNIE'S LEAD. AND THE WAY THEY WERE DIFFERENT IS, THEY STOLE, THEY GOT INTO FIGHTS, THEY BROKE THE LAW. THEY GET VERY TOLERANT OF CRISIS AND CHAOS IN THEIR LIFE. THEY SOMETIMES, ACTUALLY, SEEMED TO NEED IT. THEY LEARNED TO DENY AND MINIMIZE THINGS THAT ARE GOING ON, WHICH THEIR PARENTS ARE DOING ABOUT THEIR ALCOHOLISM.

WE SEE HIS MOTHER DOING THAT WHEN THE SCHOOL TALKS TO HER IN THE RECORDS ABOUT SOME OF HIS PROBLEMS. SHE TRIES TO ACT LIKE OTHER PEOPLE, OTHER KIDS, ARE PICKING ON CHAD. CHILDREN OF ALCOHOLICS LEARN TO PLOT NEGATIVE EMOTIONS. THEY ALSO TEND TO TRY TO LOOK NORMAL.

I FOUND THAT ALL OF THESE THINGS, THIS WHAT I JUST SAID TO YOU, COMES FROM RESEARCH ABOUT CHILDREN OF ALCOHOLICS. I FOUND ALL OF THESE THINGS WERE PRESENT IN CHAD'S FAMILY.

**Q. YOU FOUND NOT ONLY THAT THE CHAOS, BUT YOU FOUND THESE EFFECT OF THE CHAOS, YOU ACTUALLY FOUND EVIDENCE OF ALL OF THOSE EFFECTS YOU JUST DESCRIBED, THE EFFECTS YOU NORMALLY PREDICT, YOU FOUND EVIDENCE OF THOSE EFFECTS?**

A. THAT'S RIGHT. CHAD, IN PARTICULAR, HAD A REAL INTEREST IN KEEPING HIMSELF NEAT, AND CLEAN, AND LOOKING GOOD. AND THAT IS ONE WAY A CHILD WILL TRY TO COPE WITH THIS KIND OF SENSE OF CHAOS.

App. 00430

DIRECT EXAM OF ARLENE ANDREWS

NOW, AT THE SAME TIME THEY ARE LEARNING THESE THINGS THAT CAN BE HARMFUL TO THEM, THEY ARE MISSING OUT ON LEARNING THINGS THAT A RESPONSIBLE PARENT WOULD WANT THEIR CHILDREN TO LEARN.  FOR EXAMPLE,  THEY DON'T WANT RESPONSIBILITY,  THEY DON'T WANT RESPECT FOR OTHERS,  THEY DON'T LEARN TO SOLVE PROBLEMS WELL.  THEY DON'T LEARN TO EFFECTIVELY COMMUNICATE ABOUT THEIR NEEDS OR FEELINGS.  THEY DON'T LEARN IMPULSE CONTROL.  THEY DON'T LEARN TO HAVE HOPES AND ASPIRATIONS FOR THE FUTURE.  THEY LIVE DAY-BY-DAY,  SOMETIMES HOUR-BY-HOUR. AND THEY DON'T LEARN TO COPE WITH DIFFICULT SITUATIONS WITH STRESS OR TRAUMA THAT MAY HAPPEN IN THEIR LIVES.

**Q.  IT IS THE CASE THAT SOME CHILDREN OF ALCOHOLICS DO LEARN RESPONSIBILITY AND THE THINGS THAT THEY HAVE MISSED?**

A.   THEY DO.  GENERALLY, PARTICULARLY, IF THEY GET SOME SORT OF TREATMENT.  ALL OF WHAT I AM DESCRIBING IS LEARNED BEHAVIOR.  ANYTHING THAT IS LEARNED CAN BE UNLEARNED, AND NEW THINGS CAN BE LEARNED.  CHILDREN -- WE ALL LEARN THROUGHOUT OUR LIVES THAT CHILDREN, IN PARTICULAR, LEARN AT A VERY FAST RATE.  BUT SOME CHILDREN, EVEN WHEN THEY ARE EXPOSED TO THESE KINDS OF THINGS, ARE MUCH MORE RESILIENT OR MAY HAVE SOMEONE, PARTICULARLY IF ONE PARENT IS AN ALCOHOLIC,  THEY HAVE ONE WHO IS TRYING TO TEACH THEM THE APPROPRIATE WAY TO BE.

AND IT DEPENDS ON THE DEGREE OF ALCOHOL USE, AS WELL. SOME PARENTS ARE BINGE DRINKERS, THEY ONLY OCCASIONALLY DRINK, EVEN THOUGH THEY ARE DEPENDENT ON IT.  ON OTHERS, IT IS EVERY

DIRECT EXAM OF ARLENE ANDREWS

DAY.  UNFORTUNATELY, IN THE FULKS FAMILY, IT WAS EVERY DAY.

Q.    SO,  IN ADDITION TO THE TWO PARENTS BEING ALCOHOLICS, CAUSING CHAOS,  YOU ALSO HAVE ON HERE THAT FURTHER CHAOS WAS CAUSED BECAUSE THEY WERE RAISED WITH LITTLE DISCIPLINE OR SUPERVISION.  YOU HAVE SORT OF TALKED ABOUT THAT.

A.    THAT'S RIGHT.   WHETHER THEY WERE DRINKING OR NOT,  YOU KNOW,  I MEAN, IN A FAMILY, WHETHER THERE IS ALCOHOLISM OR NOT, IF THERE IS VERY LITTLE DISCIPLINE OR SUPERVISION, CHILDREN FEEL CONFUSED, AND LOST, AND CHAOTIC.  BECAUSE THEY NEED SOME SORT OF CONSISTENCY.  THEY ALSO NEED FOR THEIR PARENTS TO AGREE WITH EACH OTHER.  NOW,  CERTAINLY, ALL PARENTS DON'T ALWAYS AGREE WITH EACH OTHER.  BUT RESPONSIBLE PARENTS, AT LEAST, TRY TO BE TOGETHER IN WHAT THEY EXPECT FROM THEIR CHILDREN.  BUT WHAT THE FULKS'S CHILDREN GOT WERE THEIR PARENTS ARGUING A LOT, ALL THE TIME, OF WHAT WAS EXPECTED OF THEM.  THERE WAS VERY LITTLE CONSISTENCY THERE.   IT CREATES A LEVEL OF ANXIETY THAT THE CHILD JUST SORT OF CARRIES WITH THEM.  WE SEE THAT WITH THE SCHOOL SITUATION WHERE THE PSYCHOLOGISTS WHO WERE ASSESSING WOULD NOTICE THE ANXIETY.

Q.    AND I THINK YOU HAVE ALSO MENTIONED BEFORE THAT THE PARENTS WEREN'T REALLY DISCIPLINING THEMSELVES EITHER?

A.    THAT'S RIGHT.

Q.    THEY WERE NOT DISCIPLINING THE CHILDREN, BUT NOT MODELING HOW YOU DISCIPLINE YOUR OWN BEHAVIOR?

A.    THAT IS RIGHT.  THE CHILDREN LEARNED NOT TO RESPECT

DIRECT EXAM OF ARLENE ANDREWS

THEM.  AND THEY DON'T RESPECT AUTHORITY.

**Q.  THIS NEXT THING IS MORE OF A MOUTHFUL,  PSYCHOLOGICALLY UNAVAILABLE CAREGIVING.  CAN YOU EXPLAIN THAT A LITTLE BIT?**

A.  THESE ARE PARENTS WHO WERE PRESENT.  THEY WERE THERE. THEY WERE PHYSICALLY CLOSE, BUT THEY WERE EMOTIONALLY UNAVAILABLE.  AND IT IS A TERM THAT WE USE.  THERE HAS BEEN RESEARCH DONE ON PSYCHOLOGICALLY UNAVAILABLE CAREGIVING.  THEY ARE THERE, BUT THEY ARE NOT MEETING THE CHILD'S EMOTIONAL NEEDS.  CHILDREN NEED,  PARTICULARLY IN THE YOUNGEST YEARS, NEED TO DEVELOP ATTACHMENTS.  THEY NEED TO BE BONDED TO PEOPLE THAT THEY CAN TRUST AND THEY FEEL CARE FOR.

IN CHAD'S CASE, I DIDN'T SENSE THERE WAS MUCH BONDING AT ALL BETWEEN HE AND HIS FATHER.  HIS FATHER WAS VERY VIOLENT TO HIS MOTHER.  AS I SAID, HE DIDN'T EVEN REMEMBER CHAD AND CHAD DOESN'T TALK MUCH ABOUT HIS FATHER.  I THINK HE EVEN, BACK THEN, HE REALLY LOOKED TO HIS OLDER BROTHERS MORE TO SPEND TIME WITH THEM.

WITH HIS MOTHER, HE HAS WHAT WE CALL AN INSECURE ATTACHMENT.  HE IS VERY ANXIOUS.  HE KIND OF YEARNED TO BE WITH HER, AND SHE WAS THERE FOR HIM, BUT, ON THE OTHER HAND, SHE WAS ALSO HITTING ON HIM A LOT.  AND I JUST SEE CHAD AS A LOST CHILD BECAUSE NEITHER OF HIS PARENTS REALLY PAID MUCH ATTENTION TO HIM AT ALL.

THEY WERE HAVING PROBLEMS WITH THE THREE OLDER ONES.  THE YOUNGER ONE, SHANNON, DEVELOPED A SEIZURE DISORDER.  HE GOT

DIRECT EXAM OF ARLENE ANDREWS

ATTENTION BECAUSE HE HAD THIS CONDITION THAT HE NEEDED HELP WITH.  AND CHAD WAS THE FOURTH CHILD IN THE SEQUENCE OF CHILDREN THERE.  HE HAD VERY LITTLE ATTENTION PAID TO HIM.

Q.    **THE SECOND THING YOU PUT ON THIS CHART, PRENATAL ALCOHOL EXPOSURE.  THE JURY HAS HEARD A LOT OF TESTIMONY.**

A.    YES.

Q.    **THAT IS NOT REALLY YOUR FIELD OF EXPERTISE, IS IT?**

A.    NOT PRENATAL ALCOHOL.  I KNOW SOMETHING OF IT.

Q.    **THAT IS NOT YOUR PARTICULAR EXPERTISE.  BUT WHAT YOU -- THE INFORMATION YOU HEARD, THE REASON YOU PUT THIS ON YOUR LIST IS, BECAUSE YOU HEARD A SUFFICIENT NUMBER OF PEOPLE TELLING YOU THAT THERE WAS PRENATAL EXPOSURE TO ALCOHOL, I THINK YOU SAID, WITH RESPECT TO ALL FOUR OF THE BOYS?**

A.    RIGHT.  AND THE WAY THAT RELATES TO CHAD'S SOCIAL FUNCTIONING IS, IF SOMEONE HAD KNOWN THAT OR IF, YOU KNOW, IF THERE HAD BEEN A WAY TO KNOW, THAT WE WOULD HAVE KNOWN THAT HE WAS AT RISK OF CERTAIN LEARNING PROBLEMS, AND THAT HE WOULD HAVE BEEN TREATED AS A SPECIAL NEEDS CHILD.  I DIDN'T SEE THAT THAT HAPPENED.

Q.    **OKAY.  SO, AND THEN THE THIRD THEME, THE THIRD IMPORTANT FACTOR IS EXPOSURE TO CONSTANT VIOLENCE IN THE HOME. AND YOU HAVE SORT OF THREE PARTS TO THAT.  DO YOU WANT TO TALK, BRIEFLY, ABOUT EACH OF THOSE?**

A.    YES.  THIS WAS -- THIS EXPOSURE TO MUTUAL VIOLENCE BETWEEN MOTHER AND FATHER REALLY TAUGHT CHAD A LOT ABOUT HOW

DIRECT EXAM OF ARLENE ANDREWS

MEN AND WOMEN RELATE.  IT WAS PROFOUND.  IT WAS CONSTANT. HIS PARENTS HAD INCREDIBLE SCORN FOR ONE ANOTHER.  BOTH VERBALLY AND PHYSICALLY VERY ABUSIVE.  IT WAS EXTREME BEHAVIOR.

THERE IS A LOT OF RESEARCH ON THE EFFECTS OF DOMESTIC VIOLENCE ON CHILDREN.  THIS IS EVEN SEPARATE FROM THE ALCOHOL OR THE PSYCHOLOGICAL NEGLECT.  AND BOYS, IN PARTICULAR, WHEN THEY HAVE BEEN EXPOSED TO MEN BEATING ON WOMEN,  THEY, INITIALLY, FEEL POWERLESS WHEN THEY ARE LITTLE AND LEARN TO FEEL,  I THINK, IN THIS CASE, THERE WERE SOMETIMES WHEN CHAD'S MOTHER WOULD LEAVE AND TAKE THEM TO SHELTERS,  BUT HE LEARNED SOMEWHAT OF A DEPENDENCY ON WOMEN, AND AT THE SAME TIME, LEARNED THAT FORCE IS THE WAY THAT MEN CONTROL WOMEN.

HE NEVER LEARNED TO CONTROL HIS ANGER.  NEITHER OF HIS PARENTS, BASED ON THE PEOPLE I TALKED TO, HAD ANGER CONTROL OR FELT VIOLENCE IS AN ACCEPTABLE WAY TO DEAL WITH THINGS.  HE FAILED TO LEARN HOW TO HANDLE HIGH-PRESSURE SITUATIONS EXCEPT FOR VIOLENCE.

AND, BASICALLY, THE LOW SELF-ESTEEM, THE DEPRESSION THAT WE SAW, PARTICULARLY, BY THE TIME HE WAS A TEENAGER, AND TAKING ON WHAT WE CALL, AGAIN, THE PSEUDOMATURE, THE ADULT ROLES BEFORE YOU ARE REALLY READY, ALL OF THOSE ARE EFFECTS WE SEE IN RESEARCH AND STUDY THAT WE SEE OF PEOPLE WHO ARE EXPOSED TO DOMESTIC VIOLENCE.

**Q.    THERE ARE OTHER THINGS THAT SOMETIMES OCCUR WITH**

**DIRECT EXAM OF ARLENE ANDREWS**

**CHILDREN IN DOMESTIC VIOLENCE SITUATIONS THAT YOU DON'T KNOW IF IT HAPPENED TO CHAD.   YOU DON'T HAVE EVIDENCE OF, BUT THE ONES YOU MENTIONED ARE ONES THAT YOU NOT ONLY READ ABOUT IN THE LITERATURE, BUT THAT YOU SAW EVIDENCE OF; IS THAT RIGHT?**

A.    RIGHT.

**Q.    AND THEN THE SECOND THING THAT YOU HAVE UNDER THAT CATEGORY OF EXPOSURE TO CONFLICT IS THE PHYSICAL ABUSE OF CHAD, HIMSELF?**

A.    AND EXPOSURE TO PHYSICAL ABUSE OF HIS BROTHERS.

**Q.    HIS BROTHERS?**

A.    YEAH.   THERE WAS THIS HITTING WITH BELTS AND SWITCHES. AND IT WAS CONSTANT, IT WAS NOT FOR DISCIPLINE.   DISCIPLINE IS SOMETHING THAT A PARENT DOES WHEN THEY ARE TRYING TO TEACH THE CHILD SOMETHING.   THERE ARE PARENTS WHO USE PHYSICAL DISCIPLINE, BUT GENERALLY THEY WILL DO IT RESPONSIBLY.   FOR EXAMPLE, IF A CHILD RUNS IN THE ROAD,  THEY WILL SPANK THEM FOR THAT,  AND SAY THAT IS THE WRONG THING TO DO.   YOU CAN RUN IN THE YARD.   YOU CAN RUN IN THE BACKYARD.  YOU CAN'T RUN IN THE ROAD.   I DIDN'T SEE ANY SIGN OF THAT HAPPENING.   EVEN WITH THE USE OF PHYSICAL FORCE, IT DIDN'T SEEM TO BE FOR ANY DISCIPLINARY REASON.

**Q.    CAN I STOP YOU FOR A MINUTE AGAIN?  MAYBE I AM ASKING THIS AS A PARENT,  BUT EVEN A GOOD PARENT DOESN'T, EVERY TIME THEY DISCIPLINE A CHILD, EXPLAIN THOROUGHLY TO THE CHILD, WELL,  THIS WAS BAD, BUT THIS, ON THE OTHER HAND, IS GOOD?**

**DIRECT EXAM OF ARLENE ANDREWS**

A.    RIGHT.   WE ARE LOOKING AGAIN HERE AT GENERAL PATTERNS. FOR THE MOST PART, OF COURSE, NO PARENT CAN DO IT.  NO PARENT IS GOING TO DO IT CONSISTENTLY.  BUT THEY ARE GOING TO, AT LEAST, TRY.  I DIDN'T SEE IN THIS FAMILY THAT THERE WAS A CLEAR EFFORT TO TRY.   USUALLY, THE PARENTS WERE SO CAUGHT UP IN ARGUING WITH EACH OTHER THAT THE FOCUS ON THE CHILD IS LOST.

**Q.    AND YOU ALSO HEARD FROM NUMEROUS SOURCES THAT THE PHYSICAL PUNISHMENT WASN'T ALWAYS PUNISHMENT IN THE SENSE OF RELATING TO A BAD ACT THAT THE CHILD HAD DONE, IT WAS RANDOM?**

A.    SOMETIMES, IT WAS BECAUSE THE PARENT WAS IN A PRETTY BAD MOOD.

**Q.    YOU HAVE ALSO MENTIONED THIS PARENT SCORN AND DISREGARD FOR ONE ANOTHER?**

A.    THE LEVEL OF ANGER AND EXPRESSIONS OF HATRED WERE VERY HIGH.

**Q.    AND DID YOU HAVE ANY INDICATION THAT THERE WERE ALSO MOMENTS OF REAL AFFECTION BETWEEN THE PARENTS,  THEY FIGHT, KIND OF MAKE UP IN A REALLY POSITIVE WAY?**

A.    NOT THAT I SAW. NOT IN THE INTERVIEWS THAT I GOT.

**Q.    THERE IS SOME INDICATION THAT THEY WERE HAVING SEX?**

A.    WELL, ONLY BECAUSE THEY HAD CHILDREN.

**Q.    WELL, THAT WOULD BE ONE INDICATION.   BUT NOT AN INDICATION OF THE CHILDREN SEEING AFFECTION, AND WARMTH, AND COOPERATION BETWEEN THEM?**

**DIRECT EXAM OF ARLENE ANDREWS**

A.    NOT THAT I AM AWARE OF.

**Q.    IT IS NOT ONLY THIS SCORN BUT --**

A.    IT IS THE ABSENCE OF AFFECTION.

**Q.    WHY IS IT IMPORTANT WHAT KIND OF SCORN OR DISREGARD THE PARENTS HAVE FOR EACH OTHER?  WHAT DO YOU LEARN FROM THAT?**

A.    WELL,  CHILDREN LEARN TO HAVE, YOU KNOW, THEIR PARENTS HAVE SCORN FOR ONE ANOTHER.  IN THIS CASE, THERE WAS PARTICULARLY SCORN FOR HIS MOTHER, DIANA.  THAT SHE -- THERE IS A LOT SAID ABOUT HOW SHE DIDN'T TAKE CARE OF THE CHILDREN, AND SHE DIDN'T DO THAT.  ALTHOUGH, THERE IS CLEAR EVIDENCE, ROGER WASN'T DOING HIS SHARE THERE EITHER.  IT IS LESS SCORN BY OUTSIDERS FOR HIM.

**Q.    AND SO, THE FOURTH MAJOR FINDING YOU HAVE IS CORRUPTIVE INFLUENCE BY PARENTS AND OLDER SIBLINGS.  YOU HAVE A NUMBER OF EXAMPLES OF THAT OR FORMS OF THAT.  CAN YOU SPEAK JUST BRIEFLY?**

A.    YES.  I THINK I HAVE MENTIONED MOST OF THESE. EXPOSURE TO THE DRINKING, AND DRUGS, AND FIGHTING ADULT NEIGHBORS, OR PEOPLE HANGING OUT AT THE HOUSE.  TOLERANCE FOR CHILDREN'S ALCOHOL AND DRUG USE.  PERIODS WHEN THE PARENTS DIDN'T LOOK FOR WORK.  CHAD REALLY DIDN'T HAVE ANYONE WHO MODELED FOR HIM HOW TO LIVE IN A RESPONSIBLE, ECONOMICALLY SELF-SUFFICIENT FAMILY LIFE.  HE WAS TAUGHT TO STEAL.  THERE WERE THESE LOOSE SEXUAL BOUNDARIES WITH THE MOTHER'S NUDITY. THE PARENTS WERE ACCUSING EACH OTHER OF AFFAIRS.  THE PARENTS

DIRECT EXAM OF ARLENE ANDREWS

ACCEPTED HIS RELATIONSHIP WITH AN OLDER WOMAN WHEN HE WAS ONLY

15.  MANY PARENTS WOULDN'T STAND FOR THAT.   THERE WAS

PORNOGRAPHY,  WATCHING VIDEOS,  MAGAZINES.

**Q.    CAN I STOP YOU A MINUTE ABOUT PORNOGRAPHY?  YOU**

**DESCRIBE CHAD AS SEEING THE PORNOGRAPHY AT A VERY YOUNG AGE.**

**DOES THAT HAVE THE SAME SORT OF EFFECT AS 18,  20 YEAR OLD**

**DECIDING TO VIEW THIS MATERIAL?**

A.    NO.   IT WOULD HAVE WHAT WE CALL PREMATURE

SEXUALIZATION.  BEING EXPOSED TO SEXUALITY BEFORE HE WAS

REALLY ABLE TO COMPREHEND IT OR TO UNDERSTAND IT IN THE

CONTEXT OF A RELATIONSHIP.

**Q.    SO, WHAT HE WOULD SEE WOULD HAVE A GREATER INFLUENCE ON**

**HIM THAN IF HE HAD ALREADY HAD A SEXUAL EXPERIENCE?**

A.    HAVE A DIFFERENT KIND OF INFLUENCE.

**Q.    AND THEN YOU WRITE -- YOU MADE THIS CHART TO SAY "OTHER**

**MAJOR FINDINGS."   I TAKE IT BY THE FACT THAT THEY ARE LESS**

**DETAILED THAN THE OTHER, THAT YOU DON'T THINK THEY HAVE AS**

**SIGNIFICANT AN INFLUENCE?**

A.    THEY WERE SIGNIFICANT, RIGHT.  THE BIG FOUR WERE THE

FIRST FOUR THAT I LISTED THERE.  BUT I HAVE MENTIONED ALREADY

THE EDUCATIONAL NEGLECT BY HIS PARENTS, NOURISHMENT, SECURITY,

THERE WERE TIMES WHEN THEY DIDN'T KNOW THEY WOULD HAVE FOOD.

THEY WOULD HAVE TO -- SOMETIMES ROGER'S PARENTS HELP THEM OUT,

SOMETIMES HIS MOTHER WENT AND GOT FOOD.  SO, THE FAMILY WOULD

NEED TO SORT OF GO OUT AND LOOK FOR FOOD.

DIRECT EXAM OF ARLENE ANDREWS

THERE WAS A STIGMA IN THE COMMUNITY BECAUSE OF THEIR FAMILY PROBLEMS.  THEIR HOUSE WAS KNOWN AS THE TROUBLED HOUSE.  AND EVEN THOUGH THEY LIVED IN A COMMUNITY WHERE THERE WERE OTHER LOW INCOME PEOPLE, THEIRS WAS DIFFERENT, AND THEY SORT OF DEVELOPED AN ATTITUDE OF ALMOST LIKE US AGAINST THE WORLD.  IT WAS THE FULKS FAMILY, AND THEY WERE DIFFERENT.

**Q.    YOU HAVE MENTIONED THE SEXUAL ABUSE,  ALTHOUGH THAT SEEMS TO BE A FAIRLY ISOLATED EVENT?**

A.    THAT'S RIGHT,  AS FAR AS I KNOW.

**Q.    HOW ABOUT THIS LAST THING, THE POOR COPING RESOURCES?**

A.    THIS IS PRETTY SIGNIFICANT BECAUSE EVERY ONE, OF COURSE, HAS DIFFICULT EXPERIENCES, AND A LOT OF CHILDREN LIVE THROUGH VERY DIFFICULT LIFE EXPERIENCES.  A LOT --

**Q.    SOME OF THEM NOT ONLY LIVE THROUGH IT, BUT ACTUALLY?**

A.    DO WELL.

**Q.    DO WELL?**

A.    YEAH.  OR MANAGE WELL.  THE KEY ISSUE IS HOW THE CHILD LEARNS TO COPE.  HOW DO THEY HANDLE IT?  WHY IS ONE CHILD DIFFERENT THAN THE OTHER?  THIS IS A MAJOR AREA OF RESEARCH.  AND WE FIND THAT, IF THERE IS SOMEONE SOMEWHERE GIVING LOVE, AND SUPPORT, AND ASSURANCE TO A CHILD, IT CAN MAKE A REALLY BIG DIFFERENCE.  AND SOME CHILDREN JUST SEEM TO BE MORE RESILIENT.  IF THEY HAVE,  PARTICULARLY IF THEY HAVE A VERY HIGH-LEVEL OF INTELLIGENCE, OR PROBLEM SOLVING SKILLS, OR PARTICULAR TYPE OF TEMPERAMENT, THEY HAVE AN ABILITY TO

DIRECT EXAM OF ARLENE ANDREWS

FORM CLOSE RELATIONSHIPS, THEY SEEM TO MAKE IT ALL RIGHT.

Q.   CAN I INTERRUPT YOU FOR A MINUTE,  TOO?  MAYBE THIS IS JUST MY LAY READING OF POP PSYCHOLOGY.  ISN'T IT ALSO TRUE THAT IT MAKES A DIFFERENCE WHETHER YOU HAVE SOMEONE IN YOUR LIFE,  WHETHER IT IS A PARENT,  SOMEONE WHO IS REALLY SUPPORTIVE OF YOU, OVER A LONG PERIOD OF TIME?

A.   THAT'S RIGHT.   CONSISTENCY IS REAL CRITICAL.   AND THE CLOSENESS,  THE ACTUAL FOCUSED ATTENTION BETWEEN THIS ADULT AND THIS CHILD IS VERY IMPORTANT.

Q.   WHAT HAPPENS WHEN PEOPLE, INSTEAD OF COPING WITH THESE IN POSITIVE WAYS, SORT OF GROWING STRONGER BECAUSE OF EITHER THEIR BIOLOGY OR OTHER THINGS ABOUT THEM, THEY CAN LEARN TO COPE -- THEY STILL HAVE TO COPE, THEY COPE IN --

A.   YOU CAN COPE IN NEGATIVE WAYS.   OBVIOUSLY, DRINKING ALCOHOL IS ONE WAY TO REDUCE ANXIETY, OR DOING DRUGS MIGHT MAKE YOU FEEL GOOD FOR A LITTLE WHILE.  IT USUALLY MAKES YOU FEEL MUCH WORSE WHEN YOU ARE COMING DOWN.   YOU CAN SHUT OFF FEELINGS AND ACT LIKE THEY ARE NOT THERE.   THERE ARE A LOT OF NEGATIVE WAYS OF COPING.   SO, EVERYBODY HAS TO COPE, IT IS JUST A MATTER OF HOW.   THERE ARE POSITIVE WAYS AND NEGATIVE WAYS.

WHAT WE SAW IN THIS FAMILY WERE A LOT OF NEGATIVE WAYS OF COPING.   EVEN THOUGH THERE WERE EFFORTS BY PEOPLE OUTSIDE THE FAMILY TO TRY TO HELP,  THEY WERE BLOCKED AT ALMOST EVERY STEP BECAUSE OF THE PARENTS' POOR COPING SKILLS AND BEING CLOSED IN

DIRECT EXAM OF ARLENE ANDREWS

THEIR FAMILY SYSTEM IN A WAY THEY WOULD NOT ACCEPT THE HELP

THAT WAS OFFERED.  FOR EXAMPLE, FROM THE MENTAL HEALTH

CENTER, OR THROUGH THE JUVENILE JUSTICE SYSTEM, OR THROUGH THE

ADOLESCENT TREATMENT UNIT AT THE HOSPITAL WHEN CHAD TRIED TO

COMMIT SUICIDE.

**Q.    SO, BASED ON EVERYTHING THAT YOU LOOKED AT,  DID YOU**

**FIND -- COULD YOU DRAW A CONCLUSION ABOUT WHETHER CHAD WAS ONE**

**OF THOSE RESILIENT CHILDREN THAT SORT OF SOMEHOW HAVE EITHER**

**INNER OR OUTER RESOURCES TO BOUNCE BACK, OR THAT HE WAS NOT?**

A.    CHAD WAS DEFINITELY NOT A RESILIENT CHILD BECAUSE HE

SHOWED SIGNS SO EARLY OF HAVING BEHAVIORAL PROBLEMS AND

EMOTIONAL PROBLEMS THAT WERE PRETTY CLEARLY LINKED TO THE KIND

OF THINGS THAT WERE GOING ON IN HIS HOME.

Q.    SO,  I WOULD JUST LIKE YOU TO SORT OF FINISH UP BY

SPEAKING A MOMENT ABOUT CUMULATIVE EFFECTS OF ALL OF THESE

THINGS.

THE COURT:  MS. JOHNSON, HOLD ON.  HOW MUCH LONGER

DO YOU THINK YOU WILL BE?

MS. JOHNSON:  I THINK THREE MINUTES.

THE COURT:  OKAY.

THE WITNESS:  BASICALLY, MOST CHILDREN CAN HANDLE ONE

OR TWO MAJOR, WHAT WE CALL THREATS, TO THEIR DEVELOPMENT OR

STRESSORS.  THEY CAN EVEN HANDLE THEM CONSISTENTLY THROUGHOUT

THEIR CHILDHOOD.  BUT WHEN YOU HAVE MULTIPLE THINGS,  WHEN YOU

ARE BOMBARDED WITH MULTIPLE STRESSORS, OR SEVERELY DEPRIVED OF

CROSS EXAM OF ARLENE ANDREWS

EMOTIONAL ATTENTION, OR THE KINDS OF THINGS THAT SOCIAL

DISCIPLINE,  WHAT CHAD NEEDED WAS SOME VERY STERN DISCIPLINE

WITH AFFECTION.  SOMEONE WHO REALLY CARED FOR HIM WHO COULD

TEACH HIM THE RIGHT THING TO DO AND GUIDE HIM, AND HE DIDN'T

HAVE THAT.  AND WHAT HE WAS WAS BOMBARDED WITH A LOT OF

NEGATIVE THINGS GOING ON IN HIS LIFE, AND HE PRETTY MUCH

HANDLED IT ALONE.

MS. JOHNSON:  THANK YOU,  MS. ANDREWS.

THE COURT:  ALL RIGHT.  LET'S TAKE OUR AFTERNOON

RECESS.  WE WILL BE IN RECESS FOR 20 MINUTES.  PLEASE GO TO

YOUR JURY ROOM.

(WHEREUPON, A SHORT RECESS WAS HELD.)

THE COURT:  ALL RIGHT.  CROSS-EXAMINATION.

MR. SCHOOLS:  THANK YOU.

BY MR. SCHOOLS:

**Q.   GOOD AFTERNOON, DR. ANDREWS.   BEFORE WE TALK ABOUT MR.**

**FULKS, I WANT TO ASK YOU A FEW QUESTIONS ABOUT DOMESTIC**

**VIOLENCE.   YOU OBVIOUSLY, BASED ON YOUR CV OR YOUR RESUME,**

**YOU HAVE HAD A LOT OF EXPERIENCE WITH DOMESTIC VIOLENCE AND**

**HAVE WORKED, AS I UNDERSTAND IT, BOTH WITH DOMESTIC VIOLENCE**

**VICTIMS AND PERPETRATORS; IS THAT RIGHT?**

A.    PRIMARILY, VICTIMS.

**Q.   AND BASED ON YOUR WORK WITH VICTIMS,  IT IS NOT**

**UNCOMMON,  IN FACT,  PERHAPS IT IS MORE COMMON THAN NOT, THAT**

**VICTIMS OF DOMESTIC VIOLENCE, UNFORTUNATELY, DON'T GET OUT THE**

**CROSS EXAM OF ARLENE ANDREWS**

**FIRST TIME?**

A.    THAT'S RIGHT.

**Q.    IN FACT, IT IS NOT UNCOMMON FOR VICTIMS OF DOMESTIC**

**VIOLENCE TO SEEK SHELTER,  RETURN TO THE ABUSER,  SEEK**

**SHELTER, RETURN TO THE ABUSER,  SEEK SHELTER, RETURN TO THE**

**ABUSER.  THAT IS A COMMON,  COMMON PATTERN?**

A.    THAT'S RIGHT.

**Q.    IT IS ALSO COMMON AMONG VICTIMS OF DOMESTIC ABUSE THAT**

**THEY,  THEMSELVES, ARE PEOPLE OF VERY LOW SELF-ESTEEM?**

A.    YES.

**Q.    AND THEY ARE OFTENTIMES PEOPLE WHO HAVE SUFFERED ABUSE**

**OR DISRUPTIVE PARENTHOOD,  CHILDHOODS, OR THE LIKE,  AS WELL;**

**IS THAT RIGHT?**

A.    THE VICTIMS OF CHRONIC DOMESTIC VIOLENCE,  YES.  OTHER

VICTIMS WILL OFTEN LEAVE RIGHT AWAY IF THEY HAVE THAT

SELF-ESTEEM THAT YOU ARE DESCRIBING.

**Q.    SO,  IT WOULD ALMOST BE FAIR TO SAY, WE WOULD EXPECT**

**THAT A YOUNG WOMAN, WHO HAS HAD AN UNSTEADY CHILDHOOD,  BEEN**

**SEXUALLY ABUSED IN HER OWN CHILDHOOD, AND THEN WHO HOOKS UP**

**WITH AN ABUSER, IS NOT GOING TO HAVE THE ABILITY TO GET OUT**

**QUICK?**

A.    RIGHT.  SHE IS NOT GOING TO BELIEVE SHE HAS THE ABILITY

TO GET OUT,  THAT'S RIGHT.

**Q.    SO, THERE WILL BE MULTIPLE OPPORTUNITIES WHEN THAT**

**YOUNG WOMAN COULD LEAVE THE RELATIONSHIP VOLUNTARILY BECAUSE**

**CROSS EXAM OF ARLENE ANDREWS**

THE ABUSER IS NOT PRESENT, AND SHE JUST WON'T GO?

A.    THAT IS RIGHT.

Q.    AND IT IS NOT UNCOMMON THAT MANY OF THOSE WOMEN LOOK BACK ON THOSE RELATIONSHIPS AFTER THEY HAVE GOTTEN OUT AND AFTER THEY RECEIVED COUNSELING, AND THEY WONDER WHY THEY DIDN'T LEAVE?

A.    THAT IS RIGHT.

Q.    AND THAT IS A COMMON TRAIT AMONG VICTIMS OF DOMESTIC VIOLENCE?

A.    UH-HUH (AFFIRMATIVE RESPONSE).

Q.    IN FACT,  IT IS ALSO COMMON, AND THIS MAY BE MORE OF A SIXTH SENSE ALMOST, THAT PERPETRATORS OF DOMESTIC VIOLENCE SEEK OUT THOSE TYPES OF WOMEN; ISN'T THAT RIGHT?

A.    YES.   AMONG SOME GROUPS,  YES.

Q.    AND SO, IT IS NOT UNCOMMON FOR SOMEONE WHO IS INCLINED TO ABUSE WOMEN TO BE ATTRACTED TO WOMEN WHO THEY UNDERSTAND, SORT OF, ALMOST IN THEIR GUT, WILL PUT UP WITH IT?

A.    RIGHT.

Q.    I WANT TO ASK YOU A LITTLE BIT NOW ABOUT MR. FULKS AND YOUR ASSESSMENT OF HIM.   DID YOU TALK TO MR. FULKS?

A.    I DID.

Q.    HOW MUCH TIME DID YOU SPEND WITH HIM?

A.    I SPENT -- I DON'T HAVE THE RECORD HERE,  PROBABLY TWO OR THREE HOURS.   JUST WENT FOR AN INTERVIEW, FOCUSED ON HIS CHILDHOOD.

CROSS EXAM OF ARLENE ANDREWS

Q.    HOW MUCH TIME, GENERALLY, DID YOU SPEND ON THE INTERVIEWS, AND THE REVIEW OF RECORDS, AND THE PREPARATION OF THE REPORTS YOU WERE READING FROM A FAIRLY LENGTHY -- NOT READING,  BUT REFERRING TO A FAIRLY LENGTHY REPORT THAT YOU HAD PREPARED?  WHAT WAS THE AMOUNT OF TIME THAT YOU SPENT ON THAT?

A.    OH, I KEEP A RECORD OF THE HOURS, BUT I HAVEN'T TABULATED THAT.  I WOULD HAVE TO -- SOMEWHERE BETWEEN 50 AND A HUNDRED.

Q.    HOURS?

A.    UH-HUH (AFFIRMATIVE RESPONSE).

Q.    AND DID YOU PREPARE A LENGTHY REPORT THAT YOU WERE REFERRING TO AND APPARENTLY MS. JOHNSON HAS A COPY, AS WELL, WHEN SHE WAS QUESTIONING YOU?

A.    I HAD NOTES THAT, YES,  WAS CHRONOLOGY AND, GENERALLY, THE KINDS OF THINGS WE JUST TALKED ABOUT.

Q.    OKAY.  BUT YOU ARE NOT HERE TO OFFER AN OPINION ABOUT CHAD FULKS'S PSYCHOLOGICAL MAKEUP IN NOVEMBER OF 2002?

A.    NO.

Q.    IN FACT,  YOUR REVIEW OF MR. FULKS'S BACKGROUND CONCLUDED WHEN HE REACHED WHAT AGE?

A.    ABOUT 15.

Q.    AND SO, THE COUNSELING OPPORTUNITIES THAT WERE AVAILABLE TO HIM POST 15, AFTER HE TURNED 15, TO THE EXTENT THEY EXISTED,  YOU ARE NOT AWARE OF THEM?

**CROSS EXAM OF ARLENE ANDREWS**

A.    I SAW SOME RECORDS, BUT, NO, I AM NOT PREPARED TO TALK TO THAT.

**Q.    YOU DID NOT REVIEW THE PRISON RECORDS FROM THE WESTVILLE, INDIANA CORRECTIONAL INSTITUTION WHERE HE WAS HOUSED FOR JUST OVER TWO YEARS PRIOR TO HIS RELEASE IN MARCH OF 2002?**

A.    NOT IN DETAIL,  NO.

**Q.    AND WHEN YOU SPOKE WITH MR. FULKS,  YOU SPECIFICALLY CONCLUDED,  AS I UNDERSTAND IT, OR YOU SPECIFICALLY DECLINED TO RELY ON HIS RELATION OF HIS OWN HISTORY TO REACH THE -- TO TESTIFY TO THE THINGS THAT YOU TESTIFIED TO TODAY?**

A.    RIGHT.  WHAT I WAS LOOKING FOR WAS RELIABILITY.   I DIDN'T TALK WITH HIM UNTIL AFTER I HAD TALKED WITH A NUMBER OF OTHER FAMILY MEMBERS.  AND SO, BY THE TIME I TALKED WITH HIM, I WAS JUST INTERESTED IN WHAT HIS PERCEPTION ON IT WAS.

**Q.    AND BUT YOU WERE AWARE, BEFORE WE EVER GOT STARTED, WHAT MR. FULKS HAD DONE OR WAS ACCUSED OF DOING?**

A.    THAT'S CORRECT.

**Q.    AND YOU WERE AWARE THAT THE PURPOSE OF YOUR EVALUATION AND YOUR ASSESSMENT WAS TO TESTIFY AS A MITIGATION WITNESS IN THIS CASE?**

A.    YES.

**Q.    AND YOU HAVE EVEN WRITTEN AN ARTICLE ABOUT TESTIFYING AS A MITIGATION WITNESS,  SOCIAL WORKER, I THINK YOU WROTE IN 1991 IN YOUR CV?**

**CROSS EXAM OF ARLENE ANDREWS**

A.    YES.

Q.    THAT ARTICLE, JUST FOR THE RECORD, IS CALLED, "SOCIAL WORK EXPERT TESTIMONY REGARDING MITIGATION IN CAPITAL SENTENCING PROCEEDINGS," AND IT APPEARED IN SOCIAL WORK MAGAZINE IN 1991?

A.    THAT'S RIGHT.

Q.    AND OFTENTIMES, WOULDN'T IT BE THE CASE, THAT AN INDIVIDUAL WHO, AS THEY GROW OLDER, LEARNS TO PROCESS THE EVENTS OF THEIR CHILDHOOD IN A WAY THAT THEY COULD NOT PROCESS THEM WHEN THEY WERE CHILDREN?

A.    YES.

Q.    AND, OFTENTIMES, CHILDREN WHO GROW UP IN DISADVANTAGED OR DISRUPTIVE CHILDHOODS ACTUALLY ARE ABLE, AS THEY GET OLDER, TO ESTABLISH FAMILIAL BONDS WITH THOSE SAME PARENTS WHO TREATED THEM POORLY WHEN THEY WERE YOUNG?

A.    YES.

Q.    AND SO, AT THE AGE OF 25, WHICH MR. FULKS WAS IN 2002, YOU DON'T HAVE ANY IDEA WHAT HIS RELATIONSHIP WITH HIS MOTHER WAS, AT THAT POINT?

A.    NO.   NOT AT THAT POINT.

Q.    WHAT HIS RELATIONSHIPS WITH HIS BROTHERS WERE, AT THAT POINT?

A.    NO.

Q.    WHAT HIS RELATIONSHIPS WITH HIS FATHER WERE, AT THAT POINT?

**CROSS EXAM OF ARLENE ANDREWS**

A.    NO.

Q.    YOU DON'T REALLY HAVE ANY IDEA WHAT SUPPORT MECHANISMS MR. FULKS HAD AVAILABLE TO HIM WHEN HE WAS RELEASED FROM THE WESTVILLE CORRECTIONAL INSTITUTION IN MARCH OF 2002?

A.    I KNOW HE WENT TO SEE SOME OF THEM, BUT I DON'T KNOW THE DEGREE TO WHICH.  I CAN'T QUALIFY WHAT THOSE RELATIONSHIPS WERE LIKE, NO.

Q.    ONE OF THE THINGS THAT IS IMPORTANT FOR INDIVIDUALS WHO ARE SEEKING THERAPY FOR ANY TYPE OF RESOLUTION OF ISSUES THAT THEY MIGHT HAVE, IS THEY BE CANDID WITH THEIR THERAPIST; ISN'T THAT RIGHT?

A.    YES.

Q.    AND SO, OFTENTIMES, AND IT IS NOT SURPRISING TO YOU THAT, IN VARIOUS PENAL INSTITUTIONS, PRISONS ACROSS THIS COUNTRY, WHETHER THEY ARE STATE PRISONS OR FEDERAL PRISONS, THERE ARE COUNSELING SERVICES AVAILABLE FOR INDIVIDUALS TO SEEK TO RESOLVE ISSUES THAT MAY HAVE ARISEN IN THEIR CHILDHOOD?

A.    THERE ARE SOMETIMES LIMITED COUNSELING SERVICES, YES.

Q.    WITHOUT QUESTION, THE QUALITY OF THOSE COUNSELING SERVICES MAY DIFFER FROM INSTITUTION TO INSTITUTION?

A.    THAT'S CORRECT.

Q.    BUT, FUNDAMENTALLY, THOSE COUNSELING SERVICES ARE NOT GOING TO WORK IF THE INDIVIDUAL IS NOT CANDID WITH THE PROVIDER?

**CROSS EXAM OF ARLENE ANDREWS**

A.    THAT IS RIGHT.   A RULE OF THUMB IN THERAPY IS, YOU DON'T, PARTICULARLY IF THERE HAS BEEN ANY TRAUMA, YOU DON'T PUSH THE ISSUE UNTIL THE PERSON IS READY TO TALK ABOUT IT. SO, IF THERE IS MINIMIZING OR WITHHOLDING, YOU WAIT UNTIL A PERSON IS READY.  THEY HAVE TO BE WILLING TO BE OPEN, AT SOME POINT,  YES.

**Q.    YOU WOULD EXPECT THEM, IN ORDER TO SEEK LEGITIMATE COUNSELING SERVICES WITHIN AN INSTITUTION THAT ARE AVAILABLE TO THEM, TO BE CANDID ABOUT THEIR PAST?  AND I UNDERSTAND, THEY MAY NOT DO THAT INITIALLY.**

A.    RIGHT.

**Q.    THERE HAS TO BE SOME SORT OF COMFORT LEVEL DEVELOPED BETWEEN PATIENT AND THERAPIST BEFORE CANDOR CAN BE HAD?**

A.    WHEN THEY HAVE BEEN COPING IN ONE WAY, LIKE HOLDING FEELINGS DOWN,  THEY HAVE TO BE READY TO TAKE ON A NEW WAY OF COPING BEFORE THEY CAN ADDRESS THOSE EMOTIONAL ISSUES.

**Q.    AND SO, BUT IT WOULD BE A LITTLE DIFFERENT WITH RESPECT TO AFFIRMATIVE MISREPRESENTATIONS ABOUT WHAT IS GOING ON PRESENTLY IN SOMEONE'S LIFE?**

A.    YES.

**Q.    WOULDN'T YOU SAY? SO, AN INDIVIDUAL IS IN THERAPY, IT MAY TAKE THEM A WHILE TO WANT TO ACTUALLY DISCLOSE THINGS THAT HAPPENED TO THEM IN THEIR CHILDHOOD THAT WERE PAINFUL; IS THAT RIGHT?**

A.    THAT'S RIGHT.

CROSS EXAM OF ARLENE ANDREWS

Q.    WOULD YOU EXPECT THAT PERSON NOT TO BE LYING ABOUT PRESENT CIRCUMSTANCES?

A.    ABOUT THE FAMILY,  RIGHT.

Q.    YOU, I THINK, MENTIONED HAVE NOT SEEN ANY RECORDS FROM THE WESTVILLE CORRECTIONAL INSTITUTION IN INDIANA; IS THAT RIGHT?

A.    I HAVE SEEN THE RECORDS.   I WENT THROUGH THEM JUST TO GET A GENERAL BACKGROUND.   I DIDN'T LOOK CLOSELY AT THEM.

Q.    AND IF, ON OCTOBER 23RD,  2001, MR. FULKS WAS MEETING WITH A THERAPIST AND REPORTED THAT HE HAD BEEN TOLD THAT HIS MOTHER HAD 14 MONTHS TO LIVE, AND THAT HE HAD A SON WHO HAS A HOLE IN HIS HEART AND SEVERAL BLOOD CLOTS WITH POSSIBLE SURGERY REQUIRED,  IF ALL OF THAT IS UNTRUE, AND MR. FULKS IS, INDEED, MISREPRESENTING THAT TO A THERAPIST FOR WHATEVER REASON HE IS REPRESENTING IT,  THEN, CLEARLY, HE IS NOT SEEKING TO TAKE ADVANTAGE OF COUNSELING SERVICES THAT ARE AVAILABLE TO HIM?

A.    A THERAPIST CAN RESPOND TO THAT IN A COUPLE OF WAYS. ONE IS TO TRY TO UNDERSTAND WHY THIS PATIENT MIGHT BE MISREPRESENTING THEIR NEEDS.   BUT, YEAH, MAY BE AVOIDING OTHER COURT ISSUES.

Q.    MAY BE EXPLAINING OTHER BEHAVIORS THAT AREN'T EXPLAINABLE?

A.    YES.

Q.    ONE OF THE THINGS YOU SAID ABOUT MR. FULKS'S FAMILY IS

**CROSS EXAM OF ARLENE ANDREWS**

**THAT THEY LEARNED TO MINIMIZE AND DENY; IS THAT CORRECT?**

A.    UH-HUH (AFFIRMATIVE RESPONSE).

**Q.    WOULD THAT TRANSLATE INTO A CONCLUSION THAT THE DEFENDANT, IN THIS CASE, HAS LEARNED TO MINIMIZE AND DENY, OR YOU DON'T KNOW WITH RESPECT TO HIS BEHAVIORS AT THIS POINT?**

A.    I KNOW THAT, IN HIS CHILDHOOD, HE WAS BEGINNING TO DO THAT.

**Q.    AND IF THE JURY HAS HEARD CONSISTENT EVIDENCE ABOUT THE DEFENDANT'S MINIMIZATION AND DENIAL THROUGHOUT THIS CASE, THEN THEY COULD CONCLUDE THAT THAT IS A TRAIT THAT IS PERSISTENT?**

A.    YES.

**Q.    YOU ARE NOT AWARE THAT, ON MAY 22ND OF 2001, IN A SOCIAL ASSESSMENT AT THE WESTVILLE CORRECTIONAL CENTER, MR. FULKS REPORTED THAT HE WAS BORN IN WEST VIRGINIA,  HIS PARENTS DIVORCED WHEN HE WAS 14,  HIS GROWING UP WAS GOOD,  HIS PARENTS ENCOURAGED SCHOOLING?**

A.    NO, I WAS NOT AWARE OF THAT.

**Q.    THAT WOULD BE INCONSISTENT WITH YOUR FINDINGS?**

A.    THAT IS DEFINITELY INCONSISTENT WITH MY FINDINGS.

**Q.    IF HE ALSO REPORTED HE WAS NOT SEXUALLY MOLESTED, WOULD THAT BE INCONSISTENT?**

A.    INCONSISTENT.  ON THE SCHOOLS,  HIS PARENTS DID HAVE HIM GO TO SCHOOL MOST OF THE TIME.  BUT THEY WEREN'T -- THEY DID NOT -- MY FINDING OF EDUCATIONAL LACK WAS THEY, AT HOME,

CROSS EXAM OF ARLENE ANDREWS

DID NOT SUPPORT HIS LEARNING.

Q.    THAT IS VERY COMMON,  ISN'T IT,  UNFORTUNATELY?

A.    IT IS.

Q.    IN FACT,  AND I DON'T KNOW WHETHER YOU LOOKED INTO IT, BUT WEST VIRGINIA COMPARED TO THE UNITED STATES'S POPULATION AS A WHOLE, IS A POOR STATE?

A.    YES,  IT IS.

Q.    AND I THINK IN 2001, SOMETHING LIKE 30 PERCENT OF CHILDREN IN WEST VIRGINIA LIVED IN POVERTY?

A.    THAT SOUNDS,  I MEAN,  I DON'T KNOW THE FIGURE, BUT I WOULD NOT BE SURPRISED.

Q.    AND SOMETHING LIKE 39 PERCENT OF THE CHILDREN IN WEST VIRGINIA IN 2001 LIVED IN A HOME WHERE NEITHER PARENT HAD A FULL-TIME YEAR-ROUND JOB; IS THAT CORRECT?

A.    I WOULDN'T BE SURPRISED.

Q.    I WANT TO ASK YOU A LITTLE BIT ABOUT THE HISTORY YOU HAVE DESCRIBED OF MR. FULKS.   THE HOUSE THAT HE LIVED IN,  IT WAS NOT PUBLIC HOUSING,  WAS IT?

A.    NO.

Q.    THERE IS AN AREA IN WEST VIRGINIA CALLED MARKHAM TERRACE, DID YOU GO TO HUNTINGTON AT ALL?

A.    I DID GO TO HUNTINGTON.   I DON'T RECALL MARKHAM TERRACE.

Q.    MARKHAM TERRACE IS A PROJECT IN THE MIDDLE OF HUNTINGTON.  THAT IS NOT WHERE THE FULKS LIVED?

**CROSS EXAM OF ARLENE ANDREWS**

A.    NO.

**Q.    THEY WERE POOR, BUT THEY WEREN'T THE POOREST OF THE POOR?**

A.    THEY WERE POOR RELATIVE TO OTHER PEOPLE IN THEIR NEIGHBORHOOD, WHICH IS WORKING POOR, WORKING CLASS NEIGHBORHOOD.  BUT THEY WERE NOT THE POOREST IN THAT SENSE.

**Q.    THEY, UP UNTIL THE AGE OF 13 OR 14, MR. FULKS HAD A TWO-PARENT HOME.  OBVIOUSLY, NOT A PERFECT TWO-PARENT HOME, BUT A TWO-PARENT HOME?**

A.    YES, HE DID.

**Q.    CERTAINLY BE A NUMBER OF THOSE CHILDREN LIVING IN POVERTY IN WEST VIRGINIA OF THOSE 30 PERCENT WHO DON'T HAVE TWO PARENTS AT HOME?**

A.    THAT'S RIGHT.

**Q.    WHOSE PARENTS WORK OR OTHERWISE ARE OCCUPIED DURING THE DAYTIME; IS THAT RIGHT?**

A.    THAT'S RIGHT.

**Q.    WHETHER THEY ARE OCCUPIED BY USING DRUGS, OR BY GETTING** A JOB, OR BY ANY OTHER ENDEAVOR THAT THAT PARENT MIGHT HAPPEN TO BE INVOLVED IN; IS THAT RIGHT?

A.    RIGHT.

**Q.    SO, THE HOME THAT MR. FULKS GREW UP IN WAS ATYPICAL IN MANY RESPECTS, BUT YOU COULD CERTAINLY FIND HOMES THAT HAD THINGS TOUGHER?**

A.    I THINK THE ACCUMULATION OF THE MULTIPLE -- THE

CROSS EXAM OF ARLENE ANDREWS

VIOLENCE, THE LEVEL OF ALCOHOLISM IN BOTH PARENTS, THE CHAOS, THE NEGLECT IS RELATIVELY RARE, EVEN IN POOR HOMES. THERE ARE A LOT OF PEOPLE WHO ARE POOR, BUT DON'T HAVE THAT KIND OF DYNAMICS. MANY PEOPLE ARE POOR BECAUSE THEY MAY HAVE A CHRONIC HEALTH PROBLEM, AND THEY TRY HARD TO HELP THEIR CHILDREN LEARN, FOR EXAMPLE. THEY READ TO THEIR CHILDREN, THEY PARTICIPATE IN SCHOOL PROGRAMS. SO THAT 39 PERCENT FIGURE OR THE 30 PERCENT FIGURE OF CHILDREN IN POVERTY MAY NOT BE LIVING AT ALL IN THE KIND OF HOME THAT WE HAVE DESCRIBED TODAY.

**Q. BUT THERE ARE PEOPLE WITHIN HOUSING PROJECTS, AND I AM NOT SELECTING THEM OUT, BUT I HAVE BEEN THERE, I HAVE SEEN IT, WHO ARE ADDICTED TO CRACK?**

A. YES.

**Q. CRACK IS A DEBILITATING ADDICTION?**

A. YES.

**Q. IT VIRTUALLY PROHIBITS ANY SORT OF PRODUCTIVE LIFE, AT ALL?**

A. THAT'S RIGHT.

**Q. CRACK ADDICTED PARENTS DON'T PAY ANY ATTENTION TO THEIR CHILDREN'S SCHOOLING?**

A. RIGHT.

**Q. THEY DON'T PAY ANY ATTENTION TO THEIR CHILDREN'S HYGIENE?**

A. THAT'S RIGHT.

CROSS EXAM OF ARLENE ANDREWS

Q.    THEY DON'T PAY ANY ATTENTION TO THEIR CHILDREN'S PHYSICAL NEEDS?

A.    UH-HUH (AFFIRMATIVE RESPONSE).

Q.    THEY ARE HORRIBLE PARENTS?

A.    ALL THE ONES I HAVE COME UP WITH.

Q.    CRACK-ADDICTED PARENTS.  YOU MENTIONED THAT MR. FULKS HAD SUFFERED SOME TYPE OF SEXUAL ABUSE.  MR. FULKS WAS NOT THE SOURCE OF THAT INFORMATION,  RIGHT?

A.    WELL,  IT WAS IN THE RECORD.  A SCHOOL PSYCHOLOGIST HAD THAT AS ONE OF HER FINDINGS.

Q.    AND DO YOU KNOW WHAT THE NATURE OF THE SEXUAL ABUSE WAS?

A.    I KNOW THAT FROM MR. FULKS.

Q.    SO, MR. FULKS WOULD HAVE REPORTED, AT AGE NINE, HE WAS MOLESTED BY A 15-YEAR-OLD FEMALE BABY-SITTER, IS THAT WHAT HE REPORTED TO YOU?

A.    ACTUALLY,  NO.  WHAT HE TOLD ME, THE FATHER OF A FRIEND OF HIS HAD MOLESTED HIM.  AND THE REPORT OF THE SCHOOL PSYCHOLOGIST SAID HE WAS MOLESTED BY AN OLDER MAN.

Q.    MR. FULKS REPORTED, AT THE AGE OF 11, HE WAS FONDLED BY THE FATHER OF A FRIEND, IS THAT THE NATURE OF SEXUAL ABUSE?

A.    YES.

Q.    NOT TO MINIMALIZE THAT, BECAUSE IT IS NOT GOOD.  IN THE COURSE OF YOUR CONDUCT ING STUDIES -- IN THE COURSE OF THE ONE YOU CONDUCTED, THERE ARE MUCH MORE SEVERE CASES OF SEXUAL

App. 00456

**CROSS EXAM OF ARLENE ANDREWS**

ABUSE THAN WHAT MR. FULKS DESCRIBED?

A.    YES.

Q.    AND IT IS NOT,  THE OFFENSES WITH WHICH MR. FULKS IS CHARGED IN THIS CASE, ARE NOT RETALIATORY,  ARE THEY?

A.    I CAN'T ANSWER THAT.   I DON'T KNOW THE DETAILS OF THE OFFENSES.

Q.    YOU WERE AWARE, AT LEAST, I WOULD IMAGINE, THAT THE TWO VICTIMS, SAMANTHA BURNS AND ALICE DONOVAN, WERE STRANGERS TO HIM?

A.    THAT'S RIGHT.

Q.    AND SO, HE WASN'T RETALIATING AGAINST THEM FOR ANYTHING THEY HAD DONE TO HIM?

A.    NOT TO MY KNOWLEDGE,  RIGHT.

Q.    AND THE SPECTRUM OF CRIME THAT MIGHT RESULT FROM A BACKGROUND LIKE YOU HAVE DESCRIBED RUNS THE GAMUT,  DOESN'T IT?

A.    THAT'S IS RIGHT.

Q.    AND YOU WOULD EXPECT, PERHAPS, A RETALIATORY CRIME. CRIMES AGAINST SIBLINGS,  CRIMES AGAINST PARENTS?

A.    THAT IS ONE OF THE POSSIBILITIES,  YES.

Q.    AND PROPERTY CRIMES?

A.    YES.

Q.    AND DRUG ABUSE CRIMES?

A.    YES.

Q.    DID YOU MAKE AN ASSESSMENT ABOUT -- I THINK YOU DID

**CROSS EXAM OF ARLENE ANDREWS**

MENTION THAT MR. FULKS, BASED ON YOUR EXAMINATION OF THE FOLKS YOU TALKED TO AND THE RECORDS YOU SAW, ABUSED DRUGS AS A YOUTH, CORRECT?

A.  THAT'S RIGHT.

Q.  BUT INDIVIDUALS CAN BE PHYSICALLY ADDICTED TO DRUGS; IS THAT RIGHT?

A.  YES.

Q.  AND THEY CAN BE MENTALLY ADDICTED TO DRUGS; IS THAT RIGHT?

A.  THAT'S RIGHT.

Q.  BUT, TYPICALLY, IN A PRISON SETTING, THEY ARE ABLE TO, AT LEAST, CLEAN THEMSELVES OUT?

A.  IN SOME PRISONS, YES.  SOME PRISONS THERE ARE DRUGS AVAILABLE.

Q.  AND, CERTAINLY, THERE ARE SITUATIONS WHERE AN INDIVIDUAL HAS ACCESS TO DRUGS IN A PRISON, BUT IT IS, RELATIVELY, RARE?

A.  RIGHT.

Q.  AND IT IS, RELATIVELY, RARE THAT THEY COULD HAVE ACCESS TO THE QUANTITY OF DRUGS IN PRISON THAT WOULD CAUSE THEM TO BE AN ADDICT?

A.  THAT'S RIGHT.

Q.  AND IF MR. FULKS HAS REPORTED TO PSYCHIATRISTS THAT HE BEGAN USING METHAMPHETAMINE AT THE AGE OF 21 YEARS OLD, AND USED IT EVERYDAY, AND HE WAS, IN FACT, INCARCERATED 14 DAYS

**CROSS EXAM OF ARLENE ANDREWS**

**AFTER HIS 21ST BIRTHDAY UNTIL MARCH 22ND, WHICH WOULD HAVE BEEN ABOUT TWO MONTHS BEFORE HIS 25TH BIRTHDAY,  IT IS INCONCEIVABLE HE WAS A METHAMPHETAMINE ADDICT DUE TO HIM HAVING CONSUMED THAT METHAMPHETAMINE DURING THE FOUR-YEAR PERIOD?**

A.   I DON'T UNDERSTAND THE ADDICTION.   THE EFFECTS OF METHAMPHETAMINE HAVE NEGATIVE EFFECTS OF THE RESULT OF USING METHAMPHETAMINE.

**Q.    YOU DON'T NECESSARILY BECOME AN ADDICT?**

A.    THE OTHER SUBSTANCES YOU HAVE MENTIONED ARE MORE ADDICTIVE.

**Q.    IF YOU ARE REPORTING AN ADDICTION BASED ON USE DURING A TIME FRAME WHEN YOU WOULD NOT HAVE HAD ACCESS TO METHAMPHETAMINE, THAT IS EXAGGERATED OR FALSE?**

A.    ADDICT OR NOT, ADDICTS HAVE CRAVINGS WHETHER THEY CAN OR CAN'T GET IT.

**Q.    IT WOULD BE UNLIKELY MR. FULKS BEGAN USING METHAMPHETAMINE AT 21,  MAY 16,  1998, AND HE WENT TO PRISON ON JUNE 1,  1998, IT IS UNLIKELY HE WOULD HAVE BECOME ADDICTED TO METHAMPHETAMINE, ASSUMING HE STARTED ON HIS BIRTHDAY?**

A.    I HAVE TALKED TO CRACK ADDICTS WHO USED IT ONCE WHO BECAME ALMOST IMMEDIATELY ADDICTIVE.

**Q.    CRACK IS LIKE THAT.**

A.    IT IS.

**Q.    CRACK ADDICTS BECOME ADDICTED, OR NOT, VERY QUICKLY.**

**CROSS EXAM OF ARLENE ANDREWS**

**AND THERE ARE, ODDLY ENOUGH, PROBABLY RECREATIONAL CRACK USERS WHO CAN USE CRACK AND NOT BE ADDICTED, AREN'T THERE?**

A.   THERE ARE SOME WHO PROBABLY THINK THEY ARE.

**Q.   BUT, NONETHELESS, CRACK AND METHAMPHETAMINE ARE DIFFERENT WITH THE RAPIDITY OF ADDICTION?**

A.   YES.

**Q.   SO, AGAIN, IT WOULD BE UNLIKELY, EVEN IF YOU ASSUME MR. FULKS STARTED USING METHAMPHETAMINE ON HIS 21ST BIRTHDAY, THAT HE GOT ADDICTED IN TWO WEEKS?**

A.   I CAN'T DRAW THAT CONCLUSION.

**Q.   THERE HAS BEEN A SIGNIFICANT AMOUNT OF DISCUSSION ABOUT MR. FULKS'S TEETH, AND THAT HE ALLOWED THEM TO COME OUT, AND HE DIDN'T OFTEN WEAR HIS DENTURES.  IS IT POSSIBLE THAT THE CHILDREN IN THAT HOME WOULD HAVE SEEN THAT AS SOMETHING SORT OF HUMOROUS AND ODD ABOUT THEIR DAD?**

A.   IT IS POSSIBLE.  I THINK THE MAIN ISSUE ABOUT THAT IS THAT THE FATHER DIDN'T CARE ENOUGH TO IMPROVE HIS APPEARANCE. IT SPEAKS TO THE ISSUE OF HOW RELATIVELY SHAMED THIS FAMILY FELT RELATIVE TO OTHER PEOPLE IN THEIR NEIGHBORHOOD.

**Q.   BUT THERE IS, I MEAN, THERE ARE TOOTHLESS PEOPLE THROUGHOUT AMERICA WHO DON'T WEAR TEETH BECAUSE THEY FIND THEM UNCOMFORTABLE OR FOR WHATEVER REASON.  IT IS NOT NECESSARILY BECAUSE THEY ARE UNCONCERNED ABOUT THEIR APPEARANCE IN SEEKING TO APPEAR FREAKISH?**

A.   PROBABLY ARE, BUT MOST PEOPLE WOULD ATTEND, TO MOST OF

CROSS EXAM OF ARLENE ANDREWS

THE PEOPLE I KNOW, MOSTLY ELDERLY WHO HAVE PLATES, TAKE THEM OUT ONLY WHEN THEY ARE ALONE OR WITH ONE OR TWO PEOPLE THEY KNOW WELL. THEY, GENERALLY, WOULD TRY TO DO SOMETHING ABOUT THEIR APPEARANCE.

**Q.   NONETHELESS, YOU ARE NOT, I WOULDN'T IMAGINE, OPINING THAT THERE ARE SIGNIFICANT PSYCHOLOGICAL OR SOCIAL CONSEQUENCES TO MR. FULKS'S FATHER NOT WEARING HIS DENTURES?**

A.   AGAIN, IT IS NOT APPEARANCE PER SE, IT IS HIS ATTENTION TO WHAT OTHER PEOPLE THINK, REALLY, TO SOCIAL NORMS.

**Q.   AND HAVE YOU SEEN A LETTER DATED MARCH 28TH, 2003, THAT MR. FULKS WROTE TO HIS FATHER IN WHICH HE NOTED THAT HE HAD SEEN A PICTURE OF HIS DAD WITHOUT HIS TEETH, AND HE REMEMBERS HE USED TO LAUGH A LOT ABOUT IT?**

A.   I DON'T RECALL THAT DETAIL.

Q.   SHOW YOU, DR. ANDREWS, WHAT IS MARKED AS GOVERNMENT'S EXHIBIT 411. THAT LOOKS LIKE A BLANK PIECE OF PAPER BECAUSE WE HAVE TAKEN OUT A BUNCH OF IRRELEVANT MATTERS IN THAT LETTER. BUT WE OFFER, I THINK, GOVERNMENT'S 411 WITHOUT OBJECTION.

        MS. JOHNSON: WITHOUT OBJECTION.

        THE COURT: WITHOUT OBJECTION. ADMITTED.

        THE WITNESS: UH-HUH (AFFIRMATIVE RESPONSE).

BY MR. SCHOOLS:

**Q.   LOOK AT PAGE THREE OF THAT LETTER, DR. ANDREWS. IT IS** A LETTER FROM MR. FULKS TO HIS DAD. "HEY, I GOT A PICTURE OF

CROSS EXAM OF ARLENE ANDREWS

THAT FACE YOU USED TO MAKE WHEN YOU TOOK YOUR TEETH OUT.

REMEMBER WE USED TO LAUGH SO MUCH?  AND I HOPE TO GET A LAUGH

OUT OF YOU."   THAT IS WHAT THE LETTER SAYS.

A.    THAT'S RIGHT.

Q.    **AT THE END IT SAYS, "I LOVE YOU.  LOVE ALWAYS, YOUR SON CHADRICK EVAN FULKS, WBS," WHICH MEANS, WRITE BACK SOON?**

A.    I THINK HE WOULD LIKE TO HAVE A LETTER RELATIONSHIP WITH HIS DAD AND HIS MOM.

Q.    **THAT IS PAGE ONE OF THE LETTER, IT IS ALL REDACTED OUT. MARCH 28TH, 2003 LETTER?**

A.    UH-HUH (AFFIRMATIVE RESPONSE).

Q.    **AND, DR. ANDREWS,  YOU INDICATED THERE WAS A LOT OF RESOURCES ON WHICH YOU RELIED TO TESTIFY TO THE MATTERS THAT YOU TESTIFIED TO ABOUT TODAY; IS THAT RIGHT?**

A.    THERE WERE A NUMBER OF RESEARCH STUDIES,  SUMMARIES AND RESEARCH STUDIES.  THERE IS A LARGE BODY OF WORK.

Q.    **AND THE VOLUME OF RECORDS YOU REVIEWED?**

A.    YOU MEAN WITH REGARD TO THE ACTUAL RECORDS?

Q.    **YES, MA'AM.**

A.    YES, SIR.

Q.    **WHAT WAS THE VOLUME OF RECORDS,  HOW MANY PAGES?**

A.    THE RECORDS THAT I LOOKED AT ABOUT HIS CHILDHOOD?

Q.    **YES, MA'AM.**

A.    I DON'T HAVE THEM WITH ME.  I DON'T KNOW EXACTLY HOW MANY PAGES.

CROSS EXAM OF ARLENE ANDREWS

Q.    IS IT A BOX-FULL, TWO BOX-FULLS, OR HALF A BOX-FULL?

A.    THAT PERTAINING JUST TO HIS CHILDHOOD NO,  NO,  IT IS A NOTEBOOK.

Q.    NOTEBOOK FULL?

A.    UH-HUH (AFFIRMATIVE RESPONSE).

Q.    THE NUMBER OF WITNESSES YOU SPOKE TO IN CONNECTION WITH YOUR ASSESSMENT, DO YOU KNOW ABOUT HOW MANY THAT WAS?

A.    I DO HAVE THAT WITH ME.  I CAN TELL YOU THAT. SIXTEEN, AND CHAD,  SEVENTEEN PEOPLE.

Q.    SIXTEEN, AND CHAD.

A.    UH-HUH (AFFIRMATIVE RESPONSE).

Q.    WERE HIS OTHER IMMEDIATE FAMILY MEMBERS, YOU MENTIONED HIS MOM AND DAD,  WERE OTHER IMMEDIATE FAMILY MEMBERS AMONG THE 16?

A.    YES.

Q.    YOU TALKED TO DEWAYNE,  RONNIE, AND SHERRI?

A.    YES.

Q.    DID YOU TALK TO HIS GRANDPARENTS?

A.    HIS GRANDMOTHERS,  YES.  HIS GRANDFATHERS ARE DECEASED.

Q.    CHAD REPORTED THAT HIS -- IN A SOCIAL ASSESSMENT WITH THE INDIANA DEPARTMENT OF CORRECTIONS, THAT HE SPENT SOME WEEKENDS WITH HIS GRANDPARENTS AND THAT THEY ENCOURAGED HIM. DID YOU FIND ANY EVIDENCE OF THAT?

A.    HIS -- ROGER'S MOTHER, NANCY FULKS, IS ENCOURAGING OF

CROSS EXAM OF ARLENE ANDREWS

HIM.  HE DIDN'T SPEND MUCH TIME WITH HER DURING THE CHILDHOOD EXCEPT FOR OCCASIONAL VISITS TO THEIR HOUSE.   BUT SHE IS ENCOURAGING HIM NOW,  YES.   SHE IS ATTACHED TO HIM.

**Q.    AND,  AGAIN,  WE TALKED ABOUT STATISTICS IN WEST VIRGINIA OF POVERTY.  THIRTY-NINE (39) PERCENT OF CHILDREN LIVE IN A HOME WITH A PARENT WITH A FULL-TIME, YEAR-ROUND JOB. IN THE YEAR 2001, I BELIEVE THERE WERE 46 MURDERS IN THE STATE OF WEST VIRGINIA.  IS THAT A STATISTIC THAT YOU ARE FAMILIAR WITH?**

A.    I AM NOT FAMILIAR WITH THAT STATISTIC.

**Q.    SO, THERE REALLY ISN'T CAUSE-AND-EFFECT THAT YOU CAN TESTIFY ABOUT WITH RESPECT TO THIS CHILDHOOD AND THE CRIME OF MURDER?**

A.    THE KEY FACTOR HERE ISN'T THE POVERTY, IT IS THE CHAOS AND THE FAMILY DYNAMICS.   THESE DYNAMICS COULD HAVE HAPPENED TO A FAMILY THAT WERE NOT IN POVERTY.

**Q.    AND,  SO,  THE COMBINATION OF FACTORS, GIVEN THE 30 PERCENT FIGURE,  I MEAN, THERE ARE OTHER PEOPLE IN WEST VIRGINIA WHO HAVE TOUGH TIMES,  TOO?**

A.    THAT'S RIGHT.

**Q.    AND THEY DON'T ALL COMMIT THE CRIMES THAT THIS DEFENDANT HAS COMMITTED?**

A.    THAT'S RIGHT.

**Q.    AND, PARTICULARLY, WITH RESPECT TO AN AGING DEFENDANT, OR A DEFENDANT WHO IS 25 YEARS OLD,  WHO HAS HAD ACCESS TO**

**CROSS EXAM OF ARLENE ANDREWS**

**PRISON COUNSELING SERVICES, AND ACCESS TO SUPPORT FROM HIS BROTHERS AT AN OLDER AGE,  AND ACCESS TO A SUPPORTIVE MOTHER AT AN OLDER AGE,  THOSE CHILDHOOD FACTORS DON'T NECESSARILY LEAD TO THIS CRIME?**

A.   NOT NECESSARILY.  IF HE KNEW HOW TO USE THE HELP THAT WAS AVAILABLE TO HIM, BUT HE WASN'T TAUGHT THAT.

**Q.    IT TAKES KNOWING HOW TO USE IT AND A WILLINGNESS TO USE IT; IS THAT RIGHT?**

A.   THAT'S RIGHT.

MR. SCHOOLS:  BEG THE COURT'S INDULGENCE.  YOUR HONOR,  CAN WE APPROACH REAL QUICK?

(WHEREUPON, A BENCH CONFERENCE WAS HELD.)

MR. SCHOOLS:  THE DEFENDANT GAVE US, IN DISCOVERY, A SERIES OF PICTURES, ONE OF WHICH I WANT TO SHOW THE WITNESS, WHICH IS THE ONE ON TOP THERE.  OBVIOUSLY, THIS WITNESS CAN'T AUTHENTICATE IT, BUT IT CAME FROM THE DEFENDANTS.  WE WILL SEEK TO ASK HER WHETHER SHE HAS SEEN IT, WHETHER IT INDICATES ANY OF THE HOUSEHOLD PROBLEMS THAT SHE TESTIFIED ABOUT.

MS. JOHNSON:  I THINK SHE HAS SEEN IT.  I DON'T KNOW WHEN IT WAS TAKEN.  THAT IS, ACTUALLY, WHY WE DIDN'T INTRODUCE IT.  I DON'T HAVE THE INFORMATION THAT WILL TELL SORT OF WHEN IT WAS,  WHERE THEY ARE,  ANYTHING LIKE THAT. I DON'T HAVE THAT.

THE COURT:  IF YOU GOT IT FROM THE DEFENDANT, IT IS AUTHENTICATED, BUT IF THIS WITNESS DOESN'T KNOW ABOUT IT.

CROSS EXAM OF ARLENE ANDREWS

MR. SCHOOLS:  I CAN ASK HER.

MS. JOHNSON:  I THINK SHE -- I DO BELIEVE SHE HAS SEEN IT, BUT I CAN'T SAY.

THE COURT:  DO YOU OBJECT IN ANY WAY?

MS. JOHNSON:  MY OBJECTION IS,  I MEAN,  I THINK HE HAS TO MAKE CLEAR THERE IS NO INFORMATION THAT, WE DON'T HAVE ANY,  SHE DOESN'T HAVE ANY ABOUT WHEN IT WAS TAKEN,  WHERE IT WAS TAKEN, THAT SORT OF THING.  I MEAN, I HAVE NO OBJECTION TO IDENTIFYING THOSE PEOPLE, BUT THAT IS ALL THE INFORMATION I HAVE.

THE COURT:  WHAT POINT DO YOU WANT TO MAKE WITH THIS?

MR. SCHOOLS:  MAKE THE POINT THE HOUSEHOLD DOES NOT LOOK IN AS MUCH DISARRAY AS THE WITNESSES HAVE TESTIFIED ABOUT.  SHE HAS SEEN IT, RELIED ON IT, REACHED CONCLUSIONS CONTRARY TO TESTIFY ABOUT THAT.

MS. JOHNSON:  I AM NOT SURE THAT IS IN THEIR HOUSEHOLD.

MR. SCHOOLS:  THE KIDS'S PICTURES ARE ON THE WALL.

THE COURT:  WHOSE PICTURES?

MR. SCHOOLS:  THE CHILDREN.

MS. JOHNSON:  THAT IS NOT GRANDMA.  I AM JUST TELLING YOU, I DON'T KNOW.  YOU CAN ASK HER ABOUT THE PICTURES.  I HAVE NO PROBLEM WITH THAT.  I AM JUST TELLING YOU, I DON'T KNOW THAT.  I DON'T THINK SHE KNOWS IT.

App. 00466

CROSS EXAM OF ARLENE ANDREWS

THE COURT:  YOU NEED TO EXCISE OUT THE OTHER TWO PEOPLE.

MR. SCHOOLS:  I HAVE.

THE COURT:  I WILL LET YOU ASK HER IF SHE KNOWS ANYTHING, OF HER OWN KNOWLEDGE, TO MAKE IT RELEVANT TO THE CASE.

(WHEREUPON, THE BENCH CONFERENCE CONCLUDED.)

BY MR. SCHOOLS:

**Q.   DR. ANDREWS,  I WILL SHOW YOU A PICTURE.  I WANT TO SHOW YOU A PICTURE THAT HAS BEEN MARKED AS GOVERNMENT'S EXHIBIT 412.  IS THAT A PICTURE YOU HAVE SEEN, DR. ANDREWS?**

A.   I THINK SO.

MR. SCHOOLS:  YOUR HONOR,  WE OFFER 412 INTO EVIDENCE.

MS. JOHNSON:  OVER OUR OBJECTION BECAUSE WE DON'T KNOW WHEN IT IS TAKEN OR WHERE.

THE COURT:  SO, DO YOU OBJECT?

MS. JOHNSON:  AS I DISCUSSED, YES,  YOUR HONOR.  I KNOW WHO IT IS.  I THINK SHE KNOWS WHO IT IS.  I DON'T THINK SHE KNOWS MORE.

THE COURT:  YOU NEED TO TRY TO LAY MORE OF A FOUNDATION.

BY MR. SCHOOLS:

**Q.   DR. ANDREWS, DO YOU KNOW WHO IS PICTURED IN GOVERNMENT'S EXHIBIT 412?**

**CROSS EXAM OF ARLENE ANDREWS**

A.   I THINK I KNOW, BUT, NORMALLY, IF I HAD A PICTURE LIKE THIS, I WOULD ASK THE FAMILY MEMBER TO POINT OUT WHO THE PEOPLE IN THE FAMILY ARE.   THE WOMAN LOOKS VAGUELY FAMILIAR TO ME, BUT I WOULD NEED TO KNOW.   I DIDN'T KNOW THESE PEOPLE AT THIS AGE,  AND, NORMALLY, IF I AM INTERVIEWING A FAMILY, I WOULD ASK THEM TO POINT IT OUT.   I DID NOT HAVE THIS PICTURE WHEN DOING THE INTERVIEW.

**Q.    YOU HAVE SEEN THE PICTURE SINCE YOU DID THE INTERVIEW?**

A.    YES.

**Q.    DID YOU RELAY, IN ANY WAY -- DID THE PICTURE HAVE ANYTHING TO DO WITH THE OPINIONS, AS YOU EXPRESSED IN THE CASE, AS PART OF THE INFORMATION YOU CONSIDERED?**

A.    NO.

**Q.    YOU DIDN'T CONSIDER THAT AT ALL?**

A.    NO.

MR. SCHOOLS:  CAN WE APPROACH,  YOUR HONOR?

(WHEREUPON, A BENCH CONFERENCE WAS HELD.)

MR. SCHOOLS:  I THINK THAT IS RELEVANT,  TOO.   THE FACT --

MS. JOHNSON:  I'M SORRY.  I DIDN'T HEAR THE FIRST THING YOU SAID.  I WAS WALKING.

THE COURT:  I WILL SUSTAIN THE OBJECTION, BUT THEN I WOULD ALLOW YOU TO QUESTION HER, YOU WOULD HAVE WANTED TO BE GIVEN A PICTURE OF A TYPICAL FAMILY SCENE, IF ONE EXISTED.

MS. JOHNSON:  SHE HAS SEEN IT.

CROSS EXAM OF ARLENE ANDREWS

MR. SCHOOLS:  THEY GAVE US THE PICTURE OF THE FAMILY. THEY OBJECT.

MS. JOHNSON:  WE GAVE IT TO YOU.  WE GAVE IT FOR DISCLOSURE.

MR. SCHOOLS:  NO, YOU HAVEN'T DONE THAT.   YOU GIVE IT TO US, YOU WERE GIVING THEM TO US UNDER RULE 16 DISCLOSURE, WHICH WAS AN INDICATION THEY WERE GOING TO OFFER IT INTO EVIDENCE.  I MEAN,  I ASKED MR. BLUME WHO WAS GOING TO AUTHENTICATE THE PICTURE.  HE SAID, DO WE HAVE OBJECTIONS TO ITS ADMISSIBILITY?  I SENT BACK AN E-MAIL, I SAID, AS LONG AS SOMEONE CAN AUTHENTICATE IT, IT IS FINE.   HE SAID RONNIE COULD DO IT; DEWAYNE COULD DO IT.  THEY DIDN'T DO IT.

THE COURT:   BUT SHE SAID SHE DID NOT RELY ON IT.

MR. SCHOOLS:  EXACTLY.  I THINK IT IS IMPORTANT THAT THIS IS INFORMATION SHE HAD AVAILABLE THAT SHE DID NOT CONSIDER IN REACHING HER CONCLUSION.

THE COURT:   YOU CAN MAKE THAT POINT.  I JUST DON'T KNOW THAT THE PICTURE, ITSELF, IS ADMISSIBLE.   YOU COULD BRING OUT THAT THERE IS A PICTURE THAT DEPICTS WHAT APPEARS TO BE A NORMAL HOME LIFE SETTING THAT SHE DIDN'T CARE TO BASE ANY EMPHASIS ON.  I THINK YOU CAN EXPLORE THAT.   I WOULD SUSTAIN THE OBJECTION TO THE PICTURE COMING IN.

MR. SCHOOLS:  I UNDERSTAND.

MS. JOHNSON:  I DO WANT TO SAY, FOR THE RECORD, WHEN YOU ASKED ABOUT WHETHER IT COULD BE AUTHENTICATED, WENT TO --

CROSS EXAM OF ARLENE ANDREWS

WE CAN IDENTIFY WHO THE PEOPLE ARE IN THAT.  THAT IS ALL THEY COULD TESTIFY TO.

THE COURT:  DO YOU WANT THE PICTURE KEPT OUT?

MS. JOHNSON:  I DO.

THE COURT:  I SUSTAIN THAT OBJECTION.

(WHEREUPON, THE BENCH CONFERENCE CONCLUDED.)

BY MR. SCHOOLS:

**Q.    DR. ANDREWS, THAT APPEARS TO BE A FAMILIAL PICTURE?**

A.    YES.

**Q.    FAMILIAL PICTURE TAKEN IN THE HOME,  RIGHT?**

A.    YES.

**Q.    PLANTS HANGING FROM THE CEILING?**

A.    YES.

**Q.    PICTURES ON THE WALL?**

A.    RIGHT.

**Q.    A "HOME SWEET HOME" MIRROR HANGING ON THE WALL?**

A.    YES.

**Q.    CHILDREN'S PICTURES ON THE WALL?**

A.    YES.

**Q.    AND YOU CAN, ACTUALLY, SEE INTO THE KITCHEN OF THAT PICTURE,  CAN'T YOU?**

A.    YES.

**Q.    THERE IS A PLANT HANGING IN THE KITCHEN?**

A.    YES.

**Q.    THINGS, GENERALLY, LOOK PRETTY ORDERLY,  DON'T THEY?**

**REDIRECT EXAM OF ARLENE ANDREWS**

A.    YES.

**Q.    BUT YOU DIDN'T CONSIDER THIS PICTURE IN REACHING YOUR CONCLUSIONS THAT YOU HAVE TESTIFIED TO ABOUT TODAY?**

A.    I DIDN'T SEE THE PICTURE UNTIL AFTER I HAD COMPLETED MY REPORT.

**Q.    IT DOESN'T CHANGE YOUR OPINION?**

A.    NO.

        MR. SCHOOLS:  BEG THE COURT'S INDULGENCE ONE SECOND. NO FURTHER QUESTIONS.  THANK YOU.  DR. ANDREWS.

        THE COURT:  REDIRECT.

    DO WE HAVE AN ID NUMBER FOR THAT PICTURE?

        MR. SCHOOLS:  412.

                        REDIRECT EXAM

BY MS. JOHNSON:

**Q.    DR. ANDREWS,  MR. SCHOOLS STARTED BY ASKING YOU ABOUT THE RELATIONSHIP BETWEEN VICTIMS AND PERPETRATORS, AS I RECALL.  AND YOU, ACTUALLY, HAVE DONE MORE WORK WITH VICTIMS THAN YOU HAVE WITH PERPETRATORS?**

A.    YES.

Q.    SO,  IT IS THE CASE THAT THERE IS, IN MANY SUCH SITUATIONS, ACTUAL AFFECTION BETWEEN VICTIMS AND PERPETRATORS, IS THAT YOUR EXPERIENCE?

        MR. SCHOOLS:  I WILL OBJECT TO MS. JOHNSON LEADING HER OWN WITNESS.

BY MS. JOHNSON:

REDIRECT EXAM OF ARLENE ANDREWS

Q.   IN YOUR EXPERIENCE, ARE THE EMOTIONS BETWEEN PERPETRATORS AND VICTIMS ALL NEGATIVE?

A.   NO.   AND PEOPLE STAY FOR MANY DIFFERENT REASONS.   IN SOME CASES, THEY ARE REALLY TRYING TO MAKE IT WORK.   THERE IS, WHAT WE CALL, A CYCLE OF VIOLENCE, WHERE ABUSE HAPPENS, YOU ARE ONE PERSON AGAINST,  USUALLY THE MAN AGAINST THE WOMAN, OR RECIPROCAL VIOLENCE.   THEN A PERIOD OF PEACEMAKING WHERE THEY ARE REALLY TRYING TO MAKE IT WORK.   AND THEN SOMETHING HAPPENS, IT DETERIORATES, THE VIOLENCE HAPPENS AGAIN.

IN OTHER RELATIONSHIPS, PARTICULARLY IN THIS ONE, THERE DOESN'T SEEM TO BE ANY PERIODS OF AFFECTION.   I THINK THE MAIN THING THAT KEPT THIS COUPLE TOGETHER WAS THEIR MUTUAL DEPENDENCE ON ALCOHOL.

Q.   JUST ONE OTHER QUESTION ABOUT BATTERING RELATIONSHIP OR ABUSIVE RELATIONSHIPS.  MR. SCHOOLS ASKED YOU IF, SOMETIMES, A PERPETRATOR MIGHT BE ATTRACTED TO THE SORT OF PERSON THAT WOULD BE AN EASY VICTIM?

A.   YES.

Q.   AND YOU SAID, "YES."   AND WHAT ABOUT PREVIOUS VICTIMS? CAN YOU DESCRIBE WHETHER THERE IS ANY PATTERN AS TO WHO THEY ARE ATTRACTED TO?

A.   THEY DO SEEM TO BE MORE LIKELY TO FIND SOMEONE WHO IS LIKELY TO BE ABUSIVE.

Q.   MR. SCHOOLS ALSO ASKED YOU ABOUT WHETHER, AS AN ADULT,

**REDIRECT EXAM OF ARLENE ANDREWS**

**WHETHER YOU KNEW ANYTHING ABOUT MR. FULKS'S ACCESS TO TREATMENT AND THERAPY AS AN ADULT, AND YOU SAID YOU DIDN'T KNOW THAT.**

A.   I DON'T KNOW.   I DID LOOK BRIEFLY AT THE RECORDS, BUT I DON'T KNOW WHAT KIND OF TREATMENT WAS AVAILABLE OR WHETHER THERE ARE PROGRAMS IN THE PRISONS FOR THEM.

**Q.   YOU CAN STATE YOU HAVE A GENERAL AWARENESS OF HOW COMPREHENSIVE PROGRAMS ARE TYPICALLY IN PRISON, OR IS THAT OUTSIDE YOUR KNOWLEDGE?**

A.   I KNOW IN SOUTH CAROLINA.  I KNOW SOMETHING ABOUT STATE PRISONS.  AND I KNOW THAT, WITH FUNDING CUTBACKS, THE FIRST --

MR. SCHOOLS:  I OBJECT TO THAT, YOUR HONOR.  IT IS IRRELEVANT.  MR. FULKS HAS NOT BEEN IMPRISONED IN SOUTH CAROLINA EXCEPT FOR THIS OFFENSE AND FOR BRIEF PERIODS BEFORE.

THE COURT:  WHAT ABOUT THAT, MS. JOHNSON?

MS. JOHNSON:  WELL, HE WAS IMPRISONED IN SOUTH CAROLINA.  BUT IF YOUR HONOR DOESN'T -- I THINK IT IS RELEVANT BECAUSE I THINK SHE HAS A GENERAL KNOWLEDGE ABOUT SOUTH CAROLINA.  I THINK SHE WAS ABOUT TO SAY SOMETHING ABOUT OTHER SYSTEMS, ALTHOUGH I DON'T THINK SHE CAN SAY ANYTHING ABOUT INDIANA, SPECIFICALLY; IS THAT RIGHT?

THE WITNESS:  THAT'S CORRECT.

THE COURT:  WHAT SYSTEM DO YOU WANT TO ASK HER ABOUT?

MS. JOHNSON:  ASK HER ABOUT HER GENERAL AWARENESS OF

REDIRECT EXAM OF ARLENE ANDREWS

TREATMENT PROGRAMS IN THE STATES, AS A WHOLE.  SHE WILL NOT BE ABLE TO SAY ANYTHING SPECIFIC.

THE COURT:  I WILL ALLOW IT AS A GENERAL QUESTION.

THE WITNESS:  I CAN ANSWER THAT AS A SOCIAL WORK PROFESSOR.  WE USED TO PREPARE PEOPLE TO WORK IN CORRECTIONS.  NOW, THERE ARE VERY FEW JOBS FOR TREATMENT WORK IN CORRECTIONS BECAUSE OF CUTBACKS.

MR. SCHOOLS:  I WILL OBJECT.  UNLESS SHE CAN BE SPECIFIC ABOUT INSTITUTIONS MR. FULKS IS INCARCERATED IN, IT IS IRRELEVANT.

THE COURT:  I THINK I AGREE WITH MR. SCHOOLS.

MS. JOHNSON:  I THOUGHT YOU OVERRULED.

THE COURT:  I DIDN'T REALIZE YOU WERE GOING THIS FAR DOWN THIS TRAIL.  I JUST DON'T THINK I CAN LET HER GENERALIZE ABOUT TREATMENT FACILITIES IN STATE INSTITUTIONS IF MR. FULKS DIDN'T SPEND ANY TIME THERE.  I WOULD SUSTAIN THE OBJECTION.

BY MS. JOHNSON:

**Q.    LET ME ASK YOU ABOUT, ARE PEOPLE EQUALLY READY TO SEEK TREATMENT DEPENDING ON SOMETHING HORRIBLE?  EVERYONE WHO HAS SOMETHING HORRIBLE TO THEM, ARE THEY EQUALLY READY TO SEEK TREATMENT?**

A.    NOT AT ALL.  I THINK THERE ARE A LOT OF INDIVIDUAL DIFFERENCES.

Q.    OR COOPERATE WITH TREATMENT, EVEN IF IT WERE OFFERED?

MR. SCHOOLS:  I OBJECT TO THE LEADING NATURE OF THE

REDIRECT EXAM OF ARLENE ANDREWS

QUESTION.

MS. JOHNSON:  I AM ASKING IF PEOPLE ARE EQUALLY READY.  I AM NOT SAYING THEY ARE OR NOT.

THE COURT:  OVERRULED.

MS. JOHNSON:  I AM ASKING.

THE WITNESS:  CAN I ANSWER IT?

BY MS. JOHNSON:

Q.    YES.

A.    PEOPLE, WHEN THEY COME TO TREATMENT, THEY SOMETIMES COME VOLUNTARILY,  THEY SOMETIMES COME BECAUSE THEY ARE STRUGGLING,  THEY SOMETIMES COME BECAUSE THEY ARE REQUIRED TO. WHETHER THEY ACTUALLY PARTICIPATE IN THE TREATMENT AND RESPOND TO IT, VARIES DRAMATICALLY FROM ONE PERSON TO ANOTHER.  IT DEPENDS A LOT ON THEIR PRIOR HISTORY OF ACCEPTING AND RECEIVING AFFECTIVE HELP,  THEIR CONFIDENCE IN THE SPECIFIC NATURE OF THE KIND OF HELP THAT IS AVAILABLE TO THEM.  THEIR TRUSTS,  THEIR ABILITY TO FORM A TRUSTING RELATIONSHIP, WHICH REALLY IS THE KEY TO ALMOST ALL TREATMENT FOR EMOTIONAL AND, TO SOME EXTENT, BEHAVIORAL PROBLEMS.

Q.    AND BASED ON WHAT YOU KNOW, BOTH ABOUT MR. FULKS'S UPBRINGING AND ABOUT HIS EXPERIENCES WITH BRIEF TREATMENT ATTEMPTS AS AN ADOLESCENT, ARE THERE FACTORS THAT LEAD YOU TO THINK HE WOULD BE LIKELY TO EITHER SEEK, OR ACCEPT TREATMENT, OR NOT LIKELY TO DO SO?

A.    IT WOULD BE UNLIKELY TO SEEK OR ACCEPT TREATMENT

REDIRECT EXAM OF ARLENE ANDREWS

BECAUSE IT WAS PARTLY LEARNED WITH HIS MOTHER.  HIS FATHER RARELY WENT TO TREATMENT.  HE DID WITH HIM ONCE IN INDIANA. HIS MOTHER, FOR THE MOST PART, DIDN'T FOLLOW THROUGH ON THE TREATMENT THAT WAS MADE AVAILABLE TO THEM.  SO, HE WOULD HAVE LEARNED NOT TO DO IT.  HE ALSO HAD A GENERAL MISTRUST.

Q.    MR. SCHOOLS ALSO ASKED YOU ABOUT A REPORT THAT MR. FULKS MADE ABOUT BECOMING AN ADDICT AT THE AGE OF 21, AND POINTING OUT THAT HE WAS INCARCERATED SHORTLY THEREAFTER.  IN YOUR EXPERIENCE, ARE PEOPLE WHO HAVE HAD THE KIND OF DRUG EXPERIENCES THAT MR. FULKS HAD AS A CHILD, DO THEY TEND TO BE PRECISE ABOUT WHEN ADDICTION STARTS OR WHEN DRUG EXPERIENCES START?

A.    NO.    THEY HAVE A VAGUE RECOLLECTION OF -- THEY COULD USUALLY SORT OF REMEMBER THE GENERAL AGE THEY WERE WHEN THEY STARTED,  BUT THEY RARELY EVEN TALK ABOUT BEING ADDICTED. THEY JUST TALK ABOUT USING,  I USED THIS,  I USED THAT.

Q.    AND THAT IS PARTLY WHY YOU DON'T RELY ON THAT PERSON AS YOUR PRIMARY SOURCE OF INFORMATION ABOUT ADDICTION,  EITHER?

A.    SOMETIMES IT IS THE ONLY PERSON YOU HAVE, BUT, YES, YOU ALWAYS TRY TO GET WHAT WE CALL COLLATERAL CONTEXT TO GET A CONFIRMATION OF WHAT WAS ACTUALLY USED.

Q.    AND, IN THIS CASE,  WITH RESPECT TO HIS CHILDHOOD USE OF ALCOHOL AND MARIJUANA AND HUFFING GAS,  YOU HAD OTHER SOURCES THAN MR. FULKS?

A.    I DID.

REDIRECT EXAM OF ARLENE ANDREWS

Q.    MR. SCHOOLS ALSO ASKED YOU ABOUT THE TEETH AND THE LETTER ABOUT THE TEETH.   DID YOU MEAN THAT THE SOLE --

MR. SCHOOLS: OBJECTION.  THIS IS GOING TO BE LEADING.  SHE WILL ASK HER -- SHE WILL PUT THE WORDS IN HER MOUTH.  SHE MIGHT AS WELL TAKE THE WITNESS STAND, JUDGE.

THE COURT:  IT DID SOUND LIKE A LEADING QUESTION.

MS. JOHNSON:  I WILL START ANOTHER WAY.  IT WILL TAKE LONGER.

BY MS. JOHNSON:

**Q.    WHEN YOU FOUND THE FULKS FAMILY WERE ASHAMED OF THEIR FAMILY, HAD AN OUTSIDER ROLE IN THE NEIGHBORHOOD, WHAT WAS THE BASIS OF THAT FINDING?**

A.    WELL, THE -- IT REALLY IS THE WAY THAT THEY TALK ABOUT THEMSELVES.  THEY SORT OF SEE THEMSELVES AS DIFFERENT.  YOU KNOW, HUMOR IS ONE WAY PEOPLE DEAL WITH FEELING UNCOMFORTABLE ABOUT THINGS.  THEY ALSO CALL THEMSELVES HILLBILLY, PARTICULARLY IN INDIANA, IN WHICH IS REALLY A PUT-DOWN TERM OUTSIDE THEIR AREA, BUT THEY TAKE IT ON IN A HUMOROUS WAY AS A BADGE OF HONOR.  IT HELPS THEM TO DEAL WITH THE DISCOMFORT ABOUT FEELING DIFFERENT AND PUT DOWN.

**Q.    THAT IS RELATED TO ANOTHER QUESTION, IS IT UNUSUAL -- WELL, WHEN A CHILD HAS BEEN EITHER ABUSED OR NEGLECTED, WOULD YOU EXPECT THAT THEY WOULD BE REJECTING OF THE PARENT THAT ABUSED OR NEGLECTED THEM, OR WOULD YOU NOT BE ABLE TO MAKE A PREDICTION?**

**REDIRECT EXAM OF ARLENE ANDREWS**

A.   NOT AT ALL.   CHILDREN HAVE AN AMAZING CAPACITY TO YEARN FOR AND WANT AFFECTION AND ATTENTION FROM THEIR PARENTS, EVEN WHEN IT IS REPEATEDLY, REPEATEDLY REJECTED.   THEY ALMOST ALWAYS WANT, AND SOMETIMES THEY WILL EVEN IDEALIZE AND IMAGINE THAT THEIR PARENTS ARE MUCH MORE CARING FOR THEM THAN THEIR BEHAVIOR -- THAT THE BEHAVIOR THAT IS OBSERVED BY AN OUTSIDE PERSON, FOR EXAMPLE, WOULD ACTUALLY OBSERVE.   WE SEE THAT A LOT WITH CHILDREN WHO ARE IN THE CHILD WELFARE SYSTEM.   THEY REALLY WANT TO BE WITH THEIR PARENT.

**Q.   AND MY LAST QUESTION IS,  WHEN YOU DESCRIBE THE CHAOS, THE CHART IS DOWN NOW, BUT THE CHAOS WAS THE PRIMARY FINDING, DID THAT MEAN, THAT ON EVERY OCCASION, EVERYONE WAS DRINKING? I WILL PUT IT DIFFERENT.   DID THAT MEAN, THAT ON EVERY OCCASION, CHAOS WAS PREVALENT?**

A.   ACTUALLY, THE CHAOS COMES FROM THE LACK OF PREDICTABILITY.   IT MEANS THAT IT IS NOT PREDICTABLE, THAT IT IS GOING TO BE CONSTANT.   IT IS JUST BASIC, IT HAPPENS OVER AND OVER.   THERE ARE THESE LITTLE PERIODS WHERE YOU KNOW THEY MIGHT HAVE A BIRTHDAY CAKE, OR THEY WENT TO THE LAKE SWIMMING SOMETIMES. SO, THERE WERE PERIODS WHEN THEY DID SOME THINGS THAT WERE SORT OF A RELIEF FROM THAT, BUT THE EVENINGS AND WEEKENDS, IN PARTICULAR, THERE WAS THIS PERVASIVE SENSE OF CHAOS.   AND THE ARGUING SEEMED TO HAPPEN JUST OUT OF THE BLUE.   NO, THEY WEREN'T CONSTANT.  SOMETIMES THE PARENTS DIDN'T SPEAK TO EACH OTHER.

Q.    THERE WERE POSITIVE EVENTS IN MR. FULKS'S CHILDHOOD?

A.    YES.

Q.    AND YOU REFERRED TO HIS MOTHER COOKING?

A.    UH-HUH (AFFIRMATIVE RESPONSE).

Q.    YOU REFERRED TO SOMETIMES THEY WOULD GO VISIT THE GRANDMA?

A.    YES.

Q.    AND THERE WERE OTHER POSITIVE THINGS?

A.    I REALLY LOOKED FOR THAT.   THE FAMILY MEMBERS VERY QUICKLY START TALKING ABOUT THE NEGATIVE THINGS.   YES, THERE WERE SOME TIMES LIKE THAT.

        MS. JOHNSON:  THANK YOU,  DR. ANDREWS.

        MR. SCHOOLS:  BRIEFLY,  YOUR HONOR.

                    RECROSS EXAM

BY MR. SCHOOLS:

Q.    DOCTOR ANDREWS, WITH RESPECT TO THE PERVASIVENESS OF THE CHAOS, YOU MENTIONED, I BELIEVE YOU FOUND A RECORD OF MS. -- OF DIANA FULKS BEING ARRESTED ON ONE OCCASION FOR PUBLIC AND DISORDERLY?

A.    I DIDN'T SEE A RECORD.   I WAS TOLD THAT BY DIFFERENT MEMBERS OF THE FAMILY.

Q.    YOU WERE TOLD SHE WAS ARRESTED ON ONE OCCASION?

A.    RIGHT.

Q.    AND YOU DIDN'T TESTIFY THAT YOU WERE TOLD OR HAD ANY RECORDS INDICATING THAT THE FATHER HAD BEEN ARRESTED FOR DRUNK

**RECROSS EXAM OF ARLENE ANDREWS**

**AND DISORDERLY CONDUCT,  YOU DID NOT SEE THAT?**

A.    NO,  I DID NOT.   HE TOLD ME HE HAD NEVER BEEN

ARRESTED.

**Q.    AND SO, IT IS NOT UNCOMMON IN FAMILIES OR SITUATIONS**

**WHERE THERE IS PERVASIVE ALCOHOLISM,  PERVASIVE, IN EFFECT,**

**BRAWLROOM FIGHTING AT THE HOUSE THAT YOU WOULD EXPECT THOSE**

**INDIVIDUALS TO BE REGULARLY ARRESTED FOR DRUNK AND DISORDERLY**

**CONDUCT?**

A.    AND WE, ACTUALLY, HAVE REFERENCE IN CHAD'S FILES THAT A

POLICE OFFICER FREQUENTLY WENT TO THE HOUSE.   IT WAS KNOWN TO

THE HOUSE.   I ASKED FOR THOSE RECORDS, THEY AREN'T THERE.   I

DON'T KNOW WHY.

**Q.    IF THE POLICE OFFICER ARRIVED, HE PERCEIVED A SITUATION**

**THAT DID NOT REQUIRE ARREST?**

A.    APPARENTLY.

**Q.    AND IN FIGHTS THAT WERE SPILLING OUT IN THE STREET AND**

**CAUSING DISRUPTION IN THE NEIGHBORHOOD, VERY WELL LIKELY COULD**

**CAUSE ARREST, COULD THEY NOT?**

A.    YES.

**Q.    AND I BELIEVE,  DOCTOR ANDREWS,  THAT YOU TESTIFIED**

**THAT ALL OF MR. FULKS'S BEHAVIORS WERE LEARNED, AND ANYTHING**

**LEARNED CAN BE UNLEARNED,  ISN'T THAT WHAT YOU SAID?**

A.    I DIDN'T SAY ALL.   IN THE CONTEXT, AT THAT POINT, THAT

HIS BEHAVIORS WERE LEARNED, AND THINGS THAT ARE LEARNED CAN BE

UNLEARNED,  YES.

COLLOQUY

MR. SCHOOLS:  THANK YOU.

THE COURT:  THANK YOU, DR. ANDREWS.  YOU MAY STEP DOWN.

DO YOU WANT TO START ANOTHER WITNESS?

MS. JOHNSON:  WE WILL NEED TO APPROACH THE BENCH ABOUT THAT.

(WHERUEPON, A BENCH CONFERENCE WAS HELD.)

MS. JOHNSON:  YOUR HONOR, I WILL CALL PETE SKIDMORE, OUR INVESTIGATOR.  AND I AM GOING TO, AS I HAVE TOLD MR. GASSER, I PLAN TO ASK HIM ABOUT TWO DIFFERENT THINGS.  ONE THING I WANT TO ASK ABOUT IS HIS INVESTIGATION OF HEATHER JO JACOBI.  BUT THE THING THAT I NOTIFIED MR. GASSER ABOUT, TO WHICH I THINK HE HAS OBJECTION, IS THAT I INTEND TO ELICIT THAT RONNIE FULKS'S ONE INTERVIEW BY MR. NETTLES AND MR. SKIDMORE SAID THAT CHAD GAVE HIM THE .45 WHEN HE WENT THROUGH INDIANA THE FIRST TIME.  AND IT IS MY POSITION --

THE COURT:  THAT WOULD BE HEARSAY, ISN'T IT?

MS. JOHNSON:  IT IS, BUT IT IS A DECLARATION AGAINST PENAL INTEREST.  MR. FULKS IS A FELON.  HE WAS AWARE THAT HE WAS A FELON.  AND WE MADE IT CLEAR THAT THAT IS WHY HE WAS NOT TO TESTIFY TO THAT IN COURT.

THE COURT:  STILL LOOKING TO HAVE A SHORT DAY TOMORROW?

MS. JOHNSON:  YES.

THE COURT:  GOING TO HAVE A SHORT DAY?

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

UNITED STATES OF AMERICA,  )   CR. NO. 4:02-992
                          )    COLUMBIA, SC
                          )    JUNE 24, 2004
                          )

VERSUS                   )
                          )

CHADRICK E. FULKS      )
    DEFENDANT.      )
                          )

BEFORE THE HONORABLE JOSEPH F. ANDERSON, JR.,
CHIEF UNITED STATES DISTRICT COURT JUDGE
JURY TRIAL
VOLUME XVIII

APPEARANCES:

FOR THE GOVERNMENT:       STROM THURMOND, JR., USA
                         SCOTT SCHOOLS, AUSA
                         JONATHAN S. GASSER, AUSA
                         UNITED STATES ATTORNEY'S OFFICE
                         1441 MAIN STREET, SUITE 500
                         COLUMBIA, SC  29201

FOR THE DEFENDANT:
                         WILLIAM F. NETTLES, IV, AFPD
                         FEDERAL PUBLIC DEFENDER'S OFFICE
                         MCMILLAN FEDERAL BUILDING
                         401 WEST EVANS STREET, ROOM 240
                         FLORENCE, SC 29503
                         JOHN H. BLUME, III, ESQ.
                         BLUME AND WEYBLE
                         P. O. BOX 11744
                         COLUMBIA, SC  29211

                         SHERRI LYNN JOHNSON, ESQ.
                         1118 AUTUMN RIDGE LANE
                         ITHACA, NEW YORK 14850

COURT REPORTER:          DEBRA R. JERNIGAN, RPR, CRR
                         UNITED STATES COURT REPORTER
                         901 RICHLAND STREET
                         COLUMBIA, SC 29201

STENOTYPE/COMPUTER-AIDED TRANSCRIPTION
*** *** *** *** ***

INDEX

DAVID BACHMAN

    DIRECT EXAM BY MR. BLUME          4

    CROSS EXAM BY MR. GASSER          32

    REDIRECT EXAM BY MR. BLUME         70

    RECROSS EXAM BY MR. GASSER         80

    RE-REDIRECT EXAM BY MR. BLUME     86

FRED BOOKSTEIN

    DIRECT EXAM BY MR. BLUME          87

    CROSS EXAM BY MR. GASSER         112

    REDIRECT EXAM BY MR. BLUME         120

ARLENE ANDREWS

    DIRECT EXAM BY MS. JOHNSON        124

    CROSS EXAM BY MR. SCHOOLS         187

    REDIRECT EXAM BY MS. JOHNSON     215

    RECROSS EXAM BY MR. SCHOOLS      223

EXHIBITS

| GOVERNMENT'S | ID | EVD |
|---|---|---|
| 411 LETTER FROM FULKS TO FATHER | | 205 |
| 412 PHOTO OF FULKS'S FAMILY | 211 | |

DEFENDANT'S

| | ID | EVD |
|---|---|---|
| 11  SLIDE THREE OF PET SCAN OF BRAIN | | 20 |
| 12PHOTO  OF FULKS CHILDREN | | 28 |
| 14  MRI DICOM OF FULKS'S BRAIN - WHITE ARCH | | 99 |
| 15  PHOTO OF UNEXPOSED AND EXPOSED ADULT MALES | | 100 |
| 16DIAGRAM OF DOTS | | 100 |
| 17PHOTO OF ISTHMUS EXPOSED AND UNEXPOSED | | 100 |
| 18DIAGRAM OF GRAPH | | 100 |
| 19RELATIVE POSITION OF CF MOS WITH DOTS | | 100 |
| 20COPY OF MS. ANDREWS' CV | | 126 |

DIRECT EXAM OF DAVID BACHMAN

THE COURT:  BRING THE JURY IN.

MR. BLUME, YOU MAY CALL YOUR NEXT WITNESS.

MR. BLUME:  WE CALL DR. DAVID BACHMAN.

DAVID BACHMAN, HAVING BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

DIRECT EXAM

BY MR. BLUME:

Q.    GOOD MORNING,  DR. BACHMAN.

A.    GOOD MORNING.

Q.    GOOD MORNING, LADIES AND GENTLEMEN.

DR. BACHMAN,  WHERE DO YOU LIVE?

A.    I LIVE IN MT. PLEASANT,  SOUTH CAROLINA, RIGHT OUTSIDE OF CHARLESTON.

Q.    AND WHAT DO YOU DO FOR A LIVING?

A.    I AM A PHYSICIAN AT THE MEDICAL UNIVERSITY OF SOUTH CAROLINA.

Q.    AND WHAT KIND OF PHYSICIAN ARE YOU?

A.    I AM A NEUROLOGIST.

Q.    AND WHAT IS A NEUROLOGIST?

A.    A NEUROLOGIST IS A SPECIALIST WHO DEALS IN DISEASES OR INJURIES RELATED TO THE BRAIN,  THE NERVOUS SYSTEM, PERIPHERAL NERVES, OR MUSCLES.

Q.    HOW LONG HAVE YOU BEEN AT THE MEDICAL UNIVERSITY?

A.    FIFTEEN YEARS.

Q.    AND WHAT ARE THE DIFFERENT THINGS YOU HAVE DONE AT THE

**DIRECT EXAM OF DAVID BACHMAN**

**MEDICAL UNIVERSITY SINCE YOU HAVE BEEN THERE?**

A.    I AM A PROFESSOR OF MEDICINE NEUROLOGY AND PSYCHIATRY AT THE MEDICAL UNIVERSITY.   I AM CURRENTLY CHIEF OF GERIATRICS AT THE VA HOSPITAL.   I AM ALSO CODIRECTOR OF THE ALZHEIMER'S CLINICAL AND RESEARCH PROGRAMS.   I HAVE BEEN A CONSULTANT TO THE INSTITUTE OF PSYCHIATRY AT THE MEDICAL UNIVERSITY.   AND ALSO WAS DIRECTOR OF THE SLEEP LAB, AT ONE TIME, AT THE MEDICAL UNIVERSITY.

**Q.    HOW DO YOU GET TO BE A NEUROLOGIST?**

A.    WELL,  YOU GO TO MEDICAL SCHOOL.  AND AFTER COMPLETING MEDICAL SCHOOL, YOU HAVE TO DO AT LEAST A YEAR OF INTERNAL MEDICINE AND THREE YEARS OF NEUROLOGY RESIDENCY.

**Q.    SO, FIRST, I ASSUME YOU HAVE TO GO TO COLLEGE.   WHERE DID YOU GO TO COLLEGE?**

A.    WENT TO CORNELL UNIVERSITY IN NEW YORK.

**Q.    WHERE DID YOU GO TO MEDICAL SCHOOL?**

A.    WENT TO EMORY UNIVERSITY IN ATLANTA,  GEORGIA.

**Q.    THEN WHAT TYPE OF TRAINING DID YOU DO AFTER THAT?**

A.    TWO YEARS OF TRAINING IN INTERNAL MEDICINE IN EMORY IN ATLANTA AND THREE YEARS OF TRAINING IN NEUROLOGY, ALSO AT EMORY IN ATLANTA.  THEN I DID A FELLOWSHIP IN BEHAVIORAL NEUROLOGY AT THE BOSTON UNIVERSITY.

**Q.    WELL,  YOU MENTIONED THE WORD "BEHAVIORAL NEUROLOGY," WHAT IS THAT?**

A.    "BEHAVIORAL NEUROLOGY" IS A SUBSPECIALTY OF NEUROLOGY.

DIRECT EXAM OF DAVID BACHMAN

IT HAS TO DO WITH THE STUDY OF INTELLECTUAL CHANGES, COGNITIVE CHANGES, BEHAVIORAL CHANGES THAT OCCUR AS A RESULT OF EITHER BRAIN INJURY OR BRAIN DISEASE.

**Q.    SO, YOU DID THESE, YOU DID YOUR TRAINING, YOU DID YOUR RESIDENCIES, THEN WHERE DID YOU GO TO WORK?**

A.    I WAS ON THE FACULTY AT BOSTON UNIVERSITY UP UNTIL I FINISHED MY FELLOWSHIP TRAINING IN '83.  FROM 1983 UNTIL 1989, I WAS ON THE FACULTY AT BOSTON UNIVERSITY.  IN 1989, I JOINED THE FACULTY AT THE MEDICAL UNIVERSITY.

**Q.    AND ARE YOU BOARD-CERTIFIED?**

A.    I AM BOARD-CERTIFIED IN NEUROLOGY, YES.

**Q.    AND THAT JUST BASICALLY MEANS YOU TAKE, AFTER ALL OF YOUR TRAINING, YOU HAVE TO TAKE A TEST?**

A.    WELL, TWO TESTS ACTUALLY, BUT, YES, THAT IS EXACTLY CORRECT.

**Q.    AND, IN YOUR WORK, PRIMARILY, IT SOUNDS LIKE YOU HAVE BEEN IN UNIVERSITY SETTINGS THROUGHOUT YOUR CAREER?**

A.    CORRECT.

**Q.    AND SO, DO YOU DO RESEARCH?**

A.    YES.

**Q.    WHAT ARE THE DIFFERENT TYPES OF THINGS YOU DO?**

A.    MY PARTICULAR AREA OF INTEREST HAS TO DO WITH DEMENTIA, ALZHEIMER'S DISEASE.  I HAVE DONE OTHER MYRIAD PSYCHIATRIC DISORDERS.  WE HAVE BRAIN DISEASE AND BRAIN INJURY THAT CAUSES BEHAVIORAL CHANGES IN PEOPLE.

DIRECT EXAM OF DAVID BACHMAN

**Q.    AND HAVE YOU PUBLISHED IN THIS AREA?**

A.    YES,  I HAVE.

**Q.    WHAT KINDS OF THINGS?**

A.    IN TERMS OF THE NUMBER OF ARTICLES OR KINDS OF ARTICLES?

**Q.    JUST A BRIEF SUMMARY.**

A.    AMONG OTHER THINGS, I WAS ON, WHEN I WAS AT BOSTON UNIVERSITY, FOR INSTANCE, I WORKED WITH THE FRAMINGHAM HEART STUDY, WHICH SOME OF YOU MAY BE FAMILIAR WITH.  WE WERE PARTICULARLY INTERESTED IN DEMENTIA, AND ALZHEIMER'S DISEASE, AND OTHER KINDS OF BRAIN PROBLEMS WITH FRAMINGHAM, SO WE PUBLISHED ARTICLES ON THAT.

ALSO PUBLISHED ARTICLES LOOKING AT DIFFERENT KINDS OF PROFILES OF NEUROPSYCHIATRIC DISTURBANCE IN DIFFERENT PATIENTS WITH DEMENTIA OR OTHER KINDS OF BRAIN INJURY.

PUBLISHED ARTICLES ON AGGRESSIVE BEHAVIOR IN PATIENTS WHO HAVE HAD HEAD INJURY AND OTHER KINDS OF BRAIN INJURIES.

ALSO PUBLISHED SOME PAPERS RELATED TO SLEEP DISTURBANCES. SO, DIFFERENT AREAS WITHIN MY FIELD.

**Q.    AND, AS I UNDERSTAND IT,  PRIMARILY YOU ARE A DOCTOR IN TREATMENT?**

A.    YES.

**Q.    BUT, ON OCCASION, YOU DO CONSULTATIONS?**

A.    OCCASIONALLY,  YES.

**Q.    LEGAL CONSULTATIONS?**

**DIRECT EXAM OF DAVID BACHMAN**

A.    YES.

Q.    AND HAVE YOU EVER BEEN CALLED AS A WITNESS TO TESTIFY ON BEHALF OF A DEFENDANT IN A CRIMINAL CASE?

A.    YES, I HAVE.

Q.    HAVE YOU BEEN QUALIFIED AS AN EXPERT WITNESS?

A.    YES, I HAVE.

Q.    IN BEHAVIORAL NEUROLOGY?

A.    YES, SIR.

Q.    HAVE YOU EVER BEEN CALLED BY THE PROSECUTION TO TESTIFY IN A CRIMINAL CASE?

A.    YES, I HAVE.

Q.    AND BEEN QUALIFIED AS AN EXPERT?

A.    YES, SIR.

MR. BLUME:  YOUR HONOR, AT THIS TIME, WE OFFER DR. BACHMAN AS AN EXPERT IN BEHAVIORAL NEUROLOGY.

THE COURT:   ANY OBJECTION?

MR. GASSER:  NO OBJECTION.

THE COURT:   YOU MAY PROCEED.

BY MR. BLUME:

Q.    DR. BACHMAN,  AT MY REQUEST,  DID YOU DO A NEUROLOGICAL EVALUATION OF THE DEFENDANT IN THIS CASE, CHAD FULKS?

A.    YES, I DID.

Q.    AND WHAT WAS THE PURPOSE OF THAT?

A.    MY UNDERSTANDING WAS THERE WAS SOME CONCERN THAT HE MIGHT HAVE SOME NEUROLOGICAL IMPAIRMENTS THAT MIGHT BE

DIRECT EXAM OF DAVID BACHMAN

IMPORTANT TO UNDERSTAND FOR PURPOSES OF HIS DEFENSE.

**Q.    AND SO, WHAT DID YOU DO?**

A.    I SAW  -- I AM GOING TO REFER TO MY REPORT THAT I SENT YOU ON JULY 31,  2003,  IS THAT ALL RIGHT?

**Q.    WE WERE TALKING ABOUT YOUR NEUROLOGICAL EVALUATION OF MR. FULKS.    WHAT DOES A NEUROLOGICAL EVALUATION CONSIST OF?**

A.    IT IS SIMILAR TO ANY KIND OF MEDICAL EVALUATION.    I SAW AND EXAMINED MR. FULKS IN MY OFFICE AT THE MEDICAL UNIVERSITY.   YOU TAKE A HISTORY.   YOU DO A PHYSICAL EXAMINATION.  AND, IN ADDITION, IN MY SPECIALTY, YOU ALSO DO WHAT IS CALLED A MENTAL STATUS EXAMINATION.

**Q.    WAS THE, I GUESS, WAS THE EVALUATION THAT YOU DID IN THIS CASE ANY DIFFERENT THAN YOU WOULD DO WITH ANYBODY THAT CAME IN WITH THE POSSIBILITY, NOT NECESSARILY,  WHEN YOU WERE TRYING TO DETERMINE IF THERE WAS A NEUROLOGICAL DISORDER?**

A.    IT IS A VERY SIMILAR APPROACH THAT I WOULD TAKE TO ANY PATIENT THAT I EXAMINE FOR WHATEVER THE REASON.

**Q.    SO,  YOU DO A HISTORY,  AS I UNDERSTAND IT?**

A.    YES.

**Q.    YOU DO A PHYSICAL EXAMINATION?**

A.    RIGHT.

**Q.    AND THEN YOU DO A MENTAL STATUS EXAMINATION?**

A.    CORRECT.

**Q.    IN THIS CASE,  YOU TOOK THE HISTORY JUST LIKE YOU WOULD FROM ANY PATIENT?**

**DIRECT EXAM OF DAVID BACHMAN**

A.    CORRECT.

**Q.    WAS THERE ANYTHING IN THAT OF SIGNIFICANCE TO YOU?**

A.    WELL, THERE WERE A NUMBER OF THINGS OF SIGNIFICANCE. THE QUESTION THAT I WAS ASKED TO ADDRESS IS, WHETHER OR NOT MR. FULKS WAS SUFFERING FROM ANY SORT OF BRAIN INJURY.  SO, IN TAKING A HISTORY FROM A PATIENT,  YOU WANT TO KNOW OR UNDERSTAND WHAT RISK FACTORS THERE MIGHT BE IN THAT PERSON'S HISTORY FOR BRAIN INJURY, AND MR. FULKS HAD QUITE A FEW.  HE TOLD ME AND OBTAINED INFORMATION, SUBSEQUENTLY, TO CONFIRM THAT, THAT APPARENTLY HIS MOTHER DRANK VERY HEAVILY WHEN SHE WAS PREGNANT WITH HIM.  HE ALSO HAD SUSTAINED A NUMBER OF HEAD INJURIES DURING THE COURSE OF HIS LIFE FROM DIFFERENT CAUSES.  HE ALSO ABUSED ALCOHOL BEGINNING AT A RELATIVELY YOUNG AGE AS A TEENAGER.  HE ALSO HAD BEEN EXPOSED TO OTHER DRUGS THAT CAN, POTENTIALLY, CAUSE BRAIN INJURY.  FOR INSTANCE,  HE TOLD ME WHAT HE HAD BEEN WHAT IS SOMETIMES CALLED A HUFFER.  SOMETIMES ADULTS, BUT MOSTLY KIDS, WILL INHALE GLUE OR GASOLINE FUMES IN ORDER TO GET HIGH.  IT IS WELL KNOWN THAT THOSE SORTS OF FACTORS CAN ALSO, POTENTIALLY, PLACE SOMEBODY AT A RISK FOR BRAIN INJURY.  SO,  THAT WAS THE KIND OF HISTORICAL INFORMATION THAT I OBTAINED FROM MR. FULKS.

**Q.    AS I UNDERSTAND IT THEN, THE PURPOSE OF GETTING THE HISTORY, IS JUST TO SORT OF KNOW WHERE TO LOOK AND HOW TO GO FROM THERE?**

A.    CORRECT.   RIGHT.

App. 00491

DIRECT EXAM OF DAVID BACHMAN

Q.    SO,  YOU OBTAINED HIS HISTORY.   THEN YOU SAID -- WHAT DID YOU DO NEXT?

A.    I DID A GENERAL PHYSICAL EXAMINATION.

Q.    DOES A PHYSICAL EXAMINATION THAT A NEUROLOGIST DOES, IS IT LIKE ANY PHYSICAL EXAMINATION?

A.    WELL,  A NEUROLOGIST IS PARTICULARLY INTERESTED IN FINDINGS ON THE EXAM THAT WOULD RELATE TO THE BRAIN,  THE BRAIN FUNCTION.  SO,  IT IS DIFFERENT IN MANY WAYS THAN SORT OF THE GENERAL PHYSICAL YOU MIGHT GET IF YOU GO TO YOUR FAMILY PHYSICIAN, WHO IS INTERESTED IN DIFFERENT KINDS OF PROBLEMS.

Q.    SO,  TALK ABOUT YOUR PHYSICAL EXAMINATION.

A.    SURE.  I WILL BE HAPPY TO.

THERE WERE A COUPLE OF THINGS ON MR. FULKS'S PHYSICAL EXAMINATION I WAS PARTICULARLY INTERESTED IN.  I THOUGHT THAT HIS FACE WAS SORT OF AN ODD APPEARANCE.  THERE WAS SOME ASYMMETRY TO HIS FACE.  THAT, IN AND OF ITSELF, DOESN'T PROVE ANYTHING, BUT AS YOU GO THROUGH ON AN EXAM LIKE THIS, YOU JUST MAKE A NOTE OF THINGS THAT SORT OF STRIKE YOU, AND THAT MAY OR MAY NOT SORT OF FIT A PATTERN LATER ON WHEN YOU EVALUATE THE PATIENT.

HE ALSO HAD, ON PHYSICAL EXAMINATION,  HE HAS A LOT OF CROWDING OF HIS TEETH IN HIS UPPER TEETH AND LOWER TEETH. AND THAT CAN SOMETIMES BE EVIDENCE THAT THERE IS SOME CONGENITAL ABNORMALITIES IN THE WAY THE PART OF THE FACE IS PUT TOGETHER.  IF THERE IS NOT ENOUGH SPACE FOR THE TEETH TO

DIRECT EXAM OF DAVID BACHMAN

FORM, BUT AGAIN, THAT IS ONE FINDING.

HIS MOVEMENTS, AS A WHOLE, WERE SORT OF SLOW, EFFORTFUL. HIS DEEP TENDON REFLEXES, YOU KNOW WHEN THEY BANG ON YOUR KNEE AND YOUR KNEE JERKS, WE DO TEST ALL OF THOSE REFLEXES THROUGHOUT THE BODY. HIS REFLEXES WERE DIMINISHED THROUGHOUT, EXCEPT FOR HIS ANKLE JERKS, WHICH WERE RELATIVELY NORMAL.

WE LOOK FOR OTHER EVIDENCE OF OTHER ABNORMAL MOVEMENTS, WHICH I DIDN'T SEE ON HIS EXAMINATION. AND HE ALSO --

**Q. WHICH YOU DID NOT SEE?**

A. WHICH I DID NOT SEE.

AND ALSO HE HAD BEEN IN A NUMBER OF ALTERCATIONS, BY HIS REPORT. AND HE HAD PAIN RELATED TO A NUMBER OF PARTS OF HIS BODY, INCLUDING HIS UPPER NECK, HIS JAW, HIS REAR END, AND HIS WRIST. SO, THOSE WERE ALSO NOTED ON HIS PHYSICAL EXAM.

**Q. OKAY. SO, AGAIN, AT THIS POINT, YOU HAVE TAKEN THE HISTORY. NOW YOU HAVE DONE THE PHYSICAL EXAMINATION. AND SO THEN, YOU DO A MENTAL STATUS EXAMINATION?**

A. RIGHT.

**Q. WHAT IS A MENTAL STATUS EXAMINATION?**

A. MENTAL STATUS EXAMINATION, AS A NEUROLOGIST DOES IT OR AS A BEHAVIORAL NEUROLOGIST DOES IT, IT IS WHAT IS CALLED SORT OF A BEDSIDE MENTAL STATUS EXAMINATION. IT IS SIMILAR BUT DIFFERENT TO WHAT A NEUROPSYCHOLOGIST DOES. A NEUROPSYCHOLOGIST HAS A CERTAIN SET STANDARD BATTERY OF TESTS

DIRECT EXAM OF DAVID BACHMAN

THAT A NEUROPSYCHOLOGIST GIVES,  SITS DOWN WITH PENCIL AND

PAPER, THESE ARE STANDARDIZED TESTS.   BEHAVIORAL NEUROLOGISTS

USES TESTS THAT ONE CAN DO SORT OF AT THE BEDSIDE, BASICALLY,

WITH SORT OF A PIECE OF PAPER,  AND A PENCIL, AND WHATEVER YOU

HAVE IN YOUR POCKET TO TEST THE PATIENT.   AND IT IS A LITTLE

BIT MORE FREESTYLE TO TRY AND TEST AND LOOK AT DIFFERENT

HYPOTHESIS ABOUT WHAT SORT OF DEFICITS A PATIENT MAY HAVE.

     SO,  THERE ARE A NUMBER OF ASPECTS OF THE MENTAL STATUS

EXAMINATION THAT I DID WITH MR. FULKS.

**Q.    SO,  YOU DID THAT.   SO NOW, THEN I GUESS WHAT I AM**

**TRYING TO GET AT, AS A BEHAVIORAL NEUROLOGIST, WAS THERE**

**ANYTHING THAT WAS OF SIGNIFICANCE TO YOU?**

A.    YES.

**Q.    ON THE MENTAL STATUS EXAMINATION?**

A.    YES.

**Q.    BRIEFLY TELL US.**

A.    ONE OF THE LITTLE BEDSIDE TESTS THAT WE GIVE IS

SOMETHING CALLED A MINI MENTAL STATE EXAMINATION.  THIS IS AN

EXAMINATION THAT TESTS ORIENTATION,  MEMORY.  YOU HAVE THEM

WRITE A SENTENCE,  DRAW A BOX,  ETC.  WE USE THIS, FOR

INSTANCE, VERY OFTEN IN SCREENING PEOPLE FOR ALZHEIMER'S

DISEASE, BUT IT IS ALSO USED TO TEST OTHER PATIENTS.  A NORMAL

SCORE IS 30,  30 OUT OF 30.   WE BEGIN TO BE WORRIED ABOUT

DEMENTIA AT 24 OUT OF 30.  MR. FULKS'S SCORE WAS 23 OUT OF 30.

SO,  PLACING HIM IN AN IMPAIRED RANGE, EVEN FOR A YOUNG

DIRECT EXAM OF DAVID BACHMAN

PATIENT WHO, OF COURSE, OUGHT TO SCORE HIGHER THAN 23 OUT OF 30.

THERE ARE OTHER ASPECTS OF THE MENTAL STATUS EXAM THAT WE DID.  WE LOOKED AT HIS SPEECH AND LANGUAGE, WHICH APPEARED TO BE NORMAL.  ALSO EXAMINED -- WAS PARTICULARLY INTERESTED IN ASPECTS OF HIS MENTAL STATUS, WHAT IT RELATED TO SOMETHING CALLED FRONTAL LOBE FUNCTION.

THE FRONTAL PARTS OF THE BRAIN ARE THE PART OF THE BRAIN THAT ARE -- WHAT ARE CALLED THE EXECUTIVE FUNCTION.  THEY ARE THE PARTS OF THE BRAIN THAT SORT OF GOVERN OUR BEHAVIOR.  IF YOU SEE -- IF YOU ARE HEADED TOWARDS THE REFRIGERATOR AND YOU KNOW YOU ARE ON A DIET, THAT IS THE PART OF THE BRAIN THAT KEEPS YOU FROM REACHING INTO THE REFRIGERATOR AND TAKING THAT PIECE OF PIE.  IT IS THE PART OF THE BRAIN THAT ENABLES US TO CONFORM OUR BEHAVIOR TO SOCIETY'S EXPECTATIONS.

SO, WHAT I WANTED TO DO, PARTICULARLY BECAUSE OF THE CIRCUMSTANCES OF MR. FULKS COMING TO SEE ME, WAS TO SORT OF PROBE A LITTLE BIT TO SEE IF THERE WERE ANY PROBLEMS IN THAT AREA.

**Q.    DID YOU FIND ANY?**

A.    YES.  HE CERTAINLY DOES EXHIBIT SOME PROBLEMS IN THAT AREA.  THERE ARE DIFFERENT WAYS THAT ONE PROBES THAT SORT OF DIFFICULTY.  ONE IS TO SIMPLY ASK PEOPLE PROVERBS.  OLD SAYINGS LIKE, WHAT DOES IT MEAN TO SAY YOU SHOULDN'T CRY OVER SPILLED MILK?  WHAT DOES IT MEAN TO SAY THAT YOU SHOULD SAVE

DIRECT EXAM OF DAVID BACHMAN

FOR A RAINY DAY?  YOU SHOULDN'T CRY OVER SPILLED MILK.  ALMOST EVERYBODY KNOWS THAT.  WELL, IT MEANS YOU SHOULDN'T GET UPSET ABOUT SMALL THINGS.  IF SOMEBODY WHO HAS VERY SEVERE FRONTAL LOBE DAMAGE WOULD SAY,  YOU SHOULDN'T CRY OVER SPILLED MILK, THEY MIGHT SAY SOMETHING LIKE, WELL, IF YOU SPILLED THE MILK, YOU SHOULDN'T WORRY ABOUT IT.  SO, IT IS A VERY CONCRETE RESPONSE WITHOUT UNDERSTANDING THAT IT IS A GENERALIZATION THAT YOU ARE LOOKING FOR.  MR. FULKS DID WELL ON SOME OF THOSE PROVERBS, AND HE DID SURPRISINGLY POORLY ON OTHER OF THOSE PROVERBS.

ANOTHER KIND OF WAY TO PROBE FRONTAL FUNCTION IS ANALOGIES.  YOU WOULD SAY SOMETHING LIKE, WELL, A CHAIR AND A TABLE ARE DIFFERENT, BUT WE KNOW THEY ARE ALSO SIMILAR IN SOME WAY.  HOW ARE THEY SIMILAR?  THEY ARE BOTH? AND YOU WOULD WANT TO SAY THEY ARE BOTH FURNITURE.  SOMEBODY WHO IS VERY CONCRETE MAY SAY,  WELL,  YOU KNOW,  THEY ARE NOT SIMILAR, OR THEY ARE BOTH MADE OUT OF WOOD.  SO, GOING TO A VERY SORT OF CONCRETE OR LOWER LEVEL OF RELATIONSHIP.  AGAIN,  MR. FULKS DID WELL ON SOME OF THE SIMPLER ANALOGIES,  BUT ON THE MORE DIFFICULTY ANALOGIES, HE HAD DIFFICULTY.

ANOTHER WAY TO LOOK AT BEHAVIOR IN THIS SITUATION IS THERE ARE CERTAIN TESTS THAT WE GIVE,  ALMOST LIKE A LITTLE GAME THAT YOU WOULD PLAY.  SO, FOR INSTANCE, ONE OF THESE GAMES IS A WAY TO SEE IF THE PATIENT CAN INHIBIT RESPONSES.  AS I SAID, IT IS LIKE WHEN YOU ARE HEADING FOR THAT REFRIGERATOR

App. 00496

DIRECT EXAM OF DAVID BACHMAN

FOR THAT EXTRA PIECE OF PIE.  YOU HAVE TO BE ABLE TO INHIBIT THOSE IMPULSES WHEN YOU ARE FACED WITH A SITUATION WHERE YOU ARE HAVING OPPORTUNITIES THAT ARE NOT SOCIALLY APPROPRIATE, YOU CAN SORT OF INHIBIT THOSE RESPONSES.  AND, FOR INSTANCE, ONE OF THE LITTLE GAMES WE PLAY IS VERY SIMPLE.  I HOLD UP TWO FINGERS, AND I INSTRUCT HIM TO HOLD UP ONE.  I HOLD UP ONE FINGER; HE IS SUPPOSED TO HOLD UP TWO.  THEN WE SORT OF MIX THEM UP.  HE HAS GOT TO MATCH.  HE HAS TO REMEMBER TO HOLD UP ONE WHEN I HOLD UP TWO; I HOLD UP TWO, HE HOLDS UP ONE.  IT IS A VERY SIMPLE-MINDED GAME.  IT DOESN'T TAKE A LOT OF INTELLECT, OBVIOUSLY, TO DO SOMETHING LIKE THIS.  BUT WHAT HAPPENS IS, IF I HOLD UP TWO, THE AUTOMATIC RESPONSE IS TO KIND OF ECHO, MATCH WHAT I AM DOING.  HE HAS DIFFICULTY INHIBITING THOSE SORTS OF RESPONSES.

THERE ARE OTHER KINDS OF TESTS THAT WE DID ALSO OF A SIMILAR NATURE.  THERE IS A TEST THAT I GIVE WHERE YOU HAVE TO -- THERE IS A LITTLE PATTERN THAT I WILL DRAW LIKE A PATTERN OF N'S AND M'S, FOR INSTANCE.  YOU DRAW TWO HUMPS FOR AN  N, AND THREE HUMPS FOR AN M.  SO, YOU HAVE TO DO THE M, WAIT INHIBIT, DO AN  N, SORT OF INHIBIT, M.  AND WHAT HAPPENS, HE STARTS GOING ON THE HUMPS, HE STARTS OFF OKAY, AND THEN IT IS JUST A BUNCH OF HUMPS.  HE CAN'T SORT OF INHIBIT AND STOP, INHIBIT AND STOP.  IT SOUNDS LIKE A VERY SIMPLE-MINDED EVEN SORT OF TASK, BUT WHAT THESE TASKS ALL TOGETHER TELL YOU IS THAT THIS IS SOMEBODY WHO IS HAVING

App. 00497

DIRECT EXAM OF DAVID BACHMAN

DIFFICULTY IN THIS PARTICULAR AREA OF FUNCTION.

**Q.    WELL, THE OBVIOUS QUESTION WOULD BE, WELL, HOW DO YOU KNOW IF SOMEBODY IS TRYING OR DOING THEIR BEST ON THESE?**

A.    WELL, I THINK THAT IS A GOOD QUESTION.  I THINK THAT WHAT YOU HAVE TO DO IS YOU HAVE SO TO LOOK AT THE OVERALL PATTERN OF HOW THEY DO ON THE TESTING.  PEOPLE WHO ARE FLAT OUT AND OUT FAKING, GENERALLY, DO PRETTY CRUMMY ON EVERYTHING. EVERY TASK YOU GIVE THEM, I DON'T KNOW, I AM CONFUSED, HOW DO YOU DO THIS, HOW DO YOU START THE TASK?  IN FACT, SOME OF THE TASKS THAT I GAVE MR. FULKS HE DID REASONABLY WELL ON. IT WAS ONLY IN A SPECIFIC SET OF TESTS THAT HE REALLY HAD DIFFICULTIES.  AND UNLESS MR. FULKS HAS BEEN STUDYING NEUROPSYCHOLOGY IN HIS SPARE TIME, I WOULDN'T THINK HE WOULD KNOW THAT THERE ARE ONLY SPECIFIC TESTS WHERE HE SHOULD HAVE DIFFICULTY.

**Q.    AND COULD YOU, BASED ON THIS EVALUATION, COULD YOU MAKE SOME SORT OF ROUGH ASSESSMENT?**

A.    WELL, BASED ON THIS ASSESSMENT, IT WAS EVIDENT TO ME THAT MR. FULKS DID HAVE SOME AREAS OF BRAIN DYSFUNCTION.  AND THEN THE TASK WAS TO FIND OUT WHY.  WHAT WAS SOME OF THE POSSIBILITIES THAT HE WOULD HAVE BRAIN DYSFUNCTION AND TRY TO PIN IT DOWN A LITTLE BIT MORE SPECIFICALLY AS TO WHY HE WOULD HAVE DIFFICULTY.

**Q.    ALL RIGHT.  AND DID YOU HAVE -- COULD YOU TELL SOME GENERAL ASSESSMENT OF HIS INTELLIGENCE LEVEL?**

**DIRECT EXAM OF DAVID BACHMAN**

A.    YEAH.   I THINK THAT, OVERALL, FOR INSTANCE, IF YOU LOOK AT THAT MINI MENTAL STATE EXAMINATION, WHERE NORMAL SCORE IS 30 OUT OF 30,  HE SCORES A 23.  AND ALSO IN LOOKING AT HIS ABILITY TO RESPOND TO VERY SIMPLE PROVERBS, I MEAN, THESE ARE KINDS OF TASKS THAT WE GIVE TO PEOPLE OF ALL DIFFERENT BACKGROUNDS,  ALL DIFFERENT EDUCATION,  ALL DIFFERENT CULTURAL BACKGROUNDS.   HIS DIFFICULTY WITH THESE KINDS OF TASKS SUGGESTED TO ME THAT HE WAS IN THE BORDERLINE LEVEL OF INTELLECTUAL FUNCTIONING.

**Q.    OKAY.   NOW,  SO BASED UPON YOUR PHYSICAL EXAMINATION, YOUR MENTAL STATUS EXAMINATION,  AS I UNDERSTAND, YOU CONCLUDED, AT THIS POINT, THAT MR. FULKS LIKELY HAD SOME TYPE OF BRAIN IMPAIRMENT?**

A.    CORRECT.

**Q.    SO,  WHAT DID YOU DO NEXT?**

A.    AS I WOULD DO WITH ANY PATIENT THEN,  YOU EXAMINE THE PATIENT,  YOU FOUND THAT THERE IS A PROBLEM, AND YOU FORM SOME HYPOTHESIS.   YOU FORM SOME GUESSES AS TO WHAT MIGHT BE CAUSING THE PROBLEM.

AND SO, I THEN ORDERED SOME ADDITIONAL TESTS TO SEE IF WE COULD PIN IT DOWN A LITTLE BIT MORE SPECIFICALLY.

**Q.    WHAT TESTS DID YOU ORDER?**

A.    I SPECIFICALLY ORDERED AN MRI SCAN OF THE BRAIN AND ALSO A PET SCAN.

**Q.    OKAY.   AND SO THESE TESTS WERE SUBSEQUENTLY CONDUCTED?**

**DIRECT EXAM OF DAVID BACHMAN**

A.    THEY WERE CONDUCTED AT THE MEDICAL UNIVERSITY,  YES.

**Q.    AND SO, LET'S FIRST TALK ABOUT -- THESE ARE BOTH,**

**THESE ARE DIFFERENT FORMS OF NEUROIMAGING?**

A.    THE MRI SCAN IS A BRAIN SCAN THAT LOOKS SPECIFICALLY AT

THE STRUCTURE OF THE BRAIN, TO SEE, FOR INSTANCE, IF YOU WERE

CONCERNED THAT THERE WAS A STROKE, OR SOMEBODY HAD HAD A HEAD

INJURY IN THE PAST, THERE MAY BE A CERTAIN PATTERN OF BRUISING

OR SCARRING TO THE BRAIN THAT YOU MIGHT SEE.   PATIENTS WHO

HAVE CERTAIN KIND OF CONGENITAL BRAIN PROBLEMS MAY HAVE OTHER

KINDS OF ABNORMALITIES THAT MIGHT SHOW UP ON AN MRI SCAN.

A PET SCAN IS A LITTLE BIT DIFFERENT.   IT IS WHAT IS

CALLED A FUNCTIONAL TEST.   IT LOOKS AT THE METABOLIC ACTIVITY

OF THE BRAIN.   YOU CAN HAVE A BRAIN THAT PHYSICALLY LOOKS

NORMAL.  YOU KNOW,  MOST TYPICAL EXAMPLE OF THIS IS

ALZHEIMER'S DISEASE.  IF YOU LOOK AT A CAT SCAN OR AN MRI SCAN

OF THE TYPICAL PATIENT WITH ALZHEIMER'S DISEASE, IT IS VERY

DIFFICULT TO DISTINGUISH THAT FROM SOMEBODY WHO DOESN'T HAVE

ALZHEIMER'S DISEASE AT A SIMILAR AGE.

ON THE OTHER HAND, IF YOU DID A PET SCAN, WHICH SHOWS THE

METABOLIC ACTIVITY OF THE BRAIN, IN ALZHEIMER'S DISEASE YOU

SEE A VERY SPECIFIC PATTERN OF ABNORMALITY THAT YOU DON'T SEE

ON THE MRI SCAN.

THE TWO TESTS ARE COMPLIMENTARY TO EACH OTHER.

**Q.    LET'S FIRST TALK ABOUT THE MRI.   WHAT WERE THE RESULTS**

**OF THAT?**

**DIRECT EXAM OF DAVID BACHMAN**

A.    THE MRI SCAN WAS ABNORMAL IN THAT IT SHOWED AN AREA OF THE BRAIN IN THE RIGHT TEMPORAL AREA WHERE THERE WAS A CYST THAT HAD FORMED.

**Q.    DR. BACHMAN, CAN YOU SEE THIS?  THIS IS WHAT IS MARKED AS DEFENDANT'S EXHIBIT 11.  ARE THESE SLICES?**

A.    YES.   WHAT YOU ARE LOOKING AT HERE -

**Q.    DR. BACHMAN.**

A.    I'M SORRY.

MR. BLUME:  WE OFFER THIS AS DEFENDANT'S EXHIBIT 17 -- 11.

MR. GASSER:  NO OBJECTION.

THE COURT:   NO OBJECTION.

BY MR. BLUME:

**Q.    NOW, DR. BACHMAN, BRIEFLY EXPLAIN WHAT YOU ARE TALKING ABOUT HERE.**

A.    I WILL DO THAT.   WITH THE MRI SCAN, THERE ARE DIFFERENT -- I DON'T KNOW, CAN YOU ADJUST THE CONTRAST ON THAT AT ALL?  IT IS REALLY NOT SHOWING.  I CAN SEE IT.   I CAN SEE IT BECAUSE I KNOW WHAT TO LOOK FOR.   THERE WE GO.   THAT IS GREAT.   WELL DONE.

WHAT YOU ARE LOOKING AT ON THIS MRI SCAN ARE WHAT ARE CALLED CORONAL VIEWS, AS IF YOU ARE TAKING SLICES OF THE BRAIN.  THEY ARE DIFFERENT VIEWS OF THE BRAIN THAT ONE CAN TAKE.  THIS IS AS IF YOU ARE TAKING A KNIFE AND YOU ARE CUTTING THE BRAIN THIS WAY IN SLICES, AND THEN YOU ARE LOOKING

DIRECT EXAM OF DAVID BACHMAN

AT A SLICE.  SO, THE TOP OF THE SCAN HERE IS THE TOP OF THE HEAD, AND THE EARS WOULD BE ON EITHER SIDE.  AND THE WHITE MATTER YOU CAN SEE ON THE INSIDE HERE IS WHITE.  AND THEN AROUND THE OUTSIDE IS YOU SEE THIS GRAY RIBBON THAT FORMS THE OUTSIDE, AND THAT IS THE GRAY MATTER.

NOW,  WHERE THE ARROW IS, YOU WILL SEE THERE IS A BLACK SPACE.  AND THAT IS BLACK BECAUSE THAT IS WATER DENSITY, THAT IS SPINAL FLUID.  ON THIS PARTICULAR MRI SCAN, THINGS THAT ARE THE DENSITY OF WATER SHOW UP AS BLACK.  AND SO, WHAT THIS SAYS HERE IS, THERE IS A SPACE HERE.  THERE IS A SACK FILLED WITH FLUID.

NOW,  THAT, IN AND OF ITSELF, DOESN'T MEAN VERY MUCH EXCEPT YOU HAVE TO ASK YOURSELF WHY.  AND THE REASON THERE IS A SACK FILLED WITH FLUID THERE IS BECAUSE THERE IS SOMETHING THAT IS SUPPOSED TO BE THERE THAT IS NOT THERE, AND THAT IS BRAIN TISSUE.  IF YOU LOOK ON THE VERY OPPOSITE SIDE OF THE SCAN,  SORT OF THE MIRROR IMAGE SIDE OF THE SCAN --

**Q.    THAT OVER HERE YOU ARE TALKING ABOUT?**

A.    I DON'T SEE YOU.

**Q.    ON THAT ONE?**

A.    WELL --

**Q.    POINT TO WHAT YOU ARE DOING, IT WILL SHOW UP?**

A.    OH, WILL IT?

**Q.    YES,  IT SHOULD.**

A.    I DON'T -- IS THAT -- OH, GREAT.

DIRECT EXAM OF DAVID BACHMAN

IF YOU WILL SEE WHERE I JUST POINTED TO, THERE IS NO BLACK SPACE OVER THERE.  SAME THING OVER HERE.   AND SAME THING, LOOK AT THE LARGE SPACE OVER HERE, THERE IS NO LARGE SPACE OVER THERE.   THAT IS BECAUSE ON THE -- THAT SIDE OF THE BRAIN,  THE BRAIN TISSUE HAS FORMED NORMALLY.   ON THE SIDE WHERE THE LONG WHITE ARROW IS,  BRAIN TISSUE DID NOT FORM NORMALLY THERE, SO SOMETHING FORMED TO TAKE ITS PLACE.   AND THEN THE BRAIN, VERY OFTEN, IF BRAIN TISSUE DOESN'T FORM NORMALLY, WHAT TAKES ITS PLACE IS FLUID,  SPINAL FLUID.   SO, WHAT YOU ARE SEEING IS A LARGE COLLECTION OF SPINAL FLUID THAT IS TAKING THE PLACE OF THE BRAIN TISSUE THAT SHOULD HAVE FORMED THERE.

Q.    SO, THAT IS THE MRI SCAN?

A.    YES.

Q.    THE ABNORMALITIES ON THAT.

WHAT ABOUT THE PET SCAN?

A.    THE PET SCAN,  AS I SAID,  IS THE SCAN THAT SHOWS SORT OF THE METABOLIC ACTIVITY OF THE BRAIN.   THAT SCAN WAS ABNORMAL, BUT INSTEAD OF SHOWING A SMALL LOCALIZED AREA OF ABNORMALITY, IT SHOWED DIFFUSE ABNORMALITY THROUGHOUT THE ENTIRE BRAIN.

Q.    WHAT DOES THAT MEAN?

A.    WELL,  IT MAKES IT,  FOR INSTANCE, IF THE QUESTION WAS, WAS THERE A HEAD INJURY THAT CAUSED THE NEUROLOGICAL IMPAIRMENT, ONE MIGHT EXPECT TO SEE A DIFFERENT PATTERN OF

DIRECT EXAM OF DAVID BACHMAN

ABNORMALITIES ON BOTH THE MRI AND THE PET.  THIS SUGGESTS TO ME THAT THERE IS SOME PROCESS OF A DIFFUSE NATURE, PERHAPS AT THE TIME THAT THE BRAIN WAS FORMED, THAT CAUSED THE BRAIN TO NOT BE NORMALLY METABOLICALLY ACTIVE.

Q.    **AND THEN YOU ALSO REVIEWED THE RESULTS OF AN EEG?**

A.    YES.

Q.    **FIRST OF ALL, WHAT IS AN EEG?**

A.    AN EEG IS ANOTHER KIND OF BRAIN TEST.  IT IS A BRAIN WAVE TEST.  MAYBE YOU HAVE SEEN PICTURES OF PEOPLE THAT HAVE ALL OF THESE WIRES HOOKED UP TO THEIR HEAD AND, BASICALLY, WHAT IT IS,  IT IS PICKING UP ELECTRICAL ACTIVITY FROM THE BRAIN.  AND THAT EEG, I THINK, WAS PERFORMED IN 1998,  IF I RECALL CORRECTLY.

Q.    **AND WHAT WERE THE RESULTS OF THAT?**

A.    I ONLY HAD AN OPPORTUNITY TO EXAMINE A COUPLE OF PICTURES FROM THE EEG AND NOT THE ENTIRE EEG.  BUT THE PICTURES I SAW, AND ALSO THE REPORT OF THAT EEG, THAT IT ALSO WAS ABNORMAL.  AND ABNORMAL IN A WAY THAT WAS SIMILAR TO THE WAY THE PET SCAN WAS ABNORMAL AND THAT IT SHOWED DIFFUSE SLOWING.  SO THAT IT SHOWED OR SUGGESTED A  DIFFUSE BRAIN ABNORMALITY.

Q.    **NOW,  SO AT THIS POINT, YOU HAVE TAKEN THE HISTORY, YOU HAVE DONE YOUR PHYSICAL EXAMINATION, YOU HAVE DONE YOUR MENTAL STATUS EXAMINATION, YOU HAVE ORDERED THESE SCANS, YOU HAVE LOOKED AT THOSE.  DID YOU ALSO, IN THIS TIME, WERE YOU**

**DIRECT EXAM OF DAVID BACHMAN**

**PROVIDED WITH SOME RESULTS OF SOME NEUROPSYCHOLOGICAL TESTING?**

A.    YES.   HE HAD HAD NEUROPSYCHOLOGICAL TESTING DONE SEVERAL TIMES OVER 2003 AND THEN ALSO IN EARLY IN 2004.

**Q.    SO,  AT THIS TIME, ON THE BASIS OF THE INFORMATION AVAILABLE, DID YOU COME TO SOME CONCLUSIONS?**

A.    WELL,  BASED ON THE MRI SCAN SUGGESTING A CONGENITAL PROCESS, AND ALSO ON THE PET SCAN SUGGESTING A DIFFUSE BRAIN PROCESS,  IT WAS SUGGESTED TO ME THAT MR. FULKS MAY WELL HAVE THIS SORT OF FETAL ALCOHOL EFFECT SYNDROME.   AND ESPECIALLY WITH HIS HISTORY OF HIS MOTHER HAVING BEEN DRINKING FAIRLY HEAVILY WHEN SHE WAS PREGNANT WITH HIM.   SO,  THAT WAS -- I HAD A LIST OF HYPOTHESES, AND THAT HYPOTHESIS MOVED TO THE TOP OF THE LIST BASED ON THESE OTHER STUDIES THAT WE OBTAINED.

**Q.    NOW,  YOU COME TO THIS HYPOTHESIS.  IF THIS WERE NOT A FORENSIC CASE,  IN OTHER WORDS, IF IT WERE JUST SOMEBODY WHO HAD COME IN,  WOULD YOUR EVALUATION, AT THIS POINT, HAVE ALL BEEN THE SAME?**

A.    OH, YES.

**Q.    OKAY.   YOU CAME TO THIS CONCLUSION.  WHAT DID YOU DO THEN?**

A.    BECAUSE THIS IS A FORENSIC CASE, AND WE WANT TO PIN THIS DOWN AS DEFINITIVELY AS WE CAN AS TO THE NATURE OF THE BRAIN INJURY THAT WAS PRESENT,  I THEN WENT TO THE MEDICAL LITERATURE TO SEE IF THERE WAS ANY MORE DEFINITIVELY TO MAKE A DIAGNOSIS RELATED TO FETAL ALCOHOL EXPOSURE.

DIRECT EXAM OF DAVID BACHMAN

AND IN GOING THROUGH THE MEDICAL LITERATURE, I SAW THAT THERE ARE CERTAIN GROUPS AROUND THE COUNTRY THAT ARE VERY INTERESTED IN THIS PROBLEM, IN DOING RESEARCH IN THIS PROBLEM. AND ONE OF THE GROUPS WAS AT THE UNIVERSITY OF WASHINGTON. AND DR. BOOKSTEIN, IN PARTICULAR, HAD BEEN DOING WORK ON ANALYZING MRI SCANS IN A MORE SOPHISTICATED WAY TO TRY TO COME UP WITH A MORE DEFINITIVE DIAGNOSIS.

Q.    SO,  WHAT DID YOU DO THEN?

A.    I CONTACTED DR. BOOKSTEIN, AND I ASKED HIM IF HE WOULD BE INTERESTED IN ANALYZING THE MRI SCANS THAT WE HAD OBTAINED.

Q.    AND WHAT DID HE SAY?

A.    WELL,  WE ACTUALLY HAD TO GET ANOTHER MRI SCAN BECAUSE IT HAD TO BE OBTAINED IN A CERTAIN WAY SO THAT DR. BOOKSTEIN COULD ANALYZE IT.   SO, WE HAD TO ARRANGE FOR A SECOND MRI SCAN TO BE OBTAINED IN COLUMBIA.   WE SENT THAT INFORMATION TO DR. BOOKSTEIN.   DR. BOOKSTEIN DID THIS COMPUTERIZED ANALYSIS AND PHONED ME BACK AND TOLD ME,  THAT, YES, THERE IS A VERY HIGH CORRELATION BETWEEN THE FINDINGS ON MR. FULKS'S MRI SCAN AND THE RESEARCH WORK THAT HE HAD BEEN DOING ON FETAL ALCOHOL EXPOSURE.

Q.    SO,  DO YOU REMEMBER WHAT WERE THE RESULTS OF HIS?  I THINK YOU SAID.

A.    HE SAID, IN THE FINAL REPORT THAT I RECEIVED FROM HIM,, HE SAID THAT, BASICALLY, THERE WAS A GREATER THAN 600 TO ONE CHANCE THAT IT WAS NOT FETAL,  THAT -- IN OTHER WORDS,  IT

DIRECT EXAM OF DAVID BACHMAN

WAS, THERE IS ONLY ONE CHANCE OUT OF 600 THAT IT WAS NOT FETAL ALCOHOL RELATED.

Q.    SO NOW,  AT THIS POINT, YOU HAVE DONE YOUR EVALUATION, YOU HAVE VIEWED THE TESTING,  YOU HAVE CONSULTED WITH DR. BOOKSTEIN.   DID YOU DO ANYTHING ELSE IN THIS CASE?

A.    RIGHT.  BECAUSE FETAL ALCOHOL IS NOT NECESSARILY A CONDITION THAT I SEE COMMONLY,  I ALSO CONSULTED WITH ANOTHER EXPERT IN THE FIELD, DR. STERLING CAROFF.   AND HAD A CHANCE TO, BY PHONE, HAD A CHANCE TO REVIEW THE RECORDS WITH HIM. AND HE, BASICALLY, CONCURRED THAT, BASED ON THE AVAILABLE INFORMATION, INCLUDING THE HISTORY,  THE EXAMINATION,  THE MRI SCAN ANALYSIS,  THAT, MOST LIKELY, THE BRAIN DYSFUNCTION THAT WE WERE SEEING WAS RELATED TO FETAL ALCOHOL EFFECTS.

Q.    DID YOU ALSO, IN THIS CASE, HAVE A CHANCE TO CONDUCT A NEUROLOGICAL EVALUATION OF MR. FULKS'S BROTHER RONNIE?

A.    YES,  I DID.

Q.    AND CAN YOU JUST  -- WELL,  ONE,  LET ME ASK YOU THIS QUESTION.   WHY WOULD THAT MATTER?

A.    WELL --

Q.    WHY WOULD YOU WANT TO DO THAT? WHAT WOULD BE THE POSSIBLE RELEVANCE?

A.    ONE OF THE THINGS, TO REALLY PIN DOWN, AS DEFINITIVELY AS POSSIBLE, THE DIAGNOSIS,  ESPECIALLY IN FETAL ALCOHOL SYNDROME.  YOU WANT TO SEE PHYSICAL CHANGES IN THE BODY.   MR. FULKS, THE DEFENDANT,  HAS SOME SUBTLE PHYSICAL CHANGES,  BUT

DIRECT EXAM OF DAVID BACHMAN

HE CERTAINLY DOESN'T HAVE THE DEFINITIVE PHYSICAL CHANGES THAT WE ASSOCIATE WITH FETAL ALCOHOL SYNDROME.

OF THE PICTURES I HAD SEEN OF MR. FULKS AND HIS FAMILY, I THINK THERE IS ONE PICTURE, ACTUALLY. I THINK THAT IS THE ONLY PICTURE THERE IS.

**Q.    YOU SAW A PICTURE?**

A.    YES.

**Q.    AND LET ME SHOW, IS THIS THE PICTURE, LET ME SEE IF I CAN ZOOM IN.**

A.    YES.

**Q.    ZOOM IT OUT A LITTLE BIT.  IS THIS THE PICTURE YOU ARE TALKING ABOUT?**

A.    YES, SIR.

**Q.    AND SO, I THINK THAT YOU ASKED ME IF THERE WERE SOME PICTURES OF MR. FULKS AS A CHILD?**

A.    THAT'S CORRECT, I DID.

**Q.    AND I OBTAINED THIS PHOTOGRAPH; IS THAT CORRECT?**

A.    YES, THAT'S RIGHT.

**Q.    THEN DID YOU ASK ME FOR ANYTHING ELSE?**

A.    WELL, I ASKED FROM YOU, I THOUGHT THAT MR. FULKS'S BROTHER RONNIE, PARTICULARLY, HAD PHYSICAL FEATURES THAT WERE VERY STRONGLY SUGGESTIVE OF FETAL ALCOHOL SYNDROME, WHETHER THERE MIGHT BE AN OPPORTUNITY TO INVESTIGATE THAT FURTHER.

**Q.    AND WHETHER IT MIGHT BE ADDITIONAL PHOTOGRAPHS?**

A.    AND ALSO WHETHER THERE MIGHT BE ADDITIONAL PHOTOGRAPHS

DIRECT EXAM OF DAVID BACHMAN

OF -- ESPECIALLY OF CHAD.  WHAT HAPPENS IS THAT THE FETUS --

MR. BLUME:  YOUR HONOR,  WE MOVE THIS IN, DEFENDANT'S EXHIBIT 12.

THE COURT:  ANY OBJECTION?

MR. GASSER:  NO.

THE WITNESS:  I SHOULD SAY, THE PHYSICAL FEATURES OF FETAL ALCOHOL SYNDROME ARE MOST EVIDENT IN CHILDREN.  AS PEOPLE AGE AND AS THEY BECOME ADULTS,  THE FACIAL FEATURES OF FETAL ALCOHOL SYNDROME CHANGE, AND THEY SOFTEN.  IT IS HARDER TO DIAGNOSE FETAL ALCOHOL SYNDROME IN MOST ADULTS.

I WAS VERY STRUCK BY MR. FULKS, THE DEFENDANT, IS THE BABY IN THE FRONT OF THIS PARTICULAR PICTURE, IS MY UNDERSTANDING. IMMEDIATELY BEHIND HIM IS HIS BROTHER RONNIE.   HIS BROTHER RONNIE HAS VERY CLASSIC FEATURES OF FETAL ALCOHOL SYNDROME. AND THERE MAY BE SUBTLE FEATURES IN HIS BROTHER IN FRONT OF HIM, BUT IT IS HARD TO SAY FOR SURE.

TWO THINGS I WOULD WANT.  I WOULD WANT ADDITIONAL PICTURES OF THE DEFENDANT WHEN HE WAS A CHILD TO BETTER CLARIFY WHETHER HE HAD PHYSICAL FEATURES WHEN HE WAS YOUNGER.   AND SECOND, AN OPPORTUNITY TO EXAMINE HIS BROTHER TO SEE IF HIS BROTHER, IN FACT, HAS THAT FETAL ALCOHOL SYNDROME.

**Q.    NOW,  YOU ASKED FOR THAT, AND WERE YOU SUBSEQUENTLY GIVEN ANY ADDITIONAL INFORMATION ABOUT THE PHOTOGRAPHS?**

A.    I WAS TOLD THAT THERE WERE NO OTHER PHOTOGRAPHS OF THE CHILDREN.

DIRECT EXAM OF DAVID BACHMAN

Q.    AS A CHILD?

A.    RIGHT.

Q.    SO, YOU SAID YOU LOOKED AT THIS, AND THERE ARE SOME THINGS WHICH YOU CAN'T REALLY SEE WELL ENOUGH OF MR. FULKS?

A.    RIGHT.   ONE OF THE CHARACTERISTIC FEATURES OF FETAL ALCOHOL SYNDROME IS SOME ABNORMALITIES OF THE UPPER FACE. YOU PUT YOUR FINGER RIGHT BELOW YOUR NOSE, THERE IS A LITTLE RIDGE RIGHT BELOW YOUR NOSE, IT IS CALLED THE PHILTRUM.  IT IS THIS LITTLE RIDGE THAT SITS THERE.  AND IN FETAL ALCOHOL SYNDROME, THAT PHILTRUM, THAT AREA IS VERY SMOOTH.  YOU DON'T HAVE THAT SORT OF NATURALLY OCCURRING RIDGE, ALTHOUGH IT CAN OCCUR LATER AND DEVELOP A LITTLE BIT LATER AT A PROMINENT AGE.  THE UPPER LIP IS VERY THIN IN THESE FOLKS. ALSO CHANGES IN THE EYES, SO THE EYES ARE VERY NARROW.  THIS IS NOT PROJECTING VERY WELL, BUT I WILL TELL YOU THAT RONNIE FULKS, WHO IS STANDING IMMEDIATELY BEHIND CHAD, HAS CLASSIC FACIAL FEATURES OF FETAL ALCOHOL SYNDROME, IN MY OPINION.

Q.    THIS ONE?

A.    RIGHT.  AND CHAD, THE BABY SITTING IN THE FRONT, YOU CAN'T SAY FOR SURE.  I REALLY CAN'T SAY FOR SURE.  IT WOULD BE BETTER IF WE HAD OTHER PICTURES TO LOOK AT.

Q.    YOU SAID RONNIE HAS THE FACIAL FEATURES YOU EXPECTED OF FETAL ALCOHOL SYNDROME.  IS THERE ANYTHING ELSE, BASED ON YOUR EXPERIENCE?

A.    HE IS -- I THINK THAT YOU HAD A CHANCE TO SEE HIM

DIRECT EXAM OF DAVID BACHMAN

PHYSICALLY.  HE HAS CLASSIC GROWTH RETARDATION ALSO.  HE IS ONLY FIVE FOOT TWO AND A HALF INCHES TALL.  HE WEIGHS 116 POUNDS.  HAS A SMALL HEAD.  HE HAS, IF YOU HAVE A CHANCE TO EXAMINE HIM PHYSICALLY, WHICH I DID, HE REALLY HAS ALL OF THE PHYSICAL FEATURES THAT ONE IS ASSOCIATED WITH FETAL ALCOHOL SYNDROME.

HE ALSO TOLD ME THAT HE WAS BORN WITH A HOLE IN HIS HEART, WHICH IS ALSO ONE OF THE THINGS THAT IS ALSO ASSOCIATED WITH FETAL ALCOHOL EXPOSURE.  SO, I HAVE GREAT CONFIDENCE THAT, FROM JUST LOOKING AT IN ANY TEXTBOOK, THAT RONNIE FULKS HAS -- RONNIE FULKS HAS FETAL ALCOHOL SYNDROME.

Q.    **NOW, WHY WOULD THAT BE SIGNIFICANT TO YOUR EVALUATION?**

A.    WELL, I THINK THAT IT TELLS YOU SOMETHING.  IT TELLS YOU THAT THERE IS NO DOUBT THAT THESE CHILDREN WERE EXPOSED TO ALCOHOL IN THEIR ENVIRONMENT.  AND IN RONNIE'S CASE, THAT EXPOSURE EXPRESSED ITSELF IN A CLASSIC FETAL ALCOHOL SYNDROME.  WHAT YOU  -- WHAT MAKES YOU VERY CONCERNED IS THAT ALL OF THESE CHILDREN WERE EXPOSED.  BUT IN RONNIE'S CASE, IT EXPRESSES ITSELF FULLY, SO IT IS CLEARLY EVIDENT TO SEE IN THE OTHER CHILDREN PROBABLY EXPRESSING IT IN DIFFERENT WAYS.

IN THE DEFENDANT'S CASE, HIS EXPRESSION WAS MORE INTERNAL.  IT IS MORE BRAIN-RELATED IN TERMS OF BRAIN DEVELOPMENT.  HE HAS LESS OF THE OUTWARD PHYSICAL MANIFESTATIONS, BUT NONETHELESS, HE IS PART OF THAT GROUP THAT CLEARLY WAS AT RISK.  I DON'T THINK THERE IS MUCH DOUBT

DIRECT EXAM OF DAVID BACHMAN

ABOUT THAT.

Q.    DR. BACHMAN, IS IT YOUR OPINION, TO A REASONABLE DEGREE OF MEDICAL CERTAINTY, THAT MR. FULKS HAS A FETAL ALCOHOL SPECTRUM DISORDER?

A.    THAT IS CORRECT.

Q.    NOT THE FULL FETAL ALCOHOL SYNDROME,  BUT WE HAVE HEARD TESTIMONY THAT FALLS WITHIN THE SPECTRUM?

A.    YES.

Q.    FINALLY,  COULD THERE BE,  I GUESS,  OTHER FACTORS THAT POSSIBLY CONTRIBUTED TO HIS NEUROLOGICAL DISORDER?

A.    I THINK, CLEARLY, MR. FULKS LIVED HIS LIFE IN A WAY THAT PLACED HIM AT RISK FOR OTHER KINDS OF BRAIN INJURY.  HE WAS DRINKING ALCOHOL AT A YOUNG AGE EXCESSIVELY.  HE WAS EXPOSED TO OTHER TYPES OF DRUGS,  ESPECIALLY THESE INHALED-TYPE THINGS LIKE GASOLINE AND GLUE THAT CAN CAUSE BRAIN INJURY.  HE ALSO HAS HAD MULTIPLE HEAD INJURIES THAT COULD REPRESENT CONCLUSIVE TYPE INJURIES THAT COULD CERTAINLY BE ADDITIVE OR ON TOP OF FETAL ALCOHOL EXPOSURE.  SURELY, THERE COULD BE FURTHER PROBLEMS SUPERIMPOSED ON FETAL ALCOHOL EXPOSURE.

Q.    FINALLY, DR. BACHMAN,  MAKE SURE I WORD THIS CORRECTLY. IS AN ALREADY DAMAGED BRAIN MORE SUSCEPTIBLE TO MORE INJURY?

A.    THERE IS NO DOUBT ABOUT THAT.  THAT IS MOST FAMILIAR WITH PEOPLE WITH THE WHOLE IDEA OF CONCUSSIONS,  FOOTBALL PLAYERS WHO HAVE A CONCUSSION, SHOULD THEY PLAY AGAIN?  WHAT

CROSS EXAM OF DAVID BACHMAN

IF THEY HAVE A SECOND CONCUSSION OR A THIRD CONCUSSION.  THE REASON THAT IS OF CONCERN TO NEUROLOGISTS IS, ONCE THE BRAIN HAS BEEN INJURED, IT IS GOING TO BE SUSCEPTIBLE TO ACCUMULATED BRAIN DAMAGE.  IT WILL BE MORE SUSCEPTIBLE TO THE NEXT INJURY AND THE NEXT INJURY.

IF YOU ARE ALREADY STARTING LIFE WITH A BAD BRAIN, IF YOU ARE ALREADY STARTING LIFE WITH BRAIN DYSFUNCTION, YOU SUPERIMPOSE OTHER FACTORS THAT PLACE THAT BRAIN AT RISK,  THAT IS GOING TO BE ADDITIVE AND GOING TO CAUSE MORE DIFFICULTY THAN IF IT WAS A PERSON WHO STARTED WITH A NORMAL BRAIN AND SUSTAINED SOME SORT OF INJURIES LATER IN LIFE.  SO,  HIS BRAIN WOULD BE MORE SENSITIVE TO THOSE SORTS OF LATER IN LIFE INJURIES.

MR. BLUME:  COURT'S INDULGENCE.  DR. BACHMAN, IF YOU COULD PLEASE ANSWER ANY QUESTIONS MR. GASSER MIGHT HAVE FOR YOU.

THE COURT:  CROSS EXAMINATION.

MR. GASSER:  GOOD MORNING, LADIES AND GENTLEMEN.

CROSS EXAM

BY MR. GASSER:

Q.   **GOOD MORNING, DR. BACHMAN.**

A.   GOOD MORNING.

Q.   **HOW ARE YOU DOING THIS MORNING?**

A.   I'M DOING ALL RIGHT.  OKAY.

Q.   **MY NAME IS JOHNNY GASSER.  I WORK IN THE U.S.**

**CROSS EXAM OF DAVID BACHMAN**

**ATTORNEY'S OFFICE.  YOU AND I HAVE NEVER MET, HAVE WE?**

A.    NO,  NOT TO MY KNOWLEDGE.

**Q.    WOULD YOU AGREE WITH DR. BECKER,  WHO TESTIFIED YESTERDAY BEFORE THIS JURY, THAT WAS CALLED BY THE DEFENSE, THAT ALSO WORKS AT THE MEDICAL UNIVERSITY IN CHARLESTON, AND WHO WAS QUALIFIED AS AN EXPERT IN THE AREA OF FETAL ALCOHOL SYNDROME AND FETAL ALCOHOL SPECTRUM, THAT THERE IS ABSOLUTELY NO EVIDENCE THAT HAS BEEN PRODUCED TO INDICATE THAT THERE IS A CAUSE-AND-EFFECT BETWEEN FETAL ALCOHOL SPECTRUM AND SOMEBODY COMMITTING VIOLENT CRIME?**

A.    I WOULD  -- YES,  TO MY KNOWLEDGE, THAT FETAL ALCOHOL SPECTRUM DISORDER DOES NOT LEAD INEVITABLY TO VIOLENT CRIME.

**Q.    YOU INDICATED THAT THE BASIS OF YOUR OPINIONS TODAY AND YOUR TESTIMONY INCLUDES CONDUCTING A PHYSICAL EXAMINATION ON MR. FULKS?**

A.    CORRECT.

**Q.    BUT EVEN BEFORE THAT, JUST TAKING A HISTORY FROM MR. FULKS?**

A.    YES.

**Q.    WHEN YOU TAKE A HISTORY, YOU INTERVIEW MR. CHAD FULKS?**

A.    YES.

**Q.    YOU CONDUCT YOUR OWN PHYSICAL EVALUATION; YOU DO A MENTAL EVALUATION?**

A.    YES.

**Q.    AFTER DOING ALL THREE OF THOSE COMPONENTS, YOU DID**

**CROSS EXAM OF DAVID BACHMAN**

ADDITIONAL TESTING TO ASSIST YOU IN EVALUATING MR. FULKS AND IN COMING TO YOUR CONCLUSIONS?

A.    YES, SIR.

Q.    NOW,  WITH REGARD TO THE HISTORY FOR MR. FULKS,  YOU INDICATED THAT MR. FULKS STATED THAT HIS MOTHER DRANK HEAVILY?

A.    YES.

Q.    YOU WERE ABLE TO CONFIRM AND CORROBORATE THAT WITH OTHER INFORMATION THAT WAS PROVIDED TO YOU BY THE DEFENSE COUNSEL?

A.    CORRECT.

Q.    YOU INDICATED THAT HE SUSTAINED HEAD INJURIES?

A.    RIGHT.  BY HIS REPORT,  YES.

Q.    BY HIS REPORT.

A.    YES.

Q.    AND HE HAD ABUSED ALCOHOL AND DRUGS, WHICH INCLUDED INHALING GLUE AND GASOLINE?

A.    YES.

Q.    NOW,  THIS SUSTAINING HEAD INJURIES,  ISN'T IT TRUE, DOCTOR,  THAT YOU WERE NOT ABLE TO CONFIRM OR CORROBORATE THE FACT THAT HE SUSTAINED THESE HEAD INJURIES WITH ANY INDEPENDENT OBJECTIVE MEDICAL EVIDENCE?

A.    TO MY KNOWLEDGE, THERE IS NO OTHER CORROBORATING EVIDENCE AVAILABLE.  BUT IT IS, PRIMARILY, FROM HIS HISTORY, THAT IS CORRECT.

Q.    ARE YOU AWARE HE HAS BEEN INSTITUTIONALIZED ON MULTIPLE

**CROSS EXAM OF DAVID BACHMAN**

TIMES IN HIS LIFE?

A.    YES.

Q.    HE WAS INSTITUTIONALIZED IN JUNE IN WEST VIRGINIA?

A.    YES.

Q.    INSTITUTIONALIZED IN A LOCAL DETENTION CENTER IN THE GREAT SMOKY MOUNTAINS OF TENNESSEE?

A.    I DON'T KNOW THAT SPECIFICALLY, BUT I BELIEVE YOU, YES.

Q.    HE WAS INSTITUTIONALIZED BY THE INDIANA DEPARTMENT OF CORRECTIONS?

A.    YES.

Q.    AND HE HAS BEEN IN EACH ONE OF THESE AND EVEN COUNTY FACILITIES WHENEVER HE WAS ARRESTED AND CHARGED WITH A CRIME IN INDIANA OR KENTUCKY OR SOUTH CAROLINA,  COUNTY FACILITIES. THEY HAVE INTAKE FORMS.  ARE YOU FAMILIAR WITH THOSE FORMS? YOU HAVE PROBABLY SEEN THEM IN YOUR TESTIMONIES ON PRIOR OCCASIONS?

A.    RIGHT,  YES.

Q.    PART OF THE INTAKE FORM,  OF COURSE,  FOR THESE PRISON OFFICIALS AND DETENTION OFFICIALS IS TO TAKE AN ORAL HISTORY OF THE INCOMING INMATE TO DETERMINE WHETHER OR NOT THEY HAVE ANY PHYSICAL OR MENTAL DISABILITIES.

A.    YES.

Q.    SO THEY CAN BE AWARE OF THOSE PHYSICAL AND/OR MENTAL DISABILITIES, AND THEY CAN ADEQUATELY SERVE THE DEFENDANT,  SO

**CROSS EXAM OF DAVID BACHMAN**

TO SPEAK?

A.    RIGHT.

Q.    NOW,  AFTER CHAD FULKS WAS ARRESTED, AND INDICTED, AND NOTICE OF THE DEATH PENALTY SERVED ON HIM,  WOULD IT SHOCK YOU TO LEARN THAT THAT IS THE FIRST TIME THAT HE HAS EVER TOLD ANYBODY THAT HE SUFFERS DIZZY SPELLS AS A CHILD AND HEADACHES THROUGHOUT -- HAS CHRONIC HEADACHES,  WOULD THAT KIND OF SURPRISE YOU?

A.    NO,  NOT PARTICULARLY.

Q.    SO,  THE FACT THAT, WHENEVER MR. FULKS WAS INTERVIEWED AT ALL OF THE DETENTION FACILITIES THAT HE WAS HOUSED IN FOR MUCH MORE MINOR OFFENSES THAN CARJACKING, RESULTING IN DEATH, AND KIDNAPING, RESULTING IN DEATH, HE NEVER MENTIONED TO THE MEDICAL STAFF WHO WERE THERE TO SERVE HIM THAT HE SUFFERED CHRONIC HEADACHES AND DIZZY SPELLS?

A.    I WOULD SAY THAT HE DIDN'T REPORT TO ME A PROBLEM WITH CHRONIC HEADACHES OR DIZZY SPELLS EITHER.

Q.    HAVE YOU SEEN SOME OF THE OTHER REPORTS FROM SOME OF YOUR COLLEAGUES THAT HAVE EITHER TESTIFIED BEFORE THIS JURY OR WILL TESTIFY BEFORE THIS JURY IN WHICH HE COMPLAINS OF CHRONIC HEADACHES?

A.    I HAVE SEEN -- I HAVE SEEN OTHER REPORTS, INCLUDING A REPORT FROM HIS PEDIATRICIAN HE WAS COMPLAINING OF HEADACHES, AS WELL.  YES,  I AM AWARE OTHER TIMES HE HAS COMPLAINED OF HEADACHES.

CROSS EXAM OF DAVID BACHMAN

Q.    ONE OF THE THINGS THAT YOU HAVE TO DO, IN ORDER TO REACH AN ADEQUATE AND INFORMED OPINION, IS TO MEASURE THE VERACITY AND THE CREDIBILITY OF WHAT MR. FULKS HAS TO SAY TO YOU?

A.    CORRECT.

Q.    YOU INDICATED THAT, DURING YOUR PHYSICAL EXAMINATION OF MR. FULKS, THAT HE HAD AN ODD APPEARANCE ON  -- ODD APPEARANCE ABOUT HIS FACE?

A.    YES,  YES.

Q.    AND THAT HIS MOVEMENTS WERE SLOW AND THAT HIS REFLEXES WERE DIMINISHED?

A.    YES.

Q.    NOW,  WAS HE -- HE HAS BEEN ON SEDATIVES AND TRANQUILIZERS THROUGHOUT HIS INCARCERATION AT VARIOUS DIFFERENT TIMES PENDING THESE CHARGES.  DID YOU MAKE AN ASSESSMENT AND TALK TO ANY OF HIS PHYSICIANS TO DETERMINE WHETHER OR NOT HE WAS SEDATED OR TRANQUILIZED?

A.    I DID, SUBSEQUENTLY, OBTAIN A LIST OF MEDICATIONS HE WAS TAKING AT THE TIME,  YES.

Q.    SO, IN FACT, AT ONE POINT IN TIME, YOU DID REALIZE HE WAS ON 11 DIFFERENT MEDICATIONS?

A.    I HAD NOT SEEN THAT LIST.  I THINK HE WAS ON FIVE OR SO MEDICATIONS AT THE TIME I EXAMINED HIM.

Q.    SO, YOU WOULD AGREE WITH ME, AS A PHYSICIAN, THAT IF YOU WERE ON MEDICATIONS, THAT CERTAIN MEDICATIONS CAN INHIBIT

**CROSS EXAM OF DAVID BACHMAN**

**REFLEXES AND BODY MOVEMENTS?**

A.    YES,  TO SOME DEGREE, THEY CAN.

**Q.    AND ALSO WERE YOU AWARE THAT -- I BELIEVE YOU MENTIONED AN EEG THAT WAS DONE ON MR. FULKS IN 1998?**

A.    YES.

**Q.    WERE YOU PROVIDED WITH THE REPORT -- THE PSYCHOLOGICAL REPORT THAT WAS PROVIDED TO THE FEDERAL JUDGE OUT OF THE LEXINGTON MEDICAL CENTER, FEDERAL BOP IN LEXINGTON,  KENTUCKY, WERE YOU PROVIDEED WITH THAT REPORT?**

A.    FROM 1998?

**Q.    YES.**

A.    NO,  I WAS NOT.

**Q.    NOW,  THESE ODD FACIAL APPEARANCES THAT MR. FULKS -- THAT YOU OBSERVED BY MR. FULKS,  THEY COULD HAVE BEEN INTENTIONAL,  COULD THEY NOT?**

A.    THEY WERE NOT EXAGGERATED-TYPE MOVEMENTS.   I THINK THESE WERE SUBTLE FINDINGS THAT I AM REFERRING TO.   IN FACT, IN MY REPORT, I THINK I MENTIONED, SPECIFICALLY -- LET ME SEE IF I CAN FIND IT.   NO TREMOR ATAXIA OR OTHER ABNORMAL MOVEMENTS WERE NOTED.   THERE WERE NO STRIKING ABNORMAL MOVEMENTS ON HIS EXAMINATION WHEN I SAW HIM IN JUNE OF LAST YEAR.   THERE WERE SOME SUBTLE FACIAL CHARACTERISTICS, BUT THAT WAS ALL.

**Q.    WELL, LET ME JUST READ TO YOU FROM PAGE 4 OF THIS 1998 FORENSIC PSYCHOLOGICAL REPORT PROVIDED TO THAT PARTICULAR**

**CROSS EXAM OF DAVID BACHMAN**

FEDERAL JUDGE.   DURING -- AND THIS WAS ON AN OCCASION -- THE PEOPLE AT THIS FEDERAL MEDICAL CENTER HAD 43 DAYS TO OBSERVE, AND EVALUATE, AND TEST MR. FULKS.

"MR. FULKS ALSO PRESENTED WITH

VARIOUS ODD MANNERISMS, SUCH AS

DRAMATIC EYE BLINKING,  HEAD

TWITCHING,  HAND RUBBING, ROCKING

BACK AND FORTH WHEN INTERVIEWED.

CLAIMED TO BE TREATED FOR

PSYCHIATRIC PROBLEMS IN THE PAST,

BUT COULD NOT RECALL WHETHER,

WHETHER WHAT HIS DIAGNOSIS WAS OR

WHAT TYPE OF TREATMENT HE RECEIVED.

WHEN ASKED IF HE HEARD VOICES OR

EXPERIENCED VISUAL HALLUCINATIONS

MR. FULKS INITIALLY SAID HE DID NOT.

LATER HE SAID HE RECEIVED MESSAGES

FROM THE TELEVISION.   HE THEN

REPORTED HE WAS HEARING THE VOICES

OF HIS DECEASED UNCLE AND SON

CALLING HIM STUPID WHICH HE REPORTED

KEPT HIM AWAKE AT NIGHT.   STAFF

NOTED MR. FULKS DID NOT BEHAVE

STRANGELY WHEN INTERACTING WITH HIS

PEERS WHILE AT RECREATION AREAS OR

**CROSS EXAM OF DAVID BACHMAN**

**AT OTHER TIMES WHEN HE WAS UNAWARE**

**STAFF WERE OBSERVING HIM."**

**SO, ON PREVIOUS OCCASIONS, MR. FULKS HAS DISPLAYED ODD FACIAL TICS AND MANNERISMS THAT, WHEN OBSERVED BY AN OBJECTIVE VIEWER IN SITUATIONS IN WHICH MR. FULKS IS NOT BEING -- DOESN'T KNOW HE IS BEING WATCHED, WERE NOT THERE, ARE YOU AWARE OF THAT?**

A.    ACCORDING TO THAT REPORT, YES.

**Q.    HE FAKES IT, ACCORDING TO THIS REPORT?**

A.    WELL, I HAVEN'T SEEN THAT REPORT, SO I CAN'T SAY. BUT CERTAINLY IT SOUNDS LIKE WHAT YOU DESCRIBED AT THAT EXAMINATION, I DID NOT SEE.

**Q.    ARE YOU AWARE THAT MR. FULKS WAS SENT TO COLUMBIA CARE, A MEDICAL DETENTION FACILITY HERE IN COLUMBIA, ON DECEMBER 15TH, 2003?**

A.    YES, I WAS AWARE OF THAT.

**Q.    DID YOU INTERVIEW DR. MILES, THE HEAD TREATING PHYSICIAN AT THE COLUMBIA CARE?**

A.    I DID NOT, NO.

**Q.    DID YOU WANT TO LOOK AT ANY OF HIS RECORDS FROM COLUMBIA CARE?**

A.    MY UNDERSTANDING THAT HE WAS AT COLUMBIA CARE PRIMARILY FOR SOME PHYSICAL INJURIES THAT HE HAD RECEIVED. SO, I WASN'T SURE WHAT THE RELEVANCE OF THAT WAS TO THE EVALUATION THAT I WAS DOING.

CROSS EXAM OF DAVID BACHMAN

Q.    BUT ONE OF THE THINGS YOU INDICATED TO THE JURY WAS THAT PART OF YOUR ASSESSMENT IS THIS PHYSICAL EXAMINATION THAT YOU CONDUCTED ON MR. FULKS,  CORRECT?

A.    ACTUALLY, THERE WASN'T VERY MUCH ON HIS PHYSICAL EXAMINATION, TO BE HONEST WITH YOU.   MOST OF IT WAS ON HIS MENTAL STATUS EXAM.

Q.    YOU INDICATED ON YOUR DIRECT EXAMINATION, YOU DISCUSSED THE ODD FACIAL APPEARANCES, THE SLOW MOVEMENTS,  THE DIMINISHED REFLEXES, AND THE FACT THAT HE APPEARED TO BE, AT TIMES, IN PAIN AT VARIOUS PARTS OF HIS BODY.  DO YOU REMEMBER THAT ON DIRECT EXAMINATION?

A.    RIGHT.   YES.

Q.    AND SO, I TAKE IT, IF YOU DIDN'T INTERVIEW DR. MILES OR REQUEST ANY OF THE INFORMATION FROM ANY OF THE OTHER EMPLOYEES AT COLUMBIA CARE,  WOULD IT SURPRISE YOU TO LEARN THAT FROM DECEMBER 15TH UNTIL AN INCIDENT THAT OCCURRED ON MAY 3RD, 2004,  THAT MR. FULKS WAS ABLE TO DECEIVE ABOUT THE ENTIRE SECURITY STAFF,  DOCTORS,  NURSES,  TECHNICIANS IN THE COLUMBIA CARE IN THINKING THAT HIS MEDICAL CONDITION WAS SO BAD THAT HE REQUIRED A WHEELCHAIR?  AND WHEN HE WAS OUT OF HIS WHEELCHAIR, NO ASSISTANCE IN WALKING DOWN THE HALL?

MR. BLUME:  MAY WE APPROACH,  JUDGE?

(WHEREUPON, A BENCH CONFERENCE WAS HELD.)

MR. BLUME:  I THINK THAT IS NOT THE EVIDENCE.   I MEAN, THAT IS AN ARGUMENT.   I MEAN, THERE IS NO EVIDENCE OF

CROSS EXAM OF DAVID BACHMAN

THAT.

MR. GASSER:  EVERY ONE OF THEM.  MR. SCHOOLS ASKED EVERY ONE OF THOSE EMPLOYEES.

MR. BLUME:  THE EVIDENCE WAS, BASICALLY, YOU WERE IN A WHEELCHAIR, WERE YOU SURPRISED BY HIS STRENGTH?  THAT DOESN'T LEAD TO THE CONCLUSION THAT HE DECEIVED THESE PEOPLE OF HIS MEDICAL CONDITION.  NUMBER ONE, IT COULD HAVE GOTTEN BETTER.  TWO, PEOPLE UNDER THE RUSH OF ADRENALINE AND STUFF, THEY ARE OFTEN STRONGER THAN THEY OTHERWISE ARE.  IT IS NOT --

MR. GASSER:  I WILL REPHRASE MY QUESTION, JUDGE.

THE COURT:  HOW WILL YOU REPHRASE IT TO STRAIGHTEN IT OUT NOW?

MR. GASSER:  I WILL REPHRASE IT BY SAYING, YOU ARE AWARE THAT DOCTORS, NURSES, AND GUARDS OBSERVED MR. FULKS IN A WHEELCHAIR, OBSERVED HIM NEEDING ASSISTANCE WHEN HE IS WALKING DOWN THE HALL BY HOLDING ONTO THE WALL, OBSERVED HIS FACIAL APPEARANCES AS IF HE WERE IN PAIN.  IN FACT, WAS TOLD HE WAS IN PAIN AND, SUBSEQUENTLY, ON MAY 3RD, HE WAS ABLE TO ENGAGE IN A PHYSICAL ASSAULT THAT REQUIRED FOUR SECURITY OFFICERS TO RESTRAIN HIM?

MR. BLUME:  AT LEAST THAT IS CONSISTENT WITH THE FACTS.

THE COURT:  ALL RIGHT.

(WHEREUPON, THE BENCH CONFERENCE CONCLUDED.)

CROSS EXAM OF DAVID BACHMAN

BY MR. GASSER:

Q.    LET ME REPHRASE THE QUESTION,  DR. BACHMAN.

ARE YOU AWARE THAT DOCTORS, AND NURSES,  AND SECURITY OFFICIALS OBSERVED MR. FULKS DURING THIS TIME PERIOD REQUIRING A WHEELCHAIR IN ORDER TO MOVE AROUND; REQUIRING THE ASSISTANCE OF A WALL WHENEVER HE WAS OUT OF HIS WHEELCHAIR AND WALKING DOWN THE HALL; INDICATED THAT HE WAS IN PAIN CONSISTENTLY; AND, MADE FACIAL APPEARANCES INDICATIVE OF BEING IN PAIN?  AND THEN, ON MAY 3RD,  2002,  WAS ABLE TO ENGAGE IN A PHYSICAL ALTERCATION THAT REQUIRED FIVE RATHER LARGE SECURITY OFFICERS TO RESTRAIN HIM?  WERE YOU MADE AWARE OF THAT FACT?

A.    NO, SIR,  I WAS NOT.

Q.    YOU INDICATE THAT MR. FULKS, ON THE FIRST MENTAL STATUS EXAMINATION WAS -- YOU REFER TO IT AS MINI MENTAL?

A.    MINI MENTAL STATUS EXAM.

Q.    MINI MENTAL STATUS EXAM?

A.    RIGHT.

Q.    HE SCORED A 23 OUT OF 40, WHICH YOU CALCULATED TO BE IN THE IMPAIRED RANGE?

A.    RIGHT.

Q.    WHAT ARE SOME OF THE QUESTIONS ASKED ON THAT EXAM?

A.    DO YOU KNOW WHAT THE DATE IS?  DO YOU KNOW WHAT THE MONTH IS?  DO YOU KNOW WHAT THE YEAR IS?  DO YOU KNOW WHAT THE SEASON IS?  DO YOU KNOW WHAT THE NAME OF THIS PLACE IS. PATIENTS ARE GIVEN THREE WORDS TO REPEAT BACK TO THE EXAMINER.

CROSS EXAM OF DAVID BACHMAN

AFTER A BRIEF DELAY, THEY ARE ASKED TO RECALL THOSE WORDS.

THEY ARE ASKED TO COPY A SIMPLE FIGURE.  THEY ARE ASKED TO

WRITE A COMPLETE SENTENCE.  THOSE ARE THE SORT OF TASKS THAT

ARE PART OF THAT EXAM.

**Q.    AND YOU ALSO INDICATED THAT THEN YOU CONDUCTED A SERIES**

**OF TESTS DEALING WITH PROVERBS AND ANALOGIES; IS THAT CORRECT?**

A.    AMONG OTHER THINGS,  YES.

**Q.    ON SOME OF THE -- ON THE MINI MENTAL STATUS EXAM, HE**

**SCORED -- SOME OF THE QUESTIONS, HE GOT CORRECT?**

A.    YES,  THAT'S CORRECT.

**Q.    HE SCORED A 23 OUT OF 40?**

A.    YES, THAT'S CORRECT.

**Q.    ON SOME OF THE PROVERBS, HE WAS ABLE TO INTERPRET THOSE**

**PROVERBS CORRECTLY?**

A.    YES.

**Q.    SOME OF THE ANALOGIES HE WAS ABLE TO ALSO UNDERSTAND**

**THE ANALOGY CORRECTLY?**

A.    THAT IS ABSOLUTELY CORRECT.

**Q.    AND YOU SAID THAT ONE OF THE REASONS WHY THAT YOU THINK**

**HE WAS TRYING TO DO HIS BEST WHEN YOU WERE MEETING WITH HIM IS**

**THAT YOU WANT TO LOOK AT THE OVERALL PATTERN, AND GENERALLY,**

**PEOPLE THAT ARE FAKING IT, WILL DO CRUMMY, I THINK ARE YOUR**

**WORDS,  CRUMMY ON EVERYTHING?**

A.    I MAY HAVE USED THE WORD "CRUMMY."  VERY OFTEN, THEY

ARE SO INTENT ON EXAGGERATING THEIR DEFICITS THEY REALLY DO

CROSS EXAM OF DAVID BACHMAN

VERY POORLY ON VERY SIMPLE THINGS THAT YOU WOULD KNOW THAT THEY WOULD ORDINARILY BE ABLE TO DO EASILY.  I DIDN'T SEE THAT PATTERN ON MR. FULKS WHEN I EXAMINED HIM.

**Q.    YOU INDICATED THAT YOU WERE NEVER PROVIDED WITH A REPORT BY FORENSIC PSYCHOLOGISTS AND FORENSIC MENTAL HEALTH EXAMINERS AT THE LEXINGTON MEDICAL CENTER IN 1998,  YOU WEREN'T PROVIDED WITH THIS REPORT?**

A.    NO, I DID NOT SEE THAT REPORT.

**Q.    DO YOU THINK -- WOULD YOU WANT TO KNOW, PRIOR TO CONDUCTING YOUR OWN PHYSICAL EXAMINATION AND MENTAL EXAMINATION ON MR. FULKS AS A CLINICIAN,  WOULD YOU WANT TO HAVE ALL OF MR. FULKS'S PRIOR MENTAL HEALTH RECORDS?**

A.    SURE.   THEY WOULD  -- THE MORE RECORDS YOU HAVE, THE BACKGROUND, THE BETTER, CERTAINLY.

**Q.    YOU WEREN'T PROVIDED WITH A FORENSIC EXAMINATION IN 1998?**

A.    I DID NOT RECEIVE THAT,  NO.

**Q.    YOU WOULD AGREE WITH ME THAT MR. FULKS HAS THE ABILITY TO LEARN FROM HIS MISTAKES?**

A.    NO, I AM NOT.   WELL, THAT IS A VERY BROAD QUESTION. AND I WOULD ASK THAT YOU,  YOU KNOW,  IF YOU COULD GIVE ME A MORE SPECIFIC IDEA OF WHAT YOU MEAN BY THAT.

**Q.    DEPENDING UPON THE SET OF CIRCUMSTANCES,  MR. FULKS, LIKE EVERYONE ELSE, CAN LEARN FROM THEIR MISTAKES,  DEPENDING UPON THE CIRCUMSTANCES?**

**CROSS EXAM OF DAVID BACHMAN**

A.   DEPENDING UPON THE CIRCUMSTANCES, HE SHOULD BE ABLE TO LEARN, YES.

Q.   SO, MR. FULKS DID REALLY, REALLY BAD ON MOST OF THE QUESTIONS IN 1998 AND WAS DEEMED TO BE MALINGERING BY THE STAFF AT THE LEXINGTON MEDICAL CENTER IN LEXINGTON, KENTUCKY. YOU ARE AWARE OF THAT?

A.   YOU HAVE TOLD ME.  I HAVE NOT SEEN THAT REPORT.

Q.   YOU HAVE NO REASON TO DISPUTE THAT.

A.   NO, SIR.

Q.   SO, ISN'T IT POSSIBLE, DOCTOR, THAT MR. FULKS LEARNED FROM HIS MISTAKES.  AND INSTEAD OF INTENTIONALLY GETTING ALL OF THE ANSWERS WRONG, WHICH, AS YOU SAY, WOULD INDICATE OBVIOUS DECEPTION, HE GOT SOME OF THE ANSWERS RIGHT, AND HE INTENTIONALLY GOT SOME OF THEM WRONG?

A.   I WOULD TELL YOU THAT WOULD NOT JUST BE LEARNING, THAT WOULD BE EXTRAORDINARY, BECAUSE IT WOULD MEAN THAT HE WOULD HAVE TO HAVE KNOWLEDGE AS TO WHICH OF THE APPROPRIATE QUESTIONS TO GET RIGHT AND WHICH OF THE APPROPRIATE QUESTIONS TO GET WRONG.  SO, UNLESS HE HAS SOME EXTRAORDINARY BACKGROUND IN NEUROPSYCHOLOGY, I WOULD FIND THAT HARD TO BELIEVE THAT JUST KNOWING THAT HE NEEDED TO DO BETTER ON THE TEST WOULD EXPLAIN HIS PERFORMANCE.

Q.   WELL, WHAT KIND OF ADVANCE KNOWLEDGE DO YOU HAVE TO HAVE WHEN YOU ARE BEING ASKED QUESTIONS SUCH AS, WHAT IS THE DATE OF THE WEEK?  WHAT IS THE MONTH OF THE YEAR?  WHO THE

**CROSS EXAM OF DAVID BACHMAN**

**PRESIDENT OF THE UNITED STATES IS?  WHAT IS THE NAME OF THE FACILITY?**

A.    IN FACT,  HE GOT MOST OF THOSE QUESTIONS CORRECT.   YOU KNOW,  WHAT WAS INTERESTING TO ME ON HIS EXAMINATION WAS NOT THAT,  WELL,  HE MESSED UP ON A FEW THINGS, MADE A FEW ERRORS. WHAT WAS INTERESTING TO ME WAS THE PATTERN OF ERRORS THAT HE MADE.   THERE WERE CERTAIN SPECIFIC AREAS OF FUNCTION, ESPECIALLY AS I WAS TALKING ABOUT THE FRONTAL LOBE FUNCTION WHERE HE REALLY BOMBED.   OTHER AREAS OF FUNCTION, SUCH AS LANGUAGE FUNCTION, FOR INSTANCE, EVEN SOME BASIC MEMORY FUNCTION WHERE HE REALLY DID PRETTY WELL.

SO, IT IS NOT JUST, GEE,  HE DID A LITTLE BIT BETTER OVERALL THAN HE DID IN 1998.   HE HAD A VERY SPECIFIC PATTERN OF DEFICITS THAT I FOUND VERY INTRIGUING AND CAUSED ME TO WANT TO GO INTO MORE DETAIL AND EXPLORE MORE AS TO WHAT WAS GOING ON.

**Q.    SO,  HE GOT THE MOST OBVIOUS AND EASIEST ANSWERS RIGHT, AND SOME OF THE ONES THAT WEREN'T OBVIOUS AND EASY LIKE THE DAY OF THE WEEK AND THE MONTH OF THE YEAR,  HE GOT WRONG?**

A.    MAYBE I AM NOT EXPLAINING MYSELF WELL.   TO SOME DEGREE,  YES, THAT IS TRUE.   BUT I THINK THE THING THAT WAS MORE STRIKING TO ME WAS NOT THAT, YES, HE GOT SOME OF THE QUESTIONS RIGHT AND SOME OF THE QUESTIONS WRONG.   THERE WAS A SPECIFIC AREA OF TESTING,  SPECIFICALLY, THIS INHIBITION TESTING, THIS FRONTAL LOBE TESTING WHERE HE WAS CONSISTENTLY

CROSS EXAM OF DAVID BACHMAN

IMPAIRED.  IT WASN'T HE GOT A LITTLE BIT WRONG AND A LITTLE BIT RIGHT ON THAT TESTING,  BUT, IN FACT, HE WAS CONSISTENTLY IMPAIRED IN THAT PARTICULAR AREA OF TESTING.  AND HOW WOULD HE KNOW, WITH HIS BACKGROUND, TO BE CONSISTENTLY WRONG IN THAT PARTICULAR AREA,  YOU KNOW?  I DON'T THINK THAT IS LIKELY THAT THAT WOULD BE DUE TO MALINGERING.  I THINK HE PROBABLY, MOST LIKELY, IS IMPAIRED IN THAT PARTICULAR AREA.

**Q.    LET ME SHOW YOU DEFENDANT'S EXHIBIT NO. 11.   YOU INDICATED THAT THESE ARE THREE DIFFERENT MRI IMAGES OR THREE DIFFERENT SECTIONS OF MR. FULKS'S BRAIN?**

A.    YES, SIR.

**Q.    AND THAT THIS SPOT RIGHT HERE, AND RIGHT THERE, AND RIGHT THERE APPEARS TO BE FLUID?**

A.    RIGHT.   THAT LARGE DARK AREA IS FLUID,  YES, SIR.

**Q.    AND IT IS A DIFFERENT SHAPE IN EACH OF THE IMAGES?**

A.    YES,  THAT'S RIGHT.  IT IS NOT A PERFECTLY ROUND CYST. A CYST THAT CONFORMS TO THE SHAPE OF THE BRAIN AROUND IT.

**Q.    AND, IN THIS EXHIBIT, I NOTICE THAT THAT APPEARANCE IS IN THAT IMAGE?**

A.    RIGHT.

**Q.    BUT IS NOT IN THAT IMAGE?**

A.    RIGHT.

**Q.    WHY IS THAT?**

A.    BECAUSE YOU ARE CUTTING THROUGH PARTS OF HIS TRACHEA THERE.   YOU ARE, ACTUALLY, BELOW THE BRAIN.   YOU ARE CUTTING

CROSS EXAM OF DAVID BACHMAN

THROUGH A DIFFERENT STRUCTURE OF THE BODY.

Q.    **THIS AREA RIGHT HERE?**

A.    THOSE ARE THE VENTRICLES OF THE BRAIN.  WE ALL HAVE THOSE, AND THEY ALL CONTAIN FLUID.  THOSE ARE NORMAL.  THERE ARE PARTS OF THE BRAIN,  PARTS OF THE BODY THAT NORMALLY CONTAIN FLUID OR AIR.  IN THIS PARTICULAR MRI SCAN, AIR AND WATER HAVE THE SAME SHADOW, THEY ARE BOTH BLACK.  WHEREAS TISSUE,  BRAIN TISSUE, HAS A WHITISH OR GRAYISH APPEARANCE. AREAS OF THE BRAIN THAT ARE SUPPOSED TO CONTAIN FLUID.  THE AREA YOU DREW THE CIRCLE AROUND IS NORMAL.  WE ALL HAVE THOSE.  THOSE ARE NORMAL SIZE,  NORMAL CONFIGURATION.  WHAT IS ABNORMAL ON THE BRAIN IS THE AREA WHERE THE LONG WHITE ARROW IS POINTING.

Q.    **BUT THESE APPEAR TO BE, AGAIN, DIFFERENT CONFIGURATIONS?**

A.    RIGHT.  THAT IS BECAUSE YOU ARE TAKING SEQUENTIAL SECTIONS THROUGH DIFFERENT PARTS OF THE BRAIN.

Q.    **AGAIN, THIS AREA RIGHT HERE APPEARS TO BE DIFFERENT THAN THE AREAS ON THE OTHER PHOTOGRAPHS?**

A.    RIGHT.  IT IS AS IF YOU WERE TAKING SECTIONS THROUGH YOUR ARM.  THERE WOULD BE ONE SECTION WOULD BE THICKER,  THE NEXT SECTION WOULD BE THINNER,  THE BONE WOULD BE THICKER, THE BONE WOULD BE THINNER, THERE WOULD BE DIFFERENT MUSCLES YOU WOULD BE CUTTING THROUGH IF YOU WERE TAKING DIFFERENT SECTIONS OF THE ARM.

CROSS EXAM OF DAVID BACHMAN

IT IS THE SAME THING WITH THE BRAIN.  AS YOU ARE CUTTING THROUGH THE BRAIN, DIFFERENT SECTIONS ARE GOING TO HAVE DIFFERENT STRUCTURES THAT WILL BE A LITTLE BIT BIGGER, A LITTLE BIT SMALLER.

**Q.    WOULD YOU AGREE WITH ME THAT PHYSICIANS, NEUROLOGISTS, NEUROSURGEONS, RADIOLOGISTS, CAN LOOK AT MRI'S AND OTHER IMAGING AND DISAGREE ON WHAT THEY ARE SEEING?**

A.    OH, SURE, YES.

**Q.    IT HAPPENS EVERY DAY?**

A.    SURE.

**Q.    AND, IN FACT, DID YOU NOT ORDER A RADIOLOGICAL EXAM, BOTH A CAT SCAN AND AN MRI, ON MR. FULKS BY LOCAL PHYSICIANS HERE IN COLUMBIA?**

A.    YES, ORDERED MRI SCAN.  I DON'T KNOW THAT I ORDERED A CAT SCAN.  I DID ORDER AN MRI SCAN IN COLUMBIA.

**Q.    I BELIEVE ANOTHER PHYSICIAN THAT WAS ASSOCIATED WITH MR. FULKS ORDERED A CAT SCAN IN DECEMBER OF 2003, AND YOU ORDERED AN MRI TO BE DONE ON MR. FULKS IN JANUARY OF THIS YEAR?**

A.    RIGHT.  THE REASON WE ORDERED THE SCAN IN COLUMBIA IS WE DIDN'T WANT TO INCONVENIENCE THE STAFF OF HAVING TO TAKE HIM BACK TO THE MEDICAL UNIVERSITY.  ORDERING THAT SCAN IN ORDER TO DO IT WITH A CERTAIN TECHNIQUE SO WE COULD SEND IT TO DR. BOOKSTEIN FOR ANALYSIS.

**Q.    AND, SPECIFICALLY, THE RADIOLOGISTS AND THE INDIVIDUALS**

**CROSS EXAM OF DAVID BACHMAN**

INTERPRETING HERE IN COLUMBIA AT PALMETTO RICHLAND, THE CAT SCANS AND THE MRI'S, WERE TOLD THAT THE PURPOSE WAS A -- POTENTIALLY LOOKING FOR EVIDENCE OF FETAL ALCOHOL SYNDROME, ARE YOU AWARE OF THAT?

A.    RIGHT.   THE PRIMARY REASON TO GET THE MRI SCAN IN COLUMBIA WAS TO OBTAIN IT FOR DR. BOOKSTEIN.  THAT WAS MY DISCUSSION WITH RADIOLOGISTS.

Q.    DID YOU GET A CHANCE TO SEE THE RADIOLOGICAL EXAMINER OF DR. EDDIE RICHMOND HERE,  RADIOLOGIST HERE IN COLUMBIA?

A.    YES.

Q.    THE REASON FOR THE EXAM -- HE STATES THE REASON FOR THE EXAM AND REPORT IS FETAL ALCOHOL SYNDROME?

A.    YES.

Q.    DR. RICHMOND, AND WHOEVER HE CONSULTED WITH AS FAR AS ANY KIND OF QUALITY ASSURANCE, WAS SPECIFICALLY LOOKING AT THE MRI FOR EVIDENCE OF FETAL ALCOHOL SYNDROME?

A.    RIGHT.

Q.    OF COURSE, YOU ARE AWARE THAT BOTH THE PHYSICIANS HERE IN COLUMBIA INDICATE MR. FULKS'S CAT SCAN WAS NORMAL, AND THAT HIS MRI WAS NORMAL?

A.    RIGHT.  THE MRI SCAN READING IN COLUMBIA IS DIFFERENT THAN THE READING BY THE RADIOLOGIST IN CHARLESTON MEDICAL UNIVERSITY, CORRECT.

Q.    WHICH CORROBORATES -- IS CONSISTENT WITH YOUR ANSWER THAT NEUROLOGISTS, AND RADIOLOGISTS, AND PHYSICIANS CAN LOOK

**CROSS EXAM OF DAVID BACHMAN**

**AT THE SAME TYPE OF IMAGING AND DISAGREE AS TO WHAT THEY ARE SEEING?**

A.    I WOULD NOT AGREE WITH YOU IN THIS PARTICULAR CASE. THE RADIOLOGIST IN COLUMBIA, YOU HAVE TO ASK WHY THEY WERE LOOKING AT THE MRI SCAN.   THEY WERE SCREENING IT TO MAKE SURE THERE WAS NO MAJOR PATHOLOGY BEFORE THEY SENT IT TO DR. BOOKSTEIN.   THEY WANT TO MAKE SURE THERE WAS NOT A TUMOR, ABSCESS,  BLOOD CLOT, OR SOMETHING THAT WOULD REQUIRE MORE URGENT TREATMENT OF MR. FULKS.   SO,  WHETHER THEY WOULD HAVE COMMENTED ON SOME CONGENITAL ABNORMALITY ON SOMETHING LIKE THIS, I CAN'T SAY. I DIDN'T TALK TO THE RADIOLOGIST WHO PREPARED THE REPORT.

**Q.    IF YOU GET A REPORT FROM A RADIOLOGIST FROM COLUMBIA, SOUTH CAROLINA THAT SAYS MR. FULKS'S MRI IS NORMAL, YOU DON'T WANT TO CONSULT WITH THAT RADIOLOGIST?**

A.    THAT REPORT IS INCORRECT.   I COULD HAVE TALKED TO THE RADIOLOGIST,  SAID, GEE,  WHAT ABOUT THE CYST?   OH, YEAH I DIDN'T KNOW YOU WERE INTERESTED IN THAT.  I WILL GO BACK AND PUT IT IN MY REPORT.  THAT IS PROBABLY WHAT HE WOULD HAVE SAID.   BUT, IN TRUTH, I DID NOT TALK TO HIM.

**Q.    ARE YOU SAYING, A RADIOLOGIST, A TRAINED PHYSICIAN, WOULD LOOK AT AN MRI,  SEE ABNORMALITY ON THE BRAIN, NOT PUT IT IN HIS REPORT?**

A.    YES, HAPPENS ALL THE TIME.

**Q.    IN THIS REPORT, DR. RICHMOND SAYS, IN INTERPRETING THE**

## CROSS EXAM OF DAVID BACHMAN

MRI OF MR. FULKS THAT WAS DONE ON JANUARY 12TH OF 2004,  THE CSF SPACES ARE NORMAL.  WHAT IS CSF?

A.    CEREBROSPINAL FLUID. HIS INTERPRETATION OF MR. FULKS'S MRI IS THAT THE CEREBROSPINAL FLUID SITUATIONS ARE NORMAL. THAT INTERPRETATION IS INCORRECT, AND I THINK YOU CAN SEE FOR YOURSELF THAT IT IS INCORRECT.

Q.    YOU DISAGREE WITH THE MRI THAT WAS DONE JANUARY 12TH. WHEN YOU LOOK AT IT, YOU DO NOT BELIEVE THE CEREBROSPINAL FLUIDS ARE NORMAL?

A.    I THINK PRETTY EVIDENTLY, THEY ARE NOT.

Q.    THERE IS NO MIDLINE SHIFT OR MASS EFFECT?

A.    CORRECT.  THERE IS NO MIDLINE SHIFT.

Q.    SO,  DR. RICHMOND IS CORRECT WHEN HE LOOKS AT THE MRI AND SAYS THERE IS NO MIDLINE SHIFT.  BUT HE IS DEFICIENT WHEN HE LOOKS AT THE CEREBROSPINAL FLUID SPACES AND CALLS THEM NORMAL?

A.    YES.

Q.    NO ALTERED AREAS OF ABNORMAL INCREASED OR DECREASED SIGNAL?

A.    RIGHT.  I WOULD AGREE WITH THAT.

Q.    SO,  HE IS RIGHT UP THERE ON AT LEAST TWO OUT OF THREE?

A.    TWO OUT OF THREE.

Q.    ON THE DWI IMAGES, THERE IS NO EVIDENCE OF SUBACUTE OR ACUTE INFARCT?

A.    CORRECT.  THOSE ARE SCANS LOOKING FOR STROKE.

CROSS EXAM OF DAVID BACHMAN

CERTAINLY, I WOULD AGREE NO AREAS OF STROKE ON MR. FULKS'S SCAN.

Q.    SO, OF THE FOUR AREAS THAT DR. BACHMAN FOCUSED ON ON THE MRI, YOU AGREE WITH DR. BACHMAN?

A.    EXCUSE ME, I'M DR. BACHMAN.

Q.    I'M SORRY.  THREE AREAS OF DR. RICHMOND.  BEEN A LONG FOUR WEEKS.

A.    I CAN IMAGINE.

Q.    OF THE FOUR AREAS THAT DR. RICHMOND DISCUSSED IN HIS REPORT, YOU AGREE WITH DR. RICHMOND IN THREE OF THE AREAS, AND YOU DISAGREE WITH HIM ON ONE?

A.    CORRECT.  I AGREE WITH THE INTERPRETATION FROM THE MEDICAL UNIVERSITY RADIOLOGIST WHO DID COMMENT ON THE CYST.

Q.    AND SO, FINALLY, DOCTOR, THE RICHMOND FINAL REPORT, NORMAL MRI OF THE BRAIN DONE WITHOUT CONTRAST, THAT WAS HIS FINAL WRITTEN OPINION?

A.    YES.

Q.    THE CAT SCAN ORDERED IN DECEMBER ON MR. FULKS'S BRAIN, THOSE THAT INTERPRETED THAT CAT SCAN ALSO INDICATED IT WAS A NORMAL CAT SCAN?

A.    I HAVE NOT SEEN THAT CAT SCAN, SO I DON'T KNOW WHETHER THE CYST AREA SHOWED UP ON THE CAT SCAN OR NOT.  I CAN'T COMMENT ON THAT.

Q.    AS AN OBJECTIVE ANALYST AND CLINICIAN, DID YOU REQUEST FROM THE DEFENSE TEAM ALL OF THE MEDICAL REPORTS AND TESTING,

## CROSS EXAM OF DAVID BACHMAN

OR WERE YOU SELECTIVE IN WHAT YOU WANTED TO SEE?

A.    NO, I BASICALLY ASKED THEM TO SEND ME WHAT THEY HAD ON MR. FULKS.

Q.    AND YOU DO AGREE THAT THERE IS NO EVIDENCE THAT MR. FULKS, HIMSELF, SUFFERS FROM FETAL ALCOHOL SYNDROME?

A.    NO.   WHEN YOU DEFINE THE SYNDROME,  INCLUDE ALL THE CLASSIC FACIAL FEATURES, YES, WHAT I THINK PEOPLE HAVE DEFINED AS FETAL ALCOHOL SPECTRUM DISORDER, SO I WOULD AGREE WITH YOU.

Q.    AND THAT IS, THE JURY HAS HEARD INFORMATION ABOUT THAT, THAT IS A CONTINUUM?

A.    YES.

Q.    DEPENDING ON A MULTIPLICITY OF FACTORS?

A.    YES, SIR.

Q.    YOU WERE LOOKING AT GOVERNMENT'S  -- I'M SORRY, DEFENDANT'S EXHIBIT NUMBER 12, WHICH WAS A FAMILY PORTRAIT OF THE FULKS CHILDREN TAKEN SOME TIME WHEN MR. FULKS WAS AN INFANT; IS THAT CORRECT?

A.    THAT IS MY UNDERSTANDING,  YES.

Q.    AND YOU STATED THAT YOU WERE NOT PROVIDED WITH ANY OTHER PHOTOGRAPHS OF CHAD FULKS, SAY, WHEN HE WAS IN KINDERGARTEN, OR FIRST GRADE, OR SECOND GRADE, OR THIRD GRADE, OR FOURTH GRADE?

A.    THAT IS CORRECT.

Q.    AND HE WOULD HAVE BEEN BORN IN 1977.  HE WOULD HAVE BEEN IN THOSE GRADES IN THE 1980'S,  OBVIOUSLY?

**CROSS EXAM OF DAVID BACHMAN**

A.    YES.

Q.    YOU DON'T THINK THAT THE SCHOOL SYSTEM IN HUNTINGTON, WEST VIRGINIA IS THE ONLY SCHOOL SYSTEM IN THE COUNTRY THAT DOESN'T TAKE PHOTOGRAPHS OF THEIR CHILDREN'A CLASSES, DO YOU?

A.    I HAVE NO INFORMATION ON THAT.   I COULDN'T ANSWER THAT.   I ASSUME MOST SCHOOL SYSTEMS OFFER A CLASS PICTURE OR A PICTURE OF KIDS EVERY YEAR.   BUT SOME DO, SOME DON'T.  I DON'T KNOW.

Q.    EVEN IF SOMEBODY MIGHT NOT BE ABLE TO AFFORD THEM,  IT IS PRETTY EASY TO GO BACK AND GET CLASS PICTURES UNLESS THE BUILDING IS BURNED DOWN AND ALL OF THE PHOTOGRAPHS ARE -- OR EVERYBODY IN THE WHOLE SCHOOL IS UNLOCATABLE (SIC)?

A.    WELL,  I ASSUME THAT MAYBE THERE ARE OTHER PICTURES, BUT IF THERE ARE, I HAVEN'T SEEN THEM.

Q.    AND I JUST THOUGHT,  YOU KNOW,  THE IDEA OF THINKING TO GO TO A SCHOOL AND LOOK FOR PHOTOGRAPHS,  I MEAN,  THAT JUST POPPED IN MY MIND WHEN YOU ANSWERED MR. BLUME'S QUESTION. WAS THAT NOT SOMETHING THAT IS PRETTY OBVIOUS FOR A CLINICIAN, IF YOU WANT TO LOOK AT PHOTOGRAPHS OF CHILDREN WHILE THEY ARE ADVANCING IN AGE, YOU JUST GO LOOK AT THEIR SCHOOL PICTURES?

A.    AGAIN,  IF THOSE PICTURES ARE AVAILABLE, CERTAINLY WOULD WANT TO SEE THEM.   MY UNDERSTANDING IS, THERE ARE NO OTHER PICTURES AVAILABLE.

Q.    THE FACT OF THE MATTER IS, THAT BY TRYING TO INFER TO THIS JURY THAT THE ONLY PHOTOGRAPH THERE IS OF CHAD FULKS IS

**CROSS EXAM OF DAVID BACHMAN**

**WHEN HE WAS AN INFANT,  I MEAN,  JUST TRYING TO MAKE IT LOOK WORSE?**

A.    I'M SORRY, I DON'T FOLLOW YOUR REASONING.

**Q.    I MEAN, THE IDEA, THE INFERENCE THAT YOU ARE TRYING TO MAKE THAT THIS -- YOU WERE ASKING FOR PHOTOGRAPHS OF CHAD FULKS AS A CHILD, AND THIS WAS THE ONLY PHOTOGRAPH THAT YOU WERE PROVIDED WITH.  THE FACT OF THE MATTER IS COMMON-SENSICAL, IF YOU REALLY WANTED, AS A CLINICIAN, TO FIND OTHER PHOTOGRAPHS OF CHAD FULKS, YOU COULD HAVE DONE THAT?**

A.    HOW?

**Q.    CONTACT THE SCHOOL.  ASK THE DEFENSE LAWYERS TO CONTACT THE SCHOOL.**

A.    WELL,  YOU KNOW,  I THINK YOUR QUESTION IS AN INTERESTING ONE, BUT I THINK YOU NEED TO DIRECT IT TOWARD MR. BLUME.  MY UNDERSTANDING IS THAT THEY DID CONTACT THE SCHOOL SYSTEM,  THEY DID OBTAIN -- TRIED TO OBTAIN SCHOOL RECORDS. AND THAT THE INFORMATION THAT I WAS GIVEN, WHETHER THAT INFORMATION IS CORRECT OR NOT,  I CAN'T TELL YOU.  BUT THE INFORMATION I WAS GIVEN, THERE WAS A CONCERTED EFFORT TO CONTACT THE SCHOOL,  CONTACT OTHER FAMILY MEMBERS, AND THAT THESE WERE THE ONLY PICTURES THAT WERE AVAILABLE FOR ME TO LOOK AT.  I AM NOT A DETECTIVE.  I CAN ONLY GO ON THE INFORMATION THAT I AM PROVIDED.

**Q.    THAT IS THE POINT I AM TRYING TO MAKE.  I AM NOT TRYING TO ACCUSE YOU OF NOT DOING ENOUGH DETECTIVE WORK.  I**

**CROSS EXAM OF DAVID BACHMAN**

KNOW THAT IS NOT YOUR JOB.  THE POINT I AM TRYING TO MAKE IS, YOU ARE -- YOU CAN ONLY MAKE YOUR ASSESSMENTS AND YOUR EVALUATIONS BASED ON THE INFORMATION THAT IS PROVIDED TO YOU?

A.    RIGHT.

Q.    IF YOU DON'T HAVE THE INFORMATION, LIKE THE '98 REPORT THAT SAYS MR. FULKS WAS MALINGERING, OR THE DECEMBER CAT SCAN, IF YOU DON'T HAVE THAT INFORMATION, IF THAT WASN'T PROVIDED TO YOU BY MR. FULKS'S LAWYERS,  THEN, OBVIOUSLY, IT DOESN'T GO INTO YOUR EVALUATION?

A.    I TRY TO TAKE EVERYTHING I POSSIBLY CAN TO PUT IT IN THE EVALUATION,  THAT IS CORRECT.

Q.    NOW,  YOU INDICATED, WHEN YOU EXAMINED RONNIE FULKS, THAT HE TOLD YOU THAT HE HAD A HOLE IN HIS HEART?

A.    THAT HE WAS BORN WITH A HOLE IN HIS HEART,  YES.  THAT IS WHAT HE TOLD ME.

Q.    I DON'T KNOW WHETHER THAT IS TRUE OR NOT TRUE.  WERE YOU PROVIDED ANY MEDICAL RECORDS?

A.    NO, I DON'T HAVE ANY OF RONNIE'S MEDICAL RECORDS.

Q.    AND I AM ALMOST THROUGH HERE,  DR. BACHMAN.

A.    ALL RIGHT.

Q.    YOU CONDUCTED -- TOOK AN ORAL HISTORY FROM CHAD FULKS.

A.    YES, SIR.

Q.    YOU TALKED ABOUT YOUR PHYSICAL EXAM.

A.    YES.

Q.    AND YOU WERE PROVIDED WITH -- DID YOUR OWN MENTAL

**CROSS EXAM OF DAVID BACHMAN**

**STATUS EXAMINATIONS, AND WE HAVE TALKED ABOUT THAT.  AND YOU WERE ALSO PROVIDED WITH NEUROPSYCHOLOGICAL TESTINGS, AS WELL?**

A.    YES,  THAT IS CORRECT.

**Q.    AND,  AGAIN,  NOT TO BEAT A DEAD HORSE.  OF COURSE, THAT PART OF THE ASSESSMENT OR THE EVALUATING THE NEUROLOGICAL TESTS WOULD BE THE VERACITY AND CREDIBILITY OF MR. FULKS?**

A.    PARTLY,  YES.

**Q.    ARE YOU AWARE THAT MR. FULKS,  OF COURSE,  WENT TO BUTNER MEDICAL CENTER IN NORTH CAROLINA?**

A.    YES,  I DID.

**Q.    AND WAS PROVIDED WITH ADDITIONAL NEUROLOGICAL TESTINGS AND EXAMINATIONS BY CLINICIANS AT BUTNER?**

A.    YES.

**Q.    AND,  OF COURSE,  THE REPORT FROM BUTNER, YOU HAVE SEEN THAT, HAVEN'T YOU?**

A.    YES,  I HAVE.

**Q.    NOW,  THE REPORT FROM BUTNER DOES NOT INDICATE, SPECIFICALLY, THAT MR. FULKS, IN THEIR OPINION, WAS MALINGERING WHEN HE WAS PROVIDED WITH THEIR TESTING,  YOU HAVE SEEN THAT?**

A.    THAT IS CORRECT.  THEY THOUGHT THAT HE WAS TRUTHFUL WHEN HE DID THE TESTING WITH THEM,  THAT'S CORRECT.

**Q.    HOWEVER,  -- BEG THE COURT'S INDULGENCE.  DID YOU SEE THE REPORT THAT THE BUTNER STAFF MADE A PART OF THEIR FINAL REPORT THAT INCLUDED THEIR ANALYSIS, THE CLINICAL INTERPRETED**

**CROSS EXAM OF DAVID BACHMAN**

**REPORT BY DR. LESLIE MORAY?**

A.    I DON'T REMEMBER THE PERSON WHO SIGNED IT, BUT I REMEMBER.

**Q.    PERSONALITY ASSESSMENT INVENTORY BY DR. MORAY, AND IT WAS CONDUCTED BY THE PSYCHOLOGICAL ASSESSMENT RESOURCE COMPANY DOWN IN ODESSA,  FLORIDA?**

A.    YES.

**Q.    DO CONTRACT WORK, BASICALLY?**

A.    YES.

**Q.    SO,  YOU SAW ON PAGE 6 OF DR. LESLIE MORAY'S REPORT, WHEN SHE DID A FULL-BLOWN DISCUSSION OF THE VALIDITY OF THE TEST RESULTS OF MR. FULKS THAT WERE CONDUCTED ON MARCH -- I'M SORRY, FEBRUARY 17TH OF 2004?**

A.    RIGHT.  I DON'T REMEMBER THE DETAILS OF WHAT WAS SAID, BUT I DO REMEMBER THAT THERE WAS A REPORT,  YES.

Q.    AND SHE WAS PRETTY BASICALLY, THE BOTTOM LINE WAS,  I WILL GET TO SOME SPECIFIC QUOTES.   THE BOTTOM LINE WAS, "BASED ON HER ANALYSIS,  ANYONE LOOKING AT THE VALIDITY AND VERACITY OF THIS NEUROLOGICAL TESTING NEEDS TO DO SO WITH CAUTION BECAUSE OF THE WAY MR. FULKS ANSWERED SOME OF THE TESTS."

MR. BLUME:  I DON'T THINK THIS IS -- MAYBE WE SHOULD APPROACH.  IT IS NOT NEUROLOGICAL TESTING, IT IS PERSONALITY TESTING.

MR. GASSER:  HE TESTIFIED TO THE FULL GAMUT ON DIRECT

EXAMINATION.

THE COURT:  I WILL ALLOW IT.  GO BACK INTO IT ON REDIRECT.

THE WITNESS:  I SAW THE PAI RESULT.  MY UNDERSTANDING ON THE PAI RESULTS WAS THAT THERE WERE CERTAIN INDICATORS.  THAT THE PAI IS A TEST OF SEVERAL HUNDRED QUESTIONS WHERE PEOPLE ARE ASKED, IN FORCED CHOICE QUESTIONS, EITHER "YES" OR "NO," "TRUTH" OR "FALSE."  THEY BREAK THESE TESTS DOWN TO VARIOUS FACTORS OR INDICATORS.

MY INTERPRETATION OF THE PAI IS, THOSE FACTORS OR LEVELS SUGGESTED MALINGERING WERE ACTUALLY NOT PARTICULARLY ELEVATED ON THAT SPECIFIC TEST.

BY MR. GASSER:

Q.    YOU SAID YOU REVIEWED IT, SO LET'S TALK ABOUT IT. WHEN SHE SAYS, "FOR THIS PROTOCOL, THE NUMBER OF UNCOMPLETED ITEMS IS WITHIN ACCEPTABLE LIMITS."

A.    YES.

Q.    "BUT ONE OR MORE SCALES HAVE A SIGNIFICANT NUMBER MORE THAN 20 PERCENT OF MISSING ITEMS?"

A.    RIGHT.

Q.    "ANY INTERPRETATION PROVIDED IN THE REPORT SHOULD, THEREFORE, BE VIEWED WITH CAUTION?"

A.    RIGHT.   THAT DOESN'T MEAN THAT HE WAS MALINGERING SO MUCH AS IT MEANS HE LEFT OUT SOME OF THE DATA, SO THEY CAN ONLY INTERPRET THE INFORMATION BASED ON THE DATA THAT IS

CROSS EXAM OF DAVID BACHMAN

AVAILABLE.

Q.    PART OF THE REASON WHY SHE IS SAYING, LIKE ANY CLINICIAN INTERPRETING TEST RESULTS SUCH AS THIS, IS THAT IT SHOULD BE VIEWED WITH CAUTION BECAUSE THERE IS NO WAY FOR YOU OR FOR ANYONE, WITH ABSOLUTE CERTAINTY, TO COME INTO A COURTROOM AND SAY, CHAD FULKS WAS ANSWERING ALL OF THESE TESTS CORRECTLY.  IT IS JUST IMPOSSIBLE TO DO.

A.    RIGHT.  YOU HAVE TO MAKE YOUR BEST CLINICAL ESTIMATE BASED UPON THE IMPRESSION OF THE PATIENT AT THE TIME.

Q.    "CERTAIN OF THESE INDICATORS FALL OUTSIDE OF THE NORMAL RANGE, SUGGESTING THAT THE RESPONDENT, CHAD FULKS, MAY NOT HAVE ANSWERED IN A COMPLETELY FORTHRIGHT MANNER.  THE NATURE OF HIS RESPONSES MIGHT LEAD THE EVALUATOR TO FORM A SOMEWHAT INACCURATE IMPRESSION OF THE CLIENT BASED UPON THE STYLE OF RESPONDING DESCRIBED BELOW."  AGAIN, SHE IS THROWING UP THAT CAUTION FLAG, IS SHE NOT?

A.    AGAIN, I WOULD QUALIFY THAT.  SHE IS NOT SAYING THAT HE LIED ON ANY ANSWERS.  WHAT SHE IS SAYING IS, HE LEFT SOME OF THE ANSWERS BLANK, SO IT IS HARD TO KNOW WHAT THAT MEANS.  I WOULD CERTAINLY AGREE WITH THAT.

Q.    "CONSIDERING NEGATIVE IMPRESSION MANAGEMENT, THERE ARE SOME SIGNS INDICATING THE CLIENT INTENDED TO PORTRAY HIMSELF IN AN UNDULY NEGATIVE LIGHT IN CERTAIN AREAS.  THIS TENDENCY MAY RESULT IN SOME DISTORTION OF THE CLINICAL PICTURE.  FOR EXAMPLE, THE RESPONDENT, CHAD FULKS, REPORTS CERTAIN

**CROSS EXAM OF DAVID BACHMAN**

**UNUSUAL EXPERIENCES WITHOUT THE LEVELS OF DISTRESS AND WEARINESS IN DEALING WITH THE ENVIRONMENT THAT WOULD BE EXPECTED TO ACCOMPANY SUCH SYMPTOMS.  ALTHOUGH THIS PATTERN IS NOT OF A MAGNITUDE THAT WOULD RENDER THE TEST RESULTS UNINTERPRETABLE,  THE INTERPRETED HYPOTHESIS PRESENTED IN THIS REPORT SHOULD BE VIEWED WITH THIS TENDENCY IN MIND.  IT IS POSSIBLE THAT THE CLINICAL SCALE ELEVATIONS COULD OVERREPRESENT THE EXTENT AND DEGREE OF SYMPTOMOLOGY IN CERTAIN AREAS."  WOULD YOU AGREE WITH THAT, AS WELL?**

A.    SURE.

**Q.    IN 1998, THE FORENSIC EVALUATORS AT LEXINGTON MEDICAL CENTER INTERPRETED MR. FULKS'S CONTINUOUSLY PROVIDING WRONG ANSWERS AND ACTING DIFFERENTLY IN THE CLINICAL SETTING THAN WITH THE GENERAL POPULATION AS BEING, MOST DEFINITIVELY, MALINGERING.  IN 2003 AND 2004, THE DIAGNOSIS IS NOT MALINGERING; HOWEVER, MR. FULKS'S RESPONSES SHOULD BE VIEWED WITH CAUTION?**

A.    YOU HAVE SORT OF LOST ME ON THE --  I FOLLOWED YOU ON THE FIRST PART.  WHAT WAS YOUR CONCLUSION FROM THE LAST PART AGAIN FROM THE BUTNER EVALUATION?

**Q.    THAT THE BUTNER EVALUATION DOESN'T SAY HE IS ABSOLUTELY MALINGERING,  BUT THE BUTNER EVALUATION INCLUDES THIS REPORT THAT YOU NEED TO QUESTION THE OVERALL VALIDITY OF HIS TEST RESULTS AND LOOK AT THEM WITH CAUTION BECAUSE OF THE WAY HE ANSWERED SOME OF THE TESTS?**

**CROSS EXAM OF DAVID BACHMAN**

A.    SURE.   I THINK THAT IS TRUE FOR ANY PERSON UNDERGOING FORENSIC EVALUATION.  I WOULD AGREE WITH YOU.

Q.    THE LAST AREA THAT I WANT TO GET INTO IS  -- ONE OTHER POINT CONCERNING THE TESTING BEFORE I GET ONTO THE LAST AREA.

A.    SURE.

Q.    I AM LOOKING AT A REPORT OR, LET ME SEE, A PAPER FROM ALCOHOL RESEARCH AND HEALTH ENTITLED THE EFFECTS OF PRENATAL ALCOHOL EXPOSURE ON EXECUTIVE FUNCTIONING.  AND THE JURY HAS BEEN -- THEY HAVE BEEN TOLD, AND THE TERM "EXECUTIVE FUNCTIONING" HAS BEEN DEFINED TO THEM MULTIPLE TIMES.  I DON'T THINK WE NEED TO DEAL WITH THAT.  ARE YOU FAMILIAR WITH THE WISCONSIN CARD SORTING TEST?

A.    YES,  UH-HUH (AFFIRMATIVE RESPONSE).

Q.    THAT IS USED TO EVALUATE COGNITION-BASED FUNCTIONING?

A.    YES.

Q.    WAS THAT TEST PERFORMED ON MR. FULKS?

A.    ON ONE OF THE -- AT BUTNER, THEY DID DO THE WISCONSIN.

Q.    THE VISUAL DISCRIMINATION REVERSAL TEST?

A.    I MAY KNOW THAT BY A DIFFERENT TERM.  I DON'T RECOGNIZE THAT PARTICULAR TEST NAME.

Q.    YOU DON'T RECOGNIZE?

A.    MAYBE THE HOOPER,  BUT I AM NOT SURE WHICH TEST THEY ARE REFERRING TO THERE.

Q.    LOOK AHEAD PUZZLES?

A.    THESE ARE ALL TESTS SORT OF FRONTAL EXECUTIVE

CROSS EXAM OF DAVID BACHMAN

FUNCTIONING OF DIFFERENT TYPES.   PROBLEM SOLVING SORT OF
TESTS.

**Q.    PROGRESSIVE PLANNING TEST?**

A.    THAT TEST, I DON'T KNOW IF IT IS THE SAME IDEA,  I AM
SURE.

**Q.    COGNITIVE ESTIMATION TEST?**

A.    RIGHT.

**Q.    THESE ARE ALL TESTS THAT CAN BE CONDUCTED ON OR COULD**
**HAVE BEEN CONDUCTED ON MR. FULKS TO EVALUATE HIS**
**COGNITION-BASED EXECUTIVE FUNCTIONING?**

A.    RIGHT.   THERE LITERALLY ARE DOZENS AND DOZENS OF
DIFFERENT KINDS OF FRONTAL EXECUTIVE TESTS.   SOME OF THESE
ARE SORT OF STANDARD TESTS.   THEY ARE ROUTINELY USED IN THE
NEUROPSYCHOLOGICAL COMMUNITY LIKE WISCONSIN CARD SORTING TEST.
SOME OF THESE ARE PARTICULAR UNIVERSITY,  PARTICULAR
RESEARCHER DEVELOP OUT OF THEIR OWN RESEARCH.

**Q.    DR. BACHMAN,  DO YOU KNOW DR. GUR?**

A.    NOT PERSONALLY.   I KNOW HIM BY REPUTATION,  YES.

**Q.    HE TESTIFIED BEFORE THIS JURY EARLIER.   WE HAD TO**
**ACCOMMODATE HIS SCHEDULE?**

A.    I UNDERSTAND.

**Q.    HE TESTIFIED DURING THE GOVERNMENT'S CASE.   ONE OF THE**
**STATEMENTS THAT DR. GUR TOLD THE JURY, IN WHICH I AGREED WITH**
**HIM ON, IS THAT HE SAID THE BEST WAY FOR ONE TO DETERMINE THE**
**EFFECT OF ANY BRAIN ABNORMALITY OR BRAIN DEFICIENCY IN A**

**CROSS EXAM OF DAVID BACHMAN**

**PERSON IS TO LOOK AT THE BRAIN IN ACTION.**

A.    YES.

**Q.    DO YOU AGREE WITH THAT STATEMENT?**

A.    YES, ABSOLUTELY.

**Q.    IN OTHER WORDS, TAKE IT OUTSIDE THE LABORATORY, OUTSIDE THE WALLS OF A CLINIC, AND LOOK AT CHAD FULKS IN REAL LIFE, IN ACTION?**

A.    WELL, WHEN YOU SAY, "IN ACTION," I WOULD SAY, NEUROPSYCHOLOGICAL TESTING, IN SOME RESPECTS, REPRESENTING IN ACTION. NEUROPSYCHOLOGIST AT A MEDICAL UNIVERSITY REFERS TO NEUROPSYCHOLOGICAL TESTING AS TAKING THE BRAIN OUT FOR A TEST DRIVE. I THINK THAT THE FUNCTIONAL BRAIN IMAGING IS A WAY TO KIND OF TAKE THE BRAIN OUT AND FUNCTION AND SEE HOW IT REALLY WORKS, WHETHER IT IS METABOLICALLY ACTIVE. I THINK REAL LIFE EXPERIENCE IS VERY IMPORTANT.

THE PROBLEM WITH REAL LIFE EXPERIENCE IS, IT IS NOT CONTROLLED. I MEAN, SOME DEPENDS ON YOUR CIRCUMSTANCES. IT DEPENDS ON YOUR ENVIRONMENT AS TO HOW MUCH IT WILL SHOW YOU. JUST TO GIVE YOU A BRIEF EXAMPLE, IF I COULD. I AM VERY INTERESTED IN STUDYING ALZHEIMER'S DISEASE. WE CERTAINLY, IN THE FRAMINGHAM STUDY AND HAWIIAN-ASIAN STUDY, WHERE YOU GO IN AND ROUTINELY SCREEN PEOPLE FOR ALZHEIMER'S DISEASE, YOU WILL FIND FOLKS AT HOME WHO CLEARLY HAVE HALLMARKS OF ALZHEIMER'S DISEASE, BUT IT IS NOT RECOGNIZED BY THE PATIENT OR THE FAMILY. YOU SAY, HOW CAN THAT BE? HOW CAN SOMEBODY WITH

CROSS EXAM OF DAVID BACHMAN

ALZHEIMER'S DISEASE NOT RECOGNIZE IT?  BECAUSE IT DEPENDS ON THE DEMANDS THEY MAKE IN THEIR ENVIRONMENT.  OLDER GENTLEMAN, ALL THEY HAVE SO TO DO IS BATHE HIMSELF, DRESS HIMSELF, AND GET BREAKFAST, GO OUT, WATCH TV,  NOT RESPONSIBLE FOR CLEANING UP OR DOING ANY OTHER CHORES.  IN FACT, HE CAN GO A LONG TIME WITH SYMPTOMS OF ALZHEIMER'S DISEASE BEFORE SOMEBODY CAN PICK UP ON IT.

IT DEPENDS ON THE ENVIRONMENT YOU ARE IN IN TERMS OF THE DEMANDS OF THAT ENVIRONMENT,  IN TERMS OF WHETHER YOU ARE GOING TO BE ABLE TO TELL WHETHER THERE IS A BRAIN PROBLEM OR NOT.

**Q.   BUT YOU HAVE GOT AN ORAL HISTORY OF CHAD FULKS THAT YOU TOOK FROM HIM, AND YOU HAVE GOT YOUR PHYSICAL EXAMINATION OF CHAD FULKS, AND YOU HAVE GOT THE MENTAL TESTING OF CHAD FULKS. WOULDN'T ANOTHER, ADDITIONAL FACTOR, SAY A FOURTH CONSIDERATION FOR A CLINICIAN, WOULD BE TO INTERVIEW THE PEOPLE OR SEE REPORTS OF CHAD FULKS'S BRAIN IN ACTION, PARTICULARLY DURING THE TIME PERIOD FOR WHICH -- THE TIME PERIOD FOR WHICH THE CRIMINAL CHARGES ARE ALL ABOUT?**

A.   WELL,  I DO HAVE REPORTS OF, OBVIOUSLY, OF OTHER LEGAL PROBLEMS THAT HE HAS HAD IN THE PAST.  ALSO HAD REPORTS FROM MR. BLUME ABOUT MR. FULKS'S JOB HISTORY,  HIS HISTORY WITH RELATIONSHIPS, HIS MARITAL RELATIONSHIPS, AND PERSONAL PROBLEMS.  SO, I DID HAVE SOME BACKGROUND INFORMATION REGARDING HIS FUNCTIONAL DIFFICULTIES.  REALLY, BEGINNING IN

CROSS EXAM OF DAVID BACHMAN

ELEMENTARY SCHOOL, HE WAS IN SPECIAL CLASSES.  I DID HAVE SOME INFORMATION IN THAT REGARD.

**Q.   DO YOU THINK IT MIGHT HAVE BEEN OF ASSISTANCE TO, SAY, INTERVIEW A GUY BY THE NAME OF JAMES HAWKINS WHERE HE COULD GIVE YOU A VISUAL OBSERVATION AND TELL YOU AND PROVIDE YOU AN ORAL HISTORY AS TO WHAT CHAD FULKS DID, AS FAR AS WHAT CHAD FULKS'S EXECUTIVE FUNCTION WAS ALL ABOUT ON NOVEMBER 5TH OF 2002?**

A.   I DON'T KNOW WHAT YOU ARE REFERRING TO.

**Q.   THE MAN HE CARJACKED, DUCT-TAPED, PERFORMED OTHER MOTOR SKILLS OVER SEVERAL HOURS?**

A.   CERTAINLY SOME HORRIBLE THINGS THAT WERE DONE.  NO DOUBT ABOUT THAT.

**Q.   I AM NOT MAKING THAT POINT.**

A.   I'M SORRY.

**Q.   DURING THE 17-DAY CRIME SPREE, THERE WERE MULTIPLE PEOPLE THAT COULD HAVE PROVIDED YOU WITH INFORMATION, ORAL INFORMATION THAT DEALT WITH CHAD FULKS'S EXECUTIVE FUNCTIONING.  AND YOU CHOSE -- YOU FELT THAT INTERVIEWING THOSE PEOPLE AND LISTENING TO THEM DESCRIBE CHAD FULKS'S BRAIN IN ACTION WAS SOMETHING THAT YOU DIDN'T NEED IN ORDER TO PROVIDE YOUR ASSESSMENT?**

A.   WHAT I WOULD SAY IS THIS:  THE QUESTION THAT I WAS ASKED IS WHETHER OR NOT MR. FULKS HAS EVIDENCE OF BRAIN DYSFUNCTION, WHICH I THINK HAS BEEN DEMONSTRATED, NOT JUST BY

CROSS EXAM OF DAVID BACHMAN

THE NEUROPSYCHOLOGICAL TESTING, BUT BY THE PET SCANNING THAT WAS DONE,  THE MRI SCANNING THAT WAS DONE,  QUANTITATIVE ANALYSIS OF THE MRI SCAN THAT WAS DONE BY DR. BOOKSTEIN.  I THINK THAT THAT WAS SUFFICIENT INFORMATION TO ANSWER THE QUESTION THAT I WAS ASKED.

NOW,  HOW THOSE DEFICITS,  HOW THOSE NEUROPSYCHOLOGICAL DEFICITS,  THOSE COGNITIVE DEFICITS TRANSLATE THEMSELVES INTO REAL WORLD PROBLEMS FOR HIM?  I THINK THAT IS ANOTHER AREA THAT,  YOU KNOW,  CERTAINLY NEEDS TO BE EXPLORED.

BUT THE BASIC QUESTION I WAS ASKED:  IS THERE EVIDENCE OF BRAIN DYSFUNCTION, AND WHAT IS THE CAUSE?  I THINK WE LOOKED AT THAT.  THERE IS EVIDENCE OF BRAIN DYSFUNCTION.  HE HAS GOT AN ABNORMAL MRI SCAN.  HE HAS AN ABNORMAL PET SCAN. QUANTITATIVE ANALYSIS OF THE CAT SCAN DONE. NEUROPSYCHOLOGICAL TESTING DONE ON SEVERAL DIFFERENT OCCASIONS.  MY EVALUATION.

WHAT WAS THE CAUSE OF IT?  I WOULD SAY THE EVIDENCE STRONGLY SUPPORTS THE IDEA THIS IS PART OF THIS FETAL ALCOHOL SPECTRUM DISORDER.  THE BIGGER QUESTION, AND IT IS A VERY DIFFICULT QUESTION THAT THE JURY IS GOING TO HAVE TO WRESTLE WITH, HOW DO THESE PROBLEMS THAT CHAD HAS HAD SINCE BIRTH INFLUENCE WHAT HE DID LATER?  AND THAT IS A QUESTION AS MUCH FOR PHILOSOPHY AS IT IS FOR MEDICINE.

**Q.    THAT IS THE POINT I AM TRYING TO MAKE.   YOU ARE A CLINICIAN.  YOU ARE LOOKING AT -- YOUR WORK IS DONE IN THE**

**REDIRECT EXAM OF DAVID BACHMAN**

**LABORATORY OR CONFINES OF YOUR OFFICE?**

A.    YES.

**Q.    THE JURY HAS HEARD FROM WITNESSES,  EYE WITNESSES TO THE EVENTS THAT TOOK PLACE DURING THE 17-DAY PERIOD, AS WELL AS OTHER EVENTS IN CHAD FULKS'S LIFE.  IT WILL BE UP TO THEM TO TAKE CHAD FULKS'S BRAIN IN ACTION WITH THE INFORMATION YOU HAVE PROVIDED.**

A.    IT IS A VERY DIFFICULT TASK THAT THEY HAVE.

        MR. GASSER:  BEG THE COURT'S INDULGENCE. DR. BACHMAN, I APPRECIATE YOU ANSWERING ALL OF MY QUESTIONS.

        THE COURT:   HOW LONG DO YOU THINK YOU WILL BE ON REDIRECT?

        MR. BLUME:  FIFTEEN MINUTES.

        THE COURT:   LET'S GO AHEAD AND TAKE A BREAK. MEMBERS OF THE JUST, TAKE A 20-MINUTE RECESS AT THIS TIME.

(WHEREUPON, A SHORT RECESS WAS HELD.)

        THE COURT:  REDIRECT.

        MR. BLUME:  THANK YOU,  YOUR HONOR.

                        REDIRECT EXAM

BY MR. BLUME:

**Q.    DR. BACHMAN,  NOW, YOU ARE A NEUROLOGIST?**

A.    YES.

**Q.    WHAT NEUROLOGISTS AND PSYCHIATRISTS DO,  IS THAT DIFFERENT?**

A.    YES.   THERE IS SOME OVERLAP,  BUT, YES,  THEY ARE

REDIRECT EXAM OF DAVID BACHMAN

DIFFERENT.

Q.    BY AND LARGE,  WOULD IT BE ACCURATE TO SAY THAT NEUROLOGISTS, IN SOME CIRCUMSTANCES, ARE INTERESTED IN DIFFERENT INFORMATION THAN PSYCHIATRISTS?

A.    YES.

Q.    AND NOW, LET ME ASK YOU.  I WILL COME BACK TO THAT IN A MINUTE.  IN YOUR EXPERIENCE,  IS IT UNUSUAL FOR PEOPLE OF, ESPECIALLY OF A LOWER SOCIOECONOMIC BACKGROUND, TO HAVE HEAD INJURIES AND NOT GO TO THE HOSPITAL?

A.    NO,  HAVING THE SOCIOECONOMIC FACTOR IS A HIGHER RISK. NOT SEEKING MEDICAL CARE WOULD NOT BE UNUSUAL.

Q.    IN FACT,  IS IT ACCURATE, OR IF IT IS NOT, PLEASE CORRECT ME, TO SAY THAT EVEN HEAD INJURIES WHICH DON'T RESULT IN HOSPITALIZATION CAN STILL HAVE AN EFFECT ON THE BRAIN?

A.    SURE.  I THINK THAT IS VERY TRUE, SUCH AS THE CONCLUSIVE INJURIES FROM SPORTS.  YOU DON'T NECESSARILY HAVE TO BE HOSPITALIZED.  WE KNOW REPETITIVE CONCLUSIVE INJURIES CAN CAUSE CUMULATIVE BRAIN INJURY.

Q.    YOU WERE PROVIDED, I THINK YOU INDICATED YOU SAW, PEDIATRIC RECORDS FROM WHEN MR. FULKS WAS A CHILD OR TEENAGER, SEEING -- INDICATING PROBLEM WITH HEADACHES?

A.    YES.

Q.    YOU WERE ASKED SOME QUESTIONS ABOUT MEDICATION THAT MR. FULKS WAS ON AT THE TIME OF YOUR EVALUATION,  DO YOU RECALL THAT?

**REDIRECT EXAM OF DAVID BACHMAN**

A.    YES.

Q.    DID YOU TAKE THAT INTO ACCOUNT IN ASSESSING HIS PHYSICAL EXAMINATION?

A.    YES, I DID.

Q.    THAT IS SOMETHING -- MANY OF THE PEOPLE YOU SEE ARE ON MEDICATIONS?

A.    YES.

Q.    SO, AS A NEUROLOGIST, THIS IS SOMETHING YOU WILL CONSIDER IN THE COURSE OF YOUR ENTIRE EVALUATION?

A.    YES, SIR.

Q.    AND YOU WERE ALSO ASKED SOME QUESTIONS, AND I AM GOING TO GO BACK AND ASK YOU A SERIES ABOUT.  THIS, I ASSUME, IN ANY CASE, ESPECIALLY FORENSIC CASE, MALINGERING IS SOMETHING THAT YOU HAVE TO, AT LEAST, TAKE INTO ACCOUNT?

A.    SURE.

Q.    AND SO, WOULD IT BE FAIR TO SAY THAT, WHEN YOU ARE CONDUCTING THE EXAMINATION IN ITS ENTIRETY, YOU ARE MAKING AN ASSESSMENT OF WHETHER YOU THINK THE INDIVIDUAL IS COOPERATING WITH YOU?

A.    YES, THAT IS VERY TRUE.

Q.    NOW, YOU INDICATED YOU HAVE SEEN NEUROPSYCHOLOGICAL TESTING RESULTS FROM DR. VENN, CORRECT?

A.    YES.

Q.    YOU ALSO SAW, I THINK, FROM DR. EVANS, DR. GUR?

A.    YES.

REDIRECT EXAM OF DAVID BACHMAN

Q.    AND ALSO FROM THE BUTNER?

A.    RIGHT.

Q.    AND BUTNER IS A FEDERAL MEDICAL CENTER,  ISN'T IT?

A.    YES, THAT IS MY UNDERSTANDING,  YES.

Q.    WHERE MR. FULKS WAS EVALUATED AT THE REQUEST OF THE GOVERNMENT?

A.    RIGHT.

Q.    I KNOW YOU ARE NOT A NEUROPSYCHOLOGIST, BUT AS A NEUROLOGIST, YOU HAVE SOME FAMILIARITY WITH THE NEUROPSYCHOLOGICAL TESTS?

A.    WE OFTEN GET REPORTS FROM NEUROPSYCHOLOGISTS WE HAVE TO TAKE INTO ACCOUNT IN OUR EVALUATION.

Q.    BASED UPON ALL OF THE REPORTS YOU REVIEWED OF THE EVALUATIONS BY DR. VENN,  DR. GUR,  DR. EVANS,  AND THE BUTNER MEDICAL FACILITY,  I GUESS IT WOULD BE FAIR TO SAY THEY GAVE HIM ALL THE NEUROPSYCHOLOGICAL TESTS YOU CAN GIVE SOMEBODY?

A.    BELIEVE IT OR NOT, THERE ARE MORE.   THEY GAVE HIM CERTAINLY A VERY WIDE BATTERY.

Q.    IN ANY OF THAT TESTING OF HIS NEUROPSYCHOLOGICAL FUNCTIONING FOR BRAIN IMPAIRMENT, WAS THERE ANY INDICATION OF MALINGERING?

A.    NOT THAT WAS EVIDENT ON THE REPORTS THAT I SAW.   IN FACT,  IN THE REPORT FROM BUTNER, THERE ARE CERTAIN VERY SPECIFIC TESTS OF MALINGERING THAT ARE GIVEN, AND THE FOLKS AT BUTNER WERE VERY CAREFUL THAT GAVE THOSE TESTS.   AND THE

App. 00554

REDIRECT EXAM OF DAVID BACHMAN

OPINION FROM THE FOLKS FROM BUTNER WAS THAT MR. FULKS SEEMED TO BE MAKING AN EFFORT.  AT LEAST THERE WAS NO EVIDENCE OF MALINGERING ON THE SPECIALLY DESIGNED MALINGERING TEST THAT THEY GAVE HIM.

**Q.    AND DO YOU RECALL THAT THE BUTNER REPORT SPECIFICALLY STATES THAT MR. FULKS DID NOT SHOW ANY EVIDENCE OF INTENTIONAL EXAGGERATION DURING THE TESTS?**

A.    I BELIEVE THAT IS WHAT THE REPORT SAYS.

**Q.    AND THEY GAVE HIM, NOT ONLY AS FAR AS MALINGERING GOES, IS IT FAIR TO SAY THAT THE RESULTS OF THE NEUROPSYCHOLOGICAL TESTING AT BUTNER WERE VERY CONSISTENT WITH THE NEUROPSYCHOLOGICAL RESULTS OF THE OTHER EXAMINERS?**

A.    ONE OF THE THINGS THAT I THINK IS VERY STRIKING ABOUT, THERE IS NEUROPSYCHOLOGICAL TESTING THAT WAS DONE FOUR TIMES OVER THE COURSE OF ABOUT A YEAR.  AND ONE OF THE THINGS THAT I WAS VERY STRUCK BY WAS THAT THE TESTING WAS VERY CONSISTENT FROM TEST TO TEST.  SO THAT THE PATTERN OF DEFICITS FOUND BY ONE NEUROPSYCHOLOGIST WAS VERY SIMILAR TO THE PATTERN OF DEFICITS FOUND BY THE OTHER NEUROPSYCHOLOGIST.

THERE IS A LITTLE BIT OF FLUCTUATION BETWEEN INDIVIDUAL TESTS AS YOU WOULD EXPECT FROM ANYBODY WHO HAS BEEN TESTED ON MULTIPLE OCCASIONS.  BY AND LARGE, I THINK WHAT IS STRIKING, MORE THAN ANYTHING ELSE, IS THE CONSISTENCY ACROSS THOSE TESTS.

**Q.    AND THEY MEASURED HIS GENERAL INTELLECTUAL ABILITY AT**

**REDIRECT EXAM OF DAVID BACHMAN**

79?

A.    SEVENTY-SEVEN (77),  79.   I THINK, AGAIN, THERE WERE A COUPLE OF POINTS VARIABILITY.  I THINK THEY WERE ALL VERY SIMILAR.

Q.    OF COURSE, ANYBODY CAN TAKE AN IQ TEST AND COME OUT WITHIN A POINT OR TWO.  IT IS NOT GOING TO BE EXACTLY THE SAME SCORE EVERY TIME?

A.    EVEN WITH FIVE OR TEN POINTS.   FIVE POINTS PARTICULARLY VARIABILITY FROM TEST TO TEST WOULD NOT BE THAT UNUSUAL.

Q.    AND THEY ALSO,  DID THEY NOT, GIVE HIM, IN ADDITION TO IQ TEST OR SORT OF INTELLIGENCE TESTING,  DID SPECIFIC NEUROPSYCHOLOGICAL TESTS?

A.    YES.

Q.    AND ON MANY OF THOSE TESTS,  NEUROPSYCHOLOGICAL TESTS EVEN ADMINISTERED BY BUTNER,  HE CAME OUT IN THE IMPAIRED RANGE?

A.    YES,  THAT IS WHAT THE REPORT SHOWS.

Q.    AND THE IMPAIRED RANGE WOULD BE -- YOU WOULD HAVE SOME TYPE OF NEUROLOGICAL IMPAIRMENT?

A.    YES.

Q.    NOW,  I WANT TO ASK YOU, THERE WERE SOME OTHER QUESTIONS ABOUT TESTING, JUST TO CLEAR IT UP.   YOU WERE ASKED SOME QUESTIONS ABOUT THE PAI?

A.    YES.

REDIRECT EXAM OF DAVID BACHMAN

Q.    I THINK WHAT MR. GASSER DISCUSSED ABOUT.  NOW,  IS IT ACCURATE TO SAY THAT THERE ARE DIFFERENT TYPES OF PSYCHOLOGICAL TESTING?

A.    YES.

Q.    AND SOME TYPES OF PSYCHOLOGICAL TESTING ARE LOOKING FOR MENTAL ILLNESS, AND SOME ARE LOOKING FOR BRAIN DYSFUNCTION; IS THAT RIGHT?

A.    IN GENERAL, THAT IS TRUE.

Q.    THE PAI, PRIMARILY, IS NOT A NEUROPSYCHOLOGICAL TEST?

A.    IT IS PERSONALITY INVENTORY.  IT IS LOOKING AT SORT OF THE PERSONALITY FEATURES.

Q.    IT IS NOT A NEUROPSYCH TEST.  IT IS NOT SOMETHING YOU DO TO DETERMINE BRAIN --

A.    IT IS NOT A DIRECT RELATION OF BRAIN FUNCTION, BY AND LARGE.

Q.    PRIMARILY, IT IS LOOKING FOR SOME POTENTIAL EVIDENCE OF A PSYCHIATRIC DIAGNOSIS?

A.    OR PSYCHOLOGICAL, YES.

Q.    OF WHETHER SOMEBODY HAS DEPRESSION, OR SCHIZOPHRENIA, OR BIPOLAR DISORDER?

A.    YES, THAT'S TRUE.

Q.    OR SOMETHING OF THAT NATURE.

NOW, YOU WERE ASKED SOME QUESTIONS ABOUT A 1998 EVALUATION AT A FEDERAL MEDICAL CENTER IN KENTUCKY.

A.    YES.

REDIRECT EXAM OF DAVID BACHMAN

Q.    YOU HAD BEEN PREVIOUSLY INFORMED -- I HAD INFORMED YOU THAT THERE HAD BEEN THIS '98 EVALUATION?

A.    YES.

Q.    MR. FULKS HAD BEEN DETECTED TO BE MALINGERING?

A.    RIGHT.

Q.    WOULD IT BE ACCURATE TO SAY, AND CERTAINLY, IF IT IS NOT, TELL THE JURY, THAT IF THERE WAS NO NEUROPSYCHOLOGICAL TESTING AND NO NEUROLOGICAL EVALUATION,  THAT THE RESULTS OF THAT REPORT, THERE WOULDN'T BE MUCH INFORMATION, AND AS A NEUROLOGIST, WOULD BE PARTICULARLY USEFUL FOR YOU?

A.    OBVIOUSLY,  IT MIGHT BE SOMETHING HIDDEN IN THE REPORT. BUT BASED ON SORT OF THE GENERAL OBVIOUS THINGS ABOUT THE REPORT,  THERE IS NOTHING OBVIOUS THAT WOULD BE HELPFUL TO ME.

Q.    BUT ONE THING THAT WOULD HAVE BEEN HELPFUL TO YOU IS THAT, AS A NEUROLOGIST, OR BE USEFUL TO YOU, WOULD BE TO SEE IF THERE HAD BEEN, FOR EXAMPLE, ANY TYPE OF TESTING, OR AN EEG, OR SOMETHING OF THAT NATURE?

A.    RIGHT.  IF THERE HAD BEEN AN MRI SCAN, OR CAT SCAN, OR EEG, OR OTHER MORE SPECIFIC MEDICAL NEUROLOGICAL TESTING.

Q.    IN FACT,  I DID PROVIDE YOU WITH THE EEG?

A.    RIGHT.

Q.    FROM THAT PARTICULAR EVALUATION?

A.    YES.

Q.    LET ME ASK YOU, BASED UPON YOUR TRAINING AS A NEUROLOGIST,  WOULD IT BE CONSISTENT OR INCONSISTENT WITH

**REDIRECT EXAM OF DAVID BACHMAN**

**SOMEBODY WHO HAS A CONGENITAL BRAIN ABNORMALITY FOR,  I MEAN, AGAIN, NOT DIAGNOSTIC, I MEAN CONSISTENT OR INCONSISTENT FOR SOMEBODY WITH A CONGENITAL BRAIN ABNORMALITY OR FETAL ALCOHOL SPECTRUM DISORDER TO FAIL THE FIRST GRADE?**

A.   IT WOULD NOT BE UNUSUAL.   IT WOULD BE CONSISTENT WITH SOMEBODY WHO HAD SOME SORT OF CONGENITAL BRAIN PROBLEM.

**Q.   WHAT ABOUT SOMEBODY WHO -- WOULD IT BE CONSISTENT OR INCONSISTENT IF SOMEBODY WERE IN CLASSES FOR SPECIAL EDUCATION OR CLASSES FOR BEHAVIORAL DISORDER?**

A.   THAT  WOULD BE ALSO CONSISTENT WITH A CONGENITAL BRAIN PROBLEM.

**Q.   WOULD IT BE CONSISTENT OR INCONSISTENT WITH A CONGENITAL BRAIN PROBLEM IF THE INDIVIDUAL WAS, ESSENTIALLY, ADJUDICATED DELINQUENT OR HAD TROUBLE WITH THE LAW FROM A VERY EARLY AGE? FOR EXAMPLE,  AT AGE NINE, IF THEY GOT IN TROUBLE FOR PULLING A GIRL'S PANTS DOWN AT SCHOOL?**

A.   YOU MIGHT EXPECT THAT SOMEBODY WHO HAD SOME SORT OF CONGENITAL BRAIN PROBLEMS,  BEHAVIOR DIFFICULTIES, MAY HAVE DIFFICULTIES CONFORMING TO THE RULES OF THE SCHOOL SYSTEM, SO THEY MIGHT BE MORE LIKELY TO GET INTO TROUBLE,  YES.

**Q.   CRIMINAL TROUBLE AT AGE, I THINK, 10 OR 11 FOR PULLING A GUN ON A CHILD?**

A.   YES.   CERTAINLY MIGHT WELL CONTRIBUTE TO THEM GETTING INTO THOSE SORTS OF PROBLEMS.

**Q.   AND IN LOOKING AT -- WOULD IT BE CONSISTENT OR**

**REDIRECT EXAM OF DAVID BACHMAN**

**INCONSISTENT WITH SOMEBODY WITH A FETAL OR ALCOHOL SPECTRUM DISORDER FOR THE INDIVIDUAL, ESSENTIALLY, TO BE ARRESTED NUMEROUS TIMES AS AN ADULT FOR VARIOUS CRIMES, INCLUDING RUNNING FROM THE POLICE,  STEALING,  BREAKING INTO CARS, WRITING BAD CHECKS, AND THAT KIND OF THING?**

A.    WELL,  IT WOULD BE CONSISTENT WITH FETAL ALCOHOL SPECTRUM DISORDER.  BUT WHAT YOU WOULD EXPECT TO SEE WITH THAT KIND OF BEHAVIOR IS SOME INTERACTION BETWEEN THAT INDIVIDUAL'S ENVIRONMENT AND THE FETAL ALCOHOL EFFECTS TOGETHER IN ORDER TO SORT OF ESCALATE TO THAT LEVEL OF BEHAVIORAL PROBLEMS.

**Q.    IN OTHER WORDS,  IF YOU TAKE A CHILD THAT HAS A CONGENITAL BRAIN ABNORMALITY OR FETAL ALCOHOL SPECTRUM DISORDER, AND THEY ARE SOCIALIZED OR RAISED IN AN ENVIRONMENT WHERE THERE IS VIOLENCE AND DISREGARD FOR THE LAW, YOU ARE MORE THAN LIKELY TO SEE THIS PATTERN OF TYPE OF LAW BREAKING?**

A.    BEING BORN WITH CONGENITAL BRAIN PROBLEMS WOULD MAKE THEM MORE VULNERABLE TO BEING IN AN ENVIRONMENT WHERE THERE WOULD BE THAT KIND OF BEHAVIOR GOING ON.

**Q.    FINALLY,  DR. BACHMAN,  SHOWING YOU THE MRI AGAIN, WHICH YOU HAVE SEEN.  AND YOU REVIEWED THIS YOURSELF?**

A.    YES.

**Q.    AND YOU HAD A NEURORADIOLOGIST AT MUSC LOOK AT IT?**

A.    YES.

**Q.    WHAT IS A NEURORADIOLOGIST?**

**RECROSS EXAM OF DAVID BACHMAN**

A.    A NEURORADIOLOGIST IS SOMEONE WHO HAS SPECIAL TRAINING AT LOOKING AT BRAIN AND SPINAL CORD PARTICULARLY.

Q.    **ANY QUESTION IN YOUR MIND THAT THERE IS A CYST IN THAT AREA OF HIS BRAIN?**

A.    I THINK YOU CAN PRETTY WELL SEE.  I DON'T THINK YOU HAVE TO BE A NEURORADIOLOGIST TO SEE THAT THERE IS A HOLE THERE THAT IS NOT SUPPOSED TO BE THERE.  IT IS A FLUID-FILLED CYST.

Q.    **IS THAT SOMETHING THAT IS GOING TO DISAPPEAR OR APPEAR?**

A.    NO.  THAT IS ALMOST CERTAINLY SOMETHING THAT MR. FULKS WAS BORN WITH AND WILL HAVE FOR THE REST OF HIS LIFE.

Q.    **IN OTHER WORDS,  IF YOU TOOK MR. FULKS RIGHT NOW AND TOOK HIM DOWN AND GAVE HIM AN MRI,  ARE YOU STILL GOING TO SEE THAT?**

A.    YES.

Q.    **AND THAT HAS BEEN THERE, IN YOUR OPINION, SINCE HE WAS BORN?**

A.    YES.

MR. BLUME:  THANK YOU.

MR. GASSER:  VERY BRIEFLY, YOUR HONOR.

THE COURT:  ALL RIGHT.

RECROSS EXAM

BY MR. GASSER:

Q.    **DR. BACHMAN, MR. BLUME MADE REFERENCE TO THE EEG THAT YOU REVIEWED FROM THE 1998 VISIT THAT MR. FULKS HAD AT THE**

**RECROSS EXAM OF DAVID BACHMAN**

**LEXINGTON MEDICAL CENTER IN LEXINGTON, KENTUCKY?**

A.    RIGHT.

**Q.    WERE YOU AWARE THAT, WHEN MR. FULKS WAS ADMINISTERED THAT EEG, DURING THE PROCEDURE, MR. FULKS CONTINUOUSLY MOVED; HE WAS INSTRUCTED BY THE MEDICAL STAFF OF THE IMPORTANCE OF KEEPING STILL IN ORDER FOR THE TEST RESULTS TO BE ACCURATE. HE RESPONDED THAT HIS MOVEMENTS WERE INVOLUNTARY AND THAT MR. FULKS DID NOT EXHIBIT THE SAME TYPE OF BODY MOVEMENTS AT TIMES WHEN HE WAS UNAWARE OF STAFF WERE WATCHING HIM.  ARE YOU AWARE THEY HAD SOME DIFFICULTY WITH THAT EEG?**

A.    YES, I WAS.

**Q.    BECAUSE HE WAS INSTRUCTED NOT TO MOVE BECAUSE MOVEMENT COULD AFFECT THE RESULTS OF THE EEG?  PRETTY BASIC?**

A.    THE TYPE OF ABNORMALITY THAT HE HAD WITH HIS EEG, THE RECORDS THAT THE AGI SAW ARE NOT PROBLEMS RELATED TO MOVEMENT. WHEN SOMEBODY MOVES DURING AN EEG, WHAT YOU SEE IS EXCESSIVE ACTIVITY.  YOU SEE MORE ACTIVITY, ELECTRICAL ACTIVITY THAN SHOULD BE THERE.  AND, IN FACT, THE ABNORMALITY ON MR. FULKS'S EEG IS THE OPPOSITE.  THE ACTIVITY IS SLOW ON THE EEG.  SO, I DO THINK THAT THE RECORD, AS I SAW IT, IS A VALID RECORD.

THERE MAY WELL HAVE BEEN OTHER PARTS OF THE RECORD WHERE THERE WAS ARTIFACT WHERE THEY HAD DIFFICULTY INTERPRETING BECAUSE THERE WAS A LOT OF MOVEMENT.  BUT THE PIECE OF THE EEG THAT I SAW, I WOULD AGREE WITH THE CONCLUSION OF THE

App. 00562

RECROSS EXAM OF DAVID BACHMAN

NEUROLOGIST THAT READ THAT EEG, IN THAT IT IS ABNORMAL BECAUSE IT DOES SHOW SOMETHING.

Q.    YOU ONLY RECEIVED PART OF THAT EEG?

A.    RIGHT.   I GOT SAMPLE PIECES OF THE EEG ALONG WITH THE NEUROLOGIST REPORT WHO INTERPRETD THE EEG.

Q.    MR. BLUME ASKED YOU ABOUT, YOU HAVE REVIEWED DR. VENN, DR. GUR,  DR. EVANS REPORTS AND, OF COURSE, YOUR OWN REPORT CONCERNING THIS ISSUE AS TO THE VALIDITY OF TEST RESULTS OF MR. FULKS,  THE NEUROPSYCHOLOGICAL TEST RESULTS?

A.    RIGHT.

Q.    AND THAT YOU RECEIVED A REPORT FROM BUTNER?

A.    YES.

Q.    HE QUOTED FROM A SENTENCE FROM BUTNER, DID HE NOT, IN HIS QUESTION THAT MR. FULKS DID NOT SHOW ANY EVIDENCE OF INTENTIONAL EXAGGERATION DURING THE TASKS.  DO YOU REMEMBER HIM QUOTING?

A.    YES,  I DO  REMEMBER THAT.

Q.    LET ME FINISH THE SENTENCE FOR YOU.

A.    OKAY.

Q.    MR. FULKS DID NOT SHOW ANY EVIDENCE OF INTENTIONAL EXAGGERATION DURING THE TASKS,  BUT HIS RECENT ILLNESS AND THE STRESS OF INCARCERATION MAY HAVE LIMITED PERFORMANCE ON SOME TASKS, ESPECIALLY THOSE INVOLVING PROCESSING SPEED.

A.    RIGHT.

Q.    IN OTHER WORDS,  THE BUTNER PEOPLE QUALIFIED AND TOOK

**RECROSS EXAM OF DAVID BACHMAN**

**INTO CONSIDERATION THE FACT THAT, WHATEVER MEDICAL CONDITION THAT MR. FULKS WAS UNDER AT THE TIME, AND THE STRESS OF INCARCERATION FACING THE DEATH PENALTY,  WOULD IMPACT OR POTENTIALLY IMPACT HIS PERFORMANCE ON THESE NEUROPSYCHOLOGICAL TESTS?**

A.    RIGHT.

**Q.    HOW COME THAT QUALIFICATION, WHICH SEEMS TO BE PRETTY OBVIOUS, WASN'T INCLUDED IN DR. VENN'S,  DR. GUR, DR. EVANS, OR YOUR REPORT?**

A.    BECAUSE, AT THE TIME, I THINK ONE OF THE THINGS THAT IS VERY EVIDENT, AGAIN, I WOULD SAY IS THE CONSISTENCY.  WHEN YOU HAVE MR. FULKS'S PERFORMANCE ON THAT NEUROPSYCHOLOGICAL TESTING, WHEN YOU HAVE SOMEBODY THAT IS IN PAIN, OR UNDER STRESS, OR DOESN'T FEEL WELL,  THE WAY IT PRIMARILY MANIFESTS ITSELF IS VARIABILITY.  SO,  IF I WERE TO DO SOME TESTING ON YOU AND YOU WEREN'T FEELING WELL,  YOU WERE FEELING KIND OF DOWN,  MAYBE YOU DIDN'T SLEEP WELL THE NIGHT BEFORE, YOU WERE TAKING MEDICATION,  YOU WOULD DO A CERTAIN LEVEL OF PERFORMANCE ON YOUR TESTING.  IF I TESTED YOU ON A DIFFERENT DAY WHEN YOU WEREN'T UNDER AS MUCH STRESS, YOU WERE BRIGHT, MORE RESTED, YOU WOULD FUNCTION AT A DIFFERENT LEVEL.

THE FACT OF THE MATTER IS, OF ALL OF THE TESTING THAT WAS DONE ON MR. FULKS,  I THINK IT WAS VERY STRIKING THAT, ACTUALLY, THERE IS NOT A LOT OF DIFFERENCE BETWEEN THE TESTING THAT WAS DONE ON ALL FOUR OF THOSE DATES.  AND SO, I WOULD

App. 00564

RECROSS EXAM OF DAVID BACHMAN

CERTAINLY AGREE THAT, AT ANY ONE POINT IN TIME, YOU HAVE TO TAKE INTO ACCOUNT WHAT MR. FULKS'S STATE OF MIND IS, WHAT IS HIS PHYSICAL STATE, WHAT MEDICATIONS HE IS UNDER.  I THINK, WHEN YOU LOOK ACROSS THE TEST, I THINK IT REASSURES YOU THAT IT IS A VALID TEST.  THAT THERE IS NOT THAT MUCH VARIABILITY BETWEEN THE TESTS.

**Q.    I AGREE WITH YOU THAT YOU MIGHT GO TO A JOB INTERVIEW ON TUESDAY, YOU MIGHT NOT FEEL WELL,  MIGHT NOT HAVE A GOOD BREAKFAST, WHATEVER IS GOING ON IN YOUR LIFE.  POOR JOB INTERVIEW.  GO ON THURSDAY, YOU MIGHT HIT THE BALL OUT OF THE PARK, SO TO SPEAK.  THE POINT IS, WITH MR. FULKS, DURING ALL OF THE TESTING THAT WAS BEING CONDUCTED, THOSE SAME STRESS LEVELS WERE THE SAME IN EACH AND EVERY ONE OF THE TESTS THAT WERE CONDUCTED ON MR. FULKS AFTER HE WAS CHARGED AND INCARCERATED ON THE OFFENSES FOR WHICH THIS JURY IS GOING TO BE DETERMINING HIS SENTENCING ON, SO THAT WAS CONSISTENT?**

A.    THAT LEVEL OF STRESS WAS CERTAINLY CONSISTENT ACROSS ALL TESTS.

**Q.    AND IT WAS PRETTY OBVIOUS, TO PEOPLE IN YOUR FIELD, IN THE NEUROPSYCHOLOGICAL FIELD, THAT THE LEVEL OF STRESS THAT MR. FULKS WAS UNDER, FACING CAPITAL MURDER CHARGE, MAY IMPACT HIS ABILITY,  THAT STRESS -- HAVING THAT STRESS MAY IMPACT HIS ABILITY TO SCORE APPROPRIATELY ON THESE TESTS.  IN OTHER WORDS,  HE MAY BE IN THE EIGHTIES IS WHAT I AM TRYING TO SAY.**

A.    WELL,  I AM NOT SURE I WOULD AGREE WITH YOU ON THAT.

RECROSS EXAM OF DAVID BACHMAN

I WOULD SAY THAT, IF YOU WERE TO APPROACH HIM UNDER DIFFERENT CIRCUMSTANCES ON SOME OF THE TESTS,  ESPECIALLY THOSE REGARDING, FOR INSTANCE, ATTENTION AND MOTOR SPEED LIKE THE FOLKS AT BUTNER POINTED OUT, YES, I WOULD EXPECT HIM TO DO BETTER.  OTHER OF THE TESTS, I AM NOT SURE IT WOULD HAVE MADE MUCH OF A DIFFERENCE.  YOU COULD ARGUE,  GEE,  HE TOOK THESE TESTS THREE OR FOUR TIMES,  WOULDN'T HE LEARN.  WOULDN'T HE HAVE PRACTICE EFFECT FOR INSTANCE.  IN FACT,  HE IS VERY CONSISTENT FROM TEST TO TEST.  I THINK THAT THAT CONSISTENCY SPEAKS TO THE VALIDITY OF THESE EVALUATIONS.  THAT IS MY OPINION.

**Q.    AND CONSISTENT WITH THE TEST IN THE SAME STRESS FACTOR IS THERE?**

A.    CERTAINLY THE STRESS OF BEING INCARCERATED, ABSOLUTELY, YES.

**Q.    THERE WERE, I AM QUOTING FROM THE NEXT PARAGRAPH FROM WHERE MR. BLUME QUOTED FROM THE BUTNER REPORT.   THERE WERE INDICATIONS HE MAY HAVE TENDED TO SELECT RESPONSES THAT WOULD OVERREPRESENT HIS CURRENT DISTRESS AND SYMPTOMS.   THOUGH THIS TREND DID NOT APPEAR TO RENDER RESULTS OVERALL UNINTERPRETABLE.**

A.    MY INTERPRETATION OF THIS, YOUR INTERPRETATION MAY BE DIFFERENT,  HE DIDN'T SAY THEY WERE MALINGERING.  THE FACTS WERE, THERE WERE INDICATIONS HE MAY TEND TO SELECT RESPONSES THAT OVERREPRESENTED HIS CURRENT DISTRESS.  BUT NOT TO THE

RE-REDIRECT EXAM OF DAVID BACHMAN

POINT WHERE HE WAS MALINGERING.

A.    SURE.   I THINK THAT IS PROBABLY CORRECT, BUT, AGAIN, I THINK THAT THE CONSISTENCY OF HIS RESPONSES FROM EXAMINER TO EXAMINER, OVER THE COURSE OF A YEAR, SUGGESTS TO ME, AT LEAST, EVEN,  THERE ARE ALWAYS LOTS OF VARIABLES WHEN YOU TEST SOMEBODY, EVEN WHEN THEY ARE NOT IN INCARCERATION.   MAYBE THEY ARE AFRAID THEY HAVE ALZHEIMER'S DISEASE.   MAYBE THEY -- MAYBE THERE IS SOMETHING ELSE GOING ON IN THE LIFE,  MARITAL STRESSES.   ALL SORTS OF STRESS PEOPLE ARE UNDER WHEN THEY COME IN.

MR. FULKS'S STRESS WAS CERTAINLY UNIQUE IN MANY WAYS. MANY PEOPLE ARE NOT FACING THE SERIOUSNESS OF THE CHARGES HE IS FACING, BUT A CERTAIN AMOUNT OF STRESS DURING NEUROPSYCHOLOGICAL TEST IS NOT UNUSUAL.   IN FACT, THE NEUROPSYCHOLOGISTS HAVE TO TAKE THAT INTO ACCOUNT WHEN THEY DO THEIR INTERPRETATIONS.

MR. GASSER:  THANK YOU.

RE-REDIRECT EXAM

BY MR. BLUME:

**Q.    I WANT TO CLARIFY ONE POINT.   WOULD IT, THE ILLNESS OR WHATEVER YOU ARE REFERRING TO AS AN INJURY WHICH HE INCURRED AT THE RICHLAND COUNTY DETENTION CENTER, WOULD IT INCREASE THE VALIDITY OF THE TEST OR DECREASE, IN YOUR MIND, IF THE OTHER NEUROPSYCHOLOGICAL TESTING DONE BY DR. VENN AND DR. EVANS OCCURRED BEFORE THAT INJURY -- HE SUFFERED THAT INJURY?**