**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION**

CHADRICK EVAN FULKS,

            Petitioner,

           v.

J. E. KRUEGER, Warden, USP Terre Haute,
UNITED STATES OF AMERICA

           Respondents.

:
:
:
:
:
:
:
:
:
:
:
:
:
:

CIVIL ACTION
(Capital Habeas Corpus)


No. 2:15–cv–00033–WTL–MJD

**Hon. William T. Lawrence
United States District Judge**

**APPENDIX TO
AMENDED PETITION FOR WRIT OF HABEAS CORPUS
PURSUANT TO 28 U.S.C. § 2241**

**VOLUME III
APP. 00568 TO APP. 00809**

PETER WILLIAMS
CLAUDIA VAN WYK
Assistant Federal Defenders
Federal Community Defender Office
for the Eastern District of Pennsylvania
601 Walnut Street, Suite 545 West
Philadelphia, PA 19106
Tel: 215.928.0520
Fax: 215.928.0826
pete_williams@fd.org
claudia_vanwyk@fd.org

*Counsel for Petitioner*

Dated: March 8, 2019

# Index to Appendix

**VOLUME I**

Expert Reports and Declarations

1. Report by Barry M. Crown, Ph.D. – March 6, 2019..................................................00001

2. Report by Julian Davies, M.D. – March 4, 2019 ....................................................00012

3. Report by Natalie Brown, Ph.D. – February 11, 2019.............................................00051

4. Report by David Bachman, M.D. – July 31, 2013...................................................00188

5. Declaration of Seymour Halleck, M.D. – September 17, 2010 ................................00190

6. Declaration of Margaret Melikian, D.O. – September 17, 2010...............................00193

7. Declaration of James H. Hilkey, Ph.D. – September 16, 2010................................00196

8. Declaration of Harry Krop, Ph.D. – September 16, 2010.........................................00199

9. Declaration of James H. Hilkey, Ph.D. – June 2, 2008............................................00209

10. Declaration of Margaret Melikian, D.O. – May 27, 2008 .......................................00223

11. Declaration of Seymour Halleck, M.D. – May 9, 2008............................................00236

12. Report by Ruben C. Gur, Ph.D. – June 13, 2004....................................................00261

13. Report by James H. Hilkey, Ph.D. – May 7, 2004...................................................00271

14. Report by Jonathan Venn, Ph.D. – March 30, 2004 ................................................00277

15. Report by Ralph Newman, M.D. et al. – February 19, 2004 ....................................00294

16. Letter from Jonathan E. Walker, M.D. to Jim Evans, Ph.D.
    January 14, 2004 .....................................................................................................00313

17. Report by James Evans, Ph. D. – January 8, 2004..................................................00315


**VOLUME II**


Witness Declarations

18. Declaration of Linda Adkins – January 27, 2017 ....................................................00321

19. Declaration of Laura Cooper – September 15, 2016 ................................................00323

20. Declaration of Sharon Dotson – June 18, 2008 ........................................................00326

21. Declaration of Nathan Faulks – June 4, 2008................................................00329

22. Declaration of Mike Kaasee – September 14, 2010 ..................................................00332

23. Declaration of Christina Kirkman – January 27, 2017 ..............................................00334

24. Declaration of Joy Krug – November 15, 2016........................................................00336

25. Declaration of Lewis Lambert, Jr. – September 14, 2010 .........................................00356

26. Declaration of Lewis Lambert, Sr. – September 14, 2010.........................................00358

27. Declaration of Marilyn Lauver – November 14, 2016 ..............................................00360

28. Declaration of Kelly Perry – January 27, 2017.........................................................00362

29. Declaration of Russell Spears – May 22, 2018.........................................................00364

Transcripts and Testimony

30. *United States v. Fulks*, 4:02-cr-992 (D.S.C.) Jury Trial Transcript Volume XVI –
Testimony of Linda Adkins – June 22, 2004................................................00366

31. *United States v. Fulks*, 4:02-cr-992 (D.S.C.) Jury Trial Transcript Volume XVIII –
Testimony of Arlene Andrews – June 24, 2004 ........................................00380

32. *United States v. Fulks*, 4:02-cr-992 (D.S.C.) Jury Trial Transcript Volume XVIII –
Testimony of David Bachman – June 24, 2004........................................00482

**VOLUME III**

33. *United States v. Fulks*, 4:02-cr-992 (D.S.C.) Jury Trial Transcript Volume XVIII –
Testimony of Fred Bookstein – June 24, 2004 ........................................00568

34. *United States v. Fulks*, 4:02-cr-992 (D.S.C.) Jury Trial Transcript Volume XX –
Testimony of Christos Davatzikos – June 28, 2004 ................................00606

35. *United States v. Fulks*, 4:02-cr-992 (D.S.C.) Jury Trial Transcript Volume XVII –
Testimony of James Evans – June 23, 2004 .............................................00627

36. *United States v. Fulks*, 4:02-cr-992 (D.S.C.) Jury Trial Transcript Volume XVII –
Testimony of Martha Floyd – June 23, 2004.............................................00694

37. *United States v. Fulks*, 4:02-cr-992 (D.S.C.) Jury Trial Transcript Volume IV – Testimony of Dewayne Fulks – June 4, 2004..........................................................00706

38. *United States v. Fulks*, 4:02-cr-992 (D.S.C.) Jury Trial Transcript Volume XVI – Testimony of Mark Fulks – June 22, 2004 ...............................................................00762

39. *United States v. Fulks*, 4:02-cr-992 (D.S.C.) Jury Trial Transcript Volume VII – Testimony of Ronnie Fulks – June 9, 2004 ..........................................................00785

**VOLUME IV**

40. *United States v. Fulks*, 4:02-cr-992 (D.S.C.) Jury Trial Transcript Volume VIII – Testimony of Ronnie Fulks – June 10, 2004 ..........................................................00810

41. *United States v. Fulks*, 4:02-cr-992 (D.S.C.) Jury Trial Transcript Volume XII – Testimony of Ruben Gur – June 16, 2004 .................................................................00825

42. *United States v. Fulks*, 4:02-cr-992 (D.S.C.) Jury Trial Transcript Volume XVII – Testimony of Cindy Harper – June 23, 2004.............................................................01002

43. *United States v. Fulks*, 4:02-cr-992 (D.S.C.) Jury Trial Transcript Volume XVII – Testimony of Sue Hatcher – June 23, 2004 .............................................................01006

44. *United States v. Fulks*, 4:02-cr-992 (D.S.C.) Jury Trial Transcript Volume XVI – Testimony of Kevin Holbrook – June 22, 2004........................................................01022

45. *United States v. Fulks*, 4:02-cr-992 (D.S.C.) Jury Trial Transcript Volume XVI – Testimony of Brian Messenger – June 22, 2004........................................................01042

46. *United States v. Fulks*, 4:02-cr-992 (D.S.C.) Jury Trial Transcript Volume XVII – Testimony of Gayle Wolfe – June 23, 2004 ..........................................................01055

Records

47. The Gallaher School Results of Selective Screening for Chadrick Fulks – November 25, 1986....................................................................................................................01064

48. The Gallaher School Referral for Multidisciplinary Assessment for Chadrick Fulks – January 6, 1987 .........................................................................................................01065

49. Academic Evaluation Report by Peggy Blatt for Chadrick Fulks February 24, 1987 ...................................................................................................01066

50. Psychological Evaluation Report by Rodney Pardue for Chadrick Fulks

March 4, 1987 ...................................................................................................01073

51. Instructional Recommendation Plan/Individualized Education Program for Chadrick
Fulks – May 12, 1987 ......................................................................................01077

52. Peyton Elementary Review for Chadrick Fulks – March 1, 1989 ............................01078

53. Instructional Recommendation Plan/Individualized Education Program for Chadrick
Fulks – May 15, 1989 ......................................................................................01079

Additional Witness Declarations

54. Declaration of Dicie Fulks – July 17, 2008 ................................................01082

55. Declaration of Gayle Wolfe – September 15, 2016 ..................................................01084

**DIRECT EXAM OF FRED BOOKSTEIN**

A.    WELL,  CERTAINLY, IF HE HAD A PHYSICAL INJURY, I UNDERSTAND THERE WAS ADDITIONAL STRESSORS WHILE AT BUTNER. AGAIN,  HIS TESTING IS RELATIVELY CONSISTENT EVEN BEFORE HE HAD PHYSICAL INJURY.   I THINK, AGAIN, SPEAKS TO THE VALIDITY OF EACH TEST.   ONE TEST, BY ITSELF, YOU COULD SAY, WELL, MAYBE IT IS NOT REPRESENTATIVE.  BUT THE FACT THAT HE HAS HAD TESTING FOUR DIFFERENT TIMES BY FOUR DIFFERENT NEUROPSYCHOLOGISTS ON ONE OCCASION, HE HAS HAD PHYSICAL STRESS, OR HE IS MEDICALLY ILL.  ON ANOTHER CASE, HE IS NOT. THE CONSISTENCY, I THINK, IS REASSURING TO ME THAT THESE ARE, IN FACT, VALID RESULTS.

MR. BLUME:  THANK YOU.

THE COURT:  THANK YOU,  SIR.  YOU MAY STEP DOWN. PLEASE CALL YOUR NEXT WITNESS.

MR. BLUME:  DR. FRED BOOKSTEIN.

FRED BOOKSTEIN, HAVING BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

DIRECT EXAM

BY MR. BLUME:

Q.    GOOD MORNING,  DR. BOOKSTEIN.   ABOUT FIVE MINUTES TO GO IN THE MORNING.   TELL ME WHEN YOU ARE SITUATED.

A.    IF I COULD SIMPLY ASK YOU TO USE THE MICROPHONE.  IT APPEARS TO NOT BE WORKING.   MY HEARING AIDS ARE NOT WORKING. ASK YOU TO USE THE MICROPHONE.

Q.    DR. BOOKSTEIN,  WHERE ARE YOU CURRENTLY EMPLOYED?

**DIRECT EXAM OF FRED BOOKSTEIN**

A.   I'M CURRENTLY EMPLOYED AT THE UNIVERSITY OF MICHIGAN, ANN ARBOR AND AT THE UNIVERSITY OF VIENNA, AUSTRIA.

**Q.   AND WHAT DO YOU DO AT THE UNIVERSITY OF MICHIGAN?**

A.   AT THE UNIVERSITY OF MICHIGAN, MY TITLE IS RESEARCH PROFESSOR AND DISTINGUISHED RESEARCH SCIENTIST.  FULL-TIME RESEARCHER IN VARIOUS ASPECTS OF STATISTICS AND MORPHOMETRICS.

**Q.   JUST BRIEFLY, WE WILL COME BACK AND TALK ABOUT THIS, WHAT IS MORPHOMETRICS?**

A.   MORPHOMETRICS IS A BRANCH OF STATISTICS THAT WORKS WITH MEASUREMENTS OF BIOLOGICAL SHAPE AND SHAPE COMPARISONS. MEASUREMENTS USUALLY COME FROM IMAGES.  STATISTICS DESCRIBES THE PATTERNS IN THOSE MEASUREMENTS AND THEIR ASSOCIATIONS WITH CAUSES OR EFFECTS OF THE SHAPE OR FORM.

**Q.   AND WHAT ABOUT THE UNIVERSITY OF VIENNA, WHAT DO YOU DO FOR THE UNIVERSITY OF VIENNA IN AUSTRIA?**

A.   RECENTLY, BECAME A PROFESSOR OF BIOMATHEMATICS IN THE INSTITUTE OF ANTHROPOLOGY.  I WORK WITH OTHER ANTHROPOLOGISTS THERE APPLYING MY METHODS TO PROBLEMS COMPARING HUMAN FORMS. AND I ALSO WORK ON FETAL ALCOHOL SYNDROME IN THE CHILDREN'S HOSPITAL IN VIENNA.

**Q.   SO, YOU DIVIDE YOUR TIME BETWEEN ANN ARBOR, MICHIGAN, AND VIENNA, AUSTRIA?**

A.   MORE OR LESS, YES.

**Q.   PRETTY GOOD GIG.  ARE YOU AFFILIATED WITH ANY OTHER ACADEMIC INSTITUTIONS OR RESEARCH GROUPS?**

App. 00569

**DIRECT EXAM OF FRED BOOKSTEIN**

A.   YES,  FOR SOME 20 YEARS, I HAVE BEEN A CONSULTANT TO MANY DIFFERENT RESEARCH PROJECTS AT THE UNIVERSITY OF WASHINGTON IN SEATTLE.

**Q.   AND WHAT HAS BEEN THE FOCUS OF THOSE?**

A.   THE FOCUS OF THAT WORK IS ALL ON FETAL ALCOHOL SYNDROME.  AND, IN FACT, THE WORK IS IN THEIR FETAL ALCOHOL AND DRUG UNIT WITHIN THE DEPARTMENT OF PSYCHIATRY.

**Q.   AND SO, WHO WORKS IN THIS PROJECT?**

A.   EXCUSE ME?

**Q.   WELL, WHAT TYPE OF PEOPLE WORK ON THIS PROJECT?**

A.   THE FETAL ALCOHOL AND DRUG UNIT COMBINES MANY DIFFERENT SORTS OF PROFESSIONALS.   THE HEAD IS A CLINICAL PSYCHOLOGIST. THERE IS ANOTHER CLINICAL PSYCHOLOGIST THERE.   TWO OTHER STATISTICIANS, RADIOLOGISTS,  SOCIAL WORKERS FROM TIME TO TIME,  BIOLOGIST,  AND OTHER CAREGIVERS WILL COME THROUGH. PEOPLE IN PUBLIC HEALTH.   QUITE A RANGE.

**Q.   NOW SO, WOULD YOU JUST BRIEFLY, I KNOW YOU SAID WHAT YOU DO, WHAT IS YOUR EDUCATIONAL BACKGROUND?**

A.   I HAVE A BACHELOR'S DEGREE FROM THE UNIVERSITY OF MICHIGAN IN MATHEMATICS AND PHYSICS, A MASTER'S DEGREE FROM HARVARD IN SOCIOLOGY, AND A PH.D., AGAIN, FROM THE UNIVERSITY OF MICHIGAN IN STATISTICS AND ZOOLOGY.  THE PH.D. WAS 1977.

**Q.   DID YOU OBTAIN THESE DEGREES THROUGH COMPLETING ANY TYPE OF SPECIAL PROGRAM?**

A.   NO MORE SPECIAL THAN THE ORDINARY PH.D. PROGRAM AT A

DIRECT EXAM OF FRED BOOKSTEIN

UNIVERSITY.

**Q.    SO,  BUT, BASICALLY, YOU ARE TRAINED IN BOTH STATISTICS AND IN BEHAVIORAL SCIENCES?**

A.    YES.

**Q.    PRIOR TO BEING AT THE UNIVERSITY OF MICHIGAN,  JUST DESCRIBE YOUR WORK EXPERIENCE AFTER COMPLETING YOUR EDUCATION.**

A.    SINCE COMPLETING MY EDUCATION,  I HAVE ALWAYS BEEN EMPLOYED AT THE UNIVERSITY OF MICHIGAN.  I WENT IN WHAT IS CALLED THE RESEARCH TRACK THERE FROM ASSISTANT RESEARCH SCIENTIST, TO ASSOCIATE RESEARCH SCIENTIST, TO FULL RESEARCH SCIENTIST.   THE CONNECTION WITH SEATTLE BEGAN IN 1984 BUT HAS NEVER BEEN REPRESENTED BY A TITLE.   IT IS JUST COAUTHORSHIP, COLLABORATION, AND COMMUTING.  AND THE ASSOCIATION WITH VIENNA AROSE ONLY ABOUT SIX YEARS AGO, AND I BECAME FULL PROFESSOR THERE ONLY THIS YEAR.

**Q.    WELL,  YOU TALKED A LITTLE BIT ABOUT MORPHOMETRICS.  IN YOUR RESEARCH IN THE AREA OF MORPHOMETRICS, HAVE YOU USED THAT RESEARCH IN AREAS OTHER THAN FETAL ALCOHOL?**

A.    I SPENT MOST OF MY CAREER DEVELOPING THESE METHODS AND APPLYING THEM TO A WIDE VARIETY OF FIELDS.   SOME OF THE APPLICATION, BESIDES ANTHROPOLOGY, INCLUDE ORTHODONTICS, PLASTIC SURGERY.   SOME APPLICATIONS IN THE HUMANITIES SUCH AS ART, AND CARICATURE, SOME FINE ARTS.   EVEN THESE METHODS HAVE BEEN USED IN CONCERTS.   SOME APPLICATIONS IN GEOLOGY.   IT APPLIES QUITE BROADLY.

DIRECT EXAM OF FRED BOOKSTEIN

Q.   AND HAVE YOU PUBLISHED IN THIS AREA?

A.   YES.   MY RESUME,  WHICH I BELIEVE YOU HAVE A COPY OF, HAS ABOUT 300-SOME ITEMS ON IT.  PERHAPS 200 OF THOSE ARE IN THE AREA OF MORPHOMETRICS OR ITS APPLICATIONS.  THAT INCLUDES ONE TEXTBOOK AND PARTS OF MANY OTHER BOOKS.

Q.   HAVE YOU RECEIVED ANY HONORS OR AWARDS RELATING TO YOUR RESEARCH IN THIS AREA?

A.   MY TITLE AT MICHIGAN IS DISTINGUISHED RESEARCH SCIENTIST.  THAT IS AN HONOR.  ONLY ABOUT FIVE OF US AT THE UNIVERSITY.  IT IS A TITLE I HAVE HELD FOR FIFTEEN YEARS NOW.

Q.   AND HAVE YOU EVER BEEN AWARDED GRANTS FOR RESEARCH BY THE GOVERNMENT,  TO DO RESEARCH FOR THE GOVERNMENT?

A.   ALMOST ENTIRELY SUPPORTED, IN FACT, ON GOVERNMENT RESEARCH GRANTS FROM THE NATIONAL INSTITUTES OF HEALTH, AND FROM THE DEFENSE DEPARTMENT IN AUSTRIA.  I AM SUPPORTED, AS WELL, BY GOVERNMENT GRANTS.

MR. BLUME:  I OFFER DR. BOOKSTEIN AS AN EXPERT IN BIOSTATISTICS AND MORPHOMETRICS.

MR. GASSER:  NO OBJECTION.

THE COURT:   YOU MAY PROCEED.

BY MR. BLUME:

Q.   DR. BOOKSTEIN,  OBVIOUSLY,  ONE ESSENTIAL ISSUE HAS TO DO WITH FETAL ALCOHOL SPECTRUM DISORDER,  WHETHER MR. FULKS SUFFERS FROM FETAL ALCOHOL SPECTRUM DISORDER.   JUST TO GET ONE THING STRAIGHT, YOU HAVE NEVER MET MR. FULKS?

**DIRECT EXAM OF FRED BOOKSTEIN**

A.    NO, I HAVE NOT.

**Q.    BUT YOU DID HAVE THE OPPORTUNITY TO REVIEW AN MRI SCAN?**

A.    YES.

**Q.    SO, WHAT I WANT TO DO IS TALK ABOUT HOW AND WHY SOMEBODY IN MORPHOMETRICS WOULD LOOK AT AN MRI SCAN.  I FIRST WANT TO TALK ABOUT THE CORPUS CALLOSUM.  CAN YOU TELL US -- THE JURY HAS HEARD SOME TESTIMONY ABOUT THIS.  TELL US WHAT THE CORPUS CALLOSUM IS.**

A.    WOULD IT HELP TO TAKE OUT A PLASTIC MODEL OR SOMETHING OF THAT SORT?

**Q.    LET'S SEE IF THEY CAN SEE IT.**

A.    THIS IS AN OBJECT I BORROWED FROM THE ANATOMY DEPARTMENT FROM THE UNIVERSITY OF MICHIGAN.

**Q.    MIGHT BE HELPFUL IF YOU COME DOWN HERE.**

A.    THIS IS A PLASTIC MODEL, SLIGHTLY SMALLER THAN LIFE SIZE, OF A NORMAL HUMAN ADULT BRAIN.  IT IS UPSIDE DOWN SO IT WON'T FALL OUT OF THE BASE, IN WHICH I AM HOLDING IT.  I AM GOING TO TAKE OFF HALF HERE AND AGAIN, REMEMBERING THAT IT IS UPSIDE DOWN, THIS IS THE BRAIN STEM COMING OUT OF THE SPINAL CORD, IT IS COMING OUT THE NECK.  THE CORPUS CALLOSUM, WHICH WE ARE TALKING ABOUT, IS THIS C-SHAPED ARCH OF TISSUE WHICH ACTUALLY IS PART OF A SHEET, AS YOU CAN SEE HERE FROM THE SIDE VIEW.  SO, IT CONNECTS THE TWO HALVES OF THE TOP OF THE BRAIN.  MANY MENTAL PROCESSES GO THROUGH IT TO PROCESS INFORMATION ON BOTH SIDES.

DIRECT EXAM OF FRED BOOKSTEIN

AROUND IT YOU SEE IS THE HOLE AROUND THE CALLOSUM, WHICH I CAN -- YES, I CAN HOLD IT.  THIS IS AN UNUSUAL SHAPE.  NOW YOU ARE SEEING IT RIGHT SIDE UP.  THE CALLOSUM CONNECTS THE TWO HALVES OF THE BRAIN AND SERVES MANY FUNCTIONS THAT REQUIRE COMPUTATION ON BOTH SIDES.

**Q.    RESUME THE STAND.**

A.    (WITNESS COMPLIES.)

**Q.    WELL,  SO, OKAY.  YOU TOLD US WHAT THE CORPUS CALLOSUM IS,  BUT IF YOU WANT TO KNOW OR ARE TRYING TO OBTAIN INFORMATION ABOUT WHETHER SOMEBODY HAS FETAL ALCOHOL SPECTRUM DISORDER, WHY SHOULD WE CARE ABOUT THE CORPUS CALLOSUM?**

A.    THERE ARE THREE REASONS.  THE FIRST ONE WAS ALREADY KNOWN TEN OR MORE YEARS AGO THAT, IN A SERIES OF CASES OF SEVERE FETAL ALCOHOL SYNDROME THAT WERE LOOKED AT BY MAGNETIC RESONANCE IMAGING AT A TIME WHEN THAT RESONANCE IMAGING WAS FAIRLY NEW,  IN MANY CASES THE CALLOSUM WAS OFTEN NOTED TO BE ABNORMAL OR PARTIALLY MISSING.  THIS IS RESEARCH FROM THE EARLY 1990'S.

THE SECOND REASON IS THAT IT HAS BEEN SHOWN IN ANIMAL EXPERIMENTS TO BE PARTICULARLY SENSITIVE TO THE EFFECTS OF ALCOHOL IN THE DEVELOPMENT OF THE BRAIN.  THIS IS RESEARCH FROM THE 1990'S THROUGH ABOUT THE YEAR 2000.  IT IS LAID DOWN EARLY.  IT IS THE FIRST STRUCTURE OF THE ADULT BRAIN, ESSENTIALLY, TO BE FORMED.  AND IT IS, ITSELF, SENSITIVE TO ALCOHOL.

App. 00574

DIRECT EXAM OF FRED BOOKSTEIN

THE THIRD REASON HAS BECOME CLEAR ONLY RECENTLY.  IT IS THAT IT IS SURPRISINGLY EASY TO MEASURE.  IT IS CLEARLY VISIBLE IN AN MRI.  IT CAN BE DIGITIZED, WHICH MEANS TRACED FAIRLY STRAIGHTFORWARDLY, AND, OTHERWISE, STANDARD STATISTICAL METHODS CAN APPLY TO IT TO EXTRACT INFORMATION RELEVANT TO THE DETECTION OF FETAL ALCOHOL DAMAGE.

**Q.    HOW DID YOU GET INTERESTED IN LOOKING AT THE CORPUS CALLOSUM AREA OF FETAL ALCOHOL?  YOU SAID YOU HAD BEEN WORKING IN THIS AREA FOR 20 YEARS?**

A.    I SHOULD PROBABLY LIST IN SOMETHING LIKE THE ORDER THE STUDIES THAT I HAVE BEEN INVOLVED IN.  WHEN I STARTED IN SEATTLE, THE WORK WAS ENTIRELY BEHAVIORAL.  IT WAS A STUDY OF THE EFFECTS OF ALCOHOL IN RELATIVELY LOW DOSES,  SOCIAL DRINKING DOSES, THAT RESULTED IN A BOOK.

SHORTLY AFTERWARDS, WE BEGAN A VERY LARGE STUDY THAT INTERVIEWED THE CARETAKERS OF SOME 400 PEOPLE OF ALL AGES WHO HAD BEEN DIAGNOSED WITH FETAL ALCOHOL.  THAT PROJECT, WHICH IS USUALLY CALLED THE SECONDARY DISABILITY STUDY, RESULTED IN A BOOK LENGTH MONOGRAPH PUBLISHED IN 1996.

BASED ON THAT, WE DECIDED THAT WE NEEDED TO LOOK MORE INTENSIVELY AT THE BRAINS OF THESE PEOPLE BECAUSE THE MECHANISM IS, OF COURSE, BRAIN DAMAGE.  SO,  A STUDY BEGAN IN SEATTLE WHICH LED TO THE PAPERS THAT I AM RELYING ON HERE TODAY.  A STUDY OF THAT INVESTIGATED THE BRAINS OF 120 FETAL ALCOHOL PATIENTS AND 60 UNEXPOSED NORMALS.  WE MEASURED THE

DIRECT EXAM OF FRED BOOKSTEIN

CORPUS CALLOSUM THEN, AND AS WE ARE NOW PROCEEDING TO MEASURE OTHER STRUCTURES, AND CORRELATED IT WITH BEHAVIOR THAT WAS ALSO MEASURED.

SEPARATELY, STUDIES ONGOING THAT IS STUDYING WHAT IS CALLED A FUNCTIONAL IMAGE.  FUNCTIONAL MRI, WHICH IS A LITTLE LIKE A PET IMAGE OF HOW THESE BRAINS ACTUALLY USE OXYGEN.

AND, FINALLY,  BASED ON THE FINDINGS OF THE CORPUS CALLOSUM IN ADULTS, THERE ARE TWO STUDIES THAT ARE TRYING TO INVESTIGATE EXACTLY THE SAME STRUCTURE ON THE DATE OF BIRTH. ONE STUDY IN SEATTLE AND ONE STUDY IN VIENNA TO SEE HOW EARLY WE CAN DETECT THIS DAMAGE.

**Q.    THAT IS USING ULTRASOUND?**

A.    YES.   THE LAST TWO STUDIES ARE USING ULTRASOUND.  IN VIENNA, WHEN DAMAGE IS FOUND, THOSE BABIES WILL BE REFERRED FOR MRI,  AS WELL, WHICH IS A MORE INFORMATIVE PICTURE.

**Q.    AS YOU BEGAN TO STUDY THE CORPUS CALLOSUM OF THE PEOPLE WITH KNOWN FETAL ALCOHOL SPECTRUM DISORDERS,  FETAL ALCOHOL SYNDROME, WHAT DID YOU LEARN?**

A.    WHAT WE LEARNED WAS QUITE SURPRISING.  WE LEARNED THAT THERE WAS ENOUGH INFORMATION IN THE OUTLINE OF THE CORPUS CALLOSUM, TAKEN UP THE MIDDLE, TO RELIABLY CLASSIFY A GREAT MAJORITY OF THE PEOPLE IN THE STUDY AS EITHER FROM THE NORMAL GROUP OR FROM THE PATIENT GROUP. WHAT THIS MEANS IS THAT THE SHAPE OF THE CALLOSUM PROVED A VERY GOOD DISCRIMINATOR.  IT DISCRIMINATED BECAUSE THE NORMAL SHAPES WERE QUITE CLOSELY

App. 00576

DIRECT EXAM OF FRED BOOKSTEIN

CONTROLLED, AND THE SHAPES OF THE PATIENTS VARIED,  WELL,  ALL OVER THE PLACE.   THE DISEASES IS DISEASE OF VARIATION, WE DISCOVERED.   AND THIS FINDING HAS NOW APPEARED IN SEVERAL PEER-REVIEWED ARTICLES IN A VARIETY OF MEDICAL JOURNALS.

**Q.    OKAY.   THEN JUST TO MAKE,  I WANT TO MAKE ONE THING CLEAR BEFORE YOU GO ANY FURTHER.   YOU STUDIED THE CORPUS CALLOSUM, NOT NECESSARILY BECAUSE IT WAS THE MOST IMPORTANT BRAIN STRUCTURE AS FAR AS BEHAVIOR GOES, BUT BECAUSE IT WAS A GOOD MARKER,  I GUESS?**

A.    YES.   THE CORPUS CALLOSUM IS A VERY GOOD SIGN OF FETAL ALCOHOL DAMAGE; SENSITIVE AND EASY TO MEASURE.

**Q.    OKAY.   SO, YOU HAVE DESCRIBED THE PROCESS OF THE STUDY AND YOU HAVE -- YOU SAID THIS HAS BEEN PUBLISHED?**

A.    YES.

**Q.    AND THIS WAS BASED ON WHAT YOU DID, AS I UNDERSTAND, JUST TO MAKE SURE I UNDERSTAND IT, YOU TOOK PEOPLE WITH KNOWN FETAL ALCOHOL SPECTRUM DISORDER, AND YOU EXAMINED THEIR CORPUS CALLOSUM.   THEN YOU ALSO TOOK PEOPLE UNEXPOSED OR NORMALS WITHOUT AND MEASURED THEIR CORPUS CALLOSUM?**

A.    LET ME BE A LITTLE MORE SPECIFIC.   WE TOOK EQUAL NUMBERS OF MALES AND FEMALES.   WE TOOK EQUAL NUMBERS OF ADULTS AND ADOLESCENTS, WHICH IS PEOPLE AGED 14 TO 17, AND WE TOOK EQUAL NUMBER OF PEOPLE WHO HAD WHAT WAS THEN CALLED FETAL ALCOHOL SYNDROME,  FAS,  FETAL ALCOHOL EFFECT,  FAE,  OR UNEXPOSED NORMALS.   THAT IS 15 PEOPLE IN EACH OF 12 GROUPS.

DIRECT EXAM OF FRED BOOKSTEIN

THE TOTAL STUDY WAS 180 PEOPLE.

Q.    SO,  YOU DID THIS STUDY, AND YOU PUBLISHED IT.  IS IT ONGOING?

A.    THE STUDY IS ONGOING.   WE ARE NOW MEASURING ADDITIONAL PARTS OF THE BRAIN FOR WHICH THERE ARE ADDITIONAL ARTICLES BY OTHERS CLAIMING SPECIFIC ALCOHOL DAMAGE.   THE CEREBELLUM, WHICH IS THE PART AT THE BACK WHICH CONTROLS BALANCE AND OTHER THINGS, AND PERHAPS OTHER FEATURES AS WELL.   THE STUDY IS ONGOING.

Q.    NOW,  WERE YOU EVER CONTACTED BY A DR. DAVID BACHMAN?

A.    YES.   PERHAPS SIX MONTHS AGO, I WAS CONTACTED BY E-MAIL AND THEN BY TELEPHONE AND ASKED IF I WOULD SPECIFY THE PARAMETERS OF AN MRI IMAGE TO BE SENT TO ME FOR MEASUREMENT IN CONNECTION WITH THIS CASE.

Q.    NOW,  I TAKE IT, JUST FROM SPEAKING WITH DR. BACHMAN AND FROM YOU, THAT THERE HAD BEEN ANOTHER MRI DONE BECAUSE YOU HAD CERTAIN SPECIFICATIONS FOR AN MRI?

A.    I MENTIONED THAT PART OF THE TEAM IN SEATTLE INCLUDES A RADIOLOGIST.   RADIOLOGISTS, SOME YEARS AGO, SPECIFIED A WAY OF TUNING THE MACHINE.  IT IS CALLED A "PULSE SEQUENCE" THAT WOULD BE MOST APPROPRIATE FOR MEASURING THE CORPUS CALLOSUM. WE MEASURED,  WE IMAGED 180 PEOPLE IN THAT SEATTLE STUDY ACCORDING TO THIS PULSE SEQUENCE, AND SO IT NEEDED TO BE APPLIED FOR THE IMAGING OF THE DEFENDANT HERE, AS WELL.   IT DOES NOT REQUIRE A SPECIAL MACHINE,  MERELY A SPECIAL SETTING

DIRECT EXAM OF FRED BOOKSTEIN

OF THE DIALS.

Q.    AND THEN, WOULD IT BE FAIR, THROUGH A LAYPERSON'S TERMS, TO SAY WHAT YOU ARE TRYING TO DO,  DO IT IN A WAY TO GET THE BEST LOOK AT THE CORPUS CALLOSUM?

A.    WE ARE TREATING IT AS IF HE WERE A 181ST SUBJECT IN THE SEATTLE STUDY.

Q.    YOU, EVENTUALLY, GOT THE MRI?

A.    YES.

Q.    AND SO WHAT DO YOU DO? YOU GET IT,  NOW,  AS I UNDERSTAND IT,  DO YOU GET THE MRI OR THE DICOM?

A.    THE MRI COMES AS SOMETHING CALLED A DICOM, WHICH IS -- I DON'T KNOW WHAT THE LETTERS STAND FOR, IT IS SOMETHING LIKE A STACK OF PHOTOGRAPHS.   SLICES, THAT WHEN YOU PUT THEM TOGETHER, MAKE A SOLID IMAGE.

I CONVERT THAT STACK OF SLICES TO SOMETHING LIKE A SOLID BLOCK OF PICTURE AND THEN PROCESS IT THROUGH A COMPUTER PROGRAM THAT HAS BEEN DEVELOPED OVER MANY YEARS.   AND I FUNDED A COMPUTER PROGRAM THAT IS FREELY AND PUBLICLY AVAILABLE.   IT TAKES PERHAPS AN HOUR OR SO TO VERY CAREFULLY TRACE AROUND THE MIDDLE OF THE CORPUS CALLOSUM IN THAT SOLID IMAGE.

WHAT RESULTS IS SOMETHING LIKE A POLYGON IN SPACE, SOMETHING YOU MIGHT MAKE OUT OF A STRING,  WHICH IS THEN TREATED AS DATA TO BE COMPARED TO THE DATA FROM THE PEOPLE THAT WE ANALYZED FROM THE MAIN SEATTLE STUDY.

DIRECT EXAM OF FRED BOOKSTEIN

**Q.    DR. BOOKSTEIN, LET ME SHOW YOU WHAT --**

A.    OH, THAT'S NICE.

Q.    LET ME SHOW YOU WHAT HAS BEEN MARKED AS DEFENDANT'S EXHIBIT 14.

MR. GASSER:  NO OBJECTION.

BY MR. BLUME:

**Q.    COULD YOU EXPLAIN TO THE JURY WHAT THIS IS?  IS THIS WHAT WE WERE TALKING ABOUT?**

A.    YES.  I WILL REMIND YOU WHAT WE ARE LOOKING AT.  YOU ARE LOOKING AT A PART OF THE BRAIN IMAGE THAT CORRESPONDS TO SORT OF THE MIDDLE OF THIS,  EXCEPT I PICKED UP THE WRONG SIDE.  YOU ARE LOOKING AT -- I SHOULD BE HOLDING UP THE OTHER HALF -- THE STRUCTURE TOWARD THE MIDDLE OF THE BOTTOM THAT YOU ARE SEEING IS THIS PIECE.  YOU ARE LOOKING AT THE FOREHEAD OVER AT THE UPPER LEFT WHICH GOES HERE AND THE CORPUS CALLOSUM, WHICH IS THIS C-SHAPED THING I AM MARKING WITH MY FINGER, IS THE WHITE ARCH, STILL SORT OF C-SHAPED, FACING DOWNWARD THERE.  THE PICTURE ITSELF OF A SLICE THROUGH THIS VOLUME NEAR THE STRUCTURE I TRACED.  IT IS ACTUALLY BEHIND IT.

SO,  THE POINTS THAT I LOCATED ARE THE 40 PLUS SIGNS THAT TRACE AROUND IT FAIRLY CAREFULLY STARTING FROM THAT CORNER AT THE CENTER LEFT.  IN THE LATER SLIDES, THAT CORNER WOULD HAVE A NAME, IT IS CALLED ROSTRUM.  THE DATA TRACED THIS AROUND FROM ROSTRUM JUST AS IF YOU WERE GOING AROUND IT WITH YOUR

DIRECT EXAM OF FRED BOOKSTEIN

FINGER HERE.   I HOPE MY FINGER IS STILL ON IT, I CAN'T SEE.

**Q.   OKAY.   SO REALLY, I MEAN, THAT IS WHAT WE ARE TALKING ABOUT?**

A.   YES.   WE ARE TALKING ABOUT -- WE ARE TALKING ABOUT THE SHAPE OF THAT SET OF 40 POINTS.

Q.   DR. BOOKSTEIN, LET ME MAKE SURE I HAVE THESE IN THE RIGHT ORDER.   I DON'T WANT TO THROW YOU OFF.   WILL YOU MAKE SURE I HAVE THESE IN THE RIGHT ORDER?

MR. BLUME:  I, AT THIS POINT, I OFFER DEFENDANT'S 15 THROUGH 19.

MR. GASSER:  NO OBJECTION.

THE COURT:   WITHOUT OBJECTION.  ADMITTED.

BY MR. BLUME:

**Q.   SO, DR. BOOKSTEIN,  THE PURPOSE THEN IS TO MAKE SURE I UNDERSTAND IT OF DOING THIS ONE WAS, THIS IS BASICALLY HOW YOU TAKE YOUR MEASUREMENTS?**

A.   YES.   THIS IS THE RAW DATA.   THIS IS THE DESCRIPTION OF THE BRAIN THAT I WAS SENT FOR THE PURPOSES OF THE COMPARISONS WE WILL BE TALKING ABOUT.

A.   OKAY.

**Q.   SO NOW WHAT I WANT TO DO IS SHOW YOU,  LET ME SHOW YOU DEFENDANT'S EXHIBIT 18.   CAN YOU SEE THAT?**

A.   YES.

**Q.   SO, CAN YOU EXPLAIN TO THE JURY WHAT WE ARE LOOKING AT HERE?**

**DIRECT EXAM OF FRED BOOKSTEIN**

A.    YES.   I AM A STATISTICIAN.  SO, THE WAY THAT I WOULD ANALYZE THE INFORMATION FROM THIS FORM WOULD BE FIRST TO LOOK AT IT AND SEE IF IT IS GROSSLY NORMAL, AND THEN TO CAREFULLY COMPARE IT TO THE MEASUREMENTS WE HAVE FROM THE RELEVANT PEOPLE FROM THE SEATTLE STUDY.   THE RELEVANT PEOPLE FROM THE SEATTLE STUDY WERE THOSE 45 ADULT MALES I MENTIONED:  15 OF THEM WERE NORMALS, AND THE OTHER 30 HAD FETAL ALCOHOL SPECTRUM DISORDER.

IN THIS PICTURE, I HAVE DRAWN YOU THE AVERAGES FOR THE UNEXPOSED SEATTLE NORMAL, THAT IS THE DOTTED LINE.   AND I HAVE PUT ON TOP OF IT, SUPERIMPOSED ON IT, USING THE STANDARD STATISTICAL METHOD, THE OUTLINE FOR THE PRISONER HERE.   AND I LABELED A PART OF IT WE WILL BE LOOKING AT IT LATER, AS WELL, THIS PART CALLED THE ISTHMUS, WHICH IS A BIT THINNER IN THE NORMALS.

**Q.    SO, THE ISTHMUS AND THE ROSTRUM; IS THAT RIGHT?**

A.    THE ROSTRUM I WAS LABELING AS A POINT, AND THE ISTHMUS WE WILL COME BACK TO IN A LATER SLIDE.

THE OUTLINE FOR THE MRI THAT WAS SENT OF THE PRISONER IS GROSSLY NORMAL. IT HAS ROUGHLY THE RIGHT PARTS IN ROUGHLY THE RIGHT PLACES.  BUT IN THE SEATTLE STUDY, OF THE 120 PEOPLE WITH DIAGNOSED FETAL ALCOHOL SPECTRUM DISORDER,  118, LIKEWISE, HAD ALL OF THE RIGHT PARTS IN, APPROXIMATELY, THE RIGHT PLACES.

**Q.    LET ME STOP YOU THERE AND JUST TALK A LITTLE BIT ABOUT**

**DIRECT EXAM OF FRED BOOKSTEIN**

**THAT.  YESTERDAY, THE JURY SAW SOME SLIDES, WHICH I SHOWED YOU, OF -- I MIGHT NOT GET THE TERM EXACTLY RIGHT,  AGENESIS, PARTIAL AGENESIS?**

A.  YES.

**Q.  WHAT IS PARTIAL AGENESIS?**

A.  PARTIAL AGENESIS IS NOT HAVING THE FULL STRUCTURE THAT YOU ARE LOOKING AT HERE.  EITHER MISSING THE BACK OR HAVING A GAP BETWEEN THE FRONT AND THE BACK.

**Q.  AND THE BACK WOULD BE?**

A.  THE BACK IS TOWARD THE RIGHT IN THE PICTURE, WHICH IS TOWARD THE BACK IN THE HEAD.

**Q.  OVER HERE?**

A.  YEAH.  THE BACK IS TOWARD -- THE BACK IS TOWARD THE RIGHT ANGLE THROUGH.

**Q.  IN SOME OF THOSE SLIDES, WHAT YOU SAW WAS, I GUESS, DRAMATIC OR COMPLETE PARTIAL AGENESIS?**

A.  YES.

**Q.  AS I UNDERSTAND IT, THAT IS VERY,  VERY RARE?**

A.  YES.  IN MY EXPERIENCE OF MR'S IN THIS SYNDROME,  I HAVE LOOKED AT ABOUT 150 NOW,  THERE WERE THREE THAT SHOWED THIS SEVERITY OF A SHAPED SIGNAL.  THREE OUT OF THE 150 HAD SERIOUSLY MISSING PARTS.

**Q.  EVEN WITH PEOPLE WITH FETAL ALCOHOL?**

A.  THIS IS 150 DIAGNOSED PATIENTS.  SO, IT IS UNUSUAL WITHIN THE SYNDROME.

DIRECT EXAM OF FRED BOOKSTEIN

Q.    TO HAVE THAT COMPLETE OR PARTIAL AGENESIS?

A.    IT IS, HOWEVER, HISTORICALLY THE REASON WE LOOKED AT THE CALLOSUM.  THAT WAS WHAT WAS FIRST NOTICED IN THE SEVERE CASES.

Q.    OKAY.

Q.    IS THERE ANYTHING ELSE ABOUT THIS PARTICULAR SLIDE THE JURY NEEDS TO KNOW?

A.    IF YOU LOOK AT THAT, THE PART LABELED ROSTRUM IN THE DEFENDANT, SEEMS TO BE A LITTLE TOO LOW, AND THE PART LABELED ISTHMUS, IN THE DEFENDANT, SEEMS TO BE A LITTLE TOO HIGH AND A LITTLE TOO THICK.  THE JOB OF STATISTICIAN IS TO PUT SOME KIND OF REASONING BEHIND THE WORD "LITTLE" IN THOSE STATEMENTS. IN THESE REMAINING SLIDES, USING MY PROFESSIONAL TRAINING, I GO INTO THE VARIATION IN THE SEATTLE SUBJECTS, THE NORMALS, AND THE PATIENTS TO SEE HOW TO ASSESS THE APPARENT DIFFERENCES OF THE PRISONER'S OUTLINE FROM THE NORMAL OUTLINE.

Q.    JUST SO I UNDERSTAND WHAT YOU ARE SAYING, OKAY?  WHAT YOU HAVE HERE IS THE AVERAGE, IS THE DOTTED LINE?

A.    YEAH.

Q.    WHAT I UNDERSTAND YOU -- WHAT YOU ARE SAYING IS, NOBODY'S CORPUS CALLOSUM IS GOING TO LOOK EXACTLY LIKE THE DOTTED LINE?

A.    CORRECT.  ONE DEFINITION OF STATISTICS IS THE LOGIC OF UNCERTAINTY.  THERE IS ALWAYS UNCERTAINTY OF AN INDIVIDUAL'S CALLOSUM AROUND THE AVERAGE.  THE REST OF THE PICTURES WILL

DIRECT EXAM OF FRED BOOKSTEIN

BE SHOWING THAT.

**Q.    AT WHAT POINT, AND I GUESS THE QUESTION IS, AT WHAT POINT DOES THE VARIABILITY BECOME CLINICALLY SIGNIFICANT?**

A.    YES.

**Q.    DR. BOOKSTEIN, I WILL SHOW YOU NOW, THIS IS DEFENDANT'S EXHIBIT 19.    WHAT ARE YOU TRYING TO CAPTURE IN THIS SLIDE?**

A.    YOU REMEMBER, I SAID A FEW MOMENTS AGO THAT THE ROSTRUM, THE HOOK AT THE LOWER LEFT, WAS A LITTLE TOO LOW, AND THE TOP OF THE ARCH WAS A LITTLE TOO HIGH.  WHAT I TRIED TO CAPTURE --

**Q.    YOU ARE TALKING ABOUT THIS?**

A.    THAT AND THE TOP.

**Q.    THIS?**

A.    WHAT I TRIED TO CAPTURE IN THIS FIGURE IS THAT RELATIONSHIP IN A WAY THAT CORRESPONDS TO A FINDING OF OUR PUBLISHED PAPER OF 2002 ABOUT AN ASPECT OF SHAPE THAT IS, IN FACT, CORRELATED WITH IQ DEFICIT IN THE PATIENTS.  THE VEHICLE FOR THAT IS SHOWN HERE.  THE LINE FROM THE TOP OF THE ARCH TO THAT SHARP CORNER IS AN EFFECTIVE WAY OF MEASURING THE VARIATION OF THIS SHAPE.  IN THE PICTURE, I CAN SEE, SO PROBABLY YOU CAN SEE, THAT SOME OF THE DOTS ARE SOLID BLACK. THOSE CORRESPOND TO THE SEATTLE UNEXPOSED, AND THEY ARE IN A FAIRLY TIGHT BAND UP THE MIDDLE.  AS I MENTIONED, CORPUS CALLOSUM IN NORMAL PEOPLE DOES NOT VARY MUCH.   THE FETAL ALCOHOL SPECTRUM DISORDER CASES, BOTH THE FAS'S AND THE

DIRECT EXAM OF FRED BOOKSTEIN

FAE'S, ARE SPREAD OUT MUCH MORE WIDELY.

AND MR. FULKS'S COPY OF THIS VECTOR IS LOCATED AT HIS INITIALS DOWN THERE AT THE BOTTOM LEFT.  YOU SEE THAT HE IS A LONG WAY FROM ANY OF THE NORMALS, AND HE IS NOT TERRIFICALLY FAR FROM SOME OF THE DIAGNOSED PATIENTS IN THIS ADULT MALE SEATTLE SAMPLE.  HIS EIGHT NEAREST NEIGHBORS ARE FROM THE PATIENT GROUP.

Q.    JUST TO MAKE SURE I UNDERSTAND WHAT YOU ARE SAYING IS, THE DARK OR THE DOTS ARE THE UNEXPOSED PEOPLE?

A.    DARK DOTS ARE UNEXPOSED.  THE PLUSES AND THE X'S ARE THE PATIENTS.

Q.    WHAT YOU ARE SAYING IS, IF YOU WERE TO CONNECT ALL OF THOSE DOTS,  DRAW A LINE TO CONNECT THEM ALL UP, YOU WOULD HAVE A FAIRLY TIGHT BAND THAT SORT OF MOVES THROUGH THE MIDDLE?

A.    IF I HAD CONTROL OF YOUR LITTLE BLUE PEN, I WOULD DRAW A LINE, SORT OF LIKE A TEETER-TOTTER, RIGHT UP THROUGH THE MIDDLE OF THE PICTURE.

Q.    SORT OF LIKE THAT?

A.    THAT IS WHERE THE PLUSES ARE PILING UP -- I'M SORRY, WHERE THE CIRCLES ARE PILING UP.  AND THE PLUSES AND THE X'S ARE MUCH MORE WIDELY SCATTERED.

Q.    NOT NECESSARILY ANY DIRECTION?

A.    NOT NECESSARILY IN EITHER DIRECTION.

Q.    THAT IS WHAT YOU MEAN BY VARIABILITY?

**DIRECT EXAM OF FRED BOOKSTEIN**

A.    CORRECT.

**Q.    THEY ARE, I GUESS, SORT OF ALL OVER THE PLACE.**

A.    FROM THIS PICTURE, THE FINDING IS THAT, IN THIS PARTICULAR MEASUREMENT, WHICH, AS I SAY, IS CORRELATED WITH IQ DEFICITS,  MR. FULKS'S SHAPE IS MUCH MORE TYPICAL OF THE PATIENT SUBGROUP IN SEATTLE THAN OF THE UNEXPOSED SUBGROUP IN SEATTLE.  AND I CAN PUT A NUMBER ON THAT IF YOU WANT ME TO

**Q.    WE WILL COME TO THAT.**

**YOU TALK ABOUT THE IQ DEFICITS.  WHAT DO YOU MEAN BY THAT?**

A.    THE REASON FOR BEING INTERESTED IN THIS PART OF THE SHAPE DESCRIPTION IS THAT, IN OUR EARLIER PUBLICATION, THAT TURNED OUT TO BE QUITE AN INFORMATIVE ASPECT OF THE SHAPE. IT PREDICTED A GREAT MANY OF THE CORRELATED BEHAVIORAL MEASUREMENTS.  AND IN THIS CASE, THE ONES THAT IT PREDICTED WERE THE ONES THAT ARE USUALLY CALLED IQ LOADED IN THE NEUROPSYCH LITERATURE.

**Q.    DO YOU RECALL WHAT WAS THE AVERAGE IQ OF THE EXPOSED INDIVIDUALS IN THE SEATTLE STUDY?**

A.    AVERAGE IQ OF THOSE INDIVIDUALS WAS ABOUT 79.

**Q.    IS THERE ANYTHING ELSE ABOUT THIS PARTICULAR --**

A.    NO, THAT IS ENOUGH.

**Q.    DR. BOOKSTEIN,  LET ME NOW SHOW YOU, THIS IS DEFENDANT'S EXHIBIT -- LET ME SEE, EXHIBIT 15.  ALL RIGHT. SO,  TELL US WHAT WE ARE LOOKING AT HERE?**

A.    I MENTIONED BEFORE THAT THE MAIN FINDING OF THE SEATTLE

DIRECT EXAM OF FRED BOOKSTEIN

STUDY WAS THIS EXTRA VARIATION IN THE PATIENT PART OF THE DATA.  THAT IS THE PICTURE ON THE RIGHT.  THE PICTURE ON THE LEFT IS OF THE SEATTLE UNEXPOSED ADULT MALES.   ALL OF THEM MALE.  SO, THERE ARE 15 OF THOSE DOTTED LINES AND, AGAIN, MR. FULKS'S OUTLINE.  THE PICTURE ON THE RIGHT IS OF THE SEATTLE 30 DIAGNOSED ADULT MALES.  OUR ATTENTION IS CALLED TO ANOTHER PART OF THE DRAWING BESIDES THE ONE THAT WE WERE USING BEFORE, WHICH IS THIS PART THAT WAS CALLED THE ISTHMUS ABOUT TWO SLIDES AGO.  FROM THE TOP OF THE ARCH ABOUT HALFWAY TOWARD THE RIGHT END OF EACH PICTURE.

**Q.    TOUCH IT.   IF YOU TOUCH IT, WE CAN SEE IT.**

A.    IF I TOUCH IT.   THE ISTHMUS IS IN HERE.   OH, LOOK AT THAT.   THAT IS FOR THE NORMALS, AND OVER HERE FOR THE PATIENTS.   AND, AGAIN, IN THESE EARLIER PUBLICATIONS, THAT TURNED OUT TO BE A PARTICULARLY SENSITIVE PART OF THE IMAGE FOR THE DISCRIMINATION OF THE PATIENTS FROM THE NORMALS.   AND ALSO, IT TURNED OUT TO BE A PART OF THE IMAGE THAT WAS STRONGLY CORRELATED WITH ONE ASPECT OF BEHAVIORAL DEFICIT THAT IS USUALLY CALLED EXECUTIVE FUNCTION,  THE PLANNING AND CONTROL OF GOAL-DIRECTED BEHAVIOR.  THERE ARE REASONS, AS WELL, FROM THE EARLY PUBLICATIONS TO LOOK AT THAT PART OF THE FORM, AS WELL.

**Q.    ON THIS THEN, THE SIGNIFICANCE OF THIS IS?**

A.    THIS IS MORE OR LESS A GUIDE FIGURE TO EXPLAIN WHAT WE ARE ABOUT TO DO IN THE NEXT SLIDE, WHICH IS TO FOCUS IN ON

DIRECT EXAM OF FRED BOOKSTEIN

THIS REGION CALLED THE ISTHMUS, WHICH ALSO TURNS OUT TO BE VERY INFORMATIVE.

**Q.     LET'S GO TO THE NEXT SLIDE.   EXPLAIN TO THE JURY WHAT WE ARE LOOKING AT.   THIS IS DEFENDANT'S EXHIBIT 17, WHICH I AM SHOWING YOU NOW.   YOU CAN PROCEED.**

A.   IT IS AS IF WE, IN SOME SENSE, TOOK SCISSORS AND CUT THAT PART OF THE PICTURE OUT FOR EACH OF THE SEATTLE SUBJECTS AND FOR MR. FULKS, AND TREATED THEM AS THE DATA WE WERE GOING TO LOOK AT SEPARATELY.

ON THE LEFT, YOU CAN SEE MR. FULKS'S ISTHMUS JUST BY ITSELF AS THE SOLID LINES AND ALL OF THE SEATTLE NORMALS IN THE DASH LINES.  WHAT YOU CAN NOTICE,  IF I TOUCH IT, MAYBE IT WILL SHOW UP,  IS THAT HE IS BELOW ALL OF SEATTLE ONES HERE, WHICH IS THE BOTTOM,  THE PART FACING THE MIDDLE OF THE BRAIN.  AND HE IS ABOVE HERE, JUST ABOUT ALL OF THE SEATTLE NORMALS.  HE IS WELL OUTSIDE OF THAT DISTRIBUTION.

BY COMPARISON, OVER HERE, HE IS RIGHT UP THE MIDDLE OF THE COMPARISON DISTRIBUTION, AS FAR AS THE LOWER ARCH IS CONCERNED, AND HE IS UP THE MIDDLE FOR MOST OF THE UPPER ARCH -- LET ME FIND THAT LINE HERE -- UP THE MIDDLE EXCEPT FOR JUST ONE LITTLE GLITCH HERE.

SO,  HE IS TYPICAL IN THIS DESCRIPTION OF THE SEATTLE EXPOSED PEOPLE -- THE SEATTLE DIAGNOSED PATIENTS, AND HE IS QUITE UNTYPICAL OF THE SEATTLE UNEXPOSED ADULT MALES.

**Q.    ALL RIGHT.   ANYTHING ELSE ABOUT THIS SLIDE?**

**DIRECT EXAM OF FRED BOOKSTEIN**

A.    NO.    AND WE ARE ALMOST DONE.

**Q.    SO NOW I WILL SHOW YOU WHAT HAS BEEN MARKED AS DEFENDANT'S EXHIBIT 17.    IS THIS RIGHT? DO I HAVE IT ORIENTED CORRECTLY?**

A.    YES.

**Q.    16.    DEFENDANT'S EXHIBIT 16.    WHAT ABOUT THIS?**

A.    WHAT I AM TRYING TO DO HERE, AS A STATISTICIAN, IS COME UP WITH A SUMMARY IMPLICATION FROM THE DATA OF HOW TO CLASSIFY THIS PERSON.

ONE WAY TO DO THAT IS TO IMAGINE FIRST THAT HE WAS FROM THE SEATTLE ADULT MALE NORMAL GROUP, AND, SECOND, THAT HE WAS FROM THE SEATTLE ADULT MALE PATIENT GROUP, AND COMPARE HOW LIKELY IT IS THAT WE WOULD HAVE GOTTEN HIS DATA UNDER THOSE TWO ASSUMPTIONS.

THIS IS CALLED THE METHOD OF LIKELIHOOD RATIOS.  IT IS A STANDARD FOR ABOUT THE LAST HALF CENTURY IN STATISTICS.

**Q.    IS IT USED IN OTHER MEDICAL --**

A.    IT IS USED IN MOST OTHER MEDICAL DIAGNOSIS SETTINGS BY PEOPLE AND ALSO, IN FACT, BY MACHINES.

**Q.    CAN YOU GIVE JUST A FEW EXAMPLES?**

A.    OH, THE MACHINE THAT ATTACHES TO YOU IN THE INTENSIVE CARE WARD AND RINGS A BELL IF YOUR HEARTBEAT DOES SOMETHING SCREWY IS ALMOST CERTAINLY RUNNING SOME OTHER ANALOGOUS VERSION OF THIS ALGORITHM FITTING ITS DATA TO WHAT IT GETS FROM NORMAL HEARTS AND WHAT IT GETS FROM DANGEROUSLY FAST

DIRECT EXAM OF FRED BOOKSTEIN

HEARTS, AND RINGING THE BELL IF IT DECIDES UNDANGEROUSLY FAST.

THERE ARE MANY,  MANY APPLICATIONS OF THIS TYPE OF LOGIC IN

CLINICAL MEDICINE.

Q.    AND IN OTHER FIELDS?

A.    AND IN OTHER FIELDS.   IF YOU ARE WORKING IN A MUSEUM,

YOU ARE PICKING UP SOME DRY INSECT AND TRYING TO DECIDE WHAT

SPECIES IT BELONGS TO,  YOU MAY USE THIS KIND OF MEASUREMENT

AND THIS KIND OF COMPUTATION.   IT IS A STANDARD WAY OF

THINKING ABOUT MULTIPLE MEASURES.

THE WORD FOR THIS IS MULTIVARIANT MORPHOMETRICS, WHERE

MULTIVARIANT MEANS A LOT OF MEASUREMENTS.

Q.    THIS IS NOT SOMETHING THAT YOU THOUGHT UP AND DECIDED

TO APPLY, IT IS USED IN A VARIETY?

A.    NO,  THIS IS A STANDARD METHOD.

Q.    ALTHOUGH YOU WERE ONE OF THE DEVELOPERS OF THIS?

A.    I AM ONE OF THE DEVELOPERS OF THE WAY IN WHICH SHAPE IS

TREATED BY THESE STATISTICAL METHODS.   I DIDN'T DEVELOP THESE

STATISTICAL METHODS, THEY WERE DEVELOPED BY OTHERS.

Q.    SO,  ANYWAY LET'S GO BACK.

A.    WHAT I HAVE DONE HERE IS, TAKEN THE TWO SLIDES THAT

SHOWED THE POSITION OF MR. FULKS'S SHAPE, THE TWO SLIDES THAT

HAD THE CF ON IT, AND COMBINED THEM, ONE IN EACH DIRECTION.

FOR THE HORIZONTAL ON THIS PICTURE, THE THING CALLED SOUTHWEST

STRING, IT IS HOW FAR HE WAS ALONG THAT VECTOR THAT WAS DRAWN.

Q.    WHY DO THEY CALL IT "SOUTHWEST STRING?"

**DIRECT EXAM OF FRED BOOKSTEIN**

A.   OH, IT IS JUST SOUTHWEST ON THE SLIDE.   THAT IS JUST MY NAME SO I DON'T FORGET IT.   IT IS ACTUALLY POINTING -- IN TERMS OF THE HEAD, IT IS POINTING FORWARD AND DOWNWARD, SORT OF POINTING TOWARD AND IN FRONT OF YOUR FEET.

THE VERTICAL HERE IS WHAT WE WERE TALKING ABOUT IN THAT SLIDE ABOUT ISTHMUS.  IT IS THE EXTENT TO WHICH THE SEATTLE SUBJECTS HAD A PATTERN OF THAT PART THAT LOOKED LIKE MR. FULKS'S, THICKER OR THINNER, INSIDE OR OUTSIDE THAT DISTRIBUTION WE WERE SHOWING.

AND NOW, FROM THIS SUMMARY, WE CAN, IN FACT, TALK ABOUT THE ODDS OF MR. FULKS'S BEING TYPICAL OF ONE OR THE OTHER OF THOSE TWO SEATTLE GROUPS, WHICH IS WHAT WE WOULD MEAN BY CLASSIFYING HIM.

IF YOU LOOK AT THIS, AND IF YOUR PICTURE IS AS CLEAR AS MINE, YOU CAN SEE THAT THE NORMALS,  THE PLUS SIGNS ARE KIND OF IN HERE.   THERE IS ONE OUT HIGHER, THAT TURNS OUT NOT TO MATTER FOR THIS COMPARISON.   AND HE IS WAY OUT AT THE OTHER END THERE.   HE IS UNUSUAL IN THE HORIZONTAL END AND UNUSUAL IN THE VERTICAL, AND IF YOU PUT THESE TOGETHER, AGAIN, IN THE STANDARD FORMULA WHICH TREATS THESE AS BELL CURVES,  THE ODDS THAT HE COMES FROM THE PATIENT GROUP INSTEAD OF THE UNEXPOSED GROUP ARE BETTER THAN 600 TO ONE.   AND THAT LEADS TO A CONCLUSION, WHICH IS WHAT I -- WHAT MY REPORT WAS DRIVING AT, THAT IN TERMS OF THIS MEASUREMENT OF THE MR OF HIS BRAIN, HIS SHAPE -- CORPUS CALLOSUM SHAPE IS NOT CONSISTENT WITH THE

CROSS EXAM OF FRED BOOKSTEIN

SEATTLE NORMAL DISTRIBUTION AND IS QUITE REASONABLY CONSISTENT WITH THE RANGE OF THE SEATTLE PATIENT DISTRIBUTION.  AS YOU SEE, HE IS SURROUNDED BY LOTS OF OTHER PATIENTS HERE.   AND A REASONABLE WAY OF FIGURING THE ODDS OF THAT COMES UP AT SOMETHING LIKE 600 TO ONE.

**Q.    SO, BASED UPON YOUR WORK OVER THE LAST 20 YEARS WITH FETAL ALCOHOL SPECTRUM DISORDERS,  FETAL ALCOHOL SYNDROME, AND YOUR WORK OF CORPUS CALLOSUM, AND APPLYING THAT TO YOUR MEASUREMENTS IN THIS CASE, WHAT WOULD BE YOUR BOTTOM LINE CONCLUSION?**

A.    WHAT WOULD BE, EXCUSE ME?

**Q.    BOTTOM LINE CONCLUSION?**

A.    MY BOTTOM LINE CONCLUSION IS THAT, BEYOND A REASONABLE DOUBT, MR. FULKS'S BRAIN WAS AFFECTED PRENATALLY BY EXPOSURE TO ALCOHOL.

MR. BLUME:  THANK YOU, DR. BOOKSTEIN.  PLEASE ANSWER ANY QUESTIONS MR. GASSER MIGHT HAVE.

THE COURT:   CROSS-EXAMINATION.

CROSS EXAM

BY MR. GASSER:

**Q.    GOOD AFTERNOON, DR. BOOKSTEIN.**

A.    GOOD MORNING.

**Q.    MY NAME IS JOHNNY GASSER.  I WORK IN THE U. S. ATTORNEY'S OFFICE HERE IN COLUMBIA.**

A.    YES.

CROSS EXAM OF FRED BOOKSTEIN

Q.    YOU AND I HAVE NEVER MET, HAVE WE, SIR?

A.    NO, WE HAVE NOT.

Q.    I AM NOT GOING TO SPEND MUCH TIME WITH YOU.  I JUST WANT TO CLARIFY, FOR MY OWN SAKE, SOME OF THE THINGS THAT YOU JUST TESTIFIED TO IN DIRECT EXAMINATION.

FIRST OF ALL, WITH REGARD TO DEFENDANT'S EXHIBIT 14, YOU INDICATED BOTH ON DIRECT EXAMINATION AND ON YOUR REPORT, WHEN YOU FIRST VISUALLY OBSERVED MR. FULKS'S CORPUS CALLOSUM ON THE MRI,  THAT THE OUTLINE SHAPE OF HIS CALLOSAL MIDCURVE LOOKS GROSSLY NORMAL?

A.    YES.

Q.    YOU SAID THAT IN YOUR REPORT?

A.    YES.

Q.    WHEN YOU ARE LOOKING AT THE MRI, YOU ARE LOOKING AT MR. FULKS'S CORPUS CALLOSUM, THAT APPEARS TO BE A NORMAL CORPUS CALLOSUM?

A.    IT APPEARS TO BE GROSSLY NORMAL.  THAT IS WHAT A NEURORADIOLOGIST WOULD REPORT OF A SHAPE LIKE THIS.

Q.    SO, SOME OF THE JURORS MAY NOT HAVE ANY EXPERIENCE IN MEDICAL TERMS, "GROSSLY" MEANS?

A.    "GROSS" MEANS IN TERMS OF THE LARGE PARTS AND THE ARRANGEMENT.  IT KIND OF HAS THE RIGHT PIECES, AND THEY ARE KIND OF IN THE RIGHT PLACES.

Q.    AND LET ME SHOW YOU A SLIDE THAT IS PART OF A DEFENSE EXPERT'S PRESENTATION YESTERDAY.

**CROSS EXAM OF FRED BOOKSTEIN**

A.    YES.

Q.    DO YOU SEE THAT?

A.    I HAVE THE SLIDE.

Q.    WHAT WE ARE TALKING ABOUT IS THIS KIND OF C-SHAPED OBJECT IN THIS PARTICULAR SLIDE THAT IS A NORMAL OR WHAT APPEARS TO BE A GROSSLY NORMAL CORPUS CALLOSUM; IS THAT CORRECT?

A.    IT IS.

Q.    JUST BY LOOKING AT MR. FULKS -- MR. FULKS'S, DEFENDANT'S EXHIBIT 14, JUST ON FIRST GLANCE, MATCHES OR IS CONSISTENT WITH THIS NORMAL CORPUS CALLOSUM DEPICTED ON THIS SLIDE?

A.    CORRECT.

Q.    CLEARLY, MR. FULKS'S CORPUS CALLOSUM IS NOT CONSISTENT WITH THE MORE OBVIOUSLY DAMAGED CORPUS CALLOSUMS IN THE OTHER FOUR SLIDES?

A.    CORRECT.

Q.    GOING ON TO DEFENDANT'S EXHIBIT 18.

A.    EXCUSE ME JUST A MINUTE WHILE I TAKE OUT MY COPY OF THIS.  THANK YOU.

Q.    AND, ACCORDING TO YOUR REPORT, AND I BELIEVE I FOLLOWED YOUR DIRECT EXAMINATION CORRECTLY,  YOU INDICATED THAT MR. FULKS'S ROSTRUM?

A.    ROSTRUM.

Q.    ROSTRUM.  THE ROSTRUM IS SOMEWHAT TOO LOW, MEANING THIS

**CROSS EXAM OF FRED BOOKSTEIN**

**AREA RIGHT HERE?**

A. CORRECT.

**Q. AND THAT AT THE TOP OF THE ARCH, IT IS SOMEWHAT TOO HIGH. I AM ASSUMING MEANING THIS AREA RIGHT HERE?**

A. YES.

**Q. AND YOU INDICATE, BASED ON YOUR STATISTICAL ANALYSIS, THAT THAT IS EVIDENCE OF AN ABNORMAL CORPUS CALLOSUM?**

A. I MEASURED THAT AND USED THE MEASUREMENT AS PART OF MY CONCLUSION.

**Q. LET ME ASK YOU THIS. THE DARK LINE OF DEFENDANT'S EXHIBIT 18 IS YOUR SKETCH OR YOUR MEASUREMENT OF MR. FULKS'S CORPUS CALLOSUM AS IT APPEARED ON HIS MRI?**

A. YES. IT IS NOT A SKETCH, IT IS A VERY CAREFUL MEASUREMENT.

**Q. VERY CAREFUL MEASUREMENT.**

A. YES.

**Q. THE DOTTED LINE, AS YOU INDICATE ON THIS EXHIBIT, THE AVERAGE, UNEXPOSED SEATTLE MALE?**

A. YES. BUT REMEMBER THAT THE WAY THAT THIS APPEARED AS EVIDENCE, IT DIDN'T USE THE DOTTED LINE. IT USED ALL OF THE SEATTLE OUTLINES. THE EVIDENCE WAS A PICTURE WITH 45 POINTS ON IT, ONE FOR EACH SEATTLE SUBJECT. IT DIDN'T JUST USE THIS ONE.

**Q. BUT THIS EXHIBIT, DEFENDANT'S EXHIBIT 18, IS A DOTTED LINE THAT THE JURY SEES IN WHICH MR. FULKS'S SOLID LINE HAS**

**CROSS EXAM OF FRED BOOKSTEIN**

**BEEN SUPERIMPOSED OVER,  IS AN AVERAGE OF THE UNEXPOSED MALES?**

A.    YES.   AS I SAID,  AS I THINK I SAID,  THE JOB OF THE STATISTICIAN IS TO TRY TO DECIDE WHEN DIFFERENCES LIKE THAT SHOULD BE TAKEN SERIOUSLY.

**Q.    SO,  IT IS A COLLECTION OF THE UNEXPOSED SEATTLE MALES,** A COLLECTION OF THEM, AND THEN IT IS OBVIOUSLY DIVIDED BY WHATEVER NUMBER OF UNEXPOSED MALES YOU USED?

A.    THIS PICTURE IS THE UNEXPOSED DIVIDED BY 15, JUST TO GET A HINT ABOUT WHERE WE SHOULD PERHAPS LOOK.  THE STATISTICS WERE BASED ON LOOKING AT ALL OF THE SEATTLE SUBJECTS, INDIVIDUALLY, BOTH THE EXPOSED AND THE UNEXPOSED.

**Q.    JUST SO I CAN UNDERSTAND THIS CORRECTLY.  I AM A BASEBALL FAN.  SO, IF YOU HAVE GOT NINE HITTERS,  YOU GOT NINE HITTERS ON A BASEBALL TEAM, AND YOU CAN DETERMINE WHAT THE AVERAGE -- THE BATTING AVERAGES OF THOSE NINE INDIVIDUALS BY SIMPLY ADDING UP ALL NINE OF THEIR BATTING AVERAGES AND DIVIDING BY NINE?**

A.    RIGHT.

**Q.    LET'S SAY THE BATTING AVERAGE IS 300.  YOU MIGHT HAVE SOMEBODY HITTING 350,  346,  333, AND YOU MIGHT HAVE HITTERS HITTING 220, 225, 230?**

A.    RIGHT.   IF I COULD FOLLOW THAT ANALOGY.  IN ONE TEAM, THE BATTING AVERAGES MIGHT GO FROM 250 TO 350, AND IN THE OTHER TEAM, THEY TURN OUT TO GO FROM 100 TO 500 WITH THE SAME AVERAGE, THAT IS THE BETTER ANALOG TO WHAT THE PICTURES THAT

CROSS EXAM OF FRED BOOKSTEIN

ARE COMING IN MY REPORT ACTUALLY SHOWED.

Q.    BUT YOU HAVE SOME HIGH, AND SOME LOW, AND THEN YOU AVERAGE IT OUT, AND THAT IS WHO WE ARE LOOKING AT, ACCORDING TO THE AVERAGE UNEXPOSED MALES DOTTED LINE?

A.    CORRECT.

Q.    I NOW SHOW YOU WHAT IS MARKED AS DEFENDANT'S EXHIBIT 15.    NOW, APPARENTLY, THIS GRAPH OR DEPICTION, THE SOLID LINE IS CHAD FULKS?

A.    YES.

Q.    AND THE DOTTED LINE IS A COLLECTION OF THE UNEXPOSED SEATTLE ADULT MALES,

A.    CORRECT.

Q.    AND THAT WOULD BE 15 OF THEM?

A.    CORRECT.

Q.    AND THE SECOND ONE OVER HERE, AGAIN, THE SOLID LINE, IS CHAD FULKS, AND THE DOTTED LINES REPRESENT A COLLECTION OF 15 OF THE EXPOSED SEATTLE MALES?

A.    NO,  IT IS ALL 30.

Q.    IT IS ALL 30 OF THE EXPOSED?

A.    ALL OF THE SEATTLE DIAGNOSED ADULT MALES,  YES.

Q.    SO,  ISN'T IT CORRECT THAT, THE JURY IS LOOKING AT THIS SECOND GRAPH, THERE ARE, ACCORDING TO YOUR STATISTICAL GRAPH, UNEXPOSED SEATTLE ADULT MALES, WHOSE DOTTED LINES ARE HIGHER THAN MR. FULKS IN SEVERAL DIFFERENT AREAS; ISN'T THAT TRUE?

A.    YES.   IN THIS PRESENTATION, THAT IS TRUE.

CROSS EXAM OF FRED BOOKSTEIN

**Q.    AND THERE ARE UNEXPOSED MALES THAT ARE BELOW?**

A.    YES.

**Q.    SO,  MR. FULKS,  THAT SOLID LINE,  HE COMES -- HE IS LOWER THAN SOME OF THE UNEXPOSED ADULT MALES --**

A.    YES.

**Q.    -- IN CERTAIN SECTIONS, AND HE IS HIGHER THAN SOME OF THE UNEXPOSED ADULT MALES?**

A.    YES.

**Q.    AND, LIKEWISE, ON THE SECOND GRAPH,  THE SAME THING. THERE ARE, IN SOME OCCASIONS, WHERE MR. FULKS'S SECTIONS OF THE CORPUS CALLOSUM IS LOWER THAN SOME OF THE EXPOSED SEATTLE ADULT MALES.   AND IN SOME SECTIONS, HE IS HIGHER THAN SOME OF THE ADULT EXPOSED MALES?**

A.    YES.   MAY I EXPLAIN?

**Q.    CERTAINLY.**

A.    THAT, IN THE REPORT,  THE ATTENTION IS NOT CALLED TO THAT.   THE ATTENTION IS CALLED TO THE SHAPE DIFFERENCE, ROUGHLY WHERE MY FINGER IS, THAT WAS ALREADY MENTIONED A COUPLE OF SLIDES BACK.   THAT ALL OF THE SEATTLE ADULT MALES UNEXPOSED HAVE THAT SLIGHT DIP IN THE SHAPE THERE THAT MR. FULKS LACKS.   FROM THIS PICTURE,  THAT IS MORE OR LESS ALL THAT ONE CAN EASILY SEE.  AND THE REPORT EXPLAINED THAT, TO GET MORE INFORMATION,  ESPECIALLY BECAUSE WE ALREADY KNOW SOMETHING HAS BEEN DETECTED AS ABNORMAL OVER IN THIS PART,  IT IS APPROPRIATE IN THIS COLLECTION OF STATISTICAL METHODS,

CROSS EXAM OF FRED BOOKSTEIN

ESSENTIALLY, TO PICK UP A MAGNIFYING GLASS AND LOOK JUST AT THIS PARTICULAR REGION,  WHICH, AS I SAID, IS THE REGION THAT IS FOUND IN THE SEATTLE STUDY TO BE CORRELATED WITH A KIND OF DEFICIT OF EXECUTIVE FUNCTIONING.

SO,  THE PURPOSE OF THIS SLIDE WAS TO INTRODUCE THE NEXT ONE, WHICH CONCENTRATES ON THE ISTHMUS BY ITSELF.   AND IN THAT SLIDE, MR. FULKS IS CLEARLY OUTSIDE THE COMPLETE SEATTLE UNEXPOSED DISTRIBUTION.

**Q.    THERE IS NO QUESTION THAT, BASED ON THE GRAPHICS YOU PROVIDED THIS JURY, THAT IN SEVERAL AREAS IN THIS DEPICTION, MR. FULKS APPEARS TO BE CONSISTENT IN CERTAIN SECTIONS OF HIS CORPUS CALLOSUM -- CONSISTENT WITH THE UNEXPOSED SEATTLE MALES?**

A.    I HAVE TO BECOME TECHNICAL TO ANSWER YOUR QUESTION. WHAT YOU JUST SAID WAS NOT A CORRECT USE OF THESE STATISTICAL METHODS. BECAUSE, IN USING THIS KIND OF SUPERPOSITION,  YOU HAVE TO ADJUST FOR KNOWN ANOMALIES ELSEWHERE IN THE PICTURE. AND THIS PICTURE WAS PUT UP, ESSENTIALLY, AS A COURTESY TO THE READER OF THE REPORT.  WHAT I MENTIONED BEFORE, BECAUSE WE HAVE ALREADY SHOWN THAT SOMETHING -- OOPS -- COULD YOU -- YEAH.  WE HAVE ALREADY SHOWN THAT SOMETHING IS UNUSUAL HERE. THAT WAS THE PREVIOUS SLIDE.   ONCE THAT IS SHOWN, THE KIND OF JUDGMENT THAT YOU ARE JUST MAKING ISN'T PERMITTED FROM THIS DIAGRAM.   THE DIAGRAM IS FOR COMPARING THE SORT OF SKI SLOPES OF THOSE DOTTED LINES, NOT FOR COMPARING THEIR POSITIONS.

REDIRECT EXAM OF FRED BOOKSTEIN

I APOLOGIZE FOR HAVING TO GIVE YOU THIS TECHNICAL ANSWER, BUT THE INFERENCE THAT YOU TRIED TO DRAW SHOULD NOT BE DRAWN HERE.

Q.    SO, WHAT I AM LOOKING AT THEN,  WE ALL ARE AND THE JURY, WHAT I AM LOOKING AT IS INACCURATE?

A.    NO.   YOU ARE LOOKING AT A PICTURE THAT IS INSIDE A REPORT.   AND THE REPORT EXPLAINS HOW THIS SET OF STATISTICAL METHODS APPLIES TO THIS PICTURE.   IT APPLIES BY EXAMINING THE LOCAL SHAPE OF THAT REGION, THE ISTHMUS, BECAUSE KNOWING THAT THE FRONT IS ALREADY UNUSUAL OR INCONSISTENT WITH THE NORMALS, IT IS INAPPROPRIATE TO LOOK AT POSITION IN THIS PLOT.  IT IS APPROPRIATE TO LOOK AT POSITION IN THE NEXT PLOT.

Q.    YOU INDICATED THAT THE LOGIC -- WHENEVER YOU ARE DEALING WITH STATISTICS, I THINK YOU HAVE REFERRED TO IT AS THE LOGIC OF UNCERTAINTY,  DO YOU RECALL MAKING THAT STATEMENT?

A.    YES.  THAT IS FROM THE TITLE OF A TEXTBOOK BY STEPHEN STIGLER ABOUT TEN YEARS AGO.

Q.    NO TWO PEOPLE HAVE THE SAME EXACT CORPUS CALLOSUM,  AS FAR AS EXACT DIMENSIONS AND MEASUREMENTS, WE ARE ALL UNIQUE IN THAT REGARD?

A.    YES.

MR. GASSER:  BEG THE COURT 'S INDULGENCE.   THAT IS ALL WE HAVE.

MR. BLUME:  THREE OR FOUR QUESTIONS.

REDIRECT EXAM OF FRED BOOKSTEIN

REDIRECT EXAM

MR. BLUME:

**Q.    DR. BOOKSTEEN, I HAVE A COUPLE OF QUESTIONS.   I WILL ASK YOU WHAT YOU PROBABLY THINK IS A STUPID QUESTION.   NEVER STOPPED ME BEFORE, WON'T STOP ME NOW.**

**WE HAVE BEEN TALKING ABOUT THE SEATTLE STUDY.  AND THE SEATTLE STUDY, SOMEBODY MIGHT ASK, WELL,  MR. FULKS IS JUST A POOR KID FROM WEST VIRGINIA.  SO, WHAT DOES A BUNCH OF BRAINS OF PEOPLE FROM SEATTLE HAVE TO DO WITH THIS CASE?**

A.    WELL,  IF YOU NEED TO FIND A DATABASE RELEVANT TO THIS SORT OF DIAGNOSIS,  YOU HAVE TO GO WHERE THE DATA ARE.  AND THE LARGEST SINGLE DATABASE OF PERSONS WITH FETAL ALCOHOL SYNDROME IS AT THE UNIVERSITY OF SEATTLE, CONTROLLED BY THE UNIVERSITY OF SEATTLE.  IT IS WHERE THESE SUBJECTS CAME FROM.

THE LARGER ISSUE YOU RAISE IS, SHOULD THAT DATA SET BE CONSIDERED REPRESENTATIVE OF A KIND OF POPULATION FROM WHICH MR. FULKS MIGHT HAVE BEEN DRAWN.  THAT DATA SET IS PRIMARILY CAUCASIAN.  SEATTLE HAS A GREAT MANY ETHNIC GROUPS INTERMIXED.  AND VERY FEW -- THERE ARE VERY FEW KNOWN CAUSES OF VARIATION IN THIS CORPUS CALLOSUM SHAPE IN TERMS OF OTHER LIFE EXPERIENCES.

THESE MEASUREMENTS HAVE CONTROLLED FOR BODY SIZE.  THESE COMPARISONS ARE EXPLICITLY CONTROLLED FOR AGE.  AND, IN SHORT,  UNLESS THERE WOULD BE A NATIONAL REGISTRY OF PERSONS WITH FETAL ALCOHOL SPECTRUM DISORDER,  SOMETHING THAT SOME OF

App. 00602

REDIRECT EXAM OF FRED BOOKSTEIN

US HAVE BEEN ASKING FOR,  YOU HAVE TO GO WHERE THE REFERENCE

DATA IS, AND THAT IS SEATTLE.

Q.    NOW, MR. GASSER ASKED YOU A FEW QUESTIONS ABOUT

AGENESIS.  I DID,  TOO.  SO I AM ASKING YOU TO CLEAR IT UP.

WHAT YOU HAVE IN THIS SLIDE IS WHAT YOU CALL, THAT IS PARTIAL

AGENESIS?

A.    YES. YES.  THAT IS PARTIAL AGENESIS.

Q.    AND I THINK YOU SAID THAT IS VERY,  VERY RARE?

A.    THAT IS RARE IN THE FULL POPULATION.   I THINK IT HAS

AN INCIDENCE IN LIKE ONE IN 2000.  WHEN IT IS FOUND, ABOUT 10

PERCENT OF THE TIME, THOSE PEOPLE HAVE FETAL ALCOHOL SYNDROME.

IN MY STUDIES OF THE HIGHER FUNCTIONING FETAL ALCOHOL GROUPS,

WE FOUND IT, I THINK IT WAS, THREE TIMES IN 150 ADULTS.  WE

HAVE FOUND IT NOW TWICE IN 15 INFANTS,  INFANTS WHO ARE TOO

YOUNG FOR IT TO BE DECIDED IF THEY ARE HIGH FUNCTIONING OR

NOT.

SO, THE EARLIER STUDIES,  THE EARLIEST STUDIES,  THE ONE

THAT MR. AGASI DREW A SLIDE FROM, FOUND IT IN ROUGHLY

ONE-THIRD OF THE SERIOUS CASES,  SEVERE CASES.

Q.    BUT THAT IS EVEN WITH FULL FETAL ALCOHOL SYNDROME?

A.    YES.

Q.    SO, EVEN IN FULL FETAL ALCOHOL SYNDROME, YOU WILL ONLY

SEE THAT, AT MOST, ONE-THIRD OF THE TIME?

A.    I THINK THAT IS A FAIR STATEMENT,  YES.

Q.    AND I TAKE IT WHAT YOU ARE DOING HERE IS WHAT A

**REDIRECT EXAM OF FRED BOOKSTEIN**

**STATISTICIAN WOULD DO IS TO NOT NECESSARILY LOOK AT ANY ONE MEASUREMENT, YOU ARE LOOKING AT THE VARIABILITY AS A WHOLE?**

A.    CORRECT.

**Q.    AND COMPUTING THE STATISTICAL SIGNIFICANCE OF THAT?**

A.    WE ARE COMPUTING THE INFORMATION CONTENT THERE. STATISTICAL SIGNIFICANCE IS ONE OF THOSE TERMS THAT IS A TERM OF ART IN MY FIELD.  SO, THE PAPERS HERE USE STATISTICAL SIGNIFICANCE.  BUT WHAT I JUST DID HERE IS A DETECTION, AND I USED IT LIKE A RATIO.

**Q.    AND, BASICALLY, AT THE CONCLUSION OF THAT, YOU CONCLUDED, BEYOND A REASONABLE DOUBT, THAT MR. FULKS HAD FETAL ALCOHOL SPECTRUM?**

A.    I'M SORRY, I'M MISSING YOUR WORDS.

**Q.    YOU CONCLUDED, BASED UPON YOUR ANALYSIS OF THE DATA AND THE 653 TO ONE NUMBER, THAT, BEYOND REASONABLE DOUBT, THAT MR. FULKS HAS A FETAL ALCOHOL SPECTRUM DISORDER?**

A.    I DIDN'T QUITE SAY IT THAT WAY.  I THINK I SAID, BEYOND A REASONABLE DOUBT, HIS BRAIN HAS BEEN DAMAGED BY PRENATAL EXPOSURE TO ALCOHOL.

**Q.    AND IN THE SEATTLE STUDY OR STUDIES,  NOT NECESSARILY THE SEATTLE STUDY, THE STUDIES YOU HAVE DONE WITH THE UNIVERSITY OF WASHINGTON AND WITH DR. STREISSGUTH AND DR. CLARREN, I GUESS THAT ARE ONGOING,  WOULD IT BE -- IS IT ACCURATE TO SAY THAT SOMEBODY WITH AN IQ ABOVE 70 AND SOME EXPOSURE TO VIOLENCE IS AT THE MOST RISK?**

**DIRECT EXAM OF ARLENE ANDREWS**

A.    ODDLY, THAT IS TRUE.   OF THE STUDIES THAT I MENTIONED TO YOU BEFORE, ONE WAS THIS COLLECTION OF INTERVIEWS WITH CARETAKERS.  AND ACROSS A WIDE RANGE IN WHICH YOUR LIFE CAN SCREW UP, BEING IN PRISON, BEING UNEMPLOYABLE, BEING KICKED OUT OF SCHOOL, THINGS LIKE THAT, ACROSS A WIDE RANGE, HAVING AN IQ ABOVE 70 WAS WORSE FOR THE PEOPLE WITH BRAIN DAMAGE FROM FETAL ALCOHOL -- FROM PRENATAL EXPOSURE TO ALCOHOL.  THE HIGH IQ DOES NOT PROTECT; THE LOW IQ IN THIS SYNDROME PROTECTS FROM THE SECONDARY DISABILITIES.

        MR. BLUME:  THANK YOU.

        THE COURT:   ANY RECROSS?

        MR. GASSER:  NO, SIR.

        THE COURT:   MEMBERS OF THE JURY, LET'S GO AHEAD AND BREAK FOR LUNCH.  IT IS FIVE MINUTES UNTIL ONE.  LET'S BREAK UNTIL, LET'S JUST SAY 2:25.  THAT WILL BE AN HOUR AND A HALF. WE ARE BREAKING UNTIL 2:25.  SEE YOU THEN.

(WHEREUPON, A LUNCH RECESS WAS HELD.)

        THE COURT:   READY TO PROCEED?

        MR. SCHOOLS:  YES, SIR.

        THE COURT:   NEXT WITNESS PLEASE.

        MS. JOHNSON:  DR. ARLENE ANDREWS.

            ARLENE ANDREWS, HAVING BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

                    DIRECT EXAM

BY MS. JOHNSON:

DIRECT EXAM OF CHRISTOS DAVATZIKOS

TRIAL JURY.)

THE COURT:  GOOD MORNING, LADIES AND GENTLEMEN.  ALL RIGHT.  MR. BLUME,  PLEASE CALL YOUR NEXT WITNESS.

MR. NETTLES:  THANK YOU,  YOUR HONOR.  AT THIS TIME, I WOULD LIKE TO INTRODUCE DEFENDANT'S EXHIBIT 32, WHICH IS THE TINA SEVERANCE TERMINATION LETTER DUE TO HER RELATIONSHIP WITH INMATE LOPEZ.

THE COURT:  ALL RIGHT.

MR. NETTLES:  I WILL NOT PUBLISH IT AT THIS TIME.  WE WILL PUT IT IN EVIDENCE.  THE JURY WILL HAVE THAT.

MR. BLUME:  THE DEFENSE CALLS CHRISTOS DAVATZIKOS.

CHRISTOS DAVATZIKOS, HAVING BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

DIRECT EXAM

BY MR. BLUME:

**Q.    GOOD MORNING.**

A.    GOOD MORNING.

**Q.    DR. DAVATZIKOS,  WHERE ARE YOU CURRENTLY EMPLOYED?**

A.    AT THE UNIVERSITY OF PENNSYLVANIA.

**Q.    AND WHAT DO YOU DO AT THE UNIVERSITY OF PENNSYLVANIA?**

A.    I'M AN ASSOCIATE PROFESSOR OF RADIOLOGY AND BIOENGINEERING.

**Q.    AND WHAT DOES A PROFESSOR OF RADIOLOGY AND BIOENGINEERING DO?**

A.    WELL,  IN MY CASE,  I AM HEAD OF THE RESEARCH SECTION,

DIRECT EXAM OF CHRISTOS DAVATZIKOS

THE SECTION OF ANALYSIS WHERE WE DEVELOP COMPUTERIZED ANALYSIS METHODS FOR TOPOGRAPHIC IMAGES WITH EMPHASIS ON MRI OF THE BRAIN.  WE HAVE SEVERAL DUTIES AND RESEARCH, AS WELL AS TEACHING AND SUPERVISING STUDENTS.

**Q.    SO, YOU TEACH, AND SUPERVISE STUDENTS, AND YOU DO RESEARCH AT THE UNIVERSITY OF PENNSYLVANIA?**

A.    RIGHT.

**Q.    PRIMARILY, REGARDING ANALYSIS OF MRI SCANS?**

A.    YES.

**Q.    AND BEFORE COMING TO THE UNIVERSITY OF PENNSYLVANIA, WHERE WERE YOU?**

A.    I WAS AT JOHNS HOPKINS MEDICAL SCHOOL.  I GOT MY PH.D. IN THE FIELD OF ENGINEERING AT HOPKINS.  I WENT ON TO THE FACULTY IN RADIOLOGY, AND THEN IN COMPUTER SCIENCE UP UNTIL THE LEVEL OF ASSOCIATE PROFESSOR, THEN I MOVED TO PENN.

**Q.    SO, YOU GOT YOUR PH.D. AT JOHNS HOPKINS?**

A.    YES.

**Q.    YOU WERE ON THE FACULTY OF RADIOLOGY FACULTY THERE?**

A.    YES,  FOR SIX YEARS.

**Q.    AND DID YOU GO THERE ON THE FULBRIGHT SCHOLARSHIP?**

A.    YES.

**Q.    ARE YOU A MEMBER OF ANY PROFESSIONAL SOCIETIES?**

A.    YES.  THE IEEE SOCIETY FOR ELECTRICAL ENGINEERING.

**Q.    AND HAVE YOU PUBLISHED IN ANY PEER-REVIEW JOURNALS?**

A.    YES, I HAVE.  I WOULD SAY ABOUT OVER A HUNDRED

App. 00607

DIRECT EXAM OF CHRISTOS DAVATZIKOS

PEER-REVIEW PUBLICATIONS.

**Q.    AND THESE, PRIMARILY, HAD TO DO WITH THE ANALYSIS OF MRI?**

A.    PRIMARILY.  OUR FOCUS IS THAT WE WORK ON ACTIVE PROJECTS, PRIMARILY, ON BRAIN.  WE WORK ON A VARIETY OF BRAIN DISORDERS.  OUR EMPHASIS HAS BEEN ON EARLY MEASUREMENT OF DEMENTIA, AND ALZHEIMER'S DISEASE, AND SCHIZOPHRENIA.

**Q.    YOU HAVE BEEN DOING SOME WORK IN ENVIRONMENTAL EXPOSURE?**

A.    ENVIRONMENTAL EXPOSURE.  EFFECTS ON THE BRAIN OF ENVIRONMENTAL EXPOSURE, PRIMARILY THROUGH CHEMICALS.  AS WELL AS TREATMENT OF DIABETES AND THE EFFECT OF DIFFERENT MEDICATIONS ON THE BRAIN.

MR. BLUME:  YOUR HONOR,  AT THIS POINT, I OFFER DR. DAVATZIKOS AS AN EXPERT ON RADIOLOGY AND BIOENGINEERING MEDICAL ANALYSIS.

MR. SCHOOLS:  NO OBJECTION.

BY MR. BLUME:

**Q.    HAVE YOU EVER TESTIFIED BEFORE?**

A.    NO.

**Q.    FIRST TIME.  LET ME ASK YOU,  DID YOU REVIEW AN MRI IN MR. FULKS'S CASE?**

A.    YES.

**Q.    TO BE CLEAR, YOU HAVE NEVER MET MR. FULKS.  YOU DON'T KNOW ANYTHING ABOUT THE CASE.  YOU WERE JUST ASKED TO LOOK AT**

**DIRECT EXAM OF CHRISTOS DAVATZIKOS**

AN MRI?

A.    RIGHT.

Q.    **AND SO, WHAT WERE YOU DOING?**

A.    WHAT DO YOU MEAN?

Q.    **WHEN YOU GOT THE MRI, WHAT DID YOU DO WITH IT?**

A.    I APPLIED A STANDARDIZED PROTOCOL FOR VOLUMETRIC AND MORPHOMETRIC ANALYSIS OF THE BRAIN MRI.  THIS IS A STANDARD PROTOCOL THAT WE HAVE BEEN USING IN ALL OF OUR STUDIES.  AND, BASICALLY, IT PARTITIONS THE BRAIN INTO A NUMBER OF MAJOR PARTITIONS AND ALLOWS US TO DISSECT MORPHOMETRIC MEASUREMENTS INTO DIFFERENT REGIONS OF THE BRAIN AND BETTER LOCALIZE ANY POTENTIAL ABNORMALITIES.

SO, I MEASURED, BASICALLY, VOLUMES OF THESE PARTITIONS OF THE BRAIN, WHICH TEND TO HAVE DIFFERENT FUNCTIONAL ROLE.  AND I COMPARED THEM WITH A COHORT OF NORMAL CONTROLLED INDIVIDUALS, FROM WHICH WE ESTABLISHED A MATHEMATICAL MODULUS, A STATISTICAL MODEL OF WHAT THE NORMAL VARIABILITY OF BRAIN MORPHOLOGY IS.  THIS ALLOWED ME TO THEN COMPARE THE NEW MRI, MR. FULKS'S MRI, WITH THESE MATHEMATICAL MODEL OF NORMAL STATISTICAL VARIATION AND TO JUDGE WHETHER OR NOT THIS IS A NORMAL OR ABNORMAL BRAIN MORPHOLOGY.

Q.    **I WILL GO OVER YOUR CHART WITH YOU.  CAN YOU BRIEFLY SUMMARIZE WHAT YOUR OVERALL CONCLUSIONS WERE?**

A.    I DON'T HAVE -- MY SCREEN IS NOT WORKING.  IT IS NOT ON.

DIRECT EXAM OF CHRISTOS DAVATZIKOS

**Q.    DO YOU NEED -- IS THIS WHAT YOU ARE LOOKING FOR?**

A.    YEAH.

Q.    WELL,  FIRST OF ALL,  LET ME SHOW YOU WHAT IS MARKED DEFENDANT'S EXHIBIT 29.

MR. SCHOOLS:  NO OBJECTION.

BY MR. BLUME:

**Q.    BEFORE WE GET TO THIS,  THIS IS A CHART?**

A.    YEAH,  IT IS ONE OF THE CHARTS,  YES.

**Q.    BUT BEFORE I GET YOU TO TELL WHAT THIS IS, WHAT WERE YOUR OVERALL CONCLUSIONS IN THIS CASE?**

A.    WELL,  AS A SUMMARY, BEFORE GETTING TO THE TECHNICAL DETAILS,  IT WAS A HIGHLY ABNORMAL PROFILE.  BASICALLY,  IF ONE, ACCORDING TO THE STATISTICAL MODEL OF NORMAL VARIATION THAT I TALKED ABOUT BEFORE,  IF ONE WERE TO DRAW AN INDIVIDUAL FROM A NORMAL POPULATION,  YOU WOULD HAVE PRACTICALLY ZERO PERCENT CHANCES OF FINDING THIS PARTICULAR BRAIN MORPHOLOGY.

**Q.    SO,  IT IS A VERY ABNORMAL BRAIN?**

A.    RIGHT.

**Q.    WERE THERE ANY PARTICULAR SIGNIFICANT ABNORMALITIES IN PARTICULAR REGIONS?**

A.    IN ORDER TO THEN DISSECT THESE OVERALL ABNORMAL PROFILES AND SEE WHERE AND HOW IT WAS ABNORMAL, I LOOKED AT THESE INDIVIDUAL REGIONS.  EACH OF THE, AS YOU SEE HERE IN THE PLOT,  THESE ARE ORGANIZED IN PAIRS, WHICH EACH PAIR RESPONDS TO A DIFFERENT BRAIN REGION.  THIS IS STANDARD

DIRECT EXAM OF CHRISTOS DAVATZIKOS

PARTITION WE HAVE BEEN USING AND OTHER PEOPLE USE. IT IS ANATOMICALLY BASED.

**Q. YOU HAVE USED THIS TYPE OF ANALYSIS IN YOUR RESEARCH IN SCHIZOPHRENIA, DEMENTIA, AND ALL OTHER TYPE BRAIN ILLNESSES AND DISEASE?**

A. THIS IS USED, NOT ONLY BY US, THIS IS A STANDARD PARTITIONING INTO THE BRAIN LOBES OF THE LEFT AND RIGHT HEMISPHERE THAT IS USED BY, BASICALLY, ALL PEOPLE IN NEUROIMAGING.

**Q. SO, WHAT IS THIS? TELL US WHAT THIS CHART IS.**

A. SO, EACH OF THESE PAIRS OF BARS ARE FOR A DIFFERENT REGION. I WOULD LIKE TO HIGHLIGHT, BASICALLY. WELL, BEFORE GOING TO THAT, I WOULD SAY THAT THE HIGHEST, THE BAR IS EITHER UPWARDS OR DOWNWARDS, THE MORE ABNORMAL THE STRUCTURE IS. FOR EXAMPLE, IF YOU LOOK AT THIS REGION OVER HERE, I DON'T KNOW IF IT SHOWS --

**Q. RIGHT THERE?**

A. YES. THIS IS MINUS THREE, WHICH MEANS IT IS THREE STANDARD DEVIATIONS BELOW THE NORMAL VALUE. THAT IS VERY ABNORMAL. IT IS VERY UNLIKELY TO FIND SOMEONE THAT HAS AN INSULA. THIS IS THE STRUCTURE OF THE BRAIN THAT IS THREE STANDARD DEVIATIONS BELOW THE NORMAL.

LIKEWISE, THERE ARE OTHER STRUCTURES. THIS IS THE LEFT TEMPORAL LOBE HERE. AND THIS IS THE INFERIOR FRONTAL GYRUS, AS WELL AS THE RIGHT FRONTAL LOBE.

DIRECT EXAM OF CHRISTOS DAVATZIKOS

ALL OF THESE REGIONS ARE ABNORMAL BY THEMSELVES.  BUT WHAT IS INTERESTING IS, THAT YOU CAN ALSO SEE PATTERNS THAT ARE EVEN MORE ABNORMAL THAN JUST LOOKING AT INDIVIDUAL VALUES. FOR EXAMPLE, IF YOU LOOK AT THE INSULA HERE, I HIGHLIGHT THE LEFT AND THE RIGHT, YOU SEE THAT THERE IS A HIGH DEGREE OF ASYMMETRY, THAT IS EVEN MORE UNLIKELY.  THE SAME THING FOR THESE STRUCTURES HERE,  THE INFERIOR FRONTAL.

SO,  NOT ALL INDIVIDUAL STRUCTURES ARE HIGHLY UNLIKELY, BUT ALSO THE -- BY COMBINING ALL OF THESE MEASUREMENTS TOGETHER, THE LIKELIHOOD OF FINDING THIS COMBINATION OF MEASUREMENTS IS ALMOST ZERO.

**Q.    DR. DAVATZIKOS,  LET ME SHOW YOU WHAT HAS BEEN PREVIOUSLY ADMITTED AS DEFENDANT'S EXHIBIT 11, WHICH IS CONTAINED IN YOUR REPORT.   AND WHAT DOES THIS SHOW?**

A.    THIS IS JUST -- I SELECTED A FEW REPRESENTATIVE SECTIONS FROM MR. FULKS'S MRI TO HIGHLIGHT THE AREA AROUND WE FOUND TWO OF THE ABNORMALITIES.  THE INSULA IS SOMEWHAT HERE, THIS AREA HERE, BUT ALSO THE ARROW SHOWS THIS DARK AREA OVER HERE, WHICH IS A WHAT IS CALLED SUBARACHNOID CYST, WHICH IS THERE AND CLEAR.  AND IT IS CONCEIVABLE THAT PART OF THE ABNORMALITIES,  AT LEAST MORE LOCALIZED, COULD BE CAUSED BY THIS CYST.  OF COURSE, THERE WERE MORE WIDESPREAD ABNORMALITIES IN THE FRONTAL LOBE AND TEMPORAL LOBE WHOSE COMBINATIONS SUGGEST THAT THEY ARE PROBABLY CONGENITAL.

**Q.    AND WHAT DO YOU MEAN BY "CONGENITAL?"**

App. 00612

**DIRECT EXAM OF CHRISTOS DAVATZIKOS**

A.   WELL, THEY WERE -- HE WAS BORN WITH THEM BECAUSE PERHAPS THERE ARE -- THERE IS A VARIETY OF REASONS.  I CANNOT TELL YOU WHAT MIGHT HAVE CAUSED THEM.  BUT A LOT OF TIMES, A LOT OF FACTORS CAN CAUSE ABNORMAL DEVELOPMENT IN UTERO.  AND THAT IS ONE VERY LIKELY SCENARIO.

**Q.   WELL, LET ME SHOW YOU DEFENDANT'S EXHIBIT 30, WHICH I BELIEVE IS ALSO -- AND WHAT DOES THIS DEMONSTRATE?**

A.   WELL, THIS SHOWS -- I PUT IT THERE, MAINLY, FOR PEOPLE WHO SEE VISUALLY TO SEE SOME OF THE REGIONS I AM REFERRING TO, BECAUSE PEOPLE MIGHT NOT BE FAMILIAR WHAT THE HIGHLIGHTED REGION  HERE IS THE INSULA, WHICH IS ONE OF THE REGIONS THAT WAS HIGHLY ABNORMAL, WHICH I SHOWED EARLIER.  IT WAS THREE STANDARD DEVIATION BELOW NORMAL.  THIS IS THE LEFT INSULA. IT WAS ANOTHER DISPLAY THAT I HAD THERE WITH THE LEFT AND RIGHT INFERIOR FRONTAL GYRUS.

MR. BLUME:  YOUR HONOR, I AM SORRY, I UNDERSTAND THERE IS NO OBJECTION TO THIS OR 31?

MR. SCHOOLS:  THAT'S CORRECT.

THE COURT:  WITHOUT OBJECTION.

BY MR. BLUME:

**Q.   WE DIDN'T REALIZE THE JURY COULDN'T SEE THIS.  WOULD YOU REAL BRIEFLY TELL US AGAIN?**

A.   AGAIN, THIS IS FOR VISUAL PURPOSES.  I WANTED PEOPLE TO VISUALIZE THE EXTENT OF THE REGION.  THIS IS ONE OF THE

DIRECT EXAM OF CHRISTOS DAVATZIKOS

SMALLEST REGIONS THAT SHOWED ABNORMALITY.  I HAD HAD IT ON MRI LEFT INSULA, WHICH IS, AGAIN, AS I SAID BEFORE, THREE STANDARD DEVIATIONS BELOW THE NORMAL.   SO, IT IS HIGHLY ABNORMALLY DEVELOPED.

**Q.    AND THEN, FINALLY, LET ME SHOW YOU DEFENSE EXHIBIT 31. AND WHAT DOES THIS DEMONSTRATE?**

A.   THIS IS ANOTHER REGION OF RELATIVELY LOCALIZED ABNORMALITY.   THIS WAS THE LAST PAIR OF MEASUREMENTS I HAD IN THE PLOT BEFORE, IT IS THE INFERIOR FRONTAL GYRUS OF THE LEFT AND THE RIGHT HEMISPHERE.  AS YOU MIGHT RECALL, THE LEFT HEMISPHERE WAS HIGHLY ABNORMAL IN THE SENSE IT WAS MUCH LOWER THAN THE AVERAGE.  AND THE RIGHT HEMISPHERE WAS, ACTUALLY, WITHIN THE NORMAL RATES AND, ACTUALLY, IN THE POSITIVE RATES. SO YOU CANNOT SEE HERE, IT IS VERY HARD TO DISPLAY THESE REGIONS BECAUSE THEY ARE THREE-DIMENSIONAL, HIGHLY CONVOLUTED REGIONS, STRUCTURES OF THE BRAIN.   YOU KIND OF SEE THE GENERAL TENDENCY, THE ASYMMETRY WHERE THE LEFT IS MUCH MUCH THINNER THAN THE RIGHT, WHICH IS A MORE BULKY AND FULL STRUCTURE.   AND THAT, OF COURSE, WAS REFLECTED IN THE NUMBERS.

**Q.    REFLECTED IN THE NUMBERS IN THE CHART?**

A.   YES,  IN THE CHART.

**Q.    AND THEN SO,  BASICALLY,  THEN,  DOCTOR,  TO SUMMARIZE, BASED ON THE RESEARCH THAT YOU HAVE BEEN CONDUCTING AT THE UNIVERSITY OF PENNSYLVANIA, AND THE QUANTITATIVE ANALYSIS THAT**

**CROSS EXAM OF CHRISTOS DAVATZIKOS**

**YOU PERFORMED AND CONDUCTED IN THIS CASE, WHAT IS YOUR SORT OF BOTTOM LINE CONCLUSION HERE?**

A.   WELL, THE BOTTOM LINE, AS I SAID IN THE BEGINNING, IS THAT THIS IS A HIGHLY ABNORMAL BRAIN MRI.  AND I SAW, BASICALLY, TWO TYPES OF ABNORMALITIES.  ONE SET WAS FAIRLY LOCALIZED, AND IT HAPPENED TO BE CLOSE TO THE SUBARACHNOID CYST.  WHICH MIGHT HAVE CAUSED HIM, IF IT IS A CHRONIC CONDITION, DUE TO PRESSURE, ET CETERA.  AND THE SECOND WAS MORE WIDESPREAD ABNORMALITIES IN THE FRONTAL LOBE AND THE TEMPORAL LOBE THAT ARE LIKELY TO BE CONGENITAL.

JUST AS A SIDE NOTE, THE FRONTAL LOBE IS A VERY IMPORTANT STRUCTURE THAT MEDIATES EXECUTIVE FUNCTIONS, DECISION-MAKING, INHIBITION OF LOWER-LEVEL INSTINCTS.  AS I SAID BEFORE, IT WAS HIGHLY BELOW THE NORMAL RANGE, ALMOST THREE STANDARD DEVIATIONS.

MR. BLUME:  THANK YOU.  PLEASE ANSWER ANY QUESTIONS MR. SCHOOLS HAS.

THE COURT:   CROSS EXAMINATION.

CROSS EXAM

BY MR. SCHOOLS:

**Q.   DR. DAVATZIKOS, GOOD MORNING. DID I GET THAT NAME RIGHT?**

A.   YES.

**Q.   MY NAME IS SCOTT SCHOOLS.  I AM ONE OF THE PROSECUTORS ON THE CASE.  I HAVE A FEW QUESTIONS FOR YOU.**

**CROSS EXAM OF CHRISTOS DAVATZIKOS**

YOU PREPARED A REPORT AND PROVIDED IT TO MR. BLUME, WHICH HE HAS PROVIDED TO US.  ARE YOU FAMILIAR WITH THE TWO-PAGE SUMMARY OF, BASICALLY, THE SAME THINGS YOU JUST TESTIFIED ABOUT?

A.   THE TWO-PAGE SUMMARY?  THERE IS ANOTHER DIFFERENT THAN I PROVIDED.

Q.   NO,  TWO-PAGE REPORT?

A.   YEAH.

Q.   HAS THE GRAPH THAT YOU HAVE DESCRIBED, ALSO?

A.   OF COURSE.

Q.   AND IN THAT REPORT,  YOU TALKED ABOUT WHAT IT MEANS WITH RESPECT TO THE ABNORMALITIES OF HIS BRAIN.  YOU MADE REFERENCE TO ANALOGY OF SOMEONE MIGHT LOOK AT A SMALL BLUE EYE AND THINK THAT IT IS NORMAL, AND SOMEONE MIGHT LOOK AT A LARGER GREEN EYE AND THINK THAT IT IS NORMAL, BUT WHEN YOU SEE THEM ON THE SAME PERSON,  THEN IT BECOMES ABNORMAL.  THAT IS THE ANALOGY USED IN THE REPORT?

A.   RIGHT,  YES.

Q.   BUT IF WE CONCLUDED THAT A PERSON WITH A SMALL BLUE EYE AND A LARGER GREEN EYE OF THE SAME PERSON COULDN'T SEE,  WE WOULD BE WRONG,  WOULDN'T WE?

A.   IF WE CONCLUDED THIS PERSON COULDN'T SEE?

Q.   RIGHT.

A.   YEAH.

Q.   SO,  THE FACT THAT MR. FULKS'S BRAIN HAS AN ABNORMAL

**CROSS EXAM OF CHRISTOS DAVATZIKOS**

**SIZE, IF IT IS A FACT, THE MEANING OF THAT FACT IS, AT THIS POINT, UNKNOWN, ISN'T IT?**

A. YOU MEAN THE FUNCTIONAL AND BEHAVIORAL MANIFESTATIONS OF THIS STRUCTURED ABNORMALITY?

**Q. YES.**

A. I WOULDN'T SAY UNKNOWN. I WOULD SAY, BECAUSE ALL STRUCTURES IN THE BRAIN ARE OR MOST OF THEM ARE, PARTICIPATE OR MEDIATE A LARGE NUMBER OF FUNCTIONS, CERTAINLY THAT PARTICULAR STRUCTURE MIGHT HAVE DIVERSE EFFECTS. BUT CERTAINLY, IT DOES HAVE EFFECTS.

**Q. THE ONLY WAY TO KNOW THIS, THOUGH, IS TO KNOW THE PRECISE EFFECTS AND WHETHER THEY ARE BRAIN-RELATED IS TO LOOK AT SIMILARLY STRUCTURED BRAINS AND LOOK AT THOSE PEOPLE AND SEE WHETHER THEY FUNCTION IN A SIMILAR WAY; IS THAT FAIR?**

A. YOU MEAN SIMILARLY ABNORMALLY?

**Q. YES.**

A. WELL, NOT NECESSARILY. I WOULD SAY THAT, GIVEN THE KIND OF STATE OF SCIENCE, IT WOULD BE VERY DIFFICULT TO PRECISELY PINPOINT THE EXPECTED BEHAVIOR OF A PARTICULAR MORPHOLOGICAL PROFILE. IN FACT, YOU CAN FIND --

**Q. LET ME STOP YOU ONE SECOND. YOU USED THE TERM "MORPHOLOGICAL PROFILE." THAT IS THE BRAIN VOLUME PROFILE THAT YOU TESTIFIED ABOUT?**

A. THE COLLECTION OF BRAIN VOLUMES, YES.

**Q. SO, YOU SAID IT IS VERY HARD TO PREDICT, BASED ON A**

**CROSS EXAM OF CHRISTOS DAVATZIKOS**

**SINGLE PERSON'S MORPHOLOGICAL PROFILE, WHAT KIND OF BEHAVIOR THAT PERSON --**

A.    WELL, IN FACT, YOU WOULD HAVE TWO PEOPLE THAT MIGHT HAVE DIFFERENT BUT SIMILAR BEHAVIORS AND MAYBE DIFFERENT MORPHOLOGICAL ABNORMALITIES OR VICE VERSA.  WHAT YOU CAN CONCLUDE, THOUGH, IS THAT SUCH AN UNUSUAL, UNUSUALLY ABNORMAL MORPHOLOGICAL PROFILE WILL HAVE LEAD TO ABNORMAL BEHAVIOR.  AND THEN ONE HAS TO LOOK AT INDIVIDUAL STRUCTURES. THAT IS WHY I DISSECTED IT INTO INDIVIDUAL STRUCTURES AND TRIED TO RELATE THESE MEASUREMENTS TO WHAT IS KNOWN IN THE NEUROSCIENCE LITERATURE.

FOR EXAMPLE, THE FRONTAL LOBE ABNORMALITIES, WHAT I SAID BEFORE, ARE VERY IMPORTANT BECAUSE WE KNOW THE FRONTAL LOBE MEDIATES HIGH-LEVEL FUNCTIONS, INCLUDING INHIBITION, DECISION-MAKING, ET CETERA.  THE INSULA, WHICH WAS HIGHLY ABNORMAL, IS ALSO LIKE A IN BETWEEN.  THE STRUCTURES THAT MEDIATE LOWER-LEVEL FUNCTIONS IN THE BRAIN, LIKE EMOTIONS, LIKE SEXUAL DRIVES, ET CETERA, ALL OF THE LOWER-LEVEL FUNCTIONS, THEY ARE, BASICALLY, COMMON IN HUMANS AND NONHUMANS.  MORE HIGHER-LEVEL FUNCTIONS THAT TAKE PLACE IN THE FRONTAL LOBE THAT ARE EITHER UNIQUE OR VERY DISTINCT IN HUMANS, LIKE EXECUTIVE FUNCTIONING, INHIBITION, ET CETERA. AND THAT -- IT IS NOT HARD TO DEDUCE FROM THAT, AN INFRASTRUCTURE LIKE THAT IS DAMAGED.  THE CONNECTION BETWEEN THESE TWO IS DEFINITELY EXPECTED TO BE DAMAGED, AS WELL.

CROSS EXAM OF CHRISTOS DAVATZIKOS

Q.    BUT THERE IS NOT A DIRECT LINK.  AND I THINK YOU AND YOUR COLLEAGUES ARE DEVELOPING SOME NEW TECHNIQUES TO TRY TO ACTUALLY TAKE VERY,  VERY SMALL SEGMENTS OF THE BRAIN AND CORRELATE THEM WITH PARTICULAR FUNCTION OR WITH PARTICULAR BRAIN ABNORMALITIES, SUCH AS EARLY DEVELOPMENT OF COGNITIVE DISORDERS BY OLD PEOPLE?

A.    WELL, ACTUALLY, MY PARTICULAR -- I LIKE TO STAY WITHIN MY OWN PARTICULAR FIELD, WHICH IS, ACTUALLY, NOT SO MUCH THE CORRELATION OF FUNCTION OF STRUCTURE, BUT MEASURING THE STRUCTURE.  THAT IS WHAT I EMPHASIZE.  THERE IS A WHOLE --

Q.    THAT IS FAIR.  SO,  YOUR AREA OF EXPERTISE IS -- YOU ARE MORE COMFORTABLE TALKING ABOUT THE MEASUREMENTS, RATHER THAN ABOUT THE MEASUREMENTS VIS-A-VIS FUNCTION?

A.    YES.

Q.    THAT IS FAIR.

ARE YOU FAMILIAR WITH THE CONCEPT OF A DEVICE CALLED A PET SCAN?

A.    YEAH.

Q.    AND AS I UNDERSTAND IT,  A PET SCAN IT IS A MECHANISM THAT ATTEMPTS TO DETERMINE BRAIN ACTIVITY; IS THAT CORRECT?

A.    RIGHT.

Q.    AND AM I CORRECT IN UNDERSTANDING THAT, IN A PET SCAN, THE IMAGES MAY LOOK DIFFERENT DEPENDING UPON WHAT TASK THE INDIVIDUAL IS PERFORMING AT A PARTICULAR TIME?

A.    TO THE EXTENT THAT THE FUNCTION OF THE BRAIN IS

CROSS EXAM OF CHRISTOS DAVATZIKOS

DIFFERENT.

Q.    RIGHT.   SO,  AND THERE ARE VARIOUS PARTS OF THE BRAIN THAT ARE ACTIVATED BASED ON VARIOUS TASKS; IS THAT CORRECT?

A.    RIGHT.

Q.    SO,  IF AN INDIVIDUAL WAS IN -- WAS HAVING A PET SCAN AND WAS ASKED TO PERFORM SOME PARTICULAR TASK,  THEN CERTAIN PARTS OF THE BRAIN MIGHT REFLECT GREATER ACTIVITY THAN OTHER PARTS; IS THAT CORRECT?

A.    RIGHT.

Q.    AND, SIMILARLY, IF THAT SAME PERSON IS SITTING IN A PET SCAN MACHINE OR LAYING IN A PET SCAN MACHINE,  WHATEVER THE CASE, AND ARE ASKED TO PERFORM A DIFFERENT TASK, THEN WE WOULD EXPECT A PET SCAN TO SHOW DIFFERENT ACTIVITY ACROSS THE BRAIN; IS THAT CORRECT?

A.    IF THIS DIFFERENT TASK WAS LINKED TO A DIFFERENT FUNCTION OF THE BRAIN.

Q.    OKAY.   BUT WITHOUT QUESTION,  THE PET SCAN IMAGE IS IN SOME WAY DEPENDENT ON WHAT THE INDIVIDUAL WHOSE BRAIN IS BEING SCANNED IS THINKING OR TRYING TO DO AT THE TIME?

A.    YEAH.

Q.    SO,  IT IS NOT NECESSARY THEN THAT, BECAUSE AN INDIVIDUAL IS PET SCANNED ON TUESDAY, AND THEN PET SCANNED AGAIN ON FRIDAY, THAT THOSE TWO PET SCANS ARE GOING TO LOOK THE SAME?

A.    NOT NECESSARILY.   BUT PEOPLE USE WHAT THEY CALL THE

CROSS EXAM OF CHRISTOS DAVATZIKOS

RESTING SCAN, WHERE, BASICALLY, IT IS KIND OF BASELINE, I THINK, ACTIVITY IN THE BRAIN.  IN FACT,  GENERALLY, THESE ARE FAIRLY REPUTABLE.  IF THE PERSON IS THINKING ACTIVELY ABOUT SOMETHING, IT WILL LOOK DIFFERENT.  BUT, IN GENERAL,  IT IS RELATIVELY REPUTABLE.

Q.   AND WHAT THE PERSON IS THINKING WHILE THEY ARE INSIDE THE PET SCAN MACHINE IS SOMETHING ONLY THE PERSON BEING PET SCANNED CAN KNOW FOR SURE?

A.   RIGHT.

Q.   AND I SUPPOSE THERE MAY BE WAYS FOR YOU TO LOOK AT THE PET SCAN AND KNOW WHAT THEY ARE NOT THINKING ABOUT, BUT NOT NECESSARILY?

A.   WELL,  THIS IS A HUGE AREA OF RESEARCH.  THERE IS WORK THAT TRIES TO RELATE THE PARTICULAR FUNCTIONAL PATTERN WITH KIND OF PREDICT WHAT THIS PERSON IS THINKING ABOUT.  FOR EXAMPLE,  THERE IS WORK TRYING TO LINK THIS TO DETECTION OF LYING,  ET CETERA.  BUT ALL OF THESE ARE IN THE STATE-OF-THE-ART NEUROPSYCHOLOGICAL RESEARCH.

Q.   HAVE YOU REVIEWED ANY OF THE PET SCANS THAT MR. FULKS HAS HAD DONE OF HIS BRAIN?

A.   NO, I DID NOT.

Q.   YOUR TESTIMONY REGARDING MR. FULKS'S BRAIN STRUCTURE IS, AS I UNDERSTAND IT, THERE ARE  -- THERE WAS TWO COLORED LINES ON THAT GRAPH; IS THAT CORRECT?

A.   RIGHT.

CROSS EXAM OF CHRISTOS DAVATZIKOS

Q.    IF WE CAN LOOK AT IT,  I BELIEVE IT IS DEFENSE EXHIBIT 29.   YOU GOT PURPLE LINES MARKED AS RELATIVE AND BLUE LINE AS ABSOLUTE?

A.    RIGHT.

Q.    AND IF I AM TO UNDERSTAND THE DIFFERENCE THERE, ABSOLUTE IS A COMPARISON OF THE VOLUME OF HIS PARTICULAR BRAIN STRUCTURE WITH THE 41 NORMAL MALES; IS THAT RIGHT?

A.    UH-HUH (AFFIRMATIVE RESPONSE).

Q.    AND THE RELATIVE NUMBER WOULD TAKE A LOOK AT THE OVERALL VOLUME OF HIS BRAIN AND THEN TRY TO NORMALIZE THOSE VALUES ACROSS THAT SPECTRUM?

A.    RIGHT.  THE REASON FOR THAT IS, IT USUALLY TENDS TO, AND IT DOES IN THIS CASE,  THAT IT TENDS TO IMPROVE OUR ABILITY TO DETECT AN ABNORMALITY BECAUSE DIFFERENT PEOPLE HAVE DIFFERENT BRAIN SIZES.  BRAIN SIZE IS NOT NECESSARILY A REFLECTION OF FUNCTIONAL ABILITY.  IT IS JUST A CONFOUNDING FACTOR, AS WE SAY.

SO, IN ORDER TO MAKE THE MEASUREMENTS MORE COMPARABLE ACROSS THE INDIVIDUALS AND REDUCE THIS CONFOUNDING EFFECT, YOU WANT TO DIVIDE THE ACTUAL VOLUMES OF ITS STRUCTURE BY THE OVERALL BRAIN VOLUME.  ESSENTIALLY, WHAT THIS GIVES IS A PERCENTAGE OF THAT PARTICULAR STRUCTURE OVER THE ENTIRE BRAIN.

Q.    BASED ON THE GRAPH THAT YOU HAVE PRESENTED IN GOVERNMENT'S EXHIBIT -- DEFENDANT'S EXHIBIT 29, THE ABSOLUTE MEASUREMENTS IN MR. FULKS'S BRAIN ARE LESS ABNORMAL THAN THE

**CROSS EXAM OF CHRISTOS DAVATZIKOS**

RELATIVE VALUES?

A.     THIS IS ALWAYS THE CASE.

Q.     AND, AGAIN,  THERE ARE STUDIES GOING ON, I THINK YOU HAVE PARTICIPATED IN SOME,  ALTHOUGH PERHAPS NOT AS THE PRIMARY RESEARCHER,  THAT ARE ATTEMPTING TO ASSOCIATE BRAIN FUNCTION WITH VERY SMALL PORTIONS OF THE BRAIN?

A.     RIGHT.

Q.     AND, AT THIS POINT,  THOUGH, THERE HAS BEEN NO STUDY THAT YOU ARE AWARE OF THAT HAS BEEN ABLE TO ASSOCIATE VARIOUS SOCIOPATHIC CONDUCT WITH BRAIN ABNORMALITIES?

A.     A LOT OF STUDIES THAT RELATE TO LESIONS IN THE BRAIN WITH NEUROLOGICAL DEFICITS,  A LOT OF THEM.  AND THAT IS WHAT -- AND THAT, ACTUALLY, RESEARCH HAS BEEN GOING ON FOR A CENTURY OR MORE,  WELL BEFORE MRI AND CAT SCANS WERE AVAILABLE, TO GIVE US MORE ACCURATE PICTURES OF THE BRAIN.

Q.     GENERALLY,  IF BASED ON WHAT I HAVE SEEN,  GENERALLY, WHAT YOU ARE TRYING TO DETERMINE IS NOT SO MUCH BRAIN ASSOCIATION AND VOLUNTARY BEHAVIOR,  BUT BRAIN STRUCTURE, TRYING TO ASSOCIATE BRAIN STRUCTURE AND DIAGNOSABLE DEFICITS; IS THAT CORRECT?

A.     WELL, TO GIVE YOU THIS -- ACTUALLY, I AM GLAD YOU BRING THIS POINT UP.  I DO PARTICIPATE, AS YOU SAID, IN SEVERAL LARGE CLINICAL STUDIES WHERE OUR GOAL IS TO DEVELOP DIAGNOSTIC TOOLS, BASED ON THESE KINDS OF MEASUREMENTS.  SO,  IT IS VERY INTERESTING THAT,  FOR EXAMPLE, THE TWO MAIN PROJECTS WE HAVE

CROSS EXAM OF CHRISTOS DAVATZIKOS

ARE SCHIZOPHRENIA AND ALZHEIMER'S DISEASE, WHERE WE TRY TO COME UP WITH HUMAN-BASED DIAGNOSTIC TOOLS.  IT IS VERY INTERESTING THAT TURNED OUT TO BE A VERY DIFFICULT PROBLEM JUST BECAUSE WE VERY RARELY -- WE NEVER SEE THESE LEVELS OF THESE ABNORMALITY SCORES.

IN OTHER WORDS, NORMAL INDIVIDUALS, AND SCHIZOPHRENIA, AND ALZHEIMER'S PATIENTS ARE MUCH CLOSER TO EACH OTHER, SO IT BECOMES VERY DIFFICULT TO HAVE DEFINITIVE DIAGNOSIS THAT THIS PERSON IS OUTSIDE THE NORMAL RANGE.  THAT IS WHY I WAS, YOU KNOW, THESE NUMBERS STRIKE US AS VERY UNUSUAL.

**Q.   BUT, AT THIS POINT, IF I AM UNDERSTANDING WHAT YOU ARE TELLING ME CORRECTLY, THE SCIENCE IS NOT YET DEVELOPED OR IS STILL DEVELOPING THAT IS ABLE TO ACTUALLY ASSOCIATE FUNCTION WITH ANY BRAIN ABNORMALITIES WITH SPECIFICITY.  NOW, I UNDERSTAND WHAT YOU SAID ABOUT THE FRONTAL LOBE AND EXECUTIVE FUNCTION, BUT WHAT I UNDERSTAND YOU TO SAY, EVEN WITH RESPECT TO SCHIZOPHRENIA AND EARLY ONSET OF ALZHEIMER'S, IT IS HARD TO LOOK AT A BRAIN AND TELL WHAT IS CAUSING IT?**

A.   IT IS HARD TO DEFINITIVELY SAY WITH PROBABILITY 100 PERCENT OR 99 PERCENT.  CERTAINLY, THERE ARE DIAGNOSTIC TOOLS BEING DEVELOPED THAT HAVE -- THAT ACHIEVE DIAGNOSTIC ACCURACIES IN THE EIGHTIES, 85 PERCENT, 88 PERCENT.  BUT IN CLINICAL PRACTICE, FOR THIS TO BE PROVED ON A DATABASE IN CLINICAL PRACTICE, THEY HAVE TO BE HIGHER DETECTION RATES.

**Q.    IN ORDER TO DETERMINE ANY CAUSE-AND-EFFECT ASSOCIATED**

**CROSS EXAM OF CHRISTOS DAVATZIKOS**

**WITH MR. FULKS'S BRAIN AND WHETHER ITS STRUCTURE HAS ANY IMPACT ON HIS BEHAVIOR, THE FIRST THING YOU KIND OF HAVE TO KNOW IS, HOW DOES HE FUNCTION,  CORRECT?**

A.    IN ORDER TO INFER LINKS BETWEEN ABNORMAL FUNCTION?

**Q.    YES.**

A.    NO.

**Q.    IN ORDER TO DETERMINE A LINK BETWEEN HIS ANATOMY AND FUNCTION?**

A.    BASED ON SCIENTIFIC KNOWLEDGE OF WHAT HAS BEEN FOUND IN DIFFERENT PEOPLE.

**Q.    BUT IN ORDER TO DETERMINE WHETHER THE PARTICULAR COMBINATION OF ABNORMALITIES THAT YOU HAVE TESTIFIED ABOUT MR. FULKS'S BRAIN HAVE ANY PARTICULAR IMPACT OR HAVE ANY PARTICULAR CAUSAL RELATIONSHIP TO A KNOWN BEHAVIOR,  YOU GOT TO FIRST KNOW WHAT THE BEHAVIOR IS,  RIGHT?**

A.    YEAH.   ALSO, IT IS MUCH MORE COMPLEX.  AGAIN,  I WOULD LIKE TO STAY WITHIN MY AREA,  BUT IT IS MUCH MORE COMPLEX AS MAYBE A SHORT NOTE BECAUSE IT ALSO HAS TO DO WITH ENVIRONMENTAL INPUTS.   SO,  ESSENTIALLY, THE BRAIN IS A SYSTEM THAT, EVEN IF THE SYSTEM IS MADE ABNORMALLY OR NORMALLY, IT RESPONDS THAT THIS BEHAVIOR WILL VARY DEPENDING ON STIMULI.   SO, IT IS EXTREMELY COMPLEX TO DEDUCE A CAUSAL, IF POSSIBLE,  CAUSAL LINK BETWEEN STRUCTURAL ABNORMALITIES AND BEHAVIOR.

**Q.    IT IS COMPLEX, AND YOU ARE NOT HERE TODAY TO TESTIFY**

**ABOUT IT BECAUSE THAT IS NOT YOUR AREA OF EXPERTISE,  RIGHT?**

A.    RIGHT.

MR. SCHOOLS:  BEG THE COURT'S INDULGENCE.

THANK YOU,  DR. DAVATZIKOS.

THE COURT:  REDIRECT.

MR. BLUME:  NO, SIR.

THE COURT:  THANK YOU,  SIR.  YOU MAY STEP DOWN.

PLEASE CALL YOUR NEXT WITNESS.

MR. BLUME:  SUBJECT TO SEVERAL PENDING MATTERS, THE DEFENDANT RESTS.

THE COURT:  VERY GOOD.

MEMBERS OF THE JURY, WE ARE GOING TO TAKE A LITTLE SHORT RECESS AT THIS TIME.  THE DEFENSE HAS NOW RESTED ITS CASE. UNDER THE RULES OF PROCEDURE, THE GOVERNMENT HAS THE OPPORTUNITY TO CALL ANY REPLY WITNESSES THAT THEY THINK MIGHT BE NECESSARY TO RESPOND TO ANY NEW MATTER THAT WAS BROUGHT OUT IN THE DEFENDANT'S CASE-IN-CHIEF.  I DON'T KNOW YET PRECISELY IF THERE WILL BE ANY, OR HOW LONG THEY WILL BE.  BUT THIS IS A GOOD POINT TO TAKE A BREAK AND LET YOU HAVE A RECESS AT THIS TIME.

THE CASE IS NOT OVER YET.  YOU HAVE NOT HEARD ALL THE EVIDENCE.  YOU HAVE NOT HEARD THE INSTRUCTIONS ON THE LAW FROM ME.  YOU HAVE NOT HEARD CLOSING ARGUMENTS.  YOU MAY NOT DISCUSS THIS CASE.  YOU MAY NOT FORM AN OPINION ABOUT THIS CASE.  WE ARE VERY NEAR THE END OF TRIAL, NOT THERE YET.

DIRECT EXAM OF JAMES EVANS

THE COURT:  PLEASE BRING IN THE JURY.  CALL YOUR NEXT WITNESS.

JAMES EVANS, HAVING BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

DIRECT EXAM

BY MR. BLUME:

**Q.    GOOD MORNING,  DR. EVANS.**

A.    GOOD MORNING.

**Q.    WHAT IS YOUR CURRENT OCCUPATION?**

A.    I'M A CLINICAL PSYCHOLOGIST IN PRIVATE PRACTICE.

**Q.    AND YOU ARE, I GUESS, SEMI-RETIRED THESE DAYS?**

A.    SEMI-RETIRED.

**Q.    WHERE ARE YOU SEMI-RETIRED FROM?**

A.    UNIVERSITY OF SOUTH CAROLINA.  TAUGHT AT THE DEPARTMENT OF PSYCHOLOGY FOR 30 YEARS.

**Q.    WHAT DID YOU TEACH THERE?**

A.    I TAUGHT VARIOUS COURSES.  A LOT OF THEM HAD TO DO WITH PSYCHOLOGICAL TESTING,  SUPERVISED INTERNSHIPS IN SCHOOL PSYCHOLOGY.  I TAUGHT ABNORMAL PSYCHOLOGY,  PSYCHOLOGY OF CONSCIOUSNESS,  NEUROPSYCHOLOGY OF LEARNING DISABILITIES, INTRODUCTION OF LEARNING DISABILITIES, INTRODUCTION TO EXCEPTIONAL CHILDREN, AND CHILD DEVELOPMENT.

**Q.    AND SO, HOW DO YOU GET TO BE A PROFESSOR IN PSYCHOLOGY? WHAT DO YOU HAVE TO DO?**

A.    BECOME A PROFESSOR IN PSYCHOLOGY.

DIRECT EXAM OF JAMES EVANS

Q.    WELL, WHAT DID YOU DO?  WHAT DID YOU DO?

A.    I HAVE A -- I GOT A BACHELOR'S DEGREE IN EDUCATION AT CLARION UNIVERSITY IN PENNSYLVANIA.   THEN I GOT A MASTER'S DEGREE IN PSYCHOLOGY FROM KANSAS STATE.  AND THEN A PH.D. IN PSYCHOLOGY FROM PEABODY COLLEGE, WHICH IS NOW PART OF VANDERBILT UNIVERSITY.

Q.    OKAY.   SO, YOU WENT THROUGH YOUR EDUCATION.  YOU GOT A BA DEGREE,  MASTER'S DEGREE AND PH.D.?

A.    YES, SIR.

Q.    THEN WHAT DID YOU DO?

A.    THEN I DID SOME POSTDOCTORAL WORK AT THE UNIVERSITY OF CALIFORNIA, SAN FRANCISCO MEDICAL SCHOOL IN NEUROPSYCHOLOGICALLY RELATED TOPICS,  INCLUDING COMPUTERIZED EEG.  I DID SOME POSTGRADUATE WORK OR POSTDOCTORAL WORK AT THE UNIVERSITY OF GEORGIA IN NEUROPSYCHOLOGY AND ALSO POSTDOCTORATE WORK AT THE MEDICAL COLLEGE OF GEORGIA IN NEUROPSYCHOLOGY.

Q.    OKAY.   WHAT ABOUT -- YOU FINISHED YOUR PH.D.,  WHERE DID YOU GO TO WORK?

A.    FOR A WHILE -- FOR THREE YEARS, I WORKED AT THE STATE HOSPITAL FOR THE MENTALLY RETARDED IN PENNSYLVANIA AFTER THE PH.D.  AND THERE, I WORKED WITH A LOT OF NEUROLOGICALLY HANDICAPPED PERSONS WORKING WITH PHYSICIANS AND PSYCHOLOGISTS, AT THE TIME.  THEN I CAME TO THE UNIVERSITY OF SOUTH CAROLINA WHERE I WAS FULL TIME, AND I ALSO HAD A PART-TIME PRIVATE

DIRECT EXAM OF JAMES EVANS

PRACTICE IN CLINICAL PSYCHOLOGY AND NEUROPSYCHOLOGY.

**Q.    AND AS PART OF YOUR WORK AS A PROFESSOR AT THE UNIVERSITY OF SOUTH CAROLINA,  DID YOU DO ANY RESEARCH AND PUBLISH ANY ARTICLES?**

A.    YES.   THAT IS SOMETHING YOU DO, OR YOU DON'T STAY.

**Q.    WELL, WHAT DID YOU DO?**

A.    I PUBLISHED AROUND 30 ARTICLES,  30,  35 ARTICLES, AND THREE OR FOUR BOOK CHAPTERS, AND EDITED -- COAUTHORED ONE BOOK, AND COEDITED TWO OTHER BOOKS.

**Q.    AND WERE THESE IN THE FIELD OF PSYCHOLOGY AND NEUROPSYCHOLOGY?**

A.    SOME WERE PUBLISHED IN JOURNALS OF NEUROPSYCHOLOGY, SUCH AS CORTEX AND INTERNATIONAL JOURNAL OF NEUROSCIENCE.  AND THE LATEST ONE WAS A BOOK CHAPTER IN AN ENCYCLOPEDIA OF THE HUMAN BRAIN IN 2002.

**Q.    AND ARE YOU LICENSED IN ANY PARTICULAR AREAS?**

A.    LICENSED IN CLINICAL AND PSYCHOLOGY IN SOUTH CAROLINA.

**Q.    AND WHAT ABOUT, ARE YOU A MEMBER OF ANY PROFESSIONAL ASSOCIATIONS,  PARTICULARLY IN RELATION TO NEUROPSYCHOLOGY?**

A.    AMERICAN PSYCHOLOGICAL ASSOCIATION DIVISION 40, WHICH IS NEUROPSYCHOLOGY.   AND ALSO, THE NATIONAL ACADEMY OF NEUROPSYCHOLOGY.   ALSO, INTERNATIONAL SOCIETY FOR NEUROLOGY.

**Q.    AND YOU INDICATED YOU HAVE DONE SOME POSTDOCTORAL TRAINING IN NEUROPSYCHOLOGY?**

A.    YES, SIR.

App. 00629

DIRECT EXAM OF JAMES EVANS

Q.    ARE YOU CERTIFIED IN ANY PARTICULAR AREAS?

A.    CERTIFIED AS A NEUROTHERAPIST AND CERTIFIED AS A QUANTITATIVE EEG TECHNOLOGIST.

Q.    AND HAVE YOU EVER BEEN QUALIFIED AS AN EXPERT WITNESS IN NEUROPSYCHOLOGY BEFORE?

A.    YES, SIR,  MANY TIMES.

MR. BLUME:  YOUR HONOR,  AT THIS TIME, I OFFER DR. EVANS AS AN EXPERT IN THE FIELD OF NEUROPSYCHOLOGY.

MR. SCHOOLS:  NO OBJECTION.

THE COURT:  ALL RIGHT.  YOU MAY PROCEED.

BY MR. BLUME:

Q.    DR. EVANS,  AT MY REQUEST, DID YOU ADMINISTER A BATTERY OF NEUROPSYCHOLOGICAL TESTS TO MR. FULKS?

A.    YES, SIR.

Q.    AND WHAT WAS THE PURPOSE OF ADMINISTERING THAT BATTERY OF TESTS?

A.    BASICALLY, THE PURPOSE WAS TO OBTAIN SOME OBJECTIVE EVIDENCE REGARDING WHETHER HE DOES OR DOES NOT HAVE BRAIN DAMAGE OR BRAIN DYSFUNCTION.

Q.    AND DID YOU ALSO HAVE THE OPPORTUNITY TO REVIEW PSYCHOLOGICAL AND NEUROPSYCHOLOGICAL TESTING WHICH HAD BEEN ADMINISTERED BY ANYONE ELSE?

A.    YES, SIR.  DR. VENN,  DR. HUELKE,  AS WELL AS THE NEUROPSYCHOLOGISTS AND PSYCHOLOGISTS FROM BUTNER, AS WELL AS THE NEUROLOGICAL EXAMINATION BY DR. BALKIN.

DIRECT EXAM OF JAMES EVANS

Q.    AND DID YOU -- SO DR. VENN, HUELKE, BUTNER.  DID YOU ALSO REVIEW SOME TESTING THAT WAS CONDUCTED BY DR. RUBEN GUR?

A.    DR. RUBEN GUR, YES.

Q.    DID YOU ALSO REVIEW A REPORT WHICH WAS DONE BY THE FEDERAL MEDICAL CENTER IN LEXINGTON, KENTUCKY, IN 1998?

A.    YES.  THE OLDER ONE, YES.

Q.    SO, YOU ADMINISTERED A BATTERY OF TESTS TO MR. FULKS, AND THEN YOU REVIEWED THIS TESTING?

A.    THAT'S CORRECT.

Q.    AND WAS THE BATTERY OF TESTS YOU ADMINISTERED, WERE THESE SOME THAT YOU JUST THOUGHT UP, OR ARE THEY PART OF AN ACCEPTED -- COMMONLY ACCEPTED BATTERY OF TESTS?

A.    WELL, THEY WERE PARTS OF COMMONLY ACCEPTED BATTERY, AS WELL AS A COUPLE THAT I DIDN'T JUST THINK UP, THAT I HAVE BEEN USING FOR A LONG TIME, WELL-ESTABLISHED AS MEASURES OF NEUROPSYCHOLOGICAL FUNCTIONING.

Q.    WHEN WE TALK ABOUT -- I GUESS, WHAT DOES A BATTERY OF TESTS MEAN, IF YOU CAN EXPLAIN THAT TO THE JURY?

A.    A BATTERY OF TESTS?  WELL, USUALLY IT WOULD BE LIKE IF YOU WERE GOING IN FOR A PHYSICAL AND THEY WOULD DO NOT ONLY A BLOOD TEST, BUT A URINE TEST, AND CHECK YOUR EKG, AND MAYBE EEG.  IN OTHER WORDS, IT WOULD BE A LARGE GROUP OF TESTS THAT THEY WOULD DO TO TRY TO GET A LARGER PICTURE OF YOUR TOTAL SELF AS IF YOU WERE -- WHEN YOU GO FOR A PHYSICAL EXAM.

Q.    SO, CAN YOU -- WHAT I WANT TO FIRST START OUT AND JUST

**DIRECT EXAM OF JAMES EVANS**

**HAVE YOU TALK TO THE JURY ABOUT ARE THE RESULTS OF THE TESTS THAT YOU ADMINISTERED.   AND SO, YOU ADMINISTERED THIS BATTERY.  FIRST, TELL THE JURY, WHAT WERE THE RESULTS OF YOUR TESTING?**

A.    IN THE BROAD VIEW OF IT?

**Q.    YES.**

A.    OKAY.   WELL, I ADMINISTERED A FEW OF THE SUBTESTS FROM THE INTELLIGENCE TEST THAT HAD BEEN ADMINISTERED EARLIER BECAUSE EARLIER PERSONS HAD FOUND -- AND THEY HAVE WHAT WE OFTEN CALL BORDERLINE INTELLIGENCE, BETWEEN LOW TO NORMAL AND MENTAL RETARDATION.   AND SINCE HE HAD ALREADY HAD THIS TEST TWO TIMES, I THOUGHT THERE MAY BE SOME PRACTICE EFFECT.  I DIDN'T WANT TO GIVE THE WHOLE TEST RIGHT AWAY THAT QUICKLY. SO,  I JUST ADMINISTERED CERTAIN OF THE SUBTESTS.   THOSE SUBTESTS CAME OUT WITH THE SAME GENERAL RANGES BUT FOUND BY TWO EARLIER PEOPLE.

**Q.    THAT WAS BORDERLINE INTELLECTUAL?**

A.    BORDERLINE INTELLECTUAL FUNCTIONING, YES.   IT WOULD BE, IN TERMS OF AN IQ SCORE,  WOULD HAVE BEEN A 75 TO 79 RANGE.   THEN I ALSO GAVE HIM A READING TEST BECAUSE, ORDINARILY, PEOPLE, UNLESS THEY HAVE A SPECIFIC LEARNING DISABILITY,  A READING TEST WILL PROVIDE SOME INFORMATION REGARDING GENERAL ABILITY.  HE CAME OUT WITH QUOTIENT OF 7TH TO 6TH GRADE LEVEL.  SO, THAT QUOTIENT WAS IN LINE WITH IQ FINDINGS.

DIRECT EXAM OF JAMES EVANS

AND THEN I ADMINISTERED A GROUP OF TESTS WHICH ARE USUALLY QUITE EASY FOR MOST PEOPLE TO DO ALL RIGHT ON, PROVIDED THEY DON'T HAVE BRAIN DAMAGE OR SOME OTHER PROBLEM OF THE BRAIN. AND IF YOU DO HAVE CERTAIN BRAIN DISORDERS, THEN YOU DON'T DO WELL ON THEM. I DON'T MEAN TO SAY YOU DON'T DO WELL ON ANY OF THEM BECAUSE, ORDINARILY, WHEN YOU HAVE A PROBLEM WITH YOUR BRAIN, IT ISN'T COMPREHENSIVE UNLESS YOU ARE IN A COMA. SOME AREAS ARE SPARED, SOME ABILITIES THAT ARE SPARED, SOME WHICH ARE DEFECTIVE. AND SO, YOU TEND TO HAVE A PATTERN OF PASSING, FAILING -- PASSING OR FAILING OF THESE NEUROPSYCHOLOGICAL TESTS.

HE HAD SOME SPECIFIC PROBLEMS ON THOSE TESTS THAT WERE OF THE TYPE SUGGESTIVE THAT THE FRONTAL LOBES OF HIS BRAIN, THE FRONT PART OF THE BRAIN WAS MALFUNCTIONING, AS WELL AS LEFT TEMPORAL, BE RIGHT IN THIS AREA, AS WELL AS SOME POSSIBILITY FROM MY TESTING OF OCCIPITAL OR POSTERIOR ON THE BACK PART OF THE BRAIN MALFUNCTIONING.

**Q. DR. EVANS, LET ME ASK YOU, IF YOU CAN EXPLAIN TO THE JURY, WHAT IS THE HALSTEAD-REITAN NEUROPSYCHOLOGICAL BATTERY?**

A. THE HALSTEAD-REITAN NEUROPSYCHOLOGICAL BATTERY IS ONE OF THE -- NOT ONE OF THE, BUT IS THE OLDEST BATTERY USED FOR THIS TYPE TESTING. AND IT HAS BEEN AROUND SINCE, PROBABLY, IN THE SIXTIES. IT HAS BEEN REFINED SOME, AND IT WAS NAMED AFTER HALSTEAD, WHO WAS A NEUROLOGIST, AND REITAN, WHO IS A PSYCHOLOGIST, NOW BE CALLED A NEUROPSYCHOLOGIST. AND THEY

DIRECT EXAM OF JAMES EVANS

DEVISED THESE TESTS AND STARTED USING THEM CLINICALLY IN THE LATE FIFTIES OR EARLY SIXTIES FOR CHECKING PERSONS TO SEE IF THEY HAD BRAIN DAMAGE OR BRAIN DYSFUNCTION.

**Q.    OKAY.    AND SO, THIS IS, BASICALLY, A BATTERY OF TESTS WHICH HAS BEEN DESIGNED BY EXPERTS TO DETERMINE, NOT ONLY IF SOMEONE HAS A BRAIN DAMAGE OR NEUROLOGICAL IMPAIRMENT,  BUT IN SOME CASES, IT CAN PROVIDE EVIDENCE OF WHERE THE DAMAGE MIGHT BE?**

A.    RIGHT.   BECAUSE SOME OF THESE TESTS REQUIRES SKILLS WHICH ARE MEDIATED BY, SAY, THE FRONTAL LOBES, AND ANOTHER OF THE SUBTESTS OR PARTS OF THE BATTERY ARE REQUIRED SKILLS THAT ARE PRIMARILY MEDIATED BY THE TEMPORAL LOBES, MAY BE MEDIATED BY OCCIPITAL LOBES, AND SO ON.

**Q.    YOU ADMINISTERED THIS BATTERY OF TESTS.  IT IS A PRETTY SET BATTERY OF TESTS?**

A.    I DID NOT ADMINISTERE THE ENTIRE BATTERY.  I ADMINISTERED THE ONES THAT ARE AMONG THOSE SENSITIVE TO THE CORTICAL MALFUNCTIONING.

**Q.    YOU TAKE THESE TESTS.  DO YOU THEN COME UP WITH SOMETHING CALLED AN IMPAIRMENT INDEX?**

A.    YES.   TWO THINGS YOU DO.  FIRST, YOU COMPARE THE SCORES AGAINST A DATABASE,  A NORMAL DATABASE,  PERSONS WHO DID NOT HAVE ANY HEAD INJURY AND WITH A HISTORY OF BRAIN DAMAGE, AND THIS GIVES YOU AN IDEA OF HOW FAR OFF THEY WERE FROM NORMAL.   AND THEN THERE ARE SIX I BELIEVE OF THE  --

DIRECT EXAM OF JAMES EVANS

SEVEN OF THE SUBTESTS WHICH ARE ESPECIALLY SENSITIVE TO BRAIN DAMAGE.  AND THE SCORES ON THOSE ARE CONSIDERED AND CHECKED TO SEE IF THE SCORES FALL BELOW A CERTAIN CUTOFF POINT.  AND IF THEY DO, LET'S SAY THEY FALL BELOW A CERTAIN CUTOFF POINT ON FIVE OF THE SEVEN,  THEN YOU WOULD PUT FIVE OVER SEVEN AND DIVIDE IT OUT TO GET A SO-CALLED IMPAIRMENT INDEX.  AND IF YOU HAD THREE OVER SEVEN OR ONE, IT WAS ONLY ONE OVER SEVEN, THE IMPAIRMENT INDEX, IT WOULD BE CONSIDERED NOT REMARKABLE. IF YOU HAD FOUR OVER SEVEN, IT WOULD BE SOMEWHAT REMARKABLE, ET CETERA.  AND THE IMPAIRMENT INDEX RESULTS IN STATEMENTS SUCH AS NO SIGNIFICANT IMPAIRMENT,  MILD IMPAIRMENT,  MODERATE IMPAIRMENT,  SEVERE IMPAIRMENT.  HIS WAS A POINT SIX,  I BELIEVE THAT IS CORRECT ON HERE, AND IT WOULD BE IN THE MODERATE IMPAIRMENT RANGE.

Q.    AND THE MODERATE IMPAIRMENT RANGE?

A.    MODERATE BRAIN IMPAIRMENT.

Q.    SO THEN, TO SUMMARIZE WHERE WE ARE NOW,  YOU DETERMINED, BASED ON YOUR TESTING, HE TESTED IN THE BORDERLINE RANGE?

A.    YES.

Q.    WHICH IS CONSISTENT WITH WHAT YOU HAD SEEN FROM DR. VENN AND DR. HUELKE?

A.    YES.

Q.    AND THEN THE NEUROPSYCHOLOGICAL BATTERY YOU ADMINISTERED DETERMINED THAT, IN ADDITION TO THE BORDERLINE

**DIRECT EXAM OF JAMES EVANS**

**INTELLECTUAL FUNCTIONING, THERE WERE SOME AREAS OF SPECIFIC DAMAGE TO THE FRONTAL LOBE AND THE -- I'M SORRY, THE FRONTAL, AS WELL AS, LEFT REGION?**

A.    AS WELL AS THE OCCIPITAL,  YES, SIR.

**Q.    WHAT WOULD, BASED ON YOUR RESEARCH AND YOUR KNOWLEDGE OF HOW THE BRAIN WORKS AND, YOU KNOW, HOW YOU UNDERSTAND THESE TESTS WORK, WHAT WOULD BE THE EFFECTS ON AN INDIVIDUAL,  YOU KNOW,  REALLY,  THE RANGE OF EFFECTS YOU WOULD EXPECT TO SEE ON SOMEBODY WITH THIS TYPE OF BRAIN IMPAIRMENT?**

A.    RIGHT.   ONE OF THE MAIN EFFECTS WOULD BE THAT HE WOULD HAVE PROBLEMS WITH WHAT SOME PEOPLE REFER TO AS EXECUTIVE FUNCTIONS.

**Q.    CAN YOU DUMB THAT DOWN A LITTLE BIT?  THAT DOESN'T MEAN MUCH TO ME.   WHAT DOES IT MEAN WHEN YOU SAY THE "EXECUTIVE FUNCTIONS?"**

A.    MOST OF US CONSIDER THAT WE HAVE OUR OWN -- WE ARE OUR OWN CEOS.   WE ARE IN CHARGE OF OUR BEHAVIORS.   THAT WE DECIDE WE WILL DO THIS, AND WE DO IT.   WE PLAN TO DO SOMETHING, AND WE FOLLOW THROUGH WITH THE PLAN.  WE SAY IT IS BECAUSE WE DECIDED TO DO SO.   IF WE DON'T FOLLOW THROUGH, YOU MIGHT SAY, BECAUSE WE DECIDED NOT TO.   SO,  IN THAT SENSE, WE ARE OUR OWN CEO'S.   AND THAT IS THESE EXECUTIVE FUNCTIONS THAT ARE, SUPPOSEDLY, WHAT WE CALL EXECUTIVE FUNCTIONS.  THESE ARE IMPAIRED IN PERSONS WHO HAVE FRONTAL LOBE DAMAGE BECAUSE THE FRONTAL LOBE IS WHAT CONTROLS, LARGELY, OUR ABILITY TO BE OUR

DIRECT EXAM OF JAMES EVANS

OWN CEO'S.

**Q.   OKAY.**

A.   MORE SPECIFICALLY, WHAT HAPPENS IF YOU HAVE DAMAGE TO THE FRONTAL LOBES, AT LEAST CERTAIN TYPES OF DAMAGE TO THE FRONTAL LOBES, IS THAT YOU HAVE A TENDENCY TO ACT IMPULSIVELY. THAT IS NOT THINKING ABOUT THE CONSEQUENCES OF YOUR ACTIONS, THAT IS ONE THING.

ANOTHER THING, IS YOU VERY LIKELY DON'T LACK FLEXIBILITY OF THOUGHT.  IN OTHER WORDS, YOU HEAR PEOPLE SAYING, WELL, YOU HAVE TO THINK OUTSIDE THE BOX.  WELL, THAT IS NOT POSSIBLE OR VERY, VERY DIFFICULT FOR PERSONS WITH FRONTAL LOBE DAMAGE.  IN FACT, THEY MIGHT HAVE TROUBLE EVEN THINKING IN THE BOX.  SO, THEY END UP HAVING SOME TROUBLE WITH SPEED OF LEARNING AND WITH BEING CREATIVE.  SOMETIMES YOU GET STUCK ON ONE AREA AND THEN CONTINUE TO ENGAGE IN SOME BEHAVIOR, EVEN THOUGH IT IS MALADAPTIVE, EVEN THOUGH IT IS NOT GETTING ANYWHERE.  THEY MIGHT CONTINUE TO DO IT.

A THIRD THING IS THAT THEY OFTEN FAIL TO PLAN AHEAD.  IT DOESN'T MEAN THEY ALWAYS FAIL TO PLAN AHEAD BUT HAVE A TENDENCY TO FAIL TO PLAN AHEAD.

AND, FINALLY, THEY FAIL TO ATTEND TO OR THEY HAVE TROUBLE ATTENDING, GENERALLY, AND THAT INCLUDES FAILING TO ATTEND VERY WELL TO THEIR OWN BEHAVIORS.  SO, IT IS ALMOST LIKE THEY DO SOMETHING AND THEN NOT AWARE THAT THEY DID IT.

AND THIS FAILURE TO ATTEND TO YOUR OWN BEHAVIORS AND ALL

DIRECT EXAM OF JAMES EVANS

OF THESE OTHER THINGS THAT I JUST MENTIONED AS EXECUTIVE CONTROL PROBLEMS, LEAD TO WHAT AN OUTSIDER MIGHT LOOK AT THE PERSON THAT HAS POOR JUDGMENT.  AND THAT IS WHAT IT IS,  POOR JUDGMENT.  THIS WILL BE MADE WORSE BY USE OF ALCOHOL.  IT CAN BE MADE A LOT WORSE WHEN YOU ARE UNDER STRESS.  AND IT CAN BE MADE WORSE IF YOU -- PERSONS IN YOUR ENVIRONMENT NEVER TAUGHT YOU HOW TO PUT ON THE BRAKES VERY WELL.

**Q.    SO THEN, AS I UNDERSTAND IT, IF YOU HAD THIS TYPE OF NEUROLOGICAL IMPAIRMENT, YOU EXPECT TO SEE IMPULSIVE ACTING, IMPULSIVE BEHAVIOR?**

A.    THAT IS FRONTAL LOBE PART, YES, SIR.

**Q.    AND BAD JUDGMENT,  BAD DECISION-MAKING?**

A.    YES, SIR.

**Q.    NOT TRYING TO PUT WORDS IN YOUR MOUTH?**

A.    THAT'S TRUE.

**Q.    AND YOU TALKED ABOUT COGNITIVE RIGIDITY OR FLEXIBILITY OR SOMETHING.  THAT IS A TWO-DOLLAR WORD.  WHAT DOES THAT MEAN?**

A.    WELL,  AS I WAS EXPLAINING EARLIER,  IT LOWERS ONE'S ABILITY TO THINK FLEXIBLY.  YOU START TO DO SOME TASK AND, INSTEAD OF BEING FLEXIBLE ABOUT IT AND THINKING, WELL,  IF I CAN'T DO IT THIS WAY, MAYBE I CAN DO IT THIS WAY, OR THIS WOULD BE A BETTER WAY TO DO IT.  I GET BETTER RESULTS IF I DO IT THAT WAY.  YOU JUST GET RIGID AND KEEP ON HAMMERING AT THE SAME -- TRYING TO DO IT THE SAME WAY, EVEN THOUGH IT IS NOT

DIRECT EXAM OF JAMES EVANS

SUCCEEDING.  WE CHECKED THAT.

ONE WAY WE CHECK IT IN THE REITAN TEST BATTERY, THE PERSON IS BLINDFOLDED, AND THEY ARE SUPPOSED TO PUT BLOCKS IN HOLES. AND SOMETIMES THEY, INSTEAD OF REACHING OUT AND FEELING THE HOLE AND THEN REACHING DOWN AND GETTING A BLOCK, THEY WILL KEEP TRYING TO PUT THE BLOCK IN THE SAME HOLE.  THAT IS ONE OF THE WAYS OF CHECKING IT.

**Q.    NOW,  DID YOU ALSO ADMINISTER TO MR. FULKS WHAT IS CALLED A QUANTITATIVE EEG?**

A.    YES,  I DID.

**Q.    AND CAN YOU TELL THE JURY WHAT A QUANTITATIVE EEG IS?**

A.    MOST PEOPLE REALIZE OR HAVE HAD SOMEBODY, OR HAD IT THEMSELVES, OR THEY REALIZE THAT IT EXISTS FROM HAVING A RELATIVE HAVING HAD TO GO AND GET AN EEG DONE.  AN EEG EVALUATION IS THE ELECTRICAL ACTIVITY OF YOUR BRAIN.  IT IS LIKE AN EKG, IN A SENSE, WHERE YOU HAVE ELECTRICAL ACTIVITY OF YOUR HEART BEING MEASURED WITH AN EKG,  BUT HERE, IT IS THE BRAIN ELECTRICAL ACTIVITY.  ORDINARILY, IN THE PAST, ONE WOULD GO TO A NEUROLOGIST, AND THEY WOULD SEND THEM OUT TO HAVE AN EEG DONE. AND WHAT IT WOULD BE IS,  IT WOULD BE A CONTINUOUSLY MOVING PAPER WITH ALL OF THESE PENS ON THE TOP THAT ARE GOING UP AND DOWN, UP AND DOWN, UP AND DOWN IN CORRESPONDENCE TO THE BRAIN ELECTRICAL ACTIVITY, WHICH IS GOING POSITIVE, NEGATIVE,  POSITIVE, NEGATIVE.  IT CREATES A TRACING ON THIS PAPER.

DIRECT EXAM OF JAMES EVANS

AND THE EEG TECHNICIAN OR NEUROLOGIST WOULD THEN LOOK AT THOSE TRACINGS AND WOULD SAY, IT LOOKS NORMAL TO ME, OR MIGHT SAY, I SEE SOME ABNORMALITY HERE OR ABNORMALITY THERE.  THE SAME WAY A PHYSICIAN IS LOOKING AT EKG TRACING, WHICH IS COMING FROM THE ELECTRODES PLACED OVER YOUR HEART AREA,  AND SAY IT LOOKS ABNORMAL OR NORMAL.  THESE ARE COMING FROM THE SCALP, AND THE ELECTRODES ARE ON THE SCALP.

WELL,  THIS QUANTITATIVE EEG IS THE SAME THING EXCEPT THAT, INSTEAD OF A NEUROLOGIST OR EEG TECHNICIAN LOOKING AT IT,  THE COMPUTER ACTUALLY IS MEASURING MANY,  MANY ASPECTS OF THE EEG,  MANY, MANY, MORE THAN ANY HUMAN EYE COULD EVER POSSIBLY SEE.  AND IS THEN CALCULATING SCORES ABOUT THE EEG, ABOUT THE PERSON'S EEG, OR BRAIN ELECTRICAL ACTIVITY.  THEN THESE SCORES, WHICH I WILL TALK A LITTLE BIT MORE ABOUT IN A MINUTE, THESE SCORES THEN ARE COMPARED TO, AGAIN, TO A NORMATIVE DATABASE,  PEOPLE WHO DIDN'T HAVE ANY BRAIN INJURY, NO BRAIN DAMAGE.  THE COMPUTER THEN GIVES YOU A PRINTOUT TELLING WHERE THEY WERE ANY ABNORMALITIES.

**Q.    ALL RIGHT.   LET ME MAKE SURE I UNDERSTAND IT.   SO THE DATA IS, BASICALLY, TAKEN LIKE A REGULAR EEG?**

A.    RIGHT.

**Q.    YOU HOOK ELECTRODES UP TO THE INDIVIDUAL'S HEAD?**

A.    PUT A CAP ON THE HEAD WITH ALL OF THESE ELECTRODES IN IT, EMBEDDED IN THE CAP, AND THEN THE ELECTRICITY FROM YOUR BRAIN IS DETECTED BY THE ELECTRODES, AND IT IS SENT INTO THE

DIRECT EXAM OF JAMES EVANS

COMPUTER, INSTEAD OF BEING SENT TO THE MACHINE WITH ALL OF THE NEEDLES GOING UP AND DOWN OR ALL THE PINS GOING UP AND DOWN ON IT.

Q.    AND THEN THE DATA IS ANALYZED BY A COMPUTER?

A.    BY THE COMPUTER.

Q.    AND THEN THE COMPUTER LOOKS BOTH AT THE INDIVIDUAL'S BRAIN AND HOW IT WORKS ITSELF,  I MEAN,  ONE PART TO ANOTHER, AND THAT KIND OF THING?

A.    RIGHT.

Q.    AND WAS IT -- I WANT TO MAKE SURE I GOT IT.  DOES IT ALSO THEN COMPARE THE DATA TO A KNOWN DATABASE OF PEOPLE WITH DIFFERENT TYPES OF KNOWN BRAIN DYSFUNCTION?

A.    NO,  IT COMPARES IT TO A NORMAL DATABASE OF PEOPLE WHO HAD NO BRAIN DAMAGE TO SEE IF THERE IS ANYTHING OUTSIDE THE NORMAL RANGE COMING FROM ANY ONE OF THESE MANY SITES, ELECTRODE POINTS, ON THE SCALP.  TWO OF THE BASIC MEASURES THAT IT IS LOOKING AT HAVE TO DO WITH FREQUENCY IMBALANCE OR COMMUNICATION BETWEEN BRAIN AREAS.

Q.    WHAT IS -- FIRST, EXPLAIN, AND IF YOU CAN, IN AS SIMPLE TERMS AS POSSIBLE, BECAUSE IT DOESN'T MEAN MUCH TO ME.  WHAT IS FREQUENCY IMBALANCE?

A.    WELL,  EVERYONE HAS HEARD OF A CHEMICAL IMBALANCE. THEY KNOW THAT CHEMICAL IMBALANCES ARE RELATED TO DEPRESSION AND OTHER MENTAL DISORDERS.  HOWEVER,  THE NEUROFUNCTION, BRAIN FUNCTION, IS NOT JUST CHEMICAL IN NATURE, IT IS

App. 00641

DIRECT EXAM OF JAMES EVANS

ELECTROCHEMICAL IN NATURE.  SO THERE CAN BE ELECTRICAL IMBALANCES, TOO.  THESE ARE DETECTED BY THE QUANTIFIED OR QUANTITATIVE EEG.

NOW, YOU MIGHT, TO GET A LITTLE MORE SPECIFIC ABOUT THAT, THE EEG WAVE FORMS THAT ARE REFLECTING BRAIN ACTIVITY, THESE WAVE FORMS ARE COMPLEX WAVES, JUST LIKE MOST ANY WAVE, UNLESS IT IS COMPUTER-GENERATED, IT IS A COMPLEX WAVE.  THAT MEANS IT IS MADE UP, COMPOSED OF A LOT OF DIFFERENT FREQUENCIES. RANGING, IN THIS CASE, FROM LIKE ONE CYCLE PER SECOND TO 30 CYCLES PER SECOND.  THAT IS ALL THIS MACHINE MEASURES IS ONE TO 30.

AND THOSE WAVE FORMS, THE COMPUTER BREAKS THEM DOWN INTO THEIR COMPONENT PARTS AND TELLS YOU HOW MUCH POWER IS IN, LET'S SAY, THE ONE TO FIVE OR ONE TO FOUR FREQUENCY RANGE, ONE TO FOUR CYCLE PER SECOND FREQUENCY RANGE.  HOW MUCH POWER, HOW MUCH ENERGY IS IN THE FOUR TO EIGHT CYCLE PER SECOND RANGE.  HOW MUCH ENERGY IS IN THE WEIGHT TO 12, AND HOW MUCH ABOVE 12.  AND THERE IS A KNOWN NORMAL RANGE FOR THAT TO HOW MUCH POWER SHOULD BE IN EACH ONE OF THOSE WHEN YOU ARE JUST SITTING THERE WITH YOUR EYES CLOSED, RESTING, OR EYES OPEN, RESTING.

AND IF YOU HAVE AN IMBALANCE OF THAT, IF YOU HAVE TOO MUCH ENERGY OR TOO MUCH POWER IN A 12 TO 18 CYCLE PER SECOND RANGE RELATIVE TO THE FOUR TO EIGHT LET'S SAY, THEN THE COMPUTER WILL TELL YOU THAT.  YOU HAVE GOT A FREQUENCY

DIRECT EXAM OF JAMES EVANS

IMBALANCE.  ONCE AGAIN, IT WOULD BE SOMEWHAT SIMILAR TO SAYING, IF YOU HAD A BLOOD TEST AND IF IT WERE POSSIBLE TO DO SO, THEY MIGHT SAY YOU HAVE TOO MUCH ACETYCHOLINE RELATIVE TO NOREPINEPHRINE .  I'M NOT TOO MUCH IN THE CHEMICAL PART OF IT, BUT THAT IS THE IDEA.  THAT IS ONE OF THE THINGS THAT IT IS LOOKING FOR.  IT IS KNOWN THAT CERTAIN OF THOSE IMBALANCES ARE RELATED TO ABNORMAL BRAIN FUNCTION, SUCH AS -- IT IS ALSO, IN TURN, THEN RELATED TO ATTENTION DEFICIT DISORDER,  BEING OVERLY HYPERVIGILANT,  DEPRESSION TO SOME EXTENT.  SO, THAT IS ONE OF THE MAJOR MEASURES --  MAJOR MEASURES OF THE EEG.

**Q.    THAT WAS FREQUENCY.  WHAT IS THE OTHER ONE?**

A.    THE OTHER ONE HAS TO DO WITH COMMUNICATION BETWEEN BRAIN AREAS SUCH AS, IS THERE TOO MUCH COMMUNICATION BETWEEN, SAY, HERE AND HERE, OR TOO LITTLE COMMUNICATION BETWEEN HERE AND HERE, OR ANY OTHER COMBINATION OF THE SITES ON A SCALP WHICH ARE MEASURING THE -- BASICALLY, MEASURING THE AREAS UNDERNEATH THE SCALP AND THE BRAIN.

**Q.    LET ME, JUST TO MAKE CLEAR.  YOU, OBVIOUSLY, COULD HAVE STOPPED AFTER THE NEUROPSYCHOLOGICAL TESTING?**

A.    I COULD HAVE.

**Q.    AND YOU WOULD HAVE BEEN,  YOU KNOW,  EVERYTHING YOU HAVE TOLD THE JURY, UP TO THIS POINT, WOULD BE EXACTLY WHAT YOU THINK?**

A.    RIGHT.  EVERYTHING I TOLD THEM, TO THIS POINT, CAME FROM THE ACTUAL NEUROPSYCHOLOGICAL TESTING, WHICH HAS BEEN

DIRECT EXAM OF JAMES EVANS

ACCEPTED IN COURTS FOR A LONG TIME.

Q.    IN ADDITION TO THAT,  YOU DECIDED TO GO AHEAD AND DO A QEEG?

A.    YES.

Q.    WHICH IS A RELATIVELY NEW TECHNOLOGY?

A.    I HAVE BEEN DOING  THEM SINCE 1992.   SOME PERSONS HAVE BEEN DOING THEM SINCE -- WELL  -- AND, ACTUALLY, AS I SAID EARLIER, ON THAT POSTDOCTORAL WORK IN CALIFORNIA, WE WERE DOING THEM IN RUDIMENTARY FASHION IN THE SEVENTIES,  BUT IT REALLY CAME INTO ITS OWN IN THE EIGHTIES.

Q.    AND WAS THE PURPOSE OF THAT TO DETERMINE IF THERE WAS ANY ADDITIONAL CONFIRMING DATA OF THE RESULT OF YOUR NEUROPSYCHOLOGICAL TESTING OR NEUROPSYCHOLOGICAL DYSFUNCTIONING?

A.    YES.  AND TO FURTHER THAT, WE SENT THAT OFF TO A NEUROLOGIST WHO IS BOARD-CERTIFIED IN EEG AND QUANTIFIED EEG AND HAD HIM INTERPRET IT,  AS WELL.

Q.    WELL,  LET ME ASK YOU THEN.  DID THE QUANTITATIVE EEG THAT YOU ADMINISTERED TO MR. FULKS,  DID IT PROVIDE ADDITIONAL SUPPORT FOR THE RESULTS OF YOUR NEUROPSYCHOLOGICAL TESTING?

A.    YES, SIR.  IT SHOWED SOME FURTHER EVIDENCE FOR FRONTAL DYSFUNCTION, BUT IT ALSO DETECTED SOME PROBLEMS WITH THE OCCIPITAL BACK PART OF THE BRAIN COMMUNICATING WITH OTHER PARTS OF THE RIGHT SIDE OF THE BRAIN, AS WELL AS THE LEFT SIDE WHICH THE OTHER -- WHICH THE PSYCHOLOGICAL TESTING SUGGESTED.

DIRECT EXAM OF JAMES EVANS

**Q.    IN OTHER WORDS,  OCCIPITAL, THAT WOULD BE CONSISTENT WITH ADDITIONAL TESTING THAT WAS ADMINISTERED BY DR. GUR?**

A.    RIGHT.  THAT IS SUPPORTED BY DR. GUR AND, I BELIEVE, OTHERS WHO, FOUND REGARDING SOME TYPE OF VISUAL PERCEPTUAL PROBLEMS.  I THINK DR. GUR SAID, SPECIFICALLY, IT WOULD HAVE TO DO MORE WITH WHAT HE FOUND HAD TO DO WITH PERCEIVING THE EMOTION IN ONE'S FACE.  NOT SO MUCH TELLING ONE THING FROM ANOTHER, BUT HE FOUND SOME PROBLEM THERE.  BUT ALSO MORE PROBLEM WOULD BE LIKELY IN KNOWING WHETHER SOMEONE WAS ANGRY OR SMILING OR, YOU KNOW,  REALLY HAPPY OR SAD,  JEALOUS, OR WHATEVER.

**Q.    NOW,  DR. EVANS, LET ME SHOW YOU WHAT HAS BEEN MARKED AS DEFENSE EXHIBIT 9 AND JUST ASK YOU IF YOU ARE FAMILIAR WITH THIS?**

A.    THAT IS ONE OF THE PRINTOUTS YOU GET FROM THE QUANTIFIED EEG - FROM THE QEEG SHOWING THERE WAS AN EXCESS OF POWER, AN IMBALANCE IN THE FREQUENCY.

        MR.  BLUME:  YOUR HONOR,  WE MOVE THE ADMISSION OF DEFENSE EXHIBIT 9.

        MR.  SCHOOLS:  CAN WE APPROACH,  YOUR HONOR?

BENCH CONFERENCE.

        MR.  SCHOOLS:  I DON'T OBJECT TO THE TESTIMONY HE IS PROVIDING CONCERNING HIS CONCLUSIONS ABOUT THIS.  I DO OBJECT TO THE PHYSICAL EVIDENCE BECAUSE I GOT THEM THIS MORNING.  WE HAD AN UNDERSTANDING, UNDER RULE 16, ANY DOCUMENTS INTRODUCED

DIRECT EXAM OF JAMES EVANS

IN CHIEF WOULD BE RECEIVED BEFORE.  NEVER SEEN THEM EVER.  I DON'T KNOW HOW TO CROSS-EXAMINE.

MR. BLUME:  PART OF IT WAS ATTACHED TO HIS REPORT. THE QEEG WAS PART OF THE REPORT, REFERENCED IT.

THE COURT:  WAS IT ATTACHED TO HIS REPORT OR NOT?

MR. BLUME:  I THOUGHT SO.  LET ME SEE.  THERE IS THE DISCUSSION OF IT.  I MEAN, IT IS JUST THE DISCUSSION AND RESULTS.  NOTHING HE WILL SAY IS NOT IN THERE.

THE COURT:  WHAT IS THE DISCUSSION?  DOES THE DISCUSSION MAKE REFERENCE TO THIS PARTICULAR CHART?

MR. BLUME:  JUST TALKS ABOUT THE PARTICULAR -- IT TALKS ABOUT THE RESULTS.  EVERYTHING, BASICALLY, HE SAID UP TO THIS POINT.

THE COURT:  I AM HAVING TROUBLE.  IS HE GOING TO EXPLAIN THIS?

MR. BLUME:  JUST GOING TO SAY -- HE IS, BASICALLY, GOING TO SAY THIS SHOWS EXACTLY WHAT IS IN THERE.  I CAN DO IT FOR DEMONSTRATIVE PURPOSES ONLY.

THE COURT:  THIS IS JUST A PICTORIAL DEPICTION?

MR. BLUME:  OF WHAT HE JUST SAID.

MR. SCHOOLS:  I DON'T KNOW WHAT IT IS.

THE COURT:  IS THIS THE ONLY ONE HE WILL PUT UP, OR WILL THERE BE OTHERS?

MR. BLUME:  THERE ARE THREE OF THEM.  I DON'T CARE. I CAN DO IT FOR DEMONSTRATIVE PURPOSE.

DIRECT EXAM OF JAMES EVANS

THE COURT:   I WILL ALLOW IT FOR DEMONSTRATIVE PURPOSES ONLY.

(WHEREUPON, THE BENCH CONFERENCE CONCLUDED.)

BY MR. BLUME:

**Q.    DR. EVANS, YOU HAVE EXPLAINED THIS, AND I DON'T WANT TO,  I WILL NOT SPEND A LOT OF TIME ON IT.   BUT YOU, BASICALLY, SAID THAT THE QEEG PROVIDED ADDITIONAL CONFIRMATORY DATA FOR YOUR NEUROPSYCHOLOGICAL TESTING?**

A.    YES.  FOR MINE, AS WELL AS FOR SOME OF WHAT DR. GUR DID.

**Q.    SO NOW, ON THIS ONE IN PARTICULAR,  IS THERE ANY -- WHAT IS IT? IS THERE ANYTHING THAT WOULD -- THIS JUST SHOWS, I TAKE IT,  THIS IS JUST A PRINTOUT OF WHAT THE DATA ACTUALLY TELLS YOU?**

A.    THIS IS A PRINTOUT OF THE FREQUENCY IMBALANCES IN THE DIFFERENT -- WHERE THEY ARE IN THE DIFFERENT FREQUENCIES. FOR EXAMPLE,  THAT SECOND ONE ON THE RIGHT, I AM HAVING TROUBLE READING THE ACTUAL WHAT IT SAYS ON THE TOP,  BUT THE ONE ON THE SECOND ONE.

**Q.    TOUCH THE ONE YOU ARE TALKING ABOUT, AND THE JURY CAN SEE IT.**

A.    THE SECOND ONE IN, ON THE LEFT.

THE COURT:   LET ME JUST SAY.  WE HAD A MISCOMMUNICATION.   MS. FLOYD ASKED ME IF IT WENT TO THE JURY. I SAID IT WAS FOR DEMONSTRATIVE PURPOSES ONLY, MEANING IT

DIRECT EXAM OF JAMES EVANS

WOULD NOT GO IN DURING DELIBERATIONS, BUT IT DOES NEED TO BE DISPLAYED TO THE JURY NOW FOR TESTIMONY.   THAT WAS MY MISTAKE.

BY MR. BLUME:

**Q.   CAN YOU JUST POINT TO WHICH ONE YOU ARE TALKING ABOUT?**

A.   IF I POINT HERE, IT WILL DO IT?

THIS ONE, THE TOP ROW, THE SECOND FROM THE LEFT.   IT SHOWS IN THAT DARKER AREA TOWARD THE FRONT THAT THERE IS EXCESSIVE POWER IN THAT FREQUENCY RANGE,  WHICH I BELIEVE, THAT AT THE TOP THERE, IS SAYING "THETA."  BUT ANYWAY, THERE IS EXCESSIVE POWER IN THAT FREQUENCY RANGE.   AND THAT IS SOMETHING THAT IS OFTEN SEEN IN PERSONS WITH ATTENTION PROBLEMS.

**Q.   THAT IS SOMETHING YOU FOUND IN YOUR NEUROPSYCHOLOGICAL TESTING?**

A.   RIGHT.

AND THEN DOWN HERE ON THE BOTTOM ROW, THE ONE FURTHEST FROM THE LEFT, IT SHOWS A MAJOR IMBALANCE IN THE, I BELIEVE IT IS 25 TO 30 RANGE, WHICH IS SOMETIMES CALLED GAMMA.   AND THAT ALSO GOES OVER A LOT OF THE FRONTAL LOBES, AS WELL AS, EXTENDING BACK TOWARD THE CENTRAL AND PARIETAL AREAS.   AND THAT IS ALSO A FREQUENCY IMBALANCE.   THAT WOULD BE COMMENSURATE WITH DYSFUNCTION IN THOSE AREAS.

**Q.   WELL,  NOW,  DR. EVANS, WHAT I WANT TO TURN TO FOR A MINUTE,  WAS THERE ANYTHING ELSE?**

App. 00648

**DIRECT EXAM OF JAMES EVANS**

A.    NO.

Q.    WHAT I WANT TO TURN TO, IN CONCLUSION, THERE HAS BEEN SOME DISCUSSION PREVIOUSLY, AND SO I JUST WANT TO GO AHEAD AND ASK YOU ABOUT IT.  WE HAVE HAD SOME PREVIOUS DISCUSSION OF THE CONCEPT OF MALINGERING OR FAKING.  AND, IN YOUR OPINION, BASED UPON YOUR -- THE EVALUATION YOU GAVE, THE TESTING YOU GAVE MR. FULKS,  WAS MALINGERING AN ISSUE?

A.    NO.

Q.    AND WHY IS THAT?

A.    WELL, HE HAD BEEN GIVEN THE WECHSLER TEST TWO TIMES, AND HE GOT THE SAME SCORE, ESSENTIALLY, BOTH TIMES.  NOW, THIS WECHSLER ADULT INTELLIGENCE SCALE HAS A GREAT MANY QUESTIONS ON IT.  AND IT INCLUDES SUCH THINGS AS BEING ABLE TO REPEAT A SERIES OF DIGITS LIKE, REPEAT AFTER ME,  4,  9, 8,  7,  3 AND THEN ANOTHER SERIES TO REPEAT BACKWARD.  IT REQUIRES SO MANY THINGS THAT ONE WOULD HAVE NO WAY OF REMEMBERING FROM ONE MONTH, ONE WEEK, EVEN ONE DAY FOR SOME OF US LATER, EXACTLY HOW MANY DIGITS THEY RECALLED THE FIRST TIME, SO THEY COULD REPEAT IT THE SECOND TIME.

FURTHERMORE,  THAT IS JUST ONE EXAMPLE.  THERE ARE MANY EXAMPLES ACROSS THOSE TESTS OF HOW IT WOULD BE VERY DIFFICULT. I COULDN'T DO IT, AND I HAVE GIVEN THOUSANDS OF THESE.  I MIGHT BE ABLE TO FAKE IT TO SOME EXTENT, BUT I COULDN'T TRAIN ANYBODY, EVEN ONE OF MY BEST GRADUATE STUDENTS.  I DON'T KNOW THAT I COULD TRAIN THEM TO FAKE IT SO THEY COULD DO IT TWO

DIRECT EXAM OF JAMES EVANS

TIMES WITH SEVERAL WEEKS BETWEEN AND COME OUT WITH THE VERY SAME SCORE.  I THINK IT WOULD BE IMPOSSIBLE.

AND THEN TO ADD TO THAT, WHEN THEY GOT TO BUTNER, THEY GAVE HIM YET A DIFFERENT TEST, AND HE CAME OUT WITH THE SAME IQ SCORE.

**Q.    YOU MEAN A DIFFERENT MEASURE?**

A.    A DIFFERENT MEASURE.

**Q.    A TOTALLY DIFFERENT?**

A.    WOODCOCK-JOHNSON COGNITIVE ABILITY TEST, WHICH IS A COMPLETELY DIFFERENT INSTRUMENT.  HE GOT THE SAME SCORE.  SO, AND THEN THE READING TEST ALSO RESULTED IN THE SAME SCORE.

**Q.    YOU MEAN THE TEST YOU GAVE?**

A.    THAT I GAVE.  AND YOU CANNOT FAKE THE BONA FIDE EEG. YOU DON'T KNOW HOW TO CHANGE YOUR BRAIN WAVES.  AND I COULD GO ON AND ON,  BUT I BET MY LIFE ON IT, HE WAS NOT MALINGERING THESE TESTS.

**Q.    SO,  BASICALLY, YOU HAVE GOT, ESSENTIALLY, FOUR DIFFERENT MEASURES,  FOUR DIFFERENT INTELLIGENCE TESTS OVER A PERIOD OF ABOUT 18 MONTHS THAT COME UP WITH THE SAME?**

A.    YES.  THREE FULL ONES AND THEN THE ONE I GAVE, PARTIALLY.

**Q.    AND THERE WERE ALSO,  WERE THERE NOT, SPECIFIC TESTS GIVEN TO LOOK FOR MALINGERING?**

A.    ONE OF THE OTHER PERSONS GAVE THE TOMM, WHICH IS A TEST OF MEMORY MALINGERING, AND FOUND NO EVIDENCE OF MALINGERING.

CROSS EXAM OF JAMES EVANS

AND DR. HUELKE, I BELIEVE, IN HIS HAVING GIVEN THE PERSONALITY ASSESSMENT INVENTORY, WHICH HAS MEASURES ON THERE OR HAS SCALES TO DETECT MALINGERING, DETECTED NO MALINGERING.  AND THE MAN WHO DID THE MRI OF THE CORPUS CALLOSUM FOUND PARTS THAT ARE ABNORMAL,  THE ONES THAT TEND TO RELATE TO EXECUTIVE FUNCTIONS,  ABSOLUTELY NO ONE CAN WILL THEIR CORPUS CALLOSUM TO CHANGE SHAPE IN ORDER TO FAKE IT.

MR. BLUME:  ONE SECOND.  DR. EVANS,  IF YOU CAN ANSWER ANY QUESTIONS THE FIRST ASSISTANT UNITED STATES ATTORNEY, MR. SCHOOLS, HAS FOR YOU, I WOULD APPRECIATE IT.

BY MR. SCHOOLS:

**Q.    GOOD MORNING,  DR. EVANS.**

A.    GOOD MORNING.

**Q.    MY NAME IS SCOTT SCHOOLS.  I'M AN ASSISTANT U. S. ATTORNEY HERE IN COLUMBIA.   YOU AND I HAVE NEVER MET BEFORE, HAVE WE?**

A.    I DON'T THINK SO.

**Q.    I DON'T EITHER.   LET ME ASK YOU A FEW QUESTIONS, DOCTOR.  I WANT TO START OUT WITH TALKING ABOUT WHAT YOUR FINDINGS ARE NOT,  OKAY?  THERE ARE A NUMBER OF PSYCHOLOGICAL DISORDERS THAT MR. FULKS DOES NOT HAVE; IS THAT CORRECT?**

A.    YES.  CERTAINLY DOES NOT HAVE ALZHEIMER'S.   I COULD GO ON WITH SEVERAL.   I DON'T THINK HE HAS SCHIZOPHRENIA.

**Q.    HE IS NOT SCHIZOPHRENIC?**

A.    I CAN IMAGINE HIM HAVING OCCASIONAL PSYCHOTIC EPISODES.

CROSS EXAM OF JAMES EVANS

NOT CRITERIA FOR SCHIZOPHRENIA, AS I WOULD SEE IT.

**Q.    ARE YOU FAMILIAR THAT THE ONLY TIME HE HAS EVER REPORTED PSYCHOTIC EPISODES IS IN THE 1998 EVALUATION WHERE HE WAS TRYING TO DO MALINGERING?**

A.    I AM FAMILIAR WITH THE FACT,  YES.  I AM FAMILIAR WITH THAT REPORT.   AND I DON'T RECALL ANYONE EVER DIAGNOSING HIM AS HAVING PSYCHOTIC EPISODES.   SEVERAL PEOPLE SAID SOME OF THE TEST RESULTS WOULD BE COMPATIBLE WITH ONE HAVING OCCASIONAL BREAKS WITH REALITY,  INCLUDING ONE ELEMENT.   BUT I DON'T THINK HE HAS EVER BEEN, INITIALLY, DIAGNOSED AS HAVING BEEN PSYCHOTIC.

**Q.    THAT WAS A LONG ANSWER.  THE ONLY TIME HE HAS EVER REPORTED ANY PSYCHOTIC HALLUCINATIONS OR AUDITORY HALLUCINATIONS WAS IN THE 1998 EVALUATION IN WHICH HE WAS DETERMINED TO BE MALINGERING; IS THAT CORRECT?**

A.    THE ONLY THING I HAVE READ,  YES, SIR.

**Q.    AND, AT THAT TIME, HE REPORTED THE TV WAS TALKING TO HIM,  DIDN'T HE?**

A.    THAT --

**Q.    THE TELEVISION,  HE WAS HEARING THE TELEVISION WAS TELLING HIM TO DO THINGS?**

A.    YES, SIR.

**Q.    THAT WAS IN 1998?**

A.    YES, SIR.

**Q.    HE HAS NOT REPORTED THOSE THINGS SINCE THEN?**

**CROSS EXAM OF JAMES EVANS**

A.    NO, SIR.  NOT THAT I AM AWARE OF.

**Q.    SOMEBODY WHO IS SCHIZOPHRENIC REPORTS DELUSIONS AND HALLUCINATIONS,  WOULDN'T YOU?**

A.    YES.   THAT IS PART OF THE -- ONE OF THE MAIN SYMPTOMS.

**Q.    AND SCHIZOPHRENICS ARE PEOPLE WHO WE COMMONLY, PERHAPS INCORRECTLY, BUT COMMONLY REFER TO AS PEOPLE WITH MULTIPLE PERSONALITIES; ISN'T THAT RIGHT?**

A.    NO, SIR.

**Q.    WHAT DO YOU CALL PEOPLE WITH MULTIPLE PERSONALITIES?**

A.    DISSOCIATIVE DISORDER.

**Q.    HE DIDN'T HAVE THAT EITHER?**

A.    HE WOULDN'T MEET THE CRITERIA FOR THE ASSOCIATE OF IDENTITY DISORDER.

**Q.    HE DOESN'T MEET THE CRITERIA, IS ANOTHER WAY OF SAYING HE DOESN'T HAVE IT?**

A.    HE DOESN'T MEET THE CRITERIA FOR MULTIPLE PERSONALITY, THAT IS TRUE.

**Q.    IF MR. FULKS IS ACTING OUT IN A PARTICULAR EPISODE, IT IS NOT BECAUSE HE HAS ASSUMED A DIFFERENT PERSONALITY AND HAS BECOME, IN FACT, A DIFFERENT PERSON THAN THE GUY SEATED AT COUNSEL TABLE HERE TODAY?**

A.    I CERTAINLY WOULD NOT DIAGNOSE HIM AS THAT,  NO.

**Q.    AND YOU DIDN'T DIAGNOSE HIM WITH INTERMITTENT EXPLOSIVE DISORDER,  DID YOU?**

A.    I DIDN'T.   I DID NOT.   I WOULDN'T COMPLETELY RULE

App. 00653

CROSS EXAM OF JAMES EVANS

THAT OUT IF I WERE.  I WASN'T ASKED TO EVALUATE HIM FOR THAT,
SO I DID NOT DIAGNOSE HIM THAT WAY.

Q.    BUT YOU READ ALL OF THESE OTHER REPORTS.  NO ONE
DIAGNOSED HIM WITH INTERMITTENT EXPLOSIVE DISORDER,  HAVE
THEY?

A.    NOT THAT I AM AWARE OF.

Q.    YOU DIDN'T DIAGNOSE HIM AS PARANOID?

A.    I DID NOT.

Q.    YOU DIDN'T DIAGNOSE HIM AS HAVING PANIC DISORDER?

A.    I DID NOT.  BUT, AGAIN, LET ME REMIND YOU, THAT I WAS
ASKED TO PROVIDE,  IF POSSIBLE,  OBJECTIVE EVIDENCE THAT HE
HAD BRAIN DAMAGE OR BRAIN DYSFUNCTION.  AND I WAS NOT ASKED
TO LOOK FURTHER INTO THESE OTHER -- SOME OF THESE OTHER
DISORDERS YOU ARE TALKING ABOUT.  SOME, I CAN RULE OUT
BECAUSE THEY ARE SO BLATANT THAT I WOULD HAVE NOTICED IT, EVEN
THOUGH I WAS NOT CHECKING FOR IT.  BUT SOME OF THE OTHER ONES
SUCH AS PANIC DISORDER AND INTERMITTENT EXPLOSIVE DISORDER ARE
POSSIBLE.  I WAS JUST NOT LOOKING FOR THOSE AND WAS NOT
TESTING FOR THEM.

Q.    BUT NOBODY ELSE HAS DIAGNOSED HIM WITH INTERMITTENT
EXPLOSIVE DISORDER,  EITHER, HAVE THEY?

A.    NOT THAT I AM AWARE OF.

Q.    NO ONE ELSE HAS DIAGNOSED HIM WITH PANIC DISORDER?

A.    NOT THAT I AM AWARE OF.

Q.    YOU DIDN'T DIAGNOSE HIM AS BEING OBSESSIVE/COMPULSIVE?

**CROSS EXAM OF JAMES EVANS**

A.    NO, I DID NOT.   AS I SAID, NO, I DID NOT, NO.

Q.    AND, DR. EVANS, IT IS NOT YOUR TESTIMONY THAT CHAD FULKS RAPED ALICE DONOVAN BECAUSE HE IS BRAIN DAMAGED?

A.    WOULD YOU REPEAT THAT?

Q.    IT IS NOT YOUR TESTIMONY, IS IT, THAT CHAD FULKS RAPED ALICE DONOVAN BECAUSE HE IS BRAIN DAMAGED?

A.    NO.   I DIDN'T EVEN KNOW HE HAD RAPED HER.

Q.    I WAS GOING TO ASK YOU ABOUT THAT.   HAVE YOU TALKED TO MR. FULKS ABOUT THE FACTS OF THIS CASE?

A.    A LITTLE BIT.

Q.    BUT YOU SAID JUST NOW THAT YOU DIDN'T KNOW THAT HE HAD RAPED ALICE DONOVAN; IS THAT CORRECT?

A.    THAT'S CORRECT.

Q.    SO, EITHER HE DIDN'T TELL YOU THAT, OR YOUR CONVERSATION WITH HIM WAS NOT THAT DETAILED?

A.    BOTH.

Q.    HE DIDN'T TELL YOU THAT?

A.    HE DIDN'T TELL ME ANYTHING ABOUT RAPING ANYBODY.   AND, I ASSUME, IF HE DID IT, THEN IT WASN'T DETAILED ENOUGH, OR HE WOULDN'T HAVE TOLD ME.   NO, HE DIDN'T TELL ME.

Q.    HE DIDN'T TELL YOU.   WHEN I ASKED YOU ABOUT CAUSE-AND-EFFECT, IF YOU WERE GOING TO MAKE A CAUSE-AND-EFFECT ANALYSIS, TO MAKE THAT ASSESSMENT, YOU WOULD HAVE TO KNOW THE DETAILS OF THE CRIME, WOULDN'T YOU?

A.    IN TERMS OF THE SPECIFIC CRIME? IT WOULD HELP.

CROSS EXAM OF JAMES EVANS

Q.    BUT YOU DON'T KNOW THOSE DETAILS?

A.    NO.   HE TOLD ME A LITTLE BIT ABOUT HAVING ESCAPED FROM A PRISON AND HAVING HIJACKED A CAR,  I BELIEVE.   BUT THAT IS ALL.

Q.    BUT DESPITE THAT KNOWLEDGE, YOU ARE STILL NOT PREPARED, IT IS NOT YOUR TESTIMONY, TODAY, THAT CHAD FULKS DID EITHER ONE OF THOSE THINGS BECAUSE OF THE DAMAGE THAT YOU ARE TESTIFYING ABOUT WITH REGARD TO HIS BRAIN?

A.    THE BEST I COULD DO IN THAT REGARD WOULD BE TO SAY THAT BRAIN DAMAGE PUTS ONE AT HIGH RISK FOR SUCH BEHAVIORS.   BUT I CAN'T SAY HE DID IT.

Q.    IN FACT,  THOUGH,  DR. EVANS,  IF MR. FULKS'S IQ IS 78, 79,  THAT IS WITHIN THE RANGE?

A.    YES, SIR.

Q.    AND THERE ARE EIGHT PERCENT OF THE PEOPLE IN THE COUNTRY WHO ARE LESS SMART THAN THAT,  ISN'T THERE?

A.    IF YOU GET UP CLOSER TO THE 80,  78,  79 RANGE, IT WOULD BE ROUGHLY THAT,  YES.

Q.    ROUGHLY EIGHT PERCENT?

A.    ROUGHLY.

Q.    AND, PRESUMABLY, ALL OF THOSE EIGHT PERCENT OF THE PEOPLE WHO ARE AS SMART AS OR LESS SMART AS MR. FULKS, ARE NOT COMMITTING THE SAME CRIMES AS HE COMMITTED?

A.    THAT IS VERY TRUE.

Q.    SO,  IT IS NOT YOUR TESTIMONY THAT MR. FULKS DOES NOT

**CROSS EXAM OF JAMES EVANS**

**HAVE THE CAPACITY TO MAKE CHOICES ON HIS OWN?**

A.   AS I TESTIFIED EARLIER,  I BELIEVE THAT HIS EXECUTIVE SKILLS ARE IMPAIRED.   I THINK HE DOES NOT HAVE AS MUCH CHOICE TO MAKE DECISIONS ON HIS OWN AS THE AVERAGE PERSON,  BUT THAT DOESN'T MEAN THAT HE HAS NO EXECUTIVE FUNCTIONS, THEY ARE JUST DEFECTIVE.

**Q.   BUT, IN FACT, DR. EVANS, THE VAST MAJORITY OF PEOPLE WITH MR. FULKS'S INTELLECTUAL QUOTIENT,  HIS IQ,  DO NOT COMMIT THESE CRIMES?  DOCTOR,  IS THAT TRUE?**

A.   NO.   THOSE CRIMES,  A CRIME OF WHAT?  YOU SAID, "DOES NOT COMMIT THOSE CRIMES."  WHAT CRIMES WERE YOU REFERRING TO?

**Q.   WELL, WHAT CRIMES DO YOU KNOW HE HAS COMMITTED?**

A.   I DON'T KNOW.   I DON'T KNOW THAT HE COMMITTED ANY CRIME EXCEPT HE TOLD ME HE CARJACKED AND WAS ACCESSORY TO CARJACKING.

**Q.   BUT THE VAST MAJORITY OF PEOPLE WHO HAVE AN IQ OF 78, OR 79, OR BELOW, DO NOT CARJACK WOMEN, DO THEY?**

A.   THAT IS TRUE.

**Q.   AND THE VAST MAJORITY OF PEOPLE WHO HAVE AN IQ OF 78, OR 79, OR BELOW CANNOT KIDNAP WOMEN DO THEY?**

A.   THAT IS TRUE.

**Q.   THE VAST MAJORITY OF PEOPLE WHO HAVE AN IQ OF 78, OR 79, OR BELOW DO NOT RAPE WOMEN,  DO THEY?**

A.   AS FAR AS I KNOW, THAT IS TRUE.

**Q.   BECAUSE, THOSE PEOPLE ARE CAPABLE OF MAKING THE**

**CROSS EXAM OF JAMES EVANS**

**DECISION NOT TO, AREN'T THEY?**

A.    WELL, ARE YOU ASKING THAT AS A QUESTION?

**Q.    IT WAS A QUESTION.   THOSE PEOPLE ARE, OBVIOUSLY, CAPABLE OF MAKING THE DECISION NOT TO DO THOSE THINGS?**

A.    I THINK I COULD REWORD THAT.  AND I AM NOT GOING TO SAY THAT IS TRUE BECAUSE I THINK I NEED TO REWORD IT AND SAY THAT THERE ARE CERTAIN CIRCUMSTANCES, CERTAIN UPBRINGING VARIABLES, FAMILY VARIABLES, ENVIRONMENTAL VARIABLES, CIRCUMSTANTIAL VARIABLES, ALCOHOL VARIABLES.  HAD THOSE BEEN PRESENT, THEN THE VAST MAJORITY OF THOSE MIGHT, IN FACT, DO THAT.   BUT, AS IT IS, I WOULD SAY THE VAST MAJORITY OF PEOPLE WITH THEIR IQ'S IN THE SEVENTIES HAVE SOME BRAKES PUT ON THEIR BEHAVIORS BY PARENTAL CONTROL, AND SO ON, AND CHURCH CONTROL. A VAST MAJORITY OF THEM DO NOT USE ALCOHOL THAT EXTENSIVELY. AND THE THE VAST MAJORITY PROBABLY NEVER HAD THE -- OR LIKELY NEVER HAD SOME OF THE OPPORTUNITIES TO BE WITH A PERSON WHO IS WITH THE WRONG CROWD AND, THEREFORE, THEY DID NOT COMMIT THEM.

SO, THE ANSWER WOULD BE, THE VAST MAJORITY DID NOT.  BUT I HAVE TO QUALIFY IT BY SAYING, THE VAST MAJORITY ALSO, VERY LIKELY, DO NOT HAVE THOSE OTHER VARIABLES.

FURTHERMORE, MANY PEOPLE IN THE 70 TO 79 IQ RANGE, DID NOT HAVE, SPECIFICALLY, FRONTAL LOBE DAMAGE, WHICH IMPAIRS EXECUTIVE FUNCTIONS.  THEY VERY WELL COULD HAVE DAMAGE IN OTHER AREAS OF THE BRAIN, WHICH WOULD IMPAIR LEARNING TO READ, LEARNING TO SPELL, LEARNING TO WRITE, ET CETERA, BUT NOT SO

CROSS EXAM OF JAMES EVANS

MUCH THE EXECUTIVE FUNCTION.

Q.    DR. EVANS,  YOU HAVEN'T CONDUCTED A STUDY OF ALL OF THESE PEOPLE WITH THE IQ OF 78 AND 79 TO DETERMINE WHAT THEIR SOCIOECONOMIC UPBRINGING WAS TO RELATE TO CAUSE-AND-EFFECT HOW THEY RELATE TO BEHAVIOR?

A.    NO.  I WAS TALKING ABOUT MY OPINION FOR OVER THE YEARS. AND YOU ASKED, DID I THINK THE VAST MAJORITY WOULD DO THIS. THERE IS NO RESEARCH, THAT I KNOW OF, TO SAY, THE VAST MAJORITY WOULD OR WOULDN'T.  I WAS GIVING MY OPINION.

Q.    BUT FACTUALLY, WE KNOW, FOR A FACT,  FACTUALLY, THE VAST MAJORITY DO NOT.  WE DON'T HAVE TO DO A STUDY ON THAT, BECAUSE IF EIGHT PERCENT OF THE PEOPLE IN THE COUNTRY WERE COMMITTING HEINOUS, MURDEROUS CRIMES, WE WOULD KNOW THAT BECAUSE WE WOULD HAVE A CRIME PROBLEM, WOULDN'T WE?

A.    THAT IS EXACTLY WHY I SAID YES, I WOULD AGREE, BASICALLY, WITH YOU, BUT I NEEDED TO QUALIFY IT, BECAUSE HE IS NOT ONE OF THE TYPICAL PERSONS FROM AN IQ OF 78,  79.

Q.    IS HE NOT THOUGH, ISN'T IT MORE LIKELY, DR. EVANS, THAT SOMEONE WHO COMES FROM A SOCIOECONOMIC BACKGROUND OF POVERTY AND ALCOHOLISM WOULD HAVE A REDUCED IQ?

A.    YES.  IT IS ALSO MORE LIKELY THAT THE MEN I HAVE SEEN IN PRISON WHO ARE ON DEATH ROW HAVE IQ'S IN THAT RANGE.  AND MANY MEN IN PRISON, NOT JUST ON DEATH ROW,  BUT MANY MEN IN PRISON.

Q.    AND MANY PEOPLE  NOT IN PRISON HAVE THAT SAME PROFILE,

**CROSS EXAM OF JAMES EVANS**

DON'T THEY?

A.    THAT'S TRUE.

Q.    OKAY.  DR. EVANS,  YOU ARE TESTIFYING TO SOMETHING YOU DO FREQUENTLY,  ISN'T IT?  OR HAVE DONE FREQUENTLY?

A.    I HAVE.  WELL,  IF YOU -- AFTER THE MAN THAT TESTIFIED YESTERDAY WHO HAD DONE IT, 200 -- WHAT, I FORGET, HOW MANY HUNDREDS OF TIMES.  I HAVE NOT TESTIFIED THAT OFTEN, BUT IF YOU ADD CIVIL AND CRIMINAL, I HAVE TESTIFIED, I WOULD SAY, AROUND 80 OR 90 TIMES.

Q.    THIS ISN'T THE FIRST TIME YOU HAVE TESTIFIED FOR A DEFENDANT IN A DEATH PENALTY CASE,  IS IT?

A.    OH, NO.

Q.    YOU HAVE DONE IT SEVERAL TIMES?

A.    YES,  SIR.

Q.    YOU HAVE MADE A SIGNIFICANT AMOUNT OF INCOME TESTIFYING FOR DEFENDANTS IN DEATH PENALTY CASES; ISN'T THAT RIGHT?

A.    I GUESS YOU WOULD HAVE TO DEFINE "SIGNIFICANT."  YEAH, I CONSIDER IT "SIGNIFICANT."

Q.    AND,  DOCTOR,  I WANT TO ASK YOU SOME GENERAL QUESTIONS ABOUT WHAT YOU DO IN YOUR CAPACITY AS A WITNESS VERSUS WHAT YOU DO IN YOUR CAPACITY AS A TREATING PHYSICIAN, BECAUSE THEY ARE DIFFERENT,  AREN'T THEY?

A.    TREATING PSYCHOLOGIST VERSUS THIS TYPE WORK?

Q.    YES.

A.    YEAH.  IT IS DIFFERENT HATS.

CROSS EXAM OF JAMES EVANS

Q.    AND ONE OF THE THINGS THAT MAKES IT DIFFERENT IS THE EVALUATION OF A PATIENT VERSUS THE EVALUATION OF A DEFENDANT IS DIFFERENT, ISN'T IT?

A.    HOW DO YOU THINK IT IS DIFFERENT?

Q.    WELL, THE INDIVIDUALS ARE MOTIVATED DIFFERENTLY, AREN'T THEY?

A.    WHAT INDIVIDUAL?

Q.    EITHER A PATIENT OR A DEFENDANT.  A PATIENT COMES TO SEE DOCTOR, AND HE OR SHE IS LOOKING FOR A CURE?

A.    OH, I SEE WHAT YOU MEAN.

Q.    ISN'T THAT RIGHT?

A.    SOMETIMES, THAT IS WHAT THEY ARE LOOKING FOR.  AND IF I AM JUST SEEING THEM OUTSIDE OF THE NEUROPSYCHOLOGY AREA -- IN THE NEUROPSYCHOLOGY AREA, THEY ARE OFTEN LOOKING TO SEE IF THEY HAVE BRAIN DAMAGE FROM A CAR WRECK, OR SOMETHING OF THAT SORT.  BUT OUTSIDE OF THAT, YES, THEY ARE COMING BECAUSE OF ANXIETY, DEPRESSION, SCHOOL LEARNING PROBLEMS, ATTENTION DEFICIT DISORDER, ET CETERA.

Q.    THEY ARE COMING TO YOU FOR A FIX.  THEY COME TO SEE YOU BECAUSE THEY HAVE GOT A PROBLEM IN THEIR LIFE THAT THEY ARE ACTUALLY TRYING TO SOLVE OR TO UNDERSTAND; IS THAT RIGHT?

A.    THAT'S TRUE.

Q.    AND YOUR NEUROPSYCHOLOGICAL EVALUATION REPORT REFLECTS THAT YOU WERE REQUESTED TO CONDUCT AN EVALUATION TO OBTAIN INFORMATION WHICH MAY BE USED IN PREPARATION FOR THE LEGAL

## CROSS EXAM OF JAMES EVANS

DEFENSE OF HIS CLIENT.  THAT IS WHAT YOU WERE ASKED TO DO IN THIS CASE; IS THAT RIGHT?

A.  THAT'S TRUE.

Q.  AND THAT IS A DIFFERENT TASK THAN TREATING A PATIENT WHO HAS COME TO YOU TO TRY TO SOLVE A PROBLEM; IS THAT CORRECT?

A.  YES.

Q.  AND THAT PATIENT WHO COMES TO YOU TO GET A PROBLEM SOLVED IS MOTIVATED TO BE SINCERE; IS THAT TRUE?

A.  YES.

Q.  BECAUSE THAT PATIENT IS NOT GOING TO GET THEIR PROBLEM SOLVED IF THEY DON'T SPEAK CANDIDLY WITH YOU; IS THAT CORRECT?

A.  YES.

Q.  AND IN SOME PLACES, IN FACT, DOCTOR, THERE ARE COMMUNICATION PRIVILEGES BETWEEN DOCTORS AND PATIENTS SO THAT THEY CAN BE CANDID WITH EACH OTHER WITHOUT FEAR THAT THAT COMMUNICATION WILL BE USED AGAINST THEM IN COURT OR IN SOME OTHER FASHION, DO YOU UNDERSTAND THAT?

A.  THERE ARE SOME SAFEGUARDS IN THAT REGARD, YES.

Q.  AND THE REASON THAT THOSE SAFEGUARDS ARE IN PLACE, YOU UNDERSTAND, IS BECAUSE IT IS IMPORTANT FOR PATIENTS TO UNDERSTAND THAT THEY CAN BE CANDID WITH THEIR DOCTOR WITH THEIR TREATMENT, AND THEIR EVALUATION WILL BE ACCURATE, THEY CAN GET CURED WITHOUT SOME FEAR OF RETRIBUTION?

A.  THAT'S TRUE.

CROSS EXAM OF JAMES EVANS

Q.    WHEN A DEFENDANT SPEAKS WITH YOU,  HE OR SHE IS IN A
TOTALLY DIFFERENT POSTURE; ISN'T THAT RIGHT?

A.    DIFFERENT POSTURE,  YES.

Q.    AND, ARGUABLY, THAT DEFENDANT IS MOTIVATED TO BE SICK,
AREN'T THEY?

A.    YES.    THEY SHOULD BE.  IF THEY AREN'T, THEY SHOULD BE.

Q.    AND BECAUSE THE LAST THING THAT CHAD FULKS OR HIS
ATTORNEY WOULD WANT YOU TO DO IS SIT ON THIS WITNESS STAND IN
FRONT OF THIS JURY AND SAY, YOU KNOW, CHAD IS A PERFECTLY
HEALTHY 27-YEAR-OLD MAN WHO MADE HIS OWN CHOICES TO KILL
WOMEN.

A.    I THINK THAT IS CORRECT.   THEY WOULDN'T HAVE ME UP
HERE IF THAT IS WHAT I SAID.

Q.    AS A RESULT OF THAT, THE TASK YOU UNDERTAKE, IN ORDER
TO ACHIEVE AN ACCURATE DIAGNOSIS OR OPINION, SHOULD PROBABLY
BE DIFFERENT, AS WELL, IN A PATIENT VERSUS A DEFENDANT?

A.    I AM NOT SURE I AGREE WITH THAT.   HOW DO YOU MEAN?

Q.    WELL,  YOU SPOKE WITH MR. FULKS OR SPENT ABOUT EIGHT
HOURS WITH HIM; IS THAT CORRECT?

A.    I THINK ABOUT EIGHT OR NINE,  YES.

Q.    AND HE TOLD YOU ABOUT VARIOUS EPISODES IN HIS LIFE; IS
THAT RIGHT?

A.    LITTLE THINGS LIKE BEAR HUNTING.

Q.    BUT Y'ALL TALKED ABOUT HIS BACKGROUND?

A.    OH, YEAH,  YEAH.

CROSS EXAM OF JAMES EVANS

**Q.    DIDN'T TALK MUCH ABOUT THE CRIMES IN THIS CASE?**

A.    NOT MUCH.

**Q.    BUT YOU DOCTORS USE A TERM CALLED A "RELIABLE HISTORIAN." THAT IS A TERM OF ART TO MEAN THAT AN INDIVIDUAL IS CAPABLE OF PROVIDING ACCURATE INFORMATION ABOUT THEIR PAST; IS THAT RIGHT?**

A.    YES.

**Q.    AND A PATIENT WHO COMES IN AND CAN REMEMBER THINGS ABOUT THEIR PAST IS CONSIDERED A "RELIABLE HISTORIAN?"**

A.    PROVIDED IT WAS ACCURATE MEMORIES,  YES.

**Q.    BUT YOU DON'T REALLY HAVE ANY REASON TO QUESTION THE MEMORY OF THE PATIENT OR THEIR RECOUNTING OF THEIR HISTORY UNLESS,  OF COURSE,  YOU HAVE SOME OBJECTIVE REASON TO DO SO, IT DOESN'T MAKE SENSE,  IT IS INCONSISTENT WITH THINGS THAT YOU KNOW ABOUT THE PATIENT?**

A.    I THINK THAT IS TRUE,  YES.

**Q.    IN THE CASE OF A DEFENDANT,  DOCTOR,  IT BECOMES MORE AND MORE IMPORTANT TO BE ABLE TO VERIFY THROUGH THIRD PARTY SOURCES THE INFORMATION THAT THE DEFENDANT HAS ACTUALLY GIVEN YOU IS ACCURATE,  ISN'T IT?**

A.    YES.  IF I WERE CHECKING ON BACKGROUND INFORMATION, YES.

**Q.    BUT, NONETHELESS,  THE MOTIVATION IS DIFFERENT.  AND IN ORDER TO VERIFY WHAT A DEFENDANT SAYS, IT WOULD BE HELPFUL TO HAVE THIRD PARTY INFORMATION ABOUT THAT DEFENDANT?**

**CROSS EXAM OF JAMES EVANS**

A.    YOU MEAN LIKE FROM FAMILY MEMBERS, OR FROM RELATIVES, OR FROM ASSOCIATES, OR A SOCIAL WORKER?

**Q.    YES.**

A.    YES, SIR.

**Q.    AND IN THIS CASE, YOU LOOKED AT OTHER EVALUATIONS CONDUCTED BY OTHER DOCTORS WHO WERE HIRED TO TESTIFY IN THIS CASE,  CORRECT?**

A.    THAT'S CORRECT.

**Q.    WERE YOU ABLE TO LOCATE ANY PHYSICIANS' RECORDS WHERE MR. FULKS WAS EVALUATED FOR PURPOSES OTHER THAN APPEARANCES IN COURT?**

A.    NO.   I THINK ALL OF THOSE THAT I SAW HAD TO DO WITH FORENSIC ISSUES.

**Q.    SO, YOU NEVER HAD AN EVALUATION FROM A PSYCHIATRIST OR** A PSYCHOLOGIST WHO CONDUCTED AN EVALUATION TO TRY TO SOLVE MR. FULKS'S PROBLEMS?

A.    NO.

**Q.    DID YOU LOOK AT THE DISCOVERY MATERIALS IN THIS CASE, DOCTOR?**

A.    SOME.

**Q.    WHAT DID YOU LOOK AT?**

A.    I LOOKED AT RECORDS FROM BUTNER.   I LOOKED AT DR. GUR'S REPORT.   I LOOKED AT DR. BOOKSTEIN'S REPORT. LOOKED AT DR. VENN'S REPORT,  DR. HUELKE'S REPORT.   I BELIEVE THAT IS ALL.

CROSS EXAM OF JAMES EVANS

Q.    YOU DIDN'T LOOK AT ANY STATEMENTS OF WITNESSES?  LIKE, YOU DIDN'T LOOK AT VERONICA EVANS' STATEMENTS OR ROBERT LEE AND NELLIE LEE'S STATEMENTS?  YOU DIDN'T LOOK AT THAT STUFF?

A.    NO,  I DID NOT LOOK AT ANYTHING LIKE THAT.

Q.    DID YOU LOOK AT A JANUARY 12, 2004 REPORT THAT INDICATED TO BE A NORMAL RADIOLOGY EXAM OF MR. FULKS ON JANUARY 12TH, 2004, AND DETERMINED TO BE NORMAL?

A.    YES.   I READ THERE WAS A NORMAL MRI.

Q.    SO, YOU HAVE READ THERE WAS A NORMAL MRI?

A.    I KNEW THAT.

Q.    DOCTOR, IN A CASE SUCH AS THIS, WHERE YOU ARE EVALUATING A DEFENDANT,  AGAIN, IT WOULD BE RELEVANT IN ASSESSING THE DEFENDANT'S SINCERITY TO UNDERSTAND HIS HISTORY OF BEING SINCERE,  WOULDN'T IT?

A.    NOT NECESSARILY.  IF I WERE QUESTIONING ABOUT THE CRIME,  YES.  BUT AS I TESTIFIED EARLIER,  I WAS HIRED TO TRY TO OBTAIN OBJECTIVE EVIDENCE BASED ON TESTS AND QUANTIFIED EEG, RATHER THAN ON HIS REPORTS ABOUT HIS BACKGROUND.  IN FACT,  I ALMOST ALWAYS, IN THESE CASES, I TRY TO MINIMIZE ANY OF MY KNOWLEDGE ABOUT THE CRIME AND ABOUT THE BACKGROUND IN ORDER TO KEEP IT MORE OBJECTIVE.  AND I LET THE OTHER PART THAT YOU ARE TALKING ABOUT,  LET THAT BE UP TO THE SOCIAL WORKER OR OTHERS WHO ARE INVOLVED IN THE TOTAL PICTURE.  I PRESENT A PIECE OF IT, AND I TRY KEEP THAT OBJECTIVE.  THEN THAT IS ALL PUT TOGETHER BY THE DEFENSE, RATHER THAN MY

CROSS EXAM OF JAMES EVANS

PUTTING IT TOGETHER ON THE BASIS OF ANY -- I DON'T TRY TO BE COMPREHENSIVE LIKE I MIGHT BE IF I WERE DOING IT FOR SOMEONE WHO HAD BEEN IN A CAR WRECK OR SOMETHING LIKE THAT.

**Q.    IT IS FAIR, DR. EVANS, TO CONCLUDE THAT, IF A DEFENDANT IN THE POSITION OF MR. FULKS HAS A HISTORY OF BEING DECEPTIVE ABOUT HIS OWN SYMPTOMS,  THEN THAT WOULD BE SOMETHING THAT SHOULD BE RELEVANT TO YOUR ANALYSIS?**

A.    RIGHT.   IT SHOULD BE.   IN OTHER WORDS,  CHECKING FOR MALINGERING,  YOU MEAN?

**Q.    WELL,  A DEFENDANT CAN BE MOTIVATED TO MALINGER, AND A DEFENDANT CAN BE MOTIVATED TO OVERREPRESENT CERTAIN CHARACTERISTICS OF HIS PERSONALITY,  CORRECT?**

A.    SURE.   THAT IS WHY WE HAVE TESTS TO TRY TO COUNTER THAT, AND HOW EXPERIENCE MIGHT ENTER THE PICTURE.  YOU GET AN IDEA OF CHEATING ON THE TEST OR NOT.

**Q.    TESTS AREN'T PERFECT.   ONE OF THE THINGS, IF I UNDERSTOOD YOU CORRECTLY, YOU SAID YOU WANTED YOUR RESULTS TO BE OBJECTIVE.   WHICH MEANS, IN EFFECT, YOU WANT YOUR RESULTS TO BE INDEPENDENT OF CHAD FULKS'S LIFE.   YOU WANT TO LOOK AT HIS BRAIN, YOU WANT TO HAVE HIM TAKE TESTS, AND THEN YOU WANT TO REACH A CONCLUSION ABOUT WHAT KIND OF PERSON HE IS WITHOUT KNOWING VERY MUCH ABOUT HIM?**

A.    RELATIVELY, YES.   THAT IS A RELATIVELY TRUE STATEMENT. I NEED TO KNOW A LITTLE BIT, AS I SAID EARLIER, IF ONE HAS NOT HAD ANY TRAINING, TO INHIBIT IMPULSES AND THE EXECUTIVE

CROSS EXAM OF JAMES EVANS

FUNCTION IS FURTHER IMPAIRED, AND I DID -- WHAT I WAS BASING THAT ON, YOU MAY THINK, WELL, WHY IS HE SAYING WHEN HE DIDN'T HAVE ANY INFORMATION. BUT I SAT HERE YESTERDAY AND HEARD THE TESTIMONY, SO I DID HAVE SOME WHICH ALLOWED ME TO SAY THAT.

**Q.    THE BOTTOM LINE IS,  MR. EVANS -- DR. EVANS, THAT IF A JURY IS GOING TO MAKE AN EVALUATION OF MR. FULKS, THAT THE EVIDENCE THAT THEY SHOULD CONSIDER IS NOT JUST THE EVIDENCE OF WHAT HAPPENED IN THE LAB, WHICH IS BASICALLY WHAT YOU DID, BUT WHAT HAPPENS IN REALITY, IN THE REAL WORLD?**

A.    THAT IS TRUE. THEY WILL CONSIDER THE SOCIAL WORKER, IN OTHER WORDS. I WILL BE ONE LITTLE PIECE TOWARDS THIS WHOLE PICTURE THAT THEY ARE PICKING UP ON RIGHT NOW IN THE LAST, HOWEVER LONG THIS HAS BEEN GOING ON, AND THEY WILL MAKE A DECISION. NOT JUST YOU, BASED ON MY RELATIVELY OBJECTIVE FINDINGS, BUT ON MANY OTHER TESTIMONIES.

**Q.    BECAUSE ALL THE TESTIMONY ABOUT WHAT MR. FULKS DID BETWEEN NOVEMBER 3RD -- NOVEMBER 4TH, 2002 AND NOVEMBER 17TH, 2002, HIS ABILITY TO FUNCTION, HIS ABILITY TO ELUDE LAW ENFORCEMENT, HIS ABILITY TO PLAN, HIS ABILITY TO PLAN ESCAPES, HIS ABILITY TO PLAN MURDERS, HIS ABILITY TO ACQUIRE CAMOUFLAGE CLOTHING TO ENHANCE HIS ABILITY TO COMMIT CRIMES, ALL OF THOSE THINGS ARE RELEVANT TO DETERMINING HOW HE FUNCTIONS IN THE REAL WORLD, RIGHT?**

A.    THAT'S TRUE. THEY ARE RELEVANT TO IT AND THEY, AS YOU SAY THAT, IT REMINDS ME OF HOW I NEED TO QUALIFY THIS SOMEWHAT

CROSS EXAM OF JAMES EVANS

AND SAY I DID NOT TESTIFY THAT HE COULD NOT DO SOME OF THESE THINGS.  I TESTIFIED THAT HE IS AT HIGH RISK FOR HAVING POOR EXECUTIVE CONTROL.  AND IT IS LIKE SOME HYPERACTIVE CHILDREN ARE AT HIGH RISK FOR BEING OVERACTIVE, BUT IF THEIR FATHER IS STANDING THERE READY TO PUNISH THEM,  THEY MAY CONCENTRATE WHILE HE IS THERE.  IF THE MOTIVATION IS EXTREMELY STRONG, THEY MAY BE ABLE TO MAINTAIN A CERTAIN CALM AND NORMAL ACTIVITY.  BUT THAT DOESN'T MEAN THEY AREN'T -- THEY DON'T HAVE A VERY STRONG TENDENCY TO WANT TO -- A NEED TO MOVE UNLESS THEY HAVE THEIR RITALIN.

**Q.    YOU INDICATED, I BELIEVE YOUR TESTIMONY WAS, DR. EVANS, AS A RESULT OF YOUR TESTING, BOTH NEUROLOGICAL AND THE BATTERY OF TESTS THAT YOU CONDUCTED, THAT MR. FULKS HAS PROBLEMS CONTROLLING IMPULSES; IS THAT CORRECT?**

A.    IN CONTROLLING HIS IMPULSES.

**Q.    IS THAT WHAT YOU SAID?**

A.    THAT IS WHAT I SAID,  YES, SIR.

**Q.    IMPULSIVE BEHAVIOR IS BEHAVIOR THAT HAPPENS QUICKLY, GENERALLY?**

A.    IT IS BEHAVIOR THAT OCCURS WHEN YOU,  YOU KNOW,  SHOOT FROM THE HIP.  PEOPLE TALK ABOUT SHOOTING FROM THE HIP, FAILING TO COUNT TO FIVE BEFORE THEY RESPOND, NOT THINKING IT THROUGH, NOT CONSIDERING THE CONSEQUENCES OF THEIR BEHAVIOR, ACTING ON IMPULSE.

**Q.    A LOT OF TIMES, PEOPLE WILL SAY, IF YOU ARE ABOUT TO**

**CROSS EXAM OF JAMES EVANS**

**GET INTO AN ARGUMENT, YOU SHOULD COUNT TO TEN BEFORE YOU SAY SOMETHING BECAUSE THAT IS A WAY TO CONTROL IMPULSE.  AND, USUALLY, IF YOU DON'T DO THAT, YOU SAY SOMETHING YOU WISH YOU HADN'T, RIGHT?**

A.    THAT IS WHAT WE TALK ABOUT, YES.  THAT IS WHAT PEOPLE WHO HAVE PROBLEMS WITH EXECUTIVE CONTROL AND SOME PSYCHOLOGISTS, WHEN THEY ARE WORKING WITH THEM, WILL GIVE THEM THAT AS A TIP.  MAKE SURE YOU COUNT TO FIVE FIRST BECAUSE YOU HAVE A TENDENCY TO EXPLODE OR DO SOMETHING YOU WILL REGRET AFTERWARDS OR WHATEVER.

**Q.    AND SO, MR. FULKS HAS IMPULSE CONTROL.  HE DOESN'T COUNT TO TEN WHEN HE SHOULD?**

A.    IN MANY SITUATIONS.

**Q.    BUT THINGS THAT ARE PLANNED ARE NOT IMPULSIVE, NECESSARILY, ARE THEY?**

A.    WELL, THAT IS -- IT SOUNDS, ON THE SURFACE, AS IF THAT IS TRUE.  BUT THE THINGS THAT WERE PLANNED GO AWRY, THEN THEY WEREN'T PLANNED WELL.  THERE IS AN ISSUE OF WHETHER OR NOT REALLY PLANNED OR THAT YOU PLANNED WELL.

**Q.    THAT IS A DIFFERENT QUESTION.  THAT IS A DIFFERENT ANALYSIS.  THINGS THAT ARE PLANNED ARE NOT IMPULSIVE.  YOU MAY HAVE A BAD PLAN.  THAT IS DIFFERENT THAN HAVING A BAD IMPULSE.**

A.    OKAY.  I THINK I COULD AGREE WITH YOU THAT, IF YOU PLAN SOMETHING, THEN YOU AREN'T DOING IT IMPULSIVELY.  PARTS

CROSS EXAM OF JAMES EVANS

OF THE PLAN YOU ARE CARRYING OUT MAY BE DONE IMPULSIVELY.

THE FIRST PART OF IT, THE OVERALL PLAN MIGHT BE -- WAS NOT

IMPULSIVE, YES.  BY DEFINITION, I BELIEVE THAT IS TRUE.

**Q.   SO, THESE IMPULSIVE -- THIS LACK OF ABILITY TO CONTROL IMPULSE, IS IT DISCRIMINATING? IS THERE A POINT BEYOND WHERE HE CAN SAY, I CAN CONTROL THAT IMPULSE?**

A.   REPEAT.

**Q.   IS IMPULSE CONTROL DISCRIMINATING?**

A.   WHAT DO YOU MEAN?

**Q.   WHAT IF SOMEBODY HAS AN IMPULSE TO RAPE?  DOES IT MEAN THEY WILL BE ABLE TO CONTROL THE IMPULSE TO KILL IN THE NEXT INSTANCE?**

A.   I THINK IT WOULD BE RELATED.  BUT I DON'T -- ARE YOU SAYING THAT, IF SOMEONE IMPULSIVELY RAPED A WOMAN AND THEN FOLLOWING THE ACT OF RAPE IMPULSIVELY DECIDED TO KILL HER, IS THAT --

**Q.   YEAH.  YOU MEAN, WOULD THE SAME PERSON, WHO HAS GOT IMPULSE CONTROL, WOULD SEEM TO MAKE BOTH OF THOSE DECISIONS BADLY, RIGHT?**

A.   IT COULD.  IT COULD ALSO GO THE OTHER WAY, AND SAY, WHAT HAVE I DONE?  HERE I WENT AND DID SOMETHING WRONG AGAIN. I AM NOT GOING TO DO ANYTHING ANYMORE.  I WILL LEAVE HER LYING THERE OR WHATEVER.

**Q.   BUT THAT CONCLUSION WOULD HAVE BEEN REACHED AFTER THE FIRST INCIDENT PROBABLY, RIGHT?**

**CROSS EXAM OF JAMES EVANS**

A.    YES.   MANY TIMES, IMPULSIVE PEOPLE WILL.  THERE IS AN OLD SAYING OH, DANG ME, THERE I WENT AND DID IT AGAIN.   AND THEN FOR A WHILE, THEY DON'T DO IT.   AND THEN ANOTHER TIME, OH, DANG ME, THERE I DID IT AGAIN.

Q.    THOSE KINDS OF "OH, DANG ME, THERE I DID IT AGAIN," THOSE TYPE OF INCIDENTS ARE NOT MAJOR CRIMINAL INCIDENTS,  IT IS NOT WHAT YOU ARE TALKING ABOUT?

A.    NO, BUT THEY COULD BE.   I MEAN I DON'T THINK THEY WOULD SAY IT IN THOSE TERMS, BUT THEY COULD BE SIMILAR.

Q.    IT IS YOUR TESTIMONY, DOCTOR, THAT IT IS POSSIBLE THAT MR. FULKS HAD THE IMPULSE TO KIDNAP AND CARJACK ALICE DONOVAN ON NOVEMBER 14TH, AND THAT WAS AN IMPULSE THAT HE WAS IMPAIRED TO PREVENT ACTING ON?

A.    I DON'T THINK I WANT TO TESTIFY REGARDING WHAT HE DID TO A SPECIFIC PERSON OR DIDN'T DO TO A SPECIFIC PERSON BECAUSE I HAVE NO IDEA WHETHER HE DID OR DIDN'T DO IT.

Q.    THE QUALITATIVE EEG THAT YOU CONDUCTED THAT YOU INDICATED WAS CONSISTENT WITH DR. GUR'S TESTIMONY.

A.    RIGHT.

Q.    WHICH WE GOT DR. GUR'S FINDING, WHICH WAS THAT THE DAMAGE TO MR. FULKS'S BRAIN THAT YOU ASSESSED WOULD CAUSE HIM VISUAL PERCEPTUAL PROBLEMS, AND HE WOULD HAVE A HARD TIME PERCEIVING EMOTION IN ONE'S FACE.   IS THAT WHAT YOU SAID?

A.    THAT HE WOULD BE IMPAIRED WITH THAT,  IN THAT FUNCTION. THAT IT MIGHT BE DIFFICULT FOR HIM TO KNOW  -- WELL,  I WILL

CROSS EXAM OF JAMES EVANS

GIVE YOU A COUPLE OF EXAMPLES OF MEN I HAVE SEEN WHO HAD THIS SAME TYPE OF PROBLEM WHERE THEIR RIGHT HEMISPHERE WAS IMPAIRED OR THE COMMUNICATION WITHIN THE RIGHT HEMISPHERE WAS IMPAIRED IN A WAY LIKE WAS TRUE WITH MR. FULKS.  AND THEY HAD TOLD ME THEY WERE CONVICTED OF KILLING A MAN IN A -- OR A CLERK, I THINK THIS HAPPENED TWO CASES I CAN RECALL.  KILLING A CLERK IN A STORE, LIKE A CONVENIENT STORE, OR A -- ONE WAS A CONVENIENT STORE, AND ONE WAS A LIQUOR STORE.  AND THEY SAID THAT HE LOOKED LIKE HE WAS GOING FOR A GUN.  I COULD TELL BY THE LOOK ON HIS FACE HE WAS GOING FOR A GUN, SO I SHOT FIRST. AND I THINK WHAT MIGHT HAVE BEEN TERROR, BUT THEY MISTOOK IT AS ANGER, AND THEY WERE GOING TO SHOOT THEM.

SO,  I DON'T KNOW -- THAT IS THE TYPE OF THING I AM TALKING ABOUT.  I DON'T KNOW WHETHER THAT IS HAPPENING IN MR. FULKS'S CASE OR NOT.  THAT IS THE TYPE OF THING I AM TALKING ABOUT.  IT IS THE TYPE OF THING ASSOCIATED WITH NOT BEING ABLE TO DISCRIMINATE LOOKS ON FACES.

ALSO COULD BE -- THAT IS A CRIMINAL ONE.  ANOTHER CRIMINAL ONE I CAN THINK OF IS A WOMAN SAYING, NO,  AND READING IT AS IF SHE WERE LUSTFUL AND WANTING HIM TO HAVE SEX WITH HER.

**Q.    YOU AND MR. FULKS DIDN'T TALK ABOUT THE RAPE INCIDENT AND WHAT HIS REACTION TO THE LOOK ON MS. DONOVAN'S FACE WAS. AND WHETHER HE DETERMINED THAT THE FEAR AND DISTRESS ON HER FACE WAS, IN FACT, SOME DIFFERENT EMOTION,  DID YOU?**

**CROSS EXAM OF JAMES EVANS**

A.    NO,  WE DID NOT.   I WAS GIVING A HYPOTHETICAL EXAMPLE.

**Q.    SO, AGAIN, DOCTOR, WHAT YOU DETERMINED IN THE LAB IS NOT NECESSARILY GOING TO BE CONSISTENT WITH WHAT OBJECTIVE PEOPLE SEE IN MR. FULKS'S LIFE?**

A.    AGAIN,  I SAID -- I TESTIFIED THAT THESE ARE NOT ALWAYS CONSISTENT.   SOMETIMES, IF YOU ARE IMPAIRED WITH ALCOHOL, IT EXACERBATES IT; SOMETIMES, IF YOU ARE UNDER STRESS, IT EXACERBATES IT OR MAKES IT WORSE; AND, SOMETIMES, IT IS -- SOMETIMES YOU CAN DO IT BETTER THAN OTHER TIMES.   IT INTERACTS WITH WHAT IS GOING ON AROUND YOU AND WHAT YOU -- WHAT OTHER THINGS YOU HAVE INGESTED.

**Q.    BUT YOU DON'T KNOW BECAUSE YOU DIDN'T ASK, AND YOU DIDN'T ASK PURPOSEFULLY.   YOU CHOSE NOT TO ASK?**

A.    ABSOLUTELY.

**Q.    YOU DIDN'T WANT TO KNOW?**

A.    I DIDN'T.

**Q.    YOU DIDN'T WANT TO CLUTTER YOUR SCIENTIFIC OPINION WITH FACTS ABOUT THIS CASE?**

A.    THAT IS THE DIRECTION I WAS AIMING,  YES.

**Q.    SO,  IF THE JURY HAS HEARD TESTIMONY THAT, AFTER AN ARMED ROBBERY OF TWO YOUNG MEN ON A HIGHWAY ON  I-65 ON JUNE 19TH,  2002,  THAT AFTER THAT ROBBERY, MR. FULKS CAME BACK TO THE VEHICLE AFTER COMMITTING THAT ROBBERY AND WAS TICKLED THAT THE VICTIMS HAD BEEN SCARED,  THAT WOULD CONTRAINDICATE --**

A.    THE VICTIMS HAD BEEN WHAT?

CROSS EXAM OF JAMES EVANS

Q.    SCARED.   THAT WOULD CONTRAINDICATE, OR IT WOULD CONTRADICT A FINDING THAT HE DOESN'T UNDERSTAND EMOTION, WOULDN'T IT?

A.    UH-HUH (AFFIRMATIVE RESPONSE).   IN THAT ONE CASE, IT WOULD,  YES.

Q.    WELL,  IF HIS BRAIN IS DAMAGED, IT IS DAMAGED,  RIGHT?

A.    YES, SIR.   THE BRAIN DAMAGE IS DAMAGE.   BUT, AS IT IS WITH MOST EVERYONE IS AWARE OF,  EVEN PERSONS WHO HAVE ALZHEIMER'S DISEASE, AT LEAST IN THE EARLY STAGES, THEY HAVE THEIR CLEAR TIMES AND CONFUSED TIMES, THAT IS BASICALLY BRAIN DYSFUNCTION.   BUT IT REACTS WITH, AS I SAID, WITH WHAT MEDICATIONS YOU ARE TAKING,  IF YOU ARE TAKING ILLEGAL DRUGS, WHETHER YOU ARE SCARED OR NOT.   IN THAT CASE, IF THAT WERE TRUE -

Q.    SO, PRESUMABLY, IF SOMEONE IS TAKING ILLEGAL DRUGS OR DRINKING, THEIR ABILITY TO -- THIS IMPAIRED ABILITY TO ASSESS EMOTIONS IS WORSE, NOT BETTER,  RIGHT?

A.    RIGHT.

Q.    SO, IF MR. FULKS WAS ABLE TO ASSESS THAT THE TWO VICTIMS OF THE 19  -- OF THE 2002 ROBBERY WERE SCARED, WHETHER HE WAS SOBER OR NOT,  THEIR TESTIMONY THAT THEY WERE, IN FACT, SCARED MEANS THAT, AT LEAST IN THAT INSTANCE, HE GOT IT RIGHT?

A.    THAT'S CORRECT.  IN THAT INCIDENT, IF THAT IS TRUE, THEN YOU ARE RIGHT.

Q.    YOU ALSO TALKED ABOUT SOME OTHER CHARACTERISTICS OF HIS

## CROSS EXAM OF JAMES EVANS

IMPAIRED EXECUTIVE FUNCTION.  DO YOU RECALL THAT TESTIMONY?

A.    YES.

Q.    SOME SORT OF SUBCOMPONENTS OF HIS IMPAIRED EXECUTIVE FUNCTION.  ONE OF THEM WAS FAILED TO PLAN AHEAD, DO YOU REMEMBER THAT?

A.    I SAID THEY HAVE A TENDENCY TO FAIL TO PLAN AHEAD, AT LEAST TO PLAN APPROPRIATELY AHEAD, EFFICIENTLY.

Q.    YOU WOULD AGREE, WOULDN'T YOU, DOCTOR, THAT EVIDENCE THAT THE DEFENDANT DID MAKE PLANS ON WHICH HE ACTED WOULD CONTRAINDICATE OR CONTRADICT THAT FINDING THAT HE DOESN'T DO THAT VERY WELL?

A.    WELL, IF THE PLAN, IF EVERYTHING WENT OFF ACCORDING TO THE PLAN, IT WAS A WELL-DESIGNED PLAN, THEN IT WOULD BE CONTRADICTED.  BUT IF IT DIDN'T, THEN IT WOULDN'T CONTRADICT IT BECAUSE YOU CAN PLAN, BUT YOU DON'T PLAN WELL.

Q.    AS YOU KNOW, DOCTOR, THERE ARE TWO MISSING WOMEN IN THIS CASE.  SO, IF MR. FULKS, IN FACT, PLANNED TO DISPOSE OF THEIR BODIES IN A FASHION WHERE THEY COULDN'T BE LOCATED, HE DID THAT WELL, DIDN'T HE?

A.    WOULD YOU SAY THAT AGAIN?  IF IN FACT -- I WILL REPEAT IT AS I HEARD IT.

Q.    I WILL ASK IT AGAIN.  THERE ARE TWO MISSING WOMEN IN THIS CASE, SAMANTHA BURNS AND ALICE DONOVAN.  IF THE DEFENDANT, IN FACT, PLANNED TO DISPOSE OF THEIR BODIES IN A MANNER WHERE LAW ENFORCEMENT COULD NOT RECOVER THEM, HE DID

**CROSS EXAM OF JAMES EVANS**

**THAT WELL, DIDN'T HE?**

A.    IF, IN FACT, HE DID THAT, THEN THAT PLAN WORKED WELL, YES.

**Q.    AND YOU ALSO --**

A.    MAKES RATIONAL SENSE.

**Q.    IF MR. FULKS PLANNED AN ESCAPE FROM HOPKINS COUNTY DETENTION CENTER BY ASSEMBLING A TORN-UP -- A SERIES OF TORN-UP BLANKETS INTO A ROPE BY USING WATER BOTTLES AS A WEIGHT AND A CLOTHING BAG TO THROW UP TO USE TO ANCHOR THE ROPE SO THAT HE COULD CLIMB UP TO THE CEILING OF THE DETENTION CENTER, REMOVE THE SCREEN AND ESCAPE, AND ALL OF THAT WENT AS PLANNED, THAT WAS A PRETTY GOOD PLAN, WASN'T IT?**

A.    IF IT WORKED ACCORDING TO PLAN, THAT WAS A PRETTY GOOD PLAN.  PROVIDED THAT HE WOULD TAKE IT TO ITS LOGICAL CONCLUSION, IF HE DID ESCAPE, WOULD ESCAPE FOR A WHILE -- WELL, I WON'T SAY ANY MORE.

**Q.    WELL, 17 DAYS ALLUDING AUTHORITIES ON AN ESCAPE IS PRETTY GOOD, ISN'T IT?**

A.    YES.

**Q.    AND YOU INDICATED THAT MR. FULKS'S ABILITY, HIS EXECUTIVE FUNCTIONS WOULD BE IMPAIRED WORSE BY ALCOHOL, OR STRESS, OR ENVIRONMENT?**

A.    ORDINARILY, EXECUTIVE FUNCTIONS, IN ANY WAY, ARE IMPAIRED BY THAT, AS YOU WELL KNOW.  IF YOU GET DRUNK, YOU LOSE YOUR EXECUTIVE CONTROL AND YOUR INHIBITIONS.  BUT IF YOU

CROSS EXAM OF JAMES EVANS

HAVE BRAIN DAMAGE, THEN IT IS A LOWER THRESHOLD FOR --

ORDINARILY, HAVE A LOWER THRESHOLD FOR LOSING CONTROL.

Q.    AND IT HAS BEEN YOUR EXPERIENCE,  HASN'T IT,
DR. EVANS,  THAT INDIVIDUALS WHO ARE IN CUSTODY RARELY HAVE
ACCESS TO ALCOHOL,  DRUGS, AND ILLEGAL SUBSTANCES?

A.    NO.

Q.    PRISONERS REGULARLY HAVE ACCESS TO ALCOHOL AND ILLEGAL
SUBSTANCES?

A.    IN MANY PRISONS THEY DO,  YES, SIR.

Q.    DO YOU HAVE ANY EVIDENCE,  DR. EVANS,  THAT MR. FULKS
ABUSED SUBSTANCES, ILLEGAL SUBSTANCES, WHILE HE WAS LOCKED UP
IN THE COLUMBIA CARE INSTITUTION?

A.    NO.   I DON'T THINK THAT HE WOULD HAVE HAD ANY THERE.
THAT IS ONE I HAVE TALKED TO SEVERAL PEOPLE WHO ARE THERE,
TWO PEOPLE WHO WERE THERE.  THEY SAID THERE WERE NO DRUGS
THERE.   THAT WOULD BE ONE THAT WOULD BE AN EXCEPTION.

Q.    IF HE MADE A DECISION TO ACCUMULATE PEPPER,  A SHANK,
MAKE A ROPE,  REMOVE THE SCREEN FROM THE WINDOW IN AN EFFORT
TO ATTEMPT TO ESCAPE, HE DID ALL OF THAT STONE COLD SOBER,
THAT WAS JUST A BAD DECISION?

A.    WAS THAT A SUCCESSFUL ATTEMPT?

Q.    NO, SIR.

A.    THAT WOULD BE A PLAN,  FOOLISH PLAN.

Q.    NOT A PLAN EXACERBATED BY ALCOHOL,  ENVIRONMENT OR
STRESS.  HE DIDN'T MAKE THAT DECISION BECAUSE HE WAS DRUNK?

App. 00678

**CROSS EXAM OF JAMES EVANS**

A.    THAT'S TRUE.

**Q.    HE MADE THAT DECISION STONE COLD SOBER?**

A.    YES, HE DID.

**Q.    WHEN HE WAS IN THE HOPKINS COUNTY DETENTION CENTER, HE DECIDED TO ESCAPE FROM THERE AND PLANNED TO DO IT AND DID IT SUCCESSFULLY, HE MADE THAT DECISION STONE COLD SOBER,  TOO?**

A.    WERE THESE THE SAME TYPE OF -- DID HE MAKE THE SAME TYPE OF PLANS? IN OTHER WORDS, VERY SIMILAR SEQUENCE OF EVENTS THAT LED TO THE ESCAPE.

**Q.    ACTUALLY,  YES.   MY QUESTION WAS, HE MADE BOTH OF THOSE DECISIONS STONE COLD SOBER,  DIDN'T HE?**

A.    YES, SIR.

**Q.    AND IF HE MADE A DECISION TO LASH OUT AT LEXINGTON COUNTY GUARDS WHILE HE WAS HOUSED IN THE LEXINGTON COUNTY DETENTION CENTER,  THAT WAS ANOTHER DECISION HE MADE STONE COLD SOBER,  RIGHT?**

A.    I DON'T, NECESSARILY, AGREE WITH THAT ONE.   HE DID TALK TO ME ABOUT THAT.   AND IF WHAT HE TOLD ME WAS TRUE, HE WAS UNDER GREAT STRESS,  MAYBE STONE COLD SOBER, BUT GREAT STRESS.

**Q.    THAT IS A BIG "IF,'  ISN'T IT?**

A.    MANY OF THE THINGS WE ARE TALKING ABOUT ARE BIG "IFS."

**Q.    AND IF MR. FULKS MADE THE DECISION TO LASH OUT AT COLUMBIA CARE GUARDS BECAUSE THEY WERE PUTTING HIM ON A SUICIDE WATCH BECAUSE OF HIS ESCAPE ATTEMPT,  THAT WAS ANOTHER**

**CROSS EXAM OF JAMES EVANS**

**STONE COLD SOBER DECISION, WASN'T IT?**

A.    IT ALSO COULD BE EASILY CONSTRUED AS AN IMPULSIVE RESPONSE TO STRESS.

**Q.    BUT STONE COLD SOBER?**

A.    SOBER, YES.

**Q.    DOCTOR, WOULD IT BE IMPORTANT, IN EVALUATING MR. FULKS'S SINCERITY WITH TREATING -- I WON'T CALL THEM TREATING, WITH HEALTHCARE PROFESSIONALS HIRED TO PROVIDE TESTIMONY IN THIS CASE, TO LOOK AT WHAT HE TOLD PREVIOUS HEALTHCARE PROVIDERS TO SEE WHETHER IT WAS CONSISTENT?**

A.    WOULD YOU REPEAT IT, PLEASE?

**Q.    SURE.   WOULD IT BE IMPORTANT, IN EVALUATING THE OPINIONS OF HEALTHCARE PROVIDERS HIRED TO TESTIFY IN THIS CASE, TO KNOW WHAT MR. FULKS MAY HAVE TOLD OTHER HEALTHCARE PROFESSIONALS OR OTHER INDIVIDUALS THROUGHOUT HIS EXISTENCE ABOUT HIS OWN MENTAL STATE AND ABOUT HIS OWN ABUSE OF VARIOUS DRUGS OR LACK THEREOF AND OTHER THINGS?**

A.    YES.   I READ THE REPORTS OF THE OTHER, OF SEVERAL OF THE OTHER HEALTHCARE PROVIDERS AND NOT THE ULTRACARE PROVIDERS, THE REPORTS OF NEUROLOGISTS, PSYCHOLOGISTS.   ARE YOU TALKING ABOUT LIKE BUTNER?  I READ THAT.

**Q.    HAVE YOU SEEN ANY OF THE BOOKING REPORTS AT RICHLAND COUNTY OR LEXINGTON COUNTY DURING WHICH MR. FULKS ULTIMATELY TOLD INDIVIDUALS THAT HE DID COMMIT SUICIDE  -- DID TRY TO COMMIT SUICIDE WHEN HE WAS YOUNGER, OVERDOSE, IT WAS BY**

App. 00680

**CROSS EXAM OF JAMES EVANS**

**HANGING, HE WAS 13, 14,  18?**

A.    NO.   I REMEMBER HAVING READ SOMETHING THAT HE

ATTEMPTING SUICIDE, BUT I DON'T RECALL WHERE I READ IT.

**Q.    YOU DON'T KNOW ABOUT INSTANCES WHERE MR. FULKS HAS**

**DENIED THAT ATTEMPT OR DESCRIBED IT HAPPENED IN A DIFFERENT**

**METHODOLOGY?**

A.    NO.

**Q.    THOSE THINGS WOULD BE IMPORTANT TO YOU IN DETERMINING**

**THE SINCERITY OF HIS REPORT OF THAT SUICIDE,  RIGHT?**

A.    IF I WERE TRYING TO DETERMINE SINCERITY OF THE REPORT

OF THE SUICIDE, BUT NOT IF I WERE TRYING TO DETERMINE IF HE

HAS BRAIN DAMAGE OR NOT.

**Q.    AGAIN,  YOUR POSITION IS, DON'T CONFUSE ME WITH THE**

**FACTS, I AM A SCIENTIST?**

A.    NO,  I THINK SCIENCE IS FACTS.

**Q.    BUT SCIENCE IS,  BUT THERE IS NO QUESTION,  DOCTOR,**

**THAT SOMETIMES WHAT YOU SEE IN THE LAB IS INCONSISTENT WITH**

**THE INDIVIDUAL'S PERSONALITY AND CHARACTER TRAITS?**

A.    THAT IS TRUE.   BUT DEPENDS ON WHAT YOU MEAN BY

"INCONSISTENT."   AGAIN, I DID NOT TESTIFY HE CONSISTENTLY HAD

PROBLEMS WITH THESE.  I TESTIFIED HE WOULD BE AT HIGH RISK OF

HAVING PROBLEMS WITH THESE, BASED ON THE FINDINGS.   THAT, TO

ME, SORT OF SUMMARIZED BY SAYING ANYONE,  MOST ANYONE WOULD

AGREE THAT PEOPLE WHO ARE INTOXICATED ARE AT HIGH RISK FOR

HAVING AN AUTOMOBILE ACCIDENT.   BUT ACTUALLY, IN FACT, MOST

CROSS EXAM OF JAMES EVANS

PEOPLE WHO DRIVE WHILE THEY ARE DRUNK AND DO NOT HAVE AUTOMOBILE ACCIDENTS ARE LUCKY.

Q.    ONE THING THAT IS DIFFERENT ABOUT THAT EXAMPLE, PEOPLE DON'T DECIDE TO HAVE AUTOMOBILE ACCIDENTS, DO THEY?

A.    NO, BUT THEY DECIDE -- THEY MAY IMPULSIVELY DECIDE TO DRIVE. I DON'T SEE THE RELEVANCE OF WHAT YOU JUST SAID.

Q.    WELL, I AM NOT SURE I UNDERSTAND THE RELEVANCE OF THE MOTOR VEHICLE ACCIDENT EITHER. BUT THE POINT IS, THAT PEOPLE WHO HAVE MR. FULKS'S PARTICULAR CHARACTERISTICS OF BRAIN, AS YOU HAVE TESTIFIED ABOUT, WE ASSUME HE HAS, IN FACT, GOT THEM, A LOT OF THOSE PEOPLE DECIDE NOT TO DO A LOT OF THINGS THAT MR. FULKS DECIDED TO DO, RIGHT?

A.    RIGHT. AND SOMETIMES THEY ARE CAPABLE OF IT, AND TIMES THEY AREN'T. ALL I SAID WAS, THEIR EXECUTIVE FUNCTIONS ARE IMPAIRED. SORT OF LIKE THE DRIVER -- INTOXICATED DRIVER'S FUNCTIONS ARE IMPAIRED, THUS PUTTING THEM AT A HIGHER RISK FOR, IN THE ONE CASE HAVING PROBLEMS OF LOSS OF CONTROL, POOR JUDGMENT, AND THE OTHER CASE HAVING A CAR WRECK.

Q.    AND THE PEOPLE WHO HAVE A CAR WRECK AND WHO ARE INTOXICATED ARE HELD ACCOUNTABLE FOR THEIR ACTIONS, AREN'T THEY?

A.    YES, THEY ARE, BECAUSE THEY HAD THE CHOICE TO DRINK OR NOT DRINK UNLESS THEY -- WELL, YEAH, I COULD SAY THEY DID. HOWEVER, IF A MAN HAS BEEN BRAIN DAMAGED THROUGH NO FAULT OF HIS OWN, THEN THAT IS A DIFFERENT STORY.

CROSS EXAM OF JAMES EVANS

**Q.    YOU ADMINISTERED A PERSONALITY ASSESSMENT OF MR. FULKS?**

A.    ALL I DID WAS GIVE THE RORSCHACH.  I DID NOT GO FURTHER THAN THAT.

**Q.    DID NOT GIVE THE PERSONALITY ASSESSMENT INVENTORY?**

A.    NO, I DID NOT.

**Q.    I AM ALMOST THROUGH, DOCTOR.  I WANT TO ASK YOU A FEW THINGS ABOUT YOUR REPORT VERY QUICKLY.**

**DOCTOR, DID YOU REVIEW ANY RECORDS FROM THE WESTVILLE CORRECTIONAL INSTITUTION, BY THE WAY?**

A.    WHERE?

**Q.    IN INDIANA?**

A.    I DON'T BELIEVE I DID.

**Q.    AND WERE YOU AWARE THAT MR. FULKS WAS ADMINISTERED A READING TEST IN MARCH 20TH OF 2000 AND HAD A 78TH PERCENTILE RANGE?**

A.    WHAT READING TEST?

**Q.    IT IS PSYCHOMETRIC DATA REPORT CONDUCTED AT WESTVILLE RECEPTION -- WESTVILLE, INDIANA RECEPTION DIAGNOSTIC UNIT PSYCHOLOGICAL UNIT?**

A.    BUT DOES IT SAY WHAT TEST WAS USED?

**Q.    NO.  GOT VOCABULARY COMPREHENSION, GAVE HIM A 78 PERCENT SCORE.**

A.    VOCABULARY COMPREHENSION IS DIFFERENT FROM READING. READING IS RECOGNIZING WORDS.  VOCABULARY COMPREHENSION DOESN'T SURPRISE ME TOO MUCH.  HE WAS QUITE GOOD AT, AS I

App. 00683

CROSS EXAM OF JAMES EVANS

RECALL, OF USING  -- HE HAD QUITE A GOOD VOCABULARY.  I WOULD SAY THAT.

Q.    YOU ARE NOT AWARE OF A LANGUAGE WRITING TEST GIVEN AT THE SAME TIME HE SCORED IN THE 89TH PERCENTILE?

A.    HOW OLD WAS HE?

Q.    TWENTY-TWO AND A HALF.

A.    HOW MUCH.

Q.    TWENTY-TWO AND A HALF.

A.    TWENTY-TWO AND A HALF.   NO,  I AM NOT AWARE OF THAT. I CAN'T IMAGINE.  I WOULD HAVE TO SEE THE TEST IN ORDER TO MAKE ANY COMMENT ON IT.

Q.    IN YOUR REPORT, DOCTOR,  YOU NOTED AT TIMES WHEN YOU WERE TALKING WITH MR. FULKS HE SPOKE IN CONVOLUTED, DISORGANIZED, SELF-CONTRADICTORY AND IRRELEVANT SPEECH?

A.    I DIDN'T SAY THAT.   THAT WAS TAKEN FROM ANOTHER REPORT, I BELIEVE.

Q.    IT IS IN YOUR REPORT?

A.    WASN'T THAT FROM SOMEBODY ELSE'S REPORT? WASN'T IT ONE I WAS REVIEWING OR SUMMARIZING WHAT SOMEBODY ELSE HAD SAID? DOESN'T SOUND LIKE WORDS I WOULD USE.

Q.    YES.   IT IS WHAT DR. VENN SAID?

A.    YES.

Q.    DR. VENN SAID HE WAS CONVOLUTED,  DISORGANIZED, SELF-CONTRADICTORY AND IRRELEVANT SPEECH?

A.    YES.

CROSS EXAM OF JAMES EVANS

Q.   THAT IS A FAKEABLE SYMPTOM,  ISN'T IT?

A.   IT COULD BE.   THAT IS ONE EXPLANATION.   THERE ARE

OTHER EXPLANATIONS.  IT IS ONE POSSIBILITY.

Q.   I AM NOT SURE IF THIS IS YOUR OBSERVATION OR FROM

READING A REPORT, HE HAD EXHIBITED INVOLUNTARY MOVEMENTS AS HE

REFERRED TO AS JUMPY MUSCLES?

A.   HE TOLD ME HE USED TO HAVE THAT WHAT HE CALLED JUMPY

MUSCLES,  I BELIEVE.

Q.   YOU ARE AWARE, DR. EVANS, WHEN MR. FULKS WAS ADMITTED

TO THE LEXINGTON FEDERAL MEDICAL CENTER IN 1988, HE EXHIBITED

WHAT WERE, SUPPOSEDLY, INVOLUNTARY MOVEMENTS THAT THOSE

DOCTORS FOUND TO BE MALINGERING?

A.   RIGHT.

Q.   AND YOU CONCLUDED, I BELIEVE,  WITH RESPECT TO THE

WEXLER SUBTEST, THAT HE WAS BELOW AVERAGE INTELLECTUAL

ABILITY?

A.   BELOW AVERAGE BORDERLINE.

Q.   WHICH MEANS, AGAIN, AS MANY AS EIGHT PERCENT OF THE

PEOPLE IN THE COUNTRY,  IF THAT ASSESSMENT IS CORRECT, ARE

THAT SMART OR LESS SMART?

A.   ROUGHLY EIGHT PERCENT,  YES.

Q.   AND YOU CONSIDERED HIS NEUROPSYCHOLOGICAL IMPAIRMENT TO

BE MODERATE?

A.   YES.

Q.   AND THERE ARE PEOPLE OUT THERE WHO HAVE SEVERE

**CROSS EXAM OF JAMES EVANS**

**IMPAIRMENT?**

A.    YES.    PEOPLE IN A COMA, OR PEOPLE WHO HAVE, YOU KNOW, SEVERELY MENTALLY RETARDED, OR PEOPLE WHO HAVE MUCH MORE PROBLEMS WITH VARIOUS FUNCTIONS THAN HE HAS.

**Q.    PEOPLE OUT THERE WHO HAVE IT WORSE?**

A.    OH, YES.

**Q.    WITH RESPECT TO YOUR RORSCHACH TEST, YOU NOTED THAT MR. FULKS WOULD USE HIS FREE HAND TO SELECTIVELY COVER THE BLOTS, AS IF HAVING DIFFICULTY WITH VISUAL PERCEPTION.  FOUR OF HIS RESPONSES WERE OF POOR FORM LEVEL.  WHAT HE REPORTED PERCEIVING DID NOT MATCH THE ACTUAL BLOT CHARACTERISTICS. THIS IS AN UNCOMMONLY LARGE NUMBER OF POOR FORM LEVEL RESPONSES, EVEN FOR A PERSON OF LIMITED INTELLIGENCE.  AND IS SUGGESTIVE OF PROBLEMS WITH REALITY TESTING?**

A.    YES.

**Q.    DOES THAT MEAN HE MIGHT HAVE BEEN FAKING IT?**

A.    EXCUSE ME?

**Q.    DOES THAT MEAN HE MIGHT HAVE BEEN FAKING IT?**

A.    I DON'T THINK SO.  I HAVE GIVEN SO MANY OF THOSE THAT I DON'T THINK HE FIXED IT UP.  DIDN'T COME OUT WITH EXTREMELY BIZARRE RESPONSES.  IF HE HAD BEEN FAKING IT, HE MIGHT HAVE SAID THINGS LIKE, I SEE THE LEFT HAND OF GOD, OR SOMETHING OF THAT SORT.  BUT HE DIDN'T.  HE SAW COMMON OBJECTS, THEY JUST DIDN'T MATCH THE BLOT CHARACTERISTICS.  I CONSIDERED THAT TO BE, AGAIN, THAT IS NOT WHAT I WAS REALLY LOOKING FOR, SO I

CROSS EXAM OF JAMES EVANS

DIDN'T PURSUE IT MUCH.

BUT IT LOOKED TO ME LIKE, NUMBER ONE, THE PROBLEM WITH REALITY TESTING WERE INDICATIVE OF PROBABLE TENDENCY TO HAVE PSYCHOTIC BREAKS. BUT I DIDN'T SEE THAT AT THE TIME. I DIDN'T SEE HIM ACTUALLY HAVE A PSYCHOTIC BREAK. THE COVERING OF THE BLOT WAS VERY PECULIAR, AND I THOUGHT IMMEDIATELY IN TERMS OF VISUAL PERCEPTUAL PROBLEMS. I GAVE HIM ANOTHER TEST FOR VISUAL PERCEPTUAL -- CERTAIN TYPES OF VISUAL PERCEPTUAL, THE VINTON LINES TEST, HE DID FINE ON IT. SO, ALMOST GOT A PERFECT SCORE ON IT.

SO, I KIND OF FORGOT ABOUT THAT UNTIL THE QEEG SHOWED SOME OCCIPITAL -- SOME PROBLEMS EXPLAINING OCCIPITAL AREA COMMUNICATING WITH TEMPORAL AND PARIETAL AREA. I THOUGHT, HUM, THAT DOES FIT WITH VISUAL PERCEPTUAL PROBLEM. THEN I NOTED THAT DR. GUR HAD ALSO FOUND SOMETHING ALONG THAT SAME LINE, ESPECIALLY IN TERMS OF READING EMOTION IN FACES. AND SO I -- IT BEGAN TO CONVERGE FROM THREE DIFFERENT SOURCES THAT HE PROBABLY DOES HAVE VISUAL PERCEPTUAL PROBLEMS OF A SORT. AND THAT IS WHAT THE COVERING OF THE BLOT, I THINK, HAD TO DO WITH. NOT THAT HE WAS ACTING WEIRD IN ORDER FOR ME TO TRY TO THINK HE WAS CRAZY. BUT, NO, I DON'T THINK SO.

**Q. I HAVE NO IDEA WHAT MY QUESTION WAS, DOCTOR. I THINK WHAT I WAS ASKING IS, IS IT POSSIBLE THAT THE RESULTS OF THE RORSCHACH TEST, INK BLOT TEST, SOMEBODY IS ASKED TO LOOK AT AN INK BLOT AND ASKED WHAT DOES IT MAKE YOU THINK OF?**

**CROSS EXAM OF JAMES EVANS**

A.    WHAT MIGHT THIS BE.

**Q.    AND HIS RESPONSES ON THAT WERE POOR FOR A PERSON EVEN OF LIMITED INTELLIGENCE, THAT WAS YOUR CONCLUSION?**

A.    THAT'S TRUE.

**Q.    AND,  THEREFORE,  YOU SUPPOSED OR YOU THOUGHT THAT, POSSIBLY, IT WAS A RESULT OF A PROBLEM WITH REALITY TESTING, WHICH, IF I UNDERSTOOD YOUR ANSWER CORRECTLY, MEANS THAT HE MIGHT HAVE BEEN IN THE MIDDLE OF SOME SORT OF PSYCHOTIC EPISODE?**

A.    NO.  IT DOESN'T MEAN THAT.  WHILE IT WOULD MEAN HE MIGHT HAVE A TENDENCY TO GO IN THAT DIRECTION,  BUT IT MAY NOT MAKE SENSE TO YOU.  I WAS NOT PUTTING MUCH IN THAT RORSCHACH, THAT WAS A SCREENING.  THERE ARE SOME THINGS YOU CAN USE RORSCHACH AS A SCREENING TEST FOR BRAIN DYSFUNCTION,  CERTAIN TYPES OF BRAIN DYSFUNCTION.  THAT IS THE PRIMARY REASON I GAVE IT.  HOWEVER, HAVING USED IT FOR PERSONALITY ASSESSMENT FOR MANY, MANY YEARS, I JUST MADE THOSE COMMENTS THAT IT LOOKED LIKE HE MIGHT POSSIBLY HAVE TENDENCIES IN THAT DIRECTION. WHICH,  BY THE WAY,  WERE CONFIRMED AS TENDENCIES BY DR. HUELKE'S USE OF THE PERSONALITY ASSESSMENT INVENTORY WHICH FOUND SIMILAR THINGS THAT HE MIGHT HAVE A TENDENCY TO LOSE REALITY TESTING,  HAVE PSYCHOTIC-TYPE EPISODES.

**Q.    YOU SAW NO EVIDENCE -- YOU WERE WATCHING HIM WHEN HE WAS WAS DOING THE TEST,  RIGHT?**

A.    HE WASN'T HAVING ANY EPISODE WHILE I WAS THERE.  IT IS

CROSS EXAM OF JAMES EVANS

LIKE SOMEBODY MIGHT HAVE A TEMPERATURE OF 98.9 OR 99.2, AND THEY AREN'T SHOWING ANY SIGNS OF FEVER YET,  BUT ALL ISN'T EXACTLY WELL HERE WITH THIS PERSON.

**Q.    DOCTOR, YOU TALKED ABOUT PRACTICE EFFECTS AT SOME POINT,  I THINK, IN YOUR TESTIMONY.  YOU TRIED TO SCREEN OUT THE PRACTICE EFFECTS?**

A.    RIGHT.   IT HAD NOT BEEN LONG SINCE DR. VENN HAD GIVEN THE WAIS.  AND I DECIDED, TO GIVE THE FULL WAIS, WOULD CALL INTO QUESTION RESULTS IF HE SCORED HIGHER BECAUSE OF THE PRACTICE EFFECTS.

**Q.    AND PRACTICE EFFECTS CAN MEAN JUST THAT AN INDIVIDUAL CAN DO BETTER ON A TEST A SECOND TIME AROUND?**

A.    FOR VARIOUS REASONS.   ONE IS THAT THEY ARE NOW FAMILIAR WITH THE TEST, AND THE OTHER IS THAT THERE ARE SOME OF THE SUBTESTS THAT YOU CAN REMEMBER.  I MEAN, IT IS POSSIBLE.   YOU ASKED THEM, YOU KNOW, THIS ISN'T ONE OF THE QUESTIONS, BUT WHAT IS THE CAPITAL OF PENNSYLVANIA?  THEY DON'T KNOW IT.  BUT  THEN THEY GO BACK AND ASK SOME OF THEIR CELLMATES, AND THEY SAY HARRISBURG.   SO, THE NEXT TIME THEY TAKE IT, THEY GET IT RIGHT.   THAT IS A POSSIBILITY WITH SOME OF THOSE TESTS AND SUBTESTS.  THAT IS WHAT I WAS TRYING TO AVOID.

**Q.    SO, BASICALLY, WHAT THE PRACTICE EFFECTS ARE,  DOCTOR, THAT INDIVIDUALS, WHO ARE BEING ASSESSED BY PROFESSIONALS HIRED AS WITNESSES, MIGHT HAVE LEARNED THINGS FROM TESTS THEY**

**REDIRECT EXAM OF JAMES EVANS**

**TOOK PREVIOUSLY?**

A.    IT IS POSSIBLE.   THEY DO LEARN THINGS ORDINARILY, AND THEY MIGHT RAISE THEIR SCORE BY FOUR OR FIVE POINTS.

MR. SCHOOLS:  BEG THE COURT'S INDULGENCE.   THANK YOU,  DOCTOR.

THE COURT:   LET'S GO AHEAD AND TAKE OUR MORNING BREAK UNLESS YOU THINK IT WILL BE VERY SHORT.

MR. BLUME:  TWO MINUTES.

THE COURT:  GO AHEAD.

                         REDIRECT EXAM

BY MR. BLUME:

**Q.    DR. EVANS, I WILL BE VERY BRIEF.   I WANT TO CLEAR A FEW THINGS UP TO MAKE SURE THE JURY UNDERSTANDS WHAT I ASKED YOU TO DO AND THE DIFFERENT TYPES.**

**NOW, THERE ARE DIFFERENT TYPES OF EVALUATIONS THAT PSYCHOLOGISTS DO?**

A.    YES, SIR.

**Q.    AND EVEN IN YOUR OWN PRACTICE,  EVEN IN THE FORENSIC SETTING, IN SOME CASES, YOU ARE ASKED TO DO A COMPREHENSIVE ASSESSMENT OF THE -- TAKING A HISTORY,  DO NEUROPSYCHOLOGICAL TESTING,  DO PERSONALITY TESTING,  INTERVIEW THE DEFENDANT ABOUT THE OFFENSE, AND SEE IF YOU HAVE -- AND THEN RENDER OPINIONS ABOUT WHETHER THE DEFENDANT WAS REALLY INSANE OR NOT COMPETENT TO STAND TRIAL, AND THAT SORT OF THING?**

A.    YES, SIR.

REDIRECT EXAM OF JAMES EVANS

Q.   AND IN OTHER INSTANCES,  YOU ARE ASKED OR A MENTAL HEALTH PROFESSIONAL IS ASKED TO DO THE WHOLE BALL OF WAX OR TO DO A PART OF IT?

A.   YES, SIR.

Q.   IN A CASE WHERE YOU ARE ASKED TO DO A PART OF IT,  YOU WOULD -- WHAT YOU DO IS DIFFERENT?

A.   YES.

Q.   AND WHAT YOU LOOK AT IS DIFFERENT?

A.   YES.

Q.   WHAT YOU TALK TO THE DEFENDANT ABOUT IS DIFFERENT?

A.   YES.

Q.   AND SO -- AND IT IS FAIR TO SAY THAT, IN THIS CASE, WHAT I ASKED YOU TO DO WAS TO TRY TO SEE IF THERE WAS OR -- NOT TO TRY,  BUT JUST TO SEE IF THERE WAS EVIDENCE THAT MR. FULKS HAD BRAIN DAMAGE,  TOTALLY APART FROM ANYTHING HE WOULD TELL YOU?

A.   RIGHT.

Q.   AND THAT IS WHY YOU WENT AND GAVE THIS COMMONLY ACCEPTED, IN YOUR FIELD, BATTERY OF TESTS?

A.   THAT'S CORRECT.

Q.   NOW,  AND THE RESULTS OF YOUR TESTING THAT HAS BEEN TALKED ABOUT INDICATED THAT MR. FULKS, AT LEAST ON THE INTELLIGENCE TEST, IS ABOUT THE EIGHTH PERCENTILE WHERE HE FALLS?

A.   YES.

REDIRECT EXAM OF JAMES EVANS

Q.    MORE OR LESS BALLPARK?

A.    MORE OR LESS.

Q.    THAT MEANS, BASICALLY, IF YOU TOOK A HUNDRED PEOPLE IN THE COUNTRY, LINED THEM UP, SORT OF, FROM THE MOST INTELLIGENT TO THE LEAST INTELLIGENT,  HE WOULD BE EIGHTH FROM THE END OF THE LINE?

A.    YES, SIR.

Q.    BUT, IN ADDITION TO THAT,  IN ADDITION TO JUST HAVING -- SOME PEOPLE JUST HAVE A 78 IQ?

A.    UH-HUH (AFFIRMATIVE RESPONSE).

Q.    OR 77 IQ, OR WHATEVER?

A.    THEY MIGHT THINK IN TERMS OF GENERALIZED BRAIN FUNCTION.  THE BRAIN FUNCTION IS JUST, GENERALLY, LESS THAN AVERAGE.  BUT IT IS NOT NECESSARILY RELATED, SPECIFICALLY, TO A FRONTAL OR ANY ONE OTHER AREA.

Q.    IN OTHER WORDS,  WHAT I AM SAYING, YOU COULD HAVE 77 OR 78 IQ AND NOT HAVE ANY PARTICULAR LOCALIZED DAMAGE TO ANY OTHER AREA OF THE BRAIN?

A.    YES,  THAT IS VERY TRUE.

Q.    YOU COULD HAVE A 77 OR 78 IQ AND ALSO, IN ADDITION TO THAT, HAVE SOME DAMAGE TO A PARTICULAR REGION IN THE BRAIN?

A.    YES, SIR.

Q.    OR REGIONS OF THE BRAIN?

A.    YES, SIR.

Q.    SO, IN THIS CASE, YOUR TESTING REVEALED THAT, IN

**REDIRECT EXAM OF JAMES EVANS**

**ADDITION TO HAVING THE 77 OR 78 IQ, HE ALSO HAD DAMAGE TO THE LEFT AND THE FRONTAL LOBE, THE FRONTAL REGION OF THE BRAIN, AND THE LEFT TEMPORAL?**

A.   FRONTAL, LEFT TEMPORAL, AND MOST LIKELY, SOME NEUROCOMMUNICATION DIFFICULTIES IN THE RIGHT POSTERIOR.

MR. BLUME:  THANK YOU.

THE COURT:  ALL RIGHT.  THANK YOU, SIR.  YOU MAY STEP DOWN.

MEMBERS OF THE JURY, WE WILL TAKE OUR 20-MINUTE RECESS AT THIS TIME.  PLEASE GO TO YOUR ROOM.  BE IN RECESS.

(WHEREUPON, A SHORT RECESS WAS HELD.)

(WHEREUPON, THE FOLLOWING WAS HEARD OUTSIDE THE PRESENCE OF TH TRIAL JURY.)

MS. JOHNSON:  MS. HATCHER, SUE HATCHER WAS A PROBATION OFFICER IN HUNTINGTON, WEST VIRGINIA.  AND WHEN -- AND WORKED WITH CHAD FULKS AS A CHILD.  AND WHEN THE  -- WHEN WE TRIED TO TALK TO HER, THE INITIAL THING PROBATION DEPARTMENT TOLD US THAT, EVEN THOUGH WE HAD A RELEASE, WE COULD NOT SPEAK TO HER.  THEN A JUDGE IN WEST VIRGINIA ISSUED AN ORDER SAYING THAT THEY COULD NOT PRECLUDE HER FROM SPEAKING TO US IF SHE WISHED TO DO SO, AND SHE DID WISH TO DO SO, AND WE HAVE TALKED TO HER.  BUT NOW SHE IS CONCERNED THAT THE ORDER DID NOT SAY THAT SHE MAY TESTIFY.  AND WHAT I WOULD JUST LIKE YOU TO SAY, THE SUBPOENA AUTHORIZES HER TO DO THAT.

THE COURT:  YOU WANT ME TO TELL HER THAT?

**DIRECT EXAM OF MARTHA FLOYD**

A.    AND I PROBABLY JUST CAN'T RECALL AGAIN ANY DATES.    I AM SURE I MADE DEPARTMENT OF HUMAN SERVICES CALL.

**Q.    YOU ARE SURE OF THAT?**

A.    I AM PROBABLY PRETTY SURE,  YES.

**Q.    SO,  WERE THERE ANY TIMES, THAT YOU CAN REMEMBER, AS YOU ARE SITTING THERE, YOU REMEMBER CHAD COMING IN WITH BLACK EYES, OR BUSTED-UP LIPS, OR CONTUSIONS?**

A.    NO, I DO NOT RECALL THAT.

**Q.    BECAUSE, AS A DEDICATED EDUCATOR, YOU WOULD HAVE DEFINITIVELY DONE SOMETHING ABOUT THAT TO MAKE SURE YOUR STAR STUDENT WAS TAKEN CARE OF?**

A.    IF CALLS WERE MADE, IT WAS PROBABLY MADE ON THE FACT OF THE PART OF NEGLECT ON THE PARENTS' PART.

MR. GASSER:  THAT IS ALL I HAVE,  YOUR HONOR.

THE COURT:   ANY REDIRECT?

MR. BLUME:  NO, THANK YOU.

THE COURT:  THANK YOU.  YOU MAY STEP DOWN.  YOU ARE EXCUSED.

NEXT WITNESS.

MR. BLUME:  WE CALL MARTHA FLOYD.

MARTHA FLOYD, HAVING BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

DIRECT EXAM

BY MR. BLUME:

**Q.    GOOD MORNING,  MS. FLOYD.**

**DIRECT EXAM OF MARTHA FLOYD**

A.   GOOD MORNING.

Q.   **YOU MIGHT WANT TO PULL THAT MICROPHONE DOWN A LITTLE. WE HAVE HAD TROUBLE REGULATING THAT MICROPHONE WITH PEOPLE.**

**NOW,  MS. FLOYD,  WHAT DO YOU CURRENTLY DO?**

A.   I AM PRIVATELY CONTRACTING WITH THE STATE OF WEST VIRGINIA TO SERVE SPECIAL NEEDS INFANTS.

Q.   **OKAY.  AND, IN THE PAST,  HAVE YOU BEEN A SCHOOL TEACHER?**

A.   YES.

Q.   **AND WHERE HAVE YOU BEEN A SCHOOL TEACHER?**

A.   AT ENSLOW MIDDLE SCHOOL, HUNTINGTON, WEST VIRGINIA, AND HUNTINGTON HIGH SCHOOL IN HUNTINGTON,  WEST VIRGINIA.

Q.   **AND HOW LONG DID YOU TEACH THERE?**

A.   ABOUT FIFTEEN YEARS.

Q.   **AND WERE YOU BORN AND RAISED IN THE WEST VIRGINIA AREA?**

A.   NO.  I WAS BORN IN BALTIMORE, RAISED IN WEST VIRGINIA.

Q.   **HOW LONG HAVE YOU LIVED IN WEST VIRGINIA?**

A.   SINCE I WAS FIVE.

Q.   **NOW,  MS. FLOYD,  WHEN YOU WERE A TEACHER AT ENSLOW MIDDLE SCHOOL,  DID YOU EVER HAVE CHAD FULKS AS A STUDENT?**

A.   YES,  I DID.

Q.   **DO YOU REMEMBER WHAT GRADE THAT WAS?**

A.   SIXTH GRADE.

Q.   **DO YOU REMEMBER CHAD AT ALL?**

A.   YES.

DIRECT EXAM OF MARTHA FLOYD

**Q. CAN YOU TELL ME HOW YOU REMEMBER HIM?**

A. HE WAS A VERY ATTRACTIVE LITTLE BOY. HE SAT AT A TABLE IN THE BACK -- TOWARD THE BACK OF THE ROOM. QUIET. FRIENDLY. WILLING. EAGER TO PLEASE.

**Q. WAS HE A POOR KID?**

A. YES. YES. HE LACKED SCHOOL SUPPLIES. WINTERS IN WEST VIRGINIA CAN BE VERY, VERY TOUGH. AND I REMEMBER HE DIDN'T HAVE A COAT OR ANY KIND OF SCHOOL FUNDING MONEY FOR BOOK RENTAL OR SPECIAL TREATS OR SNACKS, NO SCHOOL SUPPLIES. HE WAS CLEAN ABOUT HIMSELF. HIS CLOTHES MIGHT HAVE BEEN KIND OF ROUGH. HE WAS TRYING.

**Q. DO YOU -- WAS HE A SLOW LEARNER?**

A. YES. BUT HE PUT FORTH AN EFFORT. WITH WHAT HE HAD GOING ON, HE DID PRETTY WELL. HE TRIED REALLY HARD.

**Q. HE TRIED HARD?**

A. HE TRIED REALLY HARD.

**Q. OKAY. WAS HE A BEHAVIOR PROBLEM IN YOUR CLASS?**

A. NO. NOT A BEHAVIOR PROBLEM. PROBABLY FOLLOWED SOME OTHER KIDS, PERHAPS. I WOULD CLASSIFY HIM AS A FOLLOWER. NO BEHAVIOR.

**Q. YOU DON'T REMEMBER HIM INITIATING ANYTHING?**

A. NO, NO, NO, NO NEVER.

**Q. BUT YOU TALKED A LITTLE BIT ABOUT SCHOOL SUPPLIES AND THAT KIND OF STUFF. DO YOU HAVE ANY PARTICULAR?**

A. WE KEPT SCHOOL SUPPLIES, OR I KEPT SCHOOL SUPPLIES IN

DIRECT EXAM OF MARTHA FLOYD

THE ROOM.  I HAD A TOKEN ECONOMY GOING WHERE STUDENTS WERE GIVEN TOKENS FOR GOOD THINGS, AND HE WOULD ALWAYS BUY SCHOOL SUPPLIES WITH HIS: PENCILS, PAPERS, ERASERS.  I CAN REMEMBER, ONE TIME, HE BOUGHT ONE OF THOSE BIG ERASERS.  AND HE WOULD LEAVE THEM AT SCHOOL.  HE NEVER TOOK THEM HOME.  NEVER TOOK ANYTHING HOME.  HE PURCHASED SCHOOL SUPPLIES IN THE CLASSROOM STORE.

Q.    AND I BELIEVE YOU TOLD ME THAT HE WOULD LIKE TO GO OFF AND SIT BY HIMSELF?

A.    KEPT A ROCKING CHAIR IN THE ROOM.  AND THIS WAS A MIDDLE SCHOOL SELF-CONTAINED ROOM.  AND I ALWAYS KEPT A ROCKING CHAIR THERE SO THEY COULD GO AND HAVE QUIET TIME, BE ALONE TO REFLECT AND THINK.  IT WAS A COZY ROCKING CHAIR.  HE WOULD GO AND SIT AND ROCK.

Q.    DO YOU REMEMBER ANYTHING ABOUT HIS PARENTS?

A.    NEVER COULD GET A HOLD OF THEM.  NEVER CAME TO SCHOOL. NEVER RESPONDED TO ANY NOTICES OF MEETINGS THAT WE HAVE TO SEND OUT FREE.  NO RESPONSE.  NO RESPONSE TO PHONE CALLS. NOTES HOME, NO RESPONSE WHATSOEVER.  EVER.

Q.    SO, NO INDICATION THEY CARED ANYTHING ABOUT HIM?

A.    NO.  ABSOLUTELY NONE.

MR. BLUME:  THANK YOU, MS. FLOYD.  ANSWER ANY QUESTIONS THESE GENTLEMEN HAVE.

THE COURT:  CROSS-EXAMINATION.

MR. BLUME:  EXCUSE ME ONE SECOND.

CROSS EXAM OF MARTHA FLOYD

BY MR. BLUME:

Q.    LET ME CLARIFY.   THE TIME YOU HAD HIM IN THE SIXTH GRADE, THIS WAS A SELF-CONTAINED BEHAVIORAL DISORDER LEARNING DISABILITY CLASS?

A.    YES,  YES IT WAS.

MR. BLUME:  THANK YOU.

THE COURT:  CROSS-EXAMINATION.

CROSS EXAM

BY MR. GASSER:

Q.    GOOD MORNING,  MS. FLOYD.

A.    GOOD MORNING.

Q.    MS. FLOYD,  MY NAME IS JOHNNY GASSER.  I AM ONE OF THE PROSECUTORS ASSIGNED TO THIS CASE.  I JUST HAVE A FEW QUESTIONS.

A.    YES.

Q.    YOU INDICATED THAT, AT 12 YEARS OLD, CHAD WOULD HAVE BEEN 12 YEARS OLD AT THIS TIME IN THE SIXTH GRADE.  THAT, AMONGST HIS PEERS, HE APPEARED TO BE A FOLLOWER,  CORRECT?

A.    YES.

Q.    YOU DID NOT MAINTAIN CONTACT WITH HIM AS HE GREW UP AND THROUGH HIS EARLIER ADULT YEARS AND INTO HIS TWENTIES,  DID YOU?

A.    NOT PERSONAL CONTACT,  NO.

Q.    SO, YOU WOULDN'T KNOW WHETHER OR NOT, SAY, WHEN HE WAS 25 YEARS OLD, WHETHER OR NOT HE WAS A FOLLOWER OR A LEADER

App. 00698

**CROSS EXAM OF MARTHA FLOYD**

**BECAUSE YOU DIDN'T HAVE ANY CONTACT WITH HIM?**

A.    NO.   BUT IN MY EXPERIENCE, THE CHILDREN -- I HAVE HAD MANY, MANY, MANY, MANY CHILDREN IN THAT SITUATION.  MY RESPONSE, MY EXPERIENCE IS THAT MIDDLE SCHOOL IS A PRETTY TELLING THING FOR MOST PEOPLE.

**Q.    YOU ARE AWARE THAT THERE ARE SOME PEOPLE THAT TEND TO BE QUIET AND SHY IN GRADE SCHOOL, AND AS THEY DEVELOP MORE PERSONAL SKILLS, MORE CONFIDENCE, THAT THEY DEVELOP INTO LEADERS OF BUSINESS AND INDUSTRY AND LAW AND MEDICINE.  YOU ARE AWARE OF THAT?**

A.    PERHAPS.   I HAVE NO PERSONAL KNOWLEDGE OF ANYONE DOING THAT.

**Q.    THE POINT I AM TRYING TO MAKE IS, YOU WERE NOT AROUND CHAD FULKS IN HIS TWENTIES TO MAKE AN ASSESSMENT TO THIS JURY AS TO WHETHER OR NOT HE WAS A LEADER OR A FOLLOWER BECAUSE YOU HAD NO CONTACT WITH HIM?**

A.    RIGHT.

**Q.    YOU INDICATED THAT MR. FULKS, WHEN HE WAS 12 YEARS OLD, THAT HE CAME TO SCHOOL, AND HE WAS VERY CLEAN?**

A.    YES.

**Q.    AND THERE ARE SOME KIDS THAT COME TO SCHOOL NOT SO CLEAN.  SOMETIMES THEY ARE DIRTY OR THEIR PARENTS OBVIOUSLY AREN'T BATHING THEM OR ENSURING APPROPRIATE HYGIENE.  HAVE YOU HAD CHILDREN THAT WEREN'T, NECESSARILY, VERY CLEAN?**

A.    YES, I HAVE.

CROSS EXAM OF MARTHA FLOYD

Q.    BUT THAT WASN'T CHAD FULKS?

A.    WELL,  HIS PERSONAL BELONGINGS WERE NOT IN ORDER.   HIS CLOTHING WOULD NOT BE IN ORDER.   HIS SHOES -- I CAN REMEMBER A TEACHER ACROSS THE HALL, WHO ALSO HAPPENED TO BE MY NEXT DOOR NEIGHBOR, PURCHASED A PAIR OF SHOES FOR HIM ONE TIME. BUT HE WAS  -- HE WOULD -- WE KEPT PERSONAL HYGIENE ITEMS IN THE ROOM.   AND EACH CHILD HAD A TOOTHBRUSH,  COMB,  AND HE WOULD MAKE USE OF THOSE.

Q.    YOU STATED THAT HIS PARENTS NEVER CAME TO THE SCHOOL OR DIDN'T RESPOND TO PHONE CALLS OR NOTES SENT HOME; IS THAT CORRECT?

A.    CORRECT.

Q.    YET, DESPITE THAT FACT,  YOU RECALL CHAD FULKS AS WANTING TO LEARN.   HE HAD A DESIRE TO LEARN?

A.    WANTING TO PLEASE, YES.

Q.    SO, HE WANTED TO ABSORB WHATEVER INFORMATION OR KNOWLEDGE THAT YOU, AS A TEACHER, WAS WILLING TO PROVIDE?

A.    I DON'T KNOW IF I WOULD GO THAT FAR.

Q.    I AM JUST REPEATING WHAT YOU, BASICALLY, SAID ON YOUR DIRECT EXAMINATION.

A.    HE TRIED HIS BEST.   HE WANTED,  YOU KNOW.   HE TRIED.

Q.    I GUESS THE POINT I AM TRYING TO MAKE, LET ME CONTRAST YOUR DESCRIPTION OF MR. FULKS AT 12 YEARS OLD IN YOUR CLASS THAT YOU PROVIDED TO THE JURY WAS ONE OF THAT HE DID NOT HAVE A BEHAVIOR PROBLEM.   HE WAS A GOOD STUDENT BEHAVIOR-WISE?

CROSS EXAM OF MARTHA FLOYD

A.    YES.  BUT WE WERE IN A CONTROLLED ENVIRONMENT, AS WELL.

Q.    **HE WAS FRIENDLY AND EAGER TO PLEASE,  I BELIEVE,  IS WHAT YOUR TESTIMONY WAS ON DIRECT EXAMINATION?**

A.    TO ME AND THE OTHER ADULT IN THE ROOM,  YES.

Q.    **AND YOU ARE AWARE THAT THE YEAR BEFORE THAT, WHEN HE WAS IN MS. WOLFE'S CLASS, THAT SHE,  TOO,  FOUND THAT HE WAS HER BEST HELPER,  HER PARTNER,  AND THE BEST THING THAT EVER HAPPENED TO HER CLASS.  THAT SHE ALSO HAD VERY POSITIVE EXPERIENCES WITH MR. FULKS WHEN HE WAS IN HER CLASS,  DID YOU KNOW THAT?**

A.    NO,  I DIDN'T KNOW THAT.

Q.    **THE FACT OF THE MATTER IS, AS AN EDUCATOR, MS. FLOYD, YOU HAVE BEEN AROUND CHILDREN THAT ARE 11,  12 YEARS OLD WHO ARE THE COMPLETE OPPOSITE OF THAT.   YOU HAVE CHILDREN WHO ARE BEHAVIOR PROBLEMS,  DO YOU NOT?**

A.    YES.

Q.    **DISRUPTIVE IN CLASS?**

A.    I HAVE HAD THOSE.

Q.    **MEAN TO OTHER STUDENTS?**

A.    I HAVE HAD THOSE.

Q.    **EVEN VIOLENT AT TIMES, VIOLENT OUTBURSTS OF KIDS, UNFORTUNATELY?**

A.    THAT USUALLY IS ON THE PLAYGROUND OR WHATEVER.

Q.    **AND THE FACT OF THE MATTER IS, CHAD FULKS, AT 11, 12 YEARS OLD, WAS NOT MEAN,  WAS NOT DISRUPTIVE,  AND DID NOT**

**CROSS EXAM OF MARTHA FLOYD**

**DISPLAY ANY VIOLENT OUTBURSTS TO OTHER STUDENTS IN THE CLASS THAT YOU SAW?**

A.    NOT THAT I SAW.

**Q.    MS. FLOYD,  MY UNDERSTANDING IS, FROM THE PREVIOUS WITNESS, THAT WEST VIRGINIA HAS REPORTING STATUTES.  IN OTHER WORDS,  THAT TEACHERS AND EDUCATORS ARE REQUIRED, UNDER THE LAW, TO REPORT ANY TIME THEY FEEL A STUDENT HAS BEEN PHYSICALLY, OR SEXUALLY ABUSED, OR EVEN SIGNIFICANTLY EMOTIONALLY ABUSED?**

A.    YES.

**Q.    AND, OF COURSE, YOU COMPLY, AS AN EDUCATOR, YOU HAVE COMPLIED WITH THOSE LAWS?**

A.    YES.

**Q.    DID YOU EVER HAVE TO CONTACT YOUR EQUIVALENT OF THE DEPARTMENT OF SOCIAL SERVICE?**

A.    I CONTACTED THE SCHOOL COUNSELOR.   THAT WAS PROPER PROCEDURE.

**Q.    DID YOU EVER SEE CHAD FULKS WITH A PHYSICAL INJURY, BLACK EYE,  BUSTED-UP LIP, OR ANYTHING LIKE THAT WHERE YOU FELT THE POLICE NEEDED TO BE CONTACTED?**

A.    REFERRED TO THE COUNSELOR.

**Q.    PHYSICAL INJURIES?**

A.    I HAVE SEEN BRUISES,  YES,  ON HIM.

**Q.    SO, YOU REPORTED IT TO THE SCHOOL COUNSELOR.  SO, THERE SHOULD BE A RECORD OF THAT, AND AN EQUIVALENT -- ANOTHER**

**CROSS EXAM OF MARTHA FLOYD**

**RECORD OF LAW ENFORCEMENT AGENCY BEING CONTACTED SINCE WEST VIRGINIA HAD A REPORTING STATUTE THAT THEY WERE TO REPORT?**

A.   IT IS MY UNDERSTANDING THAT EDUCATIONAL RECORDS DON'T HAVE TO BE KEPT FOR VERY LONG,  LONG PERIODS OF TIME.

Q.    AND HOW MANY TIMES --

A.   I DON'T KNOW HOW THE COUNSELING SERVICE, DEPARTMENT OF HUMAN SERVICES DOES.   ALSO, WITH OTHER STUDENTS,  I HAVE HAD TO WAIT UP TO SIX MONTHS BEFORE ANYONE RESPONDED TO A REPORT.

Q.    BUT YOU WERE NEVER CALLED TO ANY TYPE OF SOCIAL SERVICE HEARING ON BEHALF OF CHAD FULKS,  WERE YOU?

A.   NO,  I WASN'T.

Q.    YOU WERE NEVER INTERVIEWED BY ANY POLICE OFFICER BECAUSE CHAD FULKS DISPLAYED SOME SORT OF PHYSICAL INJURY IN WHICH THEY WANTED TO INVESTIGATE,  WERE YOU?

A.   I DID HAVE QUESTIONS POSED TO ME,  YES.

Q.    BY WHO?

A.   SCHOOL RESOURCE OFFICER.  AND THE COUNSELOR.

Q.    AND DO YOU KNOW WHAT WAS DONE AS A RESULT OF THAT?

A.   I'M SORRY?

Q.    DO YOU KNOW WHAT WAS DONE AS A RESULT OF THAT?

A.   I BELIEVE THAT THEY INVOLVED HIS PROBATION OFFICER. AND BEYOND THAT, I WASN'T INVOLVED.

Q.    SO, HE MAY HAVE GOTTEN INTO A FIGHT WITH SOME OTHER KID IN SCHOOL OR ONE OF HIS BROTHERS?

A.   PERHAPS, BUT I DID NOT GET THAT IMPRESSION.

CROSS EXAM OF MARTHA FLOYD

Q.    NOT ONE TIME?

A.    WHAT?

Q.    ONE TIME YOU ARE TALKING ABOUT?

A.    ONE TIME, I SAW HIM WITH BRUISES.

Q.    ONE TIME, YOU ARE DESCRIBING THIS EVENT WITH THE SCHOOL RESOURCE OFFICER?

A.    WELL,  IT IS USUALLY A CULMINATION OF EVENTS. OFTENTIMES, AS YOU SAY,  MAYBE YOU WILL SEE A BRUISE, AND MANY CHILDREN DON'T WANT YOU TO KNOW WHAT IS GOING ON AT HOME, AND THEY MAY SAY, OH, I FELL OFF MY BIKE,  MY BROTHER HIT ME. AND AFTER YOU SEE IT, THEN YOU KNOW.

Q.    I UNDERSTAND.

A.    IT IS KIND OF A SENSE YOU HAVE WHEN YOU HAVE THOSE KIDS.

Q.    ARE YOU DESCRIBING THAT IN GENERAL OR TALKING ABOUT THIS CASE, SPECIFICALLY?

A.    I WOULD SAY THIS CASE APPLIES, AS WELL AS OTHERS.

Q.    I APOLOGIZE IF I AM NOT UNDERSTANDING YOUR TESTIMONY. ARE YOU TELLING THIS JURY THAT YOU SAW BRUISES ON CHAD FULKS OVER A PERIOD OF TIME AND FELT CONCERNED ENOUGH TO REPORT THAT, AND THAT IT WAS REPORTED, AND ACTION WAS TAKEN, IS THAT WHAT YOU ARE SAYING?

A.    I DON'T KNOW IF ACTION WAS TAKEN OR NOT.

Q.    AND SO, ONE TIME DURING ONE PORTION OF THAT SCHOOL YEAR, YOU OBSERVED BRUISES ON CHAD FULKS, AND YOU NOTIFIED THE

**DIRECT EXAM OF SUE HATCHER**

**SCHOOL COUNSELOR AND TALKED TO THE SCHOOL RESOURCE OFFICER?**

A.    I PROBABLY WOULD NOT HAVE DONE THAT BASED ON ONE BRUISE ONE TIME.

**Q.    I AM TALKING ABOUT ONE TIME YOU REPORTED IT?**

A.    SEVERAL TIMES.

**Q.    AND SO, WOULD THERE BE RECORDS INDICATING THAT YOU REPORTED THIS SEVERAL TIMES?**

A.    I DON'T KNOW.

MR. GASSER:  THAT IS ALL I HAVE.

THE COURT:  ANY REDIRECT?

MR. BLUME:  NO.

THE COURT:  THANK YOU.  YOU MAY STEP DOWN.  PLEASE CALL YOUR NEXT WITNESS.

MS. JOHNSON:  SUE HATCHER.

SUE HATCHER, HAVING BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

DIRECT EXAM

BY MS. JOHNSON:

**Q.    MS. HATCHER,  WHERE DO YOU LIVE?**

A.    HUNTINGTON,  WEST VIRGINIA.

**Q.    AND ARE YOU CURRENTLY EMPLOYED?**

A.    NO,  I AM RETIRED.

**Q.    AND WHAT DID YOU DO BEFORE YOU WERE RETIRED?**

A.    I WAS A SOCIAL WORKER WITH WEST VIRGINIA DEPARTMENT OF HUMAN RESOURCES FROM 1968 UNTIL 1986; FROM 1986 UNTIL 2003 I

DIRECT EXAM

BY MR. GASSER:

Q.    MR. FULKS, MY NAME IS JOHNNY GASSER.    I AM AN ASSISTANT U. S. ATTORNEY HERE IN COLUMBIA, SOUTH CAROLINA. YOU AND I HAVE NEVER MET, HAVE WE?

A.    NO, SIR.

Q.    NEVER SPOKEN?

A.    NO, SIR.

Q.    HOW OLD ARE YOU, MR. FULKS?

A.    THIRTY-TWO.

Q.    WHERE DO YOU LIVE?

A.    INDIANA.

Q.    WHO DO YOU LIVE WITH?

A.    I LIVE WITH TINA SEVERANCE, MY GIRLFRIEND.

Q.    WHAT DO YOU DO FOR A LIVING?

A.    I WORK AT COACHMAN RV.

Q.    WHAT DO YOU DO AT COACHMAN RV?

A.    I'M A RECEIVER.  I PUT ALL THE MATERIALS IN STOCK.

Q.    HOW LONG HAVE YOU HAD THAT JOB?

A.    ALMOST A YEAR.

Q.    WHAT DID YOU DO BEFORE YOU WORKED AT COACHMAN?

A.    I DONE ESCORTING FOR MOBILE HOMES, FLAG CAR SERVICE FOR MOBILE HOMES.

Q.    SO, IS THE MOBILE HOME BUSINESS, IS THAT KIND OF YOUR TRADE?

A.   YEAH, IN INDIANA, YES, SIR.

Q.   DID YOU GRADUATE FROM HIGH SCHOOL?

A.   NO, SIR.

Q.   DID YOU GET YOUR GED?

A.   NO, SIR.

Q.   YOU ARE AWARE YOUR BROTHER GOT HIS GED WHILE HE WAS IN PRISON?

A.   YES, SIR.

Q.   AND YOUR BROTHER ALSO GOT A WELDING CERTIFICATE?

A.   YES, SIR.

Q.   DID HE EVER TAKE ADVANTAGE OF HIS WELDING CERTIFICATE AND BECOME A WELDER?

A.   I BELIEVE SO.

Q.   SO, HE HAS A TRADE?

A.   YES, SIR.

Q.   YOUR BROTHER CHAD, DOES HE HAVE ANY PHYSICAL DISABILITIES THAT WOULD KEEP HIM FROM EARNING A LIVING AND PAYING HIS TAXES, PHYSICAL DISABILITIES?

A.   NONE THAT I AM AWARE OF, NO.

Q.   HOW MANY BROTHERS DO YOU HAVE, MR. FULKS?

A.   THREE.

Q.   CHAD, RONNIE, AND SHANNON?

A.   YES, SIR.

Q.   HOW OLD IS CHAD?

A.   CHAD IS 26.

Q.    HOW OLD IS RONNIE?

A.    RONNIE IS 25.

Q.    HOW OLD IS SHANNON?

A.    SHANNON IS 23.

Q.    AND YOUR SISTER, SHERRI, HOW OLD IS SHE, MR. FULKS?

A.    THIRTY-FIVE (35).

Q.    SO, SHE IS THE OLDEST?

A.    YES, SIR.

Q.    THERE WERE FOUR BOYS?

A.    YES, SIR.

Q.    WHERE DOES RONNIE LIVE?

A.    JUST WHEREVER.  I DON'T THINK HE HAS GOT A PERMANENT RESIDENCE.  HE USUALLY STAYS WITH HIS GIRLFRIEND OR A FRIEND OF HIS.

Q.    DOES HE WORK?

A.    NO, SIR.

Q.    SHANNON, WHERE DOES HE LIVE?

A.    HE LIVES WITH MY FATHER.

Q.    HE WORKS AND HAS A WIFE AND TWO KIDS, CORRECT?

A.    NO, HE IS NOT MARRIED NO LONGER.  HE HAS TWO KIDS. HE AND HIS WIFE ARE DIVORCED NOW.

Q.    NOW, YOUR SISTER, SHERRI, DOES SHE WORK?

A.    YES, SIR.

Q.    SHE HAS GOT A COMMON-LAW HUSBAND, DOESN'T SHE?

A.    YES, SIR.

Q.    DOES SHE HAVE CHILDREN?

A.    YES.

Q.    RONNIE IS NOT CURRENTLY IN PRISON?

A.    NO, SIR.

Q.    OBVIOUSLY, YOU ARE NOT CURRENTLY IN PRISON?

A.    NO, SIR.

Q.    SHANNON HAS NEVER BEEN TO JAIL,  HAS HE?

A.    NO.

Q.    SHANNON GREW UP IN THE SAME HOUSEHOLD YOU GREW UP IN?

A.    YES, SIR.

Q.    HAS A GOOD JOB AND HAS TWO CHILDREN?

A.    YES, SIR.

        MS. JOHNSON:  YOUR HONOR,  I DON'T WANT TO OBJECT, BUT HE IS REPEATEDLY LEADING THE WITNESS.  THIS IS HIS WITNESS.

        THE COURT:  I PREFER YOU ASK NONLEADING QUESTIONS. I REALIZE THE RULE THAT MAY COME TO PLAY HERE.

        MR. GASSER:  YOUR HONOR,  THESE ARE PERIPHERAL QUESTIONS.  NOT POINTED TO ANY OF THE SPECIFIC ISSUES HERE. IF THAT IS THE WAY SHE WANTS TO HANDLE IT,  THAT IS FINE.

BY MR. GASSER:

Q.    HOW OLD WERE YOU WHEN YOUR PARENTS WERE DIVORCED,  MR. FULKS?

A.    I WAS -- HONESTLY, I WAS AROUND 18, I BELIEVE.  I AM NOT REAL SURE ON THE AGE.  I WAS INCARCERATED WHEN THEY

DIVORCED.  I DIDN'T KNOW THEY WERE DIVORCED UNTIL I GOT OUT.

Q.     AND WHAT WERE YOU INCARCERATED ON?

A.     I DON'T REMEMBER THE EXACT CHARGES.  THERE WAS MULTIPLE CHARGES.

Q.     PROPERTY CRIMES?

A.     YES, SIR.

Q.     MR. FULKS,  I WANT TO DRAW YOUR ATTENTION TO, FIRST OF ALL, FRIDAY AFTERNOON, NOVEMBER 8TH.  NOW,  I KNOW YOU MAY NOT BE AWARE OF THE DATES OR THE TIMES,  BUT DO YOU RECALL, SOME TIME IN NOVEMBER, MS. SEVERANCE SHOWING UP AT YOUR DAD'S HOUSE?

A.     YES, SIR.

Q.     WERE YOU LIVING WITH YOUR FATHER THEN?

A.     YES, SIR.

Q.     AND AFTER MS. SEVERANCE SHOWED UP THAT AFTERNOON, WHERE DID YOU AND HER GO?

A.     WE WENT TO MY BROTHER  -- I MET MY BROTHER CHAD AND WENT TO MY BROTHER RONNIE'S HOUSE.

Q.     PRIOR TO THAT INCIDENT, WHEN IS THE LAST TIME YOU HAD SEEN YOUR BROTHER CHAD?

A.     IT HAD BEEN A WHILE.

Q.     DO YOU KNOW WHERE HE WAS?

A.     YES,  I DO.  HE WAS LOCKED UP.

Q.     MR. FULKS,  YOU ARE OBVIOUSLY UPSET BECAUSE YOUR BROTHER IS ON TRIAL,  IS THAT A FAIR STATEMENT?

A.      YEAH.

Q.      HE IS ON TRIAL FOR HIS LIFE?

A.      YES, SIR.

Q.      AND THAT TREMENDOUSLY UPSETS YOU?

A.      YES, IT DOES.

Q.      DO YOU LOVE YOUR BROTHER?

A.      MORE THAN ANYTHING IN THIS WORLD.

Q.      YOU WOULD DO ANYTHING FOR HIM?

A.      YES, I WOULD.  I WOULD DO ANYTHING FOR ANY OF MY FAMILY.  THAT IS WHAT FAMILIES ARE FOR.

Q.      DO YOU THINK CHAD WOULD DO ANYTHING FOR YOU?

A.      YEAH.  YEAH, HE WOULD.

Q.      WOULD YOU DO ANYTHING FOR YOUR BROTHER RONNIE?

A.      YES.  I WOULD DO ANYTHING FOR ANY OF MY FAMILY.  JUST AS I STATED, I WOULD DO ANYTHING FOR MY FAMILY.

Q.      YOU BROTHERS ARE PRETTY CLOSE?

A.      YEAH, PRETTY MUCH.

Q.      WHEN YOU AND MS. SEVERANCE AND YOUR BROTHER CHAD GOT TOGETHER THAT AFTERNOON, YOU SAID YOU WENT TO YOUR BROTHER RONNIE'S HOUSE?

A.      YES, SIR.

Q.      WHAT DID YOU DO THERE?

A.      WE SAT DOWN THERE AND TALKED.  WE PLAYED CARDS, IF I AM NOT MISTAKEN.  AND GOT HIGH.

Q.      WHAT DO YOU MEAN YOU "GOT HIGH?"

A.    SELF-EXPLANATORY, I GOT HIGH.  WHAT PART DON'T YOU UNDERSTAND?

Q.    DID YOU SMOKE MARIJUANA?

A.    YES, I DID.

Q.    DO YOU KNOW WHAT CRYSTAL METH IS?

A.    YES, I DO.

Q.    WHAT IS CRYSTAL METH?

A.    METHAMPHETAMINES.  IT IS SPEED.

Q.    DID YOU SMOKE IT, AS WELL?

A.    YES, I DID.

Q.    DID YOU DRINK?

A.    NO, I DIDN'T DRINK.

Q.    WAS YOUR BROTHER CHAD SMOKING MARIJUANA?

A.    YES.

Q.    SMOKING CRYSTAL METH?

A.    YES, SIR.

Q.    TINA SEVERANCE?

A.    YES, SIR.

Q.    HOW LONG DID YOU, AND YOUR BROTHER CHAD, AND TINA, HOW LONG DID Y'ALL SIT AROUND SMOKING MARIJUANA AND CRYSTAL METH?

A.    JUST A LITTLE WHILE.  ALL WE DONE WAS LIKE HALF A GRAM, $50 WORTH.

Q.    DO YOU KEEP TRACK OF TIME WHEN YOU ARE SMOKING CRYSTAL METH?

A.    NOT NORMALLY.  I DON'T KEEP TRACK OF TIME FOR NOTHING.

NO, NOT NORMALLY.

Q. DID YOU GO TO BED THAT FRIDAY NIGHT?

A. I DON'T BELIEVE SO.

Q. SOME TIME SATURDAY MORNING WHEN IT WAS LATE OUT, DID YOU AND TINA SEVERANCE GO SOMEWHERE?

A. YES, WE DID.

Q. WHERE DID YOU GO?

A. WE WENT TO MY FATHER'S HOUSE AND GOT MY LAUNDRY. AND THEN WENT TO A MOTEL IN STURGIS, MICHIGAN.

Q. WHAT DID YOUR BROTHER CHAD DO, DO YOU KNOW?

A. HE WAS TO MEET US AT THE MOTEL.

Q. DID HE EVER SHOW UP AT THE MOTEL?

A. NO, SIR, HE DIDN'T.

Q. WHEN YOU GOT TO THIS MOTEL AT STURGIS, MICHIGAN WITH TINA SEVERANCE, WHAT DID YOU OBSERVE?

A. WHEN WE FIRST GOT THERE, THERE IS, I DON'T KNOW, FOUR TO FIVE MICHIGAN STATE POLICE CARS SITTING OUT BEHIND THE MOTEL. I GOT SCARED AND TOLD MS. SEVERANCE THAT I AM GOING TO STAY THERE. I AM GOING TO GET CAUGHT UP IN A BUNCH OF STUFF. SHE SAID I WILL TAKE THE CAR, GO BACK BY MYSELF. WE WENT IN THE MOTEL ROOM AND MR. BASHAM WAS SITTING THERE AND WAS TWO OR THREE GUYS THEY HAD MET, I GUESS, AT A K-MART. AND I JUST, I DIDN'T KNOW NONE OF THEM. I WAS SCARED. I WAS NERVOUS. I TOLD TINA TO TAKE ME OUT OF THERE. I WENT BACK TO MY BROTHER RONNIE'S HOUSE.

Q.    WHEN YOU FIRST HOOKED UP WITH YOUR BROTHER THAT PREVIOUS AFTERNOON AT YOUR DAD'S HOUSE, OR WHEN TINA CAME UP AND GOT YOU, AND YOU SAW YOUR BROTHER OR WERE WITH YOUR BROTHER THAT DAY AT YOUR DAD'S OR OUTSIDE YOUR DAD'S HOUSE AT RONNIE'S, DID YOU SEE HIM WITH SOME FIREARMS?

A.    NO, I DIDN'T.  NOT AT FIRST.  NO, I DIDN'T.

Q.    YOU SAY "NOT AT FIRST."  THE ENTIRE TIME THAT YOU SPENT WITH HIM, DID YOU SEE HIM WITH FIREARMS?

A.    NO, I NEVER SEEN HIM WITH NO FIREARMS.

Q.    MR. FULKS, LET ME REMIND YOU THAT YOU ARE UNDER OATH.

A.    YES, I KNOW I AM UNDER OATH.

Q.    AND THAT YOU ARE SUBJECT TO THE PENALTIES OF PERJURY.

A.    YES, SIR.

Q.    YOU CAN BE PROSECUTED IN CRIMINAL COURT FOR PERJURY.

A.    YES, SIR.

Q.    DO YOU REMEMBER THE DAY BEFORE YOUR BROTHER WAS ARRESTED IN INDIANA, DO YOU REMEMBER AGENTS CHRISTOPHER FAVO AND TIMOTHY THERIAULT, FBI AGENTS, COMING TO INTERVIEW YOUR MOM -- YOUR FATHER, YOUR STEPMOTHER, AND YOU AT 7205 NORTH 11150 WEST, SHIPSHEWANNA, INDIANA, DO YOU REMEMBER THAT, MR. FULKS?

A.    YES.

Q.    AND DO YOU REMEMBER THAT THE AGENTS SPENT A SIGNIFICANT AMOUNT OF TIME IN YOUR FATHER AND STEPMOTHER'S HOUSE, CORRECT?

A.    YES, SIR.

Q.    AND THEY INTERVIEWED THE THREE OF YOU TOGETHER, DO YOU REMEMBER THAT?

A.    YES, SIR.

Q.    AND YOUR BROTHER WAS STILL AT-LARGE, WAS HE NOT?

A.    YES, SIR, HE WAS.

Q.    AND THEY WERE WANTING TO TRY AND FIND YOUR BROTHER BEFORE ANYONE ELSE GOT HURT; ISN'T THAT A FAIR STATEMENT?

A.    YES, SIR.

Q.    AND AFTER A WHILE, AFTER THEY CONDUCTED THEIR INTERVIEW, THESE AGENTS LEFT YOUR FATHER'S HOUSE, DO YOU REMEMBER THAT, MR. FULKS?

A.    YES, SIR.

Q.    YOU TOOK IT UPON YOURSELF TO WALK OUTSIDE BECAUSE YOU WANTED TO TELL THEM SOMETHING, BUT YOU DIDN'T WANT TO TELL IT IN THE PRESENCE OF YOUR FATHER OR STEPMOTHER, DO YOU REMEMBER THAT?

A.    YES, I DO.

Q.    AND ISN'T IT A FACT, MR. FULKS, AND I AGAIN REMIND YOU YOU ARE UNDER OATH, YOU TOLD THESE FBI AGENTS THAT YOU SAW CHAD, THAT HE WAS WITH ANOTHER GUY ABOUT FIVE FOOT SEVEN WITH DARK HAIR, THAT YOU SAW CHADRICK WITH TWO REVOLVERS AND THE BOY WITH A .45?

A.    I -- WHEN THEY CAME BACK TO THE HOUSE THE SECOND TIME, I NEVER SEEN CHAD WITH A GUN.  I SEEN BRANDON WITH A GUN WHEN

WE LEFT THE MOTEL TO GO TO RONNIE'S BECAUSE THE COP WAS BEHIND US, AND BRANDON HAD A PISTOL AND SAID HE WASN'T GOING OUT LIKE THAT. AND I TOLD -- WE STOPPED AT A GAS STATION. I TOLD MS. SEVERANCE, TELL HIM TO GET RID OF THE GUN, OR I WILL TAKE THE GUN FROM HIM. I AIN'T GOING OUT LIKE THIS. I AM NOT GETTING CAUGHT UP IN ALL THIS.

Q. MR. FULKS, YOU DIDN'T ANSWER MY QUESTION. IT IS A SIMPLE "YES" OR "NO," THEN YOU HAVE ALL THE TIME IN THE WORLD TO EXPLAIN.

A. NO.

Q. OKAY.

A. YES, SIR.

Q. ISN'T IT A FACT, WHEN THESE FBI AGENTS, THE DAY BEFORE YOUR BROTHER WAS EVER ARRESTED, WHEN THEY LEFT YOUR FATHER AND STEPMOTHER'S HOUSE, YOU FOLLOWED THEM OUTSIDE SPECIFICALLY TO TELL THEM SOMETHING, DO YOU REMEMBER THAT?

A. YES, SIR.

Q. AND, ISN'T IT A FACT, THAT YOU TOLD THESE TWO FBI AGENTS THAT YOU SAW CHADRICK WITH TWO REVOLVERS AND THE BOY WITH A .45?

A. I MIGHT HAVE TOLD THEM THAT, I DON'T REMEMBER. I DON'T RECALL THAT. I COULD HAVE TOLD THEM THAT. I DON'T REMEMBER TELLING THEM THAT.

Q. MR. FULKS, THE REASON WHY YOU TOLD THEM THAT WAS BECAUSE YOU SAW YOUR BROTHER CHAD IN THE POSSESSION OF TWO

REVOLVERS AND YOU WANTED TO LET THE FBI KNOW THAT BECAUSE YOU DIDN'T WANT ANYTHING TO HAPPEN TO HIM WHEN HE WAS ARRESTED BY LAW ENFORCEMENT; ISN'T THAT TRUE, MR. FULKS?

A. YES, IT IS.

Q. MR. FULKS, YOUR BROTHER HAS BEEN WRITING YOU LETTERS SINCE HE HAS BEEN INCARCERATED, HAS HE NOT?

A. YES, HE HAS.

Q. HAVE YOU BEEN WRITING HIM BACK?

A. AT TIMES, YES.

Q. DO YOU RECALL RECEIVING A LETTER, MR. FULKS, FROM YOUR BROTHER, WHICH HE INCLUDED SOME PAMPHLETS, SOME BROCHURES OF THE MEDICAL PRISON FACILITY THAT HE WAS STAYING AT HERE IN COLUMBIA?

A. YES, SIR, I DO.

Q. HE ASKED YOU FOR YOUR ASSISTANCE IN ESCAPING, DID HE NOT?

A. NO, HE NEVER STRAIGHT OUT SAID HE WAS GOING TO ESCAPE. I JUST -- I KNOW CHAD SOMETIMES GETS SOME HAIR-BRAINED IDEAS, AND I ASSUMED THIS WAS WHAT HE WAS TALKING ABOUT, YES. BUT HE NEVER, HE NEVER DIRECTLY SAID THAT HE WAS GOING TO ESCAPE, NO.

Q. YOU HAVE NEVER DONE ANYTHING -- YOU WOULDN'T TRY TO HELP HIM ESCAPE, WOULD YOU, MR. FULKS?

A. AT THE TIME, YES, I PROBABLY WOULD, IF YOU WANT TO BE HONEST. YES, I PROBABLY WOULD.

Q.    DID YOU COME -- I'M SORRY?

A.    BECAUSE I LOVE MY BROTHER.

        MR. GASSER:  BEG THE COURT'S INDULGENCE.   THANK YOU, YOUR HONOR,  THAT IS ALL I HAVE.

        THE COURT:   DO YOU WANT TO BREAK FOR LUNCH NOW SO WE DON'T INTERRUPT YOUR CROSS?

        MS. JOHNSON:  YES, SIR.

        THE COURT:   WE WIL BREAK A LITTLE BIT EARLY TODAY. IT IS 12:35.   LET'S COME BACK AT 2:00 O'CLOCK.   THAT WILL GIVE YOU ALMOST AN HOUR AND A HALF FOR LUNCH.   HAVE A NICE LUNCH.   DON'T DISCUSS THIS CASE.   SEE YOU BACK AT 2:00 O'CLOCK.

(WHEREUPON, A LUNCH RECESS WAS HELD.)

        THE COURT:   BRING IN THE JURY.   MS. JOHNSON,  YOU MAY CROSS-EXAMINE THE WITNESS.

CROSS EXAM

BY MS. JOHNSON:

Q.    GOOD AFTERNOON,  DEWAYNE.

A.    HEY.

Q.    MR. GASSER ASKED YOU IF YOU HAD MET WITH DEFENSE COUNSEL.

A.    RIGHT.

Q.    AND YOU HAVE MET WITH DEFENSE COUNSEL?

A.    I BELIEVE SO,  YES.

Q.    A NUMBER OF TIMES.   AND YOU ALSO, WHEN THE GOVERNMENT

ASKED YOU TO COME OVER AND TALK WITH THEM, YOU WENT OVER THERE, TOO; IS THAT RIGHT?

A. YES, MA'AM.

Q. BUT THEN THEY DIDN'T ASK TO TALK TO YOU?

A. YES.

Q. BUT YOU WOULD HAVE TALKED TO THEM?

A. YES, MA'AM.

Q. MR. GASSER, (SIC) HAS ANYONE ASKED YOU TO LIE?

A. NO, MA'AM.

Q. HAS ANYONE TOLD YOU ANYTHING ABOUT WHAT YOU OUGHT TO DO ON THE STAND?

A. NO, MA'AM. TELL THE TRUTH.

Q. TELL THE TRUTH. HAS YOUR BROTHER ASKED YOU TO LIE?

A. NO, MA'AM.

Q. WHEN CHAD AND BRANDON BASHAM FIRST ARRIVED IN INDIANA, YOU MET BRANDON BASHAM FOR THE FIRST TIME?

A. YES, SIR (SIC).

Q. AND YOU SAW HIM AT THE MOTEL?

A. YES, MA'AM.

Q. FIRST TIME YOU SAW HIM?

A. YES, MA'AM.

Q. AND WHAT WAS YOUR IMPRESSION OF HIM THEN?

A. I DIDN'T LIKE HIM. HE JUST GAVE ME A WEIRD FEELING. I TOLD CHAD I DIDN'T WANT TO BE AROUND HIM. I DON'T KNOW. I HAD A WEIRD FEELING. I JUST DIDN'T.

Q.    AND THEN LATER WHEN HE WAS IN THE JEEP WITH YOU,  HE WAS WAVING THE GUN AROUND?

A.    YES, SIR (SIC).

Q.    WHY WAS HE WAVING THE GUN AROUND?

A.    BECAUSE THERE WAS A MICHIGAN STATE POLICE CAR LIKE TWO CARS BEHIND US.  HE WAS AFRAID WE WERE GOING TO GET PULLED OVER.

Q.    THEY WEREN'T ACTUALLY CHASING YOU?

A.    NO, MA'AM.

Q.    BUT HE WAS WAVING THE GUN AROUND ANYWAY?

A.    YES, MA'AM.

Q.    WHAT DID HE SAY ABOUT IT?

A.    HE SAID HE WASN'T GOING OUT LIKE THAT.   AND I GOT SCARED.   WE STOPPED AT THE GAS STATION.  I TOLD MS. SEVERANCE THEY NEEDED TO DO SOMETHING BECAUSE I DIDN'T WANT TO BE AROUND THE BOY,  I WAS SCARED OF HIM.

Q.    THAT IS WHAT YOU TOLD TINA?

A.    YES, MA'AM.

Q.    AND THAT NIGHT, YOU ALL DID CRANK TOGETHER; IS THAT RIGHT?

A.    YES, MA'AM.

Q.    AND THE NEXT MORNING?

A.    ACTUALLY, IT WAS THE PREVIOUS NIGHT.   THE PREVIOUS NIGHT.

Q.    AND THEN AFTER ALL OF THAT,  YOU TOLD CHAD SOMETHING

LIKE YOU HAVE TO GET THIS CRAZY FUCKER OUT OF HERE?

A. YES, MA'AM.

Q. WHY DID YOU SAY THAT?

A. BECAUSE HE JUST GAVE ME THE CREEPS. I HAD WEIRD VIBES ABOUT IT. I DIDN'T WANT TO BE AROUND HIM.

Q. MR. GASSER ASKED YOU A LITTLE BIT ABOUT YOUR FAMILY. HOW MANY KIDS ARE THERE IN YOUR FAMILY?

A. FIVE.

Q. CAN YOU GO OVER THE BIRTH ORDER OF THEM?

A. THERE IS SHERRI, ME, RONNIE, CHAD, AND SHANNON.

Q. AND DID CHAD HAVE A NICKNAME AS A KID?

A. YES, MA'AM, HE DID.

Q. WHAT WAS HIS NICKNAME?

A. HILLBILLY THE KID.

Q. HILLBILLY THE KID. WHO DID HE GET THAT NAME FROM?

A. ME.

Q. FROM YOU. WAS THERE A REASON HE HAD THAT NAME?

A. NO. I JUST -- I JUST THOUGHT OF HIM.

Q. DEWAYNE, DID YOUR PARENTS DRINK?

A. YES, MA'AM.

Q. DO YOU REMEMBER YOUR PARENTS BEING DRUNK?

A. YEAH.

Q. WHEN YOU WOULD GET HOME FROM SCHOOL, WOULD THEY BE DRUNK THEN?

A. MOST OF THE TIME, YES.

Q.     AND SOMETIMES YOUR DAD WOULD WORK?

A.     YES, MA'AM.

Q.     WHAT KIND OF WORK DID HE DO?

A.     HE WORKED FOR -- WHEN WE WAS YOUNGER, HE WORKED AT A GAS STATION.  AND THEN HE WORKED FOR -- WORKING AT EXTERMINATING FOR A WHILE.  AND AFTER HE LOST HIS JOB AT WORKING AT EXTERMINATING, HE WORKED TO GET A WELFARE CHECK FOR A PLACE CALLED MEALS ON WHEELS.

Q.     SO,  WHEN HE WORKED FOR MEALS ON WHEELS,  WAS THAT A JOB THAT HE GOT INDEPENDENTLY, OR DID HE HAVE TO DO THAT FOR WELFARE?

A.     HE HAD TO DO THAT FOR WELFARE.

Q.     HE HAD TO DO THAT TO GET WELFARE?

A.     YES, MA'AM.

Q.     IT WAS NOT A FULL-TIME JOB?

A.     NO, MA'AM.

Q.     DID HE DO ANYTHING ON THE SIDE TO GET EXTRA MONEY?

A.     HE GOT AUTOS AND PAINTED CARS.

Q.     DID YOUR MOTHER WORK?

A.     NO, MA'AM.

Q.     AND WHEN YOUR DAD WAS NOT WORKING, SOMETIMES HE DRANK DURING THE DAY?

A.     YES, MA'AM.

Q.     AND THEN AS THE NIGHT WENT ON,  THERE WOULD BE MORE DRINKING?

A.    YES, MA'AM.

Q.    AND, YOU KNOW, WE TALK ABOUT DRINKING.  ARE WE TALKING ABOUT, YOU KNOW, ON WEEKENDS THEY DRINK?

A.    YEAH.   ABOUT EVERY DAY.

Q.    ABOUT EVERY DAY.   SO,  DURING THE WEEK,  TOO?

A.    YES, MA'AM.

Q.    AND,  YOU KNOW,  PEOPLE HAVE DIFFERENT IDEAS OF WHAT DRINKING IS.   WHEN YOU ARE TALKING ABOUT DRINKING,  HOW MUCH WOULD THEY DRINK?

A.    USUALLY 12-PACK,  24-PACK.   WE HAD A REFRIGERATOR DOWNSTAIRS THEY PRETTY MUCH KEPT STOCKED.

Q.    AND DID THEY USE ANY OTHER DRUGS OTHER THAN ALCOHOL?

A.    YES.  I HAVE SEEN MY DAD SMOKE MARIJUANA BEFORE.

Q.    YOUR MOM DIDN'T SMOKE MARIJUANA?

A.    NOT THAT I AM AWARE OF.

Q.    BUT YOUR DAD DID.   WHERE DID HE GET THE MARIJUANA?

A.    FROM HIS FRIENDS.

Q.    FROM HIS FRIENDS.   DID HE EVER GROW MARIJUANA?

A.    YES,  HE DID ONCE, I REMEMBER,  IN OUR BASEMENT.

Q.    AND WHY  -- DO YOU KNOW WHY HE STOPPED GROWING IT IN THE BASEMENT?

A.    YES.  BECAUSE MY SISTER WAS WATCHING US AND THOUGHT SHE HEARD SOMETHING IN THE BASEMENT, SO SHE CALLED THE POLICE AND HAD THEM SEARCH THE BASEMENT.  THEY FOUND NO ONE.  BUT HE CAME HOME, AND SHE TOLD HIM THAT THEY CALLED THE POLICE,  HAD THE

POLICE AT THE HOUSE, THOUGHT SHE HEARD SOMEONE IN THE BASEMENT. DAD FREAKED OUT BECAUSE HE FIGURED HE FOUND THE MARIJUANA PLANTS. HE POURED THEM ALL -- POURED OIL ALL OVER THEM, AND THEY NEVER DID COME BACK.

Q. AFTER THAT, HE CONTINUED TO USE MARIJUANA?

A. OCCASIONALLY.

Q. HE GOT IT FROM HIS FRIENDS AFTER THAT?

A. YES, MA'AM.

Q. WOULD YOU COME HOME SOMETIMES ON A SCHOOL DAY AND FIND YOUR PARENTS PASSED OUT?

A. SOMETIMES, YES.

Q. OR HOW ABOUT WHEN YOU WOULD WAKE UP IN THE MORNING?

A. NO. THEY USUALLY UP IN THE MORNINGS.

Q. USUALLY UP IN THE MORNINGS?

A. YES. MOM WOULD BE UP. MOM WAS ALWAYS UP IN THE MORNING TO GET THE KIDS OFF TO SCHOOL.

Q. AND WHEN THEY WOULD PASS OUT, WOULD ANYTHING BAD HAPPEN OTHER THAN JUST THEIR BEING PASSED OUT?

A. YEAH. MOM FELL ASLEEP A FEW TIMES WITH A CIGARETTE AND CAUGHT THE BED ON FIRE A FEW TIMES.

Q. AND SOMETIMES THERE WOULD BE PANS LEFT ON THE STOVE --

A. YES, MA'AM.

Q. -- WHEN THEY PASSED OUT? THEY WERE HEATING?

A. YES.

Q. YEAH. DID YOUR PARENTS FIGHT?

A.    YES, MA'AM.

Q.    BY "FIGHT," YOU MEAN THEY ARGUED A LOT?

A.    ARGUED, FIST FOUGHT.

Q.    WHEN YOU SAY THEY FOUGHT WITH THEIR FISTS, ARE YOU JUST TALKING ABOUT THAT YOUR DAD WOULD HIT YOUR MOM WITH HIS FISTS?

A.    THEY BOTH.  THEY BOTH HIT EACH OTHER WITH FISTS. KETCHUP BOTTLES.

Q.    ANYTHING ELSE?

A.    COFFEE POTS, SKILLETS.

Q.    WHATEVER WAS THERE?

A.    EXCUSE ME?

Q.    WHATEVER WAS THERE?

A.    YES, MA'AM.

Q.    DO YOU KNOW WHAT THEY WERE FIGHTING ABOUT MOST OF THE TIME?

A.    USUALLY, MONEY.

Q.    "USUALLY, MONEY?"

A.    USUALLY, MONEY.

Q.    DID THEY EVER ACCUSE EACH OTHER OF ANYTHING?

A.    CHEATING ON EACH OTHER.  THEY FOUGHT OVER THAT A FEW TIMES.

Q.    SO, THAT IS BOTH WAYS.  BOTH YOUR MOM ACCUSED YOUR DAD, AND YOUR DAD WOULD ACCUSE YOUR MOM?

A.    YEAH.

Q.    THAT WOULD BE SOME OF THE FIGHTING?

A. YES, MA'AM.

Q. DID YOU ALWAYS KNOW WHAT THE FIGHTING WAS ABOUT?

A. NO. I DON'T EVEN THINK THEY KNEW.

Q. DID YOU EVER TRY TO STOP THEM FROM FIGHTING?

A. YEAH. YES.

Q. DID ANYONE ELSE EVER TRY TO STOP THEM FROM FIGHTING?

A. YES, MA'AM.

Q. WHEN YOU WERE PRETTY LITTLE, YOU MOVED TO HUNTINGTON?

A. YES, MA'AM.

Q. AND WHERE DID YOU LIVE IN HUNTINGTON?

A. 129 LEEWARD AVENUE.

Q. AND BEFORE YOU LIVED ON LEEWARD, WHERE DID YOU LIVE?

A. 119 PINE STREET.

Q. AND THOSE ARE REAL CLOSE TO EACH OTHER?

A. YEAH. THE ONE ON PINE STREET WAS RIGHT BEHIND THE ONE ON LEEWARD AVENUE.

Q. WHEN YOU MOVED TO LEEWARD AVENUE, DID YOU HAVE A BASEMENT THERE?

A. YES, MA'AM.

Q. AND WHAT WAS IN THE BASEMENT?

A. POOL TABLE, JUKE BOX.

Q. HOW DID YOUR DAD BUY THE POOL TABLE?

A. I AM NOT REAL SURE HOW. I AM NOT EXACTLY SURE WHERE HE GOT IT OR HOW HE GOT IT. I JUST REMEMBER HE GOT IT.

Q. IT DIDN'T COME WITH THE HOUSE, HE DID BUY IT?

A.    NO, MA'AM.

Q.    WHAT WAS ON THE WALLS DOWN IN THE BASEMENT?

A.    PENTHOUSE PICTURES,  PLAYBOY PICTURES,  NUDE PICTURES.

Q.    NUDE PICTURES OF WOMEN?

A.    YES, MA'AM.

Q.    AND WERE YOU KIDS ALLOWED TO GO DOWN THERE?

A.    WELL, YEAH. YES, MA'AM.

Q.    WHEN YOU SAY, "WELL, YEAH,"  YOU WOULD GO DOWN THERE OFTEN?

A.    YES, MA'AM.

Q.    WOULD THAT BE TRUE OF YOUR YOUNGER BROTHERS,  TOO?

A.    THAT WOULD BE TRUE OF ALL OF US.   ALL OF US SPENT TIME IN THE BASEMENT.

Q.    DID ANYBODY ELSE COME OVER?

A.    YES, MA'AM.

Q.    AND WHAT WOULD THEY DO THERE?

A.    DRINK.

Q.    DID ANY OF THEM DO ANY OTHER DRUGS OTHER THAN DRINKING?

A.    MARIJUANA.

Q.    AND YOU SAID THAT YOUR PARENTS WOULD FIGHT WITH EACH OTHER.   WERE ANY OF THOSE PEOPLE FIGHTING WITH EACH OTHER, TOO?

A.    YES, MA'AM.

Q.    LIKE, WHO CAN YOU THINK OF THAT WAS FIGHTING?

A.    MY LITTLE GARY,  DAD GARY,  MOM AND BO,  DAD AND SANDY,

DAD AND MOM, JERRY, IT WAS JUST ALL OF THEM.

Q. SO, AFTER SOME OF THESE PEOPLE WOULD BE DRINKING A LOT AND THEN THERE WOULD BE A FIGHT, WOULD ANYBODY CALL THE POLICE?

A. OH, YES, MA'AM. POLICE WAS CONSTANTLY AT OUR HOUSE. THEY STARTED REFERRING TO OUR HOUSE AS "THE LITTLE BLUE HOUSE ON THE CORNER" THEY CAME SO MUCH.

Q. HOW DO YOU KNOW THEY REFERRED TO YOUR HOUSE AS "THE LITTLE BLUE HOUSE ON THE CORNER?"

A. BECAUSE DAD HAD A POLICE SCANNER. WE WOULD HEAR THEM ON THE POLICE SCANNER, HEAR THE RADIO CALL GO OUT. EVERYBODY KNEW TO RUN AND HIDE.

Q. WHY DID YOUR DAD HAVE A POLICE SCANNER?

A. JUST FOR THAT PURPOSE. KNOW THEY ARE ON THEIR WAY UP THERE.

Q. WHEN THEY WERE ON THEIR WAY UP THERE, WHAT WOULD EVERYBODY DO?

A. THEY WOULD DISPERSE. GO TO THE BASEMENT OR GO TO THEIR OWN HOMES.

Q. AND YOUR DAD HEARD THIS STUFF ABOUT "THE LITTLE BLUE HOUSE ON THE CORNER" A NUMBER OF TIMES?

A. YES. SO OFTEN, HE PAINTED THE HOUSE YELLOW.

Q. SOMETIMES, WHEN THE POLICE CAME, DID THEY EVER TAKE YOU AND YOUR MOM AWAY?

A. YES, MA'AM, THEY DID.

Q. AND HOW LONG WOULD YOU BE GONE?

A. SOMETIMES JUST OVERNIGHT, SOMETIMES A DAY OR TWO.

Q. AND ONCE IN AWHILE, I SHOULD SAY, DID THEY EVER TAKE YOUR DAD AWAY?

A. NO, MA'AM.

Q. NO.

A. THEY MADE HIM LEAVE A FEW TIMES.

Q. THEY MADE HIM LEAVE A FEW TIMES?

A. YES, MA'AM.

Q. AND WHEN HE WOULD LEAVE, WHAT WOULD YOU DO?

A. I WOULD TRY AND GO WITH HIM.

Q. YOU WOULD TRY AND GO WITH HIM. DEWAYNE, THERE IS A GLASS OF WATER RIGHT THERE IF YOU WOULD LIKE TO TAKE A DRINK OF WATER.

THE COURT: MR. FULKS, IF YOU WANT US TO TAKE A LITTLE RECESS, WE WILL BE GLAD TO DO SO.

THE WITNESS: NO, I AM FINE.

BY MS. JOHNSON:

Q. I POURED YOU A LITTLE GLASS OF WATER. THAT IS YOUR WATER. WHEN YOU WERE A CHILD, WERE YOU EVER HUNGRY?

A. YES, MA'AM.

Q. HOW OFTEN WERE YOU HUNGRY?

A. SOMETIMES, PRETTY OFTEN. IT DEPENDS ON IF DAD WAS WORKING OR IF HE HAD A SPARE JOB PAINTING CARS. IT WAS QUITE OFTEN.

Q.    ONCE A WEEK,  TWICE A WEEK?

A.    YOU COULD SAY THAT,  YES, MA'AM.

Q.    AT TIMES, THERE WAS NO FOOD IN THE HOUSE?

A.    AT TIMES,  YES.

Q.    WHEN YOU WERE -- WHEN YOU WERE HUNGRY AND THERE WAS NO FOOD IN THE HOUSE, WHAT DID YOU DO?

A.    WHATEVER I HAD TO DO TO GET FOOD.  SOMETIMES I WOULD GO STEAL,  SOMETIMES I WOULD GO TO A NEIGHBOR'S HOUSE.

Q.    WAS THERE A NEIGHBOR THAT GAVE YOU FOOD SOMETIMES?

A.    YES, MA'AM.

Q.    AND WHO WAS THAT?

A.    LINDA ATKINS.

Q.    THAT WAS LINDA ATKINS.  WHEN YOU SAID SOMETIMES YOU WOULD GO STEAL FOOD,  WHERE WOULD YOU STEAL FOOD?

A.    EXCUSE ME?

Q.    WHERE WOULD YOU STEAL FOOD FROM?

A.    CONVENIENT STORE.

Q.    ANY PLACE ELSE?

A.    NEIGHBORS' HOUSES.

Q.    WHEN YOU STOLE THE FOOD,  DID YOU GIVE ANY TO YOUR BROTHERS AND SISTERS?

A.    SOMETIMES.  MOST OF THE TIME I JUST -- I FEND FOR MYSELF.

Q.    SOMETIMES, YOU HAD IT FOR YOURSELF.  HOW CLEAN WAS YOUR HOUSE?

A.    NOT VERY CLEAN AT ALL.

Q.    WHAT YOU MEAN BY THAT, THERE WERE A LOT OF PAPERS AROUND?  WHAT DO YOU MEAN BY "VERY CLEAN?"

A.    DISHES PILED UP IN THE SINK,  TRASH LAYING,  PRETTY NASTY.

Q.    AND DID YOU ALWAYS FIND SOME CLEAN DISHES IN THE CUPBOARD?

A.    NO.   NOT ALWAYS.

Q.    WERE THERE BUGS?

A.    YES, MA'AM.

Q.    HOW MANY BUGS?

A.    SOMETIMES ENOUGH, IF YOU TURNED THE LIGHT ON, YOU HAD TO WAIT A FEW MINUTES FOR THEM TO LEAVE.

Q.    DEWAYNE,  HOW DID YOU FEEL ABOUT THE HOUSE BEING DIRTY?

A.    ASHAMED.

Q.    "ASHAMED."  HOW DO YOU FEEL ABOUT BEING CLEAN NOW?

A.    GOOD.  MY HOUSE IS NEVER DIRTY.

Q.    YOUR HOUSE IS NEVER DIRTY.   HOW OFTEN DO YOU TAKE A SHOWER?

A.    SOMETIMES TWO,  THREE TIMES A DAY.

Q.    AS CHAD GOT OLDER, DID HE TAKE A LOT OF SHOWERS,  TOO?

A.    YES.  CHAD LIVED WITH ME FOR A WHILE.   I USED TO TELL HIM HE WAS WORSE THAN ANY WOMAN I HAD EVER SEEN IN THE BATHROOM.   HE WOULD TAKE LOTS OF BATHS.

Q.    HOW ABOUT YOUR HANDS?  YOUR HANDS BEING DIRTY, DO YOU

WASH YOUR HANDS A LOT?

A.    CONSTANTLY.

Q.    DO YOU KNOW WHY YOU DO THAT?

A.    NO, I DON'T.   THEY MIGHT BE DIRTY.

Q.    YOU SAID THAT YOUR MOTHER AND YOUR FATHER FOUGHT A LOT. DID YOUR FATHER EVER HIT YOU?

A.    YES, MA'AM.

Q.    WHY DID HE HIT YOU?

A.    BECAUSE I TRIED TO GET IN BETWEEN HIM AND MOM.

Q.    DID HE HIT THE OTHER CHILDREN?

A.    YES, MA'AM.

Q.    HOW WOULD HE PICK WHICH CHILD HE WAS HITTING?

A.    WITH HIS FIST.   POOL STICK, BELT, SWITCH, JUST WHATEVER.

Q.    SO, YOU SAID HE WOULD HIT THEM WITH HIS FISTS, OR POOL STICK, OR BELT.   WHERE WOULD HE HIT YOU?

A.    IN THE BACK, IN THE HEAD.

Q.    DEWAYNE, DO YOU HAVE ANY PERMANENT INJURIES FROM YOUR FATHER HITTING YOU?

A.    YES, MA'AM.

Q.    AND WHAT IS THAT?   CAN YOU TELL ME WHAT THE PERMANENT INJURY IS?

A.    I AM DEAF IN MY RIGHT EAR.

Q.    DEAF IN YOUR RIGHT EAR.   SO, YOUR DAD HIT YOU WITH HIS FIST, AND POOL STICKS, AND OTHER STUFF AS WELL AS A BELT.   DID

YOUR MOM EVER HIT YOU?

A.    YES, ON OCCASIONS.

Q.    PARDON ME?

A.    YES, MA'AM, ON OCCASIONS.

Q.    ON OCCASIONS.  AND WHERE DID SHE HIT YOU?

A.    USUALLY IN THE BACK OR IN THE LEGS.  THERE IS A TIME SHE HIT ME IN THE HEAD WITH AN ASHTRAY.

Q.    WHEN YOU WERE LITTLE, YOU WERE TOO SMALL TO FIGHT BACK.  DID THERE COME A TIME WHEN YOU DID FIGHT BACK?

A.    YES, MA'AM.

Q.    AND WHAT HAPPENED THEN?

A.    GOT DOWN TO THE -- HE TRIED TO BEAT ME UP BECAUSE I FOUGHT HIM BACK.

Q.    DID YOU ALSO FIGHT WITH YOUR MOM AS YOU GOT OLDER?

A.    YES, MA'AM.

Q.    WHEN YOUR PARENTS WOULD TALK TO YOU, HOW WOULD THEY SPEAK TO YOU?

A.    WHAT DO YOU MEAN?

Q.    WELL, DID YOUR DAD EVER TELL YOU HE LOVED YOU?

A.    NO.

Q.    WHAT WOULD HE CALL YOU?

A.    "YOU LITTLE BASTARD."

Q.    WE ARE TALKING ABOUT HE CALLED YOU THAT ONCE, TWICE, ONCE A YEAR?

A.    SO OFTEN I THOUGHT IT WAS MY NAME, TO BE HONEST.

Q. YOU THOUGHT YOUR NAME WAS "LITTLE BASTARD."

A. IT SEEMED THAT WAY. IT FELT THAT WAY.

Q. IT FELT THAT WAY. DID HE CALL YOU ANYTHING ELSE?

A. JUST BAD NAMES.

Q. LOTS OF THINGS?

A. HIS FAVORITE ONE WAS HE CALLED US ALL STUPID.

Q. DID YOUR MOM CALL YOU NAMES, TOO?

A. SOMETIMES. WHEN SHE WAS DRUNK, YES.

Q. THERE WERE DRUGS AND ALCOHOL IN YOUR HOUSE WHEN YOU WERE A CHILD. DID YOU USE THEM WHEN YOU WERE A CHILD?

A. YES, MA'AM.

Q. HOW OLD DO YOU THINK YOU WERE WHEN YOU STARTED DRINKING ALCOHOL?

A. PROBABLY 13, 14.

Q. AND HOW ABOUT WHEN YOU SAY DRUGS, ARE YOU TALKING ABOUT MARIJUANA?

A. YES, MA'AM.

Q. AND HOW OLD DO YOU THINK YOU WERE WHEN YOU STARTED USING MARIJUANA?

A. PROBABLY AROUND THE SAME AGE I STARTED DRINKING.

Q. WHERE DID YOU GET THE ALCOHOL AND THE DRUGS?

A. FROM THE HOUSE.

Q. FROM THE HOUSE. FROM YOUR PARENTS AND YOUR PARENTS' FRIENDS?

A. (WITNESS NODS HEAD AFFIRMATIVELY.)

Q.    DID YOU GET HIGH ON ANYTHING OTHER THAN ALCOHOL AND MARIJUANA?

A.    YES, MA'AM.

Q.    AND WHAT WOULD THAT BE?

A.    WHATEVER I COULD GET MY HANDS ON.  PAINT,  GASOLINE.

Q.    SO, YOU WERE HUFFING,  SNIFFING GASOLINE AND PAINT.
   DO YOU KNOW WHETHER CHAD HUFFED PAINT OR GASOLINE?

A.    NO.   I DON'T EXACTLY RECALL.   I DON'T KNOW.

Q.    YOU DON'T KNOW WHETHER HE DID IT OR DIDN'T DO THAT. DO YOU KNOW WHETHER HE DRANK AS A CHILD?

A.    I BELIEVE SO,  YES.

Q.    AND HOW DID CHAD GET THE ALCOHOL?

A.    SAME WAY ALL OF US DID, OUT OF THE REFRIGERATOR.

Q.    OUT OF THE REFRIGERATOR?  WAS THERE A TIME YOU AND YOUR FRIENDS WOULD GO DRINK ON THE HILLSIDE?

A.    YES, MA'AM.

Q.    AND ABOUT HOW OLD WOULD YOU HAVE BEEN THEN?

A.    PROBABLY 13.

Q.    THIRTEEN,  FOURTEEN.   AND DID YOU TAKE CHAD WITH YOU?

A.    YEAH.

Q.    AND YOU GAVE CHAD ALCOHOL,  TOO; IS THAT RIGHT?

A.    YES, MA'AM.

Q.    SO,  CHAD IS SIX YEARS YOUNGER THAN YOU ARE,  SO HE WOULD HAVE BEEN MAYBE EIGHT YEARS OLD AT THAT TIME?

A.    YES, MA'AM.

Q.    YOU SAID THAT YOU STOLE FOOD.   DID YOU STEAL ANYTHING ELSE AS A KID?

A.    YES, MA'AM.

Q.    WHAT DID YOU STEAL?

A.    CARS,  CAR STEREOS.

Q.    ARE YOU TALKING ABOUT YOU DID THIS ONCE OR TWICE?

A.    NO.   I DONE IT I CONSIDERED QUITE OFTEN.   THAT IS HOW I SURVIVED.  THAT IS HOW I LIVED.   THAT IS HOW I MADE SURE THAT WE DIDN'T GO HUNGRY, THAT WE HAD SOMETHING.

Q.    SO,  SOMETIMES YOU WOULD STEAL SOME OF THESE OTHER THINGS AND THEN SELL THEM AND BUY FOOD; IS THAT RIGHT?

A.    YES.

Q.    DID YOU TEACH CHAD HOW TO STEAL?

A.    YES, MA'AM.

Q.    BECAUSE -- WHY DID YOU TEACH HIM HOW TO STEAL?

A.    SO I COULD KEEP HIM WITH ME.  I DIDN'T HAVE TO WORRY ABOUT HIM BEING AT HOME.

Q.    DID YOU LEARN TO BREAK INTO CARS FROM SOMEBODY ELSE?

A.    YES, MA'AM.

Q.    WHO WAS THAT?

A.    A FRIEND OF MINE,  RICKY JENKINS.

Q.    DID YOU TEACH CHAD HOW TO BREAK INTO CARS?

A.    YES, MA'AM.

Q.    FOR THE SAME REASON YOU WOULD TEACH HIM OTHER WAYS TO STEAL?

A.    YES, MA'AM.

Q.    HOW OLD WERE YOU WHEN YOU STOLE A CAR FOR THE FIRST TIME?

A.    GOSH, YOUNG.   REAL YOUNG.   I RECKON, 12 OR 13, RIGHT AROUND THERE.

Q.    COULD YOU DRIVE A CAR WHEN YOU WERE 12 OR 13?

A.    I WAS THE ONLY 14-YEAR-OLD KID IN MY NEIGHBORHOOD WHO HAD A CAR.

Q.    DID YOU STEAL A CAR WITH CHAD WHEN YOU WERE 16?

A.    YES, MA'AM.

Q.    SO, CHAD WOULD HAVE BEEN ABOUT TEN THEN?

A.    YES, MA'AM.

Q.    DID YOUR PARENTS KNOW THAT YOU WERE STEALING STUFF?

A.    YEAH.

Q.    HOW WOULD THEY HAVE KNOWN?

A.    THE BASEMENT WAS FULL OF BICYCLES.   I MEAN, THERE WAS 60 BICYCLES, 5 KIDS, THEY DIDN'T BUY ANY BICYCLES, SO IT IS KIND OF OBVIOUS.

Q.    DID THEY TELL YOU IT WAS WRONG TO STEAL?

A.    NOT REALLY, NO.

Q.    DID THEY EVER TELL YOU IT WAS WRONG?

A.    NO.  MY MOM WOULD SAY, YOU ARE GOING TO JAIL SOME DAY. BUT AS FAR AS TRYING TO STOP US OR LEAD US DOWN THE RIGHT PATH, NO, MA'AM.

Q.    SHE TOLD YOU YOU MIGHT GO TO JAIL, BUT SHE DIDN'T TELL

YOU IT WAS WRONG, AND SHE DIDN'T EVER MAKE YOU BRING IT BACK, OR SOMETHING LIKE THAT?

A.    RIGHT.

Q.    DID YOUR PARENTS TAKE CARE OF YOU?

A.    THEY KEPT A ROOF OVER OUR HEAD.

Q.    DID THEY HELP YOU WITH YOUR HOMEWORK?

A.    NO.

Q.    DID THEY CLAMP DOWN ON YOU WHEN YOU DIDN'T DO WHAT YOU WERE SUPPOSED TO DO IN SCHOOL?

A.    NO, MA'AM.

Q.    YOU DIDN'T DO WHAT YOU WERE SUPPOSED TO DO IN SCHOOL?

A.    NO, MA'AM.

Q.    DO YOU REMEMBER ONE TIME YOUR MOM CAME TO SCHOOL REALLY MAD?

A.    YEAH.

Q.    TELL ME ABOUT THAT.

A.    I HAD A TEACHER, MS. CORD.  WE HAD -- WE WAS SUPPOSED TO BE DOING SOME KIND OF PROJECT WITH A RED INK PEN. SOMEBODY HAD TOOK MY INK PEN, SO I WASN'T DOING MY WORK.  AND SHE CAME OVER AND WANTED TO KNOW WHERE MY INK PEN WAS.  I TOLD HER SOMEBODY TOOK IT.  SHE TOLD ME I WAS A LIAR.  I TOLD HER SHE WAS A LIAR.  I GOT HIT BY A RULER.  I SAID I WILL GET MY MOM.  I GOT UP, AND I WALKED OUT AND GOT MY MOM.  I TOLD HER MY MOM WOULD WHOOP HER ASS.

Q.    WHEN YOU TOLD YOUR MOM?

A.    SHE CAME DOWN TO THE SCHOOL WITH CURLERS IN HER HAIR, FLIP-FLOP, AND SAW THE TEACHER.

Q.    WHAT DID SHE SAY TO YOUR TEACHER?

A.    THEY LOCKED EVERY DOOR AND CALLED THE POLICE.

Q.    THEY CALLED THE POLICE?

A.    (WITNESS NODS HEAD AFFIRMATIVELY.)

Q.    DID IT TAKE ANYBODY ELSE TO GET YOU TO GO TO SCHOOL OTHER THAN YOUR MOM AND DAD?

A.    SOMETIMES TRUANT OFFICER, AL BEEKS.

Q.    YOU REMEMBER THE NAME OF THE TRUANT OFFICER?

A.    OH, YEAH.   HE WOULD PICK YOU UP AND BRING YOU TO SCHOOL, YEAH,  WHEN HE COULD CATCH ME.

Q.    WHAT WAS SCHOOL LIKE FOR YOU AND YOUR BROTHERS?

A.    HARD.   VERY HARD.

Q.    WHY WAS IT HARD?

A.    KIDS.   NAME CALLING.   IT WAS HARD.

Q.    THERE ARE FIVE KIDS IN YOUR FAMILY.  DID ANY OF YOU GRADUATE FROM HIGH SCHOOL?

A.    NO, MA'AM.

Q.    DID YOUR PARENTS TRY TO GET YOU TO STAY IN SCHOOL?

A.    NO, MA'AM.

Q.    YOUR PARENTS HAVE YOU DO OTHER THINGS LIKE SPORTS, OR SCOUTS, OR CAMPS, OR TRAINING?

A.    NO.   THAT WOULD HAVE TOOK AWAY FROM DRINKING TIME. NO.

Q.    DID THERE COME A TIME WHEN YOUR DAD TOOK YOU INTO THE BASEMENT TO TATTOO YOU?

A.    YES, MA'AM.

Q.    DO YOU KNOW WHY HE DID THAT?

A.    NO.

Q.    ABOUT HOW OLD WOULD YOU HAVE BEEN THEN,  JUST A GUESS?

A.    I HONESTLY COULDN'T TELL YOU.   EVERY ONE OF US KIDS HAD A TATTOO:   SHANNON WASN'T EVEN PROBABLY, MAYBE 8,  9 AT THE VERY,  VERY MOST.   I LEFT HOME WHEN I WAS 15 OR 16 YEARS OLD.

Q.    YOU LEFT HOME WHEN YOU WERE 15 OR 16, AND SHANNON IS TEN YEARS YOUNGER THAN YOU.   SO,  AT THE TIME THAT HE TOOK YOU IN TO THE BASEMENT, HE TATTOOED ALL FIVE OF YOU; IS THAT RIGHT?

A.    YES, MA'AM.

Q.    SO, SHANNON,  IF YOU WERE 15,  COULDN'T HAVE BEEN MORE THAN FIVE OR SIX AT THAT TIME; IS THAT RIGHT?

A.    SOMETHING LIKE THAT.

Q.    MIGHT HAVE BEEN YOUNGER.   YOU DON'T KNOW WHY HE DID THAT?

A.    NO, MA'AM,  I DON'T.

Q.    DID YOUR PARENTS SET RULES FOR YOU LIKE ABOUT BEDTIME, AND CURFEW, AND THAT KIND OF THING?

A.    YEAH,  BUT IT DIDN'T MATTER.   THEY DIDN'T GO UP THERE TO SEE IF WE WOULD ABIDE BY THE RULES.

Q.    THEY DIDN'T MAKE YOU ABIDE BY THE RULES?

A.    NO.

Q.    DID YOUR PARENTS TRY TO PROTECT YOUR SISTER, SHERRI, FROM HAVING SEX AT A VERY YOUNG AGE?

A.    NOT THAT I REMEMBER,  NO, MA'AM.

Q.    DID YOU TRY TO DO THAT?

A.    YEAH,  I TRIED.

Q.    DO YOU REMEMBER A PARTICULAR INCIDENT WITH RICHARD PARKER?

A.    YEAH.

Q.    CAN YOU TELL US ABOUT THAT INCIDENT?

A.    SHERRI AND -- MOM AND SHERRI HAD BEEN FIGHTING BECAUSE SHERRI WAS LIKE OH, LORD, I DON'T KNOW IF SHE WAS 15,  16, SOMETHING LIKE THAT.   SHE HAD AN INFATUATION WITH THIS 23, 24-YEAR-OLD GUY.   MOM TOLD HER SHE NEED NOT BE AROUND THAT GUY.   SHERRI TOOK IT UPON HERSELF, SHE WOULD GO SEE THE GUY. I TOOK IT UPON MYSELF THAT, NO SHE WOULDN'T.   I FOLLOWED HER DOWN THE ROAD.   TOLD HER TO COME HOME.   SHE WAS BEING A BUTT.   I GRABBED HER ARM AND SAID SHE WASN'T GOING OVER THERE, YOU WERE GOING BACK HOME.   SHE STARTED SCREAMING. THE GUY CAME OUT OF THE HOUSE YELLING WANTING TO KNOW WHAT WAS GOING ON.

Q.    YOU TOLD HIM IT WASN'T HIS BUSINESS AND WHAT?

A.    TO GET BACK IN THE HOUSE.  HE WANTED TO KNOW WHAT WAS GOING ON.  AND SHERRI STARTED SCREAMING I WAS TRYING TO RAPE

HER.

Q.    STARTED SCREAMING THAT YOU, HER BROTHER, WAS TRYING TO RAPE HER?

A.    AND THE GUY WENT AND CALLED THE POLICE.   THE POLICE PULLED UP.  AND I WASN'T GOING TO RUN BECAUSE I WAS ALREADY SCARED OF THE LAW GETTING CALLED.  AND SHERRI TOOK OFF RUNNING.  THE COPS CHASED HER DOWN.  I GUESS WHEN HE GRABBED HER,  HE GRABBED HER SHIRT,  RIPPED HER SHIRT OFF OF HER, WAS GOING TO TAKE HER --

Q.    WAIT A MINUTE.   THE POLICE OFFICER RIPPED HER SHIRT OFF?

A.    SHE WAS RUNNING.  HE REACHED OUT TO GRAB HER, SHE WAS RUNNING,  HE GRABBED HER SHIRT,  RIPPED HER SHIRT OPEN.   THEY TOOK HER OVER TO THE YOUTH CENTER.   I STARTED BEING MOUTHY. TOLD THEM THEY WASN'T GOING TO TAKE HER.   TOLD ME TO SHUT UP OR THEY WOULD TAKE ME, TOO.   I STARTED RUNNING BACK TO THE HOUSE.   THE POLICE CAR WAS AT THE HOUSE.   MOM WAS OUT THERE THROWING SOME STUFF AT HIM.   TRYING TO GET HIM OUT OF THE CAR BECAUSE HE RIPPED SHERRI'S BLOUSE OFF.

Q.    YOUR MOM WAS WHAT?

A.    TRYING TO GET HIM OUT OF THE CAR.   HE CALLED FOR BACKUP BECAUSE HE RIPPED SHERRI'S CLOTHES OFF.

Q.    DID THE FIGHTING,  DRINKING, AND EVERYTHING ELSE GOING ON IN THE HOUSE, DID IT AFFECT ALL OF YOU KIDS THE SAME WAY AS FAR AS YOU COULD TELL?

A.    NO.    I THINK IT AFFECTED CHAD A LITTLE MORE THAN IT DID US.

Q.    WHAT WOULD MAKE YOU THINK THAT?

A.    BECAUSE HE WAS ONLY -- I DON'T KNOW, HE WAS JUST MORE EMOTIONAL. HE CRIED A LOT. IT JUST BOTHERED HIM. YOU COULD TELL IT BOTHERED HIM WORSE THAN IT DID THE REST OF US.

Q.    HE DIDN'T GET -- DO YOU FEEL THAT HE GOT USED TO IT A LITTLE BIT AS YOURSELF AS TIME WENT ON?

A.    YEAH.

Q.    OR A LITTLE MORE THAN CHAD DID?

A.    I KIND OF GOT USED TO IT.

Q.    HE WAS YOUNGER. WHAT IS THE BEST MEMORY YOU HAVE OF YOUR CHILDHOOD?

A.    GETTING TO LEAVE, GETTING TO MOVE OUT WHEN I WAS 15 YEARS OLD.

Q.    BEFORE YOU ACTUALLY MOVED OUT, DID YOU EVER WANT TO LEAVE HOME?

A.    YES.

Q.    DID YOU EVER ASK ANYBODY TO TAKE YOU WITH THEM?

A.    YEAH, EVERYBODY THAT WOULD COME AND VISIT.

Q.    WERE YOU THE ONLY CHILD IN YOUR HOUSE THAT ASKED PEOPLE TO TAKE YOU AWAY?

A.    NO. I BELIEVE ALL OF US TRIED EXCEPT SHANNON. HE WAS THE BABY.

Q.    DID YOU EVER FOLLOW AN ADULT AROUND THE NEIGHBORHOOD?

A.    YES, MA'AM.

Q.    WHO WAS THAT?

A.    RICHARD BECKER.

Q.    HE WAS NICE TO YOU?

A.    YES, MA'AM.  KIND OF LOOKED UP TO HIM AS MY DAD.

Q.    WHAT WAS HIS JOB?

A.    HE WAS FROM THE MAIL CARRIER.

Q.    HE WAS THE MAIL CARRIER.  WHILE YOU WERE GROWING UP, DID YOU EVER LIVE ANY PLACE ELSE FOR PART OF THE YEAR?

A.    I STAYED WITH MY GRANDPARENTS DURING THE SUMMERS.

Q.    AND WHERE DID YOUR GRANDPARENTS LIVE?

A.    LINCOLN COUNTY, WEST VIRGINIA.  AND THEY LIVED IN LOWER SOUTH CAROLINA FOR A WHILE.  I LIVED OUT THERE WITH THEM FOR A WHILE.

Q.    WERE THINGS BETTER AT YOUR GRANDPARENTS?

A.    YEAH.

Q.    DID YOU WANT TO GO BACK AT THE END OF SUMMER?

A.    I DIDN'T WANT TO LEAVE.  I DIDN'T WANT TO LEAVE.

Q.    DID THE OTHER KIDS IN YOUR FAMILY GET TO GO SPEND SUMMERS THERE?

A.    NO.

Q.    HAVE YOU EVER BEEN ARRESTED?

A.    YES, MA'AM.

Q.    RONNIE HAS BEEN ARRESTED.  YOUR OTHER BROTHER RONNIE HAS BEEN ARRESTED,  TOO?

A.    YES, MA'AM.

Q.    HAVE YOU EVER BEEN LOCKED UP?

A.    YES, MA'AM.

Q.    WHEN YOU WERE FIRST LOCKED UP, HOW DID YOU FEEL ABOUT BEING LOCKED UP?

A.    HONESTLY, THANKFUL.  I WASN'T SCARED NO MORE.  I HAD A PLACE TO LIVE.  I HAD FOOD IN MY BELLY.  I FELT SAFE.

Q.    DID YOU SAY THE OTHER INMATES WERE YOUR FAMILY AND YOU FELT SAFE?

A.    YEAH.

Q.    DEWAYNE, DO YOU HAVE A JOB NOW?

A.    YES, MA'AM.

Q.    AND YOU DO NOT BEAT YOUR CHILDREN?

A.    NO, MA'AM.  MY DAUGHTER IS 11 YEARS OLD.  I GROUND HER.  HER BARBIES WILL SIT IN THE CORNER, THAT WAS HER PUNISHMENT.  YOU COULDN'T HAVE HIT THAT KID AND HURT HER WORSE THAN TAKING HER BARBIES AWAY.

Q.    THE WAY YOU DISCIPLINED HER WAS TAKING HER BARBIES AWAY?

A.    YES, MA'AM.

Q.    SO, ARE YOU NOT LIVING THE LIFE YOUR PARENTS HAD?

A.    NO, MA'AM.

Q.    DO YOU FEEL YOU HAVE OVERCOME YOUR CHILDHOOD?

A.    I WILL NEVER FORGET MY CHILDHOOD.

Q.    DEWAYNE, HAVE YOU EVER THOUGHT ABOUT SUICIDE?

A. YES.

Q. WHAT AGE DO YOU THINK YOU STARTED THINKING ABOUT SUICIDE?

A. EVER SINCE I CAN REMEMBER. EVER SINCE I CAN REMEMBER.

Q. ARE WE TALKING ABOUT YOU THINK ABOUT IT ONCE A YEAR?

A. NO. OFTEN. VERY OFTEN.

Q. ONCE A MONTH?

A. OFTEN. VERY OFTEN.

Q. ONCE A WEEK?

A. I WOULD HAVE TO SAY THAT, YES.

Q. HAVE YOU EVER ACTUALLY TRIED TO KILL YOURSELF?

A. YES, MA'AM.

Q. DID YOU EVER TAKE PILLS TO TRY AND KILL YOURSELF?

A. YES, MA'AM.

Q. DID YOU EVER TRY TO SET YOURSELF ON FIRE?

A. YES, MA'AM.

Q. AND YOU DID ACTUALLY SET YOURSELF ON FIRE?

A. YES.

Q. AND YOU ONCE SPLIT YOUR HEAD OPEN WITH A BEER BOTTLE ON PURPOSE?

A. YES.

Q. YOU HATE THE THOUGHT OF VIOLENCE?

A. YES.

Q. BUT YOU HAVE HIT TINA?

A. YES, MA'AM.

Q. AND YOU ARE ASHAMED OF THAT?

A. YEAH. TOLD HER IT WAS ALL MY FAULT.

Q. COULD YOU SAY THAT AGAIN?

A. YES. I DON'T WANT TO BE LIKE MY FATHER.

Q. YOU DON'T WANT TO BE LIKE YOUR FATHER. YOU KNOW IN A LOT OF THIS YOU HAVE BEEN LOOKING DOWN A LOT. THIS HAS BEEN HARD FOR YOU TO COME AND TELL THIS.

A. IT IS EMBARRASSING IS WHAT IT IS.

Q. YOU ARE ASHAMED OF YOUR FAMILY?

A. WHAT DO YOU MEAN?

Q. WELL, YOU DIDN'T DO THESE THINGS YOU ARE TELLING ABOUT MOSTLY.

A. EXCUSE ME?

Q. IT IS YOUR PARENTS THAT DID THESE THINGS THAT ARE HARD FOR YOU TO TELL ABOUT; IS THAT RIGHT?

A. YES, MA'AM.

Q. SO, WHY ARE YOU TELLING THESE THINGS?

A. BECAUSE IT NEEDS TO BE DONE. I NEED TO GET IT OFF MY CHEST. SO EVERYBODY WILL KNOW THAT NONE OF US HAD AN EASY LIFE. WE AIN'T THE WAY WE ARE BECAUSE WE CHOOSE TO DO. WE ARE THE WAY WE ARE BECAUSE WE HAD TO BE THIS WAY. WE NEVER HAD A CHANCE TO BE KIDS. WE WAS BORN ADULTS. THAT IS THE WAY WE WAS RAISED. WE WAS RAISED ADULTS. WE WASN'T RAISED AS CHILDREN.

Q. AFTER ALL YOUR FATHER DID TO YOU, DO YOU LOVE HIM?

A.    YES, I LOVE MY FATHER.   I LOVE MY FATHER AND BROTHER BOTH VERY MUCH.

Q.    YOU SEE HIM PRETTY OFTEN?

A.    YES,  I LIVE RIGHT DOWN THE STREET FROM HIM.

Q.    WHY DO YOU LOVE YOUR FATHER?

A.    I WISH I COULD HONESTLY ANSWER THAT QUESTION.  I DON'T KNOW.   I GUESS BECAUSE HE IS MY FATHER.

Q.    AND YOUR MOTHER, LOOKING BACK ON IT AND ALL THE THINGS THAT SHE DID,  DO YOU LOVE HER?

A.    YES.

Q.    DO YOU KNOW WHY YOU LOVE HER?

A.    YEAH.

Q.    WHY IS THAT?

A.    BECAUSE SHE IS ABOUT THE STRONGEST PERSON I HAVE EVER MET IN MY LIFE.

Q.    SHE IS VERY STRONG?

A.    YEAH.

Q.    SO, IT IS NOT BECAUSE OF WHAT SHE DID FOR YOU?

A.    (WITNESS SHAKES HEAD NEGATIVELY.)

Q.    DO EITHER OF YOUR PARENTS DRINK TODAY?

A.    NO, MA'AM.

Q.    AND HOW OLD WERE YOU WHEN THEY QUIT DRINKING?

A.    HONESTLY, I DON'T EVEN REMEMBER.

Q.    AFTER YOU MOVED OUT?

A.    YEAH.

Q.      AFTER YOU MOVED OUT, YOUR MOM QUIT DRINKING?

A.      YES, MA'AM.

Q.      AND DID YOUR FATHER QUIT DRINKING AFTER YOUR MOTHER QUIT DRINKING?

A.      NO.    MY FATHER DIDN'T QUIT DRINKING UNTIL I BELIEVE HE MOVED TO INDIANA.

Q.      SO,  QUITE A BIT LATER?

A.      EXCUSE ME?

Q.      IT WAS QUITE A BIT LATER THAT HE QUIT DRINKING?

A.      YES, MA'AM.

Q.      IT WAS AFTER THEY WERE SEPARATED?

A.      YES, MA'AM.

Q.      HAS YOUR FATHER EVER TOLD YOU HE WAS SORRY FOR WHAT HE DID TO YOU?

A.      NO.  NOT THAT I EXPECT HIM TO,  BUT NO.

Q.      HAS YOUR MOTHER TOLD YOU?

A.      YES, MA'AM.

        MS. JOHNSON:  SHE HAS.

    EXCUSE ME A MINUTE.   THANK YOU VERY MUCH,  MR. FULKS.

        THE COURT:   ANY REDIRECT?

        MR. GASSER:  YES, SIR.

                    REDIRECT EXAM

BY MR. GASSER:

Q.      MR. FULKS,  YOU TOLD THE JURY THAT YOU TAUGHT CHAD HOW TO STEAL?

A.    YES, SIR.

Q.    YOU TAUGHT CHAD HOW TO DRINK ALCOHOL?

A.    YES, SIR.

Q.    DID YOU TEACH HIM HOW TO RAPE WOMEN?

A.    WHAT KIND OF BULLSHIT IS THAT? NO, I AIN'T EVER TAUGHT HIM HOW TO RAPE NOBODY.

Q.    SO, HE MASTERED THAT TRADE ON HIS OWN?

A.    I COULDN'T ANSWER THAT.

Q.    YOU UNDERSTAND --

A.    I WOULDN'T ANSWER THAT.  IF YOU ASK ME SOME BULLSHIT QUESTIONS LIKE THAT, YOU OUGHT TO TAKE ME OFF THIS BENCH RIGHT NOW.  I WON'T ANSWER ANY QUESTIONS LIKE THAT, SIR.

THE COURT:  MR. FULKS.  WAIT JUST A MINUTE.  LET'S KEEP THIS ON A CIVIL TONE HERE.  TRY TO ANSWER THE QUESTION. IF IT IS AN OBJECTIONABLE QUESTION, THE ATTORNEYS FOR THE OTHER SIDE WILL OBJECT, AND THEN I WILL RULE ON WHETHER IT IS A PROPER QUESTION OR NOT.  GO AHEAD.

MS. JOHNSON:  YOUR HONOR, I THINK IT IS INFLAMMATORY AND ATTEMPTING TO GOAD THE WITNESS.  HE ANSWERED THE QUESTION HE DOES NOT KNOW.

MR. GASSER:  I AM NOT GOADING.

THE COURT:  I DIDN'T MEAN TO IMPLY HE DIDN'T ANSWER THE QUESTION.  I WAS TRYING TO KEEP THE TONE DOWN A LITTLE BIT.  GO AHEAD.

BY MR. GASSER:

Q.    MR. FULKS,  MS. JOHNSON ASKED YOU A SERIES OF QUESTIONS ABOUT TEACHING YOUR BROTHER HOW TO DO CERTAIN THINGS.   DO YOU RECALL THAT?

A.    YES,  I DO.

Q.    I SIMPLY ASKED YOU --

A.    I ANSWERED YOU.   SO GET ON WITH YOUR NEXT QUESTION.

Q.    DID YOU TEACH HIM HOW TO CARJACK?

A.    NO,  I DIDN'T.

Q.    DID YOU TEACH HIM HOW TO KIDNAP?

A.    NO,  I DIDN'T.

Q.    DID YOU TEACH HIM HOW TO KILL?

A.    NO,  I DIDN'T.

Q.    THIS UPBRINGING THAT YOU HAVE DESCRIBED TO THE JURY. CHAD WAS 14 YEARS OLD WHEN YOUR PARENTS DIVORCED; IS THAT CORRECT?

A.    I BELIEVE SO,  YES.

Q.    HIS DATE OF BIRTH IS ACTUALLY MAY 16TH,  1977,  WOULD YOU ARGUE WITH THAT?

A.    NO, MA'AM  -- NO, SIR.

Q.    HE JUST HAD HIS 27TH BIRTHDAY,  CORRECT?

A.    YES, SIR.

Q.    AND HE WAS 25 YEARS OLD WHEN ALICE DONOVAN WAS CARJACKED AND KIDNAPPED AND KILLED IN NOVEMBER OF 2002,  IF MY MATH IS CORRECT.

A.    I GUESS SO.

Q. HE WAS 25 YEARS OLD WHEN SAMANTHA BURNS WAS KIDNAPED, CARJACKED, AND KILLED IN NOVEMBER OF 2002, CORRECT?

A. I BELIEVE SO, YEAH.

Q. SO, YOU HAVE DESCRIBED YOUR VERSION OF CHAD FULKS'S UPBRINGING WITH HIS PARENTS UP UNTIL THE TIME HE WAS 14 YEARS OLD WHEN THEY SEPARATED. IS THAT THE DESCRIPTION YOU JUST PROVIDED TO THIS JURY?

A. YES, SIR.

Q. HE IS CHARGED WITH OFFENSES AGAINST MS. BURNS AND MS. DONOVAN 11 YEARS LATER.

A. YES, SIR.

MS. JOHNSON: THIS IS OUTSIDE THE SCOPE OF CROSS. I DID NOT ASK HIM ABOUT ANYTHING RELATED TO HIS BEHAVIOR LATER.

THE COURT: I THINK THAT IS A PROPER POINT TO BE MADE, BUT I WILL OVERRULE THE OBJECTION.

BY MR. GASSER:

Q. WHAT YOU ARE DESCRIBING TO THE JURY IS YOUR VERSION AS TO YOUR UPBRINGING AND CHAD'S UPBRINGING MORE THAN A DECADE BEFORE ALICE DONOVAN AND SAMANTHA BURNS WERE KILLED. THAT IS WHAT YOU HAVE DESCRIBED TO THE JURY, CORRECT?

A. YES.

Q. IN FACT, YOU, BEING OLDER THAN CHAD, YOU WERE RAISED BY YOUR PARENTS UP UNTIL THE TIME THAT YOU WERE LEGALLY A MAN, 18 YEARS OLD; IS THAT CORRECT, MR. FULKS?

A. NO.

Q.   NO?

A.   NO, IT IS NOT.   I LEFT HOME WHEN I WAS 15, 16 YEARS OLD.

Q.   OKAY.

A.   IF YOU HAD LISTENED, YOU WOULD HAVE HEARD ME STATE THAT.

Q.   YOUR PARENTS WERE TOGETHER, THEY HAD NOT DIVORCED BY THE TIME YOU BECAME 18?

A.   I DON'T KNOW.   I WAS LOCKED UP WHEN THEY SEPARATED. I DON'T KNOW.

Q.   YOU HAD BASICALLY THE SAME UPBRINGING AS CHAD FULKS?

A.   YEAH.

Q.   RONNIE HAD BASICALLY THE SAME UPBRINGING AS CHAD FULKS?

A.   YES.

Q.   SHANNON HAD BASICALLY THE SAME UPBRINGING AS CHAD FULKS?

A.   NO.   SHANNON NEVER HAD THE SAME UPBRINGING WE DID.

Q.   HE WAS TATTOOED AT THE AGE OF FIVE YEARS OLD I BELIEVE YOU INDICATED?

A.   YES, SIR.

Q.   HE, AT LEAST AT A YOUNG AGE, SAW WHAT YOU CLAIM TO BE YOUR PARENTS' DRINKING AND FIGHTING, SHANNON WAS ABLE TO SEE THAT, AS WELL?

A.   YES, SIR.

Q.   SHANNON WAS ABLE TO, I GUESS, SEE SOME OF THE PENTHOUSE

CENTERFOLDS IN THE BASEMENT OF YOUR HOME?

A.    YES, SIR.

Q.    AND RONNIE SAW THAT?

A.    YES, SIR.

Q.    AND YOU SAW THAT?

A.    YES, SIR.

Q.    AND CHAD SAW THAT?

A.    YES, SIR.

Q.    AND ALL FOUR OF YOU OBSERVED, AT TIMES, POLICE COMING TO THE HOUSE?

A.    YES, SIR.

Q.    AND ALL FOUR OF YOU, AT TIMES, OBSERVED THE HOUSE IN UNCLEAN CONDITIONS?

A.    YES, SIR.

Q.    AND ALL FOUR OF YOU, AT TIMES, ACCORDING TO YOU, WOULD SEE YOUR MOTHER HIT ON YOUR DAD AND YOUR DAD HIT ON YOUR MOM; IS THAT CORRECT, MR. FULKS?

A.    YES, SIR.

Q.    YOU INDICATED, IN RESPONSE TO MS. JOHNSON, THAT YOU AND YOUR FRIENDS WOULD GO DRINK AT THE AGE OF 12, 13, 14 YEARS OLD?

A.    YES, SIR.

Q.    SO, YOU HAD FRIENDS IN THE SAME NEIGHBORHOOD THAT GREW UP IN POVERTY, IN THE POOR CONDITIONS, AS WELL, MR. FULKS?

A.    MY FRIENDS DIDN'T LIVE IN MY NEIGHBORHOOD.    THERE WAS

MAYBE TEN KIDS THAT LIVED IN OUR NEIGHBORHOOD.

Q.     YOU DIDN'T HAVE ANY FRIENDS WHO GREW UP WITH ALCOHOLIC PARENTS?  YOURS WERE THE ONLY ALCOHOLIC PARENTS IN YOUR NEIGHBORHOOD?

A.     YES, SIR.

Q.     AND ALL OF YOUR FRIENDS WERE MIDDLE CLASS OR UPPER MIDDLE CLASS?

A.     YES, SIR.

Q.     SO,  IT IS YOUR TESTIMONY THAT YOU WERE THE ONLY LOWER-INCOME PEOPLE IN YOUR NEIGHBORHOOD?

A.     I WOULDN'T SAY WE WERE THE ONLY LOWER-INCOME PEOPLE IN OUR NEIGHBORHOOD.  WE WAS THE ONLY LOWER INCOME IN OUR NEIGHBORHOOD THAT MY FAMILY DRANK LIKE THEY DID.  THE REST OF THEM HAD NORMAL LIVES.

Q.     BUT YOU AND YOUR BROTHERS GREW UP IN THE SAME HOUSEHOLD?

A.     YES, SIR.

Q.     AND YOU HUNG OUT WITH KIDS THAT WERE DRINKING,  SMOKING MARIJUANA?  YOU HUNG OUT WITH KIDS THAT WERE COMMITTING PROPERTY CRIMES?

A.     YES, SIR.

Q.     YOU HUNG OUT WITH KIDS THAT DIDN'T SEEM RIGHT IN THE HEAD,  KIND OF CRAZY,  WOULD DO KIND OF STUPID THINGS?

A.     NO.   THEY SEEMED NORMAL TO ME.

Q.     BUT THESE WERE THE SAME KIDS THAT ARE SMOKING MARIJUANA

WITH YOU, DRINKING UNDERAGE, COMMITTING PROPERTY CRIMES. YOU HUNG OUT WITH OTHER KIDS IN THE NEIGHBORHOOD, YOU DIDN'T DO THAT ALL BY YOURSELF?

A. NO, SIR.

Q. SO, THIS SAME UPBRINGING THAT YOU TELL THE JURY ABOUT THAT YOU HAD, HOW MANY 44-YEAR-OLD GRANDMOTHERS HAVE YOU KIDNAPED?

A. I HAVE NEVER KIDNAPED NO ONE.

Q. HOW MANY 44-YEAR-OLD GRANDMOTHERS DO YOU THINK RONNIE HAS KIDNAPED?

A. NONE. NOT THAT I AM AWARE OF. YOU HAVE TO ASK RONNIE THAT.

Q. HOW MANY 44-YEAR-OLD GRANDMOTHERS HAS SHANNON KIDNAPED?

A. YOU WOULD HAVE TO ASK SHANNON.

Q. SHANNON DOESN'T HAVE A CRIMINAL RECORD, DOES HE?

A. I DON'T KNOW. YOU HAVE TO ASK SHANNON.

Q. YOU KNOW THAT --

A. I DON'T KNOW. ASK SHANNON, NOT ME.

Q. SHANNON WAS RAISED IN THE SAME FAMILY AS YOU, AND HE CHOSE NOT TO COMMIT CRIME; ISN'T THAT TRUE, MR. FULKS?

A. YEAH.

Q. HOW MANY 44-YEAR-OLD MOTHERS HAVE YOU CARJACKED?

A. DIDN'T I JUST TELL YOU I HAVE NEVER DONE NOTHING LIKE THAT? YOU WANT TO GO LOOK AT MY RECORD, YOU WILL SEE ALL MY SHIT IS PETTY. GRAND LARCENY, AND THAT IS IT. I HAVE NEVER

DONE NO SERIOUS CRIMES, SIR. IF YOU WANT TO LOOK AT MY RECORDS, GET YOUR FACTS STRAIGHT BEFORE YOU COME HERE WITH THIS STUPID SHIT. DON'T PUT WORDS IN MY MOUTH. I HAVE NEVER DONE ANYTHING LIKE THAT. I HAVE NEVER COMMITTED NO SERIOUS CRIMES.

THE COURT: MR. FULKS.

THE WITNESS: CAN I TAKE A RECESS, PLEASE? PLEASE?

THE COURT: LET ME SAY. THE COURT REPORTER HAS TO TAKE DOWN EVERYTHING THAT IS SAID. WHEN YOU TALK VERY FAST, IT IS HARD FOR HER TO KEEP UP WITH YOU. TRY TO SLOW DOWN.

LET'S TAKE A 20-MINUTE RECESS AT THIS TIME. PLEASE GO TO YOUR JURY ROOM.

(WHEREUPON, A SHORT RECESS WAS HELD.)

THE COURT: PLEASE BRING IN THE JURY.

ALL RIGHT. PLEASE CONTINUE.

MR. GASSER: THANK YOU.

BY MR. GASSER:

Q. MR. FULKS, I APOLOGIZE IF YOU MISINTERPRETED MY QUESTION.

A. I AM SORRY FOR BEING RUDE. THIS IS HARD. THIS IS HARD.

Q. LET ME REPHRASE IT, MR. FULKS. THE POINT IS, YOU HAVEN'T KIDNAPED ANY WOMAN BEFORE, HAVE YOU?

A. NO, SIR.

Q. YOU HAVE NEVER CARJACKED A WOMAN BEFORE, HAVE YOU?

A.    NO, SIR.

Q.    YOU HAVE NEVER RAPED A WOMAN BEFORE, HAVE YOU?

A.    NO, SIR.

Q.    YOUR BROTHER RONNIE, YOUR BROTHER SHANNON HAVE NOT KIDNAPED, RAPED, OR CARJACKED ANOTHER WOMAN BEFORE, HAVE THEY?

A.    NO.

Q.    YOU HAVEN'T BEEN INVOLVED IN KILLING SOMEBODY, HAVE YOU?

A.    NO.

Q.    NEITHER HAVE ANY OF YOUR BROTHERS?

A.    NO.

Q.    ALL OF YOU GREW UP IN THE SAME ENVIRONMENT THAT YOUR BROTHER CHAD GREW UP IN?

A.    YES, SIR.

Q.    IN FACT, THE WAY I HAD PHRASED MY QUESTIONS, BEFORE THAT OFFENDED YOU SO BADLY, THAT YOU RAISED YOUR VOICE AND SWORE AT ME, WAS FOR EVEN BEING ACCUSED AS ANYTHING AS HORRIBLE AS RAPE,  KIDNAPING THAT OFFENDED YOU?

A.    IT MAKES ME ANGRY THAT YOU ARE PORTRAYING HIM AS A MONSTER.  HE IS NOT A MONSTER.  YES,  IT DOES.

Q.    DESPITE ALL OF THE PROPERTY CRIMES YOU HAVE COMMITTED OR ALL OF THE THEFTS THAT YOU HAVE COMMITTED,  YOU WOULD NEVER FORCE YOURSELF ON ANOTHER WOMAN,  WOULD YOU?

A.    NO, SIR.

Q.    CAN YOU THINK OF ANYTHING WORSE,  ANYTHING MORE VILE,

ANYTHING MORE VICIOUS THAN FORCING YOURSELF SEXUALLY ON ANOTHER WOMAN?

MS. JOHNSON: YOUR HONOR, THAT IS IRRELEVANT WHAT HIS OPINION OF WHAT A VILE CRIME IS.

THE COURT: MR. GASSER, I THINK YOU ARE PROBABLY GOING TO THE LIMIT OF PROPER CROSS EXAMINATION. I WILL LET YOU ASK THAT QUESTION. I THINK YOU BETTER STOP IT AT THAT.

BY MR. GASSER:

Q. YOU CAN'T THINK OF ANYTHING MORE HORRIBLE THAN FORCING YOURSELF ON ANOTHER WOMAN?

A. YES, THERE ARE THINGS MORE HORRIBLE.

Q. KILLING SOMEBODY?

A. THERE ARE MORE TERRIBLE THINGS THAN THAT.

Q. YOU HAVE NEVER DONE THAT?

A. I HAVE NEVER BEEN PUT IN THAT SITUATION. I CAN'T HONESTLY ANSWER THAT. AS FAR AS NOW, NO, I HAVEN'T.

Q. AND OF ALL OF THE KIDS, HOW MANY OF THE KIDS THAT YOU GREW UP STEALING, COMMITTING PROPERTY CRIMES, SMOKING MARIJUANA, DRINKING FROM THE AGE OF 12, 13, 14, HOW MANY OF YOUR FRIENDS THAT YOU GREW UP WITH ENDED UP BEING CARJACKERS AND KIDNAPPERS, DO YOU KNOW?

A. I DON'T KNOW. I HAVEN'T. NONE THAT I AM AWARE OF. I LOST CONTACT WITH MY FRIENDS WHEN I MOVED OUT.

Q. SO, YOU AND YOUR THREE OTHER BROTHERS ARE RAISED IN THE ENVIRONMENT THAT YOU DESCRIBED TO THE JURY, CORRECT?

A.    YES, SIR.

Q.    AND YOU GREW UP WITH SEVERAL -- YOU GREW UP WITH FRIENDS IN THE SAME NEIGHBORHOOD DOING SOME OF THE SAME THINGS THAT YOU DID; IS THAT CORRECT?

A.    YES, SIR.

Q.    AND YOU UNDERSTAND YOUR BROTHER CHAD HAS PLED GUILTY TO KIDNAPING, AND CARJACKING, AND RAPE -- HASN'T PLED TO RAPE, HE ADMITTED RAPING A 44-YEAR-OLD WOMAN,  DO YOU UNDERSTAND THAT?

A.    YES, SIR.

Q.    YOU MENTIONED BEFORE, IN RESPONSE TO ONE OF MS. JOHNSON'S -- THE END OF HER QUESTIONING, THAT YOU DIDN'T HAVE ANY CHOICES.  DO YOU REMEMBER MAKING THAT RESPONSE TO MS. JOHNSON?

A.    YES, SIR.

Q.    WELL,  IN FACT,  YOU DO HAVE CHOICES,  DO YOU NOT,  MR. FULKS?

A.    IT DEPENDS ON WHAT YOU ARE TALKING ABOUT.

Q.    SHE ASKED YOU ABOUT YOUR DAUGHTER.  DO YOU REMEMBER THOSE QUESTIONS?

A.    YES, SIR.

Q.    AND YOU HAVE MADE A CHOICE TO TRY AND RAISE YOUR DAUGHTER THE BEST THAT YOU CAN?

A.    YES, SIR.

Q.    I ASKED YOU WHETHER OR NOT YOU HAVE EVER KIDNAPED

ANYBODY BEFORE, DO YOU REMEMBER THAT?

A.    YES, SIR.

Q.    YOU HAVE MADE THE CHOICE NOT TO KIDNAP PEOPLE?

A.    YES, SIR.

Q.    YOU HAVE MADE THE CHOICE NOT TO CARJACK PEOPLE?

A.    YES, SIR.

Q.    YOU HAVE MADE THE CHOICE NOT TO RAPE WOMEN?

A.    YES, SIR.

Q.    DESPITE YOUR UPBRINGING THAT YOU DESCRIBED TO THIS JURY, INCLUDING BEING DEAF AS A RESULT OF YOUR FATHER BEATING YOU, YOU HAVE MADE CHOICES NOT TO HURT OTHER PEOPLE, HAVEN'T YOU?

A.    TO A CERTAIN EXTENT.  I WILL NOT SAY I HAVE NEVER HURT OTHER PEOPLE.

Q.    SO, YOU DO HAVE CHOICES, DON'T YOU, MR. FULKS?

A.    WE ALL HAVE CHOICES, SIR.

Q.    INCLUDING YOUR BROTHER CHAD?

A.    EVERYONE HAS CHOICES, SIR.  WE ALL HAVE TO LIVE BY THE CHOICES WE MAKE.

        MR. GASSER:  I COULDN'T AGREE WITH YOU MORE, MR. FULKS.  THAT IS ALL WE HAVE.

        MS. JOHNSON:  NO FURTHER QUESTIONS, YOUR HONOR.

        THE COURT:  THANK YOU, MR. FULKS.  YOU MAY STEP DOWN.

        MR. SCHOOLS:  THE GOVERNMENT CALLS MISSY JEFFERS.

SOMEHOW, THAT FAMILY WAS IGNORED.  AND I FEEL LIKE NOBODY CARED ENOUGH.

MS. JOHNSON:  THANK YOU.  IF YOU WOULD ANSWER ANY QUESTIONS.

THE COURT:  CROSS-EXAMINATION.

MR. GASSER:  WE HAVE NO QUESTIONS,  YOUR HONOR.

THE COURT:  THANK YOU.  YOU MAY STEP DOWN.  PLEASE CALL YOUR NEXT WITNESS.

MR. BLUME:  CALL MARK FULKS.

MARK FULKS, HAVING BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

DIRECT EXAM

BY MR. BLUME:

**Q.    GOOD AFTERNOON, MR. FULKS.  WHERE DO YOU LIVE?**

A.    IN SHIPSHEWANNA,  INDIANA.

**Q.    WHAT DO YOU DO THERE?**

A.    I DRIVE A TRUCK.

**Q.    AND DO YOU HAVE ANY KIDS?**

A.    YES,  ONE.

**Q.    AND WHAT IS HER NAME?  HOW OLD IS SHE?**

A.    CASSANDRA FULKS, SHE IS 13.

**Q.    THIRTEEN (13).  AND NOW, JUST SO THE JURY UNDERSTANDS, YOU ARE MR. FULKS'S UNCLE?**

A.    YES,  I AM.

**Q.    AND YOU ARE HIS FATHER'S BROTHER?**

A.    YES.

Q.    NOW,  WHAT I WANT TO DO IS, YOU KNOW, YOU AND I TALKED ABOUT IT.   I WILL ASK YOU SOME QUESTIONS BASED ON WHAT YOU KNOW ABOUT KNOWING YOUR BROTHER AND KNOWING HIS WIFE.   YOU KNOW HIS WIFE, DIANA?

A.    YES.

Q.    YOU KIND OF GREW UP THE SAME, OUT IN THE COUNTRY, IN THE SAME GENERAL AREA?

A.    YES.

Q.    THIS IS ABOUT -- HOW FAR WAS IT FROM HUNTINGTON?

A.    HOW FAR WAS IT FROM HUNTINGTON?

Q.    WHERE YOU GREW UP?

A.    WELL, I THINK IT IS ABOUT 25 MILES.

Q.    AND WHAT IS THE NAME OF THE PLACE,  THE AREA?

A.    RANGER, WEST VIRGINIA.

Q.    RANGER, WEST VIRGINIA.   AND SO -- NOW, YOU ARE YOUNGER THAN CHAD'S DAD,  RIGHT?

A.    YES.

Q.    AND WHAT IS THE AGE DIFFERENCE?

A.    I THINK ABOUT SEVEN YEARS, MAYBE, SOMETHING LIKE THAT.

Q.    JUST TO MAKE IT CLEAR, YOU ARE SEVEN YEARS YOUNGER?

A.    YES.

Q.    HE IS YOUR OLDER BROTHER?

A.    YES.

Q.    IS HE THE OLDEST?

A.    YES.

Q.    AND, YOU KNOW, OF COURSE, THAT CHAD AND DIANA?

A.    EXCUSE ME?

Q.    I'M SORRY, ROGER AND DIANA ARE NO LONGER MARRIED?

A.    YES.

Q.    WHAT I WANT TO DO IS ASK YOU JUST SOME QUESTIONS ABOUT SOME OF THIS.  DO YOU REMEMBER WHEN DIANA WAS PREGNANT WITH RONNIE?

A.    WELL, NO NOT REALLY.  NOT TO REMEMBER THAT SHE WAS PREGNANT WITH HIM.  I REMEMBER WHEN SHE HAD HIM.

Q.    THAT IS WHAT I WAS GETTING AT.  TELL THE JURY ABOUT THAT, SORT OF.

A.    I DIDN'T KNOW SHE WAS PREGNANT UNTIL MY MOM TOLD ME SHE HAD HER BABY.  AND NOBODY KNOWED SHE WAS PREGNANT, OR SHE THOUGHT AT THE TIME SHE HAD A TUMOR.  AND THEN, MADE A GESTURE THAT IT WAS A FIVE-POUND TUMOR, FIVE-POUND LITTLE BOY.

Q.    NOW, WOULD IT BE FAIR TO SAY THAT YOUR BROTHER AND YOUR SISTER-IN-LAW, THEY WERE ALCOHOLICS?

A.    YES.

Q.    CAN YOU DESCRIBE WHAT YOU MEAN BY THAT?

A.    THE MAJORITY OF THE TIME WHEN YOU SEE THEM, THEY WAS BOTH DRINKING.  ANY TIME I EVER SEEN THEM DRINKING, OR IF, A LOT OF TIMES, I HAVE SEEN THEM PASSED OUT DRUNK FROM THE DRINKING.  I WILL SAY, 90 PERCENT OF THE TIME I HAVE SEEN THEM

TOGETHER AT THEIR HOME, THEY WERE USUALLY DRINKING.

Q.    DID IT GET WORSE OVER THE YEARS?

A.    YES, IT DID.

Q.    AND IT GOT WORSE, I GUESS, AFTER THEY MOVED TO HUNTINGTON?

A.    YES.

Q.    AND THEN KIND OF CONTINUED TO PROGRESS?

A.    YES, THAT IS FOR SURE.

Q.    YOU SAID YOU CAME IN AND FOUND THEM PASSED OUT.  CAN YOU TELL A LITTLE BIT MORE ABOUT THAT?

A.    WELL, A LOT OF TIMES, WHEN I TRAVELLED FROM INDIANA TO WEST VIRGINIA TO VISIT, THEIR HOUSE WAS ON THE WAY TO MY MOM'S HOUSE.

Q.    WHEN YOU WERE ABOUT 15, YOU MOVED UP TO INDIANA?

A.    YES.  ON THE WAY TRAVELLING THROUGH, I WOULD STOP BY THEIR HOUSE TO VISIT.  ON THE WAY IN OR THE WAY OUT, I WOULD USUALLY STOP AND VISIT FOR A WHILE.  I WOULD USUALLY FIND THEM IN THE BASEMENT DRINKING, PARTYING WITH THEIR NEIGHBORS AND FRIENDS.  SEVERAL TIMES I HAVE WALKED IN AND SEEN HIS MOTHER, DIANA, JUST KIND OF LAYING ACROSS THE BED PASSED OUT.  JUST SORT OF -- I COULDN'T SAY FOR SURE, LOOK LIKE WHERE SHE IS TRYING TO GET READY TO BED, AND DIDN'T QUITE MAKE IT, AND JUST PASSED OUT ACROSS THE BED.

Q.    AND WOULD SHE BE CLOTHED?

A.    PARTIAL, I WOULD SAY.  HALF-NAKED, I GUESS, I COULD

SAY.  SHE WASN'T NOTHING EXPOSED, BUT SHE WAS HALF UNDRESSED.

Q.    AND ANYBODY THAT WAS IN THE HOUSE COULD HAVE SEEN THIS?

A.    DEFINITELY, YES.

Q.    PEOPLE HAVE TALKED ABOUT THIS, I JUST WANT TO GO AHEAD AND ASK YOU SOME QUESTIONS ABOUT WHAT YOU SAW.  DID YOU EVER SEE THEM FIGHT?

A.    YES I DID.

Q.    CAN YOU DESCRIBE THE FIGHTS?

A.    WELL, LIKE TWO MEN FIGHTING IN A BAR IS THE BEST I COULD TELL YOU.  THEY WERE, ACTUALLY, FIST FIGHTING, THROWING THINGS, AND WHATEVER THEY COULD GET THEIR HANDS ON. BOTH OF THEM, NOT JUST THE ONE, BOTH OF THEM DOING THE SAME.

Q.    SO, YOU SAY, THEY FIGHT WITH THEIR FISTS, THEY FIGHT?

A.    JUST WHATEVER THEY GET THEIR HANDS ON.  I MEAN, NOT ONE TIME.  I REMEMBER ONE TIME, IN PARTICULAR, IN KENTUCKY, HIS MOTHER, DIANA, PULLED A SHOTGUN ON HIM POINTING RIGHT AT IT FACE.

Q.    WHAT WAS THAT ABOUT?

A.    WELL, THE NIGHT BEFORE, THAT THEY HAD BEEN OUT DRINKING A LITTLE BIT, AND ROGER WAS KIND OF FEELING AROUND ON ANOTHER GIRL THAT WAS THERE, AND DIANA CAUGHT HIM.  THEN THEY STARTED FIGHTING, AND SHE RAN IN AND GOT THE SHOTGUN AND WAS POINTING IT AT HIM.

Q.    YOU REMEMBER ANY OTHER PARTICULAR FIGHTS?  YOU SAID

**THEY FOUGHT OVER JEALOUSY?**

A.    ONE TIME, ANOTHER TIME THAT I REMEMBER, THEY WAS FIGHTING OVER THE BEDCOVERS.   THE NIGHT BEFORE THEY WENT TO BED, THEY HAD ALSO BEEN DRINKING A LITTLE BIT.   DURING THE NIGHT, THEY WERE ARGUING OVER,  ONE WAS PULLING THE COVER OFF THE OTHER.   I THINK THEY GOT TO ARGUING ABOUT THAT.   DIANA KEPT SLAPPING ROGER ON THE BACK SAYING, GIVE HER THE COVERS. AND THEN ROGER KEPT TELLING HER NOT TO HIT HIM ANYMORE. DON'T HIT ME,  DON'T HIT ME NO MORE.   FINALLY, NEXT THING I KNOW, HE HIT HER PRETTY HARD, AND THEN THEY STARTED A FIGHT IN THE BEDROOM.

**Q.    YOU DESCRIBED A FEW INCIDENTS, BUT JUST TO -- AND YOU SAID WHEN THEY WERE DRINKING A LITTLE.  ACTUALLY, WOULD IT BE FAIR TO SAY THEY WERE GETTING DRUNK?**

A.    YES,  GETTING DRUNK THE NIGHT BEFORE.

**Q.    YOU DESCRIBED SOME OF THESE THINGS THAT YOU SAW,  BUT BASED ON WHAT YOU SAW, YOU OBSERVED, FIGHTING WAS A PRETTY REGULAR THING?**

A.    YES.

**Q.    WERE THEY JEALOUS OF EACH OTHER?**

A.    WELL,  I DON'T REALLY -- I COULDN'T REALLY ANSWER THAT. I DON'T KNOW IF IT WAS EXACTLY JEALOUS OF ONE ANOTHER.

**Q.    OKAY.   DO YOU REMEMBER -- DID YOU EVER HAVE A CONVERSATION OR HEAR A CONVERSATION WHERE SOMEBODY ASKED ROGER WHY HE STAYED WITH HER?**

A.    YES.

Q.    CAN YOU RELAY THAT CONVERSATION?

A.    YES.  MY FATHER ASKED BEFORE HE DIED.  HE HAD TO ASK HIM SEVERAL TIMES WHY HE STAYS WITH DIANA IF THEY ARE THAT SO UNHAPPY.  AND HE, BASICALLY, BASED IT ON HIS APPEARANCE OF HOW HE LOOKS THAT HE WOULD NOT BE ABLE TO GET ANOTHER WOMAN.

Q.    BECAUSE HE DIDN'T HAVE ANY TEETH?

A.    BECAUSE HE DIDN'T HAVE NO TEETH AT ALL.  HE JUST FELT THAT HE WAS NOT DESIRABLE,  WOULDN'T BE AS DESIRABLE TO ANOTHER WOMAN.

Q.    AND DO YOU REMEMBER, DID YOU  -- WAS IT THE SAME CONVERSATION, DID HE MAKE A COMMENT ABOUT HOW MUCH THEY DRANK AND WHY?

A.    YES.  MY FATHER WAS MAKING, ACTUALLY, A COMPLAINT ABOUT HIS SON-IN-LAW DRANK A SIX-PACK OF BEER EVERY DAY BEFORE HE GOT HOME FROM WORK.  MY BROTHER ROGER SPOKE UP AND SAID, WELL, THAT AIN'T NOTHING DAD,  ME AND DIANA DRINK A CASE AND A HALF EVERY DAY.  I THOUGHT THAT WASN'T MUCH TO BRAG ABOUT.

Q.    AND DID HE SAY THEY DRANK TO TOLERATE EACH OTHER?

A.    YEAH.  HE SAID THAT IS THE ONLY WAY THEY COULD TOLERATE EACH OTHER IS DRINKING.

Q.    I WANT TO ASK YOU, AGAIN, THERE HAS BEEN SORT OF TESTIMONY ABOUT THIS,  BUT I JUST WANT TO HAVE YOU GIVE YOUR PERSPECTIVE ON IT SINCE YOU ARE FROM A DIFFERENT SIDE OF THE FAMILY.  YOU WERE THERE DIFFERENT TIMES THAN OTHER PEOPLE.

**IN HUNTINGTON, THEY MOVED IN THIS HOUSE ON LEEWARD AVENUE.  DO YOU REMEMBER THIS HOUSE?**

A.    YES.

**Q.    AT SOME POINT, I GUESS, THEY GOT THE POOL TABLE?**

A.    YES.

**Q.    AS I UNDERSTAND IT, DOWN IN THAT ROOM, ALSO, WERE THERE, LIKE, PORNOGRAPHIC PICTURES ON THE WALL, DO YOU REMEMBER THAT?**

A.    HONESTLY, I CAN'T REMEMBER THAT.

**Q.    IF YOU DON'T REMEMBER,  YOU DON'T REMEMBER.**

A.    NO.  NO.

**Q.    SO, WHAT WOULD HAPPEN DOWN THERE?**

A.    WELL, MOST OF THE TIME, THEY STARTED OUT IN PLAYING POOL AND DRINKING BEER, OF COURSE.  THEN SMOKING POT, TOO. ALL OF THEM, NOT JUST ONE.  PROBABLY, EVERY ONE OF THEM WAS DOWN THERE.  AND THAT USUALLY WENT ON ALL NIGHT LONG, SOMETIMES UP IN THE WEE HOURS OF THE MORNING LIKE DAYLIGHT OR WHATEVER.  AND, USUALLY, WHEN THEY WERE DOING THAT, A LOT OF TIMES, IT WOULD END UP IN FIGHTING, YOU KNOW.  IT WAS LIKE DRINKING,  FIST FIGHTING.  I CAN'T SAY I REALLY SEEN ROGER OR DIANA EITHER ONE DOING THE FIST FIGHTING, BUT USUALLY IT WAS SOMEONE IN THERE FIGHTING.  BUT MOST OF THE TIME, WHEN IT WAS GOING ON, THE KIDS WAS EITHER UPSTAIRS, OR THE ONES THAT WERE HOME, WERE MOSTLY THE OLDEST AND -- IT WAS SHERRI AND THE YOUNGEST, SHANE.  THE BOYS, MOSTLY,  ROGER DIDN'T KNOW,

HONESTLY, WHERE THEY WAS AT.

Q.    THEY WERE JUST OUT RUNNING THE STREETS?

A.    YES.

Q.    DID YOU EVER SEE YOUR BROTHER OR YOUR SISTER-IN-LAW, DID YOU EVER SEE THEM KICK THE KIDS?

A.    YES, I HAVE.

Q.    AND DESCRIBE THAT A LITTLE BIT.

A.    WELL, I CAN TELL YOU ONE PARTICULAR TIME WITH RONNIE THAT HE WAS JOKING ABOUT A QUART OF BEER HE HAD HID THAT BELONGED TO HIS DAD. HE WAS THINKING ABOUT IT. RONNIE KEPT TELLING HIM. IT WASN'T KICKING, IT WAS HITTING HIM THAT TIME. A LOT OF TIMES, WHEN THE KIDS DO SOMETHING THAT UPSET THE PARENTS OR THEY KNOW THEY ARE GOING TO GET WHIPPED, MOST OF THE TIME, THEY TAKE OFF RUNNING. USUALLY, THAT IS THE FIRST THING THEY DID WAS, ROGER, MOST OF THE TIME, WOULD TRY AND REACH OUT AND KICK THEM BECAUSE HE COULDN'T CATCH THEM. HE WOULD KICK THEM IN THE REAR PRETTY HARD.

Q.    DID YOU EVER SEE HIM HIT IN THE HEAD?

A.    YES.

Q.    HIT THEM IN THE MIDDLE OF THE BACK?

A.    YES.

Q.    DID HE THROW THINGS AT THEM?

A.    YES.

Q.    WHAT ABOUT DIANA?

A.    YES.

Q.    DID YOU EVER HEAR YOUR BROTHER TELL ANY ONE OF HIS CHILDREN HE LOVED THEM, AT THAT TIME?

A.    AT THAT TIME, NO.

Q.    DID EITHER ROGER OR DIANA EVER ENCOURAGE CHAD OR ANY OTHER KIDS TO TRY IN SCHOOL, DO WELL IN SCHOOL?

A.    I HAVE NEVER HEARD THEM SAY ANYTHING ABOUT THE SCHOOL. NEVER ENCOURAGED THEM.  NEVER HEARD THEM DISCUSSING ANYTHING OF SCHOOL.

Q.    DO YOU REMEMBER THAT YOUR BROTHER TATTOOED --

A.    YES.  HE TATTOOED MOST ALL THE KIDS WHEN THEY WERE REAL YOUNG.  I CAN'T SAY HOW YOUNG THEY WAS, BUT -- I DON'T KNOW.  THEY WAS PROBABLY TEN YEARS OLD, SOME OF THEM. WASN'T MUCH.  THE OLDEST PROBABLY WASN'T 14, MAYBE.

Q.    DO YOU HAVE ANY IDEA WHY HE DID THAT?

A.    NO, SIR, I DON'T.

Q.    DO YOU, AGAIN, THERE HAS BEEN SOME TESTIMONY ABOUT THIS, BUT I JUST WANT TO SEE IF YOU RECALL ANY OF THIS.  DID YOU HEAR ROGER AND DIANA?  DID YOU EVER HEAR THEM CURSE AT THE CHILDREN?

A.    YES, SEVERAL TIMES.

Q.    AND, YOU KNOW, I JUST WANT, SO IT IS CLEAR, EVERYBODY UNDERSTANDS THIS, BUT I AM GOING TO ASK YOU.  CAN YOU USE SOME OF THE ACTUAL LANGUAGE THAT YOU HEARD USED?

A.    THE ACTUAL LANGUAGE THEY USED?

Q.    UH-HUH (AFFIRMATIVE RESPONSE).  EVERYBODY UNDERSTANDS.

**DON'T WORRY?**

A.   WELL, THEY CALLED THEM A COCKSUCKING MOTHER-FUCKER BASTARD A LOT, THAT WAS HIS MOTHER.  ONE WAS MOTHER-FUCKING BASTARD.  THAT CAME FROM BOTH SIDES, DIANA AND ROGER.

**Q.   ANY OTHER NAMES?**

A.   WELL,  SON OF A BITCH.  AND MOSTLY THEM.

**Q.   NOW,  CAN YOU DESCRIBE, AGAIN, I DON'T WANT TO BEAT A DEAD HORSE, SO TO SPEAK.  YOU WOULD HAVE BEEN THERE DIFFERENT TIMES THAN SOME OF THESE OTHER PEOPLE WOULD HAVE BEEN.  WHEN YOU SHOWED UP,  YOU KNOW,  YOU WERE EITHER ON YOUR WAY OUT OF TOWN,  I UNDERSTAND YOU WEREN'T THERE ALL THE TIME,  YOU LIVED IN INDIANA, YOU WOULD STOP IN, I GUESS, A COUPLE OF TIMES A YEAR ANYWAY.  WHEN YOU WOULD COME TO THAT HOUSE, WHAT WAS IT LIKE?**

A.   CROWDED WITH PEOPLE AND DIRTY.  REALLY CLUTTERED.  DISHES LOOK LIKE THEY HAVEN'T BEEN DONE IN A WHILE.  USUALLY, NO FOOD IN THE HOUSE.  THAT IS ABOUT IT,  I GUESS.

**Q.   DO YOU RECALL -- DID YOU EVER SEE, THE ENTIRE TIME, DID THE FAMILY EVER SIT DOWN AND EAT A MEAL TOGETHER OR ANYTHING LIKE THAT?**

A.   NO, SIR.  I CANNOT RECALL THAT.  I CAN RECALL SEVERAL TIMES OF HER COOKING LIKE POTS OF BEANS AND CORN BREAD.  BUT AS FAR AS A GOOD SUPPER AT THE TABLE, I COULD NOT EVER REMEMBER THAT,  NO.

**Q.   AND WERE THERE BUGS IN THE HOUSE?**

A.    YES, LIKE ROACHES.

Q.    NOW, DO YOU RECALL, AGAIN, THAT CHAD AND HIS BROTHERS, I GUESS, COULD BE A HANDFUL?

A.    YES, THEY WOULD BE A HANDFUL.

Q.    PARDON ME?

A.    THEY WAS A HANDFUL, I AM SURE, YES.

Q.    AND, DO YOU RECALL, WHENEVER YOU WOULD COME AROUND OR ANYTHING LIKE THAT, THERE WOULD BE THINGS THAT WOULD APPEAR TO YOU, BASED ON, YOU KNOW, YOUR SORT OF EXPERIENCE, THAT THEY HAD STOLEN?

A.    YES.  A LOT OF TIMES, THERE WOULD BE A LOT OF EXTRA BICYCLES IN THEIR YARD.  JUST APPEAR.  COULDN'T SAY THEY REALLY STOLE THEM OR GAVE TO THEM, BUT MY OPINION, THEY WAS STOLEN, YES.

Q.    AND THE KIDS WOULD SAY, WELL, WE FOUND IT, OR SOMETHING LIKE THAT?

A.    YES, THEY WOULD FIND THEM STEREOS, CAR STEREOS, AND VCR A LOT OF TIMES THAT WOULD -- THEY WOULD SAY THEY FOUND THEM.

Q.    I THINK IT WOULD ALSO BE FAIR TO SAY, I THINK YOU INDICATED, THAT IF THEY HAD FOUND SOMETHING AND BROUGHT IT HOME AND IT WAS SOMETHING ROGER AND DIANA WANTED, THEY WOULD JUST TAKE IT THEMSELVES AND KEEP IT?

A.    YEAH, KIND OF OVERLOOK IT.  THEY DIDN'T TRY TO CORRECT THEM FOR IT, JUST CALLED THEM, AT THE TIME, AND THEN

CROSS EXAM OF MARK FULKS

TAKE WHAT, IF IT WAS SOMETHING THAT THEY THOUGHT THEY WOULD NEED OR WANT, YOU KNOW, NORMALLY THEY WOULD GO AHEAD AND TAKE IT FOR THEMSELVES, AND THAT WAS THE END OF IT. THEY WOULDN'T SAY ANYTHING ELSE ABOUT IT.

Q. MR. FULKS, DID YOU TRY AND ENCOURAGE YOUR BROTHER ROGER TO COME DOWN HERE AND TESTIFY FOR HIS SON?

A. YES, I DID.

Q. AND WOULD HE DO IT?

A. NO.

Q. WHY NOT?

A. WELL, IN MY OPINION, HE DIDN'T CARE ENOUGH TO DO IT. HE DIDN'T CARE. IT SEEMED LIKE HE DIDN'T CARE ENOUGH TO DO IT, TO MAKE IT LOOK BAD ON HIMSELF THAT HE WAS A BAD PARENT. ALONG, AT THE SAME TIME, WITH MY OPINION.

Q. DO YOU REMEMBER WHEN CHAD WAS IN PRISON UP IN INDIANA?

A. YES.

Q. AND THAT WAS ABOUT LIKE, I GUESS, 45 MINUTES TO AN HOUR FROM WHERE HIS DAD LIVES, OR SOMETHING LIKE THAT?

A. YES.

Q. HE WAS IN THERE FOR A COUPLE OF YEARS?

A. YES.

Q. DO YOU REMEMBER IF HIS DAD ONE TIME EVER DID GO SEE HIM?

A. NO.

MR. BLUME: MR. FULKS, I AM DONE WITH YOU. I THINK

CROSS EXAM OF MARK FULKS

ONE OF THESE GENTLEMEN WILL ASK YOU SOME QUESTIONS.

THE COURT: CROSS-EXAMINATION.

CROSS EXAM

BY MR. GASSER:

Q. GOOD AFTERNOON, MR. FULKS. MY NAME IS JOHNNY GASSER. I WORK IN THE U. S. ATTORNEY'S OFFICE. I AM ONE OF THE PROSECUTORS ASSIGNED TO THIS CASE. AND I DON'T HAVE THAT MANY QUESTIONS FOR YOU. I DO WANT TO ASK YOU A COUPLE OF THINGS.

YOUR BROTHER ROGER AND DIANA SEPARATED WHEN CHAD WAS 14 YEARS OLD; ISN'T THAT TRUE?

A. I COULDN'T SWEAR TO IT, THE AGE OF HIM, BUT IT WAS PRETTY CLOSE, YES.

Q. IF THERE WAS OTHER TESTIMONY IN THE RECORD THAT CHAD WAS 14 WHEN HIS MOM LEFT THE DAD, YOU WOULDN'T DISPUTE THAT?

A. NO.

Q. AND SHE, ACTUALLY, TOOK CHAD AND THE KIDS AND MOVED TO OHIO, RIGHT ACROSS THE RIVER FROM HUNTINGTON, WEST VIRGINIA?

A. AFTER ROGER LEFT, YES.

Q. SO, WHEN CHAD WAS 14 YEARS OLD, THIS UPBRINGING THAT YOU HAVE JUST DESCRIBED TO THE JURY, I MEAN, THAT WAS A PRETTY RADICAL CHANGE IN THE LIVES OF ALL OF THOSE KIDS TO HAVE ROGER, THE DRUNK AND THE ABUSER, OUT OF THE HOUSE?

A. I DON'T UNDERSTAND YOUR QUESTION.

Q. I MEAN, YOU WOULD AGREE WITH ME THAT IT IS A PRETTY

## CROSS EXAM OF MARK FULKS

RADICAL CHANGE THAT THE DESCRIPTION OF WHAT LIFE WAS LIKE THAT YOU PROVIDED TO THE JURY WITH ROGER, AND DIANA, AND THE KIDS, THAT WAS DRASTICALLY ALTERED WHEN ROGER MOVED OUT OF THE HOUSE AND LEFT AND MOVED TO INDIANA?

A.    SURE,  IT WAS.

Q.    BECAUSE HE WAS NO LONGER IN CHAD FULKS'S LIFE AT THAT POINT?

A.    THE ONLY CONTACT IS WHEN HE CONTACTED HIM.

Q.    THE POINT IS, FROM THE TIME CHAD FULKS WAS 14,  HE WAS LIVING WITH HIS MOTHER, AND THE LIFESTYLE THAT YOU HAVE JUST DESCRIBED TO THE JURY DIDN'T EXIST ANYMORE.  HIS DAD WASN'T AROUND?

A.    HIS DAD WEREN'T AROUND.  I CAN TELL YOU THAT.

Q.    THE FACT HIS MOTHER, DIANA, FOUND RELIGION,  SHE CONVERTED.  SHE TURNED HER LIFE OVER TO GOD; ISN'T THAT TRUE?

A.    THAT IS WHAT I HEARD.

Q.    SHE STOPPED DRINKING?

A.    I COULDN'T SAY THAT.

Q.    STOPPED SWEARING AT THE KIDS?

A.    I COULDN'T SAY THAT.

Q.    BECAME A PENTECOSTAL MINISTER?

A.    I HAVE HEARD THAT,  YES.

Q.    AND YOU ARE AWARE THAT CHAD WAS 25 YEARS OLD AT THE TIME THAT HE COMMITTED THESE OFFENSES FOR WHICH THIS JURY WILL ULTIMATELY PASS HIS SENTENCE,  DO YOU KNOW THAT?

CROSS EXAM OF MARK FULKS

A.    YES.

Q.    DID YOU HAVE A PRETTY TOUGH UPBRINGING AS WELL,  MR. FULKS?

A.    NO.

Q.    SO,  ROGER, AND YOU, AND YOU HAVE ANOTHER BROTHER, DON'T YOU?

A.    YES.

Q.    Y'ALL GREW UP A MIDDLE-CLASS FAMILY?

A.    YES.

Q.    I AM CURIOUS.   YOU HAVE TESTIFIED THAT, AT TIMES, THAT ROGER WOULD KICK THE KIDS IN THE REAR END, AND WOULD STRIKE THE CHILDREN, OR THROW THINGS AT THE KIDS, AND THIS HAPPENED IN YOUR PRESENCE?

A.    YES.

Q.    AND THAT HE WOULD SWEAR AT THE KIDS IN YOUR PRESENCE?

A.    YES.   BOTH, NOT JUST ROGER.

Q.    I KNOW EVERYONE IS DIFFERENT,  MR. FULKS.  I HAVE THREE BROTHERS AND NINE NEPHEWS AND NIECES, AND SO I AM TRYING TO PUT MYSELF WATCHING ONE OF MY BROTHERS DO SOMETHING LIKE THIS TO THEIR CHILDREN.   DID YOU EVER HAVE TO PHYSICALLY GO AND PULL ROGER OFF ONE OF HIS CHILDREN?

A.    NO.   IT NEVER GOT TO THAT.   THEY USUALLY WAS RUNNING. THEY GOT AWAY, BUT, YES, I HAVE SPOKE UP AND TRIED TO STOP HIM.   AND HE TELLS ME THEY AIN'T MY FUCKING BUSINESS.

Q.    BUT, OBVIOUSLY, YOU WOULDN'T HAVE SAT BACK AND WATCHED

## CROSS EXAM OF MARK FULKS

ROGER COMMIT A SERIOUS INJURY ON ONE OF YOUR NEPHEWS?

A.    NO.

Q.    YOU WOULDN'T HAVE LET THAT HAPPEN?

A.    NO.

Q.    IN FACT, THAT NEVER DID HAPPEN IN YOUR PRESENCE?

A.    NOT WHERE I HAD TO PULL HIM OFF,  NO.

Q.    YOU WAS ALWAYS AVAILABLE,  I MEAN, IF CHAD HAD EVER CALLED YOU INTO HIS ADULT YEARS, IF HE EVER DID CALL YOU AND TALK TO YOU, YOU WERE WILLING TO TALK TO HIM?

A.    YES.

Q.    YOU WERE ALWAYS THERE FOR SUPPORT FOR CHAD?

A.    YES.

Q.    SO, AFTER HIS MOTHER LEFT WHEN HE WAS 14 YEARS OLD, AS HE THEN MATURED AT A YOUNG MAN AT THE AGE OF 18,  19, 20 YEARS OLD, WAS HAVING TO MAKE IMPORTANT DECISIONS IN LIFE,  YOU WERE THERE TO PROVIDE SUPPORT FOR HIM, IF HE ASKED IT?

A.    WITH ALL MY FAMILY, MY NEPHEWS.

Q.    THAT WAS MY NEXT QUESTION.  HE HAD AN EXTENSIVE GROUP OF FAMILY MEMBERS,  AUNTS AND UNCLES,  NEPHEWS,  COUSINS.  HE HAD AN EXTENSIVE GROUP OF FAMILY MEMBERS IN INDIANA AND IN WEST VIRGINIA THAT LOVED HIM, AND CARED ABOUT HIM, AND WOULD SUPPORT HIM IN TIMES OF NEED, ISN'T THAT A FAIR STATEMENT?

A.    NO.  I COULDN'T SAY THAT THEY HAD ALL OF THEM THAT WOULD SUPPORT HIM ANY TIME,  NO.  I COULDN'T SAY THAT.

Q.    YOU INDICATED YOU WOULD, AS WOULD ALL OF YOU.

## CROSS EXAM OF MARK FULKS

A.    I AM TALKING ABOUT ALL OF MY NEPHEWS.  I WOULD SUPPORT THEM AND MY FAMILY.

**Q.    BUT YOU WOULD SUPPORT CHAD, YOURSELF, IF HE NEEDED HELP?**

A.    YES.

**Q.    DID YOU, ON THAT ONE OCCASION IN INDIANA, WHEN HE WAS GETTING READY TO BE SENTENCED?**

A.    YES.

**Q.    YOU WROTE A LETTER IN JANUARY OF 2000 TO HIS SENTENCING JUDGE,  JUDGE BROWN,  CORRECT?**

A.    YES,  I DID.

**Q.    DO YOU REMEMBER THE LETTER, MR. FULKS, OR DO YOU WANT TO TAKE A QUICK LOOK AT IT?**

A.    I REMEMBER THE LETTER.

MR. GASSER:  YOUR HONOR,  WE ARE MOVING GOVERNMENT'S 410 INTO EVIDENCE AT THIS TIME.  I THINK THERE IS NO OBJECTION.

THE COURT:   IS THAT CORRECT, NO OBJECTION?

MR. BLUME:  THAT'S CORRECT.

THE COURT:   OKAY.

BY MR. GASSER:

**Q.    MR. FULKS, LOOK RIGHT THERE ON YOUR SCREEN.   THAT IS JANUARY 31,  2000?**

A.    YES.

**Q.    AND YOU RECOGNIZE YOUR HANDWRITING?**

App. 00779

## CROSS EXAM OF MARK FULKS

A.    YES.

Q.    AGAIN, SO THE JURY UNDERSTANDS, ABOUT AN HOUR AND A HALF OR SO, CERTAIN CERTIFIED INDICTMENTS WERE PUBLISHED TO THE JURY, INCLUDING THE BURGLARY INDICTMENT FOR WHICH MR. FULKS PLED GUILTY TO IN THE YEAR 2000.  AND THAT IS -- YOU WERE WRITING THE JUDGE THAT WAS GOING TO SENTENCE HIM ON THAT CHARGE; IS THAT CORRECT?

A.    I BELIEVE THAT WAS THE CHARGE, YES.

Q.    I WANT TO GO AHEAD HERE AND PUBLISH THE LETTER.

"DEAR JUDGE BROWN:  I'M WRITING TO
YOU TO ASK YOU WHEN YOU PASS
SENTENCE ON CHAD FULKS THAT YOU HAVE
MERCY AND UNDERSTANDING.  I AM
CHAD'S UNCLE AND I'VE ALWAYS
BELIEVED IN CHAD.  I KNOW HE HAS
DONE WRONG BUT I ALSO KNOW THAT HE
HAS TURNED HIS LIFE AROUND.  SEVERAL
DIFFERENT REASONS.  ONE IS, I'VE
WATCHED HIM GROW UP WITH NO REAL
SUCCESS UNTIL THE LAST TWO YEARS.
I WATCH HIM START WALKING ON THE
PATH TO THE LORD.  I KNOW YOU HEAR
THAT A LOT, BUT I SEE IT IN HIM
BECAUSE I GAVE MY LIFE TO THE LORD A
COUPLE OF YEARS AGO.  I KNOW WHAT

CROSS EXAM OF MARK FULKS

IT TAKES TO CHANGE.  ANOTHER THING
I HAVE SEEN HIM RUN FROM THE LAW
MANY TIMES,  BUT NOW I HELPED GET
HIM OUT ON HIS BAIL AND I DIDN'T
HAVE TO MAKE HIM STAY AROUND AND
SHOW UP FOR COURT.  HE DID THAT ON
HIS OWN AND WHEN HE PLEADED GUILTY
-- AND WHEN HE PLEADED GUILTY THAT
MADE ME EVEN MORE PROUD OF HIS
CHANGE.  JUDGE,  I KNOW HE HAS TO
PAY FOR HIS WRONGDOING.  HE IS YOUNG
YET AND I BELIEVE WITH ALL MY HEART
THAT CHAD CAN MAKE A GOOD DIFFERENCE
IN THIS WORLD.  I PRAY THAT
SOMETHING GOOD COMES FROM ALL OF HIS
MISTAKES HE'S MADE IN HIS YOUNG
LIFE.  I ALSO WILL PRAY FOR ALL OF
THOSE INVOLVED IN THE SENTENCING.
GOD BLESS YOU AND YOUR" -- "WHATEVER
IT MAY BE."

A.   "DECISION."

Q.   **"WHATEVER IT MAY BE.  MARK FULKS."  THAT IS YOUR LETTER?**

A.   YES.

Q.   **NOW,  MR. FULKS,  I GUESS, PRIOR TO JANUARY OF 2000,**

## CROSS EXAM OF MARK FULKS

YOU BECAME A BORN-AGAIN CHRISTIAN?

A.    YES.

Q.    AND WOULD YOU, AT TIMES, TALK TO CHAD ABOUT THAT?

A.    YES, I HAVE.  I WOULD OVER THE TELEPHONE.

Q.    AND WITH YOUR CONVERSATIONS THAT YOU HAD WITH YOUR NEPHEW CHAD, BASED ON WHAT HE WAS TELLING YOU, YOU BELIEVED THAT CHAD FULKS HAD TURNED HIS LIFE OVER TO GOD, AS WELL?

A.    I HAD NO REASON NOT TO BELIEVE IT.

Q.    AND THAT -- THE BASIS OF YOUR OPINION IN THIS LETTER TO JUDGE BROWN WAS BASED ON WHAT CHAD FULKS WAS TELLING YOU WHENEVER YOU WOULD HAVE CONVERSATIONS WITH HIM?

A.    ON APPEARANCE, HE WAS DIFFERENT WHEN HE WAS OUT.  WHEN HE CAME TO OUR HOUSE TO STAY, YOU COULD TELL A DIFFERENCE IN CHAD.  HE TALKED MORE ABOUT THE LORD, MORE ABOUT CHANGING HIS LIFE AND DOING RIGHT.  BUT HE ALSO EXPLAINED IT WAS HARD FOR HIM TO DO SO.

Q.    WELL, YOU WOULD AGREE WITH ME, WOULD YOU NOT, MR. FULKS, THAT PEOPLE THAT GENUINELY AND TRULY DO TURN THEIR LIFE OVER TO THE LORD, THEY DON'T KIDNAP AND CARJACK WOMEN?

A.    NOT AND HAVE THEIR HEART IN THE RIGHT PLACE, NO.

Q.    THEY DON'T KILL WOMEN?

A.    I CAN'T SAY THAT THEY WOULD.

Q.    I NOTICE YOU INDICATED TO THE JUDGE THAT YOU SAW THAT, ACTUALLY, DURING THE PREVIOUS TWO YEARS FROM THE TIME YOU WROTE THIS LETTER, THAT IN THE TWO YEARS BEFORE YOU WROTE THIS

## CROSS EXAM OF MARK FULKS

LETTER, HE HAD BEEN INCARCERATED IN TENNESSEE, YOU WERE AWARE OF THAT?

A.   I AM NOT SURE HOW LONG IT WAS, BUT I WAS AWARE HE WAS IN TENNESSEE IN JAIL, YES.

Q.   AND, MR. FULKS, OBVIOUSLY, WHEN YOU WROTE TO THE JUDGE, TO JUDGE BROWN HERE THAT, "I BELIEVE WITH ALL MY HEART THAT CHAD CAN MAKE A GOOD DIFFERENCE IN THE WORLD," YOU REALLY BELIEVED THAT, MR. FULKS, WHEN YOU ARE WRITING THAT, OR YOU WOULDN'T HAVE PUT IT IN THE LETTER?

A.   I BELIEVED THAT, AT THE TIME. YES, I DID.

Q.   THAT CHAD FULKS, AT THE TIME, HAD ALL OF THE PHYSICAL SKILLS TO MAKE A DIFFERENCE IN THIS WORLD?

A.   IT COULD HAVE BEEN -- YEAH, IT COULD HAVE BEEN MOTORED TO THAT WAY. I DON'T KNOW HOW TO PUT THE WORDS. YES, WITH HELP, AND IF HIS HEART WAS IN THE RIGHT PLACE WITH THE WORD, HE COULD HAVE. WITH EITHER ONE, HE COULD HAVE.

Q.   IN MARCH OF 2002, WHEN CHAD FULKS WAS PAROLED FROM PRISON, IF HE NEEDED ANYTHING, YOU WOULD HAVE HELPED HIM OUT, MR. FULKS?

A.   WHEN WAS THAT?

Q.   IN MARCH 22ND OF 2002?

A.   THAT IS WHEN HE WAS PAROLED FROM INDIANA?

Q.   WHEN HE WAS PAROLED AND HE ACTUALLY STARTED LIVING IN PORTAGE, INDIANA, NOT TOO FAR FROM WHERE YOU WERE LIVING?

A.   YES. AGAIN, I WOULD HAVE DONE FOR ALL OF MY NEPHEWS

REDIRECT EXAM OF MARK FULKS

AND FAMILY.

MR. GASSER:  BEG THE COURT'S INDULGENCE.  MR. FULKS, THANK YOU VERY MUCH.

MR. BLUME:  I HAVE JUST A COUPLE OF QUESTIONS.

REDIRECT EXAM

BY MR. BLUME:

**Q.    YOU SAID, IN THIS TIME FRAME MR. GASSER IS TALKING ABOUT THE LETTER WITH YOU,  YOU SAID THAT YOU THOUGHT, AT THAT POINT, IN THE LETTER,  YOU THOUGHT CHAD WAS TRYING?**

A.    YES.

**Q.    BUT THAT HE HAD SAID IT WAS HARD?**

A.    YES,  HE DID.

**Q.    IT WAS HARD FOR HIM TO SAY, I GUESS, TO NOT COMMIT CRIME?**

A.    YES,  HE DID SAY THAT.

**Q.    AND THAT WAS, I THINK, IN PART, BECAUSE HE HAD A DRUG PROBLEM?**

A.    HE DID HAVE A DRUG PROBLEM,  YES.

**Q.    AND PART BECAUSE WHAT HE HAD BEEN THROUGH IN HIS LIFE HAD HAD AN EFFECT ON HIM?**

A.    YES,  I AM SURE IT DID HAVE AN EFFECT ON HIM,  YES.

MR. BLUME:  THANK YOU.

THE COURT:  THANK YOU,  SIR.  YOU MAY STEP DOWN.

LADIES AND GENTLEMEN,  LET'S TAKE OUR AFTERNOON RECESS.

WE WILL TAKE A 20-MINUTE RECESS.  ALL RIGHT WE WILL BE IN

DIRECT EXAM

BY MR. GASSER:

Q.    GOOD AFTERNOON, MR. FULKS.

A.    HEY.

Q.    MR. FULKS, YOU ARE GOING TO NEED TO SPEAK RIGHT IN THAT MICROPHONE SO THOSE JURORS ON THE BACK ROW CAN HEAR YOU.

A.    ALL RIGHT.

Q.    MR. FULKS, MY NAME IS JOHNNY GASSER.  I WORK IN THE U.S. ATTORNEY'S OFFICE HERE IN COLUMBIA.  AND I BELIEVE YOU AND I BRIEFLY MET DURING ONE OF THE BREAKS TODAY; IS THAT CORRECT?

A.    YES.

Q.    I AM GOING TO TRY TO MAKE THIS AS BRIEF AS POSSIBLE, BUT I DO HAVE SOME QUESTIONS TO ASK YOU, OKAY?

HOW OLD ARE YOU, MR. FULKS?

A.    THIRTY.

Q.    AND ARE YOU CURRENTLY UNEMPLOYED?

A.    YES.

Q.    WHAT WAS YOUR LAST JOB THAT YOU HELD?

A.    RUNNING A MACHINE, A LASER.

Q.    DO YOU HAVE A PERMANENT HOME RIGHT NOW?

A.    NO.

Q.    YOU FLEW IN LAST NIGHT?

A.    YES.

Q.    YOU WERE FLOWN IN BY THE JUSTICE DEPARTMENT?

A.     YES.

Q.     STAYED AT THE ADAMS MARK HOTEL,  I BELIEVE?

A.     RIGHT.

Q.     WHEN IS THE LAST TIME THAT YOU HAD A RESIDENCE THAT YOU STAYED IN FULL TIME?

A.     ABOUT A YEAR AND A HALF.

Q.     DO YOU HAVE FRIENDS THAT WILL TAKE YOU IN?

A.     YEAH.

Q.     AND I AM NOT TRYING TO EMBARRASS YOU,  MR. FULKS.   BUT JUST SO THE JURY UNDERSTANDS,  I BELIEVE IN 1993, SOMETIME AROUND 1993 YOU HAD A BURGLARY AND AN ASSAULT, PHYSICAL ASSAULT CONVICTION; IS THAT CORRECT?

A.     YES.

Q.     WAS THAT THE MOST SERIOUS CONVICTION THAT YOU HAVE HAD?

A.     YES.

Q.     A BURGLARY AND AN AGGRAVATED ASSAULT?

A.     YES.

Q.     I WANT TO DRAW YOUR ATTENTION TO NOVEMBER OF 2002.   DO YOU REMEMBER, ON NOVEMBER 20TH,  2002, BEING ARRESTED BY MEMBERS OF THE GOSHEN POLICE DEPARTMENT AND OTHER LAW ENFORCEMENT AGENCIES IN NORTHERN INDIANA?  WHEN I SAY "ARRESTED," THAT MAY BE TOO HARSH OF A WORD, BEING SEIZED AND THEN BEING QUESTIONED?

A.     YES.

Q.     BECAUSE YOU WEREN'T CHARGED WITH ANYTHING AT THAT TIME,

RIGHT?

A.    RIGHT.

Q.    AND MS. ADAMS WAS SEIZED WITH YOU DURING THAT SAME TIME PERIOD?

A.    YES.

Q.    IT WAS THE DAY YOUR BROTHER CHAD FULKS WAS ARRESTED?

A.    YES.

Q.    AND THOSE ARE SOME OF THE EVENTS THAT DAY AND SOME EVENTS LEADING UP TO THAT DAY THAT I WANT TO TALK WITH YOU ABOUT.

A.    (WITNESS NODS HEAD AFFIRMATIVELY.)

Q.    DURING THAT TIME PERIOD, WHERE WERE YOU LIVING?

A.    GOSHEN, INDIANA.

Q.    WITH MS. ADAMS?

A.    YES.

Q.    AT 322 WEST OAK RIDGE; IS THAT RIGHT?

A.    YES.

Q.    AND YOU, ACTUALLY, HAD A JOB DURING THAT TIME?

A.    YES.

Q.    AND WHAT WAS YOUR LINE OF WORK?

A.    I THINK I WORKED IN PLASTIC MOLDINGS.

Q.    PLASTIC MOLDINGS?

A.    YES.

Q.    DID YOU DO PART-TIME WORK FOR A JANITORIAL SERVICE?

A.    YES.

Q.    IF THERE IS A WAY FOR YOU TO MAKE MONEY, YOU WANTED TO MAKE MONEY?

A.    YES, SIR.

Q.    SOMEBODY WAS WILLING TO GIVE YOU A JOB, YOU WOULD TAKE THE JOB?

A.    YES.

Q.    WOULD YOU PUT IN AN HONEST DAY'S WORK, IN YOUR OPINION?

A.    YES.

Q.    DESERVED THE WAGES YOU RECEIVED?

A.    YES.

Q.    I WANT YOU TO -- I WILL TALK WITH YOU ABOUT THE DAY THE POLICE STOPPED YOU ON NOVEMBER 20TH.  MR. FULKS, I AM GOING TO TAKE YOU FORWARD ABOUT 10 OR 12 DAYS BEFORE THAT DAY.

A.    OKAY.

Q.    I WANT TO DRAW YOUR ATTENTION TO FRIDAY EVENING, NOVEMBER 8TH.  NOW, DID YOU KNOW THAT ON AUGUST 26TH, THAT YOUR BROTHER WAS ARRESTED IN MADISONVILLE, KENTUCKY, WAS BEING HOUSED AT THE HOPKINS COUNTY DETENTION CENTER, DID YOU KNOW THAT?

A.    NO, I DIDN'T.

Q.    YOU HADN'T BEEN IN TOUCH WITH ANY FAMILY MEMBERS?

A.    RIGHT.

Q.    MY UNDERSTANDING, YOU DON'T HAVE A RELATIONSHIP WITH YOUR MOTHER??

A.    I DON'T TALK TO REALLY NONE OF MY FAMILY.

Q.    YOU DON'T TALK TO ANY OF YOUR FAMILY?

A.    NO, NOT REALLY.

Q.    DURING THAT TIME PERIOD, WASN'T DEWAYNE LIVING WITH YOUR DAD AND YOUR STEPMOM IN SHIPSHEWANNA?

A.    HE MIGHT HAVE BEEN.  I AM NOT REALLY SURE.

Q.    DO YOU REMEMBER THAT FRIDAY, NOVEMBER 8TH, SOME 12 DAYS BEFORE YOUR BROTHER WAS ARRESTED IN YOUR PRESENCE, DO YOU REMEMBER YOUR BROTHER CHAD SHOWING UP WITH YOUR BROTHER DEWAYNE AND TINA SEVERANCE AT YOUR HOUSE?

A.    YES.

Q.    HOW OFTEN WOULD YOU SEE YOUR BROTHER DEWAYNE DURING THOSE TIME PERIODS?

A.    JUST EVERY ONCE IN A GREAT WHILE.

Q.    SO, WHEN HE SHOWED UP WITH YOUR BROTHER CHAD, WAS THAT SOMETHING UNUSUAL?

A.    I MEAN, NOT THAT I THOUGHT OF AT THE TIME, NO.

Q.    WHEN I SAY "YOUR RESIDENCE," THIS IS THE SAME HOUSE THAT YOU WERE LIVING WITH ANDREA ADAMS; IS THAT CORRECT?

A.    RIGHT.

Q.    THE HOUSE IN GOSHEN?

A.    RIGHT.

Q.    WHAT DID Y'ALL DO, TINA SEVERANCE, DEWAYNE -- YOUR BROTHER DEWAYNE, YOUR BROTHER CHAD, WHAT DID Y'ALL DO?

A.    SAT UP AND PARTIED.

Q.    WHEN YOU SAY "PARTIED," YOU WERE USING DRUGS?

A.    YES.

Q.    DID THOSE DRUGS INCLUDE MARIJUANA?

A.    YES.

Q.    METHAMPHETAMINES?

A.    YES.

Q.    YOU WOULD SMOKE BOTH OF THOSE DRUGS?

A.    YES.

Q.    AND DRINKING ALCOHOL?

A.    YES.

Q.    SMOKING THE METH, WHEN YOU SMOKED METH,  MY UNDERSTANDING IS, THAT YOU CAN STAY AWAKE FOR LONG PERIODS OF TIME?

A.    YES.

Q.    DO YOU REMEMBER ANYBODY EVEN GOING TO SLEEP THAT FRIDAY NIGHT?

A.    I DON'T REMEMBER NONE OF THAT.   I MEAN, IT HAS BEEN A WHILE.

Q.    NOW,  BEFORE THEY EVEN -- BEFORE Y'ALL STARTED USING THE DRUGS THAT NIGHT,  MR. FULKS,  DO YOU REMEMBER,  I MEAN, DO YOU KNOW WHO TINA SEVERANCE IS?  DO YOU KNOW HER?

A.    YES.

Q.    SO, I ASKED YOU ABOUT TINA SEVERANCE AND YOUR BROTHER CHAD.   DO YOU REMEMBER SEEING ANOTHER GIRL BY THE NAME OF ANDREA?

A.    YEAH.

Q.    AND SHE HAD THE SAME FIRST NAME AS THE WOMAN YOU WERE LIVING WITH, AT THE TIME?

A.    YES.

Q.    AND DO YOU REMEMBER SEEING A YOUNG MAN THAT WAS WITH YOUR BROTHER CHAD?

A.    YES.

Q.    YOU NOW KNOW HIS NAME TO BE WHAT?

A.    BRANDON.

Q.    HAD YOU EVER MET HIM BEFORE?

A.    NO.

Q.    IS THAT THE FIRST TIME YOU HAD EVER SEEN THE MAN, BRANDON AND THE WOMAN, ANDREA?

A.    YES.

Q.    EVENTUALLY, BRANDON AND ANDREA WERE DROPPED OFF SOMEWHERE ELSE?

A.    YES.

Q.    THAT FRIDAY NIGHT CHAD, YOUR BROTHER DEWAYNE, AND TINA SEVERANCE, DID THEY ALL STAY THERE THAT FRIDAY NIGHT?

A.    I DON'T KNOW.  WE MIGHT HAVE.  I DON'T REALLY.  I MEAN, I DON'T REALLY REMEMBER, TO TELL YOU THE TRUTH.

Q.    DO YOU THINK?

A.    BUT I KNOW WE WAS THERE.  I DON'T REMEMBER IF WE ALL STAYED THERE OR --

Q.    THAT IS FINE.  WHEN YOU ARE SMOKING MARIJUANA AND SMOKING METH, AND IF YOU DO IT FOR LONG PERIOD OF TIME, DO THE

DAYS KIND OF MESH IN WITH EACH OTHER?

A.     WE WAS UP FOR A FEW DAYS,  YEAH.

Q.     EVENTUALLY,  MR. FULKS,  MS. SEVERANCE,  BRANDON AND THIS OTHER WOMAN NAMED ANDREA,  THEY EVENTUALLY LEFT YOUR HOUSE; IS THAT CORRECT?

A.     YES.

Q.     DO YOU REMEMBER EVEN WHAT CAR THEY WERE DRIVING IN?

A.     I DON'T REMEMBER WHAT THEY WAS IN.   IN A VAN.

Q.     IN A VAN.   LET'S GO FORWARD THEN.   AND YOU DIDN'T SEE THEM AGAIN.   YOU DIDN'T SEE THEM WHEN THEY LEFT.   YOU DIDN'T SEE THEM AGAIN UNTIL THE NIGHT BEFORE CHAD WAS ARRESTED; IS THAT CORRECT?

A.     THAT'S CORRECT.

Q.     YOU DON'T KNOW WHAT THEY WERE DOING?

A.     NO.

Q.     AND YOU,  YOURSELF,  YOU HAD NO KNOWLEDGE OF THAT, YOU HAD NOTHING TO DO WITH ANY OF THAT,  CORRECT?

A.     CORRECT.

Q.     MR. FULKS,  LET ME MOVE FORWARD, FAST FORWARD TO TUESDAY NIGHT, NOVEMBER 19TH.   I BELIEVE YOU HAD A JOB WITH THE JANITORIAL SERVICE SOMETIME THAT AFTERNOON,  CORRECT?

A.     CORRECT.

Q.     DO YOU REMEMBER COMING HOME?

A.     YES.

Q.     AND WHO WAS AT YOUR HOUSE THAT WASN'T AT YOUR HOUSE

WHEN YOU LEFT TO GO DO THIS JOB?

A.    MY BROTHER.

Q.    WHICH BROTHER?

A.    CHAD.

Q.    AND JAMES LAMBDIN, DO YOU KNOW JAMES?

A.    YES.

Q.    JAMES IS ANDREA'S SON?

A.    YES.

Q.    WAS HE THERE, TOO?

A.    HE COULD HAVE BEEN, YES.

Q.    AND IT WASN'T UNCOMMON FOR HIM TO HAVE A FRIEND OVER WATCHING TV, WAS IT? THAT IS KIND OF NORMAL?

A.    YES.

Q.    DO YOU KNOW A GUY BY THE NAME OF DAVION NOLTE?

A.    YES.

Q.    WHO IS DAVION NOLTE?

A.    IT WAS ANDREA'S DAUGHTER'S BOYFRIEND.

Q.    THAT TUESDAY NIGHT, DAVION, DO YOU REMEMBER, AS SOON AS YOU GOT HOME FROM WORK, DAVION COMING OVER?

A.    NO, I DON'T REMEMBER HIM COMING OVER.

Q.    WHEN YOU SAW YOUR BROTHER CHAD THERE, ALL OF THESE OTHER PEOPLE YOU HAD SEEN HIM WITH, THEY WEREN'T WITH HIM; IS THAT CORRECT?

A.    NO, THEY WEREN'T.

Q.    HE WAS BY HIMSELF?

A.    YES.

Q.    MR. FULKS, DID YOU KNOW YOUR BROTHER WAS WANTED, AT THAT POINT?

A.    WHEN HE GOT ARRESTED?

Q.    WHEN HE SHOWED UP AT YOUR HOUSE ON TUESDAY NIGHT, NOVEMBER 19TH.  IT IS OKAY IF YOU DON'T REMEMBER OR YOU DIDN'T KNOW.

A.    I DON'T KNOW IF I KNEW THEN OR NOT, I MEAN.

Q.    DO YOU REMEMBER YOUR BROTHER ASKING YOU FOR SOMETHING?

A.    FOR A RIDE.

Q.    I AM TALKING ABOUT THE NIGHT BEFORE, TUESDAY NIGHT, NOVEMBER 19TH.  LET ME ASK YOU THIS, MR. FULKS.  LET ME DO IT THIS WAY.  WHEN YOUR BROTHER GOT ARRESTED, AND YOU AND ANDREA WERE STOPPED IN THE BERETTA, YOU GOT A PRETTY GOOD MEMORY OF THAT.  IT IS THE DAY YOUR BROTHER WAS ARRESTED, RIGHT?

A.    CORRECT.

Q.    YOU WERE TAKEN DOWN TO THE GOSHEN POLICE DEPARTMENT?

A.    CORRECT.

Q.    DO YOU REMEMBER BEING INTERVIEWED, YOU MAY NOT REMEMBER THEIR NAMES, BUT SPECIAL AGENT THEODORE -- TED MAY, AND SPECIAL AGENT THERIAULT, TWO SPECIAL AGENTS, DO YOU REMEMBER BEING INTERVIEWED BY THEM?

A.    YES.

Q.    IT WOULD BE A FAIR STATEMENT, MR. FULKS, YOU WEREN'T

TRUTHFUL WITH THEM AT THE BEGINNING, WERE YOU?

A.    NO, I WASN'T.

Q.    YOU WERE SCARED FOR YOUR BROTHER?

A.    YES.

Q.    OF COURSE, YOU WERE USING DRUGS, AND YOU WERE SCARED FOR YOURSELF?

A.    CORRECT.

Q.    I WANTED TO MAKE SURE, SO THE JURY UNDERSTANDS, YOU DIDN'T HAVE ANYTHING TO DO WITH ALICE DONOVAN, AND YOU DIDN'T HAVE ANYTHING TO DO WITH SAMANTHA BURNS?

A.    NO.

Q.    WHEN THE COPS ARE TALKING TO YOU, KNOWING YOU ARE DOING DRUGS, KNOWING WHAT YOUR BROTHER TOLD YOU THE NIGHT BEFORE, YOU WERE A LITTLE WORRIED ABOUT WHAT WOULD HAPPEN TO YOU?

A.    YES.

Q.    THAT IS A FAIR STATEMENT. DO YOU REMEMBER TELLING THE FBI AGENTS THAT NIGHT THAT, OR THAT DAY ON THE 20TH, WHEN YOU WERE TAKEN DOWN TO GOSHEN POLICE DEPARTMENT, DO YOU REMEMBER TELLING THEM THAT WHEN CHAD SHOWED UP AT YOUR HOUSE THE NIGHT BEFORE, THAT HE WAS ASKING YOU IF YOU COULD GET HIM SOME WEED?

A.    I REMEMBER GETTING HIM SOME, YES.

Q.    HE TOLD YOU HE WAS IN A LOT OF TROUBLE?

A.    YES.

Q.    AND THAT HE WAS SCARED?

A. YES.

Q. DO YOU REMEMBER TELLING HIM THAT YOU SAW THE STORY ON THE NEWS?

A. YEAH, I RECALL THAT NOW.

Q. AND WHAT HE WAS BEING ACCUSED OF IN SOUTH CAROLINA AND WEST VIRGINIA, POSSIBLY?

A. YES.

Q. DID YOU INQUIRE OF HIM AS TO WHAT VEHICLE HE HAD SHOWED UP IN? DO YOU REMEMBER ASKING HIM THAT?

A. YES.

Q. DO YOU REMEMBER WHAT HIS RESPONSE WAS THAT YOU TOLD THE FBI AGENTS, HIS FACIAL RESPONSE?

A. NO, I DON'T REMEMBER.

Q. YOU DON'T DENY, THOUGH, WHEN THIS WAS FRESHEST IN YOUR MIND, ON NOVEMBER 20TH, WHEN LITERALLY LESS THAN 24-HOURS AFTER CHAD SHOWED UP AT YOUR HOUSE, THAT YOU TOLD THE FBI AGENTS THAT, WHEN YOU ASKED WHAT VEHICLE HE WAS DRIVING, HE SMILED?

A. I DON'T REMEMBER THAT.

Q. BUT WHAT I AM SAYING IS, YOU DON'T DENY, YOU WOULD AGREE WITH ME THAT, WHEN THE FBI AGENTS WERE INTERVIEWING YOU ON THE AFTERNOON OF NOVEMBER 20TH AT THE GOSHEN POLICE DEPARTMENT, YOUR MEMORY WAS BETTER THAT AFTERNOON AS TO THE EVENTS THAT HAD HAPPENED SOME 12 OR 12 HOURS OR LESS BEFORE, DO YOU REMEMBER IT, YOUR MEMORY WAS BETTER?

A.    CORRECT.

Q.    YOU ARE NOT DENYING ON NOVEMBER 20TH, WHEN 12 HOURS BEFORE CHAD FULKS SHOWS UP AT YOUR HOUSE, AND YOU ASK HIM WHAT CAR HE WAS DRIVING, THAT HE SMILED?

A.    NO, I AM NOT DENYING IT.

Q.    DID YOU ASK HIM WHAT WAS SO FUNNY?

A.    NO.

Q.    DO YOU REMEMBER THEN ASKING HIM IF HE WAS STILL DRIVING THE SAME CAR?  AND YOU WERE TALKING ABOUT THE CAR YOU HAD SEEN THAT HE HAD STOLEN AND WAS INVOLVED IN THAT HIGH-SPEED CHASE. THAT IS WHAT WE ARE TALKING ABOUT, THAT IS WHAT YOU SAW ON TELEVISION, THE HIGH-SPEED CHASE WITH THE OHIO STATE POLICE?

A.    YES.

Q.    YOU ASKED HIM IF HE WAS DRIVING THE SAME BMW?

A.    YES.

Q.    AND, OF COURSE, HIS RESPONSE WAS?

A.    I DON'T REMEMBER WHAT HE REALLY SAID.  THERE IS A LOT OF STUFF THAT HAPPENED SINCE THEN.

Q.    BUT YOU KNEW HE WAS STILL DRIVING THE SAME CAR BECAUSE YOU SAW IT THE NEXT DAY?

A.    YEAH.

Q.    SO, HE TOLD YOU HE WAS DRIVING THE SAME CAR?

A.    YES.

Q.    AND, OF COURSE, AT THAT POINT IN TIME, WHEN MR. FULKS WAS SITTING IN YOUR HOME THAT YOU ARE LIVING IN, YOUR BROTHER

CHAD TELLS YOU HE IS DRIVING THE SAME STOLEN BMW THAT YOU SAW HIM RUNNING FROM THE POLICE IN ON THAT VIDEO IN OHIO THAT HAD BEEN ON THE NEWS, YOU GET NERVOUS?

A.    YES.

Q.    BECAUSE YOU DON'T WANT NOTHING TO DO WITH THIS?

A.    NO, I DON'T.

Q.    YOU REMEMBER DAVION BEING THERE. AND DAVION, ALSO, HE WAS KIND OF YOUNGER THEN, RIGHT, HE WAS 20?

A.    I BELIEVE HE WAS THERE.

Q.    HE KIND OF PIPED UP AND SAID, I SAW THAT ON TV, DO YOU REMEMBER THAT?

A.    NOT REALLY. I KIND OF RECALL.

Q.    MR. FULKS, DO YOU REMEMBER ASKING YOUR BROTHER, WHAT MOST PEOPLE WOULD PROBABLY ASK THEIR BROTHER, WHICH IS, HOW DID YOU GET THE CAR? DO YOU REMEMBER ASKING HIM THAT QUESTION?

A.    NO.

Q.    YOU MAY NOT REMEMBER THAT, BUT YOU DON'T DENY THAT YOU TOLD THE FBI THAT YOU ASKED HIM THAT QUESTION? YOU TOLD THE FBI THAT, ON NOVEMBER 20TH, WHEN YOU WERE BEING INTERVIEWED BY THEM, SOME 12 OR 14 HOURS AFTER YOU HAD THIS CONVERSATION WITH YOUR BROTHER?

A.    NO, I DON'T DENY IT.

Q.    AND WHAT ABOUT, DO YOU REMEMBER YOUR BROTHER CHAD TELLING YOU THAT HE TOOK THE CAR OFF OF A GIRL FROM OHIO OR

SOUTH CAROLINA? THOSE WERE HIS WORDS? HE TOOK THE CAR FROM A GIRL EITHER FROM OHIO OR SOUTH CAROLINA?

A.    I DON'T REMEMBER HIM SAYING THAT.

Q.    JUST TO BE CLEAR, SO THE JURY IS CLEAR, YOU ARE NOT SAYING HE DIDN'T SAY THAT?

A.    RIGHT.

Q.    YOU ARE SAYING, YOU DON'T REMEMBER HIM SAYING THAT?

A.    RIGHT.

Q.    AND YOU ARE ADMITTING AND AGREEING, TO THIS JURY, THAT YOUR MEMORY OF THE CONVERSATION YOU HAD WITH YOUR BROTHER ON NOVEMBER 19TH, THE EVENING OF NOVEMBER 19TH, WAS BETTER ON NOVEMBER 20TH, THE NEXT DAY, WHEN THE FBI WERE INTERVIEWING YOU AND WRITING THINGS DOWN?

A.    RIGHT.

Q.    CLEARLY YOUR --

A.    NO,  I WAS PRETTY STILL DRUGGED UP, TO TELL YOU THE TRUTH.

Q.    WHAT I AM TALKING ABOUT IS, TOMORROW, YOUR MEMORY OF YOU TESTIFYING IN FRONT OF THIS JURY TODAY,  YOU WILL HAVE A BETTER MEMORY OF WHAT YOU TOLD US TODAY, IF YOU ARE ASKED ABOUT IT TOMORROW, THAN YOU WILL A YEAR AND A HALF FROM NOW, WON'T YOU?

A.    YES.

Q.    COMMON SENSE?

A.    (WITNESS NODS HEAD AFFIRMATIVELY.)

Q. DO YOU REMEMBER, MR. FULKS, AFTER -- YOU ARE NOT DENYING THIS, DO YOU REMEMBER HIM SAYING TO YOU THAT THE OTHER BOY GOT STUPID?

A. YES.

Q. SO, YOU REMEMBER HIM SAYING, THE OTHER BOY GOT STUPID. BUT YOU DON'T REMEMBER HIM SAYING THAT HE TOOK IT OFF A GIRL FROM OHIO OR SOUTH CAROLINA?

A. NO.

Q. AND, AT THAT POINT IN TIME, HE STOPPED TALKING ABOUT THE INCIDENT?

A. YES.

Q. MR. FULKS, YOUR BROTHER CHAD NEVER DENIED KILLING THE WOMAN IN SOUTH CAROLINA TO YOU, DID HE?

A. HE DIDN'T SAY NOTHING ABOUT HER.

Q. YOU KNEW THEN THAT HE WAS ACCUSED OR THE ALLEGATIONS WERE THAT HE WAS INVOLVED IN THE DISAPPEARANCE, ABDUCTION, AND KILLING OF A WOMAN IN SOUTH CAROLINA, YOU KNEW THAT, DIDN'T YOU, MR. FULKS?

A. I SAW IT WHEN IT WAS ON THE NEWS, YES, SIR.

Q. AND BROTHERS TO BROTHERS, IN THE CONFINES OF A HOME IN GOSHEN, INDIANA, ON THE NIGHT OF NOVEMBER 19TH, CHAD FULKS NEVER TOLD YOU OR NEVER DENIED KILLING THE WOMAN IN SOUTH CAROLINA, DID HE?

A. NO.

Q. AND HE NEVER TOLD YOU, I HAD NOTHING TO DO WITH THAT

19-YEAR-OLD GIRL IN WEST VIRGINIA BEING KIDNAPPED, OR RAPED, OR KILLED. HE NEVER TOLD YOU THAT, DID HE?

A. NO.

Q. IT WAS JUST THE TWO OF YOU. HE COULD HAVE TAKEN YOU INTO ANOTHER ROOM, BLOOD BROTHERS, HE COULD HAVE DONE THAT, HE NEVER DID THAT?

A. NO.

Q. HE NEVER DENIED KILLING OR RAPING ANYBODY, DID HE, MR. FULKS?

A. NO.

Q. THAT EVENING, MR. FULKS, YOUR BROTHER ASKED YOU TO HELP GET RID OF THE CAR, DIDN'T HE?

A. YEAH. OR YEAH.

Q. YOU WERE STILL NERVOUS ABOUT IT, CORRECT?

A. YES.

Q. AND YOU AGREED TO HELP?

A. YES.

Q. AND WHEN ALL WAS SAID AND DONE, AFTER YOU TOLD THE FBI EVERYTHING THAT YOU TOLD THEM ON THE 20TH, WHICH IS, BASICALLY, TO SOME DEGREE, OTHER THAN THOSE PARTS THAT YOU FORGET, YOU ARE TELLING THIS JURY YOU WERE NEVER CHARGED WITH ANYTHING, WERE YOU, MR. FULKS?

A. NO.

Q. YOU COOPERATED WITH LAW ENFORCEMENT?

A. YES.

Q.    AND THEY CHOSE NOT TO CHARGE YOU WITH ANYTHING?

A.    YES.

Q.    SO, LET'S GO TO THE NEXT MORNING, AND I AM ALMOST THROUGH.  YOU DON'T HAVE A LICENSE.  YOU WEREN'T ALLOWED TO DRIVE THEN, SO YOU NEEDED ASSISTANCE FROM SOMEBODY,  CORRECT?

A.    YES.

Q.    SO,  AND YOUR GIRLFRIEND AT THE TIME, ANDREA ADAMS, SHE IS WORKING THE LATE SHIFT.  SHE WILL NOT GET HOME UNTIL ABOUT 7:30 RIGHT?

A.    YES.

Q.    WHEN ANDREA ADAMS GOT HOME AT 7:30, DO YOU REMEMBER ASKING HER SOMETHING?

A.    YES.

Q.    WHAT DID YOU ASK HER?

A.    TO GIVE ME AND CHAD A RIDE.

Q.    DID SHE AGREE?

A.    YES.

Q.    DID YOU RIDE WITH HER?

A.    YES.

Q.    WHEN YOU WALKED OUT THE DOOR THAT MORNING,  DID YOU SEE CHAD GO DOWN TO THE BMW?

A.    HE WALKED TOWARD IT,  YES.

Q.    IT WAS PARKED A COUPLE OF BLOCKS AWAY?

A.    YES.

Q.    IS THAT THE FIRST TIME YOU SAW THE CAR,  YOU KNOW,

WITH YOUR OWN EYES?

A.    YES.

Q.    AND SO, WHO LED THE WAY TOWARDS BRISTOL?

A.    WE JUST FOLLOWED HIM.

Q.    YOU HAD NEVER SEEN THAT CAR BEFORE, OTHER THAN WHAT YOU SAW DURING A TV CHASE WITH THE OHIO STATE POLICE?

A.    RIGHT.

Q.    DID YOU KNOW WHERE YOU WERE GOING, AT THAT TIME?

A.    NO.

Q.    EVENTUALLY, DID HE STOP AND DO SOMETHING WITH THE BMW?

A.    PARKED IT.

Q.    DID YOU GET OUT OF THE CAR?

A.    NO.

Q.    IF I WERE TO EVEN SHOW YOU A PHOTOGRAPH OF THE BMW WHERE IT WAS FOUND,  DO YOU THINK YOU WOULD RECOGNIZE THAT?

A.    YES.

Q.    LET'S TRY THAT.   LET ME SHOW YOU GOVERNMENT'S EXHIBIT 199, FIRST.   JUST GENERALLY,  DO YOU RECOGNIZE THIS FARM AREA?

A.    YES.

Q.    THAT IS THE AREA WHERE YOUR BROTHER CHAD TOOK THE CAR, DOES IT LOOK LIKE IT?

A.    YES.

Q.    LET ME SHOW YOU GOVERNMENT'S EXHIBIT 200.   A LITTLE CLOSER-UP VIEW.   LET ME SHOW YOU GOVERNMENT'S EXHIBIT 201.

Q. HOW ABOUT GOVERNMENT'S EXHIBIT 203, DO YOU SEE THE BACK END OF THAT CAR THERE?

A. YES.

Q. NOW, DID YOU ACTUALLY HELP YOUR BROTHER PARK THE CAR?

A. NO.

Q. DID HE DO THAT ON HIS OWN?

A. HE DID IT ON HIS OWN.

Q. WHEN HE CAME BACK IN THE CAR, DO YOU REMEMBER IF HE HAD ANYTHING ON HIS PERSON?

A. TWO BAGS.

Q. WHAT DID HE DO WITH THOSE BAGS?

A. PUT THEM IN THE TRUNK.

Q. YOU, YOURSELF, YOU NEVER DROVE THE BMW, DID YOU?

A. NO, I DIDN'T.

Q. MR. FULKS, NOW, WHEN YOU LEFT THAT RURAL AREA NEAR BRISTOL, DID SOMEBODY FORGET SOMETHING BACK AT YOUR HOUSE?

A. YEAH.

Q. AND SO, WHERE DID YOU GO?

A. WENT BACK TO THE HOUSE.

Q. JUST FOR A POINT OF CLARIFICATION, DID YOU TELL ANDREA THAT CHAD NEEDED TO DROP A CAR OFF AT A FRIEND'S HOUSE AND GET A RIDE TO ANOTHER FRIENDS?

A. I MIGHT HAVE SAID THAT, YES.

Q. SHE DIDN'T KNOW WHAT WAS GOING ON. SHE WAS JUST DOING YOU A FAVOR?

A.    RIGHT.

Q.    WHEN YOU GO BACK TO YOUR HOUSE,  WHO GOES INSIDE THE RESIDENCE,  DO YOU REMEMBER?

A.    I DO.

Q.    AND YOU COME BACK OUT?

A.    YES.

Q.    AND YOU GET BACK IN THE CAR?

A.    YES.

Q.    AND YOU ARE IN ANDREA'S BERETTA?

A.    YES.

Q.    WHO IS IN THE BACK SEAT?

A.    CHAD.

Q.    NOW,  YOU START HEADING TOWARDS WHERE, AGAIN?

A.    BRISTOL.

Q.    WHO IS DOING THE DIRECTING?

A.    I THINK CHAD WAS.   I MEAN.

Q.    DID YOU KNOW WHERE YOU WERE GOING?

A.    YEAH.   I MEAN,  I KNEW THE WAY TO BRISTOL.

Q.    DO YOU REMEMBER WHAT YOU STOPPED FOR BECAUSE YOU FORGOT?  WHAT YOU WENT INSIDE TO GET? IT IS OKAY IF YOU DON'T, I JUST WONDER.

A.    MIGHT HAVE WENT TO GO GET A KEY OR SOMETHING,  I DON'T REALLY RECALL.

Q.    NOW,  EVENTUALLY, AS YOU WERE DRIVING ON ONE OF THE COUNTY ROADS, WHAT HAPPENED?

A. WE WAS PULLED OVER.

Q. DID SOMEBODY TELL ANDREA TO STOP THE CAR?

A. I DON'T KNOW IF WE SAID "STOP."

Q. YOU DON'T REMEMBER THAT?

A. I REMEMBER HER STOPPING, YES.

Q. WHO GOT OUT OF THE CAR?

A. CHAD.

Q. BUT THAT CAR ONLY HAS TWO DOORS TO IT, RIGHT?

A. RIGHT.

Q. AND IF YOU ARE SITTING IN A FRONT SEAT, WHO HAD TO OPEN THE DOOR?

A. HE OPENED THE DOOR.

Q. HE JUST REACHED UP AND OPENED THE DOOR AND GOT OUT?

A. YES.

Q. YOU STAYED PUT?

A. YEAH.

Q. EVENTUALLY, YOU WERE HANDCUFFED AND PUT IN A CAR BY A POLICE UNIT THERE; IS THAT CORRECT?

A. YES.

Q. ANDREA WAS HANDCUFFED AND PUT IN A POLICE UNIT?

A. YES.

Q. YOU, EVENTUALLY, SAW THAT THEY HAD SEIZED AND ARRESTED YOUR BROTHER?

A. YES.

Q. YOU WENT DOWN TO THE POLICE STATION, AND YOU WERE

INTERVIEWED BY LAW ENFORCEMENT OFFICIALS?

A. YES.

Q. ORIGINALLY, MR. FULKS, WERE YOU KIND OF HESITANT ABOUT COOPERATING WITH LAW ENFORCEMENT AND TELLING THEM AND ASSISTING THEM IN FINDING MS. DONOVAN'S CAR?

A. YES. I WAS LYING, YES.

Q. PROTECTING YOUR BROTHER?

A. YES.

Q. AFTER A WHILE, DID YOU FINALLY MAKE A DECISION TO COOPERATE WITH LAW ENFORCEMENT AND ASSIST THEM IN WHATEVER MEANS POSSIBLE IN LOCATING MS. DONOVAN'S CAR?

A. YES.

Q. AND, IN FACT, WERE YOU WILLING TO EVEN BE PLACED IN A POLICE CAR AND/OR AN FBI CAR AND GO OUT TO THAT AREA AND TRY AND IDENTIFY CERTAIN LANDMARKS TO SEE IF YOU COULDN'T HELP FIND THE CAR?

A. YES.

Q. AND DID YOU DO THAT WITH LAW ENFORCEMENT?

A. YES.

Q. YOU ACTUALLY ASSISTED THE FBI WITH CERTAIN LANDMARKS, AND YOU ASSISTED THEM IN FINDING MS. DONOVAN'S CAR?

A. YES.

MR. GASSER: BEG THE COURT'S INDULGENCE.

BY MR. GASSER:

Q. MR. FULKS, JUST ONE OR TWO MORE QUESTIONS. YOU HAVE

INDICATED TO THE JURY THAT YOU HAVE A TOUGH TIME REMEMBERING EVERYTHING THAT HAPPENED ON THE 19TH AND THE 20TH; IS THAT CORRECT?

A.    YES.

Q.    YOU HAVE A TOUGH TIME REMEMBERING EXACTLY WHAT YOU TOLD THE FBI ON THE 20TH WHEN YOU WERE INTERVIEWED?

A.    YES.

Q.    WOULD YOU AGREE WITH ME THAT, WHEN YOU DECIDED TO TELL THE TRUTH TO THE FBI AS TO WHAT CHAD TOLD YOU AND WHERE YOU WENT AND WHAT YOU DID, IT WAS, IN FACT, THE TRUTH?

A.    YES.

        MR. GASSER:  MR. FULKS,  THANK YOU VERY MUCH.

        THE COURT:   DO YOU WANT TO DO CROSS NOW OR DO IT TOMORROW?

        MS. JOHNSON:  YOUR HONOR,  I THINK THE JURY IS EXPECTING TO GO HOME NOW.

        THE COURT:   I WANTED TO GIVE YOU THE OPTION. MEMBERS OF THE JURY,  WE WILL TAKE -- WE WILL BREAK NOW AND COME BACK AT TWELVE NOON, AS WE SAID, TOMORROW.   HOW LONG DO YOU THINK YOUR CROSS WILL BE?

        MS. JOHNSON:  FIFTEEN TO 20 MINUTES.

        THE COURT:   LET'S GO AHEAD AND BREAK FOR THE DAY. ASK YOU TO BE BACK AT TWELVE NOON TOMORROW.   HAVE A NICE LITTLE BREAK HERE.   ENJOY YOUR TOUR OF THE GOVERNOR'S MANSION TOMORROW.

*** END OF REQUESTED TRANSCRIPT ***

* * * * * * * * * * * * * * * * * * * * * * * * *

CERTIFICATE OF REPORTER

I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM MY STENOGRAPHIC NOTES IN THE ABOVE-ENTITLED MATTER.

_____

DEBRA R. JERNIGAN, RPR, CRR

DATE _____