**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION**

|  |  |  |
|---|---|---|
| CHADRICK EVAN FULKS, | : | |
| | : | CIVIL ACTION |
| Petitioner, | : | (Capital Habeas Corpus) |
| | : | |
| v. | : | |
| | : | No. 2:15–cv–00033–WTL–MJD |
| J. E. KRUEGER, Warden, USP Terre Haute, | : | |
| UNITED STATES OF AMERICA | : | **Hon. William T. Lawrence** |
| | : | **United States District Judge** |
| Respondents. | : | |
| | : | |

**APPENDIX TO
AMENDED PETITION FOR WRIT OF HABEAS CORPUS
PURSUANT TO 28 U.S.C. § 2241**

**VOLUME IV
APP. 00810 TO APP. 01086**

PETER WILLIAMS
CLAUDIA VAN WYK
Assistant Federal Defenders
Federal Community Defender Office
for the Eastern District of Pennsylvania
601 Walnut Street, Suite 545 West
Philadelphia, PA 19106
Tel: 215.928.0520
Fax: 215.928.0826
pete_williams@fd.org
claudia_vanwyk@fd.org

*Counsel for Petitioner*

Dated: March 8, 2019

# Index to Appendix

**VOLUME I**

Expert Reports and Declarations

1. Report by Barry M. Crown, Ph.D. – March 6, 2019.................................................00001

2. Report by Julian Davies, M.D. – March 4, 2019 .....................................................00012

3. Report by Natalie Brown, Ph.D. – February 11, 2019.............................................00051

4. Report by David Bachman, M.D. – July 31, 2013....................................................00188

5. Declaration of Seymour Halleck, M.D. – September 17, 2010 ................................00190

6. Declaration of Margaret Melikian, D.O. – September 17, 2010...............................00193

7. Declaration of James H. Hilkey, Ph.D. – September 16, 2010................................00196

8. Declaration of Harry Krop, Ph.D. – September 16, 2010.........................................00199

9. Declaration of James H. Hilkey, Ph.D. – June 2, 2008...........................................00209

10. Declaration of Margaret Melikian, D.O. – May 27, 2008 .......................................00223

11. Declaration of Seymour Halleck, M.D. – May 9, 2008...........................................00236

12. Report by Ruben C. Gur, Ph.D. – June 13, 2004...................................................00261

13. Report by James H. Hilkey, Ph.D. – May 7, 2004..................................................00271

14. Report by Jonathan Venn, Ph.D. – March 30, 2004 ..............................................00277

15. Report by Ralph Newman, M.D. et al. – February 19, 2004 ...................................00294

16. Letter from Jonathan E. Walker, M.D. to Jim Evans, Ph.D.
    January 14, 2004 ....................................................................................................00313

17. Report by James Evans, Ph. D. – January 8, 2004................................................00315

**VOLUME II**

Witness Declarations

18. Declaration of Linda Adkins – January 27, 2017 ...................................................00321

19. Declaration of Laura Cooper – September 15, 2016 ................................................00323

20. Declaration of Sharon Dotson – June 18, 2008 .........................................................00326

21. Declaration of Nathan Faulks – June 4, 2008 ............................................................00329

22. Declaration of Mike Kaasee – September 14, 2010 ...................................................00332

23. Declaration of Christina Kirkman – January 27, 2017 ..............................................00334

24. Declaration of Joy Krug – November 15, 2016 .........................................................00336

25. Declaration of Lewis Lambert, Jr. – September 14, 2010 .........................................00356

26. Declaration of Lewis Lambert, Sr. – September 14, 2010 .........................................00358

27. Declaration of Marilyn Lauver – November 14, 2016 ..............................................00360

28. Declaration of Kelly Perry – January 27, 2017 .........................................................00362

29. Declaration of Russell Spears – May 22, 2018 .........................................................00364

Transcripts and Testimony

30. *United States v. Fulks*, 4:02-cr-992 (D.S.C.) Jury Trial Transcript Volume XVI – Testimony of Linda Adkins – June 22, 2004 ........................................................00366

31. *United States v. Fulks*, 4:02-cr-992 (D.S.C.) Jury Trial Transcript Volume XVIII – Testimony of Arlene Andrews – June 24, 2004 ......................................................00380

32. *United States v. Fulks*, 4:02-cr-992 (D.S.C.) Jury Trial Transcript Volume XVIII – Testimony of David Bachman – June 24, 2004 .......................................................00482

**VOLUME III**

33. *United States v. Fulks*, 4:02-cr-992 (D.S.C.) Jury Trial Transcript Volume XVIII – Testimony of Fred Bookstein – June 24, 2004 ........................................................00568

34. *United States v. Fulks*, 4:02-cr-992 (D.S.C.) Jury Trial Transcript Volume XX – Testimony of Christos Davatzikos – June 28, 2004 ................................................00606

35. *United States v. Fulks*, 4:02-cr-992 (D.S.C.) Jury Trial Transcript Volume XVII – Testimony of James Evans – June 23, 2004 ...........................................................00627

36. *United States v. Fulks*, 4:02-cr-992 (D.S.C.) Jury Trial Transcript Volume XVII – Testimony of Martha Floyd – June 23, 2004 ..........................................................00694

37. *United States v. Fulks*, 4:02-cr-992 (D.S.C.) Jury Trial Transcript Volume IV – Testimony of Dewayne Fulks – June 4, 2004...........................................................00706

38. *United States v. Fulks*, 4:02-cr-992 (D.S.C.) Jury Trial Transcript Volume XVI – Testimony of Mark Fulks – June 22, 2004 ..............................................................00762

39. *United States v. Fulks*, 4:02-cr-992 (D.S.C.) Jury Trial Transcript Volume VII – Testimony of Ronnie Fulks – June 9, 2004 ...........................................................00785

**VOLUME IV**

40. *United States v. Fulks*, 4:02-cr-992 (D.S.C.) Jury Trial Transcript Volume VIII – Testimony of Ronnie Fulks – June 10, 2004 ...........................................................00810

41. *United States v. Fulks*, 4:02-cr-992 (D.S.C.) Jury Trial Transcript Volume XII – Testimony of Ruben Gur – June 16, 2004 .................................................................00825

42. *United States v. Fulks*, 4:02-cr-992 (D.S.C.) Jury Trial Transcript Volume XVII – Testimony of Cindy Harper – June 23, 2004............................................................01002

43. *United States v. Fulks*, 4:02-cr-992 (D.S.C.) Jury Trial Transcript Volume XVII – Testimony of Sue Hatcher – June 23, 2004 ..............................................................01006

44. *United States v. Fulks*, 4:02-cr-992 (D.S.C.) Jury Trial Transcript Volume XVI – Testimony of Kevin Holbrook – June 22, 2004.......................................................01022

45. *United States v. Fulks*, 4:02-cr-992 (D.S.C.) Jury Trial Transcript Volume XVI – Testimony of Brian Messenger – June 22, 2004.......................................................01042

46. *United States v. Fulks*, 4:02-cr-992 (D.S.C.) Jury Trial Transcript Volume XVII – Testimony of Gayle Wolfe – June 23, 2004 ...........................................................01055

Records

47. The Gallaher School Results of Selective Screening for Chadrick Fulks – November 25, 1986........................................................................................................................01064

48. The Gallaher School Referral for Multidisciplinary Assessment for Chadrick Fulks – January 6, 1987 .......................................................................................................01065

49. Academic Evaluation Report by Peggy Blatt for Chadrick Fulks February 24, 1987 .....................................................................................................01066

50. Psychological Evaluation Report by Rodney Pardue for Chadrick Fulks

March 4, 1987 ................................................................................................01073

51. Instructional Recommendation Plan/Individualized Education Program for Chadrick Fulks – May 12, 1987 ................................................................................01077

52. Peyton Elementary Review for Chadrick Fulks – March 1, 1989 ............................01078

53. Instructional Recommendation Plan/Individualized Education Program for Chadrick Fulks – May 15, 1989 ................................................................................01079

Additional Witness Declarations

54. Declaration of Dicie Fulks – July 17, 2008 ................................................................01082

55. Declaration of Gayle Wolfe – September 15, 2016 ....................................................01084

THE COURT: PLEASE BRING IN THE JURY.

ALL RIGHT. YOU MAY CROSS-EXAMINE, MS. JOHNSON.

MS. JOHNSON: THANK YOU.

CROSS EXAM

BY MS. JOHNSON:

Q. HELLO, MR. FULKS.

A. HELLO.

Q. MR. GASSER ASKED YOU YESTERDAY ABOUT A NUMBER OF THINGS THAT YOU SAID YOU DID NOT RECALL.

A. CORRECT.

Q. AND YOU DIDN'T DENY THAT YOU HAD SAID ANY OF THOSE THINGS, YOU JUST DIDN'T REMEMBER. DO YOU HAVE A LOT OF TROUBLE REMEMBERING THINGS?

A. YEAH.

Q. DO YOU HAVE A GED, OR DID YOU GRADUATE FROM HIGH SCHOOL?

A. NO, I WAS KICKED OUT.

Q. AND DO YOU HAVE A DRIVER'S LICENSE?

A. NO.

Q. IS THERE ANYTHING ELSE YOU KNOW OF THAT MIGHT CONTRIBUTE TO YOUR POOR MEMORY?

A. DO A LOT OF DRUGS.

Q. YOU DO A LOT OF DRUGS?

A. YES.

Q. AND, ACTUALLY, WHEN I HAVE ASKED YOU SOME THINGS ABOUT

YOUR FAMILY, YOU DON'T REMEMBER ALL OF THOSE THINGS EITHER?

A.     NO.

Q.     THIS MORNING, A STUDENT OF MINE BOUGHT YOU BREAKFAST; IS THAT RIGHT?

A.     YES.

Q.     BUT OTHER THAN THAT,  NO ONE HAS GIVEN YOU ANYTHING --

A.     NO.

Q.     -- WHILE YOU HAVE BEEN HERE.   AND NO ONE HAS SUGGESTED TO YOU THAT YOU SHOULD LIE?

A.     NO.

Q.     EVERYBODY HAS TOLD YOU THAT YOU SHOULD --

A.     TELL THE TRUTH.

Q.     -- TELL WHAT YOU REMEMBER.   SO,  I AM GOING TO ASK YOU ABOUT GROWING UP.

YOU ARE CHAD'S BROTHER?

A.     YES.

Q.     YOU ARE BETWEEN DEWAYNE AND CHAD; IS THAT RIGHT?

A.     YES.

Q.     AND HOW OLD ARE YOU NOW?

A.     THIRTY.

Q.     AND WOULD YOU SAY THAT YOU HAD AN EASY CHILDHOOD?

A.     NO.

Q.     DID YOUR PARENTS DRINK?

A.     YES.

Q.     CAN YOU TALK ABOUT HOW MUCH YOUR MOM DRANK?

A.    EVERY DAY, ALL DAY.

Q.    SO, SOMETIMES YOU WOULD BE AT SCHOOL, AND WHEN YOU WOULD COME HOME FROM SCHOOL, COULD YOU TELL WHETHER SHE HAD ALREADY BEEN DRINKING?

A.    YEAH.

Q.    AND HOW COULD YOU TELL?

A.    I MEAN, THEY DRANK EVERY DAY.

Q.    AND YOUR DAD, SOMETIMES HE WOULD WORK, BUT WHEN HE WOULD COME HOME FROM WORK, THEN WOULD HE ALSO DRINK?

A.    YES.

Q.    AND WHAT WE WE ARE TALKING ABOUT DRINKING, ARE WE TALKING ABOUT --

A.    DRINKING UNTIL THEY GET DRUNK.

Q.    -- UNTIL THEY GET DRUNK? STAGGERING DRUNK?

A.    YES.

Q.    PASSING OUT DRUNK?

A.    YES.

Q.    DID YOUR PARENTS USE, TO YOUR KNOWLEDGE, ANY OTHER DRUGS, OTHER THAN ALCOHOL?

A.    YES.

Q.    AND WHAT WAS THAT?

A.    MARIJUANA.

Q.    MARIJUANA. BOTH OF THEM?

A.    YES.

Q.    DO YOU KNOW HOW THEY GOT MARIJUANA?

A.    I GUESS THEY BOUGHT IT FROM ONE OF THEIR FRIENDS.

Q.    WAS THERE EVER AN OCCASION WHEN YOUR FATHER GREW MARIJUANA?

A.    YES.

Q.    AND WHAT HAPPENED THEN?

A.    MY SISTER THOUGHT SHE HEARD SOMEBODY IN THE BASEMENT AND CALLED THE COPS.   WHEN THEY SHOWED UP, THEY WENT IN THE BASEMENT AND SHINED THEIR LIGHTS DOWN THERE.   AND WHEN MY FATHER CAME HOME, I TOLD HIM SHE CALLED THE COPS, AND HE WENT DOWN THERE AND THREW ALL THE PLANTS AWAY.

Q.    DID THE POLICE EVER COME AND ARREST YOUR FATHER FOR THE MARIJUANA?

A.    NO.

Q.    BUT HE DIDN'T GROW MARIJUANA AFTER THAT?

A.    NO.

Q.    HE CONTINUED TO USE MARIJUANA AFTER THAT?

A.    YES.

Q.    DID YOUR PARENTS FIGHT A LOT?

A.    YES.

Q.    YOU ARE TALKING ABOUT ONCE A MONTH,  ONCE A WEEK, EVERY DAY?

A.    IT SEEMED LIKE EVERY DAY.

Q.    AND WHEN WE -- WHEN YOU SAY "FIGHT," DO YOU MEAN THEY WOULD ARGUE?

A.    YES,  FIGHT,  ARGUING,  YES.

Q.    AND WHAT WOULD THEY DO WHEN THEY PHYSICALLY FIGHT?

A.    PICK UP ANYTHING.  WELL, MY MOM WOULD PICK UP WHATEVER SHE CAN GET HER HANDS ON.

Q.    LIKE, DO YOU REMEMBER, SPECIFICALLY, ANYTHING SHE EVER PICKED UP TO BEGIN WITH?

A.    SHE BUSTED A KETCHUP BOTTLE OVER HIS HEAD ONE TIME. COFFEE POT, ASHTRAYS.

Q.    KIND OF, WHATEVER WAS HANDY?

A.    YES.

Q.    AND YOUR FATHER DIDN'T JUST TAKE IT?

A.    RIGHT.

Q.    HE WOULD GO AFTER HER, TOO?

A.    YES.

Q.    DID YOUR MOM EVER BEAT YOU KIDS?

A.    YEAH.

Q.    AND WHAT WOULD SHE HIT YOU WITH?

A.    IT DEPENDS ON HOW MAD SHE WAS.

Q.    WHEN YOU WOULD SEE HER COMING, WHAT WOULD YOU DO?

A.    RUN.

Q.    YOU WOULD RUN.  AND WHAT WOULD SHE SAY WHEN YOU WERE RUNNING?

A.    TELL ME I HAVE TO COME HOME SOME TIME.

Q.    BUT THEN, WHAT WOULD HAPPEN WHEN YOU DID FINALLY COME HOME?

A.    NOTHING.

Q.    WHY IS THAT?

A.    BECAUSE THEY WAS EITHER OVER BEING DRUNK, OR OVER BEING MAD, OR PASSED OUT.

Q.    AND YOUR FATHER WOULD HIT YOU,  TOO?

A.    NOT AS MUCH.

Q.    NOT AS MUCH AS YOUR MOM?

A.    RIGHT.

Q.    BUT BOTH OF THEM WOULD CUSS YOU OUT?

A.    YES.

Q.    REALLY BAD?

A.    YES.

Q.    WERE YOU AND YOUR BROTHERS EVER IN FIGHTS WITH OTHER PEOPLE IN THE NEIGHBORHOOD?

A.    YES.

Q.    SO, WHAT WOULD HAPPEN WHEN SOMEBODY NEW MOVED INTO THE NEIGHBORHOOD?

A.    THEY WOULD GET BEAT UP.

Q.    BY YOU AND YOUR BROTHERS?

A.    YES.

Q.    WHY WAS THAT?

A.    BECAUSE THEY WAS NEW.

Q.    BECAUSE THEY WERE NEW.   ABOUT HOW OLD WERE YOU WHEN YOU MOVED FROM PINE STREET TO LEEWARD STREET, RIGHT AROUND THE CORNER?

A.    HOW OLD WAS I?

Q.   ABOUT HOW OLD.

A.   SEVEN OR EIGHT, MAYBE.

Q.   SOMETHING LIKE THAT.   AND DO YOU REMEMBER WHAT WAS IN THE BASEMENT IN LEEWARD? YOU SAID THERE WAS MARIJUANA ONE TIME, BUT WHAT WAS REGULARLY THERE?

A.   A POOL TABLE.

Q.   A POOL TABLE WAS THERE.   WOULD OTHER PEOPLE COME TO PLAY THAT POOL TABLE?

A.   YES.

Q.   THEY WOULD PLAY POOL?

A.   YES.

Q.   WHAT ELSE WOULD THEY DO?

A.   PARTY.

Q.   AND HOW OFTEN WOULD OTHER PEOPLE BE THERE PARTYING?

A.   EVERY NIGHT.

Q.   REALLY, EVERY NIGHT?

A.   EVERY NIGHT.

Q.   AND SO, HOW MANY PEOPLE WOULD COME?

A.   I DON'T KNOW.   THERE WOULD PROBABLY BE EIGHT,  NINE PEOPLE THERE EVERY NIGHT,  MAYBE MORE.

Q.   AND IN ADDITION TO PLAYING POOL, WHAT ELSE WOULD THESE PEOPLE DO?

A.   DO DRUGS.

Q.   AND DRINK?

A.   AND DRINK,  YEAH.

Q.    AND WOULD ANY OF THEM EVER FIGHT?

A.    YEAH.    THERE WAS A FIGHT THERE EVERY NIGHT.

Q.    WHO WERE THE FIGHTS BETWEEN?

A.    EVERYBODY THAT WAS THERE DRINKING.

Q.    SO,    SOMETIMES YOUR MOTHER WOULD BE FIGHTING WITH THE OTHER PEOPLE THAT WERE THERE?

A.    YES.

Q.    SOMETIMES YOUR FATHER?

A.    YES.

Q.    SOMETIMES THEY WOULD JUST FIGHT AMONG THEMSELVES?

A.    IF MY MOM GOT INTO IT WITH SOMEBODY,    THEN MY DAD WOULD GET INTO IT, THEN EVERYBODY IS FIGHTING.

Q.    DID ANYONE EVER CALL THE POLICE?

A.    YEAH.

Q.    AND WHAT WOULD HAPPEN WHEN THE POLICE CAME?

A.    THEY WOULD HEAR IT GO OVER THE POLICE SCANNER. EVERYBODY WOULD BREAK UP AND GO HOME, AND COME AND DO IT THE NEXT NIGHT.

Q.    DID YOU EVER GET DRUGS OR ALCOHOL IN YOUR OWN HOME AS A CHILD?

A.    YES.

Q.    HOW WOULD YOU GET THEM?

A.    THEY WAS DOWNSTAIRS PARTYING,    I WOULD BE DOWN THERE WITH THEM,    GO AROUND AND TAKE THE MARIJUANA OUT OF THE ASHTRAYS.

Q. SO, YOU WOULD TAKE THE LITTLE ROACHES, THE LITTLE BUTTS OUT OF THE ASHTRAYS?

A. YEAH.

Q. AND WHAT AGE DO YOU THINK YOU STARTED DOING THAT AT?

A. SIX.

Q. WHY DID YOU DO THAT?

A. EVERYBODY ELSE WAS.

Q. DO YOU KNOW, FOR YOURSELF, WHETHER YOUR BROTHERS DEWAYNE AND CHAD ALSO DRANK AND USED DRUGS?

A. YES.

Q. AND THAT WOULD HAVE BEEN -- YOU DON'T KNOW EXACTLY THE AGE?

A. NO.

Q. THAT WOULD HAVE BEEN YOUNG, TOO?

A. YES.

Q. BECAUSE CHAD IS YOUNGER THAN YOU?

A. YES.

Q. DID YOU EVER USE ANYTHING ELSE TO GET HIGH ON AS A CHILD?

A. GASOLINE, PAINT.

Q. YOU WOULD SNIFF THAT?

A. YES.

Q. HUFF THAT. AND HOW ABOUT YOUR BROTHERS? ARE YOU AWARE WHETHER THEY DID THAT, TOO?

A. NO, I AM NOT REALLY SURE IF THEY DID OR NOT.

Q.    YOU DON'T KNOW WHETHER THEY DID?

A.    PROBABLY DID.

Q.    BUT YOU DON'T KNOW YOURSELF?

A.    RIGHT.

Q.    WERE YOU IN MUCH TROUBLE AS A KID?

A.    A LOT.

Q.    WHAT KIND OF TROUBLE DID YOU GET INTO?

A.    JUST ABOUT EVERYTHING.

Q.    CAN YOU GIVE ME A COUPLE OF EXAMPLES?

A.    BEATING UP PEOPLE AND CUTTING THEM.

Q.    CUTTING THEM?

A.    STEALING.

Q.    STEALING,  BEATING UP PEOPLE.  WHEN YOU SAY "CUTTING THEM," YOU MEAN WITH A KNIFE?

A.    YES.

Q.    DID YOUR DAD EVER ASK YOU TO TAKE THE BLAME FOR ANYTHING CRIMINAL HE DID?

A.    YES.

Q.    AND WOULD YOU TELL THE JURY ABOUT THAT?

A.    OKAY.  HE WENT AND TORE UP SOMEBODY'S CAR,  SMASHED ALL THE WINDOWS IN IT,  CUT THE SEATS UP, JUST TORE THE WHOLE INSIDE OF THE CAR UP.  CAME BACK HOME,  SAID WHAT HE HAD DONE. I TOLD HIM I WOULD TAKE THE BLAME FOR IT AND LEFT THE STATE.

Q.    DID YOU SAY, "LEFT THE STATE?"

A.    YES.

Q. YOU TOOK THE BLAME FOR IT AND THEN LEFT THE STATE?

A. YES.

Q. HOW OLD WERE YOU?

A. STILL A MINOR, PROBABLY 16.

Q. OTHER THAN THE DRUGS, DRINKING, AND FIGHTING, DID YOUR PARENTS DO A GOOD JOB OF KEEPING YOU IN AT NIGHT?

A. WE GOT TO DO ANYTHING WE WANT.

Q. DID THEY HELP YOU WITH YOUR HOMEWORK?

A. NO.

Q. DID THEY GET DOWN ON YOU WHEN YOU WEREN'T DOING SO WELL IN SCHOOL?

A. NO.

Q. DID YOU HAVE A LOT OF TROUBLE IN SCHOOL?

A. KIND OF, YES.

Q. CAN YOU REMEMBER THE FIRST TIME YOU GOT IN TROUBLE IN SCHOOL?

A. YES.

Q. AND WHAT WAS THAT?

A. I WAS IN KINDERGARTEN.

Q. AND WHAT DID YOU DO?

A. BEAT UP A SIXTH GRADER.

Q. AND THEN, YOUR PARENTS WERE CALLED TO THE SCHOOL?

A. YES.

Q. AND AFTER THAT, DID THINGS CHANGE FOR YOU AT SCHOOL?

A. YEAH, EVERYBODY LEFT ME ALONE.

Q. THEY LEFT YOU ALONE. BEFORE THAT, THERE WERE SOME MAKING FUN OF YOU?

A. YES.

Q. BUT AFTER THAT, NOBODY BOTHERED YOU?

A. RIGHT.

Q. MR. FULKS, HOW TALL ARE YOU?

A. FIVE-TWO.

Q. MAYBE YOU COULD GET DOWN FOR THE JURY TO SHOW THEM. TO NOT MISLEAD THEM, LET ME TAKE OFF MY SHOES. MR. FULKS, WAS THERE A TIME, WHEN YOU WERE A CHILD, THAT YOUR MOTHER WAS ASKED WHETHER OR NOT TO GIVE YOU A GROWTH HORMONE?

A. YES.

Q. AND YOU KNOW THAT SHE REFUSED TO LET YOU TAKE ANY GROWTH HORMONE?

A. YES, THEY WEREN'T SURE OF THE SIDE EFFECTS.

Q. THAT IS NOT BECAUSE THAT IS WHAT YOU WANTED?

A. RIGHT.

Q. DO YOU SPEAK TO YOUR MOTHER TODAY?

A. NO.

Q. SOMETIMES, YOUR BROTHERS AND SISTERS HAVE TRIED TO TRICK YOU INTO TALKING TO HER ON THE PHONE?

A. YES.

Q. BUT YOU DON'T TALK TO HER?

A. NO.

Q. CAN YOU TELL THE JURY WHY YOU ARE MAD AT HER?

A.    OH, WHEN I WAS LOCKED UP IN OHIO, SHE SAID I CAN GET PAROLED TO HER HOUSE.   THEN, WHEN IT CAME TIME FOR ME TO GET OUT AND COME TO HER HOUSE, SHE SAID, NO, I COULDN'T GET PAROLED THERE.   SO THEY KEPT ME IN THERE.

Q.    ABOUT HOW MUCH LONGER DID YOU HAVE TO STAY IN THERE?

A.    FOURTEEN MONTHS.

Q.    WHAT IS YOUR WORST MEMORY OF YOUR CHILDHOOD?

A.    I BLOCKED A LOT OF THAT OUT.

Q.    SO, YOU DON'T REMEMBER A SPECIFIC THING?

A.    RIGHT.

Q.    HOW ABOUT YOUR BEST MEMORY,  DO YOU REMEMBER ANYTHING POSITIVE?

A.    LEAVING THE HOME.

Q.    WHAT AGE DID YOU LEAVE HOME AT?

A.    FOURTEEN.

Q.    YOU HAVE ONLY BEEN TO PRISON ONE TIME; IS THAT RIGHT?

A.    YES.

Q.    AS A JUVENILE, YOU WENT OTHER TIMES?

A.    I WAS NEVER LOCKED UP AS A JUVENILE.

Q.    ONLY ONE TIME IN PRISON?

A.    YES.

Q.    THAT WAS FOR WHAT?

A.    AGGRAVATED ASSAULT AND BURGLARY.

Q.    BUT YOU HAVE BEEN IN A NUMBER OF OTHER FIGHTS?

A.    YES.

Q.   WHAT WAS THE MOST RECENT ONE?

A.   EXCUSE ME?

Q.   HOW LONG AGO WAS THE MOST RECENT TIME YOU WERE IN A FIGHT, BIG FIGHT WITH SOMEBODY?

A.   I AM NOT REALLY SURE.

Q.   IT WASN'T MORE THAN A YEAR AGO?

A.   NO.

Q.   TODAY, DO YOU USE ANY DRUGS?

A.   YES.

Q.   AND WHAT DRUGS DO YOU USE TODAY?

A.   MARIJUANA.

Q.   ANY OTHER DRUGS?

A.   I HAVE DONE METH.

Q.   METH, THAT IS THE SAME AS CRANK?

A.   YES.

Q.   HOW ABOUT CRACK?

A.   NO.

Q.   NOT CRACK?

A.   I HAVE SMOKED IT, BUT, NO.

Q.   YOU DON'T LIKE IT LIKE YOU LIKE MARIJUANA AND CRANK?

A.   YES.

MS. JOHNSON: THANK YOU, MR. FULKS.

THE COURT:   REDIRECT.

MR. GASSER: VERY BRIEFLY, YOUR HONOR.

REDIRECT EXAM

BY MR. GASSER:

Q. MR. FULKS, HOW IS IT THAT YOU CAN REMEMBER BEING IN KINDERGARTEN AND BEATING UP A SIXTH GRADER, AND THE GROWTH HORMONE ISSUE YOU DESCRIBED, YOU REMEMBER ALL OF THESE NIGHTS OF PEOPLE DRINKING AND FIGHTING AT YOUR HOUSE, BUT YOU CAN'T REMEMBER WHAT YOU TOLD THE FBI?

A. BECAUSE WHAT I DO REMEMBER WENT OVER YEARS.

Q. SO, YOU CAN'T REMEMBER WHAT YOU TOLD THE FBI A YEAR AND A HALF AGO, BUT YOU CAN REMEMBER SOMETHING THAT HAPPENED 23 YEARS AGO?

A. I MEAN -- I DON'T KNOW.

Q. AND YOU HAVE BEEN TO PRISON ONE TIME?

A. YES.

Q. AND YOUR BROTHER CHAD GREW UP IN THE SAME, EXACT ENVIRONMENT AND THE SAME, EXACT HOUSEHOLD THAT YOU GREW UP IN?

A. YES, SIR.

MR. GASSER: THAT IS ALL I HAVE, YOUR HONOR.

THE COURT: THANK YOU. YOU MAY STEP DOWN. PLEASE CALL YOUR NEXT WITNESS.

MR. GASSER: THE GOVERNMENT WOULD CALL DAVION NOLTE.

DAVION NOLTE, HAVING BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

DIRECT EXAM

BY MR. GASSER:

Q. GOOD AFTERNOON, MR. NOLTE.

DIRECT EXAM OF RUBEN GUR

RUBEN GUR, HAVING BEEN FIRST DULY SWORN,

TESTIFIED AS FOLLOWS:

DIRECT EXAM

BY MR. BLUME:

Q.    DR. GUR, WHERE ARE YOU CURRENTLY EMPLOYED?

A.    UNIVERSITY OF PENNSYLVANIA IN PHILADELPHIA.

Q.    AND WHAT DO YOU DO AT THE UNIVERSITY OF PENNSYLVANIA?

A.    I AM A PROFESSOR IN THE MEDICAL SCHOOL, PRIMARY APPOINTMENT IN THE DEPARTMENT OF PSYCHIATRY AND SECONDARY APPOINTMENT IN THE DEPARTMENTS OF NEUROLOGY AND RADIOLOGY.

Q.    AND DO YOU ALSO WORK AT THE BRAIN BEHAVIOR LABORATORY AT THE UNIVERSITY OF PENNSYLVANIA?

A.    YES.  I DIRECT THE BRAIN BEHAVIOR LABORATORY.

Q.    WHAT IS THE BRAIN BEHAVIOR LABORATORY?

A.    IT IS A LABORATORY THAT HAS BEEN WORKING FOR THE PAST OVER 20 YEARS IN THE AREA OF USING IMAGING IN ORDER TO UNDERSTAND THE WAY THE BRAIN REGULATES BEHAVIOR.  SO,  WE HAVE BEEN INVOLVED IN RESEARCH, BASIC AND CLINICAL RESEARCH, LOOKING AT HOW NORMAL BRAIN FUNCTIONS AND HOW BRAIN DAMAGE CAN INFLUENCE WHAT WE CAN DO, AND HOW WE THINK, AND HOW WE FEEL.

Q.    AND SO, YOU SAID YOU HAVE -- YOUR PRIMARY APPOINTMENT IS IN PSYCHIATRY, BUT YOU ARE ALSO APPOINTED IN NEUROLOGY AND APPOINTMENT IN NEUROLOGY RADIOLOGY?

A.    YES.

Q.    WHAT ARE THE DIFFERENCES BETWEEN PSYCHIATRY,

**DIRECT EXAM OF RUBEN GUR**

**RADIOLOGY, AND NEUROLOGY?**

A.    PSYCHIATRY IS THE DISCIPLINE THAT CONCERNS ITSELF WITH DISORDERS OF COMPLEX BEHAVIORS.  SO, VARIOUS DISORDERS INVOLVE DISRUPTION OF BEHAVIOR THAT IS MORE COMPLEX THAN SIMPLE REFLEXES.

NEUROLOGY FOCUSES MORE ON HARD-WIRED BEHAVIOR, ALTHOUGH THERE IS A BRANCH OF NEUROLOGY THAT LOOKS AT MORE COMPLEX BEHAVIOR, AS WELL.  IN THAT SENSE, THERE IS SOME OVERLAP. TRADITIONALLY, TRADITIONALLY, PSYCHIATRY HAD A BIG PART OF IT DEVOTED TO UNKNOWN BEHAVIORS WITHOUT REALLY ASSUMING OR UNDERSTANDING THAT THERE IS A NEURAL BASIS TO THOSE ABNORMALITIES.  MORE AND MORE, THE FIELD HAS BECOME HEAVILY BIOLOGICAL BECAUSE OF THE ADVANCES IN BASIC NEUROSCIENCE. AND, SO, INCREASINGLY, WE LEARN HOW BRAIN ABNORMALITIES REALLY ARE AT THE HEART OF THE MOST SEVERE FORMS OF SO-CALLED MENTAL ILLNESSES.

AND RADIOLOGY IS THE DISCIPLINE THAT CAN USE TOOLS IN ORDER TO STUDY THE BRAIN AND REALLY DOCUMENT THE ANATOMY OF THE BRAIN, AND MORE RECENTLY THE PHYSIOLOGY OF THE BRAIN.

**Q.    YOU TEACH IN ALL THREE AREAS?**

A.    YES.

**Q.    AND SO, I ASSUME THAT, SINCE YOU ARE A PROFESSOR AT THE MEDICAL SCHOOL, MOST OF YOUR TEACHING IS OF MEDICAL STUDENTS?**

A.    WELL, I TEACH ALSO AT THE COLLEGE, AT THE UNDERGRADUATES, USUALLY BE A SEMINAR.  I TEACH MEDICAL

DIRECT EXAM OF RUBEN GUR

STUDENTS, REGULAR STUDENTS. WE HAVE A FEDERALLY-FUNDED TRAINING GRANT TO TEACH POSTDOCTORATE FELLOWS. SO, AFTER YOU GET YOUR M. D. OR YOUR PH.D., IF YOU WANT TO HAVE A CAREER IN RESEARCH, YOU NEED TO SPEND ANOTHER COUPLE OF YEARS LEARNING A SPECIFIC AREA. AND OUR SPECIFIC AREA IS ON THE USE OF IMAGING IN RESEARCH AND CLINICAL PRACTICE.

**Q. BY IMAGING, YOU MEAN CAT SCANS, MRI SCANS, AND BRAIN SCANS?**

A. YES.

**Q. AND, BRIEFLY, AND I KNOW YOU WILL TALK ABOUT THIS BECAUSE THIS IS WHAT YOU ARE AN EXPERT IN, WHAT IS COGNITIVE NEUROSCIENCE?**

A. COGNITIVE NEUROSCIENCE IS A FIELD THAT HAS REALLY MATURED OVER THE PAST DECADE TAKING ADVANTAGE OF ADVANCES IN METHODS FOR STUDYING THE BRAIN AND, IN PARTICULAR, LOOKING AT THE BRAIN CHANGES THAT OCCUR WITH COMPLEX BEHAVIOR. AND SO, WE CAN NOW MAKE DIRECT LINKS BETWEEN CONCEPTS OF COGNITION, THE WAY PEOPLE THINK AND FEEL, AND SPECIFIC SYSTEMS IN THE BRAIN. AND THAT FIELD IS NOW RECOGNIZED AS COGNITIVE NEUROSCIENCE.

**Q. SO, COGNITION IS, BASICALLY, IN LAYPERSON'S TERMS OR TO DUMB IT DOWN A LITTLE BIT FOR ME, IS THE WAY PEOPLE THINK?**

A. EXACTLY. AND I WOULD INCLUDE FEELING, MORE COMPLEX FEELING AS PART OF COGNITION, ALTHOUGH THERE IS NOW PEOPLE WHO SAY THERE SHOULD BE MORE SO AFFECTIVE NEUROSCIENCE,

DIRECT EXAM OF RUBEN GUR

NEUROSCIENCE OF EMOTION.  BUT MOST PEOPLE, WHEN THEY TALK ABOUT COGNITIVE NEUROSCIENCE, ALSO MEAN TO COVER THE AREA OF EMOTION PROCESSES.

Q.    CAN YOU BRIEFLY RELAY YOUR EDUCATIONAL BACKGROUND TO THE JURY,  PLEASE?

A.    WELL,  I GOT MY BACHELOR DEGREE IN PSYCHOLOGY AND PHILOSOPHY FROM THE HEBREW UNIVERSITY IN JERUSALEM IN ISRAEL IN 1970.  I GOT MY MASTER DEGREE IN CLINICAL PSYCHOLOGY AT MICHIGAN STATE UNIVERSITY IN 1971.  MY PH.D. IN CLINICAL PSYCHOLOGY SAME PLACE,  1973.  I DID POSTDOCTORATE TRAINING AT STANFORD UNIVERSITY.  AND ANOTHER ONE AT THE UNIVERSITY OF PENNSYLVANIA.  AND THEN I, IN ADDITION, DID AN INTERNSHIP IN CLINICAL PSYCHOLOGY, INCLUDING EXPERIENCE WORKING IN PRISON PSYCHIATRIC UNIT IN THE STATE PRISON OF SOUTHERN MICHIGAN IN JACKSON,  MICHIGAN.

Q.    AND CAN YOU ALSO TELL THE JURY A LITTLE BIT ABOUT, SINCE COMPLETING YOUR FORMAL EDUCATION,  POSTDOCTORAL TRAINING, WHAT YOU HAVE BEEN DOING?

A.    SINCE COMPLETING MY TRAINING,  I HAVE BEEN ENGAGED IN THE THREE PRONGS OF ACTIVITY THAT ACADEMIC MEDICINE IS FOSTERING, WHICH IS RESEARCH; CLINICAL WORK; AND, TEACHING. THE RESEARCH AT THE UNIVERSITY OF PENNSYLVANIA WAS ONE OF THE PLACES WHERE THIS WHOLE IMAGING RESEARCH HAS STARTED.  AND SO, PENN HAS ALWAYS BEEN MAKING AN EFFORT TO STAY AT THE FOREFRONT.  AND, AS SOMEONE WHO IS TRAINED IN PSYCHOLOGY,

DIRECT EXAM OF RUBEN GUR

INTERESTED IN BEHAVIOR, I BECAME PART OF A MULTIDISCIPLINARY TEAM THAT PUT TOGETHER THE INSTRUMENTATION AND THE METHODOLOGY IN ORDER TO USE IMAGING TO BETTER UNDERSTAND CONNECTIONS BETWEEN BRAIN INTEGRITY AND BEHAVIOR.  SO, MY RESEARCH IN THE CLINICAL WORK HAVE REALLY COMPLIMENTED EACH OTHER.

IN RESEARCH, WE STUDY HEALTH IN PEOPLE AS WELL AS PATIENTS WITH DIFFERENT FORMS OF BRAIN DYSFUNCTION, EITHER SO-CALLED NEUROLOGICAL OR SO-CALLED PSYCHIATRIC.  AND A LOT OF THE EFFORT, INITIALLY, WAS TO CHARACTERIZE THE BRAIN DISORDERS. FIND OUT HOW DOES A STROKE LOOK WHEN YOU DO AN IMAGING OF THE BRAIN.  HOW DOES ALZHEIMER'S DISEASE LOOK.  HOW DOES PARKINSON'S, SCHIZOPHRENIA, BIPOLAR DISORDERS.  AND BY STUDYING A LOT OF HEALTHY PEOPLE, WE WERE ABLE TO DOCUMENT THE SPECIFIC ABNORMALITIES THAT YOU CAN SEE WHEN YOU LOOK AT BRAIN IMAGES.  AND RELATE THOSE ABNORMALITIES TO THE ABNORMALITIES IN COMPLEX BEHAVIOR THAT YOU SEE IN THOSE PATIENTS.  AND, OF COURSE,  EVERYTHING WE LEARNED, WE TRY TO TEACH TO THE STUDENTS.  AND SO, THE BIG,  IMPORTANT PART OF MY ACTIVITY HAS BEEN TEACHING AT THE VARIOUS LEVELS.

**Q.    AND DO YOU PUBLISH ARTICLES?**

A.    WELL,  YES.  THEY SAY PUBLISH OR PERISH IS THE COMMAND IN ACADEMIA. AT PENN IS PUBLISH OR YOU NEVER EXISTED.  YOU REALLY HAVE TO PUBLISH AND PUBLISH OF ONE KIND, WHICH IS THE REFEREED PUBLICATIONS.  SO,  WE ONLY COUNT PAPERS THAT WERE REFEREED BY COLLEAGUES.

DIRECT EXAM OF RUBEN GUR

Q.    BY THAT, YOU JUST MEAN THAT, BEFORE SOMETHING IS PUBLISHED, IT HAS TO BE REVIEWED BY YOUR PEERS OR BY OTHER PEOPLE IN THE FIELD, AND DETERMINED TO BE SCIENTIFICALLY CORRECT?

A.    EXACTLY.   EVERY PAPER HAS TO GO THROUGH A REVIEW PROCESS WHERE OPINIONS ARE SOLICITED FROM PEERS AND THAT IT GOES TO AN EDITORIAL BOARD THAT MAKES DECISIONS.   AND THE PAPER HAS TO BE TECHNICALLY FLAWLESS,  BUT, IN ADDITION, ADD SUBSTANTIALLY TO THE LITERATURE BEFORE IT CAN BE PUBLISHED.

Q.    AND, APPROXIMATELY, HOW MANY SEPARATE ARTICLES AND STUDIES HAVE YOU PUBLISHED DURING YOUR CAREER?

A.    AT THIS POINT, I THINK I JUST PASSED THE 200.

Q.    AND ARE YOU BOARD-CERTIFIED IN ANY PARTICULAR AREAS?

A.    YES,  I AM BOARD-CERTIFIED IN CLINICAL NEUROPSYCHOLOGY BY THE AMERICAN BOARD OF PROFESSIONAL PSYCHOLOGY.

Q.    AND DO YOU CURRENTLY DO RESEARCH FOR VARIOUS BRANCHES OF THE FEDERAL GOVERNMENT?

A.    YES.   THIS RESEARCH THAT WE ARE DOING IS ACTUALLY QUITE EXPENSIVE.   YOU CAN'T CONTEMPLATE A SERIOUS STUDY WITHOUT AT LEAST 3, $400,000 FOR THE PROJECT.   AND, SO, THE WAY WE OBTAIN FUNDING IS WE HAVE TO DESCRIBE THE IDEA FOR THE STUDY IN DETAIL,  SHOW EVIDENCE THAT WE CAN CARRY OUT THE STUDY,  CONDUCT PRELIMINARY WORK TO SHOW THAT THE STUDY CAN PRODUCE MEANINGFUL RESULTS,  AND THEN WE SEND IT TO WASHINGTON.  AND THERE ARE STUDY SECTIONS THAT CONSIST OF

DIRECT EXAM OF RUBEN GUR

EXPERTS AROUND THE COUNTRY, AND THEY MEET THREE TIMES A YEAR IN WASHINGTON AND REVIEW GRANTS WITHIN THEIR AREAS.  SO, EACH ONE OF THOSE PROPOSALS WILL GO TO THE COMMITTEE OF ABOUT 25 PEERS, WHO WILL REVIEW THE IDEAS AND DECIDE WHETHER THE PROJECT IS WORTH FUNDING AND WHAT PRIORITY LEVEL.

SO, WITHIN THAT, WE HAVE SEVERAL INDIVIDUAL PROJECTS THAT ARE CALLED R-1'S,  THESE ARE, IN SOME WAYS, THE MOST COVETED GRANTS BECAUSE YOU GET, SAY, FIVE YEARS TO PURSUE A CERTAIN HYPOTHESIS OR SPECIFIC DIRECTION IN YOUR RESEARCH.

ANOTHER MECHANISM IS THE CENTER GRANTS.  AND WE HAVE JOINTLY APPLIED WITH DIFFERENT COLLEAGUES FROM DIFFERENT DEPARTMENTS AND CREATED A CENTER FOR BASIC NEUROSCIENCE AT THE UNIVERSITY WHERE PEOPLE COLLABORATED, ALL LEVELS, ALL THE WAY FROM THE VERY BASIC MOLECULAR STUDIES UP TO MORE COMPLEX STUDIES OF COMPLEX BEHAVIOR AND IMAGING.

SO, JUST TO GIVE YOU AN IDEA, AN R-1, AN AVERAGE R-1  THAT I HAVE, WILL HAVE ABOUT $300,000 A YEAR FOR 3 TO 4 TO 5 YEARS. OUR CENTER IS 1.5 MILLION DOLLARS A YEAR FOR FIVE YEARS.  AND WE HAVE HAD THE CENTER SINCE 1987.  EVERY FIVE YEARS, YOU HAVE TO COME UP FOR COMPETING RENEWAL, AND THE CENTER IS SCRUTINIZED.  IN EFFECT, THEY HAVE ASSIGNED VISITS OF THE EXPERTS COMING TO US AND LOOKING OVER OUR SHOULDERS AND MAKING SURE THAT EVERYTHING IS DONE,  IS DONE RIGHT.  AND THEN, IT IS A LITTLE TOUGH BECAUSE, BASICALLY, YOU ARE ASKING FOR THE MONEY FROM YOUR COMPETITION.  ALL OF THOSE COLLEAGUES,

DIRECT EXAM OF RUBEN GUR

THEMSELVES, APPLY FOR GRANTS, AND THEY LITERALLY SEE THE MONEY

AS COMING FROM THEIR OWN POCKET,  BOTH AS TAXPAYER AND AS

PEOPLE TRYING TO COMPETE FOR THE SAME AMOUNT OF MONEY.  SO,

THERE IS QUITE A BIT OF SCRUTINY OF OUR WORK FROM ALL STAGES,

FROM THE PLANNING, TO THE EXECUTION, TO FINALLY WHEN WE SUBMIT

IT FOR PUBLICATION.

**Q.    DR. GUR, IN THE COURSE OF YOUR CAREER,  HAVE YOU**
**RECEIVED ANY AWARDS FOR YOUR WORK IN THE FIELD OF**
**NEUROSCIENCE?**

A.    YES,  I HAVE RECEIVED SEVERAL AWARDS.  THE ONE THAT I
CONSIDERED MOST HIGHLY IS AN AWARD FROM THE FAMILIES OF PEOPLE
WHO SUFFER FROM SEVERE MENTAL ILLNESS.  AND THEY GAVE ME THE
LOGAN AWARD FOR EXCELLENCE IN RESEARCH IN COMPLEX BEHAVIOR.

**Q.    AND ARE YOU A MEMBER OF ANY PROFESSIONAL ASSOCIATIONS?**

A.    YES,  I AM A MEMBER, FELLOW STATUS, IN THE AMERICAN
PSYCHOLOGICAL ASSOCIATION,  AMERICAN PSYCHOLOGICAL SOCIETY,
WHICH IS MORE PSYCHOLOGY SORT OF INTERESTED IN BASIC SCIENCE.
THE AMERICAN COLLEGE OF NEUROPSYCHOPHARMACOLOGY, THE AMERICAN
ASSOCIATION FOR THE ADVANCEMENT OF SCIENCE, AND INTERNATIONAL
NEUROPSYCHOLOGICAL SOCIETY.  SEVERAL OTHERS, BUT THESE ARE
THE MOST IMPORTANT ONES.

**Q.    AND, DR. GUR, HAVE YOU EVER BEEN QUALIFIED AS AN EXPERT**
**WITNESS BEFORE?**

A.    YES,  I WAS.

**Q.    AND HAVE YOU EVER BEEN RETAINED BY THE PROSECUTION OR**

**DIRECT EXAM OF RUBEN GUR**

**THE UNITED STATES GOVERNMENT IN A CRIMINAL CASE?**

A.    YES,  I WAS.

**Q.    AND YOU HAVE ALSO BEEN RETAINED, ON OCCASION, BY ATTORNEYS FOR DEFENSE COUNSEL?**

A.    THIS IS NOT --  I HAVEN'T DONE A LOT OF IT.   MY DAY JOB KEEPS ME PRETTY BUSY.   BUT AS PART OF MY APPOINTMENT, I AM ALLOWED ONE DAY SEVEN RULE, WHERE I CAN DO CONSULTATIONS ON VARIOUS ISSUES, INCLUDING MEDICAL LEGAL CONSULTATIONS.

**Q.    SO,  THAT JUST GOES PRIMARILY, YOU ARE AN ACADEMIC AND RESEARCHER.   BUT, ON OCCASION, YOU DO SOME CONSULTATION WORK?**

A.    THAT IS CORRECT.

MR. BLUME:  YOUR HONOR,  AT THIS TIME, I WOULD MOVE TO QUALIFY DR. GUR AS AN EXPERT IN COGNITIVE NEUROSCIENCE.

THE COURT:   ANY VOIR DIRE BY THE GOVERNMENT?

MR. GASSER:  NO, SIR.

THE COURT:   ALL RIGHT.  YOU MAY PROCEED.

BY MR. BLUME:

**Q.    DR. GUR,  AT MY REQUEST, DID YOU REVIEW CERTAIN MATERIALS AND CONDUCT CERTAIN TESTING IN THE CASE OF UNITED STATES OF AMERICA VERSUS CHADRICK FULKS?**

A.    YES,  I DID.

**Q.    CAN, YOU BRIEFLY, TELL THE JURY WHAT MATERIALS YOU REVIEWED?**

A.    FIRST, I REVIEWED PREVIOUS TESTING THAT WAS DONE ON MR. FULKS BY DR. EVANS AND DR. VENN.   I, THEN, APPLIED SOME

DIRECT EXAM OF RUBEN GUR

METHODS THAT WERE DEVELOPED FOR INTERPRETING THE TESTS.  THEN I REVIEWED -- THEN I TESTED MR. FULKS MYSELF IN ORDER TO PURSUE AREAS THAT SHOWED POTENTIAL DYSFUNCTION AND CHARACTERIZE BETTER THE NATURE OF THE DEFICIT.  I REVIEWED ALL OF THE IMAGING STUDIES THAT WERE DONE ON MR. FULKS.  THERE WERE TWO SETS OF MRI SCANS, AND TOGETHER WITH MY COLLEAGUE, DR. CHRISTOS DAVITZKOS, APPLIED QUANTITATIVE METHODS TO ANALYZE THE IMAGING DATA.  I ALSO REVIEWED THE CAT SCANS AND APPLIED STANDARD METHODS TO EXAMINE THE CAT SCANS QUANTITATIVELY.  I ANALYZED THOSE DATA AND REACHED SOME CONCLUSIONS ABOUT THE STATE OF MR. FULKS'S BRAIN AND HOW IT RELATES TO HIS BEHAVIOR.

**Q.    DR. GUR, WE ARE GOING TO GO THROUGH ALL OF THIS IN SOME DETAIL.   AND WE WILL TALK ABOUT WHAT THE DIFFERENT TESTS ARE AND THAT KIND OF THING.   BUT JUST AT THE BEGINNING, BEFORE WE SORT OF MARCH THROUGH THIS IN DETAIL,   COULD YOU GIVE THE JURY AN OVERALL SUMMARY OF YOUR CONCLUSIONS IN THIS CASE?**

A.   OVERALL,  I FOUND CONSIDERABLE CONSISTENCY AMONG THE NEUROPSYCHOLOGICAL TEST RESULTS, THE IMAGING STUDIES OF BRAIN STRUCTURE OR ANATOMY, AND IMAGING STUDIES OF BRAIN FUNCTION OR PHYSIOLOGY THAT INDICATE THAT MR. FULKS HAS A HIGHLY ABNORMAL BRAIN.  AND THE ABNORMALITY IN THE BRAIN STRUCTURE AND FUNCTION EXPLAIN A LOT OF THE BEHAVIORS, AND THE COGNITIVE, AND EMOTIONAL DEFICITS THAT HAVE BEEN DOCUMENTED IN HIS CASE.

**Q.    YOU SAID HE HAS A HIGHLY ABNORMAL BRAIN.   IS IT**

**DIRECT EXAM OF RUBEN GUR**

**ABNORMAL STRUCTURALLY,  METABOLICALLY,  BEHAVIORALLY,  ALL?**

A.   ALL OF THE ABOVE IS THE CORRECT ANSWER, IF THIS WERE A MULTIPLE CHOICE.

**Q.   WELL,  DR. GUR,  WHAT I WANT TO DO NOW IS, SO WE CAN SORT OF GET THE JURY ORIENTED, IF WE COULD TALK A LITTLE BIT ABOUT THE STRUCTURE OF THE BRAIN AND HOW THE BRAIN WORKS AND DEVELOPS, I THINK IT WOULD POTENTIALLY HELP THE JURORS UNDERSTAND YOUR TESTIMONY.**

**DID YOU BRING  -- DID YOU PREPARE, FOR DEMONSTRATIVE PURPOSES FOR THE JURY TO SEE, A SERIES OF SLIDES AND PICTURES ABOUT THE BRAIN?**

A.   YES.   AND I HOPE I WILL BE ABLE TO SHOW THAT BECAUSE I THINK THAT WILL HELP CLARIFY A LOT OF WHAT I WILL BE SAYING. I DID PREPARE A SHORT PRESENTATION THAT EXPLAINS HOW THE DIFFERENT PARTS OF MY EVALUATION ARE CONDUCTED AND WHAT THEY MEAN.

MR. GASSER:  I HAVE NO OBJECTION TO WHAT HE PLANS ON DOING WITH GENERALITIES.

THE COURT:  OFFERING THIS AS AN EXHIBIT?

MR. BLUME:  THERE ARE SEVERAL I WILL OFFER AS EXHIBITS.  MOST OF THESE ARE FOR DEMONSTRATIVE USES ALONG THE WAY.

THE COURT:  MAKE IT CLEAR WHAT IS DEMONSTRATIVE.

MR. BLUME:  IT WILL BE CLEAR WHEN I TRY TO OFFER THE ONES.

App. 00835

DIRECT EXAM OF RUBEN GUR

BY MR. BLUME:

Q.    MR. GUR, CAN YOU SEE WHAT IS ON THE SCREEN?  IT SHOULD BE IN FRONT OF YOU.

A.    I CAN SEE WHAT IS ON THE SCREEN.

Q.    DR. GUR,  LET'S TALK A LITTLE BIT ABOUT THE BRAIN, AND THE BRAIN STRUCTURE, AND HOW IT DEVELOPS.  AND I THINK, BY NOW, LADIES AND GENTLEMEN,  YOU SEE THE SCREEN.  WHAT IS THIS?  FIRST,  TELL US WHAT THIS IS.

A.    OKAY.

THE COURT:  I AM TOLD WE NEED TO TAKE A BREAK. LET'S TAKE A FIFTEEN MINUTE RECESS AT THIS TIME.  PLEASE GO TO YOUR JURY ROOM.  RECESS FOR 15 MINUTES.

(WHEREUPON, A SHORT RECESS WAS HELD.)

THE COURT:  PLEASE CONTINUE.

BY MR. BLUME:

Q.    DR. GUR, CAN YOU SEE THE IMAGE ON YOUR SCREEN?

A.    YES.

Q.    AND JUST TO LET YOU KNOW, IF THERE ARE THINGS YOU WANT TO POINT OUT, I SHOULD HAVE EXPLAINED THIS TO YOU EARLIER. IF YOU TOUCH THE SCREEN,  IT WILL SHOW UP.  AND THEN, WE CAN CLEAR IT FROM HERE. SO, IF THERE ARE THINGS YOU WANT TO PULL IN, OR OUTLINE, OR DRAW, OR TOUCH, YOU CAN DO IT ON THE SCREEN.

BUT WHAT I WANT TO DO FOR MY OWN BENEFIT, AND FOR THE JURY'S BENEFIT, IS TO TALK, BEFORE WE SORT OF GO INTO YOUR

**DIRECT EXAM OF RUBEN GUR**

**TESTIMONY ABOUT THE ABNORMALITIES OF MR. FULKS'S BRAIN, IF WE COULD TALK A LITTLE BIT ABOUT HOW THE BRAIN WORKS AND THE STRUCTURE OF THE BRAIN,  SORT OF GET EVERYBODY ON THE SAME PAGE ORIENTED.   CAN YOU BRIEFLY DESCRIBE WHAT IS ON THIS SLIDE?**

A.    WHAT YOU SEE HERE IS A CARTOON, REALLY, OF THE BUILDING BLOCK OF THE BRAIN.   AND THIS IS WHAT YOU SEE IS A NERVE CELL CALLED NEURON.   AND NO NEURON REALLY LOOKS LIKE THAT,  BUT ALL OF THEM HAVE THOSE FEATURES.   SO,  IT IS LIKE, IF YOU DREW A STICK FIGURE OF A HUMAN,  THERE IS NOT A HUMAN THAT LOOKS LIKE THAT, BUT IT IS AN IDEA OF WHAT ARE THE MAIN PARTS OF A HUMAN BEING.   HERE YOU SEE THE MAIN PARTS ARE THE CELL BODY THAT ARE RIGHT HERE, THAT IS DISTINGUISHED IN THAT IT HAS A LOT OF THOSE LITTLE PROTRUSIONS COMING OUT THAT ARE CALLED DENDRITES.   THESE PROTRUSIONS ARE IN ORDER TO COMMUNICATE WITH THE ADJACENT NEURONS.   THEY GET INFORMATION FROM ADJACENT NEURONS, AND THE INFORMATION IS CHEMICAL, BUT THE CHEMICAL INFORMATION CHANGES THE ELECTRICAL POLARITY OF THE MEMBRANE OF THE CELL OR THE SKIN OF THE CELL.   AND AFTER ENOUGH INFORMATION GETS IN, THE POLARITY CHANGES ENOUGH SO THAT IT SENDS AN ELECTRICAL PULSE.

THE ELECTRICAL PULSE WORKS LIKE ELECTRICITY IN AN OUTLET OF YOUR HOUSE.  IT TRAVELS VERY FAST, AND IT TRAVELS DOWN THIS LONG FIBER THAT YOU SEE COMING OUT, AND THAT IS CALLED AN AXON.   WHEN IT TRAVELS THROUGH THAT FIBER, IT TERMINATES HERE

DIRECT EXAM OF RUBEN GUR

AT THE END WHERE YOU SEE THE TERMINALS OF THAT FIBER.  THAT IS WHERE OTHER NERVE CELLS EXIST, OR THERE MAY BE A MUSCLE.  AND DEPENDING UPON WHAT IS THERE, IF THERE ARE OTHER NERVE CELLS, THAT MEANS THE INFORMATION GOES FORWARD TO OTHER NEURONS.  IF THERE IS A MUSCLE, THEN THE MUSCLE WILL CONTRACT, AND YOU WILL MOVE OR SOMETHING, A MUSCLE WILL MOVE.

THE RED NODE THAT YOU SEE HERE,  IN REALITY, THEY ARE NOT RED, THEY ARE WHITE BECAUSE THEY ARE REALLY MADE OF FAT.  AND THEY ARE CALLED MYELIN.  THIS IS VERY IMPORTANT BECAUSE THIS FAT DOESN'T LET THE ELECTRICAL SIGNAL DISSIPATE AND GO AROUND THE SAME WAY.  IF YOU WANT TO SEND ELECTRICITY THROUGH LONG DISTANCE, YOU SHIELD THE CABLES WITH RUBBER.  THE BRAIN DOESN'T HAVE RUBBER.  WHAT IT USES IS FAT IN ORDER TO INSULATE THOSE FIBERS AND ALLOW THE ELECTRICAL SIGNAL TO GO WHERE IT IS SUPPOSED TO GO.

ONE THING THAT I WILL SHOW YOU IN A MOMENT IS THAT, WHEN YOU ARE BORN, YOU HAVE NO FAT IN YOUR BRAIN.  THERE IS, VIRTUALLY, NONE OF THAT RED,  NONE OF THESE MYELIN SHEATHS. THEY DEVELOP AS YOU GROW.  THAT IS WHY, FOR EXAMPLE, IF YOU TICKLE A BABY IN THE FOOT, THE BABY WILL THROW UP BOTH ARMS AND FEET.  THE BABY CAN'T REALLY CONTROL WHERE THE MOVEMENT IS GOING, IT GOES EVERYWHERE.  THERE IS NONE OF THAT INSULATION THAT ALLOWS THE COMMAND TO GO WHERE IT IS SUPPOSED TO GO. AND THEN, THIS INSULATION BEGINS TO BUILD UP IN AREAS THAT CONTROL MOVEMENT AND SLOWLY BEGINS TO BUILD UP IN FURTHER AND

DIRECT EXAM OF RUBEN GUR

FURTHER AREAS UNTIL THE BABY COULD REALLY MOVE AND TOUCH SOMETHING AND EVENTUALLY GET UP AND START WALKING AND START MOVING ABOUT AND CONTROLLING HIMSELF.

**Q. NOW, IS THAT ALL ABOUT THAT? I'M SORRY.**

A. YEAH, I THINK THAT IS, BASICALLY.

**Q. SO, THAT IS THE SMALLEST PART, THAT IS THE NERVE CELL?**

A. THAT IS THE SMALLEST PART. ONE NERVE CELL. AND WE JUST HAVE SEVERAL MILLIONS OF THOSE, AND THEY ALL COMMUNICATE WITH EACH OTHER. AND, EVENTUALLY, THE INFORMATION REACHES THE PART OF THE BODY THAT NEED TO MOVE IN ORDER FOR US TO DO SOMETHING. SO, IF IT IS WALKING, IT WILL REACH THE LEG MUSCLES, AND THE LEGS WILL START WALKING. IF IT IS TALKING, IT WILL REACH THE FACE MUSCLES, AND MY MOUTH WILL BE MOVING.

ONE THING I SHOULD NOTE THAT, THOSE NEURONS ARE VERY, VERY SMALL. BUT THE FIBERS, THE AXONS THAT COMMUNICATE TO DISTANCES CAN BE AS LONG AS -- THERE IS ONE THAT CONNECTS ALL THE WAY FROM THE BRAIN TO THE TIP OF YOUR TOE. SO IT CAN BE VERY, VERY LONG.

**Q. DOCTOR, IN THIS NEXT SLIDE, WHAT IS IT? CAN YOU EXPLAIN TO THE JURY WHAT YOU HAVE HERE?**

A. YES. HERE IT SHOWS JUST THE OVERALL, THE LARGEST STRUCTURES OF THE BRAIN. AT THE BOTTOM HERE, YOU SEE THE PICTURE LOOKING AT THE LEFT SIDE OF THE BRAIN. AND THE TOP SHOWS, IF I SLICE THE BRAIN STRAIGHT DOWN THE MIDDLE AND OPEN IT UP AND IT SHOWS YOU, ESSENTIALLY, THE OTHER SIDE, BUT FROM

DIRECT EXAM OF RUBEN GUR

INSIDE.  SO, IF YOU LOOK OUTSIDE AT THE BOTTOM,  OF COURSE, THESE ARE NOT THE COLORS THAT YOU WILL SEE,  BUT JUST COLORED THEM FOR YOUR CONVENIENCE.

THE MAJOR PARTS OF THE BRAIN ARE THE FRONTAL LOBE RIGHT HERE, AND THAT IS A BIG CHUNK OF BRAIN.  AND THAT IS WHAT YOU SEE HERE IS THE OUTER LAYER OF IT.  BEHIND IT, IS THE PARIETAL LOBE, AND BEHIND THAT, IS THE OCCIPITAL LOBE.  SORT OF SQUISHED IN THE MIDDLE IN GREEN HERE IS THE TEMPORAL LOBE, WHICH IS THE PART OF THE BRAIN THAT IS RIGHT WHERE YOUR TEMPLES ARE BEHIND THE EARS.

THE WAY INFORMATION WORKS IS THAT, IF YOU LOOK AT SOMETHING, THE FIRST PLACE IT GOES TO IS THE BACK OF YOUR BRAIN IN THE OCCIPITAL LOBE.  THE OCCIPITAL REALLY SEES BLOTCHES OF LIGHTS AND LINES AND REALLY DOESN'T MAKE ANY MEANING OUT OF THEM.  BUT IT INTERPRETS THEM FOR THEIR SPATIAL LAYOUT AND SENDS INFORMATION FORWARD TO THE PARIETAL LOBE.  IN THE PARIETAL LOBE, FOR EXAMPLE, YOU WILL SEE A LOT OF THE HORIZONTAL LINE,  VERTICAL LINE,  ANOTHER HORIZONTAL, ANOTHER VERTICAL AND SAY, OH, THAT IS A SQUARE.  THEN THAT INFORMATION GETS FURTHER AHEAD, AND IT THEN ACQUIRES MEANING, AND SAY, OH, IT IS A WINDOW, IT IS A DOOR.  AND THEN, WHEN IT GOES FURTHER, IT SAYS, OH, THIS IS SOMETHING I CAN WALK THROUGH.  SO, THE MORE FORWARD IT MOVES, THE MORE IT BECOMES FROM JUST A PURE PERCEPT OF JUST LINES AND SHADES AND COLORS, INTO A MEANINGFUL OBJECT AND, EVENTUALLY, SOMETHING THAT YOU

DIRECT EXAM OF RUBEN GUR

MAY WANT TO ACT UPON.

NOW THE FRONT OF THE BRAIN IS THE EXECUTIVE.  THAT IS THE PART OF YOUR BRAIN THAT SAYS,  ALL RIGHT,  NOW LET ME GO FORWARD AND MOVE THROUGH THAT DOOR.   SO,  IF YOU HAVE LESIONS IN THE FRONTAL LOBE, FOR EXAMPLE, IN PARKINSON'S DISEASE,  YOU HAVE DIFFICULTIES WITH FRONTAL LOBE FUNCTION, YOU HAVE THE PHENOMENA THAT THESE PEOPLE CANNOT MAKE THE FIRST STEP.   THEY WILL STAND IN FRONT OF THE DOOR, AND THEY JUST CAN'T MOVE IN.  ONCE THEY START WALKING, THEY WILL WALK.   AND ONCE THEY START WALKING, SOMETIMES THEY CAN'T STOP.  YOU HAVE TO TELL THEM, OKAY,  NOW STOP.   SO,  THE FRONTAL LOBE IS THE EXECUTIVE THAT DECIDES WHAT TO DO WITH ALL OF THAT INFORMATION THAT COMES FROM THE BACK OF THE BRAIN.

THE TEMPORAL LOBE IN GREEN HERE IS THE -- GETS A LOT OF AUDITORY INFORMATION THE SAME WAY THAT THE OCCIPITAL GETS VISUAL INFORMATION.  THE TEMPORAL LOBE GETS THE AUDITORY INFORMATION AND INTEGRATES WHAT YOU HEAR WITH WHAT YOU -- WITH WHAT YOU SEE AND PUTS THAT IN MEMORY.   AND THAT IS -- THE TEMPORAL LOBE IS VERY IMPORTANT TO UNDERSTAND MEMORY.

WHEN YOU LOOK AT THE ABOVE, THE BRAIN IS SLICED IN TWO IMPORTANT STRUCTURES.  ONE IS THE CEREBELLUM, I WILL BE GOING FROM LEFT TO RIGHT.   CEREBELLUM IS THE LITTLE BRAIN TUCKED AWAY RIGHT BEHIND THE VISUAL, THE OCCIPITAL,  THE VISUAL VORTEX.  AND IT LOOKS AS IF IT IS LIKE ANOTHER LITTLE BRAIN INSIDE OUR BRAIN.  AND IT IS CLEAR THAT ITS MAIN FUNCTION IS

DIRECT EXAM OF RUBEN GUR

CONTROLLING MOVEMENT.  SO,  IT ALLOWS US TO MAKE FINE MOTOR MOVEMENTS.  AND, UNLIKE ALL OF THE OTHER PARTS OF THE BRAIN, IT CONTROLS THE SAME SIDE OF THE BODY.  SO,  GENERAL RULE, THE LEFT SIDE OF OUR BRAIN CONTROLS THE RIGHT SIDE OF OUR BODY, WHEREAS THE RIGHT SIDE OF OUR BRAIN CONTROLS THE LEFT SIDE OF OUR BODY.  AND THAT IS TRUE FOR ALL STRUCTURES EXCEPT FOR THE CEREBELLUM, WHICH CONTROLS THE SAME SIDE OF THE BODY.

ANOTHER IMPORTANT STRUCTURE HERE IN YELLOW IS THE CORPUS CALLOSUM.  THAT IS REALLY A BODY OF NERVE FIBERS.  THERE ARE NERVE CELLS, THOSE LONG FIBERS THAT YOU REMEMBER FROM THE DRAWING OF THE NEURON THAT THESE ARE THE AXONS,  THE LONG FIBERS.  AND THE CORPUS CALLOSUM CONNECTS THE TWO SIDES OF THE BRAIN AND ALLOWS INFORMATION TO GO BACK AND FORTH.

ONE REMARKABLE FEATURE OF THE BRAIN IS IT IS ENTIRELY DIVIDED IN TWO.  SO, IN SOME WAYS, IT IS ALMOST INCORRECT TO TALK ABOUT OUR BRAIN.  WE SHOULD BE TALKING ABOUT OUR BRAINS. WE HAVE TWO OF THEM.  IF IT WEREN'T FOR THE CORPUS CALLOSUM, IT WOULD BE FALLING TO THE SIDE.  ACTUALLY, TAKE THEM AND SEPARATE THEM, AND YOU HAVE TWO BRAINS.  AND SO, THE CORPUS CALLOSUM ALLOWS COMMUNICATION BETWEEN THOSE TWO PARTS OF THE BRAIN.

NOW,  WHERE YOU SEE AT THE BOTTOM, IS THE BRAIN STEM.  THE BRAIN STEM REALLY CONNECTS THE BRAIN TO THE REST OF OUR BODY, AND THE BRAIN STEM GOES THROUGH OUR SPINAL CORD AND THEN SPREADS TO OUR LEGS.  THIS IS HOW THE BRAIN CAN CONTROL ALL

DIRECT EXAM OF RUBEN GUR

OF OUR REMOTE ORGANS, AND ALSO THAT IS HOW IT REGULATES ALL OF OUR BODY FUNCTIONS SO WE DON'T HAVE TO WORRY ABOUT BREATHING, OR SWEATING, OR ALL OF THOSE OTHER THINGS THAT WE NEED TO DO IN ORDER TO REGULATE OUR BODY FUNCTIONS.  WE DON'T REALLY HAVE TO THINK ABOUT, NOW, I BETTER DIGEST THAT FOOD THAT I ATE A MOMENT AGO, SO I NEED TO SPRINKLE SOME CHEMICALS ON IT SO IT GETS DIGESTED.  ALL OF THIS IS DONE IN THE SO-CALLED AUTONOMIC NERVE SURFACE, WHICH AUTONOMIC MEANING, WORKS BY ITSELF.  FEEDS THROUGH THE BRAIN ON THE BRAIN STEM THAT YOU SEE HERE COLORED IN RED.

NOW, ONE MORE IMPORTANT STRUCTURE IS THE THALAMUS.  I WILL BE FOCUSING ON STRUCTURES THAT WILL EXPLAIN SOME OF WHAT WE SEE WITH MR. FULKS.  THE THALAMUS IS INDICATED HERE BY THE ARROW.  THIS IS SORT OF THE SWITCHBOARD FOR THE BRAIN.

**Q.    THIS IS RIGHT HERE IN THE MIDDLE?**

A.    RIGHT HERE.  IT IS THE SWITCHBOARD. AND YOU CAN SEE WHY IT IS RIGHT SMACK IN THE MIDDLE OF THE BRAIN.  IT GETS ALL INFORMATION FROM THE VARIOUS PARTS OF THE BRAIN AND DECIDES WHERE THE INFORMATION SHOULD GO.  SO,  IF YOU THINK OF THE FRONTAL LOBE AS THE CHIEF EXECUTIVE OF THE BRAIN, AS THE BIG BOSS,  THE SWITCHBOARD IS WHERE THE INFORMATION GETS HANDLED.  AND THE THALAMUS DECIDES IF THE INFORMATION NEEDS TO BE,  IF THIS IS -- IF IT NEEDS TO BE ACTED UPON OR NOT ACTED UPON,  SHOULD IT BE IGNORED.  SO, YOU CAN IMAGINE IF YOU TRY,  IF SOMEBODY CALLS IN, TRIES TO REACH THE BOSS, IT IS

DIRECT EXAM OF RUBEN GUR

IMPORTANT THAT THERE BE A GOOD SWITCHBOARD OPERATOR SO YOU KNOW WHERE TO CONNECT AND WHAT DIFFERENT PARTS OF THE ORGANIZATION ARE BEST TO DEAL WITH A PARTICULAR ISSUE.   SO, THAT IS REALLY WHAT THE THALAMUS DOES FOR THE BRAIN.

**Q.    DOCTOR, IN THIS SLIDE, CAN YOU JUST BRIEFLY EXPLAIN WHAT MYELINATION IS?**

A.    SO,  AS I MENTIONED, BABIES ARE BORN WITHOUT ANY FAT IN THE BRAIN.   WITHOUT ANY OF THE MYELIN THAT ALLOWS FOR SUFFICIENT TRANSMISSION OF INFORMATION.   THE WAY WE LEARN ABOUT BRAIN MATURATION, INITIALLY, WAS THROUGH LOOKING AT POSTMORTEM PEOPLE WHO DIED, AND WE LOOK AT THEIR BRAIN, DONATED THEIR BRAINS TO SCIENCE.   THEN THEY ARE COLLECTED, AND THE BIGGEST COLLECTION OVER THE YEARS HAS BEEN OF DR. YAKOVLEV AND HIS COLLEAGUES AT HARVARD.   WHAT HE DID WITH THOSE BRAINS WAS TRY TO LOOK AT WHAT CHANGES AS YOU GROW, WHAT DEVELOPS THE SIDE OF THE BRAIN.   THEY HAD DECIDED, IF THEY TAKE A SLICE OF BRAIN AND PUT THAT STAIN ON IT,  THE STAIN GETS ATTRACTED TO FAT.   SO,  WHEN THEY STARTED STAINING THOSE BRAINS, IF YOU LOOK AT THE UPPER LINE HERE, A BABY AT FULL TERM,  THIS WHAT YOU SEE.  HERE IS THE CORPUS CALLOSUM. YOU REMEMBER THAT WAS THE YELLOW PART IN THE CARTOON.  AND IN A BABY, AT FULL TERM, IF YOU PUT THE STAIN, YOU DON'T SEE MUCH.  YOU GET, BASICALLY, A GRAY APPEARING AREA RIGHT HERE THAT DOESN'T SHOW THAT THERE IS ANY FAT THERE.   WHEN YOU DO THE SAME TO A TWO-YEAR-OLD BABY'S BRAIN, UNFORTUNATELY IF HE

DIRECT EXAM OF RUBEN GUR

DIED AT AGE 2,  YOU CAN BEGIN TO SEE BLACK APPEARING HERE IN THE BACK OF THE CALLOSUM, AND THE REST IS GRAY.  WHEN YOU DO THE SAME STAINING IN AN ADULT, YOU CAN SEE IT IS PITCH-BLACK HERE.  THIS IS NOT COMPLETELY BLACK.  SO,  THAT WAY, WE LEARN THAT, BY TRACING THE PROCESS OF MYELINATION, THE PROCESS IN WHICH FAT BEGINS TO INSULATE THE TRANSMISSION,  WE CAN HAVE AN IMPORTANT IMPACT OF BRAIN DEVELOPMENT.  THAT IS HOW WE CAN TRACE THE DEVELOPMENTS OF THE BRAIN.

**Q.    WHAT DOES THIS FIGURE TELL US?**

A.    WHAT YAKOVLEV AND HIS COLLEAGUES DID,  THEY LOOKED AT THE MYELINATION OF DIFFERENT PARTS OF THE BRAIN AND DISCOVERED, QUITE SURPRISINGLY, THAT DIFFERENT PARTS OF THE BRAIN MYELINATES AT DIFFERENT RATES.  SOME OF THEM ARE ALREADY PITCH-BLACK WHERE YOU STAINED THEM BY THE FIRST YEAR OF LIFE. SOME OF THEM BECOME COMPLETELY MYELINATED BY THE SECOND YEAR OF LIFE.  BUT SOME OF THEM DO NOT BECOME MYELINATED UNTIL THE THIRD DECADE OF LIFE.

SO, HE TRIED TO MAKE SENSE OF WHAT PARTS MATURE FAST AND WHAT PARTS MATURE MORE SLOWLY.  AND CAME UP WITH A CONCLUSION THAT THOSE PARTS ARE RESPONSIBLE FOR SENSING AND MOVING, THEY MATURE FIRST.  AND THAT EXPLAINS WHY A BABY CAN SMELL,  CAN HEAR, AND THEN, EVENTUALLY, WALK.  THEN COME THE PARTS THAT DEAL WITH MORE OF INTEGRATION OF INFORMATION AND UNDERSTANDING OF INFORMATION.  AND THEN LAST TO COME ABOARD IS THE FRONTAL PART OF THE BRAIN,  THE CHIEF EXECUTIVE.  AND THAT RELATES TO

DIRECT EXAM OF RUBEN GUR

WHY SOME ADOLESCENTS CAN BE, AND THAT REALLY, ACCORDING TO YAKOVLEV'S HYPOTHESIS, DOES NOT BECOME COMPLETELY MYELINATED UNTIL EARLY IN THE THIRD DECADE OF LIFE.  SO,  SOMETIME AT THE EARLY TWENTIES, IS WHEN THAT PART BECOMES COMPLETELY CONNECTED TO THE REST OF THE BRAIN.  AND THAT MAY EXPLAIN, IF ANY OF YOU HAVE EXPERIENCE WITH TEENAGERS OR REMEMBER WHEN YOU WERE A TEENAGER YOURSELF,  WHICH THEY ARE VERY SMART,  THEY CAN DO A LOT OF VERY,  VERY SMART THINGS,  BUT SOMETIMES THEY DO SOMETHING THAT LEAVES US WONDERING, WHAT WERE YOU THINKING? AND THEY ARE ABLE TO THINK,  BUT THE HIGHWAY THAT CONNECTS THE THINKING PART TO THE BRAIN TO THE CHIEF EXECUTIVE THAT TELLS THEM WHAT TO DO IS ONLY A COUNTRY ROAD.  IT IS NOT A HIGHWAY YET.  AND THE INFORMATION JUST DOESN'T GET THERE ON TIME.

**Q.    NEXT?**

A.    NOW,  IF YOU JUST TAKE THE BRAIN AND TAKE THEM OUT AND PUT THEM ON A SCALE AND WEIGH THEM, THIS IS A STUDY THAT LOOKED AT THOUSANDS OF BRAINS AS A FUNCTION OF AGE.  AND YOU CAN SEE THAT BRAIN WEIGHT GOES UP FROM BIRTH UP TO AROUND AGE 21 OR 22, AFTER WHICH IT STAYS STABLE.  AND THEN,  OF COURSE, WHEN AGING BEGINS,  BRAIN CELLS BEGIN TO DIE, AND THE BRAIN WEIGHT BEGINS TO GO DOWN AS YOU GROW OLDER.

**Q.    NOW,  WHY DOES THE BRAIN WEIGHT GO UP?**

A.    WELL,  PRESUMABLY,  BECAUSE OF THE FAT, REALLY,  BECAUSE IT TURNS OUT THAT WHEN YOU ARE BORN,  ALL OF THE BRAIN CELLS YOU WILL EVER HAVE ARE ALREADY IN PLACE.  SO, THE BRAIN,

App. 00846

DIRECT EXAM OF RUBEN GUR

ITSELF, IS FULLY FORMED, IT'S TERM.  VERY LITTLE KEEPS GROWING AFTER THE BABY IS BORN.  AND EVERYTHING THAT GETS ADDED TO IT IS THAT MYELIN THAT ALLOWS FOR SMOOTHER COMMUNICATION OF INFORMATION INSIDE THE BRAIN.  AND FAT IS HEAVY.  AND SO, THAT IS WHAT EXPLAINS THE INCREASING BRAIN WEIGHT UP TO AGE 21 OR 22.

**Q.    DOCTOR?**

A.    WE NOW, FORTUNATELY, DON'T HAVE TO WAIT FOR SOMEONE TO DIE IN ORDER TO STUDY THE BRAIN.  THE MAIN METHOD THAT LETS US LOOK AT BRAIN ANATOMY, YOU HAVE TO REMEMBER, TO UNDERSTAND THE BRAIN, WE HAVE TO UNDERSTAND THE BRAIN ANATOMY OF THE STRUCTURE.  AND WE ALSO HAVE TO UNDERSTAND THE FUNCTION OF THE BRAIN.  SO, IN THE SAME WAY, IF YOU WANT TO BUY A USED CAR, YOU OPEN THE HOOD AND SEE THERE IS AN ENGINE, ALL THE PARTS ARE THERE.  YOU ARE NOT GOING TO ASSUME THAT THAT CAR IS STILL RUNNING.  IN FACT, THE ANATOMY OF THE BRAIN IS STILL INTACT AFTER AN INDIVIDUAL IS DEAD.  IT CAN STAY INTACT FOR QUITE SOME TIME.  SO, YOU WANT TO TURN ON THE ENGINE AND SEE IF THE CAR CAN MOVE.  AND THAT IS SORT OF THE PHYSIOLOGY OF THE BRAIN, THE ACTIVITY OF THE BRAIN.  THEY BOTH NEED TO BE UNDERSTOOD TO KNOW HOW THE BRAIN IS FUNCTIONING.  ARE ALL THE PARTS THERE, AND IS THE BRAIN ACTIVE?

NOW, THE MAIN METHOD TO STUDY BRAIN STRUCTURE OR ANATOMY IS CALLED MAGNETIC RESONANCE IMAGING OR MRI.  AND THE WAY IT WORKS IS THAT YOU PUT THE HEAD IN A VERY STRONG MAGNETIC

DIRECT EXAM OF RUBEN GUR

FIELD.  SO, WHEN YOU PUT IT IN A STRONG MAGNETIC FIELD, THAT IS MANY TIMES STRONGER THAN THE STRENGTH OF THE MAGNETIC FIELD OF OUR PLANET.  IT IS A VERY STRONG MAGNET.  ALL OF THE MOLECULES IN YOUR BRAIN ALIGN THEMSELVES WITH THAT MAGNET, AND THEY ALL GO IN LINE WITH THAT FORCE.  AND THEN, WHAT WE DO IS, WE SEND PULSE,  MAGNETIC PULSE OR RADIO FREQUENCY PULSE THAT IS NOT  -- THAT IS AN ANGLE TO THE MAIN MAGNETIC FIELD. ALL OF THE MOLECULES TRY TO ALIGN THEMSELVESS WITH THE NEW BOSS,  THE NEW FORCE.  BUT THAT FORCE IS ONLY THERE VERY BRIEFLY.  THEY ONLY SEND IT FOR 20 MILLISECONDS, TWENTY-THOUSANDS OF A SECOND.  YOU CAN BARELY NOTE THAT.  AND SO, MOLECULES GET LOST FOR A MOMENT,  DON'T KNOW WHERE TO GO, AND THEN THEY REALIGN THEMSELVESS WITH THE MAIN MAGNETIC FIELD.

AND WHAT HAPPENED, WHEN THEY REALIGNED THEMSELVES IS THAT THEY,  WHEN IT IS LIKE IF YOU TOOK A PENCIL AND TRIED TO PLAY WITH IT,  MOVE IT,  YOU WILL SEE IF IT COMES BACK TO POSITION, IT DOESN'T JUST COME BACK, BUT IT RATTLES A LITTLE BIT.  THAT RATTLING, WE CAN LISTEN TO USING ANTENNAS, LIKE RADIO ANTENNAS.  SO, THERE IS A BIG PRINCIPLE IN BIOLOGY WHICH IS -- WORKS IN LIFE, WHICH IS, BIG BODIES MOVE SLOWLY AND SMALL BODIES MOVE FAST.  AND SO, WE HAVE SMALL MOLECULES AND BIGGER MOLECULES.  AND SO, THE SMALL MOLECULES RATTLE FIRST.

THE FIRST ECHO THAT WE HEAR FROM THAT PERTURBATION COMES FROM THE SMALL MOLECULES, WHICH IS WATER.  THERE IS A LOT OF

DIRECT EXAM OF RUBEN GUR

WATER MOLECULES IN OUR BRAIN.  SO, WE CAN SEE THE WATER COMING FIRST.  THEN THE PROTEINS, WHICH ARE BIGGER MOLECULES, RATTLE IN PLACE.  AND LAST COME THE BIG, FAT MOLECULES, THEY RATTLE INTO PLACE.  DEPENDING UPON WHEN WE LISTEN TO THE ECHO, WE CAN HIGHLIGHT DIFFERENT ASPECTS OF THE BRAIN.  SO, THE FIRST IMAGE THAT YOU SEE HERE ON THE LEFT IS OBTAINED VERY QUICKLY AFTER THE ECHO, AND SO, WATER LOOKS VERY BRIGHT.  AND WHAT YOU SEE AS WHITE HERE IS REALLY LIQUID.  IT IS CALLED CEREBROSPINAL FLUID.  AND OUR BRAIN IS REALLY BATHING IN FLUID.  IT IS REALLY SITTING IN A POOL OF FLUID WHICH IS FORTUNATE BECAUSE, OTHERWISE, WE WOULD GET BRAIN DAMAGE EVERY TIME WE SNEEZE.  WHEN THE BRAIN MOVES INSIDE OUR SKULL, THE BACK OF OUR SKULL IS VERY NICE AND SMOOTH, BUT THE FRONT OF OUR SKULL HAS SOME PRETTY NASTY BONES RIGHT HERE ABOVE THE EYES, THE ORBITAL PART.  AND, SO, IF THE BRAIN WOULD HIT THOSE BONES, IT WOULD GET SQUISHED AND DAMAGED.  SO, THERE IS LIQUID THAT CUSHIONS THE BLOW.  THE LIQUID IS ALSO INSIDE THE BRAIN, AND THE LIQUID INSIDE THE BRAIN IS CALLED VENTRICLES OF THE BRAIN.  SO, THAT FLUID SERVES TWO PURPOSES.  IN ADDITION TO CUSHIONING THE BRAIN AS IT MOVES AROUND IN OUR SKULL, IT ALSO FEEDS THE BRAIN AND SUPPLIES SOME OF THE NUTRIENTS THE BRAIN NEEDS AS WELL AS SOME OF THE  -- IT SUPPLIES A LOT IN ADDITION TO THE BLOOD THAT SUPPLIES THE MAIN SUPPLY OF NUTRIENT IN THE BRAIN.

NOW, IF WE TAKE THE ECHO, TIME IT A BIT LATER, AS YOU SEE

DIRECT EXAM OF RUBEN GUR

IN THE SECOND IMAGE, WE CAN BEGIN TO BETTER APPRECIATE THE TWO OTHER PARTS, THE TWO OTHER TYPES OF TISSUE THAT WE HAVE IN THE BRAIN THAT WE ALREADY TALKED ABOUT. ONE IS THE GRAY MATTER WHICH ARE THE BRAIN CELLS THEMSELVES WITH THOSE SHORT PROTRUSIONS AROUND THEM THAT ARE DENDRITES. AND WHITE MATTER, WHICH IS THE FAT, THE MYELIN. SO, THE WHITE MATTER ARE THE BUNDLES OF FIBERS THAT ARE NOW SURROUNDEDED BY FAT OR WHAT WE CALL WHITE MATTER. AND SINCE EACH OF THEM HAVE A DIFFERENT CHEMICAL COMPOSITION, IT GIVES A DIFFERENT SIGNAL WHEN WE LISTEN TO THE ECHO. AND SO, WE CAN TELL THE COMPUTER, WE HAVE A LOT OF THOSE, THOSE PICTURES THAT YOU SEE ARE GENERATED BY A COMPUTER, AND THEY JUST, BASICALLY, TELL YOU THAT IN INTENSITY, HOW MANY REVERBERATIONS DID THEY GET FROM THAT PARTICULAR REGION. AND SO, IT TELLS YOU THE INTENSITY OF EACH PICTURE ELEMENT OR PIXEL. AND SINCE THESE ARE SLICES, WE KNOW THEY HAVE A CERTAIN THICKNESS. SO, WE CALL THEM NOT PIXELS, YOU KNOW, PIXEL IS A PICTURE ELEMENT. IF YOU TOOK ANY PICTURE AND YOU BLOW IT UP AND BLOW IT UP AND BLOW IT UP, EVENTUALLY, YOU WILL SEE A BUNCH OF DOTS THAT REALLY COMPOSE THAT PICTURE. HERE, THE PROCESS IS REVERSED. THE COMPUTER GENERATES THOSE DOTS, AND SO FOR THOSE DOTS, WE LOOK, AND WE SEE A PICTURE OF THE BRAIN. SO, EACH ONE OF THOSE DOTS, WE KNOW THE EXACT SIZE OF THIS. AND IN THIS CASE, IT IS ONE CUBIC MILLIMETER, EACH ONE OF THOSE DOTS. AND SO, WE CAN TELL THE COMPUTER IN YOUR INFINITE PATIENCE

DIRECT EXAM OF RUBEN GUR

NOW, THROW ALL OF THOSE PICTURES INTO THREE PILES.  ONE PILE THAT IS GRAY MATTER,  ONE PILE THAT IS WHITE MATTER,  AND ONE PILE THAT IS CEREBRAL SPINAL FLUID OR CSF.  IT USED TO BE THE COMPUTER HAD TO WORK THE WHOLE NIGHT FOR EACH BRAIN,  BUT THEY DON'T COMPLAIN.  THEY DO THAT, AND WHEN YOU COME IN THE MORNING, YOU FIND EXACTLY THE ANSWER, HOW MANY VOXELS ARE IN EACH PILE, AND THEN KNOWING THE DIMENSION OF THE VOXEL, YOU CAN CALCULATE, PRECISELY, THE VOLUME OF WHAT IS THE VOLUME OF THE GRAY MATTER,  WHITE MATTER, AND FLUID.

Q.    SO,  DOCTOR, AS I UNDERSTAND IT, THERE ARE THREE BASIC COMPONENTS:  GRAY MATTER,  WHITE MATTER, AND CEREBROSPINAL FLUID?

A.    CORRECT.

**Q.    AND SO, THAT IS SORT OF -- WHAT IS THAT?**

A.    THAT IS ILLUSTRATED IN THE LAST PICTURE.  THE LAST PICTURE IS WHAT THE COMPUTER IS GIVING YOU BACK WHEN YOU COME IN THE MORNING AND IT PAINTS THE GRAY MATTER, YOU CAN SEE HERE IS IN WHITE; WHITE MATTER IS IN GRAY, AND JUST TO CONFUSE YOU A LITTLE, THE FLUID IS IN BLACK.  SO WE KNOW EXACTLY WHICH TYPE OF TISSUE IS IN EACH AREA.

SO,  WHEN WE APPLIED THIS METHOD, AND WE STARTED LOOKING AT WHAT HAPPENS WITH DEVELOPMENT,  IF YOU LOOK AT THE TOP PANEL HERE,  YOU CAN SEE THIS IS YEARS, IT TELLS YOU WHAT IS THE -- HOW MUCH GRAY MATTER THERE IS, DEPENDING UPON YEARS FROM ZERO TO 30.  YOU CAN SEE THAT THE AMOUNT OF WHITE MATTER

DIRECT EXAM OF RUBEN GUR

AT THE TOP, AS WHITE MATTER GOES UP STEADILY AND VERY CONSISTENTLY WITH WHAT WE SAW FROM POSTMORTEM STUDY, IT KEEPS GOING UP UNTIL THE AGE OF AROUND 21, AND THEN, IT LEVELS OFF AND BEGINS TO GO DOWN.  SO,  THAT WAS NOT SURPRISING.  WE EXPECTED THAT, FROM THE WORK OF YAKOVLEV THAT, AS THE WHITE MATTER BUILDS,  WHITE MATTER BUILDS UP WITH AGE.  THE SURPRISING FINDING WAS THAT GRAY MATTER, ACTUALLY, GOES DOWN WITH AGE.  THAT LITTLE BABIES HAVE MORE GRAY MATTER THAN ADOLESCENTS, AND ADOLESCENTS HAVE MORE GRAY MATTERS THAN ADULTS.

AND THAT TURNS OUT IS BECAUSE OF THE PROCESS OF PRUNING. IN THE SAME WAY THAT YOU DON'T WANT THE TREE TO GROW WILD AND ALLOW ALL OF THE BRANCHES TO COME OUT, YOU NEED TO TAKE OFF BRANCHES THAT DON'T DO ANYTHING,  OUR BRAINS PRETTY MUCH DECIDE IF YOU HAVEN'T USED A PARTICULAR PART,  YOU PROBABLY DON'T NEED IT.  AND THAT PART SHRIVELS OFF.  THAT HAPPENS MOST AGGRESSIVELY DURING EARLY ADOLESCENCE BETWEEN THE AGE OF AROUND 12 AND 18 OR 19.  AND THAT IS WHY,  FOR EXAMPLE,  IF YOU HAVEN'T LEARNED HOW TO PLAY THE VIOLIN WHEN YOU WERE A LITTLE CHILD,  YOU CAN'T START NOW.  IT JUST WON'T WORK. THAT PART THAT CAN PLAY THE VIOLIN IS GONE.  OR LIKE MYSELF, IF YOU DON'T LEARN A FOREIGN LANGUAGE WHEN YOU ARE A CHILD, THEN YOU WILL ALWAYS HAVE AN ACCENT IN THAT LANGUAGE.  YOU WILL NEVER REALLY MASTER IT COMPLETELY.  OR SKIING, FOR EXAMPLE.  YOU CAN LEARN SKIING AT AN OLDER AGE,  BUT ON THE

DIRECT EXAM OF RUBEN GUR

CATWALKS, YOU CAN ALWAYS TELL THOSE WHO LEARN IT AS CHILDREN FROM THOSE WHO LEARN IT A LITTLE BIT LATER.  THEY ARE JUST NOT COMPLETELY AT PEACE WITH A SKI.

YOU HAVE TO REMEMBER THAT OUR BRAINS, EVEN THOUGH WE DO A LOT OF FANCY AND WONDERFUL THINGS AND PLAY WITH COMPUTERS AND DRIVE CARS,  OUR BRAINS WERE PRETTY MUCH SET IN PLACE AT THE TIME WHEN WE WERE A HUNTER/GATHERER SOCIETY, ROWING THE SAVANNAH.  AND THIS IS HOW THEY ARE OPTIMIZED TO OPERATE. AND SO, BY AND LARGE, IF YOU WERE A CHILD GROWING IN THE HUNTER/GATHERER SOCIETY,  WHATEVER YOU HAVEN'T LEARNED BY AGE 13, YOU ARE NOT GOING TO LEARN ANY MORE.  YOUR EDUCATION WAS COMPLETE BY THAT AGE.  AND SO,  OUR BRAINS WILL ALLOW THOSE PARTS THAT HAVEN'T BEEN CONSISTENTLY USED TO SHRIVEL OFF, AND THAT IS THE PROCESS OF PRUNING.

SO,  THERE ARE TWO MAJOR PROCESSES OF MATURATION, BRAIN MATURATION:  ARE MYELINATION AND PRUNING.  MYELINATION, THE BUILD-UP OF CONNECTIONS; PRUNING, THE SHRIVELING OFF OF PARTS OF THE BRAIN THAT HAVEN'T BEEN USED.

**Q.    WHAT DO WE SEE IN THIS NEXT SLIDE?**

A.    THERE IS ANOTHER PRINCIPLE IN BIOLOGY THAT SAYS, WHATEVER COMES ONBOARD LAST, JUMPS OFFBOARD FIRST.  I GUESS IT WORKS IN POLITICS, TOO.  SO,  HERE YOU SEE THAT THESE ARE ADULTS. ALL ADULTS BETWEEN THE AGES OF 18 AND 45, AND DURING THAT AGE,  GRAY MATTER CONTINUES TO GO DOWN,  WHITE MATTER CONTINUES TO GO UP, AND WHEN YOU LOOK AT CEREBROSPINAL FLUID,

DIRECT EXAM OF RUBEN GUR

IT GOES UP.  AND THE REASON IT GOES UP IS, EVERY TIME A BRAIN CELL DIES, ITS PLACE IS TAKEN UP BY FLUID.   AND SO, WHEN WE SEE MORE FLUID THAN WE EXPECT IN A BRAIN,  THEN WE CAN CONCLUDE THAT SOME TISSUE WAS THERE THAT WAS SUPPOSED TO BE THERE IS MISSING.

NOW -- ONCE WE HAVE THE BRAIN -- NOW,  I MENTIONED THAT THE MRI ARE ACQUIRED SLICE BY SLICE, BUT OUR COMPUTER EXPERTS ARE PUTTING -- STACKING UP THOSE SLICES ONE ON TOP OF THE OTHER AND MAKING IT INTO A THREE-DIMENSIONAL MRI.   AND ONCE WE HAVE A THREE-DIMENSIONAL MRI, WE CAN RESLICE IT IN ANY DIRECTION THAT WE WANT.   SO,  THIS SLICE SHOWS YOU THE TWO IMPORTANT STRUCTURES THAT ARE RELEVANT TO OUR CASE.   ONE IS THE FRONTAL LOBE, WHICH YOU REMEMBER IS OUR CHIEF EXECUTIVE, IT CAN BE DIVIDED INTO TWO PARTS.

**Q.    DR. GUR,  JUST TO MAKE SURE,  THE BACK OF THE HEAD IS HERE?**

A.    THIS IS THE BACK OF THE HEAD.

**Q.    THIS IS THE FRONT OF THE HEAD?**

A.    THIS IS THE FRONT.

SO,  HERE THE FRONT OF THE BRAIN, THE CHIEF EXECUTIVE,  IS DIVIDED INTO TWO PARTS, THE DORSAL AND ORBITAL.   THE ORBITAL FRONTAL CORTEX IS RIGHT IN THIS AREA HERE.   SO, THAT PART IS RIGHT HERE THAT IS SIGNIFIED BY THE ARROW I PUT IN EARLIER. YOU CAN SEE THAT IT SITS RIGHT ABOVE THE EYES.   HERE YOU CAN SEE THE NOSE OF THAT INDIVIDUAL AND THE EYES.   AND THAT

DIRECT EXAM OF RUBEN GUR

ORBITAL PART OF THE BRAIN SITS RIGHT BEHIND THE EYES.  AND IT IS CLOSELY CONNECTED TO A REGION THAT YOU CAN'T SEE HERE BECAUSE YOU HAVE TO MOVE OUTWARD MORE, AND YOU SEE IT HERE, THE AMYGDALA, WHICH IS IN THE HEART OF THE BRAIN AND INTERACTS VERY INTIMATELY WITH THE ORBITAL FRONTAL AREA.  AND THIS IS WHAT THEIR RELATIONSHIP IS.

AMYGDALA IS THE PART OF THE BRAIN THAT DECIDES WHETHER ANYTHING THAT YOU SEE HAS EMOTIONAL SIGNIFICANCE.  IN PARTICULAR,  IF IT IS RELEVANT TO WHETHER YOU NEED TO FIGHT OR TO RUN AWAY.  SO,  THIS IS THE PART THAT DECIDES, IS IT SCARY, OR IS IT -- AM I COMFORTABLE HERE? AND THAT IS WHEN IT KEEPS WORKING.  SO,  IF YOU ARE LOOKING AT THE FACE,  THE AMYGDALA WILL NOT DO ANYTHING UNTIL THERE IS AN EMOTION ON THE FACE.  YOU WILL SEE THE AMYGDALA BEGIN TO WORK.  MOST OF THE OUTPUT OF THE AMYGDALA RELATES TO FIGHT OR FLEE.  IT IS A VERY PRIVATIVE STRUCTURE.  IT DOESN'T TALK.  IT JUST TELLS YOU, FOR EXAMPLE, SOMEBODY IS AT A COCKTAIL PARTY AND SOMEONE INSULTS YOU.  THE AMYGDALA YELLS, "KILL THE BASTARD."  THAT INFORMATION, FORTUNATELY, GOES FORWARD INTO THE FRONT -- ORBITAL FRONTAL AREA.  THE ORBITAL FRONTAL IS PART OF THE EXECUTIVE.  THE EXECUTIVE IS RESPONSIBLE FOR PUTTING THIS IN CONTEXT.  COME ON, YOU ARE AT A COCKTAIL PARTY,  PEOPLE AROUND,  MAYBE YOU CAN DO SOMETHING ELSE LIKE GIVE A NASTY COMMENT IN RESPONSE.  IT TAKES THE OUTPUT OF THE AMYGDALA AND COUNTERS IT.

DIRECT EXAM OF RUBEN GUR

NOW, ANOTHER PART YOU WILL NOTICE ABOUT THE ORBITAL REGION IS THAT IT IS SITTING ON TOP OF BONES.  AND SO, IT IS AN AREA THAT IS VERY PRONE TO DAMAGE WITH ANY KIND OF HEAD INJURY. THAT IS WHY WE SEE, A LOT OF TIMES WITH HEAD INJURIES, PEOPLE WHO WERE NORMALLY QUITE CALM AND COOL AND COLLECTED, ALL OF A SUDDEN, GO INTO OUTBURSTS OF UNCONTROLLABLE EMOTIONS THAT MAY INCLUDE EITHER ANGER OR FEAR.

**Q.    DOCTOR, WHAT DO WE HAVE HERE?**

A.    ON THE NEXT IS A STUDY WE DID IN COLLABORATION WITH A GROUP AT TOYAMA UNIVERSITY IN JAPAN.  THEY WERE ABLE TO STUDY PEOPLE AS SOON AS THEY, BASICALLY, POPPED OUT OF THE WOMB. HERE IS A BABY, A ONE-MONTH-OLD BABY,  THREE-MONTHS-OLD BABY, SIX-MONTH-OLD BABY.  WHEN YOU DIVIDE THE BRAIN IN GRAY MATTER,  WHITE MATTER,  CSF,  YOU WILL SEE, IN A ONE-MONTH-OLD BABY, THERE IS NO FAT.  REMEMBER THE FAT IS IN GRAY.  AND YOU BEGIN TO SEE THE FAT DEVELOPING RIGHT HERE IN THE MIDDLE OF THE BRAIN, WHICH IS THE PART THAT IS RESPONSIBLE FOR SENSING AND FOR ACTION.  AND THEN THE FAT, THE GRAY CONTINUES TO SPREAD. YOU CAN SEE A ONE YEAR OLD,  THREE YEAR OLD,  A TEN YEAR OLD,  BUT ONLY IN THE 20 YEAR OLD CAN YOU SEE THE, YOU CAN SEE THIS GRAY AREA SPREAD ALL THE WAY TO THE FAR REACHES OF THE FRONTAL LOBE.  SO,  EVEN A TEN YEAR OLD STILL HAS VERY TENUOUS CONNECTION ALONG THE DIFFERENT PARTS OF THE BRAIN.  IT IS STILL NOT WORKING AS A WELL-OILED MACHINE.  I GUESS I DON'T NEED TO TELL ANY PARENT.

DIRECT EXAM OF RUBEN GUR

NOW, THESE ARE THE AVERAGES.  THESE ARE THE AVERAGES.  ON THE LEFT, YOU SEE FOR THE WHOLE BRAIN OF GRAY MATTER AND WHITE MATTER, AND THE POINT I WANT TO SHOW IS THE BLUE LINES ARE FOR BABIES WHO ARE LESS THAN TWO YEARS OLD, THE GREEN LINE IS CHILDREN BETWEEN TWO YEARS AND TEN YEARS, AND THE RED LINE IS THE ADULTS.  SO,  IF YOU LOOK AT GRAY MATTER,  YOU CAN SEE THAT NEWBORN BABIES HAVE A HIGHER VOLUME OF GRAY MATTER THAN ADULTS OR CHILDREN.  BUT IF YOU LOOK AT THE WHITE MATTER DOWN HERE,  THEY STILL HAVEN'T REACHED THE AMOUNT OF WHITE MATTER FOR THE WHOLE BRAIN.

NOW,  THIS DIFFERENCE IS PARTICULARLY PRONOUNCED FOR THE FRONTAL LOBE HERE THAT YOU SEE THAT THEY ALREADY LOST A LOT OF GRAY MATTER,  BUT THEY STILL HAVE A LOT OF WHITE MATTER TO BUILD BEFORE THEY REACH ADULTHOOD.  IN THE TEMPORAL LOBE, WHICH IS THE PART THAT RELATES TO MEMORY, THIS PROCESS OF MYELINATION IS NEARLY COMPLETE.  THERE IS JUST A LITTLE BIT MORE FOR THE LEFT GRAY MATTER, THE LEFT WHITE MATTER TO GROW. BUT THAT IS WHY CHILDREN HAVE TREMENDOUS MEMORY.  THEY CAN LEARN, AND THEY CAN REMEMBER.  SO THE MEMORY PART OF THE BRAIN IS ALREADY WORKING.  IT IS JUST THE EXECUTIVE THAT NEEDS TO BE,  TO GET IMPORTED.

Q.    **WHAT DO WE HAVE HERE?**

A.    HERE WE SEE A VERY RECENT STUDY JUST CAME OUT LAST MONTH PUBLISHED IN THE PROCEEDINGS OF NATIONAL ACADEMY OF SCIENCES BY CALIBRATION BETWEEN UCLA, AND  NCIH, AND

DIRECT EXAM OF RUBEN GUR

UNIVERSITY OF MARYLAND.  AND THIS, BASICALLY, TAKES ALL OF THE DATA WE HAVE ABOUT DEVELOPMENT AND TURNS THEM INTO A MOVIE.  SO, YOU CAN SEE, IF YOU LOOK AT THE LEFT PICTURE HERE, THIS SHOWS YOU A PICTURE OF THE LEFT SIDE OF THE BRAIN TAKEN FROM THE SIDE,  AS SOON AS YOU TOUCH, YOU WILL SEE BLUE MEANS MYELINATION.  YOU CAN SEE IT STARTED RIGHT IN THIS STRIP HERE, WHICH IS THE SENSORY MOTOR STRIP, AND MOVES FORWARD, AND THE LAST AREA TO BECOME BLUE IS THE FRONT OF THE BRAIN.  YOU WILL SEE THAT REPEATED AFTER BEN TOUCHES THE RIGHT SIDE.  AND THIS IS A VIEW FROM THE TOP.  IF YOU GO HERE FIRST TO VIEW, AND THIS IS A VIEW FROM THE BOTTOM.  SO,  THIS, BASICALLY, THIS MOVIE IS GENERATED FROM REAL MRI THAT WERE ALL PUT IN THESE THREE-DIMENSIONAL SCALES AND SEGMENTED AND A LOT OF TAPE THAT WERE MADE SO CAN YOU SEE THEM IN A MOVIE.  SO, YOU SAW OVER A FEW SECONDS WHAT REALLY TAKES PLACE OVER SEVERAL YEARS.

**Q.    DOCTOR,  YOU HAVE BEEN TALKING ABOUT THE MRI AND HOW IT WORKS. CAN YOU BRIEFLY TALK ABOUT THE PET?**

A.    YES.  OUR NEXT -- NOW, AS I MENTIONED, YOU CANNOT -- YOU CAN'T -- YOU CAN'T UNDERSTAND THE BRAIN JUST FROM LOOKING AT THE ANATOMY ANY MORE THAN, YOU KNOW, IF YOUR CAR IS WORKING BY JUST VERIFYING THAT THERE IS AN ENGINE IN PLACE.  SO,  YOU NEED TO LOOK AT IT IN ACTION.  AND POSITRON EMISSION TOMOGRAPHY, OR PET, IS AN IMAGING TO LET YOU LOOK AT HOW ACTIVE THE BRAIN IS.  THE REASON WE CAN LOOK AT HOW ACTIVE THE BRAIN IS IS THAT EVERY TIME ONE OF THOSE BRAIN CELLS

DIRECT EXAM OF RUBEN GUR

FIRES, IT NEEDS ENERGY BEFORE IT CAN FIRE AGAIN.  EACH NEURON GETS REALLY EXHAUSTED AFTER ONE PULSE.  AND, IMMEDIATELY, IS LOOKING FOR A WAY TO REGENERATE THE ENERGY TO SEND ANOTHER PULSE.  THE BRAIN ONLY EATS SUGAR.  OUR MUSCLES CAN EAT PROTEINS, BUT OUR BRAIN DOESN'T GET PROTEINS.  THE PROTEINS DON'T GET THROUGH TO THE BRAIN BECAUSE THERE IS A BARRIER THAT STOPS ANY BIG MOLECULE FROM ENTERING FROM THE BLOOD TO THE BRAIN.  SO,  WHEN THE BRAIN GETS ENERGY BY BREAKING DOWN SUGAR USING OXYGEN, SO IT IS BASICALLY BURNING THE SUGAR WITH OXYGEN,  AS SOON AS THE NEURON IS EXHAUSTED,  ASKS, SAYS, GIVE ME SOMETHING, I AM HUNGRY,  I AM SUFFOCATING,  THE BLOOD GUSHES INTO THE AREA,  BRINGS WITH IT SUGAR AND OXYGEN, AND THE CELL TAKES THE SUGAR AND THE OXYGEN,  BURNS THE SUGAR WITH THE OXYGEN, AND USES WHAT COMES OUT AS THE ENERGY SO IT CAN DO ANOTHER PULSE.

NOW,  WHEN SUGAR BREAKS DOWN,  IT RELEASES A TOXIC. THESE ARE -- REALLY, THE PRODUCTS OF THIS METABOLISM ARE TOXIC TO THE BRAIN.  THEY HAVE -- A SCIENTIST GAVE THEM A NAME, FREE RADICALS.  AS SOON AS THEY GET RELEASED, THEY ATTACK THE CELLS.  AND WOULD KILL THEM UNLESS THEY GET CARRIED AWAY BY THE BLOOD.  SO,  OUR BLOOD FLOWING THROUGH THE BRAIN IS BOTH BRINGS THE GROCERIES AND TAKES AWAY THE GARBAGE.  AND SO, IT IS IMPORTANT THAT THE BLOOD WILL KEEP FLOWING THROUGH THE BRAIN IN ORDER TO KEEP FEEDING IT AND TAKING AWAY ALL OF THE TOXIC BY-PRODUCTS.

DIRECT EXAM OF RUBEN GUR

WHAT POSITRON EMISSION TOMOGRAPHY DOES IS A LITTLE FOOLING AROUND WITH THE BRAIN.  WE TAKE A MOLECULE THAT LOOKS EXACTLY LIKE SUGAR OR GLUCOSE, BUT IT IS SYNTHETIC.  AND IT DOESN'T BREAK DOWN.  ONCE IT GETS INTO THE CELL,  IT STAYS THERE FOR A LITTLE BIT.  AND THAT MOLECULE GETS TAGGED WITH A RADIOACTIVE LABEL.  SO,  ESSENTIALLY, YOU PUT IN ANOTHER ATOM THAT HAS A LOT MORE POSITIVELY CHARGED PARTS THAN NEGATIVELY CHARGED PARTS.  THE NEGATIVELY CALLED CHARGE PARTS ARE POSITRON.  WHEN THERE ARE MORE PARTS THAN ANOTHER, THAT IS CALLED ATOMS.  THE POSITRONS KEEP FLYING OUT LOOKING FOR A MATE, BASICALLY.  THEY ARE LOOKING FOR A NEGATIVELY CHARGED PARTICLE.  THESE ARE ABUNDANT IN THE BRAIN, SO THEY WILL USUALLY TRAVEL NO MORE THAN THREE MILLIMETERS BEFORE THEY HIT A NEGATIVELY CHARGED PARTICLE, WHICH IS CALLED AN ELECTRON.

SO, WHEN A POSITRON HITS AN ELECTRON, THEY BOTH EXPLODE, ESSENTIALLY,  ANNIHILATE OUT OF THAT EXPLOSION.  THERE ARE TWO LIGHT PARTICLES THAT COME OUT OF THAT EXPLOSION, WHICH, FORTUNATELY FOR US, TRAVEL EXACTLY 180 DEGREES FROM EACH OTHER.  THEY GO AWAY.

A.    WHAT WE DO IS, WE ESSENTIALLY SURROUND THE BRAIN WITH DETECTORS, AND WHEN THE DETECTORS -- TWO DETECTORS THAT LOOK AT EACH OTHER GET TRIGGERED EXACTLY AT THE SAME TIME,  WE KNOW THAT SOME SUGAR WAS EATEN UP IN THAT PLANE.  AND FROM ALL OF THAT INFORMATION, WE CAN CONSTRUCT THE THREE-DIMENSIONAL PICTURE OF THE BRAIN WHERE THE BRIGHT SPOTS TELL US A LOT OF

DIRECT EXAM OF RUBEN GUR

SUGAR WENT THERE.  IF A LOT OF SUGAR GOES TO THE PART OF THE BRAIN, IT MEANS THAT THAT BRAIN IS WORKING.  AND UNLIKE ANATOMY, YOU CAN DO AN MRI TO SOMEONE WHO IS SLEEPING OR SOMEONE WHO IS BEING SCARED TO DEATH IN THE SCANNER,  THE ANATOMY IS NOT GOING TO CHANGE.  THE MRI WILL LOOK THE SAME. BUT IF YOU DO A PET SCAN,  THE RESULTS WILL DIFFER A LITTLE BIT DEPENDING UPON WHAT THE PERSON WAS DOING INSIDE THE SCANNER.  AND HERE ARE ILLUSTRATIONS.  IF YOU ARE LISTENING, YOU WILL SEE ACTIVATION HERE WHICH IS THE TEMPORAL PART OF THE BRAIN RIGHT BEHIND THE TEMPLE.  IF YOU ARE LOOKING,  THE ACTIVATION WILL BE MORE IN THE BACK OF THE BRAIN,  WHICH IS RIGHT HERE, WHICH IS WHERE THE VISUAL INFORMATION GOES.  IF YOU ARE THINKING,  THE CHIEF EXECUTIVE GOES UP,  THE FRONT OF THE BRAIN RIGHT HERE.  SO,  CHANGES CAN BE,  THEY CAN BE SUBTLE, BUT CLEAR CHANGES DEPENDING UPON WHAT THE PERSON IS DOING.

AND,  OF COURSE,  IN VARIOUS DISORDERS, EPILEPSY,  FOR EXAMPLE, IS CHARACTERIZED BY ABNORMALLY HIGH ACTIVITY IN THE TEMPORAL LOBE, USUALLY IN A PARTICULAR REGION.  AND THAT IS WHY THE REASON EPILEPSY HAPPENS IS, WHEN THERE IS A LOT OF SUGAR UPTAKE BUT NOT ENOUGH BLOOD GOING.  AND SO, THE FREE RADICALS BEGIN TO KILL THE CELLS AND PRODUCE WHAT IS KNOWN AS AN EPILEPTIC FAULTNESS THAT WILL DISCHARGE ABNORMALLY.

SO,  NOW WE ARE DONE WITH EXPLAINING TO YOU THE ANATOMY OF THE BRAIN, THE PHYSIOLOGY OF THE BRAIN AND THE FINAL CHAPTER

DIRECT EXAM OF RUBEN GUR

IS, BEHAVIOR.   AND, ACTUALLY, IT DIDN'T, THE FACT THAT THE
BRAIN CONTROLS BEHAVIOR THAT TODAY EVERYBODY SORT OF ASSUMES
THIS IS TRUE,  I DOUBT THERE ARE MANY PEOPLE WHO THINK
DIFFERENTLY.   BUT ACTUALLY, IT IS A FAIRLY RECENT DISCOVERY.
PLATO,  FOR EXAMPLE,  THOUGHT THAT COURAGE RESIDES IN THE
HEART,  REASON RESIDES IN THE HEAD, AND BASE QUALITIES ARE IN
THE STOMACH.   ALBERTUS MAGNUS CAME CLOSER TO THE SIGHT.   HE
THOUGHT IT HAPPENED IN THE HEAD, IT DIDN'T HAPPEN IN THE
TISSUE.  HE THOUGHT IT HAPPENED IN THE VENTRICLES, THE
CEREBROSPINAL FLUID IN THE BRAIN.   BECAUSE THERE ARE THREE OF
THOSE VENTRICLES INSIDE THE BRAIN, IT FIT HIS IDEA OF THREE
DIFFERENT ASPECTS OF THE BRAIN.   RENE DESCARTES SAID,  NO,
NO,  IT CAN'T BE THE VENTRICLES.  ALL I SEE IN THE VENTRICLES
IT IS FLUID.  IT MUST BE INSIDE THE BRAIN.   UNFORTUNATELY,
HOW CAN IT BE IN THE BRAIN IF HE ALREADY KNEW WE DON'T HAVE
ONE BRAIN,  WE HAVE TWO BRAINS?  AND SINCE HE WAS CATHOLIC AND
BELIEVED STRONGLY THAT,  YOU KNOW,  THE AFTERLIFE, AND SO ON,
IF WE HAVE TWO BRAINS, WE MUST HAVE TWO SOULS,  WHAT HAPPENS
IF ONE OF THEM IS GOOD AND THE OTHER IS BAD.

LET ME SEARCH, LET ME SEE IF THERE IS ANY STRUCTURE INSIDE
THE BRAIN THAT IS NOT SPLIT.   THE PINEAL GLAND THAT IS NOT
DIVIDED IN TWO, AND HE SAID, AHA, THIS IS THE SEAT OF THE
SOUL.   THE PINEAL GLAND TURNS OUT IS AN IMPORTANT GLAND, BUT
DOES NOTHING RELATED TO WHAT WE THINK OF AS MIND OR SOUL.
AND SO THE FIELD WAS A LITTLE BIT IN DISARRAY AND GAVE RISE TO

DIRECT EXAM OF RUBEN GUR

A FIELD OF PHRENOLOGY, WHERE THESE INVESTIGATORS TRIED TO CULMINATE THE SHAPE OF THE SKULL WITH THESE VARIATIONS.  THEY SAID PEOPLE WITH HIGH BROWS TEND TO BE MORE INTELLECTUAL. THEY SAID THIS IS THE SITE OF INTELLECT.  SO, THEY ACTUALLY DISCOVERED THE EXECUTIVE,  THE ROLE OF THE FRONTAL LOBE PRETTY EARLY.  BUT THEY GOT SOMETIMES, FOR EXAMPLE, THEY THOUGHT PEOPLE WHO HAD PROTRUSIONS IN THE BACK OF THE HEAD WOULD BE GREAT MATHEMATICIANS.  AND THEY WERE FRENCH, SO THEY THOUGHT ABOUT THE THIRD OF THE BRAIN WAS DEVOTED TO WINE APPRECIATION RIGHT HERE.

BUT IT BECAME CLEAR THAT THIS IS NOT A VERY EFFICIENT WAY TO GO, AND THE FIELD WAS REALLY IN A CRISIS UNTIL FRENCH NEUROSURGEON BY THE NAME OF PAUL BROCA REASONED, AS FOLLOWS. HE SAID, IF THERE IS DIFFERENT PARTS OF THE BRAIN DOING DIFFERENT THINGS, LET'S TAKE VERY IMPORTANT FUNCTION,  THE MOST IMPORTANT FUNCTION AND SEE IF THAT HAS A LOCATION IN THE BRAIN.  SO,  WHAT IS THE MOST IMPORTANT FUNCTION? HE SAID SPEECH.  IT IS VERY HARD TO SURVIVE IF YOU CAN'T TALK.  SO, HE SAID, LET ME SEE IF I CAN FIND A PATIENT WHO IS NOT DEMENTED,  WHO IS VERY NORMAL IN INTELLIGENCE, BUT LOST THE ABILITY TO TALK. AND HE WAS PRESENTED WITH MONSIEUR LELONG, WHO FIT THE BILL EXACTLY.

HE WAS A GENTLEMAN IN HIS FIFTIES,  WAS MARRIED,  HAD CHILDREN,  RAISED A FAMILY,  WAS AN UPRIGHT CITIZEN, AND ALL OF A SUDDEN, STARTED TO SPEAK LESS AND LESS AND LESS.  AND AT

DIRECT EXAM OF RUBEN GUR

THE POINT WHERE WHEN BROCA MET HIM, HE HAD ONLY SEVEN WORDS HE COULD USE.  THESE WORDS WERE:  1,  2,  3,  YES,  NO, TOUJOURS, WHICH MEANS ALWAYS AND HIS NAME.   BUT BROCA SHOWED THAT HE WASN'T DEMENTED, HE WAS ACTUALLY QUITE SMART, WAS ABLE TO USE THESE WORDS EXACTLY TO COMMUNICATE.   WE USED ONE FOR ONE; TWO FOR TWO; AND THREE FOR ANY NUMBER LARGER THAN TWO. BUT WHEN YOU ASKED HIM,  SAY,  HOW MANY CHILDREN DO YOU HAVE, HE WILL SAY TROIS AND POINT OUT THE CORRECT ANSWER FIVE.   HOW OLD ARE YOU?  HE WOULD SAY THREE BUT GAVE A COMPLICATED SIGNAL THAT INDICATED HIS CORRECT AGE.   AND HE USED YES FOR YES; NO FOR NO; AND TOUJOURS FOR EVERYTHING ELSE.

BUT HE WASN'T AUGMENTED.  HE WAS ABLE TO COMMUNICATE THAT WAY.   WELL,  BROCA, ONCE HE ESTABLISHED THAT, HE, OF COURSE, COULDN'T WAIT FOR POOR MONSIEUR LELONG TO DIE AND, FORTUNATELY, FOR MONSIEUR LELONG,  FORTUNATELY FOR OUR FIELD, HE DIED TWO YEARS AFTER BEING EXAMINED BY BROCA.   HE OPENED UP THE BRAIN, LOOKED AT THE SKULL,  LO AND BEHOLD, THERE WAS A BIG LESION IN THE THIRD FRONTAL CONVOLUTION OF THE LEFT HEMISPHERE.   HE PUBLISHED THAT HERE IS THE SEAT OF SPEECH. HE WAS LUCKY, DEAD ON THE MONEY.   HE PUBLISHED IN 1864, AND NOW WE ARE 140 YEARS LATER, AND THAT IS VERY FIRMLY ESTABLISHED.  A LESION IN THE LEFT FRONT PART OF THE BRAIN PRODUCES DIFFICULTIES SPEAKING.

MOST IMPORTANTLY, HE ALSO ESTABLISHED THE METHOD THAT SERVED US FOR A HUNDRED YEARS, WHICH IS LOOKING FOR PATIENTS

DIRECT EXAM OF RUBEN GUR

THAT CAN'T DO VARIOUS THINGS AND FINDING OUT WHAT PARTS OF THE BRAIN ARE MISSING.  AND THAT IS HOW WE DISCOVERED THAT, IF THE LESION IS MORE IN THE BACK OF THE LEFT,  PEOPLE CAN TALK FINE, BUT THEY DON'T UNDERSTAND ANYTHING.  AND IF THE LESION IS IN THE RIGHT SIDE IN THE SAME PLACE,  THEY CAN TALK, BUT THEY DON'T HAVE ANY EMOTION IN THEIR SPEECH.

SO,  THE FIRST CASE PRESENTED WAS A TEACHER WHO CAME IN WITH A COMPLAINT THAT SHE LOST CONTROL OF HER CLASSROOM.  AND DURING THE CLINICAL INTERVIEW, THE PHYSICIAN OBSERVED SHE WAS TALKING IN A STRAIGHT VOICE, HAD NO EMOTIONAL INFLECTION. SO, OBVIOUSLY, YOU TAKE A BUNCH OF KIDS, AND YOU TELL THEM, PLEASE, SIT QUIETLY,  IT IS NOT GOING TO WORK.  YOU HAVE TO PUT EMOTION IN YOUR SPEECH, AND THAT IS WHAT SHE COULDN'T DO. SHE HAD THE LESION IN EXACTLY BROCA'S AREA, BUT ON THE RIGHT SIDE.

OTHER LESIONS ON THE RIGHT HEMISPHERE PRODUCE DIFFICULTIES IN UNDERSTANDING SPATIAL RELATIONS.  AND REALLY, THIS IS HOW THE FIELD OF NEUROPSYCHOLOGY WAS DEVELOPED.  PSYCHOLOGISTS STARTED TO GET INTO THIS EVALUATION, AND NOW, INSTEAD OF TALKING TO A PATIENT AND TRYING TO FIGURE OUT THEIR FLUENCY, WE HAVE STANDARD TESTS.  WE TELL A PATIENT,  OKAY,  YOU HAVE ONE MINUTE,  HOW MANY WORDS CAN YOU SAY THAT START WITH C? AND YOU COUNT HOW MANY, AND YOU COLLECT A LOT OF DATA ON THE HEALTHY PEOPLE ACROSS THE AGE RANGE.  YOU KNOW WHAT THE AVERAGE NUMBER OF WORDS THAT THE HEALTHY PERSON WILL GIVE YOU

DIRECT EXAM OF RUBEN GUR

IS AND WHAT THIS PARTICULAR PATIENT GAVE YOU.  AND THEN, YOU GO ON AND YOU LOOK AT VERBAL COMPREHENSION.  YOU GIVE A STANDARD SET OF TESTS THAT SAY -- WILL TELL THEM, TAKE THE GREEN CHIP,  THE BIG GREEN CHIP, AND PUT IT ON TOP OF THE LITTLE RED CHIP.  AND SEE IF THEY CAN UNDERSTAND WHAT YOU ARE INSTRUCTING THEM. SO, IF THERE IS A DIFFICULTY THERE, PEOPLE WITH LESIONS, MORE IN THE LEFT MORE IN THE BACK, WILL HAVE A HARD TIME,  THEY WILL GET CONFUSED, THEY WON'T UNDERSTAND WHAT YOU WANT THEM TO DO.  AND THAT IS THROUGH THOSE KINDS OF TESTING, LOOKING AT VARIOUS ASPECTS OF EXECUTIVE FUNCTIONS AND MEMORY AND SPATIAL ABILITIES, YOU CAN MAP THE BRAIN AND FIND OUT WHAT PARTS OF THE BRAIN DON'T SEEM TO BE WORKING RIGHT. AND THAT IS DONE MUCH MORE RIGOROUSLY THROUGH STANDARD TESTING THAN NEUROLOGIST OR NEUROSURGEON CAN DO BY JUST TALKING AND TRYING TO GET A FEEL FOR IT.

**Q.    SO,  DR. GUR,  AS I UNDERSTAND IT,  YOU CAN MEASURE THE BRAIN STRUCTURE.  YOU DO THAT WITH AN MRI?**

A.    YES.

**Q.    YOU CAN MEASURE THE PHYSIOLOGY OF THE BRAIN, AND YOU DO THAT WITH THE PET SCAN?**

A.    CORRECT.

**Q.    AND THEN, YOU CAN MEASURE HOW THE BRAIN IS ACTUALLY WORKING BEHAVIORALLY,  HOW IT IS BEHAVING, YOU DO THAT WITH NEUROPSYCHOLOGICAL TESTING?**

A.    ABSOLUTELY.  IN THE SAME WAY THAT THE FUNCTION OF THE

DIRECT EXAM OF RUBEN GUR

HEART IS TO PUMP BLOOD, THE FUNCTION OF THE BRAIN IS TO BEHAVE. SO, THE SAME WAY WHEN YOU, ULTIMATELY, YOU CAN SCAN THE HEART AND YOU SEE THE HEART IS HEALTHY, YOU MEASURE ITS RATE, AND IT IS FINE, BUT IF IT DOESN'T PUMP BLOOD, IT IS NOT, IT IS NOT DOING ITS JOB. THE JOB OF THE BRAIN IS BEHAVIOR. SO, ULTIMATELY, THE STATE OF THE BRAIN IS MEASURED BY THE BEHAVIOR.

**Q. AND, DR. GUR, IN THIS CASE, MIGHT HELP WE COULD MOVE ON SOME NOW AND TALK ABOUT THAT, MOVE ON TO MR. FULKS'S CASE. IN THIS CASE, DO YOU HAVE ACCESS TO AN MRI?**

A. I WAS GOING TO JUST QUICKLY ILLUSTRATE SOME OF THESE MEASURES.

**Q. YOU CAN DO IT NOW OR IN THE CONTEXT OF WHAT YOU, ACTUALLY, DISCOVERED IN THIS CASE.**

A. WE HAVE IT, MIGHT AS WELL DO IT, BECAUSE I THINK IT WILL --

**Q. OKAY. WHAT IS THIS THEN?**

A. SO, THIS NOW LOOKS MORE DETAILED AT THE EXECUTIVE. SO, THE TEST THAT YOU SEE CALLED "ATTENTION CPT," YOU SEE THOSE SEVEN SEGMENT DISPLAYS FLASHING VERY RAPIDLY.

**Q. JUST TO BE CLEAR, THIS IS AN EXAMPLE OF NEUROPSYCHOLOGICAL TEST, THE THIRD THING YOU WERE TALKING ABOUT?**

A. YES.

THE PATIENT IS ASKED TO PUSH A BUTTON EVERY TIME THEY SEE

DIRECT EXAM OF RUBEN GUR

A NUMBER.  SO,  THE STRUCTURE HERE IS THE NUMBER 5.  SO, WHEREAS, ON THE LEFT, IT IS A MEANINGLESS COMBINATION.  SO, YOU ARE ONLY SUPPOSED TO HIT THE BUTTON WHEN YOU SEE AN ACTUAL NUMBER.  THE BOTTOM ONE IS LOOKING AT YOUR ABILITY TO COME UP WITH A CONCEPT OF GROUPS.  SO YOUR INSTRUCTION IS TO CLICK ON AN OBJECT THAT DOES NOT BELONG.  NOW,  IF YOU LOOK CAREFULLY, YOU MAY WANT TO CHOOSE THE SQUARE ON THE RIGHT BECAUSE IT IS THE ONLY SQUARE.  ON THE OTHER HAND, YOU MAY WANT TO CHOOSE THE LEFT MOST OBJECT BECAUSE IT IS THE ONLY ONE THAT IS SMALL. OR YOU WOULD WANT TO CHOOSE THIS OBJECT, WHICH IS THE ONLY ONE THAT HAS THICK -- THAT IS DRAWN IN THICK LINES.  SO, REALLY, NONE OF THOSE OBJECTS BELONG, DEPENDING UPON WHAT RULE YOU WANT TO ADOPT.  AND THE COMPUTER KNOWS, BASICALLY, RANDOMLY CHOOSES ONE OF THOSE RULES.  AND SO, IF YOU CHOOSE,  IF YOU HAPPEN TO CLICK ON THE SQUARE AND THE COMPUTER IS THINKING SIZE,  YOU WILL GET ZIP,  NO,  TRY AGAIN.  AND A NEW CARD WILL SHOW UP.  AND IF YOU CHOOSE BY SHAPE AGAIN,  YOU WILL GET ZIP AGAIN UNTIL YOU SAY,  WAIT,  MUST BE SOMETHING ELSE. THEN YOU SAY, OH, IT COULD BE SIZE, AND YOU BEGIN TO CHOOSE BY SIZE.  THEN YOU GET BINGO,  YOU GOT IT.  AND THE COMPUTER LETS YOU SIT ON YOUR GLORY FOR 10 TRIES.  AND THEN, THE COMPUTER SWITCHES ON YOU.

AND ALL OF A SUDDEN, AS HAPPENS IN LIFE,  THE SAME THING THAT ALWAYS WORKED DOESN'T WORK ANYMORE.  WHAT DO YOU DO? DO YOU FALL ON YOUR FEET? DO YOU THINK ABOUT ALTERNATIVES?  AND

DIRECT EXAM OF RUBEN GUR

HERE IS WHERE THE FRONTAL EXECUTIVE LOBE GETS AN OPPORTUNITY EITHER TO SHINE OR TO FAIL.

NEXT.  AND IN ADDITION, WE LOOK AT THE INTERACTION.  YOU RECALL I TALKED ABOUT THE RELATIONSHIP BETWEEN THE TEMPORAL LOBE AND THE EXECUTIVE, AND THAT IS VERY IMPORTANT IN MEMORY. BECAUSE IF YOU WANT TO REMEMBER SOMETHING,  IT HELPS IF YOU CAN ORGANIZE IT INTO MEANINGFUL CHUNKS,  PARTICULARLY IF YOU WANT TO REMEMBER WORDS.  IF I ASK YOU TO REMEMBER A BUNCH OF WORDS,  YOU WILL JUST TRY TO REMEMBER, BY THE SOUND OF MY VOICE, IT WILL BE HARD.  YOU TRY TO SAY WAIT A MINUTE,  SOME OF THESE WERE TOOLS,  SOME OF THESE WERE CLOTHING ITEMS, SOME OF THESE WERE NAMES OF CITIES.  AND ONCE WE BEGIN TO CHUNK IT, IT IS EASIER BECAUSE THERE WILL BE FEWER THINGS THAT YOU HAVE TO REMEMBER.

AND SO, WE TEST FOR WORD MEMORY,  WE TEST FOR FACE MEMORY, WE SHOW THEM 20 FACES, MIX THEM UP WITH 20 OTHER FACES, AND ASK THEM IF THEY HAVE SEEN THAT FACE BEFORE, AS WELL AS SPATIAL MEMORY.  WHAT IS INTERESTING, FOR EXAMPLE, IN SPATIAL MEMORY, YOU SEE 20 OF THESE SHAPES AND THEN, WHEN YOU TRY TO DECIDE WHAT I HAVE SEEN AND WHAT I HAVEN'T SEEN,  MOST PEOPLE COME OUT SAYING, I ANSWERED COMPLETELY RANDOMLY.  I HAVE NO IDEA WHY I WAS ANSWERING AND, ACTUALLY, THE TYPICAL ANSWER IS 80 PERCENT CORRECT.  AND THE REASON IS, THIS IS DONE BY YOUR RIGHT HEMISPHERE THAT IS NOT TALKING.  YOUR LEFT HEMISPHERE THAT IS THINKING AND TALKING IN WORDS SAYS, I DON'T KNOW WHAT

DIRECT EXAM OF RUBEN GUR

I AM DOING.   BUT THE RIGHT HEMISPHERE SENDS YOUR FINGER TO THE RIGHT ANSWER.   AND WE HAVE A FEELING THAT IT IS INTUITION.

ANOTHER IMPORTANT FUNCTION THAT WE ARE MEASURING MORE RECENTLY, BUT IT TURNS OUT TO BE EXTREMELY IMPORTANT TO BEHAVIOR, IS EMOTION.  NOT ONLY COGNITION IS IMPORTANT BUT EMOTION.   WHEN YOU WANT TO LOOK AT EMOTION PROCESSING, THE MOST IMPORTANT PART IS THE FACE, BECAUSE THE FACE IS WHERE EMOTIONS ARE EXPRESSED MOST CLEARLY,  NOT ONLY WITHIN A SPECIES BUT EVEN AT CROSS SPECIES.

SO,  HERE, IN THIS PICTURE, YOU SEE THE PEOPLE LYING IN LINE.  IF YOU JUST LOOKED AT THE BODY YOU COULDN'T TELL WHERE THEY ARE LYING.   IF YOU ZOOM IN TO THE FACE, YOU CAN PRETTY MUCH TELL THEIR POSITION IN THE LINE BY LOOKING AT THE FACE. NUMBER 9 ALREADY SEES THE MOTOR HAS FLOWN OVER HIM, HE IS QUITE HAPPY.   NUMBER 12 IS STILL HOLDING A STIFF UPPER LIP, BUT NUMBER 13 LOOKS CONCERNED.   SO, WHAT WE HAVE DONE IS, ESSENTIALLY, OBTAINED PICTURES FROM ACTORS AND ACTRESSES WHO DISPLAY DIFFERENT EMOTIONS AT DIFFERENT LEVELS OF INTENSITY. THEN WE SHOW THOSE PICTURES TO HEALTHY PEOPLE AND ASK THEM TO IDENTIFY THE EMOTION AND TELL US THE INTENSITY OF THE EMOTION. AND BASED ON THAT, WE ARE ABLE TO CONSTRUCT TESTS TO FIND OUT IF SOMEBODY UNDERSTANDS EMOTIONAL EXPRESSIONS.   AND TO OUR SURPRISE, INITIALLY, BECAUSE IT SEEMS LIKE SOMETHING EVERYBODY SHOULD BE ABLE TO DO,  IT TURNS OUT NOT TO BE VERY EASY IF YOU

DIRECT EXAM OF RUBEN GUR

HAVE BRAIN DAMAGE.

SO, NOW WE ARE TURNING TO MR. FULKS.

**Q.    WE ARE TURNING TO MR. FULKS.    TALKED ABOUT STRUCTURE, TALKED ABOUT PHYSIOLOGY, TALKED ABOUT BEHAVIOR.    LET'S FOLLOW THAT SAME PATTERN AND LET'S GO FIRST TO THE MRI AND THE BRAIN STRUCTURE.**

A.    YES.

**Q.    WHAT DO WE HAVE ON THIS SLIDE?**

A.    MRI.  I WOULD DEFER GOING INTO THE DETAIL TO DR. DAVITZKOS SINCE HE DID THE COMPLETE ANALYSIS,  BUT THE MRI, IF YOU LOOK AT IT,  THE BRAIN LOOKS MISSHAPEN.  IT IS NOT, IN PARTICULAR,  I MEAN,  THERE IS THE CLINICAL READING OF SUBARACHNOID OR ARACHNOID CYST, BUT THIS IS ALMOST THE LEAST OF THE TROUBLES.

**Q.    FIRST, WHAT IS AN ARACHNOID CYST?**

A.    IT IS LIKE A CYST.  IT IS LIKE, REALLY, I GUESS WE CALL IT A ZIT, BUT IT IS INSIDE THE HEAD, AND IT KEEPS GROWING, AND IT CAN,  IT IS USUALLY NOT,  IT IS NOT MALIGNANT, AND IT JUST -- YOU USUALLY KEEP LEAVE IT THERE UNLESS IT BEGINS TO GROW TO THE POINT WHERE IT COMPRESSES THE BRAIN AND BEGINS TO CAUSE TROUBLE.  OTHERWISE, PROBABLY SOME PEOPLE IN THIS ROOM WITH A CYST, AND THEY DON'T EVEN KNOW IT.  SO, IT DOESN'T.  BUT, I MEAN, DEPENDING UPON THE SIZE, IT CAN BEGIN TO IMPACT, AND THAT IS USUALLY WHEN YOU WILL COME TO THE ATTENTION OF A PHYSICIAN.  BUT WE DO, HEALTHY PEOPLE, OCCASIONALLY, WE FIND

DIRECT EXAM OF RUBEN GUR

TUMORS IN PEOPLE WHO JUST COME IN IN ORDER TO PARTICIPATE AS RESEARCH VOLUNTEERS, AND THESE ARE OPERABLE, AND IT IS GOOD WE DISCOVERED THEM IN TIME AND THE PERSON DIDN'T EVEN NOTICE THAT THERE WAS SOMETHING WRONG.   USUALLY, ONCE A TUMOR GETS A CERTAIN SIZE, THEN IT BEGINS TO PUSH BRAIN STRUCTURES, AND THAT IS WHEN YOU BEGIN TO SEE SYMPTOMS.

**Q.    HE HAS THIS CYST, BUT IN ADDITION TO THAT?**

A.    THE MAIN THING IS THAT YOU SEE THE WHOLE BRAIN IS MISSHAPEN.   YOU CAN SEE THERE ARE AREAS HERE THAT SHOULD BE FILLED.   AND THEY ARE FILLED HERE ON THE  -- WELL, RADIOLOGIST LIKE TO THINK OF SCANNING SOMEONE FROM THE BOTTOM UP.   SO, WHEN THEY SHOW A PICTURE, WHAT IS ON YOUR LEFT IS REALLY THE RIGHT SIDE, AND WHAT IS ON YOUR RIGHT IS THE LEFT SIDE.   THAT ARROW IS REALLY POINTING TO THE LEFT PART OF THE BRAIN.   AND THE WHOLE BRAIN IS HAS AN ABNORMAL SHAPE TO IT THAT SEEMS TO ALREADY ORIGINATE IN THE BOTTOM, IN THE BASE OF IT, IN THE STRUCTURES THAT REALLY ARE FULLY DEVELOPED DURING PREGNANCY.

**Q.    AND WHAT IS THE SIGNIFICANCE OF THAT?**

A.    THIS IS SOMETHING THAT WE MAKE A DISTINCTION BETWEEN DYSTROPHY AND ATROPHY.   ATROPHY IS A PART OF THE BRAIN THAT WAS THERE, AND THEN IT DIES OFF.   DYSTROPHY IS THE PART THAT NEVER MADE IT.   AND THIS LOOKED,  THIS BRAIN LOOKS DYSTROPHIC IN THE SENSE THAT IT NEVER REALLY -- IT DOESN'T LOOK LIKE IT IS A FULLY BAKED CAKE.   IT IS AS IF SOMETHING,  SOMETHING

DIRECT EXAM OF RUBEN GUR

HAPPENED EARLY ON THAT DISRUPTED THE NORMAL LAYING OUT OF THE DIFFERENT BRAIN STRUCTURES.

**Q.    AND WOULD THAT BE CONSISTENT OR INCONSISTENT WITH FETAL ALCOHOL EXPOSURE?**

A.    THAT IS PROBABLY THE MOST LIKELY CAUSE FOR SOMETHING LIKE THAT BECAUSE THAT MEANS THAT THE CONDITIONS WEREN'T RIGHT THROUGHOUT THE TIME WHEN THE FETUS WAS DEVELOPING.  IT WAS A PERSISTENT, CHRONIC CONDITION THAT JUST DIDN'T ALLOW THE BRAIN TO GET THE NORMAL SHAPE THAT YOU WOULD EXPECT FROM THE BRAIN. I MEAN,  IT IS THERE.  ALL OF THE PARTS ARE THERE,  BUT SOME PARTS ARE BIGGER THAN THEY SHOULD BE.  SOME PARTS ARE SMALLER THAN THEY SHOULD BE.  AND IT JUST DOESN'T LOOK LIKE A NORMAL BRAIN THAT YOU -- THAT YOU WOULD SEE WHEN YOU LOOK AT THAT ORIENTATION.

**Q.    ANYTHING ELSE ON THIS?**

A.    DR. DAVITZKOS WAS ABLE TO, THROUGH HIS SOFTWARE, SHOW EXACTLY WHAT ARE THE REGIONS THAT SEEM TO BE MOST PROBLEMATIC. YOU WILL NOTE THAT INVOLVES, ESPECIALLY, THE INFERIOR FRONTAL PART.  THE LOWER FRONTAL PART THAT WE DESCRIBE AS THE ORBITAL FRONTAL AREA.  THE ONE THAT TELLS YOU TO STOP,  THINK ABOUT ALTERNATIVES,  PARTICULARLY IN RELATION TO EMOTIONAL SITUATIONS.

**Q.    IT SAYS HERE, "LOSS OF BRAIN TISSUE."**

A.    IT MEANS THAT HE EXPECTED, WHEN HE COMPARED IT TO A LARGE SET OF NORMAL BRAINS, HE EXPECTED TO SEE TISSUE THERE,

DIRECT EXAM OF RUBEN GUR

AND THERE WASN'T.

Q.    AND WITHOUT GOING BACK OVER WHAT WE TALKED ABOUT EARLIER,  THAT WOULD MEAN THERE IS AN ABSENCE OF GRAY MATTER?

A.    YES.   IT IS MOSTLY IN GRAY MATTER.  AND THAT IS ANOTHER REASON WHY IT HAS PROBABLY HAPPENED, MOST OF THE MISCHIEF HAPPENED BEFORE BIRTH.   AS I MENTIONED, THE WHITE MATTER FORMS AFTER BIRTH.   THERE IS SOME WHITE, BUT NOT AS MUCH AS GRAY MATTER.

Q.    WHAT ARE THE ABNORMALITIES OF THE WHITE MATTER, JUST BRIEFLY?

A.    I THINK DR. DAVITZKOS WILL PROBABLY BE ABLE TO CHARACTERIZE IT A LOT BETTER.

Q.    YES,  I WILL JUST DEAL WITH THAT WITH HIM.   OKAY.  GO TO THE NEXT SLIDE.

A.    YEAH.   THIS IS AGAIN FROM, YOU WILL SEE MORE DETAIL OF THAT FROM DR. DAVITZKOS.  WHERE THIS METHOD, AS I MENTIONED, WE CAN MEASURE EACH STRUCTURE AND FIND OUT THE VOLUME OF THAT STRUCTURE.  AND HE IS, BASICALLY, TRANSLATING IT INTO STANDARD DEVIATION UNITS.   STANDARD DEVIATION.   SO, IF I MEASURED THE HEIGHT OF EVERYBODY IN THIS ROOM,  I WILL GET AN AVERAGE, SAY,  5 FEET 11 INCHES.   THAT REALLY DOESN'T TELL US MUCH BECAUSE YOU COULD HAVE THAT MEASURE, COME IN THE ROOM WHERE HALF THE ROOM OF MIDGETS AND HALF ARE NBA PLAYERS.   YOU WANT TO GET ANOTHER ESTIMATE OF HOW MUCH VARIATION WAS THERE AROUND THE MEAN.   AND THE WAY WE DO IT, WE CALCULATE WHAT WE CALL A

DIRECT EXAM OF RUBEN GUR

STANDARD DEVIATION, WHICH IS, ESSENTIALLY, THE AVERAGE OF THE DIFFERENCES FROM THE AVERAGE.  NOW,  WE KNOW, MATHEMATICALLY, THAT THE STANDARD DEVIATION IS HELPFUL BECAUSE, IF THE DISTRIBUTION, LIKE MOST DISTRIBUTION ARE WHAT WE CALL BELL SHAPE OR NORMAL DISTRIBUTION,  MOST PEOPLE ARE, ON THE AVERAGE, AND AS YOU GET AWAY FROM THE AVERAGE,  YOU GET FEWER AND FEWER PEOPLE HAVING THAT VALUE.  SO,  STANDARD DEVIATION TELLS YOU, WITHIN ONE STANDARD DEVIATION FROM THE MEAN,  YOU WILL FIND TWO-THIRDS OF THE PEOPLE.  SO,  IF I KNOW THAT THE AVERAGE HEIGHT IN THIS ROOM IS FIVE FEET EIGHT INCHES, AND THE STANDARD DEVIATION IS THREE INCHES,  THEN I KNOW THAT TWO-THIRDS OF YOU WILL BE BETWEEN FIVE-FIVE AND SIX -- FIVE ELEVEN.  I AM NOT VERY GOOD WITH ARITHMETIC.  AND THE TWO STANDARD DEVIATION WOULD BE 99  -- 98 PERCENT OF YOU WILL BE WITHIN TWO STANDARD DEVIATION.  AND THAT IS A RULE THAT APPLIES TO EVERYTHING THAT HAS A DISTRIBUTION THAT LOOKS LIKE A BELL,  THE NORMAL DISTRIBUTION.  YOU CAN SEE SOME REGIONS. HE HAS STATED THEM IN STANDARD DEVIATION UNITS.  MINUS ONE MEANS ONE STANDARD DEVIATION; MINUS TWO,  MINUS THREE IS THREE STANDARD DEVIATION FROM THE MEAN.  YOU WILL SEE IN THE BAR THERE ARE SEVERAL REGIONS WHERE THE VOLUME IS ALMOST THREE STANDARD DEVIATION LOWER THAN THE AVERAGE, AND SOME AT THE SAME INDIVIDUAL.  FOR SOME REGIONS IN SOME OTHER AREAS, THE VOLUME IS THREE STANDARD DEVIATION LARGER THAN YOUR AVERAGE BRAIN.  THAT IS HIGHLY UNUSUAL.  SO, AGAIN, THIS CHART

DIRECT EXAM OF RUBEN GUR

DR. DAVITZKOS WILL TALK ABOUT IT WHEN HE COMES IN, IN MORE DETAIL, JUST SHOWS -- SUMMARIZES, IN A BAR GRAPH, THE ABNORMALITIES IN VARIOUS BRAIN IMAGES.

Q.     NEXT.

A.     HERE IS MR. FULKS'S PET SCAN.   THESE LOOK LIKE THE MRI ARE SIMILAR, BUT THEY ARE FUZZIER, THEY ARE FUZZIER BECAUSE THE RESOLUTION IS NOT QUITE AS GOOD.   YOU RECALL, WITH MRI, WE CAN GET THE PIXEL DOWN TO ONE MILLIMETER.   WITH PET, BECAUSE THE POSITRON WIGGLES A LITTLE BIT BEFORE IT HITS AN ELECTRON, POSSIBLE RESOLUTION IS ABOUT THREE MILLIMETERS.  IT IS VERY HARD TO GET THE BETTER THAN THREE MILLIMETER.  SO,  IF I PUT ONE POINT IN THE MIDDLE OF THE MRI SCANNER,  I AM NOT GOING TO SEE A POINT,  I AM GOING TO SEE A BALL THAT WILL BE ABOUT THREE MILLIMETERS IN SIZE, AND THAT IS THE BEST I CAN DO.  I CAN'T IMPROVE ON THAT.  THEY ARE FUZZIER.  THEY DON'T TELL US THE ANATOMY.  THEY TELL US HOW MUCH SUGAR WENT INTO DIFFERENT PARTS.

WHAT YOU SEE HERE ARE SLICES STARTING FROM THE TOP WHERE THERE IS ALMOST NO BRAIN AND BEGINNING TO SLICE THE BRAIN DOWN FURTHER DOWN.  AND EVERYTHING LOOKS QUITE NORMAL AND A LITTLE BIT LOW AT THE TOP.  NOW, THE MRI,  THE PET, WAS READ BY A CLINICAL RADIOLOGIST WHO READS THEM AND WAS READ AS HAVING ABNORMALLY LOW CORTICLE UPTAKE RELATIVE TO BASAL GANGLIA.

Q.     WHAT DOES THAT MEAN?

A.     WHAT THAT MEANS IS, THERE ARE TWO KINDS OF PET SCANS

DIRECT EXAM OF RUBEN GUR

YOU CAN DO.  ONE OF THEM IS QUANTITATIVE, WHERE YOU ACTUALLY KNOW HOW MUCH SUGAR WAS TAKEN UP FOR EACH HUNDRED GRAM OF TISSUE EVERY MINUTE.  SO, YOU CAN ACTUALLY MEASURE THAT, BUT IT IS A PROCEDURE THAT REALLY NEEDS A MAJOR ACADEMIC CENTER TO DO BECAUSE YOU NEED TO PUT A CATHETER IN AN ARTERY, AND THAT IS A COMPLICATION.  MR. FULKS DID NOT GET THE QUANTITATIVE SCAN.  HE GOT -- HE DIDN'T GET AN ARTERIAL SAMPLING,  SO ALL WE KNOW IS HOW MANY COUNTS,  POSITRONS DID WE GET FROM EACH PART OF THE BRAIN.  THIS IS FINE.  IT IS VERY CLOSELY RELATED TO METABOLISM, BUT IT DOESN'T TELL US WHETHER ANYTHING IS ABNORMALLY HIGH OR ABNORMALLY LOW,  ONLY HOW IT IS RELATIVE TO THE AVERAGE.

SO,  WHAT THE COMPUTER DOES IS, IT TAKES THE HIGHEST NUMBER THAT HE SEES IN THE WHOLE BRAIN AND GIVES IT -- MAKES IT WHITE, STRONG WHITE.  TAKES THE LOWEST NUMBER, MAKES IT BLACK.  AND ALL OF THE NUMBERS IN BETWEEN GETS VALUES IN BETWEEN.  SO,  WHEN YOU SEE A VERY HOT AREA,  YOU DON'T,  YOU KNOW IT IS RELATIVE TO EVERYTHING ELSE.  SOMETHING IN A RELATIVE STATE HERE.  YOU CAN'T SAY WHETHER, ABSOLUTELY, IT IS HIGH, OR ABSOLUTELY, IT IS LOW.

NOW, WHAT HAPPENS HERE IS, WHEN WE BEGIN TO SLICE, AND ON HERE, I TRIED TO SHOW HOW THE SLICES ARE MOVING DOWN THE BRAIN.  WHEN WE COME TO THE THALAMUS,  YOU MAY OR MAY NOT RECALL,  YOU MAY RECALL IS THE SWITCHBOARD OPERATOR,  USUALLY THE THALAMUS, AS WE GO DOWN THE BRAIN, YOU SEE WE GET THROUGH,

DIRECT EXAM OF RUBEN GUR

THESE SLICES ARE PRETTY HOT UP TO THE THIRD PANEL FROM THE TOP WHEN YOU BEGIN TO SEE THE MIDDLE BEING COLD.  THE HOT PART IS THE SINGULAR GYRUS, WHICH IS IN THE MIDDLE OF THE BRAIN, AND THEN, RIGHT AFTER THAT, IT COMES TO THE CALLOSUM, WHICH IS WHITE MATTER,  FAT,  AND WHITE MATTER DOESN'T TAKE A LOT OF SUGAR.  IT ALMOST DOESN'T METABOLIZE.  SO, YOU CAN SEE PITCH-BLACK.  BUT RIGHT AFTER THE WHITE MATTER COMES FLUID WHICH HAS ZERO METABOLISM.  NO METABOLISM.  AND THEN, AS SOON AS YOU PASS THE FLUID, YOU SHOULD BE HITTING THE THALAMUS. AND WHAT THE RADIOLOGIST DID NOT NOTICE IS THAT YOU DON'T SEE A THALAMUS THERE.  IT IS SO -- IT IS STILL DARK.  AND YOU BEGIN TO SEE BRIGHT SPOTS.  ONLY IF YOU SEE TWO LINES FROM THE BOTTOM HERE,  YOU BEGIN TO SEE WHAT YOU ARE BEGINNING TO SEE ARE THE BASAL GANGLIA.

THE BASAL GANGLIA ARE VERY,  VERY HIGH IN HIS CASE.  AND, AGAIN, WHEN YOU GET FURTHER DOWN TO THE CEREBELLUM, IT SEEMS TO BE ASYMMETRIC AND LOW.  AND SO, BASAL GANGLIA ARE REALLY THE PLACE THAT PRODUCES THE NEUROTRANSMITTERS THAT GET ATTACKED BY ALCOHOL.  ESSENTIALLY, GET MODIFIED BY ALCOHOL. AND THEY PROJECT TO THE FRONT OF THE THE BRAIN.  SO THE FAVORITE PLACE WHERE ALCOHOL GOES OR TWO PLACES. ONE IS THE FRONT OF THE BRAIN, AND THE OTHER IS THE CEREBELLUM.  AND THAT IS WHY TWO THINGS HAPPEN WHEN YOU ARE DRUNK IS YOU ARE NOT A VERY GOOD EXECUTIVE.  IN FACT,  YOU DON'T MAKE VERY GOOD DECISIONS.  AND THE OTHER IS THE CEREBELLUM, YOUR

DIRECT EXAM OF RUBEN GUR

MOVEMENT IS NOT STEADY.   YOU CAN'T WALK A STRAIGHT LINE.

ALL OF THOSE KINDS OF THINGS ARE CEREBELLUM FUNCTIONS.   AND

WHEN YOU DRINK CHRONICALLY, YOU GET THE TREMORS.   AND THE

TREMORS, AGAIN, ARE RELATED TO THE CEREBELLUM BEING IMPAIRED.

AND SO, BY VISUAL INSPECTION, BECAUSE THE BASAL GANGLIA ARE SO

HOT IN MR. FULKS,  IT IS VERY DIFFICULT TO SAY WHAT THE REST

IS, AND THAT IS WHY I THINK THE RADIOLOGIST MAY HAVE MISSED

THE LOW UPTAKE IN THE THALAMUS.

**Q.    WHAT IS THE SIGNIFICANCE IN THE LOW UPTAKE IN THE**

**THALAMUS?**

A.    THAT MEANS YOUR SWITCHBOARD IS NOT OPERATING,  IT IS

NOT OPERATING WELL.   A MESSAGE IS MISINTERPRETED, SENT TO THE

WRONG PLACE.  THINGS THAT SHOULD GO TO THE LABOR DEPARTMENT GO

TO THE JUSTICE DEPARTMENT.   THINGS THAT SHOULD GO TO THE

PRESIDENT GO TO THE, YOU KNOW, TO HIS,  I DON'T KNOW, THE

PERSON RESPONSIBLE FOR CLEANING THE STAIRS.   THOSE THINGS ARE

JUST NOT SENT TO WHERE THEY ARE SUPPOSED TO GO.

THE NEXT SLIDE WILL SHOW THE ACTUAL PET RESULTS.   SO, THE

IMAGE IS SORT OF A REPRESENTATION OF THE RESULTS.   IT LOOKS

COMPLICATED.  I THINK I CAN EXPLAIN THAT.   WHAT WE DO IS, WE

TAKE HOW MANY COUNTS YOU GET FOR EACH REGION, AND WE APPLY A

STANDARD SET OF 35 REGIONS TO THE BRAIN.   WE PUSH A BUTTON.

WE GET HOW MANY PHOTONS WORK IN THIS AREA.  HOW MANY PHOTONS

DO WE DETECT FROM COMING FROM THAT AREA.   WE TAKE THAT

NUMBER, WE DIVIDE IT BY THE TOTAL NUMBER OF PHOTONS WE GOT IN

DIRECT EXAM OF RUBEN GUR

THE TOTAL BRAIN.   THAT TELLS US WHETHER EACH REGION GIVES US A VALUE.  WHERE THE VALUE IS ONE,  IF IT IS ABOVE ONE, IT MEANS THAT MORE SUGAR WENT TO THAT AREA.   IF IT IS BELOW ONE, IT MEANS THAT LESS SUGAR WENT TO THIS AREA.

WE APPLIED THE SAME TEMPLATE TO MR. FULKS THAT WE ALREADY HAVE DATA ON FOR A LARGE SAMPLE OF HEALTHY PEOPLE, IN THIS CASE, HEALTHY MEN, SO WE CAN,  THERE ARE INTERESTING SEX DIFFERENCES.  MEN AND WOMEN HAVE SOMEWHAT DIFFERENT PATTERN OF BRAIN ACTIVITY.  WE ARE COMPARING MR. FULKS TO MEN.   SO,  THE GREEN LINE YOU SEE IS THE HEALTHY PEOPLE, AND THE LINES THAT YOU SEE COMING UP AND DOWN FROM THE GREEN LINES GIVE YOU THE STANDARD DEVIATION.

THE THICK BLUE LINE IS MR. FULKS.   AND STARS WERE PLACED IN AREAS WHERE MR. FULKS SHOWS VALUES THAT ARE MORE THAN THE STANDARD DEVIATION AWAY FROM THE AVERAGE.   SO, THE TOP PANEL SHOWS THE REGION TO ALL BRAIN RATIOS.   YOU WILL SEE THERE ARE TWO REGIONS THAT ARE HIGHLY ABNORMAL IN TERMS OF HAVING VERY LOW METABOLISM.   ONE IS PART OF THE OCCIPITAL, WHICH IS THE BACK OF THE BRAIN. AS YOU REMEMBER, THAT IS THE PART THAT ANALYZED VISUAL INFORMATION.   IN THAT PART, THAT ONE REGION IS CALLED  FG,  FUSIFORM GYRUS RIGHT HERE IS THE PART THAT RELATES TO MORE COMPLEX SHAPES.  AND SOME PEOPLE THOUGHT THAT JUST THIS PART IS SPECIALIZED FOR FACES.   BUT IT IS A HUGE CHUNK OF REAL ESTATE IN THE BRAIN, AND IT IS UNLIKELY THAT FACES IS THE ONLY THING THAT IT DOES.   AND THERE IS MORE AND

DIRECT EXAM OF RUBEN GUR

MORE EVIDENCE THAT IT IS NOT JUST FACES,  BUT IT ALSO VERY COMPLICATED THINGS THAT HAVE PERSONAL MEANING.

Q.    DR. GUR, LET ME MAKE SURE I UNDERSTAND.   ONE WAY TO READ A PET SCAN OR A COMMON WAY IS A RADIOLOGIST WOULD JUST LOOK AT THE FILM OF THE INDIVIDUAL, AND BASED UPON THEIR CLINICAL EXPERIENCE AND TRAINING, SORT OF WHAT A NORMAL ONE LOOKS LIKE, LOOKS AT IT AND SAYS,  OKAY,  I THINK THIS IS NORMAL OR ABNORMAL; IS THAT CORRECT?

A.    YES.   THAT WORKS QUITE WELL FOR MRI.   BUT IS NOT A VERY GOOD PRACTICE FOR PET.

Q.    BUT THEN THE OTHER WAY, WHICH YOU HAVE BEEN TALKING ABOUT, YOU CAN ALSO -- THE TEST GENERATES, ESSENTIALLY, A LOT OF DATA THAT CAN BE ANALYZED BY A COMPUTER.   SO, A QUANTITATIVE ASSESSMENT YOU ARE TALKING ABOUT HERE IS COMPARING THE RESULTS OF AN INDIVIDUAL PERSON'S PET SCAN WITH THAT OF A NUMBER OF OTHER NORMAL INDIVIDUALS?

A.    YES.   AND THIS IS REALLY THE WAY IT SHOULD BE DONE BECAUSE THERE ARE, AS YOU CAN SEE, IF YOU LOOK AT THE GREEN LINES HERE, YOU CAN SEE MORE, ACTUALLY, IN THE -- IF YOU LOOK AT THAT SYMMETRY, BECAUSE RADIOLOGISTS ARE TRAINED TO LOOK AT THE SYMMETRIES.   THERE ARE A LOT OF NO TWO BRAINS LOOK EXACTLY THE SAME.   SO,  WHEN A RADIOLOGIST LOOKS AT THE BRAIN SCAN,  GOES SLICE BY SLICE, HE IS PARTICULARLY TUNED TO SEE, IT SHOULD BE SYMMETRIC.   AND THAT IS TRUE FOR ANATOMY.   BUT IT IS NOT TRUE FOR PET.   PET,  A NORMAL PET IS NOT SYMMETRIC.

DIRECT EXAM OF RUBEN GUR

IT DOESN'T LOOK SYMMETRIC.   THERE ARE SUBTLE DIFFERENCES BETWEEN THE TWO SIDES.   AND IT IS VERY DIFFICULT IN ANY,  I MEAN, WE HAVE SOME RADIOLOGISTS WHO HAVE BEEN READING PET SCANS EVER SINCE THE PET SCAN WAS CREATED.   BEEN READING IT SINCE 1983 OR '83, AND STILL WOULD MISS THINGS THAT WE CAN SEE QUANTITATIVELY.

WHAT YOU SEE QUANTITATIVELY, THIS IS THE PET SCAN.  THIS IS REALLY THE RESULT OF THE PET SCAN.   THE IMAGE THAT YOU LOOK AT IS A WAY, CONVENIENTLY, TO TRY TO APPRECIATE WHAT THE PET SCAN SHOWS.

**Q.    OKAY.**

A.    WE NEED TO LOOK AT A COUPLE MORE.  THE OTHER REGION THAT SHOWS ABNORMALLY LOW METABOLISM IS THE THALAMUS.   YOU CAN SEE THAT IS THE FOURTH REGION FROM THE RIGHT.   AND YOU CAN SEE THAT THIS ONE IS ABOUT THREE OR FOUR STANDARD DEVIATIONS LESS THAN NORMAL.   IN FACT,  I WENT BACK TO OUR DATA SCAN,  DATA SET TO SEE, AND THERE IS NOBODY,  NOBODY IN OUR ENTIRE SAMPLE OF HEALTHY PEOPLE WE STUDIED, THAT HAS SUCH LOW METABOLISM IN THE THALAMUS.   SO, IT IS HIGHLY ABNORMAL.

IN CONTRAST, THERE ARE SOME REGIONS, PARTICULARLY IN THE FRONTAL LOBE,  ONE IN THE OCCIPITAL, AND THE BASAL GANGLIA THAT WERE SO ASTUTELY NOTED BY THE CLINICIAN THAT ARE ABNORMALLY HIGH.   THESE ARE REGIONS THAT RELATE,  I THINK, QUITE TELLINGLY, THEY RELATE TO THE EFFECT OF, RELATE TO WHAT ALCOHOL DOES.   IT INCREASES,  BY ITS ACTION OF THE ADULT

DIRECT EXAM OF RUBEN GUR

SYSTEM, INCREASES, AT THIS TIME, ABNORMALLY IN THE FRONT PART OF THE BRAIN.  AND THE OTHER ABNORMALITIES,  IF YOU LOOK AT THE BOTTOM BAR,  THE BOTTOM BAR TAKES THE SAME VALUE AND DOES SOMETHING SIMPLE.  IT TAKES LEFT MINUS RIGHT.  AND WHAT YOU CAN SEE HERE,  THIS ILLUSTRATES THAT EVEN DEGREES ARE NOT SYMMETRIC.  THERE IS NO STRUCTURE IN THE BRAIN THAT HAS SYMMETRIC METABOLISM.

BY AND LARGE, MR. FULKS'S BRAIN FOLLOWS THE SAME PATTERN AS THE HEALTHY BRAINS, BUT WITH NOTABLE EXCEPTIONS.  MOST NOTABLE IS THAT REDUCED ACTIVITY IN THE BASAL GANGLIA ON THE LEFT.  SO,  THIS IS LEFT MINUS RIGHT. SO,  IF A POINT IS ABOVE THE ZERO, IT MEANS THERE IS MORE ACTIVITY TO THE LEFT. IF IT IS BELOW THE ZERO, THERE IS MORE ACTIVITY TO THE RIGHT. AND YOU CAN SEE TWO REGIONS THAT ARE ABNORMALLY LOW ON THE LEFT SIDE, AND A BUNCH OF THEM THAT ARE ABNORMALLY HIGH ON THE LEFT SIDE.

AND THE OTHER WORRISOME REGION IS THE MID TEMPORAL LOBE, BECAUSE WHEN YOU HAVE TOO HIGH A METABOLISM IN THE TEMPORAL LOBE, THIS IS THE SITUATION THAT WE SAW THAT MAY, EVENTUALLY, GIVE RISE TO SEIZURES UNLESS THERE IS ENOUGH,  ENOUGH BLOOD SUPPLY TO TAKE AWAY THE EXCESS HIGH ALCOHOLISM.

**Q.    ARE EXCESSES IN BASAL GANGLIA AN ABNORMALITY THAT IS ASSOCIATED WITH FETAL ALCOHOL EXPOSURE?**

A.    VERY MUCH SO.   THEN THE FINAL ABNORMALITY IS IN THE CEREBELLUM, WHICH IS THE LAST POINT ON THE BOTTOM PART.

DIRECT EXAM OF RUBEN GUR

NOTE, THAT IN HEALTHY PEOPLE, THESE ARE ALL RIGHT-HANDERS BECAUSE MR. FULKS IS RIGHT-HANDED AND COMPARED HIM TO RIGHT-HANDERS, IN RIGHT-HANDERS, THE RIGHT CEREBELLUM IS MORE ACTIVE THAN THE LEFT.  AND SO, THAT POINT IS BELOW THE ZERO LINE.  AND YOU RECALL, THE CEREBELLUM IS THE DISSECTION,  ALL PARTS OF THE BRAIN CONTROL THE OPPOSITE SIDES THAT THE CEREBELLUM CONTROLS THE SAME SIDE.  AND IN MR. FULKS'S CASE, THE CEREBELLUM IS SYMMETRIC, WHICH TELLS US THAT IT DOES NOT HAVE ENOUGH ACTIVITY ON THE RIGHT SIDE, AND THAT IS ANOTHER REGION THAT YOU SEE AFFECTED BY ALCOHOL.

ESSENTIALLY, WHAT YOU GET WITH ALCOHOL FETAL SYNDROME, YOU GET A PICTURE OF A BRAIN OF SOMEBODY WHO IS A CHRONIC ALCOHOLIC.  WHO WAS BORN WITHOUT FETAL ALCOHOL SYNDROME BUT BECAME CHRONICALLY ALCOHOLIC.  ESSENTIALLY, A BABY WITH FETAL ALCOHOL SYNDROME IS BORN DRUNK, HAS TO SPEND THE FIRST FEW MONTHS GOING THROUGH WITHDRAWAL.

THIS HIGHLIGHTS THE PART THAT IS MISSING HERE,  THE THALAMUS.  IF YOU LOOK IN THE MIDDLE LINE, YOU CAN SEE WHERE SLICING OUR WAY DOWN THE BRAIN AND THIS,  THE PLACE WHERE YOU SEE A STRAIGHT LINE GOING DOWN THE MIDDLE IS THE SINGULAR GYRUS, YOU SEE ALL OF THE SLICES HERE,  HERE,  BUT HERE IS WHERE YOU GET TO THE CORPUS CALLOSUM.  YOU CAN SEE, FAINTLY UNDER IT, THERE IS FLUID,  BUT HERE IS WHERE YOU EXPECT TO SEE THE THALAMUS.  AND USUALLY, IT COMES OUT VERY NICELY AS A HEART SHAPE, AND HERE IT IS NOT SEEN,  BARELY SEEN.  I MEAN,

DIRECT EXAM OF RUBEN GUR

I CAN IMAGINE IT THERE BECAUSE I KNOW WHAT TO LOOK FOR.  BUT NOT UNTIL YOU GET TO THE BASAL GANGLIA AND BEGIN TO SEE THE HOT FLAMING BASAL GANGLIA IN THE MIDDLE OF THE BRAIN RIGHT HERE.

**Q.    SO, WE HAVE NOW LOOKED AT MR. FULKS'S MRI, WHICH IS THE STRUCTURE.  LOOKED AT MR. FULKS'S PET SCAN, WHICH IS, ESSENTIALLY, THE PHYSIOLOGY OF HIS BRAIN.  AND NOW, AS I UNDERSTAND IT, WE ARE GOING TO LOOK AT BRAIN BEHAVIOR THROUGH OTHER NEUROPSYCHOLOGICAL TESTINGS?**

A.    THE FIRST FIGURE HERE, ESSENTIALLY, SHOWS WHAT HAPPENS IF YOU TAKE THE NEUROPSYCHOLOGICAL TEST THAT MR. VENN GAVE, AND THEN YOU TAKE THE NEUROPSYCHOLOGICAL TEST THAT MR. EVANS GAVE, AND PUT THEM INTO A FORMULA THAT IS BASED ON THE CLINICAL EXPERIENCE, AND REALLY USES THE REASON FOR WHY THOSE TESTS WERE GIVEN.  SO, IF YOU RECALL, THE REASON WE ARE MEASURING VERBAL FLUENCY IS BECAUSE, IF WE FIND A DEFICIT IN FLUENCY, WE THINK THERE IS A LESION IN THE LEFT FRONT.  IF WE LOOK AT -- WE LOOK AT MEMORY, WE ARE WONDERING IF THERE IS A LESION IN THE TEMPORAL LOBE.

WHEN WE STUDY SPATIAL ABILITIES, WE LOOK TO SEE HOW THE RIGHT HEMISPHERE IS DOING.  ALL OF THIS INFORMATION HAS BEEN FROZEN AS A SET OF WEIGHTS, AND THERE IS AN ALGORITHM THAT LETS US PUT IN THE NEUROPSYCHOLOGICAL TEST RESULTS AND GET A PICTURE OF THE BRAIN THAT INTERPRETS IT.  AND THE PICTURE IS BASED ON EXPERTS.  IT IS CALLED AN EXPERT SYSTEM.  THOSE

App. 00885

DIRECT EXAM OF RUBEN GUR

EXPERTS, THE REASON I LIKE TO USE IT, ESPECIALLY IN

MEDICAL/LEGAL CASES IS, THOSE EXPERTS DON'T KNOW FROM FULKS,

DON'T KNOW FROM TRIALS,  THEY HAVE NO INVOLVEMENT IN THIS.

THEY JUST SAID, IF YOU SEE A SCORE LIKE THIS, AND A TEST LIKE

THIS, IT MEANS THIS.

     AND SO, WE TAKE AND WE PUT THEM THROUGH,  PUT THE TEST

COURSE THROUGH THE ALGORITHM AND SEE WHAT THE EXPERT SYSTEM

TELLS US.   AND WHEN WE TAKE MR. VENN'S TESTING,  DR.VENN'S

TESTING AND DR. EVANS' TESTING, WE GET EXACTLY THE SAME ANSWER

WHICH IS IN THIS PICTURE.  WHEN IT IS YELLOW, IT MEANS

RELATIVELY -- AGAIN, WE ARE ALL RELATIVE HERE,  YOU NOTICE

THAT EVEN THE YELLOW IS MORE THAN ONE STANDARD DEVIATION WORSE

THAN NORMAL.   SO, IT DOESN'T MEAN THAT.  I MEAN,  OUR CLIENT

IS REALLY NOT, YOU KNOW, A VERY BRIGHT INDIVIDUAL.   BUT

AGAINST THAT BACKGROUND, YOU HAVE, ESPECIALLY, DIFFICULTIES IN

THIS FRONTAL PART THAT I JUST PUT AN ARROW ON, AND IT IS

EXACTLY THE SAME PART THAT IS SHOWING UP IN DR. EVANS, AND

THAT IS THE ORBITAL FRONTAL PART OF THE BRAIN.   IT IS THE ONE

THAT SITS RIGHT ABOVE THE EYES THAT IS SUSCEPTIBLE BOTH TO THE

EFFECT OF ALCOHOL AND TO THE EFFECTS OF HEAD INJURIES.

     NOW,  WE ALSO SEE AN ABNORMALITY FURTHER BACK IN THE

TEMPORAL PARIETAL JUNCTURE WHICH IS IN THE FACE AREA OF THE

VISUAL SYSTEM OR THE AREA THAT MAKES INTERPRETATION OF MORE

COMPLEX,  MORE COMPLEX INFORMATION.   THESE IMAGES WERE

GENERATED ON THE TRADITIONAL NEUROPSYCHOLOGICAL TESTING THAT

DIRECT EXAM OF RUBEN GUR

WERE DONE BY DR. VENN AND EVANS, AND I UNDERSTAND THAT THEY, THEMSELVES, WILL OFFER THEIR OWN INTERPRETATIONS OF THOSE TESTS LATER ON.

Q.    BUT THE BOTTOM LINE ON THIS IS,  THE BLUE THAT YOU SEE, IS IN THE SAME BASIC REGION OF THE BRAIN IN BOTH PLACES?

A.    YEAH.

Q.    AND THE INTENSITY MARKS THAT, I GUESS, THE INTENSITY OF THE COLOR MARKS THE SEVERITY OF THE ABNORMALITY.

A.    THE BLUE COLORS MEAN BAD; RED COLOR MEANS OKAY; YELLOW COLORS MEAN,  YOU KNOW,  RELATIVELY EXCELLENT.

Q.    NOW,  IN ADDITION TO REVIEWING THE TESTING OF DR. VENN AND DR. EVANS,  DID YOU ALSO,  YOURSELF, CONDUCT SOME NEUROPSYCHOLOGICAL TESTING?

A.    YES.  I CONDUCTED MY OWN TEST IN ORDER TO TRY TO BETTER CHARACTERIZE THE EXACT NATURE OF THE DEFICITS.  THE DIFFERENCE BETWEEN THE TEST I GAVE AND TRADITIONAL TEST IS THAT THE TESTS I GAVE WERE COMPUTERIZED, AND THEY WERE BASED ON EXPERIENCE WITH IMAGING.  SO, THE TRADITIONAL NEUROPSYCHOLOGICAL TESTS ARE BASED ON EXPERIENCE WITH PATIENTS WHO HAD DIFFERENT TYPE OF BRAIN LESIONS AND WERE TESTED, AND THAT IS HOW WE CAN LINK A PARTICULAR PERFORMANCE TO A PARTICULAR BRAIN LESION.

OUR TESTS WERE DONE DIFFERENTLY.  WE TAKE HEALTHY PEOPLE, STICK THEM IN A SCANNER, AND GIVE THEM TESTS, AND SEE WHICH PARTS OF THE BRAIN BECOME ACTIVE FOR EACH TEST.  SO,  THESE

DIRECT EXAM OF RUBEN GUR

TESTS CAN MORE -- CAN HIT THE TARGET MORE CLEARLY, BECAUSE WITH LESIONS, IT IS RARE YOU GET THE NICE LESION IN ONE AREA. USUALLY, LESIONS WILL BE IN MORE THAN ONE AREA,  BE MORE DEFUSED.  WITH OUR TESTS, WE CAN PINPOINT A MORE DIRECT LINK BETWEEN PARTICULAR BEHAVIOR AND A PARTICULAR BRAIN SYSTEM.

**Q.    AND THESE ARE TESTS THAT YOU AND YOUR COLLEAGUES AT THE UNIVERSITY OF PENNSYLVANIA DEVELOPED?**

A.    YES.   WE DEVELOPED OTHER TESTS LIKE THAT.   WE DEVELOPED ELSEWHERE.   OUR TESTS WERE PUBLISHED IN THE REFEREE LITERATURE AND ARE BEING USED RIGHT NOW AROUND THE COUNTRY AND REALLY AROUND THE WORLD IN MULTIPLE STUDIES AND CLINICAL APPLICATIONS.

**Q.    OKAY.   IS THERE ANY OTHER ADVANTAGE OF COMPUTER-GENERATED TESTS?**

A.    YES.   THE OTHER ADVANTAGE IS THAT, WITH A TRADITIONAL TEST,  YOU CAN ONLY LOOK AT PERFORMANCE.   YOU CAN ONLY TELL HOW WELL SOMEONE DOES.   BUT, AS EVERYONE KNOWS, OR AT LEAST WILL REALIZE, IF YOU THINK ABOUT IT,  PERFORMANCE RULE IS TWO HORNS.   ONE IS CALLED ACCURACY; THE OTHER IS CALLED SPEED. IN PRINCIPLE,  ANYBODY COULD BUILD THE TAJ MAHAL IF GIVEN ENOUGH TIME.   YOU WOULD GO VERY,  VERY SLOWLY, AND YOU END UP DOING A PERFECT JOB.   OR EVEN IF YOU ARE VERY GOOD AT SOMETHING, IF YOU ARE PUSHED TO DO IT VERY QUICKLY,  YOU WILL MAKE MISTAKES.   SO,  WHENEVER WE ARE ASKED TO DO SOMETHING, WE SORT OF HAVE TO JUGGLE,  ARE WE GOING TO GO FOR SPEED, OR

DIRECT EXAM OF RUBEN GUR

ARE WE GOING TO GO FOR ACCURACY, AND USUALLY WE FIND SOME SORT OF A HAPPY MEDIUM, AT LEAST WE ARE HAPPY WITH, THE BOSS MAY SAY, GEE, I WISH YOU WOULD HAVE TAKEN MORE TIME AND DONE IT MORE ACCURATELY OR THE BOSS MAY SAY, I WISH YOU, YOU KNOW, I DON'T MIND YOU MAKING MISTAKES, BUT I NEEDED IT YESTERDAY. NOW THAT YOU BRING ME A PERFECT PRODUCT TODAY, IT IS NO GOOD FOR ME. SO, DEPENDING UPON THE SITUATION, YOU ALWAYS HAVE TO JUGGLE, YOU WANT TO WORK FAST, YOU WANT TO WORK ACCURATELY. WITH A COMPUTERIZED TESTING, WE, LITERALLY, HAVE HOW MUCH TIME THE PERSON SPENT ON EACH ITEM, ITEM BY ITEM, ACCURATE TO THE MILLISECOND. SO, WE CAN LOOK AT THAT BULL HOLDING BOTH HORNS, AND WE KNOW IN WHAT WE OFTEN SEE IS SOMETIMES PEOPLE TRY TO HIDE A DIFFICULTY BY FOCUSING AND TRYING TO PERFORM WITHOUT A MISTAKE, BUT THEN WE SEE THAT THEIR SPEED GOES BELOW NORMAL. OR ON THOSE ITEMS WHERE THEY GO FAST, WE SEE THEIR ACCURACY DROP. SO, WE CAN CALCULATE REALLY WHAT WE CALL EFFICIENCY, WHICH IS ACCURACY DIVIDED BY TIME. YOU KNOW, HOW WELL DO YOU DO GIVEN THE AMOUNT OF TIME.

**Q. SO, DR. GUR, IS THIS SLIDE THAT THE JURY IS NOW SEEING, DOES THAT SUMMARIZE THE RESULTS OF YOUR TESTING?**

A. YES. THIS SLIDE SUMMARIZES THE RESULTS OF MY TESTING. AND THE TOP PART SHOWS THE ACCURACY. AND THE BOTTOM PART SHOWS THE SPEED. AND YOU CAN SEE THAT IN AREAS WHERE, I MEAN, IN GENERAL, MR. FULKS WORKED VERY DILIGENTLY AND REALLY,

DIRECT EXAM OF RUBEN GUR

VISIBLY, WAS TRYING TO PERFORM WELL.   BUT WHEN HE WAS TRYING TO DO THINGS THAT HE WASN'T GOOD AT,  PARTICULARLY FRONTAL LOBE STUFF,  HIS ACCURACY CAME AT THE EXPENSE OF SPEED.   SO, IF HE WANTS TO DO -- TO BE A GOOD EXECUTIVE, HE NEEDS TIME.

IN TERMS OF ACCURACY, ONE VERY ABNORMAL PERFORMANCE WE SAW FOR THAT TEST WHERE I SHOWED YOU WHERE YOU HAVE TO PICK OUT THE ONE THAT DOESN'T BELONG, HE GOT THE FIRST ONE,  PROBABLY HE WAS LUCKY VERY QUICKLY WITH THE VERY FIRST IDEA, AND HE WORKED ON THAT.   BUT THEN, ONCE IT CHANGED, HE GOT LOST, AND HE CONTINUED LONGER THAN FOR ANYBODY I HAVE SEEN TRYING TO FIGURE OUT THE PRINCIPLE.   SO,  WHEN HE DISCOVERED A PRINCIPLE, HE WAS ABLE TO FOLLOW IT.   BUT WHEN THAT PRINCIPLE WASN'T WORKING ANYMORE,  HE STILL KEPT TRYING TO DO THE SAME THING.   REPEATING, AND REPEATING, AND REPEATING.   AND THAT IS SOMETHING THAT YOU SEE VERY RARELY, BUT YOU DO SEE IN CASES OF FRONTAL LOBE DAMAGE.   THEY WILL KEEP TRYING THE SAME STRATEGY AGAIN AND AGAIN.

IN TERMS OF MEMORY,  YOU KNOW, THE MOST REMARKABLE PART IS THAT HIS IMMEDIATE MEMORY IS POOR, EXTREMELY POOR FOR WORD, FOR FACES,  LESS SO FOR SHAPES; BUT HIS LONG-TERM MEMORY IS ACTUALLY QUITE NORMAL.   HE HAS A HARD TIME LEARNING NEW INFORMATION,  BUT WHATEVER CAME IN STAYS THERE.   IF HE LEARNS SOMETHING HE WILL REMEMBER IT QUITE NORMALLY.

HIS INTELLECTUAL ABILITIES ARE BELOW AVERAGE FOR ACCURACY, ALTHOUGH HE WAS WORKING QUITE NORMALLY INTERPRETING FOR SPEED.

DIRECT EXAM OF RUBEN GUR

SPATIAL ABILITIES ARE NORMAL FOR ACCURACY, BUT HE WORKED VERY SLOWLY.  SO, HIS SPEED WAS ABNORMAL.  AND HIS SENSORY MOTOR FUNCTION, WHICH IS THE TEST MOST SENSITIVE TO ALCOHOL EFFECTS, I MEAN, HAD I NOT KNOWN THAT HE IS IN PRISON AND DOESN'T HAVE ALCOHOL AVAILABLE TO HIM BEFORE TESTING, HIS PERFORMANCE IS WHAT YOU GET FROM PEOPLE WITH ALCOHOLISM.

MOST REMARKABLY, I THOUGHT, WAS HIS PERFORMANCE ON EMOTION DISCRIMINATION.  HIS ACCURACY WAS AVERAGE, BUT HE, IT WAS REALLY A CHALLENGE FOR HIM TO TELL THE EMOTIONAL EXPRESSION AS YOU CAN SEE BY THE HIGHLY ABNORMAL SPEED.  THE ONE EXCEPTION IS RECOGNIZING HAPPY WHERE HE WAS IMPAIRED IN HIS ACCURACY AS WELL AS IN SPEED.  SO, EVEN THOUGH HE SLOWED DOWN, HE STILL HAS A HARD TIME RECOGNIZING THAT EMOTION.

THE COURT:  MR. BLUME, WE NEED TO BREAK FOR LUNCH SOMEWHERE WHEN YOU GET TO A GOOD STOPPING POINT.

MR. BLUME:  I THINK NOW IS A GOOD TIME.

THE COURT:  LET'S BREAK FOR LUNCH AT THIS TIME.  BE BACK AT 2:00 O'CLOCK.  THAT WILL GIVE YOU AN HOUR AND A HALF. HAVE A NICE LUNCH.  SEE YOU BACK AT 2:00 O'CLOCK.

(WHEREUPON, THE FOLLOWING WAS HEARD OUTSIDE THE PRESENCE OF THE TRIAL JURY.)

THE COURT:  QUICK QUESTION. DID THE GOVERNMENT FILE A MOTION IN REGARD TO THE MALINGERING?

MR. SCHOOLS:  WE HAVE NOT FILED A RESPONSE.

THE COURT:  WANTED TO MAKE SURE WE DIDN'T MISPLACE

IT.

MR. SCHOOLS:  I THINK WE NEED TO TALK ABOUT IT.

THE COURT:  WE WILL DO IT, WHATEVER IS APPROPRIATE. I HAVEN'T HEARD HIM SAY ANYTHING YET THAT BRINGS THAT INTO ISSUE YET.  BUT MAYBE HE HAS.

MR. SCHOOLS:  I THINK, YOUR HONOR --

THE COURT:  WHY DON'T WE WAIT UNTIL WE FINISH HIS DIRECT.

MR. SCHOOLS:  MR. BLUME HAS INDICATED HE WANTS TO SOFTEN THE BLOW COMING IN.  WE NEED TO RESOLVE IT BEFORE HE GETS OFF DIRECT.

MR. BLUME:  EXCUSE THE WITNESS, YOUR HONOR?

THE COURT:  YOU CAN STEP DOWN.  ALL RIGHT.

MR. SCHOOLS:  IN 1998, THE DEFENDANT WAS ARRESTED ON A FEDERAL CHARGE ON INTERSTATE TRANSPORTATION, STOLEN MOTOR VEHICLE.  AS A RESULT OF THAT ARREST, HE WAS SENT OFF TO THE FEDERAL MEDICAL CENTER IN LEXINGTON, KENTUCKY, FOR EVALUATION TO DETERMINE HIS MENTAL COMPETENCY TO ASSIST HIS COUNSEL IN HIS DEFENSE AND ALSO TO DETERMINE HIS MENTAL STATE AT THE TIME OF THE OFFENSE.

THE FINDINGS OF THE EXAMINER AT LEXINGTON WERE THAT THE DEFENDANT WAS MALINGERING, AND AMONG THE THINGS THAT THE DEFENDANT WAS MALINGERING ABOUT WAS THAT HE WAS EXHIBITING INVOLUNTARY PHYSICAL MOVEMENTS, INCLUDING THE SHAKING OF HIS HAND, AND EYE TWITCHING, AND MOVEMENTS SUCH AS THAT.  THE

DIAGNOSIS WAS BASED ON THE FACT THAT DOCTORS AND OTHER PERSONNEL IN LEXINGTON MEDICAL CENTER OBSERVED HIM WITH THESE SUPPOSED INVOLUNTARY MOVEMENTS WHEN HE WAS BEING QUESTIONED BY MEDICAL PERSONNEL OR IN THE PRESENCE OF MEDICAL PERSONNEL. BUT WHEN HE WAS BEING OBSERVED BY OTHER INDIVIDUALS WITHIN THE FACILITY WHEN HE WAS NOT ACTUALLY BEING DIAGNOSED, WHEN HE WAS INTERACTING WITH OTHER INMATES, WHEN HE WAS IN RECREATION, OR THOSE TYPE OF THINGS, THOSE INVOLUNTARY MOVEMENTS WENT AWAY. ONE OF THE THINGS THAT THIS, AND ALL OF THESE WITNESSES WHO I THINK WILL TESTIFY FOR THE DEFENSE, A COUPLE OF SORT OF BASIC PREMISES ABOUT THE FACT THAT THIS PREVIOUS EVALUATION TOOK PLACE, THE MOST IS MR. FULKS HAD THE EVALUATION. IF THE EVALUATION IS CORRECT, HE WOULD HAVE LEARNED OF IT. I THINK THAT IS --

THE COURT: IF THE EVALUATION HAD BEEN CORRECT?

MR. SCHOOLS: HE HAS LEARNED FROM HIS PRIOR MISTAKES. THE DEFENDANT FIGURED OUT AFTER BEING EVALUATEED IN 1998 THAT, IF HE IS GOING TO EXHIBIT INVOLUNTARY MOVEMENTS OR OVERREPRESENT, BASED ON HIS PERFORMANCE ON TESTS OF ANY PARTICULAR MENTAL ILLNESS, THAT HE HAS TO DO A BETTER JOB OF IT. I THINK THAT IS ONE OF THE MOST IMPORTANT THINGS ABOUT THIS.

THIS WITNESS JUST TESTIFIED THAT, BASED ON THIS DEFENDANT'S BRAIN FUNCTION, IF SOMETHING ENTERS HIS BRAIN, IT STAYS IN THERE, HE REMEMBERS IT. IN 1998, HE WAS EVALUATED

BY LEXINGTON.  HE ATTEMPTED, ACCORDING TO THE REPORT, TO FEIGN CERTAIN INVOLUNTARY MOVEMENTS, TO FEIGN MENTAL ILLNESS BASED ON HIS PERFORMANCE ON TESTS.  I THINK THAT PROCESS EDUCATED HIM AND WOULD, CERTAINLY, FORM THE BASIS OF AN EVALUATION.  OTHER RELEVANT CIRCUMSTANCES WITH RESPECT TO THIS EVAL IS WHETHER OR NOT ANY OF THESE EXPERTS HAVE SEEN IT.  BECAUSE, OBVIOUSLY, WE HAD A MEDICAL RECORD WHERE A DOCTOR HAD EXAMINED MR. FULKS'S BRAIN AND DETERMINED THAT IT PERFORMED PERFECTLY NORMALLY.  THEY DID AN MRI, HAD THESE IMAGES FROM SOMEONE WHO TOOK THESE IMAGES PRIOR TO EVEN THIS CASE ARISING.  IT WAS TOTALLY NORMAL.  A DOCTOR CAME IN AND TESTIFIED, WELL, I BELIEVE X ABOUT HIS BRAIN, WHO HAD NOT CONSIDERED THAT PREVIOUS -- THAT PREVIOUS REPORT, THAT WOULD BE INFORMATION THAT WOULD IMPEACH, NOT THE CREDIBILITY OF THE WITNESS SO MUCH AS TO THE VALUE OF HIS OPINION.

AND HERE, IT IS THE SAME THING.  WE THINK, IF A WITNESS OR AN EXPERT'S OPINION IS IN ANY WAY DEPENDENT ON OR RELYING ON INTERVIEWS WITH MR. FULKS, OBSERVATIONS OF MR. FULKS, OR REPORTS WHERE OTHER PEOPLE HAVE INTERVIEWED MR. FULKS, OR OBSERVED MR. FULKS, THEN THE FACT THAT MR. FULKS HAD BEEN THROUGH THIS PREVIOUS MENTAL EVALUATION, HAS HAD THIS DIAGNOSIS IS RELEVANT TWICE.  IT IS RELEVANT BECAUSE HE HAD BEEN EDUCATED BY THE PROCESS.  HE HAS LEARNED, ARGUABLY, TO DO IT BETTER.  AT LEAST THAT IS A VALID ARGUMENT, WE THINK, BASED ON THE REPORT AND THE OTHER ANALYSIS, THAT HERE IS A

REPORT THAT THE DEFENDANTS SHOULD HAVE BEEN AWARE ABOUT.

MAYBE THESE WITNESSES SAW IT.  I DON'T KNOW BECAUSE WE DON'T HAVE ANY IDEA WHAT THESE WITNESSES SAW, AT THIS POINT. BUT I THINK IT IS A VALID METHOD OF CROSS-EXAMINATION TO SAY, WERE YOU AWARE THAT, IN 1998, THIS DEFENDANT WAS PRESENTED FOR EVALUATION AT THE LEXINGTON MEDICAL CENTER, AND HE WAS DIAGNOSED AS HAVING ANTISOCIAL PERSONALITY DISORDER AND MALINGERING, AND THE MALINGERING DIAGNOSED WAS BASED ON HIS, ALLEGEDLY, FEIGNING INVOLUNTARY MOVEMENTS IN THE PRESENCE OF MEDICAL PERSONNEL THERE.  AND IN ADDITION TO MAKING REPRESENTATIONS TO MEDICAL PERSONNEL THAT SEEMED INCONSISTENT WITH SOMEONE OF HIS INTELLIGENCE, AMONG THE THINGS THEY SAID IN THE FORENSIC EVAL DONE IN 1998 WAS THAT MR. FULKS CLAIMED NOT TO KNOW HIS MOTHER'S PHONE NUMBER,  NOT TO KNOW WHY HE WAS INCARCERATED.  HE THOUGHT HE WAS IN JAIL BECAUSE HE HAD BROKEN INTO A CAR.  WHEN, IN FACT, IT WAS A MONTH AFTER HE HAD ENGAGED IN THIS ENTIRE USE WITH MS. LEE IN MYRTLE BEACH, WHEREIN HE HAD FEIGNED THE INJURY TO HIS CHILD THAT RESULTED IN HIM ACTUALLY STEALING A CAR.

SO,  I THINK IT IS EXTREMELY RELEVANT TO ESTABLISH MR. FULKS'S MOTIVATION IN THE PRESENCE OF DOCTORS WHO ARE EVALUATING HIM FOR THE PURPOSE OF PRESENTING A MEDICAL OPINION IN A DEATH PENALTY CASE THAT, WHEN PRESENTED WITH THAT SAME OPPORTUNITY IN A MUCH LESS SEVERE CIRCUMSTANCE,  HE WAS CHARGED IN 1998 WITH AN OFFENSE FOR WHICH HE WAS SENTENCED TO

ONE YEAR IN PRISON, AND HE FACES THE DEATH PENALTY TO THIS CASE. I THINK IT IS CRITICAL THAT THIS JURY UNDERSTAND THAT HE HAS BEEN THROUGH THIS PROCESS BEFORE. HE LEARNED FROM IT. AND TO THE EXTENT THIS DIAGNOSIS HAS ANY WEIGHT, THAT THE EXPERTS WHO ARE TESTIFYING, BASED ON HISTORICAL INFORMATION PROVIDED BY MR. FULKS, ARE AWARE OF --

THE COURT: MOST OF WHAT THIS WITNESS HAS TESTIFIED ABOUT HAS COME FROM OBJECTIVE BRAIN SCREENINGS, THOUGH, RIGHT?

MR. SCHOOLS: HIS REPORT INDICATES HE INTERVIEWED MR. FULKS. I PRESUME HE WILL SAY THE OBSERVATION OF MR. FULKS AND CONVERSATION WITH MR. FULKS ARE CONSISTENT WITH HIS BRAIN SCAN. AND I THINK HE DID SAY THAT. THAT HE HAD A CONVERSATION WITH MR. FULKS, AND HE EXHIBITED SYMPTOMS THAT WERE CONSISTENT WITH THE BRAIN ANALYSIS THAT HE HAS DEDUCTED. I THINK, OBVIOUSLY, MR. FULKS'S SINCERITY AND MOTIVATION IN THIS PROCESS IS CRITICAL. I WOULD IMAGINE THAT, ANY INDIVIDUAL WHO IS MOTIVATED TO FEIGN SOME SORT OF MENTAL ILLNESS OR TO PRESENT SOME SORT OF SYMPTOM THAT IS NOT REAL, CAN DO SO. AND DOCTORS HOPE THAT THEY CAN TEASE THAT OUT. I THINK THAT ANY DOCTOR WHO IS WORTH HIS WEIGHT WOULD TESTIFY THAT AN INDIVIDUAL WHO HAS BEEN THROUGH THAT PROCESS ONCE, WHO HAS FIGURED OUT THAT THE PATTERN AND ACTIVITIES HE ENGAGED IN DURING THAT PREVIOUS INCIDENT WERE INSUFFICIENT TO DEMONSTRATE WHATEVER TRADE IT WAS HE WAS TRYING TO DEMONSTRATE, WOULD BE

BETTER AT IT THE SECOND TIME AROUND.

I THINK THAT IS CRITICAL INFORMATION TO THIS JURY'S ANALYSIS OF ALL OF THIS TESTIMONY.  WHILE I UNDERSTAND THE DEFENDANTS WOULD WANT TO KEEP IT OUT,  I HONESTLY CAN'T FATHOM A REASON WHY THIS EVIDENCE IN THIS REPORT IS NOT VALUABLE INFORMATION TO THAT JURY'S ANALYSIS OF THE VALUE OF EACH OF THESE EXPERT OPINIONS.

THE COURT:  WHAT ABOUT BASIC HEARSAY PROBLEM WITH, THIS IS A STATEMENT BY A PRIOR TREATING DOCTOR OR PRIOR EXAMINING DOCTOR?

MR. SCHOOLS:  THE DOCTOR WILL TESTIFY, ULTIMATELY. BUT AS FAR AS HEARSAY GOES,  WHAT AN EXPERT RELIES ON --

THE COURT:  THE DOCTOR WHO GAVE THIS MALINGERING ANALYSIS WILL TESTIFY IN THIS CASE?

MR. SCHOOLS:  IF YOUR HONOR PERMITS IT, WE INTEND HIM TO TESTIFY,  YES, SIR.  THE ISSUE IS NOT NECESSARILY WHETHER, WE ARE NOT, AT THIS POINT, OFFERING IT FOR ITS TRUTH.  THE QUESTION IS, ARE YOU AWARE OF IT.  ARE YOU AWARE THE DEFENDANT WENT THROUGH THIS PROCESS? ARE YOU AWARE OF THIS DIAGNOSIS? ARE YOU AWARE THAT, IN A PRIOR CLINICAL SETTING, THE DEFENDANT WAS DEEMED TO HAVE BEEN FAKING SYMPTOMS? AND I THINK ALL OF  -- WHAT IS IN THIS DOCTOR'S SCOPE OF KNOWLEDGE, PRIOR TO MAKING AN EVALUATION AND AN OPINION, IS CRITICAL. IT IS -- THE RULES OF EVIDENCE ALLOW IT.  WE ARE NOT OFFERING IT.  THE DOCTOR RELIES ON INFORMATION AS HEARSAY.  THE RULES

OF EVIDENCE ALLOW, IF THE EVIDENCE IS NOT MORE PREJUDICIAL THAN PROBATIVE, FOR THAT TO BE ADMITTED. IT IS A BASIS FOR THE DOCTOR'S OPINION.

CERTAINLY, THE CONTRARY HAS TO BE TRUE THAT WE CAN ASK THE DOCTOR THINGS ABOUT THE DEFENDANT THAT HE MAY NOT HAVE CONSIDERED TO DETERMINE HOW THOSE THINGS WOULD EFFECT HIS OPINION, OR WHETHER THEY WOULD EFFECT HIS OPINION. AND THAT IS WHY WE ARE SEEKING --

THE COURT: MR. BLUME, WHAT IS YOUR RESPONSE?

MR. BLUME: WELL, I MEAN, OUR POSITION IS, YOUR HONOR, THAT WE THINK IT SHOULD BE EXCLUDED. OBVIOUSLY, THAT IS THE REASON WE HAVE FILED THE MOTION AND THE PLEADING. I THINK, OVERALL, CERTAINLY, THE PEOPLE AT BUTNER, THEY WERE AWARE OF THE FACT THAT HE HAD PREVIOUSLY BEEN DETERMINED TO BE MALINGERING IN 1998. IN FACT, THEY GAVE HIM, AT BUTNER, EVERY TEST OF MALINGERING KNOWN TO THE UNIVERSE. THE PRIMARY FOCUS OF THEIR EVALUATION AT BUTNER IN 2000 -- LAST YEAR WAS TO DETERMINE WHETHER MR. FULKS WAS MALINGERED, AND THERE WAS NO EVIDENCE OF MALINGERING IN THEIR EVALUATION.

THE COURT: WELL, MR. SCHOOLS WILL STAND BACK UP AND SAY, THAT JUST SHOWS HE LEARNED WELL THE FIRST TIME.

MR. BLUME: IT JUST CAN'T. I MEAN, IT REALLY CAN'T BE DONE. I MEAN, YOU CAN'T, THERE IS NOBODY, CERTAINLY NOBODY WITH HIS IQ, EVEN WITH SOMEBODY -- OVERALL, MOST EXPERTS SAY, YOU KNOW, THEY COULDN'T MALINGER. THEY

COULDN'T SURVIVE A LOT OF THESE.  IF YOU KNOW HOW TO TAKE THEM

AND CERTAINLY GET THE CONSISTENCY OF SCORES THAT YOU SEE

BETWEEN WHAT THE BUTNER PEOPLE GOT,  WHAT DR. EVANS GOT,  WHAT

DR. VENN GOT,  WHAT DR. GUR GOT,  ALL OF THE EXPERTS,

INCLUDING THE GOVERNMENT, OF HIS COGNITIVE FUNCTIONING, IS

WITHIN ONE POINT OF EACH OTHER.  AND ON NONE OF THOSE TESTS

WAS THERE ANY INDICATION THAT MR. FULKS WAS MALINGERED OR

FAKING.

SO,  I MEAN,  I THINK THAT, TO ME, THE PREJUDICIAL VALUE

OF ALLOWING THAT,  SURE,  I WILL NOT SIT HERE AND DISPUTE

THAT, IN 1998 THEY EVALUATED HIM IN LEXINGTON AND THEY

DETERMINED HE WAS MALINGERING, THAT IS A HISTORICAL FACT.

THEY DID DETERMINE THAT.  BUT THE QUESTION IS,  SHOULD THAT

BE INJECTED IN THIS PROCEEDING AT THIS POINT?  AND I THINK, ON

BALANCE, WHEN YOU LOOK AT THE CONSISTENCY OF THE PRESENT

EVALUATIONS,  EVERYONE'S OBSERVATIONS, AND PUT FORTH HIS BEST

EFFORT, THE BUTNER REPORT FROM THE PSYCHOLOGISTS INDICATE IT

WAS THEIR IMPRESSION,  THEIR FEELING, NOT ONLY FROM THE

RESULTS OF THE TESTING, BUT THEIR OBSERVATION OF MR. FULKSM

THAT HE WAS PUTTING FORTH HIS BEST EFFORT.  THEN, YOU KNOW, I

WOULD THINK THAT THE PREJUDICIAL VALUE OF THAT OUTWEIGHS ITS

PROBATIVE VALUE.

MR.  SCHOOLS:  I THINK THAT IS ENTIRELY A WEIGHT

ISSUE,  YOUR HONOR.   IN 1998, THE REPORT PREPARED BY

DR. SIMXOC AT LEXINGTON STATES THAT MR. FULKS CLAIMED NOT TO

KNOW WHY HE WAS INCARCERATED OTHER THAT SAYING HE HAD BROKEN A CAR WINDOW, WAS IN THE SEAT.  HE ALSO SAID HE DID NOT KNOW IF HE GRADUATED FROM HIGH SCHOOL,  WHAT TOWN HE GREW UP IN, IF HE WAS PRESENTLY MARRIED, OR WHAT HIS MOTHER'S PHONE NUMBER WAS, DESPITE HAVING WRITTEN HIS MOTHER'S PHONE NUMBER AND ADDRESS ON FORMS.  MR. FULKS CLAIMS TO HAVE BEEN TREATED FOR PSYCHIATRIC PROBLEMS IN THE PAST BUT COULD NOT RECALL WHERE, WHEN,  WHAT HIS DIAGNOSIS WERE, OR WHAT TYPE OF TREATMENT HE RECEIVED.  WHEN ASKED --

THE COURT:  SLOW DOWN JUST A LITTLE BIT.

MR. SCHOOLS:  WHEN ASKED IF HE HEARD VOICES OR EXPERIENCED VISUAL HALLUCINATIONS,  MR. FULKS, INITIALLY, SAID HE DID NOT.  LATER,  HE SAID HE RECEIVED MESSAGES FROM THE TELEVISION.  STAFF NOTED MR. FULKS DID NOT BEHAVE STRANGELY WHEN INTERACTING WITH HIS PEERS WHILE IN RECREATION AREAS OR OTHER TIMES WHEN HE WAS UNAWARE STAFF WERE OBSERVING HIM. DURING THESE TIMES, STAFF REPORTED MR. FULKS LAUGHED AND TALKED APPROPRIATELY TO PEERS.  HOWEVER,  WHEN INTERVIEWED BY PSYCHOLOGY AND SOCIAL WORK STAFF,  MR. FULKS, AGAIN, DISPLAYED MANY OF THE ODD BEHAVIORS MENTIONED.

HE WAS ADMINISTERED AN EEG DURING A PROCEDURE.  MR. FULKS CONTINUOUSLY MOVED.  HE WAS INSTRUCTED BY MEDICAL STAFF OF THE IMPORTANCE OF KEEPING STILL IN ORDER FOR THE TEST RESULTS TO BE ACCURATE.  HE RESPONDED THAT HIS MOVEMENTS WERE INVOLUNTARY.

IT IS JUST --

THE COURT:  TO BE SURE I UNDERSTAND.  YOU INTEND TO CALL THE DOCTOR LATER IN YOUR CASE AT SOME POINT,  EITHER CASE-IN-CHIEF OR REBUTTAL, THAT MADE THAT ANALYSIS?

MR. SCHOOLS:  YES.

THE COURT:  WON'T BE ANY CROSS-EXAMINATION PROBLEM?

MR. SCHOOLS:  NO, SIR.  IT IS NOT A QUESTION OF CONFRONTATION ISSUE.  AND I DON'T THINK IT IS A CONFRONTATION CLAUSE ISSUE ANYWAY, BECAUSE WITH RESPECT TO THE PRESENTATION WITH THIS WITNESS, THE CROSS-EXAMINATION REPORT IS NOT BEING OFFERED FOR ITS TRUTH, IT IS BEING OFFERED AS THE POTENTIAL BASES UPON WHICH AN EXPERT OR SOMETHING UPON WHICH AN EXPERT MIGHT RELY TO FORM AN OPINION.  THE DOCTOR MIGHT SAY, NO, IT DOESN'T MEAN ANYTHING TO ME, IT WAS TOO LONG AGO.  ONE THING FOR SURE,  YOUR HONOR, THIS IS THE SAME -- I BELIEVE IT IS THE SAME PROBLEM WE HAVE CONFRONTED IN THE DISQUALIFICATION MOTION ON MR. BASHAM.  IF MR. FULKS HAD BEEN DIAGNOSED IN 1998 WITH A DIAGNOSIS THAT IS CONSISTENT WITH WHAT THESE DOCTORS WERE SAYING,  THE DEFENSE WOULD BE THE FIRST ONE TO BE OFFERING THIS AND SUGGESTING IT WAS PURELY RELEVANT.  AND SO, I DON'T KNOW WHY, BECAUSE IT IS NOT FAVORABLE TO THEIR CLIENT,  IT BECOMES NOT RELEVANT AND TOO PREJUDICIAL.  I THINK ALL OF THAT GOES TO WEIGHT.  AND I THINK IT IS A CRITICAL PIECE OF EVIDENCE THE JURY NEEDS TO HEAR TO BE EVALUATED.  NOT ONLY IS MR. FULKS'S CREDIBILITY CRITICAL TO EVERYTHING IN THIS CASE,

IT IS CRITICAL TO THEIR ENTIRE DEFENSE, WHICH IS BASED ON STATEMENTS HE MADE TO LAW ENFORCEMENT.  AND IT IS, LIKEWISE, CRITICAL TO THEIR DOCTOR'S EVALUATIONS OF HIM.  IF HE IS LYING TO THEM, IF HE IS MAKING UP SYMPTOMS, IF HE IS FAKING IT, THEN THEIR DIAGNOSISES ARE NOT ACCURATE.

THE COURT:  THERE IS A FAMOUS STUDY THAT WAS DONE -- MY DAUGHTER, WHO MAJORED IN SOCIOLOGY TOLD ME ABOUT IT, I HAVE A COPY OF IT IN MY LIBRARY, WHERE THEY STUDIED ALL OF THESE SOURCES.  THEY TOOK EIGHT PEOPLE WHO WERE PERFECTLY NORMAL AND SENT THEM TO EIGHT DIFFERENT PHYSICIANS TO BE EVALUATED TO DETERMINE IF THEY WERE COMPETENT.  THEY TRIED TO TRICK THE PHYSICIANS.  THEY WERE SUCCESSFUL IN TRICKING THE PHYSICIANS. DON'T QUOTE ME TO IT, I THINK IN ALL EIGHT CASES.  I MEAN, DEMONSTRATING THAT THIS IS NOT AN EXACT SCIENCE.  WHICH IS, I GUESS, SOMEWHAT OF A REASON TO LET IT IN.  SO, WHAT I AM SAYING --

MR. SCHOOLS:  THAT IS OUR POSITION.  I THINK IF AN INDIVIDUAL -- IF THOSE EIGHT INDIVIDUALS HAD BEEN THROUGH THE PROCESS BEFORE AND NOT GOTTEN IT RIGHT,  I THINK, INFERENTIALLY COMMON-SENSICALLY THEY WOULD BE BETTER AT IT THE SECOND TIME.  I THINK THAT IS IMPORTANT.  AND,  YOU KNOW, ONE OF THE THINGS, WE HAVEN'T CROSS-EXAMINED THESE DOCTORS YET.  ONE OF THE THINGS I WOULD THINK THAT IS CRITICAL TO THE PSYCHOANALYSIS OF ANY INDIVIDUAL IS THE PATIENT'S MOTIVATION. AND THERE IS NO QUESTION THAT MR. FULKS'S MOTIVATION IN THIS

INSTANCE IS HIGH TO DEMONSTRATE SOME SORT OF MENTAL IMPAIRMENT OR FEIGN SOME SORT OF MENTAL IMPAIRMENT SO THIS JURY WILL ATTRIBUTE THE HORRIBLE THINGS THAT HE HAS ADMITTED HE HAS DONE TO SOME BRAIN ABNORMALITY OR MENTAL ILLNESS.

I MEAN, IN 1998, HIS MOTIVATION WAS VERY LOW. AND DESPITE THAT LOW MOTIVATION IN 1998, HE STILL ATTEMPTED TO GAIN THE DOCTOR. I THINK THAT IS ALL RELEVANT TO THE ASSESSMENT IN PSYCHIATRIC TESTING.

THE COURT: I WILL DENY THE MOTION IN LIMINE AND ALLOW CROSS-EXAMINATION OF THE WITNESS ABOUT THE 1998 EVALUATION AT BUTNER. WE WILL TAKE IT A QUESTION AT A TIME. I DON'T KNOW HOW FAR I WILL LET YOU GO. BUT I THINK IT IS FAIR GAME. CREDIBILITY IS A BIG ISSUE IN THIS CASE. THE WITNESS MAY HAVE WAYS TO EXPLAIN THE EARLIER ANALYSIS, I DON'T KNOW. AND, CERTAINLY, THE DEFENDANT IS GOING TO BE GIVEN THE OPPORTUNITY TO SHOW THAT, IN THE MOST RECENT BUTNER EVALUATION, THERE WAS NO MALINGERING FOUND BY THE FEDERAL AUTHORITIES. THAT IS, CERTAINLY, PROPERLY ADMISSIBLE EVIDENCE. WITH THAT, WE WILL BREAK FOR LUNCH. WE WILL SEE YOU BACK AT 2:00 O'CLOCK.

MR. SCHOOLS: THE DONNA WARD INCIDENT, WE RAISED THE ISSUE THE OTHER DAY. WE HAVE SOME DEVELOPMENTS ON THAT WE CAN TALK ABOUT NOW.

THE COURT: TELL ME ABOUT THEM.

MR. SCHOOLS: MS. WARD ARRIVED IN COLUMBIA YESTERDAY.

AND WE ALSO PURSUED SOME ADDITIONAL RECORDS WITH RESPECT TO THIS MATTER,  CONDUCTED SOME ADDITIONAL INVESTIGATION.  THIS IS WHAT WE HAVE DETERMINED, AT THIS POINT.   MS. WARD, INITIALLY, INDICATED THAT SHE BELIEVED THE PHONE CALL THAT SHE GOT FROM THE UNKNOWN INDIVIDUAL ALL ON THE 17TH OCCURRED AT 4:15 IN THE AFTERNOON BECAUSE SHE REMEMBERED SHE WAS AT SEARS AND AN ANNOUNCEMENT CAME ON THE OVERHEAD -- ON THE LOUDSPEAKER THE STORE WAS ABOUT TO CLOSE.   I ASKED AGENT BRUNING TO CONTACT THE SEARS STORE IN CHILLICOTHE, OHIO TO DETERMINE WHAT THEIR HOURS WERE ON NOVEMBER 17TH OF 2002, AND HE FOUND OUT THEIR HOURS WERE TWO TO NINE P.M.

THE COURT:   I WONDERED ABOUT IT WHEN YOU SAID THAT. THE QUESTION MARK POPPED IN MY HEAD WHEN YOU SAID THAT.

MR. SCHOOLS:  THAT WAS MY THOUGHT, AS WELL.   THAT IS WHY I ASKED HIM TO CALL.   MR. BRUNING HAD SOME ADDITIONAL CONVERSATIONS WITH THE FOLKS AT SPRINT.  THEY WERE, ACTUALLY, ABLE TO DEVELOP A RECORD THAT SHOWS THE TIME OF THE PHONE CALLS ON THR 17TH.   AND IF I COULD JUST SHOW THE COURT GOVERNMENT'S EXHIBIT NUMBER 355 IS THE RECORD WITH THE TIME ON IT.  AND I CAN BLOW UP THE RELEVANT PORTION OF THREE -- SEE, THREE PHONE CALLS ON THE 17TH,  ONE REPRESENTED AT 7:36:26, ONE AT 20:11:29, AND ANOTHER ONE AT 7:38:29.   SPRINT CELLULAR IS LOCATED IN OVERLAND  -- EXCUSE ME, SHAWNEE MISSION, KANSAS, WHICH IS CENTRAL TIME.   THE TIMES REFLECTED IN THIS RECORD ARE, ACTUALLY, CENTRAL TIME.   WE HAVE OBTAINED FROM MS. DONNA

WARD THE PHONE NUMBERS FOR HER CELLPHONE AND THE PHONE NUMBER FOR THEIR HOME PHONE.

IF THE COURT LOOKS AT THE FIRST CALL THAT WAS PLACED ON NOVEMBER 17TH, 2002, IT APPEARS TO BE A MISDIALED OF HER HOME PHONE.  THERE IS INSERTED A ZERO AFTER THE AREA CODE, BUT OTHERWISE, THE PHONE NUMBER MATCHES THE HOME PHONE NUMBER OF DONNA WARD, 740-947-7144.  THREE MINUTES LATER OR TWO MINUTES LATER, AT 19:38:29, WHICH IS A PHONE CALL PLACED AT 740-708-0151, WHICH IS MS. WARD'S CELLULAR TELEPHONE.  SO, THAT CALL IS REFLECTED TO, ACTUALLY, HAVE OCCURRED AT 7:38:29 CENTRAL TIME, WHICH IN CHILLICOTHE, OHIO, WOULD BE 8:38 EASTERN STANDARD TIME.

MS. WARD'S PHONE RECORDS REFLECT THAT AT 8:38 P.M., ON NOVEMBER 17TH, 2002, SHE RECEIVED AN INCOMING PHONE CALL AT THAT TIME.  BECAUSE OF THE CENTRAL TIME/EASTERN TIME VARIATION, MEANS THAT THE PHONE CALL WAS PLACED USING THE SPRINT PREPAID CARD CALLED MS. WARD AT 8:38.  ALL OF THAT, COMBINED WITH THE SEARS, FINDING THEY DIDN'T CLOSE UNTIL 9:00 O'CLOCK P.M., ON THE 17TH, IN REALITY, NOT AT FOUR, MEANS THAT SHE WAS CORRECT ABOUT HAVING HEARD THE ANNOUNCEMENT THAT SEARS WAS ABOUT TO CLOSE.  SHE WAS JUST WRONG ABOUT WHAT TIME IT WAS.

WE HAVE TALKED WITH MS. WARD ABOUT THAT.  SHE NOW RECALLS THERE WAS SOME SORT OF MIDNIGHT MADNESS GOING ON.  IT WAS NIGHTTIME.  WHAT SHE REMEMBERED, THE ANNOUNCEMENT CAME ON THE

LOUD SPEAKER INDICATING THE STORE WAS ABOUT TO CLOSE PRIOR TO HER RECEIVING THE PHONE CALL OR ABOUT THE SAME TIME.

THE COURT:  TIME IS MORE SIGNIFICANT NOW BECAUSE, ARGUABLY, MR. BASHAM AND MR. FULKS WEREN'T TOGETHER THAT LATE.

MR. SCHOOLS:  THEY WERE NOT TOGETHER AT THAT POINT. MR. BASHAM WAS IN THE OHIO RIVER.  MR. FULKS WOULD HAVE PLACED THIS PHONE CALL WITH THE CALLING CARD.

THE COURT:  SO, IT IS MUCH MORE DAMAGING TO THE DEFENDANT THAN IT MIGHT HAVE BEEN.

MR. SCHOOLS:  YES, SIR.

THE COURT:  BECAUSE OF THE TIME DELAY.

MR. SCHOOLS:  YES, SIR.  WHILE WE DON'T HAVE THE TOLL RECORD FROM THE PHONE FROM WHICH THAT CALL WAS PLACED, WE HAVE CONFIRMED IT WAS A PAY PHONE IN PORTSMITH, OHIO, WHICH IS IN THE VICINITY OF WAVERLY, ASHLAND, THAT WHOLE KENTUCKY, WEST VIRGINIA, OHIO, THREE STATE AREA.

THE OTHER CONCERN THAT WAS RAISED BY THE DEFENSE WAS ONE OF NOTICE AND ABILITY TO BE PREPARED TO RESPOND TO THIS EVIDENCE.  MS. WARD WAS IN OUR OFFICE YESTERDAY AFTERNOON. SHE ADVISED US THAT, ON MAY 21ST, SHE WAS VISITED BY PETE SKIDMORE, THE INVESTIGATOR FOR THE DEFENSE, WHO WAS THERE PUTATIVELY TO INTERVIEW AMY WARD.  MS. WARD WAS PRESENT FOR THE INTERVIEW, AND SHE ADVISED US THAT SHE TOLD MR. SKIDMORE ABOUT THIS PHONE CALL SHE HAD RECEIVED ON NOVEMBER 17TH, INDICATING IT WAS SOMETHING ABOUT WHICH SHE HAD CONCERN.

SO, THE REALITY IS, I HAVE MADE THIS POINT BEFORE TO THE COURT, ONCE AGAIN, AND I AM NOT PROUD OF THIS EITHER, BUT THE DEFENSE INVESTIGATOR WAS AHEAD OF US ON THIS, AND THEY WERE AWARE OF THE PHONE CALL, NOT ONLY BEFORE WE WERE, BUT BEFORE OPENING STATEMENTS IN THE CASE. AT LEAST, CONSTRUCTIVELY, AWARE THROUGH MR. SKIDMORE.

THE COURT: I THOUGHT THIS WAS GOING TO BE A HARD CALL TO MAKE. NOW, IT DOESN'T LOOK SO HARD, UNLESS THE DEFENDANT CAN TELL ME SOMETHING PRETTY POWERFUL. YOUR INVESTIGATOR HEARD ABOUT THIS CALL WAY BACK THERE.

MR. BLUME: WAIT. THAT IS NOT AN ACCURATE CHARACTERIZATION OF THIS. I DO WANT TO -- I FOUND OUT, ACTUALLY, YESTERDAY WHEN I CALLED HIM ABOUT THIS, THAT HE HAD INTERVIEWED HER. HE DIDN'T REALLY MAKE ANY BIG DEAL ABOUT ANYTHING BECAUSE THERE WAS NO INDICATION ANY OF THIS WAS CONNECTED TO THIS CASE. OR THAT THEY COULD TIE ANY OF THIS TO US. AND THERE WAS NO INDICATION OF THAT, WHATSOEVER. I MEAN, THE ONLY TIME, THE FIRST TIME I EVER HEARD ANYTHING ABOUT THIS AT ALL, MYSELF, WAS LAST WEEK MR. GASSER SAID SOMETHING TO ME ABOUT IT. AND HE SAID, BOY, MS. WARD TOLD ME THIS THING AND, YOU KNOW, HE SAID, ISN'T IT AN UNUSUAL COINCIDENCE. WE ARE NOT GOING TO DO ANYTHING WITH IT BECAUSE I GUESS, AT THAT POINT, THEY DIDN'T HAVE ANYTHING TO KNOW ABOUT IT.

SO, I MEAN, THAT IS JUST NOT ACCURATE. WE HAVE DONE NO

INVESTIGATION OF THIS.  WE HAD NO KNOWLEDGE OF THIS BEING SIGNIFICANT.  WE HAD NO INDICATION OF THIS LINK TO OUR CASE.

THE COURT:  DO YOU ACKNOWLEDGE MS. WARD'S MOTHER TOLD YOUR INVESTIGATOR ABOUT THIS MYSTERIOUS CALL TO GO TO THE HARDWARE STORE?  I UNDERSTAND YOU DIDN'T CONNECT THE DOTS. THAT INFORMATION WAS MADE KNOWN TO YOUR INVESTIGATOR?

MR. BLUME:  YES.  SHE ALSO TOLD HIM SHE TOLD LAW ENFORCEMENT POLICE OFFICERS MONTHS AGO.  THE MAIN POINT, IN MY OPINION,  IF YOU DO THIS,  YOU ARE DIRECTING A DEATH VERDICT. WE HAVE MADE ALL OF OUR DECISIONS ABOUT THIS CASE BASED ON WHAT WE PERCEIVE TO BE A KNOWN UNIVERSE OF FACTS, WHICH ARE BAD ENOUGH, IN AND OF THEMSELVES.  AND WE HAVE DEVELOPED A STRATEGY, IN LIGHT OF WHAT THE KNOWN UNIVERSE OF FACTS WAS. WE HAVE STOOD UP IN FRONT OF THIS JURY, AND WE HAVE GIVEN AN OPENING STATEMENT ABOUT THIS CASE BASED ON WHAT THE KNOWN UNIVERSE OF FACTS WERE TO US.  WE HAVE CROSS-EXAMINED EVERY WITNESS WHO HAS TESTIFIED ABOUT WHAT THEY WERE DOING ON THE 17 DAYS, BASED ON THE KNOWN UNIVERSE OF FACTS.

IF THIS COMES IN AT THIS POINT, WE STILL HAVEN'T HAD ANY TIME TO INVESTIGATE IT AND DETERMINE WHETHER IT IS ADDITIONAL INVESTIGATION TO BE DONE.  WE LOSE ANY CREDIBILITY WE HAVE WITH THIS JURY.  THERE IS NO WAY YOU CAN CURE THAT.  THEY ARE GOING TO BELIEVE WE TRIED TO DO THIS TO YOU.  WE WILL LOSE OUR CASE IN MITIGATION.  WE HAVE BEEN DEPRIVED OF THE RIGHT TO EFFECTIVELY CROSS-EXAMINE THE WITNESSES AND DEVISE A STRATEGY

WHICH MAKES SENSE IN LIGHT OF THIS.

THE GOVERNMENT -- THIS GOES BACK TO BASIC FACTS.  THEY KNEW ABOUT AMY WARD NOVEMBER 2002 ON.  THEY COULD HAVE GONE AND INTERVIEWED THEM.  APPARENTLY, THERE WAS A DISCUSSION WITH SOMEBODY IN LAW ENFORCEMENT.  THIS INFORMATION NEVER CAME OUT, WAS NEVER PROVIDED TO US.  THEY KNEW THAT THEY HAD THAT SPRINT CARD FROM THE BEGINNING.  YOU WOULD THINK THEY WOULD HAVE HAD SOME MOTIVATION TO DETERMINE WHAT CALLS WERE MADE, WHAT THEY WERE.  NONE OF THAT WAS DONE.  I HAD ABSOLUTELY NO INDICATION IN THE WORLD, UNTIL THIS THING CAME UP, THAT ANYTHING ON THAT CARD COULD LINK, YOU KNOW, THAT CALL TO MR. FULKS.

THE COURT:  LET ME ASK YOU THIS.  DID THE GOVERNMENT DISCLOSE THAT MS. WARD -- THAT THE THEFT OF MS. WARD'S POCKETBOOK WOULD BE BROUGHT OUT AT TRIAL?

MR. SCHOOLS:  YES, SIR.

THE COURT:  THAT WAS IN THE TRIAL BRIEF?

MR. SCHOOLS:  IN THE TRIAL BRIEF.  I KNOW WE HAD PROVIDED INFORMATION ABOUT MS. WARD PRIOR TO THE TRIAL BRIEF.

THE COURT:  SHE WAS LISTED AS A WITNESS?

MR. SCHOOLS:  YES, SIR.

THE COURT:  AND WAS THE DEFENSE TEAM AWARE THAT, WHEN MR. FULKS WAS ARRESTED, HE HAD HER CELLPHONE, AND ID, AND DRIVER'S LICENSE?

MR. SCHOOLS:  YES, SIR.  PRESUMABLY, THAT IS WHY

THEY SENT THEIR INVESTIGATOR TO INTERVIEW AMY WARD.  THEY UNDERSTOOD SHE WOULD BE A WITNESS.  WHAT MS. WARD TELLS US, NO REASON FOR MR. BLUME AND I TO GET INTO A CONTEST ABOUT WHAT TOOK PLACE DURING OUR CONVERSATION.  BUT MS. WARD TELLS US THAT SHE TALKED WITH MR. SKIDMORE.  SHE TOLD HIM ABOUT THE PHONE CALL.  SHE TOLD HIM THAT SHE WAS AWARE THAT THE INDIVIDUALS WHO HAD STOLEN HER PURSE WOULD HAVE HAD ACCESS TO HER PHONE NUMBER BECAUSE OF THE CELLPHONE CALL.  IT SCARED HER.  SHE CONNECTED THOSE DOTS.  MR. SKIDMORE ADVISED HER, ACCORDING TO MR. WARD, I WAS NOT THERE, HE WOULD MAKE IT KNOWN TO DEFENSE COUNSEL.  NOT SAYING HE DID THAT.  THAT IS WHAT HE TOLD MS. WARD.

AT THAT POINT, YOUR HONOR, NOT KNOWING WHEN THE PHONE CALL WAS PLACED OR BY WHOM,  IT IS POSSIBLE THAT PHONE CALL COULD HAVE BEEN PLACED BY BRANDON BASHAM.  WE NOW KNOW, FROM THE RECORDS, IT WASN'T PLACED BY MR. BASHAM.  YOU KNOW,  YOUR HONOR,  IF MR. FULKS GOES BACK TO COLUMBIA CARE TONIGHT AND CONFESSES TO HIS CELLMATE,  THAT WOULD, LIKEWISE, BLOW THE DEFENSE STRATEGY.  I KNOW THAT.  IT DOESN'T MEAN IT WOULD BE INADMISSIBLE.  OR, IF HIS CELLMATE FROM RICHLAND COUNTY GETS MOTIVATED TO COME TELL US, SOMEHOW, A VERY COMPELLING STORY IN THE MIDDLE OF THIS TRIAL THAT WE DIDN'T ANTICIPATE AND DIDN'T KNOW TO GO SEE THAT THE DEFENDANT HAD CONFESSED TO HIM,  IT IS INCONCEIVABLE THAT THE COURT WOULD KEEP THAT OUT.

I MEAN, ULTIMATELY, THIS IS A TRUTH-SEEKING FUNCTION.

AND THE ONE PERSON IS, AND, YOUR HONOR, I THINK IT IS WEEKS VERSUS UNITED STATES SUPREME COURT CASE, IT IS THE RARE DEFENSE ATTORNEY THAT GETS THE WHOLE TRUTH FROM HIS CLIENT. THE ONE PERSON WHO HAD THIS INFORMATION SINCE NOVEMBER 19TH OF 2002 IS CHAD FULKS.  SO,  WHILE I UNDERSTAND THE DEFENDANT'S CONCERN ABOUT THE MIDTRIAL DEVELOPMENT OF THIS EVIDENCE, THERE ARE CASES THAT, AND WE CAN CITE THEM TO YOUR HONOR THIS AFTERNOON, THAT TALK ABOUT THE ADMISSIBILITY OF EVIDENCE DISCOVERED DURING THE COURSE OF THE TRIAL WHEN THERE HAS BEEN NO NEGLIGENCE ON THE PART OF THE GOVERNMENT IN DISCOVERING INFORMATION.

I HAVE TALKED -- I TALKED TO AMY WARD ON THE PHONE AT LEAST TWICE.  I TALKED TO HER DAD ON THE PHONE THREE OR FOUR TIMES.  I DIDN'T KNOW TO ASK THEM WHETHER THEY HAD RECEIVED ANY PHONE CALLS FROM A SUSPECT ON THE 17TH OF NOVEMBER.  IN RETROSPECT, IT IS SURPRISING TO ME THEY DIDN'T TELL ME.  THEY DIDN'T TELL ME.  IT IS NOT AS IF WE NEVER TALKED TO AMY WARD BEFORE SHE SHOWED UP HERE.  SHE HAD BEEN INTERVIEWED, TALKED ON THE PHONE, AGREED TO COME TESTIFY.  TALKED TO HER DAD ABOUT THE ARRANGEMENTS.  THEY HAD NEVER MENTIONED IT.  I CERTAINLY DIDN'T KNOW TO ASK BECAUSE I HAD NO REASON TO THINK THAT THAT PHONE CALL HAD BEEN PLACED.

MR. BLUME:  JUDGE, WE ARE AT THE THIRD WEEK, ALMOST THE END OF A CAPITAL TRIAL IN THE GOVERNMENT'S CASE.  YOU ARE TALKING ABOUT DROPPING A PIECE -- I DON'T USUALLY TALK --

DROPPING A PIECE OF INFORMATION INTO THIS THAT TOTALLY GUTS

EVERYTHING -- THAT MIGHT TOTALLY DEGUT EVERYTHING WE HAVE.

THE COURT:  IN YOUR OPENING STATEMENT, HELP ME WITH THAT.  IS IT MR. BASHAM DID ALL OF THE BAD ACTS, HE HAD THE GUN, ET CETERA, ET CETERA?  YOU SAY THIS UNDERMINES YOUR OPENING STATEMENT.

MR. BLUME: UNDERMINES CREDIBILITY.  WE HAD NO IDEA. LIKE, WE WILL TRY TO DRAW OUT THE DISTINCTIONS, TALK ABOUT THE DEFENDANT'S LIFE AND BACKGROUND, YOU KNOW.  WE ARE GOING TO TRY AND TELL YOU THE TRUTH ABOUT THIS.  GOING TO LET THIS COME IN IT DROPS, ESSENTIALLY, A COMPLETELY OTHER -- WHAT THEY ARE GOING TO PORTRAY, AS ANOTHER ATTEMPTED, YOU KNOW, LURING SOMEBODY OUT TO CARJACK.  A COMPLETELY, YOU KNOW -- I'M SORRY.  COMPLETELY NEW AND SEPARATE ASPECT IN THIS AFTER, I MEAN, I WOULD HAVE PLANNED TONS OF THINGS DIFFERENTLY. CROSS-EXAMINED WITNESSES DIFFERENTLY.  I AM NOT ATTRIBUTING ANY BAD FAITH TO THEM.  THEY HAD PLENTY OF MOTIVATION TO IT. THEY HAD ACCESS.

WE DIDN'T RUN DOWN EVERY SINGLE LEAD.  ENOUGH BAD THINGS ANYWAY.  WE WERE DEVELOPING A CASE, DEVELOPING A STRATEGY. WE HAVE HAD OUR EXPERTS EVALUATE THEM IN LIGHT OF A CERTAIN WAY. AND IT IS JUST, YOU KNOW, TWO SPORTS ANALOGIES.  ONE, THERE IS TIME WHEN THE REFEREE THROWS THE PILE IT ON FLAG. THIS IS PILING ON.  THERE IS ALSO, YOU KNOW, A TIME WHERE, YOU KNOW, LIKE THE BASEBALL TEAM, IT HAS TO HAVE THE ROSTER.

AFTER THAT, YOU CAN'T MAKE ADDITIONS, YOU KNOW, OR DELETIONS. THE THIRD WEEK OF A CAPITAL TRIAL IS NOT THE TIME, WHERE WE HAVE ALREADY OPENED, ALL THE MAIN WITNESSES HAVE BEEN CALLED, WE HAVE CROSS-EXAMINED, TO THROW THAT INTO THIS.  I CANNOT IMAGINE ANYTHING MORE PREJUDICIAL.  AND IT TOTALLY DEGUTS US.

THE COURT:  YOUR POINT THE OTHER DAY THAT YOU MADE, YOU SAID IT IS UNFAIR, YOU HAVE ALREADY MADE YOUR OPENING STATEMENT AND STRUCTURED IT IN A CERTAIN WAY.  AND YOUR EXPERTS HAD PREPARED FOR THIS CASE ON A KNOWN UNIVERSE OF FACTS.  I UNDERSTAND YOUR ARGUMENT REGARDING THE OPENING STATEMENT.  I DON'T UNDERSTAND HOW IT WOULD REALLY AFFECT YOUR EXPERT'S TESTIMONY.

MR. BLUME:  NOW IT WOULD AFFECT OUR OPENING STATEMENT.  ALSO WOULD AFFECT, CONCEIVABLY, WE WOULD HAVE HAD A DIFFERENT APPROACH TO LOTS OF THIS.  CONCEIVABLY, WE WOULD HAVE, AND I WOULD IMAGINE WE WOULD HAVE CROSS-EXAMINED ALL OF THE WITNESSES THAT WERE WITH THEM, MS. SEVERANCE, MS. RODDY, AND ALL OF THE OTHER PEOPLE, POTENTIALLY, IN DIFFERENT WAYS ABOUT WHAT HAS HAPPENED.  AND, YOU KNOW, POTENTIALLY, HAD A DIFFERENT TAKE ON THIS.

THE EXPERTS, I MEAN, THE KNOWN UNIVERSE OF FACTS, WE ARE NOT GOING TO ASK TO GET THEM BACK IN -- SEVERAL BACK IN TO SEE MR. FULKS ABOUT THIS, OR BE ABLE TO INCORPORATE THIS, AT LEAST SOME OF THE LATER ONES.  I THINK, IN THIS CIRCUMSTANCE, THAT ONE REASON YOU HAVE A NOTICE REQUIREMENT UNDER REMAINING

CIRCUMSTANCES IN CAPITAL CASES IS THAT -- SO YOU WILL HAVE NOTICE.  YOU WILL BE ABLE TO RESPOND AND MEET THE CHARGES AGAINST YOU AND BE ABLE TO DEVELOP IT IN A COHERENT FASHION. WE CAN'T DO IT AT THIS POINT.

I JUST THINK THAT, YOU KNOW,  IT WOULD BE INCREDIBLY PREJUDICIAL.  IF THEY WANT TO GET THIS OUT, THE TIME AND PLACE TO DO IT, IF THEY THINK IT IS A REALLY IMPORTANT CRITICAL FACT, THERE WILL BE ANOTHER TRIAL IN WEST VIRGINIA AFTER THIS.  THEY ARE GOING TO TRY -- A FEDERAL TRIAL IS SCHEDULED THERE,  CHARGED WITH THAT.  THE TIME IS TO LET THIS BE INVESTIGATED, LET THE DEFENSE LAWYERS UP THERE,  WHETHER IT IS ME AND MS. NEWBERGER,  SOMEBODY ELSE AND MS. NEWBERGER, LET THEM TAKE IT INTO ACCOUNT, DEAL WITH IT IN A COHERENT, RATIONAL MANNER.  WE, IN WEEK THREE OF A CAPITAL CASE IN THE GOVERNMENT'S TRIAL, I CAN'T IMAGINE ANYTHING MORE PREJUDICIAL, ANYTHING MORE DEVASTATING.

THE COURT: I DON'T, FOR A SECOND, DOUBT THE SIGNIFICANCE OF THE EVIDENCE BECAUSE IT PUTS, ARGUABLY, PUTS YOUR CLIENT OF LURING IN A POTENTIAL VICTIM WHEN HE WAS APART FROM MR. BASHAM.  I REALIZE HOW POWERFUL IT IS.

MR. BLUME:  NOT BEING ABLE TO SAY ANYTHING ABOUT HOW WE CROSS-EXAMINED WITNESSES,  HOW WE FORMULATED OUR CASE.  TO DEAL WITH IT IN THE OPENING STATEMENT.  IT WOULD TOTALLY UNDERMINE OUR CREDIBILITY IN EVERY RESPECT, AND I THINK IT IS THE LEGAL EQUIVALENT, IN THE THIRD WEEK OF A CAPITAL TRIAL, OF

DIRECTING A DEATH VERDICT.

THE COURT:  LET ME THINK ABOUT IT OVER LUNCH.

MR. SCHOOLS:  I WOULD WANT TO RAISE ONE OTHER ISSUE WITH RESPECT TO THAT WHOLE ISSUE, YOUR HONOR.  YOU KNOW, UNFORTUNATELY, SOMETIMES FACTS GET IN THE WAY OF THE DEFENSE. AND, I THINK, IN SOME WAYS, THAT IS WHAT HAS HAPPENED HERE. THROUGH NO -- I DON'T INTEND TO CAST ASPERSIONS ON ANYBODY ON THE DEFENSE TEAM AT ALL.  I DON'T INTEND TO DO THAT. SOMETIMES, THE FACTS GET IN THE WAY OF OF THE DEFENSE AND REALITY.  THE TWO ISSUES IS, DOES THE JURY GET TO KNOW ABOUT THESE FACTS THAT ARE SQUARELY IN THE WAY OF THE DEFENSE?  WHAT ARE THE DEFENSE ATTORNEYS GOING TO ARGUE NOW? I MEAN,  THEY NOW HAVE THIS INFORMATION.  IT IS IN THE PUBLIC DOMAIN.  ARE THEY GOING TO -- IT IS IN THEIR DOMAIN ANYWAY.  ARE THEY GOING TO BE ALLOWED TO STAND UP IN FRONT OF THIS JURY AND ARGUE THAT MR. FULKS DIDN'T INTEND THAT ANDREA FRANCIS AND DEANNA FRANCIS BE VICTIMS OF HE AND MR. BASHAM WHEN THE REALITY IS,  APPEARS TO BE THAT, AFTER MR. BASHAM BOTCHED THE ATTEMPT TO KIDNAP DEANNA FRANCIS AT 7:21 P.M. ON NOVEMBER 17TH,  2002,  MR. FULKS, UNSATISFIED, SOUGHT ANOTHER VICTIM FOR HIS PURPOSES.  AND I THINK THAT IS CLEARLY CONTRARY TO ANY ARGUMENT THAT THE DEFENSE ATTORNEYS MIGHT MAKE TO THIS JURY THAT THIS DEFENDANT DID NOT INTEND THAT AS A CRIME, DID NOT INTEND DEANNA FRANCIS, AND DID NOT INTEND ALICE DONOVAN, AND SAMANTHA BURNS AS VICTIMS.

SO, THERE ARE TWO ISSUES HERE.  ONE IS, DOES THE JURY HEAR ABOUT IT?  WE THINK THAT ABSENT, BASED ON THE WAY IT WAS DEVELOPED,  THAT THE JURY DOESN'T HEAR ABOUT IT, THEN THEIR VERDICT IS LESS LIKELY TO BE JUST.  AND SECOND OF ALL, EVEN IF THE JURY DOESN'T HEAR ABOUT IT, THAT THE ABILITY OF THE DEFENSE COUNSEL TO ARGUE TO A JURY BASED ON THIS EVIDENCE, THIS DEFENDANT WAS SOMEHOW BRANDON BASHAM'S DUPE, SHOULD BE INHIBITED.

THE COURT:  ALL RIGHT.  I WOULD LIKE TO THINK ABOUT IT OVER LUNCH.  WE TOLD THE JURY TO BE BACK AT TWO.  WHY DON'T WE BE BACK AT 2:15.  WE WILL TELL THE MARSHALS TO TELL THE JURORS WE WILL BE A LITTLE LATE STARTING.  TAKE THEM OUT FOR SOME FRESH AIR, IF YOU WANT TO, WHEN THEY GET BACK AT TWO. ALL RIGHT.  ANYTHING ELSE?

MR. SCHOOLS:  NO, SIR.

THE COURT:  BE IN RECESS UNTIL 2:15.

(WHEREUPON, A LUNCH RECESS WAS HELD.)

THE COURT:  ON THE MATTER WE WERE DEBATING BEFORE LUNCH, I WOULD LIKE TO HOLD THAT UNDER ADVISEMENT FOR A LITTLE WHILE.  I WANT MY LAW CLERK TO RESEARCH THE STATUTE REQUIRING THREE DAYS ADVANCE NOTICE OF THE WITNESS LIST OF A CAPITAL CASE.  I WANT TO SEE IF THERE IS ANY CASE LAW ON THAT.  I AM ASSUMING THAT THE WITNESS, MS. WARD'S MOTHER, WAS NOT LISTED AS A WITNESS?

MR. SCHOOLS:  THAT'S CORRECT.  WE HAVE LOOKED AT

THAT CASE LAW, AS WELL, YOUR HONOR.  I WILL BE HAPPY TO ADDRESS IT.

THE COURT:  YOU HAVE LOOKED AT IT?

MR. SCHOOLS:  LOOKED AT SOME.  THERE IS ONE CASE, I BELIEVE IT IS OUT OF THE CENTRAL DISTRICT OF CALIFORNIA, THAT IMPOSES A HEAVIER BURDEN ON THE GOVERNMENT UNDER THESE CIRCUMSTANCES THAN THE OTHER CASES.  BUT, GENERALLY, THE CASE LAW SEEMS TO INDICATE THAT, WHERE INFORMATION CAME TO THE GOVERNMENT'S ATTENTION AFTER THE COMMENCEMENT OF THE TRIAL, THE VIOLATION OF THE THREE-DAY STATUTE IS INTENDED TO GIVE THE DEFENDANT THREE DAYS NOTICE AND ABILITY TO CONDUCT ANY INVESTIGATION IT MAY NEED TO CONDUCT.  IF THE DEFENDANT OR THE COURT, GENERALLY, THAT SAME BASIC ACCOMMODATION OF THE EVIDENCE COMING IN.

THE COURT:  ALL RIGHT.  WELL, DID THEY MAKE ANY DISTINCTION BETWEEN GUILT PHASE AND PENALTY PHASE?  PROBABLY NOT.

MR. SCHOOLS:  NO, SIR.  NOT THAT I RECALL.  ONE OF OUR LAWYERS PULLED THE CASE.  I READ THROUGH THEM BRIEFLY YESTERDAY AFTERNOON.

MR. BLUME:  I DON'T WANT TO KEEP DOING THE SAME THING.  THE THREE-DAY THING HERE WILL DO NOTHING FOR US.  WE HAD STAKED OUT A POSITION.  WE HAVE WAITED OUT --

THE COURT:  YOU ARE SAYING, THE THREE DAYS RUNNING RIGHT NOW WON'T DO YOU ANY GOOD?

MR. BLUME:  NOT A BIT.

THE COURT:  THREE DAYS BEFORE THE TRIAL BEGAN DEADLINE MIGHT SAVE YOU, IS WHAT YOU ARE SAYING.

NOW, ANOTHER JUROR ISSUE.  A JUROR APPROACHED MS. FLOYD YESTERDAY TO SAY THAT HER OR HIS SON, I GUESS IT IS, IS BEING DEPLOYED TO IRAQ THIS WEEKEND.  THE JUROR WANTED TO SEE IF WE COULD ADJOURN FRIDAY BECAUSE THE CHILD WAS GOING TO LEAVE ON SATURDAY, AND HE WANTED TO BE WITH HIM TO HAVE DINNER AND ALL THE NIGHT BEFORE.  WE LEARNED TODAY THE CHILD, ACTUALLY, SHIPS OUT AT NOONTIME ON FRIDAY, NOT SATURDAY.  SO, WE NEED TO MAKE A DECISION WHETHER WE LOSE ANOTHER JUROR, OR STOP EARLY, OR TELL THEM HE WILL JUST HAVE TO SEE HIS CHILD AT HOME.  HE HAS BEEN COMMUTING.  ANY THOUGHTS?

MR. SCHOOLS:  GENERAL THOUGHTS, ARE, YOUR HONOR, WE HAVE KIND OF BOGGED DOWN THIS WEEK, TO BE CANDID WITH THE COURT.  WE HAVE A LOT OF WITNESSES THAT ARE HERE WE HOPE CAN GET TO TESTIFY TO GET OUT OF HERE.  NOT TRYING TO STOP EARLY IF HE IS A LOCAL.  IF HE IS A LOCAL OR, AT LEAST, A COMMUTING JUROR, CLOSE ENOUGH TO MAKE IT HOME AT NIGHT, HE STICK AROUND AND PERSEVERE.

THE COURT:  ALL RIGHT.  MR. BLUME, DO YOU HAVE A POSITION ONE WAY OR THE OTHER?

MR. BLUME:  NO, I LEAVE IN IT THE COURT'S DISCRETION.

THE COURT:  AS I WAS SAYING, I WILL SAY THAT, IN DISCUSSING THIS MATTER OVER LUNCH WITH MY LAW CLERKS, REALLY

AND TRULY HAVEN'T MADE UP MY MIND, BUT I SUGGESTED TO MY LAW CLERKS, IF I DECIDE TO ADMIT THE EVIDENCE, I MIGHT OFFER -- I MIGHT ADMIT IT UNDER CERTAIN CONTINGENCIES. THAT IS, IT BE A FULL DEVELOPMENT TO THE JURY IT WAS NOT DISCLOSED TO THE DEFENDANT UNTIL AFTER THE TRIAL BEGAN. AND, SECONDLY, OFFER THE DEFENDANT A TWO-DAY HIATUS IN THE TRIAL, WHICH I WOULD BLAME ON MYSELF IN FRONT OF THE JURY. I WOULD JUST BLAME IT ON MY SCHEDULE TO PERMIT THE DEFENDANT TWO UNFETTERED DAYS TO DO WHATEVER INVESTIGATION NEEDS TO BE DONE.

NOW, THAT MIGHT, IF THE DEFENDANT WANTED TO DO THAT, THAT MIGHT DOVETAIL WITH THE JUROR'S DESIRE TO FINISH EARLY THIS WEEK. ANYWAY, LET ME LOOK AT THESE AUTHORITIES, AND WE WILL DECIDE THAT LATER.

MR. GASSER: BEFORE THE JURY IS BROUGHT UP, I DON'T KNOW IF YOU HAVE MADE THE RULING ON THE '98 REPORT. WHEN WE PUT THE DOCTOR BACK UP ON THE STAND, I DON'T KNOW HOW MUCH MR. BLUME WILL REFERENCE THIS, BUT HE MADE REFERENCE IN HIS ARGUMENT TO YOU, HE KEEPS REFERRING TO THE BOP DOCTORS AT BUTNER AS GOVERNMENT DOCTORS. AND WHILE, TECHNICALLY, THAT IS TRUE, THEY ARE NOT PROSECUTION DOCTORS. THEY ARE NOT U. S. ATTORNEY DOCTORS. AND I KNOW, WHEN I PROSECUTED IN THE STATE SYSTEM, THE DOCTORS, PSYCHOLOGISTS, PSYCHIATRISTS AT THE HALL INSTITUTE, THE SOUTH CAROLINA STATE CIRCUIT COURT JUDGE WOULD SIGN A COMPETENCY OR ORDER A MENTAL EVALUATION, AND THAT IS WHERE THEY WOULD GO TO. I KNOW ALL OF THOSE DOCTORS AND

PSYCHOLOGISTS AND SOCIAL WORKERS.  THEY DIDN'T CONSIDER THEMSELVES AS PROSECUTION WITNESSES.  THEY CONSIDERED THEMSELVES, IN FACT, WITNESSES FOR THE COURT.  THEY CONSIDERED THEMSELVES COMPLETELY OBJECTIVE.  THEY WEREN'T FOR ONE SIDE OR THE OTHER.

I AM ASSUMING, THE EMPLOYEES AT THESE FEDERAL MEDICAL FACILITIES, I WOULD BE SHOCKED IF THESE PSYCHOLOGISTS, AND PSYCHIATRISTS, AND SOCIAL WORKERS CONSIDER THEMSELVES AN ARM OF THE PROSECUTION.

THE COURT:  CAN'T YOU EXPLORE THAT WITH THE WITNESS WHEN HE IS ON THE STAND?  I MEAN,  RATHER THAN ME LIMIT MR. BLUME?

MR. GASSER:  I DON'T HAVE A PROBLEM.   THE INFERENCE THAT HE DRAWS IS WE HAVE --

THE COURT:  I UNDERSTAND.  WHAT I AM SAYING, RATHER THAN LIMIT MR. BLUME IN HIS CHOICE OF ADJECTIVES, I WOULD LIKE YOU TO DEVELOP IT THROUGH TESTIMONY.

MR. GASSER:  THAT IS FINE.

THE COURT:  ALL RIGHT.  BRING IN THE JURY,  PLEASE.

(WHEREUPON, THE FOLLOWING WAS HEARD IN THE PRESENCE OF THE TRIAL JURY.)

THE COURT:  IF THE WITNESS WILL RESUME THE STAND. MR. BLUME, YOU CAN RESUME YOUR DIRECT EXAMINATION.

BY MR. BLUME:

Q.    DR. GUR,  BEFORE THE LUNCH BREAK, WE WERE TALKING ABOUT

**DIRECT EXAM OF RUBEN GUR**

YOUR TESTING THAT YOU CONDUCTED IN THIS CASE.  AND PREVIOUS TO THAT, WE WERE TALKING ABOUT THE DIFFERENT TYPES OF TESTS WHICH HAVE BEEN DONE ON MR. FULKS.  WE TALKED ABOUT THE MRI SCAN.  THEN WE TALKED ABOUT THE PET SCAN.  AND THEN WE TALKED ABOUT THE NEUROPSYCHOLOGICAL TESTING.  AND ONE ISSUE I WOULD LIKE TO ADDRESS, BEFORE WRAPPING UP HERE, IS WHAT IS KNOWN AS THE QUESTION OR SOMETIMES WHAT IS REFERRED TO AS MALINGERING.  OR ANOTHER WORD FOR IT, MORE COMMONSENSE WORD, IS FAKING.

NOW,  AS I UNDERSTAND IT, AND CORRECT ME IF I AM WRONG, THAT THE MRI SCAN IS, BASICALLY, A TYPE OF A PICTURE OF THE BRAIN?

A.    YOU ARE RIGHT.

Q.    SO,  I MEAN,  NOBODY, NO MATTER WHAT THEIR MOTIVATION, NO MATTER WHAT THEIR DESIRE, CAN FAKE WHAT IS ON AN MRI SCAN?

A.    THAT IS CORRECT.  THE ONLY THING THAT ONE CAN DO, IF THEY DON'T WANT TO COOPERATE, IS MOVE WHEN THE SCAN IS DONE. AND THAT WILL CREATE MOTION ARTIFACTS.  IF THEY ARE VERY SEVERE, MAKE THE SCAN DIFFICULT TO INTERPRET.

Q.    BUT THAT, OBVIOUSLY, DID NOT HAPPEN HERE?

A.    NO,  NO.

Q.    THERE IS NO INDICATION OF MOVEMENT IN THIS MRI SCAN?

A.    NO,  NO,  NO.  YOU CAN SEE MOVEMENT VERY EASILY ON MRI.  THERE IS NO MOVEMENT.

Q.    AND IS THE SAME TRUE WITH THE PET SCAN?

**DIRECT EXAM OF RUBEN GUR**

A.    THE SAME IS TRUE FOR THE PET SCAN,  YES.

Q.    I MEAN,  IN OTHER WORDS,  IT IS A DIFFERENT TYPE OF IMAGE OR PICTURE OF THE BRAIN, AND, YOU KNOW, YOU CAN'T FAKE IT.  WHAT IS THERE IS THERE?

A.    NO,  YOU CAN'T.

Q.    OKAY.  WELL,  THEN, THAT BRINGS US TO THE THIRD COMPONENT OF YOUR TESTIMONY, WHICH IS THE NEUROPSYCHOLOGICAL TESTING.  AND IN THE TESTING OF THAT, YOU WERE AWARE OF, IN THIS CASE THAT YOU REVIEWED,  YOU REVIEWED THE RAW DATA OF DR. VENN'S TESTING?

A.    CORRECT.

Q.    YOU REVIEWED THE RAW DATA OF DR. EVANS' TESTING?

A.    YES.

Q.    AND WAS THERE ANY INDICATION OF MALINGERING OR FAKING IN THAT TEST DATA?

A.    WELL,  AS YOU CAN IMAGINE, IT IS POSSIBLE TO FAKE, MALINGER, AND,  THEREFORE,  BOTH DR. VENN AND DR. EVANS USED SPECIAL TESTS THAT ARE DESIGNED TO DETECT MALINGERING OR FAKING.  AND ALL OF THOSE TESTS INDICATED, CLEARLY, THAT THERE WAS NO FAKING OF THOSE TESTS.

Q.    I MEAN, THE REASON I ASK, AND JUST TO CUT TO THE CHASE, ARE YOU AWARE OF THE FACT THAT, IN 1998,  MR. FULKS WAS EVALUATED BY, FOR A DIFFERENT OFFENSE,  WAS EVALUATED BY MENTAL HEALTH PROFESSIONALS AT THE FEDERAL BUREAU OF PRISONS, YOU ARE AWARE OF THAT?

**DIRECT EXAM OF RUBEN GUR**

A.    YES, I SAW THAT REPORT.

Q.    AND YOU ARE AWARE OF THE FACT, ARE YOU NOT, THAT AT LEAST AT THAT TIME, IN 1998, THEY DETERMINED THAT HE WAS -- THEY SAID MALINGERING, BUT JUST IN LAY TERMS, THAT MEANS HE WAS FAKING; IS THAT RIGHT?

A.    YES, THAT'S RIGHT.

Q.    IN OTHER WORDS, THAT HE WAS TRYING TO, THAT HE -- HE TOOK THE TEST, AND WHEN THEY SCORED THE TEST, THEY DETERMINED THAT THE TEST RESULTS WERE INCONSISTENT WITH WHAT THEY SAW?

A.    THEY ALSO CONCLUDED A TEST THAT WAS DESIGNED TO DETECT MALINGERING, AND THE TEST INDICATED THAT HE WAS NOT MALINGERING.

Q.    OKAY. AND ALTHOUGH -- SO THAT JUST RAISED THE QUESTION. I UNDERSTAND YOU CAN'T FAKE THE MRI, YOU CAN'T FAKE THE PET. THAT IS WHAT IT IS. SO, YOU CAN IMAGINE HOW IT WOULD RAISE A QUESTION IN A JUROR'S MIND, WELL, IF HE FAKED IN 1998, AND HE TOOK SOME OF THESE TESTS THAT HE TRIED TO FAKE IT, HOW CAN WE BE SURE HE IS NOT FAKING THIS?

A.    THAT IS PERFECTLY UNDERSTANDABLE.

Q.    WELL, IT IS AN UNDERSTANDABLE QUESTION. WHAT IS YOUR RESPONSE TO IT?

A.    I THINK IT IS A VERY IMPORTANT CONCERN, PARTICULARLY WHEN, IN THE MEDICAL/LEGAL CONTEXT, WHEN SOMEONE IS PRESENTED WITH A SITUATION WHERE, IF THEY DON'T PERFORM WELL, THEY MAY COME OUT WITH A BETTER RESULT. SO, THERE IS MOTIVATION TO

DIRECT EXAM OF RUBEN GUR

FAKE, AND THAT IS WHY IT IS IMPORTANT TO INCLUDE MEASURES THAT ARE SENSITIVE TO EFFORTS TO FAKE.

BOTH DR. VENN AND DR. EVANS WERE SENSITIVE TO THAT ISSUE AND, THEREFORE, INCORPORATED MEASURES OF FAKING.  AND UNLIKE 1998, WHERE THE MEASURES OF FAKING INDICATED THAT HE WAS, IN THE RECENT EVALUATION, THERE WAS CLEAR INDICATION THAT HE WASN'T.

**Q.   ARE YOU ALSO AWARE THAT, IN 2003, HE WAS EVALUATED, NOT ONLY BY DR. VENN AND DR. EVANS,  BUT ALSO BY PSYCHOLOGISTS AT ANOTHER FEDERAL BUREAU OF PRISONS FACILITY IN BUTNER,  NORTH CAROLINA?**

A.   YES,  I SAW THAT REPORT.

**Q.   AND, BASED UPON YOUR REVIEW OF THAT REPORT,  DID THE MENTAL HEALTH PROFESSIONALS AT BUTNER DETECT ANY MALINGERING WHEN THEY EVALUATED HIM IN 2003?**

A.   NO.   THEY THREW AT HIM THE BEST,  NEWEST TEST MEASURES OF MALINGERING.  AND FROM HIS PERFORMANCE,  AGAIN,  IT IS CLEAR THAT HE WAS NOT MALINGERING WHILE BEING TESTED AT BUTNER.

**Q.   AND WHEN YOU EVALUATED MR. FULKS THIS YEAR,  I ASSUME THAT, IN ADDITION, I MIGHT BE WRONG,  BUT I ASSUME THAT, IN ADDITION TO SPECIFIC TESTS FOR MALINGERING, SOME OF IT IS ALSO BASED UPON YOUR EXPERIENCE?**

A.   WELL,  ULTIMATELY, THE JUDGMENT OF MALINGERING IS A CLINICAL JUDGMENT.   THE TESTS GIVE YOU AN INDICATION AND

DIRECT EXAM OF RUBEN GUR

SOMETIMES GIVE YOU A VERY STRONG AND CLEAR INDICATION.  BUT, ULTIMATELY, IT IS BASED ON YOUR EXPERIENCE AND LOOKING AT THE PERFORMANCES.  AND HIS PERFORMANCE, WHEN I TESTED HIM, IT WAS QUITE APPARENT THAT HE WAS MAKING AN EFFORT TO DO THE BEST HE CAN, AND HE WAS FRUSTRATED WHEN HE WAS NOT ABLE TO PERFORM WELL.  AND HE DID PERFORM WELL IN SEVERAL TESTS.

SO, THE DEFICIT IS, WHAT YOU GET WITH MALINGERERS IS, BECAUSE THEY DON'T KNOW WHAT TESTS MIGHT BE IMPORTANT AND WHAT MIGHT NOT BE IMPORTANT, THEY WOULD TEND TO JUST DO MORE POORLY ACROSS-THE-BOARD.  AND THAT IS PART OF THE RATIONALE FOR MALINGERING TESTS.  ESSENTIALLY, YOU GIVE PEOPLE A TEST THAT EVEN SOMEONE WITH ADVANCE ALZHEIMER'S WOULD DO WELL ON. IT IS DISGUISED AS BEING MORE DIFFICULT THAN IT REALLY IS. AND SO, ONE WHO IS TRYING TO FAKE WOULD DO POORLY ON A TEST THAT EVEN PEOPLE WITH SEVERE BRAIN DAMAGE DO WELL ON.  AND THAT -- NONE OF THAT HAPPENED IN MR. FULKS'S TESTING, EITHER IN MY  -- THE TESTING THAT I DID, OR THE TESTING DONE AT BUTNER, OR THE TESTING DONE BY DOCTORS EVANS AND VENN.

Q.    AND SO, JUST TO SORT OF SUMMARIZE, IS WHAT YOU ARE SAYING IS THAT, BASED UPON YOUR REVIEW OF THE TESTING BY DR. VENN AND DR. EVANS, BY THE MENTAL HEALTH PROFESSIONALS AT BUTNER, AND IN YOUR CLINICAL JUDGMENT, MR. FULKS IS NOT MALINGERING IN TAKING THESE NEUROPSYCHOLOGICAL TESTS?

A.    THAT IS CORRECT.

Q.    IS IT ALSO ACCURATE TO SAY, THE RESULTS FROM THE

**DIRECT EXAM OF RUBEN GUR**

**NEUROPSYCHOLOGICAL TESTING WERE CONSISTENT WITH THE DEFICITS AND THE ABNORMALITIES FOUND ON THE MRI SCAN AND THE PET SCAN?**

A.   YES.   AND THAT IS REALLY WHAT CONVINCES ME MORE THAN ANYTHING ELSE.   HE WOULD HAVE HAD TO KNOW QUITE A BIT OF MY FIELD.   HE WOULD HAVE TO TAKE A COUPLE OF COURSES TO BE ABLE TO GENERATE A PATTERN OF BEHAVIORAL DEFICIT THAT WILL FIT THE PATTERN OF ABNORMALITIES THAT WE SEE ON THE BRAIN IMAGES.   AS FAR AS I KNOW,  HE DOESN'T HAVE THAT KNOWLEDGE.

**Q.   BUT, AGAIN, NO MATTER HOW SORT OF MOTIVATED YOU ARE TO HELP YOURSELF,  YOU CAN'T FAKE WHAT IS ON THE MRI,  YOU CAN'T FAKE WHAT IS ON THE PET?**

A.   THAT'S CORRECT.   YOU CAN'T FAKE EITHER OF THOSE.

**Q.   DR. GUR,  WHAT I WANTED TO MOVE TO NOW IS SORT OF, I GUESS, WHAT I WOULD CALL THE BOTTOM LINE.   WE TALKED ABOUT THE ABNORMALITIES IN MR. FULKS'S BRAIN; WE TALKED ABOUT THE ABNORMALITIES WE SAW ON THE MRI; TALKED ABOUT THE ABNORMALITIES ON THE PET SCAN; TALKED ABOUT THE ABNORMALITIES FOUND IN THE NEUROPSYCHOLOGICAL TESTING.   AND,  SO,  I GUESS THE REAL QUESTION IS,  OKAY,  HE HAS GOT AN ABNORMAL BRAIN. IT IS ABNORMAL IN ALL OF THESE DIFFERENT AREAS.   SO,  WHAT DOES IT MEAN?**

A.   ONE OTHER POINT, IF I MADE IT, WE DIDN'T GET INTO IT WHEN I SAW THE ORBITAL FRONTAL SIGNS. AS YOU KNOW, I ASKED FOR ONE MORE TEST TO BE ADMINISTERED TO HIM, WHICH IS AN OLFACTORY TEST.   THE REASON IS THAT THE OLFACTORY BULB IS

DIRECT EXAM OF RUBEN GUR

RIGHT UNDER THE ORBITAL LOBE, SO IT IS IMPOSSIBLE TO GET --
DAMAGE THE ORBITAL CORTEX WITHOUT DAMAGING SOMEWHAT OF THE
OLFACTORY BULB.  THAT TEST INDICATED THAT HE HAS DIFFICULTIES
SMELLING,  WHICH IS EXACTLY WHAT YOU WOULD EXPECT, BASED ON
THAT SPECIFIC REGION.

SO,  WHEN YOU PUT ALL OF IT TOGETHER,  IT IS CLEAR THAT HE
HAS AN ABNORMAL ANATOMY.  AND THE MAIN REGIONS THAT ARE
INVOLVED ARE THE FRONTAL EXECUTIVE PART,  THE TEMPORAL MEMORY
PART,  THE CORPUS CALLOSUM, WHICH IS AN AREA THAT
DR. BOOKSTEIN WILL FOCUS ON.  HE HAS ABNORMAL PHYSIOLOGY AND,
AGAIN, WE SEE IN THE SAME REGIONS,  IN THE FRONTAL,  TEMPORAL,
AND THEN THE PHYSIOLOGY SHOWS,  ALSO,  REDUCED ACTIVITY IN THE
THALAMUS,  THE SWITCHBOARD,  THE FUSIFORM GYRUS,  THE PART
THAT LOOKS AT FACES AND COMPLEX FACIAL ASPECTS, AND THE RIGHT
CEREBELLUM, WHICH IS RESPONSIBLE FOR THE TREMOR,  FOR THE
RIGHT HAND TREMOR, AND THOSE KINDS OF SIGNS.

MR. GASSER:  YOUR HONOR,  MAY WE APPROACH,  PLEASE?

(WHEREUPON, A BENCH CONFERENCE WAS HELD.)

MR. GASSER:  WE HAD, SPECIFICALLY, ON THE RECORD, MR.
SCHOOLS AND MR. THURMOND AND I, WE HAD SPECIFICALLY DISCUSSED
WHEN WE WERE DISCUSSING ALL OF THESE MENTAL HEALTH ISSUES
WHETHER THEY WOULD HAVE ANY EXPERTS COME IN HERE TALKING ABOUT
MENTAL RETARDATION.

MR. BLUME:  I WILL NOT SAY HE IS MENTALLY RETARDED.

THE COURT:  YOU THOUGHT HE WAS HEADING IN?

DIRECT EXAM OF RUBEN GUR

MR. BLUME:  I'M SORRY.   I WILL HAVE HIM AFFIRMATIVELY SAY HE IS NOT.

(WHEREUPON, THE BENCH CONFERENCE CONCLUDED.)

MR. GASSER:  THANK YOU,  YOUR HONOR.

THE WITNESS:  AND IF YOU LOOK AT THE BEHAVIORAL ABNORMALITIES, THE DEFICITS ARE EXACTLY WHAT YOU WOULD EXPECT IF YOU PUT THESE IN EXECUTIVE FUNCTIONING MEMORY,  IN THE VIGILANTS, THAT IS THE SWITCHBOARD PART, AND SENSORY MOTOR FUNCTION.

**Q.    SO, BASICALLY, THAT IS REAFFIRMING YOUR POINT ANATOMICALLY,  PHYSIOLOGY, AND BEHAVIORALLY, HIS BRAIN IS BAD?**

A.    AND IN ABOUT THE SAME PLACES.

**Q.    AND SO, THEN YOU PREVIOUSLY DISCUSSED, AS I UNDERSTAND IT, THAT HIS BRAIN IS DAMAGED IN WAYS WHICH ARE CONSISTENT WITH FETAL EXPOSURE TO ALCOHOL?**

A.    YES.   YOU CAN TRY TO GAUGE THE AGE AT WHICH DAMAGE OCCURRED.   THE DIFFERENT STAGES OF DEVELOPMENT, THE DAMAGE WOULD RESULT IN A DIFFERENT WAY OF ADJUSTING.   AS THE BRAIN IS GROWING,  IN SOME WAYS, IT IS GOOD IF THE DAMAGE OCCURS TO A YOUNG BRAIN BECAUSE THE SAME DAMAGE OCCURRED TO A YOUNG AND ELDERLY BRAIN COULD KILL THE ELDERLY, AND THE YOUNG WOULD STILL SURVIVE.   BUT THE FLIP SIDE OF THAT SAME COIN IS THAT, THE EARLIER THE DAMAGE,  THE MORE THERE WILL BE ABNORMALITIES DOWN THE STREET, AND THE BRAIN WILL JUST LOOK MISSHAPED.

IT IS THE SAME WAY IF YOU TAKE THE ANALOGY OF A TREE THAT

### DIRECT EXAM OF RUBEN GUR

GETS STRUCK BY LIGHTNING.  IF IT IS AN OLD TREE, YOU WILL SEE THE SIGN OF THE LIGHTNING,  YOU WILL SEE THE BURNING,  YOU WILL ALWAYS LOOK AT THE TREE AND SAY, THIS IS A TREE HIT BY LIGHTNING.  IF THE TREE IS HIT WHEN IT IS YOUNG, IT WILL STILL GROW TO FULL SIZE, MAY LIVE AS LONG AS A NORMAL TREE. BUT BECAUSE OF IT, IT WOULD BE MISSHAPEN.  THE TRUNK WILL NOT BE QUITE WHERE IT SHOULD BE.  THE BRANCHES WILL COME OUT BEFORE THEY ARE SUPPOSED TO, OR AFTER THEY ARE SUPPOSED TO, AND YOU WILL SEE THAT THERE IS SOMETHING SERIOUSLY MISSHAPEN ABOUT THAT TREE.  AND YET, THE TREE HAS SURVIVED.

THE BRAIN IS THE SAME WAY.  IT KEEPS TRYING TO REPAIR ITSELF.  AND IN THAT PROCESS, PRODUCES ANOMALIES, SOME SUGGEST BEING LARGE, SOME BEING SMALL FOR THE KIND OF ENERGY THAT HAPPENS VERY EARLY.  THE REASON I AM THINKING OF FETAL ALCOHOL IS BECAUSE THE REGIONS ARE EXACTLY THOSE REGIONS THAT YOU SEE AFFECTED BY ALCOHOL.  THESE ARE PARTS OF THE BRAIN THAT ALCOHOL LIKES TO GO TO, AND ACTIVATE, AND DESTROY.

**Q.    AND THEN AS I TAKE IT,  BUT THERE WERE ALSO ABNORMALITIES,  AS I UNDERSTAND YOUR TESTIMONY, ABOVE AND BEYOND WHAT YOU WOULD, NECESSARILY, EXPECT FROM FETAL EXPOSURE TO ALCOHOL?**

A.    YES.

**Q.    AND THEN I BELIEVE YOU INDICATED THE TWO MOST LIKELY CAUSES OF THAT ARE HEAD INJURIES AND SUBSTANCE ABUSE?**

A.    CORRECT.

DIRECT EXAM OF RUBEN GUR

**Q.    I MEAN, HEAD INJURIES WOULD RESULT IN LOSS OF CONSCIOUSNESS OR -- I GUESS ANY TYPE OF HEAD INJURY COULD CONCEIVABLY AFFECT THE BRAIN?**

A.    WE USED TO THINK THERE IS NO LOSS OF CONSCIOUSNESS, THEN THERE WAS NO STRUCTURAL DAMAGE.  BUT THAT IS, CLEARLY, INCORRECT.  THERE ARE SOME, DEPENDING UPON WHERE YOU GET THE BLOW, SOME BLOWS WILL PRODUCE LOSS OF CONSCIOUSNESS MORE THAN OTHERS.  AS A RULE, IT IS,  YOU DON'T GET A LOT OF TISSUE DAMAGE IF THERE IS NO LOSS OF CONSCIOUSNESS, BUT THERE HAVE BEEN DOCUMENTED CASES WHERE NO LOSS OF CONSCIOUSNESS OCCURRED AND YET, THERE IS STRUCTURAL DAMAGE.

IN THE CASE OF MR. FULKS,  THERE WERE NUMEROUS INSTANCES OF HEAD INJURIES WITH LOSS OF CONSCIOUSNESS.  AND THOSE THAT ARE MOST WORRISOME ARE THOSE THAT WERE HIT STRAIGHT ON TOP OF HIS HEAD BECAUSE THEY WOULD AFFECT THE VERY SAME REGIONS THAT WERE ALREADY SUSCEPTIBLE BECAUSE OF THE FETAL ALCOHOL EXPOSURE.

**Q.    BUT, AGAIN, THE BOTTOM LINE IS, BASED UPON THE MRI AND THE PET SCAN, YOU CAN CLEARLY SEE ABNORMALITIES IN THE BRAIN ABOVE AND BEYOND WHAT YOU WOULD EXPECT FROM FETAL ALCOHOL?**

A.    YES.

**Q.    AND YOU ALSO HAVE IMPOVERISHED, STRESSFUL ENVIRONMENT. WHY IS THAT AN ELEMENT?**

A.    WE USED TO THINK THE ENVIRONMENT DOESN'T REALLY CHANGE THE BRAIN.  BUT THERE IS MORE AND MORE EVIDENCE THAT SOME

DIRECT EXAM OF RUBEN GUR

BRAIN STRUCTURES ARE HIGHLY SENSITIVE TO ENVIRONMENTAL STRESS. AND EVEN PEOPLE NOW THAT WE CAN LOOK AT PEOPLE WHEN THEY ARE ALIVE,  PEOPLE WERE STUDIED BEFORE AND AFTER STRESSFUL EVENTS, WAS A JAPANESE STUDY ON PEOPLE,  WITH FLOOD AND EARTHQUAKES. YOU CAN ACTUALLY SEE STRUCTURAL CHANGES AND, PARTICULARLY, SEE THEM IN THEIR REGION CALLED THE HIPPOCAMPAL.   PROLONGED STRESS DOES ALSO IMPACT THE BRAIN,  THE BRAIN FUNCTION.

**Q.    WHAT IS THE BOTTOM LINE.   HE HAS A HIGHLY ABNORMAL BRAIN?**

A.    THAT IS VERY CLEAR.

**Q.    AND AREAS THAT ARE MOST AFFECTED, THE EXECUTIVE FUNCTIONING AND, AGAIN, JUST BRIEFLY, WHAT IS THE EXECUTIVE FUNCTIONING?**

A.    IT IS THE PART THAT TELLS YOU STOP,  THINK ABOUT THE CONTEXT,  THINK ABOUT YOUR LONG-TERM GOALS, AND ACT IN ACCORDANCE WITH WHAT IS GOOD FOR YOU.

**Q.    SO, THAT WOULD AFFECT THINGS LIKE JUDGMENT,  IMPULSE CONTROL?**

A.    MOSTLY IMPULSE CONTROL, BECAUSE THAT IS THE PART THAT HOLDS THE ANALAGOUS LINE IN CHECK, AS WELL AS JUDGMENT.

**Q.    DECISION MAKING?**

A.    DECISION MAKING.

**Q.    THAT IS ONE AREA THAT IS AFFECTED.   THEN YOU TALK ABOUT SWITCHBOARD.   AGAIN, WHAT IS THAT?**

A.    THAT IS THE THALAMUS.   THE THALAMUS, IN ORDER FOR THE

DIRECT EXAM OF RUBEN GUR

EXECUTIVE TO MAKE GOOD DECISIONS, THEY NEED TO HAVE THE INFORMATION COME FROM THE RIGHT PLACES.  AND WHEN THE SWITCHBOARD IS SENDING INFORMATION TO THE WRONG PLACES, IT IS HARD FOR THE EXECUTIVE TO GAUGE, EVEN IF THE EXECUTIVE WAS INTACT, IT IS HARD FOR THE EXECUTIVE TO COME UP WITH APPROPRIATE DECISIONS.  AND SO, ALONG WITH THE EXECUTIVE IS IMPAIRED, AND IT IS WORKING ON BAD INFORMATION THAT, INEVITABLY, WILL LEAD TO A LOT OF BAD DECISIONS.

**Q.    THAT IS A DOUBLE WHAMMY TO THE THINKING PROCESS?**

A.    YES.

**Q.    AFFECT?**

A.    THAT IS THE ABILITY TO UNDERSTAND AND COMMUNICATE EMOTION.  WE MEASURE THE VERY NARROW FACET OF THAT IS THE ABILITY TO INTERPRET FACIAL EXPRESSIONS OF EMOTION.  HE WAS IMPAIRED IN THAT.

**Q.    NOW, JUST TO MAKE CLEAR HERE, YOU ARE NOT SAYING THAT MR. FULKS IS LEGALLY INSANE? IN OTHER WORDS,  THAT HE DIDN'T KNOW THE DIFFERENCE BETWEEN RIGHT AND WRONG?**

A.    NO.  HE IS MORE LIKE THAT ADOLESCENT.  IF YOU ASKED HIM, AFTER THE FACT,  DID YOU KNOW THAT WHAT YOU DID WAS WRONG?  YEAH.  THEY CAN EXPLAIN BETTER THAN YOU CAN EXPLAIN WHAT IS RIGHT AND WHAT IS WRONG, EXCEPT AT THE MOMENT THE BRAIN DOESN'T WORK EFFICIENTLY ENOUGH TO RELAY THAT INFORMATION TO THE EXECUTIVE AND ALLOW THE EXECUTIVE TO MAKE AN INFORMED DECISION OF THAT TOPIC.

DIRECT EXAM OF RUBEN GUR

Q.    AND YOU ARE NOT SAYING THAT MR. FULKS IS MENTALLY RETARDED?

A.    WELL, NO, I DON'T. I AM NOT SAYING HE IS RETARDED. HE IS CLEARLY NOT A VERY BRIGHT INDIVIDUAL.  HE IS LESS INTELLIGENT THAN THE AVERAGE PERSON.

Q.    AS I UNDERSTAND, HIS OVERALL IQ FALLS IN THE HIGH SEVENTIES, WHICH PUTS IT IN THE SORT OF THE BORDERLINE RANGE?

A.    JUST AT THE BORDERLINE.  A FEW MORE POINTS -- LESS POINTS, HE WOULD HAVE PASSED THE THRESHOLD; A FEW MORE POINTS, HE WOULD BE IN THE NORMAL RANGE.  THE IQ, ITSELF, IS SORT OF A FRUIT SALAD.  YOU TAKE ALL OF THE ABILITIES, YOU MEASURE AND MIX THEM TOGETHER AND COME UP WITH ONE NUMBER. WHEN REALLY, AS WE ALL KNOW, THERE ARE DIFFERENT THINGS THAT WE HAVE TO DO FOR OUR INTELLIGENCE.  AND EVERYBODY HAS SOME STRENGTH AND SOME WEAKNESSES.

AND SO, IN SOME AREAS, HE IS WEAK ENOUGH TO BE WELL BELOW WHAT WE WOULD CALL A THRESHOLD FOR RETARDATION.  IF YOU DIVIDE THE INTELLIGENCE INTO THE DIFFERENT COMPONENTS, WELL ONLY ONE OF THEM IS EXECUTIVE, ANOTHER ONE IS MEMORY. ANOTHER ONE IS VISUAL SPATIAL PROCESSING.  IN A REGULAR IQ MEASURE, YOU HAVE ALL OF THOSE MEASURES.  YOU COME UP WITH ONE NUMBER.  THAT ONE NUMBER, WHEN YOU DO IT WITH MR. FULKS, COMES UP ON THE BORDERLINE SLIGHTLY ABOVE THE CUT OF RETARDATION.  BUT A LOT OF THE MEASURES THAT GO INTO THAT FRUIT SALAD ARE BELOW THAT, WELL BELOW THAT THRESHHOLD.

DIRECT EXAM OF RUBEN GUR

**Q.    SOME ARE ABOVE AND SOME ARE BELOW?**

A.    YES.

**Q.    THE OVERALL COMPONENT PUTS HIM IN THE BORDERLINE?**

A.    EXACTLY.

**Q.    NOW,  IF YOU -- I JUST WANTED TO SORT OF ASK YOU ONE MORE THING, WHICH I FORGOT TO ASK ABOUT AND GO BACK.   NOW, YOU WERE TALKING ABOUT THE EFFECTS OF THE STRESSFUL ENVIRONMENT.  IF MR. FULKS, LET'S SAY, HAD BEEN, YOU KNOW, BORN JUST LIKE HE WAS AND ADOPTED, AND JUST, HYPOTHETICALLY, ADOPTED AND PUT IN A LOVING,  SUPPORTING,  NURTURING FAMILY, WOULD HE LIKELY HAVE THE SAME BRAIN FUNCTION THAT HE DOES TODAY?**

A.    IT IS UNLIKELY THAT IT WOULD BE ANYTHING DIFFERENT ABOUT THESE MRI OR HIS PET SCAN.  BUT BEHAVIOR IS, TOO, A LARGE EXTENT SHAPED BY YOUR UPBRINGING.  IT IS NOT ALL BIOLOGY.  YOU CAN TAKE THE SAME KID AND USE THE ENVIRONMENT IN ORDER TO GIVE HIM A BETTER EXECUTIVE.  WHEN THE EXECUTIVE IS NOT WORKING WELL, THEN, IN FACT, THOSE INDIVIDUALS TEND TO BE EVEN MORE LIKELY TO ACCEPT DIFFERENT STRUCTURES.   THEY LIKE STRUCTURE, AND THEY REALIZE THERE IS SOMETHING WRONG IN THEIR OWN EXECUTIVE, SO THEY ARE LOOKING FOR GUIDANCE.  IF YOU GUIDE THEM WELL, THEY CAN TURN OUT BEING FINE.  IF THEY ARE GUIDED OTHERWISE, THEY CAN TURN OUT TO BE VERY DIFFICULT.

**Q.    JUST TO MAKE SURE I UNDERSTAND YOUR LAST STATEMENT. EVEN ASSUMING HE HAD BEEN,  YOU KNOW,  BORN IN AN ADOPTIVE**

**CROSS EXAM OF RUBEN GUR**

**FAMILY, HE WOULD STILL HAVE DIFFICULTIES?**

A.    YES.

**Q.    THEY JUST PROBABLY WOULDN'T BE THE SAME MAGNITUDE THAT THEY ARE NOW?**

A.    THAT IS EXACTLY WHAT I AM TRYING TO SAY.

MR. BLUME:  I OFFER DEFENDANT'S EXHIBIT 8.

MR. GASSER:  NO OBJECTION.

THE COURT:  ALL RIGHT.  WITHOUT OBJECTION.

MR. BLUME: DR. GUR,  IF YOU WOULD PLEASE ANSWER ANY QUESTIONS THAT MR. GASSER MAY HAVE.

THE COURT:  CROSS-EXAMINATION.

CROSS EXAM

BY MR. GASSER:

**Q.    GOOD AFTERNOON,  DR. GUR.**

A.    GOOD AFTERNOON.

**Q.    MY NAME IS JOHNNY GASSER.  I WORK IN THE U. S. ATTORNEY'S OFFICE HERE IN COLUMBIA,  SOUTH CAROLINA.   AND YOU AND I HAVE NOT HAD AN OPPORTUNITY TO MEET; IS THAT CORRECT?**

A.    THAT'S CORRECT.  NICE TO MEET YOU.

**Q.    WE JUST HAD, ACTUALLY, WHEN WE GOT BACK FROM WORK YESTERDAY AFTER INTERVIEWING SOME WITNESSES,  ME AND MY COLLEAGUES LOOKED ON MR. SCHOOLS'S COMPUTER, AND WE JUST GOT YOUR REPORT E-MAILED TO US LAST NIGHT OR YESTERDAY MORNING, BUT WE DIDN'T GET TO LOOK AT IT UNTIL LAST NIGHT.   SO,  I WANT YOU TO BEAR WITH ME.  I MIGHT NOT BE UNDERSTANDING SOME**

**CROSS EXAM OF RUBEN GUR**

OF THE THINGS THAT IS INCLUDED IN YOUR REPORT.   ANYTIME YOU WANT TO CLARIFY A POINT, FEEL FREE TO DO SO,  OKAY,  SIR?

A.    SURE.

Q.    WHEN WERE YOU RETAINED IN THIS MATTER,  DR. GUR?

A.    AS I RECALL, IT WAS TOWARD THE END OF 2003.

Q.    WOULD YOU AGREE WITH ME THAT HUNDREDS OF THOUSANDS, IF NOT MILLIONS, OF AMERICANS THAT ARE ALIVE TODAY, HAVE SOME SORT OF BRAIN ABNORMALITY?

A.    YES.

Q.    INCLUDING, FROM THE LOWEST DEGREE TO THE HIGHEST DEGREE, IS THAT A FAIR STATEMENT?

A.    I THINK, YEAH.   I MEAN,  WE SOMETIMES EVEN FIND IT IN COLLEGE UNDERGRADUATES WHO VOLUNTEER FOR AN EXPERIMENT.

Q.    EPILEPSY, THAT INVOLVES A BRAIN ABNORMALITY?

A.    YES.

Q.    DO YOU EVEN KNOW THE NUMBER OF EPILEPTICS THAT LIVE IN THE UNITED STATES.   COULD YOU FATHOM A GUESS?

A.    I UNDERSTAND THE PREVALENCE IS QUITE HIGH.   IT IS CLOSE TO ALMOST ONE PERCENT.

Q.    YOU MENTIONED ALMOST ONE PERCENT OF THE POPULATION, WHICH IS APPROACHING 290 MILLION?

A.    YES. NO.   I MEAN, OUR POPULATION DOES.

Q.    ABOUT ONE PERCENT?

A.    OUT OF 290 MILLION,  RIGHT.

Q.    ONE PERCENT OF THE POPULATION HAS EPILEPSY?

**CROSS EXAM OF RUBEN GUR**

A.    SOME FORM OF EPILEPSY.

**Q.    SOME FORM OF EPILEPSY.   IF MY MATH IS CORRECT, THAT IS CLOSE TO 3 MILLION PEOPLE?**

A.    YES.

**Q.    YOU MENTIONED ALZHEIMER'S DISEASE.   OF COURSE, AT THE EARLY STAGES, PEOPLE CAN BE DIAGNOSED WITH ALZHEIMER'S DISEASE, AND FOR SOME PEOPLE, FOR SEVERAL YEARS, CONTINUE TO, AT LEAST, BE ABLE TO INTERACT WITH THEIR FAMILY, THEIR LOVED ONES, PEOPLE IN THE COMMUNITY; IS THAT CORRECT,  SIR?**

A.    THAT IS CORRECT,  YES.

**Q.    PEOPLE CAN HAVE A SLIGHT PARALYSIS OR SOME SORT OF PARALYSIS IN A PORTION OF THEIR BODY, WHICH, OBVIOUSLY, IS A DIRECT RESULT OF SOME SORT OF BRAIN ABNORMALITY; IS THAT CORRECT,  DR. GUR?**

A.    WELL,  IT DEPENDS IF IT IS CHILDREN OR ELDERLY PEOPLE. IF IT IS DYSTROPHY OR STROKE,  BUT,  YES,  THE ANSWER IS YES.

**Q.    I, MYSELF, HAD A BAD STUTTERING PROBLEM AS A CHILD. AND THAT HAD SOMETHING TO DO WITH, APPARENTLY, SOME SORT OF ABNORMALITY THAT HAS, AT LEAST, BETTERED ITSELF.   BUT PEOPLE WHO STUTTER, THAT CAN BE DIRECTLY?**

A.    WELL,  STUTTERING HAS BEEN STUDIED, AND AS FAR AS I KNOW, THERE IS NO STRUCTURAL DAMAGE IN STUTTERERS.

**Q.    MY COLLEAGUES TELL ME I HAVE A TWITCH.   AND SOME PEOPLE HAVE NERVOUS TWITCHES OR BODY MANNERISMS CAN BE DIRECTLY RELATED TO POSSIBLY,  NO MATTER HOW SLIGHT, SOME SORT**

**CROSS EXAM OF RUBEN GUR**

OF BRAIN ABNORMALITY, OR SOME CONDITION, OR SOMETHING GOING ON IN THE BRAIN?

A.   SOME OF IT COULD BE, SOME OF IT COULD BE LEARNED.  IN SEVERE CASES, LIKE TOURETTE SYNDROME, THEN IT WOULD BE MORE THAN A TWITCH.  IF YOU FIND YOURSELF CURSING WITHOUT MEANING TO, THEN MAYBE.

Q.   WELL, I AM GLAD YOU WEREN'T IN MY OFFICE LAST NIGHT. I COULD GO ON AND ON.  EYE PROBLEMS.  MANY EYE PROBLEMS THAT ARE ASSOCIATED.  PEOPLE WHO HAVE PROBLEMS WITH SIGHT CAN BE ASSOCIATED WITH BRAIN ABNORMALITIES?

A.   THAT IS LESS FREQUENT, BUT, YES.

Q.   HEARING IMPAIRMENT?

A.   WELL, HEARING IMPAIRMENT IS USUALLY PERIPHERAL, SO THERE IS SOMETHING WRONG WITH THE MACHINERY IN THE EARS.  BUT IT CAN GET, FOR EXAMPLE, HEARING IMPAIRMENT WITH A TUMOR GROWING RIGHT ON THE NERVE THAT SUPPLIES THE TEMPORAL LOBE.

Q.   WOULD YOU ALSO AGREE THAT MANY PEOPLE THAT HAVE SOME OF THE BRAIN ABNORMALITIES, I KNOW THERE ARE MANY, MANY, MANY MORE THAT I DON'T NEED TO GET INTO, THEN THERE ARE SECONDARY AFFECTS.  PEOPLE THAT -- THERE MAY BE EMOTIONAL OR MENTAL AFFECTS AS A RESULT OF THAT.  PEOPLE GET DEPRESSED, OR PEOPLE DEVELOP OTHER CONDITIONS BECAUSE THEY LOST THE USE OF THEIR RIGHT ARM, OR THEY HAVE PROBLEMS WITH VERTIGO, OR THEIR EPILEPTIC CONDITION HAS CREATED OTHER BEHAVIORAL AND EMOTIONAL PROBLEMS.  YOU WOULD AGREE WITH THAT, WOULD YOU NOT, SIR?

**CROSS EXAM OF RUBEN GUR**

A.   I AM AFRAID I CAN'T ANSWER IT IN A SIMPLY "YES" OR "NO," BECAUSE THERE IS A DIFFERENCE.  FOR EXAMPLE,  IF YOU LOSE AN ARM, AND YOU GO THROUGH A PERIOD OF DEPRESSION BECAUSE OF WHAT HAPPENED TO YOU, AND YOU ARE MOURNING THE LOSS OF YOUR ARM.  INTERESTINGLY, IF YOU HAVE A BRAIN LESION, IT REALLY DEPENDS ON WHERE THE LESION IS.  AND IN SOME CASES, THE SIGNS THAT SOMETHING IS ABNORMAL IS THAT YOU ARE SICK.  IN FACT, SOME PEOPLE, AFTER A STROKE, THEY ARE PARALYZED, AND RIGHT AFTER THEN, THEY BECOME HAPPIER THAN THEY EVER WERE BEFORE. AND PART OF THAT IS THAT THE PART OF THE BRAIN THAT MAKES YOU SAD WAS GONE.  AND SO, YOU HAVE ABNORMALLY JOVIAL PEOPLE WHO HAVE JUST SUFFERED A STROKE, AND YOU ASK THEM WHY ARE YOU SO HAPPY, AND YOU GET STRANGE ANSWERS.  LIKE,  IF I DIDN'T HAVE A STROKE, I WOULDN'T HAVE MET SUCH A WONDERFUL DOCTOR LIKE YOU.  SO,  IT DEPENDS.

**Q.   AND, OF COURSE, PEOPLE REACT EMOTIONALLY, AND MENTALLY, AND EVEN PHYSICALLY,  PEOPLE REACT DIFFERENTLY, DEPENDING UPON THE CIRCUMSTANCES.  AND WHAT I MEAN BY THAT IS, SOMEBODY MIGHT HAVE A MAJOR -- A SOLDIER IN IRAQ MAY LOSE BOTH OF HIS LEGS AND COME BACK HERE AND NEVER -- BE IN A WHEELCHAIR WITH NO LEGS FOR THE REST OF HIS LIFE.  BUT THAT PERSON MAY HAVE AN INCREDIBLE POSITIVE OUTLOOK ON LIFE, EVEN THOUGH, DESPITE THE FACT, THEY LOST TWO LEGS.  AS OPPOSED TO SOMEBODY ELSE WHO MAY HAVE A MINOR CONDITION PHYSICALLY OR MINOR CONDITION -- BRAIN ABNORMALITY,  FOR WHATEVER REASON, WHATEVER ELSE IS**

**CROSS EXAM OF RUBEN GUR**

**GOING ON IN THEIR LIFE, THEY HAVE SIGNIFICANT, OR CLINICAL DEPRESSION, OR MENTAL PROBLEMS, OR OTHER THINGS. YOU WOULD AGREE WITH THAT, WOULDN'T YOU? IT ALL DEPENDS ON THE PERSON?**

A. I WOULD AGREE TO YOUR LAST STATEMENT. I AGREE, ABSOLUTELY, YOU SEE, PARADOXICALLY, PEOPLE ARE SLIGHTLY INJURED REACT IN A CATASTROPHIC WAY. PEOPLE SEVERELY INJURED MAINTAIN VERY GOOD MORALE, HELP THEM OVERCOME IT. A LOT OF IT DEPENDS ON THEIR PERSONALITY MAKEUP.

**Q. YOU SAID IT BETTER THAN I DID, SIR. I APPRECIATE THAT. I GUESS THE POINT I AM TRYING TO MAKE, I GUESS, IS OF THE HUNDREDS OF THOUSANDS IF NOT MILLIONS, AS YOU SAY, PEOPLE THAT HAVE BRAIN ABNORMALITIES, INCLUDING PEOPLE THAT HAVE THE BRAIN ABNORMALITY THAT YOU CLAIM THAT MR. FULKS HAS, 99.9 PERCENT OF THEM DON'T RAPE WOMEN, DO THEY?**

A. I AM NOT SURE ABOUT THE STATISTICS ON THAT. BUT I HAVEN'T SEEN A BRAIN QUITE AS ABNORMAL AS THAT OF MR. FULKS.

**Q. IN ALL OF YOUR YEARS, YOU ARE TELLING THIS JURY, IN ALL OF YOUR YEARS OF STUDY AND RESEARCH, THAT YOU HAVEN'T SEEN A BRAIN AS ABNORMAL AS MR. FULKS? YOU JUST VOLUNTEERED THAT INFORMATION ON CROSS-EXAMINATION?**

A. WELL, I THINK I SAID THAT BEFORE, THAT THAT PARTICULAR CONFIGURATION OF ABNORMALITIES I HAD NOT SEEN BEFORE.

**Q. AND MUCH OF WHAT YOU HAVE DISCUSSED HERE TODAY IS YOUR SUBJECTIVE OPINION, BASED ON YOUR EXPERIENCE, AND YOUR INTERPRETATION OF THE IMAGING THAT YOU HAVE DESCRIBED TO THE**

**CROSS EXAM OF RUBEN GUR**

**JURY, IS THAT A FAIR STATEMENT?**

A. HOPEFULLY. AT LEAST, I TRIED TO SEPARATE WHAT I DESCRIBED AS EVIDENCE AS FINDINGS FROM MY OPINION REGARDING THOSE FINDINGS.

**Q. IN OTHER WORDS, DOCTORS, MANY, MANY DOCTORS, WELL-EDUCATED, WELL-RESEARCHED, WELL-EXPERIENCED PHYSICIANS AND PSYCHIATRISTS, WHEN I SAY "PHYSICIANS," I MEAN BOTH MEDICAL DOCTORS AND PH.D.'S, SUCH AS YOURSELF, THEY CAN LOOK AT THE SAME IMAGING, THEY CAN TAKE THE SAME CLINICAL HISTORY, AND THEY CAN DISAGREE AS TO A DIAGNOSIS AND A TREATMENT PROCEDURE; ISN'T THAT THE TRUTH?**

A. IT USED TO BE TRUE. I DON'T THINK IT IS TRUE ANY LONGER. I WOULD BE SURPRISED IF PEOPLE WITH THE SAME KIND OF BACKGROUND, AND EDUCATION, AND EXPERIENCE AS MYSELF, WOULD LOOK AT THE DATA THAT I HAVE BEEN LOOKING AT AND ARRIVE AT VERY DIFFERENT CONCLUSIONS.

**Q. YOU ARE SURE ABOUT THAT?**

A. YEAH, I AM SURE. I WOULD BE SURPRISED, YES.

**Q. WELL, LET ME ASK YOU THIS. AND I WANT TO BE AS FAIR TO YOU AND MR. FULKS AS POSSIBLE, SO I PICKED AN ORGANIZATION THAT I WOULD ASSUME THAT YOU WOULD AGREE WITH IS AN ORGANIZATION THAT IS WELL-KNOWN IN THIS FIELD AND IS MOST DEFINITELY NOT A PRO LAW ENFORCEMENT ORGANIZATION. DID YOU HAVE AN OPPORTUNITY -- HAVE YOU EVER HEARD OF THE NATIONAL COALITION TO ABOLISH THE DEATH PENALTY?**

**CROSS EXAM OF RUBEN GUR**

A.    I HAVEN'T SPECIFICALLY HEARD ABOUT THEM,  NO.

**Q.    YOU WERE QUOTED BY THEM TWO DAYS BEFORE THIS JURY WAS SELECTED IN AN UNDERLYING ARTICLE.  YOU DON'T REMEMBER TALKING TO SOMEBODY FROM THE NATIONAL COALITION TO ABOLISH THE DEATH PENALTY SOME TIME PRIOR TO MAY 8TH,  2004?**

A.    I DON'T REMEMBER TALKING TO SOMEBODY.

**Q.    LET ME GIVE YOU A COPY OF THE ARTICLE TO SEE IF THAT WILL REFRESH YOUR MEMORY.  I BELIEVE ONE OF YOUR QUOTES IS RIGHT SMACK DAB THERE ABOUT THE ONE,  TWO,  THREE,  FOUR, FIVE,  SIXTH PARAGRAPH?**

A.    OKAY.  I SEE WHAT THIS ARTICLE IS REPORTING.  IT WAS A CONFERENCE THAT WAS ORGANIZED BY THE AMERICAN BAR ASSOCIATION.

**Q.    RIGHT.**

A.    AND INCLUDED FOUR PEOPLE. I WAS ONE OF THEM.  AND I WAS ASKED TO MEET WITH THE PRESS AND, I GUESS, IN PREPARATION TO THE SUPREME COURT GOING TO RULE ABOUT EXECUTING JUVENILES.

**Q.    JUVENILES.  I AM TALKING ABOUT, I WANT TO USE THIS ARTICLE, BASED UPON YOUR OPINION THAT, IN YOUR FIELD, IN YOUR OVERALL FIELD, YOU THINK THAT EXPERTS AREN'T -- MY QUESTION TO YOU WAS THAT,  DON'T YOU AGREE, THAT THERE ARE RESEARCHERS AND PEOPLE THAT ARE EXPERIENCED IN YOUR FIELD,  PHYSICIANS,  PH.D. DOCTORS THAT CAN LOOK AT CLINICAL INFORMATION,  LOOK AT BRAIN IMAGING, SUCH AS YOURSELF, AND DISAGREE ON A PARTICULAR DIAGNOSIS?  AND YOUR TESTIMONY, IN FRONT OF THIS JURY, PRIOR**

**CROSS EXAM OF RUBEN GUR**

**TO ME GIVING YOU THAT ARTICLE, YOU SAY, NO, THAT MOST PEOPLE, WITH YOUR EXPERIENCE AND EDUCATION, WOULD TEND TO AGREE WITH YOUR OPINION THAT YOU HAVE RENDERED TO THIS JURY,  DO YOU RECALL THAT TESTIMONY?**

A.    YES.

**Q.    NOW,  JUST TO PUT THIS ARTICLE,  AGAIN,  YOU WOULD AGREE WITH ME THAT THE NATIONAL COALITION TO ABOLISH THE DEATH PENALTY IS CERTAINLY NOT A CONSERVATIVE PRO LAW ENFORCEMENT, PRO JUSTICE ORGANIZATION, THAT IS FAIR TO SAY; IS IT NOT?**

A.    I AM NOT FAMILIAR WITH THIS ORGANIZATION.  I JUST HEARD ABOUT THEM TODAY.  I MEAN,  I WOULD BE HAPPY TO CHECK OUT WHAT THEY ARE FOR.

**Q.    DR. GUR,  GIVEN YOUR EDUCATIONAL BACKGROUND,  THE NAME, ITSELF, THE "NATIONAL COALITION TO ABOLISH THE DEATH PENALTY?"**

A.    I AM EMBARRASSED TO SAY, I DO READ THE PAPERS,  BUT MOST OF WHAT I READ, I MAY BE REALLY A LITTLE BIT OUT OF CONTACT WITH EVERYTHING THAT HAPPENS.

**Q.    I WANTED TO MAKE SURE I GOT AN ARTICLE THAT YOU WERE QUOTED IN.  AND SO, THAT IS THE REASON WHY WE WERE ABLE TO FIND THIS ARTICLE.  IT IS MAY 8TH.  I KNOW YOU DON'T KNOW THE JURY PROCESS SELECTION BEGAN MAY 10TH,  2004.  THIS ARTICLE DEALT WITH THE ISSUE, AS YOU SAID, OF WHETHER OR NOT, FROM A MEDICAL PERSPECTIVE, THE EXECUTING OF 16 AND 17-YEAR-OLDS. THAT IS WHAT THIS ARTICLE DEALS WITH, IN GENERAL; IS THAT CORRECT?**

**CROSS EXAM OF RUBEN GUR**

A.    THAT IS WHAT IT SEEMS LIKE FROM WHAT I WAS ABLE TO READ.

**Q.    AND AS YOU WELL KNOW,  THE UNITED STATES GOVERNMENT, THE FEDERAL GOVERNMENT, IN WHICH EVERY ONE OF THESE JURORS WAS TOLD DURING JURY SELECTION, THE FEDERAL DEATH PENALTY BARS THE SEEKING OR IMPOSITION OF THE DEATH PENALTY AGAINST ANYBODY WHO IS 16 OR 17 YEARS OLD.  I KNOW THIS HAS NOTHING TO DO WITH THIS PROCESS.  YOU UNDERSTAND THAT,  DON'T YOU SIR?**

A.    I AM NOT SURE I UNDERSTAND YOUR QUESTION.

**Q.    YOU KNOW THE FEDERAL DEATH PENALTY STATUTE, THE GOVERNMENT CAN'T SEEK THE DEATH PENALTY AGAINST ANYONE UNDER THE AGE OF 18 YEARS OLD.  DID YOU KNOW THAT, BASED ON YOUR EXPERIENCE, I BELIEVE, IN RESPONSE TO MR. BLUME, THAT YOU HAVE TESTIFIED BEFORE IN COURTS ON THESE MATTERS?**

A.    NOT ON THAT SPECIFIC ISSUE,  BUT I THINK YOU ARE RIGHT. I AM PRETTY SURE YOU ARE RIGHT.  I AM NOT A LAWYER.  I DON'T KNOW.

**Q.    ONE OF THE THINGS THAT THEY ASKED YOUR OPINION ABOUT DURING THIS ARTICLE DEALT WITH THIS WHOLE ISSUE THAT YOU BROUGHT UP BEFORE THE JURY DEALING WITH INTERPRETING BRAIN IMAGING AND TO EXPLAIN HUMAN BEHAVIOR.  THAT IS THE CRUX THEY WERE ASKING YOU ABOUT, THE REPORTER, WHOEVER WAS WITH THIS ORGANIZATION; WAS IT NOT?**

A.    I THINK THE REPORTER MUST HAVE SAT IN THE ROOM BECAUSE I NEVER GAVE AN INTERVIEW,  AN INDIVIDUAL INTERVIEW.

**Q.    WOULD YOU AGREE WITH ME THAT, WHEN YOU WERE SITTING IN THE ROOM,  YOU KNOW JEROME KAGAN, A NOTED HARVARD UNIVERSITY PSYCHOLOGIST?**

**A.    YES.**

**Q.    YOU KNOW DR. KAGAN.  WHILE YOU WERE SITTING IN THE ROOM AND THAT THIS ARTICLE REFERENCES,  HE INDICATED THAT HE WAS PART OF THAT CAMP THAT ARGUES THAT BRAIN SCIENCE DOESN'T BELONG IN COURT BECAUSE THERE IS NO EVIDENCE LINKING SPECIFIC CHARACTERISTICS OF TEENS' BRAINS TO ANY LEGALLY RELEVANT CONDITION SUCH AS IMPAIRED MORAL JUDGMENT OR INABILITY TO CONTROL MURDEROUS IMPULSES.  THAT WAS -- HE WAS IN ONE CAMP SAYING THAT THIS WHOLE BRAIN IMAGING THAT YOU HAVE DISCUSSED FOR ABOUT THREE TO FOUR HOURS WITH THIS JURY DOESN'T BELONG IN** A COURT OF LAW BECAUSE IT IS NOT RELIABLE.  I KNOW YOU MAY BE FRIENDS,  BUT I TAKE IT YOU DISAGREE WITH MR. KAGAN?

A.    YEAH, KAGAN HAS NOT DONE A SINGLE IMAGING STUDY IN HIS WHOLE LIFE.  HE IS A PSYCHOLOGIST, A VERY,  VERY EXCELLENT PSYCHOLOGIST.  HIS ENTIRE LIFE WORK HAS BEEN ON BEHAVIOR. IT USED TO BE THAT COGNITIVE PSYCHOLOGISTS ARGUED THEY COULD BUILD WHOLE SCIENCE WITHOUT KNOWING ANYTHING FROM THE BRAIN. HE COMES FROM THAT TRADITION.  AND IT IS CHANGING VERY RAPIDLY.

**Q.    OKAY.  LET'S NOT STOP AT DR. KAGAN.  LET'S BE FAIR AND MOVE ON.  I GUESS YOU, IN ONE OF THE EXHIBITS THAT MR. BLUME AND YOU WENT OVER IN FRONT OF THE JURY,  I CAN'T REMEMBER**

**CROSS EXAM OF RUBEN GUR**

WHICH ONE IT WAS, IT HAD SOMETHING TO DO WITH, I BELIEVE, ONE OF YOUR COLLEAGUES TOUCHED A BUTTON, AND THERE WERE FOUR SCREENS, AND THE BRAIN ALL TURNED TO BLUE, DO YOU REMEMBER THAT EXHIBIT?

A.    YES.

Q.    YOU SAID IT CAME FROM PEOPLE IN UCLA, AND MARYLAND, AND NIH, I BELIEVE?

A.    CORRECT.

Q.    SITTING IN THAT SAME ROOM, SOME TIME PRIOR TO MAY 8TH THIS YEAR WHEN YOU WERE DISCUSSING THE RELIABILITY OF THIS TYPE OF INTERPRETING BRAIN IMAGERY, IT WASN'T SIMPLY DR. KAGAN, BUT YOU KNOW DR. ELIZABETH SOWELL, ANOTHER PROMINENT BRAIN DEVELOPMENT RESEARCHER FROM UCLA, WHO, IN THAT VERY CONFERENCE, TOOK A DIM VIEW OF THE MOVEMENT TO APPLY NEUROSCIENCE TO THE LAW:

> "DELAYED FRONTAL-LAB MATURATION MAY EVENTUALLY BE SHOWN TO AFFECT TEENAGER'S CAPACITY TO MAKE LONG-TERM PLANS AND CONTROL THEIR IMPULSES, SHE SAYS,  BUT NO CURRENT RESEARCH CONNECTS SPECIFIC BRAIN TRAITS OF TYPICAL TEENAGERS TO ANY MENTAL OR BEHAVIORAL PROBLEMS.  THE SCIENTIFIC DATA AREN'T READY TO BE USED BY THE JUDICIAL SYSTEM, SHE

**CROSS EXAM OF RUBEN GUR**

REMARKS.  THE HARDEST THING FOR
NEUROSCIENTISTS TO DO IS TO BRING
BRAIN RESEARCH INTO REAL-LIFE
CONTEXTS."

I TAKE IT YOU DISAGREE WITH HER.  THAT IS FINE IF YOU DO.
YOU DISAGREE WITH DR.  SOWELL WHEN SHE SAYS -- YOU WOULD
AGREE, YOU CALL YOURSELF A NEUROSCIENTIST?  THAT IS WHAT YOU
ARE?

A.    YES.

Q.    YOU DISAGREE WITH HER, "THE HARDEST THING FOR A
NEUROSCIENTIST TO DO IS TO BRING BRAIN RESEARCH INTO REAL-LIFE
CONTEXTS."  YOU DISAGREE WITH HER?

A.    I DON'T DISAGREE WITH HER.  WE DISAGREE ON SOME
ISSUES,  BUT I  -- SHE IS A FAIRLY -- SHE IS IS A NEUROLOGIST,
AND SHE HAS DONE A COUPLE OF STUDIES WITH IMAGING.  I THINK
IT IS HER OPINION.  I THINK THE STATEMENT, AS YOU QUOTED TO
ME, IS TOO GENERAL EVEN TO KNOW WHAT TO AGREE OR DISAGREE.  I
AM SURE THERE ARE SOME AREAS THAT, WHERE THE KNOWLEDGE IS MORE
TENUOUS THAN OTHERS.  I THINK SHE IS WAY OFF SAYING THAT
THERE ARE NO LINKS THAT HAVE BEEN ESTABLISHED.  I MEAN,
EITHER SHE IS IGNORANT OF OR IGNORING A FAIRLY SIZABLE BODY OF
LITERATURE.

Q.    SHE IS IGNORANT OR IGNORING CERTAIN INFORMATION THAT
YOU BELIEVE IS APPLICABLE?

A.    BECAUSE -- YES,  DEFINITELY.

Q.    HOW ABOUT DR. B. J. CASEY OF CORNELL UNIVERSITY WEILL MEDICAL COLLEGE IN NEW YORK CITY, WHO WAS IN THAT SAME CONFERENCE WITH YOU?

A.    INCIDENTALLY, NONE OF THESE PEOPLE WERE THERE.  AT LEAST, I DIDN'T SEE THEM THERE.   THERE WERE FOUR OF US.   THEY MAY HAVE BEEN INTERVIEWED.  I HAVE NO IDEA HOW THEY CAME INTO IT,  BUT I AM PRETTY SURE I WOULD HAVE RECOGNIZED THEM IF THEY WERE THERE.

Q.    DO YOU AGREE OR DISAGREE WITH DR. B. J. CASEY OF THE WEILL MEDICAL COLLEGE OF NEW YORK WHEN HE SAYS THAT:

        "IT IS AMAZING HOW LITTLE WE KNOW

        ABOUT THE DEVELOPING BRAIN."

 WOULD YOU AGREE WITH THAT STATEMENT?

A.    IT IS SHE.

Q.    SHE?

A.    I WOULD ENDORSE IT.   IT IS AMAZING HOW LITTLE WE KNOW. EVERYTHING I TOLD YOU TODAY REALLY JUST PRETTY MUCH SUMS UP WHAT WE KNOW, YOU KNOW, A BIT MORE THAN WHAT I SAID.   I CAN'T CONVEY EVERYTHING IN THIS SHORT TIME.   BUT IN THE SAME TIME, I AGREE THAT THERE IS A LOT.   WE ARE JUST NOW DONE SCRATCHING THE SURFACE AND GETTING INTO MUCH FIRMER CONNECTIONS.

Q.    AND DR. CASEY,  SHE,  WOULD YOU AGREE OR DISAGREE, THIS WAS ONE OF THE THINGS THAT YOU DEMONSTRATED TO THIS JURY, I BELIEVE?  YOU TALKED ABOUT THE MRI AND BRAIN SCANNING TECHNIQUES.  YOU TALKED ABOUT THAT IN FRONT OF THIS JURY,  DID

CROSS EXAM OF RUBEN GUR

YOU NOT, DR. GUR?

A.    YES.

Q.    DO YOU AGREE WITH DR. CASEY WHEN SHE SAYS:

"BRAIN-SCANNING TECHNIQUES,

INCLUDING THE POPULAR MRI, REMAIN A

'CRUDE LEVEL OF ANALYSIS.' AT BEST,

BLOOD-FLOW MEASUREMENTS INDIRECTLY

TAP INTO BRAIN-CELL ACTIVITY AS

PEOPLE PERFORM A TASK, SUCH AS

IDENTIFYING EMOTIONS IN POSED FACES,

THAT MAY SUPERFICIALLY STIMULATE A

REAL-WORLD ENDEAVOR.  WHAT IS MORE,

MANY CRITICAL BRAIN-CELL RESPONSES

ARE TOO FAST FOR THE MRI TO TRACK."

THAT IS ONE OF THE THINGS THAT YOU EVEN TALKED ABOUT IN
FRONT OF THIS JURY WHEN YOU SHOWED UP WITH SOME OF THE FACES
IN THE BRAIN IMAGING, DID YOU NOT?

A.    YES.  I HOPED THAT I EXPLAINED THAT EACH ONE OF THOSE
MEASURES HAS AN INDICATION.  I MEAN, YOU ARE BASICALLY
CRITICIZING A RULER FOR NOT MEASURING THE TEMPERATURE.  SO
THAT THESE METHODS DON'T MEASURE WHAT THEY ARE DESIGNED TO
MEASURE.  AND I THINK WE HAVE LEARNED A LOT MORE WHEN WE CAN
STUDY THE MOLECULAR LEVEL.  WHAT WE DESCRIBED TODAY TAKES
PLACE IN LARGE REGIONS.  I DON'T -- SHE IS NOT QUESTIONING
THE VALIDITY OF THE MRI.  BUT SHE IS SAYING, WITH AN MRI, YOU

CANNOT STUDY,  YOU CANNOT REALLY SEE A MOLECULE.   YOU CAN'T GO DOWN TO THE MOLECULAR LEVEL OF THE BRAIN.   YOU CAN'T EVEN GO TO THE CELL.  YOU CAN'T SEE CELLS WITH MRI'S.   BUT WHAT YOU DO SEE IS A REFLECTION OF THE INTEGRITY OF THE MOLECULES IN THE CELLS.

**Q.    I GUESS WHAT I AM TRYING TO SAY WHEN I ASK YOU, ISN'T IT TRUE, MANY PEOPLE IN YOUR PROFESSION WITH LIKE EDUCATIONAL EXPERIENCES, RESEARCH EXPERIENCE, ON-THE-JOB TRAINING, PHYSICIANS, AND DOCTORS DISAGREE AT TIMES OVER LOOKING AT SCANS,  CAT SCANS,  MRI'S ABOUT WHAT THEY ARE LOOKING AT, THERE ARE DISAGREEMENTS?**

A.    MAYBE I MISUNDERSTOOD YOUR QUESTION.   I THOUGHT YOU ASKED ME WHETHER A GROUP OF PEOPLE WITH MY BACKGROUND WOULD DISAGREE ABOUT THE BRAIN OF MR. FULKS.   ABOUT IF THEY HAD ALL OF THE DATA THAT I HAD ON MR. FULKS,  WOULD THEY COME OUT WITH A DIFFERENT CONCLUSION.   I AM NOT TRYING TO SAY THAT OUR FIELD IS LOVEY-DOVEY, HUNKY-DORY.  NOBODY DISAGREES WITH ANYBODY.   IN FACT, THERE ARE LOTS OF AREAS OF DISAGREEMENT.

**Q.    ONE AREA OF DISAGREEMENT THAT I RECENTLY DISCUSSED WITH SOME OF YOUR COLLEAGUES, AS YOU KNOW, IS THIS WHOLE IDEA OF WHAT YOU JUST DID IN FRONT OF THE JURY, THAT YOU COULD SOMEHOW INTERPRET BRAIN IMAGING TO OFFER SOME SORT OF EXPLANATION FOR HUMAN BEHAVIOR.  THERE IS SIGNIFICANT DISAGREEMENT IN USING THIS BRAIN IMAGING THAT YOU ARE DESCRIBING TO INTERPRET WHY MR. FULKS ACTED THE WAY HE DID.  I MEAN,  I JUST NAMED THREE**

**CROSS EXAM OF RUBEN GUR**

**PEOPLE IN ONE ARTICLE.**

 A.    I MEAN,  IT IS DISAGREEMENT THEY HAVE ARE VERY SPECIFIC AND LEGITIMATE.   I THINK SOME OF THEM ARE LEGITIMATE.   I THINK SOME OF THE -- AT LEAST PART OF WHAT YOU QUOTED TO ME FROM BARBARA SOWELL'S -- EXCUSE ME, ELIZABETH SOWELL'S STATEMENT,  I WOULD LIKE TO TALK TO HER ABOUT IT.   I DON'T THINK SHE WILL REALLY -- WHAT CAN I DO?  SHE IS NOT HERE.

 **Q.    LET ME MOVE ON.   I NOTICED, IN SOME OF THE PUBLICATIONS, I WAS ABLE TO READ, THAT WE GOT OFF THE INTERNET, THAT YOU HAD PUBLISHED, ONE OF THE THINGS THAT YOU APPEAR TO BE PRETTY CONSISTENT IN, DR. GUR,  IT IS YOUR OPINION.  I HAVE SEEN DIFFERENT AGES,  DEPENDING UPON WHAT ARTICLE YOU ARE QUOTED IN,  IT IS YOUR OPINION, IS IT NOT, UNTIL SOMEBODY IS 21 OR 22 OR 23, IN THAT RANGE, UNTIL THE BRAIN IS FULLY DEVELOPED; IS THAT CORRECT,  SIR?**

 A.    YES.

 **Q.    AND MUCH OF YOUR INTERPRETING THIS BRAIN IMAGING THAT YOU HAVE DESCRIBED AND SHOWN TO THE JURY AND TALKED ABOUT, IT IS SUBJECTIVE AND NOT, NECESSARILY, EXACT.   DO YOU KNOW WHAT I MEAN BY THAT?  YOU CAN'T SAY,  SCIENCE IS NOT EXACT; ISN'T THAT TRUE?**

 A.    THE INTERPRETATION IS AS GOOD AS I CAN MAKE IT.   AND, OF COURSE,  EVEN THE NUMBERS ARE NOT EXACT.   THEY EACH CONTAIN SOME ELEMENT OF ERROR.

 **Q.    THAT IS THE REASON WHY -- DO YOU HAVE A COPY OF YOUR**

**CROSS EXAM OF RUBEN GUR**

REPORT?  IF NOT,  I CAN GIVE YOU ONE.  DO YOU HAVE A COPY?

A.    I DON'T HAVE ONE IN FRONT OF ME.

Q.    OKAY.  I WILL GIVE YOU ONE.  SHOWING YOU AT THE TOP OF PAGE 2 WHEN YOU WRITE IN YOUR REPORT,  RIGHT AT THE TOP OF THE PAGE I WILL PUBLISH IT:

"REDUCED FUSIFORM AND THALAMIC ACTIVITY COULD BE," YOUR WORDS, "COULD BE A RESULT OF HEAD INJURIES, MOST LIKELY A BLOW TO THE TOP OF THE HEAD.  THE ABNORMAL INCREASED ACTIVITY IN SOME TEMPORAL, OCCIPITAL, FRONTAL REGIONS COULD REFLECT" --

AND HOW DO YOU PRONOUNCE THAT NEXT WORD?

A.    "EPILEPTIFORM."

Q.    THANK YOU.

"OR PSYCHOTIC PROCESS, POSSIBLY RELATED TO FETAL ALCOHOL SYNDROME."

NEXT SENTENCE.  "THIS COULD ALSO RELATE THE FINDINGS, THEY MAY LEAD TO FURTHER TISSUE DETERIORATION."

AND ARE YOU SURE YOU DON'T HAVE A LAW DEGREE, DR. GUR.  YOU DON'T HAVE A LOT HERE.  IT SEEMS TO ME THAT YOU ARE NOT BEING SPECIFIC BECAUSE YOU CAN'T BE SPECIFIC BECAUSE SCIENCE IS INEXACT.

**CROSS EXAM OF RUBEN GUR**

A.    THIS IS EXACTLY WHAT I TRIED TO EXPLAIN, WHICH IS, I AM TRYING TO SEPARATE EFFECT FROM MY INTERPRETATION OF IT.  SO, THE FACT THAT FUSIFORM AND THALAMIC ACTIVITY IS REDUCED IS THE DATA.  AND WHEN I SAID I COULD BE MORE TENTATIVE, IT IS BECAUSE I CAN'T BE ABSOLUTELY SURE ABOUT THE CAUSE FOR THAT ABNORMALITY.  SO, I HOPE YOU DON'T INTERPRET THE "COULD" THAT RELATES TO THE INTERPRETATION OF THE FINDING TO INDICATE THAT I DON'T -- THAT I DON'T -- THAT I HAVE ANY DOUBTS ABOUT THE FINDING ITSELF.

**Q.    ONE OF THE THINGS THAT YOU TRY DO IN YOUR FIELD,  I THINK YOU HAVE, OBVIOUSLY, DEDICATED YOUR ENTIRE PROFESSIONAL AND ADULT LIFE TO, IS THAT YOU TRY AND FIGURE OUT WHY PEOPLE COMMIT VIOLENT CRIMES.  THAT IS ONE OF THE THINGS YOU TRY AND FIGURE OUT; IS THAT CORRECT?**

A.    THAT IS CORRECT.

**Q.    YOU FEEL, BASED ON YOUR RESEARCH, YOU CAN TAKE BRAIN IMAGING, OF COURSE, YOU NEED CLINICAL HISTORY AS WELL, DO YOU AGREE WITH THAT?**

A.    YES.

**Q.    YOU ARE LOOKING FOR, IN ORDER TO KIND OF PUT YOUR FINGER ON TO AS TO WHY SOMEBODY WOULD CARJACK ANOTHER HUMAN BEING,  KILL ANOTHER HUMAN BEING,  RAPE ANOTHER HUMAN BEING, IS THAT A FAIR STATEMENT?**

A.    THAT IS A VERY FAIR STATEMENT.

**Q.    DO YOU TAKE IN THE FACT, DOCTOR, SOME PEOPLE ARE JUST**

**CROSS EXAM OF RUBEN GUR**

**PLAIN MEAN OR EVIL?**

A.   I HAVE LIVED TOO LONG TO BE ABLE TO SAY THAT I DON'T BELIEVE SUCH PEOPLE EXIST.   THERE ARE SOME MEAN PEOPLE OUT THERE.

**Q.   AND THAT IS A VERY HONEST ANSWER.  I APPRECIATE THAT ANSWER.   COUPLE OF POINTS BEFORE I GO ONTO THE NEXT SUBJECT MATTER, AND I AM NOT GOING TO BE -- I WILL TRY TO MAKE THIS AS BRIEF AS POSSIBLE.   WHEN YOU WERE DISCUSSING YOUR QUALIFICATIONS, I WANTED TO BE SURE ON THIS.  NOT NECESSARILY YOUR QUALIFICATIONS, BUT WHAT YOU DO, BASICALLY, DURING A WORKING DAY.  YOU INDICATED THAT YOU TEACH STUDENTS AND ALSO LECTURED AT SEMINARS; IS THAT CORRECT?**

A.   YES.

**Q.   YOU RESEARCH, AND WRITE,  PUBLISH?**

A.   YES.

**Q.   YOU HAVE A PRACTICE, THAT IS WHAT,  DIRECTOR OF BRAIN BEHAVIOR LAB?  I WOULD CONSIDER YOU ARE A PRACTICING PSYCHOLOGIST?**

A.   YES.   BUT IT IS WITHIN THE MEDICAL SCHOOL.   I DON'T HAVE A PRIVATE PRACTICE.

**Q.   AND HOW LONG HAVE YOU BEEN AN EXPERT WITNESS?**

A.   ACTUALLY, I CAN ALMOST PINPOINT THE DAY THE FIRST TIME I WAS INVITED, IT WAS AROUND 1990.

**Q.   SO,  ABOUT 14 YEARS YOU HAVE BEEN HIRED TO CONSULT, BY LAWYERS, AS AN EXPERT WITNESS IN THE AREAS THAT YOU HAVE,**

**CROSS EXAM OF RUBEN GUR**

**BASICALLY, TESTIFIED TO BEFORE THIS JURY; IS THAT CORRECT?**

A.   AT DIFFERENT RATES.   I MEAN,  BETWEEN 1990 AND THE NEXT CASE, A COUPLE OF YEARS.  AND THEN, SOMETIMES, I GET TWO OR THREE CASES IN A YEAR, AND SOMETIMES A YEAR WILL GO BY.   I AM NOT LOOKING FOR THEM.  BUT IF A CASE IS PRESENTED TO ME THAT I FEEL I HAVE TIME TO WORK ON AND SOUNDS INTERESTING, I WILL TAKE IT ON.

**Q.    AND THAT IS NOT SIMPLY TESTIFYING.  HOW MANY CASES DO YOU THINK YOU HAVE WORKED ON WITH REGARD TO CRIMINAL CASES, ANY TYPE OF CONSULTATION?**

A.   SINCE 1990?

**Q.    TO INCLUDE REVIEWING SOMEBODY ELSE'S MATERIAL,  NOT NECESSARILY MEETING WITH ANY DEFENSE LAWYERS?**

A.   I CAN LOOK AT THE EXACT NUMBER.   RIGHT NOW I WOULD SAY IT IS IN THE NEIGHBORHOOD A BIT OVER 20.

**Q.    YOU INDICATED TO MR. BLUME THAT YOU HAD, AT ONE TIME, OR A TIME BEEN HIRED BY A PROSECUTION ENTITY?**

A.    YES.

**Q.    WHEN WAS THAT?**

A.    THAT WAS IN A CASE OF FORMER CONGRESSMAN WHO WAS ACCUSED OF EMBEZZLING ABOUT 10 MILLION DOLLARS FROM HIS FRIENDS  -- FORMER FRIENDS,  I SUPPOSE.   AND ARGUED THAT IT WAS CAUSED BY THE INTAKE OF ANTIMALARIA DRUG.   HE HAD A PET SCAN AND MRI THAT I SUBMITTED TO THE SAME KIND OF ANALYSIS THAT YOU SAW TODAY.

Q.    SO, YOU HAVE BEEN HIRED BY THE PROSECUTION ENTITY ONE TIME?

A.    NO.

Q.    YOU DON'T HAVE TO DESCRIBE THE WHOLE --

A.    MAYBE THREE TIMES TOTAL.

Q.    HOW MANY?

A.    MAYBE THREE.

Q.    SO, OUT OF EVERY 20, YOU HAVE BEEN HIRED BY PROSECUTION THREE TIMES, AND THE REST OF THE TIME, 17 PLUS, BY THE CRIMINAL DEFENSE TEAM; IS THAT CORRECT?

A.    THAT WOULD BE ABOUT RIGHT, YEAH.

Q.    AND WERE YOU EVER HIRED BY THE PROSECUTION IN A CASE INVOLVING A HOMICIDE?

A.    NO.

Q.    SO, IF YOU HAVE TESTIFIED IN FRONT OF JURIES ACROSS THE COUNTRY IN MURDER CASES, IT HAS ALWAYS BEEN FOR THE DEFENSE?

A.    I MEAN, THAT IS CARRYING IT FAR ACROSS THE COUNTRY. I MAY HAVE TESTIFIED -- THIS IS PROBABLY MY FOURTH OR FIFTH TIME. USUALLY, THE PROSECUTION IS NOT ALL THAT EAGER TO FIND OUT IF THE BRAIN IS ABNORMAL.

Q.    OR DISAGREES WITH YOU.  JUST DISAGREES WITH YOU?

A.    I'M SORRY?

Q.    OR THEY DISAGREE WITH YOU?

A.    YEAH.

Q.    LET'S GO TO WHAT YOU USED TO DEVELOP THIS OPINION THAT YOU HAVE PROVIDED TO THE JURY.   MY UNDERSTANDING IS THAT, BASED UPON YOUR REPORT AND YOUR TESTIMONY IS THAT YOU REVIEWED THE COMPREHENSIVE NEUROPSYCHOLOGICAL TESTING PERFORMED BY DR. JAMES EVANS AND JONATHAN VENN.   AND THAT INCLUDED THE PET SCANS,  THE MRI SCANS,  THE CAT SCANS; IS THAT CORRECT?

A.   I REVIEWED THEM.   YEAH.   I REVIEWED.   ARE YOU ASKING IS IT CORRECT?  I REVIEWED THE VENN DATA.

Q.    I AM GOING TO MAKE SURE WHAT YOU REVIEWED BEFORE YOU TENDERED YOUR OPINION TO THE JURY.

A.    YES.

Q.    OF COURSE, DR. EVANS AND DR. VENN WERE HIRED BY MR. FULKS,  AS WELL,  WERE THERE TO DIRECT MR. FULKS'S DEFENSE?

A.    YES.

Q.    YOU SAID SOMETHING ABOUT, YOU TOOK THE RESULTS, YOU KIND OF APPLIED YOUR OWN FORMULAS AND DID SOMETHING WITH THEM. DO YOU REMEMBER SAYING THAT?

A.    YEAH.   WELL, NO  -- YES.

Q.    AND YOU ADMINISTERED ADDITIONAL COMPUTERIZED TESTS TO MR. FULKS, YOU, YOURSELF?

A.    YES.

Q.    ADMINISTERED NEUROPSYCHOLOGICAL TESTS TO MR. FULKS?

A.    YES.

Q.    AND YOU CONDUCTED INTERVIEWS?

A.    YES.

CROSS EXAM OF RUBEN GUR

**Q.    THOSE ARE THE THREE THINGS YOU USED TO COME TO YOUR CONCLUSIONS OR YOUR OPINIONS.   THE TESTING BY THE TWO OTHER DEFENSE DOCTORS,  YOUR INTERVIEW WITH MR. FULKS,  AND THE TESTING THAT YOU -- COGNITIVE TESTING THAT YOU PROVIDED MR. FULKS,  THOSE THREE THINGS?**

A.    FOR THE BEHAVIORAL PART,  YES.

**Q.    AND HOW LONG DID YOU INTERVIEW MR. FULKS?  OVER HOW MANY PERIOD OF DAYS?**

A.    I HAD ONE INTERVIEW WITH HIM FOR ABOUT AN HOUR AND A HALF.

**Q.    ONE NINETY-MINUTE INTERVIEW WITH CHAD FULKS?**

A.    BEFORE I STARTED THE TESTING, THE WHOLE SESSION TOOK ABOUT THREE AND A HALF HOURS, INCLUDING THE TESTING.

**Q.    YOU NEVER MET MR. FULKS BEFORE?**

A.    NO.

**Q.    YOU INTERVIEWED HIM FOR 90 MINUTES AND THEN GAVE HIM A SERIES OF TESTS THAT LASTED APPROXIMATELY THREE AND A HALF HOURS?**

A.    YES.   THE WHOLE,  YES.

**Q.    DO YOU THINK YOU GOT MR. FULKS'S WHOLE LIFE STORY IN NINETY MINUTES,  DR. GUR?**

A.    I WASN'T TRYING TO.   I HAD THE BENEFIT OF HAVING MATERIAL ABOUT HIS PREVIOUS TESTING AND INTERVIEWS, AND I JUST WENT AFTER SPECIFIC ISSUES THAT I THOUGHT NEEDED FURTHER CLARIFICATION.

App. 00958

CROSS EXAM OF RUBEN GUR

Q.    WELL, THAT IS WHY I ASKED YOU WHAT YOU HAD.  I APOLOGIZE IF MY QUESTION WAS WHAT MATERIALS YOU USED TO FORM YOUR OPINION.  I DON'T KNOW IF THE JURY WAS FOLLOWING IT.  I WROTE DOWN, BASICALLY, THE THREE THINGS YOU TOLD ME ON CROSS-EXAMINATION.  SO,  YOU ARE NOW SAYING THAT YOU DID HAVE -- YOU WERE PROVIDED ACCESS TO THE POLICE REPORTS, AND DOCUMENTS, AND STATEMENTS, AND LETTERS, AND PRIOR PSYCHOLOGICAL TESTING, AND PRIOR MENTAL HEALTH EXPERTS OPINION'S/REPORTS,  YOU WERE PROVIDED ALL OF THAT INFORMATION?

A.    WELL,  NOT ALL OF IT.  I WAS PROVIDED A SUMMARY OF THE CASE.  I AM SORRY IF I MAYBE MISUNDERSTOOD YOUR QUESTIONING. I REVIEWED THOSE THREE THINGS YOU MENTIONED.  I DIDN'T TRY TO IMPLY THAT I DIDN'T SEE ANYTHING ELSE.  I DID SEE MORE MATERIAL.  I CAN PROVIDE YOU WITH A WHOLE LIST OF WHAT I HAVE.

Q.    SUMMARIZE FOR US.

A.    I HAD, AS I RECALL, I SAW A SYNOPSIS OF THE CASE.  I SAW SOME OF THE REPORTS FROM THE PRISON.  I SAW THE INTERVIEW MATERIAL AND THE TESTING MATERIAL FROM DR. VENN AND EVANS.

Q.    THE TWO?

A.    I SAW SOME LETTERS THAT HE WROTE.  I SAW THE BUTNER REPORT MORE RECENTLY.

Q.    THE TWO -- YOU SAY YOU SAW SOME REPORTS FROM DR. EVANS AND DR. VENN YOU HAVE ALREADY TALKED ABOUT,  THOSE ARE THE TWO EXPERTS FOR MR. FULKS?

**CROSS EXAM OF RUBEN GUR**

A.    RIGHT.

**Q.    THE SUMMARY,  WAS THAT SOME SORT OF SUMMARY PROVIDED BY DEFENSE COUNSEL TO YOU?**

A.    I DON'T REMEMBER EXACTLY.   SOME OF IT WAS THAT. THERE WERE SOME COPIES OF SOME COPIES OF REPORTS.   I MEAN, I WILL BE HAPPY TO GIVE YOU THE EXACT LIST.

**Q.    LET ME ASK IT THIS WAY.   YOU ARE A PH.D. DOCTOR.  YOU WOULD AGREE WITH ME THAT, A PH.D. PSYCHOLOGIST OR A MEDICAL DOCTOR,  WHEN REACHING A DIAGNOSIS OR A CONCLUSION OR WHEN WANTING TO RENDER AN OPINION ABOUT AN IMPORTANT MATTER,  THEY NOT ONLY WANT TO ORDER TESTING DONE AND THEN SUBJECTIVELY, ANALYZE THAT TESTING,  THEY WANT TO GET AS MUCH CLINICAL INFORMATION AS POSSIBLE,  MEANING THEY WANT TO INTERVIEW THE SUBJECT MATTER, IF THAT IS POSSIBLE.   THEY WANT ACCESS TO ALL MATERIAL WITNESSES, IF THERE ARE WITNESSES,  ALL MATERIAL THAT RELATE TO THE SUBJECT MATTER SO THAT YOU CAN HAVE AS MUCH INFORMATION AS POSSIBLE ON THE CLINICAL END BECAUSE, THAT IS JUST AS IMPORTANT AS THE TESTING AND INTERPRETING THE TESTING. WOULD YOU AGREE WITH THAT AS A DOCTOR,  WOULD YOU NOT?**

A.    IN THE DAY OF MANAGED CARE, DO YOU THINK DOCTORS HAVE TIME FOR THAT?  I MEAN, YOU HAVE TO RELY BY -- RELY ON WHAT IS THERE.   CLINICALLY, I WOULDN'T SURVIVE IF I SPENT THE WHOLE DAY WITH EVERY PATIENT GOING OVER THEIR HISTORY.   I GO OVER WHAT OTHER PEOPLE HAVE DONE, AND UNLESS I HAVE REASON TO DOUBT,  I ACCEPT WHAT IS IN THE FILE.  I THINK EVERY

App. 00960

PSYCHOLOGIST OR PHYSICIAN DOES THAT.

Q.    YOU, AS A PROFESSIONAL, AS YOU ARE IN RUNNING THIS BRAIN CENTER AND HAVING TESTIFIED IN COURT BEFORE, YOU WANTED TO MAKE SURE THAT YOU HAD ALL OF THE INFORMATION AVAILABLE THAT WOULD ALLOW YOU TO MAKE YOUR OWN INFORMED, OBJECTIVE OPINION AS TO THE CREDIBILITY OF CHAD FULKS BEFORE YOU CAME INTO THIS COURTROOM, DID YOU NOT? TO OFFER YOUR OPINION TO THE 16 PEOPLE, 12 OF WHICH ARE GOING TO DECIDE WHETHER OR NOT MR. FULKS LIVES OR DIES, I MEAN, THAT IS IMPORTANT TO YOU, IS IT NOT?

A.    VERY IMPORTANT.

Q.    AND, BASICALLY, YOU ARE ALMOST A PRISONER OF WHAT IS PROVIDED TO YOU BY THE DEFENSE ATTORNEYS, ARE YOU NOT? IF THEY DON'T PROVIDE YOU DOCUMENTATION, YOU CAN'T SEE IT?

A.    THAT IS CORRECT.

Q.    YOU TOLD THIS JURY THAT PART OF THE BASIS -- AN IMPORTANT PART OF THE BASIS OF YOUR OPINION TO THIS JURY IS YOUR INTERVIEW WITH MR. FULKS, YOUR TESTING OF MR. FULKS, AND THE VERACITY OR THE CREDIBILITY OF THAT INTERVIEW AND THAT TESTING; ISN'T THAT TRUE?

A.    I DIDN'T SAY IT, BUT IT IS TRUE.

Q.    SO, THE CREDIBILITY OF MR. FULKS IS NOT AN IMPORTANT FACTOR IN YOUR ANALYSIS?

A.    THE CREDIBILITY IS, AND THERE ARE STANDARD WAYS OF ASSESSING IT.  SO, I WAS VERY INTERESTED IN FINDING OUT THE

CROSS EXAM OF RUBEN GUR

RESULTS OF THE MALINGERING TESTS THAT DR. VENN GAVE HIM.  BUT HAVING HAD THOSE RESULTS,  I SAW NO REASON TO RE-EXAMINE AGAIN THAT ISSUE.

Q.    YOU WOULD AGREE WITH ME THAT IS A  -- YOU WOULD AGREE WITH THE COMMON PREMISE THAT A GOOD INDICATOR OF FUTURE CONDUCT IS PAST BEHAVIOR,  WOULD YOU AGREE WITH THAT STATEMENT?

A.    I THINK THAT IS, BY AND LARGE, A GOOD RULE.  IT HAS ITS LIMITS, BUT IT IS A FAIR SUMMARY.

Q.    SO,  IF THERE WERE -- YOU SAY YOU ARE LOOKING AT TESTS FROM DR. VENN AND DR. EVANS CONCERNING THIS MALINGERING ISSUE. THE BOTTOM LINE IS,  THAT YOU ARE STILL,  YOU AND THE TWO DOCTORS THAT WORK FOR MR. FULKS,  YOU ARE LOOKING AT SUBJECTIVELY INTERPRETING THOSE RESULTS,  ARE YOU NOT?

A.    THE INTERPRETATION WOULD BE,  WOULD HAVE AN ELEMENT OF SUBJECTIVITY TO IT.

Q.    SO,  IF THERE WERE DOCUMENTS OUT THERE, AND WITNESSES OUT THERE, AND PEOPLE OUT THERE THAT COULD PROVIDE YOU OBJECTIVE INFORMATION AS TO ALL OF THE LIES, AND THE MANIPULATIONS, AND DECEIT OF MR. CHAD FULKS SINCE THE TIME HE WAS 16 YEARS OLD, TO THE TIME HE WAS 26 YEARS OLD, WHEN YOU MET HIM,  WOULDN'T YOU WANT THAT INFORMATION IN ORDER TO REACH AN INFORMED DECISION BEFORE THIS GROUP OF PEOPLE?

A.    THERE WAS A LOT OF INFORMATION OF THAT KIND THAT I DID GET.  I MEAN,  I REALIZE GOING IN THAT MR. FULKS IS NOT,  YOU

KNOW, HOW DO YOU CALL THEM --

**Q.    BELIEVABLE?**

A.    AN ALL-AMERICAN SOMEONE THAT WE CAN ALL BE PROUD OF AND SO ON.  I MEAN --

**Q.    I AM NOT TALKING ABOUT THAT, SIR.  I AM NOT TALKING ABOUT PAST CRIMINAL BEHAVIOR.**

A.    I THOUGHT YOU WERE.

**Q.    THE DEFENSE ATTORNEYS PROVIDED YOU -- I AM TALKING ABOUT INFORMATION, WITNESSES, AND STATEMENTS, AND POLICE REPORTS OVER THE PAST TEN YEARS WHICH CLEARLY INDICATE MR. FULKS WAS A MANIPULATOR, A LIAR, A DECEIVER.  AND THE PEOPLE THAT HE MANIPULATED, LIED, AND DECEIVED BELIEVED HIM, AT THAT POINT IN TIME, AS WELL.  WOULDN'T YOU WANT THAT INFORMATION IN ORDER FOR YOU TO MAKE AN INFORMED OPINION AS TO THE CREDIBILITY OF MR. FULKS FROM YOUR INTERVIEWING HIM AND GIVING HIM THESE TESTS?**

A.    AS I WAS SAYING, I DID GET QUITE A BIT OF INFORMATION. AND IF YOU ASK ME, BEFORE GOING TO INTERVIEW HIM IS HE A LIAR, MANIPULATOR, A THIEF, AND ALL THAT, I KNEW HE WAS.  I AM NOT SITTING HERE BEING SHOCKED BY WHAT YOU ARE TELLING ME.

**Q.    HIS MOTIVATION, YOU WOULD AGREE WITH ME THAT ONE WHO IS FACING EXECUTION, HAS NO GREATER MOTIVE TO FAKE BAD OR TO LIE, YOU WOULD AGREE WITH THAT?**

A.    SURE.

**Q.    SELF-PRESERVATION?**

**CROSS EXAM OF RUBEN GUR**

A.    SURE.

Q.    YOU INDICATE IN YOUR REPORT, I BELIEVE IT IS ON PAGE 3, AND YOU ALSO TESTIFIED TO THIS THAT, "IN GENERAL, ALL OF THE EVALUATIONS," I GUESS THAT INCLUDES DR. EVANS AND VENN, "AGREE MR. FULKS HAS PUT FORTH A GOOD EFFORT AND WAS NOT TRYING TO FEIGN DYSFUNCTION; THEREFORE, THE TESTING IS CONSIDERED A VALID INDICATION OF HIS NEUROCOGNITIVE ABILITIES." THAT IS WHAT YOU PUT IN YOUR REPORT AND, OF COURSE, YOU HAVE ALREADY SAID THAT IS YOUR OPINION, AS WELL AS THE OTHER TWO DOCTORS' OPINIONS; IS THAT CORRECT?

A.    YES.

Q.    AND YOU COULD BE WRONG?

A.    YES, THAT IS AN OPINION.

Q.    YOU COULD BE RIGHT.  I MEAN, TO BE FAIR TO YOU, YOU COULD BE RIGHT?

A.    ABSOLUTELY.  I COULD BE WRONG.

Q.    NOW, UNDER THE PRIOR TESTING IN THE BEHAVIORAL IMAGE PORTION OF YOUR REPORT WHEN YOU DESCRIBE THE LESIONS, LESIONS OF THE KIND -- LESIONS OF THE KIND DEPICTED BY BEHAVIORAL IMAGE, ASSOCIATED WITH SEVERAL COGNITIVE AND EMOTIONAL DEFICIENCIES, DOCUMENTED IN THE TESTING IN THE COGNITIVE DOMAIN -- THIS IS YOUR RESULTS, I GUESS -- IN THE COGNITIVE DOMAIN, INDIVIDUALS WITH SUCH LESIONS TEND TO HAVE VISUAL PERCEPTION PROBLEMS.  THEY WILL BE CONSIDERED CLUMSY AND INATTENTIVE, AND THEY ARE EASILY DISTRACTIBLE.  THEY HAVE

**CROSS EXAM OF RUBEN GUR**

**DIFFICULTY SIZING UP SITUATIONS IN THE COGNITIVE DOMAIN.   IS THAT YOUR OPINION OF MR. FULKS?**

A.   THIS IS WHAT MOST PEOPLE WHO HAVE THAT KIND OF LESION WOULD LOOK LIKE.   I WASN'T ABLE TO VERIFY THAT MR. FULKS HAS ALL OF THESE CHARACTERISTICS. BUT I BELIEVE HE HAS MOST.

**Q.   LET ME OFFER YOU A COUPLE OF PIECES OF EVIDENCE THAT THIS JURY HAS SEEN TO SEE IF THAT MIGHT SWAY YOUR OPINION ONE WAY OR THE OTHER.   I BELIEVE ONE OF YOUR QUOTES EARLY ON IN YOUR DIRECT TESTIMONY WAS,  QUOTE,  YOU NEED TO LOOK AT THE BRAIN IN ACTION.   DO YOU REMEMBER MAKING THAT STATEMENT?**

A.   YES.

**Q.   SO,  VISUAL?**

A.   WITH REFERENCE TO LOOKING AT PHYSIOLOGICAL INSTEAD OF PHYSICAL.

**Q.   WERE YOU PROVIDED WITH A COPY OF THE VIDEOTAPE SHOWING MR. FULKS DRIVING AN AUTOMOBILE AT 130 MILES PER HOUR, IN AND OUT OF TRAFFIC, WITH HIS LIGHTS OFF,  WHILE BEING CHASED, WERE YOU PROVIDED WITH THAT?**

A.   NO.   HE TOLD ME IN THE INTERVIEW THINGS LIKE THAT HAPPENED.

**Q.   YOU WOULDN'T EXPECT SOMEBODY TO DRIVE AN AUTOMOBILE 130 MILES PER HOUR,  OUTRUN MULTIPLE POLICE OFFICERS WHO ARE TRAINED AT THEIR RESPECTIVE ACADEMIES, TO HAVE, QUOTE, VISUAL PERCEPTUAL PROBLEMS,  WOULD YOU,  DOCTOR?**

A.   I THINK HE IS.  HE STARTED DRIVING AT AN AGE THAT YOU

CROSS EXAM OF RUBEN GUR

WOULDN'T WANT TO KNOW.   HE WAS A CHILD WHEN HE STARTED

DRIVING.  AND I PROBABLY -- ABOUT HALF OF HIS BRAIN IS DEVOTED

TO DRIVING.   I MEAN, THAT IS REALLY WHAT HE WAS DOING A LOT.

THAT WOULD BE AN EXAMPLE OF THAT INDIVIDUAL WHO LEARNED TO SKI

AS A CHILD.

Q.    YOU MENTIONED THE LESIONS THAT YOU CLAIM, THAT YOU SAY ARE ON THE BRAIN SCAN-- THE LESIONS THAT ARE ON THE BRAIN SCAN OF MR. FULKS.  I AM NOT QUESTIONING YOUR DIAGNOSIS OF THESE LESIONS ON THE BRAIN SCAN,  I DON'T WANT YOU TO THINK THAT. BUT ALSO, PEOPLE MAY BE CLUMSY OR INATTENTIVE.   WERE YOU PROVIDED WITH EITHER NOTES, OR THE TESTIMONY, OR THE FBI 302 OF AN INDIVIDUAL BY THE NAME OF JAMES HAWKINS, WHO WAS KIDNAPED AND CARJACKED, AND WHO TESTIFIED AND PROVIDED A STATEMENT INDICATING THAT IT WAS MR. FULKS THAT TOOK OVER THE LEAD ROLE, IT WAS MR. FULKS THAT MARCHED HIM TO A TREE,  MR. FULKS VIOLENTLY TIED HIM TO A TREE WITH DUCT TAPE,  WERE YOU PROVIDED WITH THAT INFORMATION?

A.    I THINK THAT WAS INCLUDED IN THE MATERIAL.

Q.    NOTHING CLUMSY OR INATTENTIVE ABOUT THAT CONDUCT, IS THERE,  SIR?

A.    IT IS HARD TO KNOW, IF YOU ARE NOT THERE.   BUT IT SOUNDS LIKE HE ACCOMPLISHED DOING THAT.

Q.    HIS GOAL.   OKAY.   AND YOU ALSO SAY THAT THESE PEOPLE WHO HAVE LESIONS AT TIMES MIGHT HAVE DIFFICULTY SIZING UP SITUATIONS.   ARE YOU AWARE, BASED ON YOUR REVIEW OF OR MAYBE

**CROSS EXAM OF RUBEN GUR**

**THE SUMMARY OF THIS CASE, AS YOU DESCRIBED, THAT THE AFTERNOON OF THURSDAY, NOVEMBER 14TH,  MR. FULKS AND HIS COHORT DROVE INTO A WAL-MART IN CONWAY,  SOUTH CAROLINA.   AND WHEN, SAY, GIVEN AN OPPORTUNITY TO APPROACH TWO GUYS OF GOOD SIZE TO CARJACK THEM,  THEY DIDN'T DO THAT.  THEY CHOSE A WOMAN WHO IS FIVE FOOT SEVEN AND 150 POUNDS BY HERSELF,  ARE YOU AWARE OF THAT INFORMATION?**

A.    YEAH.   ACTUALLY, MR. FULKS, HIMSELF, TOLD ME ABOUT THAT INCIDENT.

**Q.    AND THEY  -- HE SIZED UP THE SITUATION,  YOU WOULD AGREE WITH ME.   AND YOU GO AFTER THE WOMAN, WHO IS MORE VULNERABLE THAN MEN?**

A.    YES.   I MEAN,  I GUESS FROM THAT PERSPECTIVE HE SIZED THE SITUATION UP WELL.

**Q.    AGAIN,  I AM JUST CITING EXAMPLES, BASED ON YOUR NEEDING TO LOOK AT THE BRAIN IN ACTION.   I AM TRYING TO SEE WHAT EXAMPLES YOU WERE PROVIDED IN WHICH THE JURY HAS BEEN PROVIDED.  THEY HAVE SEEN MR. FULKS BRAIN IN ACTION.**

A.    I MEAN, THERE ARE MANY INSTANCES WHERE HE, OBVIOUSLY, DID NOT SIZE UP THE SITUATION WELL AND GOT INTO A LOT OF TROUBLE FOR IT.

**Q.    OR HE CHOSE?**

A.    IT DOESN'T MEAN THAT.  WHEN SOMEBODY IS CLUMSY, IT DOESN'T MEAN THAT THEY SPILL WATER EVERY TIME THEY GIVE TESTIMONY IN COURT,  BUT --

CROSS EXAM OF RUBEN GUR

Q.    ANOTHER RATIONAL EXPLANATION IS, HE CHOSE TO ACT THAT WAY.    HE CHOSE?

A.    YEAH.    I AM NOT MAKING -- GIVING OPINION ON --

Q.    WHEN YOU INTERVIEWED MR. FULKS, YOU INDICATED YOU WERE IN A CELL DURING THIS 90-MINUTE INTERVIEW.  AND YOU SAY THAT "HIS SPEECH WAS SLOW AND SOMEWHAT SLURRED, WITH MINIMAL PROSODY"; IS THAT CORRECT?

A.    YES.

Q.    WHAT DOES "PROSODY" MEAN?

A.    PROSODY IS THE INTONATION THAT YOU PUT ON YOUR VOICE IN ORDER TO PUT EMPHASIS IN THE RIGHT PLACE.  SO, SAY, I WENT UP TO THE BOSS, HE GAVE ME THE NEWS.   YOU CAN SAY THE SAME THING AND SAY, I WENT UP TO THE BOSS, HE GAVE ME THE NEWS.   TOTALLY DIFFERENT THINGS.

Q.    "HIS FACE HAD A STARE THAT SEEMED TO REFLECT EFFORTS TO UNDERSTAND WHAT WAS GOING ON AROUND HIM."   DO YOU REMEMBER WRITING THAT IN YOUR REPORT?

A.    YES.

Q.    DID YOU WANT TO INTERVIEW, VIRTUALLY,  I DON'T KNOW IF YOU NEEDED TO INTERVIEW ALL OF THEM,  JUST, RANDOMLY, A DOZEN PEOPLE THAT MR. FULKS CAME INTO CONTACT WITH, FROM THE TIME HE ESCAPED ON NOVEMBER 4TH, 2002, UNTIL THE TIME HE WAS APPREHENDED ON NOVEMBER 20TH,  DID YOU WANT TO RANDOMLY SELECT MAYBE 12 TO 15 PEOPLE AND ASK THEM IF HIS SPEECH WAS SLOW AND SOMEWHAT SLURRED,  HIS FACE HAD A STARE THAT SEEMED TO REFLECT

**CROSS EXAM OF RUBEN GUR**

**EFFORTS TO UNDERSTAND WHAT WAS GOING ON AROUND HIM,  DID YOU WANT TO DO THAT?**

A.    WELL, I ONLY COMMENTED ON WHAT I SAW.

Q.    THAT IS THE POINT I AM TRYING TO MAKE.  WHEN ONE OF HIS EXPERTS THAT CAME INTO HIS CELL TO INTERVIEW HIM IN PREPARATION TO DO A REPORT TO OFFER OPINIONS IN FRONT OF THE PEOPLE THAT ARE GOING TO DECIDE WHETHER HE LIVES AND DIES, HIS SPEECH WAS SLOW AND SOMEWHAT SLURRED, AND HIS FACE HAD A STARE THAT SEEMED TO REFLECT EFFORTS TO SEEM TO UNDERSTAND WHAT WAS GOING ON AROUND HIM.  THE REALITY, DR. GUR, YOU WOULD BE SURPRISED THAT NOT ONE PERSON THAT WAS AROUND CHAD FULKS, NOT ONE PERSON DURING THIS ENTIRE 17-DAY CRIME SPREE, EVER DESCRIBED CHAD FULKS IN THAT MANNER.  WOULD THAT SURPRISE YOU?

MR. BLUME:  YOUR HONOR, THAT IS A MISSTATEMENT OF THE EVIDENCE.

THE COURT:  I'M SORRY?

MR. BLUME:  MISSTATING THE EVIDENCE.

BY MR. GASSER:

Q.    **PUT IT THIS WAY, ABSENT DRUG AND ALCOHOL INDUCEMENT, BECAUSE YOU SAID HE WASN'T UNDER THE INFLUENCE OF ALCOHOL WHEN YOU SAW HIM.**

A.    WHEN I SAW HIM.  IT WOULD BE SOMEWHAT SURPRISING, BUT NOT ENTIRELY, BECAUSE PEOPLE MAY BE ONE WAY ONE SITUATION AND ANOTHER WAY IN ANOTHER.  WHEN YOU ARE UNDER TREMENDOUS

App. 00969

CROSS EXAM OF RUBEN GUR

EMOTIONAL UPHEAVAL, THEN EVEN PEOPLE WHO SPEAK WITHOUT MUCH INTONATION, THEY CAN BECOME VERY ANIMATED.  IN FACT,  THE PEOPLE WITH FRONTAL BRAIN DAMAGE, THEY VACILATE BETWEEN SOMETIMES SEEMING TOTALLY APATHETIC, AND THEN, ALL OF A SUDDEN, SOMETHING GOES OFF, AND THEY BECOME VIOLENT AND GO INTO OUTBURSTS OF SCREAMING AND VIOLENT BEHAVIOR.

SO, WHAT YOU ARE TELLING ME IS, I SUGGEST THAT HE DOES HAVE PROBLEMS IN REGULATING HIS AFFECT.  IT COULD BE EITHER ABSENT OR BE VERY,  VERY VIOLENT.  AND THAT IS NOT ATYPICAL. NOT BE SURPRISING FOR FRONTAL LOBE DAMAGE.

**Q.   OR, HE COULD BE FAKING.  HE COULD BE PURPOSEFULLY ALTERING HIS SLURRED SPEECH,  STARING AROUND THE ROOM?**

A.   ANY BEHAVIOR CAN BE FAKED.

**Q.   AND YOU SAW HIM.  HE WAS IN A SOMEWHAT SIGNIFICANT ALTERED STATE PHYSICALLY FROM THIS CRIME SCENE, YOU ARE AWARE OF THAT, AREN'T YOU?**

A.   WHEN I SAW HIM, HE HAD A TUBE COMING OUT OF HIS BELLY AND --

**Q.   HE WAS PHYSICALLY DIFFERENT?**

A.   YES.

**Q.   LET ME SHOW YOU WHAT IS MARKED GOVERNMENT'S EXHIBIT 302 AND ASK IF YOU WERE PROVIDED THIS PHOTOGRAPH?**

A.   EXCUSE ME.  IF I APPEAR NERVOUS, A BIG PART OF IT IS I DON'T KNOW IF MY FLIGHT IS THE LAST FLIGHT.  IF I MISS MY PLANE, I HAVE TO GET UP 7:00 O'CLOCK TOMORROW MORNING AND BE

CROSS EXAM OF RUBEN GUR

IN HARRISBURG, PENNSYLVANIA BY AROUND TEN.

MS. JOHNSON:  IF I CAN INTERRUPT.  THERE IS A LATER FLIGHT OUT.

THE WITNESS:  OKAY.  THANK YOU.

BY MR. GASSER:

Q.    WERE YOU PROVIDED WITH THIS PHOTOGRAPH TO SHOW CHAD FULKS AND THE PHYSICAL CONDITION -- PHYSICALLY, MEANING HIS BODY'S PHYSICAL CONDITION THE DAY HE WAS ARRESTED ON NOVEMBER 20TH, 2002, DID YOU EVER SEE THAT PICTURE BEFORE?

A.    NO, I DIDN'T.

Q.    AND, AS A PSYCHOLOGIST, BEFORE YOU INTERVIEWED HIM, GAVE HIM THESE TESTS, DID YOU WANT TO KNOW ALL OF THE DRUGS THAT HE WAS ON THAT SOME OTHER PSYCHIATRIST, PSYCHOLOGIST, WORKING ON BEHALF OF THE DEFENSE TEAM, HAD BEEN PROVIDING HIM? DID YOU WANT TO KNOW THAT?

A.    I ASKED FOR HIS HISTORY OF SUBSTANCE ABUSE.

Q.    THAT IS NOT WHAT I AM TALKING ABOUT.  ARE YOU AWARE THAT, DURING THE PENDENCY OF HIS INCARCERATION, THAT HE HAS BEEN ON MEDICATION?

A.    YES.

Q.    AND SOME OF THE MEDICATION INCLUDES TRANQUILIZING AGENTS?

A.    YES.

Q.    SEDATIVES, OBVIOUSLY, AND SOME SORT OF TRANQUILIZER, YOU WILL APPEAR A LOT MORE CALMER, SAY, IN AN INTERVIEW ROOM

**CROSS EXAM OF RUBEN GUR**

OR IN A COURTROOM THAN YOU WOULD IF YOU WERE NOT ON A TRANQUILIZER OR SEDATIVE?

A.    YES.

Q.    WHAT IMPACT DID YOU TAKE TO DETERMINE WHAT LEVELS OF SEDATION OR TRANQUILIZERS HE MAY OR MAY NOT HAVE BEEN ON? WERE YOU CONCERNED ABOUT THAT WHEN YOU WERE INTERVIEWING HIM OR DURING THIS NEUROLOGICAL TESTING?

A.    I WAS CONCERNED.  I WANTED TO HAVE THIS INFORMATION. SURPRISINGLY, TRANQUILIZERS DON'T HAVE MUCH IMPACT, POSITIVE OR NEGATIVE, ON THE NEUROPSYCHOLOGICAL PERFORMANCE.  SO,  IF YOU GIVE -- LET ME EXPLAIN THAT.  IF YOU GIVE THE SAME TEST TO THE SAME INDIVIDUAL TWICE,  ONCE WHEN THEY ARE MEDICATED, ONCE WHEN THEY ARE UNMEDICATED,  YOU MAY SEE SOME CHANGES IN ONE TEST SCORE OR THE OTHER.  BUT ONE OF THE FINDINGS THAT WAS QUITE SURPRISING WHEN IT SHOWED UP 15 YEARS AGO WAS THAT THOSE AFFECTS ARE VERY SMALL.  AND, REALLY, THE PROFILE IS NOT SUBSTANTIALLY AFFECTED BY THE PRESENCE OF MEDICATION ON BOARD.

WE STUDIED PATIENTS WITH SCHIZOPHRENIA WHERE WE ADMINISTERED A BATTERY OF TEST.  THEY WERE HALLUCINATING, THEY WERE ACUTELY ILL, AND THEN WE TREATED THEM AND TESTED THEM AGAIN, AND I WOULD CHALLENGE ANYBODY TO SEE THERE IS ANYTHING ABNORMAL ABOUT THEM.  SO, THE SYMPTOMS IMPROVED VERY DRAMATICALLY.  THE NEUROCOGNITIVE PERFORMANCE,  THIS PROFILE IS VERY BOTCHED.

Q.    OKAY.  I WILL TALK ABOUT THREE OTHER AREAS, JUST SO,

**CROSS EXAM OF RUBEN GUR**

**YOU KNOW, THE JURY KNOWS I WILL GO TO THE END AS QUICK AS POSSIBLE.  I KNOW THIS HAS BEEN LONG.  I WANT TO TALK ABOUT THIS SOLE ISSUE OF POTENTIAL FETAL ALCOHOL SYNDROME.  I WANT TO GO INTO THE 1998 REPORT AND THEN A FEW OTHER QUESTIONS ABOUT YOUR REPORT, OKAY?  SO, THREE SUBJECT MATTERS.**

**YOU ARE NOT SAYING THAT MR. FULKS -- YOU HAVE NOT DIAGNOSED MR. FULKS WITH FETAL ALCOHOL SYNDROME.  YOU ARE SAYING THAT, WHAT YOU ARE SEEING ON THE BRAIN SCAN OR IMAGING, IS CONSISTENT WITH FETAL ALCOHOL SYNDROME?**

A.    YES.

**Q.    WERE YOU PROVIDED WITH ANY MEDICAL REPORTS AND HOSPITAL REPORTS FROM WHEN CHAD FULKS WAS BORN IN MAY OF 1977?**

A.    I WAS PROVIDED WITH SOME HOSPITAL RECORDS.

**Q.    DID THEY INDICATE THAT THE DOCTORS AND THE NURSES NOTED THAT THE MOTHER WAS DRUNK, I MEAN, IS THAT IN THERE?**

A.    I BELIEVE THAT IS WHERE I SAW THAT.  THERE WERE SEVERAL SOURCES INCLUDING -- A LOT OF TIMES I KNOW SOMETHING AND YOU ASK ME WHERE DID I LEARN IT.  I HAVE A HARD TIME REMEMBERING.  I BELIEVE THERE WERE OTHER INDICATIONS THAT SHE WAS DRUNK WHEN SHE DELIVERED HIM.

**Q.    WOULD IT BE FAIR TO SAY, THAT THERE ARE NO REPORTS OF ANY DOCTOR'S OFFICE WHERE MR. FULKS WAS BORN INDICATING THAT THE MOTHER, NO BLOOD REPORTS, NOTHING TO SHOW THE MOTHER WAS DRUNK OR INTOXICATED, AT THE TIME MR. FULKS WAS BORN?**

A.    I AM NOT SURE EXACTLY WHERE THE SOURCE OF THAT

CROSS EXAM OF RUBEN GUR

INFORMATION WAS.  BUT I RECALL MAYBE ONE OF THE -- I CAN CHECK, BUT I RECALL -- WHAT I DO WITH IS WITH A PIECE OF INFORMATION, I REMEMBER THE PIECE, AND I REMEMBER WHETHER I BELIEVED THE SOURCE OF IT.  AND IF I BELIEVE THE SOURCE OF IT, I PUT IT IN ONE CORNER OF MY MIND; IF I DON'T BELIEVE THE SOURCE OF IT, I PUT IT IN ANOTHER CORNER.  AND THAT PIECE OF INFORMATION THAT HIS MOTHER WAS USING ALCOHOL HEAVILY, WAS DRUNK WHEN SHE GOT THERE, I CAN'T QUOTE YOU THE SOURCE RIGHT NOW, BUT I REMEMBER CHECKING IT OFF AS THAT SOUNDS LIKE A PROBLEM.

**Q.   WAS IT HIS MOTHER?**

A.   NO, I DID NOT TALK TO HIS MOTHER.

**Q.   DID YOU --**

A.   I MAY HAVE READ SOME MATERIAL FROM --

**Q.   DID YOU ASK ANYBODY?  MS. THOMPSON? ANYBODY TALK TO MS. THOMPSON?  SHE HAS BEEN TALKED TO BY ALL PARTIES INVOLVED IN THIS.  DID YOU TALK TO HER?**

A.   I DID NOT TALK TO HER.

**Q.   SO,  YOU DIDN'T ASK THE MOTHER, WHO GAVE BIRTH TO CHAD FULKS, IF SHE WAS DRUNK OR HEAVILY USING DRUGS AT THE TIME OF CHAD'S BIRTH?**

A.   NO.

**Q.   THAT IS NOT SOMETHING YOU WOULD WANT TO KNOW BEFORE DIAGNOSING FETAL ALCOHOL SYNDROME?**

A.   IF I HAD DOUBTS, I MIGHT HAVE WANTED TO CHECK THEM.

CROSS EXAM OF RUBEN GUR

AS I REMEMBER, I CLASSIFIED THE SOURCE AS BEING RELIABLE.  I AM SORRY, I CAN'T PINPOINT WHAT THE SOURCE WAS.

**Q.    WHAT YOU ARE DESCRIBING IN THESE BRAIN SCANS IS ALSO CONSISTENT,  IS IT NOT, WITH THE FACT THAT CHAD FULKS, HIMSELF, PERSONALLY, HIS OWN CHOICE, ABUSED ALCOHOL AND MULTIPLE DRUGS DURING HIS ADULT LIFE,  CORRECT?**

A.    A LOT OF WHAT WE SEE LOOKS LIKE IT MAY HAVE BEEN EXACERBATED BY SUBSTANCE ABUSE.  I WOULDN'T CARE TO COMMENT ON WHETHER SUBSTANCE ABUSE IS BEHAVIOR OF CHOICE.  THERE IS A LOT OF CONTROVERSY ON THAT ISSUE IN THE FIELD.  IT IS, FOR EXAMPLE,  HIGHLY GENETIC,  IT RUNS IN FAMILIES.  AND IT HAPPENS EVEN WHEN CHILDREN ARE ADOPTED AWAY.  IF THEIR PARENTS WERE DRUG ADDICTS, THEY CAN GROW UP IN A VERY NICE ENVIRONMENT.  AND THEN, ALL OF THE NICE ADOPTING PARENTS DON'T UNDERSTAND WHY THEIR KID IS ADDICTED.

**Q.    DO YOU HAVE A COPY OF THE 1998 REPORT THAT YOU REFERENCED AT THE END OF YOUR DIRECT EXAMINATION?**

A.    I'M SORRY,  I DON'T.

**Q.    WHEN WAS IT THAT YOU BECAME AWARE THAT THIS REPORT EXISTED?**

A.    I THINK IT WAS -- MAYBE I HEARD SOME ALLUSION TO IT, BUT THE FIRST TIME I SAW IT WAS YESTERDAY.

**Q.    YESTERDAY?**

A.    (WITNESS NODS HEAD AFFIRMATIVELY.)

**Q.    WELL,  LET ME ASK YOU THIS.   SOMEBODY THAT IS A**

**CROSS EXAM OF RUBEN GUR**

**TEACHER AT THE ESTEEMED UNIVERSITY OF PENNSYLVANIA,  DO YOU TEACH YOUR STUDENTS TO BE OBJECTIVE,  DR. GUR?**

A.    YES.

**Q.    SIMPLE QUESTION.**

A.    YES,  SURE.

**Q.    AND WHEN YOU ARE BROUGHT IN FOR CONSULTATION,  DO YOU BELIEVE THAT YOU ARE OBJECTIVE COMING INTO THE MATTER?**

A.    YES.

**Q.    AND DO YOU EXPECT THE PEOPLE THAT HIRE YOU TO EXPECT YOU TO BE OBJECTIVE?**

A.    YES.

Q.    AND AS AN OBJECTIVE DOCTOR PH.D., AND AN OBJECTIVE PSYCHOLOGIST,  ISN'T ONE OF THE MOST CRITICAL PIECES OF INFORMATION THAT YOU WOULD WANT TO HAVE BEFORE EVEN STARTING ANY TYPE OF INTERVIEW WITH A PATIENT, OR ANY TYPE OF TESTING, IS ALL OTHER REPORTS OF COLLEAGUES IN THE AREA OF MENTAL HEALTH?

        MR. BLUME:  YOUR HONOR,  CAN WE APPROACH ON THIS?

(WHEREUPON, A BENCH CONFERENCE WAS HELD.)

        MR. BLUME:  I THINK I OBJECT TO THIS.   I THINK THIS IS UNFAIR.   IT WAS AN OUTSTANDING MOTION.

        THE COURT:   WHAT?

        MR. BLUME:  IT WAS AN OUTSTANDING MOTION IN LIMINE PENDING.

        MR. GASSER:  THAT IS NOT THE QUESTION.  THAT IS NOT

CROSS EXAM OF RUBEN GUR

THE QUESTION, WHETHER IT IS ADMISSIBLE OR NOT ADMISSIBLE.

WHAT HE WAS SAYING IS, WHETHER THE MALINGERING WAS ADMISSIBLE,

NOT WHETHER THE REPORT AND EVERYTHING ELSE WOULD BE

ADMISSIBLE.

THE COURT:  I THINK IT IS A FAIR QUESTION.  THE

WITNESS HAS TO FORM HIS OPINION BASED ON PROFESSIONAL

EXPERTISE.

MR. GASSER:  NO QUESTION ABOUT IT.

MR. BLUME:  SO,  IF YOU GRANTED THE MOTION IN LIMINE,

HE STILL COULD HAVE DONE THIS.

MR. GASSER:  THE MOTION IN LIMINE WAS NOT TO GET IN

THE OPINION IT WAS MALINGERING.  THE MOTION IN LIMINE -- I CAN

STILL ASK HIM IF HE REVIEWED ALL THE TESTING IN 1998.

THE COURT:  ALL RIGHT.  OVERRULE THE OBJECTION.

(WHEREUPON, THE BENCH CONFERENCE CONCLUDED.)

BY MR. GASSER:

**Q.   AS AN OBJECTIVE PH.D. DOCTOR,  TEACHER,  ISN'T SOMEBODY IN THE FIELD THAT YOU ARE,  BEFORE MEETING WITH AND TESTING A PATIENT TO DETERMINE THEIR CREDIBILITY,  YOU WOULD WANT TO KNOW IF OTHER COLLEAGUES,  OTHER MENTAL HEALTH EXPERTS,  OTHER PSYCHOLOGISTS HAVE HAD AN OPPORTUNITY TO PROVIDE TESTING TO THAT PARTICULAR PATIENT, AND THE OPPORTUNITY TO OBSERVE THAT PARTICULAR PATIENT, AND THE OPPORTUNITY TO RENDER OPINIONS TO THAT PARTICULAR PATIENT JUST SO YOU WOULD HAVE THAT INFORMATION, IS THAT A FAIR STATEMENT,  SIR?**

**CROSS EXAM OF RUBEN GUR**

A.    YES.

Q.    **YOU ARE TELLING THIS JURY THAT THERE WAS A -- YOU RECEIVED FROM A FEDERAL MEDICAL CENTER IN LEXINGTON, KENTUCKY** A FORENSIC REPORT BY A FORENSIC PSYCHOLOGIST THAT HAD AN OPPORTUNITY,  HIM AND HIS TEAM, TO EVALUATE MR. FULKS FOR A PERIOD OF 43 DAYS IN 1998, AND YOU NEVER GOT THE REPORT UNTIL YESTERDAY?

A.    YEAH.

Q.    **BUT YOU HEARD OF THE REPORT?**

A.    I HEARD THAT THERE WAS SOME REPORT.  I WAS TOLD IT WASN'T A NEUROPSYCHOLOGICAL TESTING.  I ASKED TO LOOK AT PREVIOUS NEUROPSYCHOLOGICAL TESTING.  I DIDN'T THINK IT WAS EXTENSIVE ENOUGH TESTING, AND IT WAS A WHILE BACK.  SO,  I DIDN'T THINK IT WAS ALL THAT RELEVANT, SO I DIDN'T FEEL PRESSED TO GET IT.  I WAS VERY HAPPY WITH THE VERY COMPREHENSIVE TESTING THAT WAS DONE MORE RECENTLY.  I GOT SOME SUMMARY OF SCHOOL PERFORMANCE,  THOSE KINDS OF THINGS.

YOU ARE RIGHT.  MAYBE I SHOULD HAVE DEMANDED EVERYTHING, BUT, FRANKLY, I FIGURED THE TESTING OF HIM NOW, WE HAVE ALL OF THE STUDIES ON HIM.  I HAVE VERY COMPREHENSIVE MEASURES.  I WAS MORE CONCERNED WITH HIS CURRENT INTELLECTUAL AND COGNITIVE ABILITIES.  SO, EVEN THOUGH I JUST SAW IT RECENTLY,  THE REPORT IS REALLY NOT ALL THAT RELEVANT TO ANYTHING THAT I WAS CONCLUDING.

Q.    **DR. GUR,  YOU ARE TELLING THIS JURY, THIS REPORT IN**

**CROSS EXAM OF RUBEN GUR**

**1998, DIDN'T CORROBORATE AND, BASICALLY, COME TO THE SAME CONCLUSIONS THAT YOU CAME TO HERE SIX YEARS LATER? ISN'T IT TRUE THAT IF THIS REPORT CAME WITH SOME OF THE SAME CONCLUSIONS THAT YOU CAME TO, YOU WOULD HAVE TALKED ABOUT THIS REPORT UP AND DOWN THIS MORNING AND ALL INTO THIS AFTERNOON, WOULDN'T YOU, SIR?**

A.   I WOULDN'T.  FIRST OF ALL, IT DOESN'T MEASURE THE SAME THINGS THAT I MEASURED IN THAT IT GIVES A PERSONALITY INVENTORY AND MALINGERING TESTS.  MALINGERING ARE RELEVANT TO NOW.  I MEAN, THE FACT THAT HE MALINGERED SIX YEARS AGO, WHENEVER, IS REALLY NOT RELEVANT.  MALINGERING, AS THE REPORT, ITSELF, INDICATES, IT IS NOT A MENTAL CONDITION THAT YOU NEED TO DIAGNOSE.  IT IS SOMETHING THAT MAY INTERRUPT WITH SOMETHING YOU ARE DOING RIGHT NOW.  WHAT YOU WANT TO KNOW IS, WHETHER THEY ARE MALINGERING ON THE TEST YOU ARE GIVING NOW.

**Q.   DR. GUR, YOU SAID THE REPORT IS SIX YEARS OLD.  SO, MR. FULKS WAS 21-YEARS-OLD.  AND SO, YOU MENTION THE FACT THAT THERE WAS SOME AGE TO THE REPORT.  THAT IS WHAT YOU TOLD THE JURY JUST A FEW MINUTES AGO, CORRECT?**

A.   DO WHAT?

**Q.   THE REPORT WAS SIX YEARS OLD, AND YOU PUT LESS SIGNIFICANCE ON THE INFORMATION CONTAINED IN IT BECAUSE IT IS SIX YEARS OLD?**

A.   WITH REGARD TO THE SPECIFIC ISSUE OF MALINGERING.

**Q.   YET -- SO, JUST ISOLATED TO THAT ISSUE?**

**CROSS EXAM OF RUBEN GUR**

A.    YES.

Q.    ALL INFORMATION ABOUT MR. FULKS WHEN HE WAS IN UTERO, WHEN HE WAS IN GRADE SCHOOL,  WHEN HE WAS AN ADOLESCENT, ALL INTO HIS ADULT YEARS, YOU WANT TO GET AHOLD OF ALL OF THAT INFORMATION?

A.    IF I HAD ALL OF THE TIME IN THE WORLD, I WOULD HAVE DONE IT.

Q.    THERE IS A REPORT OUT THERE BY A BOP MENTAL HEALTH TEAM IN 1998, AND YOU DIDN'T SEE IT.  YOU HEARD ABOUT IT, BUT YOU DIDN'T ASK TO SEE IT?

A.    I HEARD.  I ASKED TO SEE IT, AND I SAW IT YESTERDAY. I UNDERSTOOD FROM THE DISCUSSION THAT IT -- HE DID NOT HAVE NEUROPSYCHOLOGICAL TESTS.   AND WHEN I SAW IT YESTERDAY, I AGREED, THERE WERE NO PSYCHOLOGICAL TESTS IN THERE.

Q.    IT DESCRIBES, IN DETAIL, THE MANIPULATIVE BEHAVIOR AND DECEIT OF MR. FULKS DURING THIS 43-DAY PERIOD?

A.    IT DESCRIBES THE IMPRESSION OF THE PERSON THAT WROTE IT THAT, FRANKLY, I THINK HE PROBABLY WAS A LITTLE BIT TAINTED, BECAUSE HE GOT THE POSITIVE FINDING ON THE MALINGERING THAT SO TAINTED HIS WHOLE INTERPRETATION.  IT WOULD HAVE TAINTED MINE. IT IS LIKE CRYING WOLF.  IF YOU KNOW SOMEBODY IS MALINGERING, EVEN IF YOU KNOW, I HAVE HAD CASES OF PEOPLE THAT I KNEW HAD REAL BRAIN DAMAGE, WHEN THEY MALINGERED, YOU CAN'T TELL WHAT IS REAL AND WHAT IS NOT REAL.   THAT IS WHY YOU WANT TO KNOW IF THEY ARE MALINGERING RIGHT NOW WHEN YOU ARE TESTING THEM.

CROSS EXAM OF RUBEN GUR

Q.    DR. ANDREW SIMCOX IS A PH.D. IN FORENSIC -- PH.D. IN FORENSIC PSYCHOLOGY.   HE AND HIS TEAM OF OTHER PSYCHOLOGISTS AND SOCIAL WORKERS SPENT 43 DAYS EVALUATING MR. FULKS'S CONDUCT, AND EVALUATING TESTS AND MRI'S, AND ALL THAT SORT OF STUFF.   AND IT WASN'T JUST ONE PERSON'S OPINION, AS YOU WELL KNOW, THIS METHODOLOGY, IT WAS EVERYBODY'S OPINION GOING INTO THIS REPORT AFTER HAVING AN OPPORTUNITY TO LOOK AT ALL OF THE MATERIAL; ISN'T THAT TRUE?

A.    NOTHING ABOUT MRI.

Q.    WELL, THERE IS NOTHING ABOUT -- I AM SORRY, NOT MRI. THEY TRIED TO DO A TEST,  I BELIEVE, AS PART OF HIS MEDICAL EVALUATION, HE WAS ADMINISTERED AN EEG DURING THE PROCEDURE. MR. FULKS CONTINUOUSLY MOVED.   HE WAS INSTRUCTED BY MEDICAL STAFF OF THE IMPORTANCE OF KEEPING STILL IN ORDER FOR THE TEST RESULTS TO BE ACCURATE.  HE RESPONDED HIS MOVEMENTS WERE INVOLUNTARY.   MR. FULKS DID NOT EXHIBIT THE SAME TYPE OF BODY MOVEMENTS AT TIMES WHEN HE WAS UNAWARE THAT STAFF WAS WATCHING HIM.   DOESN'T THAT FALL INTO WHAT YOU TOLD THE JURY AT THE END OF YOUR DIRECT EXAMINATION,  A PATIENT DOESN'T WANT TO COOPERATE, ALL HE HAS TO DO IS MOVE AROUND WHEN YOU DO SOME OF THIS TESTING?

A.    YES.   YES.   HE SEEMS TO HAVE BEEN, CLEARLY, MALINGERING IN 1998.

Q.    AND LET'S GET IT CLEAR, SO THE JURY UNDERSTANDS.   THIS WAS A 43-DAY STAY AT A FEDERAL MEDICAL FACILITY IN KENTUCKY.

**CROSS EXAM OF RUBEN GUR**

**AND MR. FULKS WAS CHARGED WITH THE MOST HEINOUS CRIME OF INTERSTATE TRANSPORTATION OF A STOLEN MOTOR VEHICLE, CORRECT?**

A. WITH THE MOST HEINOUS?

**Q. THE MOST HEINOUS CRIME OF STEALING A CAR AND DRIVING IT ACROSS LINES?**

A. YOU THREW ME OFF THERE A MOMENT. YES. NO, I WAS -- I UNDERSTAND THAT. AND, OBVIOUSLY, HE WASN'T VERY SUCCESSFUL. HE WAS PICKED UP RIGHT AWAY AS MALINGERING.

**Q. SO, MR. FULKS SPENDS 43 DAYS IN A FACILITY. AND HE DECEIVES AND MANIPULATES THE PEOPLE IN THAT FACILITY, FAKES BAD BOTH MENTALLY, PHYSICALLY TESTING-WISE WHEN HE IS UNDER THE CHARGE OF STEALING A CAR. AND, IT IS YOUR OPINION, AS YOU ALREADY STATED, THAT WHEN THE DEATH PENALTY IS ON THE TABLE, YOU DON'T GET ANY MORE SERIOUS THAN THAT. AND IT IS MORE LIKELY SOMEBODY WOULD MALINGER OR FAKE BAD WHEN SOMEBODY IS FACING DEATH THAN FACING, SAY, A PROPERTY CRIME, DO YOU AGREE WITH THAT?**

A. WHAT ARE YOU ASKING?

**Q. THAT IT IS MORE LIKELY THAT SOMEBODY WOULD FAKE BAD --**

A. SURE.

**Q. -- WHEN THEY ARE FACING THE DEATH PENALTY THAN THEY WOULD WHEN THEY ARE FACING A PROPERTY CRIME?**

A. THAT'S RIGHT.

**Q. LET ME USE, SO I AM EXACT, ONE OF THE RESULTS THAT YOU WERE PRETTY EMPHATIC ABOUT. AND YOU HAVE HAD AN OPPORTUNITY**

**CROSS EXAM OF RUBEN GUR**

TO REVIEW THIS REPORT.  YOU SAID YOU LOOKED AT IT YESTERDAY. IT IS A PRETTY THOROUGH NINE-PAGE REPORT.  IT IS NINE PAGES. YOU WOULDN'T DISPUTE THAT,  WOULD YOU, SIR?

A.    YEAH, NINE PAGES.

Q.    AND IN THIS REPORT, YOU KNOW, BECAUSE YOU HAVE REVIEWED IT, AT LEAST YOU REVIEWED IT YESTERDAY,  THAT THE CONCLUSIONS THAT I AM DISCUSSING WERE MADE BY THE STAFF AS FAR AS HE WAS MALINGERING, AND HE WAS FAKING BAD AND THAT WE WAS MANIPULATIVE, THAT WAS WHAT THE STAFF'S CONCLUSIONS WERE AND THE FORENSIC PSYCHOLOGISTS CONCLUSIONS WERE,  CORRECT?

A.    YES.

Q.    DO YOU EVEN KNOW, AS A RESULT, A JUDGE FOUND HIM COMPETENT TO STAND TRIAL.  HE PLED GUILTY TO THESE CHARGES IN FEDERAL COURT.  DID YOU KNOW THAT?

A.    I DID NOT.

Q.    YOU DON'T DISPUTE MY WORD ON THAT?

A.    NO.  I PUT IT IN THAT CORNER OF RELIABLE SOURCES.

Q.    I APPRECIATE THAT.

YOU MENTIONED SOMETHING AT THE END OF YOUR DIRECT EXAMINATION.  YOU SAID YOU HAD A VERY STRONG OPINION DURING THE TESTING THAT YOU GAVE MR. FULKS THAT WHATEVER -- WITH REGARD TO HIS BRAIN,  HIS ABILITY TO ABSORB INFORMATION, FOR LACK OF A BETTER PHRASE,  WHATEVER COMES IN, STAYS THERE.  IF HE LEARNS SOMETHING,  HE WILL REMEMBER IT.  DO YOU RECALL TESTIFYING IN THAT REGARD,  SIR?

**CROSS EXAM OF RUBEN GUR**

A.    THAT IS WHAT THE DATA SUGGESTS.

**Q.    SO, IN 1998,  MR. FULKS TRIED TO FAKE BAD,  LEARNED THAT STAFF MEMBERS WERE WATCHING HIM WHEN HE DIDN'T KNOW THAT THEY WERE WATCHING HIM,  LEARNED THE TESTS HE WOULD BE GIVEN, AND THE QUESTIONS THAT PSYCHOLOGISTS AND SOCIAL WORKERS WOULD BE PROVIDED, AND EVEN, IN YOUR OWN WORDS, HE IS THE TYPE OF PERSON THAT, WHATEVER COMES IN, STAYS THERE.  AND WHEN HE LEARNS SOMETHING, HE WILL REMEMBER IT.   ISN'T IT FAIR,  A FAIR STATEMENT,  A FAIR CONCLUSION,  DOCTOR,  THAT MR. FULKS KNEW EXACTLY WHAT YOU AND YOUR FELLOW COLLEAGUES WERE GOING TO DO WITH REGARDS TO TESTING AND INTERVIEWS BECAUSE HE WENT THROUGH THE SAME PROCESS IN 1998?  ISN'T THAT A FAIR CONCLUSION TO MAKE?**

A.    NOT ENTIRELY BECAUSE THE TEST THAT HE GOT MORE RECENTLY ARE TESTS THAT WEREN'T AVAILABLE AT THE TIME.

**Q.    DESPITE THAT FACT --**

A.    THESE ARE THE MALINGERING TESTS.

**Q.    WHICH ARE NOT CONCLUSIVE.   IT IS IMPOSSIBLE TO DETERMINE WHETHER OR NOT SOMEBODY IS TELLING THE TRUTH OR FAKING BAD OR NOT.   IT IS IMPOSSIBLE?**

A.    I GUESS,  YEAH -- NO --  YEAH.  I AM THINKING ABOUT POLYGRAPHY.  AND THERE ARE SOME USE OR FUNCTION TO LOOK AT THAT.   YOU ARE RIGHT.  IF SOMEBODY WANTS TO FAKE BAD, THEY CAN FAKE BAD.   BUT IT IS VERY DIFFICULT TO FAKE BAD AND NOT BE CAPTURED BY ONE OF THOSE NEW MALINGERING TESTS.   AND THEY

USE SOME OLD MALINGERING TESTS THAT CAUGHT HIM.  AND I WOULD BE VERY SURPRISED IF HE WOULD BE ABLE TO PERFORM IN A WAY THAT WOULDN'T BE CAPTURED ON THE NEWER MALINGERING TESTS THAT ARE MUCH STRONGER, MUCH BETTER CONSTRUCTED.

**Q.    JUST A FEW MORE QUESTIONS IN THIS REPORT AND I WILL MOVE ON TO MY LAST MATTER.  YOU NOTICE IN THIS REPORT, THIS FORENSIC PSYCHOLOGIST DIDN'T JUST RELY ON AN INTERVIEW WITH MR. FULKS OR TESTING.  HE ACTUALLY WENT OUT AND WANTED TO INTERVIEW PEOPLE, HIMSELF, THAT HAD INFORMATION ABOUT MR. FULKS'S LIFE, HIS UPBRINGING, HIS PERSONALITY, AND THE CIRCUMSTANCES SURROUNDING THE CRIME FOR WHICH HE WAS CHARGED. DID YOU NOTICE THAT?**

A.    YEAH.  IN THE VERSION I SAW, THE NAMES WERE TAKEN OUT.

**Q.    ROBERT LEE AND NELLIE LEE, WHO THE JURY WILL HEAR FROM LATER ON IN THE WEEK; AMBER FOWLER, WHO THE JURY WILL HEAR FROM; HIS MOTHER, DIAN THOMPSON.  THIS FORENSIC PSYCHOLOGIST DIDN'T WANT TO RELY ON AN INTERVIEW WITH THE SUSPECT AND TESTING AND WHATEVER KIND OF -- WHEN I SAY "TESTING," BOTH COGNITIVE TESTING AND MEDICAL TESTING, BUT HE WANTED TO, ACTUALLY, INTERVIEW PEOPLE THAT KNEW CHAD FULKS OR KNEW SOMETHING ABOUT THE CRIME.  IS THAT SOMETHING THAT YOU DO IN OTHER EVALUATIONS, SIR?**

A.    FRANKLY, I, USUALLY, WHEN SOMEBODY COMES TO ME AND WANTS TO RETAIN ME TO TESTIFY, I TRY TO MAKE SURE THAT THEY ALSO RETAIN A REGULAR CLINICAL NEUROPSYCHOLOGIST LIKE DR. VENN

AND DR. EVANS.  AND I JUST CAN'T AFFORD TO DO THE THOROUGH EVALUATION MYSELF OF FAMILY MEMBERS AND SO ON.  BUT I EMPHASIZE AND CONSULT TO THE PERSON RETAINING ME THAT THEY SHOULD GET SOMEBODY LIKE THAT.  AND GET THE VERY THOROUGH INFORMATION.  AND, UNFORTUNATELY, I HAVE TO RELY ON OTHER PEOPLE TO RELAY TO ME.  I AGREE THAT IT WOULD HAVE BEEN -- I WOULD HAVE BEEN HAPPIER IF I COULD TALK TO ALL OF THOSE PEOPLE,  BUT I DON'T USUALLY DO THAT.

**Q.    THIS REPORT INDICATED, ACCORDING TO THE PEOPLE ON THIS TEAM, MR. FULKS WAS VIEWED AS EXTREMELY VAGUE AND UNRELIABLE AS FAR AS HIS HISTORY.  DID YOU CONSIDER HIM TO BE EXTREMELY VAGUE AND UNRELIABLE, OR WAS HE COOPERATIVE WITH YOU?**

A.    HE WAS COOPERATIVE WITH ME.  FROM WHAT I COULD TELL, HE WAS MAKING EVERY EFFORT TO GIVE ME THE INFORMATION I ASKED FOR.

**Q.    YOU NOTED IN THIS REPORT, YOU MAY HAVE NOTED, I GUESS, PROBABLY, IN YOUR INTERVIEW WITH HIM,  IN A JUVENILE FACILITY, HE GOT HIS HIGH SCHOOL EQUIVALENCY,  GED; EARNED A CERTIFICATE AS A WELDER. SO, HE HAD A TRADE. DID HE TELL YOU THAT,  AS WELL?**

A.    YES.

**Q.    JUST TO BE SPECIFIC, SINCE YOU INDICATED YOU HAD AN OPPORTUNITY TO REVIEW THIS REPORT, BUT YOUR TESTIMONY IS THIS REPORT DOESN'T CHANGE YOUR FINDINGS THAT YOU DESCRIBED TO THE JURY; IS THAT TRUE,  SIR?**

**CROSS EXAM OF RUBEN GUR**

A.    THAT IS TRUE,  YES.

Q.    SO, THE FACT THAT, WHEN YOU READ IN THE REPORT THAT MR. FULKS ALSO PRESENTED WITH VARIOUS ODD MANNERISMS, SUCH AS DRAMATIC EYE BLINKING,  HEAD WITCHING,  HAND RUBBING, ROCKING BACK AND FORTH WHEN INTERVIEWED, HE CLAIMED TO HAVE BEEN TREATED FOR PSYCHIATRIC PROBLEMS IN THE PAST.  COULD NOT RECALL WHEN,  WHERE,  WHAT HIS DIAGNOSIS WAS, OR WHAT TYPE OF TREATMENT HE RECEIVED.  WHEN ASKED IF HE HEARD VOICES OR EXPERIENCED VISUAL HALLUCINATIONS, MR. FULKS, INITIALLY, SAID HE DID NOT.  LATER, HE SAID HE RECEIVED MESSAGES FROM THE TELEVISION.  HE THEN REPORTED HE WAS HEARING THE VOICES OF HIS DECEASED UNCLE AND SON CALLING HIM STUPID,  WHICH HE REPORTED KEPT HIM AWAKE AT NIGHT.

I KNOW YOU READ THAT IN THE REPORT.  BUT I GUESS HE DIDN'T SAY ANY OF THAT STUFF TO YOU, HEARING VOICES IN THE TELEVISION.  THAT WOULD HAVE BEEN IN YOUR REPORT, WOULD IT NOT?

A.    YES.  I ASKED HIM ABOUT HALLUCINATIONS.

Q.    AND ONE OF THE REASONS THEY KNEW HE WAS MALINGERING WAS BECAUSE THEY HAD STAFF MEMBERS, DURING THIS TIME PERIOD WHEN HE WASN'T BEING TESTED OR INTERVIEWED, TO MONITOR HIM, AND THROUGHOUT THE ENTIRE 43 DAYS, HE HAD ABSOLUTELY NORMAL INTERACTION WITH ALL OF THE OTHER INMATES OR PATIENTS AT THAT FACILITY; ISN'T THAT TRUE?

A.    THAT IS TRUE.

CROSS EXAM OF RUBEN GUR

**Q.    NEVER DISPLAYED ANY OF THE HEAD TWITCHING, AND HAND RINGING, AND ALL OF THE STUFF THAT IS DESCRIBED IN THE REPORT WHEN HE WASN'T IN A CONTROLLED ENVIRONMENT WITH ONE OF THE EVALUATORS; ISN'T THAT TRUE,  SIR?**

A.    YES.

**Q.    I BELIEVE YOU EVEN MENTIONED SOMETHING ABOUT THE HAND TWITCHING IN YOUR REPORT?**

A.    NO,  I AM TALKING ABOUT SOMETHING ELSE.   I AM TALKING ABOUT A SLIGHT TREMOR THAT DOESN'T -- IS NOT PRESENT ALL THE TIME.   PRESENT, ESPECIALLY, WHEN HE IS WORKING WITH THE OTHER HAND.   SO, AND THAT IS A SIGN.   IF HE LEARNS SOMEWHERE ABOUT THAT SIGN, I AM IMPRESSED.

**Q.    THEY ALSO NOTED IN THEIR REPORT, AS YOU NOTED IN YOUR REPORT, THAT HIS SPEECH WAS DIFFERENT WHEN HE WAS BEING INTERVIEWED BY CLINICIANS AS OPPOSED TO WHEN HE WAS INTERMINGLING WITH OTHER PATIENTS AND STAFF MEMBERS,  DID THEY NOT?**

A.    YES,  I NOTICED THAT WAS NOTED.

**Q.    MALINGERING IS NOT A MENTAL ILLNESS,  DO YOU AGREE?**

A.    YES.

**Q.    INTENTIONAL PRODUCTION OF FALSE OR GROSSLY EXAGGERATED PHYSICAL OR PSYCHOLOGICAL SYMPTOMS MOTIVATED BY OBVIOUS EXTERNAL INCENTIVES, SUCH AS AVOIDING --**

A.    YOU ARE REPORTING FROM THE DIAGNOSTIC STATISTICAL MANUAL.

CROSS EXAM OF RUBEN GUR

Q.    DSM-IV?

A.    YES.

Q.    AND YOU WOULD ALSO AGREE WITH ME THAT ANTISOCIAL PERSONALITY DISORDER IS NOT A MENTAL ILLNESS?

A.    WE CAN SPEND AN HOUR ON THAT ONE, I'M AFRAID.  BUT I THINK -- IT IS NOT ONE THAT I CLASSIFY WITH THE SEVERE FORMS OF MENTAL ILLNESS OF THE KIND THAT WOULD QUALIFY AS AN AXIS-I DSM DIAGNOSIS.

Q.    DOES THE DSM-IV DEFINE ANTISOCIAL PERSONALITY DISORDER AS:

"A CLUSTER OF ABHORRENT PERSONALITY

TRAITS CHARACTERIZED BY PERVASIVE

PATTERN OF DISREGARD FOR AND

VIOLATION OF THE RIGHTS OF OTHERS.

THIS PATTERN BEGINS IN EARLY

ADOLESCENCE AND CONTINUES INTO

ADULTHOOD AND IS CHARACTERIZED BY

DECEPTION, IMPULSIVE AND

IRRESPONSIBLE BEHAVIOR, AGGRESSION,

AND LACK OF REMORSE."

IS THAT A FAIR DEFINITION OF ANTI-SOCIAL PERSONALITY DISORDER?

A.    THIS IS, AGAIN, THE DEFINITION OF -- THE CURRENT DEFINITION IN THE DSM-IV.  I BELIEVE THE DSM-V WOULD BE A LITTLE DIFFERENT.  THIS IS WHAT DSM-IV SAYS.

Q.    THE PSYCHOLOGICAL TEAM IN 1998 CLEARLY DIAGNOSED MR. FULKS AS HAVING AN ANTI-SOCIAL PERSONALITY DISORDER,  DID THEY NOT?

A.    THAT IS WHAT THEY DID, YES.

Q.    YOU WOULD AGREE WITH THAT, BASED ON EVEN JUST A REVIEW OF THE REPORT, BASED ON WHAT YOU KNOW ABOUT MR. FULKS, HE CLEARLY HAS ANTISOCIAL PERSONALITY DISORDER?

A.    I BELIEVE IT IS PROBABLY AN AXIS TO AN APPROPRIATE DIAGNOSIS.

Q.    I DON'T KNOW HOW MUCH YOU HAVE SEEN --

A.    BY DEFINITION, HE HAS DONE A LOT OF BAD THINGS.

Q.    THAT IS THE POINT.

A.    THAT IS THE SHORT WAY OF DESCRIBING WHAT IS SAYS HERE.

Q.    FROM THE TIME OF THIS REPORT IN 1998, TO THE TIME THAT YOU SAW HIM,  THIS PATTERN, CHARACTERIZED BY DECEPTION, IMPULSIVE AND IRRESPONSIBLE BEHAVIOR, AGGRESSION, AND LACK OF REMORSE,  I MEAN,  FITS HIM TO A T BASED ON WHAT YOU KNOW; DOES IT NOT?

A.    IT DOES.

Q.    LAST COUPLE OF POINTS.   YOUR REPORT ON THE PART OF INTERPRETATION OF NEUROPSYCHOLOGICAL EVALUATION.   DO YOU SEE THAT SECTION OF YOUR REPORT?  TOWARDS THE END, I BELIEVE?

A.    YES.

Q.    WHERE YOU WRITE ON THE SECOND PARAGRAPH THERE SECOND SENTENCE:

**CROSS EXAM OF RUBEN GUR**

"PROBABLY OF GREATEST RELEVANCE TO

THIS CASE ARE MR. FULKS'S IMPAIRED

ABILITY TO PROCESS EMOTION AND THE

IMPAIRED ABILITY TO UNDERSTAND

EMOTIONAL EXPRESSIONS ON OTHER

PEOPLE'S FACES."

DO YOU SEE THAT?

A.    YES.   UH-HUH (AFFIRMATIVE RESPONSE).

Q.    YOU SAY THAT ONE OF THE GREATEST RELEVANCES OF THIS CASE IS HE HAD AN IMPAIRED ABILITY TO UNDERSTAND THE EMOTIONAL EXPRESSION ON OTHER PEOPLE'S FACES.   YOU EVEN HIGHLIGHT THAT AS SAYING, PROBABLY ONE OF THE GREATEST RELEVANCIES TO THIS CASE IN YOUR REPORT; IS THAT TRUE,  DOCTOR?

A.    YES.

Q.    ARE YOU TELLING THIS JURY THAT, ON NOVEMBER 14TH, 2002, AS CHAD FULKS STRADDLED ALICE DONOVAN AND RAPED HER, AND LOOKED AT HER FACE, HE HAD AN IMPAIRED ABILITY TO UNDERSTAND HER EMOTIONAL EXPRESSION AS HE WAS RAPING HER?  IS THAT WHAT YOU MEAN BY THAT?

A.    YES.

Q.    HE IS ON TOP OF A WOMAN WHO HAD JUST BEEN RAPED.   HE IS AS CLOSE AS A MAN CAN GET TO A WOMAN.   HE IS PENETRATING HER.  AND IT IS YOUR OPINION THAT CHAD FULKS DID NOT UNDERSTAND THE EMOTIONAL EXPRESSION ON ALICE DONOVAN'S FACE?

A.    I THINK IT IS REALLY HARD TO BELIEVE,  BUT BASED ON THE

TESTING, HE JUST DOES NOT INTERPRET EMOTIONAL EXPRESSIONS

NORMALLY.

Q.    LET ME SHOW YOU.   SO, I TAKE IT, BASED ON THAT ANSWER,

**THREE DAYS BEFORE THAT, ON NOVEMBER 11TH OF 2002,  WHEN CHAD**

**FULKS DECKED OUT IN CAMOUFLAGE, INCLUDING THIS TURKEY MASK,**

**PARTICIPATED IN THE CARJACKING AND KIDNAPPING OF A 19-YEAR-OLD**

**COED IN WEST VIRGINIA,  HE HAD AN IMPAIRED ABILITY TO SEE THE**

**ABSOLUTE FEAR OF GOD ON SAMANTHA BURNS'S FACE?  HE WAS**

**IMPAIRED?  HE COULDN'T SEE THAT FEAR?**

A.    WELL,  ACCORDING TO THE TESTING,  HE HAS A VERY

DIFFICULT TIME DETECTING EMOTIONS ON THE FACE AND INTERPRETING

THEM.   NOW,  IT COULD BE, IN HER CASE, WHEN EMOTION IS VERY

EXTREME IT COULD BE  -- YOU KNOW,  WHENEVER WE TEST SOMEONE,

WE TAKE A SAMPLE OF WHAT COULD HAPPEN IN LIFE.   IT COULD BE,

UNDER CERTAIN CONDITIONS, THAT HE DOES -- SOMETHING DOES COME

THROUGH.   IT IS VERY HARD FOR ME TO INTERJECT.   BUT THE TEST

CLEARLY SHOWS THAT HE REALLY HAS A VERY DIFFICULT TIME

UNDERSTANDING EMOTIONS.

Q.    LAST QUESTION OR TWO.   WOULD YOU AGREE WITH ME THAT,

**ABSENT A SEVERE PSYCHOTIC DISORDER MAKING SOMEONE INSANE,**

**WOULD YOU AGREE WITH ME THAT, MOST ADULT MINDS, EVEN THE MIND**

**OF CHAD FULKS, THAT THEY UNDERSTAND THE SIMPLEST THINGS TO GET**

**THROUGH,  TO GET THROUGH THE DAY.   FOR INSTANCE,  WHEN THEY**

**ARE THIRSTY, YOU DRINK.   WHEN YOU ARE HUNGRY,  YOU EAT.**

**WHEN YOU ARE TIRED,  YOU SLEEP.   WHEN YOU ARE COLD,  YOU PUT**

**CROSS EXAM OF RUBEN GUR**

**ON A COAT OR A BLANKET.  WHEN YOU ARE DIRTY,  YOU BATHE.**

**THE BASIC HUMAN FUNCTIONING, YOU WOULD AGREE WITH ME, THAT THE**

**OVERWHELMING MAJORITY OF PEOPLE IN THIS COUNTRY, ABSENT A**

**SEVERE AND SIGNIFICANT PSYCHOLOGICAL OR MENTAL DISORDER,**

**THOSE COME NATURAL,  DO THEY NOT,  DR. GUR?**

A.    YEAH.

Q.    AND TO THOSE SAME PEOPLE,  YOU WOULD AGREE,  THAT AS

**NATURAL AS EATING WHEN ARE YOU HUNGRY OR DRINKING WHEN YOU ARE**

**THIRSTY,  YOU DON'T RAPE WOMEN, YOU DON'T CARJACK WOMEN,  YOU**

**DON'T KIDNAP WOMEN, AND YOU DON'T KILL WOMEN.  THAT IS AS**

**BASIC AN UNDERSTANDING OF HUMAN RATIONALE AS EATING WHEN YOU**

**ARE HUNGRY,  DRINKING WHEN YOU ARE THIRSTY,  PUTTING A COAT ON**

**WHEN YOU ARE COLD; IS IT NOT,  DR. GUR?**

A.    WELL,  YOU HAVE JUST, IN THOSE FUNCTIONS THAT YOU MENTIONED,  AS STRANGE AS IT MAY SEEM,  THERE ARE SEVERE FORMS OF MENTAL ILLNESS THAT ARE SEVERE WHERE PEOPLE DON'T DO THAT. SCHIZOPHRENIA, THEY MAY STOP BATHING FOR MONTHS.  THEY WILL NEGLECT TO EAT.  THEY WILL KEEP -- THEY WILL WALK AROUND WITH HEAVY COATS IN THE HEAT OF THE SUMMER, AND THEY WILL DIE OF DEHYDRATION NOT NOTICING THAT THEY ARE HOT.

SO, WHEN THE BRAIN IS DAMAGED, A LOT OF STRANGE THINGS HAPPEN.  IT IS JUST NOT THE SAME AS WHEN YOU ARE OPERATING WITH A FULL DECK AND ALL OF THE PIECES ARE IN PLACE.  AND I AGREE WITH YOU,  FORTUNATELY,  THANKS TO THE GOOD LORD, MOST PEOPLE DON'T GO AROUND RAPING AND KILLING AND DOING THOSE

THINGS.  BUT WHEN YOUR BRAIN IS DAMAGED AS BADLY AS THAT, YOU MAY BE ABLE TO DO A LOT OF THE BASIC THINGS, AND YOU MAY BE ABLE TO DO A LOT OF THINGS THAT ARE NOT NORMAL.

**Q.    IS IT YOUR OPINION, ON NOVEMBER 11TH, 2002,  AND NOVEMBER 14TH,  2002, THAT CHAD FULKS DIDN'T HAVE ANY CHOICES?**

A.    I AM SURE HE HAD CHOICES.

**Q.    AND HE MADE THOSE CHOICES?**

A.    THAT IS WHAT I AM QUESTIONING.  HE MADE THE CHOICES. THE QUESTION IS, WHETHER HIS EXECUTIVE WAS WORKING IN ON BEING INTACT WHEN HE MADE THEM.

     MR. GASSER:  BEG THE COURT'S INDULGENCE.  YOUR HONOR, I APPRECIATE THE TIME YOU GAVE ME.

     MR. BLUME:  I HAVE ABOUT TEN OR FIFTEEN MINUTES.  GO AHEAD AND DO IT?

     THE COURT:  YEAH.  I THINK IT WOULD BE BEST.

                    REDIRECT EXAM

BY MR. BLUME:

**Q.    DR. GUR,  IT WON'T BE THAT LONG.  I WANT TO START AND TALK ABOUT AND MAKE CLEAR, JUST TO BE FAIR TO YOU, WHAT YOU WERE ASKED TO DO AND WHAT YOU WEREN'T ASKED TO DO, AND PUT THAT INTO CONTEXT OF SOMETIMES DIFFERENT TYPES OF EVALUATIONS. YOU WEREN'T ASKED, FOR EXAMPLE, IN THIS CASE, TO RENDER AN OPINION ON WHETHER MR. FULKS WAS COMPETENT TO STAND TRIAL?**

A.    NO.  NO.

**Q.    YOU WEREN'T ASKED TO RENDER AN OPINION ON WHETHER HE**

**WAS LEGALLY INSANE AT THE TIME OF THE OFFENSE?**

A.    NO.

**Q.    YOU WEREN'T ASKED TO REALLY DO A BROAD-BASED PSYCHOLOGICAL EVALUATION OR SOCIAL HISTORY FROM MR. FULKS; IS THAT CORRECT?**

A.    THAT'S CORRECT.

**Q.    WHAT YOU WERE ASKED TO DO,  WHAT I ASKED YOU TO DO WAS, TO DETERMINE SOLELY, BASED UPON YOUR TESTING, AND BASED UPON THE IMAGING DATA WHICH WAS AVAILABLE, AND THE OTHER NEUROPSYCHOLOGICAL TESTING,  I ASKED YOU COULD YOU TRY AND DETERMINE FOR ME HOW MR. FULKS'S BRAIN WORKS; IS THAT CORRECT?**

A.    THAT IS PRETTY MUCH WHAT THE REFERRAL QUESTION WAS.

**Q.    AND I DIDN'T ASK YOU EVEN TO RENDER A DIAGNOSIS?**

A.    THAT'S CORRECT.

Q.    IN OTHER WORDS,  TO SAY -- TO TELL ME, YOU KNOW,  DOES HE --

          MR. GASSER:  YOUR HONOR,  I HATE TO OBJECT.   BUT HOW AM I TO CROSS-EXAMINE MR. BLUME? I MEAN,  I OBJECT TO THE FORM OF THE QUESTION.   THERE IS NO WAY WE CAN ADEQUATELY GO INTO THIS.   IF HE WANTS TO KNOW WHAT HE WAS ASKED TO DO, THAT IS FINE.   BUT SAYING MR. BLUME WAS ASKING HIM OR ANYONE ELSE WAS ASKING HIM.

          THE COURT:   REWORD YOUR QUESTION JUST A BIT AND SOLVE THE PROBLEM.

          MR. BLUME:  TRYING TO CUT TO THE CHASE.  HE WAS ASKED

TO DO A LIMITED EVALUATION AND NOT BROAD-BASED.

THE COURT:  I UNDERSTAND.

BY MR. BLUME:

Q.    WELL, DR. GUR, YOU WEREN'T ASKED TO RENDER EVEN A DIAGNOSIS?

A.    I WAS NOT ASKED.

Q.    AND, IS IT ACCURATE TO SAY THEN THAT, AGAIN, YOU WERE JUST ASKED TO DETERMINE, BASED UPON ALL OF THE AVAILABLE DATA, WHETHER MR. FULKS HAD ANY ABNORMALITY OF THE STRUCTURE OF HIS BRAIN, ANY ABNORMALITY OF THE PHYSIOLOGY OF HIS BRAIN, OR ANY ABNORMALITY ON HOW HIS BRAIN FUNCTIONS?

A.    YES.

Q.    AND SO, BECAUSE OF THE LIMITED -- IS IT ACCURATE OR IS IT FAIR TO SAY, IF IT IS NOT, YOU KNOW, PLEASE TELL THE JURY THAT, BECAUSE, YOU KNOW, WHAT YOU WERE ASKED TO DO WAS MORE LIMITED, THEREFORE, THE INFORMATION THAT YOU WOULD NEED WOULD BE MORE LIMITED?

A.    YES.

Q.    I WANT TO TALK ABOUT -- OKAY.  NOW, YOU HAVE TESTIFIED, PREVIOUSLY, AND I BELIEVE YOU ALSO TESTIFIED ON CROSS-EXAMINATION, THAT THE IMAGING STUDIES, THE MRI AND THE PET SCAN, SHOW INDICATIONS OF WHAT YOU CALL THE NEURODEVELOPMENTAL DISORDER?

A.    YES.

Q.    AND AS I UNDERSTAND IT, WHAT THAT MEANS IS, YOU CAN

JUST SEE ON THE MRI, SEE ON THERE, THAT THERE IS DAMAGE IN THE PARTS OF THE BRAIN WHICH -- OR THE WAY THE DAMAGE LOOKS IS THAT IT IS NOT SOMETHING THAT HAS BEEN THERE SINCE BIRTH?

A.    YES.

Q.    SO, IF IT IS CLEAR THAT THE DAMAGE HAS BEEN THERE SINCE BIRTH, IN SOME WAYS IT DOESN'T MATTER WHAT ANYBODY SAYS, THE PICTURE IS THERE, AND THE DAMAGE HAS BEEN THERE SINCE BIRTH?

A.    YES.

Q.    I MEAN, IT IS SORT OF LIKE IF SOMEBODY SAYS, WELL, YOU KNOW, THERE IS NOTHING THIS CHILD WAS COMPLETELY, YOU KNOW, IN UTERO, NOTHING EVER HAPPENED. AND, YOU KNOW, NOTHING EVER HAPPENED; THE MOTHER NEVER DRANK; THE MOTHER NEVER FELL. THERE WERE NEVER ANY TOXINS, WHATEVER IT IS, ANY NUMBER OF EXPOSURES. IT DOESN'T MATTER WHAT THEY SAID. THE FACT IS, THERE IS NEURODEVELOPMENTAL DISORDER?

A.    I MEAN, HAD I BEEN TOLD THAT HE HAD A PERFECTLY HEALTHY PREGNANCY, AND DELIVERY, AND SO ON, I JUST WOULD HAVE SCRATCHED MY HEAD LONGER WONDERING HOW COME.

Q.    BECAUSE, WHAT IS IN THE FILM, IS WHAT IS IN THE FILM?

A.    YEAH.

Q.    NOW, I WANT TO ASK YOU TO JUST GO BACK TO THE LEXINGTON EVALUATION IN 1998 JUST TO MAKE CLEAR ON THAT. NOTHING WAS DONE IN 1998. THEY DIDN'T DO ANY MRI SCANS? THEY DID NOT DO A PET SCAN; IS THAT CORRECT?

A.    THAT'S CORRECT.

Q.    THEY DIDN'T DO ANY NEUROPSYCHOLOGICAL TESTING?

A.    NO.

Q.    SO,  THEY DIDN'T, ESSENTIALLY, THEY DIDN'T REALLY, AT THAT TIME,  THEY DID NOT?

A.    THEY HAD ONE,  AS I RECALL.  THERE WAS ONE OR TWO TESTS THAT A -- PSYCHOLOGICAL TESTS, BUT YOU COULD USE THEM AS A NEUROPSYCHOLOGICAL.  BUT THE SAME TESTS WERE REPEATED BY BOTH, I BELIEVE, BOTH VENN AND EVANS, SO THEY WOULD NOT HAVE HAD THAT INFORMATION.

Q.    BUT NO ASSESSMENT WAS MADE, AT THAT TIME, OR ATTEMPT TO MAKE AN ASSESSMENT OF HOW HIS BRAIN FUNCTIONED?

A.    CORRECT.

Q.    AND, UNQUESTIONABLY, AS WE TALKED ABOUT DURING YOUR DIRECT EXAMINATION,  HE TRIED TO FAKE DURING THAT EVALUATION?

A.    YES.

Q.    AND THEY CAUGHT HIM?

A.    YES.   THEY CAUGHT HIM.

Q.    BUT THE TEST HE WAS GIVEN THEN, OTHER THAN, I THINK, THE SIRS YOU ARE THINKING OF?

A.    THE SIRS, THEY RELATE TO --

Q.    HE DIDN'T GET ANY OF THE BATTERY OF TESTS WHICH DR. VENN GAVE HIM,  DR. EVANS GAVE HIM, OR YOU GAVE HIM?

A.    THAT'S CORRECT.

Q.    SO HE WOULD HAVE HAD NO,  WHEN HE TOOK THOSE TESTS

WOULD HAVE BEEN TAKING THEM, ESSENTIALLY, FOR THE FIRST TIME, WOULDN'T HAVE HAD ANY PRIOR EXPERIENCE WITH THEM?

A.    THAT'S RIGHT.

Q.    NO IDEA, REALLY, HOW TO FAKE, EVEN IF HE TRIED TO DO SO?

A.    I MEAN,  IF HE WANTED TO FAKE, MOST PEOPLE TRY TO FAKE JUST SAYING I DON'T KNOW, WHETHER THEY KNOW THE ANSWER, OR THEY GIVE THE WRONG ANSWER WHEN THEY KNOW THE RIGHT ANSWER.

Q.    NOW?

A.    THERE ARE WAYS OF DETECTING FAKING JUST BASED ON THE PERFORMANCE IN SPECIFIC TESTS.  BUT THIS IS REALLY WHAT THE SPECIAL -- THE SO-CALLED VALIDITY TESTS ARE HERE TO -- THAT IS WHAT THEY WERE DESIGNED TO DO.  IN OTHER WORDS,  NO MATTER HOW MOTIVATED YOU ARE TO FAKE,  NO MATTER HOW HARD YOU TRY, YOU CAN'T FAKE THE MRI OR THE PET SCAN.

A.    THAT'S CORRECT.

Q.    WOULD IT BE CONSISTENT OR INCONSISTENT WITH YOUR TESTING IF VARIOUS WITNESSES DESCRIBE MR. FULKS AS BEING QUIET?

A.    QUIET?

Q.    NOT TALKING MUCH,  STARING OUT THE WINDOW?

A.    IT IS HARD TO SAY.  IT WOULD BE EITHER CONSISTENT OR NONCONSISTENT WHEN PEOPLE ARE TOGETHER.  I WOULD OBSERVE ANYBODY HERE.  I WOULD FIND THEM SOMETIMES QUIET,  SOMETIMES RAMBUNCTIOUS,  HOPEFULLY FROLICKING IN THE SUN.  PEOPLE DO

VARIOUS THINGS UNDER DIFFERENT CONDITIONS.

Q.    NO, I MUST HAVE MISUNDERSTOOD THE LINE OF CROSS-EXAMINATION.  I WILL MOVE ON TO SOMETHING ELSE.   I MUST HAVE MISUNDERSTOOD THE POINT.

FINALLY, I WANT TO GET TO SOMETHING THAT YOU TALKED ABOUT AT THE END AND JUST TO MAKE CLEAR.   YOU ARE NOT SAYING -- YOU ARE NOT SAYING THAT MR. FULKS DOES NOT KNOW THE DIFFERENCE BETWEEN RIGHT AND WRONG?

A.    I AM NOT SAYING THAT.

Q.    AND, CLEARLY, HE ALSO WOULD KNOW THAT IT IS WRONG TO CARJACK SOMEBODY?

A.    YES.

Q.    AND, CLEARLY, KNOW IT IS WRONG TO RAPE SOMEBODY?

A.    YES.

Q.    AND HE WOULD HAVE THE ABILITY TO KNOW IF HE WERE COMMITTING THE ACT OF RAPE,  OBVIOUSLY, THIS WAS AGAINST THE PERSON'S WILL?

A.    YES.

Q.    AND SO, AGAIN,  YOUR TESTIMONY IS, NOT THAT HE IS TOTALLY DEPRIVED OF THE ABILITY TO MAKE A CHOICE OR TO DECIDE?

A.    CORRECT.

Q.    JUST AS I UNDERSTAND IT,  THE ESSENCE OF YOUR TESTIMONY IS THAT, HIS ABILITY TO MAKE GOOD DECISIONS,  CORRECT DECISIONS, APPROPRIATE DECISIONS IS IMPAIRED BY HIS NEUROLOGICAL DYSFUNCTION?

A.    AND MOST IMPORTANT, CONTROL OF IMPULSES.

MR. BLUME:  THANK YOU.

THE COURT:  ANYTHING FURTHER?  MEMBERS OF THE JURY, LET'S TAKE A 20-MINUTE RECESS.  GO TO YOUR JURY ROOM.  TAKE OUR AFTERNOON RECESS AT THIS TIME.

(WHEREUPON, A SHORT RECESS WAS HELD.)

THE COURT:  COUPLE OF THINGS.  THE JUROR'S SON WHO IS REPORTING TO IRAQ ASKED MS. FLOYD, IN THE PRESENCE OF THE OTHER JURORS,  UNLIKE THE FIRST JUROR THAT I EXCUSED THIS MORNING, WHO CALLED MS. FLOYD ASIDE.  THIS JUROR SPOKE TO MS. FLOYD IN THE PRESENCE OF THE OTHERS AND SAID HIS SON WILL BE LEAVING FROM FORT BRAGG.  HE DID NOT WANT TO BE EXCUSED FROM THE JURY.  HE DID NOT WANT TO TAKE A WHOLE DAY OFF.  HE JUST WANTED TO LEAVE A LITTLE BIT EARLY ON THE DAY BEFORE HIS SON IS TO REPORT.  WELL,  HIS SON HAS TO REPORT OR DEPART RATHER AT LUNCHTIME ON FRIDAY.  WHICH MEANS, THIS JUROR WOULD LIKE US TO BREAK TWO OR THREE HOURS EARLY TOMORROW; IS THAT CORRECT?

THE CLERK:  NO, SIR.  HE WANTED TO -- THAT IS NOT MY UNDERSTANDING AT ALL.  HE WANTED TO BE WITH HIM ON FRIDAY BEFORE HE LEFT.

THE COURT:  I THOUGHT YOU SAID HE WANTED TO LEAVE A LITTLE BIT EARLY.

THE CLERK:  THAT WAS HIS ORIGINAL REQUEST.

THE COURT:  OKAY.  HE WANTS TO BE WITH HIM.  IN

DIRECT EXAM OF CINDY HARPER

MS. JOHNSON:  YES, SHE IS RIGHT THERE.

THE COURT:  IF YOU HAVE BEEN DULY SUBPOENAED AND YOU HAVE FIRSTHAND INFORMATION ABOUT THIS CASE, IT IS MY OPINION, THAT YOU SHOULD GIVE THAT TESTIMONY UNDER OATH.  AND I AM ORDERING YOU TO DO SO.

MS. JOHNSON:  THANK YOU, YOUR HONOR.

THE COURT:  VERY GOOD.  PLEASE BRING IN THE JURY.

(WHEREUPON, THE FOLLOWING WAS HEARD IN THE PRESENCE OF THE TRIAL JURY.)

THE COURT:  NEXT WITNESS, PLEASE.

MR. BLUME:  THE DEFENSE CALLS CINDY HARPER.

CINDY HARPER, HAVING BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

DIRECT EXAM

BY MR. BLUME:

Q.    GOOD MORNING, MS. HARPER.  HOW ARE YOU?

A.    FINE.

Q.    CAN YOU TELL ME WHERE DO YOU LIVE NOW?

A.    CONWAY, SOUTH CAROLINA.

Q.    AND HOW LONG HAVE YOU LIVED THERE?

A.    THIRTEEN YEARS.

Q.    AND WHERE ARE YOU FROM, ORIGINALLY?

A.    HUNTINGTON, WEST VIRGINIA.

Q.    AND ARE YOU MARRIED?

A.    I AM.

DIRECT EXAM OF CINDY HARPER

Q.    AND IS THAT YOUR HUSBAND BACK HERE IN THE COURTROOM?

A.    YES,  ROBERT HARPER.

Q.    DO YOU HAVE ANY CHILDREN?

A.    I HAVE TWO.

Q.    HOW OLD ARE THEY?

A.    SIXTEEN AND NINE.

Q.    AND CAN YOU TELL ME WHAT DO YOU DO?

A.    I TEACH.   I HAVE NOT TAUGHT IN THE PUBLIC SCHOOL FOR A WHILE, BUT I TEACH -- CURRENTLY TEACHING PRESCHOOL IN A PRESCHOOL LOCATION.

Q.    DID YOU USED TO TEACH IN WEST VIRGINIA?

A.    I DID.

Q.    AND WHAT DID YOU TEACH THERE?

A.    I TAUGHT FIRST GRADE,  THIRD GRADE,  BUT PRIMARILY KINDERGARTEN.

Q.    AND YOU WOULD KNOW -- WERE YOU THE KINDERGARTEN TEACHER FOR CHAD FULKS?

A.    I WAS.

Q.    AND I KNOW THAT I HAVE TALKED TO YOU ABOUT THIS, AND I JUST WANT TO ASK YOU, REALLY, JUST A COUPLE OF QUESTIONS.

A.    OKAY.

Q.    DO YOU REMEMBER  -- DO YOU REMEMBER IT AT ALL?

A.    YES,  A LITTLE.   JUST A LITTLE.

Q.    TELL ME WHAT YOU REMEMBER.

A.    OKAY.   I REMEMBER HIM AS A VERY QUIET CHILD.   SHY,

DIRECT EXAM OF CINDY HARPER

DIFFICULTY WITH LEARNING.  AND I REMEMBER ONE PARTICULAR INCIDENT WHERE HE GOT VERY SICK.  HE WENT INTO -- WE HAD -- IN MY KINDERGARTEN ROOM, WE HAD REST ROOM FACILITIES FOR THE CHILDREN AND FOR THE ADULTS.  AND HE WENT INTO THE REST ROOM, AND I MISSED HIM.  HE HAD BEEN IN THERE FOR A WHILE.  WHEN I WENT IN TO CHECK ON HIM,  HE HAD HAD A VERY BAD CASE OF DIARRHEA.  HE HAD ON JEANS, AND A PAIR OF COWBOY BOOTS, AND IT WAS A MESS.

AND I DO REMEMBER, AT SOME POINT, I HAD TO FIND SOMEONE ELSE TO ASSIST ME BECAUSE I HAVE OTHER CHILDREN THAT I HAVE TO ATTEND TO.  WHAT I REMEMBER IS THAT I INQUIRED AS TO WHETHER HE HAD BEEN PICKED UP BY A PARENT OR SOMEONE IN THE FAMILY. AND THAT THAT HAD BEEN A PROLONGED TIME.  AND I JUST FELT VERY BAD BECAUSE IT WAS,  IT WAS A BAD SITUATION.

**Q.    HORRIBLY EMBARRASSING SITUATION?**

A.    UH-HUH (AFFIRMATIVE RESPONSE).

**Q.    IT WAS A REALLY LONG TIME FOR SOMEBODY?**

A.    YES.

**Q.    DO YOU REMEMBER HOW MANY DAYS HE MISSED THAT YEAR IN KINDERGARTEN?**

A.    ONLY AFTER LOOKING AT HIS RECORDS.  THAT INDICATED THIRTY-SOMETHING.

**Q.    THIRTY-FIVE (35) DAYS?**

A.    YES.

MR. BLUME:  PLEASE ANSWER ANY QUESTIONS THESE

DIRECT EXAM OF GAYLE WOLFE

GENTLEMEN MIGHT HAVE.

THE COURT:  CROSS-EXAMINATION.

MR. GASSER:  WE HAVE NO QUESTIONS.

THE COURT:  THANK YOU.  YOU MAY STEP DOWN.  PLEASE CALL YOUR NEXT WITNESS.

MR. BLUME:  GAYLE WOLFE.

GAYLE WOLFE, HAVING BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

DIRECT EXAM

BY MR. BLUME:

Q.    GOOD MORNING, MS. WOLFE.  YOU MIGHT WANT TO PULL THAT MICROPHONE UP SO EVERYBODY CAN HEAR YOU.  WHAT DO YOU DO FOR A LIVING?

A.    I'M AN EDUCATOR.

Q.    WHERE ARE YOU AN EDUCATOR?

A.    CABELL COUNTY, HUNTINGTON, WEST VIRGINIA.

Q.    HOW LONG HAVE YOU BEEN DOING THAT?

A.    I HAVE BEEN IN EDUCATION SINCE 1974.

Q.    AND ARE YOU MARRIED?

A.    YES.

Q.    DO YOU HAVE CHILDREN?

A.    TWO.

Q.    HOW OLD ARE THEY?

A.    TWENTY-EIGHT (28),  26, BOYS.

Q.    SO,  I AM SORRY, YOU SAID YOU HAVE BEEN A TEACHER FOR

**DIRECT EXAM OF SUE HATCHER**

**SCHOOL COUNSELOR AND TALKED TO THE SCHOOL RESOURCE OFFICER?**

A.    I PROBABLY WOULD NOT HAVE DONE THAT BASED ON ONE BRUISE ONE TIME.

**Q.    I AM TALKING ABOUT ONE TIME YOU REPORTED IT?**

A.    SEVERAL TIMES.

**Q.    AND SO, WOULD THERE BE RECORDS INDICATING THAT YOU REPORTED THIS SEVERAL TIMES?**

A.    I DON'T KNOW.

MR. GASSER:  THAT IS ALL I HAVE.

THE COURT:   ANY REDIRECT?

MR. BLUME:  NO.

THE COURT:   THANK YOU.  YOU MAY STEP DOWN.   PLEASE CALL YOUR NEXT WITNESS.

MS. JOHNSON:  SUE HATCHER.

SUE HATCHER, HAVING BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

DIRECT EXAM

BY MS. JOHNSON:

**Q.    MS. HATCHER,  WHERE DO YOU LIVE?**

A.    HUNTINGTON,  WEST VIRGINIA.

**Q.    AND ARE YOU CURRENTLY EMPLOYED?**

A.    NO,  I AM RETIRED.

**Q.    AND WHAT DID YOU DO BEFORE YOU WERE RETIRED?**

A.    I WAS A SOCIAL WORKER WITH WEST VIRGINIA DEPARTMENT OF HUMAN RESOURCES FROM 1968 UNTIL 1986; FROM 1986 UNTIL 2003 I

DIRECT EXAM OF SUE HATCHER

WAS A PROBATION OFFICER WITH THE WEST VIRGINIA SUPREME COURT

OF APPEALS.

Q.    SO,  ALMOST 20 YEARS, YOU WERE A PROBATION OFFICER?

A.    CORRECT.

Q.    NOT QUITE.   AND WHAT DOES A PROBATION OFFICER DO?

A.    WE SUPERVISE  -- I WORKED WITH JUVENILES, SPECIFICALLY,

SO WE SUPERVISED JUVENILES WHO ARE ON PROBATION.   WE WRITE

REPORTS FOR THE COURT.   WE DO PREDISPOSITION REPORTS.   WE

ARE LIAISONS WITH SCHOOLS,  FAMILY.   WE WORK WITH FAMILIES,

AND CHILDREN, AND THE SCHOOLS, THE COUNSELORS,  THAT TYPE OF

THING.

Q.    AND I SHOULD HAVE ASKED YOU BEFORE, YOU ARE ALSO A

PARENT?

A.    YES.

Q.    AND YOUR SONS ARE GROWN?

A.    SON AND DAUGHTER BOTH ARE GROWN.

Q.    DO YOU REMEMBER COMING INTO CONTACT WITH CHAD FULKS IN

THE ROLE OF BEING HIS PROBATION OFFICER?

A.    YES, MA'AM.

Q.    AND YOU HAVE ACTUALLY RECEIVED THE PROBATION RECORDS

FOR CHAD FULKS FROM CABELL COUNTY?

A.    YES.

Q.    YOU HAVE REVIEWED THEM?

A.    YES.

Q.    AND DO YOU REMEMBER HOW OLD CHAD WAS WHEN HE WAS

**DIRECT EXAM OF SUE HATCHER**

ASSIGNED TO YOU?

A.   WHEN HE WAS INITIALLY ASSIGNED TO ME, HE WAS NINE YEARS OLD.

Q.   NINE YEARS OLD?

A.   YES.

Q.   AND THAT IS QUITE YOUNG?

A.   VERY YOUNG.   I DON'T GET MANY CHILDREN IN ELEMENTARY SCHOOL.

Q.   WHAT OFFENSES WAS HE CHARGED WITH AT THAT TIME?

A.   HE WAS CHARGED WITH BATTERY.   HE WAS ACTUALLY CHARGED WITH TWO BATTERIES AT THIS TIME.

Q.   SO,  TELL THE JURY ABOUT EACH ONE OF THOSE.

A.   THE FIRST BATTERY WAS ON AN ELDERLY WOMAN.  AND THE SECOND CHARGE WAS IN A SCHOOL INCIDENT WHERE A PARENT HAD GONE INSIDE TO PICK UP HER SON AND LEFT HER -- IT WAS EITHER FOUR OR FIVE-YEAR-OLD DAUGHTER ON THE PLAYGROUND.   AND THE ALLEGATIONS WERE THAT CHAD AND ANOTHER BOY HAD ASKED HER FOR MONEY.  AND WHEN SHE DIDN'T GIVE MONEY TO THEM,  HE SAID, DO YOU WANT TO SEE SOMETHING FUNNY?  AND PULLED HER PANTS DOWN. HE WAS NEVER ADJUDICATED ON THAT CHARGE  -- I MEAN, HE WAS NOT ADJUDICATED ON THE FIRST CHARGE OF THE ELDERLY WOMAN.   HE WAS PLACED ON IMPROVEMENT PERIOD.   WE DIDN'T REQUIRE ADJUDICATION ON IMPROVEMENT PERIOD.   HE WAS ADJUDICATED ON THE SMALL GIRL, ON THAT CHARGE, AND PLACED ON PROBATION.

Q.   NOW,  LET ME GO BACK A MINUTE TO THE CHARGE WITH THE

**DIRECT EXAM OF SUE HATCHER**

ELDERLY WOMAN, AND THERE WAS A BATTERY ON HER.   DO YOU
REMEMBER WHAT THAT WAS WITH?

A.    I DON'T RECALL.

Q.    AND DID HE DO THAT BY HIMSELF?

A.    I THINK A BROTHER WAS INVOLVED IN THAT WITH HIM.

Q.    HIS OLDER BROTHER RONNIE?

A.    I THINK SO.

Q.    YOU ACTUALLY, FOR A SHORT TIME, WERE THE PROBATION
OFFICER FOR RONNIE; IS THAT RIGHT?

A.    YES.

Q.    ALSO FOR RONNIE?

A.    YES.

Q.    AND LATER ON, HE WAS ALSO CHARGED WITH ONE OTHER OFFENS
THAT YOU HAD SOME CONNECTION WITH; IS THAT RIGHT?

A.    YES.

Q.    THAT WOULD HAVE BEEN MORE LIKE WHEN HE WAS 11 OR 12?

A.    HE WAS 12.

Q.    AND WHAT WAS THAT OFFENSE?

A.    THAT WAS AN ASSAULT WHERE HE HELD A GUN TO A CHILD'S
HEAD AT A PIZZA RESTAURANT AND TOLD HIM TO STICK UP HIS HANDS.

Q.    AND YOU DON'T HAVE COMPLETE RECORDS ON THAT; IS THAT
RIGHT?

A.    I DON'T HAVE COMPLETE RECORDS ON THAT.   I JUST HAVE
THE CHARGE,  THE LIST OF THE CHARGE, AND THAT HE WAS PLACED ON
IMPROVEMENT PERIOD.   SO, HE WAS NOT ADJUDICATED ON THAT

DIRECT EXAM OF SUE HATCHER

CHARGE, EITHER.

Q.    YOU DON'T RECALL WHAT REALLY HAPPENED TO THAT CHARGE; IS THAT RIGHT?

A.    I DON'T HAVE A LOT OF MEMORY WITH THAT ONE.

Q.    BUT WITH RESPECT TO THE FIRST TWO CHARGES OF PULLING THE LITTLE GIRL'S PANTS DOWN AND WITH HIS BROTHER RONNIE ATTACKING AN OLDER LADY, YOU DO REMEMBER THAT?

A.    YES.

Q.    SO, AT THE TIME WHEN HE WAS CHARGED WITH THIS, HE WAS NINE, AND YOU WENT TO VISIT HIS HOME; IS THAT RIGHT?

A.    YES.

Q.    AND YOU SPOKE TO HIS PARENTS?

A.    YES.

Q.    DID YOU TELL ME THAT YOU THOUGHT THIS WAS A TYPICAL ALCOHOLIC FAMILY?

A.    WE HAD A LOT OF COMPLAINTS THAT THE PARENTS WERE USING ALCOHOL, FROM THE SCHOOL, FROM NEIGHBORS.  EVEN IN CONTACT WITH THE POLICE DEPARTMENT SAID THAT THEY HAD -- THAT THEY WERE AWARE THERE WAS ALCOHOLISM THERE.

Q.    SO, YOU ACTUALLY ALSO SPOKE TO NEIGHBORS, AND THE POLICE, AND THE SCHOOL IN THE CONTEXT OF INVESTIGATING THIS?

A.    YES.

Q.    AND THE FAMILY,  THE PARENTS,  DID YOU SPEAK TO BOTH PARENTS?

A.    I, MAINLY, HAD CONTACT WITH THE MOTHER.  I RARELY SAW

DIRECT EXAM OF SUE HATCHER

THE FATHER.

**Q.    AND DID YOU THINK THAT SHE WAS OPEN AND FORTHCOMING TALKING TO YOU ABOUT WHAT WAS GOING ON?**

A.   NO.   I FELT LIKE SHE ACTED LIKE SHE WOULD COOPERATE WITH ME.   I FELT LIKE THERE WERE THINGS GOING ON THAT I COULD NEVER PROVE OR NEVER KNEW,  BUT I HAD CONCERNS THAT THERE WERE MORE THINGS GOING ON.   SHE SEEMED TO THINK THAT THEY WERE DOING WELL, THERE WERE NO SERIOUS PROBLEMS.   AND I FELT LIKE A CHILD OF THIS AGE, HE HAD A NUMBER OF BULLYING PROBLEMS, FIGHTING PROBLEMS AT SCHOOL.   NEIGHBORS REPORTED BULLYING IN THE NEIGHBORHOOD,  NAME CALLING.   THINGS THAT WERE REALLY OUT OF THE NORM FOR CHILDREN OF THIS AGE,  IN MY EXPERIENCE, WITH THE CHILDREN I WORKED WITH.   SO, I FELT LIKE SHE DISCOUNTED THAT A LOT.   SHE APPEARED TO TRY TO COOPERATE,  BUT I DIDN'T REALLY FEEL LIKE SHE WAS BEING FORTHCOMING WITH EVERYTHING.

**Q.    AND SHE DIDN'T TAKE IT TOO SERIOUSLY?**

A.    NO.

**Q.    YOU DID NOT,  HOWEVER,  SEE ANY SIGNS OF ANY PHYSICAL ABUSE,  DID YOU?**

A.    I DID NOT.   I SUSPECTED IT.

**Q.    YOU DID NOT RECEIVE DIRECT INFORMATION ABOUT SEXUAL ABUSE EITHER; IS THAT RIGHT?**

A.    CORRECT.

**Q.    AFTER YOU HAD CONDUCTED THIS INVESTIGATION, WHAT DID YOU RECOMMEND?**

**DIRECT EXAM OF SUE HATCHER**

A.    I RECOMMENDED THAT CHAD BE PLACED IN THE CUSTODY OF THE DEPARTMENT OF HUMAN SERVICES.   WE PLACED HIM IN A FOSTER CARE PLACEMENT.

**Q.    AND WHY DID YOU RECOMMEND THAT?**

A.    IN MY WORKING WITH CHAD, I FELT LIKE -- I LIKED CHAD. HE WAS  -- THERE WAS A GOOD SIDE TO CHAD THAT I COULD SEE. HE COOPERATED WITH ME.   HE TRIED TO COMPLY WITH WHAT I ASKED HIM TO DO.   HE WAS NEVER DISRESPECTFUL WITH ME, OR WHEN I WAS THERE, HE COOPERATED.   SO, I FELT LIKE, IF HE WERE SUPERVISED CORRECTLY, THAT HE WOULD HAVE MORE OF A CHANCE OF BEING SUCCESSFUL.

**Q.    AND YOU ACTUALLY ALSO TALKED TO TEACHERS AT SCHOOL WHO SORT OF GAVE YOU A SIMILAR REPORT, THAT HE WORKED HARD FOR THEM?**

A.    YES.

**Q.    SO, YOU FELT THAT HE MIGHT BE WILLING TO MAKE AN EFFORT IN A FOSTER HOME?**

A.    IF HE WAS GIVEN DIRECTION AND HE WAS,  YOU KNOW,  HE WAS NOT OUT ON THE STREET AT NIGHT.   I HAD GOTTEN A NUMBER OF REPORTS FROM THE SCHOOL AND NEIGHBORS THAT HE WAS OUT ON THE STREETS.   I JUST FELT LIKE HE WAS NOT BEING SUPERVISED, AND HE NEEDED THAT DIRECTION.

**Q.    AND, IS IT FAIR TO SAY, THAT THE OTHER REASON IS THAT THE NATURE OF THE OFFENSE AT THIS YOUNG AGE?**

A.    YES.   I WAS VERY CONCERNED ABOUT THAT.   AND THE

DIRECT EXAM OF SUE HATCHER

PARENTS OF THE LITTLE GIRL WERE VERY CONCERNED.  THEY FELT LIKE THEIR SON WAS BEING INTIMIDATED WHEN HE WAS OLDER AT THAT SCHOOL WITH CHAD.  AND IT IS RARE THAT I HAD A CHILD WITH THAT TYPE OF EVENTS AT THAT EARLY AGE.

**Q.    OF THE OFFENSE WITH THE BATTERY ON THE OLDER WOMAN, THAT WOULD BE UNUSUAL AT THE AGE OF NINE,  AS WELL?**

A.    YES,  YES.

**Q.    EVEN IN THE COMPANY OF AN OLDER CHILD, THAT WOULD STILL BE UNUSUAL?**

A.    CORRECT.

**Q.    WHEN YOU SAY IT WAS "RARE," OVER THE YEARS,  DID YOU COUNT UP ABOUT HOW MANY CASES YOU HAD WHERE YOU ARE TALKING ABOUT A NINE OR TEN YEAR OLD THAT HAD --**

A.    I HAVE THOUGHT ABOUT THAT.  I WOULD SAY, ELEMENTARY AGE CHILDREN, I PROBABLY HAD NO MORE THAN 15.  I CAN RECALL NINE.  BUT I AM SURE THERE WERE SOME I CAN'T RECALL.

**Q.    YOU REMEMBER THEM BECAUSE IT WAS UNUSUAL?**

A.    IT WAS.  IT WAS UNUSUAL FOR ME TO GO TO THE ELEMENTARY SCHOOL AND MEET WITH CHILDREN THERE.

**Q.    I ASKED YOU TO THINK ABOUT,  YOU DON'T KNOW WHAT HAPPENED TO ALL OF THOSE KIDS?**

A.    NO.

**Q.    BUT OF THOSE NINE -- IS THAT NINE, PLUS CHAD?**

A.    CORRECT.

**Q.    SO, THAT IS TOTAL OF TEN.  OF THOSE, THERE IS CHAD,**

## DIRECT EXAM OF SUE HATCHER

AND THEN THERE IS ONE PERSON WHO MURDERED SOMEONE --

A.    YES.

Q.    -- YOU TOLD ME.   AND THREE PEOPLE WHO ARE DECEASED?

A.    CORRECT.

Q.    AND THOSE WEREN'T NATURAL CAUSES,  AS FAR AS YOU REMEMBER?

A.    I THINK TWO OF THOSE WERE MURDERS, AND ONE WAS A SUICIDE.

Q.    ONE WAS A SUICIDE.   SO, HALF OF THOSE PEOPLE GOT INTO MAJOR PROBLEMS?

A.    CORRECT.

Q.    DID ANYONE ELSE MAKE THAT RECOMMENDATION BESIDES YOU?

A.    THERE WERE PEOPLE THAT SUGGESTED TO US, THE POLICE OFFICER, WHO WAS A JUVENILE POLICE OFFICER, FELT LIKE CHAD SHOULD BE REMOVED FROM THE HOME.

Q.    AND THAT JUVENILE POLICE OFFICER WAS ALLEN MEEKS; IS THAT RIGHT?

A.    YES.

Q.    WHAT HAS MR. MEEKS DONE SINCE THEN?

A.    HE IS NOW CHIEF OF POLICE IN BARBOURSVILLE, WHICH IS AN OUTLYING AREA OF HUNTINGTON.

Q.    SO, HE IS A RESPONSIBLE --

A.    HE WAS VERY RESPONSIBLE.

Q.    AND HE THOUGHT, AT THAT SAME TIME WHEN CHAD WAS NINE, HE THOUGHT CHAD OUGHT TO BE REMOVED FROM HIS HOME?

**DIRECT EXAM OF SUE HATCHER**

A.    YES.

Q.    **AND WHO ELSE?**

A.    THE SCHOOL PRINCIPAL.  I HAD AN INTERN THAT WAS WORKING WITH ME, AND SHE FELT LIKE THAT HE SHOULD BE REMOVED FROM THE HOME.

Q.    **AND WAS CHAD, IN FACT, REMOVED FROM HIS HOME AT THIS TIME?**

A.    NO,  HE WAS NOT.

Q.    **AND WHAT DID HAPPEN?**

A.    HE WAS PLACED ON PROBATION FOR ONE YEAR.

Q.    **AND HOW DID YOU FEEL ABOUT THAT?**

A.    I WAS UPSET.  I FELT THIS WAS A DISSERVICE TO HIM. HOWEVER, THE LAW, AT THAT TIME, REQUIRED THAT A CHILD BE PLACED IN LEAST RESTRICTIVE ALTERNATIVE.  AND SO, THE JUDGE --

Q.    **SO, THAT IS WHAT HAPPENED?**

A.    THE JUDGE DID THAT,  YES.

Q.    **DID YOU KNOW THAT HE WAS ALSO REFERRED FOR COUNSELING AT THAT TIME?**

A.    YES.

Q.    **AND WHAT DID THE RECORDS REFLECT ABOUT THE COUNSELING HE ACTUALLY GOT?**

A.    THE RECORDS REFLECT, I BELIEVE, THAT HE ONLY -- THEY ONLY KEPT ONE APPOINTMENT.  IF THERE WERE MORE THAN THAT, IT WAS ONLY ONE OR TWO MORE.  THEY DID NOT FOLLOW THROUGH WITH THE COUNSELING.

CROSS EXAM OF SUE HATCHER

Q.    THE JURY HEARD TESTIMONY YESTERDAY THAT, WHEN CHAD GOT IN TROUBLE, THE PARENTS HAD BEEN WITH HIM TO COURT,  THEY CAME HOME AND LAUGHED ABOUT IT, AND ALSO THAT THEY ENCOURAGED STEALING.  IN YOUR EXPERIENCE, NEARLY 20 YEARS WORKING WITH KIDS,  WHAT KINDS OF EFFECTS DO THOSE SORTS OF PARENTAL REACTION HAVE ON A CHILD'S CHANCE OF MAKING IT INTO BECOMING A LAW-ABIDING CITIZEN?

A.    NONE.   VERY LITTLE TO NONE.   I MEAN,  OBVIOUSLY,  IF THEY ARE MAKING FUN OF THE COURT SYSTEM, THEN THEY HAVE NO REGARD FOR THE COURT SYSTEM AUTHORITY, AND DO NOT PASS THAT ON TO THEIR CHILDREN.

Q.    SO,  IF YOU HAD KNOWN THAT, YOU WOULD HAVE FELT EVEN WORSE ABOUT THE SITUATION?

A.    YES.

MS. JOHNSON:  THANK YOU,  MS. HATCHER.   PLEASE ANSWER ANY QUESTIONS MR. GASSER MIGHT HAVE.

THE COURT:   CROSS-EXAMINATION.

CROSS EXAM

BY MR. GASSER:

Q.    GOOD AFTERNOON,  MS. HATCHER.

A.    HELLO.

Q.    MY NAME IS JOHNNY GASSER.  I WORK IN THE U. S. ATTORNEY'S OFFICE.  I HAVE JUST A FEW QUESTIONS FOR YOU.

A.    OKAY.

Q.    I WAS A LITTLE BIT CONFUSED.  DID YOU MAKE THIS

**CROSS EXAM OF SUE HATCHER**

RECOMMENDATION THAT CHAD BE PLACED IN FOSTER CARE WHEN YOU DEALT WITH HIM WHEN HE WAS NINE YEARS OLD OR 12 YEARS OLD?

A.    WHEN HE WAS NINE.

Q.    AND WHEN HE WAS DEALING WITH YOU, BOTH WHEN HE WAS NINE AND WHEN HE WAS 12, YOU INDICATED HE WAS VERY COOPERATIVE, AND HE WAS NEVER DISRESPECTFUL.   I WANT TO MAKE SURE I USED YOUR WORDS.

A.    I DON'T RECALL HIM BEING DISRESPECTFUL.   THE BEST OF MY RECOLLECTION, HE DID COOPERATE.   I DON'T REMEMBER MUCH ABOUT THE LAST PERIOD WHEN HE WAS 12.   I REMEMBER MORE WHEN HE WAS YOUNGER.

Q.    AND CONTRAST THAT WITH YOU, IN YOUR LINE OF WORK, HAVE HAD TO DEAL WITH CHILDREN THAT WERE NOT COOPERATIVE?

A.    EXPLAIN.  I DON'T KNOW WHAT YOU MEAN.

Q.    YOU INDICATED THAT CHAD WAS COOPERATIVE AND CHAD WAS NEVER DISRESPECTFUL.   I AM USING YOUR WORDS THAT YOU USED ON DIRECT EXAMINATION.

A.    YES.

Q.    IN YOUR LINE OF WORK AS A PROBATION OFFICER,  IN DOING THE SAME TYPE OF EVALUATIONS THAT YOU HAVE DESCRIBED TO THE JURY THAT YOU HAD TO DO WITH CHAD,  YOU HAVE, OBVIOUSLY, DEALT WITH CHILDREN THAT ARE NOT COOPERATIVE AND EXTREMELY DISRESPECTFUL?

A.    YES.

Q.    CHAD DIDN'T FALL UNDER THAT CATEGORY?

**CROSS EXAM OF SUE HATCHER**

A.    NO,  HE DIDN'T.

Q.    OF COURSE, THE TWO PEOPLE THAT WERE KILLED, IN RESPONSE TO MS. JOHNSON'S QUESTIONS, YOU REMEMBER AT LEAST NINE, MAYBE AS MANY AS 15 KIDS THAT YOU DEALT WITH STARTING AT THE AGE OF NINE YEARS OLD, AND THAT TWO OF THOSE CHILDREN WERE KILLED WHEN THEY WERE ADULTS.  THEY WERE VICTIMS OF MURDER?

A.    YES.

Q.    SO, THEY COULD HAVE BEEN LAW-ABIDING CITIZENS THAT, UNFORTUNATELY, FELL PREY TO MURDERS?

A.    I DON'T HAVE THE SPECIFICS OF WHAT HAPPENED.  I HAD HEARD THAT THEY WERE INVOLVED IN CRIMINAL ACTIVITY.  BUT AGAIN, I DON'T HAVE THE DIRECT INFORMATION ON THAT.

Q.    YOU DON'T HAVE ANY INFORMATION THAT THE TIME THAT THEY WERE MURDERED,  I MEAN,  YOU UNDERSTAND?

A.    I HAVE BEEN TOLD THAT ONE OF THEM WAS INVOLVED IN DRUG ACTIVITY.

Q.    DURING HIS LIFETIME?

A.    AT THE TIME HE WAS KILLED.

Q.    BUT TO BE A MURDER VICTIM BY LAW,  YOU UNDERSTAND,  YOU HAVE GOT TO BE INNOCENT AT THAT POINT?

A.    WELL CERTAINLY,  CERTAINLY,  YES.

Q.    AND DURING THIS TIME PERIOD THAT YOU WERE CONCERNED ABOUT CHAD FULKS'S SITUATION AT HOME,  HE WAS NOT ACCUSED, AT THAT POINT IN TIME, AND THERE WERE NO ALLEGATIONS THAT HE HAD RAPED ANYBODY?

## CROSS EXAM OF SUE HATCHER

A.    NO.

**Q.    THAT HE HAD CARJACKED ANYBODY?**

A.    NO.

**Q.    THAT HE HAD KIDNAPED ANYONE?**

A.    NO.

**Q.    THAT HE HAD KILLED ANYBODY?**

A.    NO.

**Q.    WHEN HE WAS 12 YEARS OLD AND YOU WERE DEALING WITH HIM, YOU INDICATED THERE WAS SOME CHARGE THAT HE HAD HELD SOME GUN TO SOME CHILD'S HEAD AND TOLD THEM TO STICK UP HIS HANDS?**

A.    YES, SIR.

**Q.    BUT YOU DON'T REMEMBER WHETHER OR NOT HE WAS, IN FACT, GUILTY OF THAT?**

A.    HE WAS NOT ADJUDICATED ON THAT.  HE WAS PLACED ON IMPROVEMENT PERIOD.  HE WAS NOT ADJUDICATED ON THAT CHARGE.

**Q.    SO,  FOR ALL THIS JURY KNOWS, THAT INCIDENT MAY NOT HAVE HAPPENED.   THE OTHER KID MAY HAVE MADE IT UP?**

A.    CORRECT.

**Q.    SO,  IN FACT,  THERE ARE NO RECORDS TO INDICATE WHEN CHAD FULKS WAS NINE YEARS OLD,  10 YEARS OLD,  11 YEARS OLD, 12 YEARS OLD,  13 YEARS OLD, LIVING UNDER THE CONDITIONS YOU HAVE DESCRIBED AND OTHER WITNESSES HAVE DESCRIBED TO THE JURY, THAT HE EVER CARJACKED,  KIDNAPED,  RAPED, OR KILLED ANYBODY?**

A.    CORRECT.

**Q.    THERE WOULD BE RECORDS IF HE EVER CARJACKED,  KILLED,**

**CROSS EXAM OF SUE HATCHER**

**OR RAPED SOMEBODY DURING THE TIME PERIOD IN WHICH HE WAS**

**LIVING UNDER THE SAME ROOF OF HIS FATHER AND MOTHER, THERE**

**WOULD BE RECORDS OF THAT?**

A.    THERE ARE SOME OTHER CHARGES WHEN HE WAS OLDER.   I WAS NOT SUPERVISING HIM AT THAT TIME.   I DON'T RECALL ALL HIS CHARGES.   BUT DURING THE TIME I WORKED WITH HIM, THERE WERE NO SUCH CHARGES.

**Q.    THERE WERE SOME CHARGES LATER ON.  HE HAD TO GO, WHEN HE WAS 15 AND 16 YEARS OLD, HE HAD TO GO -- HE WAS INCARCERATED AT JUVENILE FACILITIES FOR A BURGLARY,  PROPERTY CRIMES, AND DRUG CRIMES,  CORRECT?**

A.    YES.

**Q.    BUT NOTHING TO SUGGEST WHEN HE WAS UNDER THE TUTELAGE OF HIS MOTHER AND FATHER, DURING THE TIMES THEY WERE ABUSING ALCOHOL, ENGAGING IN PHYSICAL FIGHTS,  ALLOWING THE CHILDREN TO STEAL,  DURING THOSE TIME PERIODS, CHAD FULKS NEVER KILLED OR RAPED?**

A.    NO, SIR.

**Q.    OR SHOT ANYBODY?**

A.    NOT THAT I AM AWARE.

**Q.    EVEN AS HE GOT OLDER,  16,  17,  18, DURING HIS EARLY ADULT YEARS, THERE WAS NO EVIDENCE THAT HE CARJACKED OR KIDNAPED WOMEN THAT YOU ARE AWARE OF?**

A.    CORRECT.

**Q.    KILLED ANYBODY?**

**CROSS EXAM OF SUE HATCHER**

A.    CORRECT.

Q.    WHEN YOU,  MS. HATCHER, WHEN YOU VISITED THE HOME AND YOU INDICATED THAT THERE WERE COMPLAINTS FROM THE SCHOOL AND FROM NEIGHBORS THAT THE PARENTS WERE ABUSING ALCOHOL, THAT IS WHAT THEY WERE ABUSING WAS ALCOHOL?

A.    YES, SIR.

Q.    AND YOU OBSERVED NO SIGNS OF PHYSICAL ABUSE, YOURSELF?

A.    CORRECT.

Q.    BECAUSE YOU DEFINITELY WOULD HAVE NOTED THAT, AND THAT WOULD HAVE BEEN A MAJOR FACTOR IN SOME JUDICIAL OR SOCIAL DETERMINATION AS TO WHETHER HE IS PLACED ON PROBATION OR PLACED IN FOSTER CARE?

A.    YES, SIR.

Q.    YOU ARE MORE LIKELY TO BE TAKEN OUT OF THE HOME AND PLACED IN FOSTER CARE IF THERE IS OBVIOUS UNCONTRADICTED EVIDENCE OF PHYSICAL ABUSE GOING ON,  CORRECT?

A.    CORRECT.

MR. GASSER:  THAT IS ALL I HAVE.

MS. JOHNSON:  NO QUESTIONS,  YOUR HONOR.

THE COURT:  ALL RIGHT.  THANK YOU.  PLEASE CALL YOUR NEXT WITNESS.  YOU MAY STEP DOWN.

MR. BLUME:  WE CALL HOWARD BECKER.

HOWARD BECKER, HAVING BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

DIRECT EXAM

App. 01021

FINALLY, THE GOVERNMENT WOULD OFFER GOVERNMENT'S 288, WHICH IS A CERTIFIED CONVICTION FROM LAGRANDE COUNTY, INDIANA. IT IS JUDGMENT OF CONVICTION FOR BURGLARY CLASS-B FELONY ON FEBRUARY 15TH OF 2000.  THE DEFENDANT WAS SENTENCED TO TEN YEARS SUSPENDED ON FOUR YEARS.

THE COURT:  ALL RIGHT.  CONSISTENT --

MR. SCHOOLS:  FOUR YEARS SUSPENDED.

THE COURT:  CONSISTENT WITH MY EARLIER RULING, THOSE ARE ALL ADMITTED.

MR. SCHOOLS:  WITH THAT, THE GOVERNMENT RESTS.

THE COURT:  LADIES AND GENTLEMEN, WE NOW TURN TO THE SECOND PHASE OF THE TRIAL AND AFFORD THE DEFENDANT AN OPPORTUNITY TO PRESENT HIS EVIDENCE FOR YOUR CONSIDERATION.

MR. BLUME:  THE DEFENSE WOULD CALL KEVIN HOLBROOK

KEVIN HOLBROOK, HAVING BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

DIRECT EXAM

BY MR. BLUME:

Q.   GOOD AFTERNOON, MR. HOLBROOK?

A.   GOOD AFTERNOON.

Q.   YOU ARE CHAD'S UNCLE; IS THAT CORRECT?

A.   YES, SIR.

Q.   AND YOU ARE HIS MOTHER'S BROTHER?

A.   THAT'S CORRECT.

Q.   AND I KNOW YOU ARE REAL NERVOUS --

A.    OH, YEAH.

Q.    -- AND ALL.  SO, I AM JUST GOING TO, YOU KNOW, JUST LIKE YOU AND I TALKED, I AM GOING TO ASK YOU SOME QUESTIONS ABOUT CHAD'S PARENTS, AND HIS FAMILY, AND HOW HE GREW UP. AND JUST GO THROUGH THAT WITH YOU.  IF I SAY ANYTHING YOU DON'T UNDERSTAND OR NEED CLARIFICATION,  JUST LET ME KNOW, OKAY?

A.    OKAY.

Q.    NOW,  CHAD'S MOTHER DIANA IS YOUR -- SHE IS OLDER THAN YOU ARE?

A.    MY OLDER SISTER,  THAT'S CORRECT.

Q.    HOW MUCH OLDER THAN YOU IS SHE?

A.    EIGHT YEARS,  NINE YEARS.

Q.    AND WHERE DID YOU GROW UP?

A.    WHERE DID I GROW UP?

Q.    UH-HUH (AFFIRMATIVE RESPONSE).

A.    BASICALLY, WAYNE COUNTY, INDIANA.

Q.    YOU GREW UP WITH YOUR -- HOW MANY OF YOU WERE THERE?

A.    SEVEN.

Q.    SEVEN?

A.    THERE WERE SEVEN OF US:  FOUR SISTERS AND TWO BROTHERS.

Q.    AND I DON'T MEAN TO EMBARRASS YOU.  IS IT FAIR TO SAY THERE IS A HISTORY OF ALCOHOLISM IN YOUR FAMILY?

A.    THAT'S CORRECT.

Q.    NOW,  WERE YOU FAMILIAR WITH -- DID YOU KNOW CHAD'S

FATHER, ROGER?

A.    YES, I DID.

Q.    AND, OBVIOUSLY, HE WAS MARRIED TO YOUR SISTER?

A.    THAT'S CORRECT.

Q.    AND DID YOU LIVE WITH THEM OFF AND ON FOR A PERIOD OF YEARS?

A.    YES, I DID.

Q.    AND NOW, AS I UNDERSTAND IT, WHEN THEY FIRST WERE TOGETHER AND GOT MARRIED, THEY DIDN'T LIVE IN HUNTINGTON, THEY LIVED OUT IN THE COUNTRY?

A.    YES, SIR.

Q.    AND YOU WERE A TEEN, AT THAT TIME?

A.    YES.

Q.    SO, SOMETIMES YOU WOULD GO OVER THERE, THOUGH, AND KEEP THE KIDS?

A.    THAT'S CORRECT.

Q.    NOW, WHAT I WANT TO ASK YOU ABOUT IS, DO YOU RECALL WHEN YOUR SISTER WAS PREGNANT WITH CHAD AND HIS OTHER BROTHERS AND SISTERS, DID SHE DRINK THEN?

A.    YES, SHE DID.

Q.    WOULD IT BE FAIR TO SAY THAT SHE DRANK A LOT DURING THAT PERIOD OF TIME?

A.    A LOT OF WHISKEY, A LOT OF IT.

Q.    AND THROUGHOUT THAT TIME, BOTH SHE AND ROGER WOULD GO OUT TO THE BARS AND SUCH?

A.    THAT'S CORRECT.

Q.    OFTENTIMES, SINCE YOU WERE A TEENAGER, YOU WOULD KEEP THE KIDS?

A.    THAT'S CORRECT.

Q.    YOU WOULD BABYSIT?

A.    I WAS HER BABYSITTER.

Q.    THIS WAS DURING THE TIME SHE WAS PREGNANT WITH CHAD?

A.    THAT'S CORRECT.

Q.    DO YOU RECALL -- DO YOU RECALL, BY ANY CHANCE, THE NIGHT THAT CHAD WAS BORN?

A.    VAGUELY.   LIKE I SAID, I HAD ALREADY BEEN WENT TO BED THAT NIGHT.

Q.    YOU WERE AT THE HOUSE?

A.    YEAH.

Q.    YOU WEREN'T LIVING THERE?

A.    I HAD COME OVER THERE THAT WEEKEND.

Q.    AND SO, WHAT HAPPENED,  DO YOU REMEMBER?

A.    WHAT I CAN REMEMBER, THEY WOKE ME UP AND SAID DIANA IS IN LABOR, GOT TO GET HER TO A DOCTOR.

Q.    YOU WERE OVER THERE THAT NIGHT SO THEY COULD GO OUT TO THE BARS?

A.    YES, SIR.

Q.    NOW,  I WANT TO, ACTUALLY, TALK ABOUT, A LITTLE BIT, NOW,  YOU RECALL YOUR SISTER WAS A PRETTY TOUGH PERSON?

A.    THAT'S CORRECT.

Q.    SHE HAD, IN FACT, I THINK BEFORE THEY MOVED TO HUNTINGTON, HAD SHE EVER WORKED AS, I GUESS, IN A BAR AS A BOUNCER OR BARMAID?

A.    BARMAID, BOUNCER.  IF A FIGHT BROKE OUT, SHE WOULD HELP TAKE CARE OF IT.  YOU CAN GO ANY WAY WITH THAT ONE.

Q.    THESE ARE COAL MINER BARS?

A.    YES.

Q.    WHICH ARE PRETTY TOUGH PLACES?

A.    YEAH.

Q.    NOW, AFTER THEY MOVED, I GUESS, TO HUNTINGTON, THEY MOVED INTO HUNTINGTON, DID YOU STAY OUT IN THE COUNTRY?

A.    YEAH, NEAR HOME.  THEN I, EVENTUALLY, MOVED TO HUNTINGTON.

Q.    AND WHEN YOU MOVED TO HUNTINGTON, DID YOU STAY WITH THEM?

A.    I STAYED WITH THEM, UH-HUH (AFFIRMATIVE RESPONSE).

Q.    AND AS I UNDERSTAND IT, YOU STAYED WITH THEM OFF AND ON.  WOULD YOU STAY THERE FOR A WHILE AND THEN MIGHT MOVE OUT?

A.    I WASN'T MARRIED AT THE TIME OR NOTHING, SO I COULD HITCH A RIDE, I WOULD TAKE OFF AND GO SOMEWHERE.

Q.    SO, WHAT I WANT TO DO NOW, THOUGH, IS ASK YOU SOME QUESTIONS ABOUT ROGER AND DIANA'S RELATIONSHIP AND WHAT YOU SAW.  I MEAN, I AM NOT ASKING YOU TO TESTIFY ABOUT THINGS YOU HEARD, THAT KIND OF THING.  I AM ASKING YOU, BASED ON

**WHAT YOU SAW AND WHAT YOU KNOW YOURSELF, IF YOU CAN ANSWER SOME QUESTIONS.  NOW,  WOULD IT BE FAIR TO SAY THAT ROGER AND DIANA FOUGHT A LOT?**

A.    YES,  IT WOULD.

**Q.    CAN YOU DESCRIBE THOSE FIGHTS FOR THE JURY?**

A.    IT USED TO GET RIGHT DOWN BARE-KNUCKLE FIST FIGHTING. THEY WOULD FIGHT LIKE TWO MEN OR WHATEVER.  SHE, MOST OF THE TIME, GOT THE BLACK EYE AT THE END OF IT.  SHE WOULD FIGHT HIM JUST LIKE A MAN WOULD,  YOU KNOW.

**Q.    YOU DESCRIBED HER TO ME AS, I THINK THE WORDS YOU USED, THAT SHE WAS A "FIST-UP FIGHTER?"**

A.    OH, YEAH.

**Q.    WHAT DO YOU MEAN BY THAT?**

A.    SHE COULD HOLD HER OWN JUST AS GOOD AS ANYBODY ELSE COULD.

**Q.    YOU MEAN LIKE NOT SLAPPING, BUT LIKE --**

A.    SHE COULD HIT YOU.  WHEN SHE HIT YOU, YOU KNOW, IT -- I PUT IT THAT WAY.  SHE PUT HER WEIGHT INTO IT.  YOU COULD FEEL IT.  SHE WAS STOUT,  HER ARM AND STUFF.

**Q.    AND WHEN THEY WOULD FIGHT,  WERE THESE FIGHTS SERIOUS?**

A.    WELL, NOBODY EVER GOT KILLED,  BUT A LOT OF THEM, ACTUALLY, A LOT OF TIMES, SHE WOULD END UP WITH THE BLACK LIPS AND SO ON.

**Q.    BUSTED LIPS?**

A.    BUSTED LIPS,  SO ON.

Q.    WHEN THEY USED TO -- WHEN THEY FOUGHT, DID THEY USE THINGS OTHER THAN THEIR FISTS?

A.    THERE WERE A FEW TIMES SHE THROWED (SIC) STUFF AT HIM, A SHOE, WHATEVER SHE COULD GET HER HAND ON, SHE THROW IT. MOST OF THE TIME, SHE WOULD MISS HIM, NOT HIT HIM.  IT WOULD DEPEND, IF SOMETHING IS LAYING AROUND, SHE WOULD PICK IT UP.

Q.    LIKE POTS, PANS?

A.    POTS, PANS, SHOES, YOU KNOW.

Q.    AND HOW WOULD YOU DESCRIBE ROGER?

A.    THAT IS A HARD ONE TO ANSWER, SIR.  HE WASN'T A VERY GOOD FATHER.

Q.    I MEAN, HIS RELATIONSHIP WITH THESE FIGHTS.  WELL, LET ME TRY TO PUT IT IN A DIFFERENT WAY.  WHAT WOULD THEY FIGHT ABOUT?

A.    MOSTLY OVER MONEY OR JEALOUSY, SOMETIMES PLAYED A ROLE INTO IT.  JUST ALL DIFFERENT THINGS.  THERE WASN'T NO CERTAIN THING.  MONEY WAS A LOT OF THEIR BIGGEST ISSUE ON FIGHTS. AGAIN, THEY WOULD FIGHT OVER MONEY, START DRINKING, TALK ABOUT MONEY, TRY TO GET HER TO GO OUT, PARTY, WAIT TABLES, SHE WOULDN'T DO IT, THEN IT WOULD END IN A FIGHT.  IT WOULD BE ON THE KIDS.  JUST DIFFERENT THINGS.

Q.    AND WHEN YOU SAY "JEALOUSY," I GUESS SOMETIMES ROGER THOUGHT DIANA WAS MESSING AROUND ON HIM?

A.    YES, SIR.

Q.    AND CAN YOU DESCRIBE ANY OF THAT?  CAN YOU REMEMBER ANY

**PARTICULAR SITUATIONS?**

A.   WELL, ONE HE IS JEALOUS OF, THE GUY'S NAME IS PAUL BLAKE, WHO LIVED UP BEHIND HIM.   HE WAS REAL JEALOUS OF HIM. HE THOUGHT DIANA WAS MESSING AROUND WITH HIM.   HE NEVER SAID, SO I DIDN'T KNOW IF SHE WAS OR WASN'T.

**Q.   SHE WOULD BE UP THERE WHEN HE COME HOME FROM WORKING?**

A.   YEAH,  SHE WOULD BE UP THERE.   IN THE PROCESS OF DRINKING THEN, AT THAT TIME.

**Q.   AND HOW OFTEN WOULD THEY FIGHT?**

A.   AIN'T NO CERTAIN TIME FRAME ON IT.   FOUR OR FIVE DAYS OUT OF THE WEEK.  SOMETIMES THEY WOULD GET ALONG FOR TWO OR THREE WEEKS,  YOU KNOW.   JUST BACK AND FORTH.

**Q.   BUT WOULD IT BE FAIR TO SAY THAT THEY FOUGHT A LOT?**

A.   THEY FOUGHT A LOT,  YEAH.

**Q.   NOW,  DURING THIS PERIOD OF TIME WHEN THEY WERE IN HUNTINGTON,  AND THE TIMES YOU WERE AROUND AGAIN, ALL I AM ASKING ABOUT IS, WHEN YOU WERE AROUND PRETTY MUCH,  DO YOU EVER RECALL THEM BEING ON FOOD STAMPS?**

A.   YES, SIR,  I DO.

**Q.   AND DO YOU EVER RECALL THAT THEY SOLD THOSE FOOD STAMPS IN ORDER TO BUY ALCOHOL?**

A.   I NEVER DID SEE IT WITH MY OWN EYES.  THEY NEVER DID HAVE NO MONEY.  THEY GO UP TO A NEIGHBOR'S HOUSE OR ONE OF THE OTHER NEIGHBORS, THEY WOULD COME BACK WITH MONEY OR, ACTUALLY, GO GET BEER THEN.   YOU COULDN'T -- NO STORE THAT I EVER SAW

COULD YOU BUY BEER WITH FOOD STAMPS.  MOSTLY, THE NEIGHBORS BOUGHT THEM OFF OF THEM, THAT IS HOW THEY GOT IT.

Q.    I WANT TO GO BACK AND ASK YOU ONE THING NOW.  THE FIGHTING YOU SORT OF TALK ABOUT, DID YOU, THE TIME THAT DIANA WAS PREGNANT WITH CHAD, I WANT TO GO BACK AND ASK YOU A QUESTION ABOUT THAT.  DID THEY FIGHT DURING THAT TIME FRAME?

A.    YEAH, SOMEWHAT.  THEY WOULDN'T, THROUGH THE YEARS IT GOT WORSE, THEY DID THE ARGUING DURING THAT TIME.

Q.    FOUGHT PHYSICALLY DURING THAT TIME FRAME?

A.    YES.

Q.    AS I UNDERSTAND, IT GOT WORSE AS THE YEARS WENT ON?

A.    AS THE YEARS WENT ON, IT GOT WORSE, THE DRINKING PICKED UP.

Q.    DID YOU EVER SEE CHAD'S FATHER, ROGER, HIT HIM, HIT THE CHILDREN?

A.    YES, SIR, I HAVE.

Q.    CAN YOU DESCRIBE THAT?

A.    HE JUST, MOST OF THE TIME, HE NEVER TRIED TO DISCIPLINE WITH A BELT OR SWITCH, HE ALWAYS USED HIS HANDS OR FIST.  HE WOULD SWING AND HIT THEM, OR KICK THEM IN THE BUTT WITH HIS FOOT, OR BASICALLY SOMETHING LIKE THAT.

Q.    SO, HIT HIM WITH HIS FIST, KICK HIM, THAT KIND OF THING?

A.    PROBABLY A FEW TIMES THEY GOT A WHIPPING WITH A BELT, ALSO.

Q.    BUT THAT IS NOT WHAT YOU MOSTLY REMEMBER?

A.    MOSTLY, PHYSICALLY WHIP WITH HIS FIST AND FEET, WHATEVER.

Q.    AND WHEN THIS HAPPENED, WHAT DID THE KIDS DO?

A.    TRY TO GET AWAY FROM HIM.  MOST OF THE TIME, THEY WOULD RUN FROM HIM AND HIDE.

Q.    GO AHEAD?

A.    HE WOULDN'T CHASE THEM OR NOTHING.  HE WOULD JUST LET THEM GO.

Q.    WOULD IT BE ACCURATE TO SAY,  IF IT IS NOT,  PLEASE TELL THE JURY,  DID THEY, DID THE KIDS PRETTY MUCH RUN THE STREETS?

A.    YES, SIR,  THAT IS CORRECT.

Q.    AND THEY WOULD BE OUT THROUGH ALL HOURS OF THE DAY?

A.    AND INTO THE NIGHT,  YES, SIR.

Q.    I WANT TO TALK A LITTLE BIT ABOUT,  DO YOU REMEMBER THAT ROGER DIDN'T HAVE ANY TEETH?

A.    YES,  I REMEMBER THAT.

Q.    AND THAT SORT OF MADE HIM, I GUESS, UNUSUAL LOOKING?

A.    VERY UNUSUAL.

Q.    PARDON ME?

A.    VERY UNUSUAL,  EXCUSE ME.

Q.    AND WERE THEY, BASED ON WHAT YOU SAW,  WERE THEY POOR?

A.    YES, SIR,  YOU COULD SAY THEY WERE.

Q.    AND OFTEN, I THINK YOU HAD TOLD ME, THAT A LOT OF TIMES

FOOD WAS PRETTY TOUGH TO COME BY?

A.   YES, SIR,  IT WAS.

Q.   AND DO YOU REMEMBER -- CAN YOU DESCRIBE, SOMEWHAT, WHAT THE HOUSE WAS LIKE?  YOU STAYED THERE ON AND OFF?

A.   ALWAYS PRETTY NASTY AND DIRTY.   HAD A LOT OF BUGS AND COCKROACHES,  I GUESS I COULD SAY.   IT WAS A PRETTY NASTY HOME.

Q.   ANYTHING ELSE?  DID YOU EVER SEE RATS OR MICE?

A.   RATS,  YES, SIR.  THEY HAD RATS, AND MICE, AND ROACHES, AND CATS, AND DOGS, AND EVERYTHING.

Q.   I WANT TO ASK YOU A FEW QUESTIONS ABOUT,  DID YOU EVER HEAR,  AGAIN, WHEN YOU WERE THERE WHAT YOU SAW.   DID YOU EVER HEAR ROGER AND DIANA CALL THE CHILDREN, YOU KNOW, CHAD AND HIS BROTHERS AND SISTERS, NAMES?

A.   YES, SIR.

Q.   AND I KNOW IT IS EMBARRASSING FOR YOU,  BUT I THINK IT IS IMPORTANT THAT THE JURY HEAR THE ACTUAL LANGUAGE.

A.   THE ACTUAL LANGUAGE?

Q.   THE ACTUAL LANGUAGE SO EVERYBODY UNDERSTANDS.   THERE HAS BEEN SOME LANGUAGE IN THIS COURTROOM.   SOME OF THE ACTUAL THINGS THAT YOU HEARD THEM YELL AT THE CHILDREN, THE NAMES THEY CALLED THEM?

A.   CALLED THEM SONS-OF-BITCHES,  FUCKERS,  MOTHER FUCKERS, ALL OF THE ABBREVIATIONS FOR DIRTY LANGUAGE.   THEY COME OUT OF THE WAY --

Q.    COCKSUCKERS?

A.    COCKSUCKERS, YOU NAME IT.    THERE ISN'T A NAME THEY HAVEN'T BEEN CALLED AT SOME POINT IN TIME.

Q.    PARDON ME?

A.    THERE WASN'T A DIRTY NAME THAT YOU COULD USE THAT THEY DIDN'T HEAR OUT OF THEIR MOUTH AT SOME POINT IN TIME OR SOMETHING.

Q.    THIS WOULD BE WHEN THEY WERE OUTSIDE YELLING AT THEM OR FOR THEM?

A.    BE IN THE HOUSE ARGUING WITH THEM, WELL, YOU LITTLE SON OF A BITCH THAT, OR YOU LITTLE FUCKER THIS, OR YOU LITTLE MOTHER FUCKER, SO ON, SO ON.    YOU HEAR THAT A LITTLE BIT. THE WHOLE NEIGHBORHOOD WOULD HEAR IT.    SHE WOULD BE SCREAMING. SCREAMING GD ASS, GODDAMN ASS IN THE HOUSE.    I GUESS I CAN SAY THAT, I'M SORRY.    EXCUSE ME, LORD, FOR USING YOUR NAME IN VAIN.

Q.    NOW, THERE HAS BEEN SOME TESTIMONY PREVIOUSLY ABOUT THIS, SO THIS WON'T BE THE FIRST TIME THE JURY WILL HAVE HEARD THIS, SO I WANT TO GET YOU TO TALK ABOUT IT, TOO.    THERE CAME A TIME ON THE HOUSE ON LEEWARD AVENUE WHEN, I GUESS, ROGER SOMEHOW GOT A POOL TABLE?

A.    YES, SIR.

Q.    AND HE PUT IT DOWN IN THE BASEMENT.    SO, AFTER THAT HAPPENED, HOW WAS THAT ROOM USED?

A.    PRETTY MUCH A PARTY ROOM THEN.    WELL, NOT EVERY NIGHT

DURING THE WEEK, MOSTLY ON THE WEEKENDS,  ON THE WEEKENDS.

HARDLY ANY WEEKEND THEY DIDN'T HAVE A PARTY DOWN THERE,

ALWAYS HAD A PARTY.  ALL THE NEIGHBORS WOULD GATHER IN THERE

AND PLAY POOL ALL NIGHT LONG.

**Q.   SOMETIMES DURING THE WEEK, BUT PRIMARILY DURING THE**

**WEEKENDS?**

A.   MOSTLY DURING THE WEEKEND.  THE OTHER PEOPLE WORKING,

BUT DURING THE WEEKEND.  POTENTIALLY, DRINK DURING THE WEEK.

ON WEEKENDS, THEY WOULD STAY UP UNTIL TWO, OR THREE, OR FOUR

IN THE MORNING.

**Q.   OKAY.  I WANT TO MAKE SURE, DURING THE WEEK THERE**

**WOULD BE PEOPLE OVER THERE AND DRINK, BUT IT WOULD END SOONER**

**THAN ON WEEKENDS?**

A.   YES,  THAT IS CORRECT.

**Q.   SO,  HOW MANY PEOPLE WOULD BE OVER THERE?**

A.   FIFTEEN (15) OR 20 PEOPLE THERE.  THEY JUST HAVE NEW

YEAR'S PARTIES AND CHRISTMAS PARTIES.  THEY USED TO HAVE

BIRTHDAY PARTIES, IT WAS FOR HIM OR HER.  I NEVER REMEMBER

THEM HAVING THE KIDS A BIRTHDAY PARTY.  I REMEMBER HIM AND HER

ALWAYS THROWING A PARTY FOR THEMSELVES.

**Q.   WAS IT A COMMON THING FOR FIGHTS TO BREAK OUT DOWN**

**THERE?**

A.   YES, SIR,  IT WAS VERY COMMON.

**Q.   AND WHO WOULD FIGHT?**

A.   SOMETIMES DIANA AND ROGER, OR ONE OF ROGER'S BROTHERS,

OR ONE OF THE NEIGHBORS, IT JUST DEPENDS.   SOME OF THE BOYS WOULD BE DOWN THERE, THEY WOULD START FIGHTS DOWNSTAIRS. DEPENDS ON WHO WAS AT THE WRONG PLACE AT THE RIGHT TIME OR WHATEVER.   IT WASN'T NO CERTAIN PEOPLE.   THEN JERRY BLAKE WOULD COME DOWN; THEY WOULD FIGHT.   HE STAYED THERE.

**Q.    WHAT WOULD PEOPLE FIGHT ABOUT?**

A.    JUST LOSING A POOL GAME, SOMETHING LIKE THAT WOULD START A FIGHT.   IT WAS, BASICALLY, THAT SIMPLE.   LOSE A GAME, GET MAD, START A FIGHT.   THEY ARGUE ABOUT SOMETHING AND, ALL OF A SUDDEN, THEY TURN INTO A FISTFIGHT.   SOME OF THEM NEIGHBORHOOD BOYS AROUND THERE.

**Q.    PARDON ME?**

A.    SOME OF THE NEIGHBORHOOD BOYS LIKED TO HARASS.   AND THEY LOVED TO FIGHT THE BLAKE BOY AND COMPASS BOY AND STUFF IN THAT NEIGHBORHOOD AT THAT TIME.

**Q.    ROGER WAS QUITE A FIGHTER AT TIMES, TOO, WASN'T HE?**

A.    YES, SIR, HE WAS.

**Q.    AND WOULD SOMETIMES DIANA GET INVOLVED, WOULD SHE FIGHT, TOO?**

A.    YES, SIR, SHE WOULD.

**Q.    WITH EITHER ROGER OR SOMETIMES WITH OTHER PEOPLE?**

A.    WITH THE OTHER PEOPLE, YEAH.

**Q.    IN ADDITION, DO YOU REMEMBER, WERE THE POLICE EVER CALLED?**

A.    YES, SIR.

Q.    AND WHAT WOULD HAPPEN?

A.    THEY HAD A SCANNER IN THEIR BASEMENT, AND YOU COULD HEAR IT ON THEM, EVERYBODY WOULD JUST SCATTER AND TAKE OFF, GO HIDE.  GO BACK TO THEIR HOUSE OR WHATEVER, YOU KNOW, IN THE NEIGHBORHOOD.  JUST GET OUT OF THE BASEMENT.  BY THE TIME THE POLICE GOT THERE, EVERYBODY WOULD ALREADY BE GONE.

Q.    AND I KNOW YOU SAID PEOPLE DOWN THERE WERE DRINKING. WERE PEOPLE USING DRUGS?

A.    THE ONLY THING I EVER SEEN WAS MARIJUANA.  I NEVER DID SEE ANYTHING BEYOND THAT.  MARIJUANA IS ALL I SEEN THEM SMOKE.  I NEVER SEEN ANYTHING PAST THAT POINT, NO HEAVY DRUGS.

Q.    ALCOHOL AND MARIJUANA?

A.    ALCOHOL AND MARIJUANA,  YES, SIR.

Q.    DO YOU RECALL EVER  -- DID ROGER LIKE TO WATCH PORNOGRAPHIC MOVIES?

A.    YES, SIR,  HE DID.

Q.    AND DID HE ALLOW THE CHILDREN TO WATCH THEM?

A.    YES, SIR,  HE DID.

Q.    EVEN WHEN THEY WERE LITTLE CHILDREN?

A.    EVEN WHEN THEY WERE LITTLE CHILDREN, THAT IS CORRECT.

Q.    I THINK YOU TOLD ME HE THOUGHT IT WAS FUNNY TO WATCH THE LITTLE KIDS WATCH THESE TAPES?

A.    HE GOT A KICK OUT OF IT IN A CERTAIN WAY.  HE THOUGHT IT WAS FUNNY.

Q.    BUT JUST TO MAKE CLEAR, WHEN YOU WERE TALKING ABOUT PORNOGRAPHIC MOVIES, WE ARE NOT TALKING ABOUT -- WE ARE TALKING ABOUT THE KIND THAT YOU BUY,  I MEAN?

A.    THE KIND YOU RENT OUT OF A MOVIE STORE.

Q.    DO YOU REMEMBER OR RECALL THAT ROGER TATTOOED HIS KIDS?

A.    YES, SIR,  I DO.

Q.    NOW,  LET ME ASK YOU, I AM ALMOST DONE.  I HAVE JUST A COUPLE OF THINGS I WANT TO ASK YOU ABOUT, MR. HOLBROOK.  DID YOU EVER SEE EITHER ROGER OR DIANA, JUST FROM WHAT YOU SAW, SHOW ANY INTEREST IN THE KID'S EDUCATION OR SCHOOLWORK?

A.    NO, SIR. I CAN'T SAY THAT I HAVE.

Q.    PARDON ME?

A.    I CAN'T SAY I EVER DID.

Q.    I THINK YOU SAID THEY NEVER REALLY HAD BIRTHDAY PARTIES OR ANYTHING LIKE THAT?

A.    NOT THAT I CAN RECALL, NO.

Q.    AND DIDN'T REALLY SORT OF ENCOURAGE THEM TO GET GOOD GRADES OR ANYTHING LIKE THAT?

A.    THAT IS CORRECT.

Q.    DO YOU REMEMBER  -- DO YOU REMEMBER THAT CHAD HAD A SPEECH IMPEDIMENT AS A CHILD?

A.    YES, SIR.

Q.    HE TALKED FUNNY?

A.    THAT'S CORRECT.

Q.    THE LAST THING I WANT TO ASK YOU A FEW QUESTIONS ABOUT.

DO YOU REMEMBER THE KIDS, AND, I GUESS, NOT JUST CHAD, BUT CHAD AND HIS BROTHERS,  DO YOU REMEMBER THAT THEY USED TO STEAL STUFF?

A.    YES, SIR,  I DO.

Q.    CAN YOU TELL THE JURY A LITTLE BIT ABOUT THAT?

A.    THEY USED TO GO OUT AND BRING IN NEW TELEVISIONS, BRING BRAND NEW LAWN MOWERS,  BRAND NEW BICYCLES.   THEY WERE ALWAYS FOUND IN THE GARBAGE.   LOOK WHAT WE FOUND IN THE GARBAGE DUMP.  SOMEBODY CLEANED OUT THE GARAGE, PUT IT NEXT TO THE ROAD.   SOME KIND OF WILD STORY.   THE PARENTS SAID, OH, WELL,  THIS IS NICE,  PUT IT IN YOUR ROOM.   WE NEEDED A NEW LAWN MOWER.  WHATEVER THEY BROUGHT HOME.

Q.    WAS IT OBVIOUS TO YOU THE KIDS STOLE THIS STUFF?

A.    WELL, YEAH,  TO ME, IT WAS.

Q.    AND WHY WAS IT OBVIOUS?

A.    I USED TO SAY DIANA, YOU DON'T WANT TO FIND OUT WHERE THIS CAME FROM.  SHE SAID, THEY FOUND IT.   THEY DIDN'T CARE. THE KIDS TELL ME THEY FOUND IT.  THEY JUST TOOK THE WORD FOR IT.

Q.    IF IT WAS SOMETHING THAT ROGER OR DIANA WANTED, THEY WOULD JUST KEEP IT?

A.    EXACTLY.

     MR. BLUME:  ONE SECOND,  MR. HOLBROOK.   THANK YOU MR. HOLBROOK.  ONE OF THESE GENTLEMEN MAY ASK YOU SOME QUESTIONS ON CROSS-EXAMINATION.

CROSS EXAM OF KEVIN HOLBROOK

THE COURT:   CROSS-EXAMINATION.

CROSS EXAM

BY MR. GASSER:

Q.   **GOOD AFTERNOON, MR. HOLBROOK.**

A.   GOOD AFTERNOON.

Q.   **MY NAME IS JOHNNY GASSER.  I AM ONE OF THE PROSECUTORS WORKING ON THE CASE.  I HAVE JUST A FEW QUESTIONS FOR YOU, OKAY?**

A.   OKAY.

Q.   **IT IS FAIR TO SAY THAT THE NEIGHBORHOOD THAT THE FULKS GREW UP IN WAS A LOWER, MIDDLE CLASS WORKING CLASS NEIGHBORHOOD,  IS THAT A FAIR DESCRIPTION?**

A.   THAT IS A FAIR DESCRIPTION,  YES, SIR.

Q.   **WHEN PEOPLE -- WHEN MEN AND WOMEN IN THAT COMMUNITY FOUND WORK, IT WAS TOUGH WORK,  IT WAS LONG HOURS?**

A.   BASICALLY, EIGHT-HOUR DAY OR SO.

Q.   **THERE WAS A COAL MINE THERE?**

A.   NO, SIR.

Q.   **WHAT KIND -- I THOUGHT YOU MENTIONED SOMETHING ABOUT MINING?**

A.   THAT IS YEARS AGO.  WHEN WE LIVED IN HUNTINGTON, WEST VIRGINIA. THAT IS THE CITY.  YOU WORK IN RESTAURANTS OR JUST DEPENDS ON WHAT YOU WANT TO DO WHEN YOU FOUND A JOB THERE, GAS STATIONS.

Q.   **BUT LIKE MOST NEIGHBORHOODS IN THIS COUNTRY,  MOST OF**

## CROSS EXAM OF KEVIN HOLBROOK

THE PEOPLE, MOST OF THE PEOPLE LIVING IN THAT NEIGHBORHOOD WERE SIMILAR WHEN IT CAME TO THE AMOUNT OF MONEY THAT WAS COMING IN?

A.    THAT'S CORRECT.

Q.    AND THERE WERE A LOT OF ADULTS, PARENTS LIVING IN THAT NEIGHBORHOOD THAT WOULD GO TO THESE BARS, NOT JUST DIANA AND ROGER; IS THAT CORRECT?

A.    THAT'S CORRECT.

Q.    AND SO, THERE WERE OTHER PEOPLE IN THAT COMMUNITY, IN THIS LOWER MIDDLE CLASS WORKING CLASS COMMUNITY, THAT EXCESSIVELY DRANK ALCOHOL, NOT JUST ROGER AND DIANA?

A.    THAT'S CORRECT.

Q.    THEY, TOO, HAD CHILDREN, A LOT OF KIDS IN THAT NEIGHBORHOOD, WEREN'T THERE?

A.    YES, SIR, THERE WAS.

Q.    AND THERE WERE A LOT OF NEIGHBORHOOD KIDS THAT WOULD STAY OUT ALL NIGHT LONG RUNNING AROUND WITH THE FULKS BOYS?

A.    THAT'S CORRECT.

Q.    AND A LOT OF NEIGHBORHOOD KIDS THAT WERE DRINKING ALCOHOL AT AN EARLY AGE, AND SMOKING MARIJUANA AT AN EARLY AGE, JUST LIKE THE FULKS BOYS?

A.    I NEVER DID WITNESS THAT.  I CAN'T SAY THAT THEY WERE.

Q.    IT WASN'T JUST CHAD FULKS THAT GREW UP IN THE HOME THAT YOU HAVE DESCRIBED TO THE JURY, BUT RONNIE FULKS GREW UP IN THAT HOME, AS WELL?

**CROSS EXAM OF KEVIN HOLBROOK**

A.    YES, SIR.

Q.    **DEWAYNE FULKS GREW UP IN THAT HOME?**

A.    CORRECT.

Q.    **SHANNON FULKS GREW UP IN THAT HOME?**

A.    CORRECT.

Q.    **SHERRI FULKS GREW UP IN THAT HOME?**

A.    ALSO CORRECT.

Q.    **WERE YOU AWARE THAT, AT TIMES, THE FULKS KIDS WOULD GO SPEND TIME WITH THEIR GRANDPARENTS, WOULD VISIT THEIR GRANDPARENTS LIKE DURING THE SUMMERTIME WHILE THEY WERE OUT OF SCHOOL?**

A.    NO, SIR, I DON'T RECALL THAT.

Q.    **YOU DON'T RECALL THAT.  YOU MENTIONED THAT THE NEIGHBORHOOD BOYS WOULD COME OVER TO THE FULKS'S HOUSE.  DO YOU REMEMBER THAT TESTIMONY?**

A.    YEAH.  THEY WOULD PLAY WITH THEM, YEAH.

Q.    **SO, THAT HOUSE WAS KIND OF -- A BUNCH OF THE NEIGHBORHOOD BOYS KIND OF USED THAT HOUSE AS A PLACE TO HANG OUT?**

A.    THAT'S CORRECT.

MR. GASSER: BEG THE COURT'S INDULGENCE.  THAT IS ALL I HAVE, YOUR HONOR, THANK YOU.

THE COURT:  ANY REDIRECT?

MR. BLUME: NO, SIR.

THE COURT:  THANK YOU. YOU MAY STEP DOWN.  PLEASE

Q.    THIS OCCURS EVEN WITH POLICE OFFICERS?

A.    POLICE OFFICERS ARE THE WORST.

Q.    AND WHEN THEY  -- WHEN YOU INVESTIGATE POLICE OFFICER SHOOTINGS,  ARE THEY OFTEN AWARE OF WHETHER OR NOT THEY EVEN RELOADED A FIREARM?

A.    THEY DON'T KNOW HOW MANY TIMES THEY SHOT,  WHERE THEY RELOADED, OR WHERE THEY WERE STANDING.

Q.    AN EYEWITNESS'S TESTIMONY CAN WILDLY DIVERGE WITH THE PHYSICAL EVIDENCE THAT YOU FIND?

A.    YES.

Q.    WHAT DO YOU GO WITH?

A.    THE PHYSICAL EVIDENCE IS THE ONLY THING YOU CAN GO WITH.

        MR. NETTLES:  THANK YOU,  NO MORE QUESTIONS.

        THE COURT:  THANK YOU,  SIR.  YOU MAY STEP DOWN. PLEASE CALL YOUR NEXT WITNESS.

        MS. JOHNSON:  WE CALL BRIAN MESSINGER.

        BRIAN MESSINGER, HAVING BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

                        DIRECT EXAM

BY MS. JOHNSON:

Q.    HELLO,  BRIAN.   HOW OLD ARE YOU?

A.    FIFTY.

Q.    AND WHERE DO YOU LIVE NOW?

A.    HUNTINGTON,  WEST VIRGINIA.

Q.    AND YOU ARE MARRIED TO LORIE MESSINGER; IS THAT RIGHT?

A.    YES, MA'AM.

Q.    WAS THERE A TIME WHEN YOU LIVED WITH CHAD FULKS'S FAMILY?

A.    YES.

Q.    ABOUT HOW OLD WAS CHAD AT THAT TIME?

A.    PROBABLY ABOUT 11.

Q.    AND HOW LONG DID YOU LIVE WITH THE FAMILY?

A.    PROBABLY, SIX MONTHS.

Q.    YOU SORT OF KEPT TRACK OF HIM FOR ANOTHER COUPLE OF YEARS?

A.    YES, UNTIL HE WAS ABOUT 15.

Q.    SINCE THEN, YOU HAVE HAD NO CONTACT?

A.    NO.

Q.    AT THE TIME YOU WERE LIVING WITH THE FULKS, YOU WERE NOT DATING YOUR WIFE LORIE; IS THAT RIGHT?

A.    NO.

Q.    YOU WERE, ACTUALLY, DATING CHAD'S SISTER SHERRI; IS THAT RIGHT?

A.    YES.

Q.    HOW DID YOU COME TO LIVE WITH THE FULKS?

A.    I MET HIS MOTHER AT CHURCH.  AT THAT TIME, I DIDN'T HAVE NOWHERE TO LIVE, SO SHE INVITED ME TO STAY WITH HER AND HER FAMILY.

Q.    SO, SHE WAS GOING TO CHURCH, AT THAT TIME?

A.    YES.

Q.    AND WHEN YOU STARTED LIVING AT THEIR HOUSE,  DID YOU THINK THAT THE FULKS KIDS WERE SUPERVISED BY THEIR PARENTS IN A SORT OF NORMAL, TYPICAL WAY?

A.    NO.

Q.    WELL, WHO DID SUPERVISE THEM?

A.    I GUESS THEY SUPERVISED THEIRSELVES.

Q.    THEY DID WHAT THEY WANTED TO DO?

A.    YES.

Q.    DID YOU HAVE AN OPINION ABOUT WHY THE PARENTS DID NOT SUPERVISE THEM?

A.    OH, MY GOSH,  DID I HAVE AN OPINION? WELL,  I GUESS I KIND OF ALWAYS THOUGHT THEY JUST HAD THEIR OWN SELVES.

Q.    THEY WERE THINKING OF THEIRSELVES?

A.    RIGHT.

Q.    AT THE TIME YOU WERE LIVING WITH THEM, THEY WERE DRINKING?

A.    YES.

Q.    HOW MUCH WERE THEY DRINKING?

A.    A LOT.

Q.    A LOT?

A.    YEAH.

Q.    AND HOW DID THEY TREAT THEIR CHILDREN?  IF THEY DIDN'T SUPERVISE THEM, WHAT DID THEY DO?

A.    WHAT DID THEY DO TO THEIR CHILDREN?

**Q.** YES.

A. THEY WHOOPED THEM A LOT IS ALL I CAN REMEMBER.

**Q. THEY YELLED AT THEM?**

A. OH, YEAH, YEAH, LOTS OF YELLING, YES, CUSSING.

**Q. THAT WAS BOTH ROGER AND DIANA; IS THAT RIGHT?**

A. YES.

**Q. DID THE BOYS HAVE IT ABOUT THE SAME AS SHERRI, OR WAS IT DIFFERENT?**

A. THEY WAS DIFFERENT. SHE, I GUESS, BECAUSE MAYBE SHE WAS THE ONLY GIRL, SHE HAD PREFERRED TREATMENT. SHE HAD HER OWN ROOM IN THE HOUSE. SHE HAD IT LOCKED WHERE NOBODY ELSE COULD GO IN IT. AND THE BOYS WERE JUST LEFT TO LIVE HOWEVER. THEY LIVED THE BEST THEY COULD.

**Q. I WAS GOING TO GET TO THAT IN A MINUTE, BUT I WILL ASK YOU NOW. YOU SAID SHE HAD HER OWN ROOM. WHERE DID THE BOYS SLEEP?**

A. JUST ANYWHERE THEY COULD. SOMETIMES THEY WOULD SLEEP UPSTAIRS WITH THE PARENTS, SOMETIMES THEY WOULD SLEEP ON THE COUCH, AND SOMETIMES THEY WOULD SLEEP ON THE FLOOR.

**Q. WHEN YOU SAY "UPSTAIRS WITH THE PARENTS," YOU MEAN IN THEIR PARENTS' BEDROOM?**

A. YES.

**Q. WAS THERE FIGHTING BETWEEN THE PARENTS, TOO?**

A. OH, YES.

**Q. AND THAT WAS JUST ARGUING OR THAT WAS SOMETHING MORE?**

A.    I HAVE SEEN SOME FIGHTS, YES.

Q.    SOME KNOCK-DOWN DRAG-OUT FIGHTS?

A.    YES.

Q.    WHAT WAS ROGER'S ATTITUDE?  THE JURY HAS HEARD EVIDENCE THAT THE BOYS STOLE A LOT.  ARE YOU AWARE OF THAT?

A.    OH, YES.

Q.    AND WHAT WAS ROGER'S ATTITUDE ABOUT THE BOY'S STEALING?

A.    I ALWAYS THOUGHT HE THOUGHT IT WAS FUNNY AND ENCOURAGED A LITTLE BIT.

Q.    THOUGHT IT WAS FUNNY AND ENCOURAGED THEM?

A.    YEAH.

Q.    WHAT WAS THE HOUSE LIKE?

A.    PRETTY NASTY.  I ALWAYS THOUGHT HE THOUGHT IT WAS FUNNY. IT HAD MICE AND BUGS, JUST FILTHY.

Q.    HAD SOME DOGS?

A.    HAD A COUPLE OF MANGY DOGS THERE.  AND THEY SLEPT THERE WITH THEM.

Q.    WAS THERE ALWAYS ENOUGH FOOD?

A.    NO.  EVERY TIME I WAS OVER THERE, THERE WAS HARDLY ANYTHING THERE.  SOMETIMES I WOULD BRING FOOD IN, OR SOMETIMES I WOULD TAKE THEM AND HELP THEM GET THEM SOMETHING TO EAT.

Q.    AND DID YOU TRY TO HELP IN ANY OTHER WAY?

A.    YEAH.  CHAD.  I TRIED TO TALK TO HIM, YOU KNOW.  HE WAS ABOUT 11 AT THE TIME, I GUESS, AND HE DIDN'T UNDERSTAND

THE DIRECTION HE WAS GOING IN, AND I WAS TRYING TO TALK TO HIM
ABOUT THAT HE WAS GOING THE WRONG WAY.  AT THAT TIME, I THINK
HE WAS TOO FAR LIKE THE OTHER BOYS TO LISTEN.

Q.    HE WAS WITH HIS BROTHERS A LOT?

A.    YES.

Q.    AND THEY WERE ALL STEALING?

A.    YES.

Q.    WERE THEY FIGHTING, TOO?

A.    YES.

Q.    DID IT EVER COME TO YOUR ATTENTION THAT THEY GOT IN
TROUBLE WITH THE LAW FOR THIS STEALING?

A.    YES.

Q.    WHAT WOULD THE PARENTS DO WHEN THEY GOT IN TROUBLE WITH
THE LAW?

A.    THEY ACT LIKE IT WASN'T NOTHING.  LET IT GO.  LAUGH
ABOUT IT, KIND OF.  DID NOTHING.

Q.    DID THEY GO TO COURT WITH THE BOYS?

A.    YEAH.

Q.    BUT WHEN THEY GOT HOME?

A.    THEY LET THEM GO.  DIDN'T DO ANYTHING, DIDN'T PUNISH
THEM OR NOTHING.

Q.    DO YOU RECALL A TIME WHEN ROGER LEFT?

A.    YES.

Q.    DID THINGS GET BETTER THEN?

A.    I THINK SO, YES.

Q.    BECAUSE THERE WASN'T ANY FIGHTING?

A.    RIGHT.

Q.    WAS DIANA ABLE TO CONTROL THE CHILDREN AFTER THAT?

A.    I DON'T THINK, AT THAT TIME, ANYBODY COULD HAVE REALLY CONTROLLED THEM.  I THINK SHE DONE HER BEST.

Q.    AFTER SUFFERING?

A.    YES.

Q.    MR. MESSINGER, YOU WERE ABUSED AS A CHILD, YOURSELF?

A.    YES.

Q.    YOU TAKE MEDICATION NOW FOR SOME MENTAL PROBLEMS YOU HAVE?

A.    YES, MA'AM.

Q.    AND IT WAS NOT EASY FOR YOU TO COME DOWN HERE AND TESTIFY,  WAS IT?

A.    NO.

Q.    WHY DID YOU DO IT?

A.    BECAUSE I UNDERSTAND,  YOU KNOW. I DON'T KNOW WHAT THE PSYCHOLOGISTS SAY ABOUT THAT.  BUT I UNDERSTAND THAT WHEN YOU ARE YOUNG, AND YOU ARE MOLESTED,  YOU ARE BEAT, ABUSED.

MR. GASSER:  YOUR HONOR, I OBJECT.  I SHOULD HAVE OBJECTED BEFORE THIS.  THIS IS TOTALLY SELF-ABSORBANT AND IT IS JUST NOT RELEVANT.

MS. JOHNSON:  I THINK IT IS RELEVANT.

MR. GASSER:  THIS IS NOT RELEVANT.

THE COURT:  ARE YOU ASKING WHY HE CAME DOWN TO

TESTIFY?

MR. GASSER:  IT IS NOT RELEVANT.

THE COURT:  I DON'T THINK IT IS RELEVANT, MS. JOHNSON.  I SUSTAIN THE OBJECTION.

BY MS. JOHNSON:

Q.  **MR. MESSINGER, WE TOLD YOU YOU DID NOT HAVE TO COME; IS THAT RIGHT?**

A.  YES, MA'AM.

Q.  **AND YOU CHOSE TO COME?**

A.  YES.

Q.  **DO YOU REMEMBER ONE OF THE CHILDREN TELLING YOU, AT THE TIME YOU WERE LIVING THERE, THAT HE WANTED TO KILL HIMSELF?**

A.  YES.

Q.  **YOU DON'T REMEMBER WHICH BOY THAT WAS,  THOUGH?**

A.  I THINK IT WAS CHAD BECAUSE I NEVER REALLY TALKED TO THE OTHER BOYS THAT MUCH.  IT WAS USUALLY CHAD.  AND, YES, I THINK I CAN REMEMBER HIM SAYING THAT.

Q.  **YOU DO REMEMBER ONE OF THEM.  YOU ARE NOT CERTAIN IT WAS CHAD?**

A.  NO.  I AM NOT REALLY SURE IT WAS CHAD.  BECAUSE I THOUGHT, AT THE TIME, THAT IT WAS KIND OF ODD THAT A LITTLE BOY AT THAT AGE WAS THINKING ABOUT SUICIDE.  AND, YOU KNOW, I CAN REMEMBER I SPENT MOST OF MY TIME TALKING TO CHAD, SO I THINK IT WAS CHAD.

MS. JOHNSON: THANK YOU,  MR. MESSINGER.  ANSWER ANY

App. 01049

CROSS EXAM OF BRIAN MESSINGER

QUESTIONS MR. GASSER MIGHT HAVE.

THE COURT:   CROSS-EXAMINATION.

CROSS EXAM

BY MR. GASSER:

Q.   **GOOD AFTERNOON, MR. MESSINGER.**

A.   GOOD AFTERNOON.

Q.   **MY NAME IS JOHNNY GASSER.  I AM ONE OF THE PROSECUTORS INVOLVED.   WE HAVE NEVER MET, HAVE WE, SIR?**

A.   NO.

Q.   **I HAVE A COUPLE OF QUESTIONS FOR YOU.   YOU INDICATED, I KNOW YOU DON'T KNOW ANYONE IN THIS COURTROOM.  OBVIOUSLY, YOU DON'T KNOW ANY OF THE JURORS.  I KNOW IT MIGHT BE DIFFICULT FOR YOU TO TALK ABOUT.   YOU INDICATED TO THE JURY THAT YOU, YOURSELF, HAD A TOUGH UPBRINGING?**

A.   YES, SIR.

Q.   **YOU WERE PHYSICALLY ABUSED, YOURSELF?**

A.   YES, SIR.

Q.   **AND DESPITE THE FACT THAT YOU HAD A TERRIBLE UPBRINGING, AND THE FACT THAT YOU SUFFERED AT THE HANDS OF PHYSICAL ABUSE,  YOU KNEW THAT GOING OUT AND CARJACKING INNOCENT PEOPLE WASN'T RIGHT?**

A.   YES.

Q.   **KIDNAPPING WOMEN, YOU DON'T DO THAT?**

A.   NO.

Q.   **RAPING WOMEN, YOU DON'T DO THAT?**

**CROSS EXAM OF BRIAN MESSINGER**

A.    NO.

Q.    KILLING WOMEN,  YOU DON'T DO THAT?

A.    NO.

Q.    WHEN YOU MOVED INTO THE FULKS'S RESIDENCE, YOU INDICATED CHAD WAS 11.  IF HE WAS BORN IN '77, THAT WOULD HAVE BEEN SOME TIME AROUND 1988?

A.    THAT IS KIND OF A GUESS.  IT WAS 11,  12 IN THAT AREA.

Q.    I AM NOT ASKING.  SOME TIME IN THE LATE EIGHTIES, IS THAT A FAIR --

A.    YES.

Q.    SO,  YOU WOULD HAVE BEEN IN YOUR MID THIRTIES?

A.    YES.

Q.    YOU DIDN'T SEE ANY OBVIOUS PHYSICAL SIGNS OF INJURY TO ANY OF THESE KIDS,  DID YOU?

A.    PHYSICAL?

Q.    I MEAN,  THESE KIDS WEREN'T GOING TO SCHOOL WITH OBVIOUS BLACK EYES, AND BLEEDING WOUNDS, AND THE SCHOOL NOT DOING ANYTHING ABOUT IT?

A.    NO.

Q.    THE KIDS WERE GOING TO SCHOOL, AND THEY WERE DRESSED APPROPRIATELY WHEN THEY WENT TO SCHOOL?

A.    I DON'T THINK THEY WENT TO SCHOOL HARDLY.

Q.    SO, YOU ARE SAYING THE KIDS, AT TIMES, WOULD SKIP SCHOOL?

A.    A LOT,  YEAH.

CROSS EXAM OF BRIAN MESSINGER

Q.  THEY CONTINUED TO GET PASSED ON TO FIFTH GRADE, TO SIXTH GRADE?

A.  I DON'T KNOW.

Q.  WERE THE POLICE EVER CALLED TO THE SCENE -- TO THE HOUSE WHEN YOU WERE THERE?

A.  YES, ONCE, BUT I DON'T REMEMBER WHAT IT WAS.

Q.  SO, THE HUNTINGTON POLICE DEPARTMENT WAS CALLED TO THE SCENE AND HAD AN OPPORTUNITY TO VIEW THE LIVING ARRANGEMENTS AND THE LIVING CONDITIONS OF THE FULKS'S FAMILY?

A.  THEY NEVER WENT IN WHEN I WAS THERE.

Q.  THEY NEVER CAME IN?

A.  NO.

Q.  YOU INDICATED YOU RECALL THE BOYS, AT TIMES, WOULD GO TO COURT?

A.  YES.

Q.  WERE YOU EVER PRESENT WHEN ANY COURT PERSONNEL WOULD COME VISIT THE HOME TO DETERMINE WHETHER OR NOT THE CHILDREN WERE BEING TREATED APPROPRIATELY?

A.  I THINK ONCE I WAS, YES.

Q.  SO, OFFICIALS IN HUNTINGTON, WEST VIRGINIA HAD AN OPPORTUNITY TO COME TO THE HOUSE OF THE FULKS AND WERE ABLE TO MAKE A DETERMINATION THAT THE CHILDREN WERE LIVING IN APPROPRIATE CIRCUMSTANCES BECAUSE NONE OF THE CHILDREN WERE EVER TAKEN OUT OF THE HOME, RIGHT?

A.  YEAH, THERE WAS ONE TAKEN OUT.

App. 01052

CROSS EXAM OF BRIAN MESSINGER

**Q.    WHO WAS TAKEN OUT?**

A.    SHANNON.

**Q.    WHEN WAS SHANNON TAKEN OUT?**

A.    I CAN'T TELL YOU THE DATE.

**Q.    WHO TOOK SHANNON OUT?**

A.    THE STATE.

**Q.    YOU DON'T REMEMBER THAT WAS AFTER CHAD WAS GROWN UP?**

A.    AFTER CHAD WAS GROWN?  NO,  I THINK CHAD WAS MAYBE 15 OR 16.  I AM NOT SURE ABOUT THAT.

**Q.    THIS WAS AFTER  -- CHAD AT 15 AND 16.  CHAD WAS JUST LIVING WITH HIS MOTHER AND HIS SIBLINGS BECAUSE ROGER HAD ALREADY MOVED OUT A COUPLE OF YEARS BEFORE THAT?**

A.    WELL,  I THINK, AT 15, THAT IS WHEN CHAD STARTED LEAVING HOME A LOT.

**Q.    YOU WOULDN'T DISPUTE THE FACT THAT CHAD WAS 14 YEARS OLD WHEN HIS PARENTS WERE DIVORCED?**

A.    NO.

**Q.    AND HIS FATHER MOVED TO INDIANA?**

A.    YES.

**Q.    AND EVEN IN YOUR OWN WORDS, WHEN ROGER LEFT, THINGS GOT A LOT BETTER?**

A.    YES.

**Q.    SO, WHEN CHAD WAS 14 YEARS OLD,  CONDITIONS IN THE FULKS'S HOUSEHOLD IMPROVED TREMENDOUSLY BECAUSE THE FATHER WASN'T THERE TO BE DRINKING, AND YELLING, AND CURSING THE**

**KIDS, RIGHT?**

A.   I DON'T KNOW ABOUT TREMENDOUSLY, BUT I SAY A LOT.

**Q.   A LOT?**

A.   YEAH.

**Q.   YOU EVEN INDICATED THAT YOU SAW DIANA TRYING TO DO HER BEST AS A SINGLE MOTHER AT THAT POINT IN TIME TO CONTROL THE BEHAVIOR OF HER CHILDREN, AND SOMETIMES SHE WAS UNABLE TO CONTROL THE BEHAVIOR OF HER CHILDREN?**

A.   RIGHT.

       MR. GASSER:  BEG THE COURT'S INDULGENCE.   THAT IS ALL I HAVE, YOUR HONOR.

       THE COURT:   REDIRECT?

       MS. JOHNSON:  NO, YOUR HONOR, THANK YOU.

       THE COURT:   THANK YOU.  YOU MAY STEP DOWN.   PLEASE CALL YOUR NEXT WITNESS.

       MS. JOHNSON:  LORIE MESSINGER.

       LORIE MESSINGER, HAVING BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

                          DIRECT EXAM

BY MS. JOHNSON:

**Q.   HOW OLD ARE YOU, LORI?**

A.   THIRTY-TWO.

**Q.   AND ARE YOU MARRIED TO BRIAN?**

A.   YES.

**Q.   AND YOU LIVE IN HUNTINGTON?**

DIRECT EXAM OF GAYLE WOLFE

GENTLEMEN MIGHT HAVE.

THE COURT:  CROSS-EXAMINATION.

MR. GASSER:  WE HAVE NO QUESTIONS.

THE COURT:  THANK YOU.  YOU MAY STEP DOWN.  PLEASE CALL YOUR NEXT WITNESS.

MR. BLUME:  GAYLE WOLFE.

GAYLE WOLFE, HAVING BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

DIRECT EXAM

BY MR. BLUME:

Q.  GOOD MORNING, MS. WOLFE.  YOU MIGHT WANT TO PULL THAT MICROPHONE UP SO EVERYBODY CAN HEAR YOU.  WHAT DO YOU DO FOR A LIVING?

A.  I'M AN EDUCATOR.

Q.  WHERE ARE YOU AN EDUCATOR?

A.  CABELL COUNTY, HUNTINGTON, WEST VIRGINIA.

Q.  HOW LONG HAVE YOU BEEN DOING THAT?

A.  I HAVE BEEN IN EDUCATION SINCE 1974.

Q.  AND ARE YOU MARRIED?

A.  YES.

Q.  DO YOU HAVE CHILDREN?

A.  TWO.

Q.  HOW OLD ARE THEY?

A.  TWENTY-EIGHT (28),  26, BOYS.

Q.  SO,  I AM SORRY, YOU SAID YOU HAVE BEEN A TEACHER FOR

**DIRECT EXAM OF GAYLE WOLFE**

**HOW LONG?**

A.    WELL, SINCE 1974.    THERE HAS BEEN SEVERAL YEARS THAT I HAVE STAYED HOME WITH THE CHILDREN WHEN THEY WERE LITTLE. BUT I GRADUATED FROM MARSHALL UNIVERSITY WITH A DEGREE IN EDUCATION IN 1974.  I STAYED HOME, PROBABLY, FIVE YEARS WITH THE KIDS.   SO,  YOU KNOW,  TAKE THOSE YEARS OFF,  20 YEARS OR MORE.

**Q.    YOU ARE NO LONGER IN THE CLASSROOM AT THE MOMENT; IS THAT RIGHT?**

A.    YES,  I AM A FIRST GRADE TEACHER RIGHT NOW.

**Q.    HAVE YOU, IN THE PAST, BEEN A SPECIAL EDUCATION TEACHER?**

A.    YES.   MOST OF MY CAREER HAS BEEN IN SPECIAL EDUCATION.

**Q.    AND WERE YOU THE SPECIAL EDUCATION TEACHER FOR MR. FULKS?**

A.    YES,  I WAS.

**Q.    AND DO YOU REMEMBER WHAT GRADE AND WHAT SCHOOL?**

A.    YES.   I TAUGHT CHAD IN THE FIFTH GRADE AT PEYTON ELEMENTARY IN CABELL COUNTY IN HUNTINGTON, WEST VIRGINIA. AND THEN I ALSO MONITORED HIM, PROBABLY, FOR ABOUT A FEW MONTHS, ONCE HE WENT INTO MIDDLE SCHOOL THE FOLLOWING YEAR.

**Q.    SO, HE WAS IN YOUR SPECIAL EDUCATION CLASS?**

A.    SELF-CONTAINED,  RIGHT.

**Q.    AND THIS WAS A CLASS FOR KIDS WITH BEHAVIORAL DISORDERS AND LEARNING DISABILITIES?**

**DIRECT EXAM OF GAYLE WOLFE**

A.    YES.

Q.    AND HOW MANY KIDS WERE IN THAT CLASS?

A.    AS I RECALL, THERE WERE SEVEN.

Q.    AND DO YOU REMEMBER ANYTHING ABOUT MR. FULKS HAVING A SPEECH IMPEDIMENT?

A.    YES, I DO.  HE HAD A PRETTY SIGNIFICANT ARTICULATION DEFICIT.  A LOT OF THE FRONTAL SOUND, LISP SOUNDS WERE SOMEWHAT POORLY CREATED WHEN HE SPOKE.

Q.    IN ADDITION TO THAT, WAS HE A SLOW LEARNER?

A.    YES, HE WAS.

Q.    CAN YOU TELL ME A LITTLE BIT ABOUT THAT?

A.    WHEN I CAME TO PEYTON ELEMENTARY, IT TOOK -- IT, OF COURSE, TAKES YOU SEVERAL MONTHS TO GET TO KNOW YOUR CHILDREN. AND CHAD NEEDED HANDS-ON LEARNING, MEANING HE NEEDED SOME TYPE OF MANIPULATIVE OR SOME TYPE OF GRAPHIC DETAILED WAY OF TEACHING HIM THAT HE WOULD LEARN.  DOESN'T MEAN HE COULDN'T LEARN, JUST MEANS IT NEEDED TO BE THE VERY BASIC, CONCRETE, MUCH BELOW HIS GRADE LEVEL.

Q.    DO YOU REMEMBER, DID HE PARTICULARLY HAVE TROUBLE WITH MATH?

A.    MATH WAS ONE OF HIS WEAKNESSES.

Q.    BUT DESPITE THE FACT THAT HE HAD THESE TROUBLES, DID HE TRY?

A.    YES. HE ALWAYS TRIED FOR ME.  JUST A VERY -- WANTED TO LEARN.  WANTED TO LEARN.

DIRECT EXAM OF GAYLE WOLFE

Q.    IN YOUR CLASS, I KNOW THIS IS A CLASS FOR KIDS WITH LEARNING DISORDERS AND DISABILITIES,  THINGS ARE RELEVANT. WAS HE A PARTICULAR PROBLEM TO YOU IN THIS CLASS?

A.    ABSOLUTELY NOT.   HE WAS MY RIGHT-HAND MAN.   COULDN'T HAVE DONE WITHOUT HIM.   HE WAS THE KID THAT I WOULD SEND TO THE OFFICE IF I NEEDED SOMETHING.  IF I HAD AN EXPLOSION IN MY CLASSROOM WITH SOME OTHER STUDENTS, HE WOULD ALWAYS HELP OUT. HE WOULD ALWAYS GO GET ME HELP.

THE BEHAVIOR DISORDERS IN THAT CLASSROOM, I HAVE EXPERIENCED MANY TIMES IN WHICH I HAVE BEEN ABUSED PHYSICALLY MYSELF,  NOT CHAD.   CHAD WAS MY HELPER.   CHAD WAS MY PARTNER.   CHAD WAS THE BEST THING THAT EVER HIT THAT CLASSROOM THAT YEAR.

Q.    DO YOU REMEMBER -- DID YOU EVER HAVE THE OPPORTUNITY TO GO TO CHAD'S HOUSE?

A.    YES,  I DID.

Q.    AND CAN YOU DESCRIBE THE NEIGHBORHOOD THAT HE LIVED IN?

A.    HUNTINGTON HAS, ON A WHOLE, AREAS OF VERY LOW SOCIOECONOMICAL NEIGHBORHOODS.  AND, OF COURSE, ALL THE WAY TO VERY HIGH SOCIOECONOMICAL NEIGHBORHOODS.   CHAD LIVED IN A NEIGHBORHOOD THAT, OF COURSE, CAME UNDERNEATH FEDERAL FUNDING CHAPTER 1, WHICH MEANS THERE WAS A HIGHER PERCENTAGE OF CHILDREN WHO CAME FROM FAMILIES THAT WOULD QUALIFY FOR FREE LUNCH.   THIS NEIGHBORHOOD WAS THAT OF A VERY LOW SOCIOECONOMIC  -- MEET VERY LOW SOCIOECONOMICAL CRITERIA TO

DIRECT EXAM OF GAYLE WOLFE

MEET THOSE STANDARDS, UNDER THE FEDERAL GOVERNMENT.  AND MOST OF THE FAMILIES GOT PUBLIC ASSISTANCE.   I SAY MOST, NOT ALL.

**Q.    HE LIVED IN A POOR NEIGHBORHOOD?**

A.    VERY.

**Q.    YOU NEVER WENT IN HIS HOUSE?**

A.    NO.

**Q.    BUT YOU WENT TO HIS HOUSE?**

A.    YES.

**Q.    SO, YOU WENT -- BASED ON WHAT YOU SAW, CAN YOU DESCRIBE THE OUTSIDE OF THE HOUSE?**

A.    WELL, IT WAS A HOUSE THAT YOU WOULDN'T WANT TO -- BEST WAY I CAN EXPLAIN IT,  IT WOULD BE A HOUSE THAT YOU WOULD NOT WANT TO SEE REPRESENTING WEST VIRGINIA.   VERY RUNDOWN.   I WAS IN THE BACKYARD OF A HOUSE WHICH WOULD HAVE SEVERAL BROKEN-DOWN CARS,  TIRES,  LOTS OF STUFF THROWN OUTSIDE.  LIKE IT WOULD JUST GO FROM THE HOUSE TO THE BACKYARD IN DISARRAY.  JUST VERY UNKEMPT.

I THINK THE ONE THING THAT SURPRISED ME MOST OF ALL WAS THE TRASH.  AND THERE WAS MANY,  MANY SIGNS OF ALCOHOL ABUSE IN THE YARD.   SIGNS OF BEER CONSUMPTION,  ALCOHOL CONSUMPTION, BOTTLES, AND THINGS LIKE THAT.

**Q.    AND I BELIEVE ON THE VISIT YOU WENT ON, THE FAMILY WAS OUTSIDE?**

A.    THIS WAS  -- THEY WERE ON THE OUTSIDE WHEN I GOT THERE.  SO,  THAT IS WHY THIS VISIT TOOK PLACE ON THE OUTSIDE OF THE

CROSS EXAM OF GAYLE WOLFE

HOUSE.

Q.    CAN YOU TELL ME, WHEN YOU GOT THERE, WERE THE PARENTS DRINKING?

A.    YES, THEY WERE.

Q.    WHAT DID THEY DO?

A.    THEY OFFERED ME A BEER.

Q.    WHEN YOU WERE THERE TO TALK TO THEM ABOUT THEIR CHILD?

A.    THAT IS THE FIRST THING THEY OFFERED ME.

MR. BLUME:  ALL RIGHT.  THANK YOU, MS. WOLFE, ANSWER ANY QUESTIONS THESE GENTLEMEN MIGHT HAVE.

THE COURT:  ANY CROSS-EXAMINATION.

MR. GASSER:  BRIEFLY, YOUR HONOR.

CROSS EXAM

BY MR. GASSER:

Q.    GOOD MORNING, MS. WOLFE.  MY NAME IS JOHNNY GASSER. I WORK IN THE U. S. ATTORNEY'S OFFICE.  WE HAVE NEVER MET, HAVE WE?

A.    NO.

Q.    I HAVE A FEW QUESTIONS FOR YOU.  YOU INDICATED THAT, AT ONE TIME, CHAD WAS IN YOUR CLASS.  HE WAS IN THE FIFTH GRADE; IS THAT CORRECT?

A.    FIFTH GRADE.

Q.    HE WOULD HAVE BEEN ABOUT TEN OR 11 YEARS OLD?

A.    PROBABLY ABOUT 11 BECAUSE I THINK HE HAD A RETENTION IN THE FIRST GRADE.

CROSS EXAM OF GAYLE WOLFE

Q.    HE IS 11 YEARS OLD WHEN HE HAD THIS SPEECH IMPEDIMENT THAT YOU HAVE DESCRIBED TO THE JURY?

A.    YES.

Q.    YOU ARE AWARE, AS HE GREW OLDER AND REACHED HIS ADULTHOOD, THAT HE GREW OUT OF THIS SPEECH IMPEDIMENT?

A.    I HAVE NOT SEEN CHAD SINCE HE WENT INTO THE SIXTH GRADE.

Q.    THAT WOULD NOT BE UNUSUAL IN YOUR EXPERIENCE THAT SOMEONE WHO HAD A SPEECH IMPEDIMENT, OR SLURRED SPEECH, OR STUTTERING, AS THEY GET OLDER AND THEIR FUNCTIONING BECOMES MORE EVOLVED, THAT THEY CAN -- THE OBVIOUSNESS OF THAT IMPEDIMENT MAY BE LESSER?

A.    ON SOME,  NOT ALL.

Q.    YOU STATED THAT HE LIVED IN A LOW SOCIOECONOMIC NEIGHBORHOOD.  HE DIDN'T LIVE IN PUBLIC HOUSING,  THOUGH, DID HE?

A.    NO.

Q.    SO, THE PARENTS EITHER PAID RENT OR PAID THEIR MORTGAGE ON THE HOME?

A.    I HAVE NO IDEA.

Q.    I WANTED TO MAKE IT CLEAR IT WAS NOT PUBLIC HOUSING THAT CHAD WAS LIVING IN.

A.    WELL, JUST BECAUSE HE LIVED IN A HOUSE, THAT DIDN'T MEAN HE DIDN'T GET PUBLIC ASSISTANCE FOR THE RENT.

Q.    I UNDERSTAND.

**CROSS EXAM OF GAYLE WOLFE**

A.    OKAY.

Q.    YOU DESCRIBE CHAD AS, LET ME GET THE QUOTE CORRECT. THAT WHEN CHAD WAS 11 YEARS OLD IN YOUR CLASS IN THE FIFTH GRADE, "HE WAS YOUR HELPER, YOUR PARTNER, AND THE BEST THING THAT HAPPENED TO YOUR CLASS?"

A.    IN THAT ROOM, YES.

Q.    SO, OBVIOUSLY, WHEN CHAD FULKS WAS 11 YEARS OLD, HE WAS NOT A BEHAVIOR PROBLEM TO YOU?

A.    NOT WITH ME.

Q.    IN FACT, IT WAS THE COMPLETE OPPOSITE. HE WAS YOUR STAR STUDENT, SO TO SPEAK?

A.    AS FAR AS BEHAVIOR, YES.

Q.    YOU DIDN'T HAVE ANY PROBLEMS WITH HIM?

A.    NONE.

Q.    MS. WOLFE, IN SOUTH CAROLINA, WE HAVE WHAT ARE KNOWN AS REPORTING STATUTES IN WHICH TEACHERS, AMONGST OTHER PROFESSIONALS, IF THEY FEEL THAT THERE IS PHYSICAL, SEXUAL, OR MENTAL ABUSE GOING ON OR TAKING PLACE IN A CHILD'S LIFE, THEY ARE, AS A MATTER OF LAW, REQUIRED TO REPORT THAT ABUSE. DOES WEST VIRGINIA HAVE SIMILAR REPORTING STATUTES?

A.    YES, THEY DO.

Q.    I AM SURE, AS MUCH AS YOU ENJOYED CHAD FULKS WHEN HE WAS 11 YEARS OLD IN YOUR CLASS, IF YOU WOULD HAVE SEEN SIGNS OF PHYSICAL INJURY TO CHAD FULKS'S FACE OR ANY OTHER PARTS OF HIS BODY, YOU WOULD HAVE REPORTED THAT, WOULD YOU NOT?

### DIRECT EXAM OF MARTHA FLOYD

A.   AND I PROBABLY JUST CAN'T RECALL AGAIN ANY DATES.   I AM SURE I MADE DEPARTMENT OF HUMAN SERVICES CALL.

**Q.   YOU ARE SURE OF THAT?**

A.   I AM PROBABLY PRETTY SURE,  YES.

**Q.   SO,  WERE THERE ANY TIMES, THAT YOU CAN REMEMBER, AS YOU ARE SITTING THERE, YOU REMEMBER CHAD COMING IN WITH BLACK EYES, OR BUSTED-UP LIPS, OR CONTUSIONS?**

A.   NO, I DO NOT RECALL THAT.

**Q.   BECAUSE, AS A DEDICATED EDUCATOR, YOU WOULD HAVE DEFINITIVELY DONE SOMETHING ABOUT THAT TO MAKE SURE YOUR STAR STUDENT WAS TAKEN CARE OF?**

A.   IF CALLS WERE MADE, IT WAS PROBABLY MADE ON THE FACT OF THE PART OF NEGLECT ON THE PARENTS' PART.

MR. GASSER:  THAT IS ALL I HAVE,  YOUR HONOR.

THE COURT:   ANY REDIRECT?

MR. BLUME:  NO, THANK YOU.

THE COURT: THANK YOU.  YOU MAY STEP DOWN.  YOU ARE EXCUSED.

NEXT WITNESS.

MR. BLUME:  WE CALL MARTHA FLOYD.

MARTHA FLOYD, HAVING BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

DIRECT EXAM

BY MR. BLUME:

**Q.   GOOD MORNING,  MS. FLOYD.**

SBAT
RESULTS OF SELECTIVE SCREENING

STUDENT NAME _Chodrich Evan Fulks_ AGE _9_ DOB ███████

SCHOOL _Gallaher_ GRADE _3_ TEACHER _Thompson_

DATE(S) SCREENED _11/25/86_ PERMISSION REC'D _11/21/86_

SIT _90_

CA _9-7_ MA _8-10_ IQ _92_ 81 Norms

| WRAT Standard Scores | Grade Level | | PIAT Age Standard Scores | Grade Level |
|---|---|---|---|---|
| Reading _80_ | _2E_ | | ___ | ___ |
| Spelling _89_ | _3B_ | | ___ | ___ |
| Math _82_ | _3B_ | | ___ | ___ |
| | | | ___ | ___ |

PPVT

CA _9-7_ LA _7-10_ LQ _82_

Please check for suspected
gifted only:

Interest Inventory ____

Learning Styles Assessment ____

Current Medical Information

Hearing _____

Vision _____

Other _____

CAT/CTBS – Date _____

____ included in Permanent Record
Card; if not please record
in percentiles below:

____ Verbal

____ Non-verbal

____ Reading total

____ Language total

____ Math total

____ TBS

Additional Remarks: _____

_____

_____

_____

Copies To:  White:  County
            Yellow: School
            Pink:   Parents

REFERRAL FOR MULTIDISCIPLINARY ASSESSMENT                    DP 108

A.  IDENTIFYING DATA
STUDENT NAME __Chad Fulks__ DOB _____ AGE _9_ SEX _m_
PARENT'S NAME _Herman Fulks_ ADDRESS _129 leeward Ave_ PHONE _None_
SCHOOL _Gallaher_ CURRENT GRADE/PLACEMENT _3_ TEACHER _D. Thompson_
REFERRED BY_____ TEACHER _✓_ PRINCIPAL_____ PARENT_____ OTHER

B.  REASON(S) FOR REFERRAL (INDICATE REASONS FOR CONCERN & SBAT RECOMMENDATIONS)
_Discipline. Needs to be under_
_a controlled situation at all_
_times._

C.  CHECK CHARACTERISTICS THAT ARE IMMEDIATELY NOTICEABLE

| ACADEMIC | BEHAVIOR | HEARING | SPEECH/LANGUAGE |
|---|---|---|---|
| PLACE | ____ AGGRESSIVE | ____ EARACHES | ____ ARTICULATION |
| | ____ WITHDRAWN | ____ FLUID | PROBLEMS |
| — WEAKNESSES IN, | ✓ DISTRACTIBLE | ____ TUBES | ____ SOUND ERRORS |
| + STRENGTHS IN, | ____ HYPERACTIVE | ____ RUNNY EARS | ____ STUTTERING |
| — READING | ✓ OTHER _No self-_ | | ____ VOICE ABNORMAL |
| — ARITHMETIC | _discipline_ | VISION | ____ LANGUAGE DELAY |
| + WRITING | PHYSICAL | | ____ NON-VERBAL |
| + SOCIAL STUDIES | | ____ WEARS CORRECTIVE | |
| + SCIENCE | ____ OVERWEIGHT | LENSES | |
| — ENGLISH | ____ UNDERWEIGHT | ____ VISUAL MUSCLE | |
| — SPELLING | ____ MOTOR PROBLEMS | PROBLEMS | |
| — WRK. HABITS | ____ OTHER KNOWN | ____ SEVERE ACUITY | |
| ____ OTHER | MEDICAL PROBLEMS | PROBLEM | |
| | ____ MEDICATION | | |

→ Complains with stomach problems
REMARKS _Does not complete tasks. Is not_
_self-directing. Needs guidance at all_
_times._

D.  THE FOLLOWING INFORMATION MUST ACCOMPANY THIS REFERRAL (PLEASE CHECK)
☐ COPY OF PERMANENT RECORD CARD
☐ PERSONAL DATA SHEET
☐ COMPUTER FORM
☐ RESULTS OF SELECTIVE SCREENING
☐ SBAT LOG OF REFERRAL
☐ MEDICAL REPORTS IF APPROPRIATE FOR SENSORY (VISUAL, HEARING AND/OR
    PHYSICAL HANDICAPP)

E.  SIGNATURES
PERSON(S) REFERRING _Dottie Thompson_ DATE _1-6-87_
TITLE _teacher_
REFERRING PRINCIPAL _R.D. Adams_ DATE _1-6-87_
SBAT MEMBERS _Juan Porter_



DATE RECEIVED BY SPECIAL EDUCATION _1/9/87_
ASSIGNED TO_____

App. 01065

# Confidential
## For Professional Use Only

# FAIRFIELD EDUCATIONAL SERVICE CENTER

Cabell County Board of Education
P.O. Box 446
Huntington, WV 25709

## PUPIL APPRAISAL SERVICES

### ACADEMIC EVALUATION REPORT

| | | | |
|---|---|---|---|
| NAME: | FULKS, CHADRICK EVAN | CASE NUMBER: | 83673 |
| SCHOOL: | GALLAHER | SEARCH AND SERVE NUMBER: | |
| DATE OF REPORT: | 2/24/87 | GRADE PLACEMENT: | 3rd |
| PARENTS: | Herman/Diana Fulks | DATE OF TESTING: | 2/11/87 |
| ADDRESS: | 129 Leeward Avenue | DATE OF BIRTH: | ████ |
| | Huntington, WV 25705 | | |

_____ Background Data    __x__ Perceptual-Motor Integration

__x__ Reason for Referral    _____ Personality

_____ Standardized Ability Assessment    __x__ Educational Achievement

__x__ Specific Problem    __x__ Classroom Observation

_____ Intellectual Assessment    __x__ General Observation

**Strengths**                          **Weaknesses**

_____    _____ Spelling _____

_____    _____

_____    _____

_____    _____

_____    _____

_____    _____

_____    _____

# A C A D E M I C  A S S E S S M E N T

**Report on:**     FULKS, CHADRICK EVAN
**Date of Examination:**  2/11/87
**Examiner:**     Peggy Blatt

## 1. STATEMENT OF PROBLEM

Subject was referred for testing by his teacher due to his behavior. The teacher states that he needs guidance and to be under a controlled situation at all times. He has no self-discipline or self-directing. Further noted is his weaknesses in most academics and he is distractible. Chad also complains with stomach problems.

## II. HISTORY

Refer to personal data compiled by the school nurse. Note permanent record report.

## III. GENERAL OBSERVATION

Subject was a cooperative and friendly right handed individual. He followed directions and attained to tasks.

He very carefully examined each question and with patience, took his time in responding. He seemed hesitant about being incorrect. His teacher stated that the last 2-3 weeks that Chad has been changing the name on other students' papers and writing his name on them.

The student communicated well with examiner, maintaining good eye contact. He said he had stayed up until midnight watching movies on the VCR. His teacher says he is fine on a one to one relationship but that he has difficulty in group situations or when trusted to be responsible when he is alone.

On the Test of Written Language he seemed to preplan his story before writing. After he began to write he would proof read after every 2-3 sentences and think about story before continuing. He appeared to have a lot of difficulty with the Jordan Left Right Reversal Test. It took him a long time to complete this test. The KTEA math sub-tests were also very difficult for subject. To add groups he drew boxes and put dots in each box, then counted the total. With subtraction problems he drew marks on paper and then crossed out the number he was subtracting. He had extreme difficulty with abstract reasoning.

A conversation with Mr. Adams, the principal, revealed that Chad has a probation officer, Ms. Hatcher. This is due to an incident involving other boys, where as they physically abused an old lady. Since that incident, Chad has been involved with minor infractions at school until yesterday, 2-10-87 when he physically pulled down a four year old girl's panties after school. Mr. Adams said his probation officer has been called and a petition is going to be signed.

_Peggy Blatt_
PEGGY BLATT, DIAGNOSTICIAN

FEBRUARY 26, 1987
Date TYPED

App. 01068

IV  TEST ADMINISTERED

( )  Basic School Skills Inventory
( )  Dictated Alphabet
( )  Johnson Handwriting Test
(x)  Jordan Left-Right Reversal Test
(x)  Kaufman Test of Educational Achievement
( )  Key Math
( )  Learning Efficiency Test
( )  Motor Free Visual Perception Test
( )  Peabody Individual Achievement Test
(X)  Peabody Picture Vocabulary Test
( )  Piaget Left/Right Awareness
( )  Pre Academic Learning Inventory
(X)  Spache Diagnostic Reading Scales
( )  Spadafore Diagnostic Reading Test
(X)  Slosson Intelligence Test
( )  Test of Early Math Ability
( )  Test of Early Reading Ability
( )  Test of Mathematical Ability
( )  Test of Visual Perceptual Skills - (Non-Motor)
(X)  Test of Written Language
( )  Visual Motor Integration
( )  Wepman Auditory Discrimination Test
(X)  Wide Range Achievement
( )  Woodcock Reading Mastery
( )  Written Expression (Informal)
( )  Other
( )

V  SCHOOL SCREENING

1.  Slosson Intelligence Test - individual intelligence test for ages
    ranging from 4 to adulthood.  Scores are mental age and IQ.  Results
    may be analyzed into information, comprehension, arithmetic, similar-
    ities and differences, vocabulary, digit span, auditory memory and
    visual motor.
    Test results register the subject in the ~~above average~~/average/~~below~~
    ~~average~~ range of intellectual abilities.

2.  Peabody Picture Vocabulary Test - is a screening instrument which
    provides an estimate of a student's verbal intelligence by measuring
    his receptive vocabulary.

        CA= ___9-7___   LA= ___7-10___   IQ= ___82___

3.  Wide Range Achievement Test - achievement is measured in reading
    (word recognition), spelling (dictated) and arithmetic (comprehension).
    Appropriate for ages 5 and over.  This test yields grade equivalents,
    percentiles and standard score.  The standard scores may be used to
    determine degree of disability in achievement if a Slosson or psycho-
    logical ability level is available.

        Reading grade level registered.    2E   RQ   80
        Spelling grade level registered.   3B   SQ   89
        Math grade level registered.       3B   MQ   82

<u>Visual Motor Integration Developmental Test (VMI)</u> - measures the degree to which visual perception and motor behavior are integrated children ages 2-15 years.

The VMI age equivalent registered_____. Types of errors displayed: Distortions____Confustions____Lack of attention to details of design____Directional Confusion____Orientation____ Integration____Segmentation_____.

<u>Motor Free Visual Perception Test</u> -

    The MVPT assesses visual perception in individual children from four through eight years of age. It is frequently used with older individuals who have motor problems. The test includes tasks of spatial orientation, visual discrimination, figure ground perception, revised closure, form constancy and visual memory.

CA:
Perceptual Age:
Perceptual Quotient:

<u>Piaget Left/Right Awareness Test</u> -

Satisfactory_____     Inadequate_____

<u>Jordan Left-Right Reversal Test</u> - designed to measure letter and number reversals in area of visual receptive functioning. Range 5-12. Those who score outside the limit for 12 years old are considered deviant.

Dev. Age 7-9

Test scores fell within/outside normal limits for age/sex group.

<u>Wepman Auditory Discrimination Test</u> - measures the students ability to discriminate similarities and differences between pairs of words presented as an auditory stimulus. Range 5 years to 8 years and older.

The results of this test were:

Satisfactory_____; borderline_____; Significant _____.

Johnson Handwriting Test - Refer to profile chart: Satisfactory_____ Inadequate____Spacing____Slant____Sizes of letters_____ Cramped/Angular____Does not make all letters correctly____Omits words and phrases_____Sequence of sentence out of order_____.

TERA – Test of Early Reading –  The TERA is designed for use with pre-school, indergarden and primary level students.  It measures reading ability and yields diagnostic information on three areas related to early reading: knowledge of the alphabet; comprehension; and the conventions of reading.

TERA results:    Total Raw Score _____

Reading Quotient _____

Percentile Score _____

or    Reading Age _____

Dictated Alphabet – Satisfactory _____  Inadequate _____

Does not know all letters _____  Confuses upper/lower case letters _____

Spache Diagnostic Reading Scales – Auditory Comprehension Level  3.5

Kaufman Test of Educational Achievement

| Comprehensive Form Subtests | Standard Score Age   Grade | % Rank Table 7 | Age Equivalent | Grade Equivalent |
|---|---|---|---|---|
| 1.  Mathematics Applications | 95 | 37 | 9-0 | 3.7 |
| 2.  Reading Decoding | 91 | 27 | 8-9 | 3.2 |
| 3.  Spelling | 84 | 14 | 8-0 | 2.6 |
| 4.  Reading Comprehension | 95 | 37 | 9-3 | 3.7 |
| 5.  Mathematics Computation | 86 | 18 | 8-9 | 3.3 |

| Comprehensive Composite Scales | | | | |
|---|---|---|---|---|
| 1.  Reading Composite | 93 | 32 | 8-9 | 3.4 |
| 2.  Mathematics Composite | 89 | 23 | 8-9 | 3.4 |
| 3.  Battery Composite | 89 | 23 | 8-6 | 3.3 |

The Test of Early Mathematics Ability – The TEMA is an individual mathematics test for children ages 4,0 to 8.11.  It measures the domains of formal and informal mathematics.

EMA results:    Total Raw Score _____

Math Quotient _____

Percentile Score _____

Math Age _____

KEYMATH DIAGNOSTIC ARITHMETIC TEST – An individually administered test designed to provide a diagnostic assessment of skills in Mathematics.

Grade Equivalent:
Percentile    :
Standard Score :

WOODCOCK READING MASTERY TESTS – An extensive measurement of reading achievement for use from grades K – 12.

| Results: | Mastery Score | Reading Gr. Score | % |
|---|---|---|---|
| Letter Identification | | | |
| Word Identification | | | |
| Word Attack | | | |
| Word Comprehension | | | |
| Passage Comprehension | | | |
| Total Reading | | | |

WRITTEN EXPRESSION – Informal test in which a student chooses a picture and writes a story. There is no formal scoring procedures. Refer to picture/story.

Adequate_____ Inadequate_____

Sentence Structure/and or Grammar_____,Punctuation_____,

Spelling_____, Story Devlopment_____.

THE TEST OF WRITTEN LANGUAGE – The TOWL is designed for use with students from the age of 7-0 to 18-11. It is a measure of written expression ability.

| TOWL Results: | Standard Scores | % | Category of Performance |
|---|---|---|---|
| Vocabulary | Unable to score due to length of story | | |
| Thematic Maturity | | | |
| Spelling | | | |
| Word Usage | | | |
| Style | | | |
| Handwriting | | | |

BASIC SCHOOL SKILLS INVENTORY – _____

_Peggy Blatt_
PEGGY BLATT, DIAGNOSTICIAN

FEBRUARY 26, 1987
Date Typed

# CONFIDENTIAL
For Professional Use Only

# P U P I L  A P P R A I S A L  S E R V I C E S

## Cabell County Board of Education
P.O. Box 446
Huntington, WV 25709

## PSYCHOLOGICAL EVALUATION REPORT

| | | | |
|---|---|---|---|
| NAME: | FULKS, CHADRICK EVAN | CASE NUMBER: | 83673 |
| SCHOOL: | GALLAHER ELEM. | GRADE PLACEMENT: | 3 |
| DATE OF REPORT: | 3/3/87 | DATE OF TESTING: | 2/4/87 |
| PARENTS: | Herman/Diana Fulks | | |
| ADDRESS: | 129 Leeward Avenue | DATE OF BIRTH: | █████ |
| | Huntington, WV 25705 | | |

_____Background Data  _____Perceptual-Motor Integration

_____Reason for Referral  _____Personality

_____Standardized Ability Assessment  _____Educational Achievement

_____Specific Problem  _____Classroom Observation

__X__ Intellectual Assessment  _____Adaptive Behavior

Comments:  The referring teacher notes that Chad "lacks self discipline" and "needs to be under a controlled situation at all times." He shows poor work habits and deficits in basic academic skill development. He previously repeated first grade.

Chad is a blond haired 9 year old of apparently average stature. During the examination I found him to be friendly, relaxed and cooperative. He worked carefully, with good effort and good humor. He cheerfully related a number of personal anecdotes prompted by certain test items.

Name FULKS, CHADRICK EVAN

DOB ████████

TEST RESULTS:

Range of Intellectual Ability As Measured By The:
Wechsler Intelligence Scale For Children-Revised
Verbal IQ ___ 87 ___
Performance IQ ___ 95 ___
Full Scale IQ ___ 90 ___

SUMMARY OF THE WECHSLER INTELLIGENCE SCALE FOR CHILDREN

| SUBTESTS | 1 2 3 4 5 6 7 8 9 10 11 12 13 14 15 16 17 18 19 20 | ABILITY MEASURED |
|---|---|---|
| INFORM. | 1 2 3 4 5 (6) 7 8 9 10 11 12 13 14 15 16 17 18 19 20 | LONG TERM MEMORY: recall of previously learned inform. |
| SIMILAR | 1 2 3 4 5 (6) 7 8 9 10 11 12 13 14 15 16 17 18 19 20 | VERBAL REASONING: at abstract and concrete levels |
| ARITH. | 1 2 3 4 5 6 7 8 9 (10) 11 12 13 14 15 16 17 18 19 20 | CONCENTRATION: sequencing; auditory arithmetic |
| VOCAB. | 1 2 3 4 5 6 (7) 8 9 10 11 12 13 14 15 16 17 18 19 20 | VERBAL FLUENCY: understand meaning of words. |
| COMPRE. | 1 2 3 4 5 6 7 8 9 10 (11) 12 13 14 15 16 17 18 19 20 | COMMON SENSE: judgement, verbal reasoning; logical solution |
| DIG. SPAN | 1 2 3 4 5 6 (7) 8 9 10 11 12 13 14 15 16 17 18 19 20 | IMMEDIATE AUDITORY MEMORY: attention; concentration |
| PIC.COMP. | 1 2 3 4 5 6 7 8 9 10 11 (12) 13 14 15 16 17 18 19 20 | VIS. PERCEPTION: alertness to essential details. |
| PIC.ARR. | 1 2 3 4 5 6 7 8 9 (10) 11 12 13 14 15 16 17 18 19 20 | VIS. SEQUENCING: alertness to social situations |
| Blk.De | 1 2 3 4 5 6 (7) 8 9 10 11 12 13 14 15 16 17 18 19 20 | VIS.PERCEPTION: reproduce abstract designs. |
| OBJ.ASSM. | 1 2 3 4 5 6 7 8 9 (10) 11 12 13 14 15 16 17 18 19 20 | VIS. MOTOR COORD.: organize parts into whole objects. |
| CODING | 1 2 3 4 5 6 7 (8) 9 10 11 12 13 14 15 16 17 18 19 20 | VIS.MOTOR COORD.: Vis. Memory; fine motor control accuracy |
| MAZES | 1 2 3 4 5 6 7 8 9 10 11 12 13 14 15 16 17 18 19 20 | VIS. MOTOR COORD.: planning following, foresight. |

TMR   EMH   LOW   AVE.   HIGH   SUPERIOR.
AVE.       AVE.

ADDITIONAL COMMENTS: Chad's Full Scale IQ of 90±4 places him within Wechsler's average classification of intelligence, at the 25th percentile when compared to the national standardization group of children his age. The 8 point difference between his Verbal and Performance IQ's is not significantly different.

Comparisons among subtest scores and general test factors suggest a relatively poor language and experiential background. Despite these limitations, Chad shows an ability to make appropriate judgments. His abstract reasoning skills are poor, both verbally and nonverbally.

# TEST RESULTS & INTERPRETATION

II.   TESTS OF VISUAL PERCEPTION AND PERCEPTUAL-MOTOR INTEGRATION

### Bender-Gestalt

Chad worked carefully on the drawings, requiring approximately 10 minutes to complete them. He was very much aware of minor deviations and remarked frequently that he had "messed up", although his performance was well within normal limits.

III.   PERSONALITY

### Draw-A-Person

Chad's drawing was age appropriate and consistent with an impression of intellectual maturity within the normal range.

### Devereux Elementary School Behavior Rating Scale

Chad was rated by his third grade classroom teacher. Significantly high ratings were given on 2 of the 11 factors – Classroom Disturbance and Inattentive-Withdrawn. Significantly low ratings were given on 2 factors – Comprehension and Need for Closeness to Teacher.

NAME  FULKS, CHADRICK EVAN

DOB  ███████

RECOMMENDATIONS

_____E.M.I. Program                                    _____Speech and/or Language Program
_____T.M.I. Program                                    _____Behavioral Disorders Program
_____P.M.I. Program                                    _____Visually Impaired Program
_____Specific L.D. Program                             _____Hearing Impaired Program
_____Gifted Program                                    _____Physically Handicapped Program
_____Special Reading Program                           _____Deaf - Blind Program
_____Early Childhood Handicapped Program               _____Multiply Handicapped Program
_____Remain in Regular Class                           _____Re-evaluate at Later Date

_____Refer for Complete Medical Examination
_____Refer for Neurological Examination
_____Refer for Hearing Examination          ___Otolaryngologist
                                              ___Audiologist
_____Refer for Vision Examination           ___Ophthalmologist
                                              ___Optometrist

_____Refer for further Social/Personality Assessment
_____Refer for Counseling   (___Individual;  ___Family)
_____Refer for Psychiatric Examination
_____Refer for Speech and/or Language Evaluation
_____Refer for Complete Educational Evaluation
_____Refer for Occupational Therapy Evaluation
_____Refer for Physical Therapy Evaluation
_____Refer for Assessment of Adaptive Behavior
_____Other_____

(Recommendations for special education placement are submitted for consideration by the
Placement Committee and should be handled in accordance with current State and Federal
Regulations).

COMMENTS:  Chad was referred because of behavior problems and poor achievement.
A complete educational evaluation of his academic skills is not yet available.
This will provide important information for the PAC in determining appropriate
interventions for Chad.

        It was noted that Chad's behavior and general demeanor during individual test-
ing sessions was exemplary.  His careful approach and regard for his performance
suggests to me that he is interested in, and perhaps somewhat anxious about, his
school performance.  Reports from the school staff indicate that he may show little
regard for social convention and school rules when he is not directly subject to
adult supervision.  Additionally, it is noted that Chad is under the supervision
of juvenile authorities.

        3/4/87                              _____
        DATE TYPED                          RODNEY A. PARDUE, School Psychologist

App. 01076

DP 400

INSTRUCTIONAL RECOMMENDATION PLAN/INDIVIDUALIZED EDUCATION PROGRAM
ANNUAL IEP

PAGE                                                                 1
PRINT DATE

COUNTY Cabell
SCHOOL Gallaher
STUDENT NAME Chadrick Evan Fulks
BIRTHDATE 00/00/00   GRADE 3
_/_Initial __annual __triennial

* TEACHER D. Thompson
* PARENT/GUARDIAN Herman/Diana Fulks
* ADDRESS Mrs. Blake 129 Leeward Ave.
  Neigh 523-4439  Huntington, W.Va
* TELEPHONE HOME —    WORK —

* MEETING DATES(S) May 12, 1987
* TRI-ANNUAL EVALUATION DATES(S) February, 1990   1987-88
* ANNUAL REVIEW DATE May, 1988   Peyton Elem.

---

**PRESENT LEVEL OF EDUCATION PERFORMANCE**

| DATA SOURCE | DATA | ABILITY INFORMATION |
|---|---|---|
| WISC | | V 87 P 95 FS 90 |
| WAIS | | V P FS |
| S-I-T | | CA9-7 MA8-10 IU 92 |
| PPVT | | CA9-7 MA7-10 IU 82 |
| W-JOHNSON I | | VC GS AS FL |

OTHERS
Bender - normal limits.
Draw-A-Person age appropriate

| DATA SOURCE | DATE | ACHIEVEMENT INFORMATION |
|---|---|---|
| WRAT | | R 2E SP 3B M 3B |
| PIAT | | M RR RC GI II |
| WOODCOCK READING | | EASYR GRSCRE FAIL |
| W-JOHNSON II | | R M WL KN S |
| KEYMATH | | GRADE SCORE |
| CTBS (TOTALS) | | GR R L M H |
| Jordan L-R Dev.Age 7-9 | | GR R L M B |
| | | GR R L M H |
| Spache - Aud.Comp. 3.5 | | GR R L M B |
| | | GR R L M U |

WEPMAN
ITPA VMI  Teacher reports:
OTHERS  Threatens other students
        can't be unsupervised
SPEECH
ARTICULATION Has been spitting
LANGUAGE at other students
OTHERS

**BRIGANCE**
WORD REC.
CONFORTABLE LEV.
R. COMP.
SPELLING
MATH
COMPUTATION
COMPREHENSION

OBSERVATION Answered questions in class, interacted appropriately w/ peers. Didn't always follow directions

---

**VOCATIONAL EVALUATION**
Devereux
High Ratings:
Classroom Disturb.
Inattentive/Withdrawn
Low Ratings:
Comprehension
Need for closeness
to teacher

KTEA
Math Applic. 3.7
Rd. Decod 3.2
Spelling 2.6
Rd. Comp. 3.7
Math Comput. 3.3
Rd. Total 3.4
Math Total 3.4
Total Test 3.3

---

**STRENGTHS**

****************
E****************

**WEAKNESS**
Spelling
Doesn't complete assignments
Threatens other students
Doesn't accept responsibility for
his actions
F****************

**TRANSPORTATION**
REGULAR   (SPECIAL)
BUS STOP

**LENGTH OF TIME
SPECIAL CARE/DEVICES
EQUIPMENT**

**ARRANGEMENTS**
Earlene Adkins
CONTACT PERSON
TELEPHONE:
528-5189

---

**SPECIAL EDUCATION SERVICES**

*SPECIAL EDUCATION Behavior Disorders
 TYPE(S)                    Program

PLACEMENT CONFIGURATION
Resource Room - Mainstream as
behavior & academic progress
permitts.

FREQUENCY PER WEEK 5 Days/week
DURATION PER SESSION 45 minutes
BEGIN DATE Sept. 2, 1987
DURATION DATE

*REGULAR ED.        *CAREER ED.
 TYPE(S)             TYPE(S)
                     Art, Music

FREQUENCY PER WEEK
DURATION PER SESSION

*PHYSICAL EDUCATION Regular
 TYPE(S)             Same as
FREQUENCY PER WEEK
DURATION PER SESSION Intermediate Study

Mike Neece will be doing counseling
at Prestera Center.
Probation Officer - Sue Hatcher

---

**HEALTH INFORMATION**

| | | |
|---|---|---|
| VISION | (PASS) | FAIL |
| COMMENT | | |
| HEARING | PASS | FAIL |
| COMMENT | | |
| OTHERS | PASS | FAIL |
| COMMENT | | |

**EDUCATION/RELATED SERVICE**
Speech/Language
2x/week  20 minutes
          per session

---

**PAC/ANNUAL REVIEW COMMITTEE MEMBERS**

| SIGNATURE | POSITION | AGREEMENT |
|---|---|---|
| Sandra L. Aliff | B.D. Specialist | (YES) NO |
| Dottie Thompson | Teacher | (YES) NO |
| Kelvey Wardie | School Psych | (YES) NO |
| Sue Hatcher | Probation Officer | (YES) NO |
| | | YES NO |
| | | YES NO |
| | | YES NO |
| | | YES NO |

---

**PARENT/GUARDIAN SIGNATURE(S)**

I HAVE HAD MY RIGHTS PRESENTED TO ME AND
I UNDERSTAND THESE RIGHTS. I ALSO UNDERSTAND THE
CONTENTS AND IMPLICATIONS OF THIS IEP, THEREFORE,
I AUTHORIZE THE COUNTY SCHOOL SYSTEM TO IMPLEMENT
THIS PROGRAM.

SIGNATURE Diana Fulks   DATE May 12, 1992

SIGNATURE                DATE

App. 01077

5th grade

R E V I E W

6th and 9th Grade Exceptional Students

1988 - 1989

STUDENT Chad Fulks          SCHOOL Peyton Elem.

Current Address 129 Leeward Ave     Phone No. none
         Huntington, WV
*RECEIVING SCHOOL_____

Date of Re-evaluation 2-6-89_____
Present Level of Performance:  Name of Evaluation Brigance
    Test Scores:
        Reading   5.6
        Spelling  4
        Math      4.2
Dates of Review and Mastery - Date 5-89 Current I.E.P.
         Tri-Annual Due 2-90

P.E. Program: (Regular)        Adaptive
    Comments:_____

Unified Arts: (Regular)        Restricted
    Comments:_____
              Normal    Deficient   Corrected
Hearing        [✓]        [ ]         [ ]        Medication Yes (No)

Vision         [✓]        [ ]         [ ]
    Comments:_____    Comments:_____

Information from Ancillary Personnel:  Regular Teacher,Speech/Language
Pathologist, etc.: At this current time Chad is in regular
Science & Health but is not keeping up. Chad is in Speech
therapy - reports will follow.
Recommendations for 1989-90 Term: Resource B.D. classroom due to
6th his low functioning level.

_____    Teacher: G. Wolfe
    (Receiving Teacher)      Specialist: Sandy Cliff
                             Date:    3-1-89
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
                   TRANSPORTATION
                                 Date:_____
Student's Name: Chad Fulks     Handicapping Condition: B.D.
Current School: Peyton         Medication:_____
Receiving School: Enslow Jr    Phone No.:_____
Parents:_____  Address: 129 Leeward Ave Hgtn.
Specialized Equipment:_____
Transport:  Date_____
Comments:

App. 01078

**CONFIDENTIAL**                                                                                          **CONFIDENTIAL**

INSTRUCTIONAL RECOMMENDATION PLAN/INDIVIDUALIZED EDUCATION PROGRAM
ANNUAL IEP

COUNTY Cabell County                                                                          PAGE                    1
SCHOOL Peyton Elementary          ■ TEACHER G. Wolfe          ■                               PRINT DATE
STUDENT NAME Chad Fulks           ■                           ■ MEETING DATES(S) 5/15/89
BIRTHDATE 00/00/00 GRADE 6th      ■ PARENT/GUARDIAN Roger + Diane Fulks ■ TRI-ANNUAL EVALUATION DATES(S) ?
                                  ■ ADDRESS 129 Leeward Ave. Huntington
_Initial ✓annual _triennial       ■ TELEPHONE HOME 525-7429 WORK   ■ ANNUAL REVIEW DATE May 1990

PRESENT LEVEL OF EDUCATION PERFORMANCE

Beverly Hills Middle School

| DATA SOURCE | DATA | ABILITY INFORMATION | | |
|---|---|---|---|---|
| WISER | V | P | FS | |
| WAISR | V | P | FS | |
| S-I. | CA | MA | IQ | |
| PPVT | CA | MA | IU | |
| W-JOHNSONI | BC | GS | AS | FL |
| OTHERS | | | | |

| DATA SOURCE | DATE | ACHIEVEMENT INFORMATION | | | | |
|---|---|---|---|---|---|---|
| WRAT | | R | SP | M | | |
| PIAT | | M | RR | RC | GI | II |
| WOODCOCK READING | | EASYR | | URSCRE | | FAIL |
| W-JOHNSON II | | R | M | WL | KN | S |
| KEYMATH | | GRADE SCORE | | | | |
| CTBS(TOTALS) | | GR | R | L | M | H |
| | | GR | R | L | M | B |
| | | GR | R | L | M | H |
| | | GR | R | L | M | B |
| | | GR | R | L | M | H |
| DEPMAN | | BRIGANCE | | | | |
| LEARY VR? | | WORD REC. 4 | | | | |
| OTHERS | | CONFORTABLE LEV. 4 | | | | |
| | | R. COMP. 4 | | | | |
| SPEECH | | SPELLING 4 | | | | |
| ARTICULATION | | MATH 4 | | | | |
| LANGUAGE | | COMPUTATION | | | | |
| OTHERS | | COMPREHENSION | | | | |
| OBSERVATION | | | | | | |

VOCATIONAL EVALUATION

STRENGTHS
Pleasant personality

*****************

WEAKNESS
Academics - Math
Spelling - Language
Needs very concreate
in learning.

*****************

TRANSPORTATION
(REGULAR BUS STOP)   SPECIAL

LENGTH OF TIME

SPECIAL CARE/DEVICES EQUIPMENT

ARRANGEMENTS

CONTACT PERSON

TELEPHONE

SPECIAL EDUCATION SERVICES

*SPECIAL EDUCATION TYPE(S) B.D.

PLACEMENT CONFIGURATION
Regular Education w/
Resource B.D. Room

FREQUENCY PER WEEK 5 days/week
DURATION PER SESSION 50 min/day
BEGIN DATE Sept 1989
DURATION DATE 6 weeks trail and then

*REGULAR ED.      *CAREER ED. if ok-
TYPE(S)            TYPE(S) in regular
All but one                 ed - no B.D.
academic subject unified arts
FREQUENCY PER WEEK
DURATION PER SESSION

Same as regular education

*PHYSICAL EDUCATION
TYPE(S)  regular

FREQUENCY PER WEEK
DURATION PER SESSION

Same as regular education
students

HEALTH INFORMATION

| | | |
|---|---|---|
| VISION | PASS | (FAIL) |
| COMMENT | | |
| HEARING | (PASS) | FAIL |
| COMMENT | | |
| OTHERS | PASS | FAIL |
| COMMENT | | |

EDUCATION/RELATED SERVICE

PAC/ANNUAL REVIEW COMMITTEE MEMBERS

| SIGNATURE | POSITION | AGREEMENT |
|---|---|---|
| Gayle Wolfe - B.D. Teacher | | (YES) NO |
| | | YES NO |
| | | YES NO |
| | | YES NO |
| | | YES NO |
| | | YES NO |
| | | YES NO |

PARENT/GUARDIAN SIGNATURE(S)

I HAVE HAD MY RIGHTS PRESENTED TO ME AND
I UNDERSTAND THESE RIGHTS. I ALSO UNDERSTAND THE
CONTENTS AND IMPLICATIONS OF THIS IEP, THEREFORE,
I AUTHORIZE THE COUNTY SCHOOL SYSTEM TO IMPLEMENT
THIS PROGRAM.

SIGNATURE                                        DATE

SIGNATURE                                        DATE

# INSTRUCTIONAL RECOMMENDATION PLAN/INDIVIDUALIZED EDUCATION PROGRAM
## ANNUAL IEP

**Student Name:** Chad Fulks          **Meeting Date(s)** 5/15/89          **OBJECTIVE EVALUATION CRITERIA**

_____initial ✓_____annual _____triennial

| | Level of Accuracy | Evaluation Procedures | Results | Date | Special Materials and Equipment |
|---|---|---|---|---|---|

**ANNUAL OUTCOMES:**
Short Term Learning Objectives

Chad will continue to obey all School and classroom rules

Level of Accuracy: 90%

Evaluation Procedures: Behavior management + teacher/student conference

**ANNUAL OUTCOMES:**
Short Term Learning Objectives

Chad will discuss academic and personal problems with teachers or peers instead of showing verbal or aggressive behavior

**ANNUAL OUTCOMES:**
Short Term Learning Objectives

Chad's regular education program will be modified to 5th grade level

Evaluation Procedures: Text

Special Materials and Equipment: Cabell County Text books

Copies To:
White: County
Yellow: School
Pink: Parent

App. 01080

# INSTRUCTIONAL RECOMMENDATION PLAN/INDIVIDUALIZED EDUCATION PROGRAM
## ANNUAL IEP

Page

**Student Name:** Chad Fulks ████ ████   **Meeting Date(s)** May 1, 1989   **OBJECTIVE EVALUATION CRITERIA**

_____initial  ✓ annual _____triennial

| | Level of Accuracy | Evaluation Procedures | Results | Date | Special Materials and Equipment |
|---|---|---|---|---|---|

ANNUAL OUTCOMES: To improve articulation skills
   Short Term Learning Objectives

① To produce the "S", "Z", "SH", "CH", "J", "TH", dark "l", and ending sounds during reading

② To produce all error sounds correctly during structured conversational speech.

③ To produce all error sounds correctly during unstructured conversational speech.

ANNUAL OUTCOMES:
   Short Term Learning Objectives

ANNUAL OUTCOMES:
   Short Term Learning Objectives

Level of Accuracy: 90%

Evaluation Procedures: Data

Special Materials and Equipment:
Self-Monitoring
Reading Text Books
Stories of Interest
Clinician-Made Activities
Consistent Clinician Monitoring
Tape Recorder
Peer Monitors if Applicable

Copies To:
White: County
Yellow: School
Pink: Parent

App. 01081

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
Florence Division

UNITED STATES OF AMERICA    )
                            )
                            )
    v.                      )    CRIMINAL NO. 4:02-992
                            )
                            )
CHADRICK E. FULKS           )
                            )
_____)

## DECLARATION OF DICIE FULKS

1.    My name is Dicie Fulks.  I am over 18 years of age and competent to give this declaration.

2.    I am familiar with Roger Fulks, his former wife Diane, and their five children.  I have personally observed their treatment of their children and their interactions with others.

3.    Diane and Roger's home was always filthy.  When their children were small, dirty diapers would cover the floors and be stuffed under furniture. The children themselves were dirty and the house was full of flies.

4.    Instead of fixing a baby bottle with milk or formula, Diane would prepare Kool-Aid bottles.  When I took Diane to the store she would buy beer instead of milk.  If the children got milk, I would have to pay for it.  I remember one time I took Diane to the store and removed the beer from the shopping cart.  I told her to use the money to purchase milk.  She told me that Roger would beat her if she did not come home with alcohol.  When we arrived at her house, the first thing Roger asked was "where is the beer?"  He ordered Diane to go back to the store to get it.

1

5.     From my observation, Roger was a shiftless man who did not work hard to provide for his family.  His priority and Diane's priority was alcohol.  They depended on others to bring food to the house and to take care of their children.

6.     Roger and Diane frequently fought and would use very foul language in front of the children.

7.     The children had little or no parenting and were left to raise themselves.  The boys were seldom at home and ran the streets of Huntington.

8.     I was not contacted by Chad Fulks' trial team.  Had I been contacted, I would have gladly cooperated and provided the information that is contained in this Declaration.

9.     In accordance with 28 U.S.C.A. § 1746, I declare that under penalty of perjury that the foregoing is true and accurate.

_Dicie Fulks_

Signed before me this ___ day of
_July_____, 2008



Notary Public for _____

My Commission Expires: _Sept 8, 2016_

Official Seal
Notary Public, State Of West Virginia
Sarah Beth Ellis
Lincoln County Clerk's Office
P.O. Box 497
Hamlin, WV 25523
My commission expires Sept. 8, 2016

- 2 -

DECLARATION OF GAYLE WOLFE
PURSUANT TO 28 U.S.C. SUBSECTION 1746

I, Gayle Wolfe, do hereby declare, affirm and verify as follows:

1. My name is Gayle Wolfe, and I was Chad Fulks' 5th grade BD teacher at Peyton Elementary. BD stands for Behavioral Disorder, meaning children with behavioral problems. I still teach in the Cabell County School District.

2. Back when Chad was a student, there were self-contained "Mental Impairment" (MI) classes, and separate self-contained BD classes. The BD classes don't exist anymore. Chad was placed in the latter. Kids in BD classes usually had lower intellectual abilities than the general population or had specific learning disabilities. Because of this, children in BD classes were taught at a slower pace than regular classes, and the children received much more individual attention than a student in a regular class would. The lessons were also much simpler and more repetitive.

3. Chad was not in my BD class because of perpetual bad behavior, but because he was a slow learner. Chad was capable of learning, but the materials needed to be basic, concrete, and far below his grade level for him to learn it. Also, I needed to find a different way to teach Chad. He needed hands-on learning, something he could see or manipulate.

4. In BD classes, we prioritized getting students out of our classrooms and into mainstream classrooms as frequently as we could. When I taught Chad, the class was a mix of kids from 3rd grade to 5th grade, and I believe we had 6 or 7 students that year. By the end of the year, I had pushed a lot of my kids out into regular ed classes with aides—usually social studies or science, because those regular ed classes were more fun for the kids. We sent an aide so that if there were problems, the regular ed teacher wouldn't have to deal with it. I was sending Chad out a lot at the end of the year, but I did all of his math and reading still because he needed so much attention with those.

5. Of course, regular ed students would know that the BD kids were coming from a special ed class, and they bullied Chad as a result. Chad was bullied for his BD placement, his lisp, and his poor clothing, among other things. There was also a peculiar physical thing about Chad's mouth, an area above his top lip that looked cut or poked in. When he spoke, that area would stretch flat. It was just one more thing in his life that opened him up for humiliation.

6. Once a student was placed in special education, the school wouldn't hold them back a grade again, they would just continue to push them forward. I gave Chad C grades because that's just what you did with special ed kids. I couldn't fail him, but he certainly wasn't earning As or Bs. So he would just get Cs.

7. Chad was helpful in class. He didn't talk back to me. When he got mad, he cried. He didn't have a lot of clothes. He was frequently dirty. He wore tight blue jeans and

cowboy boots, so he didn't fit in at the school. Chad had no sense of caution. I saw him get caught up in some serious fights on the playground, but I can't recall if he ever needed medical attention.

8. Chad was a follower, not a leader. He would get into trouble at school, but not because he was the one starting it. Other kids would misbehave, and they would lure Chad into it by getting him to misbehave too. Chad was vulnerable. If something was occurring around him, there were many times when someone else smarter would pull him in. I had to really keep an eye on him to be sure he didn't get swept up in trouble because of the other kids. For example, there was another kid in the class, Rodney Hester, who got Chad to do things he wouldn't have otherwise done. Rodney was a 3rd grader, but he was easily capable of influencing Chad, who was a 5th grader.

9. The teacher who handled the BD class before me created a bad precedent at the school. When kids went out to the playground and there was trouble, the kids in the BD class would get blamed, and then other kids quickly learned to blame them for things, too. That teacher was responsible for starting this pattern. I told the other teachers at the school that they needed to watch what happened before and after the fights, that there was more going on than they realized at first glance. But everyone just viewed the BD kids as the bad kids in the building without looking at why certain behavior was happening.

10. Chad grew up in a rough neighborhood. I made a number of home visits. I was never allowed to see inside the house. Their living room was basically in the yard, with a couch on the front porch. There was a lot going against Chad. His family was horrible. He didn't ask to be born to them. When I arrived, one time, his mother offered me alcohol to drink. The Fulks' house was that house you didn't want on your block, beer cans everywhere. I don't remember Chad's parents coming in to school for conferences.

11. Chad was very backward socially. He was not someone who would go up to another kid to make a friend. If there was a group, he joined in with what the group was doing. But one on one, he was shy. When he was my student, the teachers were receiving money each week to take the BD kids into the community to teach them basic social skills, like manners and conversation. We took these types of trips because the BD students' social skills were so bad. Even a game on the playground would turn into warfare with these kids because they did not know how to interact with one another. At one point, a reporter from the *Herald-Dispatch* got ahold of Chad's parents and did this article claiming the poor kids in town were not able to participate in all of the field trips because they couldn't pay for them. This was not at all true, and I confronted the reporter. The paper ended up printing a retraction, as well as an extra article about the work we did in special education. The Fulks egged this issue on even though it was false—they said he went on trips and watched all of the other kids having fun while he had to sit out. Chad's parents seemed more interested in stirring up trouble than taking care of their child.

12. Back when Chad was a student, we would usually order IQ testing after a teacher noticed a student experiencing problems. We would then place the child on a School Assistance Team (SAT) plan, which would include IQ and academic testing with a psychologist,

then an attempt at accommodations. For the IQ testing, the psychologist would take the student to a private room. The testing for my students often took place over several days because it could be so overwhelming for them. The slower pace helped—a little bit here, little bit there.

13. If a student had intellectual disabilities that went beyond the self-contained mental impairment and BD classes that were in the school, the next step was a specialized school setting, where you would be moved from the school to a facility where you would live. This option was very expensive for the county, so the school sought to avoid it. In general, a separate placement would only get financed if there was a lawsuit. There was otherwise not much lower you could go than a self-contained class.

I declare under penalty of perjury and pursuant to the laws of the United States of America, 28 U.S.C. § 1746, that the foregoing is true and correct.

Executed in Cabell County
State of West Virginia
On the _15_ day of ___9___ , _2016_

_Skip F Wolfe_