IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | | |
|---|---|---|
| CHADRICK FULKS, | ) | No. 2:15-CV-00033-JRS-MJD |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| *versus* | ) | |
| | ) | |
| J.E. KRUEGER, | ) | |
| *Warden, Terre Haute USP*, | ) | |
| | ) | |
| Respondent. | ) | |

## <u>RESPONDENT'S RETURN TO ORDER TO SHOW CAUSE</u>

JOSHUA J. MINKLER
UNITED STATES ATTORNEY

Joe Howard Vaughn
Assistant United States Attorney
United States Attorney's Office
10 West Market Street, Suite 2100
Indianapolis, IN 46204
Tel. (317) 229-2447
Fax (317) 226-6125
Email: Joe.Vaughn@USDOJ.GOV

Robert Frank Daley, Jr.
Kathleen Michelle Stoughton
Special Assistant United States Attorneys
1441 Main Street, Suite 500
Columbia, SC 29201
Tel. (803) 929-3000
Fax (803) 929-3135
Email: Robert.Daley@USDOJ.GOV
Email: Kathleen.Stoughton@USDOJ.GOV

*Counsel for Respondent*

**TABLE OF CONTENTS**

**PAGE**

TABLE OF AUTHORITIES ................................................................................................ iv

I. INTRODUCTION ................................................................................................ 1

II. BACKGROUND ................................................................................................. 2

    A. Fulks and his co-defendant engaged in a 17-day crime spree, culminating
       in the carjacking, kidnapping, rape, and murder of Alice Donovan ............................. 2

    B. Fulks was indicted, pleaded guilty, and proceeded to the penalty phase ......................... 8

        1. Fulks was indicted on eight counts, including carjacking and
            Kidnapping resulting in the death of Alice Donovan, and the
            Government filed a notice of intent to seek the death penalty ............................. 8

        2. Fulks pleaded guilty to all eight counts of the superseding
            indictment and proceeded to the penalty phase ...................................................... 9

        3. The jury returned a verdict of death for carjacking and
            kidnapping resulting in the death of Alice Donovan ......................................... 10

    C. The Fourth Circuit affirmed Fulks' conviction and sentence of
       death .......................................................................................................................... 13

    D. Fulks filed a § 2255 motion raising 33 claims, each of which
       was rejected by the District Court in a 175-page ruling upheld
       by the Fourth Circuit ................................................................................................. 14

    E. Fulks filed the instant § 2241 petition in the Southern District
       of Indiana, which he amended after three years to assert claims
       of ineligibility to be executed under *Atkins* and *Madison* ........................................ 15

    F. After filing the instant § 2241 petition, Fulks received permission
       to file and filed a second § 2255 motion in the District of South
       Carolina ..................................................................................................................... 15

III. ARGUMENT ....................................................................................................... 16

    A. Fulks' *Atkins* claim pursuant to § 2241 must be dismissed for lack of jurisdiction because Fulks cannot show that § 2255 is "inadequate or ineffective" to test the legality of his detention ................................... 16

        1. Congress created § 2255 in an attempt to divert federal prisoners' collateral attacks on their convictions and sentences to the "more convenient jurisdiction of the sentencing court," allowing claims under § 2241 only in very narrow circumstances ............................................. 17

        2. The savings clause does not allow Fulks' *Atkins* claim to Proceed under § 2241 because Fulks cannot meet his burden of showing that § 2255 is "inadequate or ineffective ............................................. 21

            a. No structural error precludes collateral review of Fulks' *Atkins* claim because the claim is cognizable in a § 2255 ....................................................................................... 23

            b. Section 2255 is not "inadequate or ineffective" simply because Fulks may be barred from filing a second § 2255 motion ....................................................................................... 24

        3. The Seventh Circuit's *Davenport* standard does not allow Fulks' *Atkins* claim to proceed under § 2241 ................................................. 26

            a. Fulks does not rely on a statutory-interpretation case ....................................................................................... 27

            b. Fulks does not rely on a retroactive decision, and he cannot establish that the alleged new rule could not have been invoked in his first § 2255 motion ............................................. 29

        4. The Seventh Circuit's *Webster* standard does not allow Fulks' *Atkins* claim to proceed under § 2241 ................................................. 31

    B. Fulk's *Ford/Madison* claim that his alleged intellectual disability renders him constitutionally ineligible to be executed fails as a matter of law ....................................................................................... 33

        1. Fulks' *Ford/Madison* claim that his alleged intellectual disability renders him ineligible to be executed must be dismissed because it is not yet ripe ....................................................... 34

ii

2. Fulks' *Ford/Madison* claim cannot proceed under § 2241 as a matter of law because Fulks cannot show that § 2255 is "inadequate or ineffective" to test the legality of his detention on the basis of those decisions ............................ 37

     a. The savings clause does not allow Fulks' *Ford/Madison* claim to proceed under § 2241 because Fulks cannot meet his burden of showing that § 2255 is "inadequate or ineffective ............................ 38

     b. The Seventh Circuit's *Davenport* standard does not allow Fulks' Ford claim to proceed under § 2241 ............................ 40

3. Fulks' *Ford/Madison* claim fails as a matter of law because he does not allege that he lacks a rational understanding of the government's rationale for his execution ............................ 42

4. Fulks' specific claim that his alleged intellectual disability under *Atkins* renders him incompetent to be executed is not cognizable under *Ford* ............................ 44

IV. CONCLUSION ............................ 45

CERTIFICATE OF SERVICE ............................ 47

iii

# TABLE OF AUTHORITIES

**CASES**                                                                          **PAGE**

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ................................................................................................ 42

*Atkins v. Virgina*,
   536 U.S. 304 (2002) ........................................................................................ *passim*

*Bell Atl. Corp v. Twombly*,
   550 U.S. 544 (2007) ......................................................................................... 42, 43

*Billiot v. Epps*,
   107 F. App'x 385 (5th Cir. 2004) ......................................................................... 36

*Brown v. Caraway*,
   719 F.3d 583 (7th Cir. 2013) ........................................................................ *passim*

*Brown v. Muniz*,
   889 F.3d 661 (9th Cir. 2018) ............................................................................ 34, 36

*Coady v. Vaughn*,
   251 F.3d 480 (3d Cir. 2001) .................................................................................. 17

*Davis v. Kelley*,
   854 F.3d 967 (8th Cir. 2017) ............................................................................ 30, 44

*Davis v. United States*,
   417 U.S. 333 (1974) ......................................................................................... 18, 19

*Dunn v. Madison*,
   138 S. Ct 726 (2018). ............................................................................................ 33

*Ford v. Wainwright*,
   477 U.S. 399 (1986) .............................................................................. 1, 33, 37, 39

*Fulks v. United States*,
   551 U.S. 1147 (2007) ............................................................................................ 13

*Fulks v. United States*,
   571 U.S. 941 (2013) .............................................................................................. 14

*Fulks v. United States*,
875 F.Supp.2d 535 (D.S.C. 2010) ................................................................................. *passim*

*Garza v. Lappin*,
253 F.3d 918 (7th Cir. 2001) ...................................................................................... *passim*

*Hall v. Florida*,
572 U.S. 701 (2014) ......................................................................................... 16, 29, 30

*Holmes v. Neal*,
816 F.3d 949 (7th Cir. 2016) ................................................................................... 36

*In re Campbell*,
874 F.3d 454 (6th Cir. 2017) ................................................................................... 36

*In re Davenport*,
147 F.3d 605 (7th Cir. 1998) ........................................................................ 20, 21, 22, 26

*In re Henry*,
757 F.3d 1151 (11th Cir. 2014) ............................................................................... 29

*In re Payne*,
722 F. App'x 534 (6th Cir. Feb. 8, 2018) ................................................................. 29

*Johnson v. United States*,
135 S. Ct. 2551 (2015) ........................................................................................... 16

*Lindh v. Murphy*,
96 F.3d 856 (7th Cir. 1996), *rev'd on other grounds*,
521 U.S. 320 (1997) ........................................................................................ 17, 18

*Madison v. Alabama*,
139 S. Ct. 718 (2019) ......................................................................................... *passim*

*McCarthan v. Director Of Goodwill Indus.-Suncoast, Inc.*,
851 F.3d 1076 (11th Cir. 2017) ............................................................................... 27

*Montana v. Cross*,
829 F.3d 775 (7th Cir. 2016) ................................................................................... 29

*Moore v. Texas*,
137 S. Ct. 1039 (2017) ..................................................................................... 17, 29, 30

*Nooner v. Norris*,
499 F.3d 831 (8th Cir. 2007)..................................................................... 36

*Panetti v. Quarterman*,
551 U.S. 930 (2007) ............................................................. 33, 36, 37, 39

*Peoples v. United States*,
403 F.3d 844 (7th Cir. 2005)..................................................................... 19

*Poe v. LaRiva*,
834 F.3d 770 (7th Cir. 2016)............................................................. *passim*

*Prost v. Anderson,*
636 F.3d 578 (10th Cir. 2011)................................................................... 27

*Rumsfeld v. Padilla*,
542 U.S. 426 (2004) ................................................................................... 18

*Sanders v. United States*,
373 U.S. 1 (1963) ............................................................................. *passim*

*Scott v. United States*,
890 F.3d 1239 (11th Cir. 2018)........................................................... 34, 36

*Shoop v. Hill*,
139 S. Ct. 504 (2019) ................................................................................ 30

*Smith v. Commissioner, Ala. Dept. of Corrections*,
___ F.3d ___, 2019 WL 2202949 (11th Cir. May 22, 2019) ................... 29

*Stewart v. Martinez-Villareal*,
523 U.S. 637 (1998) ..................................................... 34, 35, 36, 39

*Stewart v. United States*,
646 F.3d 856 (11th Cir. 2011)................................................................... 19

*Suggs v. United States*,
705 F.3d 279 (7th Cir. 2013)..................................................................... 39

*Swann v. Taylor*,
173 F.3d 425, 1999 WL 92435 (4th Cir. Feb. 18, 1999)........................... 35

*Taylor v. Gilkey*,
314 F.3d 832 (7th Cir. 2002)............................................................. *passim*

*Teague v. Lane*,
489 U.S. 288 (1989) ........................................................................... 41

*Tyler v. Cain*,
533 U.S. 656 (2001) ........................................................................... 19

*United States v. Addonizio*,
442 U.S. 178 (1979) ........................................................................... 18

*United States v. Davis*,
___ S. Ct. ___, 2019 WL98544 (*cert. granted* January 4, 2019) ............................................. 16

*United States v. Fulks*,
454 F.3d 410 (4th Cir. 2006) ........................................................ 8, 9, 13, 24

*United States v. Fulks*,
683 F.3d 512 (4th Cir. 2012) ........................................................ 2, 14

*United States v. Hayman*,
342 U.S. 205 (1952) ........................................................................... 18

*United States v. MacDonald*,
641 F.3d 596 (4th Cir. 2011) ........................................................... 24

*United States v. Obeid*,
707 F.3d 898 (7th Cir. 2013) ...................................................... 36, 40

*United States v. Prevatte*,
300 F.3d 792 (7th Cir. 2002) ........................................................... 20

*United States v. Wheeler*,
139 S. Ct. 1318 (2019) ...................................................................... 26

*Webster v. Daniels*,
784 F.3d 1123 (7th Cir. 2015) ................................................... *passim*

*Williams v. Kelley*,
858 F.3d 464 (8th Cir. 2017) ..................................................... 29, 30

## STATUTES

18 U.S.C. § 371 ........................................................................................................ 8
18 U.S.C. § 922(g)(1) .............................................................................................. 8
18 U.S.C. § 922(j) .................................................................................................... 8
18 U.S.C. § 924(c)(1)(A) ......................................................................................... 8
18 U.S.C. § 924(o) ................................................................................................... 8
18 U.S.C. § 1201 ................................................................................................... 2, 8
18 U.S.C. § 2119 ...................................................................................................... 8
18 U.S.C. § 2119(3) ................................................................................................. 2
18 U.S.C. § 2312 ...................................................................................................... 8
18 U.S.C. § 3593(a) ................................................................................................. 9
28 U.S.C. § 2241 .............................................................................................. *passim*
28 U.S.C. § 2244(b)(1) ........................................................................................... 35
28 U.S.C. § 2244(b)(3)(A) ...................................................................................... 19
28 U.S.C. § 2244(b)(3)(C) ...................................................................................... 19
28 U.S.C. § 2255 .............................................................................................. *passim*
28 U.S.C. § 2255(a) ........................................................................................... 18, 39
28 U.S.C. § 2255(e) ......................................................................................... 1, 19, 26
28 U.S.C. § 2255(h) .......................................................................................... 19, 23
28 U.S.C. § 2255(h)(2) ........................................................................................... 28
U.S.C. § 924(c) ...................................................................................................... 22

## RULES

Fed. R. Civ. Proc. 15(a)(2) ..................................................................................... 24
Federal Rule of Civil Procedure 12(b)(6) ............................................................... 43
Federal Rule of Civil Procedure 15(a) .................................................................... 24

## I. __INTRODUCTION__

Petitioner Chadrick Fulks, a federal prisoner under a sentence of death, has filed an amended petition for writ of habeas corpus under 28 U.S.C. § 2241 by way of the savings clause, 28 U.S.C. § 2255(e). Fulks's petition raises two distinct arguments in support of his claim that his execution would violate the Eighth Amendment. This Court should reject both claims and dismiss the petition. Fulks must litigate these issues, if at all, in a § 2255 proceeding in the district court of his conviction and sentence—the District of South Carolina—and not in this court.

First, Fulks claims that he is intellectually disabled (mentally retarded) and ineligible for the death penalty under *Atkins v. Virgina*, 536 U.S. 304 (2002), and its progeny. This claim must be dismissed because Fulks does not meet the requirements of the savings clause of 28 U.S.C. § 2255. In short, Fulks cannot show that § 2255 is "inadequate or ineffective" to test the legality of his detention, and he therefore cannot bring a § 2241 petition attacking his sentence. By definition, a pure *Atkins* claim can never be brought under § 2241 because such a claim is constitutional and thus does not categorically elude the permission for successive § 2255 motions.

Fulks's second claim is that he cannot be executed under *Ford v. Wainwright*, 477 U.S. 399 (1986), and its progeny (specifically, *Madison v. Alabama*, 139 S. Ct. 718 (2019)), because his alleged intellectual disability renders him incompetent to be executed. This claim must be dismissed for a variety of reasons. First, this *Ford/Madison* claim is not ripe. Fulks's execution is not imminent—no execution date has been set, and the federal government does not even have a current protocol to administer drugs for execution. Second, Fulks does not meet the requirements of the savings clause; he cannot show that § 2255 is "inadequate or ineffective" to test the legality of his detention. Like *Atkins* claims, a *Ford* claim can never be brought under § 2241 because

1

such a claim is constitutional and thus does not categorically elude the permission for successive § 2255 motions. Third, Fulks's *Ford/Madison* claim fails as a matter of law because he does not allege in his § 2241 petition that he lacks a rational understanding of the government's rationale for his execution. Finally, Fulks's claim that his alleged intellectual disability under *Atkins* renders him incompetent to be executed is not cognizable under *Ford*. For all these reasons, it is clear that this Court should dismiss Fulks's § 2241 petition.

## II.     <u>BACKGROUND</u>

Fulks is currently imprisoned at F.C.C.-Terre Haute on death row. The capital sentence was imposed on Fulks's convictions in the District of South Carolina for carjacking resulting in death, in contravention of 18 U.S.C. § 2119(3), and kidnapping resulting in death, as proscribed by 18 U.S.C. § 1201. These charges related to the abduction and murder of Alice Donovan on November 14, 2002, in the course of a multistate crime spree engineered by Fulks and his cohort, Brandon Basham, following their escape from a Kentucky jail. Three days prior to Donovan being carjacked, kidnapped, and killed, Samantha Burns suffered the same fate in West Virginia at the hands of Fulks and Basham. *United States v. Fulks*, 683 F.3d 512, 515 (4th Cir. 2012) ("*Fulks III*").

> **A.     Fulks and His Co-Defendant Engaged in a 17-Day Crime Spree, Culminating in the Carjacking, Kidnapping, Rape, and Murder of Alice Donovan.**

The facts surrounding the carjacking, kidnapping, rape, and murder of Alice Donovan were set out at length by the Fourth Circuit in Fulks's direct appeal and in the district court's order denying Fulks's first § 2255 motion. They are as follows:

> Fulks, who grew up in the tri-state area around Huntington, West Virginia, began dating an exotic dancer named Veronica Evans in April 2002. Shortly thereafter, Fulks, who was then

twenty-five years old, began living with Evans and her three-year-old son Miles in the eastern Kentucky community of Lewisburg. On June 11, 2002, Fulks and Evans were married. Fulks supported his new family in the same way he had supported himself for years—by breaking into cars and stealing. And as he had with other women, Fulks often became violent with Evans, sometimes beating her severely and assaulting her sexually.

On August 25, 2002, Fulks directed Evans to use a stolen credit card to buy a necklace at a Wal–Mart in Madisonville, Kentucky. Upon entering the store, Evans reported to police that Fulks was in the parking lot with a gun and that she was afraid he would kill her. The police responded and searched Evans's car, discovering, among other things, stolen credit cards and a pistol. The officers subsequently arrested Evans and Fulks and transported them to the Hopkins County Detention Center (the "HCDC"). Three-year-old Miles was placed in foster care. On August 27, 2002, Evans agreed to cooperate with the government and was released from the detention center. On the basis of evidence seized from their home, Fulks was ultimately charged with twelve counts of credit card fraud in Hopkins County, Kentucky.

Brandon Basham had been housed at the HCDC on bad check charges for over a year when Fulks arrived in late August 2002. According to guards at the prison, Basham was disruptive and annoying, often pestering his fellow inmates. In order to protect him from other prisoners, Basham was frequently reassigned cell mates, and, in mid-October 2002, he was placed in a cell with Fulks. On November 3, 2002, after about two months in custody, the Kentucky State Police served Fulks with an indictment charging him with first degree abuse of a child aged twelve years or younger (Miles). The next evening, at approximately 6:30 p.m., a jailer released Fulks and Basham, at Basham's request, into an outdoor recreation area. The jailer became diverted administering medication to other inmates, and when she returned at about 8:00 p.m. to check on Fulks and Basham, they were gone. They had escaped from the HCDC through the ceiling of the recreation area by using a makeshift rope made of blankets and sheets.

By the following day, November 5, 2002, Fulks and Basham had made their way on foot to the residence of James Hawkins, about eight to twelve miles from the HCDC. Basham approached the residence and, after using the phone, persuaded Hawkins to drive him and Fulks to a nearby convenience store. Shortly after departing

from the house, Hawkins agreed to drive Fulks and Basham to their car, which they claimed to be located about forty miles away in Robards, Kentucky. At some point, Basham pulled a knife on Hawkins, and Fulks ordered Hawkins to pull to the side of the highway so that Fulks could drive. Soon thereafter, Fulks stopped the truck on a remote state road, intending to abandon Hawkins. Basham started to tie Hawkins to a tree, but Fulks, dissatisfied with Basham's effort, soon took over the job. Once Fulks was convinced that Hawkins would be unable to escape, he and Basham departed in Hawkins's truck. Hawkins freed himself some fifteen hours later, hailed a passing motorist, and called the police. According to Hawkins's testimony at trial, although Basham held him at knifepoint throughout the carjacking incident, Fulks remained in charge, with Basham merely following Fulks's orders.

After leaving Hawkins, Fulks and Basham drove to Portage, Indiana, where, on November 6, 2002, they abandoned Hawkins's truck at a hotel and proceeded on foot to a trailer shared by Tina Severance and Andrea Roddy. Fulks had met Severance at the Westville (Indiana) Correctional Institute in 2001, while he was serving time there and she was working as a correctional officer. After a few hours in the trailer, Fulks and Basham became very nervous, and the four of them (Fulks, Basham, Severance, and Roddy) travelled in Severance's van to the Sands Motel in northern Indiana, where they spent the next two nights. At some point while at the Sands Motel, Fulks told Severance that he had escaped from prison because he feared a lengthy prison sentence on the pending child abuse charges. During their second night at the Sands Motel, Fulks asked Severance if she knew where they could obtain firearms. She replied that a friend, Robert Talsma, kept firearms at his home in nearby Michigan City, Indiana. On the morning of November 8, 2002, in accordance with a preconceived plan, Severance and Roddy lured Talsma away while Fulks and Basham broke into his home and stole several firearms, as well as a ring and some checks.

The four of them then drove Severance's van to Sturgis, Michigan, where they rented a motel room. Basham and Roddy spent the night of November 8, 2002, at the motel, while Fulks and Severance spent that night in Goshen, Indiana, smoking marijuana and methamphetamine with Fulks's brother, Ronnie Fulks. The next day, Fulks and Severance returned to the Sturgis motel to find Basham crouched on the floor holding a gun. Apparently convinced that the authorities had caught up with them, Basham was highly

4

agitated, repeatedly asserting that he was going to shoot a police officer. He eventually calmed down, and the four then drove to the Indiana home of Ronnie Fulks, where they spent the night.

On November 10, 2002, Fulks, Basham, Severance, and Roddy, with Fulks driving Severance's van, travelled to Piketon, Ohio, where they checked into a Town and Country Motel. They then drove to a nearby Wal–Mart, where Basham wrote bad checks for items that Roddy later returned for cash. Also on November 10, 2002, at a K–Mart in Piketon, Ohio, Fulks met a young woman with a butterfly tattoo (later determined to be Heather Jacobi) with whom he used drugs. On that same date, Fulks stole a purse and cell phone belonging to nineteen-year-old Amy Ward from a vehicle parked at a Wal–Mart in Waverly, Ohio. On the following day, Fulks, Basham, Severance, and Roddy drove to Kenova, West Virginia, and rented a room at the Hollywood Motel. Fulks and Basham then left the motel, not to return until the early morning hours of November 12, 2002.

According to statements Fulks made to the FBI in 2003, after he and Basham left the Hollywood Motel on November 11, 2002, they smoked methamphetamine and then drove to the Barboursville Mall, near Huntington, West Virginia, intending to break into cars and steal purses. When they arrived at the mall, they split up. The next time Fulks saw Basham, he was driving a car up and down the rows of the parking lot and yelling Fulks's name. In the passenger seat was the owner of the car, a nineteen-year-old Marshall University student named Samantha Burns. After spotting Basham, Fulks returned to Severance's van and followed Basham and Burns to a Foodland grocery store, where Fulks left the van and began driving Burns's car. They then visited several automatic teller machines and withdrew cash from Burns's account. They later returned to the Foodland to retrieve the van, at which point Basham announced that he wanted to find a place to rape Burns. Fulks then followed Basham in Severance's van to a secluded area by the Ohio River. Fulks parked some distance from Burns's car, and in such a way that his view of the passenger side of the car was obstructed. He observed Basham exit the driver's side of the car and walk around to the passenger's side. He saw nothing else until about twenty minutes later when Basham—alone—drove Burns's car to where Fulks was parked and informed Fulks that he wanted to burn the vehicle in order to remove any fingerprints. After buying gasoline, Basham set fire to Burns's car on a rural road near Lavalette, West Virginia, and he and Fulks returned to the Kenova motel. From that

5

point forward, Basham wore, on a chain around his neck, a heart-shaped ring that was later determined to belong to Burns. Although both Fulks and Basham have admitted that Burns is dead, her body has never been recovered.

On November 12, 2002, Fulks, Basham, Severance, and Roddy drove the van to Little River, South Carolina, where Fulks had lived during the late 1990s. During their trip to Little River, Basham repeatedly taunted Severance by asking whether she wanted to go "swimming" in the Ohio River. Fulks eventually ordered Basham to stop teasing Severance, and Basham complied. When the four of them arrived at Little River, they checked in at the Lake Shore Motel. Fulks and Basham spent the following day, November 13, 2002, breaking into cars and stealing purses. On November 14, the four left Little River for the Beach Walk Hotel in Myrtle Beach, South Carolina. After checking in, Fulks and Basham left the hotel in Severance's van.

At around 2:00 p.m. on November 14, 2002, Carl Jordan stumbled upon Fulks and Basham burglarizing his son's residence outside Conway, South Carolina. According to Jordan, both Fulks and Basham fired gunshots at him, with Fulks shooting out the back window of Jordan's truck. Jordan then attempted to retreat in his truck, with Fulks and Basham following in Severance's van. Fulks and Basham eventually gave up the chase, abandoned Severance's van, and stole a white pickup truck. They then made their way to a Wal–Mart store in Conway, South Carolina, where, according to Fulks's 2003 statements to the FBI, they planned to steal a car.

At 2:37 p.m. that same day, a Wal–Mart surveillance camera recorded a blue BMW driven by Alice Donovan enter the Wal–Mart parking lot, with Fulks and Basham following closely behind. As Donovan parked, Basham exited the truck and approached the BMW while Fulks circled the row of vehicles and parked opposite the BMW. Both vehicles then began moving again, travelling outside the range of the cameras. Fulks soon abandoned the pickup truck and began driving the BMW, with Basham and Donovan in the back seat. After leaving the Wal–Mart parking lot, Fulks and Basham made several (some successful) attempts to withdraw money from Donovan's account at various automatic teller machines. At some point, they crossed into North Carolina and stopped at a cemetery, where first Basham and then Fulks raped Donovan. According to Fulks's statements to the FBI, he did not want to rape Donovan but felt pressure from Basham to do so. They

then reentered South Carolina and, according to Fulks, Basham ordered him to stop along a dirt road so that they could leave Donovan tied up, in order to prevent her from contacting the authorities. Fulks complied with this request and Basham, carrying a gun but no rope or tape that Fulks could see, began leading Donovan away from the car. Donovan implored Fulks to convince Basham to leave the gun in the car, but Basham refused to do so. Basham then led Donovan into the woods and out of Fulks's sight. He returned twenty minutes later, alone. As with Burns, both Fulks and Basham have admitted that Donovan was killed, but her body has never been found.[1]

Fulks and Basham then returned to the Beach Walk Hotel in Myrtle Beach, where they informed Severance and Roddy that the police were in possession of the van, and that Fulks and Basham needed to return to West Virginia alone. According to Fulks, it was on their return journey to West Virginia that Basham first informed him that he had killed Burns and Donovan. On November 15, 2002, Fulks and Basham arrived in Huntington, West Virginia, and spent the next two nights smoking crack cocaine at the residence of Beth McGuffin, a friend of Fulks. McGuffin testified that, during the time she spent with Fulks and Basham, Fulks controlled what he and Basham did.

Two days after arriving at McGuffin's home, on November 17, 2002, Fulks and Basham drove to the Ashland Mall in nearby Ashland, Kentucky, where they planned to break into cars. At around 7:30 p.m., in the Ashland Mall parking lot, Basham attempted to carjack Deanna Francis and her fifteen-year-old daughter. After Francis reported the incident, a police officer spotted Basham and began to pursue him on foot. Basham initially eluded the officer by running behind some railcars, but he was apprehended at around 9:00 p.m. that evening, hiding across the railroad tracks in the Ohio River.

---

[1] "On January 18, 2009, six years after the death of Alice Donovan, a search team located seven pieces of bone that appeared to be part of a human skull in a rural area of northeast Horry County, South Carolina. The search team subsequently found several additional bone fragments, including one that appeared to be a forearm bone. DNA testing confirmed that these partial remains were Alice Donovan's." *Fulks v. United States*, 875 F.Supp.2d 535, 623 (D.S.C. 2010) ("*Fulks II*").

7

Fulks returned to McGuffin's home late that same evening and was there when the television stations reported Basham's arrest. The following day, November 18, 2002, Fulks left Huntington in Donovan's BMW for his brother's home in Goshen, Indiana. That evening, an Ohio State Trooper, having observed the BMW and ascertained that it was stolen, attempted to apprehend Fulks at a rest area near Marion, Ohio. Following a highway chase reaching speeds of 130 miles per hour, Fulks narrowly escaped. He arrived at his brother's home in Indiana on the evening of November 19, 2002, and, on the morning of November 20, 2002, hid the BMW in a barn near Bristol, Indiana. Police officers had earlier set up a surveillance operation at Fulks's brother's home and, on the afternoon of November 20, 2002, after a brief foot chase, Fulks was finally apprehended.

*United States v. Fulks*, 454 F.3d 410, 413-17 (4th Cir. 2006)("*Fulks I*"); *Fulks II*, 875 F.Supp.2d at 541-45.

**B.      Fulks Was Indicted, Pleaded Guilty, and Proceeded to the Penalty Phase.**

**1.      Fulks was indicted on eight counts, including carjacking and kidnapping resulting in the death of Alice Donovan, and the Government filed a notice of intent to seek the death penalty.**

Fulks and Basham were indicted in the District of South Carolina on December 17, 2002. The Grand Jury returned a Superseding Indictment on April 23, 2003, charging Fulks and Basham with eight separate offenses and setting forth special findings supporting the imposition of the death penalty on the first two Counts: (1) carjacking resulting in Alice Donovan's death (18 U.S.C. § 2119); and (2) kidnapping resulting in Alice Donovan's death (18 U.S.C. § 1201).[2]   The

---

[2] In addition to the carjacking and kidnapping offenses, Fulks and Basham were indicted for the following offenses: (1) interstate transportation of a stolen motor vehicle (18 U.S.C. § 2312); (2) conspiracy to commit numerous offenses, including carjacking and kidnapping (18 U.S.C. § 371); (3) conspiracy to use firearms in furtherance of a crime of violence (18 U.S.C. § 924(o)); (4) use of a firearm during and in relation to a crime of violence (18 U.S.C. § 924(c)(1)(A)); (5) being felons in possession of firearms (18 U.S.C. § 922(g)(1)); and (6) possession of stolen firearms (18 U.S.C. § 922(j)). *Fulks I*, 454 F.3d at 417 n.3.

government filed a notice of intent to seek the death penalty pursuant to 18 U.S.C. § 3593(a) and

the Federal Death Penalty Act ("FDPA").  *Fulks I*, 454 F.3d at 417.

### 2. Fulks pleaded guilty to all eight counts of the superseding indictment and proceeded to the penalty phase.

The district court summarized the proceedings prior to the sentencing phase of Fulks's trial:

> In January 2004, the court determined that it would be necessary to sever Basham and Fulks for separate trials. On May 4, 2004, six days before the scheduled commencement of jury selection, Fulks decided to tender pleas of guilty to all eight counts of the superseding indictment and the court began the colloquy required by Rule 11 of the Federal Rules of Criminal Procedure. With regard to the carjacking and kidnapping counts on which the prosecution was seeking the death penalty, Fulks admitted to raping Donovan, but disclaimed any knowledge or participation in her murder.

> Near the end of the Rule 11 colloquy, the court asked Fulks to detail his involvement in the crimes for which he was pleading guilty. Fulks responded, through Blume, his attorney, that he would rely on his Rule 302 Statement (the "302") given to the Federal Bureau of Investigation during the investigatory stage of the case. When the court expressed its concern about the propriety of accepting a guilty plea to an offense carrying a potential death sentence without a clear admission by the defendant that he participated in the conduct at issue, defense counsel suggested that, for Count One at least, a guilty plea could be tendered pursuant to the *Pinkerton* theory of liability.

> After the court expressed its continued concern regarding the validity of the tendered plea, the court adjourned the Rule 11 colloquy for four days and invited counsel for both the government and the defendant to research the issue and submit memoranda on the viability of a guilty plea to a capital case under *Pinkerton*.

> Both the government and the defense responded with memoranda arguing that a plea pursuant to *Pinkerton* was appropriate under the circumstances presented in this case. The court thereupon accepted Fulks's guilty plea as to Count One, premised upon a *Pinkerton* theory of liability, and then accepted

Fulks's plea to Counts Two through Eight as well, with no reliance on *Pinkerton*.

Upon Fulks's guilty plea, the court proceeded with the penalty phase to select jurors who would determine Fulks's sentence. Jury selection on the penalty phase of the case required two weeks beginning May 10, 2004. The five-week trial commenced on June 1, 2004, and on June 30, 2004, the jury deliberated and returned a verdict of death on Counts One and Two.

*Fulks II*, 875 F.Supp.2d at 548-49.

### 3. The jury returned a verdict of death for carjacking and kidnapping resulting in the death of Alice Donovan.

A jury was selected and the court proceeded to the sentencing phase. The district court noted in its order denying Fulks's § 2255 motion: "The trial record reveals as complete and exhaustive a mitigation defense as one could reasonably expect in capital cases." *Fulks*, 875 F.Supp.2d at 568. "Trial counsel painted a compelling and empathetic picture of a young Chad Fulks growing up in poor, crowded, filthy, and deplorable living conditions, raised by violently abusive, sexually deviant, emotionally neglectful, and alcoholic parents who did not appear to care at all about their children's well being." *Id.* The mental health case prepared for and presented in Fulks's sentencing phase was exhaustive:

In developing its mental health case in mitigation, Fulks's trial team hired or consulted with many experts, including the following individuals: Drs. Jonathan Venn, David Bachman, Ruben Gur, Christos Davatzikos, Fred Bookstein, James Evans, Margaret Melikian, Seymour Halleck, James Hilkey, Arlene Andrews, and Howard Becker.

Trial counsel initially retained Dr. Venn to complete a neuropsychological battery of evaluations on Fulks, including Halstead–Reitan testing. According to Dr. Venn's seventeen-page neuropsychological evaluation report dated March 30, 2004 (Gov't Ex. 10G), he examined Petitioner on at least eight occasions, and also interviewed several individuals in preparing his report.

10

Specifically, Dr. Venn interviewed Dr. Elin Berg, a psychiatrist who treated Fulks during his pretrial detention; Betty Burroughs, a mental health social worker who saw Fulks during his pretrial detention; Lieutenant Bob Garrison of the Lexington County Detention Center; and Dr. Oliver P. Harden, a physician who treated Fulks during his pretrial detention. Because Dr. Venn's neuropsychological battery indicated that Fulks was low functioning and that he had brain damage, trial counsel asked neurologist Dr. Bachman to also conduct a neurological evaluation of Fulks. Dr. Bachman believed based on his neurological exam, brain imaging tests, and patient history that Fulks most likely had a fetal alcohol spectrum disorder ("FASD").

Thereafter, the trial team retained Dr. Fred Bookstein, who conducted brain imaging studies to help confirm the FASD diagnosis. Dr. Bookstein prepared a report for trial counsel (Gov't Ex. 10A). Dr. Christos Davatzikos examined Fulks's quantitative brain imaging and prepared a report for trial counsel (Gov't Ex. 10B). The trial team also retained Dr. James R. Evans, a licensed clinical psychologist, to conduct a neurophysiological evaluation report (Gov't Ex. 10C), which indicated that Fulks had brain damage and neuropsychological impairment, and other mental illnesses.

In determining the range of potential mental health issues involved in Fulks's case, trial counsel consulted with psychologist Dr. James Hilkey (Gov't Ex. 16), and forensic psychiatrist Dr. Seymour Halleck (Gov't Ex. 15). Trial counsel also retained psychologist Dr. Ruben Gur, forensic psychiatrist Dr. Margaret Melikian, and Dr. Howard Becker, a teaching expert with academic expertise in FASD. Trial counsel conducted multiple focus groups and also retained attorney Jeff Bloom, a jury/litigation consultant, to conduct a mock trial and record the mock jury's deliberations and comments (Gov't Exs. 6–8). Bloom's efforts resulted in a recommendation that FASD evidence was the strongest mitigator for trial counsel to pursue.

After conducting a thorough mental health investigation, including input from at least ten mental health experts, trial counsel decided to call six experts to present Fulks's mental health case in mitigation. Contrary to Petitioner's contentions, trial counsel presented a substantial mental health case that did not rest singularly on a FASD diagnosis. Trial counsel presented testimony of the following experts in FASD, cognitive neuroscience, behavioral neuroscience, and neuropsychology: Dr. Ruben Gur testified as an

expert in cognitive neuroscience; Dr. David Bachman testified as an expert in behavioral neurology; Dr. Howard Becker testified as an expert in FASD; Dr. James Evans testified to the battery of neuropsychological tests he administered to Fulks and to his review of tests administered by others; Dr. Fred Bookstein was qualified as an expert in biostatistics and morphometrics and testified regarding the anatomical abnormalities of Fulks's brain and their significance; and Dr. Arlene Andrews testified as an expert in child development and conducting family history assessments. Dr. Andrews presented her research regarding Fulks's childhood and explained the significance of Fulks's childhood experiences.

*Id.* at 555-56. Testimony regarding Fulks's intelligence was also presented at trial:

Petitioner also claims that trial counsel should have called Dr. Hilkey and Dr. Melikian to explain his borderline range of intelligence—a topic that the experts at trial fully explained. Dr. Evans testified that Fulks suffers from borderline intelligence, ranging from 75–79, moderate brain impairment, and cognitive impairment. (TT Vol. 17 at 10, 13.) Dr. Gur explained that Fulks "is clearly not a bright individual" and that his I.Q. test "comes up on the borderline, slightly above the cut of retardation. But a lot of the measures that go into that fruit salad [that make up I.Q.] are below that, well below that threshold." (TT Vol. 12 at 139.) Dr. Andrews testified that having an I.Q. above 70 actually makes people with brain damage from prenatal exposure more susceptible to breaking the law, being unemployable, being kicked out of school, and other problems. (TT Vol. 18 at 124.)

*Id.* at 558.

As a result of the exhaustive mitigation case Fulks presented, all 12 jurors found: Fulks's mother abused alcohol while she was pregnant with him; Fulks suffered from learning disabilities as a child; Fulks was neglected by his parents; Fulks lived in a filthy house infested with roaches and ants; Fulks's parents did not provide him with adequate clothing or school supplies; Fulks's parents sold food stamps for beer; Fulks was left without supervision; Fulks was permitted to roam the streets as a young child; a principal, police officer, and probation officer all recommended Fulks be removed from the home at the age of nine; Fulks's parents gave him little attention or

affection; Fulks was subjected to emotional and physical abuse as a child; Fulks grew up seeing his parents frequently fighting each other; Fulks grew up seeing heavy drinking and frequent fighting by other adults in his own house; Fulks grew up seeing graphic photographs of naked women papering the walls and ceiling of his basement; Fulks's father showed him pornographic movies as a young child; Fulks started drinking at the age of 9 and using marijuana at 11 or 12, and his parents made no effort to stop him; Fulks's brother taught him to inhale gasoline and paint as a young teenager; Fulks's mother ignored his stealing; Fulks's brother taught him to steal, fight, and break into cars; and Fulks attempted suicide at age 13. *See id.* at 573, n. 25.[3]

Fulks did not pursue an *Atkins* claim of mental retardation/intellectual disability during his trial.  None of the experts found him to be mentally retarded.

At the conclusion of the sentencing phase, the jury deliberated and returned a verdict of death on Counts One and Two.

**C.**      **The Fourth Circuit Affirmed Fulks's Conviction and Sentence of Death.**

Fulks thereafter appealed to the United States Court of Appeals for the Fourth Circuit.  The Fourth Circuit rejected the appeal and affirmed the sentence of death on both Counts One and Two. *Fulks I*, 454 F.3d at 413.  Fulks then petitioned the United States Supreme Court for a writ of certiorari. The Supreme Court denied the petition. *Fulks v. United States*, 551 U.S. 1147 (2007).

---

[3] Additionally, 11 jurors found that Fulks frequently went hungry or was uncertain whether he would get food as a child.  Ten jurors found Fulks's parents cared so little for his education that they never helped him with homework and even left him at school with soiled pants, and Fulks was diagnosed with depression, substance abuse, and possible sociopathic tendencies at age 14. Nine jurors found Fulks's brain was permanently damaged by his mother's drinking during her pregnancy.  *See Fulks II*, 875 F.Supp.2d at 573, n.25.

**D.    Fulks Filed a § 2255 Motion Raising 33 Claims, Each of Which Was Rejected by the District Court in a 175-Page Ruling Upheld by the Fourth Circuit.**

Fulks next filed a § 2255 motion, which he subsequently amended. Contending that his trial counsel were constitutionally ineffective in a variety of ways, and that other violations of his constitutional rights rendered his death sentence infirm, Fulks asserted 33 far-ranging claims in his § 2255 petition, as amended. *See Fulks*, 875 F.Supp.2d at 554. A number of these claims related to the mitigation defense presented by Fulks's counsel at trial: Claim 1, Mental Health Mitigation, *id.* at 555-60; Claim 3, Mitigation Regarding Petitioner's Early Life, *id.* at 564-74; Claim 4, Assignment of Tasks to Law Clerks, *id.* at 574-76; Claim 5, Court's Instructions On Mitigating Factors, *id.* at 576-79; Claim 13, Minor Participation, *id.* at 594-97; Claim 14, Future Dangerousness, *id.* at 597-600; and Claim 26, Preparation of Mitigation Witnesses. *See id.* at 616-18.

The district court conducted an evidentiary hearing, during which the court heard from a total of eight witnesses. *Fulks*, 875 F.Supp.2d at 553. Upon due consideration, the district court issued an exhaustive memorandum opinion and order rejecting each proffered claim. *Id.* at 535-633. The court nonetheless granted a certificate of appealability as to Claims 1 through 28 and Claim 33. *Id.* at 632-33. From that order and a subsequent one entered on January 13, 2011, denying Fulks's motion to alter or amend the judgment, Fulks timely filed a notice of appeal.

Fulks appealed. The Fourth Circuit rejected each argument and affirmed the district court's denial of § 2255 relief. *Fulks III*, 683 F.3d at 515. Fulks petitioned the Supreme Court for a writ of certiorari. It was denied. *Fulks v. United States*, 571 U.S. 941 (2013).

**E.** **Fulks Filed the Instant § 2241 Petition in the Southern District of Indiana, Which He Amended After Three Years to Assert Claims of Ineligibility to Be Executed Under *Atkins* and *Madison*.**

On January 29, 2015, Fulks filed a *pro se* § 2241 petition, raising several ineffective assistance of counsel claims. Dkt. 1. Respondent filed a return and a subsequent supplement to the return in September and November 2015. Dkt. 12 & 18. On February 1, 2016, the Federal Community Defender Office for the Eastern District of Pennsylvania ("FCDO") was appointed to represent Fulks. Dkt. 22-24. The FCDO subsequently requested over three years of extensions to file an amended petition. Dkt. 26, 29, 33, 35, 37, 39, 41, 44, 48, 50, 52, & 54. On March 8, 2019, Fulks filed a 70-page amended § 2241 petition raising completely new claims and withdrawing all of his previous ineffective assistance of counsel claims raised in his original *pro se* § 2241 petition. Dkt. 55. In this amended § 2241 petition, Fulks claims that he (1) is intellectually disabled (mentally retarded) and ineligible for the death penalty under *Atkins* and its progeny; and (2) cannot be executed under *Ford* and its progeny (specifically *Madison*), because his intellectual disability and Fetal Alcohol Spectrum Disorder ("FASD") render him incompetent to be executed.

**F.** **After Filing the Instant § 2241 Petition, Fulks Received Permission to File and Filed a Second § 2255 Motion in the District of South Carolina.**

On June 16, 2016, a year and a half after Fulks filed his *pro se* § 2241 petition and four months after the FCDO began representing Fulks in this litigation, the Fourth Circuit granted authorization for Fulks to file a successive § 2255 motion in the District of South Carolina. *In re Fulks*, No. 16-9 (4th Cir. docketed May 23, 2016), Dkt. 19. On the same day, Fulks's counsel[4] filed a successive § 2255 motion raising a claim that he should receive a whole new capital

---

[4] The same counsel who represent Fulks in this action in the Southern District of Indiana represent Fulks in his second/successive § 2255 motion in the District of South Carolina.

15

sentencing hearing because (1) § 924(c)(3)(B)'s residual clause is unconstitutionally vague in light of *Johnson v. United States*, 135 S. Ct. 2551 (2015); (2) kidnapping under § 1201 and carjacking under § 2119 do not qualify as "crimes of violence" under the force/elements clause of § 924(c)(3)(A); and, therefore, (3) Fulks's convictions under §§ 924(c) and 924(o) should be vacated. *See United States v. Fulks*, 4:02-cr-992 (D.S.C.), Dkt. 1618. The proceeding is currently held in abeyance awaiting the Supreme Court's decision in *United States v. Davis*, ___ S. Ct. ___, No. 18-431, 2019 WL 98544, (cert. granted January 4, 2019); *see Fulks*, 4:02-cr-992, at Dkt. 1652. In *Davis*, the Supreme Court will decide whether § 924(c)(3)(B)'s residual clause is unconstitutionally vague. The *Davis* decision is expected by the end of June.

## III.   **ARGUMENT**

**A.   Fulks's *Atkins* Claim Pursuant to § 2241 Must Be Dismissed for Lack of Jurisdiction Because Fulks Cannot Show That § 2255 is "Inadequate or Ineffective" to Test the Legality of His Detention.**

Fulks argues that he is intellectually disabled and therefore ineligible for the death penalty under *Atkins* and its progeny. In *Atkins*, the Supreme Court held that execution of the mentally retarded constitutes cruel and unusual punishment prohibited by the Eighth Amendment. *Atkins*, 536 U.S. at 321. *Atkins* adopted the clinical definition of intellectual disability[5]: deficits in intellectual functioning, deficits in adaptive functioning, and onset of these deficits before the age of 18. *Id.* at 318. Twelve years later, in *Hall v. Florida*, 572 U.S. 701, 704, 710 (2014), the Supreme Court embraced *Atkins*' definition of intellectual disability but rejected as unconstitutional a Florida law that restricted *Atkins* claims to defendants with an IQ score of 70 or

---

[5] *Atkins* used the term "mental retardation," but in *Hall v. Florida*, 572 U.S. 701, 704 (2014), the Supreme Court adopted the term "intellectual disability."

16

less. Three years after *Hall*, in *Moore v. Texas*, 137 S. Ct. 1039, 1049-50 (2017), the Supreme Court applied *Hall* and faulted the Texas Court of Criminal Appeals for concluding that the petitioner's IQ scores, some of which were at or below 70, established that he was not intellectually disabled. Fulks asserts that he is ineligible for the death penalty under *Atkins*, *Hall*, and *Moore* and that this claim is properly brought under § 2241. *See* Dkt. 55 at 48, ¶ 129.

This claim cannot proceed under § 2241. By definition, a pure *Atkins* claim can never be brought under § 2241 because such claims are constitutional and thus do not categorically elude the permission for successive § 2255 motions.[6] Even if § 2241 relief could be sought for a constitutional error, Fulks cannot show that § 2255 is "inadequate or ineffective" with respect to his *Atkins* claim because there was no barrier to his ability to raise this claim at trial, on appeal, and in his first § 2255 motion. Fulks's claim cannot now be brought under § 2241, and it must be dismissed.

> **1.** **Congress created § 2255 in an attempt to divert federal prisoners' collateral attacks on their convictions and sentences to the "more convenient jurisdiction of the sentencing court," allowing claims under § 2241 only in very narrow circumstances.**

At common law, the writ of habeas corpus was used to challenge the validity of detention without trial. *See Lindh v. Murphy*, 96 F.3d 856, 867 (7th Cir. 1996) (en banc), *rev'd on other grounds*, 521 U.S. 320 (1997). In the early part of the twentieth century, the Supreme Court's broad interpretation of later-enacted statutes authorizing habeas corpus relief transformed the writ

---

[6] To the extent Fulks argues that he need not satisfy the savings clause for his *Atkins* claim to proceed under § 2241 because he challenges the execution rather than the imposition of his sentence, that claim must fail. Fulks is not "challenging some aspect of the execution of [his] sentence." *See* Dkt. 55 at 54, ¶ 144 (*quoting Coady v. Vaughn*, 251 F.3d 480, 485 (3d Cir. 2001)). He is challenging, on constitutional grounds, his eligibility for the death sentence imposed.

into a device for "[c]ollateral review of judgments entered after full opportunity for litigation." *Id.* at 868. These decisions led to a large increase in the number of federal prisoner habeas corpus petitions. *See United States v. Hayman*, 342 U.S. 205, 211-13 (1952). Because a writ of habeas corpus acts on the prisoner's custodian and therefore must be filed in the district of his confinement, these prisoner petitions disproportionately burdened those district courts whose territorial jurisdiction encompassed a major penal institution. *See Rumsfeld v. Padilla*, 542 U.S. 426, 447 (2004).

In 1948, Congress responded to the Judicial Conference's proposal "to alleviate the burden of habeas corpus petitions filed by federal prisoners in the district of confinement" by creating a substitute post-conviction remedy for federal prisoners. *United States v. Addonizio*, 442 U.S. 178, 185 (1979). Codified at 28 U.S.C. § 2255(a), this new statutory procedure diverted federal prisoner collateral attacks from the district of confinement into the "'more convenient' jurisdiction of the sentencing court," *Hayman*, 342 U.S. at 219, while still "afford[ing] federal prisoners a remedy identical in scope to federal habeas corpus," *Davis v. United States*, 417 U.S. 333, 343 (1974). To that end, § 2255 provides that "[a] prisoner in custody . . . claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States . . . may move the court which imposed the sentence to vacate, set aside, or correct the sentence." 28 U.S.C. § 2255(a).

The 1948 legislation clearly reflected Congress' intent that this new motion be used instead of, and not in addition to, the traditional habeas corpus remedy. It contained an exclusivity provision—now known as the savings clause—stating that district courts "shall not" entertain a federal prisoner's application for a writ of habeas corpus "unless it also appears that the remedy

18

by motion [under § 2255] is inadequate or ineffective to test the legality of his detention." 28 U.S.C. § 2255(e).

The savings clause found in § 2255(e) was dormant for the first half-century after its enactment. During that time, § 2255's adequacy was never seriously called into question because there were no categorical restrictions on the filing of repetitive § 2255 motions. Although successive motions could be dismissed under modified *res judicata* principles like "abuse of the writ," courts could entertain them on the merits when the "ends of justice" so required. *See Sanders v. United States*, 373 U.S. 1, 12 (1963); *see also Peoples v. United States*, 403 F.3d 844, 847 (7th Cir. 2005).

The enactment of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) altered this landscape, indirectly causing the savings clause to take on new-found importance. The AEDPA sought to enhance the finality of criminal judgments by "dramatically limit[ing] successive attempts at [postconviction] relief." *Stewart v. United States*, 646 F.3d 856, 859 (11th Cir. 2011); *see also Tyler v. Cain*, 533 U.S. 656, 661 (2001). To that end, the law prohibits a defendant from filing a "second or successive" collateral attack unless he first applies to the court of appeals "for an order authorizing the district court to consider the application." 28 U.S.C. § 2244(b)(3)(A); *see* 28 U.S.C. § 2255(h). The appellate court must certify that a second or successive application contains (1) persuasive new evidence of his innocence of the crime; or (2) a new rule of constitutional law made retroactive by the Supreme Court to cases on collateral review. 28 U.S.C. § 2255(h); 28 U.S.C. § 2244(b)(3)(C).

"The history makes clear that § 2255 was intended to afford federal prisoners a remedy identical in scope to federal habeas corpus." *Davis*, 417 U.S. at 343. And, "[i]n general, federal

19

prisoners who wish to attack the validity of their convictions or sentences are required to proceed under § 2255." *United States v. Prevatte*, 300 F.3d 792, 799 (7th Cir. 2002) (*quoting Garza*, 253 F.3d at 921). As a result, "in the *overwhelming majority* of cases § 2255 specifically prohibits prisoners from circumventing § 2255 and challenging their convictions or sentences through a habeas petition under § 2241." *Id.* (*quoting Garza*, 253 F.3d at 921) (emphasis added). However, the savings clause found in § 2255(e) "allows prisoners to bring § 2241 petitions if they can show that the § 2255 remedy is inadequate or ineffective to test the legality of the prisoner's detention." *Id.* (*quoting Garza*, 253 F.3d at 921) (internal quotation marks and alteration omitted).

The Seventh Circuit has long held that to pass through the savings clause and proceed under § 2241, there must be a structural problem with § 2255 that prevents an opportunity to address the claim on collateral review. *See, e.g.*, *Webster v. Daniels*, 784 F.3d 1123, 1136 (7th Cir. 2015) (en banc) ("All of these decisions hold, nevertheless, that there must be some kind of structural problem with section 2255 before section 2241 becomes available."); *In re Davenport*, 147 F.3d 605, 610-11 (7th Cir. 1998) (finding a structural problem where § 2255 foreclosed even one round of effective collateral review of actual innocence claim). Because the "essential function" of habeas corpus "is to give a prisoner a reasonable opportunity to obtain a reliable judicial determination of the fundamental legality of his conviction and sentence," the court has explained that "[a] procedure for post-conviction relief can fairly be termed inadequate when it is so configured as to deny a convicted defendant any opportunity for judicial rectification of so fundamental a defect in his conviction as having been imprisoned for a nonexistent offense." *Davenport*, 147 F.3d at 609, 611.

Fulks's *Atkins* claim cannot proceed under § 2241 because he cannot satisfy the savings clause's requirement that § 2255 be "inadequate or ineffective" to test the legality of his detention. There is no structural problem in § 2255 foreclosing effective collateral review of his *Atkins* claim, and the claim does not fall within either of the narrow paths for § 2241 relief set forth by the Seventh Circuit in *Davenport* and *Webster*. Fulks's *Atkins* claim must be dismissed.

> **2. The savings clause does not allow Fulks's *Atkins* claim to proceed under § 2241 because Fulks cannot meet his burden of showing that § 2255 is "inadequate or ineffective."**

First, Fulks's *Atkins* claim cannot proceed under § 2241 because there is no structural error in § 2255 foreclosing collateral review of the claim, and § 2255 is not "inadequate or ineffective" simply because Fulks may be barred from filing a successive § 2255 motion. Qualification to proceed under § 2241 "generally requires a structural problem in § 2255 that forecloses even one round of effective collateral review, unrelated to the petitioner's own mistakes." *Poe v. LaRiva*, 834 F.3d 770, 772 (7th Cir. 2016) (*quoting Taylor v. Gilkey*, 314 F.3d 832, 835 (7th Cir. 2002)) (internal quotation marks and alteration omitted). "In other words, something more than a lack of success with a section 2255 motion must exist before the savings clause is satisfied." *Webster*, 784 F.3d at 1136.

The Seventh Circuit established narrow pathways through the savings clause to relief under § 2241 in *Davenport* and *Webster*. *See Davenport*, 147 F.3d at 611-12; *Webster*, 784 F.3d at 1140 n.9. In both cases, the court identified a structural problem in § 2255 that wholly foreclosed collateral review of a claim and thus justified permitting a federal prisoner to file a habeas petition under § 2241. *See Poe*, 834 F.3d at 773-74. In *Davenport*, the court permitted appellant Sherman Nichols' § 2241 petition to proceed because he presented "a claim that he could *at no time* present

in a motion under section 2255, nor earlier in his direct appeal." *Davenport*, 147 F.3d at 610 (emphasis added). Nichols was convicted of "using" a firearm during a drug offense at a time when case law nearly uniformly established that mere possession of a firearm was sufficient to prove "use" under 18 U.S.C. § 924(c). *Id.* at 607. After his first § 2255 motion, the Supreme Court ruled that mere possession was insufficient to establish use, and it made the rule retroactive on collateral review. *Id.* The Seventh Circuit concluded that § 2255 was "inadequate or ineffective" to test Nichols' claim that he was imprisoned for a non-existent crime, and it permitted Nichols' claim to proceed under § 2241. *See id.* at 611-12. Nichols could not have used his first § 2255 motion to obtain relief because his claim was squarely foreclosed by precedent when that motion was filed, and he did not qualify to file a successive motion under § 2255(h) because his claim did not rely on new evidence or a new rule of *constitutional* law. *Id.* at 610. *Davenport* recognized a structural problem in the failure of § 2255(h) to permit a successive petition for new rules of *statutory* law made retroactive by the Supreme Court. *See Poe*, 834 F.3d at 773.

*Webster*, like *Davenport*, held that a claim satisfies the § 2255(e) savings clause where there was a structural problem in § 2255. *See Poe*, 834 F.3d at 774. Webster filed an *Atkins* claim under § 2241, seeking to present evidence discovered after his initial § 2255 motion was denied that revealed he had been diagnosed as mentally retarded a year before the commission of the crime for which he was sentenced to death. *Webster*, 784 F.3d at 1133-35. Webster could not have used § 2255 at the time *Atkins* was decided because he did not yet have the new evidence, and he could not file a successive § 2255 motion after the evidence was discovered because the Fifth Circuit required that the evidence show he could not be found guilty of the offense, rather than the penalty. *Id.* at 1134; *see Poe*, 834 F.3d at 774. The court determined Webster's challenge

22

to his sentence could not, "as a structural matter," be entertained by the use of a § 2255 motion and that he could therefore proceed under § 2241. *Webster*, 784 F.3d at 1139. *Davenport* and *Webster* permit a federal prisoner to file a § 2241 petition only where a structural error forecloses effective collateral review of a claim under § 2255.

> **a.** **No structural error precludes collateral review of Fulks's *Atkins* claim because the claim is cognizable in a § 2255 motion.**

Unlike in *Davenport* and *Webster*, Fulks cannot establish that a structural error in § 2255 precludes review of his *Atkins* claim. His claim that his intellectual disability renders him categorically ineligible for the death penalty is based wholly on the Eighth Amendment to the Constitution, s*ee Atkins*, 536 U.S. at 321 (holding executing a mentally retarded offender violates the Eighth Amendment), and it is therefore cognizable in a § 2255 motion. In § 2255(h), Congress explicitly provided a path for review of claims based on new constitutional cases decided after a federal prisoner has exhausted his first § 2255 motion. *See* 28 U.S.C. § 2255(h) (allowing certification of a second or successive § 2255 motion that contains "a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable"). Section 2255 is thus not "inadequate or ineffective" to address Fulks's *Atkins* claim.

Fulks's attempt to find authority to proceed under § 2241 in the Seventh Circuit's decision in *Garza* is unavailing. Like in *Davenport* and *Webster*, Garza's petition was allowed to proceed under § 2241 only because § 2255 effectively foreclosed *any* collateral review of his claim. *See Garza*, 253 F.3d at 923. Garza's § 2241 petition relied upon a decision from the Inter-American Commission on Human Rights that introduction of certain evidence during the sentencing phase of his trial violated international human rights norms. *Id.* at 920. Garza could not have raised the Commission's decision in his direct appeal or his first § 2255 motion because the United States

had no judicially cognizable treaty obligation not to execute Garza until the Commission issued its decision. *Id.* at 923. But his argument also could not be the basis for a successive § 2255 motion because it did not rely on newly discovered evidence or a new rule of constitutional law. *Id.* The Seventh Circuit allowed Garza's claim to proceed under § 2241 only because § 2255 "does not now and never has provided an adequate avenue for testing Garza's present challenge to the legality of his sentence." *Id.* It was "literally impossible" for Garza to have raised his claim any earlier. *Id.*

Fulks asserts that he is intellectually disabled and that the Eighth Amendment thus prohibits his execution under the Supreme Court's decisions in *Atkins*, *Hall*, and *Moore*. *See* Dkt. 55 at 48, ¶ 129. Unlike the claims raised in *Davenport*, *Webster*, and *Garza*, this constitutional challenge to Fulks's sentence is exactly the type of claim § 2255 was designed to address. Because his *Atkins* claim is cognizable under § 2255, Fulks is unable to establish that a structural problem in § 2255 forecloses collateral review, and the savings clause does not permit him to proceed with a § 2241 petition.

> **b.** **Section 2255 is not "inadequate or ineffective" simply because Fulks may be barred from filing a second § 2255 motion.**

Seventh Circuit law has plainly established that the § 2255(e) savings clause is not satisfied merely because a claim cannot be brought in a second or successive § 2255 motion.[7] Fulks asserts

---

[7] As noted above, *supra* pp. 15-16, Fulks has already received permission from the Fourth Circuit to file a successive § 2255 motion, *In re Fulks*, No. 16-9, Dkt. 19, and the successive motion is currently pending in the District of South Carolina, *United States v. Fulks*, 4:02-cr-00992 (D.S.C.), Dkt. 1618. The Fourth Circuit grants broad leave to amend a second or successive § 2255 motion, requiring only compliance with Federal Rule of Civil Procedure 15(a). *See United States v. MacDonald*, 641 F.3d 596, 616 (4th Cir. 2011). Rule 15(a) permits a party to amend its pleading with the opposing party's written consent or the court's leave. Fed. R. Civ. Proc. 15(a)(2).

that in *Garza*, the Seventh Circuit permitted a § 2241 petition where "Garza's legal claim did not satisfy the conditions necessary for a successive § 2255 petition . . . ." Dkt. 55 at 47, ¶ 127. But *Garza* does not hold that anyone who does not qualify to file a successive § 2255 motion can proceed under § 2241. To the contrary, the Seventh Circuit held that "[t]he mere fact that Garza's petition would be barred as a successive petition under § 2255 . . . is not enough to bring the petition under § 2255's savings clause; otherwise, the careful structure Congress has created to avoid repetitive filings would mean little or nothing." *Garza*, 253 F.3d at 921.

*Taylor* makes this point abundantly clear. *See Taylor*, 314 F.3d at 836. There, the petitioner wanted to argue, based on a new Supreme Court decision, that the district court erred in denying his first § 2255 motion. *Id.* at 833-34, 836. The intervening decision, however, did not create a new and retroactive rule of constitutional law. *See id.* at 835-36. At most, it showed that the district court had erred in applying an old rule to his situation, for which § 2255(h) would not allow a second collateral attack. *Id.* at 836. Taylor argued that whenever § 2255(h) closes the door to a renewed challenge under § 2255, the savings clause must open the door to a challenge under § 2241. *Id.* The Seventh Circuit disagreed, concluding that this would make § 2255(h) self-defeating. *See id.* Congress intended through the AEDPA to define limited circumstances that permit successive collateral attacks, and "[t]he escape hatch in [§ 2255(e)] must be applied in light of that history." *Id.*

Although Fulks may now be barred from raising his *Atkins* claim in a successive § 2255 motion because he does not rely on new evidence or a new, retroactive constitutional decision of the Supreme Court, the law is clear that "something more than a lack of success with a section 2255 motion must exist before the savings clause is satisfied." *Webster*, 784 F.3d at 1136.

25

"Congress is entitled to—and through [§ 2255(h)] did—decide that two rounds of judicial review are sufficient in all but the extraordinary situation." *Taylor*, 314 F.3d at 836. That it has chosen to bar second or successive § 2255 motions for new constitutional cases not made retroactive does not render § 2255 "inadequate or ineffective." Were it otherwise, the AEDPA's limits on successive § 2255 motions would not serve their purpose.

In sum, this Court does not have jurisdiction to consider Fulks's *Atkins* claim under § 2241 because there is no structural error in § 2255 foreclosing collateral review of the claim, and § 2255 is not "inadequate or ineffective" simply because Fulks may be barred from filing a second § 2255 motion.

> **3. The Seventh Circuit's *Davenport* standard does not allow Fulks's *Atkins* claim to proceed under § 2241.**

Second, Fulks's *Atkins* claim cannot proceed under the narrow avenue for a § 2241 remedy established by the Seventh Circuit in *Davenport*.[8] *Davenport* requires a petitioner to meet three

---

[8] The Seventh Circuit has held that the savings clause permits habeas relief for claims where, subsequent to the prisoner's direct appeal and first § 2255 motion, the substantive law changed such that the conduct of which the prisoner was convicted is deemed not to be criminal. *Davenport,* 147 F.3d at 609-612. Additionally, the Seventh Circuit has held that the savings clause also permits habeas relief for claims that the defendant's sentence exceeded the then-mandatory guidelines maximum. *Brown v. Caraway*, 719 F.3d 583 (7th Cir. 2013). Although these holdings are binding on this court, the government disagrees with them. Respondent notes this objection to preserve the issue for appeal. The government has set forth its position on this issue in a recent petition for certiorari in *United States v. Wheeler*, No. 18-420 (pet. for writ of cert. filed on Oct. 3, 2018), which was denied. *See United States v. Wheeler*, 139 S. Ct. 1318 (2019). The petition for a writ of certiorari can be found at 2018 WL 4846931. Under the savings clause, a federal prisoner may seek habeas corpus relief only if "the remedy by motion [under § 2255] is inadequate or ineffective to test the legality of his detention." 28 U.S.C. § 2255(e). That language suggests courts focus on whether a particular challenge to the legality of the prisoner's detention was *cognizable* under § 2255, not on the likelihood that the challenge would have succeeded in a particular court at a particular time. "'To test' means 'to try,'" and "[t]he opportunity to test or try

26

conditions to satisfy the § 2255(e) savings clause and proceed with a claim under § 2241: (1) "the prisoner must show that he relies on a 'statutory-interpretation case,' rather than a 'constitutional case;'" (2) "the prisoner must show that he relies on a retroactive decision that he could not have invoked in his first § 2255 motion;" and (3) there must be a "grave enough error to be deemed a miscarriage of justice corrigible therefore in a habeas corpus proceeding." *Brown v. Caraway*, 719 F.3d 583, 586 (7th Cir. 2013). Fulks is unable to meet the *Davenport* standard. In fact, he asserts no argument related to any of the three prerequisites.

### a. Fulks does not rely on a statutory-interpretation case.

Fulks fails the first prong of the *Davenport* test because he does not rely on a statutory-interpretation case. *See Brown v. Caraway*, 719 F.3d at 586. He instead relies on the Supreme Court's decisions in *Atkins*, *Hall*, and *Moore*, all of which are grounded in the Eighth Amendment. *See* Dkt. 55 at 48, ¶ 129.

---

a claim . . . neither guarantees any relief nor requires any particular probability of success; it guarantees access to a procedure." *McCarthan v. Director Of Goodwill Indus.-Suncoast, Inc.,* 851 F.3d 1076, 1086 (11th Cir. 2017) (en banc) (citation omitted). "In this way, the clause is concerned with process—ensuring the petitioner an *opportunity* to bring his argument—not with substance— guaranteeing nothing about what the *opportunity* promised will ultimately yield in terms of relief." *Prost v. Anderson,* 636 F.3d 578, 584 (10th Cir. 2011); *Taylor v. Gilkey*, 314 F.3d 832, 835-36 (7th Cir. 2002). As Judge Easterbrook has explained, "[a] motion under § 2255 could reasonably be thought 'inadequate or ineffective to test the legality of [the prisoner's] detention' if a class of argument were categorically excluded, but when an argument is permissible but fails on the merits there is no problem with the adequacy of § 2255." *Brown v. Caraway*, 719 F.3d at 597 (Easterbrook, C.J., concerning circulation under Circuit Rule 40(e)) (brackets in original). Thus, even where relief was foreclosed by precedent when the defendant filed his first § 2255 motion, the existence of that precedent is not sufficient to render § 2255 inadequate or ineffective. In any event, as argued in this return, Fulks's § 2241 petition must be dismissed even under the law as set forth in *Davenport* and *Brown*.

The Seventh Circuit has clearly established that *Davenport* precludes the use of § 2241 for claims based on a constitutional case. *See Poe*, 834 F.3d at 773 ("Poe contends that [*Brown v.*] *Caraway* misreads *Davenport*, asserting that *Davenport* does not actually preclude use of § 2241 for a constitutional case. This contention is meritless."). A claim based on a new constitutional case does not fall within the savings clause because, as discussed above, § 2255(h) already provides a remedy where such a claim arises after a direct appeal and first § 2255 motion: It permits a second or successive § 2255 motion where a new rule of constitutional law is made retroactive to cases on collateral review by the Supreme Court. 28 U.S.C. § 2255(h)(2); *Poe*, 834 F.3d at 773 ("Because § 2255(h) already provides a remedy for new constitutional cases, these types of cases would not fall under the savings clause . . . ."). The savings clause therefore allows a claim to proceed under § 2241 only when it is based on a new rule of *statutory* law. *See Poe*, 834 F.3d at 773.

Fulks argues that the savings clause permits the use of § 2241 to bring claims that rely on *any* new legal basis "not available at the time of the petitioner's trial proceedings or his § 2255 proceedings," *see* Dkt. 55 at 45-46, ¶ 123, but he provides no case law to support this claim. Contrary to his assertion, Seventh Circuit precedent establishes a narrow avenue for claims in "exceptional cases" to pass through the § 2255 savings clause, *see Garza*, 253 F.3d at 922, and that avenue allows only claims based on statutory-interpretation cases to proceed under § 2241.

Fulks's § 2241 petition fails the first *Davenport* condition because *Atkins*, *Hall*, and *Moore* are not statutory-interpretation cases; they are all constitutional cases rooted solely in the Eighth Amendment. *See Atkins*, 536 U.S. at 321 ("Construing and applying the Eighth Amendment in light of our 'evolving standards of decency,' we therefore conclude that [the death penalty] is

excessive and that the Constitution 'places a substantive restriction on the State's power to take the life' of a mentally retarded offender."); *Hall*, 572 U.S. at 704 ("[Florida's] rigid rule, the Court now holds, creates an unacceptable risk that persons with intellectual disability will be executed, and thus is unconstitutional."); *Moore*, 137 S. Ct. at 1048 ("We granted certiorari to determine whether the [Texas Court of Criminal Appeals'] adherence to superseded medical standards and its reliance on *Briseno* comply with the Eighth Amendment and this Court's precedents."). Fulks cannot satisfy the first prong of the *Davenport* test.

> **b.** **Fulks does not rely on a retroactive decision, and he cannot establish that the alleged new rule could not have been invoked in his first § 2255 motion.**

Fulks fails the second prong of the *Davenport* test because he does not rely "on a retroactive decision that he could not have invoked in his first § 2255 motion." *See Brown*, 719 F.3d at 586. In *Webster*, the Seventh Circuit "articulated that [*Davenport*'s] second prong is satisfied if it would have been futile to raise a claim in the petitioner's original section 2255 motion, as the law was squarely against him." *Montana v. Cross*, 829 F.3d 775, 784 (7th Cir. 2016) (internal quotation marks and alteration omitted) (*quoting Webster*, 784 F.3d at 1136). First, neither *Hall* nor *Moore* has been determined to be retroactive by the Supreme Court, this Circuit, or any other Circuit. The Sixth, Eighth, and Eleventh Circuits have held that neither case is retroactive. *Smith v. Commissioner, Ala. Dept. of Corrections*, --- F.3d ----, 2019 WL 2202949, at \*4-5 (11th Cir. May 22, 2019) (*Moore* is not retroactive); *In re Payne*, 722 F. App'x 534, 538 (6th Cir. Feb. 8, 2018) (unpublished) (*Hall* and *Moore* are not retroactive); *Williams v. Kelley*, 858 F.3d 464, 474 (8th Cir. 2017) (*Hall* and *Moore* are not retroactive); *In re Henry*, 757 F.3d 1151, 1157-58 (11th Cir. 2014) (*Hall* is not retroactive).

Additionally, Fulks does not rely on a new rule that could not have been invoked in his first § 2255 motion. He asserts that *Hall* and *Moore* are new legal bases for his intellectual disability claim that were not available at the time of his trial or his first § 2255 petition. Dkt. 55 at 48, ¶ 129. But *Hall* and *Moore* were derived directly from *Atkins*; they merely "expounded on the definition of intellectual disability . . . ." *See Shoop v. Hill*, 139 S. Ct. 504, 507 (2019) (per curiam); *see also Williams*, 858 F.3d at 474 (noting *Hall* and *Moore* "discuss purely procedural issues") (*quoting Davis v. Kelley*, 854 F.3d 967, 970 (8th Cir. 2017)). *Atkins*, *Hall*, and *Moore* all enunciated the same test for determining intellectual disability: deficits in intellectual functioning, deficits in adaptive functioning, and onset of these deficits before the age of 18. *See Atkins*, 536 U.S. at 308 n.3; *Hall*, 572 U.S. at 710; *Moore*, 137 S. Ct. at 1045. At bottom, Fulks's claim that he is intellectually disabled and thus ineligible for the death penalty is grounded in the Supreme Court's 2002 decision in *Atkins*. *See* Dkt. 55 at 3 ("Mr. Fulks is intellectually disabled and is ineligible for the death penalty under *Atkins v. Virginia* and its progeny."). Fulks's death sentence was imposed in 2004. *Fulks*, No.4:02-cr-00992 (D.S.C.), Dkt. 854. He had the opportunity to raise his *Atkins* claim at his sentencing, on direct appeal, in his initial § 2255 motion, and on appeal of the denial of his § 2255 motion. At no point has the law precluded Fulks's claim that he is intellectually disabled and thus ineligible for the death penalty under *Atkins*. He does not rely on a retroactive decision that he could not have raised in his first § 2255 motion, and he cannot satisfy *Davenport*'s second requirement. Fulks cannot satisfy at least the first two of *Davenport*'s three prongs, and his *Atkins* claim cannot pass through the savings clause and proceed under § 2241.

**4. The Seventh Circuit's *Webster* standard does not allow Fulks's *Atkins* claim to proceed under § 2241.**

Third, Fulks's *Atkins* claim cannot proceed under the narrow avenue for a § 2241 remedy established by the Seventh Circuit in *Webster*. Fulks cannot satisfy the *Webster* test because his *Atkins* claim is based on new diagnostic standards, not newly discovered, previously existing evidence that counsel did not uncover before trial despite diligent efforts. In *Webster*, the Seventh Circuit held that "there is no categorical bar against resort to section 2241 in cases where new *evidence* would reveal that the Constitution categorically prohibits a certain penalty . . . ." *Webster*, 784 F.3d at 1139 (emphasis added). Webster claimed that newly discovered evidence on which his § 2241 claim relied—Social Security Administration records shedding additional light on his intellectual disability—would demonstrate that he was categorically and constitutionally ineligible for the death penalty under *Atkins* and *Hall*. *Id.* at 1125, 1133-34. The court held that, in the narrow circumstances of that case, the savings clause permitted Webster to resort to a petition under § 2241. *See id.* at 1138.

*Webster* announced a three-part test for determining whether a claim of newly discovered evidence can satisfy the § 2255 savings clause and proceed under § 2241: "First, the evidence sought to be presented must have existed at the time of the original proceedings." *Id*. at 1140 n.9. "Second, the evidence must have been unavailable at the time of trial despite diligent efforts to obtain it. Third, and most importantly, the evidence must show that the petitioner is constitutionally ineligible for the penalty he received." *Id.* Fulks is unable to satisfy *Webster*'s test.

Fulks does not rely on newly discovered *evidence* at all; he relies on a "newly available diagnostic standard" under the AAIDD-2012 and DSM-5, which he contends is "new factual

evidence" for his *Atkins* claim. *See* Dkt. 55 at 51, ¶ 137. He does not provide a single case supporting the proposition that the new diagnostic standard constitutes newly discovered evidence under *Webster*. Perhaps this is because courts have rejected attempts to apply *Webster* outside the unique context of that case. In *Webster* itself, the Seventh Circuit explained that its ruling depended on an "array of limitations, both legal and factual." *Webster*, 784 F.3d at 1140 n.9 (announcing three-part test for proceeding with newly discovered evidence claim under § 2241). The court noted that "it will be a *rare* case where records that *predate* the trial are found much later, despite diligence on the part of the defense, and where those records bear directly on the constitutionality of the death sentence." *Poe*, 834 F.3d at 774 (*quoting Webster*, 784 F.3d at 1140) (internal alteration omitted) (emphasis in original). In *Poe*, the Seventh Circuit highlighted that "the *Webster* court took great care to assure that its holding was narrow in scope . . . ." *Id*. In short, "there is nothing in *Webster* to suggest that its holding applies outside the context of new evidence." *Id*. A new diagnostic standard is not new evidence or a new fact under *Webster*; it is merely a development in the framework followed by medical professional in diagnosing intellectual disability. Moreover, even if the new diagnostic standard could be considered "new evidence," it cannot satisfy *Webster*'s second prong because it did not "exist[] at the time of the original proceedings," *see Webster*, 784 F.3d at 1140 n.9; the AAIDD-2012 and DSM-5 were adopted in 2012 and 2013, respectively, *see* Dkt. 55 at 48 ¶ 129. Fulks is therefore unable to avail himself of the narrow avenue *Webster* provides for access to § 2241.

In conclusion, this Court does not have jurisdiction to consider Fulks's *Atkins* claim under § 2241 because Fulks cannot satisfy the savings clause's requirement that § 2255 be "inadequate or ineffective" to test the legality of his detention. There is no structural problem in § 2255

32

foreclosing effective collateral review of his *Atkins* claim, and the claim does not fall within either of the narrow paths for § 2241 relief set forth by the Seventh Circuit in *Davenport* and *Webster*. Fulks's *Atkins* claim must be dismissed.

> **B.** **Fulk's *Ford/Madison* Claim That His Alleged Intellectual Disability Renders Him Constitutionally Ineligible to Be Executed Fails As a Matter of Law.**

Fulks also argues that his cognitive and adaptive functioning deficits render him categorically ineligible for the death penalty under *Madison* and its ancestors.[9] *See* Dkt. 55 at 56. In *Ford*, the Supreme Court held that "the Eighth Amendment prohibits a State from carrying out a sentence of death upon a prisoner who is insane." *Ford*, 477 U.S. at 409-10. In *Panetti v. Quarterman*, 551 U.S. 930, 959 (2007), the Court determined, based on *Ford*, that the Eighth Amendment also "prohibits the execution of a prisoner whose mental illness prevents him from rationally understanding why the State seeks to impose that punishment." *Madison*, 139 S. Ct. at 722 (*quoting Panetti*, 551 U.S. at 959) (internal quotation marks and alteration omitted). And, as Fulks notes, the Supreme Court in *Madison* held that the test for determining competency to be executed is that "enunciated in *Panetti v. Quarterman*: whether the prisoner's mental state is so distorted by mental illness that he lacks a rational understanding of the State's rationale for his execution." Dkt. 55 at 58-59, ¶ 156 (*quoting Madison*, 138 S. Ct. at 723) (internal citation and quotation marks omitted).

Fulks's *Ford/Madison* claim must be dismissed for several reasons. First, this Court does not have jurisdiction to consider Fulks's *Ford/Madison* claim because Fulks's execution is not imminent and the claim is therefore not ripe. Second, this Court does not have jurisdiction to

---

[9] Respondent refers to this as the "*Ford/Madison* claim" throughout.

consider Fulks's claim pursuant to § 2241 because he cannot show that § 2255 is "inadequate or ineffective" to test the legality of his detention under the *Ford* line of cases. Third, Fulks fails to state a claim upon which relief can be granted because he does not allege that he satisfies the test for incompetency to be executed established by the Supreme Court in *Ford*, *Panetti*, and *Madison*. Finally, Fulks's claim that his supposed intellectual disability under *Atkins* renders him incompetent to be executed is not cognizable under *Ford*, *Panetti*, and *Madison*.

> **1.** **Fulks's *Ford/Madison* claim that his alleged intellectual disability renders him ineligible to be executed must be dismissed because it is not yet ripe.**

Fulks's argument that he is intellectually disabled and thus ineligible for the death penalty is grounded in *Ford* and *Panetti*'s holdings that the Eighth Amendment prohibits the execution of a prisoner who has no rational understanding of why the government seeks to execute him. This claim must be dismissed because it is not yet ripe. A claim ripens only when its factual predicate accrues. *See Brown v. Muniz*, 889 F.3d 661, 669 (9th Cir. 2018). A prisoner's claim that his execution would violate the Constitution thus does not ripen until his execution is imminent. *See id.* Although there is no bright-line test for determining when an execution is "imminent," Fulks's execution is far from imminent under any standard. He does not have a set execution date, and the federal government does not even have a protocol in place to administer drugs for execution. Fulks's *Ford/Madison* claim is premature and must be dismissed.

Because a *Ford* claim asserts that a prisoner is not competent to be executed, courts have widely held that such a claim does not ripen unless the prisoner is both incompetent to be executed *and* facing imminent execution. *See, e.g.*, *Scott v. United States*, 890 F.3d 1239, 1248 (11th Cir. 2018). This requirement stems from *Stewart v. Martinez-Villareal*, 523 U.S. 637 (1998), in which

the Supreme Court held that a petitioner's *Ford* claim, which he raised for the second time after his first claim was dismissed as premature, was not a "second or successive" application barred by the AEDPA.[10] The Court explained that the *Ford* claim—which was initially dismissed as premature "because [the petitioner's] execution was not imminent and therefore his competency to be executed could not be determined at that time"—was "unquestionably ripe" after the State issued a warrant for his execution. *Id.* at 643, 644-45. Although the petitioner technically raised the *Ford* claim for the second time, he was not required to obtain authorization to file a second or successive application before the claim could be heard. *Id.* at 643-44.

The year after *Martinez-Villareal* was decided, the Fourth Circuit considered *Ford* claims that a district court found to be procedurally defaulted in *Swann v. Taylor*, 173 F.3d 425, 1999 WL 92435, at \*18 (4th Cir. Feb. 18, 1999) (unpublished) (table). The Fourth Circuit explained that *Martinez-Villareal*'s holding was based, in part, on the fact that "a *Ford* claim does not ripen for resolution *until execution is imminent* because an individual's competency to be executed cannot properly be assessed until that time." *Id.* at \*17 (emphasis added). It noted that "[a]lthough *Martinez-Villareal* does not expressly mandate that a *Ford* claim presented in an initial § 2254 application by a capital prisoner whose execution is not imminent be dismissed without prejudice as premature and then revisited once execution becomes imminent, the [Supreme] Court unquestionably endorsed such an approach in its disposition." *Id.* at \*18. It therefore remanded the case with instructions to dismiss the *Ford* claims without prejudice, allowing the petitioner to reopen the claims "after his execution becomes imminent . . . ." *Id.*

---

[10] The AEDPA provides, in relevant part, that a "claim presented in a second or successive habeas corpus application under section 2254 that was presented in a prior application shall be dismissed." 28 U.S.C. § 2244(b)(1).

The Fifth, Sixth, Seventh, Eighth, Ninth, and Eleventh Circuits have likewise construed Supreme Court precedent to require execution to be imminent before a *Ford* claim becomes ripe. *See, e.g.*, *Scott*, 890 F.3d at 1248 ("Because a *Ford* claim asserts that a petitioner is not competent to be executed, the Court [in *Panetti*] noted that such a claim does not ripen unless the petitioner both is incompetent to be executed and imminently faces execution in that state.") (*citing Panetti*, 551 U.S. at 943); *Brown*, 889 F.3d at 669 ("*Panetti* therefore deemed the inmate's petition not to be second or successive because his *Ford* claim did not ripen until just before the time of his execution.") (*citing Panetti*, 551 U.S. at 945); *In re Campbell*, 874 F.3d 454, 466 (6th Cir. 2017) ("A competency claim under *Ford* is a habeas issue, and it does not become ripe until an execution date is set.") (*citing Martinez-Villareal*, 523 U.S. at 643); *Holmes v. Neal*, 816 F.3d 949, 954 (7th Cir. 2016) ("[T]he statutory bar on second or successive applications does not apply to a *Ford v. Wainright* claim brought in an application filed *when the claim is first ripe*. No such hearing [on petitioner's competency to be executed] has been held, because the state has yet to set an execution date, which must precede the hearing.") (*quoting Panetti*, 551 U.S. at 946-47) (internal quotation marks and alteration omitted) (emphasis in original); *United States v. Obeid*, 707 F.3d 898, 902 (7th Cir. 2013) ("*Ford* claims are generally unripe until well after AEDPA's standard one-year limitation period for filing an initial petition has run (because the prisoner cannot raise a *Ford* claim until his execution is imminent) . . . ."); *Nooner v. Norris*, 499 F.3d 831, 834 (8th Cir. 2007) ("The Court [in *Martinez-Villareal*] concluded the applicant was entitled to a hearing on the merits of his *Ford*-based incompetency claim, because the state issued a warrant for the applicant's execution and the applicant's claim was 'then unquestionably ripe.'") (*quoting Martinez-Villareal*, 523 U.S. at 643, 646); *Billiot v. Epps*, 107 F. App'x 385, 387 (5th Cir. 2004) (unpublished)

("Because an execution date has not been scheduled and Billiot's execution is not imminent, his *Ford* claim is premature."). The overwhelming weight of the case law establishes that a *Ford* claim is not ripe until execution is imminent.

Allowing Fulks to raise his *Ford/Madison* claim now—when his execution is not only not imminent but is potentially years away—"does not conserve judicial resources, reduce piecemeal litigation, or streamline federal habeas proceedings." *See Panetti*, 551 U.S. at 946 (internal quotation marks and alterations omitted). Because incompetence to be executed is not necessarily a permanent condition, a determination as to Fulks's competency now does not foreclose the possibility that his status may change in the future, and it would not bar either party from raising the question again closer to his date of execution. *See id.* at 934 ("Prior findings of competency do not foreclose a prisoner from proving he is incompetent to be executed because of his present mental condition."); *see also Ford*, 477 U.S. at 429 (O'Connor, J., concurring in the result in part and dissenting in part) ("Regardless of the number of prior adjudications of the issue, until the very moment of execution the prisoner can claim that he has become insane sometime after the previous determination to the contrary."). In *Panetti*, the Supreme Court recognized that federal courts cannot resolve a *Ford* claim before a prisoner's execution is imminent, and the federal courts of appeals have agreed. *See Panetti*, 551 U.S. at 946. Because Fulks's execution is far from imminent, his *Ford/Madison* claim is not yet ripe and it must be dismissed.

        **2.**      **Fulks's *Ford/Madison* claim cannot proceed under § 2241 as a matter of law because Fulks cannot show that § 2255 is "inadequate or ineffective" to test the legality of his detention on the basis of those decisions.**

As with his *Atkins* claim, this Court does not have jurisdiction to consider Fulks's *Ford/Madison* claim pursuant to § 2241 because Fulks cannot satisfy the savings clause's

requirement that § 2255 be "inadequate or ineffective." There is no structural problem in § 2255 foreclosing effective collateral review of his *Ford/Madison* claim, and the claim does not fall within the narrow path for a § 2241 remedy set forth by the Seventh Circuit in *Davenport*.[11]

### a. The savings clause does not allow Fulks's *Ford/Madison* claim to proceed under § 2241 because Fulks cannot meet his burden of showing that § 2255 is "inadequate or ineffective."

Section 2255 is not "inadequate or ineffective" to test the legality of Fulks's detention because his *Ford/Madison* claim is cognizable in a second-in-time § 2255 motion. As discussed above, *supra*, p. 21, qualification to proceed under § 2241 "generally requires a structural problem in § 2255 that forecloses even one round of effective collateral review, unrelated to the petitioner's own mistakes." *Poe*, 834 F.3d at 772 (internal quotation marks and alteration omitted). Fulks cannot establish that a structural problem in § 2255 forecloses review of his *Ford/Madison* claim because § 2255 is in fact the proper vehicle for his constitutional challenge to his sentence. Like his *Atkins* claim, his *Ford/Madison* claim is rooted in the Constitution: The bar on executing offenders incompetent to understand their sentences announced in *Ford*, *Panetti*, and *Madison* is

---

[11] Fulks briefly asserts that his *Ford/Madison* claim can proceed under § 2241 pursuant to the Seventh Circuit's decision in *Webster* because he challenges the "fundamental legality" of his sentence. Dkt. 55 at 69, ¶ 179. To the extent Fulks is asserting that *Webster* provides authority for his claim to proceed directly under § 2241 without passing through the savings clause, that claim must fail. As discussed *supra*, pp. 31-32, *Webster* allowed a claim to pass through the savings clause after the Seventh Circuit identified a structural error in § 2255 that prohibited the petitioner from introducing new evidence that bore directly on his eligibility for the death penalty. *Webster*, 784 F.3d at 1125, 1138. The court held that, in the narrow circumstances before it, the claim of newly discovered evidence could proceed under § 2241. *See id.* at 1139. *Webster* does not create a path for claims to proceed directly under § 2241.

Additionally, Fulks makes no argument that he satisfies the three-part test set forth in *Webster* for determining when a claim of newly discovered evidence can satisfy the § 2255 savings clause. *See id.* at 1140 n.9. His *Ford/Madison* claim does not rely on any new evidence at all. *Webster* therefore does not open the door to Fulks's *Ford/Madison* claim under § 2241.

based on the Eighth Amendment's prohibition on cruel and unusual punishment. *See Ford*, 477 U.S. at 409-10 ("[T]he Eighth Amendment prohibits a State from carrying out a sentence of death upon a prisoner who is insane."); *Panetti*, 551 U.S. at 962 (remanding *Ford* claim for evaluation of the underpinnings of petitioner's assertions and noting that "there is precedent to guide a court conducting Eighth Amendment analysis"); *Madison*, 139 S. Ct. at 731 (holding "the Eighth Amendment may prohibit executing Madison," depending on "whether he can reach a 'rational understanding' of why the State wants to execute him"). Under the plain language of § 2255, a federal prisoner wishing to argue that his "sentence was imposed in violation of the Constitution or laws of the United States" must bring a § 2255 motion before "the court which imposed the sentence . . . ." 28 U.S.C. § 2255(a). Section § 2255 is therefore not "inadequate or ineffective" to address Fulks's Eighth Amendment *Ford/Madison* claim.

Fulks asserts that there is a structural problem with § 2255 because § 2255(h) bars him from bringing his *Ford/Madison* claim in a second § 2255 motion. Dkt. 55 at 68, ¶ 178. This contention suffers two fatal flaws. First, the Seventh Circuit has plainly established that § 2241's remedy does not become available simply because a petitioner is unable to meet the requirements for filing a successive § 2255 motion. *See Taylor*, 314 F.3d at 836; *supra* pp. 24-26. Second, because *Ford* claims only ripen when an execution is imminent, courts have broadly held that petitions raising newly ripened *Ford* claims are not "second or successive" barred by the AEDPA. The Seventh Circuit explained in *Suggs v. United States*, 705 F.3d 279, 282 (7th Cir. 2013), that "if an incompetency challenge to the death penalty is not ripe when a petitioner files the first application, the petitioner's second application once the challenge is ripe is not 'second or successive.'" *See also Martinez-Villareal*, 523 U.S. at 644-45 (noting that a motion is not "second

39

or successive" under the AEDPA just because it is numerically a second motion).[12] Thus, even if § 2255(h)'s bar on successive petitions were a structural error opening the door to a § 2241 remedy, it would be irrelevant here because Fulks's *Ford/Madison* claim may be brought as a second-in-time § 2255 motion. There is no structural error in § 2255 foreclosing collateral review of Fulks's *Ford* claim.

Section 2255 is the proper avenue for constitutional challenges to a sentence, and Fulks's Eighth Amendment *Ford/Madison* challenge to his death sentence can and should be raised through § 2255. Section 2255 is not "inadequate or ineffective," and Fulks's claim cannot proceed under § 2241.

> **b.** **The Seventh Circuit's *Davenport* standard does not allow Fulks's *Ford* claim to proceed under § 2241.**

As discussed above, *supra* pp. 26-30, *Davenport* requires a petitioner to meet three conditions to satisfy the § 2255(e) savings clause and proceed with a claim under § 2241: (1) "the prisoner must show that he relies on a 'statutory-interpretation case,' rather than a 'constitutional case;'" (2) "the prisoner must show that he relies on a retroactive decision that he could not have invoked in his first § 2255 motion;" and (3) there must be a "grave enough error to be deemed a miscarriage of justice corrigible therefore in a habeas corpus proceeding." *Brown*, 719 F.3d at 586. Fulks is unable to meet the *Davenport* standard.

---

[12] Although *Martinez-Villareal* addressed whether a federal habeas petition filed by a state prisoner pursuant to § 2254—rather than § 2255—was "second or successive" under the AEDPA, the Seventh Circuit has held that "[o]n this point, there is no material difference between motions under § 2255 and petitions under § 2254 . . . ." *Obeid*, 707 F.3d at 901. A § 2255 motion is therefore not "second or successive" if it raises a *Ford* claim when that claim becomes ripe.

40

Fulks does not meet the first *Davenport* requirement because he relies on *Ford*, *Panetti*, and *Madison*, all of which are cases grounded in the Eighth Amendment to the Constitution. *See supra* pp. 38-39. He does not rely on a statutory-interpretation case.

Fulks cannot meet the second *Davenport* requirement because he does not rely "on a retroactive decision that he could not have invoked in his first § 2255 motion." *See id*. As an initial matter, because Fulks's execution is not yet imminent, his *Ford/Madison* claim has never been ripe for consideration in a § 2255 motion. *See supra* pp. 34-37. But if Fulks's *Ford/Madison* claim *is* ripe now, it was also ripe when he filed his first § 2255 motion in 2008 and could have been raised at that time. *Ford* was decided in 1986, well before Fulks's 2004 trial and conviction, direct appeal, initial § 2255 motion, and appeal of the denial of his § 2255 motion. *Ford* is not a new decision that Fulks could not have raised in his first § 2255 motion.

Moreover, Fulks's argument that *Madison* is a "new legal development" that entitles him to relief is foreclosed by *Teague v. Lane*, 489 U.S. 288 (1989). In addition to not being cognizable under § 2241 in the first place, new constitutional rules are generally not retroactive on collateral review. *See id.* To determine whether a rule is retroactive, this Court must first decide if it is a new rule. Under *Teague*, "a case announces a new rule when it breaks new ground or imposes a new obligation on the States or the Federal Government," or when "the result was not *dictated* by precedent existing at the time the defendant's conviction became final." *Id.* at 301. *Madison* does not create a new rule at all; the Court made clear in its opinion that the result was dictated by *Panetti*, explaining that the question of whether *Panetti* permits the execution of a prisoner "merely because he suffers from dementia, rather than psychotic delusions," was "already answered" by

*Panetti*.[13]  *Madison*, 139 S. Ct. at 726, 728.  Any claim based on *Madison* is barred by *Teague* because *Madison* is not a new rule that is retroactive on collateral review.  Neither *Ford* nor *Madison* enables Fulks to satisfy the second *Davenport* prong.  Because Fulks fails to satisfy at least the first two *Davenport* requirements, Fulks's *Ford/Madison* claim does not fall within *Davenport*'s narrow class of claims that may proceed under § 2241.

In conclusion, this Court does not have jurisdiction to consider Fulks's *Ford/Madison* claim pursuant to § 2241 as a matter of law because Fulks has failed to establish that § 2255 is "inadequate or ineffective" to test the legality of his detention.  There is no structural error in § 2255 barring effective collateral review of his claim, and he cannot satisfy the *Davenport* test. Fulks's *Ford/Madison* claim therefore cannot proceed under § 2241.

> **3.  Fulks's *Ford/Madison* claim fails as a matter of law because he does not allege that he lacks a rational understanding of the government's rationale for his execution.**

Should this Court determine that Fulks's *Ford/Madison* claim is ripe and that it may proceed under § 2241, it must be dismissed with prejudice for failure to state a claim upon which relief can be granted.  Under the Federal Rules of Civil Procedure, which apply in federal habeas proceedings unless inconsistent with governing statutes and rules, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*quoting Bell Atl. Corp v. Twombly*, 550 U.S. 544, 570 (2007)); *see* Rules Governing Section 2254 Cases, Rule 1(b) (permitting courts to "apply these rules to a habeas corpus petition" not filed under § 2254) and Rule 12 ("The Federal Rules of Civil

---

[13] Even if *Panetti* were somehow a new rule and not merely a derivation of *Ford*, a point which the Government disputes, it was decided in 2007 and therefore could have been raised in Fulks's initial § 2255 motion, which was decided in 2010.

Procedure, to the extent that they are not inconsistent with any statutory provisions or these rules, may be applied to a proceeding under these rules."). Fulks's *Ford/Madison* claim must be dismissed for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) because he fails to allege that he falls within the categorical bar to execution announced in *Ford* and *Madison.*

The crux of Fulks's *Ford/Madison* claim is that he "has struggled throughout his life with profound CNS deficits that followed him from the womb, impaired his development, and prevented him from understanding and functioning adaptively in the world. This Court should recognize his ineligibility for the death penalty and grant him § 2241 relief on this ground." Dkt. 55 at 69-70, ¶ 181. Despite acknowledging the test for incompetency to be executed announced by *Madison* and *Panetti*—"whether the prisoner's mental state is so distorted by mental illness that he lacks a rational understanding of the State's rationale for his execution," Dkt. 55 at 58-59, ¶ 156 (internal quotation marks omitted)—Fulks does not once allege that his claimed intellectual disability and FASD have rendered him unable to comprehend the rationale for his execution. Accepting every fact alleged in Fulks's petition with respect to his claimed intellectual disability and FASD and drawing all reasonable inferences from those facts in Fulks's favor, as the Court must, *see Bell Atl. Corp.*, 550 U.S. at 563, Fulks has not stated a sufficient *Ford/Madison* claim. He does not claim to be incompetent to be executed under *Ford* and its progeny. He does not make a single allegation that his mental state is so distorted that he lacks a rational understanding of the rationale for his execution, and his claim must be dismissed.

**4. Fulks's specific claim that his alleged intellectual disability under *Atkins* renders him incompetent to be executed is not cognizable under *Ford*.**

Finally, this Court should reject Fulks's attempt to shoehorn his *Atkins* claim into a *Ford/Madison* claim because intellectual disability claims are not properly raised under *Ford* and its progeny. *See Davis*, 854 F.3d at 972 (declining to treat petitioner's *Atkins* claim as though it were a *Ford* claim). Fulks argues that, because of the adaptive and executive functioning deficits that accompany his FASD and intellectual disability, "carrying out Mr. Fulks's death sentence would violate the Eighth Amendment for precisely the same reasons that led the Supreme Court to announce a categorical ban on the intellectually disabled in *Atkins*." Dkt. 55 at 56-57, ¶ 149. Although *Atkins* and *Ford* both announced bars to execution based on the Eighth Amendment's prohibition on cruel and unusual punishment, the two lines of cases are rooted in different policies and serve different purposes.

In *Atkins*, the Supreme Court explained that society views intellectually disabled offenders "as categorically less culpable than the average criminal." *Atkins*, 536 U.S. at 315-16. The Court determined that the deficiencies exhibited by the intellectually disabled "diminish their personal culpability." *Id.* at 318. Whereas *Atkins* focused on the prisoner's moral culpability for the crime he committed, *Ford* and its progeny devoted their attention to the prisoner's ability to understand his punishment. In *Madison*, for example, the Supreme Court explained that "[w]hat matters is whether a person has the 'rational understanding' [of the reasons for his death sentence] *Panetti* requires." *Madison*, 139 S. Ct. at 727. *Atkins* and *Ford* established Eighth Amendment claims derived from entirely different policy concerns: the former based on culpability and the latter on competency. These standards are not interchangeable. This Court should therefore decline Fulks's

44

invitation to conflate *Atkins*' analysis of the culpability of intellectually disabled offenders with *Ford*'s analysis of competency to be executed.

To sum up, Fulks's *Ford/Madison* claim cannot proceed under § 2241 for four reasons. First, Fulks's claim is not yet ripe because his execution is not imminent. Second, this Court does not have jurisdiction to consider Fulks's *Ford/Madison* claim under § 2241 because Fulks cannot show that § 2255 is "inadequate or ineffective" to test the legality of his detention under the *Ford* line of cases. Third, should this Court decide that Fulks's *Ford/Madison* claim is ripe and that it can proceed under § 2241, the claim should be dismissed with prejudice for failure to state a claim upon which relief can be granted because Fulks does not allege that he satisfies the test for incompetency to be executed established by the Supreme Court in *Ford* and its progeny. Finally, Fulks's claim that his intellectual disability under *Atkins* renders him incompetent to be executed is not cognizable under *Ford*.

## IV. <u>CONCLUSION</u>

This Court should dismiss Fulks's § 2241 petition.[14] Fulks should litigate his Eighth Amendment issues, if at all, in a § 2255 proceeding in the district court of his conviction and sentence—the District of South Carolina. First, his intellectual disability claim must be dismissed

---

[14] Respondent has moved to dismiss Fulks's § 2241 petition as a matter of law based on the allegations in his petition. For this reason, Respondent has not addressed the numerous factual assertions made by Fulks in his § 2241 petition. Because Fulks's petition should be dismissed, there is no need for oral argument or an evidentiary hearing. In short, the court can dismiss Fulks's § 2241 petition based on the papers filed without any argument. To the extent the court does not agree, however, Respondent denies Fulks's allegations, including those that assert that he is intellectually disabled and not competent to be executed. Additionally, if the court were to not dismiss Fulks's petition, Respondent requests an extension to conduct discovery, including depositions, expert examinations, and other appropriate discovery necessary to respond to Fulks's substantive claims prior to any evidentiary hearing.

because Fulks does not meet the requirements of the savings clause of 28 U.S.C. § 2255 because he cannot show that § 2255 is "inadequate or ineffective" to test the legality of his detention. Second, his *Ford/Madison* claim that he cannot be executed because he is incompetent to be executed must be dismissed because (1) the claim is not ripe, (2) Fulks does not meet the requirements of the savings clause for this claim—he cannot show that § 2255 is "inadequate or ineffective" to test the legality of his detention, (3) his claim fails as a matter of law because he does not allege that he lacks a rational understanding of the government's rationale for his execution, and (4) his claim that his alleged intellectual disability under *Atkins* renders him incompetent to be executed is not cognizable under *Ford*. For all these reasons, it is clear that this Court should dismiss Fulks's § 2241 petition.

Respectfully submitted,

JOSHUA J. MINKLER
UNITED STATES ATTORNEY

*/s/Joe Howard Vaughn*
Joe Howard Vaughn
Assistant United States Attorney
United States Attorney's Office
10 West Market Street, Suite 2100
Indianapolis, IN 46204
Tel. (317) 229-2447
Fax (317) 226-6125
Email: Joe.Vaughn@USDOJ.GOV

*/s/Robert Frank Daley, Jr.*
Robert Frank Daley, Jr.
Kathleen Michelle Stoughton
Special Assistant United States Attorneys
1441 Main Street, Suite 500
Columbia, SC 29201
Tel. (803) 929-3000
Fax (803) 929-3135
Email: Robert.Daley@USDOJ.GOV
Email: Kathleen.Stoughton@USDOJ.GOV

June 12, 2019                                    *Counsel for Respondent*

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | | |
|---|---|---|
| CHADRICK FULKS, | ) | No. 2:15-CV-00033-JRS-MJD |
| | ) | |
| Petitioner, | ) | |
| | ) | **<u>CERTIFICATE OF SERVICE</u>** |
| *versus* | ) | |
| | ) | |
| J.E. KRUEGER, | ) | |
| *Warden, Terre Haute USP*, | ) | |
| | ) | |
| Respondent. | ) | |

I hereby certify that on June 12, 2019, the foregoing document was served on all parties or

their counsel of record through the CM/ECF system if they are registered users or, if they are not,

by serving a true and correct copy at the address(es) listed below:

Claudia Van Wyk, Esquire
Peter Konrad Williams, Esquire
FEDERAL COMMUNITY DEFENDER OFFICE
601 Walnut Street, Suite 545W
Philadelphia, PA 19106
Email:  Claudia_Vanwyk@fd.org
Email:  Pete_Williams@fd.org

**[SIGNATURES FOLLOWING]**

47

Respectfully submitted,

JOSHUA J. MINKLER
UNITED STATES ATTORNEY

*/s/Joe Howard Vaughn*
Joe Howard Vaughn
Assistant United States Attorney
United States Attorney's Office
10 West Market Street, Suite 2100
Indianapolis, IN 46204
Tel. (317) 229-2447
Fax (317) 226-6125
Email:  Joe.Vaughn@USDOJ.GOV

*/s/Robert Frank Daley, Jr.*
Robert Frank Daley, Jr.
Kathleen Michelle Stoughton
Special Assistant United States Attorneys
1441 Main Street, Suite 500
Columbia, SC 29201
Tel. (803) 929-3000
Fax (803) 929-3135
Email: Robert.Daley@USDOJ.GOV
Email: Kathleen.Stoughton@USDOJ.GOV

*Counsel for Respondent*

June 12, 2019