**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION**

|  |  |  |
|---|---|---|
| | : | |
| CHADRICK EVAN FULKS, | : | CIVIL ACTION |
| | : | (Capital Habeas Corpus) |
| Petitioner, | : | |
| v. | : | No. 2:15–cv–00033–JRS–MJD |
| | : | |
| J. E. KRUEGER, Warden, USP Terre Haute, | : | **Hon. James R. Sweeney II** |
| UNITED STATES OF AMERICA, | : | **United States District Judge** |
| | : | |
| Respondents. | : | |
| | : | |

**MOTION TO ALTER OR AMEND JUDGMENT
AND MEMORANDUM IN SUPPORT**

CLAUDIA VAN WYK
PETER WILLIAMS
Assistant Federal Defenders
Federal Community Defender Office
for the Eastern District of Pennsylvania
601 Walnut Street, Suite 545 West
Philadelphia, PA 19106
Tel: 215.928.0520
Fax: 215.928.0826
pete_williams@fd.org
claudia_vanwyk@fd.org

*Counsel for Petitioner*

Dated: October 17, 2019

## PRELIMINARY STATEMENT

Petitioner Chadrick Fulks shall be referred to as Mr. Fulks or Petitioner. Mr. Fulks's

Amended Petition for Writ of Habeas Corpus (Dkt. No. 55) shall be referred to as the "Amended

Petition" and cited as "AP" followed by the relevant page number. His Reply in Support of

Amended Petition (Dkt. No. 67) shall be referred to as the Reply and cited as "RAP" followed by

the relevant page number.

The diagnosis of intellectual disability shall be referred to as intellectual disability or

"ID." It shall be referred to as "mental retardation" when referred to historically.

All other citations are self–explanatory or will be explained.

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................... i

TABLE OF CONTENTS................................................................................................ ii

INTRODUCTION ......................................................................................................... 1

ARGUMENT................................................................................................................. 3

I.   *ATKINS* DETERMINATIONS ARE NOT CONFINED TO EVIDENCE IN EXISTENCE
     AT THE TIME OF TRIAL.......................................................................................... 3

     A.   *Atkins* Rendered All Intellectually Disabled Individuals Ineligible for Execution. ......... 4

     B.   Confining an *Atkins* Determination to the Time of Trial Violates *Moore–I*'s
          Requirement that Current Diagnostic Standards Be Employed in an *Atkins* Analysis. ... 6

     C.   *Webster* Does Not Tie *Atkins* Determinations to the Time of Trial. ............................... 7

     D.   The Categorical Nature of the Ban on the Execution of the Intellectually Disabled
          Supports Mr. Fulks's Request for § 2241 Review. ...................................................... 9

II.  THE COURT ERRED IN REJECTING MR. FULKS'S CHALLENGE TO THE
     EXECUTION OF HIS DEATH SENTENCE. ................................................................... 10

III. THE COURT ERRED IN ITS ANALYSIS OF MR. FULKS'S REQUEST FOR  § 2241
     REVIEW.................................................................................................................. 12

     A.   *Davenport*, *Garza*, and *Webster* All Support Mr. Fulks's Claim for § 2241 Review.... 12

     B.   Mr. Fulks Is Entitled to § 2241 Review Because He Cannot File a Successive Petition
          under § 2255(h). ................................................................................................... 13

     C.   Mr. Fulks Could Not Have Raised His *Atkins* Claim at Trial or in § 2255
          Proceedings. ......................................................................................................... 15

     D.   *Webster* Applies to Mr. Fulks's Case and Supports His Claim for Relief. .................... 19

     E.   Mr. Fulks's *Atkins* Claim Is Sufficient for § 2241 Review. .......................................... 21

Petitioner, Chadrick Evan Fulks, through counsel, hereby moves this Court, pursuant to Federal Rule of Civil Procedure 59(e), to alter or amend its Order and Judgment issued September 20, 2019, denying Mr. Fulks's Amended Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2241. In support of this motion, Mr. Fulks submits the following:

## INTRODUCTION

1. On March 8, 2019, Mr. Fulks filed a counseled Amended Petition pursuant to 28 U.S.C. § 2241. In it, he averred that he was intellectually disabled and that his execution was constitutionally prohibited by *Atkins v. Virginia*, 536 U.S. 304 (2002), and its progeny. Mr. Fulks argued that he is intellectually disabled under current diagnostic standards as well as current legal standards as set forth by *Hall v. Florida*, 572 U.S. 701 (2014), *Moore v. Texas*, 137 S. Ct. 1039 (2017) ("*Moore–I*"), and *Moore v. Texas*, 139 S. Ct. 666 (2019) ("*Moore–II*"). The current diagnostic standards had not been released at the time of Mr. Fulks's trial or at the time he filed his § 2255 petition, and thus constituted a newly available factual basis for his *Atkins* claim. *Hall*, *Moore–I*, and *Moore–II* were similarly unavailable to Petitioner at trial or during his initial § 2255 proceedings and constituted newly available legal bases for his claim. AP at 45–55.

2. Mr. Fulks argued he is entitled to review under 28 U.S.C. § 2241, as opposed to 28 U.S.C. § 2255, because he is challenging the execution rather than the imposition of his sentence: he did not argue that the death sentence was improperly rendered at the time of trial, but that—under current legal and diagnostic standards—he now meets the criteria for *Atkins* relief and is ineligible to be executed. *Id.*

3. Additionally, citing Seventh Circuit jurisprudence on this issue, including *In re Davenport*, 147 F.3d 605 (7th Cir. 1998); *Garza v. Lappin*, 253 F.3d 918 (7th Cir. 2001); and *Webster v. Daniels*, 784 F.3d 1123 (7th Cir. 2015), Mr. Fulks argued that that § 2241 review was

appropriate under §2255(e), also known as the "Savings Clause," as § 2255 was "inadequate or ineffective to test the legality of his detention." 28 U.S.C. § 2255(e). Because these diagnostic and legal authorities were unavailable to Mr. Fulks at the time of his trial and his § 2255 proceedings, he could not have pursued an *Atkins* claim at either of those times. Because these developments do not meet the requirements for a successive § 2255 motion under § 2255(h), Mr. Fulks cannot file a § 2255 motion now. Accordingly, Mr. Fulks has established that he is intellectually disabled and constitutionally exempt from execution, but is without an avenue under § 2255 to vindicate this claim for relief. This constitutes a structural defect in § 2255 that prevents Mr. Fulks from obtaining "a reasonable opportunity to obtain a reliable judicial determination of the fundamental legality of his conviction and sentence." *Davenport*, 147 F.3d at 609 (internal quotations omitted). *See also* AP at 45–55; RAP at 2–9.

4. On September 20, 2019, this Court denied Mr. Fulks's Amended Petition. Dkt. No. 73 ("§ 2241 Opinion"). The Court acknowledged the extensive evidence proffered regarding Mr. Fulks's intellectual disability, but did not reach the merits of Petitioner's claims as it held that Mr. Fulks was not entitled to review under § 2241. § 2241 Opinion at 1. The Court held that *Atkins* claims related only to evidence that could have been presented at the time of trial; rejected Mr. Fulks's claim that he was challenging the execution of his sentence as Mr. Fulks was asking this Court to vacate his death sentence; held that the Seventh Circuit's rulings in *Davenport*, *Garza*, and *Webster* did not support Mr. Fulks's request for relief; and held that Mr. Fulks had not otherwise satisfied the Savings Clause because the Court found that he had not identified a structural defect in § 2255 that deprived him of a reasonable opportunity to raise his claim. *Id.* at 14–29.

5. Mr. Fulks respectfully submits that the Court's findings on these issues constitute manifest error and respectfully requests that the dismissal of his Amended Petition be vacated, and the parties be permitted to litigate the merits of Mr. Fulks's claim.

**ARGUMENT**

6. "A claimant can invoke [Rule 59(e)] to direct a court's attention to matters such as newly discovered evidence or a manifest error of law or fact." *Russell v. Delco Remy Div. of General Motors Corp.*, 51 F.3d 746, 749 (7th Cir. 1995). Mr. Fulks respectfully submits that this Court's September 20, 2019, ruling was based on a number of manifest errors of law, and should be withdrawn.

**I.** *ATKINS* **DETERMINATIONS ARE NOT CONFINED TO EVIDENCE IN EXISTENCE AT THE TIME OF TRIAL.**

7. The Court based its analysis, inter alia, on the premise that *Atkins* claims relate only to whether a death sentence was lawfully imposed and that evidence had to be available at the time of trial to be relevant to an *Atkins* claim. Citing *Webster*, the Court contrasted a claim for relief under *Atkins* with a claim for relief under *Ford v. Wainwright*, 477 U.S. 399 (1986):

> [A]lthough claims under *Atkins* and *Ford* are similar, they apply different standards and focus on different time periods. *Atkins* addresses the constitutionality of sentencing an individual to death, while *Ford* asks whether a person subject to a death sentence can have that sentence carried out. Thus, for example, evidence of further intellectual tests conducted on a prisoner sentenced to a death sentence would have "no bearing on the *initial* conviction and sentence"—that is, the *Atkins* inquiry—"though they would be highly pertinent to the ultimate ability of the government to carry out the sentence" consistent with *Ford*.

§ 2241 Opinion at 12 (quoting *Webster*, 784 F.3d at 1140). *See also id.* at 23 (finding *Webster* to be inapplicable to Mr. Fulks's case because *Webster* involved newly discovered but pre-existing facts, and Mr. Fulks relies on "newly *created* standards used to assess whether anyone is intellectually disabled") (emphasis in original); *id.* at 24 ("This limitation in *Webster* is important

3

because *Atkins* focuses on the time of trial. *Webster* made clear that the evidence at issue must have existed at the time of trial to be 'relevant' to an *Atkins* claim.") (citing *Webster*, 784 F.3d at 1140).

8. As set forth below, these rulings are contrary to *Atkins*, its progeny, and *Webster*.

**A.** **_Atkins_ Rendered All Intellectually Disabled Individuals Ineligible for Execution.**

9. Just as *Ford* imposed a substantive restriction on executing an incompetent defendant and *Roper v. Simmons*, 543 U.S. 551 (2005), barred the execution of individuals who committed potentially capital crimes as juveniles, *Atkins* imposed a categorical ban on the *execution* of the intellectually disabled. *Atkins*, 536 U.S. at 321. The Supreme Court announced the categorical nature of the ban in *Atkins*: "we therefore conclude that such [capital] punishment is excessive and that the Constitution 'places a substantive restriction on the State's power to take the life' of a mentally retarded offender." *Id.* (quoting *Ford*, 477 U.S. at 405). *See also id.* at 317 (leaving to the States "the task of developing appropriate ways to *enforce the constitutional restriction upon [their] execution of sentences*") (emphasis added) (citing *Ford*, *supra*); *id.* at 321 ("We are not persuaded that the *execution of mentally retarded* criminals will measurably advance the deterrent or the retributive purpose of the death penalty.") (emphasis added).

10. The nature of the Supreme Court's ruling is not surprising as the question in *Atkins* was whether the *execution* of the intellectually disabled was constitutional:

> [T]he American public, legislators, scholars, and judges have deliberated over the question whether the death penalty should ever be imposed on a mentally retarded criminal. The consensus reflected in those deliberations informs our answer to the question presented in this case: whether *such executions* are "cruel and unusual punishments" prohibited by the Eighth Amendment to the Federal Constitution.

*Id.* at 307 (emphasis added). *See also id.* at 318–19 ("[O]ur death penalty jurisprudence provides two reasons consistent with the legislative consensus that the mentally retarded *should be categorically excluded from execution*.").

11. In the years that followed, the Supreme Court repeatedly confirmed that *Atkins* prohibited the *execution* of the intellectually disabled, not just the imposition of the death sentence on intellectually disabled defendants. In 2005, when announcing a categorical ban on the execution of individuals who committed crimes as juveniles, the Supreme Court noted that *Atkins*, like *Roper*, bars "the *execution* of a mentally retarded person." *Roper*, 543 U.S. at 559 (emphasis added). In 2014, the Supreme Court rejected practices relating to the interpretation of intelligence testing in *Atkins* proceedings that violated diagnostic standards because those invalid practices would create in an "unacceptable risk that persons with intellectual disability will be *executed*." *Hall*, 572 U.S. at 704 (emphasis added). In 2015, *Brumfield v. Cain*, 135 S. Ct. 2269 (2015), again confirmed that "[i]n [*Atkins*], this Court recognized that the *execution* of the intellectually disabled contravenes the Eighth Amendment's prohibition on cruel and unusual punishment" and that the "Eighth Amendment places a *substantive restriction* on the State's power to *take the life* of a mentally retarded offender." *Id.* at 2273–74 (emphasis added, internal citations and quotations omitted). Finally, in 2017, *Moore–I* rejected invalid diagnostic practices, again because the use of such practices "creat[ed] and unacceptable risk that persons with intellectual disability will be *executed*." *Moore–I*, 137 S. Ct. at 1044 (quoting *Hall*, *supra*) (emphasis added).

12. The Supreme Court's *Atkins* jurisprudence has consistently established that *Atkins* categorically bars the *execution* of the intellectually disabled, and does not place any additional restrictions on eligibility for an *Atkins* claim. This jurisprudence focuses only on whether the

individual being *executed* is intellectually disabled, not whether the individual was diagnosable as intellectually disabled at the time the sentence was imposed. This Court's ruling to the contrary would authorize the execution of the intellectually disabled and runs contrary to *Atkins*, *Roper*, *Hall*, *Brumfield*, and *Moore–I*.

**B.      Confining an *Atkins* Determination to the Time of Trial Violates *Moore–I*'s Requirement that Current Diagnostic Standards Be Employed in an *Atkins* Analysis.**

13.     In *Moore–I*, the Supreme Court considered procedures employed by the Texas Court of Criminal Appeals ("CCA") when it denied Mr. Moore's *Atkins* claim and employed outdated standards for ID in doing so. *Moore–I*, 137 S. Ct. at 1044. The Supreme Court overturned the CCA's ruling and held that courts must apply the "medical community's current standards" in making an *Atkins* determination. *Moore–I*, 137 S. Ct. at 1053. Citing manuals from the American Psychiatric Association ("APA") and the American Association on Intellectual and Developmental Disabilities ("AAIDD"), *Moore–I* held that "[r]eflecting improved understanding over time, . . . current manuals offer the best available description of how mental disorders are expressed and can be recognized by trained clinicians." *Id.* (internal quotations omitted). In accordance with this holding, *Moore–I* did not assess the CCA's post–conviction determination based on the clinical definitions that were in place at the time of trial, but the diagnostic authorities that were present at the time *Moore–I* was litigated. *Id.* at 1050–53 (citing APA and AAIDD manuals from 2012 and 2013).

14.     Requiring evidence of intellectual disability to have existed at the time of trial in order to be relevant to an *Atkins* claim would violate *Moore–I*'s requirement that current, prevailing standards be used in *Atkins* determinations. "Reflecting improved understanding over time," *id.* at 1053, the diagnostic standards change as knowledge of the disorder and the

instruments used to identify it progress. An intellectually disabled defendant might satisfy current, prevailing standards, but fail to meet the outdated standards present at the time of trial. Indeed, in *Moore–I*, the outdated practices employed by the CCA had been replaced by new ones by the time the CCA reviewed Mr. Moore's *Atkins* claim. *Id.* at 1050–53. And, under current standards and contrary to the CCA's rulings, the Supreme Court eventually found Mr. Moore to be intellectually disabled. *Moore–II*, 139 S. Ct. at 672. Arresting the *Atkins* analysis at the trial date would violate *Moore–I* and create an "unacceptable risk that persons with intellectual disability will be executed." *Moore–I*, 137 S. Ct. at 1044 (citations omitted).

C.     ***Webster* Does Not Tie *Atkins* Determinations to the Time of Trial.**

15.     The Seventh Circuit's ruling in *Webster* did not restrict an *Atkins* determination to the evidence of intellectual disability that existed at the time of trial. Consistent with *Atkins* and its progeny, the *Webster* court made clear that *Atkins* "prohibits the *execution* of the intellectually disabled." *Webster*, 784 F.3d at 1132 (emphasis added).

16.     Moreover, the *Webster* court based its holding on the fact that *Atkins* and *Roper* created a "narrow set of cases presenting issues of constitutional ineligibility for *execution*," which exposed an inadequacy in § 2255. *Id.* at 1138–39. As discussed at length in the Amended Petition and the Reply, the *Webster* court considered a case in which the defendant had litigated an *Atkins* claim at trial and during his initial § 2255 proceedings, and in which relief on that claim had been denied at every stage of the proceedings. *Id.* at 1125–32. Mr. Webster's counsel found additional evidence of ID, but was barred from raising it in a successor petition because it was not a new, retroactive rule of constitutional law, and it did not constitute clear and convincing evidence that he was innocent of the crime for which he had been sentenced to death. *Id.* at 1132–33. On the one hand, Mr. Webster was constitutionally ineligible to be executed,

7

while, on the other, Congress had included no provision in § 2255 for him to realize his claim for relief. *Id.* at 1138–39. The Seventh Circuit found Mr. Webster to be entitled to § 2241 review because "[t]o hold otherwise would lead in some cases—perhaps Webster's—to the intolerable result of condoning an *execution* that violates the Eighth Amendment." *Id.* at 1139 (emphasis added).

17. There is nothing in *Webster* to suggest that the Seventh Circuit issued a rejection of the Supreme Court's focus on the execution as the constitutionally relevant time. The *Webster* court instead dealt with the facts before it to assess whether a structural problem prevented Webster from proceeding under § 2255. The relevant passage from *Webster* reads as follows:

> We have established thus far that a person who proposes to show that he is categorically ineligible for the death penalty, based on newly discovered evidence, may not be barred from doing so by section 2255. But this rule cannot apply to all newly discovery evidence or else there would never be any finality to capital cases involving either the intellectually disabled or minors. [FN] Looking particularly at the intellectually disabled, it would always be possible to conduct more IQ and adaptive functioning tests in the prison. Those new scores would have no bearing on the *initial* conviction and sentence, though they would be highly pertinent to the ability of the government to carry out the ultimate sentence. But our concern is with the former, not the latter.
>
> [FN] In fact, given the rule in *Ford v. Wainwright* [citation omitted], which holds that '[t]he Eighth Amendment prohibits the State from inflicting the penalty of death upon a prison who is insane" [citation omitted] there will always be some lack of finality for a person whose mental condition "prevents him from comprehending the reasons for the penalty or its implications." [citation omitted] Both parties have assumed, however, that the *Ford* standard is higher than the one imposed in *Atkins* and *Hall*. We assume for present purposes that this is correct.
>
> What distinguishes Webster's case from the one we just hypothesized are two facts: first, the newly discovered evidence that current counsel have proffered existed before the time of the trial, and is relevant for precisely that reason; second, although the facts are disputed, there is evidence indicating that they were not available during the initial trial as a result of missteps by the Social Security Administration, not Webster's counsel.

*Webster*, 784 F.3d at 1140.

18. The *Webster* court addressed a claim involving pre-existing evidence and the above discussion reflected that. There is no reason to believe that the Seventh Circuit was making a wide–ranging finding that unconstitutionally restricted the scope of an *Atkins* analysis.

19. Finally, even assuming *arguendo* that *Webster* confined an *Atkins* analysis to evidence of ID that was in existence at trial (and it does not), *Webster* was issued prior to *Moore–I*, which mandated review under current diagnostic standards. *See* Section B, *supra*. Accordingly, to the extent *Webster* actually did confine an *Atkins* analysis to evidence in existence at the time of trial, *Moore–I* overruled any such holding.

**D. The Categorical Nature of the Ban on the Execution of the Intellectually Disabled Supports Mr. Fulks's Request for § 2241 Review.**

20. That *Atkins* categorically bars the *execution* of the intellectually disabled, as opposed to simply the *imposition* of a death sentence on someone who is ID, is significant. Procedural barriers that would normally be permissible become constitutionally invalid if they permit an unconstitutional *execution* to occur. The Seventh Circuit described this dynamic:

> In Webster's case, the problem is that the Supreme Court has now established that the Constitution itself forbids the execution of certain people: those who satisfy the criteria for intellectual disability that the Court has established, and those who were below the age of 18 when they committed the crime. [footnote omitted.] In virtually all other situations, Congress has almost unlimited discretion to select the penalty, or the range of penalties, that go along with a particular crime. If Congress selects 20 years, but because of some error that went undetected through direct appeals and an initial motion under section 2255 the defendant receives 25 years, there is no doubt a problem, but it is likely not one of constitutional dimension. Congress could have chosen 25 years to begin with, and the defendant would have had nothing to complain about.

*Webster*, 784 F.3d at 1139.

21. The categorical nature of Mr. Fulks's constitutional claim strengthens his application for review. Because Mr. Fulks avers that he is constitutionally ineligible and because there is a constitutional requirement that current diagnostic standards be applied to an *Atkins*

9

claim, he cannot be denied review under section 2241 because he relied on diagnostic standards that emerged after his trial. Similarly, procedural barriers cannot be relied on to deny him review of his claim. Either because he is challenging the execution of his sentence, rather than the imposition of it, or because he satisfies the Savings Clause, he is entitled to litigate the merits of this claim and establish that he is intellectually disabled.

## II.     THE COURT ERRED IN REJECTING MR. FULKS'S CHALLENGE TO THE EXECUTION OF HIS DEATH SENTENCE.

22.     Mr. Fulks argued that his Amended Petition challenged the execution, rather than the imposition of his sentence, and thus, was cognizable under § 2241 without having to satisfy the Savings Clause. AP at 54–55; RAP at 9–10. The Court acknowledged that challenges of this kind are cognizable under § 2241 and that Mr. Fulks "is not claiming that his sentence violated *Atkins* at the time it was imposed," but that it is unconstitutional now. § 2241 Opinion at 14–16; *id.* at 16 n.5. Citing *Figueroa v. Tarquino*, 373 F. App'x 789 (7th Cir. 2018), the Court held that by asking the Court to "set aside" Mr. Fulks's death sentence, his claim "falls squarely within § 2255(a)'s language permitting claims that a prisoner's sentence should be vacated because it violates federal law."[1]

23.     This finding is in error. Mr. Fulks's argument—which recognizes that he was not ineligible for execution under *Atkins* at the time of his trial, but contends that he is now—is by definition a challenge to the *execution* of his death sentence rather than its *imposition*.

---

[1] § 2241 Opinion at 15–16; *id.* at 16 n.5. The Court also cited examples where § 2241 petitioners challenged conditions of parole, time credit calculations, and the behavior of the Bureau of Prisons as examples of challenges to the execution rather than the imposition of the sentence. *Id.* at 14–15. As with *Figueroa*, the Seventh Circuit granted § 2241 review in those settings without passing through the Savings Clause, but did not rule that these were the only settings in which defendants could challenge the execution, as opposed to the imposition, of their sentences. *See Storm v. United States Parole Comm'n*, 667 F. App'x 156 (7th Cir. 2016); *Ihmoud v. Jett*, 272 F. App'x 525 (7th Cir. 2008).

24. Additionally, *Figueroa*, on which the Court relies for the proposition that any request to "set aside" a sentence must pass through the Savings Clause, does not support this conclusion. Mr. Figueroa was serving a non–capital sentence, and his claim did not involve a categorical exemption. *Figueroa*, 737 F. App'x at 789–90. Because capital cases are the only cases involving categorical exemptions from execution, they are the only cases where the legality of the imposition of the death sentence can be separated from the legality of its execution.

25. Moreover, the *Figueroa* court's ruling focused on characteristics of a term of years that would not apply to a death sentence. It relied on the fact that Mr. Figueroa did not ask it to "set aside" his sentence because this necessarily meant that he was challenging the execution of his sentence, rather than its imposition. *Id.* at 790. However, the *Figueroa* court did not address whether the inverse was true, i.e. that a request to set aside a sentence *always* meant that the defendant was seeking to challenge the imposition rather than the execution of his sentence. *Id.*

26. Finally, the Court's ruling violates *Atkins* and its progeny. *Atkins* categorically prohibits the *execution* of the intellectually disabled. *See* Section I, *supra*. *Moore–I* further requires that *Atkins* claims be assessed under current, prevailing diagnostic standards, rather than the outdated ones. *Id.* By construing any challenge to Mr. Fulks's execution based on his intellectual disability as a challenge to the *imposition* of that sentence, this Court necessarily excludes *Atkins* challenges from defendants like Mr. Fulks who were not ID at the time of trial, but are ID now. This will create the precise situation that *Hall*, *Moore–I*, and *Webster* sought to avoid: an unacceptable risk that an intellectually disabled person will be executed.

**III. THE COURT ERRED IN ITS ANALYSIS OF MR. FULKS'S REQUEST FOR § 2241 REVIEW.**

27. The Court noted that the Seventh Circuit has found § 2241 review appropriate in a number of different settings, as set forth by *Davenport*, *Garza*, and *Webster*; acknowledged that these three cases were not exhaustive; and held that *Webster* was an example of the Seventh Circuit's expanding § 2241 review into a new area. § 2241 Opinion at 17–25. However, the Court also found that these three cases did not support Mr. Fulks's claim for review and that Mr. Fulks was not otherwise entitled to § 2241 review because he had not established a structural problem with § 2255. *Id.* at 17–29.

28. All of these rulings were based on errors of law. *Davenport*, *Garza*, and *Webster* all support Mr. Fulks's claim for relief; Mr. Fulks has established a structural problem with § 2255(h); and granting § 2241 review is both consistent with and required by the holdings in these cases and the language in § 2255(e).

**A.** ***Davenport*, *Garza*, and *Webster* All Support Mr. Fulks's Claim for § 2241 Review.**

29. The enduring theme throughout *Davenport*, *Garza*, and *Webster* is that § 2241 is designed "to give a prisoner a reasonable opportunity to obtain a reliable judicial determination of the fundamental legality of his conviction and sentence." *Davenport*, 147 F.3d at 609 (internal quotations omitted).

30. In each one of these cases, the Seventh Circuit faced a setting where the defendants were unable to raise the claim in question at trial, on direct appeal, or during § 2255 proceedings and were simultaneously unable to file a successive petition under § 2255(h). In *Davenport*, one petitioner (Nichols) could not have relied on a new, retroactive rule of statutory law because it did not meet the criteria of § 2255(h). *Davenport*, 147 F.3d at 610–11. In *Garza*, the petitioner relied on an opinion by the Inter–American Commission on human rights that was

12

also unavailable in prior proceedings and did not satisfy § 2255(h). *Garza*, 253 F.3d at 923. In *Webster*, the additional evidence undermined the constitutionality of the sentence but did not satisfy § 2255(h). *See* Section I(C), *supra* (discussing *Webster*). In all three of these settings, the Seventh Circuit granted § 2241 review. *Id.*; *Garza*, 253 F.3d at 923; *Davenport*, 147 F.3d at 610–11.

31.     These same conditions are present in Mr. Fulks's case. As set forth above and in prior pleadings, he was unable to pursue his *Atkins* claim earlier because the legal and diagnostic standards upon which he relies did not exist. And, he does not satisfy the conditions necessary to file a successive petition under § 2255(h). Just as in *Webster*, *Garza*, and *Davenport*, he should be granted § 2241 review.

**B.      Mr. Fulks Is Entitled to § 2241 Review Because He Cannot File a Successive Petition under § 2255(h).**

32.     Citing *Poe v. Lariva*, 834 F.3d 770, 772 (7th Cir. 2016), the Court found *Davenport*, *Garza*, and *Webster* inapplicable to Mr. Fulks's case and rejected Mr. Fulks's reliance on new legal authority because § 2255(h) permits "certain constitutional claims to be brought in successive § 2255 motions, and thus there is no 'structural problem' with § 2255 that forecloses judicial review." § 2241 Opinion at 19; *id.* at 18 (ruling that the Seventh Circuit made clear in *Poe* and *Davenport* that there is "not a similar problem with § 2255 petitioners such as Mr. Fulks who raise constitutional claims"); *id.* at 27 (noting that § 2255(h) "permits successive constitutional claims in certain circumstances" and that "[t]he Seventh Circuit has made clear that—except in the limited circumstances presented in *Webster*—there is no structural problem with § 2255 for constitutional claims").

33.     These rulings are contradicted by *Davenport*, *Poe*, *Webster*, and § 2255(h) itself. Mr. Fulks cannot file a successive § 2255 petition based on new legal developments. Section

2255(h) only permits successive petitions based on new legal authority when the petition is based on "a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable." 28 U.S.C. § 2255(h)(2).

34. Mr. Fulks's Amended Petition does not rely on a new rule that has been made retroactive by the Supreme Court. *Hall*, *Moore–I*, and *Moore–II*, did not constitute new rules at all, but were instead interpretations of an old rule: *Atkins*. Moreover, the Supreme Court has never ruled that *Moore–I*, *Moore–II*, or *Hall* were to be retroactively applied. Just like the defendant in *Webster*, Mr. Fulks is placed in the constitutionally untenable position of being eligible for *Atkins* relief in the wake of *Hall* and *Moore–I*, but unable to realize that claim through a successive § 2255 petition as he is not relying on a new rule. Just as the *Davenport* court found § 2255 to be inadequate where it denies the defendant the ability to challenge his imprisonment for a "nonexistent offense," *Davenport*, 147 F.3d at 611, and the *Webster* court found § 2255 to be inadequate as it prevented Mr. Webster from challenging his constitutionally prohibited sentence, § 2255 is inadequate here as it denies Mr. Fulks the ability to challenge his constitutionally prohibited sentence.

35. *Poe* does not establish a prohibition on the presentation of constitutional claims through § 2241. To the contrary, the *Poe* court acknowledged that *Webster*'s holding stemmed from the impossibility of Mr. Webster's position: "the defendant could not have used § 2255 at the time of [*Atkins*] because he did not have the new evidence of his social security records . . . and he could not use the new evidence when discovered because" it did not constitute "evidence of innocence of the offense." *Poe*, 834 F.3d at 774. Rather than categorically reject constitutional claims as not cognizable under § 2241, the *Poe* court based its rejection of Mr. Poe's § 2241 petition on the fact that the habeas petitioner filed a claim for relief under § 2241 when he should

14

have pursued the same claim under § 2255, could easily have filed a timely § 2255 petition on this issue, but waited until the statute of limitations had run to request relief under § 2255. *Id.* at 774 ("In contrast to *Webster*, Poe was unable to bring his *Richardson* claim because *he* filed the wrong petition under § 2241 and his subsequent petition under § 2255 was untimely.") (emphasis in original). Here, Mr. Fulks raises a claim of categorical exemption from execution that, like Mr. Webster's and in contrast to Mr. Poe's, could not have been raised in initial § 2255 proceedings (*see* Section C, *infra*) and could not be raised in a successor § 2255 motion.

**C.     Mr. Fulks Could Not Have Raised His *Atkins* Claim at Trial or in § 2255 Proceedings.**

36.     The Court found that Mr. Fulks does not satisfy the Savings Clause because Fulks could have raised an *Atkins* claim earlier. *Id.* at 26–27. It similarly held that *Garza* failed to support Mr. Fulks's request for review as it was "literally impossible" for Mr. Garza to have raised his claim earlier as the factual predicate did not yet exist. *Id.* at 19. Acknowledging that *Davenport* found the Savings Clause to be met even though the habeas petitioner could have raised this claim during his initial § 2255 proceedings, the Court held that the reasoning in *Davenport* did not apply to Mr. Fulks's case because *Davenport* involved a claim based on a change in statutory law and § 2255(h) permits successive petitions on certain constitutional claims. *Id.* at 27–28. Mr. Fulks cited the § 2255 court's denial of his co–defendant's *Atkins* claim for reasons that were later found to be invalid under *Moore–I* and *Moore–II* as an example demonstrating that Fulks's *Atkins* claim would have been unsuccessful if filed prior to *Moore–I*. The Court rejected that argument as too speculative. *Id.* at 25–29.

37.     The Court errs. Mr. Fulks could not have filed an *Atkins* claim at trial or at the time of his § 2255 petition, regardless of what the § 2255 court held in the co–defendant's case. The diagnostic standards upon which he relies had not yet been released at that time, these

15

standards were not binding until *Moore–I* was handed down in 2017, and the Supreme Court had not rejected certain diagnostically inappropriate practices until *Hall* and *Moore–I* were both issued. *See* AP at 45–55. Accordingly, although federal inmates can file *Atkins* claims under § 2255 as a general matter, Mr. Fulks could not have filed an *Atkins* claim as he did not have had sufficient evidence under then–current diagnostic and legal standards to support it.

38.     The Court's ruling would require habeas petitioners to anticipate legal and diagnostic developments and file unsupported claims based on the possibility that either science or the law could develop in a favorable direction. Such a requirement would be untenable. *Davenport* explicitly recognized that such a requirement "would just clog the judicial pipes to require defendants, on pain of forgetting all right to benefit from future changes in the law, to challenges to settled law in their briefs on appeal and in postconviction filings." *Davenport*, 147 F.3d at 609.

39.     Even if he had been able to file an *Atkins* claim in his § 2255 petition, such a claim would have been rejected. As set forth in Mr. Fulks's Amended Petition and his Reply, the legal landscape changed with the issuance of *Hall* and *Moore–I*. *Hall* held that intellectual disability cannot be assessed according to any single factor, but rather is a "conjunctive and interrelated assessment." *Hall*, 572 U.S. at 723. In *Hall*, the Court struck down a Florida statute establishing a "strict IQ test score cutoff of 70" for determining the applicability of *Atkins*.[2] In doing so, the Court held that, in addition to IQ scores, "an individual's ability or lack of ability to adapt or adjust to the requirements of daily life, and success or lack of success in doing so, is

---

[2] As set forth in the Amended Petition, the diagnosis of intellectual disability involves three criteria: deficits in intellectual functioning, deficits in adaptive functioning, and onset before the age of eighteen. As *Hall* and current diagnostic standards make clear, the assessment of intellectual functioning is made through both formal IQ testing and clinical assessment, and is "conjunctive and interrelated" with the assessment of adaptive behavior. *See* AP at 2–8;

16

central to . . . diagnosing intellectual disability." *Id.* at 705 (citing DSM–5, at 37); *see also*

*Brumfield*, 135 S. Ct. at 2277–78 (testimony that petitioner "scored 75 on an IQ test and *may*

*have scored higher on another test . . .* was entirely consistent with intellectual disability"

because "any IQ test score has a margin of error and is *only a factor* in assessing mental

retardation") (emphasis added). More broadly, *Hall* mandated that States did not have

"unfettered discretion to define the full scope of the constitutional protection" identified in

*Atkins. Hall*, 572 U.S. at 719. Rather, with *Hall*, the Court established that the assessment of an

*Atkins* claim must be "informed by the views of medical experts." *Id.* at 721; *see also id*. at 720–

21 (recognizing that "[i]f the States were to have complete autonomy to define intellectual

disability as they wished, the Court's decision in *Atkins* could become a nullity, and the Eighth

Amendment's protection of human dignity would not become a reality").

40.     *Moore–I* built on the framework of *Hall* and, as noted above, required that courts

apply current diagnostic standards when making an *Atkins* determination. *Moore–I*, 137 S. Ct. at

1053. The Supreme Court further invalidated a number of specific diagnostically inappropriate

practices employed by courts when assessing adaptive behavior in an *Atkins* determination,

including: (1) making an adaptive behavior determination based on an individual's strengths,

rather than his or her weaknesses; (2) relying on erroneous stereotypes regarding the

intellectually disabled;[3] (3) considering criminal conduct and prison behavior as part of an

---

[3] *Moore–I* cited the AAIDD's *User's Guide: Intellectual Disability, Definition, Classification, and Systems of Supports*, AAIDD (2012), which lists the following specific erroneous stereotypes surrounding individuals with intellectual disability: individuals with ID "look and talk differently from person in the general population;" "are completely incompetent and dangerous;" "cannot do complex tasks;" cannot get driver's licenses, buy cars, or drive cars;" "do not (and cannot) support their families;" "cannot romantically love or be romantically loved;" "cannot acquire vocational and social skills necessary for independent living;" and "are characterized only by limitations and do not have strengths that occur concomitantly with the limitations." *Id.* at 26.

adaptive behavior analysis; (4) viewing risk factors for intellectual disability as evidence undermining the diagnosis of ID, rather than an identified cause of intellectual disability; and (5) viewing co–occurring disorders as undermining a diagnosis of ID. *Id.* at 1050–53. All of these practices were invalid and rejected by the Supreme Court, but were nevertheless employed by many reviewing courts and jurisdictions prior to *Moore–I*. *See* AP at 51–54; SAR at 5–8.

41.     The Fourth Circuit was one jurisdiction that employed diagnostically inappropriate practices as to both prongs. *Id.* For example, in *Richardson v. Branker*, 668 F.3d 128 (4th Cir. 2012), the Fourth Circuit considered an *Atkins* claim from a habeas petitioner who received IQ scores of 73 and 74, both of which were well within the presumptive range for ID under then–applicable diagnostic guidelines and well within the ID–range after *Hall*. *Id.* at 151. Nevertheless, the Fourth Circuit rejected the habeas petitioner's *Atkins* claim. It found "no error in the [state] court's determination that Richardson failed to meet the first prong of the statutory definition of mental retardation because he does not have a qualifying IQ score of 70 or below." *Id. See also Green v. Johnson*, 515 F.3d 290, 300 (4th Cir. 2008) (denying *Atkins* relief on prong one because three of the defendant's four IQ scores "exceed[ed] the maximum score of 70").

42.     Prior to *Moore–I*, the Fourth Circuit similarly deviated from current diagnostic standards regarding a defendant's adaptive behavior. *Walker v. Kelly*, 593 F.3d 319, 324–28 (4th Cir. 2010) (denying *Atkins* relief on prong two the habeas petitioner's strengths rather than his weaknesses; his prison and criminal functioning; his verbal functioning; and erroneous stereotypes such as the belief that people with ID do not have the ability to form romantic relationships, look and talk differently than the general population, and cannot acquire the vocational and social skills for independent living); *Green*, 515 F.3d at 303 (denying prong two finding by focusing on the habeas petitioner's strengths, rather than his weaknesses; his criminal

functioning; and erroneous stereotypes such as the belief that people with ID cannot have romantic relationships, cannot acquire the vocational and social skills necessary for independent living, and are completely incompetent and dangerous); *Prieto v. Zook*, 791 F.3d 465, 471–72 (4th Cir. 2015) (denying *Atkins* relief on prong two by relying on the habeas petitioner's strengths, rather than his weaknesses; relying on prison functioning; and relying on erroneous stereotypes, including the belief that people with ID cannot do complex tasks, cannot obtain a driver's license; are completely incompetent and dangerous; and cannot acquire the vocational and social skills necessary for independent living).

43. The Supreme Court rejected all of these practices in *Hall*, *Moore–I*, and *Moore–II*. However, as the Fourth Circuit employed these now–invalidated practices when adjudicating *Atkins* claims prior to the issuance of these decisions, Mr. Fulks would have been precluded from pursuing an *Atkins* claim by the Fourth Circuit regardless of how his co–defendant's *Atkins* claim was adjudicated.

### D. *Webster* Applies to Mr. Fulks's Case and Supports His Claim for Relief.

44. The Court differentiates *Webster* from Mr. Fulks's case, inter alia, by holding that he "primarily relies on the Supreme Court's decision in *Hall* as the new legal basis for his first [*Atkins*] claim," *Hall* pre–dated *Webster*, and "[i]f reliance on the Supreme Court's decision in *Hall* was all that was required to meet the Savings Clause," *Webster* "would have been dramatically different" as there "would have been no need, for example to even examine whether Webster's claim of reliance on new evidence was sufficient" nor any need for the Seventh Circuit to limit its decision to evidence that existed before trial but was went undiscovered through no fault of counsel. § 2241 Opinion at 19–20.

45. This is not supported by the facts of *Webster* or the holding in *Hall*. The Supreme Court's issuance of *Hall* did not change the analysis in Mr. Webster's case. To establish a diagnosis of intellectual disability, and thus, be entitled to relief under *Atkins*, a defendant must meet three prongs: deficits in intellectual functioning as set forth by IQ testing (prong one); deficits in adaptive functioning (prong two); and onset before the age of 18 (prong three). *Hall* relates specifically to the prong one component of an ID analysis, recognizes the interrelated nature of a prong one and prong two determination, rejects the imposition of a hard IQ cutoff – including Florida's imposition of a hard cutoff IQ score of 70, and recognizes the inherent imprecision in IQ testing. *See* AP at 47–51.

46. In *Webster*, the reviewing § 2255 court found prong one to be present, and denied relief based on its determination that prong two had not been established. *Webster*, 784 F.3d at 1132 (noting that in Mr. Webster's initial § 2255 proceedings, the Fifth Circuit "was willing to accept that Webster had a low I.Q., but it found that the government's evidence of his adaptive functioning had effectively countered those numbers."). Indeed, the Seventh Circuit noted that, contrary to the situation in *Hall*, the main area of dispute between the parties was primarily adaptive functioning:

> At a more general level, the government treated this case as the reverse of the one the Supreme Court discussed in *Hall v. Florida*. In *Hall*, the defendant's I.Q. score was 71, but the Florida courts refused to allow him to introduce evidence of adaptive functioning that would have shown him to be intellectually disabled. In Webster's case, virtually all of the I.Q. scores put him in the range of mild to moderate intellectual disability, but the government argued strongly (and both the court and the jury were persuaded) that his adaptive functioning was good enough to demonstrate that he was not, in fact, so disabled.

*Id.* at 1143.

47. Accordingly, *Hall* would have been no use to Mr. Webster because the dispute in his case centered around adaptive functioning, not intellectual functioning.

20

48. Moreover, to the extent that there was any material dispute as to whether Mr. Webster met prong one even in the face of the Fifth Circuit's finding that he did, *Hall* would still not have advanced his case. All of Mr. Webster's IQ scores fell well within what parties agreed was the presumptive range for ID. *Id.* at 1142. The Government challenged the validity of those scores only. *Id.* The Government did not challenge that, if valid, those scores would require a prong two analysis. *Id.*

49. Finally, Mr. Fulks does not rely primarily on *Hall* to argue that new legal developments entitle him to § 2241 review. He relies just as much on *Moore–I*. Although *Hall* established that the assessment of an *Atkins* claim must be "informed by the views of medical experts," and that courts may not "disregard[] established medical practice," *Hall*, 572 U.S. at 712, 719, *Moore–I* made diagnostic standards binding on *Atkins* proceedings, mandated that those *Atkins* proceedings be *current*, and rejected a number of improper practices relating to the assessment of adaptive functioning . *Moore*, 137 S. Ct. at 1053. Even after *Hall*, courts— including the Fourth Circuit—continued to deviate from current diagnostic standards in adjudicating *Atkins* claims. *See* Section C, *supra* (citing *Prieto*, 791 F.3d at 470–72). *Moore–I* specifically rejected these practices in the adjudication of adaptive behavior. *Moore–I*, 137 S. Ct. at 1050–53.

**E.  Mr. Fulks's *Atkins* Claim Is Sufficient for § 2241 Review.**

50. Citing *Webster*, the Court held that, by itself, an *Atkins* claim is insufficient to establish that a defendant is entitled to § 2241 review. § 2241 Opinion at 24–26. "[I]f Mr. Fulks's theory is accepted, he could refile his claims with each revision of the medical standards governing the diagnosis of intellectual disability." *Id.* at 24.

51.     Mr. Fulks does not ask for § 2241 review based solely on his status as an intellectually disabled person. He bases his request for review on the fact that he falls into the category of habeas petitioners who were not ID under past diagnostic and legal standards, but do qualify for the diagnosis under the current ones. Just as in *Webster*, *Garza*, and *Davenport*, he relies on legal and factual developments that post–date his § 2255 proceedings, entitle him to relief, and could not have been brought in a successive petition under § 2255(h). *See* AP at 45–55; RAP at 5–8. His case presents a paradox: his execution is constitutionally prohibited, but the framework of § 2255 has no mechanism under which he can vindicate this claim. Section 2241 constitutes the only avenue through which he can pursue this claim for relief.

52.     Mr. Fulks cannot refile his claims with each revision of medical standards. Just as the *Webster* court found that the new evidence of his intellectual disability would have been significant in his *Atkins* litigation, *Webster*, 784 F.3d at 1143, for a habeas petitioner to refile based on a change in diagnostic standards, he must establish—as Mr. Fulks has done here—that the new diagnostic developments would have been significant in either the litigation or (as is the case here) the existence of his *Atkins* claim.

53.     That being said, *Atkins* and its progeny categorically prohibit the execution of all intellectually disabled defendants and require that the ID determination be made under current, prevailing diagnostic standards. Nothing in any of the authorities discussed above or otherwise offered by the Government authorizes the execution of the intellectually disabled. The Eighth Amendment entitles Mr. Fulks to review of his claim. Section 2241 review is appropriate because no other settings are available to him.

WHEREFORE, Mr. Fulks respectfully requests that the Court grant Mr. Fulks's request to alter or amend its judgment, vacate its September 20, 2019, order and judgment denying relief on his Amended Petition, dismiss the Government's procedural arguments, and permit merits review of Mr. Fulks's *Atkins* claim. A proposed order accompanies this motion.

Respectfully submitted,

/s/ Peter Williams
CLAUDIA VAN WYK
PETER WILLIAMS
Assistant Federal Defenders
Federal Community Defender Office
for the Eastern District of Pennsylvania
601 Walnut Street, Suite 545 West
Philadelphia, PA 19106
Tel: 215.928.0520
Fax: 215.928.0826
claudia_vanwyk@fd.org
pete_williams@fd.org

Dated: October 17, 2019

**CERTIFICATE OF SERVICE**

I, Peter Williams, hereby certify that on this 17th day of October, 2019, a copy of the forgoing was served via ECF filing on the following people:

Joe Howard Vaughn, Esquire
Assistant United States Attorney
Office of the United States Attorney
Southern District of Indiana
10 West Market Street, Suite 2100
Indianapolis, IN 46204–3048

Robert Frank Daley, Jr.
Kathleen Michelle Stoughton
Special Assistant United States Attorneys
1441 Main Street, Suite 500
Columbia, SC 29201

/s/ Peter Williams
Peter Williams